1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF ILLINOIS

2                        EASTERN DIVISION

3

      ROWENA DZIUBLA,                )

4                                    )

                      Plaintiff,     )

5                                    )

               -vs-                  ) No. 1:18-cv-4542

6                                    )

      J.C. ANDERSON, INC., and       )

7     PETER ERLING JACOBSEN,         )

                                     )

8                     Defendants.    )

9                        The videotaped deposition of

10    ROWENA DZIUBLA, called for examination, pursuant

11    to the Federal Rules of Civil Procedure for the

12    United States District Courts pertaining to the

13    taking of depositions, taken before Suzanne

14    Burke, a Certified Shorthand Reporter in the

15    State of Illinois, at 222 North LaSalle Street,

16    Suite 2600, Chicago, Illinois, on June 20, 2019,

17    A.D., commencing at the hour of 10:19 a.m.

18

19

20

21

22

23

24

EXHIBIT
4

APPEARANCES:

GOLDMAN & EHRLICH
20 South Clark
Suite 500
Chicago, Illinois 60603
BY: MR. SAM SEDAEI
Sam@goldmanehrlich.com
312-332-6733,
    appeared on behalf of the plaintiff;

VEDDER PRICE, PC
222 North LaSalle Street
Suite 2600
Chicago, Illinois 60601-1106
BY: MR. EUGENE BOYLE
BY: MS. MICHELLE T. OLSON
Eboyle@vedderprice.com
312-609-7692,
    appeared on behalf of the defendant
    J.C. Anderson, Inc.;

PRETZEL & STOUFFER
One South Wacker Drive
Suite 2500
Chicago, Illinois 60606
BY: MR. EDWARD B. RUFF III
BY: MARY HELEN CRONIN
Mcronin@pretzel-stouffer.com
312-578-7458

    -and-

CLIFFORD LAW OFFICES
120 North LaSalle Street
Suite 3100
Chicago, Illinois 60602
BY: MR. JAMES C. PULLOS
Jcp@cliffordlaw.com
312-899-9090,

    -and-

---

APPEARANCES (Cont'd):

PIPPIN LAW OFFICES
385 First Street
Suite 215
Lake Oswego, Oregon 97034
BY: JAMES M. PIPPIN
Jim@pippinlawoffices.com
503-607-0224,
    appeared on behalf of the defendant
    Peter Erling Jacobsen.

ALSO PRESENT:

MR. DANIEL FROMAN,

    the videographer;

MR. MICHAEL POWER, JR.

I N D E X

WITNESS:                          PAGE

ROWENA DZIUBLA

    Examination By Mr. Boyle
    Examination By Mr. Ruff

E X H I B I T S

DEPOSITION EXHIBIT NOS.       PAGE

Exhibit 1        14
Exhibit 2        16
Exhibit 3        17
Exhibit 4        17
Exhibit 5        18
Exhibit 6        18
Exhibit 7        24
Exhibit 8        28
Exhibit 9        44
Exhibit 10       63
Exhibit 11       70

---

I N D E X

DEPOSITION EXHIBIT NOS.          PAGE

Exhibit 12       82
Exhibit 13       84
Exhibit 14       92
Exhibit 15       102
Exhibit 16       120
Exhibit 17       121
Exhibit 18       121
Exhibit 19       128
Exhibit 20       130
Exhibit 21       132
Exhibit 22       134
Exhibit 23       150
Exhibit 24       153
Exhibit 25       163
Exhibit 26       166
Exhibit 27       169
Exhibit 28       176
Exhibit 29       178
Exhibit 30       185
Exhibit 31       188
Exhibit 32       189
Exhibit 33       197
Exhibit 34       199
Exhibit 35       206
Exhibit 36       210
Exhibit 37       215
Exhibit 38 (no exhibit was marked)    --
Exhibit 39       246
Exhibit 40       297
Exhibit 41       306
Exhibit 42       308
Exhibit 43       314
Exhibit 44       318
Exhibit 45       319
Exhibit 46       321
Exhibit 47       330

---

THE VIDEOGRAPHER: We are going on the record at 10:19 a.m. on Thursday, June 20th, 2019. Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference. Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video recorded deposition of Rowena Dziubla.

THE WITNESS: It's Dziubla.

THE VIDEOGRAPHER: Dziubla.

THE WITNESS: There you go.

THE VIDEOGRAPHER: Taken by counsel for the defendant in the matter of Rowena Dziubla v. J.C. Anderson, Incorporated, and Peter Erling Jacobsen, filed in the United States District Court for the Northern District of Illinois, Eastern Division, case No. 1:18-cv-04542.

This deposition is being held at Vedder Price located at 222 North LaSalle Street,

---

2 (Pages 2 - 5)

1   Chicago, Illinois.
2       My name is Daniel Froman from the
3   firm Veritext Legal Solutions. The court
4   reporter is Suzanne Burke from the firm Veritext
5   Legal Solutions.
6       I am not authorized to administer an
7   oath, I'm not related to any party in this
8   action, nor am I financially interested in the
9   outcome.
10       Counsel and all present in the room,
11   please state your appearances and affiliations
12   for the record.
13       MR. BOYLE: Eugene A. Boyle on behalf of
14   J.C. Anderson, Inc.
15       MS. OLSON: Michelle Olson on behalf of
16   J.C. Anderson, Inc.
17       MR. POWER: Michael Power,
18   J.C. Anderson.
19       MR. PIPPIN: Jim Pippin, personal
20   attorney for Peter Jacobsen.
21       MR. PULLOS: Jim Pullos on behalf of
22   Peter Jacobsen.
23       MR. RUFF: Ed Ruff, R-u-f-f, on behalf
24   of Peter Jacobsen.

1       MS. CRONIN: Mary Cronin on behalf of
2   Peter Jacobsen.
3       MR. SEDAEI: Sam Sedaei for plaintiff.
4       (Witness sworn.)
5       ROWENA DZIUBLA,
6   called as a witness herein, having been first
7   duly sworn, was examined and testified as follows:
8       EXAMINATION
9   BY MR. BOYLE:
10     Q. Good morning, Ms. Dziubla. My name is
11   Gene Boyle. I represent J.C. Anderson, Inc., who
12   is one of the defendants in the lawsuit that
13   you've brought in Federal Court. I will be
14   referring to J.C. Anderson with the acronym JCA
15   throughout the proceeding today. If I do, I'd
16   ask you to understand that I'm referring to
17   J.C. Anderson. Is that acceptable?
18     A. Yes.
19     Q. Okay. I'm going to be asking you a
20   series of questions today about the claims that
21   you've asserted in the lawsuit. When I'm
22   finished, counsel for Mr. Jacobsen will have an
23   opportunity to ask you questions during the
24   proceeding.

1       Have you ever had your deposition
2   taken before?
3     A. No.
4     Q. Okay. So as you probably have gathered,
5   we have a court reporter here today. She's
6   taking down everything that's said in the
7   proceedings, so we'll have a complete record of
8   the proceedings after the event. We also have a
9   videographer, so there will be a video recording
10   of what we discuss here today.
11     A. Okay.
12     Q. Do you understand that?
13     A. Yeah.
14     Q. Okay. Your testimony is -- you just
15   were given an oath, so your testimony here must
16   at all times be truthful. It will have the same
17   meaning and effect as if we were in the courtroom
18   in front of the judge. Do you understand that?
19     A. Yeah.
20     Q. There's a few ground rules that will
21   make the process go a little smoother that I'll
22   run through with you right now.
23     A. Okay.
24     Q. Probably the most important one is if

1   there's any question that I or anybody asks you
2   that you don't understand, you should always feel
3   free to say I don't understand or let me know
4   somehow that you need clarification.
5     A. Okay.
6     Q. I'll be happy to do that.
7     If I do ask you a question and you
8   go ahead and answer it, I'll assume that you
9   understood the question.
10     A. All right.
11     Q. We need you -- even though we're being
12   video recorded today, we need you to provide
13   verbal answers to my questions, no shakes of the
14   heads --
15     A. Right.
16     Q. -- or shrugs of the shoulders. They
17   can't be picked up by the court reporter.
18     A. Right.
19     Q. Do you understand that?
20     A. Yeah.
21     Q. Okay. As we start to get into the
22   questioning, you may anticipate what I'm asking
23   you before I'm completely done with my question.
24   I just ask that you wait until I finish the

3 (Pages 6 - 9)

1  question before you give your answer.
2      A.  Yeah.
3      Q.  And I'll attempt to do the same as
4  you're providing the answer.
5      A.  Okay.
6      Q.  Is that fair?
7      A.  Yeah.
8      Q.  At any time if you need a break, just
9  let me know, and we'll take a break.  And the
10  only rule is that if I've asked you a question,
11  I'll need you to answer the question before we
12  take the break.
13      A.  Yeah, that sounds good.
14      Q.  So is there any reason that you are
15  aware of why you would not be able to give
16  truthful testimony here today?
17      A.  No, there isn't.
18      Q.  Okay.  Are you on any medication or
19  drugs that you think might impact your ability to
20  provide truthful testimony?
21      A.  No.
22      Q.  If at any point during today's
23  deposition, for any medical reason, you need to
24  take a prescription or anything, please just let

1  us know that.  Okay?
2      A.  Sure.
3      Q.  Okay.  What did you do -- tell me a
4  little bit about what you did to prepare for your
5  deposition today?
6      A.  Basically just read over some of the
7  stuff that I had submitted; tried not to over
8  think things.
9      Q.  Anything else?  Did you meet with your
10  attorney?
11      A.  Yeah.
12      Q.  Okay.
13      A.  Yeah.
14      Q.  When did you meet with your attorney?
15      A.  We had a phone conversation yesterday
16  morning to review and then briefly --
17      MR. SEDAEI:  You don't need to say what
18  we talked about.
19      THE WITNESS:  Oh.
20  BY MR. BOYLE:
21      Q.  No, I'm not asking --
22      A.  And then --
23      Q.  Go ahead.
24      A.  Oh, and then briefly this morning before

1  the deposition.
2      Q.  Okay.  When you had your phone
3  conversation yesterday, was anybody else on the
4  call with you?
5      A.  No.
6      Q.  It was just you and Mr. Sedaei?
7      A.  Yes.
8      Q.  Okay.  And then you met again briefly
9  this morning?
10      A.  Yes.
11      Q.  Okay.  Was there anybody else present
12  when you met this morning?
13      A.  No.
14      Q.  You say you read some stuff that you
15  submitted.  Do you remember what it is that you
16  reviewed?
17      A.  I just went through the packet, the EEOC
18  packet, and went through -- I'm trying to think
19  specifically the stuff.  I looked up with -- I
20  looked up an email to see if I had asked -- if I
21  had said that I wanted to come back to work
22  there.  And I wanted confirmation in front of me
23  that I had actually asked for it, and I found it.
24      Q.  You found that email?

1      A.  Yes.
2      Q.  Okay.  Is that a document that you've
3  produced --
4      A.  Yeah.
5      Q.  -- in this case?
6      A.  Yeah.
7      Q.  Do you remember the date of that email?
8      A.  I don't.
9      Q.  But you're sure that that's a document
10  that you've produced in this case?
11      A.  Yes.
12      Q.  Any other documents that you recall
13  reviewing?
14      A.  Just basically read over some stuff to
15  see.  I think one was a text message from one of
16  the subcontractors that I work with, Nema
17  (phonetic), to just kind of reaffirm that I
18  didn't remember things incorrectly in terms of,
19  you know, when things got shut down with my
20  email.  How puzzled he was about me not being at
21  the walk-throughs, that all of a sudden I -- my
22  responsibilities had been reallocated, and he
23  wanted to know if I was okay.
24      Q.  Anything else?

4 (Pages 10 - 13)

1    A.  That's all I recall.
2    Q.  And is it fair to say that everything
3  that you reviewed in preparation for today's
4  deposition you've through your counsel already
5  produced in the case?
6    A.  Absolutely.
7        MR. BOYLE:  Can we get these marked as
8  Exhibit 1.
9        (Document marked as Dziubla Deposition
10       Exhibit No. 1 for identification.)
11       MR. BOYLE:  I made five copies.
12       (Discussion off the record.)
13  BY MR. BOYLE:
14   Q.  So, Ms. Dziubla, I've handed you what
15  we've marked as Deposition Exhibit 1, and ask you
16  to take a quick look at that.  You -- and when
17  you're ready, let me know if you've seen a copy
18  of this document before?
19   A.  Yes.
20   Q.  Okay.
21   A.  I have.
22   Q.  Do you remember when?
23   A.  No.  I mean, like, the exact date, no.
24  I mean, it looks familiar.  I didn't read through

1  all of everything that's in here.  If there's
2  anything added, I'm assuming the dates of 2018 --
3    Q.  Okay.
4    A.  It looks familiar.
5    Q.  Do you recall reviewing the document
6  sometime prior to October 31st of 2018?
7    A.  No, I don't -- I don't have that
8  timeline in my head.  Sorry.
9    Q.  Okay.  Did you provide the information
10  that your attorney used to complete this
11  document?
12   A.  Yeah.
13   Q.  Okay.
14   A.  I would think so.
15   Q.  And as you review the document, is
16  everything contained in the document true and
17  accurate to the best of your knowledge?
18   A.  Yes.
19   Q.  Okay.  If you could hand that back to
20  me.
21       Thanks.
22       Can I have this marked as Exhibit 2,
23  please.
24

1        (Document marked as Dziubla Deposition
2        Exhibit No. 2 for identification.)
3  BY MR. BOYLE:
4    Q.  I've now handed you what we've marked as
5  Deposition Exhibit 2, and same question.  I'd
6  like you to take a look at this.  These are your
7  discovery interrogatory responses.  I have a few
8  questions about these.  Let me know when you've
9  had time to take a look at them.
10   A.  Okay.
11       MR. SEDAEI:  Yeah, and you realize this
12  is not the amended version, right?
13       MR. BOYLE:  That's correct.
14       THE WITNESS:  Yeah.
15  BY MR. BOYLE:
16   Q.  So, Ms. Dziubla, have you seen a copy of
17  these responses before?
18   A.  Yes, I have.
19   Q.  Okay.  Did you review these answers with
20  your attorney prior to submitting them?
21   A.  Yes, I did.
22   Q.  Okay.  And flipping to the last page of
23  the dep -- the exhibit, is that your signature?
24   A.  Yes.

1    Q.  Okay.
2    A.  The verification page?
3    Q.  That's correct.
4    A.  Yes.
5    Q.  Okay.  And is everything to your
6  knowledge contained in these interrogatory
7  responses true and accurate to the best of your
8  knowledge?
9    A.  Yes.
10   Q.  Okay.
11       These will be 3.  Mark these as
12  Exhibit 3, please.
13       (Document marked as Dziubla Deposition
14       Exhibit No. 3 for identification.)
15       MR. BOYLE:  Could we also get this
16  marked as Exhibit 4.
17       (Document marked as Dziubla Deposition
18       Exhibit No. 4 for identification.)
19  BY MR. BOYLE:
20   Q.  So, Ms. Dziubla, we've handed you two
21  documents that have been marked Exhibits 3 and
22  Exhibit 4.  Exhibit 3 is a copy of your amended
23  answers to the interrogatories, and Exhibit 4 is
24  a document that was just produced by your

1  attorney today which is your verification to
2  those answers.
3           With respect to Exhibit 3, the
4  amended answers to interrogatories, have you seen
5  this document before?
6   A.  Yes.
7   Q.  Okay.  And did you review the document
8  and help your attorney prepare the document?
9   A.  Yes.
10   Q.  Okay.  And are the answers provided in
11  this document true and accurate --
12   A.  Yes.
13   Q.  -- to the best of your knowledge?
14           And with respect to Exhibit 4, is
15  that your signature?
16   A.  Yes.
17           MR. BOYLE:  Can I get these marked as
18  the next two exhibits, please.
19           (Documents marked as Dziubla
20            Deposition Exhibit Nos. 5 and 6
21            for identification.)
22  BY MR. BOYLE:
23   Q.  Now I've handed you documents we've
24  marked as Exhibits 5 and Exhibit 6, two separate

1  documents.  Exhibit 5 is a copy of your responses
2  to Defendant J.C. Anderson's request for document
3  production, and Exhibit 6 is your amended
4  responses to JCA's document request.  Have you
5  seen these documents before?
6   A.  Yes.
7   Q.  Okay.  And to your knowledge, are the
8  responses contained therein accurate and
9  complete?
10   A.  Yes.
11   Q.  Okay.  Can you hand those back.
12           And what is your date of birth?
13   A.  July 30th, 1979.
14   Q.  And can you -- what is your full name?
15   A.  Rowena Dziubla.
16   Q.  Okay.  Have you gone by Rowena -- is
17  your middle initial T?
18   A.  No, it's not.
19   Q.  Okay.  Can you provide all prior names
20  that you've gone by?
21   A.  Born Rowena Toledo Tulacz.
22   Q.  You'll have to go a little bit slow for
23  the court reporter.
24   A.  Oh, so Rowena Toledo Tulacz was my birth

1  name, and then I married, became Rowena Toledo
2  Schwanderlik.  And then when I got divorced, I
3  dropped the Schwanderlik and took on Toledo or
4  Toledo, because it was my mom's name.  And then
5  when I remarried, I dropped the Toledo altogether
6  and kept the -- his last name Dziubla.
7   Q.  Okay.  So you're currently married?
8   A.  Correct.
9   Q.  And what's your husband's name?
10   A.  Dan Dziubla.
11   Q.  Okay.  How long have you been married?
12   A.  Four years in April.
13   Q.  Have you had any prior marriages?
14   A.  Yes.
15   Q.  You just mentioned one.
16   A.  Yeah.
17   Q.  Who were you married to previously?
18   A.  Ken Schwanderlik.
19   Q.  And how did that marriage end?
20   A.  With divorce and --
21   Q.  And what were -- go ahead.
22   A.  Oh, and bankruptcy.
23   Q.  And what were the dates of the marriage?
24   A.  I might be a little bit loose on the

1  years.  I want to say 2008, and that was for
2  three years.  We got married in 2005.  Sounds
3  about right.
4   Q.  And you said you've been married to your
5  current husband for four years?
6   A.  Uh-huh.
7   Q.  What's your anniversary date?
8   A.  April 18, 2015.
9   Q.  Have you had any other prior marriages?
10   A.  No.
11   Q.  What's your current address?
12   A.  106 Parkchester Road in Elk Grove
13  Village, 60007.
14   Q.  How long have you lived at that address?
15   A.  Not 100 percent sure, just because I
16  relocated for work a couple times.  So I was,
17  like, kind of there, but not really there.  I was
18  living in Louisiana, so more than five years.
19   Q.  Does anyone live at that address with
20  you?
21   A.  My husband does.
22   Q.  Anybody else?
23   A.  No.
24   Q.  Okay.  Has anybody lived at that address

6 (Pages 18 - 21)

1  with you and your husband at any time since
2  September of 2017?
3      A.  No.
4      Q.  Okay.  Has anybody other than you and
5  your husband lived at that residence with you at
6  any time?
7      A.  No.
8      Q.  Do you have any current plans to move?
9      A.  No.
10     Q.  Have you ever been arrested?
11     A.  No.
12     Q.  Have you ever been charged with a crime?
13     A.  No.
14     Q.  Have you ever served in the military?
15     A.  No.
16     Q.  Other than this case, have you ever been
17 a party either as a plaintiff or a defendant to
18 any other civil lawsuit?
19     A.  No.
20     Q.  Now, you mentioned that there -- you've
21 been a party to a bankruptcy previously; is that
22 correct?
23     A.  Yeah.
24     Q.  Okay.  And when was that?

1      A.  I want to say it was probably 2018,
2  maybe April, April of 20 -- 2008, sorry, 2008.
3      Q.  And what were the circumstances that led
4  you to file for bankruptcy?
5      A.  The divorce.
6      Q.  And specifically what about divorce, the
7  divorce, led you to file for bankruptcy?
8      A.  We had a lot of debt and I was the
9  breadwinner, and I was carrying all of his
10 financial issues, and I wanted it to be gone.  So
11 I figured the best way to do it was to clean the
12 slate.
13     Q.  What was the outcome of the bankruptcy?
14     A.  I don't understand that question.
15     Q.  How did the bankruptcy end?
16     MR. SEDAEI:  Objection, form.
17 BY THE WITNESS:
18     A.  Yeah, I don't know what that means.
19 BY MR. BOYLE:
20     Q.  What -- my question is what was
21 the outcome of the bankruptcy?  What specifically
22 don't you understand about that question?
23     A.  Like, don't bankruptcy -- it was filed
24 and it was -- I don't know what you're looking

1  for.
2      Q.  Were all your debts discharged?
3      A.  Oh, yes.
4      Q.  Okay.  So all the debt that you had
5  during the time that you were married up until
6  the divorce, all that debt was discharged; is
7  that correct?
8      A.  With the exception of my student loans.
9      Q.  Okay.  Any other debts that were not
10 discharged as a result of that bankruptcy?
11     A.  No.
12     MR. BOYLE:  Can I get this marked as the
13 next exhibit, please.
14     (Document marked as Dziubla Deposition
15     Exhibit No. 7 for identification.)
16 BY MR. BOYLE:
17     Q.  Ms. Dziubla, I've handed you a document
18 we've marked Deposition Exhibit 7.  This is a
19 document that you produced to us in discovery.
20 Do you recognize the document?
21     A.  Yes.
22     Q.  And is this, in fact, a -- the
23 discharge, a document relating to the bankruptcy
24 that you just described?

1      A.  I believe so, yes.
2      Q.  Okay.  Do you have any other documents
3  relating to the bankruptcy case that you filed?
4      A.  That's it.
5      Q.  This is the only document you have in
6  your possession?
7      A.  Yes.
8      Q.  Okay.  What is the highest level of
9  education that you've achieved?
10     A.  A bachelor's.
11     Q.  Where did you receive your bachelor's?
12     A.  Harrington College of Design.
13     Q.  Where is Harrington College located?
14     A.  It was on Madison and Wells, but now
15 they're out of business.
16     Q.  Does -- the school is no longer in
17 existence?
18     A.  Yeah, they -- as far as I -- what I
19 heard, they shut down.  They closed down a couple
20 years ago.
21     Q.  And what was your -- what degree did you
22 receive from Harrington?
23     A.  Bachelor's of fine arts.
24     Q.  Okay.  Did you have a major?

7 (Pages 22 - 25)

1    A.  Interior design.
2    Q.  Do you have any other undergraduate
3 degrees?
4    A.  No.
5    Q.  Okay.
6    A.  Oh, like, an associate's?  Does that
7 matter?
8    Q.  Yes.
9    A.  Oh, engineering science.
10    Q.  Where did you receive your engineering
11 science degree?
12    A.  From Wilbur Wright College in Chicago.
13    Q.  Okay.  Do you remember the year of that?
14    A.  No.
15    Q.  Where did you go to high school?
16    A.  Von Steuben Metropolitan Science Center.
17    Q.  And when did you graduate?
18    A.  In Chicago.
19        In 1997.
20    Q.  Do you remember roughly how long after
21 1997 it was that you received your associate's
22 degree from Wright College?
23    A.  Before 2006.  That's about as good as I
24 can -- yeah, before 2006.  It took me a while.  I

1 was going part time.
2    Q.  Do you hold any other professional
3 certifications or licenses?
4    A.  We got certified in ProCore a couple
5 weeks ago -- a couple months ago.  I mean --
6    Q.  What's ProCore?
7    A.  It's a document management software
8 that's used in the construction industry.
9    Q.  Any other professional certifications or
10 licenses?
11    A.  Not that I recall.
12    Q.  Do you presently have any current plan
13 to pursue further education?
14    A.  I do, probably more along the lines of
15 nutrition and fitness.
16    Q.  Do you know specifically what types of
17 further education you'd like to receive in
18 connection with nutrition and fitness?
19    A.  No, not yet.  I'm still trying to figure
20 out what's respected in the industry, in the
21 fitness industry.  It's kind of what I'm doing as
22 a side -- as my side business.  So I don't know
23 what's got, you know, a good reputation.  I don't
24 want to just get it from anywhere and have it

1 not -- no one cares.  So I'm not sure yet.
2    Q.  But you feel somehow that further formal
3 education in that area would assist you with your
4 side business; is that fair to say?
5    A.  Yeah, I think it will -- it's what
6 people see.  You know, they see the acronym at
7 the end of their name, they assume that you're an
8 expert, so it doesn't matter your experience.
9 So, yeah, I think it will help.
10    Q.  Okay.  And is that because you -- are
11 you trying to expand your side business?
12    A.  Absolutely.
13    MR. BOYLE:  Can we please have this
14 marked as the next exhibit.
15        (Document marked as Dziubla Deposition
16        Exhibit No. 8 for identification.)
17 BY MR. BOYLE:
18    Q.  Ms. Dziubla, we've handed you what we've
19 marked as Deposition Exhibit 8.  Do you recognize
20 this document?
21    A.  No.  I mean, I'm assuming that this is
22 the recruiter that they employed to get me the
23 position there at JCA, but I had -- I never drew
24 this up.  Usually the recruiters send this stuff

1 out with their own heading and they just kind of
2 do it for you.
3    Q.  And when you say the recruiter, is that
4 up in the upper left corner, you see where it
5 says ALJ Group?
6    A.  Yeah.
7    Q.  Is that the recruiter?
8    A.  What is that, Todd Justic?  Yeah, that's
9 him.
10    Q.  Okay.  And who is Todd Justic?
11    A.  Todd Justic is a recruiter that found me
12 and recruited me to bring me over to
13 J.C. Anderson.  He's also very good friends with
14 Mike Yazbec.
15    Q.  When you say he found you, can you
16 describe a little bit more how that occurred?
17    A.  Actually, if I'm recalling correctly, I
18 reached out to a company called Summit Design
19 Build that works in the West Loop and spoke to
20 their senior estimator there about a position
21 with the company.  We had a long conversation.  I
22 was going to interview there.  And she said that
23 she was actually on her way out, and was, like,
24 you know what, I think it would be better if you

1  didn't. And then a couple -- I forget the time
2  frame, but a short time later, I guess she was
3  working with Todd, also, and mentioned my name
4  and said, hey, if you could help her out, here is
5  her information. So that's kind of how.
6     Q. You were put in touch with --
7     A. I was put in touch with Todd, yeah.
8     Q. Okay. So it's fair to say that at that
9  time you were looking to make a move, you reached
10  out to this other company called Summit?
11     A. Yeah.
12     Q. And they connected you with the
13  recruiter for ALJ; is that accurate?
14     A. Yeah.
15     Q. Okay. And now this document which we've
16  marked as Deposition Exhibit 8, you said this was
17  prepared by the recruiting agency?
18     A. That's usually how they -- yeah, that's
19  how they do it, because they -- I'm surprised
20  actually my information, my personal information,
21  is on top. Because usually they take all that
22  off before they send it over to the client.
23     Q. Did you provide them with a resume that
24  you were using at that time from which they then

1  created this document?
2     A. Prob -- yeah, probably.
3     Q. Do you still have a copy of that resume?
4     A. No.
5     Q. But it's fair to say that the only way
6  he would have obtained this information is from
7  information that you provided to him, correct?
8     A. Yeah.
9        MR. SEDAEI: Objection, calls for
10  speculation.
11  BY MR. BOYLE:
12     Q. And as you review this Deposition
13  Exhibit 8, does it contain all of the employment
14  that you had prior to joining JCA?
15     A. It contains people I did work with
16  previously. I don't know if the order is right
17  or -- let me just look at it here.
18        It looks about right.
19     Q. So as you --
20     A. I worked for those people. I don't know
21  if it's -- I mean, I don't know how he spun it to
22  JCA, you know. There might -- that's the other
23  thing, too. I mean, that's their job is to put
24  me in the best light possible to the client, so

1  that he gets his commission, right. So I'm
2  not -- I mean, it looks like it's all the
3  employers that I've worked for, yes.
4     Q. Okay. So as you review this document,
5  you've worked for all these employers, correct?
6     A. Yes.
7     Q. And are there any that you've worked for
8  during the time frame covered by this document
9  that are not on here?
10     A. Not that I can see.
11     Q. Okay. So looks like your most recent
12  employment prior to joining JCA was with
13  Blinderman Construction; is that correct?
14     A. Yes.
15     Q. And what was the date -- when did you
16  join JCA?
17     A. I'm not sure.
18     Q. Would it have been in September of 2016?
19     A. I don't -- honestly I don't recall the
20  year. I feel like it was -- I feel like May is a
21  good month that I started. I don't recall what
22  year it was, though.
23     Q. Sometime in 2016?
24     A. Honestly I don't know. I honestly

1  don't -- I mean, like, I can do the math right
2  now. I don't recall when I started or how long I
3  worked there for.
4     Q. Do you remember when your employment at
5  JCA ended?
6     A. 2017, sometime in September or October.
7     Q. Do you remember how long you had worked
8  for the company at the time your employment ended
9  approximately?
10     A. Over a year.
11     Q. So sometime in 2016, you joined JCA; is
12  that correct?
13     A. Sure.
14     Q. Okay. So and this document indicates
15  that you started with Blinderman Construction in
16  May of 2015; is that correct?
17     A. Uh-huh.
18     Q. Is that accurate?
19     A. Yes, it is.
20     Q. Okay. So you worked for Blinderman for
21  approximately 1.3 years; is that fair to say?
22     A. Yes.
23     Q. Why did you -- it says you were an
24  estimator/project manager --

9 (Pages 30 - 33)

1    A.   Yes.
2    Q.   -- for that company?
3    A.   Correct.
4    Q.   Is that accurate?
5    A.   Yes.
6    Q.   And why did you leave Blinderman?
7    A.   Presented with a new opportunity closer
8  to home, more money, something a little bit
9  closer to the type of work that JCA did, was
10  interiors only.  I was very confident in my skill
11  set there because of my education and most of the
12  work that I had done in the industry.  So I
13  figured it was a good move.
14    Q.   Now, when you say you were presented
15  with a new opportunity, what do you mean by that?
16    A.   The recruiter when he reached out to me.
17    Q.   Okay.  So you were looking for
18  employment at the time; is that correct?
19    A.   I don't understand.
20    Q.   You were looking for another job at the
21  time?
22    A.   Honestly when Todd contacted me, I
23  wasn't actively looking for anything.  He just
24  kind of reached out to me, and I was, like, yeah,

1  I'll listen.  I mean, just like with anybody that
2  a recruiter reaches out to.  I mean, just because
3  you listen to them doesn't mean you're going to
4  jump ship.
5    Q.   But I -- unless I misunderstood, I
6  thought that the way you got in touch with Todd
7  is you were talking to another company about
8  employment with that company and they put you in
9  touch with Todd?
10    A.   Right.  But I don't know what that time
11  frame was between talking to Ellie and talking to
12  Todd.  I don't know, like, if that was two months
13  or if that was an entire year honestly.  I have
14  no idea.
15    Q.   So in any event, you felt like JCA
16  presented a better opportunity for you than the
17  opportunity that you had currently at Blinderman;
18  is that fair to say?
19    A.   Yes, yes.
20    Q.   Okay.  Were you asked to leave
21  Blinderman?
22    A.   No.
23    Q.   Did they terminate your employment?
24    A.   I put in my two weeks and he had me

1  leave early.
2    Q.   Okay.
3    A.   It was just, like, might as well.
4    Q.   At the time you left Blinderman, were
5  you having any issues with any of the employees
6  there?
7    A.   Not at all.
8    Q.   Okay.  So on this document Deposition
9  Exhibit 8, your prior employer was F.E. Moran,
10  Inc.?
11    A.   Yep.
12    Q.   What type of company is F.E. Moran,
13  Inc.?
14    A.   They're a mechanical contractor.
15    Q.   Okay.  And it looks like you worked for
16  them from approximately March of 2014 till May of
17  2015; is that correct?
18    A.   Yes.
19    Q.   So a little over a year --
20    A.   Correct.
21    Q.   -- with F.E. Moran?
22         And you started out there as a
23  project manager assistant; is that correct?
24    A.   Yes.

1    Q.   And then you were promoted to project
2  manager just prior to leaving the company; is
3  that accurate?
4    A.   Yes.
5    Q.   Can you tell me why you left F.E. Moran?
6    A.   Well, again, a recruiter reached out to
7  me, and he said if I wanted to hear about an
8  opportunity he had.  And I listened to him, and I
9  pretty much had a very solid background in
10  general contracting; and being in a -- mechanical
11  contractor was just something that wasn't really
12  on the path.  And he's, like, well, I've got this
13  great place.  It's in West Loop.  Sold me on
14  Blinderman.  Again, more money, more opportunity
15  for growth.  The type of projects they were
16  working on seemed like they would be in line with
17  what I was going for.
18    Q.   Do you recall whether or not the
19  recruiter knew that you were looking; is that why
20  he contacted you?
21    A.   Let's see.  How -- no.  I know for sure
22  he caught me off guard, because he -- the name of
23  the company that he had worked for at the time
24  was called Hard Hat Hub.

10 (Pages 34 - 37)

1      And when he first reached out to
2 me -- first of all, he called me on my work phone
3 which caught me off guard, because they're slick
4 like that. And then second of all, I heard Hard
5 Hat Hub, and immediately, I was, like, oh, you
6 want to talk to our safety guy, because it's PPE.
7 Like, he's selling hardhats and goggles and
8 stuff. I'm, like -- he's, like, no, no, no,
9 he's, like, I'm a recruiter. I'm, like, what,
10 for safety gear. And he's, like, no, I'm a
11 headhunter, and I was, like, oh.
12      And then he was, like, do you want
13 to talk, and I was, like, sure. It doesn't hurt
14 to listen.
15   Q. And what was this person's name?
16   A. It's actually Kyle Jacobson. So he
17 originally worked for Hard Hat Hub, and then I
18 later ended up working for him at Talent Hitch.
19   Q. Now, were you ever asked to leave
20 F.E. Moran company?
21   A. No.
22   Q. Okay.
23   A. No.
24   Q. So prior to that, you worked for Atlas

1 Restoration; is that correct?
2   A. Yes.
3   Q. And you worked for them for about seven
4 months?
5   A. Yes.
6   Q. Okay. Why did you leave Atlas
7 Restoration?
8   A. It was a contract position that I took,
9 and it was pretty much over. So I forgot how I
10 came across -- oh, F.E. Moran's in-house
11 recruiter had just reached out to me while I was
12 at Atlas, and the circumstances at Atlas, they're
13 kind of a ma-and-pa shop kind of thing, you know,
14 low overhead. And I just figured, you know,
15 moving into a corporate atmosphere like F.E.
16 Moran, a big company like that that has the
17 wingspan that they do in our industry, I thought
18 it was a good move.
19      But, yeah, I mean, again, I wasn't
20 looking. The recruiter, I mean, that's what they
21 do. They reach out to people; and if you're
22 willing to listen, they'll tell you about it.
23   Q. Was there anything about -- well, let me
24 strike that.

1      It was a contract position. Do you
2 have a copy of the contract you had with them?
3   A. Uh-uh.
4   Q. Do you remember how long that contract
5 was for?
6   A. I shouldn't say -- it was, like, temp to
7 perm. I don't know that it was, like -- I got
8 Atlas through a staffing agency. So it wasn't --
9 you know, they hired me on for, I think, like,
10 three months, and then they -- it was temporary
11 for three months, and then they hired me on.
12 So -- but it wasn't like I was going to stay
13 there. They're just too seasonal.
14   Q. But in any event, they did make you a
15 permanent employee after the --
16   A. Oh, yeah, oh, absolutely, yeah.
17      He said I was too expensive. That's
18 another reason why I didn't stay.
19   Q. Who is he?
20   A. The owner of the company, Marty
21 Silverman.
22   Q. Were you satisfied with your
23 compensation at Atlas Restoration?
24   A. Yep.

1   Q. So prior to Atlas, you worked for a
2 company called the Mason Group; is that correct?
3   A. The Macon Group, yes.
4   Q. Oh, I'm sorry, Macon Group.
5      And, once again, you were an
6 estimator, project manager, safety coordinator;
7 is that accurate?
8   A. Yep.
9   Q. Okay. And you worked for them from
10 February 2012 to June 2013. So, again, about one
11 month -- one year and four months; correct?
12   A. Yes.
13   Q. Okay. And why did you leave the Macon
14 Group?
15   A. So how I got to the Macon Group was
16 because I was in New Orleans at -- working for
17 Paschen, and I wanted to come back home to
18 Chicago. And I basically took any job that I
19 could get. And they offered me a salary that was
20 substantially less than what I was making and
21 promised me that I would be brought up to snuff
22 after a certain amount of time, and he didn't.
23 And I continued to receive additional
24 responsibilities, and I wasn't going to do it.

