Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4      ROWENA DZIUBLA,            )
                                   )
 5             Plaintiff,          )
                                   )
 6         vs.                     ) No. 1:18 CV 4542
                                   )
 7      J.C. ANDERSON, INC., and   )
        PETER ERLING JACOBSEN,     )
 8             Defendants.         )
                                   )
 9

10             The deposition of PETER JACOBSEN,

11      called by the Plaintiff for examination, pursuant to

12      notice and pursuant to the Federal Rules of Civil

13      Procedure for the United States District Courts

14      pertaining to the taking of depositions, taken

15      before JODI ANNE FEIGN, Certified Shorthand Reporter

16      and Notary Public within and for the County of Cook

17      and State of Illinois, at 20 South Clark Street,

18      Suite 500, Chicago, Illinois, on the 27th day of

19      June, 2019.

20

21

22

23

24
```

EXHIBIT
7

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1      PRESENT:

 2
                GOLDMAN & EHRLICH
 3
                        (20 South Clark Street
 4                        Suite 500
                          Chicago, Illinois 60603
 5                        312-332-6733
                          sam@goldmanehrlich.com)
 6

 7           By:  MR. SAM SEDAEI,
                          Appearing on behalf of the Plaintiff;
 8

 9           PRETZEL & STOUFFER, CHARTERED

10                        (One South Wacker Drive
                          Suite 2500
11                        Chicago, Illinois 60606
                          312-346-1973
12                        ERUFF@PRETZEL-STOUFFER.COM)

13           By:  MR. EDWARD B. RUFF,
                          Appearing on behalf of the Defendant,
14                        PETER JACOBSEN;

15           VEDDER PRICE

16                        (222 North LaSalle Street
                          Chicago, Illinois  60601
17                        312-609-7569
                          molson@vedderprice.com)
18
             By:  MS. MICHELLE T. OLSON,
19                        Appearing on behalf of the Defendant,
                          J.C. ANDERSON, INC.;
20

21

22

23

24
```

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1     APPEARANCES CONTINUED:

 2        CLIFFORD LAW OFFICES

 3            (120 North LaSalle Street
              31st Floor
 4            Chicago, Illinois  60602
              312-899-9090
 5            JCP@CLIFFORDLAW.COM)

 6        By:  MR. JAMES C. PULLOS,
              Appearing on behalf of the Defendant,
 7            J.C. ANDERSON, INC.

 8              *   *   *   *   *   *   *   *   *   *

 9

10                  I N D E X
       Witness:
11
       PETER JACOBSEN,
12
       Direct examination by Mr Sedaei         4-62
13
       Cross Examination by Mr. Ruff          63-77
14