11 (Pages 38 - 41)

1    Q.  So you were dissatisfied with your
2  compensation at that company; is that fair to
3  say?
4    A.  Yes.
5    Q.  Okay.  And did you let the person know
6  that you were dissatisfied with your
7  compensation?
8    A.  Yes, yep.
9    Q.  And was your employment -- did Mason
10  Group -- Macon Group terminate your employment?
11    A.  No, no, they kept me on.
12    Q.  You mentioned that prior to that you
13  were in New Orleans.
14    A.  Uh-huh.
15    Q.  With the FH Paschen Company?
16    A.  Correct.
17    Q.  And what type of company is FH Paschen?
18    A.  FH Paschen is a general contractor.
19  Actually I helped them open their satellite
20  office in New Orleans.  So when they got -- they
21  were expecting to get about $30 million worth of
22  work down there when they opened the office, and
23  we ended up with $300 million.  And it was
24  basically me and the vice president of that

1  location and our project engineers and we just
2  worked our butts off to make it happen.
3    Q.  And what prompted you to want to leave
4  the Macon Group?
5    A.  Are we going back to the Macon -- I was
6  at Paschen before the Macon Group.
7    Q.  I'm sorry, I meant to say the Paschen
8  Group.
9    A.  Oh, well, because I wanted to come back
10  home.  And I spoke to my manager and I said, you
11  know, is there a position for me up in Chicago.
12  And she assured me that there wasn't, and I
13  didn't really have a recourse.  And at that
14  time -- sorry, excuse me.
15      So at the time my dad was going
16  through cancer, and I knew I had to get home, so
17  I just took whatever I could to get home.
18    Q.  And that was in 2012?
19    A.  Yeah.
20    Q.  And do you need to take a minute?
21    A.  I'm fine, I'm fine.
22    Q.  Can we continue?
23    A.  Yeah.
24    Q.  Did your father pass away in 2012?

1    A.  I actually honestly -- I don't recall
2  what year he passed away in.  But he was sick,
3  and I couldn't visit him regularly, because of me
4  being out there, and it was on my dime to come
5  home.  So -- but he did pass away very quickly
6  after being diagnosed.
7    Q.  Do you remember what year that is?
8    A.  I -- honestly it was all a blur.
9      (Discussion off the record.)
10  BY MR. BOYLE:
11    Q.  Was your decision to leave the FH
12  Paschen Group a voluntary decision?
13    A.  Yes.
14    Q.  They did not terminate your employment?
15    A.  Correct.
16      Thank you.
17     MR. BOYLE:  Can I have this marked,
18  please.
19      (Document marked as Dziubla Deposition
20      Exhibit No. 9 for identification.)
21  BY MR. BOYLE:
22    Q.  Handing you a document that we've marked
23  as Deposition Exhibit 9.  Do you recognize this
24  document?

1    A.  It looks like it's a PDF of my Linkedin
2  profile.
3    Q.  This is a document that you produced to
4  us in discovery.
5    A.  Oh, then I PDF'd it, yeah.
6    Q.  So do I understand you to be saying that
7  this is a copy of your Linkedin resume?
8    A.  Correct.
9    Q.  Is this a current resume?
10    A.  Yeah, it's the same stuff.  It's
11  basically what's up there now.
12    Q.  So this is all information that you
13  provided onto your Linkedin profile; is that
14  correct?
15    A.  Correct.
16    Q.  So I noticed that on this version of
17  your resume you did not include Atlas
18  Restoration.  Is there any reason why you left
19  Atlas Restoration off of this document?
20    A.  Probably just because it was a short
21  duration, and it was kind of not really in line
22  with anything.
23    Q.  Okay.
24    A.  I mean, I'm on good terms with them.

1 It's not out of resentment or anything.
2 Q. Okay. And so on page 1 of the document,
3 you indicate that your dates of employment
4 for J.C. -- at J.C. Anderson were from May of
5 2016 through October of 2017; is that accurate?
6 A. Yes.
7 Q. Okay. And then you immediately began
8 working with Talent Hitch in October of 2017; is
9 that correct?
10 A. Yes.
11 Q. And your work with Talent Hitch ended in
12 March of 2018?
13 A. Correct.
14 Q. Okay. And then there -- and then
15 there's an entry here above that where it says
16 confidential construction industry consultant?
17 A. Yes.
18 Q. What does that refer to?
19 A. My current place of employment, the day
20 job.
21 Q. And you didn't -- so why did you state
22 that that was confidential?
23 A. So I work for Broadway
24 Electric/Cornerstone Contracting. And the

1 relationships that they've established in the
2 industry, in order to bid on the types of work
3 that we do that is in the public sector, it's in
4 their best interest that the employees don't list
5 where they're at. Because I wear different hats
6 for them as well as other employees do. And it's
7 just better that it's left vague.
8 None of the employees in the company
9 actually have updated profiles for that reason.
10 So I figure that was a good way to stay connected
11 to construction; and, you know, when people do
12 look me up, they know that, you know, I'm a real
13 person that's asking them for a proposal and
14 that, you know, that there is some type of good
15 reputation that's associated with me by being
16 online and seeing my history and all that stuff.
17 Q. So this document is an accurate summary
18 of the positions that you've held during the time
19 period covered --
20 A. Yes.
21 Q. -- in the document?
22 A. Yes.
23 Q. If you flip to the third page of the
24 document -- I'm sorry, the fourth page of the

1 document, which is document Bates No. 938,
2 there's a reference to General Electric. Do you
3 see that?
4 A. Yes.
5 Q. You did not include General Electric on
6 the resume that you had submitted to JCA. Do you
7 know why that is?
8 A. I'm not sure. Maybe it was just a
9 cutoff point that Todd gave me, like, only go
10 back so far or -- I'm not sure.
11 Q. Well, I'll show you Exhibit 8, which is
12 the resume that you had the recruiter give to
13 JCA.
14 A. Yeah.
15 Q. And it includes Jupiter Realty which
16 is -- goes further back.
17 A. Oh.
18 Q. So my question is: Do you know why
19 General Electric was left off of the information
20 that you submitted to JCA?
21 A. I don't recall.
22 Q. What position did you hold for General
23 Electric?
24 A. It was basically a cost controller for

1 various job sites in the Indiana area where I
2 traveled from job to job and collected all types
3 of costs that pertain to material costs for the
4 job, hours, submitting that, and then billing the
5 client.
6 Q. Why did your employment with General
7 Electric end?
8 A. So I decided to leave there, because I
9 was on the road a lot and I had just gotten
10 married and it didn't seem like it was a good fit
11 for us if I was going to stay on the road if we
12 wanted to have a good healthy relationship. So I
13 figured I would quit and look for another job.
14 Q. And did you have a positive experience
15 working for General Electric?
16 A. The company was awesome. It was a lot
17 of hours and their pay structure was a little bit
18 different. They weren't set up really -- you
19 know, they entice you in the beginning in terms
20 of you're going to be working all this overtime,
21 you're getting time and a half, double time. And
22 then when they sign you on as a full-time
23 employee, like, you end up with a base and then
24 you end up getting commission based on -- I don't

1 know, there's some criteria that just didn't add
2 up, because I couldn't, like, decide to get more
3 busy. It was up to them if I ever hit my quota
4 in terms of hours, so that I could make that
5 additional money. So if they chose not to let me
6 work more hours, I couldn't hit my quota, so I
7 didn't have a -- I was, like, it's not a win-win
8 situation.
9     Q. Did you let them know that you were
10 dissatisfied with that aspect of your employment?
11     A. I did. I tried to negotiate with them,
12 and I said, well, you know, the only thing I can
13 do, because I'm traveling all the time, is I
14 can't interview if I'm traveling, so I have to
15 go, and they understood.
16     Q. Did you tell the recruiter not to
17 include this in the information that you provided
18 to JCA?
19     A. I don't know why I would.
20     Q. I'm asking if you recall that you did?
21     A. I do not recall saying that to him, no.
22     Q. Okay. And you have no reason -- or no
23 knowledge as to why it was left off?
24     A. No.

1     Q. Okay. And when you work with these
2 recruiters, I mean, do you get to approve what
3 they submit to companies that you were trying to
4 get a job with?
5     A. You know, honestly, this stuff happens
6 really fast with these guys, because, you know,
7 they're wheeling and dealing and they want to get
8 their sale, they want to get their 20 percent on
9 you, you know, on your salary and stuff. They
10 want to close. So it's, like -- they basically
11 say, hey, do you trust me, and it's, like, well,
12 yeah, I trust you. They're going to spin it, so
13 that you get the job.
14     Q. Did you review Deposition Exhibit 8
15 before it was submitted to JCA?
16     A. Honestly I don't recall if I did or not.
17     Q. Okay. I'll take this back.
18         So by my count, if we go back to
19 March of 2012 or let's go back to February of
20 2012 when you began with the Macon Group, you've
21 had eight different jobs in the construction
22 industry during that period of time.
23     A. Okay.
24     Q. Each -- and those jobs are averaging

1 about one to one and a half years in each job.
2 Would you agree with me?
3     A. Yes.
4     Q. Okay. Why do you believe your tenure at
5 these eight positions has been so short?
6     A. I think a lot of it had to do with life
7 circumstances. Life circumstances and just
8 wanting to pursue a career in construction and
9 set myself up at a place that I knew I could be
10 there for a long time. I mean, it just seemed
11 like opportunity -- either a life circumstance
12 came or an opportunity came. And, you know, you
13 got to pivot.
14     Q. Do you recall telling anybody at any
15 time that you believe you had just become
16 dissatisfied with employers after a six to
17 one-year period of time?
18     A. No, I don't recall that.
19     Q. You don't recall saying that to anybody?
20     A. No.
21     Q. Do you think that that's an aspect of
22 your personality?
23     A. No.
24     Q. Now, you described how your resume was

1 given to JCA before you became employed by them.
2 Can you tell me what you recall from how the
3 recruiting process went once they contacted JCA
4 on your behalf?
5     A. How the recruiting -- well, so, I mean,
6 he set up the interview for me to meet with them.
7 I recall not being able to get into the parking
8 lot because it was closed. Met Bill Burfeind,
9 had the interview. Was a little bit taken back
10 that there was -- I think it was Boulukos, Steve
11 Boulukos, Yazbec, and Greg Garland in the room
12 for the interview, which I thought was a lot for
13 a first interview.
14     Q. Do you remember when that interview was?
15     A. A couple months before I started, maybe
16 a month.
17     Q. Okay. And tell me what you remember
18 from the interview?
19     A. I thought it was really strange that
20 Yazbec and Boulukos did all the talking when I
21 would be working for Garland. So it was just
22 interesting that my supervisor didn't have
23 anything to say. But after getting to know Greg,
24 I understood why.

1    It's just basic questions. They
2    told me about the company, the history of the
3    company, how long they had been around, what they
4    specialize in, typical stuff. Went over, you
5    know, my strengths if you'd be able to feel
6    comfortable -- I'd never worked with the unit
7    pricing software that they used. So I told them
8    I was confident in that. In terms of volume,
9    too, that was another big concern of theirs. A
10   volume of bids that they did, because it was all
11   interior, so they -- it was a big turnaround.
12   And I assured them that, you know, having worked
13   for Paschen I could handle volume and paperwork
14   as one of my specialties.
15        So, you know, just a normal
16   interview where they're checking out your
17   strengths and, you know, your -- essentially
18   you're selling yourself, too.
19        Q.   Okay. Do you recall -- what do you
20   recall your impression being of the company after
21   that initial interview?
22        A.   Very traditional. I mean, the whole
23   place is laced in dark stained wood. I mean, it
24   was something that I was very familiar with in

1    terms of the industry. You know, either you go
2    to a place and it's cutting edge and modern, an
3    open floor plan, or you go to a place like JCA
4    and everyone has got an office and a leather
5    chair. And, I mean, it's just -- I just remember
6    thinking, okay, that's the type of company it is.
7    That's it.
8         Q.   Anything else?
9         A.   No.
10        Q.   Okay. Was there a follow-up interview
11   after that?
12        A.   That I don't remember. If it was, it
13   wasn't in person. I feel like it went -- I know
14   Yazbec and I had a couple emails back and forth
15   and next then thing I knew I was there.
16        Q.   So you don't remember any subsequent
17   interviews?
18        A.   I don't.
19        Q.   Okay. But you subsequently received an
20   offer to work there?
21        A.   Right, correct.
22        Q.   And who extended the offer?
23        A.   I think it was Mike Yazbec.
24        Q.   And what's his position with the

1    company?
2         A.   I don't know. President. I'm not sure.
3    Up there, number one in charge.
4         Q.   What -- do you remember what position
5    you were offered?
6         A.   The estimating position.
7         Q.   And you accepted that position?
8         A.   Yes.
9         Q.   Did you accept it right away?
10        A.   I don't know what right away -- I mean,
11   I would say within a couple days, I think.
12        Q.   Was there any negotiation over your
13   compensation that took place?
14        A.   I think Todd did a little something.
15   I'm not sure. They always try to, you know, do
16   the best they can with it. It wasn't through me.
17        Q.   So you accepted the position. It was
18   for an estimating job. Tell me what your job
19   duties were in that position?
20        A.   So as an estimator for JCA, you
21   basically go to the walk-throughs that you're
22   assigned to, which is checking out the job sites
23   for existing conditions, so that you can put
24   together a thorough proposal. And unlike other

1    companies, a lot of people don't do unit pricing
2    like they do, which is something that Greg had
3    brought in and that I liked, because at -- when
4    you're in a fast pace, you can't always go out to
5    subs for quotes. And Greg was very good at
6    deriving these unit prices for us, so it made us
7    a little bit more independent and a little bit
8    more fluid when bidding things.
9         So we would basically put
10   together -- we would do our take-offs on the
11   drawings, and then we would put together a draft
12   proposal or estimate of the work that needed to
13   be done using this program that he had, what's
14   the word, loaded all these unit pricing in there,
15   so that, you know, pretty much -- so everything
16   would be done kind of in the same way. Like, we
17   would all -- if we were all wrong on something,
18   we were wrong the same way every time.
19        And then we would present and work
20   with the project managers based on, you know,
21   logistics of the building, certain things that
22   were specific to a job site that the project
23   managers knew by working with the clients, and
24   adjust the pricing and our conditions and our

1  exclusions and stuff accordingly.
2     Q.  Describe this walk-through process that
3  you mentioned?
4     A.  So at the walk-through, you know, you go
5  out there, and it's going to be your competitors,
6  the other general contractors. You'll have your
7  subs there. If you have subs that you know for
8  sure are in the building or familiar with working
9  in the building, you're going to make sure that
10  they come down there and they know that you're
11  bidding on the job, so they can have their eyes
12  on it as opposed to just bidding off the plans.
13       It's a way to kind of build
14  camaraderie a little bit and build relationships.
15  If there's new subs out there, you want to make
16  sure you talk to them, you know, let them know
17  you're one of the GCs bidding on it, give them
18  your card, network, talk about jobs that you're
19  on with them. It's very -- I don't know, you go
20  out there and, you know, you build relationships
21  and you hang out, you make friends. And you
22  basically walk -- you walk the site and take
23  pictures and stuff and document, you know, do the
24  job part of it. But it's very much about

1  being -- representing, you know, the company to
2  the client and representing the company to the
3  subs, because they're the ones that give you the
4  numbers which gets you your jobs.
5     Q.  So the client's there. The subs are
6  there.
7     A.  Yeah.
8     Q.  You mentioned the other companies that
9  you're competing with are there?
10     A.  Yep.
11     Q.  Anybody else there?
12     A.  Usually the building engineer will be,
13  too, because he -- he or she knows their way
14  around the building.
15       I'm trying to think who else.
16  That's basically -- those are the key players,
17  you know, that you want to have there, so that
18  you get good bids and numbers.
19     Q.  And how many walk-throughs -- just take
20  an average month during your employment with JCA,
21  how many average -- how many walk-throughs would
22  you be assigned to go to?
23     A.  I mean, there were times where we were
24  bidding -- you know, we had multiple projects

1  bidding on a day. So, I mean, sometimes it would
2  be three or four walk-throughs a week, and
3  sometimes it wouldn't be -- it just depends how
4  we got assigned.
5       Greg was our supervisor. So, like,
6  if somebody had a tight bid, you know, I might do
7  a walk-through for Tim and come back and give Tim
8  all my photos. And then Tim would do a
9  walk-through for me and come back with no photos.
10  But, you know, we would -- sorry, I just thought
11  it was hilarious. That's -- it's just how our
12  schedules would open up, what we had on our
13  plate. Greg was good about making sure that, you
14  know, we weren't -- that we were balanced, you
15  know, and that we were getting each other's back.
16  We were very tight, the three of us.
17     Q.  So who is Tim?
18     A.  Tim's the other -- another estimator.
19     Q.  Okay. You were -- was there any other
20  estimators other than you and Tim?
21     A.  I think Ed Bowen and Mike Stazinski were
22  considered estimators, air quotes.
23     Q.  Why do you say air quotes?
24     A.  Just because I think they didn't

1  really -- to my knowledge, they didn't really go
2  on as many walk-throughs as we did. We seemed to
3  get the brunt of the interior work, and I think
4  they were allocated to more specific clients. So
5  they might have been more project management,
6  too. I think they just kind of filled whatever
7  needs JCA needed them for.
8     Q.  Did they -- did Ed and Mike report to
9  Greg?
10     A.  I'm not sure about that honestly.
11     Q.  But you and Tim reported to Greg?
12     A.  Yes.
13     Q.  So is it fair to say that you and Tim
14  were the primary estimators and that Ed and Mike
15  did some estimating, but it was more job
16  specific?
17     A.  I would say I -- that's a fair
18  statement, yeah.
19     Q.  Okay. So is Tim the only other person
20  in the company that did --
21     A.  What I did.
22     Q.  -- pretty much exactly the same thing
23  that you were doing; is that --
24     A.  Yes, yes.

16 (Pages 58 - 61)

1 Q. Okay. And then the walk-through then is
2 essentially the first step in the process which
3 ultimately leads to JCA getting the business; is
4 that fair to say?
5 A. Well, in putting together a proposal.
6 That's the first -- you want to put together an
7 accurate proposal, and you can't do it if you, A,
8 have crappy relationships with your subs, because
9 then they're going to give you a high number and
10 then your number is high. And, B, you want to
11 have a good understanding of the existing
12 conditions, because that can determine whether or
13 not you're going to make money on the job. I
14 mean, you can bid it low and then all of a
15 sudden, it's, like, oh, we didn't know the
16 freight is all the way, you know, on the east
17 side of the building. So then it costs you more
18 money to get the job done and then you lose
19 money.
20 So it's about putting together the
21 proposal and then hopefully it's there, it's the
22 PMs that get -- it's the PM's job to get the job.
23 It's on -- build the relationships and get the
24 jobs. We're just the number people basically.

1 Q. So when you were working for JCA, you
2 were expected to -- you were given some
3 employment policies and procedures that you were
4 expected to follow; is that accurate?
5 A. They gave us a binder when I was --
6 started. It was called, I think, an employee
7 handbook or something.
8 MR. BOYLE: If we could get this marked,
9 please.
10 (Document marked as Dziubla Deposition
11 Exhibit No. 10 for identification.)
12 BY MR. BOYLE:
13 Q. So I've handed you what we've marked as
14 Exhibit 10, ask you to take a moment to scan
15 that. We received this from you in discovery.
16 My first question is going to be: Is this a copy
17 of the binder that you received when you began
18 your employment?
19 A. I think it's one of the things in the
20 binder. There's a lot of stuff in there for
21 training purposes, and it's, like -- it's one of
22 the things.
23 Q. Okay. And is it fair to say that this
24 contains some of the policies and procedures that

1 applied to your employment while you were
2 employed by JCA?
3 A. Yeah. Honestly I never really read it.
4 Q. You never read the document?
5 A. (Nodding).
6 Q. Did you ever refer to it during your
7 employment?
8 A. (Nodding). Not that I recall.
9 Q. Okay. So did you take any -- did you
10 care what was in the document?
11 A. I did care honestly; but as soon as I
12 got started there, I mean, we hit the ground
13 running. And I was just -- you know, I don't
14 know, I'm, like, I'll -- if I need it, I'll look
15 at it. I mean, it's all here. Whenever I need
16 to refer to it, I'll look -- you know, it's just
17 basic policies.
18 You know, I knew they had a really
19 strict dress code, so I made sure I adhered to
20 that when I was out, you know, in public, and --
21 Q. So you understood that the policies in
22 here you were expected to follow. It's just you
23 only referred to it if you needed to review a
24 particular policy; is that --

1 A. Yeah, if I thought I didn't understand
2 something, I knew I could go back and refer it --
3 refer to it, but I never, like, went through it
4 and studied it.
5 Q. Can you flip to page 1048, Dziubla 1048.
6 Are you there?
7 A. Yes.
8 Q. Okay. So directing your attention to
9 the highlighted portion of the second paragraph.
10 A. Okay.
11 Q. The sentence reads, Your employment is
12 at will, meaning that either J.C. Anderson or the
13 employee can end the relationship at any time for
14 any reason or without cause -- with or without
15 cause or prior notice. Did you see that? Did
16 you see that where I'm reading from?
17 A. Right now?
18 Q. Yeah.
19 A. Yes, I see that right now.
20 Q. All right. And did you know you were an
21 at-will employee while you were employed by
22 JCA -- Anderson?
23 A. Illinois is an at-will state, isn't it?
24 I believe so.

17 (Pages 62 - 65)

1    Q.  I'm asking you if you knew if you --
2    that you were an at-will employee while you were
3    at JCA?
4    A.  Yeah.
5    Q.  So can you flip to 1095.  And this page
6    contains JCA's confidentiality policy, correct?
7    A.  Yes.
8    Q.  Okay.  And did you understand that while
9    you were employed by JCA that you would have
10   access to and come into contact with confidential
11   information belonging to the company?
12   A.  As far as, like -- I don't understand.
13   Like, in terms of, like, social security numbers
14   and stuff or --
15   Q.  Business information that was developed
16   by JCA that they used in connection with how they
17   bid jobs.
18   A.  Yeah, everybody has that.  Every company
19   has their way of doing things.
20   Q.  Okay.  So JCA was no different, correct?
21   They had their way of doing things.  I think you
22   mentioned some program that Greg had --
23   A.  Right.
24   Q.  -- that that was how you guys --

1    A.  Yes.
2    Q.  -- developed your bids, right?
3    A.  Correct.
4    Q.  And that was unique or proprietary to
5    JCA, correct?
6    A.  It -- yeah.
7    Q.  Did you understand, whether or not you
8    read this policy, that you had an obligation to
9    keep that type of thing confidential, not share
10   it with other companies?
11   A.  Yes.
12   Q.  Okay.  Would -- strike that.
13         If you could flip to page 1085.  Do
14   you see on that page the policy that relates to
15   return of company property?
16   A.  Yes.
17   Q.  And you agree that the provision
18   provides that upon termination of your employment
19   that you were required to return all company
20   property to JCA?
21   A.  Yes.
22   Q.  Okay.  Did you understand that company
23   property would include documents like we've
24   discussed, the proprietary bidding process that

1    JCA would follow?  Is that JCA's property?
2    A.  Yes.
3    Q.  Okay.  And the documents that they
4    use -- that you internally would use as an
5    estimator to develop your proposal for a client,
6    those documents, that was JCA property, correct?
7    A.  Sure.
8    Q.  Things like if they had a list of the
9    subcontractors and all the contacts that they
10   developed with those subcontractors, that would
11   be JCA's property, correct?
12   A.  Well, I mean, half the people on that
13   list are people I worked with before in the past.
14   They can't just take ownership of the subs.  I
15   mean --
16   Q.  Well, if they had -- go ahead.
17   A.  Well, I'm just saying, like, it's --
18   when you're in the industry for a while, you know
19   what people are good at and what other -- and
20   what subs aren't.  So, I mean, in terms of, like,
21   a sub list, like, it's not like I'm never going
22   to call a sub and ask them to not -- I'm not
23   going to, like, not work with them.  I can't
24   forget I ever knew them, because I knew them

1    prior.  I met them, I mean.
2    Q.  But to the extent JCA compiled its own
3    list of the subs that they preferred and had
4    contacts with --
5    A.  That particular list is theirs, yeah.
6    Q.  Okay.  And did you have that kind of
7    information in your possession when you left the
8    company?
9    A.  Maybe by way of emails and stuff.  If I
10   needed a -- I know sometimes, like, if email went
11   down or -- yeah.
12   Q.  So the --
13   A.  Yeah, I did have that.
14   Q.  And did you return it to the company at
15   the time your employment ended?
16   A.  Didn't think about it when it was --
17   everything was going on.
18   Q.  So the answer is no, correct?
19   A.  Correct, the answer is no.
20   Q.  Okay.  And why not?
21   A.  I didn't think about it with everything
22   that was going on.  I was trying to figure out
23   how I was going to find a job.
24

18 (Pages 66 - 69)

1      (Document marked as Dziubla Deposition
2      Exhibit No. 11 for identification.)
3      MR. SEDAEI:  Is this a good time to take
4  five?
5      MR. BOYLE:  That's fine, sure.
6      THE VIDEOGRAPHER:  We are going off the
7  record at 11:35 a.m.  This is the end of media
8  set 1.
9      (A short recess was taken.)
10      THE VIDEOGRAPHER:  We are back on the
11  record at 11:48 a.m.  This is media set 2.
12  BY MR. BOYLE:
13      Q.  Okay.  Ms. Dziubla, when we broke, I had
14  handed you a Company Exhibit 11.  Have you had a
15  chance to take a look at that?
16      A.  Oh, no, I haven't looked through it.
17      Q.  I just need you to glance at it.  You
18  produced this to us in discovery.  Do you
19  recognize the document?
20      A.  Yeah.
21      Q.  And I just need you to confirm you did
22  not return this to the company until your
23  attorneys gave it to us in connection with this
24  lawsuit; is that correct?

1      A.  Correct.
2      Q.  Okay.  I'd like to have you flip to
3  page 1129 of the document.  Do you see that page?
4      A.  Yes.
5      Q.  Okay.  So is it fair to say that this
6  document contains all of JCA's processes and
7  procedures for bidding on its customers' work?
8      A.  Yeah.
9      Q.  And if -- I'm going to have you flip
10  again forward to page 1146.  What is that page?
11      A.  Looks like a sub list.
12      Q.  Okay.  And there's individuals named
13  from -- at each of these subcontractors; is that
14  correct?
15      A.  Yes.
16      Q.  And those are the contacts that JCA has
17  developed with the individuals that are listed,
18  correct?
19      A.  Yes.
20      Q.  Can you flip forward again to page 1207.
21  Now, is this actually a templet of the actual
22  contract that JCA enters into with its customers
23  once the -- once an agreement is reached?
24      A.  I honestly -- I wouldn't know.  I wasn't

1  part of that process at the company.
2      Q.  But you do agree that you didn't return
3  any of this information to the company after your
4  employment was terminated, correct?
5      A.  Honestly I didn't know that I had to.
6      Q.  Okay.  So when you began working for
7  your next employer Talent Hitch --
8      A.  Yes.
9      Q.  -- did you bring this document with you?
10      A.  No.
11      Q.  Have you shared any of the information
12  in this manual with any other individual?
13      A.  No.
14      Q.  Okay.  Do you have this document with
15  you at your current position with Cornerstone
16  Consulting?
17      A.  No.
18      Q.  Have you shared the document with
19  anybody at Cornerstone Consulting?
20      A.  No.
21      Q.  Have you used or relied on any of the
22  information in this exhibit in connection with
23  any of your subsequent employment?
24      A.  I don't understand that question.

1      Q.  Have you used any of the information or
2  documents contained in Company Exhibit 11 in
3  connection with the services you've provided to
4  anybody other than JCA?
5      MR. SEDAEI:  Objection, form.
6      But answer if you understand.
7  BY THE WITNESS:
8      A.  The actual specific documents, no.  The
9  knowledge I have of the industry, yes, which
10  happens to be, like I said, relationships with
11  subs.  I'm not going to just cut my own throat
12  and not use relationships I've built over the
13  years that I've worked in the industry.  So but
14  did I, like, use their sub list -- which, by the
15  way, this sub list is, like, a generic sub list.
16  It's changed, like, ten times when I was working
17  there.  But did I use that sub list and
18  specifically call those people, no.
19  BY MR. BOYLE:
20      Q.  Okay.  And did you refer to any of the
21  procedures in here while you were performing
22  services for anybody other than JCA?
23      A.  No.
24      Q.  Okay.  We at this time would make a

1  formal request to you and your attorney for you
2  to return all documents that you have in your
3  possession that belong to JCA.
4      A.  Okay.  You can have them.  Yeah.
5      Q.  And do you understand that the
6  procedures that are contained in Company
7  Exhibit 11, you know, we have a right to pursue
8  legal claims if we believe that there is
9  additional documents in your possession that you
10  failed to return?  Do you understand that?
11      MR. SEDAEI:  Objection, calls for a
12  legal conclusion.
13          But answer if you know the answer.
14  BY THE WITNESS:
15      A.  What was the question again?
16  BY MR. BOYLE:
17      Q.  Do you understand that we have a legal
18  right to pursue you for your failure to return
19  these documents to the company?
20      A.  These specific documents which I've
21  already given to you guys?
22      Q.  As well as any other company property
23  that you may have in your possession that you
24  didn't think to return on your departure.

1      A.  Everything that I was asked to return I
2  returned.
3      Q.  Well, we have two examples here that you
4  didn't return.
5      A.  I wasn't asked to return them.  I didn't
6  know I needed to return them.  If you would have
7  said, hey, Ro, send back that binder we gave you,
8  I would have sent it back.  I didn't know it
9  needed to go back.
10      Q.  Is it just your understanding that when
11  you leave an employer you have no obligation to
12  return the property that was given to you by that
13  employer?
14      MR. SEDAEI:  Objection, mischaracterizes
15  the testimony.
16          But answer if you understand it.
17  BY THE WITNESS:
18      A.  I think the last question answered it.
19  If I was asked to give it back, I would have
20  given it back.  It's not like I was withholding
21  anything.  I returned all -- everything he asked
22  me to return I gave him back.
23  BY MR. BOYLE:
24      Q.  Now, you mention that your direct -- I

1  can take that back.
2      A.  Oh.
3      Q.  Your direct supervisor while you
4  worked -- well, strike that.
5          Let me ask you first.  You explained
6  what you've done, what you were responsible for
7  doing as an estimator, while you were employed by
8  JCA.  Did that ever change?  Did the content of
9  your job ever change over the course of your
10  employment with JCA?
11      A.  It was pretty consistent.
12      Q.  Okay.  And your direct supervisor was
13  Greg Garland, correct?
14      A.  Correct.
15      Q.  How would you describe your relationship
16  with Mr. Garland?
17      A.  I would have to say it was great.
18      Q.  And was that throughout your employment
19  with the company?
20      A.  Yeah, absolutely.  He was somebody I
21  confided in.  We used to do -- we tried to get a
22  wellness program going at the company by running.
23  We went out for Sushi Thursdays at Jewel.  I
24  mean, we hung out all the time.  If I needed

1  somebody to talk to or an ear, I could call Greg.
2  He was very supportive.
3      Q.  Does it continue to be good to this day?
4      A.  I don't talk to anyone there because of
5  this.  I lost a lot of relationships and a lot of
6  friendships because of this.
7      Q.  So as far as you know, does your
8  relationship with Mr. Garland remain on good
9  terms?
10      A.  As far as I know, yeah.
11      Q.  And what did you think of Mr. Garland as
12  far as his supervisory skills?
13      A.  I know he didn't like being the bad guy,
14  you know, but he was very knowledgeable in what
15  he did and under a lot of stress for sure.  So
16  sometimes things didn't come off as polished as
17  he would have liked it.  But it's just kind of
18  par for the course.  He had a lot on his plate
19  and he was very good at what he did.
20      Q.  Did you -- was your work supervised by
21  anybody other than Mr. Garland while you were at
22  the company?
23      A.  I want to say to an extent the project
24  managers kind of helped out with in terms of

1  making sure that, you know, any documents that
2  were leading our proposals and stuff were going
3  to make the company money. So if they had
4  something to say or experience-wise, you know,
5  they would share that kind of as -- I don't know
6  if it was supervising, but, I mean, they -- our
7  proposals didn't go out unless the PM signed off
8  on it. So, yeah, they would mark it up. If it
9  was wrong, they would mark it up. So that is
10  kind of supervising.
11  Q. Anybody other than the project managers
12  that supervised your work?
13  A. No. And I think they're called project
14  executives there, but, yeah. No, that's it as
15  far as I know.
16  Q. Okay. You mentioned Steve Boulukos,
17  Boulukos?
18  A. Boulukos.
19  Q. Did he have supervisory involvement with
20  your job?
21  A. Well, he was -- I think he was Greg's
22  boss. So, like, shit hit the fan, I mean, Steve
23  was involved for sure. If he didn't approve of
24  something that was going on, he made sure that,

1  you know, the message came down, you know, the
2  lines of communication.
3  Q. And how would you describe your working
4  relationship with Steve?
5  A. I mean, cordial. We, you know,
6  definitely didn't have the same amount of touch
7  points as Greg and I did. I didn't see him on a
8  daily basis even though, you know, we're in close
9  proximity to each other. But, yeah, it was
10  always cordial, friendly, you know, weather talk
11  and lunchroom. He seemed very supportive.
12  Q. How would you describe your -- did you
13  enjoy working at J.C. Anderson?
14  A. I did actually. That whole relationship
15  I had with Tim and Greg was something I had never
16  had anywhere else. And, you know, you have your
17  things that you bitch about to your coworkers.
18  But other than that, I mean, it was, like, I felt
19  very confident about my responsibilities there.
20  I knew that if I had a question, I could go to
21  Greg and he wasn't going to just blow me off,
22  like, some -- you know, sometimes happens. I
23  mean, like, he was a mentor. So, yeah, really --
24  I mean.

1  Q. And did what you just described apply
2  throughout your employment at JCA, or was there a
3  point in time when you came to be unhappy working
4  there?
5  A. You know, we talked about a couple
6  issues. There were things that Greg wanted to
7  accomplish in the company that he was frustrated
8  with, that we all kind of just shared
9  conversations on. But it wasn't, like,
10  detrimental to me working there. It wasn't like
11  I couldn't go on. I mean, I knew I had Greg and
12  I -- you know, Tim and I had each other's back.
13  Q. What issues are you referring to?
14  A. Just, I mean, you know, company politic
15  stuff. You know, Steve wants to do something one
16  way and the guys are, like, you know, we think --
17  you know, Greg wants to do it a different way.
18  He thinks it would be better, would be more
19  profitable. And, you know, the owner of the
20  company says do it one way, you do it that way.
21  You know, you grumble, grumble about it, and you
22  move on.
23  Q. So was there ever a point, though, where
24  you ceased to enjoy working at JCA?

1  A. No.
2  Q. Okay. So it's your testimony that you
3  were happy working at JCA right up until the end
4  of your employment?
5  A. I had no plans for leaving, not at all.
6  Q. That wasn't my question.
7  A. I was happy, yes.
8  Q. Now, do you recall in July of 2017, so
9  approximately three to four months before the --
10  your departure from the company, having a series
11  of confrontations with your supervisors and
12  coworkers regarding your work performance?
13  A. No.
14  Q. Do you know an employee by the name of
15  Seth Ehrlich?
16  A. Yes.
17  Q. And what was Mr. Ehrlich's position with
18  the company?
19  A. I think he was a project executive.
20  Q. So is he one of these individuals you
21  described that might have input into the
22  estimating work that you were doing?
23  A. Yes.
24  MR. BOYLE: Have this marked, please.