15              *   *   *   *   *   *   *   *   *   *

16

17

18                  E X H I B I T S

19

20     Exhibit No. 1                          37

21     Exhibit No. 2                          48

22     Exhibit No. 3                          55

23     Exhibit No. 4                          59

24
```



Peter Jacobsen - 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1       (Witness duly sworn.)
2           PETER JACOBSEN,
3    called as a witness on behalf of the Plaintiff
4    having been first duly sworn on oath, was examined
5    and testified as follows:
6           DIRECT EXAMINATION
7           BY: MR. SEDAEI
8    Q.  Good morning, Mr. Jacobsen.
9    A.  Good morning.
10   Q.  My name is Sam Sedaei, and I'm the attorney
11   for the plaintiff in this case, Ms. Dziubla.
12          Will you please state your full name
13   for the record?
14   A.  Peter Erling Jacobsen.  Erling is spelled,
15   E-R-L-I-N-G.
16   Q.  Thank you.
17          Mr. Jacobsen, have you ever been
18   deposed before?
19   A.  Yes.
20   Q.  Have you ever been -- have you been deposed
21   more than once before?
22   A.  No.
23   Q.  Okay.  When was the last time you've been
24   deposed?

Page 4

1    A.  I was deposed I think in the year 2000.
2    Q.  And what kind of a case was that?
3    A.  I was testifying on behalf of Payne Stewart
4    who was a professional golfer who was killed in a
5    plane crash.  He was my friend.
6    Q.  Sorry to hear that.
7           Okay.  And just -- what kind of a case
8    was it generally?  Was it a -- would it be --
9    A.  It was a wrongful death suit.
10   Q.  Okay.
11   A.  Regarding the manufacturer of the airplane.
12   Q.  Okay.  Do you understand that your
13   testimony today will be under oath?
14   A.  Yes.
15   Q.  So I'm going to go over some basic ground
16   rules, and I would ask you to please keep them in
17   mind as we proceed.
18          So it's -- and you might recall some of
19   this from the last deposition you had -- but a
20   deposition is much like a conversation but there is
21   certain differences.
22          For one, we have a court reporter here
23   today who is attempting to transcribe the
24   conversation, therefore, we cannot interrupt each

Page 5

1    other.
2           So please wait until I have finished
3    asking a question before answering, and I will try
4    to wait until you have responded to a question
5    before speaking.
6           Also, when answering questions, please
7    try to use full answers, yeses and nos versus
8    uh-huhs or ung-huhs.
9           Sounds good?
10   A.  Yes.
11   Q.  And please make sure all of your answers
12   are verbal rather than, you know, head nods or head
13   shakes.
14          If you need to take a break, just let
15   me know, but please only ask for a break after you
16   have answered a question but before I have posed a
17   new question.
18          Okay?
19   A.  I understand.
20   Q.  If you don't hear or understand the
21   question, ask me and I will repeat or rephrase.  But
22   if you do answer a question, I will assume that you
23   understood the question.
24          Can I ask you if you've consumed any

Page 6

1    medicine, alcohol or recreational drugs over the
2    past 12 hours?
3    A.  No.
4    Q.  Is there any reason such as being under
5    unusual stress, a physical or mental condition or
6    under the influence of any substances that would
7    prevent or limit your ability today to give truthful
8    answers to my questions?
9    A.  No.
10   Q.  Mr. Jacobsen, do you know why you are here
11   today?
12   A.  Yes.
13   Q.  Why are you here today?
14   A.  I'm being sued by your plaintiff.
15   Q.  And have you had the chance to read the
16   complaint in this case?
17   A.  Yes.
18   Q.  What did you do to prepare for today's
19   deposition?
20   A.  I met with my attorney last night.
21   Q.  Okay.  And have you met with anyone else in
22   preparation for today?
23   A.  No.
24   Q.  Have you looked at any documents?

Page 7



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1    A. Yes. | 1    Q. Who's your employer? |
| 2    Q. What documents have you looked at? | 2    A. I work for NBC Sports. I also work for a |
| 3    A. I read your client's deposition. | 3   company that I own called Peter Jacobsen Sports. |
| 4    Q. Okay. Have you read any other documents? | 4    Q. Do you work for anyone else? |
| 5    A. Yes. I read the complaint, the lawsuit. | 5    A. I don't understand. |
| 6    Q. Anything else? | 6    Q. Well, you know what, we are going to delve |
| 7    A. I did see the EEOC report. | 7   a little deeper later into like various |
| 8    Q. Can you think of any other documents you | 8   organizations that you have partnerships with or you |
| 9   looked at? | 9   do projects with, but for now, I think that's |
| 10    A. No. | 10   sufficient. |
| 11    MR. RUFF: You may have seen some photos. | 11    For how long have you been involved |
| 12    THE WITNESS: Yes, I did see some photos | 12   with NBC Sports? |
| 13   from the day in question. | 13    A. Since 2009. |
| 14    MR. SEDAEI: O. Okay. Can you tell me the | 14    Q. And when did you start Peter Jacobsen |
| 15   city and state you reside in? | 15   Sports? |
| 16    A. I live in Bonita Springs, Florida, | 16    A. 1988. |
| 17   B-O-N-I-T-A, Springs, Florida. | 17    Q. What is your role or title at NBC Sports? |
| 18    Q. I just want to ask you some questions about | 18    A. I would be a golf analyst slash announcer. |
| 19   your level of education. | 19    Q. So you make regular appearances on programs |
| 20    What is the highest level of education | 20   on NBC? |
| 21   you have? | 21    A. I am paid per the week that I work. And I |
| 22    A. I went to four years of college without a | 22   do broadcast at PGA tour events and get paid as an |
| 23   degree. | 23   independent contractor. |
| 24    Q. So you didn't graduate? | 24    Q. Okay. And what is your role at Peter |
| Page 8 | Page 10 |

| | |
|---|---|
| 1    A. I did not. | 1   Jacobsen Sports other than being the founder? |
| 2    Q. What college did you go to? | 2    A. CEO. |
| 3    A. University of Oregon. | 3    Q. How many employees approximately does Peter |
| 4    Q. Are you from Portland? | 4   Jacobsen Sports have? |
| 5    A. Yes, I am. | 5    A. Fourteen. I believe it's 14 right now. |
| 6    Q. I've been there twice and I have still not | 6    Q. Okay. And what does the company do |
| 7   seen Portland sunny, rain the whole time, and it was | 7   exactly? |
| 8   summer. | 8    A. Sports marketing. We create tournaments, |
| 9    What year -- what years did you attend | 9   PGA tour events, special events involving PGA tour |
| 10   University of Oregon? | 10   players. |
| 11    A. '73, '74, '75 and '76. | 11    We also represent corporations in the |
| 12    Q. Do you have any post high school degrees? | 12   golf space, manage their spend and help them |
| 13    A. No. | 13   basically integrate their -- their products in |
| 14    Q. Where did you go to high school? | 14   trying to arrange their awareness in the golf space. |
| 15    A. I went to Lincoln High School downtown | 15    Q. I know it's a small company with 14 |
| 16   Portland, Oregon. | 16   employees, but do you have a specific individual at |
| 17    Q. And did you graduate from high school? | 17   Peter Jacobsen Sports who is in charge of human |
| 18    A. Yes, I did. | 18   resources? |
| 19    Q. Did you graduate in 1973? That's the | 19    A. Yes. |
| 20   year -- | 20    Q. Who's that person? |
| 21    A. I would assume so. Oh, yeah, I graduated | 21    A. Monica Cruz, C-R-U-Z. |
| 22   on time. | 22    Q. At NBC Sports, who do you report to? Is |
| 23    Q. Okay. Are you currently employed? | 23   there somebody you report to? Is there a contact |
| 24    A. Yes. | 24   you have there that you work with? |
| Page 9 | Page 11 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1     A.  The producer each week is the gentleman I
2 work under as he produces each t.v. show.
3     Q.  And who is he?
4     A.  Tommy Roy, R-O-Y.
5     Q.  Okay.  And would it be accurate to say that
6 at Peter Jacobsen Sports, you don't report to
7 anybody, you are the highest person there?
8     A.  Yes, I'm the highest person there.
9     Q.  So we just covered two entities.  So I want
10 to cover other businesses, companies, organizations,
11 institutions, associations or clubs you are involved
12 in.  And then I would ask -- and then I'm going to
13 ask you questions about those.  We covered NBC.
14       Do you have some kind of an
15 involvement with Golf Channel?
16     A.  Yeah.  Let's see if I can explain.
17       Comcast owns NBC Sports and they also
18 own Golf Channel.
19     Q.  Okay.
20     A.  So I make appearances on NBC and Golf
21 Channel.
22       In the business, it's kind of
23 considered the same thing.  One is on network.  One
24 is on cable.

Page 12

1     Q.  So would it be accurate to say you have a
2 contract with Comcast?
3     A.  I haven't looked at my contract, but I
4 would assume -- I can't really tell you.  I'd have
5 to look at the contract as to who the entity is
6 with.
7     Q.  Okay.  And we talked about Peter Jacobsen
8 Sports.
9       What is Peter Jacobsen Challenge Keno?
10     A.  Oh, that's a -- that's a parlor game that
11 I've been involved with for 30 years.
12     Q.  What is exactly your involvement with that
13 game?
14     A.  My name and likeness is on the game and I
15 get royalties.
16     Q.  Okay.  Can you think of any other
17 organizations or companies you have some kind of
18 partnership with?
19     A.  Yes, I'm involved with a parlor game called
20 Golden Tee.  It's out of Chicago.  Incredible
21 Technologies is the company.
22       I also have a contract to be a brand
23 ambassador for Lexus, the automobile company.  I
24 also have a contract with Cleveland Srixon Golf out

Page 13

1 of Huntington Beach, California.
2     Q.  The last one was Cleveland --
3     A.  It's Cleveland Srixon.  I'll spell that,
4 S-R-I-X-O-N.
5     Q.  So going back to Golden Tee, what is
6 exactly your role or involvement with then?
7     A.  I do voiceovers.  The game has been going
8 on since somewhere around the mid '90s to the late
9 '90s, and I do voiceovers for players when they play
10 the game along with Jim Nance who is also a CBS
11 broadcaster.
12     Q.  Now, going to your brand ambassadorship
13 with Lexus, when did you get involved with that?
14     A.  I started with Toyota back in 19, I
15 believe, 84.  And then when Lexus became a brand in
16 1989 -- Lexus is under Toyota.  Toyota -- Lexus is a
17 subsidiary of Toyota.
18       I -- they moved me to the Lexus