1    (Document marked as Dziubla Deposition
2        Exhibit No. 12 for identification.)
3  BY MR. BOYLE:
4    Q.  So we've handed you what we've marked as
5  Deposition Exhibit 12, and ask you to take a look
6  at that and let me know when you've had a chance
7  to read it.
8    A.  Okay.
9    Q.  Do you recognize this email?
10    A.  Not really -- I mean, vaguely.  I mean,
11  obviously I wrote it.  I mean, I don't remember.
12  I'm trying to recall what it was in response to.
13    Q.  And you sent it to Steve Boulukos and
14  Mike Yazbec, correct?
15    A.  Yes.
16    Q.  And they were the two top executives at
17  the company at the time?
18    A.  Yes.
19    Q.  Okay.  And you say you don't remember
20  what this email was about?
21    A.  I don't know what prompted me to -- I'm
22  trying -- like I said, I'm trying to recall.
23    Q.  So let me direct your attention to the
24  sentence that says, I take a lot of pride in what

1  I do and to hear that my very best was received
2  in the way Seth portrayed offended me.  I
3  appreciate you both taking time to hear my side.
4        Does that help to refresh your
5  recollection as to what was going on?
6    A.  I don't remember the circumstances.
7    Q.  So you don't remember any incident that
8  was occurring with respect to the way Seth
9  Ehrlich was characterizing your work?
10    A.  Not -- I mean, not with respect to this
11  email.  I don't know what this email is
12  referencing, what incident it's referencing --
13    Q.  Okay.
14    A.  -- with him.
15    Q.  Do you recall why you felt the need to
16  send this email to the two top executives at the
17  company?
18    A.  Well, I mean, so you make it sound
19  like -- I mean, Mike and Steve have an open-door
20  policy, too.  You know, you could always walk in
21  there and talk to them.  It's not, like, you
22  know, this was sent through, like, up a chain, a
23  memo chain.  I could just walk down the hallway.
24        I felt -- I mean, they were the next

1  people to talk to, is Greg, then them.  I mean, I
2  didn't -- and they were also the people that
3  were -- they did my review and all that stuff and
4  that was positive.  So, like, I mean, they're
5  my -- I didn't see any -- it's not like I was
6  going to the highest of powers.  I mean, they're
7  just the next -- they're just the people I talked
8  to.
9    Q.  And where you say you meant no
10  disrespect, do you have any recollection of what
11  you were referring to when you said you meant no
12  disrespect?
13        MR. SEDAEI:  I'm going to object since
14  the questions have been asked and answered.
15        But you can answer again if you have
16  an answer to the question.
17  BY THE WITNESS:
18    A.  I really don't know what this is in
19  reference to.
20  BY MR. BOYLE:
21    Q.  Okay.  Can I have that back.
22        (Document marked as Dziubla Deposition
23        Exhibit No. 13 for identification.)
24

1  BY MR. BOYLE:
2    Q.  So I've handed you what we've marked as
3  Deposition Exhibit 13, and I'll state that this
4  is a document that your attorneys produced to us
5  in discovery.  Take a moment to review the
6  document, please.
7    A.  Okay.
8    Q.  Do you remember sending this email to
9  Mr. Boulukos?
10    A.  Yes.
11    Q.  Okay.  Why don't you tell me what this
12  incident related to?
13    A.  I'm trying to figure out the whole thing
14  with the Excel.  So we have -- so when we did
15  proposals, there was templets.  And it's up to
16  the estimators to use the most latest templet,
17  which, you know, differed depending on what
18  project it was.  You know, some of the PMs would
19  say -- you know, you'd use a templet that they
20  used on another job, just because, like, why go
21  back to the original templet when it's just going
22  to be another templet for the same client.  Like,
23  why not just use that.  But sometimes there would
24  be outdated exclusions or clarifications that

1  they would make to the overall general templet,
2  and stuff would just kind of get muddled
3  sometimes when putting things together.
4        I'm trying to recall the whole --
5  hold on.
6        I don't recall all the different
7  processes that -- right now, you know, just
8  because it's been a couple years. But it sounds
9  like I had something that needed to get update to
10  signify what stage I was in the bid. And you
11  couldn't go in there to update it if somebody was
12  in it. So it was really frustrating, because,
13  like, you know, you have a break in your
14  schedule. And you're, like, okay, I'm going to
15  go in there and update; and you're, like, damn
16  it, somebody's in it. And then you'd have to go
17  back. And if you forgot or something else took
18  your attention away, it just didn't get done.
19        And I don't know, Steve sent out
20  this email, and I just -- I wrote him back. And
21  I was just, like, I don't -- I felt like the
22  email was talking down to me and our group. It
23  was kind of condescending. And I just wanted to
24  say, hey, man, you know, I'm doing the best I

1  can. And, you know, I just learned how to do
2  this. I'm doing -- I don't think I should be --
3  I should get an email like this.
4        The minute I sent it, Greg leaned
5  over and he was, like, that's it, we're going to
6  have a meeting. So I immediately got called into
7  the office, I think -- or, no, he called me over
8  and basically told me not to send anymore emails
9  like to this to Steve at Steve's direction.
10  Q.  Okay. So let me ask you about that. So
11  first of all, let's take a step back.
12  A.  Okay.
13  Q.  So the first email on this document is
14  Steve sending out an email to you, Greg Garland,
15  Ed Bowen, and copying Mike Yazbec, correct?
16  A.  Yes.
17  Q.  And the content of his email is that he
18  doesn't like that -- the way this estimating
19  sheet that you just described is being updated,
20  correct?
21  A.  Yeah.
22  Q.  Is that fair?
23  A.  Yeah.
24  Q.  Okay. And he's sending this out to the

1  group stating if anybody, you know, has
2  difficulty with what my expectations are, please
3  let me know; is that correct? He sent this to --
4  A.  Yeah, I'm actually -- I mean, I just
5  noticed it now that it's just to Ed and me. I
6  mean, there's still Mike Stazinski. And I don't
7  know why Tim and Mike were left off of it. It
8  must have been something we were working on, Ed
9  and I were working on.
10  Q.  And it's also to Greg?
11  A.  And to Greg, right.
12  Q.  Right.
13  A.  But it's not our whole team.
14  Q.  And so you felt that you needed
15  to respond to this directly to Steve, so you sent
16  your email to Steve alone, correct?
17  A.  Right.
18  Q.  Okay. And Steve is the second highest
19  ranking executive at the company, correct?
20  A.  Yeah. I didn't think he needed to have
21  an audience with what I wanted to say to him. I
22  honestly did it out of respect.
23  Q.  Well, your last sentence in your
24  response says, I really don't think any of my

1  efforts warrant getting emails like this,
2  correct? Is that what your definition of showing
3  respect to the --
4  A.  Yeah.
5  Q.  -- management --
6  A.  I think it's me standing my -- I'm just
7  saying to him -- I mean, the subject email is
8  why. I mean, the way it's phrased and
9  everything, I think I have -- I mean, that's why
10  they -- you hire somebody with the experience
11  that they have and you expect them to have a
12  voice, right? I mean, I don't think I was rude.
13  I don't think I was disrespectful or anything. I
14  just addressed him personally and said, hey, you
15  know, I'm doing the best I can. I'd appreciate
16  it if you wouldn't send emails like this. I
17  don't think there's anything wrong with what I
18  said.
19  Q.  Okay. And so following your sending
20  this email, you described a conversation that you
21  had -- Greg came to you and told you --
22  A.  Like, as soon as the email went out,
23  like, no -- within three minutes Greg and I could
24  see each other in the office the way it was set

23 (Pages 86 - 89)

1  up. Within three minutes, he leaned over and he
2  was, like, don't send out anymore emails. So
3  within, like, two seconds, my email went to
4  Steve, Steve forwarded it to Greg or called him.
5  And Greg was, like, don't send out emails like
6  that anymore. And I was, like, why can't I
7  respond to Steve's email to me and his way with
8  an email back saying, hey, you know, I'm just --
9  why can't I respond back to him. I don't
10  understand. He's just, like, just don't do it
11  anymore.
12      Q. So Steve was not happy with the manner
13  in which you responded to his email?
14      A. I guess not.
15      Q. Was there -- did you from that point
16  forward refrain from sending that kind -- those
17  types of emails?
18      A. As far as -- I mean, as far as I know.
19      Q. And you said something about you were
20  supposed to deal with Greg or something. I might
21  have misunderstood. You were supposed to -- from
22  that point forward, your contact was supposed to
23  go through Greg?
24      A. No.

1      Q. No. Okay. I thought I -- I may have
2  misunderstood that.
3          Did this -- subsequent to this
4  email, did your relationship with Steve change at
5  all?
6      A. I mean, we didn't -- it's not like we
7  had a relation -- like, a relationship where,
8  like, Greg and I did. I mean, I would still go
9  into there and talk to him about stuff. I was
10  never -- I wasn't, like, hostile towards him or
11  anything. I still treated him with respect,
12  still watched whatever TV show they had on in the
13  lunchroom and cracked jokes, I mean.
14      Q. Did you ever have any discussion with
15  this email -- about this email with Steve?
16      A. No.
17      Q. What did Greg tell you about the email
18  other than you shouldn't send emails like this
19  anymore?
20      A. Don't piss off Steve by sending emails
21  like this.
22      Q. Anything else?
23      A. That's pretty much it. He was just,
24  like --

1          MR. BOYLE: Can I get this exhibit
2  marked, please.
3          (Document marked as Dziubla Deposition
4          Exhibit No. 14 for identification.)
5  BY MR. BOYLE:
6      Q. Handed you what we've marked as
7  Deposition Exhibit 14. Do you recognize this
8  document?
9      A. Yes.
10      Q. Can you tell us what it is?
11      A. It's something on social media. Looks
12  like it's on Instagram. Yeah, I had a -- they
13  always say when -- well, Rodan & Fields is an
14  MLM. And, like, when you start those kinds of
15  things, they're, like, you should have a kick-off
16  party at your house. Like, two people came. So
17  but, you know, you don't say that on social
18  media. Instead you're, like, well, this was
19  great. It was great, you know.
20          So, yeah, it's just basically what
21  you do with social media when it comes to
22  advertising for, you know, Woderation and Rodan &
23  Fields.
24      Q. So what is -- let's step back. What is

1  Woderation?
2      A. Woderation is a company that I
3  started -- I want to say I started everything
4  started in July of 2017. That's basically
5  evolved from just being online fitness training
6  to actually working with women, being an advocate
7  for women's health in the construction industry.
8  I've narrowed it down to that, where all my
9  clients are women in the construction industry,
10  and I help them find a medium to being healthier.
11      Q. And is that the side business you
12  referred to?
13      A. Yes.
14      Q. And you're continuing to -- in your
15  efforts to try to grow that business, correct?
16      A. Correct.
17      Q. Okay. And this Exhibit 14 is a social
18  media posting regarding the launch or the
19  start-up of Woderation?
20      A. Yeah. More or less, like, Rodan &
21  Fields. But, yeah, the start of me, like, trying
22  to start a business.
23      Q. Okay. And who is Rodan & Fields?
24      A. It's an MLM. It's like Avon or Mary Kay

24 (Pages 90 - 93)

1 or it's just a Gotera. I mean, it's just an MLM,
2 cosmetics.
3   Q. I'm going to switch gears a little bit
4 and we're going to talk about the golf outing you
5 attended on September 18th of 2017. Do you
6 remember that golf outing?
7   A. Yep.
8   Q. Okay. The outing is referred to as The
9 Kev, correct?
10   A. Correct.
11   Q. Tell me what is your -- what is The Kev
12 in your understanding -- to your understanding?
13   A. From what I remember, I think the -- I
14 believe Kevin is short for -- or Kev is short for
15 Kevin, which used to be, I want to say, the CFO
16 of JCA many moons ago who died from pancreatic
17 cancer. And The Kev is a fundraising event. I
18 don't know if it's sponsored by JCA, but it's a
19 fundraising event that takes place to help the
20 family with financial -- so they do, like, silent
21 auctions, and it helps them raise money for his
22 daughters and his family, so that they can
23 continue to do what they do. It's a charity
24 event for that family.

1   Q. Okay. And you attended the event on
2 September 18, 2017; is that correct?
3   A. Yes.
4   Q. All right. Had you attended the
5 previous year?
6   A. Yes.
7   Q. Okay. So with respect to the event on
8 September 18, 2017, let me start by asking were
9 you golfing that day?
10   A. Not, like -- no, I was just -- my goal
11 there was to actually take pictures, because -- I
12 can't remember if Lauren was going to be there,
13 their marketing person. But it wasn't -- I
14 wasn't there to golf. I was basically there to
15 network, because I can't golf. I don't know how
16 to golf.
17   Q. Okay.
18   A. So, yeah, I was there to network. That
19 was my goal; and then if it came down to, like,
20 shooting a couple, because the guys were, like,
21 hey, you know, try this hole or whatever, I would
22 do it. But I wasn't there to, like, score or
23 anything.
24   Q. Okay. And this is a voluntary event?

1   A. Yes.
2   Q. Okay.
3   A. You're highly encouraged to go. But,
4 yeah, it's voluntary. If you didn't go, it
5 wasn't a big deal.
6   Q. Okay. And, in fact, hadn't you decided
7 to go at the last minute?
8   A. I did. I decided to go at the last
9 minute, and I made a donation to kind of help
10 support the cause because -- yeah, it's a
11 networking event and you should go. Rachael
12 talked me into it. She goes all the time. We
13 were kind of close. So she was, like, hey, you
14 can hang out with me and, you know, whoever she
15 hangs out with.
16   Q. Who did you -- I'm sorry, you might --
17 this might have just been in part of your answer,
18 but who did you go to the event with?
19   A. I know the agreement was -- so my car
20 was getting detailed that day. So they had a
21 shop that worked on all of our cars or -- or some
22 kind of relationship with the detail shop. So
23 the plan was that I would leave my car at JCA's
24 parking lot, and I would go -- I think I went

1 with Rachael and she was going to take me back,
2 but she couldn't because she left because she got
3 drunk. So I think I came with her. Maybe one
4 other person might have come with in the car. I
5 don't remember. But I got there in somebody
6 else's car.
7   Q. And who is Rachael?
8   A. She is, I don't know, accounting.
9   Q. She's a JCA employee?
10   A. Correct.
11   Q. Are you friends with Rachael?
12   A. No.
13   Q. Were you friends?
14   A. Not anymore.
15   Q. Were you friends with her at the time?
16   A. At that time, I thought we were, yes.
17   Q. Why are you no longer friends?
18   A. Honestly when all this stuff happened,
19 like I said before, I just kind of cut ties with
20 everyone, just for everyone's best interest. I
21 didn't want her to get tied up in it either. So
22 just kind of looking out for her best interest,
23 she had some things she was struggling with. I
24 didn't want to add anything to her plate. So I

1  just cut everyone off.
2     Q.  So do you remember when you arrived at
3  the outing?
4     A.  Probably at a reasonable -- well, before
5  everything kicked off. I mean, I think it's --
6  I'm trying to think if it was lunch, you come in
7  for lunch, then you go out for golf, and then you
8  come in for dinner. So it was definitely before
9  lunch, because I was able to eat and stuff.
10  Yeah, right around when stuff was supposed to
11  kick off, noon.
12     Q.  And what do you recall from the point --
13  so you recall having lunch?
14     A.  Yeah.
15     Q.  Okay. Were you with anybody at that
16  point in time? Who did you have lunch with?
17     A.  I don't remember who was at my table.
18     Q.  Okay.
19     A.  Honestly.
20     Q.  Okay. Once you and Rachael -- you think
21  Rachael and you arrived together, did you stay
22  with her or did you join another group?
23     A.  I don't remember.
24         Like, so I was part of different

1  groups throughout. I don't know what order they
2  happened in.
3     Q.  What do you mean you were part of
4  different groups throughout?
5     A.  Well, you just kind of bounce around
6  from, like, group to group. But I don't know
7  what order it happened in. Like, who was I
8  talking to at lunch, I don't know. Did I hang
9  out with Tim and a couple other of our employees,
10  yes. Did I hang out with some of our subs, yes.
11  What order it happened in, I mean, you know, it's
12  just about networking.
13     Q.  Okay. You mentioned that Rachael got
14  drunk?
15     A.  Yeah.
16     Q.  Were you drinking?
17     A.  I probably had a drink or two, yeah.
18     Q.  Okay. Were you drinking before you got
19  to the outing?
20     A.  No.
21     Q.  Okay.
22     A.  I was at work.
23     Q.  Okay. Do you remember how many drinks
24  you had that day?

1     A.  I don't remember exactly.
2     Q.  And you said you'd go around from group
3  to group. Were you going around by yourself or
4  were you going around because -- I just need to
5  understand the process of the golf outing and how
6  that works.
7     A.  Yeah, so, you know, you sit there and
8  you have lunch -- you have your lunch. And then
9  everyone gets together and you come up with
10  teams. So I think, like, four or five people get
11  on a team. And then you pick a cart and go pick
12  up your cart, and then you drive to a hole.
13  Everybody starts at a hole.
14         And so since my main objective was
15  to get pictures of everyone, I just got in my own
16  cart and started driving around taking pictures
17  of people, which is kind of what we did the year
18  before. We had a really good time with Greg.
19  Greg drove and took me and Lauren, and we took
20  all kinds of pictures.
21         So you just stop by and you're,
22  like, hey, how is it going, you know, Vortex
23  Flooring. And then you shoot the shit for a
24  little bit and then you leave. You got -- I got

1  in my cart and drove off and just -- and then
2  eventually I got bored, because you're driving
3  around taking pictures of everyone. And some
4  people were really serious about the golf outing,
5  so they actually wanted to golf, and then other
6  people were relaxed.
7         So, you know, I was trying to find
8  people to meet up with. Texted Tim, like, what
9  hole are you at, I'm at hole whatever. I'm,
10  like, I have no idea where that hole is because I
11  don't get golf.
12         So, you know, just trying to find
13  out where people are and hook up with them. I
14  think I met up with -- I know I met up with
15  Rachael before she got sick. And last year we
16  had hung out with her and one of the McKenna Hill
17  Group. And she started making some weird
18  comments while I was in the golf cart, and I was,
19  like, okay, well, she's clearly far along.
20         So I separated myself from her
21  immediately, because she was just -- and then
22  I -- she was just -- I don't know, started
23  getting text photos of, like, there was tampons
24  in the bathroom and then she threw up all over

1  herself. And I was, like, I don't even want to
2  deal with this. Like, I'm not -- I'm separating
3  myself from her immediately.
4       So I'm not sure what happened with
5  her later in the night. I just know she ended up
6  sleeping in the bathroom for, like, two hours,
7  she said, and then she drove home when she was
8  finally, like, coherent enough to drive, so...
9       MR. BOYLE: Can I have this marked as
10  the next exhibit, please.
11       (Document marked as Dziuba Deposition
12       Exhibit No. 15 for identification.)
13  BY MR. BOYLE:
14   Q. So, Ms. Dziubla, I've handed you
15  Deposition Exhibit 15, which is a copy of your
16  complaint in this case. I'd like to direct your
17  attention to paragraph 9 of the complaint.
18   A. Okay.
19   Q. Let me know when you've had a chance to
20  read that.
21   A. Yep, read it.
22   Q. Okay. So the first sentence of that
23  paragraph states that, "During the event,
24  Jacobsen offered to provide JCA employees

1  instructions on how to hit a 'chip shot'". Do
2  you see that?
3   A. Yes.
4   Q. And Jacobsen is Peter Jacobsen; is that
5  correct?
6   A. Correct.
7   Q. So what do you remember about how he was
8  providing instruction on how to hit a chip shot?
9   A. Can you rephrase that?
10   Q. Sure. You said he offered to provide
11  JCA employees instructions on how to hit a chip
12  shot. How did he offer employees that type of
13  instruction?
14   A. So, okay, so I was going around taking
15  pictures; and then I got pulled over by that
16  group that was there. So I think there was,
17  like, four or five of us. And trying to remember
18  about -- it was just basically, like, hey, do you
19  play golf, and I was, like, no, I don't know how
20  to play golf. And then he was, like, oh, come
21  on, take a chip shot.
22       So we were just -- I guess it's
23  putting to the hole. So a couple people went to
24  putt, and he was just talking them through it.

1   Q. Okay. And so your understanding is that
2  when you say chip shot that that's putting into
3  the hole?
4   A. I guess, yeah.
5   Q. Okay.
6   A. I think it's --
7   Q. Okay. And did -- were you offered to
8  receive instruction on how to hit a chip shot?
9   A. Yes.
10   Q. And the next sentence of the complaint
11  says, "As a JCA employee, Plaintiff felt
12  obligated to go along with the demonstration."
13       What do you mean you felt obligated?
14  Why did you feel obligated?
15   A. Well, I mean, Jacobsen is the -- you
16  know, he's the guest of honor there. You know,
17  he's there. He's -- it's kind of -- you know,
18  you don't want to -- if you're hosting a party
19  and you have your head key person there, you want
20  to be cordial with them; and he offered it. So I
21  was, like, well, yeah, I guess I have to.
22       And to be quite frank, I had
23  actually talked to Jacobsen earlier in the night
24  when I arrived there, and he made me very

1  uncomfortable when I originally talked to him.
2  And I didn't really want to have anything to do
3  with him there. But it was just, like, oh, well,
4  you know, come on, we got an expert here. Just
5  take his -- you know, let him tell you what to
6  do. And I was, like, all right, sure.
7   Q. So I just need to understand, so you're
8  driving around in a golf cart by yourself --
9   A. Yes.
10   Q. -- going from hole to hole?
11   A. Yes.
12   Q. Okay. And you drive up to a hole where
13  Peter Jacobsen is providing golf instruction?
14   A. No, I drove up to a hole and got flagged
15  down, hey, Ro, we've got these autographed
16  things. Do you want to stop by, and I'm, like,
17  oh, I don't think I want to. And they're, like,
18  oh, come on. And what am I going to do, insist
19  on it. So I'm, like, okay, fine.
20       So he had these autographed rags.
21  I'm, like -- or whatever they're called, like,
22  ball cleaners or something. I'm, like, fine,
23  whatever, cool, I'll stop by.
24       So I did. And I was just, like --

27 (Pages 102 - 105)

1   I'm, like, don't make it weird. You know, I'm
2   just trying to go along with the flow of things.
3   The instructions weren't going on when I pulled
4   up. It was just, like, hey, come here, and, you
5   know, the guest of honor is here. Oooh, come get
6   a signed piece of paraphernalia that I didn't
7   really care about.
8       Q.   Describe for me what type of instruction
9   you received from Mr. Jacobsen?
10      A.   So, I mean, I don't recall the exact
11  instructions, but I know that, like, he verbally
12  cued me to perform the same type of -- to attempt
13  the same type of, I guess what it's called, a
14  chip shot; and when I wasn't getting it, then he
15  decided to demonstrate to kind of guide me
16  physically.
17          And that's when he made his comment,
18  and I was just, like, whoa. And I was just --
19  and I -- that's -- kind of honestly, like,
20  every -- it was, like, I was out of my body
21  looking down at me, and all I can picture is
22  Schumacher's face, just -- him just laughing and,
23  like, buddying it up with the two of them.
24          And I was just, like, did I hear

1   what I just heard? I was just, like, shocked.
2       Q.   So who was there when this incident was
3   going on?
4       A.   So, you know, I'm standing there doing
5   my whatever. Jacobsen is behind me. He's
6   guiding my hands. I'm -- Jim's in front of me,
7   and I don't know where the rest of the people are
8   because my back is to them. So I don't know what
9   their proximity is.
10      Q.   Okay. But I'm just -- let's start with
11  who was there. So you said Jim --
12      A.   Oh.
13      Q.   -- you said Peter Jacobsen, you said
14  yourself.
15      A.   Tim was there.
16      Q.   And that's -- Tim is who?
17      A.   Tim Lee was the other estimator. He was
18  there. I want to say Kacper was there from
19  Aspen.
20      Q.   What's Kacper's name?
21      A.   Which is Kacper Cojowski. I don't know.
22  I'm taking a shot at his last name. He's with
23  Aspen Painting, so he's one of our subs that we
24  use a lot.

1       Q.   Okay.
2       A.   Just going off from memory, maybe Adam
3   was there. I forget his last name. I don't
4   remember anything else.
5       Q.   Okay.
6       A.   In terms of people.
7       Q.   Okay. And do you recall how -- where
8   people were standing in relation to where you and
9   Mr. Jacobsen were?
10      A.   Well, like I said, my back was to them,
11  so I don't know if they were, like, right here or
12  if they were, like, over there. My back was to
13  them.
14      Q.   Okay. So you described how he --
15  because you weren't understanding the instruction
16  that he was giving you on how to physically
17  perform the shot, then he physically assisted you
18  on how -- what he was trying to explain, correct?
19      A.   Correct.
20      Q.   Now, in your complaint, you say he took
21  a position behind plaintiff and assertively
22  pressed his hip against plaintiff's buttocks; is
23  that correct?
24      A.   Yes, he was close.

1       Q.   Okay. And is -- did you say anything to
2   him at that time?
3       A.   I was, like, this is weird. And before
4   I could process it, that's when he made that
5   comment, and I've -- honestly I've received --
6   perfect example is we had an outing previously, I
7   don't know if it was that year, for JCA, they
8   have an employee that's an ex-golfer Clint
9   Hickman, and he gave me the same type of
10  demonstration at Topgolf where he was behind me,
11  but it certainly did not include a comment like
12  that. It was done very professionally, and he
13  guided me, and I was able to hit the ball. I
14  didn't think I was going to experience anything
15  different than that.
16      Q.   Now, did -- you've already answered
17  this, but was Jacobsen also providing
18  instructions to the other golfers that were
19  standing there?
20      A.   Physically?
21      Q.   Just I'm asking --
22      A.   Providing instruction, yes, he provided
23  instructions to the other people as well on how
24  to improve their shot.

28 (Pages 106 - 109)

1    Q.   Okay.  Now, did you complain to anybody
2    after this incident occurred?
3    A.   I mean, it -- you know, we got done.
4    They're, like, hey, let's take a photo.  I'm,
5    like, all right, whatever.  I was, like, how do I
6    process this.  We started driving around.
7         And actually because Tim and I were
8    so close, you know, we're sitting there.
9    Everybody gets out to take their shot, and Tim
10   just kind of looks over at me, and he's, like,
11   dude, are you okay.  And I'm, like, I'm not okay.
12   And he's, like, I can't believe that happened;
13   and I'm, like, I don't know what to do.
14   Q.   So when did this exchange with Tim Lee
15   occur?
16   A.   I'm -- maybe a couple holes after that
17   hole.  I'm not sure of the time frame.  But I was
18   just going back and forth in my head.  I'm, like,
19   did that really happen.
20   Q.   So after the -- you received the
21   instruction from Mr. Jacobsen, you took your
22   picture, and you got back in your golf cart and
23   you left that area?
24   A.   I did definitely leave the area.  I

1    don't know if it was just me or if we left as a
2    group collectively.
3    Q.   You don't remember that?
4    A.   I don't remember if I left in a golf
5    cart with somebody or if they hopped in my cart
6    or whatever.
7         But I did spend the remainder of the
8    afternoon with other -- with Tim and with Adam
9    and a couple other people from our office.  I
10   just don't know what order it came in.
11   Q.   But if I'm understanding correctly, Tim
12   and the other -- Kacper and Adam, they were
13   actually golfing that day, correct?
14   A.   Yeah.  They were doing more of it, yeah,
15   they were partaking in more of it in terms of,
16   like, finishing the golf.  But it's all relaxed.
17   You know, it's not like anyone is really keeping
18   score.  But they were golfing, yeah.
19   Q.   They were golfing?
20   A.   Yeah.
21   Q.   So they proceeded to the next hole and
22   you went somewhere else?
23   A.   I might have gone with them.  Because I
24   did end up -- like I said, I ended up spending my

1    afternoon with them several times, like, you just
2    kind of -- I might have had my own cart and drove
3    along with them to the next hole, but I know that
4    I stayed with people.  I wasn't solo after that.
5    I stayed with people, so --
6    Q.   But you can't say for sure?  You don't
7    remember where you -- whether you went with them
8    or you went somewhere else?
9    A.   Okay.  Then I went them, if I wasn't by
10   myself.  I wasn't by myself after that happened
11   at any point in time.  So I --
12   Q.   So you stayed with that group and then
13   you proceeded to the next hole?
14   A.   Right.  But Jacobsen didn't stay with
15   the group.  Like, they were part of their own
16   little thing.  He was on his own team.
17   Q.   Okay.  And this conversation you just
18   described where Tim asked you if you were all
19   right, that just occurred at some later point in
20   the day?
21   A.   Yeah, I mean, like, we were driving
22   around.  So I think we met -- we probably met up
23   with a couple other carts, and we just had an
24   opportunity.  I wasn't saying much, and usually

1    I'm pretty social and I joke around and all that
2    stuff, and I wasn't saying much.  And he just,
3    like -- he knew something was wrong, because, I
4    mean, we hung out all the time at work.  We were
5    good coworkers.
6         And I -- you know, I told him,
7    like -- I told him what happened.  He was, like,
8    wow, I can't believe -- you know, then, of
9    course, Kacper is there.  And he's, like, what
10   happened.  And, you know, and I told him.  He's,
11   like, I can't believe that that happened.  He's,
12   like, oh, my God.  And they could tell I was --
13   there was something -- I was upset.
14   Q.   Okay.  I mean, so since you remember
15   that you -- now you remember that you went with
16   them after this incident with Mr. Jacobsen, I
17   want to know how long after you -- that incident
18   before you had this discussion with Tim and now I
19   understand Kacper was part of it, too?  Was it --
20   do you remember -- have any recollection as to
21   how long after it was?
22   A.   It was -- like, it's within three hours.
23   Q.   Okay.
24   A.   Because it was before dinner, so dinner

29 (Pages 110 - 113)

1   is, like, at 5:00. So if we were golfing by 1:00
2   and that happened, like, midway through, I mean,
3   it all -- it happened before dinner.
4      Q. Okay. So you believe it was closer to
5   the dinner when you had that discussion with
6   them?
7      A. I'd say, like, yeah, midway through,
8   yeah, sure, closer to dinnertime.
9      Q. Okay. And you said you started golfing
10  at 1:00?
11     A. I think so. That's all -- I'm just
12  throwing that number out there. It could have
13  been 11:00.
14     Q. Okay.
15     A. I don't know.
16     Q. Okay. Did you have any other
17  conversations with anybody that day regarding the
18  incident with Mr. Jacobsen?
19     A. Yeah. Actually so when we got done, you
20  know, whatever, finishing our holes, heading back
21  to dinner, we -- you got to go park all your golf
22  carts and stuff and everybody comes together and
23  you find people. And Joe McGuire was another
24  person that I really confided in about stuff. I

1   thought he was one of their best PMs. He was
2   standing at one of their booths where the carts
3   were, and Kacper actually went up to him, and
4   he's, like, dude, you wouldn't believe what just
5   happened. And he starts telling McGuire about
6   it, and McGuire looks over at me, and he's, like,
7   what did Jim do. And I'm, like, he just started
8   laughing; and he's, like, no way. He's, like,
9   yeah, it doesn't surprise me.
10      And I was just, like, what do I do;
11  and he's, like, I don't know. I'm, like, hey,
12  you want this souvenir? And I just kind of
13  chucked the ball cloth at him. I'm, like, do you
14  want it. He's, like, fuck, no. I mean, he's,
15  like, I can't believe that happened. He's, like,
16  I'm not surprised, though. Jim would think
17  that's funny.
18     Q. So this occurred after you were done
19  golfing for the day and you were returning your
20  carts?
21     A. Yes.
22     Q. So this was -- this would have been
23  right around dinnertime?
24     A. Yes.

1      Q. Okay. And it was Joe McGuire, yourself,
2   and Kacper?
3     A. And Tim.
4     Q. Any other discussions at the outing that
5   you had about that incident?
6     A. I mean, I talked with -- Sergio gave me
7   a ride back to the office. I talked with him
8   about it when I left.
9     Q. And who is Sergio?
10     A. I think he's their general
11  superintendent.
12     Q. Okay. He gave you a ride back to the
13  office. Do you know -- do you recall what time
14  that was?
15     A. I didn't finish -- I definitely didn't
16  partake in dinner because of how upset I was. So
17  I want to say it was before 5:00, and we ended up
18  talking at the office for a couple hours about
19  everything that happened.
20     Q. What do you remember -- was there
21  anybody else present?
22     A. No. Just me and Serg.
23     Q. And what do you recall saying to Sergio
24  about the incident?

1      A. I honestly don't remember if I told him
2   anything specific. I just told him -- sorry. So
3   I was supposed to get a ride back, but I didn't.
4   So I was actually -- when I was at the golf
5   outing and they were going through the auctions
6   and stuff like that, I looked up at Serg, and
7   he's, like, do you have a ride back, and I said,
8   no, I don't. And he said, are you okay. I said,
9   no, I'm not. And he's, like, do you need a ride
10  home. And I'm, like, no, I'll be fine.
11      So I stood there, and he stayed
12  within eye -- within -- so that I could still see
13  him, and within five minutes, I looked up at him
14  and I said, I need to go home. And he said, all
15  right, I'm here. He's, like, I'll take you home
16  right now. And within five minutes, he took --
17  we got in his car and he drove me back to the
18  office.
19      MR. SEDAEI: Take a minute if you need
20  to.
21  BY THE WITNESS:
22     A. And I -- honestly I just sat in the car
23  and I think I just fought back tears. And then
24  we got back to the car, and I couldn't find my

1  keys for the car, because the detail shop had it.
2  So we were looking and we spent, like, 45 minutes
3  looking just for the keys trying to figure that
4  out. And then all of a sudden, we noticed a note
5  on the car that said the keys are in the gas
6  tank. We thought that was funny.
7       And then we just started talking
8  about -- he started talking about, you know, how
9  he ended up at JCA and how grateful he was that
10  Steve gave him a chance. If it wasn't for JCA,
11  he wouldn't have a career. He was just -- we
12  just started talking. And he's, like, look,
13  he's, like -- like I said, I don't remember if I
14  told him any details, but he just -- we just
15  talked. And he's, like, just -- I know you're
16  upset. He's, like, don't make any rash
17  decisions. He's, like, promise me you won't
18  quit. And I'm, like, I won't. I'm not going to.
19  BY MR. BOYLE:
20     Q. Okay. Anything else you remember saying
21  to Sergio or Serg or him --
22     A. Sergio.
23     Q. -- or him saying to you?
24     A. I mean, we just talked about stuff

1  that -- you know, he vented about stuff he has to
2  deal with there. And it was just kind of,
3  like -- I don't know, it was just coworkers
4  talking. That's it. He's very con -- he's a --
5  I actually -- a good friend of his was a friend
6  of mine from cross fit. So we had that
7  connection, and he was just being a concerned --
8  I think, concerned dad, I think honestly.
9     Q. Okay. And fair enough. My question was
10  kind of open-ended. But I just want to know
11  about anything you remember saying about the
12  incident with Peter Jacobsen?
13     A. I don't recall giving him any details.
14     Q. Okay. And prior to -- you subsequently
15  sent an email to Jim Schumacher that evening.
16  But before that, did you have any discussions
17  with anybody about the incident that you haven't
18  shared so far?
19     A. Well, as soon as -- I mean, I drove home
20  that night and I cried the entire way home. I
21  got home. My husband wasn't in the house. I
22  realized he was in the garage; and I came into
23  the garage and he looked at me and he's, like,
24  what the fuck happened to you. And I busted out

1  crying, and I told him as best I could what
2  happened. He's, like, you have to say something
3  about that right now. He's, like -- I mean, he's
4  never seen me that way. I don't get upset like
5  this. He's, like, you have to say something
6  about this right now. He's, like, you have to
7  let them know this happened. You can't -- and,
8  I'm, like, well -- I mean, I didn't know how to
9  process everything.
10       So he encouraged me to make sure
11  that I reached out to JCA immediately and tell
12  them what happened and express my concern with
13  the issue and that I was very upset.
14     Q. Anybody other than your husband that you
15  talked to that night before you sent your email
16  to Jim Schumacher?
17     A. I don't recall. That's -- no, not that
18  I know of except that.
19     Q. Okay.
20       (Document marked as Dziubla Deposition
21       Exhibit No. 16 for identification.)
22  BY MR. BOYLE:
23     Q. If you could hand me that back.
24     A. Oh, sorry.

1     Q. So I've just handed you Deposition
2  Exhibit 16. Is this a copy of the email that you
3  sent to Mr. Schumacher that evening?
4     A. Yes.
5     Q. And this is the email, correct?
6     A. Correct.
7     Q. You can hand it back to me.
8     A. Oh.
9       (Document marked as Dziubla Deposition
10       Exhibit No. 17 for identification.)
11       MR. BOYLE: Get this one marked as well,
12  please.
13       (Document marked as Dziubla Deposition
14       Exhibit No. 18 for identification.)
15  BY MR. BOYLE:
16     Q. So I just handed you two emails that you
17  sent to Mr. Schumacher the following day.
18  December -- Deposition Exhibit 17 is an email you
19  sent at 11:58 a.m. on the 19th, and Deposition
20  Exhibit 18 is a follow-up email you sent at
21  12:00 o'clock, so just a couple minutes later.
22  Do you recognize these emails?
23     A. Yes.
24     Q. All right. So looking at Deposition

31 (Pages 118 - 121)

1  Exhibit 17, you stated that you're going to be
2  working from home?
3     A.  Yes.
4     Q.  Okay.  And you let Greg know that you'd
5  be working from home; is that correct?
6     A.  Yes.
7     Q.  So were you performing work in the
8  morning?
9     A.  Yeah.
10    Q.  Okay.  And then it also says that you
11 were -- that you filed an EEOC charge?
12    A.  Yes.
13    Q.  Okay.  Why -- so this is at
14 11:00 o'clock or 11:58 in the morning.  You had
15 already filed an EEOC charge.  Can you tell me
16 why you felt it so important to file a charge
17 right away?
18    A.  Well, first of all, it turned out not to
19 be an EEOC claim, because I had never done that
20 before.  And it was actually a request to be
21 interviewed to complete a claim.
22        Second of all, I have no -- it's not
23 like this is something that I do on a regular
24 basis.  So everything that I knew is that if

1  something like this happens and it happens at
2  work you file a claim right away.  You make sure
3  that -- otherwise, it could be used against you.
4  So what I thought I did was something that I
5  was -- you just had to do right away, because it
6  was very serious.
7        And I knew how I felt and I was very
8  upset about it, and I was, like, this is
9  protocol, because I don't want it to fall back on
10 me that, like, whoa, why did you take two days to
11 file it.  You know, you weren't -- or whatever.
12 I just didn't want it to be used against me.  So
13 I just did what I thought I was supposed to do.
14    Q.  Which was to immediately contact the
15 EEOC?
16    A.  Right.  Because it's employ -- I mean,
17 that's what I thought they did.  I mean,
18 obviously I know different now, but that's what I
19 thought that's what you do.  Something happens at
20 work, which I was at a work event, you file an
21 EEOC claim, if something like that happens.
22    Q.  Even before you've given the company an
23 opportunity to investigate the claim?
24    A.  As -- from anything that I ever absorbed

1  in terms of how to process that, I was just told
2  it needs to be done right away.  That's what I
3  gathered from -- it just needs to be done right
4  away.  I didn't know that there was a period of
5  time I was supposed to give.  I just did it right
6  away.
7     Q.  Did somebody tell you that?
8     A.  I did reach out to a friend of mine, who
9  is a cop, and I told her how I was feeling, and
10 she said that that's where you start.
11    Q.  Okay.  And did you contact the EEOC that
12 morning?
13    A.  I went on their website, and -- that's
14 why, like, I put in all my information and I
15 thought it was filing a claim, and it wasn't; but
16 I went on their website.
17    Q.  And then the next email states, and
18 that's Deposition Exhibit 18, that you're taking
19 PTO for the remainder of the workday.  So you
20 requested PTO.  Did you -- why did you decide to
21 take PTO -- why were you working in the morning
22 and then decided to take PTO in the afternoon?
23    A.  Because I couldn't focus.  And I
24 remember that when I had my concussion I didn't

1  give myself time to process things, and I just
2  felt that I needed -- well, also, too, I believe
3  I was -- because I have clarification on here
4  from what I'm gathering from this, is that I was
5  just clarifying that I decided that I wanted to
6  take the day off, and it wasn't clear in my
7  original email.  Because I'm, like, that's not
8  going to happen in my condition.  So this was me
9  telling them, hey, man, I planned on working from
10 home this morning, but I don't think I'm going to
11 make it throughout the day.  And a couple minutes
12 later, I'm, like, for clarification, I'm taking
13 today off.
14        So it's not like everything is
15 hunky-dory and I was, like, oh, I'm going to take
16 today off because whatever.  I was telling them
17 that morning that I was very upset and that my
18 intention was to work, but I wasn't going to.
19    Q.  Did somebody tell you that you should
20 take PTO for the day rather than working from
21 home?
22    A.  My cop girlfriend said that -- Beata,
23 she said that I should take the time that I need.
24    Q.  Why was that?