19 representation, and I've been with Lexus ever since.
20     Q.  So as a brand ambassador, what do you do
21 exactly?
22     A.  I make appearances.  I wear their logo on
23 my shirt.  I carry their golf bag.  I play their
24 clubs.  I've got woods and irons and putters and

Page 14

1 hybrids in my bag.
2     Q.  So in layman terms, would you say they are
3 your sponsor?
4     A.  Yes.
5     Q.  Okay.  And I'm sorry if you answered this
6 question, but what is your involvement with the
7 Cleveland Srixon?
8     A.  Same thing.  I play the Lexus -- sorry.
9       I play the Cleveland Srixon clubs,
10 irons, woods, putters, hybrids and I carry their bag
11 and play their golf ball.
12     Q.  Okay.  Can you think of any other
13 organizations, clubs, companies you work with in any
14 capacity?
15     A.  Throughout my career?
16     Q.  Let's focus on current ones.
17     A.  Donald Ross.  Donald Ross is a shirt
18 company.  I wear their shirts when I play on the PGA
19 Tour.
20     Q.  So again, kind of a sponsorship
21 relationship?
22     A.  Yes.  And that -- I believe that's it.
23     Q.  Okay.  And by the way, if you think about,
24 you know -- if you want to like go back to any

Page 15

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 questions that I've asked if something else comes to<br>2 mind, you can do that.<br>3    A. Okay.<br>4    Q. Okay. Do you know if any of these<br>5 organizations or contacts know about this ongoing<br>6 lawsuit?<br>7    A. Yes.<br>8    Q. Which ones do?<br>9    A. Lexus and NBC Sports and Cleveland Srixon.<br>10    Q. Do you know how they know?<br>11    A. I told them.<br>12    Q. Did they ask you?<br>13    A. No. I volunteered to let them know.<br>14    Q. Is there a reason why you haven't<br>15 volunteered to let the other organizations or<br>16 companies we talked about know?<br>17    A. It didn't seem necessary to tell them.<br>18    Q. Okay. Have you ever been sued for any<br>19 reason other than the lawsuit we are here for today?<br>20    A. No.<br>21    Q. To your knowledge, has anyone ever alleged<br>22 either formally or informally that you sexually<br>23 harassed them, again, other than the ongoing<br>24 lawsuit?<br><div align="right">Page 16</div> | 1    A. When I was in high school, I learned how to<br>2 play golf from my father. And one of the ways he<br>3 taught my family to play was to try to impersonate<br>4 the great players, the Lee Trevinos, the Jack<br>5 Nicklaus, the Arnold Palmers.<br>6    I decided to go out and actually do<br>7 that. So I did it through high school and college.<br>8 Then I've been on tour for 43 years and have on<br>9 occasion done clinics, instructional clinics with a<br>10 group, ending it with doing some impressions and<br>11 impersonations of other famous golfers.<br>12    Q. And just so I'm clear, how did you exactly<br>13 make money by doing these things? Are you paid for<br>14 these clinics?<br>15    A. Sometimes I'm paid, yes.<br>16    Q. And were you paid for doing those<br>17 impressions throughout high school?<br>18    A. No.<br>19    Q. Do you still do those clinics?<br>20    A. I still do clinics, but I very rarely do<br>21 impersonations because I do the older golfers, the<br>22 Arnold Palmers, the Lee Trevinos and nobody knows<br>23 those players anymore.<br>24    Q. You don't do Tiger Woods?<br><div align="right">Page 18</div> |
| 1    A. No.<br>2    Q. Mr. Jacobsen, would you consider yourself<br>3 some kind of a comedian?<br>4    A. No.<br>5    Q. Are you somebody who likes to joke, make<br>6 people laugh?<br>7    A. I try -- I think I take a lighthearted<br>8 approach to most things in my life, certainly my<br>9 golf career.<br>10    That -- I would probably be considered<br>11 somebody who likes to have fun in the profession<br>12 that I am in which is taken pretty -- fairly<br>13 serious.<br>14    Q. Have you ever done any gigs where you<br>15 actually made money for making jokes or doing<br>16 stand-up or anything like that?<br>17    A. No.<br>18    Q. Okay. Have you done any gigs where you<br>19 made money for doing impressions?<br>20    A. Yes.<br>21    Q. And when did you do that?<br>22    A. I've done that my whole career.<br>23    Q. Okay. So how do you make money by doing<br>24 impressions?<br><div align="right">Page 17</div> | 1    A. No. If I could do Tiger Wodds's swing, I'd<br>2 do it every day, every shot.<br>3    Q. Okay. Do you recall a time when you said a<br>4 joke in any context, it could be in family, it could<br>5 be outside, where you said a joke that offended<br>6 someone and that person told you that the joke<br>7 offended them?<br>8    A. No.<br>9    Q. Do you recall a time when you did anything<br>10 that offended somebody and they told you that what<br>11 you had done was offensive?<br>12    And you can think for a minute on your<br>13 answer. I know I'm asking these questions that go<br>14 back your whole life, so --<br>15    A. No.<br>16    Q. Do you know who Jim Schumacher is?<br>17    A. Yes.<br>18    Q. Who is he?<br>19    A. He is -- he's named in the lawsuit, but he<br>20 is a friend of my tour caddy.<br>21    Q. Who's your tour caddy?<br>22    A. Troy Martin.<br>23    Q. Is Mr. Schumacher not your friend?<br>24    A. I met Jim Schumacher through my tour caddy<br><div align="right">Page 19</div> |



Case: 1:18-cv-04542 Document #: 50-7 Filed: 01/10/20 Page 8 of 22 PageID #:242

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1    about two years ago. | 1    A. No. |
| 2    Q. And what was the context in which you met | 2    Q. Would it refresh your memory if I say that |
| 3    were Mr. Schumacher? | 3    he is an employee of J.C. Anderson? |
| 4    A. We met at a golf tournament in Hawaii at | 4    A. Yes. |
| 5    the Hualalai Resort at a tournament that I was | 5    Q. So having said that, do you recall -- |
| 6    playing in. | 6    A. Well, I don't know him. I know of him |
| 7    Q. And was Mr. Schumacher also playing or was | 7    through the complaint. |
| 8    he a spectator? | 8    Q. Okay. But beyond what you learned from the |
| 9    A. I don't know. I don't know that. | 9    complaint, you don't know anything about him? |
| 10    Q. Okay. Do you remember the situation that | 10    A. No. |
| 11    led you to meet Mr. Schumacher, like who introduced | 11    Q. Do you know who Michael Power is? |
| 12    who? | 12    A. Same thing, I only know his name through |
| 13    A. My tour caddy introduced me to him. | 13    the complaint. |
| 14    Q. Okay. What do you recall from that | 14    Q. And you are aware that he works at J.C. |
| 15    conversation while you were being introduced to | 15    Anderson? |
| 16    Mr. Schumacher? | 16    A. Yes. |
| 17    A. Because he's a friend of my tour caddy and | 17    Q. Do you know who Ms. Dziubla is? |
| 18    he was with my tour caddy, Troy, and he said meet my | 18    A. Miss -- |
| 19    friend Jim. | 19    Q. The plaintiff in this case? |
| 20    Q. Do you know if there was a reason -- okay. | 20    A. The plaintiff, I do, same, through the |
| 21    Do you know if Mr. Schumacher wanted to | 21    complaint. |
| 22    meet you? | 22    Q. Do you recall meeting her? |
| 23    A. I don't know that. | 23    A. No. |
| 24    Q. Okay. You said about two years ago. | 24    Q. Do you recall attending an event called The |
| Page 20 | Page 22 |
| 1    Can you be more specific? | 1    Kev in 2017? |
| 2    A. Oh, gosh. | 2    A. Yes. |
| 3    Q. The month, the year? | 3    Q. Did you attend the event at anyone's |
| 4    A. Well, no -- well, it was probably in | 4    invitation? |
| 5    January because the tournament is in January. I | 5    A. Yes. |
| 6    would have to -- I don't know. | 6    Q. Whose invitation? |
| 7    Q. So if I say January, 2017 -- | 7    A. The invitation came through Troy Martin, my |
| 8    A. January, it could have been 17, it could | 8    caddy, from Jim Schumacher. |
| 9    have been 16. | 9    Q. And did you accept the invitation? |
| 10    Q. Okay. How often do you talk to | 10    A. I did. |
| 11    Mr. Schumacher? | 11    Q. Do you recall why? |
| 12    A. I think after I met Jim, I spoke to him | 12    A. I did it because it was for a good cause. |
| 13    twice. | 13    When I talked to Jim on the phone, he told me that |
| 14    Q. Okay. Let's talk about those two times | 14    it was to raise money for a family who had lost |
| 15    that you spoke together. | 15    their father to, I believe, cancer. |
| 16    When is the first time? | 16    Q. So at some point after you received the |
| 17    A. Again, probably at that tournament in | 17    invitation, you had a phone conversation with |
| 18    Hawaii and another time with Troy. I don't recall | 18    Mr. Schumacher? |
| 19    when or where. | 19    A. Yes. |
| 20    But in the world of golf, you meet a | 20    Q. Do you recall around when that was? And if |
| 21    lot of people, you shake a lot of hands and it's a | 21    it helps, the The Kev was in September of 2017. |
| 22    big game. It's a big world of golf. | 22    A. Yeah, it was in September, yes. |
| 23    Q. Okay. Do you know who Michael Yasbeck | 23    I believe the conversation started |
| 24    (phonetic) is? | 24    somewhere around June or July of that year, two or |
| Page 21 | Page 23 |



Peter Jacobsen - 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 three months preceding the event. | 1 Q. Was it your understanding that the |
| 2 Q. But as far as the specific phone | 2 attendees were -- some of them were JCA employees? |
| 3 conversation goes, do you recall how long before the | 3 A. I didn't know that at the time. |
| 4 event that was? | 4 Q. So all you knew was the cause, and that |
| 5 A. June or July. | 5 there were going to be some people there? |
| 6 Q. Okay. | 6 A. Yes. |
| 7 A. Yeah. | 7 Q. Were you offered compensation for your |
| 8 Q. But nothing more specific than that? | 8 attendance? |
| 9 A. No. | 9 A. Jim told me he wanted to give me $10,000, |
| 10 Q. And during that call, my understanding is | 10 but I told him I didn't want the money because it |
| 11 that you said you had talked about the cause that | 11 was such a good cause. |
| 12 was being advanced by the event. | 12 Q. Okay. So is it that you didn't get -- you |
| 13 What else do you recall talking about? | 13 didn't receive the money or you got it and gave it |
| 14 A. I remember being unavailable to the | 14 to charity? |
| 15 event because I was flying out from Chicago to | 15 A. I never received any money. |
| 16 Atlanta for the next tournament, and it was going to | 16 Q. But did you ask that that money be sent to |
| 17 be a tight squeeze for me to get to the event and | 17 charity, to the charity you were there for? |
| 18 then get to my airplane. | 18 A. Yes. I wanted them to go back to the |