32 (Pages 122 - 125)

1    A.  Because I needed -- because I don't
2  know.
3    Q.  Did she tell you why you should request
4  PTO?
5    A.  What did she say?  She said -- or else,
6  like -- something to the extent of or else they
7  won't understand that you're -- what you're going
8  through, something to that extent is what I
9  recall.
10    Q.  So she told you to take PTO, so that
11  people understood how -- that you were going
12  through a lot?
13    A.  Honestly I don't recall what her exact
14  words were.
15    Q.  So were you all -- you were already
16  concerned about how people were going to be
17  interpreting your actions?
18    A.  I was not concerned about that.  I
19  honestly -- I was not concerned about what anyone
20  was thinking.
21    Q.  Okay.  But you filled out a form on the
22  EEOC's website?
23    A.  Right.
24    Q.  At the suggestion of your friend Beata,

1  correct?
2    A.  Well, she said once the -- yeah, she's,
3  like, this is where it starts.  I'm, like, what
4  do I do, and she said, this is where it starts.
5  I said, okay.  So that's what I did.
6    Q.  Okay.  And then you requested PTO, so
7  that nobody could think that you weren't upset
8  about the whole situation?
9    A.  I didn't do it because she told me to do
10  anything.  I did it because I couldn't -- I had
11  intentions of working that day and I realized
12  that I couldn't.  And like I said before, when I
13  had my concussion that I worked through, I didn't
14  give myself the time to heal, and I'm -- actually
15  still have issues from it.  And I was deciding
16  that this was -- I was giving -- entitling
17  myself, empowering myself, to say, you know what,
18  Ro, this is fucked up, you need to take time off.
19  It wasn't, like, oh, my cop friend said to do it,
20  a grown woman.
21    Q.  But she did tell you that, correct?
22    A.  That was her advice.
23    Q.  And you didn't actually request PTO
24  until you had received that advice from Beata?

1    A.  That I don't know.  I don't know what
2  that timeline is.
3      MR. BOYLE:  Can I have this marked as
4  Exhibit 19.
5      (Document marked as Dziubla Deposition
6      Exhibit No. 19 for identification.)
7  BY MR. BOYLE:
8    Q.  So I'm handing you what we've marked as
9  Deposition Exhibit 19.  Is this a copy of the
10  texts -- your texts with Beata that you produced
11  to us in discovery?
12    A.  Yes.
13    Q.  And so on the first page, you see that
14  your text screen starts on Tuesday at 9:00 a.m.?
15    A.  Yeah, it says Tuesday.
16    Q.  Okay.  And so if you flip to page 694,
17  at the top of the page, she advises you, Take PTO
18  today, and there can be an argument that you are
19  okay.  Take PTO today.  There can be an argument
20  that you are okay if you're doing work even from
21  home today.  Do you see that?
22    A.  Yes.
23    Q.  So as of your texting at 9:00 a.m.,
24  Beata is advising you to take PTO today, because

1  there can be an argument that you were okay if
2  you were doing work from home?
3    A.  Okay.
4    Q.  Okay.  And in your email to Jim saying
5  you're going to take PTO, you sent that to him at
6  noon.  Okay.  So you got the advice from Beata at
7  9:00 a.m., Okay, and then at noon, you're telling
8  Jim I'm going to take PTO today; is that correct?
9    A.  That order is correct, yes.
10    Q.  Okay.  You can hand that back to me.
11      Actually I'm going to hand you back
12  dep -- your text with Beata.  Ask you to flip to
13  the second page.  It's No. 691.  She also advised
14  you that morning that you should contact the
15  EEOC, correct?
16    A.  Right.
17    Q.  And then after that, you -- that's what
18  you did, you contacted the EEOC?
19    A.  That's what I told her I was going to
20  do.
21    Q.  Okay.  And then flipping to the next
22  page, 692.
23    A.  Uh-huh.
24    Q.  In the course of that same text exchange

33 (Pages 126 - 129)

1  with Beata, at the bottom of the page, you told
2  her you want out of the industry immediately.
3      A.  Yeah.
4      Q.  Okay.  Hand that back to me.
5          Mark this next exhibit, please.
6          (Document marked as Dziubla Deposition
7          Exhibit No. 20 for identification.)
8  BY MR. BOYLE:
9      Q.  So I'm handing you Deposition
10 Exhibit 20.  That's -- this is Jim Schumacher's
11 response to the email you sent him the prior
12 night at 7:36 p.m.  His response was sent to you
13 at 3:05 in the afternoon the following day.  Do
14 you recall receiving this email from Jim?
15     A.  Yes.
16     Q.  And the first thing he says is that he's
17 very sorry that you had the experience, and he
18 thanks you for bringing it to his attention,
19 correct?
20     A.  Yes.
21     Q.  And he acknowledges your complaint.  And
22 he says that a -- the company does not tolerate
23 harassment and that they will be conducting a
24 full investigation of the concerns raised in your

1  email.  Do you see that?
2      A.  Yes.
3      Q.  Okay.  So you were aware, correct, that
4  the company was planning to fully investigate the
5  incident that occurred at the golf outing?
6      A.  To fully investigate it with the people
7  that work there, yes, I was fully aware of that.
8  They were going to do an internal investigation
9  with everyone that worked at the company.
10     Q.  Okay.
11     A.  Which means whose best interest is going
12 to be represented?  Not mine.
13     Q.  Well, didn't the investigation include
14 people who were at the golf outing?
15     A.  It was conducted by somebody that works
16 for the company.  So whose best interest is being
17 represented during that investigation?  Not mine.
18     Q.  Well, my question just is -- I just want
19 to know if you were aware the company was going
20 to conduct an investigation?
21     A.  Yeah, oh, yeah, I was aware.  They told
22 me, yeah, we're going to conduct an internal
23 investigation.  Mike Powers is going to be
24 handling it.  I thought to myself, well, that's

1  not going to -- not, like -- how is that going to
2  come up with anything that says, you know what,
3  Ro, we're sorry this happened to you.  You know,
4  this is how we're going to help you through this
5  matter.  At that point in time, I knew for a fact
6  the investigation would go their way.
7      Q.  So what that -- and that was your
8  reaction to receiving the email from Jim
9  Schumacher?
10     A.  I didn't believe there was a bit of
11 sincerity in this at all, no.
12     Q.  Okay.  So you were dismissive of the
13 investigation right from the beginning?
14     A.  Yes.
15     Q.  And didn't -- you subsequently received
16 an email shortly thereafter from Mike Power
17 letting you know that he was going to investigate
18 the complaint, correct?
19     A.  I think so, yes.
20         MR. BOYLE:  Let's get it marked.
21         (Document marked as Dziubla Deposition
22         Exhibit No. 21 for identification.)
23 BY MR. BOYLE:
24     Q.  Is this a copy of the E -- Deposition

1  Exhibit 21 that has just been handed to you, is
2  this a copy of the email that you received from
3  Mike?
4      A.  Yes.
5      Q.  Okay.  In the email, he lets you know
6  that he's been asked to investigate the matter
7  that you reported, and that he tried to call your
8  cell, but that you were unavailable and it did
9  not go into voicemail.  Was there something --
10 were you accepting calls on your cell that night?
11     A.  I had no reason not to.
12     Q.  Okay.  In any event, he sent this email
13 at 4:45 in the afternoon on the 19th, correct?
14     A.  Yes.
15     Q.  And he's asking --
16     A.  4:42 actually it says.
17     Q.  You're correct, I'm sorry.  4:42.
18         And he's inviting you to either
19 discuss it over the phone or to conduct an
20 off-site meeting, so that you can go into your
21 complaint.
22     A.  Yes.
23     Q.  Do you recall what your response was to
24 Mike's email?

34 (Pages 130 - 133)

1   A.   We ended up meeting, so I must have
2   agreed.  We ended up meeting off site at Rose
3   Garden in Elk Grove.
4           (Document marked as Dziubla Deposition
5       Exhibit No. 22 for identification.)
6   BY MR. BOYLE:
7   Q.   Handing you Deposition Exhibit 22.  Is
8   this your email response to Mike Power that
9   evening?
10  A.   Oh.  Oh, okay.  I guess we didn't agree
11  at that point in time.
12  Q.   Pardon me?
13  A.   I guess I didn't agree -- I don't know
14  how the meeting at Rose Garden transpired.  I got
15  my timing wrong.  I guess that's my response to
16  him, is this email.
17  Q.   So Mike emails you at 4:45 -- 4:42
18  saying we're going to conduct an investigation,
19  when is a good time to meet; and an hour later,
20  you respond to him by email saying I've reached
21  out to an attorney and you gave the name and the
22  number of the attorney, correct?
23  A.   Right.
24  Q.   That was your response?

1   A.   Yes.  It's right here.
2   Q.   And you also advised him that you're
3   going to need to take another day of PTO the next
4   day?
5   A.   Yes.
6   Q.   Okay.  No response to his invitation to
7   meet with you to discuss your concerns, though?
8   A.   Well, from what I understood, the minute
9   you talk to an attorney, like, you shouldn't talk
10  to the other people.  I mean, that was my
11  understanding.  That's the only reason why I
12  responded that way.
13  Q.   So let's talk about that.  So you've
14  explained why you felt it was the thing to do to
15  contact the EEOC and you've explained why you
16  felt it was the thing to do to, you know, not
17  work from home, but to conduct -- to take PTO.
18  What -- why were you -- why did you contact an
19  attorney so quickly?
20  A.   Again, I thought that was part of the
21  process.  And to be quite frank, just having my
22  experience that I've had with how things have
23  gone at JCA before and how the guys handle
24  things, I didn't feel that my best interest would

1   be represented at all.  And I felt like they were
2   basically gearing up to put themselves in a
3   position where I was going to get let go.  That's
4   just basically what I thought.
5           And if I remember correctly, I
6   believe on Tuesday, at some point in time, all of
7   my -- I was completely severed from the company.
8   My company emails were shut off.  Everything was
9   shut off.  And that to me didn't say, hey, Ro, we
10  really empathize with what happened to you.  It
11  said to me, oh, shit, we better cover our asses.
12  Q.   Well, let's -- just to keep the timeline
13  straight.  The golf outing was on a Monday,
14  correct?
15  A.   Right.
16  Q.   And these exchanges that we're talking
17  about right now were the next day, which is
18  Tuesday, right?
19  A.   Right.
20  Q.   And on Wednesday, you had your meeting
21  with Mike Power at the Rose Garden, correct, in
22  the morning?
23  A.   I believe so, that's how it rolled out.
24  Q.   Right.  And on Wednesday afternoon, your

1   email access was terminated?
2   A.   Was it?  Is that the timeline?
3   Q.   That's the timeline.  So it wasn't
4   Tuesday.  So when I -- so we're focused here on
5   Tuesday, and I'm trying to understand your
6   thinking of contacting the EEOC, claiming PTO,
7   contacting a lawyer, and basically wanting the
8   company to deal with your lawyer on Tuesday.
9   What made you think that, you know, that was the
10  way that you were supposed to respond to having
11  filed a complaint?
12  A.   I -- that's -- I don't know.  That's
13  what I thought you needed to do.  That's what I
14  was, like -- I mean, I've never done -- nothing
15  like this has ever happened in my entire career.
16  I've worked in the construction industry for
17  20 years have.  I've dealt with lewd comments.
18  I've dealt with all kinds of sexism in the
19  industry.  And I never in my life had something
20  like that directed towards me personally like
21  that.
22          I didn't know what to do.  I was --
23  that's what -- I looked up -- this was the first
24  guy that popped up, was Ross Peters.

Q. Did you ever make any prior -- prior to
this incident, had you ever made any prior
complaints to JCA about any sort of harassment or
discrimination?

A. Not to my recollection, no.

Q. Okay. Have you ever made a complaint to
any other prior employer about any harassment or
anything you were subjected to while working for
them?

A. No.

Q. Okay. So this is the first complaint
that you've ever brought?

A. Yes.

Q. Okay. So you did testify that the
company commenced its investigation, correct?

A. Yes.

Q. You met with Mike Powers to discuss the
incident the following morning, correct?

A. On Wednesday?

Q. Yes.

A. Yes.

Q. All right. Tell me what you remember
about your meeting with Mike?

A. We were at a diner and sitting across

from each other, and he was taking notes of
everything that I was telling him about what
happened at the incident. He asked me if I would
be able to go to walk-throughs, at least, and I
told him that I didn't think it would come off as
a positive thing if I went to the walk-throughs,
because I was very upset.

And I knew that if I went to the
walk-through and I saw some of, you know, the
subs that I was close with, if they had asked me
if something was wrong, just like today, I
probably would have lost it. And then they would
have been, like, what's going on, and I wouldn't
be able to tell them, because that wouldn't have
been professional.

So I said, no, probably not. I
won't -- at this time I'm too upset to go to
walk-throughs. I don't think I would put JCA in
a good light being so upset. And I wanted
obviously not to create a poor image of the
company showing up there upset and crying.

Q. Do you recall anything else that you
guys discussed during this meeting?

A. Yeah, I took the opportunity with the

one-on-one with Mike, I actually thought that we
had somewhat of a decent professional
relationship in terms of, you know, if I needed
something for the office or whatever, I knew I
could count on Powers to -- you know, like, I was
out of the office a lot, but I needed to print
emails. So I'm, like, hey, man, get me a remote
printer, so he did. He seemed very supportive.
And I took the opportunity to share with him some
things that happened in our department that if he
was going to address them with the higher-ups,
with Mike and Steve, these are some things that
could possibly, you know, be an issue.

And it -- you know, Tim Lee, he was
Asian. They used to call him Tim Ree all the
time and joke around. And he's, like, it doesn't
bother me, but, you know, it kind of sucks that
they make racist comments in my presence.

And I just shared -- that's one of
the comments I remember sharing with Powers. I
shared with him just a bunch of stuff that Greg
and I talked about. And I'm just, like, you
know, these things need to get addressed, man.
You need it -- you know, I just took it as a

one-on-one because we were there.

And he's, like, let's talk about
what's going on. I thought there might be some
kind of resolution. I didn't think I was going
to get terminated.

Q. And anything else that you remember that
you guys discussed?

A. Just the regular stuff I think that I
talked to Greg about, you know, just policies and
procedures and stuff that, you know -- Greg's
really -- I'm sure I mentioned Greg was
frustrated, and, you know, he should take some of
the stuff. He's getting an inside source. You
know, he should take some of the stuff to the
guys to improve the company.

Q. Do you remember having any conversation
with a coworker by the name of David Gross?

A. Yeah, vaguely.

Q. What do you remember?

A. I don't know specifically honestly what
I talked to Powers about. But, I mean, Dave
was -- you know, he's an older guy that's been
with the company for a while, and they used to
watch some show, I forget, was it about cheaters,

36 (Pages 138 - 141)

1  I think it was Cheaters. They would watch in the
2  lunchroom. And the guys would all sit there and
3  cackle and stuff, and, you know, then they would
4  make their comments. And I -- you know, a lot of
5  African-Americans on the show. So you have Steve
6  Boulukos sitting there laughing at the TV calling
7  them orangutans. Then you got, you know, Dave
8  making his comments and stuff. It was hard to
9  swallow being in that room, you know, so I got up
10  and left. I -- often times when that show was
11  on, I wouldn't eat in the lunchroom, because I
12  had to be around that.
13       And Dave was commenting about my
14  tattoos and stuff. And I was, like, honestly,
15  dude, Bill Burfeind said I should embrace it.
16  You know, I specifically -- I mean, that's
17  another thing, too. I'm, like, here you have
18  Bill Burfeind, who's VP of development, sitting
19  down and had a heart-to-heart talk with me and
20  said, look, I appreciate artwork. He's, like,
21  you express yourself. He's, like, we're not
22  wound that tight where you can't do that. And I
23  said, you know what, I'm not going to do it on
24  the job sites. I never once went to a meeting or

1  anything and let any of my tattoos show at JCA or
2  any other company. And Bill literally had -- he
3  showed me all this artwork that he had by this
4  artist he employed that he commissioned that had
5  all this beautiful artwork, and they did it for
6  him and when he had his family and stuff. And he
7  was so supportive.
8       And here I have Dave telling me,
9  like, why would you do that to your body. That's
10  permanent. And I'm, like, what's it to you, man.
11  Q.  Why were you so -- did your conversation
12  about tattoos with Bill Burfeind -- how do you
13  pronounce it?
14  A.  Burfeind.
15  Q.  Burfeind. Did that occur after Gross
16  had commented on your tattoos?
17  A.  I don't -- Gross was always making
18  comments on it. Bill Burfeind, honestly I was
19  there probably two weeks, and he had come into
20  the office to see how I was doing on a bid. And
21  my sleeve was poking out and I really quick
22  pulled my sleeve down, and he said, ho-ho, wait a
23  second, he's, like, what are you doing.
24  Q.  Okay.

1  A.  And then I told him about it. It was
2  two weeks after working there. And that's
3  another thing that solidified, hey, like, maybe
4  this place is going to be okay, because this guy
5  is cool. This guy is, like, hey, you know,
6  you're an individual. I appreciate that.
7  Q.  But -- okay. So fast forward to your
8  meeting with Mike. You shared with him that you
9  didn't appreciate Dave Gross commenting on your
10  tattoos, is that --
11  A.  I didn't. I mean, there's a lot of
12  stuff and I --
13  Q.  Is that correct?
14  A.  Correct, maybe, yeah.
15  Q.  All right. And what you just told me
16  about, people making inappropriate and racist
17  comments in the lunchroom, is this the first time
18  you brought that to Mike Power's attention?
19  A.  He was in there. He was in the
20  lunchroom when that stuff was happening. You can
21  hear it all through the office.
22  Q.  So what -- why were you tell -- what was
23  the point of telling him about this in this
24  meeting that you're having to discuss what

1  occurred at the golf outing?
2  A.  Just to reiterate to him that it bothers
3  other employees, that there -- maybe they're not
4  saying anything, but, guess what, they're
5  expressing that they're upset.
6  Q.  Okay. So you were complaining about
7  that -- those issues that you had observed?
8  A.  I was informing him.
9  Q.  Okay. So you weren't -- you were just
10  informing him?
11  A.  I was informing him, yes.
12  Q.  Okay, okay. Did you also have some
13  discussion with Mike at this meeting about this
14  employee Seth Ehrlich?
15  A.  I believe so. Probably. I don't
16  remember exactly what I said about Seth.
17  Q.  Did you tell Mike that you thought Seth
18  Ehrlich was out to get you?
19  A.  I felt like he was definitely and this
20  isn't just under speculation. I received several
21  people telling me in the office that were with
22  Seth as he tried to persuade Yazbec that I was
23  not a suitable estimator.
24       Like, Tim Lee. Tim Lee was, like,

1  dude -- we were at the Sox game, and he's, like,
2  this guy is -- he is hard trying to get you
3  fired. And I'm, like, well, that sucks.
4      Q. Okay. And you shared your feelings on
5  that with Mike at this meeting?
6      A. Yeah.
7      Q. And --
8      A. Well, yeah. I mean, I was just letting
9  everything out. I was just trying to find some
10  kind of resolution.
11      Q. Did you also talk about an employee by
12  the name of John Angelovicz, Angelovicz?
13      A. Angelovicz.
14      Q. Angelovicz.
15      A. Not that I recall.
16      Q. Do you remember having a conversation
17  with Mike at the meeting about how he speaks
18  negatively about you and that you no longer deal
19  with him?
20      A. He's just con -- he -- when John was in
21  a mood, he could be a real jerk. And he talked
22  down to all of us. And, you know, Tim dealt with
23  it. But, again, you know, we're coworkers. So
24  Tim would be, like, man, why does he got to be

1  such an asshole, and I'm, like, that's John.
2  Like, if John wanted to put you in his place, he
3  did, and he made sure you felt little.
4      Q. And you were sharing your feelings about
5  this with Mike at the meeting on the 20th?
6      A. I was sharing with him this information,
7  yes.
8      Q. Okay. Did you tell Mike that you felt
9  like the environment at JCA was toxic?
10      A. I don't know if that was my exact words.
11  I don't know that I used the word toxic.
12      Q. Okay. Do you believe the environment at
13  JCA was toxic?
14      A. Today, no.
15      Q. Okay. Did you believe it at that time?
16      A. I was very upset. It was three days
17  after the incident. I was very upset.
18      Q. Okay. So it's possible you told Mike
19  that you felt that the environment was toxic?
20      A. It's possible.
21      Q. Okay. Do you remember telling Mike that
22  you should never have taken the job at JCA?
23      A. Again, I was very upset. And the thing
24  is is that, because when you're in the industry

1  for so long, I expressed to a couple of people
2  before I started there, and I was, like, hey,
3  check this out, I got a job at JCA. And they're,
4  like, oooh, no, you don't want to work there.
5  That's a boy -- it's an old boys' club. And I
6  was like, no, no, I don't think so. I mean, they
7  told me about -- I mean, Yazbec and Steve really
8  sold me on the company, about how they wanted to
9  transform and all that stuff and the way Greg was
10  talking. I was, like, no, you guys got it wrong.
11  They're, like, well, do what you want to do.
12      Q. And did you tell Mike that you didn't
13  want to come into work because you were concerned
14  of what other people were going to say?
15      A. Yeah, I didn't want to have to deal with
16  all the questions. Like, where were you, what
17  happened, why are you so upset. I mean, I just
18  didn't want to deal with the questions, because I
19  wouldn't be able to keep myself -- I knew I
20  wouldn't be able to keep myself together. I was
21  upset.
22      Q. And when you say where were you, you
23  mean, you know, that day and the prior day?
24      A. Yeah, why wasn't I in the office.

1      Q. Okay.
2          Okay. Let's take a break.
3          THE VIDEOGRAPHER: We are going off the
4  record at 1:22 p.m. This is the end of media
5  set 2.
6          (A short recess was taken.)
7          THE VIDEOGRAPHER: We are back on the
8  record at 1:38 p.m. This is media set 3.
9  BY MR. BOYLE:
10      Q. So, Ms. Dziubla, when we left off, we
11  were talking about the meeting that you and
12  Mr. Power had on the 20th to discuss your
13  complaint and your other concerns about the
14  company. Is there anything that you recall being
15  said during that meeting that we haven't
16  discussed?
17      A. No.
18      Q. Okay. At the end of the meeting, was
19  there a discussion between you and Mr. Power
20  about you are not feeling like you were ready to
21  come back and authorizing you for PTO through the
22  end of the week?
23      A. I don't know if that was done at the
24  meeting or in an email. I don't recall if it was

1  done at the meeting or through an email where I
2  asked for it.
3    Q.  Okay.  But you did not return to work on
4  the 21st or the 22nd, correct?
5    A.  Correct.
6    Q.  Okay.  And is it your understanding that
7  Mike Power had approved your use of PTO to cover
8  those days?
9    A.  I -- he -- we -- I believe he knew I
10  wasn't coming in. I don't know if my PTO was
11  approved or not. I guess it's approved, yeah, he
12  knew I wasn't coming in, so he was acknowledging
13  that.
14    Q.  Okay.  So you believe that you and Mike
15  understood that you wouldn't be -- would not be
16  working on the 21st and the 22nd and that you
17  would be using PTO?
18    A.  As a result of that meeting, I'm not
19  sure.
20    Q.  Okay.
21    A.  Sorry.
22      MR. BOYLE:  Have this marked.
23      (Document marked as Dziubla Deposition
24      Exhibit No. 23 for identification.)

1  BY MR. BOYLE:
2    Q.  Handing you what we've marked as
3  Deposition Exhibit 23, this is an email you sent
4  to Mike on the following Monday at 1:30 in the
5  afternoon, the date of September 25th.  Do you
6  remember sending this email to Mike?
7    A.  Yes.
8    Q.  Okay.  Is -- do you recall any
9  communication either by email, text, telephone or
10  otherwise between when you met with Mike on the
11  20th and your sending him this email on the 25th?
12    A.  I don't recall, no.
13    Q.  Okay.
14    A.  I mean --
15    Q.  And in this email, you're telling him
16  that you're -- you continue to be emotionally,
17  mentally, and physically upset, and that you're
18  seeing a therapist and that you want to discuss
19  your options, correct?
20    A.  Yes.
21    Q.  What did you mean by discuss your
22  options?
23    A.  Well, like, what was going to happen to
24  me.  Am I going to be on PTO, like, what was

1  going -- if I wanted to take time to continue to
2  have -- to sort this out to get to a grounds
3  where I felt comfortable. I mean, I don't know.
4      It might not seem like much to you
5  guys, but my life literally fell apart when all
6  that happened. I mean, I slept on the couch for
7  weeks. I literally -- I mean, I was in the best
8  shape of my life when this happened, and
9  everything just went to shit in, like, two weeks.
10  And I was, like, what is going to -- like, how am
11  I going to get past this. I was asking him for
12  help.
13    Q.  And did you have specific options in
14  mind that you wanted to discuss?
15    A.  I didn't know what they were. I was
16  asking -- he's the HR guy. You know, Mike, what
17  happens. What's the next -- what's going on.
18  And the entire time I always felt like I was
19  being put on the defensive. I never felt like
20  they were ever looking out for my interest.
21    Q.  I understand, but I'm just asking if you
22  had any particular options at that point in time
23  that you were looking for?
24    A.  On -- like, as of the specific day, no,

1  I didn't know -- I didn't have anything to
2  suggest.
3      (Document marked as Dziubla Deposition
4      Exhibit No. 24 for identification.)
5  BY MR. BOYLE:
6    Q.  So handing you another email which we've
7  marked as Deposition Exhibit 24, this is
8  Mike Power's response to your email on Monday,
9  the 25th, at 4:28 p.m.  Do you recall receiving
10  this email from Mike?
11    A.  Yes.
12    Q.  Okay.  And Mike tells you that he was or
13  they were expecting that you would have showed up
14  for work on Monday; is that correct?
15    A.  That's what it says, yes.
16    Q.  Okay.  And that on the 20th he approved
17  your PTO time through the end of the week; is
18  that correct?
19    A.  Yes.
20    Q.  And is it accurate as he states in the
21  email that they hadn't heard from you at all
22  since that time?
23    A.  I don't recall.
24    Q.  Okay.  And he indicates to you that he

1  would like you to come in, so that they can
2  discuss the investigation that they had
3  conducted, correct?
4      A.  Yes.
5      Q.  Okay.  You can hand that back to me.
6          And following your receipt of this
7  email, did you then have a meeting with the
8  company on the following day?
9      A.  Yes, I came into their office.
10     Q.  Okay.  Do you remember what time
11 approximately the meeting took place?
12     A.  No.
13     Q.  Okay.  Who was present at the meeting?
14     A.  Mike Yazbec and Powers.
15     Q.  And where did the meeting take place?
16     A.  The conference room, the large
17 conference room.
18     Q.  Okay.
19     A.  Where I had my interview.
20     Q.  What do you remember being said during
21 the meeting?
22     A.  I remember Powers saying that they
23 concluded their investigation and that basically
24 that they didn't feel like anything wrong

1  happened.  And I expressed to them that I was
2  very upset and I wanted to know what my options
3  were to go and somehow cope with what was going
4  on.
5          And Powers just kind of sat there
6  with this blank look on his face.  And I was,
7  like, I don't know.  And I'm, like, you know,
8  I've been reading up.  Is it FMLA, what is it,
9  what do I do so that I can make time for myself
10 to see a therapist and to work through this and
11 being in the environment that I was in.  And he
12 just kind of shrugged his shoulders.  He's, like,
13 well, you got a copy of the employee manual,
14 didn't you?  And I'm, like, I didn't read it.
15 It's still under my desk I told him.  Like, I
16 didn't even have it in my possession when we had
17 that meeting.  It was under my desk.
18         And literally, I'll tell you this,
19 two or three weeks after starting there, I was
20 going through it kind of, like, just trying to
21 overview it; and I had the binder open and I went
22 to flip it and all the pages came out.  And I
23 was, like, screw that, and I just closed it and
24 stuck it back in the box.  Like, I didn't even

1  put the thing back together.
2          So I was, like, I don't even know
3  what's in there.  And I was sincerely asking him
4  for guidance, because I'm, like, you're the HR
5  person, what happens, what are the next steps.
6          And I forget why, but he -- Powers
7  left, and it was just me and Yazbec.  And Yazbec
8  made some comment, like, I have daughters, too.
9  And I knew that I couldn't -- I knew that I'm
10 not -- I wasn't about to say anything, because
11 whatever I said, I mean, Yazbec could just say I
12 said something else.  And I just sat there and
13 cried and I didn't say anything to him.
14         I think Mike went to go get the book
15 from under my desk, and then he came back.  And
16 all I remember is -- I don't know where the
17 conversation -- I don't know.  They just told me
18 their conclusion.  It was just kind of, like, I
19 was asking for help, and they were just, like,
20 didn't really do anything.
21         And Yazbec started to say something,
22 and Mike kind of shot him a look and just went
23 like this, and Yazbec was, like, okay.
24         And then I think it was -- the

1  decision was is that I would come up to -- I
2  would let them know how I wanted to proceed when
3  I left, that it was still open, and that I would
4  have to look at the options on my own, because I
5  wasn't going to get any help from them.  And that
6  I would let them know.
7          And at some point in time after
8  that, I told them basically that, like, I needed
9  a job and I'll figure it out.  I needed to figure
10 shit out.  I needed to get a paycheck.  So I was,
11 like, fine, if this means me driving an hour to
12 go get therapy and it sucks up my whole evening
13 outside of my work, I'm going to have to do it.
14 So I'm, like, I'm coming in.
15         And no sooner did I send that email,
16 got a phone call, I'm, like, all right, what's
17 the -- oh, look at that.  You guys want to
18 present me with a severance package.  Why am I in
19 this position.
20     Q.  Well, let's -- you know, we're going to
21 stick right now ti the meeting that's taking
22 place on the 26th, and I have a few questions to
23 follow up.
24         So, first of all, there was a

40 (Pages 154 - 157)

1  discussion about FMLA?
2      A.  The discussion was basically Powers told
3  me that FMLA was unpaid.  And I said, well, how
4  do I do that, what do I do with the forms.  And
5  he's, like, it's in the employee manual, and he
6  just basically threw his hands up, like, figure
7  it out yourself.  And I was, like, okay, is that
8  my only option.  What else -- like, what else
9  happened, like, what else can I do.  And I just
10  didn't get anything from them.
11      Q.  And you felt that it was the company's
12  responsibility to provide you with those options;
13  is that fair to say?
14      A.  I felt like the relationship I had with
15  the company and having had a good review the year
16  prior and everything, I thought we had a
17  relationship where they would help me to some
18  extent and have some kind of empathy for the
19  situation.  And if I asked them, hey, how do you
20  do this and you have some idea of it, to share
21  with it.  Instead it was just, like, figure it
22  out, look it up, Google it.
23      Q.  Were there any employee benefits that
24  the company offered that you felt were being

1  denied to you?
2      A.  So that's the other thing, too.  The way
3  things kind of roll at JCA is that --
4      Q.  Let me just -- let's try to so we can
5  get through this --
6      A.  Well, it's in regards to the benefits.
7      Q.  Let me just get the question out.
8      A.  Okay.
9      Q.  I just want to know if there are any
10  employee benefits that you felt were being denied
11  to you; and, if so, what benefits are you
12  referring to?
13      A.  As far as documented employee benefits,
14  no, I didn't feel like that was being denied.
15      Q.  Okay.  And FMLA was presented as an
16  option, but that's unpaid leave, as you said,
17  correct?  So that wasn't going to -- are you
18  saying that that wasn't going to be acceptable to
19  you?
20      A.  FMLA was not acceptable to me.  I'm the
21  one that came up with it.  I was not given any
22  kind of -- like, it's not, like, Mike, like, oh,
23  we're concerned, here's an option for you.  I had
24  to ask and say what is this, and then he kind of

1  described it to me.
2      Q.  Okay.  You mentioned that Mike Yazbec
3  made a comment when Mike Power stepped out about
4  his having two daughters.
5      A.  Yes.
6      Q.  How did you -- what did you interpret
7  from that comment?  Why was he bringing that up?
8      A.  I guess he was just trying to -- maybe
9  that was his way of expressing that he's
10  concerned.
11      Q.  Is that how you took it?
12      A.  I thought -- how I took it was that he
13  thought that was the right thing to say.  I
14  didn't feel it was genuine.
15      Q.  Why not?
16      A.  Because they wouldn't have handled
17  things the way they did if they -- if it was
18  genuine.
19      Q.  Any other reason?
20      A.  No.
21      Q.  Was there discussion about the concerns
22  that you've raised that you were not in a
23  position to go through walk-throughs and
24  represent JCA in the manner that an employee

1  should represent JCA during a walk-through?
2      A.  During that meeting?
3      Q.  Correct.
4      A.  I don't recall that.
5      Q.  Do you recall Mike Yazbec and Mike Power
6  telling you that they were concerned about the
7  comments you had made about the prior meeting about
8  how you couldn't represent the company
9  positively?
10      A.  I recall Mike saying that when I met
11  with him that I wouldn't be able -- claiming that
12  I said I wouldn't be able to represent the
13  company, and I tried to reiterate to them that I
14  never said I wouldn't talk positively of the
15  company.  I merely said that because I was upset
16  that my actions would be interpreted poorly and
17  reflect poorly on the company, and I didn't want
18  to do that.  And I kept trying to correct him.
19  But what he wrote down in his notes was something
20  that would benefit their position.
21      Q.  What he wrote down in his notes is that
22  you said that you would be unable to represent
23  the company positively?
24      A.  Right, but that's not what I said.

41 (Pages 158 - 161)

1    That's just what he wrote down in his notes.

2    Q.  Was there a discussion about their

3  needing to know that you would be able to provide

4  your best efforts in all aspects of your job in

5  order to continue?

6    A.  Yeah.  They're, like, when are you going

7  to come back to work, and clearly I was very

8  upset.  And I was, like, when do I get time to

9  deal with this?  It's been one shot after the

10  other after it happened.  I never had an

11  opportunity to deal with it.  I still honestly

12  haven't had an opportunity to deal with it.

13  Because I --

14    Q.  Because why?

15    A.  Because this is going on.  Every time

16  something about the case comes up, my -- I mean,

17  everything just goes into a tailspin.

18        I don't feel like this should have

19  been the outcome.  You shouldn't lose your job

20  for standing up for yourself.

21    Q.  When the discussion was around whether

22  or not you were going to be or able to return to

23  work, what did you say?  What was your response?

24    A.  I don't recall.  Like I said, when I

1  left, the -- I believe the agreement was that I

2  was going to let them know.  I don't know that I

3  gave them a concrete response when I was there in

4  person.

5    Q.  Did you ever -- do you recall telling

6  Mike Power or Mike Yazbec that the only way you'd

7  be able to come back to work is if Jim Schumacher

8  was never allowed to speak to you?

9    A.  I think I said that, and they said it

10  was unreasonable.

11    Q.  And were they correct?

12    A.  I was upset.

13    Q.  Anything else you recall being said at

14  the meeting?

15    A.  No.

16      MR. BOYLE:  Can I get this marked,

17  please.

18      (Document marked as Dziubla Deposition

19      Exhibit No. 25 for identification.)

20  BY MR. BOYLE:

21    Q.  We're handing you what we've marked as

22  Deposition Exhibit 25, which is an email that you

23  sent to Mike Power following the meeting on the

24  26th.  Do you recall sending this email?

1    A.  Yes.

2    Q.  And at the last sentence of the email,

3  you indicate that you can save the company the

4  trouble of the FMLA paperwork, and you will

5  report to work tomorrow as usual, correct?

6    A.  Correct.

7    Q.  Hand that back to me.

8        Do you recall what happened next

9  after you sent this email?

10    A.  Yeah.  Like I said, they -- I got a

11  phone call.

12    Q.  Okay.  And who was the call with?

13    A.  The people disclosed to me were Powers

14  and Yazbec.

15    Q.  Okay.

16    A.  No idea if somebody else was in the room

17  with them.

18    Q.  Okay.  And what was -- what do you

19  recall being discussed during that phone call?

20    A.  Basically if I would consider a

21  severance package.  I don't -- I mean, there's a

22  lot of -- I think a lot of other stuff that was

23  talked about.  But basically if I would consider

24  a severance package.  They were prepared to offer

1  me four weeks, and I, again, asked them why is it

2  coming to this.  I didn't understand why this was

3  the next step after our meeting was a severance

4  package.  The minute I say I'm coming back to

5  work why is the next step, hey, do you want to

6  sign this, so that you don't have a job anymore

7  when I specifically said I was going to come back

8  to work.