| 19 And I spoke to Troy a few times, and | 19 charity that we were there for. |
| 20 then I told Troy I would do it because of the | 20 Q. And you told Mr. Schumacher that? |
| 21 charity and because of the family. | 21 A. Yes. |
| 22 And then Jim Schumacher called me and | 22 Q. Were you paid or reimbursed for any travel |
| 23 said he would pick me up at the hotel. | 23 accommodations for attending the event? |
| 24 Q. At the hotel you were staying at in | 24 A. No. |
| Page 24 | Page 26 |
| 1 Chicago? | 1 Q. Were you already in Chicago for some other |
| 2 A. Correct. | 2 reason during that time? |
| 3 Q. And what was your role going to be at the | 3 A. Yes. |
| 4 event? | 4 Q. Why were you in Chicago? |
| 5 A. My role at the event was going to be just | 5 A. I was in Chicago for an NBC golf event that |
| 6 like I've done a thousand times, I would go from | 6 was held at Conway Farms. It was the BMW |
| 7 group to group, meet the participants, thank them | 7 Championship. |
| 8 for being there, and if, on occasion, give them | 8 Q. So prior to attending The Kev, who else do |
| 9 instructions or pointers about their golf. | 9 you recall speaking with other than Mr. Schumacher |
| 10 I would possibly demonstrate, some | 10 from JCA? |
| 11 people could be on the tee hitting a driver or | 11 A. Nobody. |
| 12 hitting a long iron or a wood or a wedge or chipping | 12 MR. RUFF: On that day? |
| 13 or putting. | 13 MR. SEDAEI: Well -- |
| 14 And we drove around in a chart and we | 14 MR. RUFF: I didn't -- yeah, I wasn't |
| 15 had to hit each group pretty quickly because we only | 15 understanding the question. Sorry. |
| 16 had a few hours. So we -- that was my -- that was | 16 MR. SEDAEI: Q. Okay. So prior to The |
| 17 my focus. | 17 Kev, you stated that you spoke with Mr. Schumacher |
| 18 Q. Okay. You said we were driving around. | 18 about the upcoming event; correct? |
| 19 Who was with you? | 19 A. Yes. |
| 20 A. Jim Schumacher was driving the cart that I | 20 Q. Okay. Who else do you recall speaking with |
| 21 was in. | 21 from JCA about the upcoming event before the actual |
| 22 Q. And who do you recall being at the event, | 22 event, it could be the day before, it could be three |
| 23 being in attendance? | 23 months before? |
| 24 A. Nobody I knew. | 24 A. I didn't speak to anybody from J.C. |
| Page 25 | Page 27 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1  Anderson.  My contact was Jim Schumacher. | 1  fun and having a wonderful time.  And I wasn't aware |
| 2      Q.  Okay.  Got it. | 2  of who these people were.  They were just |
| 3          Prior to attending The Kev, did anyone | 3  participating in a charity event. |
| 4  from JCA provide you with any instructions on how to | 4      Q.  Do you recall having conversations with |
| 5  properly interact with JCA employees while at the | 5  various employees -- I'm sorry, various attendees at |
| 6  event? | 6  the event? |
| 7      A.  No. | 7      A.  No. |
| 8      Q.  Prior to attending the event, did anyone | 8      Q.  When you were going from group to group, do |
| 9  from JCA provide you with a copy of JCA's sexual | 9  you recall giving golf instructions to any of the |
| 10  harassment policies? | 10  attendees? |
| 11      A.  No. | 11      A.  No. |
| 12      Q.  Were you provided any training or | 12      Q.  But you are not saying that it didn't |
| 13  orientation on JCA's sexual harassment policies | 13  happen, right, you're just saying you don't recall? |
| 14  prior to attending that event? | 14      A.  Customary -- |
| 15      A.  No. | 15          MR. RUFF:  Let him finish. |
| 16      Q.  Okay.  So you talked a little bit about | 16          THE WITNESS:  I'm sorry.  I'm sorry, Sam. |
| 17  what you did that day. | 17          MR. SEDAEI:  Q.  No.  No, I'm done with the |
| 18          But can you kind of just like generally | 18  question. |
| 19  describe your day to me, what you did, kind of a | 19          Did you understand the question? |
| 20  sequential format? | 20      A.  Yes. |
| 21      A.  Jim picked me up at the airport -- excuse | 21          Customary practice for me or any |
| 22  me. | 22  professional golfer when you are out at an outing or |
| 23          Jim picked me up at the hotel.  We | 23  a Pro Am event, especially when you're going from |
| 24  drove to the golf course.  I was unfamiliar with the | 24  group to group, you meet, you engage and you |
| Page 28 | Page 30 |
| 1  golf course. | 1  instruct. |
| 2          We went out.  He asked me to sign some | 2          And on so many occasions, I would say |
| 3  flags which were to be given out to the | 3  thousands of occasions, we will give a tip.  We will |
| 4  participants. | 4  be asked to watch somebody's swing, whether it's |
| 5          We went inside, and I remember we had | 5  with a driver, a wood or a hybrid or an iron, they |
| 6  lunch, a quick lunch as I signed the flags. | 6  will ask you specifically, I need help with my |
| 7          Then when I was done with that, I went | 7  putting.  I need help with my wedges.  And you are |
| 8  out onto the porch to take pictures with the family. | 8  there as a guest, and I jump in and help. |
| 9  And we took probably 10 or 12 pictures. | 9      Q.  Okay.  And do you recall specifically doing |
| 10          And then when all of the participants | 10  that kind of thing when you were at The Kev with the |
| 11  had got -- had assembled in their carts and had left | 11  attendees? |
| 12  for their starting holes, that's when we got in our | 12      A.  No. |
| 13  chart and went out to join them. | 13      Q.  Can you tell me what a chip shot is?  I'm |
| 14      Q.  And what did you do after that? | 14  not a golfer. |
| 15      A.  We got out on the golf course and we went | 15      A.  Okay.  There are so many shots in the game |
| 16  from group to group and we met the players, | 16  of golf which require a different stance and |
| 17  participants. | 17  different proximity to the ball for power and for |
| 18          I thanked them for being there which is | 18  balance. |
| 19  customary practice for me at a Pro Am.  I always | 19          A chip shot is a shot that is close to |
| 20  want to be as hospitable and engaging as possible. | 20  the green, in close proximity to the green, usually |
| 21          And we went from group to group.  And I | 21  used with a wedge which is an iron in a bag. |
| 22  believe there were probably 20 to 25 groups which is | 22          And that requires you to make a short |
| 23  somewhere near a hundred participants. | 23  swing on balance because you are not trying to hit |
| 24          And I remember everybody having so much | 24  the ball a long ways.  You are trying to get the |
| Page 29 | Page 31 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 | ball a short distance up to the hole or in the hole. |
| 2 | Q.  Okay.  And that's called a chip shot? |
| 3 | A.  That's a chip shot. |
| 4 | Q.  And you would use what you call an iron for |
| 5 | that? |
| 6 | A.  Yes. |
| 7 | Q.  I've heard these phrases -- excuse me. |
| 8 | What is an iron and what is a wood? |
| 9 | A.  An iron would be anything from a sand wedge |
| 10 | up to a long iron or a two iron.  And there is about |
| 11 | 11 -- 10 or 11 in the bag depending on your |
| 12 | configuration of your bag. |
| 13 | A wood would be the longest clubs in |
| 14 | your bag.  It could be a driver, a three wood, a |
| 15 | four wood, a five wood.  So those are called woods |
| 16 | because they used to be made of wood. |
| 17 | Back when I started, I played woods. |
| 18 | Now-a-days, they are mostly made of metal.  They |
| 19 | call them metal heads or composite heads.  So even |
| 20 | though they are not wood anymore, we still call them |
| 21 | woods. |
| 22 | Q.  Okay.  And irons, are they actually made of |
| 23 | iron? |
| 24 | A.  They can be made of so many different -- |

Page 32

| | |
|---|---|
| 1 | Q.  Okay.  Now let's go to the wood. |
| 2 | In what kind of situations do you use |
| 3 | the wood? |
| 4 | A.  You would use a wood off the tee when you |
| 5 | are trying to hit the ball as long as you possibly |
| 6 | can.  You are looking for maximum distance.  You |
| 7 | would use a wood in the fairway. |
| 8 | Q.  I'm so sorry, what is the fairway?  I've |
| 9 | heard that term twice now. |
| 10 | A.  Yeah, the fairway, there are -- there |
| 11 | usually -- there could be three or four or even five |
| 12 | different heights of cut on a golf course. |
| 13 | The fair would be the optimum place to |
| 14 | put the ball off the tee.  That's the short cut |
| 15 | grass.  That's the -- that's the ideal place to be |
| 16 | able to accurately play your shot where you make |
| 17 | solid contact to put the proper spin on the ball. |
| 18 | The next cut would be the intermediary |
| 19 | rough.  And then the other -- the long rough -- |
| 20 | you've probably heard the word rough -- would be the |
| 21 | longest rough where it could be anywhere from two |
| 22 | inches to eight inches. |
| 23 | And so if your ball is in the fairway |
| 24 | and you have access to be able to put the club |

Page 34

| | |
|---|---|
| 1 | they can be a forged steel.  They can be a cast |
| 2 | club.  I don't know what they are exactly made of. |
| 3 | I don't know the formula. |
| 4 | Q.  Okay. |
| 5 | A.  But they are called irons and they are |
| 6 | called woods.  There is also a new thing called a |
| 7 | hybrid which is kind of an in-between club. |
| 8 | Q.  My self-esteem about golf is just |
| 9 | plummeting as you're speaking. |
| 10 | Can you tell me in general terms in |
| 11 | what kind of a situation or at what point you use an |
| 12 | iron on the golf course? |
| 13 | A.  You can use an iron off the tee for |
| 14 | accuracy or you could use an iron off the fairway |
| 15 | for a certain distance that you hit the club. |
| 16 | There are some players, like Tiger |
| 17 | Woods, you mentioned him, he's very long.  Somebody |
| 18 | like me at 65, I'm a senior, I'm not as long, so I |
| 19 | would use a higher numbered iron. |
| 20 | So when you use -- the reason there is |
| 21 | so many different irons in the bag is they go a |
| 22 | specific distance. |
| 23 | So once you calculate your distance, |
| 24 | you then choose the iron to hit to the green. |

Page 33

| | |
|---|---|
| 1 | behind the ball without any interference with grass, |
| 2 | that's when you would use a wood from the fairway. |
| 3 | Q.  So again, the questions I ask you may seem |
| 4 | a little dumb to you, but I have to understand. |
| 5 | So you have the area where there is the |
| 6 | flag, and again, from what I've seen of golf, where |