9        And basically we agreed that they

10  would send something over for me to consider.

11    Q.  Okay.  And didn't -- isn't it true that

12  during the call that Mike Yazbec said that based

13  on the email you had just sent it did not appear

14  that you were at all happy to be coming back to

15  work?

16    A.  Can you say that again?

17    Q.  Yeah.  Didn't Mike Yazbec say that it

18  appeared to them from your email that you did not

19  want to come back to work, and that you were only

20  coming back because you needed a paycheck?

21    A.  I don't recall that.

22    Q.  Okay.  Did he tell you that it did not

23  appear that you were happy to be coming back to

24  work?

1    A.   It appeared I was very unhappy.  It had
2  nothing to do with me coming back to work.
3    Q.   You don't recall Mike Yazbec saying it
4  doesn't appear to us that you want to come back
5  here?
6    A.   No, I don't.
7    Q.   Okay.
8    A.   I'm sorry.
9    Q.   And -- but it's during that call that
10  you were offered the option to -- a severance
11  package, correct?
12    A.   I was offered the option to review one,
13  yes.
14    Q.   Okay.  And the amount of time was four
15  weeks, correct?
16    A.   Correct.
17    Q.   And you agreed that you would take some
18  time to think about that?
19    A.   I said I would review it when it came
20  over.
21        (Document marked as Dziubla Deposition
22         Exhibit No. 26 for identification.)
23  BY MR. BOYLE:
24    Q.   Handing you Deposition Exhibit 26, which

1  is an email that you sent to Mike Power later in
2  the day on the 26th.  Do you recall sending this
3  email?
4    A.   Yes.
5    Q.   So you start off the email by saying a
6  compromise is being set up for -- is not
7  settling -- setting me up for failure, correct?
8    A.   Uh-huh.
9    Q.   What did you mean by that?
10    A.   Honestly I don't know.
11    Q.   But as the email goes on, you indicate
12  that compromise is six months, which would give
13  you the opportunity to conduct a proper job
14  search.  Do you see that?
15    A.   Yes.
16    Q.   Okay.  So you were willing to accept six
17  months' severance pay, correct?
18    A.   Yeah.  I mean, I was trying to figure
19  out what was going on.
20    Q.   Okay.
21    A.   And either way, I was out of a job.
22    Q.   What makes you say that?
23    A.   Because they wouldn't let me -- I
24  specifically said I wanted to come back to work,

1  and they didn't want me to -- like, they wanted
2  to negotiate this instead.  I specifically said I
3  wanted to come back in, and their whole goal was
4  to negotiate a severance package with me.
5    Q.   And when you say you specifically said
6  you wanted to come back, you're referring to your
7  email that you sent them on the 26th?
8    A.   Where I said I'll come -- report to work
9  as usual, yes.
10    Q.   Do you recall having a call later in the
11  day on the 27th -- I'm sorry, it was actually the
12  next day, on the 27th, to discuss your
13  counterproposal of six months?
14    A.   I don't remember that phone call.
15    Q.   Okay.  Do you recall having a discussion
16  with -- at any time with Mike Yazbec and
17  Mike Power where they told you that due to your
18  short tenure with the company the most they could
19  offer was six weeks?
20    A.   Yes.
21    Q.   Okay.  And what was your response to
22  that?
23    A.   I think it was before I got any of the
24  paperwork.  I'm not sure.  So I was just, like,

1  okay, well, send it over, and I will review it
2  with you.  Like, they wanted me to commit to
3  something on the phone, and I was, like, fine,
4  I'll review whatever you want.
5        (Document marked as Dziubla Deposition
6         Exhibit No. 27 for identification.)
7  BY MR. BOYLE:
8    Q.   So handing you Deposition Exhibit 27,
9  which is an email exchange between you and
10  Mike Power on September 27th, it starts out --
11  well, first of all, do you recall sending this
12  email to Mike Power?
13    A.   Yes.
14    Q.   Okay.  And it starts out by your
15  responding to something that Mike had said to you
16  about whether or not FMLA is paid time.  And your
17  statement in the email is, of course, he would
18  say that now.  That's why he puts nothing in
19  writing.  Silly me for trusting his word like he
20  said.
21    A.   Uh-huh.
22    Q.   Okay.  What did he say; what did Steve
23  tell you?
24    A.   So earlier that year, I had told Greg

43 (Pages 166 - 169)

1   that -- sorry.
2        So earlier that year, I had told
3   Greg that I needed to talk to him about having a
4   hysterectomy, because of my health issues. And I
5   said I need to figure something out, because I
6   don't know that I can go 12 -- obviously I don't
7   have 12 weeks of vacation. I'm, like, what do I
8   do. And Greg was, like, look, he's, like, we'll
9   talk to Steve. Steve has worked with -- you
10  know, like, McGuire had something with his ACL or
11  something and one of the other guys. He's, like,
12  trust me, we'll talk to Steve. We'll see how
13  things go.
14       So I got a meeting with Steve. And
15  Steve was very, very empathetic about it. And
16  he's, like, I understand this is tough for you.
17  He's, like, whatever you need to do, whatever
18  time, you know, he's, like, we will make it work
19  for you. We will make it work for you.
20  Everything will work out. Don't worry about no
21  pay. He's, like, we will make it work for you.
22  You do what you need to do to be healthy, and
23  we'll make it work for you.
24       And I was, like, that's awesome.

1   Thanks. And I literally was going to schedule my
2   hysterectomy in December, and I couldn't because
3   I got fired. So -- and I'm still struggling with
4   the issues I have, because I haven't had a good
5   chance to really deal with that aspect of my
6   life.
7        So that's what I'm referring to. Is
8   that for any other reason, Steve would have, you
9   know, backed me and supported me, but not for
10  this reason. This reason I lose my job.
11       Q.  Okay. Well, do you know if the
12  company's benefit programs would provide you with
13  some sort of short-term disability or -- in the
14  event of a medical situation that, you know,
15  required you to be away from work?
16       A.  Our meeting with Steve was a, like,
17  under-the-table meeting. Those guys that got
18  what they got, that's not part of company policy.
19       Q.  How do you know?
20       A.  That's what Greg told me.
21       Q.  Okay. And --
22       A.  They don't get the -- and their --
23  that's what Greg told me. And it was made very
24  clear that he was helping me out. It was a favor

1   that he was doing for me, because he empathized
2   with what I was going through.
3        Q.  But you -- when -- and you say those
4   guys, you're talking --
5        A.  Steve.
6        Q.  Who are you talking about?
7        A.  Steve. Steve specifically -- this was
8   an under-the-table thing. This was, like, we're
9   going to help you out. We care about your
10  health. We're going to help you out and just,
11  you know, you don't obviously tell any of the
12  other employees that we're creating a condition
13  for you for that, so that you can take care of
14  this for yourself personally. You know, don't
15  tell the other employees.
16       Q.  And when did you have this discussion
17  with Steve?
18       A.  I don't recall the timing, but it was
19  earlier that year.
20       Q.  Okay, okay. And when you -- you
21  referred to other guys that they've -- I think
22  you said something about Joe and did somebody
23  else have some sort of an AC -- you were talking
24  about an ACL and --

1   A.  I know it was McGuire. And then I think
2   shortly before I left, I think his name is Matt
3   Kantro, I think he ended up going out for
4   another -- something that wasn't work related.
5   But, you know, obviously the guys are, like, oh,
6   work from home, do whatever you need to get back
7   on your feet, don't worry about it, if you need
8   extra time. And that's the same thing Steve said
9   he was going to do for me when I told him about
10  my hysterectomy.
11       Q.  And what -- this Matt Cantrel that you
12  said was --
13       A.  Kantro, K-a-n-t-r-o.
14       Q.  And what was the nature of his
15  condition?
16       A.  Oh, I don't recall for him. I don't
17  know.
18       Q.  Okay.
19       A.  But it -- yeah, it wasn't work related.
20       Q.  Okay. So this is the email, though,
21  that you spent -- sent him in response to the
22  company telling you that what they could do is
23  increase the severance pay from four weeks to
24  six weeks, correct?

44 (Pages 170 - 173)

1     A.   I don't know that that's the case.
2     Q.   What --
3     A.   What was your question again?
4     Q.   So you had the meeting on the phone call
5  with Mike and -- Yazbec and Power, and they told
6  you because of your years of service, they could
7  increase the severance to six weeks, but -- and
8  then you sent this email in response to that,
9  correct, or shortly after that?
10    A.   I don't -- that's the thing, I don't
11 know that this email is in response to that phone
12 conversation.
13    Q.   Okay.  But you subsequently had another
14 call with those two where they said that six
15 weeks is the most we're going to be able to --
16    A.   Yes.
17    Q.   -- to offer?
18         Okay.  And do you recall Mike Yazbec
19 saying if six weeks isn't acceptable to you, then
20 you are able to come back to work, you'd be free
21 to come back to work?
22    A.   I don't recall that.
23    Q.   Do you recall during that call you
24 telling them that you would accept the six weeks

1  and that go ahead and draft the agreement?
2     A.   I recall telling them to send the
3  agreement.  I don't recall agreeing to it.  I
4  said to send the agreement.  I wanted to see
5  what -- I mean, what were they going to send
6  over, what was going to be in there.  I agreed to
7  the six weeks maybe.  And I was, like, fine,
8  draft it with the six weeks.  I wasn't going to
9  agree to anything on the phone, and if you note,
10 I mean -- never mind.
11    Q.   And isn't it true that you -- I mean,
12 you agreed to the six weeks in the same call
13 where Mike said, look, if the six weeks is not
14 acceptable to you, you can come back to work?
15    A.   Like I said, I don't recall him saying
16 that other half.
17    Q.   Well, in any event, you subsequently
18 changed your mind, correct?  And six weeks was no
19 longer acceptable to you, correct?
20    A.   Based on what was in that agreement, I
21 didn't understand why Jacobsen was represented in
22 it.  I didn't understand -- I still didn't
23 understand why it was coming down to that
24 resolution, but I thought to myself either, A, I

1  accept this separation agreement and not have a
2  job or, B, I don't accept it and not have a job.
3  So I was trying to consider it.
4         But I wasn't going to sign it for
5  six weeks if they were going to have me waive all
6  of my past, present, and future rights; and for
7  whatever reason, anything having to do with
8  Jacobsen.  Like, I didn't understand why he was
9  even in that document.
10         (Document marked as Dziubla Deposition
11         Exhibit No. 28 for identification.)
12 BY MR. BOYLE:
13    Q.   So handing you what we've marked as
14 Deposition Exhibit 28, this is the email that you
15 sent to them on the 29th, correct, where you told
16 them that the six weeks was no longer acceptable;
17 and even the six months that you had
18 subsequent -- you had previously suggested, that
19 was no -- that was not acceptable either,
20 correct?
21    A.   Correct.
22    Q.   All right.  And that -- and this --
23 there was a markup of the separation agreement
24 attached to this email, correct?

1     A.   Yes, that's what it says, yeah.
2     Q.   And in that markup, do you recall how
3  much severance you were requiring in order to
4  separate from the company?
5     A.   Like I said, I was trying to consider
6  coming to some kind of resolution from -- with
7  them; and I asked for a year's compensation,
8  which was 80,000.
9     Q.   Okay.  Now, you sent this email at
10 1:15 a.m. on Friday, the 29th, correct?
11    A.   Yes.
12    Q.   Okay.  And had you received anything in
13 writing from the company prior to this time
14 telling you that your employment had been
15 terminated?
16    A.   No, but they were trying to get me to
17 sign a separation agreement, so what is -- what
18 part of that says I'm still employed.
19    Q.   My only question is:  Had you received
20 anything in writing saying, Ro, your employment
21 is terminated?
22    A.   No.  That came after.
23    Q.   Okay.  Did anybody from the company tell
24 you your employment had been terminated?

45 (Pages 174 - 177)

1    A.  No.
2    Q.  Okay.  And, in fact, hadn't Mike Yazbec
3  said you can come back to work if the six weeks
4  is not acceptable?
5    A.  I don't know why you keep bringing that
6  up.  I do not recall him ever, ever giving me
7  that option, ever.
8    Q.  Well, is it -- you do recall them asking
9  you when are you coming back to work?
10    A.  And I told them I was coming back to
11  work tomorrow in my email.
12        (Document marked as Dziubla Deposition
13        Exhibit No. 29 for identification.)
14  BY MR. BOYLE:
15    Q.  So we've handed you Deposition
16  Exhibit 29.  Do you recognize this document?
17    A.  Yes.
18    Q.  And is this the termination letter that
19  you received from the company?
20    A.  Yes.
21    Q.  Okay.  It's dated October 2nd, 2017,
22  correct?
23    A.  Yes.
24    Q.  Do you remember when you received it?

1    A.  No.
2    Q.  You have no recollection of when you got
3  this letter?
4    A.  I don't recall if he emailed it first
5  and then sent the original.  I know I ended up
6  getting an original in the mail.  So I don't --
7  no, I don't.
8    Q.  Okay.  You haven't produced any emails
9  to us.  So do you have an email that says you
10  received this that would establish the date that
11  you received it?
12    A.  From Mike to me?  I mean, I -- that's
13  what I'm saying, I don't know when I -- if it
14  just showed up, then I guess it came on the 3rd,
15  because this would be dated -- it's not like it's
16  same day delivery.
17    Q.  Okay.  But in any event, sometime after
18  the letter was dated you recall receiving it,
19  correct?
20    A.  Yes.
21    Q.  And you have an original of this
22  document; is that correct?
23    A.  Yes.
24    Q.  Okay.  Now -- thanks.

1        You said, you know, you told them in
2  your email of September 26th that FMLA was
3  unacceptable and that you would report to work as
4  usual, correct?
5    A.  Uh-huh.
6    Q.  And then on the 27th, the following day,
7  is when you had all these discussions about a
8  year severance or six weeks severance, correct?
9    A.  As part of the separation agreement,
10  yeah.
11    Q.  Right.  Those discussions started on the
12  27th, correct?
13    A.  They actually started -- that phone call
14  happened, if I recall, that same day.  It
15  happened within minutes of me sending that email
16  telling him I was going to come back.
17    Q.  No.
18    A.  They made a phone call.  They're --
19  trust me, they didn't want me coming back.
20    Q.  The -- you --
21    A.  That's why all my stuff is in email,
22  because the two of them are on the phone.
23    Q.  Correct, I stand corrected.  The first
24  call where the four weeks was discussed took

1  place on the 26th, and then the discussions about
2  the six weeks, the six months, and the year took
3  place on the 27th and the 29th when you sent that
4  email, correct?
5    A.  They're -- yeah, they're phone calls.  I
6  don't have any --
7    Q.  Right.
8    A.  Like I said, I don't recall the
9  timeline; but you've asked me questions about
10  things that were contained in those phone calls
11  and I agree to some of them.
12    Q.  So my question is:  From the point in
13  time where you started to discuss the severance,
14  which was probably middle of the day on the 26th,
15  until the time you received the termination
16  letter, did you tell anybody at the company that
17  you wanted to come back to work?
18    A.  I wasn't -- I don't recall talking to
19  anyone.
20    Q.  So is this -- your email of the 26th the
21  last expression of your intent to return to work
22  to the company as far as you can recall?
23    A.  Should I have begged to come back when
24  they're presenting me with severance?

1   Q. I'm just asking you to answer the
2  question. If it was -- I'm asking what you
3  recall.
4       Do you recall any discussion of your
5  desire to return to work subsequent to this email
6  that you sent on the 26th?
7   A. I did not.
8   Q. Did you tell anybody that you wanted to
9  come back to work?
10   A. I was being presented with a severance
11  package.
12   Q. That's not my question.
13   A. They wanted me out. Why would I be,
14  like, oh, God, please, let me come back.
15   Q. My question is: Did you tell anybody?
16   A. No, I didn't.
17   Q. Okay. Did you tell Mike Yazbec or
18  Mike Power at any point that despite how you felt
19  about this event that you were going to do your
20  best to do the best for the company, for JCA, if
21  you were to come back to work? Did you ever have
22  that type of a discussion with anybody at the
23  company?
24   A. With the way things rolled out, I didn't

1  think that was even an option. It was very clear
2  to me that they didn't want me back. So why
3  would I make that kind of statement?
4   Q. Was there anything about the company's
5  investigation of your claim that you found
6  inappropriate or that you would have wanted them
7  to do differently?
8   A. I think it should -- if they were truly
9  taking it seriously, it should have been done by
10  a third party. I mean, we do all kind of things
11  in construction -- we can't even test and balance
12  our own areas unless we have a third party do it,
13  because it's the most objective -- I just don't
14  think they ever took it seriously. And if they
15  did, somebody -- a third party would have had an
16  objective viewpoint.
17   Q. Anything other than that? Anything
18  about the content of what the company did that
19  you objected to?
20   A. How they handled everything?
21   Q. Correct.
22   A. I don't think how everything rolled out
23  should have happened. I don't think if you go to
24  somebody with an extreme concern like I did that

1  the resolution would be to present them with a
2  severance package.
3   Q. Well, I'm just talking about the
4  investigation. Is there anybody that you felt
5  they should have talked to that they didn't?
6   A. I don't actually know everyone they
7  talked to as part of the investigation.
8   Q. Is there --
9   A. I just know some people.
10   Q. I'm sorry.
11   A. Sorry.
12   Q. Is there anything about the timing of
13  the investigation that you felt was lacking?
14   A. No.
15   Q. Would you characterize yourself as
16  somebody who is easily offended?
17   A. Not at all.
18   Q. Okay. You like to joke around with, you
19  know, coworkers and friends?
20   A. Yes.
21   Q. Have you ever told an offensive joke
22  before?
23   A. Not that I recall.
24   Q. Have you ever made a vulgar comment or

1  joke or reference to anybody?
2   A. I mean, I try to do -- I mean, I try to
3  act with everyone's interest in mind and not
4  offend people generally.
5   Q. Did you ever share jokes of sexual --
6  that are of a sexual nature with coworkers?
7   A. I don't recall.
8   Q. Okay.
9       (Document marked as Dziubla Deposition
10       Exhibit No. 30 for identification.)
11  BY MR. BOYLE:
12   Q. We're handing you what we've marked as
13  Deposition Exhibit 30, which is copies of some
14  text messages that you produced to us during
15  discovery. Ask you to take a look at this and
16  tell me if you recognize it?
17   A. I don't recognize the text, but -- and I
18  don't know in what context it was -- who it was
19  with or -- it's a copy and paste of something.
20   Q. You produced this to us in discovery.
21  So I'm asking you if you recognize it?
22   A. I don't recognize it. I'm sorry.
23   Q. Do you recall sending this text to your
24  coworker Greg Garland on or about July 22nd of

47 (Pages 182 - 185)

1  2017?
2      A.  I don't.
3      Q.  Have you had an opportunity to read the
4  entire thing?
5      A.  I am honestly having a hard time
6  focusing on reading it.  I just know that I
7  copied and pasted it from there, and, I mean, I
8  don't really understand why this is here.  But --
9      Q.  Well, have you had an opportunity to
10  read the text itself?
11      A.  Yeah.
12      Q.  Okay.  Would you agree that this would
13  qualify as a sexual -- sexually charged joke?
14      A.  Honestly it wasn't anything out of the
15  norm between -- stuff between Greg's ginger jokes
16  and stuff.  It wasn't anything out of the norm.
17      Q.  So you're saying that this is --
18      A.  Greg and I conversed like that -- I
19  mean, this -- first of all, I don't think it's
20  that bad.  Second of all, Greg and I conversed
21  like this regularly and also with the rest of the
22  team.  It's just something that -- I mean, he had
23  signs around the office about, like, kick a
24  ginger day and stuff like that, so...

1      Q.  We're not talking about Greg right now.
2  I'm just talking about --
3      A.  Well, I'm just trying to explain my
4  relationship with him.  It's not like it's,
5  like -- it was -- I think it was in context of
6  our relationship, is what I'm trying to say.
7      Q.  So you think in the context of your
8  relationship with a coworker you can send some --
9  an email or a text --
10      A.  A text message.
11      Q.  -- of this nature?
12      A.  And other messages that he's sent in
13  return, in other previous -- yeah, based on our
14  relationship, yeah.
15      Q.  And you believe that there's nothing
16  really that bad with this joke?
17      A.  I copied and pasted it from the
18  internet, and I was just sharing it with him.
19  There's -- I don't think it was out of context in
20  how we spoke at all.
21      Q.  Okay.
22      A.  And what part of that says that's from
23  Greg?  Like, does it say?  I mean, I'm just
24  wondering, because I don't recall sending that to

1  him.  It's just cold.
2          (Document marked as Dziubla Deposition
3           Exhibit No. 31 for identification.)
4  BY MR. BOYLE:
5      Q.  So handing you what we marked as
6  Deposition Exhibit 31.  Do you recognize this
7  document?
8      A.  I've seen it on the internet.
9      Q.  Is this a screen shot of your Facebook
10  page?
11      A.  Yes.
12      Q.  And is this a post that you published on
13  your Facebook page?
14      A.  That I shared, yes, it is.
15      Q.  Okay.  Do you characterize this post as
16  vulgar?
17      A.  No, not if you -- if you watch the
18  video, I don't think -- no.  Kind of take it out
19  of context doing screen shots like this, but, no,
20  I don't think so.
21      Q.  Okay.  Do you find it offensive?
22      A.  I don't know that I would have shared it
23  if I did.
24      Q.  Okay.  Can I have that back.

1          (Document marked as Dziubla Deposition
2           Exhibit No. 32 for identification.)
3  BY MR. BOYLE:
4      Q.  So I'm handing you Deposition
5  Exhibit 32.  Is this another post from your
6  Facebook page.
7      A.  Yep.
8      Q.  Do you recognize this post?
9      A.  Yep.
10      Q.  Okay.  And you posted this on your
11  Facebook page, correct?
12      A.  Correct.
13      Q.  And do you find this to be an offensive
14  post?
15      A.  No.
16      Q.  So you -- posts like this do not offend
17  you?
18      A.  It was said in good humor to the two
19  people that I copied.  It's not like I generated
20  the post.  And, again, I mean, I'm a product of
21  20 years in our industry.  My threshold for
22  things offending me is pretty high.  So when I
23  get offended, it takes something pretty serious
24  to do that.

1    Q. So, Ms. Dziubla, I'm handing you what
2 we've previously marked as Deposition Exhibit 15,
3 which is a copy of the complaint in the case. I
4 want to direct your attention to paragraph 13.
5 Take a second.
6     (Discussion off the record.)
7 BY MR. BOYLE:
8    Q. Actually let me hand you -- this is the
9 original, so let me hand you that. This is just
10 my copy. Thanks.
11     So I want to ask you some questions
12 about paragraph 13. In that paragraph, you state
13 that JCA made unequal demands on you. Can you
14 identify any unequal demands that you're
15 referring to in this paragraph of the complaint?
16    A. I don't know if those -- I don't
17 understand that phrase. This is, like, weird
18 verbiage. I don't know what that means. Like,
19 what I said, I don't know how that translates
20 into -- what does that mean?
21    Q. I mean, you're accusing JCA of placing
22 unequal demands on you, and I'm asking you what
23 unequal demands did JCA place on you?
24     MR. SEDAEI: Read the rest of the

1 paragraph, and see if that helps you answer the
2 question.
3 BY THE WITNESS:
4    A. I guess they were basically asking me
5 to, like, not -- if I could guaranty that I
6 wouldn't be emotional about what had happened,
7 and I didn't think that that was fair to ask them
8 of me. Like, could I guaranty that I would be in
9 front of clients and not lose my shit because of
10 what happened, and I was, like, no I don't think
11 I can. I'm very upset.
12 BY MR. BOYLE:
13    Q. And that's what you mean by unequal
14 demands?
15    A. That's what I'm gathering, yeah.
16    Q. Any other examples that you can think of
17 that you believe --
18    A. With respect to this paragraph, that's
19 what it is.
20    Q. Right. Is there anybody else that you
21 felt were -- was treated differently with respect
22 to speaking positively about the company?
23    A. I don't understand the question.
24    Q. So when you say, you know, unequal

1 demands are placed on you, unequal compared to
2 what? I mean, how they were treating other
3 employees or just -- you just felt that was an
4 unfair demand? Are you referring to any other
5 employees of JCA that were treated differently
6 than you?
7    A. If I was, I don't recall specifically.
8    Q. Okay. As you sit here -- I just want to
9 know, like, as you sit here, do you -- does
10 anybody come to mind?
11    A. That was under the same -- I know -- so
12 I don't know that it pertains to this statement.
13    Q. Well, that's what -- I'm only referring
14 to that statement.
15    A. That's what I'm saying.
16    Q. Yeah. Is there anybody that comes to
17 mind that was treated differently than you as it
18 pertains to your allegation there in
19 paragraph 13?
20    A. Besides Joe McGuire, Matt Kantro.
21    Q. Well, it's --
22    A. I mean, it's not the same situation.
23    Q. That's -- so I want to be --
24    A. The exact same situation to me -- like,

1 nothing like that has happened to anyone else in
2 the company that I know of.
3    Q. Okay.
4    A. So no one has been in the same
5 situation.
6    Q. Okay. So let's ask -- you mentioned Joe
7 McGuire. How was he treated differently than
8 you?
9    A. Well, that's the thing I was referring
10 to the preservation of his employment when he
11 needed to deal with something personal.
12    Q. Which was a knee injury, did you say?
13    A. I don't know. ACL or something.
14    Q. Okay.
15    A. That's what I was probably referring to.
16    Q. Okay. And how was he treated
17 differently than you?
18    A. He wasn't fired. He wasn't presented
19 with a severance package when he said I need to
20 take time off, because I have a personal issue.
21    Q. You don't know, do you? I mean, how
22 that's why I'm asking you --
23    A. He's still there.
24    Q. -- how was he treated --

1   A. He's still there.
2   Q. Did he miss any work?
3   A. He was allowed to have flextime, so that
4   he could deal with what was going on with him.
5   Q. How do you know?
6   A. He told me.
7   Q. What did he tell you?
8   A. That's the basic extent of it, that,
9   like, that's -- and then Greg backed it up, too.
10  I mean, that's the basic extent of it is -- I
11  didn't ask all the details. I mean, it's his
12  personal life.
13  Q. So I --
14  A. But they worked with him.
15  Q. I need to understand correctly. He had
16  an ACL surgery, I assume?
17  A. He had some type of physical something
18  that kept him -- that was not acquired at work
19  that kept him from being able to adhere to his
20  responsibilities. I'm assuming walk-throughs,
21  stuff that required him to be active and about.
22  And they took care of him, because he's been with
23  the company a long time. He's one of their best
24  PEs --

1   Q. Well --
2   A. -- and all that stuff.
3   Q. When you say they took care of him
4   because, okay, you don't know --
5   A. Oh, yeah, I am assuming that's why
6   they took care of him.
7   Q. Okay.
8   A. They said he was good at what he did.
9   Q. So what you do know is that he had a
10  physical injury?
11  A. Right.
12  Q. And he was gone from work for a period
13  of time and he didn't get fired. That's what you
14  know, correct?
15  A. Right. And he didn't miss out on any
16  pay.
17  Q. Okay. And who is the other employee
18  that you mentioned?
19  A. Matt Kantro.
20  Q. Okay. And what were the circumstances
21  with respect to Matt Kantro?
22  A. I don't know. I know less about his
23  circumstances. I just know that he got the same
24  setup as McGuire.

1   Q. And you only know that because somebody
2   told you that?
3   A. I feel like there's more, but that's all
4   that I can adhere to now.
5   Q. Okay. Anybody else?
6   A. No.
7   Q. Anybody else that you can think of that
8   would support your allegation in paragraph 13?
9   A. I mean, I have speculations, but -- I
10  have speculations that Rachael has got some kind
11  of something going on, because of how she's able
12  to show up to these events and get completely
13  shit-faced and still have a job. I don't have
14  anything concrete from that.
15          I guess I didn't understand that's,
16  you know, why I was in the position I was when
17  both years in a row she got so completely
18  intoxicated that she couldn't even walk. And
19  Yazbec even said, like -- made a comment, like,
20  doesn't she ever shut up, because she just kept
21  talking. So I'm sure there's something going on
22  there.
23  Q. Anybody else?
24  A. That's it.

1   Q. I'll take that back.
2          I'm sorry, I took it one second too
3   soon. I also wanted to ask you about
4   paragraph 18. You state in paragraph 18 that in
5   retaliation JCA subjected plaintiff to unequal
6   terms and conditions and swiftly terminated her
7   employment. Other than --
8   A. Wait, where are we again?
9   Q. Paragraph 18.
10  A. There's two 18s.
11  MR. SEDAEI: Of Count I, I believe.
12  BY THE WITNESS:
13  A. Of Count I. Okay.
14          Okay.
15  BY MR. BOYLE:
16  Q. Okay. What other employee do you
17  believe received more favorable treatment than
18  you? Anybody other than you've already
19  identified?
20  A. No.
21  MR. BOYLE: Okay. We're up to 33.
22          (Document marked as Dziubla Deposition
23          Exhibit No. 33 for identification.)
24

50 (Pages 194 - 197)

BY MR. BOYLE:

Q. Do you recognize Deposition Exhibit 33?

A. Yes.

Q. And are these copies of a text exchange that you had with Rachael, looks like, beginning at 9:41 p.m. on -- or maybe 8:28 p.m. on Monday, September 18th, which was the date of the golf outing?

A. Yes.

Q. Okay. Is this the same Rachael that you just referred to?

A. Yes.

Q. Okay. So you were texting with her on the night of the golf outing regarding what happened at the golf outing, correct?

A. Yeah.

Q. Okay. And, again, these documents were produced by you to us. Is this a complete -- and I will represent to you this is everything you gave to us. Is this a complete exchange of your text discussion with Rachael that night?

A. Yeah, to the -- yeah.

Q. So turning to the third page, which is marked No. 718, Bates No. 718, you told Rachael

that you want to never come back to the company; is that correct?

A. I was pretty humiliated. Yeah.

Q. And a couple pages later, you also told her that you would only leave JCA if it was to work for yourself, the top of that page.

A. Which page?

Q. 724.

A. Yes.

Q. Did you -- and that's -- you're referencing the discussion you already told us about with Serg where you said you wouldn't leave unless it was to work for yourself, correct?

A. Correct.

Q. Okay. So you recall when in 2017 you started to look for new employment?

A. No.

Q. Okay. Was it before you left JCA?

A. No.

Q. It was not?

A. Nope.

MR. BOYLE: Get this marked, please.

(Document marked as Dziuba Deposition Exhibit No. 34 for identification.)

BY MR. BOYLE:

Q. So handing you Deposition Exhibit 34.

A. Yep.

Q. This is some posts that you produced to us in discovery. I want to start towards the bottom of the page. It was the exchange between you and Gurbeer Sanghera?

A. Uh-huh.

Q. Dated September 15, 2017. Do you see that? Take a minute to --

A. The longer -- the bigger of the two emails in the middle?

Q. It's at the bottom of -- it's in the middle. There's a line pointing to follow-up consulting work.

A. Okay.

Q. And then on September 15th, 2017.

A. Yeah.

Q. Who is Gurbeer Sanghera?

A. He is -- I don't know his exact title there, but he's, like, Kyle's second in command at Talent Hitch.

Q. So he works at Talent Hitch, correct?

A. Correct, yeah.

Q. And that's the company that you went to work with immediately after you left JCA, correct?

A. Correct.

Q. Okay. And in this exchange that was on September 15th, he says that you were in the week prior talking about work that you could do for Talent Hitch; is that correct?

A. Right. Yep.

Q. All right. So you were, in fact, looking to perform work for Talent Hitch prior to leaving JCA, correct?

A. In addition to working for JCA. It was supposed to be consulting work done on the side while working with JCA. I had no intention of leaving JCA. This was to be done as I knew -- Kyle was the one that was at Hard Hat Hub. I had a relationship with him. We were friends. He started his own company Talent Hitch from Hard Hat Hub, and he said, Ro, we recruit for the construction industry, you have experience in the construction industry, come in and talk to our guys, so they can know how to pitch positions and stuff, so they know what an actual project

51 (Pages 198 - 201)

1  manager is, so they know what an estimator does.
2  Come in and teach our guys.
3      So I gave them a quote on what it
4  would cost for me to do that in my free time.
5  That's what this is.
6      Q.  And you feel like you could have done
7  that in addition to your work at JCA?
8      A.  Absolutely.  I've got a full-time job
9  now and I'm running a business.  Yeah,
10  absolutely.
11      Q.  And that business -- you were also
12  running that business at the same time, right?
13      A.  Yeah.
14      Q.  That business being your personal
15  fitness business?
16      A.  Yeah.
17      Q.  Okay.  So this was solely to do contract
18  work while you were working at JCA?
19      A.  Correct.
20      Q.  Okay.  So let's go to the top now.  This
21  is a separate exchange.  It looks like it starts
22  on September 28th.
23      A.  Okay.
24      Q.  And that's between you and Kyle, and you

1  said he's the owner of Talent Hitch, correct?
2      A.  Correct.
3      Q.  All right.  And so you tell Kyle on
4  September 28th, funny how things work out.  Looks
5  like I'm looking for a new job after all.
6      A.  Right.
7      Q.  Okay.  So you were reaching out to
8  Talent Hitch to tell them that you were looking
9  for a new job on September 28th?
10      A.  Didn't look like things were going in my
11  direction, so, yeah, I was reaching out to him
12  and saying it's ironic that here we are talking
13  about me doing this as a side job and, you know,
14  things are going -- it didn't look like I was --
15  my employment was going to be preserved at JCA.
16  So I reached out to him.
17      Q.  Okay.  And he immediately responds that
18  so you want to recruit.  So that he's suggesting
19  you could go work with Talent Hitch as a
20  recruiter?
21      A.  Yeah, which is funny because the reason
22  why I reached out to him is because he was a
23  recruiter.  My implication for that message was
24  for him to go find me a job, not to go and work

1  for him.
2      Q.  Okay.  But you responded that it
3  wouldn't hurt to give it a shot, so you were open
4  to going and working with him?
5      A.  Well, I was, like -- yeah, I mean, I
6  was, like, I guess, you know.  If things turn out
7  the way they -- they're going, I mean, it
8  wouldn't hurt to give it a shot.
9      Q.  Okay.  And then the next thing you tell
10  him on that same day, which is the 28th, that
11  they let you go.  They, you're referring to JCA?
12      A.  I don't see it.  Where is it?
13      Q.  So just keep going to the right.  You
14  have to go -- read left to right.  It says, sorry
15  that didn't sound enthusiastic LOL.  I'm just not
16  happy about being in this position.  They let me
17  go, Kyle.
18      A.  Oh, yes.
19      Q.  Okay.  So you told Kyle on
20  September 28th that JCA let you go?
21      A.  Yes.
22      Q.  Okay.  And then just continuing now, you
23  got to go back, so he offers to have you come
24  into the office on Monday to talk to Gurbeer and

1  him.  Do you see where --
2      A.  Yeah.
3      Q.  Okay.  And Monday would have been
4  October 2nd, correct?
5      A.  Okay.
6      Q.  I have a calendar.
7      A.  Yeah.
8      Q.  But I'll let you know --
9      A.  Sure.
10      Q.  -- Monday is the 2nd.
11      So did you go in and talk to him
12  that Monday?
13      A.  That I don't recall.
14      Q.  Okay.  Do you recall when you started
15  with Talent Hitch?
16      A.  No, but I'm sure there's documents that
17  have the actual date.  I don't recall when I
18  actually started with them.  It was very close
19  after I was let go.
20      Q.  Okay.  Well, so if I was able to provide
21  documents that showed that you were already
22  recruiting on their behalf on October 3rd, which
23  was the next day --
24      A.  Okay.

1    Q.  -- would that help you recall whether or
2  not you spoke with them on October 2nd, the day
3  before?
4    A.  Yeah.
5    Q.  Okay.  And they offered you the position
6  that day?
7    A.  Yeah, it was just kind of, like -- I
8  mean, it wasn't, like, a -- you know, they're a
9  start-up company.  It's not, like, a formal
10  position.  It was kind of, like, hey, you know,
11  let's see how this goes, if you can get, you
12  know, legs in this.  I mean, I had never done it
13  before.  So it wasn't, like, anything formal.
14    Q.  Okay.  Okay.  Thanks.
15        (Document marked as Dziuba Deposition
16        Exhibit No. 35 for identification.)
17  BY MR. BOYLE:
18    Q.  I'm handing you document -- or
19  Deposition Exhibit 35.  Take a minute to look
20  through this.  It's something you gave us in
21  discovery, and I have just a couple questions to
22  ask you about it.
23    A.  Okay.
24    Q.  Do you recognize the document?

1    A.  Yes.
2    Q.  Can you tell me what is it?
3    A.  Just journaling.  Just -- I mean, I type
4  a lot faster than I write, so I was just
5  journaling and documenting how I was feeling, and
6  I tend to be kind of sarcastic in tough
7  situations.  So it's just me writing my thoughts
8  down.
9    Q.  Okay.  So this is a personal journal
10  that you created?
11    A.  Yeah.
12    Q.  And the first page was dated
13  September 20th, 2017.  Is that when you started
14  doing this journaling?
15    A.  I started one prior to that.  It was
16  handwritten, I think.  And then I started this,
17  because, again, I had a lot to put down and I --
18  it was just easier to type it.
19    Q.  Do you recall when you started the prior
20  one?
21    A.  No.
22    Q.  Was it following your -- the event that
23  took place at the golf outing?  Was it after the
24  golf outing?