| 7 | there is like really short grass right next to the |
| 8 | hole, that area is called what? |
| 9 | A.  The green. |
| 10 | Q.  The green. |
| 11 | And then there is the area with a |
| 12 | little longer grass right along the edges of the |
| 13 | green; correct? |
| 14 | A.  Yes. |
| 15 | Q.  What is that area called? |
| 16 | A.  It could be called the collar or the |
| 17 | fringe.  That's another one of the heights of cut we |
| 18 | talked about. |
| 19 | Q.  Correct. |
| 20 | Would you ever use a wood on either the |
| 21 | green or the collar or the fringe? |
| 22 | A.  Yes. |
| 23 | Q.  And the reason you would use a wood in |
| 24 | those areas is why? |

Page 35

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1   A.  When -- depending on the elevation change | 1   on the second page? |
| 2   of the shot, you could be going up the hill or you | 2   A.  Yes. |
| 3   could be going down a hill. | 3   Q.  All right.  This is one of the -- one of |
| 4       The speed of the green plays into this, | 4   plaintiff's allegations in this case. |
| 5   but you also could be hitting out of a different | 5       Would you please read it and then tell |
| 6   length of -- cut of grass. | 6   me if you believe any of that information is |
| 7       The fringe sometimes can be a little | 7   inaccurate? |
| 8   longer depending on the golf course.  So if you are | 8   A.  Read it out loud or -- |
| 9   trying to hit a specific shot, you can use a three | 9       MR. RUFF:  No, just read it to yourself. |
| 10   wood, a four wood, a five wood, a hybrid. | 10       MR. SEDAEI:  Q.  Yes.  Just read it to |
| 11       I've even used my sand wedge which is | 11   yourself. |
| 12   an iron and I've deled (phonetic) the ball. | 12       (WHEREUPON, witness peruses |
| 13       In other words -- let me have that-- I | 13       document.) |
| 14   will take the iron because the sand wedge is the | 14       THE WITNESS:  I read that. |
| 15   heaviest club in your bag and it's got a thick | 15       MR. SEDAEI:  Q.  You read it? |
| 16   flange, and I will take the club and I will hit it | 16   A.  Yes. |
| 17   in the belly, in the middle, in the forehead we call | 17   Q.  Okay.  To your understanding, is any of |
| 18   it, and that's going to make the ball roll with some | 18   this information inaccurate? |
| 19   speed to get it out of the grass. | 19   A.  Yes. |
| 20       And then hopefully you have the proper | 20   Q.  Which part is inaccurate? |
| 21   measured strike to get the ball close to the hole. | 21   A.  When it says that's when I take my wood |
| 22   Q.  Okay.  Thank you. | 22   out.  I would never say that. |
| 23       Okay.  So you may have already with | 23   Q.  Is there anything else in this paragraph |
| 24   your answer to my previous question, already | 24   that's inaccurate? |
| Page 36 | Page 38 |
| 1   answered this one, but do you recall specifically | 1   A.  I don't think so.  Customary practice when |
| 2   providing Ms. Dziubla, the plaintiff in this case, | 2   you are showing someone how to hit a chip shot is so |
| 3   with instructions on how to -- how to hit the ball | 3   many times beginners in golf, they take the stance |
| 4   or how to hit a chip shot? | 4   of a driver or to hit a long shot. |
| 5   A.  No. | 5       And so many times you have to push the |
| 6       MR. SEDAEI:  This will be Exhibit 1. | 6   golfer closer to the ball, get closer proximity |
| 7       (WHEREUPON, Exhibit No. 1 was | 7   because you are using a shorter club.  So many |
| 8       marked for identification.) | 8   people assume the longer stance of a driver or a |
| 9       MR. SEDAEI:  Q.  I'm showing you what's | 9   long shot. |
| 10   marked as Exhibit 1. | 10       So I can only assume as I was giving |
| 11       Would you please take a look at this | 11   instruction to the plaintiff or to anybody, that I |
| 12   document and tell me if you've ever seen this | 12   had to get them -- get her closer to the ball. |
| 13   before? | 13   Q.  Okay.  So regarding the part that you said |
| 14   A.  Yes, I've seen this before. | 14   is inaccurate, just the statement, you said that you |
| 15   Q.  And is it your understanding that this is | 15   would never say that. |
| 16   the complaint that's filed in this case? | 16       But you said that you don't even |
| 17   A.  Yes. | 17   remember giving instructions to the plaintiff; |
| 18   Q.  When was the first time you saw this | 18   correct? |
| 19   complaint? | 19   A.  Correct. |
| 20   A.  July, 2018.  I believe I got this the day | 20   Q.  So you don't actually remember what you did |
| 21   it was -- whatever date it was filed. | 21   or did not say? |
| 22   Q.  Okay.  And who did you get it from? | 22   A.  I don't remember what I did or did not say. |
| 23   A.  I got it from Jim Schumacher. | 23   But when I was told by Jim Schumacher about the |
| 24   Q.  So if you look at Paragraph 9 which will be | 24   complaint, he said, you told that stupid Rodney |
| Page 37 | Page 39 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    Dangerfield joke about beginners start with the
2    irons and they end up in the woods.
3        The woods being the club in the bag and
4    the trees or the forest adjacent to the fairway
5    because a driver or a wood is hard to control and
6    what happens is you spray the ball.
7        And if you're a beginner, you have a
8    difficult time controlling the ball, putting the
9    ball in the fairway.
10   Q.  Okay.  And after Mr. Schumacher told you
11   that, did you recall that, yes, you made such a
12   joke?
13   A.  I don't recall, no.  But I've said that
14   joke a thousand times.  It's a common golf joke.
15   Q.  Okay.  You can hold on to that exhibit.  I
16   may have other questions about it, but for now, I
17   think I'm fine.
18       When was -- so you explained to me what
19   you did throughout the day when you were attending
20   The Kev.
21       After the golf portion was over, what
22   do you recall doing?
23   A.  I recall finishing up the day and hurrying
24   into the clubhouse to change my shoes and to get to

Page 40

1    the airport.
2        And I remember saying to Jim, we got to
3    go or I'm going to miss my flight because I was
4    flying to Atlanta for another tournament that I
5    needed to get to.
6    Q.  Okay.  This question is not related to what
7    you just answered, but something I should have asked
8    in the beginning.
9        Can you tell me your date of birth?
10   A.  Yes, March 4th, 1954.
11   Q.  So then Mr. Schumacher drove you to the
12   airport; is that correct?
13   A.  Correct.
14   Q.  Okay.  And you got on your flight and --
15   A.  Everything was -- I made my flight, yes.
16   Q.  All right.  At what point after The Kev
17   event did you first hear that Ms. Dziubla had made
18   certain allegations about her interactions with you
19   at the event?
20   A.  I don't recall, but it was sometime, I
21   think, in November when I heard about the complaint
22   or I heard about her displeasure with the
23   interaction.
24   Q.  Is it possible that it was any earlier than

Page 41

1    November?
2    A.  I don't recall.
3    Q.  Okay.  But to the best of your
4    recollection, it was November?
5    A.  Yes.
6    Q.  Of 2017?
7    A.  Yes.
8    Q.  Okay.  And who was the person that
9    contacted you?
10   A.  Jim Schumacher.
11   Q.  And how did he contact you?
12   A.  He called me.
13   Q.  Did he have your phone number?
14   A.  Yes.
15   Q.  And was this the first time you talked to
16   Mr. Schumacher since the event?
17   A.  No.  He called me the day after to thank me
18   for coming to the day, and they made a record amount
19   of money and they were elated about the success of
20   the event.
21   Q.  And when he called to thank you during that
22   call, he didn't mention anything about Ms. Dziubla's
23   allegations?
24   A.  I don't recall if he did or not.  I don't

Page 42

1    think so.
2    Q.  Then you recall there being another call
3    later during which he talked about Ms. Dziubla's
4    allegations against you?
5    A.  Yes.
6    Q.  During the call when he -- during the
7    second call when he discussed with you Ms. Dziubla's
8    allegations, what do you recall him specifically
9    saying?
10       I think you already mentioned that he
11   talked about the joke you made.  It was during that
12   call?
13   A.  Yes.
14   Q.  Okay.  What else?
15   A.  Yeah.  He told me there was a complaint by
16   the plaintiff about a joke that I told.  And he
17   didn't go into specifics.
18       He just told me there was someone that
19   was upset about the day.  And to me, it was a very
20   successful day.
21       It was a day that I've done a thousand
22   times before.  I didn't understand what could have
23   been the problem.
24   Q.  Based on the physical contact you may have

Page 43



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    had with Ms. Dziubla as you describe you sometimes
2    have with people when you are trying to show them
3    how to do like a chip shot, and the joke -- you may
4    have told the joke that you have said many times, do
5    you think somebody who is not a professional golfer,
6    a female who is getting those instructions from you,
7    might not understand the joke and might get
8    offended?
9        A.   I don't know.
10           In the world I live, the golf world,
11   people understand golf.
12       Q.   But did you understand that the attendees
13   at The Kev were not all professional golfers?  Did
14   you know that?
15       A.   Well, there aren't that many professional
16   golfers in the world.  And I knew that everybody
17   there was not a professional golfer.  I didn't have
18   that knowledge if they could have been professional
19   or not.
20           But I assume if they are out on the
21   golf course, they are willing to partake,
22   participate, learn, have fun, learn the game.
23       Q.   But you wouldn't assume that because they
24   were on the golf course that they knew how to play

Page 44

1        Q.   So other than the call that you received
2    from Mr. Schumacher in November of 2017 where you
3    discussed Ms. Dziubla's allegations, do you recall
4    speaking with anyone else from JCA since then --
5        A.   No.
6        Q.   -- about Ms. Dziubla's allegations?
7        A.   No.
8        Q.   Have you exchanged any emails with anybody
9    from JCA regarding Ms. Dziubla's allegations since
10   The Kev event until today?
11       A.   No.
12       Q.   So going back to that call in November
13   of 2017, do you know why Mr. Schumacher was reaching
14   out to you to tell you that an employee was
15   offended?