1    A.  Yes.
2    Q.  Okay.  So you had started another one
3  after the golf outing, and then you continued
4  with this, and this is just typewritten.  You
5  went from handwritten to typewritten?
6    A.  Right.  But you referred to the first
7  one as another one.  That was the first one.
8    Q.  I'm sorry.
9    A.  Yeah.
10    Q.  That was probably unclear.
11    A.  Okay.
12    Q.  So the golf outing --
13    A.  Yeah, I started --
14    Q.  -- occurred, and then you started a
15  handwritten journal, correct?
16    A.  I believe so, yes.
17    Q.  And then you changed over to a
18  typewritten journal, and that's what this is,
19  correct?
20    A.  Correct.
21    Q.  All right.  And tell me again why you
22  created this?
23    A.  Because I had a lot to put down, and it
24  was easier for me to type it.  I don't -- I don't

1  know, I don't have the patience to write,
2  handwrite.  It's gotten worse actually.
3    Q.  Okay.  So I'd like to refer you to your
4  entry on September 23rd, 2017.  It starts on
5  page 807.
6    A.  Uh-huh.
7    Q.  Okay.  And I'm going to be asking you
8  about something that appears on page 808.  Tell
9  me when you've got there.
10    A.  You want me to start on 807?
11    Q.  I just wanted to let you know that I'm
12  going to be asking you about your entry for
13  September 23rd.  Okay?
14    A.  Okay.
15    Q.  So on page 808, second paragraph, you
16  state, I've also started looking online for jobs
17  again and then started thinking how do I explain
18  this short-term employment.  I'm really burnt out
19  in the construction industry.  Do you see where
20  I'm reading?
21    A.  Yes.
22    Q.  Okay.  So, in fact, you started looking
23  for employment on the 23rd or even prior to that
24  date?

1    A. I guess that's what it looks like.
2    Q. Is that accurate? Do you recall that?
3    A. It's what I wrote. I mean, why would I
4  lie to myself?
5    Q. Okay. So, again, you were looking for
6  employment before your employment with JCA
7  terminated, correct?
8    A. At no part of that -- again, it's not
9  like everything was going as if they wanted to
10  preserve me. Every single action they took was
11  as if they wanted to get rid of me. I'm not an
12  idiot. I need -- like I said, I needed a job. I
13  needed pay. I was going to look -- my best
14  interest was to start looking, because it's not
15  like I was -- I mean, they had no intention of
16  preserving my employment. What am I going to do?
17  Wait until -- I'm going to get the pipeline
18  loaded to -- it's going to happen.
19        (Document marked as Dziubla Deposition
20        Exhibit No. 36 for identification.)
21  BY MR. BOYLE:
22    Q. Handing you Deposition Exhibit 36. Can
23  you tell us what this is?
24    A. Looks like a text message between me and

1  a good friend of mine.
2    Q. And her name is Claudia Pritchett?
3    A. Yes.
4    Q. That's a personal friend of yours?
5    A. Yes.
6    Q. Okay. Have you been friends for a long
7  time?
8    A. Yes.
9    Q. Directing your attention to the second
10  page, you are speaking to Claudia. You say, I'm,
11  like, dude, I get a concussion and work through
12  it and you guys say you'll cover me with my
13  hysterectomy, but I get assaulted at a work
14  function and I get six weeks because I've only
15  worked there a year.
16    A. Uh-huh.
17    Q. Do you see that?
18    A. Yes.
19    Q. Okay. So let me ask first about your
20  concussion. When did that occur?
21    A. I don't recall when it exactly happened.
22    Q. Can you give me an approximate date?
23    A. It was before the golf outing.
24    Q. How far -- how long before?

1    A. I have no idea.
2    Q. A month? Was it a month?
3    A. Not a month. No, not a month.
4    Q. Less than a month?
5    A. No, more than a month.
6    Q. Okay.
7    A. Before the golf outing.
8    Q. Sometime in 2017. The golf outing was
9  in September.
10    A. I'm trying to think. I had to do the
11  battle -- I don't remember. I mean, I was only
12  there for a year, so, I mean, it was while I was
13  there.
14    Q. How did it happen?
15    A. I was at cross fit working out on my own
16  time, and I went to do a power jerk, and I let go
17  of the bar and it fell on my head.
18    Q. Did you have to go to the hospital?
19    A. Nope.
20    Q. You did not?
21    A. I did not go to the hospital, but I
22  actually -- when I got back to work, one of the
23  guys, Jason Hawkins, I was talking to him about
24  one of his bids, and he noticed -- and he's,

1  like, are you okay? And I'm, like, what do you
2  mean. And he's, like, I don't know, you're kind
3  of -- you're a little off today. And I was,
4  like -- then I started thinking and I started
5  paying attention to my mannerisms, and I was,
6  like, oh, maybe this did have an impact on me.
7        And then I went and got checked out.
8  And flying colors. She said -- she's, like, you
9  answer half these questions better than people
10  with -- you know, without concussions. He's,
11  like -- she's, like, there's no way you have a
12  concussion.
13        But the guys -- you know, Ed Bowen
14  and, was it, Larry, you know, they're both dads,
15  and they're, like, you know, you really should
16  take some time off for yourself, you shouldn't
17  work so hard, you know, you should give you some
18  time -- you know, they were very concerned and
19  they wanted to encourage me to talk to them about
20  taking time off.
21        And I'm, like, we're just too busy,
22  you know. You know, and the doctor said I didn't
23  have one. I had, like -- I think I even had an
24  MRI done. So, you know, I didn't want to take

1  time off.  I just kept working.
2      Q.   Okay.  So you were never actually
3  diagnosed with a concussion?
4      A.   Correct.
5      Q.   Okay.  Have you had any lingering
6  effects from that event?
7      A.   No.  I mean, it's not -- I have vertigo,
8  but, I mean, it could be a combination of things.
9  I mean, that's one of the side effects, but I've
10  had vertigo on and off for years.
11      Q.   Okay.  So flipping to the next page
12  then, you're discussing with her why the six
13  weeks that the company offered you was
14  unacceptable to you.  But in the -- about halfway
15  down through the page, you say to Claudia that
16  you have the -- you've texted, bunch of assholes.
17      A.   Yeah.
18      Q.   Who are you referring to?
19      A.   Probably Steve.
20      Q.   Okay.  And then the next text says
21  meanwhile I'm franticly looking for a job?
22      A.   Right.
23      Q.   So on the 27th, you were franticly
24  looking for a job?

1      A.   I might have exaggerated a little bit.
2  But, again, it's not like they were looking to
3  preserve my employment, at least, that was my
4  perception of it.
5          (Document marked as Dziubla Deposition
6      Exhibit No. 37 for identification.)
7  BY MR. BOYLE:
8      Q.   So Deposition Exhibit 37 is an email
9  exchange between you and Matthew Davison --
10      A.   Okay.
11      Q.   -- dated September 27th, 2017, at
12  11:47 a.m.
13          Who is Matthew Davison?
14      A.   Looks like a recruiter.
15      Q.   Well, when you say looks like, I mean,
16  can you be a little bit more specific?  Who are
17  you emailing?
18      A.   I don't know him personally.  He's a
19  recruiter.  He's just a recruiter that I think
20  might have contacted me previously.
21      Q.   Okay.  So he's a recruiter.  You know
22  he's a recruiter, because you're emailing him?
23      A.   Yeah, Talent Consultant.
24      Q.   All right.  So he -- there's an email

1  exchange between you and him back in July,
2  correct, where he's reaching out to you saying
3  Hope all is well.  I want to drop you a note to
4  see how everything is going on your end.
5      A.   Right.
6      Q.   Okay.  And then the next exchange is you
7  contacting him on the 27th saying, I am sorry for
8  not replying back to you.  It's been a hell of a
9  ride these last few months, and it looks like I'm
10  going to have to start looking for a job
11  officially.
12      A.   Uh-huh.
13      Q.   Do you see that sentence?
14      A.   Yes.
15      Q.   Okay.  First of all, what did you mean
16  by it's been a hell of a ride the last few
17  months?
18      A.   I'm not sure.
19      Q.   You don't know what you meant by that?
20      A.   I don't know what I was referring to,
21  no.  I mean, it's a recruiter, too.  It's not
22  like I'm going to tell him my whole story, be,
23  like, hey, man, this is what happened and -- you
24  know, I mean, I'm going to blow over stuff.  I

1  mean, it's not for him to know.  He doesn't need
2  to know what's been going on in my life, you
3  know.  Plus I get to explain away what's
4  happened, why I haven't contacted him since July.
5  I don't know that it was anything specific.
6      Q.   Okay.  But you are advising him that
7  you're looking for a job officially as of that
8  point in time?
9      A.   Yeah, I have to tell him it's official,
10  so that he takes it serious.
11          Here.
12      Q.   So I'm going to hand you your amended
13  answers to interrogatories.  Referring you to
14  interrogatory No. 11.
15          MR. SEDAEI:  What exhibit number is
16  this?
17  BY MR. BOYLE:
18      Q.   You were asked to --
19          THE WITNESS:  Oh, 3.
20  BY MR. BOYLE:
21      Q.   -- to provide information regarding all
22  of your employers going back to September 26th of
23  2015.
24      A.   Uh-huh.

55 (Pages 214 - 217)

1    Q.   And you've provided a table containing a
2  number of your employers going all the way back
3  actually to 2014.  Is this a complete statement
4  of all of your employers during that time period?
5    A.   I think we established earlier that I
6  left off -- I think Atlas and GE are left off.
7  We established that earlier, that there was some
8  inconsistency there.
9    Q.   Right.  I think Atlas, I think they
10 might be out of that time frame.  This only goes
11 back to 2014.
12   A.   Yeah, I'm not sure, but --
13   Q.   Okay.  But in any event, these are all
14 your employers --
15   A.   Yep.
16   Q.   -- since March of 2014?
17   A.   Yeah.
18   Q.   Okay.  And starting at -- with Talent
19 Hitch, which is the company that you went to work
20 for immediately after JCA, you list the dates of
21 employment as October 2017 through March 2018?
22   A.   Uh-huh.
23   Q.   Are those correct dates?
24   A.   Those are the dates I listed.  I mean,

1  we just went over that.  What was that -- yeah, I
2  guess, yeah.  October 3rd --
3    Q.   Okay.
4    A.   -- I started.
5    Q.   All right.  And you worked through March
6  of 2018 and you left Talent Hitch to go work for
7  Cornerstone, correct?
8    A.   Yeah, Cornerstone/Broadway Electric.
9    Q.   Okay.  Now, did you have any problems,
10 performance type problems, when you were working
11 at Talent Hitch, job performance?
12   A.   No.
13   Q.   Okay.  Did you have any conflicts with
14 your coworkers?
15   A.   Nothing out of the ordinary that
16 wasn't --
17   Q.   Okay.  Do you recall having a coworker
18 there by the name of Sam?
19   A.   Yes.
20   Q.   Okay.  Did you have problems with Sam?
21   A.   Sam charged at me and tried to
22 physically attack me after we had a conversation
23 about me trying to help him with how he was
24 handling some of his clients and stuff.  And with

1  me being portrayed as the expert in the industry,
2  I was trying to help him out.
3        And went to leave the room to exit
4  the argument, and for whatever reason, he felt
5  the need to tell me to go fuck myself; and I was,
6  like, okay, so then I walked away.  And he
7  started charging after me; and one of my pregnant
8  coworkers stood between us as he tried to
9  literally come after me, and I got as far away as
10 possible as I could from him.
11   Q.   So you had a confrontation with Sam?
12   A.   He had a confrontation with me.  I was
13 trying to get away from him, because he just lit
14 up for no reason.
15   Q.   Okay.  And how did that situation get
16 handled by Talent Hitch?
17   A.   We agreed that I would work from home.
18 I believe that was the outcome, is that -- and
19 then I would come in for meetings, I think, if I
20 needed to come into the office.  Just because of
21 camaraderie and stuff, it's easier to team build
22 and stuff if you're in person.
23        But it really set me up as a -- at a
24 disadvantage to do that, because I couldn't

1  overhear things that were going on with other
2  clients.  I lost my sixth sense to listen to what
3  was going on in the office, because I was at home
4  isolated from everything.
5    Q.   And so were you dissatisfied with the
6  manner in which Talent Hitch resolved that
7  situation?
8    A.   No, not at all.  I mean, he was doing
9  the best he could.  I mean, not at all.
10   Q.   I want to show you a document that you
11 gave us in discovery.  It's an exchange that you
12 had with Latavia.
13   A.   Okay.
14   Q.   And do you know who Latavia is?
15   A.   Talk Space.  I'm just glancing at the
16 cover sheet there.
17   Q.   Yeah.  February 14th.  I'd like you to
18 just read that second paragraph if you wouldn't
19 mind.
20   A.   I sent an email to my boss Kyle, owner
21 at Talent Hitch, about what he planned to do
22 about the whole Sam situation, and he responded
23 with how -- quotes, how has your communication
24 been with each other.  And to me that says Sam

1  gets a pass if we can get you -- wait. If we can
2  get you both to stay and be happy. My reply on
3  the email was that's not the response I was
4  looking for. Let's talk Friday. I'm so pissed I
5  want to quit on the spot, but I also don't want
6  to end on bad terms, so I still get my
7  commission. No one has contracts. I don't want
8  anyone to have to sue anyone. I also totally get
9  where Kyle is coming from. Not all employees get
10  along.
11     Q. Okay. That's what I want.
12         Having read that, does that change
13  your prior testimony about whether or not you
14  were satisfied with the manner in which that
15  whole situation was resolved?
16     A. At the time I was upset.
17     Q. Okay.
18     A. Am I not allowed to get upset? I don't
19  under -- I mean, like, I just don't -- I'm not
20  allowed to get upset apparently.
21     Q. But the situation was bad enough that
22  your immediate reaction was you wanted to quit,
23  correct?
24         Isn't that what you told your

1  counselor?
2     A. Yeah, it's there.
3         You know, to kind of put things in
4  perspective --
5     Q. Let's -- I'll -- let's just --
6     A. Well --
7     Q. Your attorney can follow up with any
8  questions he has.
9     A. Okay.
10        MR. SEDAEI: I'll give you a chance to
11  put things in perspective.
12  BY MR. BOYLE:
13     Q. So you're currently working at
14  Cornerstone Construction. You started there in
15  March of 2018, correct?
16     A. Yes.
17     Q. And what's your job title?
18     A. I'm an estimator/project manager.
19     Q. And how much are you paid?
20     A. $90,000 per year.
21     Q. Okay. Other than Talent Hitch,
22  Cornerstone, and your personal fitness business,
23  have you had any other employment since you left
24  JCA?

1     A. No.
2     Q. Okay. Now, you're seeking damages in
3  this action, correct?
4     A. Yes.
5     Q. And, in fact, in your 26(a) disclosures,
6  you indicate that you're seeking emotional
7  distress damages in the amount of $300,000,
8  correct?
9     A. Yes.
10    Q. Do you see that?
11    A. Right.
12    Q. Okay. Let me ask you how you came up
13  with that number?
14        MR. SEDAEI: I -- you shouldn't disclose
15  anything you discussed with any of our attorneys.
16  BY THE WITNESS:
17    A. I don't know that I recall.
18  BY MR. BOYLE:
19    Q. You don't recall?
20    A. I thought I answered you. I don't
21  recall.
22    Q. Okay. Now, you're alleging that you
23  suffered emotional distress as a result of the
24  events we've been discussing, correct?

1     A. Yes.
2     Q. Okay. What is it specifically that you
3  allege caused your emotional distress?
4     A. The physical act of the incident with
5  Jacobsen and the results of my employment with
6  JCA has definitely impacted me on a personal and
7  a professional level.
8     Q. Anything else?
9     A. That's -- I don't know. Did you want me
10  to elaborate, or I don't understand --
11    Q. No. I just want to --
12    A. -- anything else.
13    Q. So you've identified those two things
14  have -- you're alleging have caused you to suffer
15  the emotional distress you are seeking to be
16  compensated for?
17    A. It's a huge -- yeah, it's a huge --
18    Q. I'm not asking you to -- you know, I'm
19  just asking you if there's anything other than
20  those two things?
21    A. No, that's pretty much it.
22    Q. Okay. So with respect to you, you said, you
23  know, the results of your employment. How did
24  that cause you emotional distress?

1       Go -- yeah.  Answer this question
2   and we'll -- how did that cause you to suffer
3   emotional distress?
4       A.  Just for the fact that I stood up for
5   myself and I lost my job basically.
6       MR. BOYLE:  Okay.  Do we need to go off
7   the record?
8       THE VIDEOGRAPHER:  Yeah.
9       We are going off the record at
10  3:18 p.m.  This is the end of media set 3.
11      (A short recess was taken.)
12      THE VIDEOGRAPHER:  We are back on the
13  record at 3:40 p.m.  This is media set 4.
14      EXAMINATION
15  BY MR. RUFF:
16      Q.  Good afternoon, Ms. Dziubla.  My name is
17  Ed Ruff, and I represent Peter Jacobsen.  Okay?
18      A.  Yeah.
19      Q.  I will be asking you some questions
20  about the event and your interaction with
21  Mr. Jacobsen.  Okay?
22      A.  Yes.
23      Q.  If at any time you don't understand me
24  or don't understand my question, please let that

1   be known.  Okay?
2       A.  Okay.
3       Q.  And we'll just stop and have the
4   question repeated or rephrased.  All right?
5       A.  Okay.
6       Q.  How are you doing so far?
7       A.  I don't know how to answer that.
8       Q.  Are you okay?
9       A.  I'm fine to proceed, yes.
10      Q.  Okay.  You understand that the celebrity
11  guest at The Kev on September 18th, 2017, was
12  Peter Jacobsen?
13      A.  Yes.
14      Q.  Have you ever looked into Mr. Jacobsen's
15  background?
16      A.  Not -- after the incident, I did.
17      Q.  Okay.  Did you ever look into it before
18  the incident?
19      A.  I had no idea.  I just thought he was a
20  friend of Jim's.
21      Q.  Did you understand prior to the day of
22  The Kev that there was going to be a celebrity
23  there?
24      A.  Yeah, like there is every year.

1       Q.  And this had been your second event?
2       A.  Correct.
3       Q.  Okay.  And so you understood that every
4   year they do have a celebrity come?
5       A.  Correct.
6       Q.  All right.  Who was it the year before?
7       A.  I want to say it was a hockey guy.
8       Q.  Do you know who it was?
9       A.  No idea.
10      Q.  Did you know before coming out to River
11  Forest Country Club on September 18th, 2017, that
12  Peter Jacobsen was going to be the celebrity?
13      A.  No.
14      Q.  So there was no prior publication or
15  pamphlet or anything on the emails that said, you
16  know, here is our celebrity?
17      A.  If there was, I didn't see it.
18      Q.  So before the event itself, you did not
19  have any knowledge of who Peter Jacobsen was?
20      A.  No, not at all.
21      Q.  You have looked him up after?
22      A.  I did.
23      Q.  And where did you look him up on, what
24  site?

1       A.  Google.
2       Q.  I'm sorry?
3       A.  Just Google.
4       Q.  Did you look him up on Wikipedia?
5       A.  I don't know what the search brought up
6   on Google, if it was a Wikipedia thing.  Just an
7   autobiography and that's all.
8       Q.  And what did you learn about him?
9       A.  I think he has a house in Florida that's
10  actually near my in-laws, I think, if it's the --
11  I mean, I don't even -- it's speculating.
12      Q.  Did you look that up prior to hiring an
13  attorney?
14      A.  I don't recall.
15      Q.  Did you look him up prior to filing a
16  lawsuit?
17      A.  Yes.
18      Q.  Did you look him up prior to reporting
19  or scheduling an interview with the EEOC?
20      A.  No, I don't think so.
21      Q.  Do you understand Mr. Jacobsen to be an
22  NBC broadcaster?
23      A.  No.
24      Q.  When you looked him up, were you

58 (Pages 226 - 229)

1　familiar with his charity work?
2　　A.　I heard about charity and that he was
3　kind of a comedian.　Like, that's what I read,
4　that's why I read it.　And I was like, oh,
5　well -- I mean, it explains his position at the
6　event.
7　　Q.　And you said that you found out that he
8　had a home in Florida.　Did you -- what else did
9　you learn, if anything?
10　　A.　I mean, I found out a Peter Jacobsen had
11　a home in Florida, and I was just, like, this is
12　stupid.　Why I am looking -- I mean, it could
13　have been somebody else for all I know.　I mean,
14　I didn't, like, dive into it and research it.
15　　Q.　Right.　But -- well, I'm not asking you
16　about the home itself.　I'm asking about Peter
17　Jacobsen.　What else did you find out?　You
18　talked about his charity work.　You talked about
19　a home in Florida.　Anything else that you
20　learned about him?
21　　A.　That's it.
22　　Q.　And then you learned that he does like
23　to make jokes out on the golf course, comedian
24　you said?

1　　　MR. SEDAEI:　Objection, mischaracterizes
2　the witness's testimony.
3　　　But answer if you know the question.
4　BY THE WITNESS:
5　　A.　I just read comedian.　I don't know
6　where he did his comedian work at.
7　BY MR. RUFF:
8　　Q.　Did you understand the extent of an
9　organization that he's involved in of what they
10　contributed to various nonprofits in the United
11　States?
12　　A.　No idea.
13　　Q.　Did you understand that he has a focus
14　connected to children's health and education?
15　　A.　No, I didn't.
16　　Q.　So you don't know the juvenile diabetes
17　research, Randall Children's Hospital, March of
18　Dimes, none -- you don't know about any of that
19　then?
20　　A.　I just know charity.　That's it.　I
21　don't know any specifics.
22　　Q.　Do you know about any of his
23　accomplishments on the -- in the golf arena?
24　　A.　No idea.

1　　Q.　Did you know that he received the Payne
2　Stewart Award?
3　　A.　No.
4　　Q.　Do you know what that is?
5　　A.　I have no idea.
6　　Q.　Do you know who Payne Stewart was?
7　　A.　No idea.
8　　Q.　Do you know what it means to be on the
9　tour?
10　　A.　I could take a swing at what I think it
11　means.
12　　Q.　What do you think it means?
13　　A.　That they're playing a series of games
14　for -- and this is all, like, referenced on Happy
15　Gilmore, playing a series of games to get -- to
16　win.　So it just narrows down the pool until
17　somebody wins.
18　　Q.　Do you know what it means to be a tour
19　event winner?
20　　A.　No.
21　　Q.　Can you name any of the major golf
22　tournaments?
23　　A.　No.
24　　Q.　Do you watch golf at all?

1　　A.　Against my will, my husband puts it on.
2　I think I saw Tiger Woods did pretty good a
3　couple -- a month ago or something like that.　I
4　wouldn't choose to watch it.
5　　Q.　Did you watch any of the golf this past
6　weekend?
7　　A.　No.
8　　Q.　Do you know what a major event is in
9　golf?
10　　A.　I have no idea.
11　　Q.　You're not a golfer, correct?
12　　A.　No, I'm not a golfer.
13　　Q.　I believe in -- somewhere, I believe it
14　may have been your diary or in the EEOC filings,
15　you indicated you have golfed less than -- as of
16　September 18th, 2017, have golfed less than five
17　times?
18　　A.　That's pretty accurate.
19　　Q.　Have you golfed any since the
20　tournament --
21　　A.　No.
22　　Q.　-- outing, The Kev?
23　　A.　No.
24　　Q.　Do you own golf clubs?

1    A.  No.

2    Q.  How long had it been prior to

3  September 18th, 2017, that you had actually

4  played golf?

5    A.  I think I referenced earlier that there

6  was a JCA outing where we went to Topgolf. That

7  would have been where we were shooting stuff off

8  of the -- where -- the ledge into your scoring

9  lanes.

10    Q.  And Topgolf is played inside, correct?

11    A.  It's half inside, half outside. It's

12  the one in -- or, at least, the one in -- I think

13  we went to the one in Naperville. So, like,

14  you're inside covered, and you hit it off a

15  ledge, and it lands in a pool of -- with the

16  other balls.

17    Q.  It wasn't -- so when you did this at

18  Topgolf, it wasn't on an actual golf course then?

19    A.  Correct.

20    Q.  Okay. And my question was: When had

21  you last played on a golf course?

22    A.  Oh, probably The Kev the year prior, I

23  would think.

24    Q.  Okay. And had you gone to Topgolf

1  before or after the year prior Kev event?

2    A.  That was in between. So it was after

3  the second -- the first Kev event.

4    Q.  And when you were at The Kev event the

5  year prior, did you actually play all 18 holes?

6    A.  No. I was just kind of screwing around.

7  You know, you screw around on the thing. I

8  probably -- to my recollection, I've never played

9  a full 18 holes of golf ever. I don't think I

10  could handle that.

11    Q.  Have you played a full nine holes?

12    A.  I remember once when I was in my -- I

13  dated a guy when I was, like, 17 that we went to

14  a golf course, and I think that was nine holes,

15  and I told him I couldn't take it anymore because

16  it was so boring and we left.

17    Q.  Does your husband Dan play golf?

18    A.  No.

19    Q.  And so you two have never gone golfing

20  together?

21    A.  No.

22    Q.  Okay. Can you tell us what types of

23  clubs might be in a typical golf pack?

24    A.  I know there's a thing called a putter,

1  because that's in mini golf. I know that there's

2  something that's a big golf club that allows you

3  to get your drive for distance. That's about it.

4    Q.  Other than something you hit your drives

5  with, do you know what that -- first of all, do

6  you know what that's called?

7    A.  Nine iron; is that right? Do I get to

8  know if that's right? No. Okay.

9    Q.  So --

10    A.  I don't know.

11    Q.  Okay. Do you know what type of golf

12  clubs are used to tee off, what the name of that

13  is?

14    A.  Uh-uh, no.

15    Q.  Do you know what type of club is used in

16  the fairway?

17    A.  No.

18    Q.  Do you know where the fairway is?

19    A.  It's someplace between where you start

20  and where the hole is, I guess.

21    Q.  Do you know if there's any difference in

22  the names of the clubs the closer you get to the

23  green?

24    A.  I know each club has a different name,

1  because that's how you tell the guy on the course

2  what you need. But that's all I know. I don't

3  know what order they're in.

4    Q.  And do you know the area where you tee

5  off, what that's called?

6    A.  (Nodding).

7    Q.  Have you ever heard of the term tee box?

8    A.  No.

9    Q.  Have you ever heard of the term -- I

10  used the term green. Is that a -- have you ever

11  heard of that term before, the green?

12    A.  Yeah.

13    Q.  Okay. So you are familiar with that?

14    A.  The green -- well, I mean, I assume it's

15  the grass. I mean, I don't know what part of the

16  course it is. I just assume it's grass, because

17  grass is green.

18    Q.  Do you know where the flag is?

19    A.  Where the hole is --

20    Q.  Okay.

21    A.  -- I'm assuming, because there's a flag

22  there.

23    Q.  So do you know what the area where the

24  hole is placed, what area of the --

60 (Pages 234 - 237)

1    A.  I don't know.

2    Q.  -- course that that's called?

3    A.  I don't know.

4    Q.  Do you know what type of club you use if

5  your ball lands in a sandy area?

6    A.  No idea.

7    Q.  Do you know what the sandy area is

8  called?

9    A.  The -- no, I -- sandy area.

10    Q.  Do you know how to rate whether you

11  scored a good number or not on a hole?

12    A.  Like, I know it's who -- wait.  A low

13  number means you got it in less strokes.

14    Q.  Yeah.

15    A.  Okay.

16    Q.  And that's what I'm getting at.  Do you

17  know what the terminology is for that?

18    A.  I have no idea.

19    Q.  Okay.  So you don't know what to shoot

20  par means, correct?

21    A.  That comes up in mini golf, so I think

22  it means if it takes a certain amount of swings

23  to get to a hole, that's par.  And if you do it

24  less, that's good.  If you do it more, it's bad.

1    Q.  Is The Kev always held at River Forest

2  Country Club?

3    A.  I just went to the two.  I just went to

4  the two, the one prior, so it was at the same

5  place the year prior.

6    Q.  Did -- you had mentioned about how

7  Rachael was involved.  And what was Rachael's

8  position again?

9    A.  Something to do with accounting.

10    Q.  And --

11    A.  I think.

12    Q.  What's Rachael's last name?

13    A.  It's Weil, W-e-i-l.

14    Q.  And were you two -- I know counsel asked

15  you some questions about that, but were you two

16  friends or just colleagues during the 15 or

17  17 months that you worked?

18    A.  I'd say we were friends.  I mean, we

19  went out outside of work.

20    Q.  And I've read your diary.

21    A.  Uh-huh.

22    Q.  Yes.  You did a diary, right?

23    A.  Yeah, the journal, yeah.

24    Q.  So I did -- you call it a journal, not a

1  diary; is that correct?

2    A.  Yes.

3    Q.  I just want to use the terminology you

4  use.

5    A.  Yeah.

6    Q.  All right.

7    A.  Journal.

8    Q.  And then I've read the submissions you

9  made at the EEOC.

10    A.  Okay.

11    Q.  All right.  And did -- you have

12  indicated, and I've seen it in the exhibits that

13  were marked here already, that Rachael was

14  drinking that day?

15    A.  Yes.

16    Q.  And I believe you used the term

17  shit-faced?

18    A.  Yes.

19    Q.  You arrived at approximately noon?

20    A.  Approximately, yes.

21    Q.  And you were already on the course by

22  1:00 o'clock?

23    A.  1:00, 1:30, something like that, yeah.

24    Q.  Did everybody tee off at the same time?

1    A.  You don't start at one hole.  Like, you

2  kind of just -- somebody starts at 8, somebody

3  starts at 4.  You just kind of -- and then you

4  guys do whatever.  So whenever you get to your

5  hole is when you start.  I don't know when

6  everybody teed off, because I wasn't with them.

7  I was --

8    Q.  Right.  So people were starting at

9  different holes, right?

10    A.  Correct.

11    Q.  Okay.  And that's what I meant.

12    A.  Oh.

13    Q.  Was the start of the event then at --

14  everybody is shooting at a --

15    A.  Yes.

16    Q.  -- different hole, but starting at the

17  same time?

18    A.  Yes.  They were all told to go find your

19  hole and start.

20    Q.  And was the start time at 1:00 o'clock?

21    A.  I don't know.

22    Q.  Okay.  Your plan was to initially be

23  with one group; is that correct?

24    A.  No.  I said earlier my whole objective

1  to going was to take photos and stuff for Lauren,
2  who couldn't be there, and just document --
3  that's what we did the year prior. Like, we just
4  went around and took candid photos. So that was
5  my goal to do that. That was my mission, I
6  guess.
7      Q. And were you told by one of the
8  supervisors or someone in an authority position
9  at JCA that you weren't needed to do the
10  photographing that day?
11     A. When I got to one of the holes, I do
12  remember I offered to take their pictures, and
13  somebody commented that, like -- so The Kev, his
14  wife was there and the girls were there. And
15  somebody said, oh, don't worry about it, they'll
16  take care of the pictures, and I think referring
17  to the girls, the daughters of Kev, Kevin.
18     Q. Did you know any of the daughters'
19  names?
20     A. No.
21     Q. Do you know them now?
22     A. No, no idea.
23     Q. So when things started at 1:00 o'clock,
24  tell -- walk us through what you first did?

1      A. I mean, to the best of my knowledge, I
2  just got into a cart and started driving around
3  and taking pictures at various holes. I mean --
4      Q. Okay. And were you taking pictures of
5  everyone or a certain group that you were
6  following?
7      A. No, just everyone. Anyone -- trying to
8  get people in candid moments, take pictures of
9  the course. You know, if they could pose for it,
10  that was cool, if not, then that was fine, too.
11         MR. RUFF: Can you get out Exhibit 39.
12  Exhibit 40, 16, 17, and 18.
13         (Discussion off the record.)
14  BY MR. RUFF:
15     Q. So you started at about 1:00 and you
16  were driving by yourself, correct?
17     A. Yeah.
18     Q. And from what I heard from the questions
19  with counsel was that somewhere between 1:00 and
20  5:00, you came up to the hole where Tim Lee,
21  Kacper Stojowski, and is it Scheitly, Adam
22  Scheitly, am I saying that -- Scheitel?
23     A. Scheitel.
24     Q. Okay.

1      A. Yeah.
2      Q. -- were located; is that correct?
3      A. Yes.
4      Q. Had you -- what time was that that you
5  came upon them?
6      A. I have no idea.
7      Q. Somewhere between 1:00 and 3:00?
8      A. Right.
9      Q. I mean 1:00 and 5:00, right?
10     A. Between starting and leaving, yes.
11     Q. And do you know what hole it was?
12     A. I have no idea.
13     Q. If the hole that -- if I told you that
14  it's been suggested that the hole is No. 2, that
15  didn't mean they started on 1, they could have
16  started on some hole, and by the time they got to
17  2, that's when you met up with them?
18     A. Right.
19     Q. Do you know what hole they started out
20  at?
21     A. No.
22     Q. Was there any kind of roster of where
23  people would be starting, like, a starters' list?
24     A. There might have been. I'm not sure how

1  that's organized. It seemed like everybody --
2  when it was, like, time to go, everybody kind of
3  just knew where to go, but it might have just
4  been because they had done it before. I had
5  never -- I have no idea.
6      Q. So do you have any idea whether it was
7  toward the beginning, middle, or end of the round
8  that you came upon Mr. Lee, Mr. Scheitel, and
9  Mr. Stojowski?
10     A. What's the question again?
11     Q. Was it beginning, middle, or end? Was
12  it around halfway through, beginning?
13     A. Oh, between 1:00 and 5:00?
14     Q. Yes.
15     A. I would have to say that it was towards
16  the latter part.
17     Q. So toward one of the latter holes. What
18  number hole?
19     A. Towards -- I have no idea what --
20     Q. Okay.
21     A. -- direction they were going in or -- I
22  have no.
23     Q. When you say the latter part, you're
24  talking about 3:00 o'clock?

62 (Pages 242 - 245)

1   A.  I'm just talking time frame.
2   Q.  Right, that's what I'm getting at.
3   A.  Right, sure.
4   Q.  Was it after, like, 3:00 or after 4:00,
5   is that what you're talking about?
6   A.  I don't know.
7   MR. RUFF:  Okay.  We had previously
8   marked this exhibit, and I don't know what your
9   number was, Gene.  But it's the diary, or the
10  journal, excuse me.
11  Sam, if you could --
12  MR. SEDAEI:  35.
13  MR. RUFF:  39 is ours.  We marked it
14  before we came in today.  We can square up the
15  marking after.  But we marked the same exhibit as
16  Exhibit 39.
17  (Document marked as Dziubla Deposition
18  Exhibit No. 39 for identification.)
19  BY MR. RUFF:
20  Q.  This is your journal?
21  A.  Yes.
22  Q.  And can we agree that, at least, the
23  document we gave you, Exhibit 39, begins on
24  Dziubla 803 and continues through 809?

1   A.  Yes.
2   Q.  And it starts on September 20th, 2017?
3   A.  Yes.
4   Q.  And this document was made
5   contemporaneously, in other words, it was made on
6   September 20th, 2017?
7   A.  Yes.
8   Q.  Okay.  So it wasn't made at some later
9   date and then September 20th put down, correct?
10  A.  Correct.
11  Q.  All right.  So this would have been --
12  the event was -- am I stating it correctly that
13  the event was the 17th or 18th?
14  MS. CRONIN:  18th.
15  BY MR. RUFF:
16  Q.  It's on the 18th.  So this would be two
17  days after the event?
18  A.  Right.
19  Q.  So things would be fresh in your mind at
20  that point; is that fair?
21  A.  Yes.
22  Q.  Now, between the time of the start and
23  the time of coming up onto the second hole, had
24  you seen Mr. Scheitel, Mr. Stojowski, and Mr. Lee

1   throughout that time before?  Had you -- in other
2   words, had you run across them before on the
3   course?
4   A.  I don't know what you mean by second
5   hole.  What does that mean?
6   Q.  That means where the event occurred,
7   okay, where -- that is the subject --
8   A.  Oh, I don't know that that was the
9   second hole I went to, though.
10  Q.  Okay.  Let's just assume that that's
11  what -- where it was.  Okay?
12  A.  Okay.
13  Q.  By the time you got to where the event
14  was, how many times had you run across this
15  threesome?
16  A.  I don't remember.
17  Q.  More than once?
18  A.  I don't remember honestly.
19  Q.  Okay.  And what had you been doing
20  during that period of time?
21  A.  Like I said, taking pictures.  I know at
22  some point in time, I went to go -- like, I
23  texted them to meet up with them to try to figure
24  out what hole they were at.  But I don't recall

1   what he said.
2   Q.  And when you texted, with whom did you
3   text?
4   A.  I think it was Tim.
5   Q.  Was he the one that you were the closest
6   with in that group?
7   A.  I don't know.  Adam was a close second.
8   Q.  Okay.  And what was Adam's position?
9   A.  I want to say assistant project manager
10  maybe.
11  Q.  So you could have text -- had a text
12  exchange with either of them or both?
13  A.  It's possible.
14  Q.  And what you did was text, and you were
15  going to meet up with them eventually?
16  A.  Yes.
17  Q.  Why was that?
18  A.  I don't know.  It's boring by yourself.
19  Q.  Okay.  And while you were out there,
20  between the time you started and the time you
21  came up to that hole where you met them, had you
22  had anything to drink?
23  A.  Yeah, probably, a couple.
24  Q.  Okay.  And you -- had you had anything

63 (Pages 246 - 249)

1  to drink over lunch?
2      A.   Well, when we got there for lunch, we
3  ate lunch, and then I -- I'm pretty sure I had a
4  drink after that.
5      Q.   And what were you drinking?
6      A.   That I don't know.  I don't remember.
7      Q.   Wine, beer, liquor?
8      A.   I can't be sure what I was feeling that
9  day.
10      Q.   And by the time you came up to meet
11  them, had you had a number of drinks by this
12  time?
13          MR. SEDAEI:  Objection, form.
14          But answer if you can.
15  BY THE WITNESS:
16      A.   I had, at least, one.  I mean, I'll
17  admit to that, had a drink.
18  BY MR. RUFF:
19      Q.   Had you had, at least, five?
20      A.   I'm sorry?
21      Q.   Had you had, at least, five?
22      A.   Five?
23      Q.   Yes.
24      A.   Oh, God.