16           Was he asking you to do something
17   because of the allegations?
18       A.   No.
19       Q.   Did he tell you why he was telling you that
20   information?
21       A.   Well, I was involved -- I was at the event.
22   I was the guest of honor, the celebrated golfer
23   there.  So he wanted to let me know what was going
24   on.

Page 46

1    golf?
2        A.   I don't know.  I -- I don't know.  I --
3    that didn't cross my mind.
4        Q.   So regardless of how successful you thought
5    The Kev event was, once you learned that
6    Ms. Dziubla was offended by her interactions with
7    you, did you consider reaching out to her and
8    apologizing for making her uncomfortable if you did
9    make her uncomfortable?
10       A.   I wanted to rectify the situation, but my
11   contact was Jim Schumacher.
12       Q.   Okay.  How did you want to rectify the
13   situation?
14       A.   Explain what happened, if that had
15   happened, her perception.
16       Q.   And you wanted to provide Ms. Dziubla with
17   the explanation?
18       A.   I would have.
19       Q.   Did you tell Mr. Schumacher that you wanted
20   to do that?
21       A.   I don't recall.
22       Q.   Did Mr. Schumacher ask you if you would be
23   willing to talk to Ms. Dziubla?
24       A.   No.

Page 45

1        Q.   But even though he wanted you to know, he
2    didn't want you to do anything about it to try to
3    rectify things?
4        A.   Well, that wasn't my business.  He was my
5    point of contact.  I let him handle it.
6        Q.   Okay.  And that's the only conversation
7    that you have had with anybody from JCA about
8    Ms. Dziubla's allegations?
9        A.   Yes.
10       Q.   Did anyone from JCA ever tell you that
11   there was going to be an investigation into
12   Ms. Dziubla's allegations?
13       A.   No.
14       Q.   Were you ever told that during the --
15   either one of the two calls you remember with
16   Mr. Schumacher that he was interviewing you as part
17   of that investigation?
18       A.   No.
19       Q.   When Mr. Schumacher called you, did he
20   actually ask you to explain yourself and your
21   recollection of the events from The Kev?
22       A.   No.
23       Q.   Did Mr. Schumacher specifically ask you
24   to confirm or deny any specific portions of

Page 47

Case: 1:18-cv-04542 Document #: 50-7 Filed: 01/10/20 Page 15 of 22 PageID #:249

Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Ms. Dziubla's allegations?
2   A.  No.
3       MR. SEDAEI:  Would it be okay if we take a
4  five minute break?
5       MR. RUFF:  Sure.
6       (WHEREUPON, a short recess was
7           taken.)
8       MR. SEDAEI:  Back on the record.
9       Exhibit 2.
10      (WHEREUPON, Exhibit No. 2 was
11          marked for identification.)
12      MR. SEDAEI:  Q.  Mr. Jacobsen, we are back
13  on the record, and I am showing you what's marked as
14  Exhibit 2.
15      Would you please take a look at that
16  document and see if you recognize it?
17      (WHEREUPON, witness peruses
18          document.)
19      THE WITNESS:  I do not recognize this.
20      MR. SEDAEI:  Q.  So you have never seen
21  that document before?
22   A.  No.
23      Q.  In the document, if you flip to the second
24  page, Section 6 on top where it says general release

Page 48

1  of claims?
2   A.  Correct.
3      Q.  And first, I will represent to you that
4  this was a severance agreement that was presented to
5  Ms. Dziubla by JCA.
6      And if we look at the paragraph that I
7  referenced, Paragraph 6, towards the end of the
8  third line, your name is included as a -- one of the
9  parties the liability against whom is being released
10  by this section.
11      Do you see that section where it says
12  Peter Jacobsen at the end of the third line?
13      MR. RUFF:  Mr. Jacobsen -- hold on just one
14  second.
15      I'm going to lodge a formal objection
16  to any questioning about a document he's never seen,
17  he is not a party to, and I don't think the court
18  would allow it.  But it's obviously a deposition, I
19  will allow the questioning.
20      But I want it on the record so that if
21  this is ever used at trial, the court is aware of
22  the fact that I object to any relevance to this
23  because it's clearly not related to him at all.
24      Go ahead.

Page 49

1      THE WITNESS:  Okay.  Would you repeat the
2  question?
3      MR. SEDAEI:  Okay.
4      Q.  With that objection noted, I was
5  going to ask the court reporter to read the
6  question, but it was kind of a long question.  Let
7  me see if I can shorten it.
8      Do you see that there is a reference to
9  your name in this paragraph that I was referring to,
10  Paragraph 6?
11   A.  Yes, I see it.
12      Q.  Okay.  Were you aware that your name was
13  going to be included in this document?
14   A.  No.
15      Q.  Did anybody from JCA ever tell you that
16  your name was being included as part of this release
17  from various forms of liabilities?
18      MR. RUFF:  Again, your question assumes
19  that he was aware of the release.  And he's already
20  established he's never seen this before.
21      And so again I object under Federal
22  Rules of Evidence regarding relevance, I believe
23  it's 608 -- 408, excuse me.
24      MR. SEDAEI:  Okay.  With the objection

Page 50

1  noted --
2      THE WITNESS:  I can answer that question.
3      The answer is no.
4      MR. SEDAEI:  Q.  Okay.  Were you -- Oh,
5  well, strike that.  I'm trying to not ask you
6  repetitive questions.
7      One moment.
8      MR. RUFF:  For the record, I rarely object,
9  but I've got to throw it in there every once in a
10  while.
11      MR. SEDAEI:  I'd be disappointed if you
12  don't.
13      Q.  So we talked about any discussions
14  you have had or have not had with anyone at JCA.
15      Have you discussed Ms. Dziubla's
16  allegations with anyone else other than
17  Mr. Schumacher and the individuals at the two or
18  three companies we discussed where you disclosed to
19  them the ongoing complaint?
20      MR. RUFF:  And his attorneys.
21      MR. SEDAEI:  Q.  And of course your
22  attorneys, yes.
23   A.  My wife knows.
24      Q.  And a biographical question I probably

Page 51



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 should have asked in the beginning, you are married? | 1   Q.  Do you know as you sit here today that at |
| 2   A.  Yes, I am.  I'm married 43 years.  I even | 2 some point, Ms. Dziubla filed a claim with the EEOC |
| 3 remember the date, December 28th, 1976.  And I'll | 3 in relation to her termination at JCA? |
| 4 never forget that date. | 4   A.  I got the EEOC, but I didn't focus on her |
| 5   Q.  Wow, almost Christmas Eve. | 5 termination.  I focused on her claim. |
| 6   Okay.  And do you have kids? | 6   Q.  Okay.  So are you aware that at some point, |
| 7   A.  I have four children -- excuse me, three | 7 Ms. Dziubla filed a claim with the EEOC? |
| 8 children, four grandchildren.  I tell my kids I'm | 8   A.  Yes. |
| 9 more concerned about my grand kids now than my kids. | 9   Q.  When did you first become aware that |
| 10   Q.  Unfortunately, my parents are the same way. | 10 Ms. Dziubla had filed a claim with the EEOC? |
| 11 My brother has two kids, and I'm pretty sure that my | 11   A.  I don't recall the specifics, but sometime |
| 12 parents love their grandchildren more than their | 12 maybe November -- November, 2017. |
| 13 children. | 13   Q.  Do you think that you may have learned it |
| 14   A.  Special, very special. | 14 through the phone call you had with Mr. Schumacher? |
| 15   Q.  And do your children know about the ongoing | 15   A.  That's possible. |
| 16 lawsuit? | 16   Q.  Are you aware as you sit here today that |
| 17   A.  Yes, they do. | 17 sometime last year, Ms. Dziubla sent a demand letter |
| 18   Q.  Did you learn -- prior to seeing the | 18 to JCA? |
| 19 complaint in this case, did you learn that | 19   A.  Yes. |
| 20 Ms. Dziubla's employment was terminated at JCA? | 20   Q.  When did you become aware of that? |
| 21   A.  I didn't know that. | 21   A.  I don't recall, but I believe it was after |
| 22   Q.  First time you learned that was when you | 22 I received the complaint. |
| 23 read the complaint? | 23   Q.  The Federal Complaint? |
| 24   A.  I don't recall. | 24   A.  Yes. |
| Page 52 | Page 54 |

| | |
|---|---|
| 1   Q.  You do know that Ms. Dziubla's employment | 1   Q.  Only then did you learn that sometime |
| 2 was terminated at JCA? | 2 before filing the complaint that there was a demand |
| 3   A.  I do know now, yes. | 3 letter sent to JCA? |
| 4   Q.  But you didn't know that before today? | 4   A.  Yes. |
| 5   A.  I did know that before today, but I don't | 5   Q.  So we discussed individuals with whom |
| 6 know when I became aware of that.  I thought that | 6 you've discussed Ms. Dziubla's allegations, family |
| 7 was what the question was. | 7 members, your attorneys, two or three companies that |
| 8   Q.  Yeah.  I was just trying to figure out when | 8 you mentioned. |
| 9 was the first time that you learned that | 9     Is there anybody else you can think of? |
| 10 Ms. Dziubla's employment was terminated? | 10   A.  Nobody else. |
| 11   A.  I don't recall. | 11   Q.  Any friends? |
| 12   Q.  Okay. | 12   A.  No friends. |
| 13     MR. RUFF:  And again, on all questions, | 13   Q.  Okay.  Any fellow professional golfers? |
| 14 Mr. Sedaei is not asking about any discussions that | 14   A.  No. |
| 15 you've had with your attorneys. | 15   Q.  Have any reporters or journalists reached |
| 16     THE WITNESS:  Okay. | 16 out to you to discuss the complaint that was filed |
| 17     MR. SEDAEI:  Q.  Don't discuss anything | 17 against you? |
| 18 you've discussed with your attorneys, yes.  That's | 18   A.  No. |
| 19 privileged. | 19     MR. SEDAEI:  This will be Exhibit 3. |
| 20   A.  Okay. | 20     (WHEREUPON, Exhibit No. 3 was |
| 21   Q.  You mentioned at the beginning of the | 21     marked for identification.) |
| 22 deposition that you had looked at the EEOC document; | 22     MR. SEDAEI:  Q.  Mr. Jacobsen, I'm showing |
| 23 is that correct? | 23 you what's marked as Exhibit 3. |
| 24   A.  Yes. | 24     Would you please take a look at this |
| Page 53 | Page 55 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1  document and tell me if you've seen this before? | 1      Q.  Okay.  So this statement is stating that |
| 2            (WHEREUPON, witness peruses | 2   you have received a copy of the J.C. Anderson's |
| 3            document.) | 3   Equal Employment Opportunity slash Affirmation |
| 4       THE WITNESS:  Yes. | 4   Action Policy. |