1      Q.   Okay.  Was Tim --
2      A.   Five?
3      Q.   Yes.  Between noon and --
4      A.   Oh, my God, no.
5      Q.   -- and whatever this was, 3:00,
6  4:00 o'clock --
7      A.   Not that recall, no.
8      Q.   -- had you had five drinks?
9      A.   Not that I recall, no.
10      Q.   Do you drink alcohol normally?
11      A.   Yes.
12      Q.   Okay.  What kind of alcohol?
13      A.   Like I said, it depends on the mood.
14  Sometimes it's a beer, sometimes it's hard
15  liquor, sometimes it's wine.
16      Q.   And what were you drinking that day
17  between noon and approximately 4:00 p.m.?
18      A.   I thought I just told you I didn't
19  remember.
20      Q.   Okay.  Were Tim, Kacper, and Adam also
21  drinking that day?
22      A.   Yes, they were.
23      Q.   Okay.  How would you know that unless
24  you had seen them out on the course?

1      A.   What do you mean, how would I know that
2  they were drinking?
3      Q.   Yes.
4      A.   Because there was -- let's see, Adam
5  peed in a bush because he was drunk.  And they
6  were actively -- I mean, we had people bringing
7  beers to the carts, so everyone had a beer.
8      Q.   So you would have met them at some point
9  before you actually met them at the time that
10  Mr. Jacobsen came up; is that fair?
11      A.   No, I don't -- I don't recall.
12      Q.   Well, then how would you know that -- my
13  point is how would you know that they were
14  drinking and that Adam was drunk?
15      A.   Because I met them afterwards.
16      Q.   Okay.
17      A.   Yeah.
18      Q.   So it was after the --
19      A.   That they were doing --
20      Q.   -- Mr. Jacobsen came up, correct?
21      A.   It was after -- I'm sorry, start again.
22  It was after?
23      Q.   What I'm trying to understand is how did
24  you know that they were drinking?

1      A.   Because I was traveling with them after
2  the incident with Jacobsen.
3      Q.   Did either Tim, Kacper, or Adam have the
4  opportunity to see you drinking before that time
5  when Mr. Jacobsen came up?
6      A.   I don't know what they saw.
7      Q.   If Mr. Stojowski says that you were
8  drinking throughout the day, would that be
9  accurate?
10      A.   Throughout the -- no, I don't think so.
11  It's not like -- throughout the day implies I'm
12  just, like, (indicating) which I wasn't, so, I
13  mean, I admitted to having a couple drinks.
14      Q.   And at the time that you -- Mr. Jacobsen
15  came up, were you under the effects of alcohol?
16      A.   I don't believe I was.
17      Q.   Were you -- I'm using Kacper's term.
18  Were you buzzing at that point?
19      A.   I don't recall being buzzed.
20      Q.   Could have been.  You just don't recall?
21      A.   I don't recall.
22      Q.   All right.  When you came up -- and some
23  of this I'm going to take from the diary.  But,
24  for instance, on page 2 of the diary, 804, about

64 (Pages 250 - 253)

1  a third of the way down from the top, it states
2  apparently I was driving right in the path of
3  where one of the women was going to hit her ball.
4  My bad.  Do you see that?
5      A.  Yes.
6      Q.  It's about a third of the way down.
7          Is that an accurate statement?
8      A.  Yes.
9      Q.  Okay.  So somebody was hitting a shot on
10  a particular hole and you happened to cross in
11  front; is that fair?
12     A.  Yeah.
13     Q.  Okay.  And that's because you weren't
14  necessarily familiar with the protocol of how to
15  look for somebody hitting.  You just
16  inadvertently did that; is that correct?
17     A.  That's -- yeah, and I didn't know,
18  like -- I don't really understand what's off
19  limits in terms of a golf course, because we kind
20  of just drove around.
21     Q.  And that's why I said not that you did
22  it intentionally, but you weren't aware of the
23  protocol --
24     A.  Oh.

1      Q.  -- of how to look for somebody --
2      A.  No.
3      Q.  Let me finish --
4      A.  Sorry.
5      Q.  -- and then you can say no.
6      A.  I'm sorry.
7      Q.  My question was:  You -- I'm not saying
8  that you did it intentionally, but you weren't
9  necessarily aware of the protocol of what to look
10  for to see if someone was hitting.  That's why
11  you found yourself in a position where you were
12  crossing the path of a woman who was going to hit
13  her ball; is that fair?
14     A.  Correct.
15     Q.  Okay.  So then as I understand it,
16  Mr. Jacobsen comes up on the scene; is that
17  right?
18     A.  Comes up on what scene?
19     Q.  You were at the hole?
20     A.  No.
21     Q.  Am I stating --
22     A.  I got flagged down.
23     Q.  Okay.
24     A.  I think I talked about that earlier.

1      Q.  Yeah, but I wasn't clear of sequence, so
2  that's what I'm trying to figure out.
3      A.  Yeah.
4      Q.  So why don't you take us through, you
5  know, what the sequence of getting to where you
6  meet Mr. Jacobsen?
7      A.  Well, I don't know the exact order of
8  it.  But I do recall coming across a group with
9  Jacobsen in it prior, and I decided to -- and I
10  think, I'm not 100 percent sure, I think that's
11  the one where The Kev's daughters were at.  And I
12  stopped to take a picture, and they said that
13  they didn't need any pictures, maybe.  I don't
14  know if that's the -- but I was, like -- I didn't
15  really stay, because I was just there to do my
16  job.
17          And then as I was driving through, I
18  was flagged down to meet with the celebrity or
19  guest of honor and then also obtain an
20  autographed piece of paraphernalia.
21     Q.  And that's what I'm trying to cover.
22     A.  Yeah.
23     Q.  Who flagged you down?  Or does Tim or
24  Adam or Tim Lee or Adam Scheitel text you come

1  over to this hole --
2      A.  No.
3      Q.  -- the celebrity --
4          Who is it then -- when you say
5  you're flagged down, I'm trying to understand it.
6      A.  It -- I mean, I don't know.  I know at
7  one point in time Tim told me what hole he was
8  at.  I don't know -- it's not my recollection
9  that it was the one that Jacobsen was on, but Jim
10  flagged me down.  I mean, he was, like, hey.  You
11  know, I mean, he's celebrating his guest of
12  honor.  And then honestly, if Tim would have done
13  it, I wouldn't have listened to him, because it's
14  Tim.  I mean, if Schumacher tells you to do
15  something, you're going to do something.
16     Q.  And that's what I'm trying to get at.
17  So who flagged you down to come over to this
18  hole?  Whatever the hole is, I believe it's hole
19  No. 2, but who flagged you down to come over?
20     A.  Jim, Jim Schumacher.
21     Q.  And is Jim Schumacher in a cart when he
22  says this?  Where's he?
23     A.  No, they're all already -- they're
24  already there, yeah.

1   Q.   That's what we don't know.
2   A.   Yeah, they're already there.
3   Q.   At this point, we don't know that.
4        So people are already gathered
5   around, and you're flagged to come over by
6   Mr. Schumacher; is that correct?
7   A.   Yes.
8   Q.   And do you know where they're gathered
9   around?  Do you know if it's by a -- where they
10  tee off, is it by the green?
11  A.   I mean, just in relation to where
12  everything happened, I want to say we were maybe
13  50 feet from the hole, so when the guys did their
14  practice, it took a couple shots, because no
15  one -- you know, unless you're an expert, I
16  guess, you can't hit that range in one shot.  So
17  I don't know what that means in terms of a green.
18  Q.   Well, let's assume the green is where
19  the hole is and where the flag --
20  A.   Yeah.
21  Q.   -- that goes into the hole sits.  Okay.
22  A.   Uh-huh.
23  Q.   How far were you from that?  Is that
24  what you're saying, you're about 60 feet?

1   A.   Yeah, like, from -- probably from the
2   wall to the other side of -- to the other side of
3   the room, the length of the room away.
4   Q.   Okay.  And when you say away, that's how
5   far the group was away from the hole where the
6   flag was?
7   A.   Yes.
8   Q.   Okay.  And do you know there's a
9   different type of cut for the area where the hole
10  is, where the flag is?  They call that the green.
11  Were you on the green or just off that green?
12  A.   I feel like we were off the green.
13  Q.   And when you're flagged down, you're
14  flagged down by Mr. Schumacher correct?
15  A.   (Nodding).
16  Q.   And what does he say?
17  A.   Something to the extent of, hey, Ro,
18  come over here.  Do you want an autographed ball
19  washer.  I'm, like --
20  Q.   And you were driving at this point?
21  A.   Yeah.
22  Q.   Okay.  So he said it loud enough to be
23  above the -- whatever noise the cart was making?
24  A.   Oh, yeah, so I could -- yeah, so that

1   it's heard.
2   Q.   All right.  And it just so happened to
3   be that three of your coworkers with whom you
4   were going to meet up at some point were the ones
5   that he was there with, or did you know to meet
6   them there?
7   A.   I did not know to meet them there.
8   Q.   All right.  So when you come up --
9   A.   Right.
10  Q.   -- on the scene, tell me who was there?
11  A.   From what I recall, they -- it's
12  those -- it's -- I want to -- I'm sure about Tim
13  and Kacper.  I feel like we met up with Adam
14  later, but it's possible that he was there as
15  well.
16  Q.   Incidentally, have you talked to any of
17  the ones who were at the hole since the time of
18  what you allege occurred between you and
19  Mr. Jacobsen?  Have you talked to any of the
20  witnesses as far as what they saw?
21  A.   I think there's text messages of me kind
22  of reaching out to them saying, hey, some shit
23  happened.  Tim said that he would help me in any
24  way -- well, he had actually checked in with me

1   to see if I was okay after it happened.  Just
2   asked me if I was okay.  And I think I reached
3   out to Scheitel afterward.  I didn't hear
4   anything back.
5        But, oddly, he texted me a couple
6   times out of the blue with, like, really cryptic
7   messages and told me that now he was an
8   estimator, and that something -- somebody we knew
9   there got -- I think, got let go, and he ended up
10  moving over to estimating or something.  There
11  was a change in personnel.
12  Q.   Right.  But the question that's -- that
13  I was asking you, have you spoken to anyone who
14  was at the scene about what happened after it
15  happened?
16  A.   Yeah.
17  Q.   Who?
18  A.   Kacper.  Well, I said earlier Kacper and
19  then Tim and then Joe McGuire.
20  Q.   Joe -- was Joe McGuire at the scene?
21  A.   No.  Sorry.
22  Q.   Okay.  So I'm just talking about --
23  A.   I'm sorry.
24  Q.   -- you spoke to Tim Lee and Kacper

1 Stojowski after the event about the event; is
2 that correct?
3    A. Yes.
4    Q. All right. I'll get to that in a
5 moment. But I'm just trying to figure out
6 anybody else that you spoke to after about what
7 happened?
8    A. That was present about -- no.
9    Q. Okay. So you've mentioned that Tim was
10 there, Kacper was there, you believe Adam
11 Scheitel was there.
12    A. Yes.
13    Q. Any -- Jim Schumacher was there?
14    A. Correct.
15    Q. Who else was there?
16    A. I don't remember.
17    Q. Obviously Mr. Jacobsen?
18    A. Oh, yeah.
19    Q. Abigail Radoha?
20    A. I don't know. The -- I'm assuming --
21 the last name I'm assuming is one of Kevin's
22 family members. That's all I know. I don't know
23 who it is or if it's the mom or the kid, or I
24 have no idea.

1    Q. Okay. Do you know was there a Radoha
2 there as well?
3    A. I don't recall.
4    Q. Did one of the Radohas take the photo of
5 you together?
6    A. Maybe.
7    Q. Okay.
8    A. I don't recall.
9    Q. So your best recollection is that one of
10 the Radohas was there, could have been there?
11    A. My recollection is my photo was taken.
12 I don't know by who.
13    Q. And you're not denying that she could
14 have been, correct, or that she was there?
15    A. I guess it's possible she could have
16 been there.
17    Q. If she has -- gives a statement that
18 says she was there and has an account of what
19 occurred, you're not disputing that she was
20 there?
21    A. I don't know who she is. I don't know
22 who you're referring -- I mean, again, I don't
23 know the difference --
24    Q. Abigail Radoha.

1    A. I know, but I don't know who that is.
2 You could --
3    Q. The daughter of Kev Radoha.
4    A. I have no idea of who that looks like or
5 any -- you know what I'm saying. Like, you could
6 put all three of those women in front of me and I
7 wouldn't be able to tell you who that is, who
8 either of them are.
9    Q. My question is very simply this. If
10 Abigail Radoha says she was there when you were
11 there and gives a statement attesting to that,
12 you're not saying she wasn't there, correct?
13 You're not disputing that?
14    A. I guess not. I don't recall her being
15 there, so...
16    Q. Okay. Was there anyone else there?
17    A. I don't recall.
18    Q. Do you know a Chad Crane?
19    A. Chad. No.
20    Q. Do you know that he was a golf pro who
21 was also there and witnessed the interaction
22 between you and Mr. Jacobsen?
23    A. I don't know.
24    Q. You're not denying he was there,

1 correct?
2    A. I'm -- yeah, I don't -- he could have
3 been there.
4    Q. Okay. And if he gives a statement that
5 he was there and he witnessed what occurred,
6 you're not disputing that he wasn't -- he was
7 there, correct?
8    A. As long as, yeah --
9    Q. Okay.
10    A. -- he's not lying.
11    Q. So if Mr. Crane was there, Abigail
12 Radoha was there, Tim Lee was there, Kacper
13 Stojowski was there, Adam Scheitel was there, Jim
14 Schumacher was there, other than you and
15 Mr. Jacobsen, that would be seven -- six other
16 people, correct?
17    A. I honestly don't recall there being that
18 many people there.
19    Q. You just don't recall it, correct?
20    A. Correct.
21    Q. You're not saying they weren't there,
22 correct?
23    A. Correct.
24    Q. All right. Now, when you approached,

67 (Pages 262 - 265)

1 Mr. Schumacher waves you down, you come over,
2 walk us through what occurs next?
3 　A. Something along the lines of, like, now
4 is your chance to get real life pro tutoring,
5 step right up kind of thing. Take your shots.
6 And I was, like, I don't play golf. I don't want
7 to.
8 　Q. And instructions were given then; is
9 that correct?
10 　A. They were verbally given, yes.
11 　Q. And so instructions were given to the
12 group as a whole?
13 　A. To the group as a whole; and then as you
14 went up, you, you know, he kind of gave you individual
15 verbal pointers. You know, like, Tim went up
16 before me, so he got guidance.
17 　Q. So if you could take us through there
18 would have been four people who received
19 guidance; is that correct?
20 　A. Including myself, yeah.
21 　Q. Yes.
22 　A. Uh-huh.
23 　Q. So it would be Tim Lee, Kacper
24 Stojowski, and Adam Scheitel, correct?

1 　A. Right.
2 　Q. And then yourself?
3 　A. Correct.
4 　Q. What order was the instruction given?
5 　A. Who went first?
6 　Q. Correct.
7 　A. I have no idea.
8 　Q. Could you have been last?
9 　A. I don't recall.
10 　Q. And so what Mr. Jacobsen did was
11 instruct on hitting a shot; is that correct?
12 　A. He performed something to show
13 originally how it's done, and then he gave
14 verbal -- I don't know what that's called, but
15 how to hit the ball into the hole from that
16 distance.
17 　Q. So we've established that, using the
18 terminology of being off the green and on the
19 green, you were off the green and he was showing
20 a shot that would hit onto the green toward the
21 hole; is that a fair characterization?
22 　A. That's my recollection of it, I guess.
23 　Q. All right. And what he did was with
24 each individual -- first of all, he showed how to

1 do it himself, correct?
2 　A. I believe so, yes.
3 　Q. And then the next phase was to
4 individually walk each person through this; is
5 that correct?
6 　A. Yeah, each person went up to take their
7 shot at it; and then he would give pointers, and
8 then they took another shot.
9 　Q. And Tim for sure went ahead of you?
10 　A. Yeah.
11 　Q. And as far as Kacper and Adam, you're
12 uncertain, but they could have?
13 　A. Correct.
14 　Q. All right. So you could have been the
15 last one; is that correct?
16 　A. Sure.
17 　Q. And as I understand, you did tell
18 everyone that you weren't skilled at golf; is
19 that correct?
20 　A. Yes.
21 　Q. Okay. And words you used were what?
22 　A. I don't -- is it written there? I don't
23 know. I don't know what I used. I don't
24 remember.

1 　Q. You said here, half -- about halfway
2 down, Then before we leave, someone suggests that
3 we each take a shot at putting on the green; is
4 that correct? It's the second page, same page,
5 804, about halfway down, maybe just a little bit
6 above halfway.
7 　A. Okay.
8 　Q. So that's what you called what you were
9 doing, a shot at putting at the green, correct?
10 　A. Yes.
11 　Q. And it says here, I swore I sucked at
12 golf and Peter said to still give it a try. Do
13 you see that?
14 　A. Yes.
15 　Q. Okay. So how did you express that you
16 were not skilled at golf? That's the question.
17 　A. I verbally told him.
18 　Q. How did you say it, what words?
19 　A. I don't play golf. I don't remember my
20 exact words. I might have even referenced the
21 last time me actually -- like, the whole
22 17-year-old. I mean, I'm, like, I don't play
23 golf. I think it's boring. I don't know why
24 people -- I mean, I don't know what I said to

1   him.
2     Q. Okay. And from what I understand is
3   that he tried to show you how to do it, correct?
4     A. Him physically?
5     Q. Yes.
6     A. Himself, yes.
7     Q. Okay. And tried to have you, you say
8   here, make a snow angel with the club, a single
9   elevation back and forth, he motioned?
10    A. Yeah.
11    Q. What did you mean by that? What did he
12   show you?
13    A. I guess it's the, like, the whole --
14   like, you're holding the golf club in front of
15   you, and I guess you maintain, like, kind of
16   rigid. And you just kind of swing back, so that
17   you're like a pendulum, so that there's no dipper
18   in how to hit the ball. I think it's a fluid
19   motion from start to finish, so it continues the
20   ball through.
21    Q. And so that's what you were trying to
22   do?
23    A. Yeah, I was trying to mimic him.
24    Q. And it didn't work?

1     A. No.
2     Q. Okay.
3     A. Well, it didn't go in the hole. I don't
4   know -- I might have executed that movement.
5   It -- the ball didn't go in the hole, so I'm
6   guessing that's what I meant, like, fail.
7     Q. Or did it mean that you didn't even hit
8   the ball?
9     A. Maybe.
10    Q. Okay.
11    A. That's a possibility. It's happened
12   before.
13    Q. Okay. And that's when Peter announced
14   that he was going to -- I'm going to need a
15   little bit more guidance; is that correct?
16    A. Yes.
17    Q. So he had actually told you that in
18   front of everyone that you may need a little bit
19   more guidance, correct?
20    A. Yep, yes.
21    Q. And just to back up a second. Peter --
22   it said, I swore I sucked at golf, and Peter said
23   to still give it a try.
24    A. Right.

1     Q. So he was encouraging you to try to get
2   involved and try to do it; is that fair?
3     A. Yes.
4     Q. Okay. And I believe you said that he --
5   well, why don't you tell me. So what happens --
6   let me even back up a little bit further.
7       When he's showing you how to swing
8   and he is showing you how to do that, are you
9   positioned where you can see him? In other
10   words, are you facing him?
11    A. I would have to be in order to see him,
12   right.
13    Q. Right. Well, that's what I'm -- either
14   you're behind him or beside him. And I'm just
15   trying to figure out were you directly across
16   from him exactly facing him?
17    A. If the hole is where the camera is, he's
18   in front of me demonstrating, and I'm standing
19   over here. And we took the -- where everything
20   happened, I took the shot from here.
21    Q. Understood. So he is facing --
22    A. In front of me.
23    Q. -- you when that's occurring?
24    A. He's, like, on the side. And I'm, like,

1   you know. He's not -- he can't face me. He's
2   hitting sideways from what I remember.
3     Q. So you're to the back of him or you're
4   facing him? That's what I'm trying to figure
5   out.
6     A. I am not directly in front of him, no.
7   I don't --
8     Q. Okay. I'm not saying in front of him
9   shooting. I'm saying where he's looking. In
10   other words, you're shooting to the left, but I'm
11   looking across the table.
12    A. I don't remember.
13    Q. Okay. When you were doing the
14   instruction, was he facing you, in other words,
15   your eyes are facing each other?
16    A. I don't remember.
17    Q. Was he to the back of you or to the side
18   of you?
19    A. When I was doing my shot?
20    Q. Yeah, when you were doing your --
21    A. By myself?
22    Q. Yes.
23    A. I don't remember.
24    Q. But he wasn't behind you actually

69 (Pages 270 - 273)

1 physically touching you at that point, correct?
2    A. Correct.
3    Q. There was a -- okay. There was a point
4 where there were -- independently you were
5 trying --
6    A. Correct.
7    Q. -- to do the motion.
8    A. Correct.
9    Q. Is that fair?
10    A. Yes.
11    Q. Okay. And where he was, whether he was
12 facing you or not, you just don't remember at
13 this point?
14    A. Correct.
15    Q. He could have been; you just don't
16 remember?
17    A. I don't remember.
18    Q. All right. But then he announces -- he
19 tells everyone that you're going to need some
20 physical instruction, so then he comes around
21 behind you at some point?
22    A. Yes.
23    Q. Okay. And you said that this was
24 similar to -- up to this point, it's similar to

1 the instruction that you received from Clint
2 Hickman?
3    A. Yeah.
4    Q. Okay. And, in fact, I think you -- and
5 I can show you, but you reported to the EEOC that
6 the instruction that was physically given by
7 Mr. Jacobsen was very similar to that given by
8 Mr. Hickman; is that fair?
9    A. The approach was, yeah.
10    Q. Okay. It's just the difference was is
11 the lewd comment; is that fair?
12    A. The lewd comment and the proximity
13 that -- I mean, Clint definitely was a little --
14 I mean, he was still behind me, but you could
15 tell it was -- it wasn't uncomfortable to begin
16 with, and then obviously minus the lewd comment.
17    Q. Okay. But my point is is that the
18 physical contact between you and Mr. Jacobsen was
19 similar to that of you and Mr. Hickman; is that
20 correct?
21    A. It was uncomfortable from the start.
22    Q. I get it.
23    A. It's similar.
24    Q. It was similar?

1    A. Right.
2    Q. What made it different was the lewd
3 comment; is that fair?
4    A. And, also, his proximity to me as a
5 person.
6    Q. Okay.
7    A. Was different.
8    Q. What is it about the proximity?
9    A. He was right up against me.
10    Q. Okay. And was Clint Hickman up against
11 you or --
12    A. No. Like I said, he was -- it was done
13 in a -- you know, like, you go to hug someone,
14 you kind of keep your butt tucked out. Like, he
15 was there behind me, but you could tell that he
16 was respecting my space behind me. There was no
17 respect of my bodily space behind me.
18    Q. Did you feel that there was anything
19 offensive about the physical contact?
20    A. Yes.
21    Q. Okay. And what was it?
22    A. I believe so.
23       That he was -- there was no space
24 between us.

1    Q. And what was it, just the physical
2 proximity or that's it?
3    A. I don't know, how would you feel if a --
4 in that situation, if a man pressed his body up
5 against yours like that? I mean, it was very
6 uncomfortable.
7    Q. I wasn't there. I'm asking you the
8 question.
9    A. It was very uncomfortable. I was, like,
10 wow this is different; and then with the comment,
11 it was just, like, holy shit.
12    Q. Absent the comment, would you have felt
13 that there was anything unusual?
14    A. Yeah. It would have bothered me a lot.
15    Q. Is there any difference in height
16 between Mr. Hickman and Mr. Jacobsen?
17    A. I don't -- I would -- I mean, if I had
18 to say, I would say maybe he's tall -- he's
19 taller. I'm not sure.
20    MR. SEDAEI: Who is taller?
21 BY THE WITNESS:
22    A. Peter.
23       I don't know what that means, but...
24

70 (Pages 274 - 277)

BY MR. RUFF:

2    Q.   Absent -- I may have asked you this, but
3  I don't know if I heard the answer.  Absent the
4  lewd comment, would you have felt anything was
5  unusual about the contact?

6    A.   Yes.

7    Q.   What was that specifically?

8    A.   Like I said, it was the lack of space
9  between our bodies.

10   Q.   Okay.  It was the proximity --

11   A.   Yeah.

12   Q.   -- how close you were?

13   A.   Yes.  Like, touching.

14   Q.   Okay.  Anything -- but nothing unusual
15  in his movement absent -- other than being close;
16  is that correct?

17   A.   Yeah, that's correct.

18   Q.   So other than his being close or closer
19  than Clint Hickman did it, there was nothing
20  offensive about the touching portion of it; is
21  that correct?

22   A.   He was touching me.  That was offensive.

23   Q.   Okay.  And what was -- what part of his
24  body was touching you?

1    A.   His lower part of his body was pressed
2  up against my butt.

3    Q.   And when you say lower part of his body,
4  was it his hip, his groin?  What was it, his
5  pelvis?

6    A.   The -- his -- I get his frontal part of
7  his bod -- I don't know, where his -- I don't
8  know where he lined up on me in terms of his
9  height.  Maybe it was his belly button.  I have
10  no idea.

11   Q.   So what was touching you, you don't
12  know; is that correct?

13   A.   Correct.

14   Q.   And what was the comment?

15   A.   Something along the lines of I'm going
16  to show her where I'm going to put my wood.

17   Q.   Are you certain -- is that -- as best
18  you can recall, that's the exact phraseology?

19   A.   I know I documented what he said the
20  night of, and I'll stand by that.

21   Q.   And --

22   A.   In my email.

23   Q.   What --

24   A.   In my email to Jim the night of,

1  whatever that says is what --

2    Q.   It's Exhibit 16.

3    A.   Oh, when you take -- yeah, when you take
4  his wood out.

5        MR. SEDAEI:  Except he said my.

6        THE WITNESS:  Yeah.  Sorry.

7  BY MR. RUFF:

8    Q.   It says here -- you're looking at
9  exhibit -- what's the number?

10       MR. SEDAEI:  16.

11       MR. RUFF:  Because we had it marked 16,
12  but we'll go by 60.

13       THE WITNESS:  No, 16.

14       MS. CRONIN:  16.

15       THE WITNESS:  He said 16, 1-6.

16  BY MR. RUFF:

17   Q.   16.  All right.  So what you're
18  referring to is demonstrating to a female how to
19  play golf does not require you to press your
20  groin into her back side and tell her that's when
21  you take his wood out?

22   A.   Yeah.

23   Q.   When you put that in quotes, is that
24  what you believe was said at that point?

1    A.   Yes.

2    Q.   And that's the entirety of what was
3  said?

4    A.   Yes, or what I heard.

5    Q.   Well --

6    A.   Like, if there was more context to it, I
7  didn't hear it.  That's what I heard.

8    Q.   And are you certain that he said when
9  you take his wood out?

10   A.   Yes.

11   Q.   The wood is in -- his is in parentheses.
12  Are you saying when you take wood out, and you're
13  adding the his?

14   A.   I'm not sure what the parentheses mean.

15   Q.   In other words, could he have said
16  that's when you take the wood out without the his
17  in there?

18   A.   He could have said that.

19   Q.   Okay.  Are you aware of the fact that
20  there is an old golf joke about woods and irons?

21   A.   I am not.

22   Q.   Okay.  Did he say beginning golfers
23  start with the irons and end up in the woods or
24  work their way in the woods?

1    A. Did he say that to me?
2    Q. Yes.
3    A. No, I don't remember that.
4    Q. Okay. Are you denying that he -- that's
5    the full joke?
6    A. I didn't know it was a joke. You know
7    what I'm saying. I didn't -- I only --
8    Q. You only heard part of it is what you're
9    saying?
10   A. I heard -- I recorded --
11       MR. SEDAEI: Mischaracterizes testimony.
12       THE WITNESS: Yeah.
13       MR. SEDAEI: But go ahead and answer
14   again.
15   BY THE WITNESS:
16   A. I mean, I just reported what I heard.
17   Did I know it was a fragment? No.
18   BY MR. RUFF:
19   Q. Right. What I'm saying is what you put
20   down here in quotes, could it have been a
21   fragment?
22   A. I suppose.
23   Q. Okay. And what I'm saying is could the
24   rest of it be beginning golfers start with the

1    irons and end up in the woods?
2    A. I don't know.
3    Q. Could have?
4    A. It could have been anything that had the
5    wood in it. I mean, I don't know.
6    Q. Or work their way in the woods, correct?
7    A. I don't know.
8    Q. And what you took from the words was a
9    sexual reference?
10   A. He was right behind me. It's a very
11   inappropriate time to make a comment or crack a
12   joke.
13   Q. Do you understand that beginning golfers
14   struggle to hit the ball straight?
15   A. Beginning golfers. Yeah, I guess.
16   Q. Okay. And they start with the irons,
17   which may be easier to control?
18   A. I don't know what that means.
19   Q. And that the woods are less easily
20   controlled?
21   A. No idea what that relates to.
22   Q. And that if you hit a wood, you might
23   end up in the woods?
24   A. I don't know what that means.

1    Q. Do you know that iron is a club?
2    A. It's a reference to a type of golf club,
3    yes.
4    Q. Okay. And did you know that wood is a
5    type of club?
6    A. I'm assuming it's the ones that have
7    wood on it. I don't know.
8    Q. Do you know that historically that woods
9    were made out of woods, but now they are still
10   referred to as woods, but they just have the
11   bigger --
12   A. No.
13   Q. -- rounder ends to them?
14   A. Not until you just told me right now
15   honestly. No idea.
16   Q. So you don't know if the entire joke
17   could have been misconstrued by you that
18   beginning golfers start with irons and end up in
19   the woods, correct?
20   A. Could have been that.
21   Q. And woods are trees, correct? Could it
22   also be trees, woods could be trees?
23   A. From what you told me today, sure.
24   Q. Have you ever heard to go into the woods

1    or poems about going -- walking through the
2    woods?
3    A. Oh, yeah, sure.
4    Q. Okay. So you know that woods can be
5    trees as well, correct?
6    A. Sure.
7    Q. And do you know that woods are also an
8    area on the golf course?
9    A. Where the trees are?
10   Q. Correct.
11   A. Okay. Yeah.
12   Q. And that if you use a wood, you can end
13   up in the woods, correct?
14   A. I don't understand what this -- I don't
15   understand what this is. Like, I -- so a golf
16   club could be called a wood. Those are his
17   words. I don't know what the terminology is.
18   Q. You think what we have going on here is
19   you hearing the word woods and jumping to a
20   conclusion as to what woods meant from a sexual
21   standpoint as opposed to an innocent construction
22   related to golf clubs and an area on the golf
23   course?
24   A. To tell you the truth, if that comment

72 (Pages 282 - 285)

1 was made without him behind me pressing up
2 against me in a room full of people, I would not
3 have said -- I would have been, like, well, that
4 was inappropriate, and then I just would have let
5 it go. The fact that it was made while he was --
6 I mean, what I heard and what I experienced is my
7 experience.
8    Q.  Understood.
9    A.  So --
10    Q.  Let's just try my question, though.
11        I'm going to ask Suzanne to read it
12 back.
13        (Whereupon, the question was read as
14        follows:
15    Q.  You think what we have going
16 on here is you hearing the word woods
17 and jumping to a conclusion as to what
18 woods meant from a sexual standpoint as
19 opposed to an innocent construction related
20 to golf clubs and an area on the golf
21 course?)
22 BY THE WITNESS:
23    A.  I do not think I jumped to a conclusion.
24

1 BY MR. RUFF:
2    Q.  If everybody else on -- that was
3 standing around there at that time came to the
4 same conclusion, that there was nothing
5 inappropriate about what was said and that it was
6 a simple golf joke, Tim Lee, Kacper Stojowski,
7 Adam Scheitel, Jim Schumacher, Peter Jacobsen,
8 Abigail Radoha, and Chad Crane, all say that it
9 was the interpretation that I just put to it, an
10 innocent construction, could you then realize
11 that perhaps you were mistaken as far as the
12 context?
13    A.  Well, here is the thing, they're all
14 familiar with golf. I don't know -- none --
15 it's -- maybe if I knew stuff like that, maybe it
16 would have registered differently, but I don't
17 know this term and -- I don't know any of this
18 terminology.
19    Q.  You raise a valid point. So had you
20 known the reference of golf to irons and woods
21 and ending up in the woods, you would agree that
22 there could be an innocent construction, but you
23 not having that reference could have come to a
24 different conclusion; is that correct?

1    A.  Say it again, I'm sorry.
2        MR. RUFF:  It was so good I can't repeat
3 it.
4        THE WITNESS:  Sorry.
5        MR. RUFF:  And, Suzanne, real loud, so
6 the jury and the Judge can hear.
7        And, oh, by the way, don't put in
8 the transcript record read as above. I want to
9 see the actual transcript, so we all know what
10 you read.
11        (Whereupon, the question was read as
12        follows:
13    Q.  You raise a valid point. So had
14 you known the reference of golf to irons
15 and woods and ending up in the woods, you
16 would agree that there could be an innocent
17 construction, but you not having that
18 reference could have come to a different
19 conclusion; is that correct?)
20        MR. SEDAEI:  I know you said that was a
21 good question, but I'm going to object to form.
22        But answer if you understand it.
23        MR. RUFF:  I think the Judge will allow
24 it.

1 BY MR. RUFF:
2    Q.  Go ahead. You want it back one more
3 time.
4    A.  I do.
5        MR. RUFF:  And, again, real loud,
6 Suzanne, please.
7        (Discussion off the record.)
8        (Whereupon, the question was read as
9        follows:
10    Q.  You raise a valid point. So had
11 you known the reference of golf to irons
12 and woods and ending up in the woods, you
13 would agree that there could be an innocent
14 construction, but you not having that
15 reference could have come to a different
16 conclusion; is that correct?)
17 BY THE WITNESS:
18    A.  I don't know that I can answer that
19 honestly, because I don't -- you don't know what
20 you don't know, and I didn't know that then.
21 BY MR. RUFF:
22    Q.  You know it now, though, correct?
23    A.  Right. But why would I speculate how
24 that -- I would feel two years ago had I known

1 something I just found out now. I can't answer
2 how this knowledge now affects me two years ago.
3    Q. I'm not asking you how it affected you.
4 You could --
5    A. That's how I'm interpreting your
6 question.
7    Q. There's no question pending.
8      All I'm asking you is very simply
9 realizing the context now, that it has no sexual
10 meaning whatsoever, but rather is a golf joke,
11 but you not having that reference which you now
12 have could have come to a wrong conclusion. Can
13 we agree on that?
14      MR. SEDAEI: Objection, mischaracterizes
15 testimony; objection, calls for speculation;
16 objection, asked and answered.
17      But answer again if you understand
18 it.
19 BY THE WITNESS:
20    A. I feel like I've covered it.
21 BY MR. RUFF:
22    Q. Right.
23      Can we have the question back.
24      We need an answer actually to this.

1 Do you need the question back or can you answer
2 it?
3    A. I just feel like I've -- I don't think I
4 can answer it.
5    Q. Right. We're going to ask for an
6 answer, though. You're required to answer.
7      MR. SEDAEI: But I think that's her
8 answer, right?
9 BY THE WITNESS:
10    A. That's my answer.
11      MR. SEDAEI: I think that's her answer,
12 I don't know, that she does not know.
13      MR. RUFF: Good try there, Sam. So --
14      MR. SEDAEI: She says she can't answer.
15      MR. RUFF: You're doing a great job in
16 speaking up for her. But let's just -- up until
17 this point, she was doing a good job in answering
18 the questions herself. Happy to give you --
19      MR. BOYLE: Ed, you want this?
20      MR. RUFF: No, they can hear me.
21      Let's just have the question and
22 answer back -- my question back.
23      THE WITNESS: I'm sorry.
24

1      (Whereupon, the question was read as
2      follows:
3      Q. All I'm asking you is very
4      simply realizing the context now, that
5      it has no sexual meaning whatsoever, but
6      rather is a golf joke, but you not having
7      that reference which you now have could
8      have come to a wrong conclusion. Can
9      we agree on that?)
10 BY THE WITNESS:
11    A. No.
12 BY MR. RUFF:
13    Q. Why not?
14    A. Because it was the contents -- it was
15 the context that the joke was presented, that he
16 was behind me presenting the joke. So I don't
17 feel like I could have come to a wrong
18 conclusion.
19    Q. The con -- you said the context which
20 would be in the middle --
21    A. He made me --
22    Q. -- of an instruction; is that correct?
23    A. With himself pressed against me, a joke
24 like that could on -- I mean, that's how it was

1 taken.
2    Q. I get it. How you would take it. My
3 point is different. Now having the joke
4 explained to you and the full joke, not a portion
5 of the joke, and realizing that you didn't know
6 irons, you didn't know woods, and you didn't know
7 there were areas on the course called woods, you
8 realize that there can be a nonsexual, just a
9 golf humor to the joke; can we agree on that?
10    A. Sure.
11    Q. Okay. And it's solely what you believe
12 the context of the joke being presented, that is
13 your issue, in other words, his proximity to you
14 at the time the joke was delivered; is that fair?
15    A. Yes.
16    Q. And the physical contact was in your
17 view offensive because of the joke, agreed?
18    A. No. I said it before. He was -- it was
19 uncomfortable from the start because he was too
20 close.
21    Q. You know, I failed to ask you this
22 before. When Mr. Jacobsen said that he was going
23 to show you physically how to do this, you had no
24 objection to that, correct?