| 5       MR. SEDAEI:  Q.  You have seen this before? | 5            Did you receive the document stated |
| 6            (WHEREUPON, witness peruses | 6   here as part of that JCA response to the EEOC? |
| 7            document.) | 7       A.  I might have.  I don't recall. |
| 8       THE WITNESS:  Yes, I have. | 8       Q.  Okay.  You don't recall when you received |
| 9       MR. SEDAEI:  Q.  And I represent to you | 9   this? |
| 10  that this is your response as to Plaintiff's Request | 10      A.  Correct. |
| 11  for Production of Documents. | 11      Q.  Okay.  I already asked this question, but I |
| 12      A.  Uh-huh. | 12  just want to confirm because it's an unusual answer. |
| 13      Q.  And if you look at the third page, that's | 13          We -- in Request Number 4, we ask for |
| 14  when the actual responses began. | 14  all communications -- and it's a very comprehensive |
| 15      A.  Okay. | 15  request -- and -- all communications that refer or |
| 16      Q.  And if you look at the response to request | 16  relate to plaintiff in this case.  And no emails or |
| 17  two, it's asking for any and all photos and videos | 17  letters were produced by you. |
| 18  from The Kev. | 18          Is there truly not a single email you |
| 19          Do you recall -- and the response, you | 19  have relating to Ms. Dziubla's allegations -- |
| 20  can read, which is the response -- your response | 20      A.  No. |
| 21  which is none other than the photograph marked as | 21      Q.  -- except to your attorney? |
| 22  Exhibit B attached J.C. Anderson's position | 22      A.  No. |
| 23  statement with the EEOC which was a single | 23      MR. RUFF:  I'm going to object to the |
| 24  photograph. | 24  editorial that that's an unusual response.  I don't |
| Page 56 | Page 58 |
| 1        I just want to get confirmation that -- | 1   find anything unusual about that response. |
| 2   did you personally take any photographs while you | 2        That's my editorial to your editorial. |
| 3   were at The Kev? | 3        MR. SEDAEI:  Sure. |
| 4       A.  No. | 4        Q.  Okay.  And one more question, if |
| 5       Q.  Did you take any videos? | 5   you could please go to the next page, request number |
| 6       A.  No. | 6   six where we are asking for a copy of any written |
| 7       Q.  And when I say The Kev, I mean not just the | 7   agreements between you and JCA relating to your |
| 8   golf portion, the dinner, the auction, anything | 8   appearance at The Kev. |
| 9   after that? | 9        Where it says none, I just want to get |
| 10      A.  No. | 10  your confirmation that you had no written contract |
| 11      Q.  Okay.  If you look at the response to | 11  with JCA for your attendance? |
| 12  Request Number 3, and -- where the request is any | 12      A.  That is correct.  There is -- there was no |
| 13  and all documents you have received from JCA | 13  written agreement between JCA and me. |
| 14  relating to JCA's discrimination, harassment and | 14      Q.  That's all I needed.  Thank you. |
| 15  retaliation policies. | 15      MR. SEDAEI:  This will be Exhibit 4. |
| 16          And after the objection section in the | 16          (WHEREUPON, Exhibit No. 4 was |
| 17  middle of the third line, it reads notwithstanding | 17          marked for identification.) |
| 18  this objection, defendant has received a copy of | 18      MR. SEDAEI:  Q.  Mr. Jacobsen, I'm showing |
| 19  J.C. Anderson's Equal Employment Opportunity slash | 19  you what's marked as Exhibit 4. |
| 20  Affirmation Action Policy as it is marked as | 20          Have you seen this document before? |
| 21  Exhibit A to J.C. Anderson's position taken with the | 21      A.  No. |
| 22  EEOC. | 22      Q.  Do you know what Wikipedia is? |
| 23          Do you see where it says that? | 23      A.  I do. |
| 24      A.  Yes, I do. | 24      Q.  And do you understand that there is an |
| Page 57 | Page 59 |



Peter Jacobsen  –  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1   entry about you on Wikipedia? | 1   you receive royalties? |
| 2      A.  It looks to be my bio. | 2      A.  Yes. |
| 3      Q.  So you have not seen this document before | 3      Q.  Okay.  Have you been asked to attend any |
| 4   or like on-line or -- | 4   other JCA sponsored events in the future? |
| 5      A.  No. | 5      A.  No. |
| 6      Q.  -- like on Wikipedia's website? | 6      Q.  If you are asked, would you attend? |
| 7      A.  No. | 7      A.  It depends on the situation.  It depends |
| 8      Q.  So there is some statements -- and I don't | 8   from a schedule standpoint. |
| 9   know who the author of these statements are, but I | 9      Q.  Okay. |
| 10   just wanted to ask you to comment on certain | 10      MR. SEDAEI:  We are going to take a break. |
| 11   statements here and tell me if -- if they represent | 11   I just need to talk to my client for a couple |
| 12   you accurately. | 12   minutes, and then I think we are pretty much ready |
| 13      So if you look at the second page under | 13   to wrap it up. |
| 14   section titled other projects -- | 14      THE WITNESS:  Okay. |
| 15      A.  Uh-huh. | 15      MR. SEDAEI:  So we'll be right back. |
| 16      Q.  -- and if you go to fifth paragraph from | 16      (WHEREUPON, a short recess was |
| 17   the top where it starts with Jacobsen is known for | 17      taken.) |
| 18   his laid back, humorous personality, would you say | 18      MR. SEDAEI:  Back on the record. |
| 19   that that's an accurate description of you? | 19      I don't have anymore questions. |
| 20      A.  Yes. | 20      Do you have any follow ups? |
| 21      Q.  Okay.  And then if you look at the third | 21      MS. OLSON:  I do not. |
| 22   line towards the middle, same paragraph, towards the | 22 |
| 23   middle, it -- there is a reference to your sharp, | 23 |
| 24   but playful humor. | 24 |
| Page 60 | Page 62 |

| | |
|---|---|
| 1      Do you see that? | 1      CROSS EXAMINATION |
| 2      A.  I do. | 2      BY:  MR. RUFF |
| 3      Q.  Do you consider that to be an accurate | 3      Q.  Mr. Jacobsen, would you get out Exhibit |
| 4   description of your sense of humor? | 4   Number 1, please? |
| 5      A.  It's hard for me to say.  Those aren't my | 5      A.  Yes. |
| 6   words. | 6      Q.  You were asked some questions about Exhibit |
| 7      Q.  I understand. | 7   Number 1. |
| 8      But do you think they accurately | 8      Do you recall that? |
| 9   represent your sense of humor?  Is that how you | 9      A.  Yes. |
| 10   would describe your sense of humor? | 10      Q.  All right.  Exhibit Number 1 is the |
| 11      A.  That's not how I describe myself.  I | 11   complaint.  And it has -- you were directed to |
| 12   wouldn't say that.  I would say light-hearted and | 12   Paragraph 9. |
| 13   having fun. | 13      Do you recall that? |
| 14      Q.  Okay.  What is Golden Tee Golf? | 14      A.  Yes. |
| 15      A.  Golden Tee, we talked about that. | 15      Q.  Okay.  And it says under the topic of |
| 16      Q.  Oh -- | 16   general allegations; do you see that? |
| 17      A.  That's the stand up parlor game that you | 17      A.  Yes. |
| 18   find in lot of bars and video game parlors. | 18      Q.  All right.  You talked about Number 9, and |
| 19      Q.  Got it.  Okay.  Yes, we did discuss that. | 19   you said -- the question was somewhere along the |
| 20      And we talked about Peter Jacobsen's | 20   lines do you have any disagreement with that. |
| 21   Challenging Keno and Peter Jacobsen's Challenging | 21      Do you recall that line of questioning? |
| 22   Poker -- | 22      A.  Yes, I do.  Yes, I do. |
| 23      A.  Yes. | 23      Q.  All right.  And you went to the comment, do |
| 24      Q.  -- where your likeness is being used and | 24   you recall that? |
| Page 61 | Page 63 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A.  Yes.

2    Q.  All right.  I want to take you through line

3  by line on this.

4        During the event, Jacobsen offered to

5  provide JCA employees instructions on how to hit a

6  chip shot.

7        And a chip shot is in quotes?

8    A.  Yes.

9    Q.  Do you see that?

10    A.  Yes.

11    Q.  Do you have any specific recollection of

12  that?

13    A.  No.

14    Q.  Okay.  Sir, you talked about a number of

15  times that you would in your career go to a

16  tournament.

17        Is it unusual for you to have had an

18  occasion to instruct or give a lesson or give a tip

19  on a chip shot?

20    A.  No.  It's common.

21    Q.  Happens I think you said thousands of

22  times?

23    A.  It happens probably eight to ten times in a

24  Pro Am round, one Pro Am round, 18 holes.

Page 64

1    Q.  Okay.

2    A.  Depending on the level -- the sophisticated

3  level of their ability.  A beginner would require

4  more attention.  A better amateur probably wouldn't

5  require much extra instruction.

6    Q.  And in a Pro Am, you may have a certain

7  level of player.

8        But was it common for you to have a

9  tournament on a level of what you would have seen in

10  The Kev?

11    A.  Yes.

12    Q.  Okay.  And how would you approach it, a

13  teaching moment like hitting a chip shot in a --

14  something like The Kev?

15    A.  What I would do is if I were coming upon a

16  group, I would ask them to demonstrate -- to hit the

17  shot.

18        I would then demonstrate.  I would

19  offer to help.  I would then demonstrate myself, and

20  then ask them to mimic or replicate my action.

21        And again, depending upon the level of

22  the ability of the player, I would have to help

23  them.

24        And again so many beginners assume the

Page 65

1  stance of a driver or a position away from the ball

2  which is not how you hit a chip shot.

3        So you've got to move in and get the

4  player, physically push them up to the ball because

5  it's so foreign to beginning golfers to stand that

6  close to the ball.

7        So on so many times, I will have to

8  move the player up, have to make contact, sometimes

9  I even have them take my stance.

10        I'll take the stance in my

11  demonstration and ask them to step into my feet.

12  And on just about every occasion they say, wow, this

13  feels awful.

14        It's because they don't play golf or

15  because it's new to them.  So this is something that

16  I do a lot.

17    Q.  Would the instruction vary, in other words,

18  if it's a male or a female?

19    A.  No.

20    Q.  Okay.  Is the mechanics or the physics of

21  it the same?

22    A.  Yes.

23    Q.  Okay.  It says here as a JCA employee,

24  plaintiff felt obligated to go along with the

Page 66

1  demonstration.

2        Would you ever make someone feel