74 (Pages 290 - 293)

1      A.   He said I was going to need a little bit
2   more guidance.  At no point was he, like, hey,
3   I'm going to press myself up against you.  When
4   he said I needed more guidance, I assumed it
5   would be similar to what I experienced with
6   Clint.
7      Q.   I get that.  So but you had no objection
8   to him coming around and grasping his arms around
9   you to help you swing.  That was similar to what
10  Mr. Hickman had done, correct?
11     A.   Had he executed it that way, that would
12  have been perfect.
13     Q.   And you had no objection to that contact
14  with that thought in mind, correct?
15     A.   Correct.
16     Q.   And, in fact, he announced to everyone
17  that that's what he was going to do, to everyone
18  present, correct?
19     A.   Actually so -- correct.
20     Q.   Can we agree that if the joke was not
21  offensive, then the contact was not offensive,
22  correct?
23     A.   No, no, because I already told you.
24     Q.   Can we agree that when you called the

1   EEOC the next morning that was done at the advice
2   of Beata, correct?
3      A.   It was online, and, yes.
4      Q.   And Beata is a police officer?
5      A.   She's a high school friend of mine that
6   is a police officer, yes.
7      Q.   And where is she a police officer?
8      A.   Chicago.
9      Q.   And what is her position in the --
10     A.   I don't know.
11     Q.   What is her last name?
12     A.   She was married -- she recently got
13  divorced.  I don't know if she was married to
14  him.  It would either be Staszewski, her maiden
15  name, or Decker the married name.
16     Q.   I didn't catch the second one.
17     A.   Decker.
18     Q.   Decker.  Okay.  And can you spell the
19  first name, Staszewski?
20     A.   S-t-a-s-z-e-w-s-k-i.
21     Q.   And when you reported to the EEOC, you
22  reported online; is that correct?
23     A.   What was done online was actually to
24  file an appointment to report a claim that I

1   didn't find out until later.
2      Q.   But you didn't give your account of what
3   was going on at that time, correct?
4      A.   Correct.
5           (Discussion off the record.)
6           THE WITNESS:  You want this back.
7           MR. SEDAEI:  So we already have an
8   Exhibit 17.  How are you going to do that?
9           (Discussion off the record.)
10          MS. CRONIN:  We have to remark it.
11          MR. SEDAEI:  Do you want me to give this
12  to you or are we going to add it?
13          MR. RUFF:  What was it -- what's 17
14  already?
15          MS. CRONIN:  17 is --
16          MR. RUFF:  I think it's because we're
17  both marking, that's -- and we had come in for
18  this.
19          What's the marking for that one.
20  Just give it another marking.
21          (Discussion off the record.)
22          MR. SEDAEI:  You want 39.
23          MR. RUFF:  It's her diary.
24          MR. SEDAEI:  But this is the one the

1   witness is holding.
2          MR. RUFF:  Just put another number on
3   it.  Let's roll.
4          MS. CRONIN:  All right.  Let's go.
5          MR. RUFF:  So we have 39 is the
6   statement and the diary and what's the --
7          MR. SEDAEI:  So what are we calling 17
8   now?
9          MS. CRONIN:  40.
10         MR. SEDAEI:  40.
11         (Document marked as Dziubla Deposition
12         Exhibit No. 40 for identification.)
13  BY MR. RUFF:
14     Q.   If we look at Exhibit 40, that is the
15  EEOC -- first of all, have you seen this document
16  before today?
17     A.   I don't recall.  I mean, it looks like
18  it's a confirmation page of maybe something I
19  submitted online.
20     Q.   Yeah, for the record, and I think this
21  was in your production as well, it's JCA 98
22  through JCA 102, and it's your interview, I
23  believe, with the EEOC investigator.
24     A.   Okay.

1   Q.   Have you seen this before?
2   A.   I feel like I answered this already.  I
3   mean, this is two years ago.  I don't remember
4   this exact document.
5   Q.   You're not denying that that's the
6   interview that occurred on October 24, 2017,
7   beginning at 8:45 p.m.?
8   A.   No.
9   Q.   Okay.  If we look at page 101 at the
10  bottom.
11  A.   Okay.
12  Q.   And, again, this would be October 24th.
13  This would be approximately five weeks, can we
14  agree, after the encounter with Mr. Jacobsen?
15  A.   Yes.
16  Q.   Okay.  And on October 24th, 2017, an
17  account was made of what you said to the
18  investigator; is that fair?
19  A.   Yes.
20  Q.   If we look on 101, about half of the way
21  down, it says -- no, excuse me, about a third of
22  the way down, Further into the afternoon I ran
23  into their group again, and Jim handed out
24  autographed flags by Peter.  Do you see that?

1       Sam, can you show her?  Thank you.
2       MR. SEDAEI:  Right here.
3   BY THE WITNESS:
4       A.   101.  Oh, I see it.  Further.  Okay.
5   BY MR. RUFF:
6       Q.   Do you see that?
7       A.   Yes.
8       Q.   Okay.  It says further in the
9   afternoon -- into the afternoon, I ran into their
10  group again, and Jim handed out autographed flags
11  by Peter, and we all took a shot at the ball.
12  Did I read that correctly?
13      A.   Yes.
14      Q.   All right.  And this is your account to
15  the investigator five weeks after the event,
16  correct?
17      A.   Yes.
18      Q.   Right?
19      A.   Yes.
20      Q.   All right.  Since I am not a good golf
21  player, Peter gave me pointers - fine.  But when
22  I wasn't getting the hang of it, he decided that
23  a more physical approach was required and
24  exclaimed to everyone that he was going to show

1   me where he puts his wood.  It was beyond
2   humiliating.
3       Did I read that correctly?
4       A.   Correct.
5       Q.   All right.  That's similar to the email
6   about when you take (his wood) -- (his) wood out.
7   You agree?
8       A.   Yes.
9       Q.   I cracked a couple jokes to Jim letting
10  him know that I was not okay with the situation,
11  and he just laughed.
12      All right.  There's no account in
13  here of the physical nature of your contact with
14  Peter.  Can we agree on that?
15      A.   Not on what you read, no.
16      Q.   I'm sorry?
17      A.   Not in what you read.  I didn't read off
18  the --
19      Q.   Yeah, I didn't see anywhere else on
20  here.  In fact, it goes onto other points in
21  here.
22      A.   Okay.
23      Q.   You're welcome to take a look at it.
24      Can we agree on that, though,

1   there's no indication of any inappropriate
2   physical contact?
3       A.   Right.
4       Q.   And then if we look at your diary, going
5   back to Exhibit 39, we talked about, So I watch
6   OG.  I see and I give it a shot - fail.  We read
7   that before?
8       A.   Yeah.
9       MR. SEDAEI:  Can we have Exhibit 39
10  again.
11      MR. RUFF:  We didn't take it away from
12  you.
13      MR. SEDAEI:  Did I just give you
14  Exhibit 39?
15      MR. BOYLE:  This was my copy.
16      MR. SEDAEI:  Okay.  Here, just look at
17  mine.
18      THE WITNESS:  Okay.
19      (Discussion off the record.)
20      MR. SEDAEI:  It's okay.
21      MR. RUFF:  I'm almost done with this, by
22  the way.
23  BY MR. RUFF:
24      Q.   So I watch OG.  I see and give it a shot

1  - fail. And Peter announces that I'm going to
2  need a little bit -- a little more guidance and
3  says something along the lines of this is when I
4  tell him where I put my wood. That's another
5  version of that same phrase, correct?
6      A.  Yes.
7      Q.  Okay. He straddles me from behind and
8  takes over my swing.
9          Did I read that correctly?
10     A.  Yes.
11     Q.  All right. There's no indication in
12 this account of any inappropriate contact
13 physically, correct?
14     A.  I think that's what straddles implies.
15     Q.  Well, straddle would be the same thing
16 Clint Hickman did, correct?
17     A.  No.
18     Q.  Okay. So he didn't straddle you to --
19 how did he do it then?
20     A.  In a nonoffensive way.
21     Q.  Okay. All right. Well, my point is is
22 there's no indication in this account of any
23 offensive touching, correct?
24         MR. SEDAEI: Objection, asked and

1  answered.
2          But answer it again if you have --
3  BY THE WITNESS:
4      A.  My reference in this in my journal is
5  what I previously said about the contact between
6  me and him. So maybe I used the same word for
7  two different meanings.
8  BY MR. RUFF:
9      Q.  Kind of like the joke, correct?
10         MR. SEDAEI: Objection, form.
11         But answer if you understand.
12 BY THE WITNESS:
13     A.  Not in the context that I was in, no.
14 BY MR. RUFF:
15     Q.  The whole context relates to the
16 comment. Can we agree on that?
17     A.  No. I told you already. Stop
18 rephrasing stuff. I already told you.
19     Q.  All right. There's no indication of any
20 offensive touching in this account. Can we agree
21 on that?
22     A.  That's your interpretation.
23     Q.  Do you agree with that?
24         MR. SEDAEI: Objection, mischaracterizes

1  testimony.
2          But answer again.
3  BY THE WITNESS:
4      A.  I believe that that phrase does -- it --
5  he straddles me from behind and takes over my
6  swing is relating to my previous comments. It
7  does not absolve him of it.
8  BY MR. RUFF:
9      Q.  No, that's not my question, ma'am.
10     A.  That's what you're leading to.
11     Q.  The reason -- a reasonably objective way
12 of looking at what you wrote there does not
13 indicate any offensive touching as far as your
14 diary indicates, true?
15     A.  It's my diary. I am documenting how I
16 feel, and I am telling you that that's what those
17 words mean.
18     Q.  All right. Move to strike the answer as
19 not responsive.
20         You want the question read back?
21         MR. SEDAEI: I think that was
22 responsive, so objecting --
23         MR. RUFF: But it's not responsive to
24 the question.

1          MR. SEDAEI: I'm sorry, if I may finish.
2          MR. RUFF: Go ahead.
3          MR. SEDAEI: And so the extent that we
4  can object to it being stricken, I'd like to --
5  I'd like that to be on the record, too.
6          MR. RUFF: Fine.
7          MR. SEDAEI: I think she's answered that
8  question more than once or twice, and you can't
9  keep asking questions until you get the answer
10 you want.
11         MR. RUFF: Well, it's called cross exam,
12 and we know that she responded --
13         MR. SEDAEI: I think it's shopping for
14 an answer.
15         MR. RUFF: Let me finish. I didn't
16 interrupt you.
17         MR. SEDAEI: Okay.
18         MR. RUFF: We all know that there was a
19 response, but it wasn't responsive to the
20 question. That's why I'm moving to strike it.
21         So let's have Suzanne read it back.
22         (Wherepon, the question was read as
23         follows:
24     Q.  The reason -- a reasonably

1  objective way of looking at what you
2  wrote there does not indicate any
3  offensive touching as far as your diary
4  indicates, true?)
5  BY THE WITNESS:
6    A.  True.
7  BY MR. RUFF:
8    Q.  Okay.  If we can go to exhibit -- we
9  have got this marked as 19.  Maybe it's best to
10  just put random numbers on it.
11        (Discussion off the record.)
12        (Document marked as Dziubla Deposition
13         Exhibit No. 41 for identification.)
14  BY MR. RUFF:
15    Q.  All right.  On Exhibit 41, this is the
16  text exchange -- I think it's the same text
17  exchange that counsel may have referred to.  This
18  just has the JCA number which they produced your
19  texts, JCA 173 through 183.  Can we agree on
20  that?
21    A.  Yes.
22    Q.  All right.  This is Lauren Graczyk.  Am
23  I saying that correctly or --
24    A.  I think it's Graczyk.

1    Q.  Graczyk.
2    A.  C-Z is pronounced like C-H.
3    Q.  And Ms. Graczyk, was she at the event?
4    A.  No.  That's why I was taking pictures.
5    Q.  Okay.  And this is your texts to her
6  beginning actually September 13th, but the one
7  that relates to after the event is actually
8  Tuesday, 10:37 a.m., on the front page.  Can we
9  agree that that's Tuesday, September 18th, 2017,
10  the day after?
11    A.  The day after, I thought it was -- it's
12  not the 19th.  Or it's the day after, yes.
13    Q.  Okay.
14        (Discussion off the record.)
15  BY MR. RUFF:
16    Q.  Excuse me, the 19th, you're right.
17  Excuse me, Ms. Dziubla, the 19th.  That would be
18  the day after, correct?
19    A.  Correct.
20    Q.  Can we agree that in this account here
21  there's no indication of any offensive touching
22  by Mr. Jacobsen regarding you in this text
23  exchange?
24    A.  Yes.

1    Q.  And you made a donation to the event on
2  page 2.  It reflects that you want your donation
3  back, correct?
4    A.  Yes.
5    Q.  So you made a donation of $50, and you
6  wanted your $50 back, correct?
7    A.  Yes.
8    Q.  Why did you want your $50 back?
9    A.  Because I was very upset about what
10  happened and --
11    Q.  Understood.  But what does that have to
12  do with donation to the family?
13    A.  It doesn't have anything to do with it
14  honestly.  I was just upset.
15        MR. RUFF:  Exhibit -- what's the next
16  one.
17        MS. CRONIN:  We are on 42.
18        (Discussion off the record.)
19        (Document marked as Dziubla Deposition
20         Exhibit No. 42 for identification.)
21        MR. SEDAEI:  We only got one of these.
22  Do you have another one?
23        MS. CRONIN:  Yes, I do.
24        MR. RUFF:  Exhibit 42 is this?

1        MS. CRONIN:  Uh-huh.
2  BY MR. RUFF:
3    Q.  Exhibit 42 is the text exchange with
4  Beata, and counsel already went through these.  I
5  have some different questions on the same
6  document now marked 42.  That's JCA 191 through
7  205 -- 206, correct?
8    A.  Yes.
9    Q.  And this is an exchange with Beata,
10  correct?
11    A.  Yes.
12    Q.  And can we agree that there is no
13  indication of any offensive touching by
14  Mr. Jacobsen in this exchange?
15        MR. SEDAEI:  Take your time and go
16  through it.
17        (Discussion off the record.)
18  BY THE WITNESS:
19    A.  What was your question again?
20        MR. RUFF:  Can you ask it again,
21  Suzanne.
22        (Whereupon, the question was read as
23         follows:
24    Q.  And can we agree that there

78 (Pages 306 - 309)

1   is no indication of any offensive
2   touching by Mr. Jacobsen in this
3   exchange?)
4   BY THE WITNESS:
5       A.  Well, she says sorry for some blunt
6   questions, but were you touched; and I answered,
7   yeah, he was showing me how to do a golf swing.
8   BY MR. RUFF:
9       Q.  Right.  So my question stands.
10      A.  Right, I'm answering her question was
11  I --
12      Q.  There's no indication anywhere in this
13  exchange of any offensive touching.  Can we agree
14  on that?
15      A.  I'm purely talking to her because I
16  wasn't offended.  It wasn't, like, hey, check
17  this out, I got groped by this guy and it was
18  awesome.  Want to share with me.  I mean, she's
19  asking me from a position of a police officer.
20  The only reason why -- I mean, that's what she
21  meant by that is that it's offensive, were you
22  touched.
23  BY MR. RUFF:
24      Q.  No, no, you're misunderstanding me.  She

1   asks you were you touched, but there's no
2   indication of any response from you indicating
3   that there was anything offensive about the
4   touching.  Can we agree on that?  Because the
5   first thing you refer to is the comment.
6       A.  I don't agree with you again.
7       Q.  All right.  Just tell me where it
8   describes any offensive touching?
9       A.  It's in the context of our conversation.
10      Q.  All right.  Just tell me what language
11  you're referring to that suggests anything that
12  there was offensive touching?
13      A.  Her question -- context of her question
14  is asking if you were touched.  That is at --
15  touched offensively, inappropriately, against
16  your will.  That is her question, and I'm
17  answering her question with yes.
18      Q.  Well, I don't see that anywhere, so why
19  do you say --
20      A.  It's on the first page.
21      Q.  Right.  It says --
22      A.  What do you think the question means?
23  That's what it means.
24      Q.  I'm reading the words, Ms. Dziubla.

1       A.  Oh, my gosh, okay.
2       Q.  Okay.  So where does it in your response
3   indicate any offensive touching?
4       A.  It does not say that.
5       Q.  Okay.  And not -- you never stated what
6   part of his body was physically touching you,
7   correct?
8       A.  I -- again, I mean, just like with her
9   and Lauren, it's not like I'm --
10      Q.  This could be answered a simple yes or
11  no.  It's --
12      A.  It could be, but --
13      Q.  -- a cross exam question.
14      A.  I just -- you're just picking words --
15  you're taking everything out of context, and it's
16  frustrating me and it's late in the day.  So this
17  is the response I'm giving you.
18      Q.  Let's just go with my question.  Okay.
19          Can we have the question back,
20  Suzanne.
21          (Whereupon, the question was read as
22          follows:
23      Q.  You never stated what part
24  of his body was physically touching

1   you, correct?)
2   BY MR. RUFF:
3       Q.  Answer.
4       A.  Correct.
5       Q.  All right.  And you've never described
6   any type of physical -- what body part or
7   anything Mr. Jacobsen touched, any body part from
8   you, correct?
9       A.  Correct.
10      Q.  But what you did mention after his --
11  the question by Beata regarding touching is the
12  comment, correct?
13      A.  Not correct.
14      Q.  Yeah, he was showing me how to do a golf
15  swing and announced to everyone this is when it
16  is -- when -- this is the time when he shows them
17  where his wood is.  That's the comment, correct?
18      A.  Right.  But in response to her
19  question --
20      Q.  Right, that's my whole point.  In
21  response to the question regarding touching, you
22  refer to the comment, true?
23      A.  False.  I answered her question.  I said
24  yes, yes.

1    Q.  And then immediately refer to the
2  comment, correct?
3    A.  Correct.
4    Q.  That's all.
5       All right.  We'll change.  We got to
6  change.
7       THE VIDEOGRAPHER:  We are going off the
8  record at 5:15 p.m.  This is the end of media
9  set 4.
10      (A short recess was taken.)
11      THE VIDEOGRAPHER:  We are back on the
12  record at 5:40 p.m.  This is media set 5.
13      MS. CRONIN:  Got it.
14      (Document marked as Dziubla Deposition
15      Exhibit No. 43 for identification.)
16  BY MR. RUFF:
17    Q.  The last text message sequence is
18  with -- I don't know where I put my -- is with
19  Rachael, Exhibit 43, correct?
20    A.  Yes.
21    Q.  Ms. Dziubla; is that correct?
22    A.  Yes, that's correct.
23    Q.  Okay.  And, again, in this
24  contemporaneous document, there was no indication

1  of any offensive touching by Mr. Jacobsen.  Can
2  we agree on that?
3       MR. SEDAEI:  Take your time, go through
4  the whole thing before you answer.
5       MR. RUFF:  Oh, here, it is.  It's all my
6  fault.
7  BY MR. RUFF:
8    Q.  While you're looking, Ms. Dziubla, the
9  exhibit encompasses, for the record, JCA 785
10  through JCA 825.
11    A.  Yes.
12      (Discussion off the record.)
13  BY MR. RUFF:
14    Q.  Are you going to be a while?
15    A.  Yeah, slow reader.
16      MR. RUFF:  Okay.  Well, let's go off the
17  record.
18      THE VIDEOGRAPHER:  Off the record at
19  5:44 p.m.
20      (Discussion off the record.)
21      THE VIDEOGRAPHER:  Back on the record at
22  5:48 p.m.
23      MR. RUFF:  Suzanne, do you mind reading
24  it back.

1       (Whereupon, the question was read
2       as follows:
3    Q.  Okay.  And, again, in this
4  contemporaneous document, there was
5  no indication of any offensive
6  touching by Mr. Jacobsen.  Can we agree
7  on that?)
8  BY THE WITNESS:
9    A.  I don't agree to that.
10  BY MR. RUFF:
11    Q.  Okay.  What page are you referring to?
12    A.  I'm referring to 796 and --
13    Q.  Anything else other than 796?
14    A.  Well, 796 and it continues on 797 at the
15  top.
16    Q.  Okay.  796, 797.  Tell me where this
17  refers to specific reference regarding offensive
18  touching?
19    A.  Yeah, he gave me a, air quotes, lesson
20  in golf and told everyone where he was going to
21  put his wood.
22    Q.  Right.  Where does it refer -- I'm not
23  talking about the comment.  I'm talking about
24  offensive touching.

1    A.  That's what lesson is in quotes, the
2  context.
3    Q.  Oh, so it's the word lesson?
4    A.  Well, it's the context of my messages.
5  I mean, you can't take --
6    Q.  So --
7    A.  I'm telling her that I was offensively
8  touched.
9    Q.  By putting lesson in quote?
10    A.  Yes.
11    Q.  Okay.  Nowhere do you refer to any body
12  parts, touching any body parts, or how he touched
13  you.  Can we agree on that?
14    A.  Yes.
15    Q.  Okay.  And in that same quote, you refer
16  to the -- what you interpreted to be and you
17  alone interpreted to be an offensive comment,
18  correct?
19    A.  That is the comment I heard, correct.
20      MR. RUFF:  All right.  Exhibit 40 --
21  what is it?
22      MS. CRONIN:  44.
23      MR. RUFF:  -- 4.
24

Veritext Legal Solutions
www.veritext.com                                888-391-3376

Page 318

1     (Document marked as Dziubla Deposition
2        Exhibit No. 44 for identification.)
3   BY MR. RUFF:
4     Q.  While we're getting the exhibit passed,
5   you talked about an incident involving a coworker
6   where you -- it's referred to in the note of your
7   psychologist regarding a contact with a coworker
8   where apparently -- and this was discovered in
9   questioning by counsel, about how a person came
10  towards you or came at you at work; is that
11  correct?
12    A.  Yes.
13    Q.  And what is that gentleman's name?
14    A.  I believe he's re -- you're referring to
15  Sam.
16    Q.  What is that gentleman's full name?
17    A.  I want to say Lerner is his last name.
18  I'm not sure.
19    Q.  L-e-r-n-e-r?
20    A.  Sure, yeah.
21    Q.  Okay.  And he was at Talent Hitch?
22    A.  Correct.
23    Q.  Is he still there?
24    A.  I have no idea.

Page 319

1     Q.  The last time you knew of him was at
2   Talent Hitch?
3     A.  Yeah, that's the last I recall, I know
4   of his last employment, yes.
5     Q.  And then you swore at him and he -- or
6   he swore at you and then you swore at him,
7   correct?
8     A.  I did not swear at him.
9     Q.  Do I need to get the exact language out?
10  In your own words, I told him to fuck off?
11    A.  No, he said to go fuck yourself and
12  chased me down the hall.  I never said anything
13  to him.  I retreated as far as I could.
14    Q.  So you don't agree that you swore back?
15    A.  I did not.
16    Q.  I'm sorry?
17    A.  I did not.
18       (Discussion off the record.)
19    MR. RUFF:  Go off the record.
20    THE VIDEOGRAPHER:  Off the record at
21  5:52 p.m.
22       (Document marked as Dziubla Deposition
23        Exhibit No. 45 for identification.)
24    THE VIDEOGRAPHER:  Back on the record at

Page 320

1   5:54 p.m.
2   BY MR. RUFF:
3     Q.  Who is Agada, A-g-a-d-a?
4     A.  I don't know.
5     Q.  Is that your counselor?
6     A.  No, I don't know.
7     Q.  Okay.  If it's represent -- this was
8   produced to us as representation --
9     A.  Oh, it says up here that was her last
10  name.  I didn't know that was her last name.
11    Q.  Okay.  So you do know who this is?
12    A.  Yes.
13    Q.  Who is Ms. Agada?
14    A.  Latavia was my Talk Space counselor.
15    Q.  Okay.  And this is a recitation, it says
16  approximately a year ago.  When did the incident
17  occur with Sam from Talent Hitch?
18    A.  I don't recall.
19    Q.  What year?
20    A.  I honestly don't recall.
21    Q.  You were there five months.  Do we need
22  to go through --
23    A.  I mean, I worked for several months from
24  home.  I don't recall.

Page 321

1     Q.  Well, this wouldn't have occurred at
2   home.  This would have occurred at the --
3     A.  I could have been in the office at that
4   time.  I mean, I came in for meetings.  I could
5   have been there that day.
6     Q.  Okay.
7     A.  But I was working from home after the
8   incident for sure.
9     Q.  And you have no idea of the day?
10    A.  I don't, I'm sorry, I don't.
11    Q.  So it would have been after you left in
12  October --
13    A.  So between October and March.
14       (Reporter interrupted.)
15    MR. BOYLE:  Can we go off the record.
16    MR. RUFF:  Yeah.
17    THE VIDEOGRAPHER:  Off the record at
18  5:56 p.m.
19       (Discussion off the record.)
20       (Document marked as Dziubla Deposition
21        Exhibit No. 46 for identification.)
22    THE VIDEOGRAPHER:  Back on the record at
23  5:57 p.m.
24

81 (Pages 318 - 321)

BY MR. RUFF:

Q. Exhibit 46, these are documents produced by you. Exhibit 46 goes from 1818 to 1884. Can we agree on that?

A. Yes.

Q. Okay. If you look at 1827, February 7, 6:17 p.m. This is a Talk Space discussion with Latavia, correct?

A. Yes.

Q. And her last name is Agada, correct?

A. That's what it says.

Q. If we go to the February 7th, 6:17, about the fifth line down, THI, do you see that?

A. Yes.

Q. Has been open for just a little over two years, and just yesterday, that would be February 6th, a coworker and I (we are all independent contractors) tried to address "my attitude" with him. I explained to him that it was a misunderstanding (oye I hate trying all this stuff out - I'm scared I'm going to leave something out) but in a nutshell, I told him I wasn't about to fight at work and said let's chalk it up to a misunderstanding; and as I

walked out of the meeting room, meeting is misspelled, he told me to go fuck myself, and I said -- and I was a piece of a sheet. I responded with grow the fuck up.

Did I read that correctly?

A. You read it correctly.

Q. Okay. So that was your response to a coworker on February 7th, 2018, correct?

A. Correct.

Q. What was the misunderstanding about?

A. Basically I was brought on the team as an expert of the industry, and I was told that at any time that I -- if I needed to coach somebody on something that I could. And I addressed it with him in front of a coworker, and he didn't like it and he said let's talk about it one on one; and I said, okay, let's go into a private room and talk about it. And so we went to go talk about it, and I said, you know, honestly I don't agree. I was very calm. I said, I don't agree with, you know, where this is going. I'm, like, let's chalk it up to misunderstanding and let's get on with our day, man. And as I went up to leave, I tried to leave peacefully, and that's

when he came at me. And I was just, like, what the fuck is going on, and I just wanted to get away from him as soon as possible.

Q. And he came at you?

A. He physically charged at me. Like, we had a portion of the office blocked off for the owner's dog. And I, like, kept going, opened the door and got into the other part; and I was, like -- and then I finally told him, I'm, like, I'm going to call the police if you don't, like, fricken get away from me.

Q. So he physically charged you, correct?

A. Yes.

Q. And he used pretty harsh words, correct?

A. Yes.

Q. And you were upset, correct?

A. Yes.

Q. Why didn't you sue him?

A. What -- it was an altercation at work. Like I said, I've been in the industry for a really long time. Every little thing that hap -- you think if I -- everything little thing that happened or every little calendar I saw with a half dressed woman, if I -- I mean, that's not

my -- I don't just go around suing people.

Q. You got a pretty tough shell, right?

A. I have a high threshold.

Q. All right. Let's go to Exhibit 46.

(Discussion off the record.)

MS. CRONIN: Let's go off the record.

THE VIDEOGRAPHER: Off the record at 6:02 p.m.

(Discussion off the record.)

THE VIDEOGRAPHER: Back on the record at 6:03 p.m.

BY MR. RUFF:

Q. So this is an email from you, at the top, 9/27/7 -- 2017 at 10:51 a.m.?

MR. SEDAEI: For the record, we're looking at Exhibit 44.

BY MR. RUFF:

Q. Is that correct?

A. Exhibit 44, yes.

Q. Okay. And it's from you to Michael Power, correct?

A. Yes.

Q. I'm going to the end of the second line, you guys took care of. Do you see that?

1   A.  Yes.
2   Q.  You guys took care of McGuire, you'll
3   take care of Mott --
4   A.  Oh, Mott.
5   Q.  -- too, now that he's out, but when it
6   comes to me and being what I've been through at a
7   WORK FUNCTION, the best you can do is put me in a
8   defensive position with no opportunity to recover
9   from this.
10      Did I read that correctly?
11  A.  Yes.
12  Q.  So you looked at the opportunity to
13  recover against JCA and Mr. Jacobsen as an
14  opportunity?
15  A.  Like, in terms of --
16  Q.  Like an opportunity, just what the
17  question says.
18  A.  Again, I don't understand.
19  Q.  Your words, ma'am.  You don't understand
20  your words?
21  A.  Please don't talk to me that way.
22  Q.  What?
23  A.  The way you're taking to me.  Like I'm
24  -- your idea of the opportunity -- no opportunity

1   to recover in terms of, like, time off and
2   figuring out what I'm going to do.  I just
3   thought that he would be more empathetic to what
4   happened instead of putting me on the defensive.
5   Q.  Move to strike --
6   A.  That's what I meant.
7   Q.  -- the answer as nonresponsive.
8       Do you know what the question is or
9   do you want it reread?
10  A.  I don't know how many times --
11  Q.  Do you want to know -- do you know what
12  the question is?
13  A.  I don't obviously.
14  Q.  Okay.
15  A.  Let's hear it again.
16      MR. RUFF:  Suzanne, can we have the
17  question.
18  BY MR. RUFF:
19  Q.  It's a yes-or-no answer.
20      (Whereupon, the question was read as
21  follows:
22      Q.  So you looked at the
23  opportunity to recover against JCA
24  and Mr. Jacobsen as an opportunity?)

1   BY THE WITNESS:
2   A.  No.
3   BY MR. RUFF:
4   Q.  You were willing to sue Mr. Jacobsen
5   because of his status, true?
6   A.  No.
7   Q.  You were willing to sue Mr. Jacobsen
8   because he was potentially an easy target,
9   correct?
10  A.  No.
11  Q.  You were willing to sue Mr. Jacobsen,
12  because once you say something against a
13  celebrity, it must be true, true?
14  A.  No.
15  Q.  You were willing to sue Mr. Jacobsen,
16  because you had an opportunity to recover;
17  whereas you didn't have that same opportunity
18  against Sam Lerner, correct?
19  A.  I don't understand the question.
20  Q.  The jury will.
21      You're willing to sue over a comment
22  when apparently you portray yourself as thick
23  skinned; but when somebody physically charges you
24  and swears at you, you don't sue, correct?

1       MR. SEDAEI:  Objection, form.
2       But answer if you understand.
3   BY THE WITNESS:
4   A.  You need to put yourself in my position.
5   I had just gotten out of a really tough situation
6   at JCA.  I'm at a new company trying to figure
7   shit out where I'm working on commission only,
8   and somebody charges at me.  If I can prevent
9   something from happening from it getting to a
10  litigation like this, I'm going to do it.  And I
11  asked him for help, and what I got was, okay, why
12  don't you work from home.
13  Q.  What opportunity did you give
14  Mr. Jacobsen before you sued him?
15      MR. SEDAEI:  Objection, form.
16      But answer if you understand the
17  question.
18  BY THE WITNESS:
19  A.  I don't understand the question.
20  BY MR. RUFF:
21  Q.  The jury will.  Thank you very much.
22      Exhibit --
23      MS. CRONIN:  Go ahead, 46, right?
24      MR. RUFF:  -- 46.

83 (Pages 326 - 329)

1     (Document marked as Dziubla Deposition
2     Exhibit No. 47 for identification.)
3 BY MR. RUFF:
4    Q. Who is this photo taken by?
5    A. I don't know.
6    Q. It was taken after the alleged incident
7 between you and Mr. Jacobsen, true?
8    A. Yes.
9    Q. Is that you in the photo?
10    A. Yes.
11    Q. Is that Mr. Jacobsen in the photo?
12    A. Yes.
13    Q. Have you ever written or said anything
14 publicly regarding Mr. Jacobsen?
15    A. Not that I recall.
16    Q. Has your attorney?
17    A. I don't know what he writes.
18     MR. SEDAEI: Objection, foundation.
19     But answer if you understand.
20 BY MR. RUFF:
21    Q. Has your attorney ever posted anything
22 about Mr. Jacobsen publicly?
23    A. I don't -- not that I know of.
24    Q. Has he posted anything about the

1 incident occurring on September 18th, 2017?
2     MR. SEDAEI: Objection, foundation.
3     But answer if you know.
4 BY THE WITNESS:
5    A. I don't know.
6     MR. RUFF: All right. I have damage
7 questions.
8     Anything else for right now?
9 Anything else for right now?
10     I have damage questions which I will
11 reserve.
12     Pass the baton unless we're going to
13 move to another day.
14     MR. BOYLE: You want to just --
15     MR. SEDAEI: Okay. So are you done?
16 Can we go off the record.
17     THE VIDEOGRAPHER: Off the record at
18 6:09 p.m.
19     (A short recess was taken.)
20     THE VIDEOGRAPHER: We are back on the
21 record at 6:18 p.m.
22     MS. CRONIN: The last exhibit was
23 incorrectly marked as Exhibit 46. The photograph
24 should be marked as Exhibit 47.

1     MR. RUFF: And we are off the record.
2     MS. CRONIN: We're done. We're off the
3 record.
4     THE VIDEOGRAPHER: This marks the end of
5 media set 5 and the end of this deposition at
6 6:18 p.m.
7     THE REPORTER: Do you want a copy of the
8 transcript?
9     MR. SEDAEI: Yeah, PDF.
10     (Whereupon, the deposition was
11     adjourned at 6:18)
12     (Signature was reserved.)
13
14
15
16
17
18
19
20
21
22
23
24

1 STATE OF ILLINOIS )
    ) SS:
2 COUNTY OF C O O K )
3     I, Suzanne Burke, Illinois CSR
4 No. 084-002573, do hereby certify that ROWENA
5 DZIUBLA was duly sworn to testify the whole
6 truth, and that the foregoing deposition was
7 recorded stenographically by me and was reduced
8 to typewriting by me, and that the said
9 deposition constitutes a true record of the
10 testimony given by said witness.
11     I further certify that the
12 reading and signing of said deposition was not
13 waived by the witness and her attorney.
14     I further certify that I am not
15 a relative or employee or attorney or counsel of
16 any of the parties, or a relative or employee of
17 such attorney or counsel, or financially
18 interested directly or indirectly in this action.
19     IN WITNESS WHEREOF, I have
20 hereunto set my hand and affixed my seal of
21 office at Chicago, Illinois, 24th of June, A.D.,
22 2019.
23     Certified Shorthand Reporter
24

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

June 24, 2019

To: Sam Sedaei, Esq.

Case Name: Dziubla, Rowena v. J.C. Anderson, Inc., et al.

Veritext Reference Number: 3405962

Witness: Rowena Dziubla        Deposition Date:  6/20/2019

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address

shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3405962
CASE NAME: Dziubla, Rowena v. J.C. Anderson, Inc.
DATE OF DEPOSITION: 6/20/2019
WITNESS' NAME: Rowena Dziubla
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
I have made no changes to the testimony
as transcribed by the court reporter.

_____
Date            Rowena Dziubla
    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
        their free act and deed.

    I have affixed my name and official seal

this _____ day of _____, 20___.

_____
    Notary Public

_____
    Commission Expiration Date

---

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3405962
CASE NAME: Dziubla, Rowena v. J.C. Anderson, Inc., et al.
DATE OF DEPOSITION: 6/20/2019
WITNESS' NAME: Rowena Dziubla
In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me.
    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
    well as the reason(s) for the change(s).
    I request that these changes be entered
as part of the record of my testimony.

    I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein.

_____
Date            Rowena Dziubla

    Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections
    in the appended Errata Sheet;
    They signed the foregoing Sworn
    Statement; and
    Their execution of this Statement is of
    their free act and deed.
    I have affixed my name and official seal

this _____ day of _____, 20___.

_____
    Notary Public

_____
    Commission Expiration Date

---

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 3405962
PAGE/LINE(S) /        CHANGE        /REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Date            Rowena Dziubla
SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
DAY OF _____, 20_____ .

_____
    Notary Public

_____
    Commission Expiration Date