3  obligated, ever, to go along with the demonstration?

4    A.  No.

5    Q.  How would you make sure that someone wasn't

6  obligated to go along with the demonstration?

7    A.  Well, if I were there giving a tip and

8  somebody chose not to participate, I'd -- in Pro

9  Am's, I have people that don't want instruction.

10        They don't want instruction.  They feel

11  like their game is either too bad or too good.  I've

12  played with people who think, oh, I'm better than

13  you.

14        So I would never make it incumbent -- I

15  would never tell somebody that they had to do it.

16    Q.  And before actually providing instruction

17  where it may require you to become more physically

18  involved as opposed to just demonstration, how would

19  you make that determination?

20    A.  If they are not understanding my

21  instruction, my verbal instruction, I would then

22  have to step in and actually, physically move

23  somebody closer to the ball.

24    Q.  And before you did that, would you announce

Page 67



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1   or declare what you were going to do? | 1   It's hard to explain how to hit a chip |
| 2   A. Sometimes. Sometimes I would just go ahead | 2   shot when somebody is a complete beginner. It's |
| 3   and ask them can I show you or I would get them in | 3   hard to really get that across. |
| 4   my stance. | 4   But, you know, it would be standard |
| 5   Sometimes you do. Sometimes you don't. | 5   practice for me to -- that's why I'm there. I'm |
| 6   But again, when you are on the golf course, you | 6   there to engage and encourage and teach. |
| 7   assume that people want to learn and really | 7   Q. And if she says in those three instances |
| 8   understand how to hit the shot. | 8   you actually told her that that's what you were |
| 9   Q. Would you be encouraging and optimistic | 9   going to do, would that also be consistent with your |
| 10   trying to get people involved? | 10   custom and practice? |
| 11   A. I'm always optimistic and encouraging and | 11   A. Yes. |
| 12   hoping people get involved, but I would never demand | 12   Q. Okay. It says here -- so is there any |
| 13   or require anybody to step up and hit a shot. | 13   question that if she felt obligated; in other words, |
| 14   Q. Ms. Dziubla has testified to this and has | 14   if she was reluctant at all, would you have |
| 15   written in a number of documents that before you | 15   continued further? |
| 16   provided physical instruction, you had demonstrated. | 16   A. No. |
| 17   Would that be within your custom and | 17   Q. Why not? Why do you say that? |
| 18   practice? | 18   MR. SEDAEI: Objection, speculation. |
| 19   A. That would be what I would do, yes. | 19   MR. RUFF: Q. I'm talking about your |
| 20   Q. And then by her own words in deposition and | 20   custom and practice, sir. |
| 21   in written documents that she has provided, in her | 21   A. I've had many Pro Am partners who don't |
| 22   own hand or in her own typewriting, she stated that | 22   want instruction. They don't want me to help them |
| 23   she wasn't, quote, getting it, end quote, but that | 23   any further than what I've done. |
| 24   you encouraged her to participate. | 24   And if someone says, objection, I don't |
| Page 68 | Page 70 |
| 1   Would that be something that would be | 1   need any physical -- |
| 2   your custom and practice to do? | 2   A. I stop. I stop. |
| 3   A. Yes. | 3   Q. Okay. Is there any question in your mind |
| 4   MR. SEDAEI: Objection, mischaracterizes | 4   that you would not have imposed upon Ms. Dziubla or |
| 5   the plaintiff's testimony, but you can answer. | 5   made her feel obligated to continue? |
| 6   MR. RUFF: Q. And, sir, if her testimony | 6   A. No. |
| 7   has been in a number of instances before the EEOC, | 7   Q. I'm continuing on, Mr. Jacobsen, in that |
| 8   in her diary, in her deposition just last week that | 8   same paragraph. |
| 9   before you did any instruction, you physically | 9   As Jacobsen took his position behind |
| 10   announced that you were going to do so, would that | 10   plaintiff, he assertedly placed his hips against |
| 11   be consistent with your custom and practice? | 11   plaintiff's buttocks. |
| 12   A. Yes, it would be. | 12   Sir, did you do that? |
| 13   Q. Describe that. | 13   A. I don't remember. |
| 14   A. Any time I'm going to give a lesson to | 14   Q. What would your custom and practice be in |
| 15   anybody -- I understand that you could give a verbal | 15   this situations? |
| 16   or you could give a demonstration. You could tell | 16   A. In a lot of -- because beginners assume a |
| 17   them what to do. | 17   driver's stance, they are way too far from the ball. |
| 18   But if they are not getting it, you | 18   If they are not understanding, you have |
| 19   want them to get it. You want them to understand | 19   to sometimes get in, make physical contact and |
| 20   it. | 20   literally move them forward. |
| 21   So you -- you have to actually | 21   And -- |
| 22   sometimes physically move someone closer to the ball | 22   Q. Why is that? |
| 23   for balance, for control, for -- the control of the | 23   A. Because you need them to get closer to the |
| 24   swing. | 24   ball, closer proximity to the ball, almost like |
| Page 69 | Page 71 |



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   assuming a putting stance.
2       Q.   Is this -- is that need to get closer to
3   the ball actually a physics principle to assist them
4   in making an accurate shot?
5       A.   When you play golf -- golf is a side-on
6   game.  Bowling is an on-line game.  Archery is an
7   on-line game.
8           Golf, like tennis, like baseball, like
9   LaCrosse, like hockey, is a side-on game.  You stand
10  to the side, parallel to the side of your target
11  line.
12          To hit a proper shot to be in balance,
13  you have to be a certain distance from that target
14  line or in this case, the golf ball.
15          So you are going to make a little bit
16  of a swing, a little bit of an arch, the rotation of
17  your body.
18          And on a chip shot for control, you
19  have to be close to the ball to allow your body to
20  make that small motion needed to play that short
21  shot.
22      Q.   And it says assertively pressed hip against
23  buttocks.  Would.
24          You have been directly behind her or to

Page 72

1   a side?
2       A.   It could be -- it could be one of many
3   things.  It could be where you are trying to
4   actually push somebody closer to the -- I've
5   actually done clinics where I've had junior players
6   where I've had to reach down and grab them by the
7   shorts or the pants and because they are little,
8   they are six, seven, eight, nine, lift them up and
9   move them a foot closer to the ball to be able to
10  get them in the right proximity.
11      Q.   If we are talking about pressing hips
12  against the buttocks, would that be -- if she's
13  shooting right-handed, would that be your left hip
14  against the right buttocks?
15      A.   Correct.  It would more than likely be the
16  left hip to the right buttocks with my arm on her
17  back or on the person's back maybe reaching around
18  trying to help that person with the arm's club
19  swing.  It can be all different things.
20      Q.   And would this be any instruction different
21  than what you have provided hundreds of time before?
22      A.   It's the same.
23      Q.   Would it matter if it was male or female?
24      A.   No.

Page 73

1       Q.   And on a given outing such as this where
2   you may have more inexperienced players than in a
3   Pro Am, for instance, is there any question in your
4   mind that you may have run across in a typical
5   tournament like this males who needed similar
6   instruction?
7       A.   Yes.
8       Q.   Any question in your mind you would have
9   provided precisely the same type of instruction?
10      A.   I've done the same to men, women, juniors,
11  seniors, it doesn't matter.
12      Q.   And, sir, regarding the comment,
13  furthermore, as he proceeded to show plaintiff how
14  to hit the shot, that's when he said that's when I
15  take my wood out, a lewd comment that was intended
16  as a sexual innuendo.  I want to take this step by
17  step.
18      A.   Okay.
19      Q.   Would you have ever said that's when I take
20  my wood out?
21      A.   No.
22      Q.   What is the joke?
23      A.   The joke is beginners start with the irons
24  and they end up in the woods, being when you start

Page 74

1   as a beginner, you usually start with a wedge which
2   is an iron.
3           Then as you progress up through the bag
4   to the driver or three wood, you get to the woods.
5   Because they are -- because woods require a longer,
6   more of a fuller swing, it's harder to control.
7           The ball can end up adjacent to the
8   fairway, off the fairway in the rough where there
9   are trees, a forest or woods.  That's the joke.
10      Q.   Would you have ever said, sir -- first of
11  all, how many times have you said similar jokes to
12  similar levels of perhaps beginner golfers?
13      A.   Hundreds of times.
14      Q.   And you said this has an old origin to it?
15      A.   Yeah.  There's a -- it's an old Henny
16  Youngman or Rodney Dangerfield joke.
17          My father was a big golf nut.  He loved
18  humor.  He loved comedy shows, and he especially
19  loved the golf humor.
20      Q.   Is there any question in your mind that you
21  would not have said that's when I take my wood out?
22      A.   There is no way I would say that.  I didn't
23  know anybody there.
24      Q.   A lewd comment that was intended as a

Page 75



Peter Jacobsen  -  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    sexual innuendo.
2         Do you ever do that on a golf course in
3    instruction?
4    A.  No.
5    Q.  Did you ever do that ever?
6    A.  No.
7    Q.  Would you have done it in this instance?
8    A.  No.
9         MR. RUFF:  I think I'm done.  That's all I
10   have.
11        Thank you, sir.
12        MR. SEDAEI:  Nothing further.
13        MR. RUFF:  Reserve signature.
14        MS. REPORTER:  Do we need this written?
15        MR. SEDAEI:  Yes.  We'll have a PDF with
16   the exhibits.
17        MS. REPORTER:  Does anyone else need a
18   copy?
19        MR. RUFF:  Copy.
20        MS. OLSON:  Copy.
21        MS. REPORTER:  PDF, Etran?
22
23
24
Page 76

1         MR. RUFF:  Etran for me.
2         MS. OLSON:  PDF.
3         MR. SEDAEI:  PDF.
4              (Witness excused.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
Page 77

