Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

    ROWENA DZIUBLA,                    )
4                                      )
                    Plaintiff,         )
5                                      )
            -vs-                       ) No. 1:18-cv-4542
6                                      )
    J.C. ANDERSON, INC., and           )
7    PETER ERLING JACOBSEN,            )
                                       )
8                   Defendants.        )

9                    The videotaped deposition of

10   ROWENA DZIUBLA, called for examination, pursuant

11   to the Federal Rules of Civil Procedure for the

12   United States District Courts pertaining to the

13   taking of depositions, taken before Suzanne

14   Burke, a Certified Shorthand Reporter in the

15   State of Illinois, at 222 North LaSalle Street,

16   Suite 2600, Chicago, Illinois, on June 20, 2019,

17   A.D., commencing at the hour of 10:19 a.m.

18

19

20

21

22

23

24

Ex. A

Page 2

```
 1  APPEARANCES:
 2  GOLDMAN & EHRLICH
    20 South Clark
 3  Suite 500
    Chicago, Illinois  60603
 4  BY: MR. SAM SEDAEI
    Sam@goldmanehrlich.com
 5  312-332-6733,
 6    appeared on behalf of the plaintiff;
 7  VEDDER PRICE, PC
    222 North LaSalle Street
 8  Suite 2600
    Chicago, Illinois  60601-1106
 9  BY:  MR. EUGENE BOYLE
    BY:  MS. MICHELLE T. OLSON
10  Eboyle@vedderprice.com
    312-609-7692,
11
      appeared on behalf of the defendant
12    J.C. Anderson, Inc.;
13  PRETZEL & STOUFFER
    One South Wacker Drive
14  Suite 2500
    Chicago, Illinois  60606
15  BY:  MR. EDWARD B. RUFF III
    BY:  MARY HELEN CRONIN
16  Mcronin@pretzel-stouffer.com
    312-578-7458
17
      -and-
18
    CLIFFORD LAW OFFICES
19  120 North LaSalle Street
    Suite 3100
20  Chicago, Illinois  60602
    BY:  MR. JAMES C. PULLOS
21  Jcp@cliffordlaw.com
    312-899-9090,
22
      -and-
23
24
```

Page 4

```
 1           I N D E X
 2  DEPOSITION EXHIBIT NOS.          PAGE
 3
    Exhibit 12              82
 4  Exhibit 13              84
    Exhibit 14              92
 5  Exhibit 15             102
    Exhibit 16             120
 6  Exhibit 17             121
    Exhibit 18             121
 7  Exhibit 19             128
    Exhibit 20             130
 8  Exhibit 21             132
    Exhibit 22             134
 9  Exhibit 23             150
    Exhibit 24             153
10  Exhibit 25             163
    Exhibit 26             166
11  Exhibit 27             169
    Exhibit 28             176
12  Exhibit 29             178
    Exhibit 30             185
13  Exhibit 31             188
    Exhibit 32             189
14  Exhibit 33             197
    Exhibit 34             199
15  Exhibit 35             206
    Exhibit 36             210
16  Exhibit 37             215
    Exhibit 38  (no exhibit was marked)  --
17  Exhibit 39             246
    Exhibit 40             297
18  Exhibit 41             306
    Exhibit 42             308
19  Exhibit 43             314
    Exhibit 44             318
20  Exhibit 45             319
    Exhibit 46             321
21  Exhibit 47             330
22
23
24
```

Page 3

```
 1  APPEARANCES (Cont'd):
 2  PIPPIN LAW OFFICES
    385 First Street
 3  Suite 215
    Lake Oswego, Oregon  97034
 4  BY: JAMES M. PIPPIN
    Jim@pippinlawoffices.com
 5  503-607-0224,
 6    appeared on behalf of the defendant
      Peter Erling Jacobsen.
 7
    ALSO PRESENT:
 8
    MR. DANIEL FROMAN,
 9
      the videographer;
10
    MR. MICHAEL POWER, JR.
11
         I N D E X
12
    WITNESS:           PAGE
13
    ROWENA DZIUBLA
14
      Examination By Mr. Boyle
15    Examination By Mr. Ruff
16       E X H I B I T S
17  DEPOSITION EXHIBIT NOS.        PAGE
18  Exhibit 1         14
    Exhibit 2         16
19  Exhibit 3         17
    Exhibit 4         17
20  Exhibit 5         18
    Exhibit 6         18
21  Exhibit 7         24
    Exhibit 8         28
22  Exhibit 9         44
    Exhibit 10        63
23  Exhibit 11        70
24
```

Page 5

```
 1      THE VIDEOGRAPHER:  We are going on the
 2  record at 10:19 a.m. on Thursday, June 20th,
 3  2019.  Please note that the microphones are
 4  sensitive and may pick up whispering, private
 5  conversations, and cellular interference.  Please
 6  turn off all cell phones or place them away from
 7  the microphones as they can interfere with the
 8  deposition audio.
 9      Audio and video recording will
10  continue to take place unless all parties agree
11  to go off the record.
12      This is media unit 1 of the video
13  recorded deposition of Rowena Dziubla.
14      THE WITNESS:  It's Dziubla.
15      THE VIDEOGRAPHER:  Dziubla.
16      THE WITNESS:  There you go.
17      THE VIDEOGRAPHER:  Taken by counsel for
18  the defendant in the matter of Rowena Dziubla v.
19  J.C. Anderson, Incorporated, and Peter Erling
20  Jacobsen, filed in the United States District
21  Court for the Northern District of Illinois,
22  Eastern Division, case No. 1:18-cv-04542.
23      This deposition is being held at
24  Vedder Price located at 222 North LaSalle Street,
```

Page 6

1  Chicago, Illinois.
2        My name is Daniel Froman from the
3  firm Veritext Legal Solutions.  The court
4  reporter is Suzanne Burke from the firm Veritext
5  Legal Solutions.
6        I am not authorized to administer an
7  oath, I'm not related to any party in this
8  action, nor am I financially interested in the
9  outcome.
10        Counsel and all present in the room,
11  please state your appearances and affiliations
12  for the record.
13        MR. BOYLE:  Eugene A. Boyle on behalf of
14  J.C. Anderson, Inc.
15        MS. OLSON:  Michelle Olson on behalf of
16  J.C. Anderson, Inc.
17        MR. POWER:  Michael Power,
18  J.C. Anderson.
19        MR. PIPPIN:  Jim Pippin, personal
20  attorney for Peter Jacobsen.
21        MR. PULLOS:  Jim Pullos on behalf of
22  Peter Jacobsen.
23        MR. RUFF:  Ed Ruff, R-u-f-f, on behalf
24  of Peter Jacobsen.

Page 7

1        MS. CRONIN:  Mary Cronin on behalf of
2  Peter Jacobsen.
3        MR. SEDAEI:  Sam Sedaei for plaintiff.
4        (Witness sworn.)
5              ROWENA DZIUBLA,
6  called as a witness herein, having been first
7  duly sworn, was examined and testified as follows:
8              EXAMINATION
9  BY MR. BOYLE:
10    Q.  Good morning, Ms. Dziubla.  My name is
11  Gene Boyle.  I represent J.C. Anderson, Inc., who
12  is one of the defendants in the lawsuit that
13  you've brought in Federal Court.  I will be
14  referring to J.C. Anderson with the acronym JCA
15  throughout the proceeding today.  If I do, I'd
16  ask you to understand that I'm referring to
17  J.C. Anderson.  Is that acceptable?
18    A.  Yes.
19    Q.  Okay.  I'm going to be asking you a
20  series of questions today about the claims that
21  you've asserted in the lawsuit.  When I'm
22  finished, counsel for Mr. Jacobsen will have an
23  opportunity to ask you questions during the
24  proceeding.

Page 8

1        Have you ever had your deposition
2  taken before?
3    A.  No.
4    Q.  Okay.  So as you probably have gathered,
5  we have a court reporter here today.  She's
6  taking down everything that's said in the
7  proceedings, so we'll have a complete record of
8  the proceedings after the event.  We also have a
9  videographer, so there will be a video recording
10  of what we discuss here today.
11    A.  Okay.
12    Q.  Do you understand that?
13    A.  Yeah.
14    Q.  Okay.  Your testimony is -- you just
15  were given an oath, so your testimony here must
16  at all times be truthful.  It will have the same
17  meaning and effect as if we were in the courtroom
18  in front of the judge.  Do you understand that?
19    A.  Yeah.
20    Q.  There's a few ground rules that will
21  make the process go a little smoother that I'll
22  run through with you right now.
23    A.  Okay.
24    Q.  Probably the most important one is if

Page 9

1  there's any question that I or anybody asks you
2  that you don't understand, you should always feel
3  free to say I don't understand or let me know
4  somehow that you need clarification.
5    A.  Okay.
6    Q.  I'll be happy to do that.
7        If I do ask you a question and you
8  go ahead and answer it, I'll assume that you
9  understood the question.
10    A.  All right.
11    Q.  We need you -- even though we're being
12  video recorded today, we need you to provide
13  verbal answers to my questions, no shakes of the
14  heads --
15    A.  Right.
16    Q.  -- or shrugs of the shoulders.  They
17  can't be picked up by the court reporter.
18    A.  Right.
19    Q.  Do you understand that?
20    A.  Yeah.
21    Q.  Okay.  As we start to get into the
22  questioning, you may anticipate what I'm asking
23  you before I'm completely done with my question.
24  I just ask that you wait until I finish the

3 (Pages 6 - 9)

Page 10

1  question before you give your answer.
2      A.  Yeah.
3      Q.  And I'll attempt to do the same as
4  you're providing the answer.
5      A.  Okay.
6      Q.  Is that fair?
7      A.  Yeah.
8      Q.  At any time if you need a break, just
9  let me know, and we'll take a break.  And the
10  only rule is that if I've asked you a question,
11  I'll need you to answer the question before we
12  take the break.
13      A.  Yeah, that sounds good.
14      Q.  So is there any reason that you are
15  aware of why you would not be able to give
16  truthful testimony here today?
17      A.  No, there isn't.
18      Q.  Okay.  Are you on any medication or
19  drugs that you think might impact your ability to
20  provide truthful testimony?
21      A.  No.
22      Q.  If at any point during today's
23  deposition, for any medical reason, you need to
24  take a prescription or anything, please just let

Page 11

1  us know that.  Okay?
2      A.  Sure.
3      Q.  Okay.  What did you do -- tell me a
4  little bit about what you did to prepare for your
5  deposition today?
6      A.  Basically just read over some of the
7  stuff that I had submitted; tried not to over
8  think things.
9      Q.  Anything else?  Did you meet with your
10  attorney?
11      A.  Yeah.
12      Q.  Okay.
13      A.  Yeah.
14      Q.  When did you meet with your attorney?
15      A.  We had a phone conversation yesterday
16  morning to review and then briefly --
17      MR. SEDAEI:  You don't need to say what
18  we talked about.
19      THE WITNESS:  Oh.
20  BY MR. BOYLE:
21      Q.  No, I'm not asking --
22      A.  And then --
23      Q.  Go ahead.
24      A.  Oh, and then briefly this morning before

Page 12

1  the deposition.
2      Q.  Okay.  When you had your phone
3  conversation yesterday, was anybody else on the
4  call with you?
5      A.  No.
6      Q.  It was just you and Mr. Sedaei?
7      A.  Yes.
8      Q.  Okay.  And then you met again briefly
9  this morning?
10      A.  Yes.
11      Q.  Okay.  Was there anybody else present
12  when you met this morning?
13      A.  No.
14      Q.  You say you read some stuff that you
15  submitted.  Do you remember what it is that you
16  reviewed?
17      A.  I just went through the packet, the EEOC
18  packet, and went through -- I'm trying to think
19  specifically the stuff.  I looked up with -- I
20  looked up an email to see if I had asked -- if I
21  had said that I wanted to come back to work
22  there.  And I wanted confirmation in front of me
23  that I had actually asked for it, and I found it.
24      Q.  You found that email?

Page 13

1      A.  Yes.
2      Q.  Okay.  Is that a document that you've
3  produced --
4      A.  Yeah.
5      Q.  -- in this case?
6      A.  Yeah.
7      Q.  Do you remember the date of that email?
8      A.  I don't.
9      Q.  But you're sure that that's a document
10  that you've produced in this case?
11      A.  Yes.
12      Q.  Any other documents that you recall
13  reviewing?
14      A.  Just basically read over some stuff to
15  see.  I think one was a text message from one of
16  the subcontractors that I work with, Nema
17  (phonetic), to just kind of reaffirm that I
18  didn't remember things incorrectly in terms of,
19  you know, when things got shut down with my
20  email.  How puzzled he was about me not being at
21  the walk-throughs, that all of a sudden I -- my
22  responsibilities had been reallocated, and he
23  wanted to know if I was okay.
24      Q.  Anything else?

4 (Pages 10 - 13)

Page 14

1    A.  That's all I recall.
2    Q.  And is it fair to say that everything
3  that you reviewed in preparation for today's
4  deposition you've through your counsel already
5  produced in the case?
6    A.  Absolutely.
7      MR. BOYLE:  Can we get these marked as
8  Exhibit 1.
9        (Document marked as Dziubla Deposition
10        Exhibit No. 1 for identification.)
11      MR. BOYLE:  I made five copies.
12      (Discussion off the record.)
13  BY MR. BOYLE:
14    Q.  So, Ms. Dziubla, I've handed you what
15  we've marked as Deposition Exhibit 1, and ask you
16  to take a quick look at that.  You -- and when
17  you're ready, let me know if you've seen a copy
18  of this document before?
19    A.  Yes.
20    Q.  Okay.
21    A.  I have.
22    Q.  Do you remember when?
23    A.  No.  I mean, like, the exact date, no.
24  I mean, it looks familiar.  I didn't read through

Page 15

1  all of everything that's in here.  If there's
2  anything added, I'm assuming the dates of 2018 --
3    Q.  Okay.
4    A.  It looks familiar.
5    Q.  Do you recall reviewing the document
6  sometime prior to October 31st of 2018?
7    A.  No, I don't -- I don't have that
8  timeline in my head.  Sorry.
9    Q.  Okay.  Did you provide the information
10  that your attorney used to complete this
11  document?
12    A.  Yeah.
13    Q.  Okay.
14    A.  I would think so.
15    Q.  And as you review the document, is
16  everything contained in the document true and
17  accurate to the best of your knowledge?
18    A.  Yes.
19    Q.  Okay.  If you could hand that back to
20  me.
21      Thanks.
22      Can I have this marked as Exhibit 2,
23  please.
24

Page 16

1        (Document marked as Dziubla Deposition
2        Exhibit No. 2 for identification.)
3  BY MR. BOYLE:
4    Q.  I've now handed you what we've marked as
5  Deposition Exhibit 2, and same question.  I'd
6  like you to take a look at this.  These are your
7  discovery interrogatory responses.  I have a few
8  questions about these.  Let me know when you've
9  had time to take a look at them.
10    A.  Okay.
11      MR. SEDAEI:  Yeah, and you realize this
12  is not the amended version, right?
13      MR. BOYLE:  That's correct.
14      THE WITNESS:  Yeah.
15  BY MR. BOYLE:
16    Q.  So, Ms. Dziubla, have you seen a copy of
17  these responses before?
18    A.  Yes, I have.
19    Q.  Okay.  Did you review these answers with
20  your attorney prior to submitting them?
21    A.  Yes, I did.
22    Q.  Okay.  And flipping to the last page of
23  the dep -- the exhibit, is that your signature?
24    A.  Yes.

Page 17

1    Q.  Okay.
2    A.  The verification page?
3    Q.  That's correct.
4    A.  Yes.
5    Q.  Okay.  And is everything to your
6  knowledge contained in these interrogatory
7  responses true and accurate to the best of your
8  knowledge?
9    A.  Yes.
10    Q.  Okay.
11      These will be 3.  Mark these as
12  Exhibit 3, please.
13        (Document marked as Dziubla Deposition
14        Exhibit No. 3 for identification.)
15      MR. BOYLE:  Could we also get this
16  marked as Exhibit 4.
17        (Document marked as Dziubla Deposition
18        Exhibit No. 4 for identification.)
19  BY MR. BOYLE:
20    Q.  So, Ms. Dziubla, we've handed you two
21  documents that have been marked Exhibits 3 and
22  Exhibit 4.  Exhibit 3 is a copy of your amended
23  answers to the interrogatories, and Exhibit 4 is
24  a document that was just produced by your

5 (Pages 14 - 17)

Page 18

1  attorney today which is your verification to
2  those answers.
3          With respect to Exhibit 3, the
4  amended answers to interrogatories, have you seen
5  this document before?
6      A. Yes.
7      Q. Okay. And did you review the document
8  and help your attorney prepare the document?
9      A. Yes.
10     Q. Okay. And are the answers provided in
11 this document true and accurate --
12     A. Yes.
13     Q. -- to the best of your knowledge?
14         And with respect to Exhibit 4, is
15 that your signature?
16     A. Yes.
17         MR. BOYLE: Can I get these marked as
18 the next two exhibits, please.
19         (Documents marked as Dziubla
20         Deposition Exhibit Nos. 5 and 6
21         for identification.)
22 BY MR. BOYLE:
23     Q. Now I've handed you documents we've
24 marked as Exhibits 5 and Exhibit 6, two separate

Page 19

1  documents. Exhibit 5 is a copy of your responses
2  to Defendant J.C. Anderson's request for document
3  production, and Exhibit 6 is your amended
4  responses to JCA's document request. Have you
5  seen these documents before?
6      A. Yes.
7      Q. Okay. And to your knowledge, are the
8  responses contained therein accurate and
9  complete?
10     A. Yes.
11     Q. Okay. Can you hand those back.
12         And what is your date of birth?
13     A. July 30th, 1979.
14     Q. And can you -- what is your full name?
15     A. Rowena Dziubla.
16     Q. Okay. Have you gone by Rowena -- is
17 your middle initial T?
18     A. No, it's not.
19     Q. Okay. Can you provide all prior names
20 that you've gone by?
21     A. Born Rowena Toledo Tulacz.
22     Q. You'll have to go a little bit slow for
23 the court reporter.
24     A. Oh, so Rowena Toledo Tulacz was my birth

Page 20

1  name, and then I married, became Rowena Toledo
2  Schwanderlik. And then when I got divorced, I
3  dropped the Schwanderlik and took on Toledo or
4  Toledo, because it was my mom's name. And then
5  when I remarried, I dropped the Toledo altogether
6  and kept the -- his last name Dziubla.
7      Q. Okay. So you're currently married?
8      A. Correct.
9      Q. And what's your husband's name?
10     A. Dan Dziubla.
11     Q. Okay. How long have you been married?
12     A. Four years in April.
13     Q. Have you had any prior marriages?
14     A. Yes.
15     Q. You just mentioned one.
16     A. Yeah.
17     Q. Who were you married to previously?
18     A. Ken Schwanderlik.
19     Q. And how did that marriage end?
20     A. With divorce and --
21     Q. And what were -- go ahead.
22     A. Oh, and bankruptcy.
23     Q. And what were the dates of the marriage?
24     A. I might be a little bit loose on the

Page 21

1  years. I want to say 2008, and that was for
2  three years. We got married in 2005. Sounds
3  about right.
4      Q. And you said you've been married to your
5  current husband for four years?
6      A. Uh-huh.
7      Q. What's your anniversary date?
8      A. April 18, 2015.
9      Q. Have you had any other prior marriages?
10     A. No.
11     Q. What's your current address?
12     A. 106 Parkchester Road in Elk Grove
13 Village, 60007.
14     Q. How long have you lived at that address?
15     A. Not 100 percent sure, just because I
16 relocated for work a couple times. So I was,
17 like, kind of there, but not really there. I was
18 living in Louisiana, so more than five years.
19     Q. Does anyone live at that address with
20 you?
21     A. My husband does.
22     Q. Anybody else?
23     A. No.
24     Q. Okay. Has anybody lived at that address

6 (Pages 18 - 21)

Page 22

1  with you and your husband at any time since
2  September of 2017?
3      A.  No.
4      Q.  Okay.  Has anybody other than you and
5  your husband lived at that residence with you at
6  any time?
7      A.  No.
8      Q.  Do you have any current plans to move?
9      A.  No.
10     Q.  Have you ever been arrested?
11     A.  No.
12     Q.  Have you ever been charged with a crime?
13     A.  No.
14     Q.  Have you ever served in the military?
15     A.  No.
16     Q.  Other than this case, have you ever been
17  a party either as a plaintiff or a defendant to
18  any other civil lawsuit?
19     A.  No.
20     Q.  Now, you mentioned that there -- you've
21  been a party to a bankruptcy previously; is that
22  correct?
23     A.  Yeah.
24     Q.  Okay.  And when was that?

Page 23

1      A.  I want to say it was probably 2018,
2  maybe April, April of 20 -- 2008, sorry, 2008.
3      Q.  And what were the circumstances that led
4  you to file for bankruptcy?
5      A.  The divorce.
6      Q.  And specifically what about divorce, the
7  divorce, led you to file for bankruptcy?
8      A.  We had a lot of debt and I was the
9  breadwinner, and I was carrying all of his
10  financial issues, and I wanted it to be gone.  So
11  I figured the best way to do it was to clean the
12  slate.
13     Q.  What was the outcome of the bankruptcy?
14     A.  I don't understand that question.
15     Q.  How did the bankruptcy end?
16         MR. SEDAEI:  Objection, form.
17  BY THE WITNESS:
18     A.  Yeah, I don't know what that means.
19  BY MR. BOYLE:
20     Q.  Okay.  What -- my question is what was
21  the outcome of the bankruptcy?  What specifically
22  don't you understand about that question?
23     A.  Like, don't bankruptcy -- it was filed
24  and it was -- I don't know what you're looking

Page 24

1  for.
2      Q.  Were all your debts discharged?
3      A.  Oh, yes.
4      Q.  Okay.  So all the debt that you had
5  during the time that you were married up until
6  the divorce, all that debt was discharged; is
7  that correct?
8      A.  With the exception of my student loans.
9      Q.  Okay.  Any other debts that were not
10  discharged as a result of that bankruptcy?
11     A.  No.
12         MR. BOYLE:  Can I get this marked as the
13  next exhibit, please.
14             (Document marked as Dziubla Deposition
15             Exhibit No. 7 for identification.)
16  BY MR. BOYLE:
17     Q.  Ms. Dziubla, I've handed you a document
18  we've marked Deposition Exhibit 7.  This is a
19  document that you produced to us in discovery.
20  Do you recognize the document?
21     A.  Yes.
22     Q.  And is this, in fact, a -- the
23  discharge, a document relating to the bankruptcy
24  that you just described?

Page 25

1      A.  I believe so, yes.
2      Q.  Okay.  Do you have any other documents
3  relating to the bankruptcy case that you filed?
4      A.  That's it.
5      Q.  This is the only document you have in
6  your possession?
7      A.  Yes.
8      Q.  Okay.  What is the highest level of
9  education that you've achieved?
10     A.  A bachelor's.
11     Q.  Where did you receive your bachelor's?
12     A.  Harrington College of Design.
13     Q.  Where is Harrington College located?
14     A.  It was on Madison and Wells, but now
15  they're out of business.
16     Q.  Does -- the school is no longer in
17  existence?
18     A.  Yeah, they -- as far as I -- what I
19  heard, they shut down.  They closed down a couple
20  years ago.
21     Q.  And what was your -- what degree did you
22  receive from Harrington?
23     A.  Bachelor's of fine arts.
24     Q.  Okay.  Did you have a major?

7 (Pages 22 - 25)

Page 26

1     A.   Interior design.
2     Q.   Do you have any other undergraduate
3   degrees?
4     A.   No.
5     Q.   Okay.
6     A.   Oh, like, an associate's?  Does that
7   matter?
8     Q.   Yes.
9     A.   Oh, engineering science.
10    Q.   Where did you receive your engineering
11  science degree?
12    A.   From Wilbur Wright College in Chicago.
13    Q.   Okay.  Do you remember the year of that?
14    A.   No.
15    Q.   Where did you go to high school?
16    A.   Von Steuben Metropolitan Science Center.
17    Q.   And when did you graduate?
18    A.   In Chicago.
19         In 1997.
20    Q.   Do you remember roughly how long after
21  1997 it was that you received your associate's
22  degree from Wright College?
23    A.   Before 2006.  That's about as good as I
24  can -- yeah, before 2006.  It took me a while.  I

Page 27

1   was going part time.
2     Q.   Do you hold any other professional
3   certifications or licenses?
4     A.   We got certified in ProCore a couple
5   weeks ago -- a couple months ago.  I mean --
6     Q.   What's ProCore?
7     A.   It's a document management software
8   that's used in the construction industry.
9     Q.   Any other professional certifications or
10  licenses?
11    A.   Not that I recall.
12    Q.   Do you presently have any current plan
13  to pursue further education?
14    A.   I do, probably more along the lines of
15  nutrition and fitness.
16    Q.   Do you know specifically what types of
17  further education you'd like to receive in
18  connection with nutrition and fitness?
19    A.   No, not yet.  I'm still trying to figure
20  out what's respected in the industry, in the
21  fitness industry.  It's kind of what I'm doing as
22  a side -- as my side business.  So I don't know
23  what's got, you know, a good reputation.  I don't
24  want to just get it from anywhere and have it

Page 28

1   not -- no one cares.  So I'm not sure yet.
2     Q.   But you feel somehow that further formal
3   education in that area would assist you with your
4   side business; is that fair to say?
5     A.   Yeah, I think it will -- it's what
6   people see.  You know, they see the acronym at
7   the end of their name, they assume that you're an
8   expert, so it doesn't matter your experience.
9   So, yeah, I think it will help.
10    Q.   Okay.  And is that because you -- are
11  you trying to expand your side business?
12    A.   Absolutely.
13         MR. BOYLE:  Can we please have this
14  marked as the next exhibit.
15         (Document marked as Dziubla Deposition
16          Exhibit No. 8 for identification.)
17  BY MR. BOYLE:
18    Q.   Ms. Dziubla, we've handed you what we've
19  marked as Deposition Exhibit 8.  Do you recognize
20  this document?
21    A.   No.  I mean, I'm assuming that this is
22  the recruiter that they employed to get me the
23  position there at JCA, but I had -- I never drew
24  this up.  Usually the recruiters send this stuff

Page 29

1   out with their own heading and they just kind of
2   do it for you.
3     Q.   And when you say the recruiter, is that
4   up in the upper left corner, you see where it
5   says ALJ Group?
6     A.   Yeah.
7     Q.   Is that the recruiter?
8     A.   What is that, Todd Justic?  Yeah, that's
9   him.
10    Q.   Okay.  And who is Todd Justic?
11    A.   Todd Justic is a recruiter that found me
12  and recruited me to bring me over to
13  J.C. Anderson.  He's also very good friends with
14  Mike Yazbec.
15    Q.   When you say he found you, can you
16  describe a little bit more how that occurred?
17    A.   Actually, if I'm recalling correctly, I
18  reached out to a company called Summit Design
19  Build that works in the West Loop and spoke to
20  their senior estimator there about a position
21  with the company.  We had a long conversation.  I
22  was going to interview there.  And she said that
23  she was actually on her way out, and was, like,
24  you know what, I think it would be better if you

8 (Pages 26 - 29)

Page 30

1  didn't. And then a couple -- I forget the time
2  frame, but a short time later, I guess she was
3  working with Todd, also, and mentioned my name
4  and said, hey, if you could help her out, here is
5  her information. So that's kind of how.
6    Q. You were put in touch with --
7    A. I was put in touch with Todd, yeah.
8    Q. Okay. So it's fair to say that at that
9  time you were looking to make a move, you reached
10  out to this other company called Summit?
11    A. Yeah.
12    Q. And they connected you with the
13  recruiter for ALJ; is that accurate?
14    A. Yeah.
15    Q. Okay. And now this document which we've
16  marked as Deposition Exhibit 8, you said this was
17  prepared by the recruiting agency?
18    A. That's usually how they -- yeah, that's
19  how they do it, because they -- I'm surprised
20  actually my information, my personal information,
21  is on top. Because usually they take all that
22  off before they send it over to the client.
23    Q. Did you provide them with a resume that
24  you were using at that time from which they then

Page 31

1  created this document?
2    A. Prob -- yeah, probably.
3    Q. Do you still have a copy of that resume?
4    A. No.
5    Q. But it's fair to say that the only way
6  he would have obtained this information is from
7  information that you provided to him, correct?
8    A. Yeah.
9      MR. SEDAEI: Objection, calls for
10  speculation.
11  BY MR. BOYLE:
12    Q. And as you review this Deposition
13  Exhibit 8, does it contain all of the employment
14  that you had prior to joining JCA?
15    A. It contains people I did work with
16  previously. I don't know if the order is right
17  or -- let me just look at it here.
18      It looks about right.
19    Q. So as you --
20    A. I worked for those people. I don't know
21  if it's -- I mean, I don't know how he spun it to
22  JCA, you know. There might -- that's the other
23  thing, too. I mean, that's their job is to put
24  me in the best light possible to the client, so

Page 32

1  that he gets his commission, right. So I'm
2  not -- I mean, it looks like it's all the
3  employers that I've worked for, yes.
4    Q. Okay. So as you review this document,
5  you've worked for all these employers, correct?
6    A. Yes.
7    Q. And are there any that you've worked for
8  during the time frame covered by this document
9  that are not on here?
10    A. Not that I can see.
11    Q. Okay. So looks like your most recent
12  employment prior to joining JCA was with
13  Blinderman Construction; is that correct?
14    A. Yes.
15    Q. And what was the date -- when did you
16  join JCA?
17    A. I'm not sure.
18    Q. Would it have been in September of 2016?
19    A. I don't -- honestly I don't recall the
20  year. I feel like it was -- I feel like May is a
21  good month that I started. I don't recall what
22  year it was, though.
23    Q. Sometime in 2016?
24    A. Honestly I don't know. I honestly

Page 33

1  don't -- I mean, like, I can do the math right
2  now. I don't recall when I started or how long I
3  worked there for.
4    Q. Do you remember when your employment at
5  JCA ended?
6    A. 2017, sometime in September or October.
7    Q. Do you remember how long you had worked
8  for the company at the time your employment ended
9  approximately?
10    A. Over a year.
11    Q. So sometime in 2016, you joined JCA; is
12  that correct?
13    A. Sure.
14    Q. Okay. So and this document indicates
15  that you started with Blinderman Construction in
16  May of 2015; is that correct?
17    A. Uh-huh.
18    Q. Is that accurate?
19    A. Yes, it is.
20    Q. Okay. So you worked for Blinderman for
21  approximately 1.3 years; is that fair to say?
22    A. Yes.
23    Q. Why did you -- it says you were an
24  estimator/project manager --

9 (Pages 30 - 33)

Page 34

1    A.  Yes.
2    Q.  -- for that company?
3    A.  Correct.
4    Q.  Is that accurate?
5    A.  Yes.
6    Q.  And why did you leave Blinderman?
7    A.  Presented with a new opportunity closer
8  to home, more money, something a little bit
9  closer to the type of work that JCA did, was
10 interiors only.  I was very confident in my skill
11 set there because of my education and most of the
12 work that I had done in the industry.  So I
13 figured it was a good move.
14   Q.  Now, when you say you were presented
15 with a new opportunity, what do you mean by that?
16   A.  The recruiter when he reached out to me.
17   Q.  Okay.  So you were looking for
18 employment at the time; is that correct?
19   A.  I don't understand.
20   Q.  You were looking for another job at the
21 time?
22   A.  Honestly when Todd contacted me, I
23 wasn't actively looking for anything.  He just
24 kind of reached out to me, and I was, like, yeah,

Page 35

1  I'll listen.  I mean, just like with anybody that
2  a recruiter reaches out to.  I mean, just because
3  you listen to them doesn't mean you're going to
4  jump ship.
5    Q.  But I -- unless I misunderstood, I
6  thought that the way you got in touch with Todd
7  is you were talking to another company about
8  employment with that company and they put you in
9  touch with Todd?
10   A.  Right.  But I don't know what that time
11 frame was between talking to Ellie and talking to
12 Todd.  I don't know, like, if that was two months
13 or if that was an entire year honestly.  I have
14 no idea.
15   Q.  So in any event, you felt like JCA
16 presented a better opportunity for you than the
17 opportunity that you had currently at Blinderman;
18 is that fair to say?
19   A.  Yes, yes.
20   Q.  Okay.  Were you asked to leave
21 Blinderman?
22   A.  No.
23   Q.  Did they terminate your employment?
24   A.  I put in my two weeks and he had me

Page 36

1  leave early.
2    Q.  Okay.
3    A.  It was just, like, might as well.
4    Q.  At the time you left Blinderman, were
5  you having any issues with any of the employees
6  there?
7    A.  Not at all.
8    Q.  Okay.  So on this document Deposition
9  Exhibit 8, your prior employer was F.E. Moran,
10 Inc.?
11   A.  Yep.
12   Q.  What type of company is F.E. Moran,
13 Inc.?
14   A.  They're a mechanical contractor.
15   Q.  Okay.  And it looks like you worked for
16 them from approximately March of 2014 till May of
17 2015; is that correct?
18   A.  Yes.
19   Q.  So a little over a year --
20   A.  Correct.
21   Q.  -- with F.E. Moran?
22        And you started out there as a
23 project manager assistant; is that correct?
24   A.  Yes.

Page 37

1    Q.  And then you were promoted to project
2  manager just prior to leaving the company; is
3  that accurate?
4    A.  Yes.
5    Q.  Can you tell me why you left F.E. Moran?
6    A.  Well, again, a recruiter reached out to
7  me, and he said if I wanted to hear about an
8  opportunity he had.  And I listened to him, and I
9  pretty much had a very solid background in
10 general contracting; and being in a -- mechanical
11 contractor was just something that wasn't really
12 on the path.  And he's, like, well, I've got this
13 great place.  It's in West Loop.  Sold me on
14 Blinderman.  Again, more money, more opportunity
15 for growth.  The type of projects they were
16 working on seemed like they would be in line with
17 what I was going for.
18   Q.  Do you recall whether or not the
19 recruiter knew that you were looking; is that why
20 he contacted you?
21   A.  Let's see.  How -- no.  I know for sure
22 he caught me off guard, because he -- the name of
23 the company that he had worked for at the time
24 was called Hard Hat Hub.

10 (Pages 34 - 37)

Page 38

1      And when he first reached out to
2  me -- first of all, he called me on my work phone
3  which caught me off guard, because they're slick
4  like that. And then second of all, I heard Hard
5  Hat Hub, and immediately, I was, like, oh, you
6  want to talk to our safety guy, because it's PPE.
7  Like, he's selling hardhats and goggles and
8  stuff. I'm, like -- he's, like, no, no, no,
9  he's, like, I'm a recruiter. I'm, like, what,
10  for safety gear. And he's, like, no, I'm a
11  headhunter, and I was, like, oh.
12      And then he was, like, do you want
13  to talk, and I was, like, sure. It doesn't hurt
14  to listen.
15      Q.  And what was this person's name?
16      A.  It's actually Kyle Jacobson. So he
17  originally worked for Hard Hat Hub, and then I
18  later ended up working for him at Talent Hitch.
19      Q.  Now, were you ever asked to leave
20  F.E. Moran company?
21      A.  No.
22      Q.  Okay.
23      A.  No.
24      Q.  So prior to that, you worked for Atlas

Page 39

1  Restoration; is that correct?
2      A.  Yes.
3      Q.  And you worked for them for about seven
4  months?
5      A.  Yes.
6      Q.  Okay. Why did you leave Atlas
7  Restoration?
8      A.  It was a contract position that I took,
9  and it was pretty much over. So I forgot how I
10  came across -- oh, F.E. Moran's in-house
11  recruiter had just reached out to me while I was
12  at Atlas, and the circumstances at Atlas, they're
13  kind of a ma-and-pa shop kind of thing, you know,
14  low overhead. And I just figured, you know,
15  moving into a corporate atmosphere like F.E.
16  Moran, a big company like that that has the
17  wingspan that they do in our industry, I thought
18  it was a good move.
19      But, yeah, I mean, again, I wasn't
20  looking. The recruiter, I mean, that's what they
21  do. They reach out to people; and if you're
22  willing to listen, they'll tell you about it.
23      Q.  Was there anything about -- well, let me
24  strike that.

Page 40

1      It was a contract position. Do you
2  have a copy of the contract you had with them?
3      A.  Uh-uh.
4      Q.  Do you remember how long that contract
5  was for?
6      A.  I shouldn't say -- it was, like, temp to
7  perm. I don't know that it was, like -- I got
8  Atlas through a staffing agency. So it wasn't --
9  you know, they hired me on for, I think, like,
10  three months, and then they -- it was temporary
11  for three months, and then they hired me on.
12  So -- but it wasn't like I was going to stay
13  there. They're just too seasonal.
14      Q.  But in any event, they did make you a
15  permanent employee after the --
16      A.  Oh, yeah, oh, absolutely, yeah.
17      He said I was too expensive. That's
18  another reason why I didn't stay.
19      Q.  Who is he?
20      A.  The owner of the company, Marty
21  Silverman.
22      Q.  Were you satisfied with your
23  compensation at Atlas Restoration?
24      A.  Yep.

Page 41

1      Q.  So prior to Atlas, you worked for a
2  company called the Mason Group; is that correct?
3      A.  The Macon Group, yes.
4      Q.  Oh, I'm sorry, Macon Group.
5      And, once again, you were an
6  estimator, project manager, safety coordinator;
7  is that accurate?
8      A.  Yep.
9      Q.  Okay. And you worked for them from
10  February 2012 to June 2013. So, again, about one
11  month -- one year and four months; correct?
12      A.  Yes.
13      Q.  Okay. And why did you leave the Macon
14  Group?
15      A.  So how I got to the Macon Group was
16  because I was in New Orleans at -- working for
17  Paschen, and I wanted to come back home to
18  Chicago. And I basically took any job that I
19  could get. And they offered me a salary that was
20  substantially less than what I was making and
21  promised me that I would be brought up to snuff
22  after a certain amount of time, and he didn't.
23  And I continued to receive additional
24  responsibilities, and I wasn't going to do it.

11 (Pages 38 - 41)

Page 42

1    Q.  So you were dissatisfied with your
2  compensation at that company; is that fair to
3  say?
4    A.  Yes.
5    Q.  Okay.  And did you let the person know
6  that you were dissatisfied with your
7  compensation?
8    A.  Yes, yep.
9    Q.  And was your employment -- did Mason
10  Group -- Macon Group terminate your employment?
11    A.  No, no, they kept me on.
12    Q.  You mentioned that prior to that you
13  were in New Orleans.
14    A.  Uh-huh.
15    Q.  With the FH Paschen Company?
16    A.  Correct.
17    Q.  And what type of company is FH Paschen?
18    A.  FH Paschen is a general contractor.
19  Actually I helped them open their satellite
20  office in New Orleans.  So when they got -- they
21  were expecting to get about $30 million worth of
22  work down there when they opened the office, and
23  we ended up with $300 million.  And it was
24  basically me and the vice president of that

Page 43

1  location and our project engineers and we just
2  worked our butts off to make it happen.
3    Q.  And what prompted you to want to leave
4  the Macon Group?
5    A.  Are we going back to the Macon -- I was
6  at Paschen before the Macon Group.
7    Q.  I'm sorry, I meant to say the Paschen
8  Group.
9    A.  Oh, well, because I wanted to come back
10  home.  And I spoke to my manager and I said, you
11  know, is there a position for me up in Chicago.
12  And she assured me that there wasn't, and I
13  didn't really have a recourse.  And at that
14  time -- sorry, excuse me.
15      So at the time my dad was going
16  through cancer, and I knew I had to get home, so
17  I just took whatever I could to get home.
18    Q.  And that was in 2012?
19    A.  Yeah.
20    Q.  And do you need to take a minute?
21    A.  I'm fine, I'm fine.
22    Q.  Can we continue?
23    A.  Yeah.
24    Q.  Did your father pass away in 2012?

Page 44

1    A.  I actually honestly -- I don't recall
2  what year he passed away in.  But he was sick,
3  and I couldn't visit him regularly, because of me
4  being out there, and it was on my dime to come
5  home.  So -- but he did pass away very quickly
6  after being diagnosed.
7    Q.  Do you remember what year that is?
8    A.  I -- honestly it was all a blur.
9      (Discussion off the record.)
10  BY MR. BOYLE:
11    Q.  Was your decision to leave the FH
12  Paschen Group a voluntary decision?
13    A.  Yes.
14    Q.  They did not terminate your employment?
15    A.  Correct.
16      Thank you.
17      MR. BOYLE:  Can I have this marked,
18  please.
19      (Document marked as Dziubla Deposition
20  Exhibit No. 9 for identification.)
21  BY MR. BOYLE:
22    Q.  Handing you a document that we've marked
23  as Deposition Exhibit 9.  Do you recognize this
24  document?

Page 45

1    A.  It looks like it's a PDF of my Linkedin
2  profile.
3    Q.  This is a document that you produced to
4  us in discovery.
5    A.  Oh, then I PDF'd it, yeah.
6    Q.  So do I understand you to be saying that
7  this is a copy of your Linkedin resume?
8    A.  Correct.
9    Q.  Is this a current resume?
10    A.  Yeah, it's the same stuff.  It's
11  basically what's up there now.
12    Q.  So this is all information that you
13  provided onto your Linkedin profile; is that
14  correct?
15    A.  Correct.
16    Q.  So I noticed that on this version of
17  your resume you did not include Atlas
18  Restoration.  Is there any reason why you left
19  Atlas Restoration off of this document?
20    A.  Probably just because it was a short
21  duration, and it was kind of not really in line
22  with anything.
23    Q.  Okay.
24    A.  I mean, I'm on good terms with them.

12 (Pages 42 - 45)

Page 46

1  It's not out of resentment or anything.
2      Q.  Okay.  And so on page 1 of the document,
3  you indicate that your dates of employment
4  for J.C. -- at J.C. Anderson were from May of
5  2016 through October of 2017; is that accurate?
6      A.  Yes.
7      Q.  Okay.  And then you immediately began
8  working with Talent Hitch in October of 2017; is
9  that correct?
10     A.  Yes.
11     Q.  And your work with Talent Hitch ended in
12  March of 2018?
13     A.  Correct.
14     Q.  Okay.  And then there -- and then
15  there's an entry here above that where it says
16  confidential construction industry consultant?
17     A.  Yes.
18     Q.  What does that refer to?
19     A.  My current place of employment, the day
20  job.
21     Q.  And you didn't -- so why did you state
22  that that was confidential?
23     A.  So I work for Broadway
24  Electric/Cornerstone Contracting.  And the

Page 47

1  relationships that they've established in the
2  industry, in order to bid on the types of work
3  that we do that is in the public sector, it's in
4  their best interest that the employees don't list
5  where they're at.  Because I wear different hats
6  for them as well as other employees do.  And it's
7  just better that it's left vague.
8          None of the employees in the company
9  actually have updated profiles for that reason.
10  So I figure that was a good way to stay connected
11  to construction; and, you know, when people do
12  look me up, they know that, you know, I'm a real
13  person that's asking them for a proposal and
14  that, you know, that there is some type of good
15  reputation that's associated with me by being
16  online and seeing my history and all that stuff.
17     Q.  So this document is an accurate summary
18  of the positions that you've held during the time
19  period covered --
20     A.  Yes.
21     Q.  -- in the document?
22     A.  Yes.
23     Q.  If you flip to the third page of the
24  document -- I'm sorry, the fourth page of the

Page 48

1  document, which is document Bates No. 938,
2  there's a reference to General Electric.  Do you
3  see that?
4      A.  Yes.
5      Q.  You did not include General Electric on
6  the resume that you had submitted to JCA.  Do you
7  know why that is?
8      A.  I'm not sure.  Maybe it was just a
9  cutoff point that Todd gave me, like, only go
10  back so far or -- I'm not sure.
11     Q.  Well, I'll show you Exhibit 8, which is
12  the resume that you had the recruiter give to
13  JCA.
14     A.  Yeah.
15     Q.  And it includes Jupiter Realty which
16  is -- goes further back.
17     A.  Oh.
18     Q.  So my question is:  Do you know why
19  General Electric was left off of the information
20  that you submitted to JCA?
21     A.  I don't recall.
22     Q.  What position did you hold for General
23  Electric?
24     A.  It was basically a cost controller for

Page 49

1  various job sites in the Indiana area where I
2  traveled from job to job and collected all types
3  of costs that pertain to material costs for the
4  job, hours, submitting that, and then billing the
5  client.
6      Q.  Why did your employment with General
7  Electric end?
8      A.  So I decided to leave there, because I
9  was on the road a lot and I had just gotten
10  married and it didn't seem like it was a good fit
11  for us if I was going to stay on the road if we
12  wanted to have a good healthy relationship.  So I
13  figured I would quit and look for another job.
14     Q.  And did you have a positive experience
15  working for General Electric?
16     A.  The company was awesome.  It was a lot
17  of hours and their pay structure was a little bit
18  different.  They weren't set up really -- you
19  know, they entice you in the beginning in terms
20  of you're going to be working all this overtime,
21  you're getting time and a half, double time.  And
22  then when they sign you on as a full-time
23  employee, like, you end up with a base and then
24  you end up getting commission based on -- I don't

13 (Pages 46 - 49)

Page 50

1  know, there's some criteria that just didn't add
2  up, because I couldn't, like, decide to get more
3  busy. It was up to them if I ever hit my quota
4  in terms of hours, so that I could make that
5  additional money. So if they chose not to let me
6  work more hours, I couldn't hit my quota, so I
7  didn't have a -- I was, like, it's not a win-win
8  situation.
9      Q. Did you let them know that you were
10  dissatisfied with that aspect of your employment?
11     A. I did. I tried to negotiate with them,
12  and I said, well, you know, the only thing I can
13  do, because I'm traveling all the time, is I
14  can't interview if I'm traveling, so I have to
15  go, and they understood.
16     Q. Did you tell the recruiter not to
17  include this in the information that you provided
18  to JCA?
19     A. I don't know why I would.
20     Q. I'm asking if you recall that you did?
21     A. I do not recall saying that to him, no.
22     Q. Okay. And you have no reason -- or no
23  knowledge as to why it was left off?
24     A. No.

Page 51

1      Q. Okay. And when you work with these
2  recruiters, I mean, do you get to approve what
3  they submit to companies that you were trying to
4  get a job with?
5      A. You know, honestly, this stuff happens
6  really fast with these guys, because, you know,
7  they're wheeling and dealing and they want to get
8  their sale, they want to get their 20 percent on
9  you, you know, on your salary and stuff. They
10  want to close. So it's, like -- they basically
11  say, hey, do you trust me, and it's, like, well,
12  yeah, I trust you. They're going to spin it, so
13  that you get the job.
14     Q. Did you review Deposition Exhibit 8
15  before it was submitted to JCA?
16     A. Honestly I don't recall if I did or not.
17     Q. Okay. I'll take this back.
18         So by my count, if we go back to
19  March of 2012 or let's go back to February of
20  2012 when you began with the Macon Group, you've
21  had eight different jobs in the construction
22  industry during that period of time.
23     A. Okay.
24     Q. Each -- and those jobs are averaging

Page 52

1  about one to one and a half years in each job.
2  Would you agree with me?
3      A. Yes.
4      Q. Okay. Why do you believe your tenure at
5  these eight positions has been so short?
6      A. I think a lot of it had to do with life
7  circumstances. Life circumstances and just
8  wanting to pursue a career in construction and
9  set myself up at a place that I knew I could be
10  there for a long time. I mean, it just seemed
11  like opportunity -- either a life circumstance
12  came or an opportunity came. And, you know, you
13  got to pivot.
14     Q. Do you recall telling anybody at any
15  time that you believe you had just become
16  dissatisfied with employers after a six to
17  one-year period of time?
18     A. No, I don't recall that.
19     Q. You don't recall saying that to anybody?
20     A. No.
21     Q. Do you think that that's an aspect of
22  your personality?
23     A. No.
24     Q. Now, you described how your resume was

Page 53

1  given to JCA before you became employed by them.
2  Can you tell me what you recall from how the
3  recruiting process went once they contacted JCA
4  on your behalf?
5      A. How the recruiting -- well, so, I mean,
6  he set up the interview for me to meet with them.
7  I recall not being able to get into the parking
8  lot because it was closed. Met Bill Burfeind,
9  had the interview. Was a little bit taken back
10  that there was -- I think it was Boulukos, Steve
11  Boulukos, Yazbec, and Greg Garland in the room
12  for the interview, which I thought was a lot for
13  a first interview.
14     Q. Do you remember when that interview was?
15     A. A couple months before I started, maybe
16  a month.
17     Q. Okay. And tell me what you remember
18  from the interview?
19     A. I thought it was really strange that
20  Yazbec and Boulukos did all the talking when I
21  would be working for Garland. So it was just
22  interesting that my supervisor didn't have
23  anything to say. But after getting to know Greg,
24  I understood why.

14 (Pages 50 - 53)

Page 54

1    It's just basic questions.  They
2  told me about the company, the history of the
3  company, how long they had been around, what they
4  specialize in, typical stuff.  Went over, you
5  know, my strengths if you'd be able to feel
6  comfortable -- I'd never worked with the unit
7  pricing software that they used.  So I told them
8  I was confident in that.  In terms of volume,
9  too, that was another big concern of theirs.  A
10 volume of bids that they did, because it was all
11 interior, so they -- it was a big turnaround.
12 And I assured them that, you know, having worked
13 for Paschen I could handle volume and paperwork
14 as one of my specialties.
15    So, you know, just a normal
16 interview where they're checking out your
17 strengths and, you know, your -- essentially
18 you're selling yourself, too.
19    Q.  Okay.  Do you recall -- what do you
20 recall your impression being of the company after
21 that initial interview?
22    A.  Very traditional.  I mean, the whole
23 place is laced in dark stained wood.  I mean, it
24 was something that I was very familiar with in

Page 55

1  terms of the industry.  You know, either you go
2  to a place and it's cutting edge and modern, an
3  open floor plan, or you go to a place like JCA
4  and everyone has got an office and a leather
5  chair.  And, I mean, it's just -- I just remember
6  thinking, okay, that's the type of company it is.
7  That's it.
8    Q.  Anything else?
9    A.  No.
10    Q.  Okay.  Was there a follow-up interview
11 after that?
12    A.  That I don't remember.  If it was, it
13 wasn't in person.  I feel like it went -- I know
14 Yazbec and I had a couple emails back and forth
15 and next then thing I knew I was there.
16    Q.  So you don't remember any subsequent
17 interviews?
18    A.  I don't.
19    Q.  Okay.  But you subsequently received an
20 offer to work there?
21    A.  Right, correct.
22    Q.  And who extended the offer?
23    A.  I think it was Mike Yazbec.
24    Q.  And what's his position with the

Page 56

1  company?
2    A.  I don't know.  President.  I'm not sure.
3  Up there, number one in charge.
4    Q.  What -- do you remember what position
5  you were offered?
6    A.  The estimating position.
7    Q.  And you accepted that position?
8    A.  Yes.
9    Q.  Did you accept it right away?
10    A.  I don't know what right away -- I mean,
11 I would say within a couple days, I think.
12    Q.  Was there any negotiation over your
13 compensation that took place?
14    A.  I think Todd did a little something.
15 I'm not sure.  They always try to, you know, do
16 the best they can with it.  It wasn't through me.
17    Q.  So you accepted the position.  It was
18 for an estimating job.  Tell me what your job
19 duties were in that position?
20    A.  So as an estimator for JCA, you
21 basically go to the walk-throughs that you're
22 assigned to, which is checking out the job sites
23 for existing conditions, so that you can put
24 together a thorough proposal.  And unlike other

Page 57

1  companies, a lot of people don't do unit pricing
2  like they do, which is something that Greg had
3  brought in and that I liked, because at -- when
4  you're in a fast pace, you can't always go out to
5  subs for quotes.  And Greg was very good at
6  deriving these unit prices for us, so it made us
7  a little bit more independent and a little bit
8  more fluid when bidding things.
9    So we would basically put
10 together -- we would do our take-offs on the
11 drawings, and then we would put together a draft
12 proposal or estimate of the work that needed to
13 be done using this program that he had, what's
14 the word, loaded all these unit pricing in there,
15 so that, you know, pretty much -- so everything
16 would be done kind of in the same way.  Like, we
17 would all -- if we were all wrong on something,
18 we were wrong the same way every time.
19    And then we would present and work
20 with the project managers based on, you know,
21 logistics of the building, certain things that
22 were specific to a job site that the project
23 managers knew by working with the clients, and
24 adjust the pricing and our conditions and our

Page 58

1  exclusions and stuff accordingly.
2     Q.  Describe this walk-through process that
3  you mentioned?
4     A.  So at the walk-through, you know, you go
5  out there, and it's going to be your competitors,
6  the other general contractors.  You'll have your
7  subs there.  If you have subs that you know for
8  sure are in the building or familiar with working
9  in the building, you're going to make sure that
10  they come down there and they know that you're
11  bidding on the job, so they can have their eyes
12  on it as opposed to just bidding off the plans.
13          It's a way to kind of build
14  camaraderie a little bit and build relationships.
15  If there's new subs out there, you want to make
16  sure you talk to them, you know, let them know
17  you're one of the GCs bidding on it, give them
18  your card, network, talk about jobs that you're
19  on with them.  It's very -- I don't know, you go
20  out there and, you know, you build relationships
21  and you hang out, you make friends.  And you
22  basically walk -- you walk the site and take
23  pictures and stuff and document, you know, do the
24  job part of it.  But it's very much about

Page 59

1  being -- representing, you know, the company to
2  the client and representing the company to the
3  subs, because they're the ones that give you the
4  numbers which gets you your jobs.
5     Q.  So the client's there.  The subs are
6  there.
7     A.  Yeah.
8     Q.  You mentioned the other companies that
9  you're competing with are there?
10     A.  Yep.
11     Q.  Anybody else there?
12     A.  Usually the building engineer will be,
13  too, because he -- he or she knows their way
14  around the building.
15          I'm trying to think who else.
16  That's basically -- those are the key players,
17  you know, that you want to have there, so that
18  you get good bids and numbers.
19     Q.  And how many walk-throughs -- just take
20  an average month during your employment with JCA,
21  how many average -- how many walk-throughs would
22  you be assigned to go to?
23     A.  I mean, there were times where we were
24  bidding -- you know, we had multiple projects

Page 60

1  bidding on a day.  So, I mean, sometimes it would
2  be three or four walk-throughs a week, and
3  sometimes it wouldn't be -- it just depends how
4  we got assigned.
5          Greg was our supervisor.  So, like,
6  if somebody had a tight bid, you know, I might do
7  a walk-through for Tim and come back and give Tim
8  all my photos.  And then Tim would do a
9  walk-through for me and come back with no photos.
10  But, you know, we would -- sorry, I just thought
11  it was hilarious.  That's -- it's just how our
12  schedules would open up, what we had on our
13  plate.  Greg was good about making sure that, you
14  know, we weren't -- that we were balanced, you
15  know, and that we were getting each other's back.
16  We were very tight, the three of us.
17     Q.  So who is Tim?
18     A.  Tim's the other -- another estimator.
19     Q.  Okay.  You were -- was there any other
20  estimators other than you and Tim?
21     A.  I think Ed Bowen and Mike Stazinski were
22  considered estimators, air quotes.
23     Q.  Why do you say air quotes?
24     A.  Just because I think they didn't

Page 61

1  really -- to my knowledge, they didn't really go
2  on as many walk-throughs as we did.  We seemed to
3  get the brunt of the interior work, and I think
4  they were allocated to more specific clients.  So
5  they might have been more project management,
6  too.  I think they just kind of filled whatever
7  needs JCA needed them for.
8     Q.  Did they -- did Ed and Mike report to
9  Greg?
10     A.  I'm not sure about that honestly.
11     Q.  But you and Tim reported to Greg?
12     A.  Yes.
13     Q.  So is it fair to say that you and Tim
14  were the primary estimators and that Ed and Mike
15  did some estimating, but it was more job
16  specific?
17     A.  I would say I -- that's a fair
18  statement, yeah.
19     Q.  Okay.  So is Tim the only other person
20  in the company that did --
21     A.  What I did.
22     Q.  -- pretty much exactly the same thing
23  that you were doing; is that --
24     A.  Yes, yes.

16 (Pages 58 - 61)

Page 62

1    Q.  Okay.  And then the walk-through then is
2  essentially the first step in the process which
3  ultimately leads to JCA getting the business; is
4  that fair to say?
5    A.  Well, in putting together a proposal.
6  That's the first -- you want to put together an
7  accurate proposal, and you can't do it if you, A,
8  have crappy relationships with your subs, because
9  then they're going to give you a high number and
10  then your number is high.  And, B, you want to
11  have a good understanding of the existing
12  conditions, because that can determine whether or
13  not you're going to make money on the job.  I
14  mean, you can bid it low and then all of a
15  sudden, it's, like, oh, we didn't know the
16  freight is all the way, you know, on the east
17  side of the building.  So then it costs you more
18  money to get the job done and then you lose
19  money.
20        So it's about putting together the
21  proposal and then hopefully it's there, it's the
22  PMs that get -- it's the PM's job to get the job.
23  It's on -- build the relationships and get the
24  jobs.  We're just the number people basically.

Page 63

1    Q.  So when you were working for JCA, you
2  were expected to -- you were given some
3  employment policies and procedures that you were
4  expected to follow; is that accurate?
5    A.  They gave us a binder when I was --
6  started.  It was called, I think, an employee
7  handbook or something.
8      MR. BOYLE:  If we could get this marked,
9  please.
10        (Document marked as Dziubla Deposition
11        Exhibit No. 10 for identification.)
12  BY MR. BOYLE:
13    Q.  So I've handed you what we've marked as
14  Exhibit 10, ask you to take a moment to scan
15  that.  We received this from you in discovery.
16  My first question is going to be:  Is this a copy
17  of the binder that you received when you began
18  your employment?
19    A.  I think it's one of the things in the
20  binder.  There's a lot of stuff in there for
21  training purposes, and it's, like -- it's one of
22  the things.
23    Q.  Okay.  And is it fair to say that this
24  contains some of the policies and procedures that

Page 64

1  applied to your employment while you were
2  employed by JCA?
3    A.  Yeah.  Honestly I never really read it.
4    Q.  You never read the document?
5    A.  (Nodding).
6    Q.  Did you ever refer to it during your
7  employment?
8    A.  (Nodding).  Not that I recall.
9    Q.  Okay.  So did you take any -- did you
10  care what was in the document?
11    A.  I did care honestly; but as soon as I
12  got started there, I mean, we hit the ground
13  running.  And I was just -- you know, I don't
14  know, I'm, like, I'll -- if I need it, I'll look
15  at it.  I mean, it's all here.  Whenever I need
16  to refer to it, I'll look -- you know, it's just
17  basic policies.
18        You know, I knew they had a really
19  strict dress code, so I made sure I adhered to
20  that when I was out, you know, in public, and --
21    Q.  So you understood that the policies in
22  here you were expected to follow.  It's just you
23  only referred to it if you needed to review a
24  particular policy; is that --

Page 65

1    A.  Yeah, if I thought I didn't understand
2  something, I knew I could go back and refer it --
3  refer to it, but I never, like, went through it
4  and studied it.
5    Q.  Can you flip to page 1048, Dziubla 1048.
6  Are you there?
7    A.  Yes.
8    Q.  Okay.  So directing your attention to
9  the highlighted portion of the second paragraph.
10    A.  Okay.
11    Q.  The sentence reads, Your employment is
12  at will, meaning that either J.C. Anderson or the
13  employee can end the relationship at any time for
14  any reason or without cause -- with or without
15  cause or prior notice.  Did you see that?  Did
16  you see that where I'm reading from?
17    A.  Right now?
18    Q.  Yeah.
19    A.  Yes, I see that right now.
20    Q.  All right.  And did you know you were an
21  at-will employee while you were employed by
22  JCA -- Anderson?
23    A.  Illinois is an at-will state, isn't it?
24  I believe so.

17 (Pages 62 - 65)

Page 66

1    Q.  I'm asking you if you knew if you --
2   that you were an at-will employee while you were
3   at JCA?
4       A.  Yeah.
5       Q.  So can you flip to 1095.  And this page
6   contains JCA's confidentiality policy, correct?
7       A.  Yes.
8       Q.  Okay.  And did you understand that while
9   you were employed by JCA that you would have
10  access to and come into contact with confidential
11  information belonging to the company?
12      A.  As far as, like -- I don't understand.
13  Like, in terms of, like, social security numbers
14  and stuff or --
15      Q.  Business information that was developed
16  by JCA that they used in connection with how they
17  bid jobs.
18      A.  Yeah, everybody has that.  Every company
19  has their way of doing things.
20      Q.  Okay.  So JCA was no different, correct?
21  They had their way of doing things.  I think you
22  mentioned some program that Greg had --
23      A.  Right.
24      Q.  -- that that was how you guys --

Page 67

1       A.  Yes.
2       Q.  -- developed your bids, right?
3       A.  Correct.
4       Q.  And that was unique or proprietary to
5   JCA, correct?
6       A.  It -- yeah.
7       Q.  Did you understand, whether or not you
8   read this policy, that you had an obligation to
9   keep that type of thing confidential, not share
10  it with other companies?
11      A.  Yes.
12      Q.  Okay.  Would -- strike that.
13          If you could flip to page 1085.  Do
14  you see on that page the policy that relates to
15  return of company property?
16      A.  Yes.
17      Q.  And you agree that the provision
18  provides that upon termination of your employment
19  that you were required to return all company
20  property to JCA?
21      A.  Yes.
22      Q.  Okay.  Did you understand that company
23  property would include documents like we've
24  discussed, the proprietary bidding process that

Page 68

1   JCA would follow?  Is that JCA's property?
2       A.  Yes.
3       Q.  Okay.  And the documents that they
4   use -- that you internally would use as an
5   estimator to develop your proposal for a client,
6   those documents, that was JCA property, correct?
7       A.  Sure.
8       Q.  Things like if they had a list of the
9   subcontractors and all the contacts that they
10  developed with those subcontractors, that would
11  be JCA's property, correct?
12      A.  Well, I mean, half the people on that
13  list are people I worked with before in the past.
14  They can't just take ownership of the subs.  I
15  mean --
16      Q.  Well, if they had -- go ahead.
17      A.  Well, I'm just saying, like, it's --
18  when you're in the industry for a while, you know
19  what people are good at and what other -- and
20  what subs aren't.  So, I mean, in terms of, like,
21  a sub list, like, it's not like I'm never going
22  to call a sub and ask them to not -- I'm not
23  going to, like, not work with them.  I can't
24  forget I ever knew them, because I knew them

Page 69

1   prior.  I met them, I mean.
2       Q.  But to the extent JCA compiled its own
3   list of the subs that they preferred and had
4   contacts with --
5       A.  That particular list is theirs, yeah.
6       Q.  Okay.  And did you have that kind of
7   information in your possession when you left the
8   company?
9       A.  Maybe by way of emails and stuff.  If I
10  needed a -- I know sometimes, like, if email went
11  down or -- yeah.
12      Q.  So the --
13      A.  Yeah, I did have that.
14      Q.  And did you return it to the company at
15  the time your employment ended?
16      A.  Didn't think about it when it was --
17  everything was going on.
18      Q.  So the answer is no, correct?
19      A.  Correct, the answer is no.
20      Q.  Okay.  And why not?
21      A.  I didn't think about it with everything
22  that was going on.  I was trying to figure out
23  how I was going to find a job.
24

18 (Pages 66 - 69)

Page 70

1    (Document marked as Dziubla Deposition
2    Exhibit No. 11 for identification.)
3    MR. SEDAEI:  Is this a good time to take
4    five?
5    MR. BOYLE:  That's fine, sure.
6    THE VIDEOGRAPHER:  We are going off the
7    record at 11:35 a.m.  This is the end of media
8    set 1.
9    (A short recess was taken.)
10   THE VIDEOGRAPHER:  We are back on the
11   record at 11:48 a.m.  This is media set 2.
12   BY MR. BOYLE:
13   Q.  Okay.  Ms. Dziubla, when we broke, I had
14   handed you a Company Exhibit 11.  Have you had a
15   chance to take a look at that?
16   A.  Oh, no, I haven't looked through it.
17   Q.  I just need you to glance at it.  You
18   produced this to us in discovery.  Do you
19   recognize the document?
20   A.  Yeah.
21   Q.  And I just need you to confirm you did
22   not return this to the company until your
23   attorneys gave it to us in connection with this
24   lawsuit; is that correct?

Page 71

1    A.  Correct.
2    Q.  Okay.  I'd like to have you flip to
3    page 1129 of the document.  Do you see that page?
4    A.  Yes.
5    Q.  Okay.  So is it fair to say that this
6    document contains all of JCA's processes and
7    procedures for bidding on its customers' work?
8    A.  Yeah.
9    Q.  And if -- I'm going to have you flip
10   again forward to page 1146.  What is that page?
11   A.  Looks like a sub list.
12   Q.  Okay.  And there's individuals named
13   from -- at each of these subcontractors; is that
14   correct?
15   A.  Yes.
16   Q.  And those are the contacts that JCA has
17   developed with the individuals that are listed,
18   correct?
19   A.  Yes.
20   Q.  Can you flip forward again to page 1207.
21   Now, is this actually a templet of the actual
22   contract that JCA enters into with its customers
23   once the -- once an agreement is reached?
24   A.  I honestly -- I wouldn't know.  I wasn't

Page 72

1    part of that process at the company.
2    Q.  But you do agree that you didn't return
3    any of this information to the company after your
4    employment was terminated, correct?
5    A.  Honestly I didn't know that I had to.
6    Q.  Okay.  So when you began working for
7    your next employer Talent Hitch --
8    A.  Yes.
9    Q.  -- did you bring this document with you?
10   A.  No.
11   Q.  Have you shared any of the information
12   in this manual with any other individual?
13   A.  No.
14   Q.  Okay.  Do you have this document with
15   you at your current position with Cornerstone
16   Consulting?
17   A.  No.
18   Q.  Have you shared the document with
19   anybody at Cornerstone Consulting?
20   A.  No.
21   Q.  Have you used or relied on any of the
22   information in this exhibit in connection with
23   any of your subsequent employment?
24   A.  I don't understand that question.

Page 73

1    Q.  Have you used any of the information or
2    documents contained in Company Exhibit 11 in
3    connection with the services you've provided to
4    anybody other than JCA?
5    MR. SEDAEI:  Objection, form.
6    But answer if you understand.
7    BY THE WITNESS:
8    A.  The actual specific documents, no.  The
9    knowledge I have of the industry, yes, which
10   happens to be, like I said, relationships with
11   subs.  I'm not going to just cut my own throat
12   and not use relationships I've built over the
13   years that I've worked in the industry.  So but
14   did I, like, use their sub list -- which, by the
15   way, this sub list is, like, a generic sub list.
16   It's changed, like, ten times when I was working
17   there.  But did I use that sub list and
18   specifically call those people, no.
19   BY MR. BOYLE:
20   Q.  Okay.  And did you refer to any of the
21   procedures in here while you were performing
22   services for anybody other than JCA?
23   A.  No.
24   Q.  Okay.  We at this time would make a

19 (Pages 70 - 73)

Page 74

1 formal request to you and your attorney for you
2 to return all documents that you have in your
3 possession that belong to JCA.
4    A.  Okay.  You can have them.  Yeah.
5    Q.  And do you understand that the
6 procedures that are contained in Company
7 Exhibit 11, you know, we have a right to pursue
8 legal claims if we believe that there is
9 additional documents in your possession that you
10 failed to return?  Do you understand that?
11        MR. SEDAEI:  Objection, calls for a
12 legal conclusion.
13        But answer if you know the answer.
14 BY THE WITNESS:
15    A.  What was the question again?
16 BY MR. BOYLE:
17    Q.  Do you understand that we have a legal
18 right to pursue you for your failure to return
19 these documents to the company?
20    A.  These specific documents which I've
21 already given to you guys?
22    Q.  As well as any other company property
23 that you may have in your possession that you
24 didn't think to return on your departure.

Page 75

1    A.  Everything that I was asked to return I
2 returned.
3    Q.  Well, we have two examples here that you
4 didn't return.
5    A.  I wasn't asked to return them.  I didn't
6 know I needed to return them.  If you would have
7 said, hey, Ro, send back that binder we gave you,
8 I would have sent it back.  I didn't know it
9 needed to go back.
10    Q.  Is it just your understanding that when
11 you leave an employer you have no obligation to
12 return the property that was given to you by that
13 employer?
14        MR. SEDAEI:  Objection, mischaracterizes
15 the testimony.
16        But answer if you understand it.
17 BY THE WITNESS:
18    A.  I think the last question answered it.
19 If I was asked to give it back, I would have
20 given it back.  It's not like I was withholding
21 anything.  I returned all -- everything he asked
22 me to return I gave him back.
23 BY MR. BOYLE:
24    Q.  Now, you mention that your direct -- I

Page 76

1 can take that back.
2    A.  Oh.
3    Q.  Your direct supervisor while you
4 worked -- well, strike that.
5        Let me ask you first.  You explained
6 what you've done, what you were responsible for
7 doing as an estimator, while you were employed by
8 JCA.  Did that ever change?  Did the content of
9 your job ever change over the course of your
10 employment with JCA?
11    A.  It was pretty consistent.
12    Q.  Okay.  And your direct supervisor was
13 Greg Garland, correct?
14    A.  Correct.
15    Q.  How would you describe your relationship
16 with Mr. Garland?
17    A.  I would have to say it was great.
18    Q.  And was that throughout your employment
19 with the company?
20    A.  Yeah, absolutely.  He was somebody I
21 confided in.  We used to do -- we tried to get a
22 wellness program going at the company by running.
23 We went out for Sushi Thursdays at Jewel.  I
24 mean, we hung out all the time.  If I needed

Page 77

1 somebody to talk to or an ear, I could call Greg.
2 He was very supportive.
3    Q.  Does it continue to be good to this day?
4    A.  I don't talk to anyone there because of
5 this.  I lost a lot of relationships and a lot of
6 friendships because of this.
7    Q.  So as far as you know, does your
8 relationship with Mr. Garland remain on good
9 terms?
10    A.  As far as I know, yeah.
11    Q.  And what did you think of Mr. Garland as
12 far as his supervisory skills?
13    A.  I know he didn't like being the bad guy,
14 you know, but he was very knowledgeable in what
15 he did and under a lot of stress for sure.  So
16 sometimes things didn't come off as polished as
17 he would have liked it.  But it's just kind of
18 par for the course.  He had a lot on his plate
19 and he was very good at what he did.
20    Q.  Did you -- was your work supervised by
21 anybody other than Mr. Garland while you were at
22 the company?
23    A.  I want to say to an extent the project
24 managers kind of helped out with in terms of

20 (Pages 74 - 77)

Page 78

1    making sure that, you know, any documents that
2    were leading our proposals and stuff were going
3    to make the company money. So if they had
4    something to say or experience-wise, you know,
5    they would share that kind of as -- I don't know
6    if it was supervising, but, I mean, they -- our
7    proposals didn't go out unless the PM signed off
8    on it. So, yeah, they would mark it up. If it
9    was wrong, they would mark it up. So that is
10   kind of supervising.
11       Q.   Anybody other than the project managers
12   that supervised your work?
13       A.   No. And I think they're called project
14   executives there, but, yeah. No, that's it as
15   far as I know.
16       Q.   Okay. You mentioned Steve Boulukos,
17   Boulukos?
18       A.   Boulukos.
19       Q.   Did he have supervisory involvement with
20   your job?
21       A.   Well, he was -- I think he was Greg's
22   boss. So, like, shit hit the fan, I mean, Steve
23   was involved for sure. If he didn't approve of
24   something that was going on, he made sure that,

Page 79

1    you know, the message came down, you know, the
2    lines of communication.
3        Q.   And how would you describe your working
4    relationship with Steve?
5        A.   I mean, cordial. We, you know,
6    definitely didn't have the same amount of touch
7    points as Greg and I did. I didn't see him on a
8    daily basis even though, you know, we're in close
9    proximity to each other. But, yeah, it was
10   always cordial, friendly, you know, weather talk
11   and lunchroom. He seemed very supportive.
12       Q.   How would you describe your -- did you
13   enjoy working at J.C. Anderson?
14       A.   I did actually. That whole relationship
15   I had with Tim and Greg was something I had never
16   had anywhere else. And, you know, you have your
17   things that you bitch about to your coworkers.
18   But other than that, I mean, it was, like, I felt
19   very confident about my responsibilities there.
20   I knew that if I had a question, I could go to
21   Greg and he wasn't going to just blow me off,
22   like, some -- you know, sometimes happens. I
23   mean, like, he was a mentor. So, yeah, really --
24   I mean.

Page 80

1        Q.   And did what you just described apply
2    throughout your employment at JCA, or was there a
3    point in time when you came to be unhappy working
4    there?
5        A.   You know, we talked about a couple
6    issues. There were things that Greg wanted to
7    accomplish in the company that he was frustrated
8    with, that we all kind of just shared
9    conversations on. But it wasn't, like,
10   detrimental to me working there. It wasn't like
11   I couldn't go on. I mean, I knew I had Greg and
12   I -- you know, Tim and I had each other's back.
13       Q.   What issues are you referring to?
14       A.   Just, I mean, you know, company politic
15   stuff. You know, Steve wants to do something one
16   way and the guys are, like, you know, we think --
17   you know, Greg wants to do it a different way.
18   He thinks it would be better, would be more
19   profitable. And, you know, the owner of the
20   company says do it one way, you do it that way.
21   You know, you grumble, grumble about it, and you
22   move on.
23       Q.   So was there ever a point, though, where
24   you ceased to enjoy working at JCA?

Page 81

1        A.   No.
2        Q.   Okay. So it's your testimony that you
3    were happy working at JCA right up until the end
4    of your employment?
5        A.   I had no plans for leaving, not at all.
6        Q.   That wasn't my question.
7        A.   I was happy, yes.
8        Q.   Now, do you recall in July of 2017, so
9    approximately three to four months before the --
10   your departure from the company, having a series
11   of confrontations with your supervisors and
12   coworkers regarding your work performance?
13       A.   No.
14       Q.   Do you know an employee by the name of
15   Seth Ehrlich?
16       A.   Yes.
17       Q.   And what was Mr. Ehrlich's position with
18   the company?
19       A.   I think he was a project executive.
20       Q.   So is he one of these individuals you
21   described that might have input into the
22   estimating work that you were doing?
23       A.   Yes.
24           MR. BOYLE: Have this marked, please.

21 (Pages 78 - 81)

Page 82

1      (Document marked as Dziubla Deposition
2          Exhibit No. 12 for identification.)
3  BY MR. BOYLE:
4      Q.  So we've handed you what we've marked as
5  Deposition Exhibit 12, and ask you to take a look
6  at that and let me know when you've had a chance
7  to read it.
8      A.  Okay.
9      Q.  Do you recognize this email?
10     A.  Not really -- I mean, vaguely.  I mean,
11 obviously I wrote it.  I mean, I don't remember.
12 I'm trying to recall what it was in response to.
13     Q.  And you sent it to Steve Boulukos and
14 Mike Yazbec, correct?
15     A.  Yes.
16     Q.  And they were the two top executives at
17 the company at the time?
18     A.  Yes.
19     Q.  Okay.  And you say you don't remember
20 what this email was about?
21     A.  I don't know what prompted me to -- I'm
22 trying -- like I said, I'm trying to recall.
23     Q.  So let me direct your attention to the
24 sentence that says, I take a lot of pride in what

Page 83

1  I do and to hear that my very best was received
2  in the way Seth portrayed offended me.  I
3  appreciate you both taking time to hear my side.
4      Does that help to refresh your
5  recollection as to what was going on?
6      A.  I don't remember the circumstances.
7      Q.  So you don't remember any incident that
8  was occurring with respect to the way Seth
9  Ehrlich was characterizing your work?
10     A.  Not -- I mean, not with respect to this
11 email.  I don't know what this email is
12 referencing, what incident it's referencing --
13     Q.  Okay.
14     A.  -- with him.
15     Q.  Do you recall why you felt the need to
16 send this email to the two top executives at the
17 company?
18     A.  Well, I mean, so you make it sound
19 like -- I mean, Mike and Steve have an open-door
20 policy, too.  You know, you could always walk in
21 there and talk to them.  It's not, like, you
22 know, this was sent through, like, up a chain, a
23 memo chain.  I could just walk down the hallway.
24     I felt -- I mean, they were the next

Page 84

1  people to talk to, is Greg, then them.  I mean, I
2  didn't -- and they were also the people that
3  were -- they did my review and all that stuff and
4  that was positive.  So, like, I mean, they're
5  my -- I didn't see any -- it's not like I was
6  going to the highest of powers.  I mean, they're
7  just the next -- they're just the people I talked
8  to.
9      Q.  And where you say you meant no
10 disrespect, do you have any recollection of what
11 you were referring to when you said you meant no
12 disrespect?
13     MR. SEDAEI:  I'm going to object since
14 the questions have been asked and answered.
15     But you can answer again if you have
16 an answer to the question.
17 BY THE WITNESS:
18     A.  I really don't know what this is in
19 reference to.
20 BY MR. BOYLE:
21     Q.  Okay.  Can I have that back.
22     (Document marked as Dziubla Deposition
23          Exhibit No. 13 for identification.)
24

Page 85

1  BY MR. BOYLE:
2      Q.  So I've handed you what we've marked as
3  Deposition Exhibit 13, and I'll state that this
4  is a document that your attorneys produced to us
5  in discovery.  Take a moment to review the
6  document, please.
7      A.  Okay.
8      Q.  Do you remember sending this email to
9  Mr. Boulukos?
10     A.  Yes.
11     Q.  Okay.  Why don't you tell me what this
12 incident related to?
13     A.  I'm trying to figure out the whole thing
14 with the Excel.  So we have -- so when we did
15 proposals, there was templets.  And it's up to
16 the estimators to use the most latest templet,
17 which, you know, differed depending on what
18 project it was.  You know, some of the PMs would
19 say -- you know, you'd use a templet that they
20 used on another job, just because, like, why go
21 back to the original templet when it's just going
22 to be another templet for the same client.  Like,
23 why not just use that.  But sometimes there would
24 be outdated exclusions or clarifications that

22 (Pages 82 - 85)

Page 86

1  they would make to the overall general templet,
2  and stuff would just kind of get muddled
3  sometimes when putting things together.
4          I'm trying to recall the whole --
5  hold on.
6          I don't recall all the different
7  processes that -- right now, you know, just
8  because it's been a couple years. But it sounds
9  like I had something that needed to get update to
10 signify what stage I was in the bid. And you
11 couldn't go in there to update it if somebody was
12 in it. So it was really frustrating, because,
13 like, you know, you have a break in your
14 schedule. And you're, like, okay, I'm going to
15 go in there and update; and you're, like, damn
16 it, somebody's in it. And then you'd have to go
17 back. And if you forgot or something else took
18 your attention away, it just didn't get done.
19         And I don't know, Steve sent out
20 this email, and I just -- I wrote him back. And
21 I was just, like, I don't -- I felt like the
22 email was talking down to me and our group. It
23 was kind of condescending. And I just wanted to
24 say, hey, man, you know, I'm doing the best I

Page 87

1  can. And, you know, I just learned how to do
2  this. I'm doing -- I don't think I should be --
3  I should get an email like this.
4          The minute I sent it, Greg leaned
5  over and he was, like, that's it, we're going to
6  have a meeting. So I immediately got called into
7  the office, I think -- or, no, he called me over
8  and basically told me not to send anymore emails
9  like to this to Steve at Steve's direction.
10 Q.   Okay. So let me ask you about that. So
11 first of all, let's take a step back.
12 A.   Okay.
13 Q.   So the first email on this document is
14 Steve sending out an email to you, Greg Garland,
15 Ed Bowen, and copying Mike Yazbec, correct?
16 A.   Yes.
17 Q.   And the content of his email is that he
18 doesn't like that -- the way this estimating
19 sheet that you just described is being updated,
20 correct?
21 A.   Yeah.
22 Q.   Is that fair?
23 A.   Yeah.
24 Q.   Okay. And he's sending this out to the

Page 88

1  group stating if anybody, you know, has
2  difficulty with what my expectations are, please
3  let me know; is that correct? He sent this to --
4  A.   Yeah, I'm actually -- I mean, I just
5  noticed it now that it's just to Ed and me. I
6  mean, there's still Mike Stazinski. And I don't
7  know why Tim and Mike were left off of it. It
8  must have been something we were working on, Ed
9  and I were working on.
10 Q.   And it's also to Greg?
11 A.   And to Greg, right.
12 Q.   Right.
13 A.   But it's not our whole team.
14 Q.   Right. And so you felt that you needed
15 to respond to this directly to Steve, so you sent
16 your email to Steve alone, correct?
17 A.   Right.
18 Q.   Okay. And Steve is the second highest
19 ranking executive at the company, correct?
20 A.   Yeah. I didn't think he needed to have
21 an audience with what I wanted to say to him. I
22 honestly did it out of respect.
23 Q.   Well, your last sentence in your
24 response says, I really don't think any of my

Page 89

1  efforts warrant getting emails like this,
2  correct? Is that what your definition of showing
3  respect to the --
4  A.   Yeah.
5  Q.   -- management --
6  A.   I think it's me standing my -- I'm just
7  saying to him -- I mean, the subject email is
8  why. I mean, the way it's phrased and
9  everything, I think I have -- I mean, that's why
10 they -- you hire somebody with the experience
11 that they have and you expect them to have a
12 voice, right? I mean, I don't think I was rude.
13 I don't think I was disrespectful or anything. I
14 just addressed him personally and said, hey, you
15 know, I'm doing the best I can. I'd appreciate
16 it if you wouldn't send emails like this. I
17 don't think there's anything wrong with what I
18 said.
19 Q.   Okay. And so following your sending
20 this email, you described a conversation that you
21 had -- Greg came to you and told you --
22 A.   Like, as soon as the email went out,
23 like, no -- within three minutes Greg and I could
24 see each other in the office the way it was set

23 (Pages 86 - 89)

Page 90

1  up. Within three minutes, he leaned over and he
2  was, like, don't send out anymore emails. So
3  within, like, two seconds, my email went to
4  Steve, Steve forwarded it to Greg or called him.
5  And Greg was, like, don't send out emails like
6  that anymore. And I was, like, why can't I
7  respond to Steve's email to me and his way with
8  an email back saying, hey, you know, I'm just --
9  why can't I respond back to him. I don't
10  understand. He's just, like, just don't do it
11  anymore.
12      Q. So Steve was not happy with the manner
13  in which you responded to his email?
14      A. I guess not.
15      Q. Was there -- did you from that point
16  forward refrain from sending that kind -- those
17  types of emails?
18      A. As far as -- I mean, as far as I know.
19      Q. And you said something about you were
20  supposed to deal with Greg or something. I might
21  have misunderstood. You were supposed to -- from
22  that point forward, your contact was supposed to
23  go through Greg?
24      A. No.

Page 91

1      Q. No. Okay. I thought I -- I may have
2  misunderstood that.
3          Did this -- subsequent to this
4  email, did your relationship with Steve change at
5  all?
6      A. I mean, we didn't -- it's not like we
7  had a relation -- like, a relationship where,
8  like, Greg and I did. I mean, I would still go
9  into there and talk to him about stuff. I was
10  never -- I wasn't, like, hostile towards him or
11  anything. I still treated him with respect,
12  still watched whatever TV show they had on in the
13  lunchroom and cracked jokes, I mean.
14      Q. Did you ever have any discussion with
15  this email -- about this email with Steve?
16      A. No.
17      Q. What did Greg tell you about the email
18  other than you shouldn't send emails like this
19  anymore?
20      A. Don't piss off Steve by sending emails
21  like this.
22      Q. Anything else?
23      A. That's pretty much it. He was just,
24  like --

Page 92

1      MR. BOYLE: Can I get this exhibit
2  marked, please.
3          (Document marked as Dziubla Deposition
4          Exhibit No. 14 for identification.)
5  BY MR. BOYLE:
6      Q. Handed you what we've marked as
7  Deposition Exhibit 14. Do you recognize this
8  document?
9      A. Yes.
10      Q. Can you tell us what it is?
11      A. It's something on social media. Looks
12  like it's on Instagram. Yeah, I had a -- they
13  always say when -- well, Rodan & Fields is an
14  MLM. And, like, when you start those kinds of
15  things, they're, like, you should have a kick-off
16  party at your house. Like, two people came. So
17  but, you know, you don't say that on social
18  media. Instead you're, like, well, this was
19  great. It was great, you know.
20          So, yeah, it's just basically what
21  you do with social media when it comes to
22  advertising for, you know, Woderation and Rodan &
23  Fields.
24      Q. So what is -- let's step back. What is

Page 93

1  Woderation?
2      A. Woderation is a company that I
3  started -- I want to say I think everything
4  started in July of 2017. That's basically
5  evolved from just being online fitness training
6  to actually working with women, being an advocate
7  for women's health in the construction industry.
8  I've narrowed it down to that, where all my
9  clients are women in the construction industry,
10  and I help them find a medium to being healthier.
11      Q. And is that the side business you
12  referred to?
13      A. Yes.
14      Q. And you're continuing to -- in your
15  efforts to try to grow that business, correct?
16      A. Correct.
17      Q. Okay. And this Exhibit 14 is a social
18  media posting regarding the launch or the
19  start-up of Woderation?
20      A. Yeah. More or less, like, Rodan &
21  Fields. But, yeah, the start of me, like, trying
22  to start a business.
23      Q. Okay. And who is Rodan & Fields?
24      A. It's an MLM. It's like Avon or Mary Kay

24 (Pages 90 - 93)

Page 94

1  or it's just a Gotera.  I mean, it's just an MLM,
2  cosmetics.
3      Q.  I'm going to switch gears a little bit
4  and we're going to talk about the golf outing you
5  attended on September 18th of 2017.  Do you
6  remember that golf outing?
7      A.  Yep.
8      Q.  Okay.  The outing is referred to as The
9  Kev, correct?
10     A.  Correct.
11     Q.  Tell me what is your -- what is The Kev
12  in your understanding -- to your understanding?
13     A.  From what I remember, I think the -- I
14  believe Kevin is short for -- or Kev is short for
15  Kevin, which used to be, I want to say, the CFO
16  of JCA many moons ago who died from pancreatic
17  cancer.  And The Kev is a fundraising event.  I
18  don't know if it's sponsored by JCA, but it's a
19  fundraising event that takes place to help the
20  family with financial -- so they do, like, silent
21  auctions, and it helps them raise money for his
22  daughters and his family, so that they can
23  continue to do what they do.  It's a charity
24  event for that family.

Page 95

1      Q.  Okay.  And you attended the event on
2  September 18, 2017; is that correct?
3      A.  Yes.
4      Q.  All right.  Had you attended the
5  previous year?
6      A.  Yes.
7      Q.  Okay.  So with respect to the event on
8  September 18, 2017, let me start by asking were
9  you golfing that day?
10     A.  Not, like -- no, I was just -- my goal
11  there was to actually take pictures, because -- I
12  can't remember if Lauren was going to be there,
13  their marketing person.  But it wasn't -- I
14  wasn't there to golf.  I was basically there to
15  network, because I can't golf.  I don't know how
16  to golf.
17     Q.  Okay.
18     A.  So, yeah, I was there to network.  That
19  was my goal; and then if it came down to, like,
20  shooting a couple, because the guys were, like,
21  hey, you know, try this hole or whatever, I would
22  do it.  But I wasn't there to, like, score or
23  anything.
24     Q.  Okay.  And this is a voluntary event?

Page 96

1      A.  Yes.
2      Q.  Okay.
3      A.  You're highly encouraged to go.  But,
4  yeah, it's voluntary.  If you didn't go, it
5  wasn't a big deal.
6      Q.  Okay.  And, in fact, hadn't you decided
7  to go at the last minute?
8      A.  I did.  I decided to go at the last
9  minute, and I made a donation to kind of help
10  support the cause because -- yeah, it's a
11  networking event and you should go.  Rachael
12  talked me into it.  She goes all the time.  We
13  were kind of close.  So she was, like, hey, you
14  can hang out with me and, you know, whoever she
15  hangs out with.
16     Q.  Who did you -- I'm sorry, you might --
17  this might have just been in part of your answer,
18  but who did you go to the event with?
19     A.  I know the agreement was -- so my car
20  was getting detailed that day.  So they had a
21  shop that worked on all of our cars or -- or some
22  kind of relationship with the detail shop.  So
23  the plan was that I would leave my car at JCA's
24  parking lot, and I would go -- I think I went

Page 97

1  with Rachael and she was going to take me back,
2  but she couldn't because she left because she got
3  drunk.  So I think I came with her.  Maybe one
4  other person might have come with in the car.  I
5  don't remember.  But I got there in somebody
6  else's car.
7      Q.  And who is Rachael?
8      A.  She is, I don't know, accounting.
9      Q.  She's a JCA employee?
10     A.  Correct.
11     Q.  Are you friends with Rachael?
12     A.  No.
13     Q.  Were you friends?
14     A.  Not anymore.
15     Q.  Were you friends with her at the time?
16     A.  At that time, I thought we were, yes.
17     Q.  Why are you no longer friends?
18     A.  Honestly when all this stuff happened,
19  like I said before, I just kind of cut ties with
20  everyone, just for everyone's best interest.  I
21  didn't want her to get tied up in it either.  So
22  just kind of looking out for her best interest,
23  she had some things she was struggling with.  I
24  didn't want to add anything to her plate.  So I

25 (Pages 94 - 97)

Page 98

1  just cut everyone off.
2      Q.  So do you remember when you arrived at
3  the outing?
4      A.  Probably at a reasonable -- well, before
5  everything kicked off.  I mean, I think it's --
6  I'm trying to think if it was lunch, you come in
7  for lunch, then you go out for golf, and then you
8  come in for dinner.  So it was definitely before
9  lunch, because I was able to eat and stuff.
10  Yeah, right around when stuff was supposed to
11  kick off, noon.
12      Q.  And what do you recall from the point --
13  so you recall having lunch?
14      A.  Yeah.
15      Q.  Okay.  Were you with anybody at that
16  point in time?  Who did you have lunch with?
17      A.  I don't remember who was at my table.
18      Q.  Okay.
19      A.  Honestly.
20      Q.  Okay.  Once you and Rachael -- you think
21  Rachael and you arrived together, did you stay
22  with her or did you join another group?
23      A.  I don't remember.
24          Like, so I was part of different

Page 99

1  groups throughout.  I don't know what order they
2  happened in.
3      Q.  What do you mean you were part of
4  different groups throughout?
5      A.  Well, you just kind of bounce around
6  from, like, group to group.  But I don't know
7  what order it happened in.  Like, who was I
8  talking to at lunch, I don't know.  Did I hang
9  out with Tim and a couple other of our employees,
10  yes.  Did I hang out with some of our subs, yes.
11  What order it happened in, I mean, you know, it's
12  just about networking.
13      Q.  Okay.  You mentioned that Rachael got
14  drunk?
15      A.  Yeah.
16      Q.  Were you drinking?
17      A.  I probably had a drink or two, yeah.
18      Q.  Okay.  Were you drinking before you got
19  to the outing?
20      A.  No.
21      Q.  Okay.
22      A.  I was at work.
23      Q.  Okay.  Do you remember how many drinks
24  you had that day?

Page 100

1      A.  I don't remember exactly.
2      Q.  And you said you'd go around from group
3  to group.  Were you going around by yourself or
4  were you going around because -- I just need to
5  understand the process of the golf outing and how
6  that works.
7      A.  Yeah, so, you know, you sit there and
8  you have lunch -- you have lunch.  And then
9  everyone gets together and you come up with
10  teams.  So I think, like, four or five people get
11  on a team.  And then you pick a cart and go pick
12  up your cart, and then you drive to a hole.
13  Everybody starts at a hole.
14          And so since my main objective was
15  to get pictures of everyone, I just got in my own
16  cart and started driving around taking pictures
17  of people, which is kind of what we did the year
18  before.  We had a really good time with Greg.
19  Greg drove and took me and Lauren, and we took
20  all kinds of pictures.
21          So you just stop by and you're,
22  like, hey, how is it going, you know, Vortex
23  Flooring.  And then you shoot the shit for a
24  little bit and then you leave.  You got -- I got

Page 101

1  in my cart and drove off and just -- and then
2  eventually I got bored, because you're driving
3  around taking pictures of everyone.  And some
4  people were really serious about the golf outing,
5  so they actually wanted to golf, and then other
6  people were relaxed.
7          So, you know, I was trying to find
8  people to meet up with.  Texted Tim, like, what
9  hole are you at, I'm at hole whatever.  I'm,
10  like, I have no idea where that hole is because I
11  don't get golf.
12          So, you know, just trying to find
13  out where people are and hook up with them.  I
14  think I met up with -- I know I met up with
15  Rachael before she got sick.  And last year we
16  had hung out with her and one of the McKenna Hill
17  Group.  And she started making some weird
18  comments while I was in the golf cart, and I was,
19  like, okay, well, she's clearly far along.
20          So I separated myself from her
21  immediately, because she was just -- and then
22  I -- she was just -- I don't know, started
23  getting text photos of, like, there was tampons
24  in the bathroom and then she threw up all over

26 (Pages 98 - 101)

Page 102

1    herself.  And I was, like, I don't even want to
2    deal with this.  Like, I'm not -- I'm separating
3    myself from her immediately.
4         So I'm not sure what happened with
5    her later in the night.  I just know she ended up
6    sleeping in the bathroom for, like, two hours,
7    she said, and then she drove home when she was
8    finally, like, coherent enough to drive, so...
9         MR. BOYLE:  Can I have this marked as
10   the next exhibit, please.
11        (Document marked as Dziubla Deposition
12        Exhibit No. 15 for identification.)
13   BY MR. BOYLE:
14   Q.  So, Ms. Dziubla, I've handed you
15   Deposition Exhibit 15, which is a copy of your
16   complaint in there.  I'd like to direct your
17   attention to paragraph 9 of the complaint.
18   A.  Okay.
19   Q.  Let me know when you've had a chance to
20   read that.
21   A.  Yep, read it.
22   Q.  Okay.  So the first sentence of that
23   paragraph states that, "During the event,
24   Jacobsen offered to provide JCA employees

Page 103

1    instructions on how to hit a 'chip shot'".  Do
2    you see that?
3    A.  Yes.
4    Q.  And Jacobsen is Peter Jacobsen; is that
5    correct?
6    A.  Correct.
7    Q.  So what do you remember about how he was
8    providing instruction on how to hit a chip shot?
9    A.  Can you rephrase that?
10   Q.  Sure.  You said he offered to provide
11   JCA employees instructions on how to hit a chip
12   shot.  How did he offer employees that type of
13   instruction?
14   A.  So, okay, so I was going around taking
15   pictures; and then I got pulled over by that
16   group that was there.  So I think there was,
17   like, four or five of us.  And trying to remember
18   about -- it was just basically, like, hey, do you
19   play golf, and I was, like, no, I don't know how
20   to play golf.  And then he was, like, oh, come
21   on, take a chip shot.
22        So we were just -- I guess it's
23   putting to the hole.  So a couple people went to
24   putt, and he was just talking them through it.

Page 104

1    Q.  Okay.  And so your understanding is that
2    when you say chip shot that that's putting into
3    the hole?
4    A.  I guess, yeah.
5    Q.  Okay.
6    A.  I think it's --
7    Q.  Okay.  And did -- were you offered to
8    receive instruction on how to hit a chip shot?
9    A.  Yes.
10   Q.  And the next sentence of the complaint
11   says, "As a JCA employee, Plaintiff felt
12   obligated to go along with the demonstration."
13        What do you mean you felt obligated?
14   Why did you feel obligated?
15   A.  Well, I mean, Jacobsen is the -- you
16   know, he's the guest of honor there.  You know,
17   he's there.  He's -- it's kind of -- you know,
18   you don't want to -- if you're hosting a party
19   and you have your head key person there, you want
20   to be cordial to go along with them; and he offered it.  So I
21   was, like, well, yeah, I guess I have to.
22        And to be quite frank, I had
23   actually talked to Jacobsen earlier in the night
24   when I arrived there, and he made me very

Page 105

1    uncomfortable when I originally talked to him.
2    And I didn't really want to have anything to do
3    with him there.  But it was just, like, oh, well,
4    you know, come on, we got an expert here.  Just
5    take his -- you know, let him tell you what to
6    do.  And I was, like, all right, sure.
7    Q.  So I just need to understand, so you're
8    driving around in a golf cart by yourself --
9    A.  Yes.
10   Q.  -- going from hole to hole?
11   A.  Yes.
12   Q.  Okay.  And you drive up to a hole where
13   Peter Jacobsen is providing golf instruction?
14   A.  No, I drove up to a hole and got flagged
15   down, hey, Ro, we've got these autographed
16   things.  Do you want to stop by, and I'm, like,
17   oh, I don't think I want to.  And they're, like,
18   oh, come on.  And what am I going to do, insist
19   on it.  So I'm, like, okay, fine.
20        So he had these autographed rags.
21   I'm, like -- or whatever they're called, like,
22   ball cleaners or something.  I'm, like, fine,
23   whatever, cool, I'll stop by.
24        So I did.  And I was just, like --

27 (Pages 102 - 105)

Page 106

1  I'm, like, don't make it weird. You know, I'm
2  just trying to go along with the flow of things.
3  The instructions weren't going on when I pulled
4  up. It was just, like, hey, come here, and, you
5  know, the guest of honor is here. Oooh, come get
6  a signed piece of paraphernalia that I didn't
7  really care about.
8     Q. Describe for me what type of instruction
9  you received from Mr. Jacobsen?
10    A. So, I mean, I don't recall the exact
11 instructions, but I know that, like, he verbally
12 cued me to perform the same type of -- to attempt
13 the same type of, I guess what it's called, a
14 chip shot; and when I wasn't getting it, then he
15 decided to demonstrate to kind of guide me
16 physically.
17        And that's when he made his comment,
18 and I was just, like, whoa. And I was just --
19 and I -- that's -- kind of honestly, like,
20 every -- it was, like, I was out of my body
21 looking down at me, and all I can picture is
22 Schumacher's face, just -- him just laughing and,
23 like, buddying it up with the two of them.
24        And I was just, like, did I hear

Page 107

1  what I just heard? I was just, like, shocked.
2     Q. So who was there when this incident was
3  going on?
4     A. So, you know, I'm standing there doing
5  my whatever. Jacobsen is behind me. He's
6  guiding my hands. I'm -- Jim's in front of me,
7  and I don't know where the rest of the people are
8  because my back is to them. So I don't know what
9  their proximity is.
10    Q. Okay. But I'm just -- let's start with
11 who was there. So you said Jim --
12    A. Oh.
13    Q. -- you said Peter Jacobsen, you said
14 yourself.
15    A. Tim was there.
16    Q. And that's -- Tim is who?
17    A. Tim Lee was the other estimator. He was
18 there. I want to say Kacper was there from
19 Aspen.
20    Q. What's Kacper's name?
21    A. Which is Kacper Cojowski. I don't know.
22 I'm taking a shot at his last name. He's with
23 Aspen Painting, so he's one of our subs that we
24 use a lot.

Page 108

1     Q. Okay.
2     A. Just going off from memory, maybe Adam
3  was there. I forget his last name. I don't
4  remember anything else.
5     Q. Okay.
6     A. In terms of people.
7     Q. Okay. And do you recall how -- where
8  people were standing in relation to where you and
9  Mr. Jacobsen were?
10    A. Well, like I said, my back was to them,
11 so I don't know if they were, like, right here or
12 if they were, like, over there. My back was to
13 them.
14    Q. Okay. So you described how he --
15 because you weren't understanding the instruction
16 that he was giving you on how to physically
17 perform the shot, then he physically assisted you
18 on how -- what he was trying to explain, correct?
19    A. Correct.
20    Q. Now, in your complaint, you say he took
21 a position behind plaintiff and assertively
22 pressed his hip against plaintiff's buttocks; is
23 that correct?
24    A. Yes, he was close.

Page 109

1     Q. Okay. And is -- did you say anything to
2  him at that time?
3     A. I was, like, this is weird. And before
4  I could process it, that's when he made that
5  comment, and I've -- honestly I've received --
6  perfect example is we had an outing previously, I
7  don't know if it was that year, for JCA, they
8  have an employee that's an ex-golfer Clint
9  Hickman, and he gave me the same type of
10 demonstration at Topgolf where he was behind me,
11 but it certainly did not include a comment like
12 that. It was done very professionally, and he
13 guided me, and I was able to hit the ball. I
14 didn't think I was going to experience anything
15 different than that.
16    Q. Now, did -- you've already answered
17 this, but was Jacobsen also providing
18 instructions to the other golfers that were
19 standing there?
20    A. Physically?
21    Q. Just I'm asking --
22    A. Providing instruction, yes, he provided
23 instructions to the other people as well on how
24 to improve their shot.

28 (Pages 106 - 109)

Page 110

1    Q.  Okay.  Now, did you complain to anybody
2  after this incident occurred?
3    A.  I mean, it -- you know, we got done.
4  They're, like, hey, let's take a photo.  I'm,
5  like, all right, whatever.  I was, like, how do I
6  process this.  We started driving around.
7        And actually because Tim and I were
8  so close, you know, we're sitting there.
9  Everybody gets out to take their shot, and Tim
10  just kind of looks over at me, and he's, like,
11  dude, are you okay.  And I'm, like, I'm not okay.
12  And he's, like, I can't believe that happened;
13  and I'm, like, I don't know what to do.
14    Q.  So when did this exchange with Tim Lee
15  occur?
16    A.  I'm -- maybe a couple holes after that
17  hole.  I'm not sure of the time frame.  But I was
18  just going back and forth in my head.  I'm, like,
19  did that really happen.
20    Q.  So after the -- you received the
21  instruction from Mr. Jacobsen, you took your
22  picture, and you got back in your golf cart and
23  you left that area?
24    A.  I did definitely leave the area.  I

Page 111

1  don't know if it was just me or if we left as a
2  group collectively.
3    Q.  You don't remember that?
4    A.  I don't remember if I left in a golf
5  cart with somebody or if they hopped in my cart
6  or whatever.
7        But I did spend the remainder of the
8  afternoon with other -- with Tim and with Adam
9  and a couple other people from our office.  I
10  just don't know what order it came in.
11    Q.  But if I'm understanding correctly, Tim
12  and the other -- Kacper and Adam, they were
13  actually golfing that day, correct?
14    A.  Yeah.  They were doing more of it, yeah,
15  they were partaking in more of it in terms of,
16  like, finishing the golf.  But it's all relaxed.
17  You know, it's not like anyone is really keeping
18  score.  But they were golfing, yeah.
19    Q.  They were golfing?
20    A.  Yeah.
21    Q.  So they proceeded to the next hole and
22  you went somewhere else?
23    A.  I might have gone with them.  Because I
24  did end up -- like I said, I ended up spending my

Page 112

1  afternoon with them several times, like, you just
2  kind of -- I might have had my own cart and drove
3  along with them to the next hole, but I know that
4  I stayed with people.  I wasn't solo after that.
5  I stayed with people, so --
6    Q.  But you can't say for sure?  You don't
7  remember where you -- whether you went with them
8  or you went somewhere else?
9    A.  Okay.  Then I went them, if I wasn't by
10  myself.  I wasn't by myself after that happened
11  at any point in time.  So I --
12    Q.  So you stayed with that group and then
13  you proceeded to the next hole?
14    A.  Right.  But Jacobsen didn't stay with
15  the group.  Like, they were part of their own
16  little thing.  He was on his own team.
17    Q.  Okay.  And this conversation you just
18  described where Tim asked you if you were all
19  right, that just occurred at some later point in
20  the day?
21    A.  Yeah, I mean, like, we were driving
22  around.  So I think we met -- we probably met up
23  with a couple other carts, and we just had an
24  opportunity.  I wasn't saying much, and usually

Page 113

1  I'm pretty social and I joke around and all that
2  stuff, and I wasn't saying much.  And he just,
3  like -- he knew something was wrong, because, I
4  mean, we hung out all the time at work.  We were
5  good coworkers.
6        And I -- you know, I told him,
7  like -- I told him what happened.  He was, like,
8  wow, I can't believe -- you know, then, of
9  course, Kacper is there.  And he's, like, what
10  happened.  And, you know, and I told him.  He's,
11  like, I can't believe that that happened.  He's,
12  like, oh, my God.  And they could tell I was --
13  there was something -- I was upset.
14    Q.  Okay.  I mean, so since you remember
15  that you -- now you remember that you went with
16  them after this incident with Mr. Jacobsen, I
17  want to know how long after you -- that incident
18  before you had this discussion with Tim and now I
19  understand Kacper was part of it, too?  Was it --
20  do you remember -- have any recollection as to
21  how long after it was?
22    A.  It was -- like, it's within three hours.
23    Q.  Okay.
24    A.  Because it was before dinner, so dinner

29 (Pages 110 - 113)

Page 114

1  is, like, at 5:00. So if we were golfing by 1:00
2  and that happened, like, midway through, I mean,
3  it all -- it happened before dinner.
4      Q. Okay. So you believe it was closer to
5  the dinner when you had that discussion with
6  them?
7      A. I'd say, like, yeah, midway through,
8  yeah, sure, closer to dinnertime.
9      Q. Okay. And you said you started golfing
10  at 1:00?
11      A. I think so. That's all -- I'm just
12  throwing that number out there. It could have
13  been 11:00.
14      Q. Okay.
15      A. I don't know.
16      Q. Okay. Did you have any other
17  conversations with anybody that day regarding the
18  incident with Mr. Jacobsen?
19      A. Yeah. Actually so when we got done, you
20  know, whatever, finishing our holes, heading back
21  to dinner, we -- you got to go park all your golf
22  carts and stuff and everybody comes together and
23  you find people. And Joe McGuire was another
24  person that I really confided in about stuff. I

Page 115

1  thought he was one of their best PMs. He was
2  standing at one of their booths where the carts
3  were, and Kacper actually went up to him, and
4  he's, like, dude, you wouldn't believe what just
5  happened. And he starts telling McGuire about
6  it, and McGuire looks over at me, and he's, like,
7  what did Jim do. And I'm, like, he just started
8  laughing; and he's, like, no way. He's, like,
9  yeah, it doesn't surprise me.
10        And I was just, like, what do I do;
11  and he's, like, I don't know. I'm, like, hey,
12  you want this souvenir? And I just kind of
13  chucked the ball cloth at him. I'm, like, do you
14  want it. He's, like, fuck, no. I mean, he's,
15  like, I can't believe that happened. He's, like,
16  I'm not surprised, though. Jim would think
17  that's funny.
18      Q. So this occurred after you were done
19  golfing for the day and you were returning your
20  carts?
21      A. Yes.
22      Q. So this was -- this would have been
23  right around dinnertime?
24      A. Yes.

Page 116

1      Q. Okay. And it was Joe McGuire, yourself,
2  and Kacper?
3      A. And Tim.
4      Q. Any other discussions at the outing that
5  you had about that incident?
6      A. I mean, I talked with -- Sergio gave me
7  a ride back to the office. I talked with him
8  about it when I left.
9      Q. And who is Sergio?
10      A. I think he's their general
11  superintendent.
12      Q. Okay. He gave you a ride back to the
13  office. Do you know -- do you recall what time
14  that was?
15      A. I didn't finish -- I definitely didn't
16  partake in dinner because of how upset I was. So
17  I want to say it was before 5:00, and we ended up
18  talking at the office for a couple hours about
19  everything that happened.
20      Q. What do you remember -- was there
21  anybody else present?
22      A. No. Just me and Serg.
23      Q. And what do you recall saying to Sergio
24  about the incident?

Page 117

1      A. I honestly don't remember if I told him
2  anything specific. I just told him -- sorry. So
3  I was supposed to get a ride back, but I didn't.
4  So I was actually -- when I was at the golf
5  outing and they were going through the auctions
6  and stuff like that, I looked up at Serg, and
7  he's, like, do you have a ride back, and I said,
8  no, I don't. And he said, are you okay. I said,
9  no, I'm not. And he's, like, do you need a ride
10  home. And I'm, like, no, I'll be fine.
11        So I stood there, and he stayed
12  within eye -- within -- so that I could still see
13  him, and within five minutes, I looked up at him
14  and I said, I need to go home. And he said, all
15  right, I'm here. He's, like, I'll take you home
16  right now. And within five minutes, he took --
17  we got in his car and he drove me back to the
18  office.
19        MR. SEDAEI: Take a minute if you need
20  to.
21  BY THE WITNESS:
22      A. And I -- honestly I just sat in the car
23  and I think I just fought back tears. And then
24  we got back to the car, and I couldn't find my

30 (Pages 114 - 117)

Page 118

1  keys for the car, because the detail shop had it.
2  So we were looking and we spent, like, 45 minutes
3  looking just for the keys trying to figure that
4  out.  And then all of a sudden, we noticed a note
5  on the car that said the keys are in the gas
6  tank.  We thought that was funny.
7          And then we just started talking
8  about -- he started talking about, you know, how
9  he ended up at JCA and how grateful he was that
10 Steve gave him a chance.  If it wasn't for JCA,
11 he wouldn't have a career.  He was just -- we
12 just started talking.  And he's, like, look,
13 he's, like -- like I said, I don't remember if I
14 told him any details, but he just -- we just
15 talked.  And he's, like, just -- I know you're
16 upset.  He's, like, don't make any rash
17 decisions.  He's, like, promise me you won't
18 quit.  And I'm, like, I won't.  I'm not going to.
19 BY MR. BOYLE:
20   Q.  Okay.  Anything else you remember saying
21 to Sergio or Serg or him --
22   A.  Sergio.
23   Q.  -- or him saying to you?
24   A.  I mean, we just talked about stuff

Page 119

1  that -- you know, he vented about stuff he has to
2  deal with there.  And it was just kind of,
3  like -- I don't know, it was just coworkers
4  talking.  That's it.  He's very con -- he's a --
5  I actually -- a good friend of his was a friend
6  of mine from cross fit.  So we had that
7  connection, and he was just being a concerned --
8  I think, concerned dad, I think honestly.
9    Q.  Okay.  And fair enough.  My question was
10 kind of open-ended.  But I just want to know
11 about anything you remember saying about the
12 incident with Peter Jacobsen?
13   A.  I don't recall giving him any details.
14   Q.  Okay.  And prior to -- you subsequently
15 sent an email to Jim Schumacher that evening.
16 But before that, did you have any discussions
17 with anybody about the incident that you haven't
18 shared so far?
19   A.  Well, as soon as -- I mean, I drove home
20 that night and I cried the entire way home.  I
21 got home.  My husband wasn't in the house.  I
22 realized he was in the garage; and I came into
23 the garage and he looked at me and he's, like,
24 what the fuck happened to you.  And I busted out

Page 120

1  crying, and I told him as best I could what
2  happened.  He's, like, you have to say something
3  about that right now.  He's, like -- I mean, he's
4  never seen me that way.  I don't get upset like
5  this.  He's, like, you have to say something
6  about this right now.  He's, like, you have to
7  let them know this happened.  You can't -- and,
8  I'm, like, well -- I mean, I didn't know how to
9  process everything.
10        So he encouraged me to make sure
11 that I reached out to JCA immediately and tell
12 them what happened and express my concern with
13 the issue and that I was very upset.
14   Q.  Anybody other than your husband that you
15 talked to that night before you sent your email
16 to Jim Schumacher?
17   A.  I don't recall.  That's -- no, not that
18 I know of except that.
19   Q.  Okay.
20       (Document marked as Dziubla Deposition
21        Exhibit No. 16 for identification.)
22 BY MR. BOYLE:
23   Q.  If you could hand me that back.
24   A.  Oh, sorry.

Page 121

1    Q.  So I've just handed you Deposition
2  Exhibit 16.  Is this a copy of the email that you
3  sent to Mr. Schumacher that evening?
4    A.  Yes.
5    Q.  And this is the email, correct?
6    A.  Correct.
7    Q.  You can hand it back to me.
8    A.  Oh.
9        (Document marked as Dziubla Deposition
10        Exhibit No. 17 for identification.)
11     MR. BOYLE:  Get this one marked as well,
12 please.
13       (Document marked as Dziubla Deposition
14        Exhibit No. 18 for identification.)
15 BY MR. BOYLE:
16   Q.  So I just handed you two emails that you
17 sent to Mr. Schumacher the following day.
18 December -- Deposition Exhibit 17 is an email you
19 sent at 11:58 a.m. on the 19th, and Deposition
20 Exhibit 18 is a follow-up email you sent at
21 12:00 o'clock, so just a couple minutes later.
22 Do you recognize these emails?
23   A.  Yes.
24   Q.  All right.  So looking at Deposition

31 (Pages 118 - 121)

Page 122

1  Exhibit 17, you stated that you're going to be
2  working from home?
3     A. Yes.
4     Q. Okay. And you let Greg know that you'd
5  be working from home; is that correct?
6     A. Yes.
7     Q. So were you performing work in the
8  morning?
9     A. Yeah.
10    Q. Okay. And then it also says that you
11 were -- that you filed an EEOC charge?
12    A. Yes.
13    Q. Okay. Why -- so this is at
14 11:00 o'clock or 11:58 in the morning. You had
15 already filed an EEOC charge. Can you tell me
16 why you felt it so important to file a charge
17 right away?
18    A. Well, first of all, it turned out not to
19 be an EEOC claim, because I had never done that
20 before. And it was actually a request to be
21 interviewed to complete a claim.
22      Second of all, I have no -- it's not
23 like this is something that I do on a regular
24 basis. So everything that I knew is that if

Page 123

1  something like this happens and it happens at
2  work you file a claim right away. You make sure
3  that -- otherwise, it could be used against you.
4  So what I thought I did was something that I
5  was -- you just had to do right away, because it
6  was very serious.
7       And I knew how I felt and I was very
8  upset about it, and I was, like, this is
9  protocol, because I don't want it to fall back on
10 me that, like, whoa, why did you take two days to
11 file it. You know, you weren't -- or whatever.
12 I just didn't want it to be used against me. So
13 I just did what I thought I was supposed to do.
14    Q. Which was to immediately contact the
15 EEOC.
16    A. Right. Because it's employ -- I mean,
17 that's what I thought they did. I mean,
18 obviously I know different now, but that's what I
19 thought that's what you do. Something happens at
20 work, which I was at a work event, you file an
21 EEOC claim, if something like that happens.
22    Q. Even before you've given the company an
23 opportunity to investigate the claim?
24    A. As -- from anything that I ever absorbed

Page 124

1  in terms of how to process that, I was just told
2  it needs to be done right away. That's what I
3  gathered from -- it just needs to be done right
4  away. I didn't know that there was a period of
5  time I was supposed to give. I just did it right
6  away.
7     Q. Did somebody tell you that?
8     A. I did reach out to a friend of mine, who
9  is a cop, and I told her how I was feeling, and
10 she said that that's where you start.
11    Q. Okay. And did you contact the EEOC that
12 morning?
13    A. I went on their website, and -- that's
14 why, like, I put in all my information and I
15 thought it was filing a claim, and it wasn't; but
16 I went on their website.
17    Q. And then the next email states, and
18 that's Deposition Exhibit 18, that you're taking
19 PTO for the remainder of the workday. So you
20 requested PTO. Did you -- why did you decide to
21 take PTO -- why were you working in the morning
22 and then decided to take PTO in the afternoon?
23    A. Because I couldn't focus. And I
24 remember that when I had my concussion I didn't

Page 125

1  give myself time to process things, and I just
2  felt that I needed -- well, also, too, I believe
3  I was -- because I have clarification on here
4  from what I'm gathering from this, is that I was
5  just clarifying that I decided that I wanted to
6  take the day off, and it wasn't clear in my
7  original email. Because I'm, like, that's not
8  going to happen in my condition. So this was me
9  telling them, hey, man, I planned on working from
10 home this morning, but I don't think I'm going to
11 make it throughout the day. And a couple minutes
12 later, I'm, like, for clarification, I'm taking
13 today off.
14      So it's not like everything is
15 hunky-dory and I was, like, oh, I'm going to take
16 today off because whatever. I was telling them
17 that morning that I was very upset and that my
18 intention was to work, but I wasn't going to.
19    Q. Did somebody tell you that you should
20 take PTO for the day rather than working from
21 home?
22    A. My cop girlfriend said that -- Beata,
23 she said that I should take the time that I need.
24    Q. Why was that?

32 (Pages 122 - 125)

Page 126

1    A.  Because I needed -- because I don't
2    know.
3    Q.  Did she tell you why you should request
4    PTO?
5    A.  What did she say?  She said -- or else,
6    like -- something to the extent of or else they
7    won't understand that you're -- what you're going
8    through, something to that extent is what I
9    recall.
10   Q.  So she told you to take PTO, so that
11   people understood how -- that you were going
12   through a lot?
13   A.  Honestly I don't recall what her exact
14   words were.
15   Q.  So were you all -- you were already
16   concerned about how people were going to be
17   interpreting your actions?
18   A.  I was not concerned about that.  I
19   honestly -- I was not concerned about what anyone
20   was thinking.
21   Q.  Okay.  But you filled out a form on the
22   EEOC's website?
23   A.  Right.
24   Q.  At the suggestion of your friend Beata,

Page 127

1    correct?
2    A.  Well, she said once the -- yeah, she's,
3    like, this is where it starts.  I'm, like, what
4    do I do, and she said, this is where it starts.
5    I said, okay.  So that's what I did.
6    Q.  Okay.  And then you requested PTO, so
7    that nobody could think that you weren't upset
8    about the whole situation?
9    A.  I didn't do it because she told me to do
10   anything.  I did it because I couldn't -- I had
11   intentions of working that day and I realized
12   that I couldn't.  And like I said before, when I
13   had my concussion that I worked through, I didn't
14   give myself the time to heal, and I'm -- actually
15   still have issues from it.  And I was deciding
16   that this was -- I was giving -- entitling
17   myself, empowering myself, to say, you know what,
18   Ro, this is fucked up, you need to take time off.
19   It wasn't, like, oh, my cop friend said to do it,
20   a grown woman.
21   Q.  But she did tell you that, correct?
22   A.  That was her advice.
23   Q.  And you didn't actually request PTO
24   until you had received that advice from Beata?

Page 128

1    A.  That I don't know.  I don't know what
2    that timeline is.
3    MR. BOYLE:  Can I have this marked as
4    Exhibit 19.
5    (Document marked as Dziubla Deposition
6    Exhibit No. 19 for identification.)
7    BY MR. BOYLE:
8    Q.  So I'm handing you what we've marked as
9    Deposition Exhibit 19.  Is this a copy of the
10   texts -- your texts with Beata that you produced
11   to us in discovery?
12   A.  Yes.
13   Q.  And so on the first page, you see that
14   your text screen starts at Tuesday at 9:00 a.m.?
15   A.  Yeah, it says Tuesday.
16   Q.  Okay.  And so if you flip to page 694,
17   at the top of the page, she advises you, Take PTO
18   today, and there can be an argument that you are
19   okay.  Take PTO today.  There can be an argument
20   that you are okay if you're doing work even from
21   home today.  Do you see that?
22   A.  Yes.
23   Q.  So as of your texting at 9:00 a.m.,
24   Beata is advising you to take PTO today, because

Page 129

1    there can be an argument that you were okay if
2    you were doing work from home?
3    A.  Okay.
4    Q.  Okay.  And in your email to Jim saying
5    you're going to take PTO, you sent that to him at
6    noon.  Okay.  So you got the advice from Beata at
7    9:00 a.m., Okay, and then at noon, you're telling
8    Jim I'm going to take PTO today; is that correct?
9    A.  That order is correct, yes.
10   Q.  Okay.  You can hand that back to me.
11   Actually I'm going to hand you back
12   dep -- your text with Beata.  Ask you to flip to
13   the second page.  It's No. 691.  She also advised
14   you that morning that you should contact the
15   EEOC, correct?
16   A.  Right.
17   Q.  And then after that, you -- that's what
18   you did, you contacted the EEOC?
19   A.  That's what I told her I was going to
20   do.
21   Q.  Okay.  And then flipping to the next
22   page, 692.
23   A.  Uh-huh.
24   Q.  In the course of that same text exchange

33 (Pages 126 - 129)

Page 130

1  with Beata, at the bottom of the page, you told
2  her you want out of the industry immediately.
3      A.  Yeah.
4      Q.  Okay.  Hand that back to me.
5          Mark this next exhibit, please.
6          (Document marked as Dziuba Deposition
7          Exhibit No. 20 for identification.)
8  BY MR. BOYLE:
9      Q.  So I'm handing you Deposition
10  Exhibit 20.  That's -- this is Jim Schumacher's
11  response to the email you sent him the prior
12  night at 7:36 p.m.  His response was sent to you
13  at 3:05 in the afternoon the following day.  Do
14  you recall receiving this email from Jim?
15      A.  Yes.
16      Q.  And the first thing he says is that he's
17  very sorry that you had the experience, and he
18  thanks you for bringing it to his attention,
19  correct?
20      A.  Yes.
21      Q.  And he acknowledges your complaint.  And
22  he says that a -- the company does not tolerate
23  harassment and that they will be conducting a
24  full investigation of the concerns raised in your

Page 131

1  email.  Do you see that?
2      A.  Yes.
3      Q.  Okay.  So you were aware, correct, that
4  the company was planning to fully investigate the
5  incident that occurred at the golf outing?
6      A.  To fully investigate it with the people
7  that work there, yes, I was fully aware of that.
8  They were going to do an internal investigation
9  with everyone that worked at the company.
10      Q.  Okay.
11      A.  Which means whose best interest is going
12  to be represented?  Not mine.
13      Q.  Well, didn't the investigation include
14  people who were at the golf outing?
15      A.  It was conducted by somebody that works
16  for the company.  So whose best interest is being
17  represented during that investigation?  Not mine.
18      Q.  Well, my question just is -- I just want
19  to know if you were aware the company was going
20  to conduct an investigation?
21      A.  Yeah, oh, yeah, I was aware.  They told
22  me, yeah, we're going to conduct an internal
23  investigation.  Mike Powers is going to be
24  handling it.  I thought to myself, well, that's

Page 132

1  not going to -- not, like -- how is that going to
2  come up with anything that says, you know what,
3  Ro, we're sorry this happened to you.  You know,
4  this is how we're going to help you through this
5  matter.  At that point in time, I knew for a fact
6  the investigation would go their way.
7      Q.  So what that -- and that was your
8  reaction to receiving the email from Jim
9  Schumacher?
10      A.  I didn't believe there was a bit of
11  sincerity in this at all, no.
12      Q.  Okay.  So you were dismissive of the
13  investigation right from the beginning?
14      A.  Yes.
15      Q.  And didn't -- you subsequently received
16  an email shortly thereafter from Mike Power
17  letting you know that he was going to investigate
18  the complaint, correct?
19      A.  I think so, yes.
20      MR. BOYLE:  Let's get it marked.
21          (Document marked as Dziuba Deposition
22          Exhibit No. 21 for identification.)
23  BY MR. BOYLE:
24      Q.  Is this a copy of the E -- Deposition

Page 133

1  Exhibit 21 that has just been handed to you, is
2  this a copy of the email that you received from
3  Mike?
4      A.  Yes.
5      Q.  Okay.  In the email, he lets you know
6  that he's been asked to investigate the matter
7  that you reported, and that he tried to call your
8  cell, but that you were unavailable and it did
9  not go into voicemail.  Was there something --
10  were you accepting calls on your cell that night?
11      A.  I had no reason not to.
12      Q.  Okay.  In any event, he sent this email
13  at 4:45 in the afternoon on the 19th, correct?
14      A.  Yes.
15      Q.  And he's asking --
16      A.  4:42 actually it says.
17      Q.  You're correct, I'm sorry.  4:42.
18          And he's inviting you to either
19  discuss it over the phone or to conduct an
20  off-site meeting, so that you can go into your
21  complaint.
22      A.  Yes.
23      Q.  Do you recall what your response was to
24  Mike's email?

34 (Pages 130 - 133)

Page 134

1    A.  We ended up meeting, so I must have
2  agreed.  We ended up meeting off site at Rose
3  Garden in Elk Grove.
4          (Document marked as Dziubla Deposition
5          Exhibit No. 22 for identification.)
6  BY MR. BOYLE:
7    Q.  Handing you Deposition Exhibit 22.  Is
8  this your email response to Mike Power that
9  evening?
10   A.  Oh.  Oh, okay.  I guess we didn't agree
11  at that point in time.
12   Q.  Pardon me?
13   A.  I guess I didn't agree -- I don't know
14  how the meeting at Rose Garden transpired.  I got
15  my timing wrong.  I guess that's my response to
16  him, is this email.
17   Q.  So Mike emails you at 4:45 -- 4:42
18  saying we're going to conduct an investigation,
19  when is a good time to meet; and an hour later,
20  you respond to him by email saying I've reached
21  out to an attorney and you gave the name and the
22  number of the attorney, correct?
23   A.  Right.
24   Q.  That was your response?

Page 135

1    A.  Yes.  It's right here.
2    Q.  And you also advised him that you're
3  going to need to take another day of PTO the next
4  day?
5    A.  Yes.
6    Q.  Okay.  No response to his invitation to
7  meet with you to discuss your concerns, though?
8    A.  Well, from what I understood, the minute
9  you talk to an attorney, like, you shouldn't talk
10  to the other people.  I mean, that was my
11  understanding.  That's the only reason why I
12  responded that way.
13   Q.  So let's talk about that.  So you've
14  explained why you felt it was the thing to do to
15  contact the EEOC and you've explained why you
16  felt it was the thing to do to, you know, not
17  work from home, but to conduct -- to take PTO.
18  What -- why were you -- why did you contact an
19  attorney so quickly?
20   A.  Again, I thought that was part of the
21  process.  And to be quite frank, just having my
22  experience that I've had with how things have
23  gone at JCA before and how the guys handle
24  things, I didn't feel that my best interest would

Page 136

1  be represented at all.  And I felt like they were
2  basically gearing up to put themselves in a
3  position where I was going to get let go.  That's
4  just basically what I thought.
5          And if I remember correctly, I
6  believe on Tuesday, at some point in time, all of
7  my -- I was completely severed from the company.
8  My company emails were shut off.  Everything was
9  shut off.  And that to me didn't say, hey, Ro, we
10  really empathize with what happened to you.  It
11  said to me, oh, shit, we better cover our asses.
12   Q.  Well, let's -- just to keep the timeline
13  straight.  The golf outing was on a Monday,
14  correct?
15   A.  Right.
16   Q.  And these exchanges that we're talking
17  about right now were the next day, which is
18  Tuesday, right?
19   A.  Right.
20   Q.  And on Wednesday, you had your meeting
21  with Mike Power at the Rose Garden, correct, in
22  the morning?
23   A.  I believe so, that's how it rolled out.
24   Q.  Right.  And on Wednesday afternoon, your

Page 137

1  email access was terminated?
2    A.  Was it?  Is that the timeline?
3    Q.  That's the timeline.  So it wasn't
4  Tuesday.  So when I -- so we're focused here on
5  Tuesday, and I'm trying to understand your
6  thinking of contacting the EEOC, claiming PTO,
7  contacting a lawyer, and basically wanting the
8  company to deal with your lawyer on Tuesday.
9  What made you think that, you know, that was the
10  way that you were supposed to respond to having
11  filed a complaint?
12   A.  I -- that's -- I don't know.  That's
13  what I thought you needed to do.  That's what I
14  was, like -- I mean, I've never done -- nothing
15  like this has ever happened in my entire career.
16  I've worked in the construction industry for
17  20 years have.  I've dealt with lewd comments.
18  I've dealt with all kinds of sexism in the
19  industry.  And I never in my life had something
20  like that directed towards me personally like
21  that.
22          I didn't know what to do.  I was --
23  that's what -- I looked up -- this was the first
24  guy that popped up, was Ross Peters.

Page 138

1    Q.  Did you ever make any prior -- prior to
2    this incident, had you ever made any prior
3    complaints to JCA about any sort of harassment or
4    discrimination?
5    A.  Not to my recollection, no.
6    Q.  Okay.  Have you ever made a complaint to
7    any other prior employer about any harassment or
8    anything you were subjected to while working for
9    them?
10   A.  No.
11   Q.  Okay.  So this is the first complaint
12   that you've ever brought?
13   A.  Yes.
14   Q.  Okay.  So you did testify that the
15   company commenced its investigation, correct?
16   A.  Yes.
17   Q.  You met with Mike Powers to discuss the
18   incident the following morning, correct?
19   A.  On Wednesday?
20   Q.  Yes.
21   A.  Yes.
22   Q.  All right.  Tell me what you remember
23   about your meeting with Mike?
24   A.  We were at a diner and sitting across

Page 139

1    from each other, and he was taking notes of
2    everything that I was telling him about what
3    happened at the incident.  He asked me if I would
4    be able to go to walk-throughs, at least, and I
5    told him that I didn't think it would come off as
6    a positive thing if I went to the walk-throughs,
7    because I was very upset.
8        And I knew that if I went to the
9    walk-through and I saw some of, you know, the
10   subs that I was close with, if they had asked me
11   if something was wrong, just like today, I
12   probably would have lost it.  And then they would
13   have been, like, what's going on, and I wouldn't
14   be able to tell them, because that wouldn't have
15   been professional.
16       So I said, no, probably not.  I
17   won't -- at this time I'm too upset to go to
18   walk-throughs.  I don't think I would put JCA in
19   a good light being so upset.  And I wanted
20   obviously not to create a poor image of the
21   company showing up there upset and crying.
22   Q.  Do you recall anything else that you
23   guys discussed during this meeting?
24   A.  Yeah, I took the opportunity with the

Page 140

1    one-on-one with Mike, I actually thought that we
2    had somewhat of a decent professional
3    relationship in terms of, you know, if I needed
4    something for the office or whatever, I knew I
5    could count on Powers to -- you know, like, I was
6    out of the office a lot, but I needed to print
7    emails.  So I'm, like, hey, man, get me a remote
8    printer, so he did.  He seemed very supportive.
9    And I took the opportunity to share with him some
10   things that happened in our department that if he
11   was going to address them with the higher-ups,
12   with Mike and Steve, these are some things that
13   could possibly, you know, be an issue.
14       And it -- you know, Tim Lee, he was
15   Asian.  They used to call him Tim Ree all the
16   time and joke around.  And he's, like, it doesn't
17   bother me, but, you know, it kind of sucks that
18   they make racist comments in my presence.
19       And I just shared -- that's one of
20   the comments I remember sharing with Powers.  I
21   shared with him just a bunch of stuff that Greg
22   and I talked about.  And I'm just, like, you
23   know, these things need to get addressed, man.
24   You need it -- you know, I just took it as a

Page 141

1    one-on-one because we were there.
2        And he's, like, let's talk about
3    what's going on.  I thought there might be some
4    kind of resolution.  I didn't think I was going
5    to get terminated.
6    Q.  And anything else that you remember that
7    you guys discussed?
8    A.  Just the regular stuff I think that I
9    talked to Greg about, you know, just policies and
10   procedures and stuff that, you know -- Greg's
11   really -- I'm sure I mentioned Greg was
12   frustrated, and, you know, he should take some of
13   the stuff.  He's getting an inside source.  You
14   know, he should take some of the stuff to the
15   guys to improve the company.
16   Q.  Do you remember having any conversation
17   with a coworker by the name of David Gross?
18   A.  Yeah, vaguely.
19   Q.  What do you remember?
20   A.  I don't know specifically honestly what
21   I talked to Powers about.  But, I mean, Dave
22   was -- you know, he's an older guy that's been
23   with the company for a while, and they used to
24   watch some show, I forget, was it about cheaters,

36 (Pages 138 - 141)

Page 142

1  I think it was Cheaters. They would watch in the
2  lunchroom. And the guys would all sit there and
3  cackle and stuff, and, you know, then they would
4  make their comments. And I -- you know, you have a lot of
5  African-Americans on the show. So you have Steve
6  Boulukos sitting there laughing at the TV calling
7  them orangutans. Then you got, you know, Dave
8  making his comments and stuff. He's, you know,
9  making his comments and stuff. He's. It was hard to
10 swallow being in that room, you know, so I got up
11 and left. I -- often times when that show was
12 on, I wouldn't eat in the lunchroom, because I
13 had to be around that.
14        And Dave was commenting about my
15 tattoos and stuff. And I was, like, honestly,
16 dude, Bill Burfeind said I should embrace it.
17 You know, I specifically -- I mean, that's
18 another thing, too. I'm, like, here you have
19 Bill Burfeind, who's VP of development, sitting
20 down and had a heart-to-heart talk with me and
21 said, look, I appreciate artwork. He's, like,
22 you express yourself. He's, like, we're not
23 wound that tight where you can't do that. And I
24 said, you know what, I'm not going to do it on
    the job sites. I never once went to a meeting or

Page 143

1  anything and let any of my tattoos show at JCA or
2  any other company. And Bill literally had -- he
3  showed me all this artwork that he had by this
4  artist he employed that he commissioned that had
5  all this beautiful artwork, and they did it for
6  him and when he had his family and stuff. And he
7  was so supportive.
8        And here I have Dave telling me,
9  like, why would you do that to your body. That's
10 permanent. And I'm, like, what's it to you, man.
11    Q.  Why were you so -- did your conversation
12 about tattoos with Bill Burfeind -- how do you
13 pronounce it?
14    A.  Burfeind.
15    Q.  Burfeind. Did that occur after Gross
16 had commented on your tattoos?
17    A.  I don't -- Gross was always making
18 comments on it. Bill Burfeind, honestly I was
19 there probably two weeks, and he had come into
20 the office to see how I was doing on a bid. And
21 my sleeve was poking out and I really quick
22 pulled my sleeve down, and he said, ho-ho, wait a
23 second, he's, like, what are you doing.
24    Q.  Okay.

Page 144

1    A.  And then I told him about it. It was
2  two weeks after working there. And that's
3  another thing that solidified, hey, like, maybe
4  this place is going to be okay, because this guy
5  is cool. This guy is, like, hey, you know,
6  you're an individual. I appreciate that.
7    Q.  But -- okay. So fast forward to your
8  meeting with Mike. You shared with him that you
9  didn't appreciate Dave Gross commenting on your
10 tattoos, is that --
11   A.  I didn't. I mean, there's a lot of
12 stuff and I --
13   Q.  Is that correct?
14   A.  Correct, maybe, yeah.
15   Q.  All right. And what you just told me
16 about, people making inappropriate and racist
17 comments in the lunchroom, is this the first time
18 you brought that to Mike Power's attention?
19   A.  He was in there. He was in the
20 lunchroom when that stuff was happening. You can
21 hear it all through the office.
22   Q.  So what -- why were you tell -- what was
23 the point of telling him about this in this
24 meeting that you're having to discuss what

Page 145

1  occurred at the golf outing?
2    A.  Just to reiterate to him that it bothers
3  other employees, that there -- maybe they're not
4  saying anything, but, guess what, they're
5  expressing that they're upset.
6    Q.  Okay. So you were complaining about
7  that -- those issues that you had observed?
8    A.  I was informing him.
9    Q.  Okay. So you weren't -- you were just
10 informing him?
11   A.  I was informing him, yes.
12   Q.  Okay, okay. Did you also have some
13 discussion with Mike at this meeting about this
14 employee Seth Ehrlich?
15   A.  I believe so. Probably. I don't
16 remember exactly what I said about Seth.
17   Q.  Did you tell Mike that you thought Seth
18 Ehrlich was out to get you?
19   A.  I felt like he was definitely and this
20 isn't just under speculation. I received several
21 people telling me in the office that were with
22 Seth as he tried to persuade Yazbec that I was
23 not a suitable estimator.
24        Like, Tim Lee. Tim Lee was, like,

37 (Pages 142 - 145)

Page 146

1 dude -- we were at the Sox game, and he's, like,
2 this guy is -- he is hard trying to get you
3 fired. And I'm, like, well, that sucks.
4    Q. Okay. And you shared your feelings on
5 that with Mike at this meeting?
6    A. Yeah.
7    Q. And --
8    A. Well, yeah. I mean, I was just letting
9 everything out. I was just trying to find some
10 kind of resolution.
11    Q. Did you also talk about an employee by
12 the name of John Angelovicz, Angelovicz?
13    A. Angelovicz.
14    Q. Angelovicz.
15    A. Not that I recall.
16    Q. Do you remember having a conversation
17 with Mike at the meeting about how he speaks
18 negatively about you and that you no longer deal
19 with him?
20    A. He's just con -- he -- when John was in
21 a mood, he could be a real jerk. And he talked
22 down to all of us. And, you know, Tim dealt with
23 it. But, again, you know, we're coworkers. So
24 Tim would be, like, man, why does he got to be

Page 147

1 such an asshole, and I'm, like, that's John.
2 Like, if John wanted to put you in his place, he
3 did, and he made sure you felt little.
4    Q. And you were sharing your feelings about
5 this with Mike at the meeting on the 20th?
6    A. I was sharing with him this information,
7 yes.
8    Q. Okay. Did you tell Mike that you felt
9 like the environment at JCA was toxic?
10    A. I don't know if that was my exact words.
11 I don't know that I used the word toxic.
12    Q. Okay. Do you believe the environment at
13 JCA was toxic?
14    A. Today, no.
15    Q. Okay. Did you believe it at that time?
16    A. I was very upset. It was three days
17 after the incident. I was very upset.
18    Q. Okay. So it's possible you told Mike
19 that you felt that the environment was toxic?
20    A. It's possible.
21    Q. Okay. Do you remember telling Mike that
22 you should never have taken the job at JCA?
23    A. Again, I was very upset. And the thing
24 is that, because when you're in the industry

Page 148

1 for so long, I expressed to a couple of people
2 before I started there, and I was, like, hey,
3 check this out, I got a job at JCA. And they're,
4 like, oooh, no, you don't want to work there.
5 That's a boy -- it's an old boys' club. And I
6 was like, no, no, I don't think so. I mean, they
7 told me about -- I mean, Yazbec and Steve really
8 sold me on the company, about how they wanted to
9 transform and all that stuff and the way Greg was
10 talking. I was, like, no, you guys got it wrong.
11 They're, like, well, do what you want to do.
12    Q. And did you tell Mike that you didn't
13 want to come into work because you were concerned
14 of what other people were going to say?
15    A. Yeah, I didn't want to have to deal with
16 all the questions. Like, where were you, what
17 happened, why are you so upset. I mean, I just
18 didn't want to deal with the questions, because I
19 wouldn't be able to keep myself -- I knew I
20 wouldn't be able to keep myself together. I was
21 upset.
22    Q. And when you say where were you, you
23 mean, you know, that day and the prior day?
24    A. Yeah, why wasn't I in the office.

Page 149

1    Q. Okay.
2       Okay. Let's take a break.
3       THE VIDEOGRAPHER: We are going off the
4 record at 1:22 p.m. This is the end of media
5 set 2.
6       (A short recess was taken.)
7       THE VIDEOGRAPHER: We are back on the
8 record at 1:38 p.m. This is media set 3.
9 BY MR. BOYLE:
10    Q. So, Ms. Dziubla, when we left off, we
11 were talking about the meeting that you and
12 Mr. Power had on the 20th to discuss your
13 complaint and your other concerns about the
14 company. Is there anything that you recall being
15 said during that meeting that we haven't
16 discussed?
17    A. No.
18    Q. Okay. At the end of the meeting, was
19 there a discussion between you and Mr. Power
20 about you are not feeling like you were ready to
21 come back and authorizing you for PTO through the
22 end of the week?
23    A. I don't know if that was done at the
24 meeting or in an email. I don't recall if it was

38 (Pages 146 - 149)

1 done at the meeting or through an email where I
2 asked for it.
3     Q.  Okay.  But you did not return to work on
4 the 21st or the 22nd, correct?
5     A.  Correct.
6     Q.  Okay.  And is it your understanding that
7 Mike Power had approved your use of PTO to cover
8 those days?
9     A.  I -- he -- we -- I believe he knew I
10 wasn't coming in.  I don't know if my PTO was
11 approved or not.  I guess it's approved, yeah, he
12 knew I wasn't coming in, so he was acknowledging
13 that.
14     Q.  Okay.  So you believe that you and Mike
15 understood that you wouldn't be -- would not be
16 working on the 21st and the 22nd and that you
17 would be using PTO?
18     A.  As a result of that meeting, I'm not
19 sure.
20     Q.  Okay.
21     A.  Sorry.
22         MR. BOYLE:  Have this marked.
23         (Document marked as Dziubla Deposition
24         Exhibit No. 23 for identification.)

1 BY MR. BOYLE:
2     Q.  Handing you what we've marked as
3 Deposition Exhibit 23, this is an email you sent
4 to Mike on the following Monday at 1:30 in the
5 afternoon, the date of September 25th.  Do you
6 remember sending this email to Mike?
7     A.  Yes.
8     Q.  Okay.  Is -- do you recall any
9 communication either by email, text, telephone or
10 otherwise between when you met with Mike on the
11 20th and your sending him this email on the 25th?
12     A.  I don't recall, no.
13     Q.  Okay.
14     A.  I mean --
15     Q.  And in this email, you're telling him
16 that you're -- you continue to be emotionally,
17 mentally, and physically upset, and that you're
18 seeing a therapist and that you want to discuss
19 your options, correct?
20     A.  Yes.
21     Q.  What did you mean by discuss your
22 options?
23     A.  Well, like, what was going to happen to
24 me.  Am I going to be on PTO, like, what was

1 going -- if I wanted to take time to continue to
2 have -- to sort this out to get to a grounds
3 where I felt comfortable.  I mean, I don't know.
4         It might not seem like much to you
5 guys, but my life literally fell apart when all
6 that happened.  I mean, I slept on the couch for
7 weeks.  I literally -- I mean, I was in the best
8 shape of my life when this happened, and
9 everything just went to shit in, like, two weeks.
10 And I was, like, what is going to -- like, how am
11 I going to get past this.  I was asking him for
12 help.
13     Q.  And did you have specific options in
14 mind that you wanted to discuss?
15     A.  I didn't know what they were.  I was
16 asking -- he's the HR guy.  You know, Mike, what
17 happens.  What's the next -- what's going on.
18 And the entire time I always felt like I was
19 being put on the defensive.  I never felt like
20 they were ever looking out for my interest.
21     Q.  I understand, but I'm just asking if you
22 had any particular options at that point in time
23 that you were looking for?
24     A.  On -- like, as of the specific day, no,

1 I didn't know -- I didn't have anything to
2 suggest.
3         (Document marked as Dziubla Deposition
4         Exhibit No. 24 for identification.)
5 BY MR. BOYLE:
6     Q.  So handing you another email which we've
7 marked as Deposition Exhibit 24, this is
8 Mike Power's response to your email on Monday,
9 the 25th, at 4:28 p.m.  Do you recall receiving
10 this email from Mike?
11     A.  Yes.
12     Q.  Okay.  And Mike tells you that he was or
13 they were expecting that you would have showed up
14 for work on Monday; is that correct?
15     A.  That's what it says, yes.
16     Q.  Okay.  And that on the 20th he approved
17 your PTO time through the end of the week; is
18 that correct?
19     A.  Yes.
20     Q.  And is it accurate as he states in the
21 email that they hadn't heard from you at all
22 since that time?
23     A.  I don't recall.
24     Q.  Okay.  And he indicates to you that he

Page 154

1 would like you to come in, so that they can
2 discuss the investigation that they had
3 conducted, correct?
4     A.  Yes.
5     Q.  Okay.  You can hand that back to me.
6          And following your receipt of this
7 email, did you then have a meeting with the
8 company on the following day?
9     A.  Yes, I came into their office.
10    Q.  Okay.  Do you remember what time
11 approximately the meeting took place?
12    A.  No.
13    Q.  Okay.  Who was present at the meeting?
14    A.  Mike Yazbec and Powers.
15    Q.  And where did the meeting take place?
16    A.  The conference room, the large
17 conference room.
18    Q.  Okay.
19    A.  Where I had my interview.
20    Q.  What do you remember being said during
21 the meeting?
22    A.  I remember Powers saying that they
23 concluded their investigation and that basically
24 that they didn't feel like anything wrong

Page 155

1 happened.  And I expressed to them that I was
2 very upset and I wanted to know what my options
3 were to go and somehow cope with what was going
4 on.
5          And Powers just kind of sat there
6 with this blank look on his face.  And I was,
7 like, I don't know.  And I'm, like, you know,
8 I've been reading up.  Is it FMLA, what is it,
9 what do I do so that I can make time for myself
10 to see a therapist and to work through this and
11 being in the environment that I was in.  And he
12 just kind of shrugged his shoulders.  He's, like,
13 well, you got a copy of the employee manual,
14 didn't you?  And I'm, like, I didn't read it.
15 It's still under my desk I told him.  Like, I
16 didn't even have it in my possession when we had
17 that meeting.  It was under my desk.
18          And literally, I'll tell you this,
19 two or three weeks after starting there, I was
20 going through it kind of, like, just trying to
21 overview it; and I had the binder open and I went
22 to flip it and all the pages came out.  And I
23 was, like, screw that, and I just closed it and
24 stuck it back in the box.  Like, I didn't even

Page 156

1 put the thing back together.
2          So I was, like, I don't even know
3 what's in there.  And I was sincerely asking him
4 for guidance, because I'm, like, you're the HR
5 person, what happens, what are the next steps.
6          And I forget why, but he -- Powers
7 left, and it was just me and Yazbec.  And Yazbec
8 made some comment, like, I have daughters, too.
9 And I knew that I couldn't -- I knew that I'm
10 not -- I wasn't about to say anything, because
11 whatever I said, I mean, Yazbec could just say I
12 said something else.  And I just sat there and
13 cried and I didn't say anything to him.
14          I think Mike went to go get the book
15 from under my desk, and then he came back.  And
16 all I remember is -- I don't know the
17 conversation -- I don't know.  They just told me
18 their conclusion.  It was just kind of, like, I
19 was asking for help, and they were just, like,
20 didn't really do anything.
21          And Yazbec started to say something,
22 and Mike kind of shot him a look and just went
23 like this, and Yazbec was, like, okay.
24          And then I think it was -- the

Page 157

1 decision was is that I would come up to -- I
2 would let them know how I wanted to proceed when
3 I left, that it was still open, and that I would
4 have to look at the options on my own, because I
5 wasn't going to get any help from them.  And that
6 I would let them know.
7          And at some point in time after
8 that, I told them basically that, like, I needed
9 a job and I'll figure it out.  I needed to figure
10 shit out.  I needed to get a paycheck.  So I was,
11 like, fine, if this means me driving an hour to
12 go get therapy and it sucks up my whole evening
13 outside of my work, I'm going to have to do it.
14 So I'm, like, I'm coming in.
15          And no sooner did I send that email,
16 got a phone call, I'm, like, all right, what's
17 the -- oh, look at that.  You guys want to
18 present me with a severance package.  Why am I in
19 this position.
20    Q.  Well, let's -- you know, we're going to
21 stick right now ti the meeting that's taking
22 place on the 26th, and I have a few questions to
23 follow up.
24          So, first of all, there was a

40 (Pages 154 - 157)

Page 158

1  discussion about FMLA?
2     A.  The discussion was basically Powers told
3  me that FMLA was unpaid.  And I said, well, how
4  do I do that, what do I do with the forms.  And
5  he's, like, it's in the employee manual, and he
6  just basically threw his hands up, like, figure
7  it out yourself.  And I was, like, okay, is that
8  my only option.  What else -- like, what else
9  happened, like, what else can I do.  And I just
10  didn't get anything from them.
11     Q.  And you felt that it was the company's
12  responsibility to provide you with those options;
13  is that fair to say?
14     A.  I felt like the relationship I had with
15  the company and having had a good review the year
16  prior and everything, I thought we had a
17  relationship where they would help me to some
18  extent and have some kind of empathy for the
19  situation.  And if I asked them, hey, how do you
20  do this and you have some idea of it, to share
21  with it.  Instead it was just, like, figure it
22  out, look it up, Google it.
23     Q.  Were there any employee benefits that
24  the company offered that you felt were being

Page 159

1  denied to you?
2     A.  So that's the other thing, too.  The way
3  things kind of roll at JCA is that --
4     Q.  Let me just -- let's try to so we can
5  get through this --
6     A.  Well, it's in regards to the benefits.
7     Q.  Let me just get the question out.
8     A.  Okay.
9     Q.  I just want to know if there are any
10  employee benefits that you felt were being denied
11  to you; and, if so, what benefits are you
12  referring to?
13     A.  As far as documented employee benefits,
14  no, I didn't feel like that was being denied.
15     Q.  Okay.  And FMLA was presented as an
16  option, but that's unpaid leave, as you said,
17  correct?  So that wasn't going to -- are you
18  saying that that wasn't going to be acceptable to
19  you?
20     A.  FMLA was not acceptable to me.  I'm the
21  one that came up with it.  I was not given any
22  kind of -- like, it's not, like, Mike, like, oh,
23  we're concerned, here's an option for you.  I had
24  to ask and say what is this, and then he kind of

Page 160

1  described it to me.
2     Q.  Okay.  You mentioned that Mike Yazbec
3  made a comment when Mike Power stepped out about
4  his having two daughters.
5     A.  Yes.
6     Q.  How did you -- what did you interpret
7  from that comment?  Why was he bringing that up?
8     A.  I guess he was just trying to -- maybe
9  that was his way of expressing that he's
10  concerned.
11     Q.  Is that how you took it?
12     A.  I thought -- how I took it was that he
13  thought that was the right thing to say.  I
14  didn't feel it was genuine.
15     Q.  Why not?
16     A.  Because they wouldn't have handled
17  things the way they did if they -- if it was
18  genuine.
19     Q.  Any other reason?
20     A.  No.
21     Q.  Was there discussion about the concerns
22  that you've raised that you were not in a
23  position to go through walk-throughs and
24  represent JCA in the manner that an employee

Page 161

1  should represent JCA during a walk-through?
2     A.  During that meeting?
3     Q.  Correct.
4     A.  I don't recall that.
5     Q.  Do you recall Mike Yazbec and Mike Power
6  telling you that they were concerned about the
7  comments you had made at the prior meeting about
8  how you couldn't represent the company
9  positively?
10     A.  I recall Mike saying that when I met
11  with him that I wouldn't be able -- claiming that
12  I said I wouldn't be able to represent the
13  company, and I tried to reiterate to them that I
14  never said I wouldn't talk positively of the
15  company.  I merely said that because I was upset
16  that my actions would be interpreted poorly and
17  reflect poorly on the company, and I didn't want
18  to do that.  And I kept trying to correct him.
19  But what he wrote down in his notes was something
20  that would benefit their position.
21     Q.  What he wrote down in his notes is that
22  you said that you would be unable to represent
23  the company positively?
24     A.  Right, but that's not what I said.

41 (Pages 158 - 161)

Page 162

1  That's just what he wrote down in his notes.
2      Q.  Was there a discussion about their
3  needing to know that you would be able to provide
4  your best efforts in all aspects of your job in
5  order to continue?
6      A.  Yeah.  They're, like, when are you going
7  to come back to work, and clearly I was very
8  upset.  And I was, like, when do I get time to
9  deal with this?  It's been one shot after the
10  other after it happened.  I never had an
11  opportunity to deal with it.  I still honestly
12  haven't had an opportunity to deal with it.
13  Because I --
14      Q.  Because why?
15      A.  Because this is going on.  Every time
16  something about the case comes up, my -- I mean,
17  everything just goes into a tailspin.
18          I don't feel like this should have
19  been the outcome.  You shouldn't lose your job
20  for standing up for yourself.
21      Q.  When the discussion was around whether
22  or not you were going to be or able to return to
23  work, what did you say?  What was your response?
24      A.  I don't recall.  Like I said, when I

Page 163

1  left, the -- I believe the agreement was that I
2  was going to let them know.  I don't know that I
3  gave them a concrete response when I was there in
4  person.
5      Q.  Did you ever -- do you recall telling
6  Mike Power or Mike Yazbec that the only way you'd
7  be able to come back to work is if Jim Schumacher
8  was never allowed to speak to you?
9      A.  I think I said that, and they said it
10  was unreasonable.
11      Q.  And were they correct?
12      A.  I was upset.
13      Q.  Anything else you recall being said at
14  the meeting?
15      A.  No.
16      MR. BOYLE:  Can I get this marked,
17  please.
18          (Document marked as Dziubla Deposition
19          Exhibit No. 25 for identification.)
20  BY MR. BOYLE:
21      Q.  We're handing you what we've marked as
22  Deposition Exhibit 25, which is an email that you
23  sent to Mike Power following the meeting on the
24  26th.  Do you recall sending this email?

Page 164

1      A.  Yes.
2      Q.  And at the last sentence of the email,
3  you indicate that you can save the company the
4  trouble of the FMLA paperwork, and you will
5  report to work tomorrow as usual, correct?
6      A.  Correct.
7      Q.  Hand that back to me.
8          Do you recall what happened next
9  after you sent this email?
10      A.  Yeah.  Like I said, they -- I got a
11  phone call.
12      Q.  Okay.  And who was the call with?
13      A.  The people disclosed to me were Powers
14  and Yazbec.
15      Q.  Okay.
16      A.  No idea if somebody else was in the room
17  with them.
18      Q.  Okay.  And what was -- what do you
19  recall being discussed during that phone call?
20      A.  Basically if I would consider a
21  severance package.  I don't -- I mean, there's a
22  lot of -- I think a lot of other stuff that was
23  talked about.  But basically if I would consider
24  a severance package.  They were prepared to offer

Page 165

1  me four weeks, and I, again, asked them why is it
2  coming to this.  I didn't understand why this was
3  the next step after our meeting was a severance
4  package.  The minute I say I'm coming back to
5  work why is the next step, hey, do you want to
6  sign this, so that you don't have a job anymore
7  when I specifically said I was going to come back
8  to work.
9          And basically we agreed that they
10  would send something over for me to consider.
11      Q.  Okay.  And didn't -- isn't it true that
12  during the call that Mike Yazbec said that based
13  on the email you had just sent it did not appear
14  that you were at all happy to be coming back to
15  work?
16      A.  Can you say that again?
17      Q.  Yeah.  Didn't Mike Yazbec say that it
18  appeared to them from your email that you did not
19  want to come back to work, and that you were only
20  coming back because you needed a paycheck?
21      A.  I don't recall that.
22      Q.  Okay.  Did he tell you that it did not
23  appear that you were happy to be coming back to
24  work?

42 (Pages 162 - 165)

Page 166

1   A.   It appeared I was very unhappy.  It had
2  nothing to do with me coming back to work.
3       Q.   You don't recall Mike Yazbec saying it
4  doesn't appear to us that you want to come back
5  here?
6       A.   No, I don't.
7       Q.   Okay.
8       A.   I'm sorry.
9       Q.   And -- but it's during that call that
10  you were offered the option to -- a severance
11  package, correct?
12      A.   I was offered the option to review one,
13  yes.
14      Q.   Okay.  And the amount of time was four
15  weeks, correct?
16      A.   Correct.
17      Q.   And you agreed that you would take some
18  time to think about that?
19      A.   I said I would review it when it came
20  over.
21           (Document marked as Dziubla Deposition
22            Exhibit No. 26 for identification.)
23  BY MR. BOYLE:
24      Q.   Handing you Deposition Exhibit 26, which

Page 167

1  is an email that you sent to Mike Power later in
2  the day on the 26th.  Do you recall sending this
3  email?
4       A.   Yes.
5       Q.   So you start off the email by saying a
6  compromise is being set up for -- is not
7  settling -- setting me up for failure, correct?
8       A.   Uh-huh.
9       Q.   What did you mean by that?
10      A.   Honestly I don't know.
11      Q.   But as the email goes on, you indicate
12  that compromise is six months, which would give
13  you the opportunity to conduct a proper job
14  search.  Do you see that?
15      A.   Yes.
16      Q.   Okay.  So you were willing to accept six
17  months' severance pay, correct?
18      A.   Yeah.  I mean, I was trying to figure
19  out what was going on.
20      Q.   Okay.
21      A.   And either way, I was out of a job.
22      Q.   What makes you say that?
23      A.   Because they wouldn't let me -- I
24  specifically said I wanted to come back to work,

Page 168

1  and they didn't want me to -- like, they wanted
2  to negotiate this instead.  I specifically said I
3  wanted to come back in, and their whole goal was
4  to negotiate a severance package with me.
5       Q.   And when you say you specifically said
6  you wanted to come back, you're referring to your
7  email that you sent them on the 26th?
8       A.   Where I said I'll come -- report to work
9  as usual, yes.
10      Q.   Do you recall having a call later in the
11  day on the 27th -- I'm sorry, it was actually the
12  next day, on the 27th, to discuss your
13  counterproposal of six months?
14      A.   I don't remember that phone call.
15      Q.   Okay.  Do you recall having a discussion
16  with -- at any time with Mike Yazbec and
17  Mike Power where they told you that due to your
18  short tenure with the company the most they could
19  offer was six weeks?
20      A.   Yes.
21      Q.   Okay.  And what was your response to
22  that?
23      A.   I think it was before I got any of the
24  paperwork.  I'm not sure.  So I was just, like,

Page 169

1  okay, well, send it over, and I will review it
2  with you.  Like, they wanted me to commit to
3  something on the phone, and I was, like, fine,
4  I'll review whatever you want.
5           (Document marked as Dziubla Deposition
6            Exhibit No. 27 for identification.)
7  BY MR. BOYLE:
8       Q.   So handing you Deposition Exhibit 27,
9  which is an email exchange between you and
10  Mike Power on September 27th, it starts out --
11  well, first of all, do you recall sending this
12  email to Mike Power?
13      A.   Yes.
14      Q.   Okay.  And it starts out by your
15  responding to something that Mike had said to you
16  about whether or not FMLA is paid time.  And your
17  statement in the email is, of course, he would
18  say that now.  That's why he puts nothing in
19  writing.  Silly me for trusting his word like he
20  said.
21      A.   Uh-huh.
22      Q.   Okay.  What did he say; what did Steve
23  tell you?
24      A.   So earlier that year, I had told Greg

43 (Pages 166 - 169)

Page 170

1  that -- sorry.
2          So earlier that year, I had told
3  Greg that I needed to talk to him about having a
4  hysterectomy, because of my health issues. And I
5  said I need to figure something out, because I
6  don't know that I can go 12 -- obviously I don't
7  have 12 weeks of vacation. I'm, like, what do I
8  do. And Greg was, like, look, he's, like, we'll
9  talk to Steve. Steve has worked with -- you
10  know, like, McGuire had something with his ACL or
11  something and one of the other guys. He's, like,
12  trust me, we'll talk to Steve. We'll see how
13  things go.
14          So I got a meeting with Steve. And
15  Steve was very, very empathetic about it. And
16  he's, like, I understand this is tough for you.
17  He's, like, whatever you need to do, whatever
18  time, you know, he's, like, we will make it work
19  for you. We will make it work for you.
20  Everything will work out. Don't worry about no
21  pay. He's, like, we will make it work for you.
22  You do what you need to do to be healthy, and
23  we'll make it work for you.
24          And I was, like, that's awesome.

Page 171

1  Thanks. And I literally was going to schedule my
2  hysterectomy in December, and I couldn't because
3  I got fired. So -- and I'm still struggling with
4  the issues I have, because I haven't had a good
5  chance to really deal with that aspect of my
6  life.
7          So that's what I'm referring to. Is
8  that for any other reason, Steve would have, you
9  know, backed me and supported me, but not for
10  this reason. This reason I lose my job.
11      Q.  Okay. Well, do you know if the
12  company's benefit programs would provide you with
13  some sort of short-term disability or -- in the
14  event of a medical situation that, you know,
15  required you to be away from work?
16      A.  Our meeting with Steve was a, like,
17  under-the-table meeting. Those guys that got
18  what they got, that's not part of company policy.
19      Q.  How do you know?
20      A.  That's what Greg told me.
21      Q.  Okay. And --
22      A.  They don't get the -- and their --
23  that's what Greg told me. And it was made very
24  clear that he was helping me out. It was a favor

Page 172

1  that he was doing for me, because he empathized
2  with what I was going through.
3      Q.  But you -- when -- and you say those
4  guys, you're talking --
5      A.  Steve.
6      Q.  Who are you talking about?
7      A.  Steve. Steve specifically -- this was
8  an under-the-table thing. This was, like, we're
9  going to help you out. We care about your
10  health. We're going to help you out and just,
11  you know, you don't obviously tell any of the
12  other employees that we're creating a condition
13  for you for that, so that you can take care of
14  this for yourself personally. You know, don't
15  tell the other employees.
16      Q.  And when did you have this discussion
17  with Steve?
18      A.  I don't recall the timing, but it was
19  earlier that year.
20      Q.  Okay, okay. And when you -- you
21  referred to other guys that they've -- I think
22  you said something about Joe and did somebody
23  else have some sort of an AC -- you were talking
24  about an ACL and --

Page 173

1      A.  I know it was McGuire. And then I think
2  shortly before I left, I think his name is Matt
3  Kantro, I think he ended up going out for
4  another -- something that wasn't work related.
5  But, you know, obviously the guys are, like, oh,
6  work from home, do whatever you need to get back
7  on your feet, don't worry about it, if you need
8  extra time. And that's the same thing Steve said
9  he was going to do for me when I told him about
10  my hysterectomy.
11      Q.  And what -- this Matt Cantrel that you
12  said was --
13      A.  Kantro, K-a-n-t-r-o.
14      Q.  And what was the nature of his
15  condition?
16      A.  Oh, I don't recall for him. I don't
17  know.
18      Q.  Okay.
19      A.  But it -- yeah, it wasn't work related.
20      Q.  Okay. So this is the email, though,
21  that you spent -- sent him in response to the
22  company telling you that what they could do is
23  increase the severance pay from four weeks to
24  six weeks, correct?

44 (Pages 170 - 173)

Page 174

1    A.  I don't know that that's the case.
2    Q.  What --
3    A.  What was your question again?
4    Q.  So you had the meeting on the phone call
5    with Mike and -- Yazbec and Power, and they told
6    you because of your years of service, they could
7    increase the severance to six weeks, but -- and
8    then you sent this email in response to that,
9    correct, or shortly after that?
10    A.  I don't -- that's the thing, I don't
11    know that this email is in response to that phone
12    conversation.
13    Q.  Okay.  But you subsequently had another
14    call with those two where they said that six
15    weeks is the most we're going to be able to --
16    A.  Yes.
17    Q.  -- to offer?
18         Okay.  And do you recall Mike Yazbec
19    saying if six weeks isn't acceptable to you, then
20    you are able to come back to work, you'd be free
21    to come back to work?
22    A.  I don't recall that.
23    Q.  Do you recall during that call you
24    telling them that you would accept the six weeks

Page 175

1    and that go ahead and draft the agreement?
2    A.  I recall telling them to send the
3    agreement.  I don't recall agreeing to it.  I
4    said to send the agreement.  I wanted to see
5    what -- I mean, what were they going to send
6    over, what was going to be in there.  I agreed to
7    the six weeks maybe.  And I was, like, fine,
8    draft it with the six weeks.  I wasn't going to
9    agree to anything on the phone, and if you note,
10    I mean -- never mind.
11    Q.  And isn't it true that you -- I mean,
12    you agreed to the six weeks in the same call
13    where Mike said, look, if the six weeks is not
14    acceptable to you, you can come back to work?
15    A.  Like I said, I don't recall him saying
16    that other half.
17    Q.  Well, in any event, you subsequently
18    changed your mind, correct?  And six weeks was no
19    longer acceptable to you, correct?
20    A.  Based on what was in that agreement, I
21    didn't understand why Jacobsen was represented in
22    it.  I didn't understand -- I still didn't
23    understand why it was coming down to that
24    resolution, but I thought to myself either, A, I

Page 176

1    accept this separation agreement and not have a
2    job or, B, I don't accept it and not have a job.
3    So I was trying to consider it.
4         But I wasn't going to sign it for
5    six weeks if they were going to have me waive all
6    of my past, present, and future rights; and for
7    whatever reason, anything having to do with
8    Jacobsen.  Like, I didn't understand why he was
9    even in that document.
10         (Document marked as Dziubla Deposition
11         Exhibit No. 28 for identification.)
12    BY MR. BOYLE:
13    Q.  So handing you what we've marked as
14    Deposition Exhibit 28, this is the email that you
15    sent to them on the 29th, correct, where you told
16    them that the six weeks was no longer acceptable;
17    and even the six months that you had
18    subsequent -- you had previously suggested, that
19    was no -- that was not acceptable either,
20    correct?
21    A.  Correct.
22    Q.  All right.  And that -- and this --
23    there was a markup of the separation agreement
24    attached to this email, correct?

Page 177

1    A.  Yes, that's what it says, yeah.
2    Q.  And in that markup, do you recall how
3    much severance you were requiring in order to
4    separate from the company?
5    A.  Like I said, I was trying to consider
6    coming to some kind of resolution from -- with
7    them; and I asked for a year's compensation,
8    which was 80,000.
9    Q.  Okay.  Now, you sent this email at
10    1:15 a.m. on Friday, the 29th, correct?
11    A.  Yes.
12    Q.  Okay.  And had you received anything in
13    writing from the company prior to this time
14    telling you that your employment had been
15    terminated?
16    A.  No, but they were trying to get me to
17    sign a separation agreement, so what is -- what
18    part of that says I'm still employed.
19    Q.  My only question is:  Had you received
20    anything in writing saying, Ro, your employment
21    is terminated?
22    A.  No.  That came after.
23    Q.  Okay.  Did anybody from the company tell
24    you your employment had been terminated?

45 (Pages 174 - 177)

Page 178

1    A.  No.
2    Q.  Okay.  And, in fact, hadn't Mike Yazbec
3  said you can come back to work if the six weeks
4  is not acceptable?
5    A.  I don't know why you keep bringing that
6  up.  I do not recall him ever, ever giving me
7  that option, ever.
8    Q.  Well, is it -- you do recall them asking
9  you when are you coming back to work?
10   A.  And I told them I was coming back to
11 work tomorrow in my email.
12        (Document marked as Dziubla Deposition
13         Exhibit No. 29 for identification.)
14 BY MR. BOYLE:
15   Q.  So we've handed you Deposition
16 Exhibit 29.  Do you recognize this document?
17   A.  Yes.
18   Q.  And is this the termination letter that
19 you received from the company?
20   A.  Yes.
21   Q.  Okay.  It's dated October 2nd, 2017,
22 correct?
23   A.  Yes.
24   Q.  Do you remember when you received it?

Page 179

1    A.  No.
2    Q.  You have no recollection of when you got
3  this letter?
4    A.  I don't recall if he emailed it first
5  and then sent the original.  I know I ended up
6  getting an original in the mail.  So I don't --
7  no, I don't.
8    Q.  Okay.  You haven't produced any emails
9  to us.  So do you have an email that says you
10 received this that would establish the date that
11 you received it?
12   A.  From Mike to me?  I mean, I -- that's
13 what I'm saying, I don't know when I -- if it
14 just showed up, then I guess it came on the 3rd,
15 because this would be dated -- it's not like it's
16 same day delivery.
17   Q.  Okay.  But in any event, sometime after
18 the letter was dated you recall receiving it,
19 correct?
20   A.  Yes.
21   Q.  And you have an original of this
22 document; is that correct?
23   A.  Yes.
24   Q.  Okay.  Now -- thanks.

Page 180

1        You said, you know, you told them in
2  your email of September 26th that FMLA was
3  unacceptable and that you would report to work as
4  usual, correct?
5    A.  Uh-huh.
6    Q.  And then on the 27th, the following day,
7  is when you had all these discussions about a
8  year severance or six weeks severance, correct?
9    A.  As part of the separation agreement,
10 yeah.
11   Q.  Right.  Those discussions started on the
12 27th, correct?
13   A.  They actually started -- that phone call
14 happened, if I recall, that same day.  It
15 happened within minutes of me sending that email
16 telling him I was going to come back.
17   Q.  No.
18   A.  They made a phone call.  They're --
19 trust me, they didn't want me coming back.
20   Q.  The -- you --
21   A.  That's why all my stuff is in email,
22 because the two of them are on the phone.
23   Q.  Correct, I stand corrected.  The first
24 call where the four weeks was discussed took

Page 181

1  place on the 26th, and then the discussions about
2  the six weeks, the six months, and the year took
3  place on the 27th and the 29th when you sent that
4  email, correct?
5    A.  They're -- yeah, they're phone calls.  I
6  don't have any --
7    Q.  Right.
8    A.  Like I said, I don't recall the
9  timeline; but you've asked me questions about
10 things that were contained in those phone calls
11 and I agree to some of them.
12   Q.  So my question is:  From the point in
13 time where you started to discuss the severance,
14 which was probably middle of the day on the 26th,
15 until the time you received the termination
16 letter, did you tell anybody at the company that
17 you wanted to come back to work?
18   A.  I wasn't -- I don't recall talking to
19 anyone.
20   Q.  So is this -- your email of the 26th the
21 last expression of your intent to return to work
22 to the company as far as you can recall?
23   A.  Should I have begged to come back when
24 they're presenting me with severance?

46 (Pages 178 - 181)

Page 182

1    Q.  I'm just asking you to answer the
2  question.  If it was -- I'm asking what you
3  recall.
4          Do you recall any discussion of your
5  desire to return to work subsequent to this email
6  that you sent on the 26th?
7    A.  I did not.
8    Q.  Did you tell anybody that you wanted to
9  come back to work?
10   A.  I was being presented with a severance
11 package.
12   Q.  That's not my question.
13   A.  They wanted me out.  Why would I be,
14 like, oh, God, please, let me come back.
15   Q.  My question is:  Did you tell anybody?
16   A.  No, I didn't.
17   Q.  Okay.  Did you tell Mike Yazbec or
18 Mike Power at any point that despite how you felt
19 about this event that you were going to do your
20 best to do the best for the company, for JCA, if
21 you were to come back to work?  Did you ever have
22 that type of a discussion with anybody at the
23 company?
24   A.  With the way things rolled out, I didn't

Page 183

1  think that was even an option.  It was very clear
2  to me that they didn't want me back.  So why
3  would I make that kind of statement?
4    Q.  Was there anything about the company's
5  investigation of your claim that you found
6  inappropriate or that you would have wanted them
7  to do differently?
8    A.  I think it should -- if they were truly
9  taking it seriously, it should have been done by
10 a third party.  I mean, we do all kind of things
11 in construction -- we can't even test and balance
12 our own areas unless we have a third party do it,
13 because it's the most objective -- I just don't
14 think they ever took it seriously.  And if they
15 did, somebody -- a third party would have had an
16 objective viewpoint.
17   Q.  Anything other than that?  Anything
18 about the content of what the company did that
19 you objected to?
20   A.  How they handled everything?
21   Q.  Correct.
22   A.  I don't think how everything rolled out
23 should have happened.  I don't think if you go to
24 somebody with an extreme concern like I did that

Page 184

1  the resolution would be to present them with a
2  severance package.
3    Q.  Well, I'm just talking about the
4  investigation.  Is there anybody that you felt
5  they should have talked to that they didn't?
6    A.  I don't actually know everyone they
7  talked to as part of the investigation.
8    Q.  Is there --
9    A.  I just know some people.
10   Q.  I'm sorry.
11   A.  Sorry.
12   Q.  Is there anything about the timing of
13 the investigation that you felt was lacking?
14   A.  No.
15   Q.  Would you characterize yourself as
16 somebody who is easily offended?
17   A.  Not at all.
18   Q.  Okay.  You like to joke around with, you
19 know, coworkers and friends?
20   A.  Yes.
21   Q.  Have you ever told an offensive joke
22 before?
23   A.  Not that I recall.
24   Q.  Have you ever made a vulgar comment or

Page 185

1  joke or reference to anybody?
2    A.  I mean, I try to do -- I mean, I try to
3  act with everyone's interest in mind and not
4  offend people generally.
5    Q.  Did you ever share jokes of sexual --
6  that are of a sexual nature with coworkers?
7    A.  I don't recall.
8    Q.  Okay.
9          (Document marked as Dziubla Deposition
10          Exhibit No. 30 for identification.)
11 BY MR. BOYLE:
12   Q.  We're handing you what we've marked as
13 Deposition Exhibit 30, which is copies of some
14 text messages that you produced to us during
15 discovery.  Ask you to take a look at this and
16 tell me if you recognize it?
17   A.  I don't recognize the text, but -- and I
18 don't know in what context it was -- who it was
19 with or -- it's a copy and paste of something.
20   Q.  You produced this to us in discovery.
21 So I'm asking you if you recognize it?
22   A.  I don't recognize it.  I'm sorry.
23   Q.  Do you recall sending this text to your
24 coworker Greg Garland on or about July 22nd of

47 (Pages 182 - 185)

Page 186

1 2017?
2    A. I don't.
3    Q. Have you had an opportunity to read the
4 entire thing?
5    A. I am honestly having a hard time
6 focusing on reading it. I just know that I
7 copied and pasted it from there, and, I mean, I
8 don't really understand why this is here. But --
9    Q. Well, have you had an opportunity to
10 read the text itself?
11    A. Yeah.
12    Q. Okay. Would you agree that this would
13 qualify as a sexual -- sexually charged joke?
14    A. Honestly it wasn't anything out of the
15 norm between -- stuff between Greg's ginger jokes
16 and stuff. It wasn't anything out of the norm.
17    Q. So you're saying that this is --
18    A. Greg and I conversed like that -- I
19 mean, this -- first of all, I don't think it's
20 that bad. Second of all, Greg and I conversed
21 like this regularly and also with the rest of the
22 team. It's just something that -- I mean, he had
23 signs around the office about, like, kick a
24 ginger day and stuff like that, so...

Page 187

1    Q. We're not talking about Greg right now.
2 I'm just talking about --
3    A. Well, I'm just trying to explain my
4 relationship with him. It's not like it's,
5 like -- it was -- I think it was in context of
6 our relationship, is what I'm trying to say.
7    Q. So you think in the context of your
8 relationship with a coworker you can send some --
9 an email or a text --
10    A. A text message.
11    Q. -- of this nature?
12    A. And other messages that he's sent in
13 return, in other previous -- yeah, based on our
14 relationship, yeah.
15    Q. And you believe that there's nothing
16 really that bad with this joke?
17    A. I copied and pasted it from the
18 internet, and I was just sharing it with him.
19 There's -- I don't think it was out of context in
20 how we spoke at all.
21    Q. Okay.
22    A. And what part of that says that's from
23 Greg? Like, does it say? I mean, I'm just
24 wondering, because I don't recall sending that to

Page 188

1 him. It's just cold.
2      (Document marked as Dziubla Deposition
3      Exhibit No. 31 for identification.)
4 BY MR. BOYLE:
5    Q. So handing you what we marked as
6 Deposition Exhibit 31. Do you recognize this
7 document?
8    A. I've seen it on the internet.
9    Q. Is this a screen shot of your Facebook
10 page?
11    A. Yes.
12    Q. And is this a post you published on
13 your Facebook page?
14    A. That I shared, yes, it is.
15    Q. Okay. Do you characterize this post as
16 vulgar?
17    A. No, not if you -- if you watch the
18 video, I don't think -- no. Kind of take it out
19 of context doing screen shots like this, but, no,
20 I don't think so.
21    Q. Okay. Do you find it offensive?
22    A. I don't know that I would have shared it
23 if I did.
24    Q. Okay. Can I have that back.

Page 189

1      (Document marked as Dziubla Deposition
2      Exhibit No. 32 for identification.)
3 BY MR. BOYLE:
4    Q. So I'm handing you Deposition
5 Exhibit 32. Is this another post from your
6 Facebook page?
7    A. Yep.
8    Q. Do you recognize this post?
9    A. Yep.
10    Q. Okay. And you posted this on your
11 Facebook page, correct?
12    A. Correct.
13    Q. And do you find this to be an offensive
14 post?
15    A. No.
16    Q. So you -- posts like this do not offend
17 you?
18    A. It was said in good humor to the two
19 people that I copied. It's not like I generated
20 the post. And, again, I mean, I'm a product of
21 20 years in our industry. My threshold for
22 things offending me is pretty high. So when I
23 get offended, it takes something pretty serious
24 to do that.

48 (Pages 186 - 189)

Page 190

1  Q.  So, Ms. Dziubla, I'm handing you what
2  we've previously marked as Deposition Exhibit 15,
3  which is a copy of the complaint in the case.  I
4  want to direct your attention to paragraph 13.
5  Take a second.
6       (Discussion off the record.)
7  BY MR. BOYLE:
8  Q.  Actually let me hand you -- this is the
9  original, so let me hand you that.  This is just
10  my copy.  Thanks.
11       So I want to ask you some questions
12  about paragraph 13.  In that paragraph, you state
13  that JCA made unequal demands on you.  Can you
14  identify any unequal demands that you're
15  referring to in this paragraph of the complaint?
16  A.  I don't know if those -- I don't
17  understand that phrase.  This is, like, weird
18  verbiage.  I don't know what that means.  Like,
19  what I said, I don't know how that translates
20  into -- what does that mean?
21  Q.  I mean, you're accusing JCA of placing
22  unequal demands on you, and I'm asking you what
23  unequal demands did JCA place on you?
24       MR. SEDAEI:  Read the rest of the

Page 191

1  paragraph, and see if that helps you answer the
2  question.
3  BY THE WITNESS:
4  A.  I guess they were basically asking me
5  to, like, not -- if I could guaranty that I
6  wouldn't be emotional about what had happened,
7  and I didn't think that that was fair to ask them
8  of me.  Like, could I guaranty that I would be in
9  front of clients and not lose my shit because of
10  what happened, and I was, like, no I don't think
11  I can.  I'm very upset.
12  BY MR. BOYLE:
13  Q.  And that's what you mean by unequal
14  demands?
15  A.  That's what I'm gathering, yeah.
16  Q.  Any other examples that you can think of
17  that you believe --
18  A.  With respect to this paragraph, that's
19  what it is.
20  Q.  Right.  Is there anybody else that you
21  felt were -- was treated differently with respect
22  to speaking positively about the company?
23  A.  I don't understand the question.
24  Q.  So when you say, you know, unequal

Page 192

1  demands are placed on you, unequal compared to
2  what?  I mean, how they were treating other
3  employees or just -- you just felt that was an
4  unfair demand?  Are you referring to any other
5  employees of JCA that were treated differently
6  than you?
7  A.  If I was, I don't recall specifically.
8  Q.  Okay.  As you sit here -- I just want to
9  know, like, as you sit here, do you -- does
10  anybody come to mind?
11  A.  That was under the same -- I know -- so
12  I don't know that it pertains to this statement.
13  Q.  Well, that's what -- I'm only referring
14  to that statement.
15  A.  That's what I'm saying.
16  Q.  Yeah.  Is there anybody that comes to
17  mind that was treated differently than you as it
18  pertains to your allegation there in
19  paragraph 13?
20  A.  Besides Joe McGuire, Matt Kantro.
21  Q.  Well, it's --
22  A.  I mean, it's not the same situation.
23  Q.  That's -- so I want to be --
24  A.  The exact same situation to me -- like,

Page 193

1  nothing like that has happened to anyone else in
2  the company that I know of.
3  Q.  Okay.
4  A.  So no one has been in the same
5  situation.
6  Q.  Okay.  So let's ask -- you mentioned Joe
7  McGuire.  How was he treated differently than
8  you?
9  A.  Well, that's the thing I was referring
10  to the preservation of his employment when he
11  needed to deal with something personal.
12  Q.  Which was a knee injury, did you say?
13  A.  I don't know.  ACL or something.
14  Q.  Okay.
15  A.  That's what I was probably referring to.
16  Q.  Okay.  And how was he treated
17  differently than you?
18  A.  He wasn't fired.  He wasn't presented
19  with a severance package when he said I need to
20  take time off, because I have a personal issue.
21  Q.  You don't know, do you?  I mean, how --
22  that's why I'm asking you --
23  A.  He's still there.
24  Q.  -- how was he treated --

49 (Pages 190 - 193)

Page 194

1  A.  He's still there.
2  Q.  Did he miss any work?
3  A.  He was allowed to have flextime, so that
4  he could deal with what was going on with him.
5  Q.  How do you know?
6  A.  He told me.
7  Q.  What did he tell you?
8  A.  That's the basic extent of it, that,
9  like, that's -- and then Greg backed it up, too.
10  I mean, that's the basic extent of it is -- I
11  didn't ask all the details.  I mean, it's his
12  personal life.
13  Q.  So I --
14  A.  But they worked with him.
15  Q.  I need to understand correctly.  He had
16  an ACL surgery, I assume?
17  A.  He had some type of physical something
18  that kept him -- that was not acquired at work
19  that kept him from being able to adhere to his
20  responsibilities.  I'm assuming walk-throughs,
21  stuff that required him to be active and about.
22  And they took care of him, because he's been with
23  the company a long time.  He's one of their best
24  PEs --

Page 195

1  Q.  Well --
2  A.  -- and all that stuff.
3  Q.  When you say they took care of him
4  because, okay, you don't know --
5  A.  Oh, yeah, I am assuming that that's why
6  they took care of him.
7  Q.  Okay.
8  A.  They said he was good at what he did.
9  Q.  So what you do know is that he had a
10  physical injury?
11  A.  Right.
12  Q.  And he was gone from work for a period
13  of time and he didn't get fired.  That's what you
14  know, correct?
15  A.  Right.  And he didn't miss out on any
16  pay.
17  Q.  Okay.  And who is the other employee
18  that you mentioned?
19  A.  Matt Kantro.
20  Q.  Okay.  And what were the circumstances
21  with respect to Matt Kantro?
22  A.  I don't know.  I know less about his
23  circumstances.  I just know that he got the same
24  setup as McGuire.

Page 196

1  Q.  And you only know that because somebody
2  told you that?
3  A.  I feel like there's more, but that's all
4  that I can adhere to now.
5  Q.  Okay.  Anybody else?
6  A.  No.
7  Q.  Anybody else that you can think of that
8  would support your allegation in paragraph 13?
9  A.  I mean, I have speculations, but -- I
10  have speculations that Rachael has got some kind
11  of something going on, because of how she's able
12  to show up to these events and get completely
13  shit-faced and still have a job.  I don't have
14  anything concrete from that.
15  I guess I didn't understand that's,
16  you know, why I was in the position I was when
17  both years in a row she got so completely
18  intoxicated that she couldn't even walk.  And
19  Yazbec even said, like -- made a comment, like,
20  doesn't she ever shut up, because she just kept
21  talking.  So I'm sure there's something going on
22  there.
23  Q.  Anybody else?
24  A.  That's it.

Page 197

1  Q.  I'll take that back.
2  I'm sorry, I took it one second too
3  soon.  I also wanted to ask you about
4  paragraph 18.  You state in paragraph 18 that in
5  retaliation JCA subjected plaintiff to unequal
6  terms and conditions and swiftly terminated her
7  employment.  Other than --
8  A.  Wait, where are we again?
9  Q.  Paragraph 18.
10  A.  There's two 18s.
11  MR. SEDAEI:  Of Count I, I believe.
12  BY THE WITNESS:
13  A.  Of Count I.  Okay.
14  Okay.
15  BY MR. BOYLE:
16  Q.  Okay.  What other employee do you
17  believe received more favorable treatment than
18  you?  Anybody other than you've already
19  identified?
20  A.  No.
21  MR. BOYLE:  Okay.  We're up to 33.
22  (Document marked as Dziubla Deposition
23  Exhibit No. 33 for identification.)
24

50 (Pages 194 - 197)

Page 198

1  BY MR. BOYLE:
2      Q.  Do you recognize Deposition Exhibit 33?
3      A.  Yes.
4      Q.  And are these copies of a text exchange
5  that you had with Rachael, looks like, beginning
6  at 9:41 p.m. on -- maybe 8:28 p.m. on Monday,
7  September 18th, which was the date of the golf
8  outing?
9      A.  Yes.
10     Q.  Okay.  Is this the same Rachael that you
11 just referred to?
12     A.  Yes.
13     Q.  Okay.  So you were texting with her on
14 the night of the golf outing regarding what
15 happened at the golf outing, correct?
16     A.  Yeah.
17     Q.  Okay.  And, again, these documents were
18 produced by you to us.  Is this a complete -- and
19 I will represent to you this is everything you
20 gave to us.  Is this a complete exchange of your
21 text discussion with Rachael that night?
22     A.  Yeah, to the -- yeah.
23     Q.  So turning to the third page, which is
24 marked No. 718, Bates No. 718, you told Rachael

Page 199

1  that you want to never come back to the company;
2  is that correct?
3      A.  I was pretty humiliated.  Yeah.
4      Q.  And a couple pages later, you also told
5  her that you would only leave JCA if it was to
6  work for yourself, the top of that page.
7      A.  Which page?
8      Q.  724.
9      A.  Yes.
10     Q.  Did you -- and that's -- you're
11 referencing the discussion you already told us
12 about with Serg where you said you wouldn't leave
13 unless it was to work for yourself, correct?
14     A.  Correct.
15     Q.  Okay.  So do you recall when in 2017 you
16 started to look for new employment?
17     A.  No.
18     Q.  Okay.  Was it before you left JCA?
19     A.  No.
20     Q.  It was not?
21     A.  Nope.
22         MR. BOYLE:  Get this marked, please.
23         (Document marked as Dziubla Deposition
24          Exhibit No. 34 for identification.)

Page 200

1  BY MR. BOYLE:
2      Q.  So handing you Deposition Exhibit 34.
3      A.  Yep.
4      Q.  This is some posts that you produced to
5  us in discovery.  I want to start towards the
6  bottom of the page.  It was the exchange between
7  you and Gurbeer Sanghera?
8      A.  Uh-huh.
9      Q.  Dated September 15, 2017.  Do you see
10 that?  Take a minute to --
11     A.  The longer -- the bigger of the two
12 emails in the middle?
13     Q.  It's at the bottom of -- it's in the
14 middle.  There's a line pointing to follow-up
15 consulting work.
16     A.  Okay.
17     Q.  And then on September 15th, 2017.
18     A.  Yeah.
19     Q.  Who is Gurbeer Sanghera?
20     A.  He is -- I don't know his exact title
21 there, but he's, like, Kyle's second in command
22 at Talent Hitch.
23     Q.  So he works at Talent Hitch, correct?
24     A.  Correct, yeah.

Page 201

1      Q.  And that's the company that you went to
2  work with immediately after you left JCA,
3  correct?
4      A.  Correct.
5      Q.  Okay.  And in this exchange that was on
6  September 15th, he says that you were in the week
7  prior talking about work that you could do for
8  Talent Hitch; is that correct?
9      A.  Right.  Yep.
10     Q.  All right.  So you were, in fact,
11 looking to perform work for Talent Hitch prior to
12 leaving JCA, correct?
13     A.  In addition to working for JCA.  It was
14 supposed to be consulting work done on the side
15 while working with JCA.  I had no intention of
16 leaving JCA.  This was to be done as I knew --
17 Kyle was the one that was at Hard Hat Hub.  I had
18 a relationship with him.  We were friends.  He
19 started his own company Talent Hitch from Hard
20 Hat Hub, and he said, Ro, we recruit for the
21 construction industry, you have experience in the
22 construction industry, come in and talk to our
23 guys, so they can know how to pitch positions and
24 stuff, so they know what an actual project

51 (Pages 198 - 201)

Page 202

1  manager is, so they know what an estimator does.
2  Come in and teach our guys.
3        So I gave them a quote on what it
4  would cost for me to do that in my free time.
5  That's what this is.
6     Q. And you feel like you could have done
7  that in addition to your work at JCA?
8     A. Absolutely. I've got a full-time job
9  now and I'm running a business. Yeah,
10  absolutely.
11     Q. And that business -- you were also
12  running that business at the same time, right?
13     A. Yeah.
14     Q. That business being your personal
15  fitness business?
16     A. Yeah.
17     Q. Okay. So this was solely to do contract
18  work while you were working at JCA?
19     A. Correct.
20     Q. Okay. So let's go to the top now. This
21  is a separate exchange. It looks like it starts
22  on September 28th.
23     A. Okay.
24     Q. And that's between you and Kyle, and you

Page 203

1  said he's the owner of Talent Hitch, correct?
2     A. Correct.
3     Q. All right. And so you tell Kyle on
4  September 28th, funny how things work out. Looks
5  like I'm looking for a new job after all.
6     A. Right.
7     Q. Okay. So you were reaching out to
8  Talent Hitch to tell them that you were looking
9  for a new job on September 28th?
10     A. Didn't look like things were going in my
11  direction, so, yeah, I was reaching out to him
12  and saying it's ironic that here we are talking
13  about me doing this as a side job and, you know,
14  things are going -- it didn't look like I was --
15  my employment was going to be preserved at JCA.
16  So I reached out to him.
17     Q. Okay. And he immediately responds that
18  so you want to recruit. So that he's suggesting
19  you could go work with Talent Hitch as a
20  recruiter?
21     A. Yeah, which is funny because the reason
22  why I reached out to him is because he was a
23  recruiter. My implication for that message was
24  for him to go find me a job, not to go work

Page 204

1  for him.
2     Q. Okay. But you responded that it
3  wouldn't hurt to give it a shot, so you were open
4  to going and working with him?
5     A. Well, I was, like -- yeah, I mean, I
6  was, like, I guess, you know. If things turn out
7  the way they -- they're going, I mean, it
8  wouldn't hurt to give it a shot.
9     Q. Okay. And then the next thing you tell
10  him on that same day, which is the 28th, that
11  they let you go. They, you're referring to JCA?
12     A. I don't see it. Where is it?
13     Q. So just keep going to the right. You
14  have to go -- read left to right. It says, sorry
15  that didn't sound enthusiastic LOL. I'm just not
16  happy about being in this position. They let me
17  go, Kyle.
18     A. Oh, yes.
19     Q. Okay. So you told Kyle on
20  September 28th that JCA let you go?
21     A. Yes.
22     Q. Okay. And then just continuing now, you
23  got to go back, so he offers to have you come
24  into the office on Monday to talk to Gurbeer and

Page 205

1  him. Do you see where --
2     A. Yeah.
3     Q. Okay. And Monday would have been
4  October 2nd, correct?
5     A. Okay.
6     Q. I have a calendar.
7     A. Yeah.
8     Q. But I'll let you know --
9     A. Sure.
10     Q. -- Monday is the 2nd.
11        So did you go in and talk to him
12  that Monday?
13     A. That I don't recall.
14     Q. Okay. Do you recall when you started
15  with Talent Hitch?
16     A. No, but I'm sure there's documents that
17  have the actual date. I don't recall when I
18  actually started with them. It was very close
19  after I was let go.
20     Q. Okay. Well, so if I was able to provide
21  documents that showed that you were already
22  recruiting on their behalf on October 3rd, which
23  was the next day --
24     A. Okay.

52 (Pages 202 - 205)

Page 206

1    Q.   -- would that help you recall whether or
2   not you spoke with them on October 2nd, the day
3   before?
4       A.   Yeah.
5       Q.   Okay.  And they offered you the position
6   that day?
7       A.   Yeah, it was just kind of, like -- I
8   mean, it wasn't, like, a -- you know, they're a
9   start-up company.  It's not, like, a formal
10  position.  It was kind of, like, hey, you know,
11  let's see how this goes, if you can get, you
12  know, legs in this.  I mean, I had never done it
13  before.  So it wasn't, like, anything formal.
14      Q.   Okay.  Okay.  Thanks.
15          (Document marked as Dziubla Deposition
16           Exhibit No. 35 for identification.)
17  BY MR. BOYLE:
18      Q.   I'm handing you document -- or
19  Deposition Exhibit 35.  Take a minute to look
20  through this.  It's something you gave us in
21  discovery, and I have just a couple questions to
22  ask you about it.
23      A.   Okay.
24      Q.   Do you recognize the document?

Page 207

1       A.   Yes.
2       Q.   Can you tell me what is it?
3       A.   Just journaling.  Just -- I mean, I type
4   a lot faster than I write, so I was just
5   journaling and documenting how I was feeling, and
6   I tend to be kind of sarcastic in tough
7   situations.  So it's just me writing my thoughts
8   down.
9       Q.   Okay.  So this is a personal journal
10  that you created?
11      A.   Yeah.
12      Q.   And the first page was dated
13  September 20th, 2017.  Is that when you started
14  doing this journaling?
15      A.   I started one prior to that.  It was
16  handwritten, I think.  And then I started this,
17  because, again, I had a lot to put down and I --
18  it was just easier to type it.
19      Q.   Do you recall when you started the prior
20  one?
21      A.   No.
22      Q.   Was it following your -- the event that
23  took place at the golf outing?  Was it after the
24  golf outing?

Page 208

1       A.   Yes.
2       Q.   Okay.  So you had started another one
3   after the golf outing, and then you continued
4   with this, and this is just typewritten.  You
5   went from handwritten to typewritten?
6       A.   Right.  But you referred to the first
7   one as another one.  That was the first one.
8       Q.   I'm sorry.
9       A.   Yeah.
10      Q.   That was probably unclear.
11      A.   Okay.
12      Q.   So the golf outing --
13      A.   Yeah, I started --
14      Q.   -- occurred, and then you started a
15  handwritten journal, correct?
16      A.   I believe so, yes.
17      Q.   And then you changed over to a
18  typewritten journal, and that's what this is,
19  correct?
20      A.   Correct.
21      Q.   All right.  And tell me again why you
22  created this?
23      A.   Because I had a lot to put down, and it
24  was easier for me to type it.  I don't -- I don't

Page 209

1   know, I don't have the patience to write,
2   handwrite.  It's gotten worse actually.
3       Q.   Okay.  So I'd like to refer you to your
4   entry on September 23rd, 2017.  It starts on
5   page 807.
6       A.   Uh-huh.
7       Q.   Okay.  And I'm going to be asking you
8   about something that appears on page 808.  Tell
9   me when you've got there.
10      A.   You want me to start on 807?
11      Q.   I just wanted to let you know that I'm
12  going to be asking you about your entry for
13  September 23rd.  Okay?
14      A.   Okay.
15      Q.   So on page 808, second paragraph, you
16  state, I've also started looking online for jobs
17  again and then started thinking how do I explain
18  this short-term employment.  I'm really burnt out
19  in the construction industry.  Do you see where
20  I'm reading?
21      A.   Yes.
22      Q.   Okay.  So, in fact, you started looking
23  for employment on the 23rd or even prior to that
24  date?

53 (Pages 206 - 209)

1     A.  I guess that's what it looks like.
2     Q.  Is that accurate?  Do you recall that?
3     A.  It's what I wrote.  I mean, why would I
4  lie to myself?
5     Q.  Okay.  So, again, you were looking for
6  employment before your employment with JCA
7  terminated, correct?
8     A.  At no part of that -- again, it's not
9  like everything was going as if they wanted to
10  preserve me.  Every single action they took was
11  as if they wanted to get rid of me.  I'm not an
12  idiot.  I need -- like I said, I needed a job.  I
13  needed pay.  I was going to look -- my best
14  interest was to start looking, because it's not
15  like I was -- I mean, they had no intention of
16  preserving my employment.  What am I going to do?
17  Wait until -- I'm going to get the pipeline
18  loaded to -- it's going to happen.
19         (Document marked as Dziubla Deposition
20         Exhibit No. 36 for identification.)
21  BY MR. BOYLE:
22     Q.  Handing you Deposition Exhibit 36.  Can
23  you tell us what this is?
24     A.  Looks like a text message between me and

1  a good friend of mine.
2     Q.  And her name is Claudia Pritchett?
3     A.  Yes.
4     Q.  That's a personal friend of yours?
5     A.  Yes.
6     Q.  Okay.  Have you been friends for a long
7  time?
8     A.  Yes.
9     Q.  Directing your attention to the second
10  page, you are speaking to Claudia.  You say, I'm,
11  like, dude, I get a concussion and work through
12  it and you guys say you'll cover me with my
13  hysterectomy, but I get assaulted at a work
14  function and I get six weeks because I've only
15  worked there a year.
16     A.  Uh-huh.
17     Q.  Do you see that?
18     A.  Yes.
19     Q.  Okay.  So let me ask first about your
20  concussion.  When did that occur?
21     A.  I don't recall when it exactly happened.
22     Q.  Can you give me an approximate date?
23     A.  It was before the golf outing.
24     Q.  How far -- how long before?

1     A.  I have no idea.
2     Q.  A month?  Was it a month?
3     A.  Not a month.  No, not a month.
4     Q.  Less than a month?
5     A.  No, more than a month.
6     Q.  Okay.
7     A.  Before the golf outing.
8     Q.  Sometime in 2017.  The golf outing was
9  in September.
10     A.  I'm trying to think.  I had to do the
11  battle -- I don't remember.  I mean, I was only
12  there for a year, so, I mean, it was while I was
13  there.
14     Q.  How did it happen?
15     A.  I was at cross fit working out on my own
16  time, and I went to do a power jerk, and I let go
17  of the bar and it fell on my head.
18     Q.  Did you have to go to the hospital?
19     A.  Nope.
20     Q.  You did not?
21     A.  I did not go to the hospital, but I
22  actually -- when I got back to work, one of the
23  guys, Jason Hawkins, I was talking to him about
24  one of his bids, and he noticed -- and he's,

1  like, are you okay?  And I'm, like, what do you
2  mean.  And he's, like, I don't know, you're kind
3  of -- you're a little off today.  And I was,
4  like -- then I started thinking and I started
5  paying attention to my mannerisms, and I was,
6  like, oh, maybe this did have an impact on me.
7         And then I went and got checked out.
8  And flying colors.  She said -- she's, like, you
9  answer half these questions better than people
10  with -- you know, without concussions.  He's,
11  like -- she's, like, there's no way you have a
12  concussion.
13         But the guys -- you know, Ed Bowen
14  and, was it, Larry, you know, they're both dads,
15  and they're, like, you know, you really should
16  take some time off for yourself, you shouldn't
17  work so hard, you know, you should give you some
18  time -- you know, they were very concerned and
19  they wanted to encourage me to talk to them about
20  taking time off.
21         And I'm, like, we're just too busy,
22  you know.  You know, and the doctor said I didn't
23  have one.  I had, like -- I think I even had an
24  MRI done.  So, you know, I didn't want to take

54 (Pages 210 - 213)

Page 214

1 time off. I just kept working.
2     Q. Okay. So you were never actually
3 diagnosed with a concussion?
4     A. Correct.
5     Q. Okay. Have you had any lingering
6 effects from that event?
7     A. No. I mean, it's not -- I have vertigo,
8 but, I mean, it could be a combination of things.
9 I mean, that's one of the side effects, but I've
10 had vertigo on and off for years.
11     Q. Okay. So flipping to the next page
12 then, you're discussing with her why the six
13 weeks that the company offered you was
14 unacceptable to you. But in the -- about halfway
15 down through the page, you say to Claudia that
16 you have the -- you've texted, bunch of assholes.
17     A. Yeah.
18     Q. Who are you referring to?
19     A. Probably Steve.
20     Q. Okay. And then the next text says
21 meanwhile I'm franticly looking for a job?
22     A. Right.
23     Q. So on the 27th, you were franticly
24 looking for a job?

Page 215

1     A. I might have exaggerated a little bit.
2 But, again, it's not like they were looking to
3 preserve my employment, at least, that was my
4 perception of it.
5         (Document marked as Dziubla Deposition
6         Exhibit No. 37 for identification.)
7 BY MR. BOYLE:
8     Q. So Deposition Exhibit 37 is an email
9 exchange between you and Matthew Davison --
10     A. Okay.
11     Q. -- dated September 27th, 2017, at
12 11:47 a.m.
13         Who is Matthew Davison?
14     A. Looks like a recruiter.
15     Q. Well, when you say looks like, I mean,
16 can you be a little bit more specific? Who are
17 you emailing?
18     A. I don't know him personally. He's a
19 recruiter. He's just a recruiter that I think
20 might have contacted me previously.
21     Q. Okay. So he's a recruiter. You know
22 he's a recruiter, because you're emailing him?
23     A. Yeah, Talent Consultant.
24     Q. All right. So he -- there's an email

Page 216

1 exchange between you and him back in July,
2 correct, where he's reaching out to you saying
3 Hope all is well. I want to drop you a note to
4 see how everything is going on your end.
5     A. Right.
6     Q. Okay. And then the next exchange is you
7 contacting him on the 27th saying, I am sorry for
8 not replying back to you. It's been a hell of a
9 ride these last few months, and it looks like I'm
10 going to have to start looking for a job
11 officially.
12     A. Uh-huh.
13     Q. Do you see that sentence?
14     A. Yes.
15     Q. Okay. First of all, what did you mean
16 by it's been a hell of a ride the last few
17 months?
18     A. I'm not sure.
19     Q. You don't know what you meant by that?
20     A. I don't know what I was referring to,
21 no. I mean, it's a recruiter, too. It's not
22 like I'm going to tell him my whole story, be,
23 like, hey, man, this is what happened and -- you
24 know, I mean, I'm going to blow over stuff. I

Page 217

1 mean, it's not for him to know. He doesn't need
2 to know what's been going on in my life, you
3 know. Plus I get to explain away what's
4 happened, why I haven't contacted him since July.
5 I don't know that it was anything specific.
6     Q. Okay. But you are advising him that
7 you're looking for a job officially as of that
8 point in time?
9     A. Yeah, I have to tell him it's official,
10 so that he takes it serious.
11         Here.
12     Q. So I'm going to hand you your amended
13 answers to interrogatories. Referring you to
14 interrogatory No. 11.
15         MR. SEDAEI: What exhibit number is
16 this?
17 BY MR. BOYLE:
18     Q. You were asked to --
19         THE WITNESS: Oh, 3.
20 BY MR. BOYLE:
21     Q. -- to provide information regarding all
22 of your employers going back to September 26th of
23 2015.
24     A. Uh-huh.

55 (Pages 214 - 217)

Page 218

1 Q. And you've provided a table containing a
2 number of your employers going all the way back
3 actually to 2014. Is this a complete statement
4 of all of your employers during that time period?
5 A. I think we established earlier that I
6 left off -- I think Atlas and GE are left off.
7 We established that earlier, that there was some
8 inconsistency there.
9 Q. Right. I think Atlas, I think they
10 might be out of that time frame. This only goes
11 back to 2014.
12 A. Yeah, I'm not sure, but --
13 Q. Okay. But in any event, these are all
14 your employers --
15 A. Yep.
16 Q. -- since March of 2014?
17 A. Yeah.
18 Q. Okay. And starting at -- with Talent
19 Hitch, which is the company that you went to work
20 for immediately after JCA, you list the dates of
21 employment as October 2017 through March 2018?
22 A. Uh-huh.
23 Q. Are those correct dates?
24 A. Those are the dates I listed. I mean,

Page 219

1 we just went over that. What was that -- yeah, I
2 guess, yeah. October 3rd --
3 Q. Okay.
4 A. -- I started.
5 Q. All right. And you worked through March
6 of 2018 and you left Talent Hitch to go work for
7 Cornerstone, correct?
8 A. Yeah, Cornerstone/Broadway Electric.
9 Q. Okay. Now, did you have any problems,
10 performance type problems, when you were working
11 at Talent Hitch, job performance?
12 A. No.
13 Q. Okay. Did you have any conflicts with
14 your coworkers?
15 A. Nothing out of the ordinary that
16 wasn't --
17 Q. Okay. Do you recall having a coworker
18 there by the name of Sam?
19 A. Yes.
20 Q. Okay. Did you have problems with Sam?
21 A. Sam charged at me and tried to
22 physically attack me after we had a conversation
23 about me trying to help him with how he was
24 handling some of his clients and stuff. And with

Page 220

1 me being portrayed as the expert in the industry,
2 I was trying to help him out.
3 And went to leave the room to exit
4 the argument, and for whatever reason, he felt
5 the need to tell me to go fuck myself; and I was,
6 like, okay, so then I walked away. And he
7 started charging after me; and one of my pregnant
8 coworkers stood between us as he tried to
9 literally come after me, and I got as far away as
10 possible as I could from him.
11 Q. So you had a confrontation with Sam?
12 A. He had a confrontation with me. I was
13 trying to get away from him, because he just lit
14 up for no reason.
15 Q. Okay. And how did that situation get
16 handled by Talent Hitch?
17 A. We agreed that I would work from home.
18 I believe that was the outcome, is that -- and
19 then I would come in for meetings, I think, if I
20 needed to come into the office. Just because of
21 camaraderie and stuff, it's easier to team build
22 and stuff if you're in person.
23 But it really set me up as a -- at a
24 disadvantage to do that, because I couldn't

Page 221

1 overhear things that were going on with other
2 clients. I lost my sixth sense to listen to what
3 was going on in the office, because I was at home
4 isolated from everything.
5 Q. And so were you dissatisfied with the
6 manner in which Talent Hitch resolved that
7 situation?
8 A. No, not at all. I mean, he was doing
9 the best he could. I mean, not at all.
10 Q. I want to show you a document that you
11 gave us in discovery. It's an exchange that you
12 had with Latavia.
13 A. Okay.
14 Q. And do you know who Latavia is?
15 A. Talk Space. I'm just glancing at the
16 cover sheet there.
17 Q. Yeah. February 14th. I'd like you to
18 just read that second paragraph if you wouldn't
19 mind.
20 A. I sent an email to my boss Kyle, owner
21 at Talent Hitch, about what he planned to do
22 about the whole Sam situation, and he responded
23 with how -- quotes, how has your communication
24 been with each other. And to me that says Sam

56 (Pages 218 - 221)

Page 222

1  gets a pass if we can get you -- wait. If we can
2  get you both to stay and be happy. My reply on
3  the email was that's not the response I was
4  looking for. Let's talk Friday. I'm so pissed I
5  want to quit on the spot, but I also don't want
6  to end on bad terms, so I still get my
7  commission. No one has contracts. I don't want
8  anyone to have to sue anyone. I also totally get
9  where Kyle is coming from. Not all employees get
10 along.
11     Q. Okay. That's what I want.
12        Having read that, does that change
13 your prior testimony about whether or not you
14 were satisfied with the manner in which that
15 whole situation was resolved?
16     A. At the time I was upset.
17     Q. Okay.
18     A. Am I not allowed to get upset? I don't
19 under -- I mean, like, I just don't -- I'm not
20 allowed to get upset apparently.
21     Q. But the situation was bad enough that
22 your immediate reaction was you wanted to quit,
23 correct?
24        Isn't that what you told your

Page 223

1  counselor?
2     A. Yeah, it's there.
3        You know, to kind of put things in
4  perspective --
5     Q. Let's -- I'll -- let's just --
6     A. Well --
7     Q. Your attorney can follow up with any
8  questions he has.
9     A. Okay.
10    MR. SEDAEI: I'll give you a chance to
11 put things in perspective.
12 BY MR. BOYLE:
13    Q. So you're currently working at
14 Cornerstone Construction. You started there in
15 March of 2018, correct?
16    A. Yes.
17    Q. And what's your job title?
18    A. I'm an estimator/project manager.
19    Q. And how much are you paid?
20    A. $90,000 per year.
21    Q. Okay. Other than Talent Hitch,
22 Cornerstone, and your personal fitness business,
23 have you had any other employment since you left
24 JCA?

Page 224

1     A. No.
2     Q. Okay. Now, you're seeking damages in
3  this action, correct?
4     A. Yes.
5     Q. And, in fact, in your 26(a) disclosures,
6  you indicate that you're seeking emotional
7  distress damages in the amount of $300,000,
8  correct?
9     A. Yes.
10    Q. Do you see that?
11    A. Right.
12    Q. Okay. Let me ask you how you came up
13 with that number?
14    MR. SEDAEI: I -- you shouldn't disclose
15 anything you discussed with any of our attorneys.
16 BY THE WITNESS:
17    A. I don't know that I recall.
18 BY MR. BOYLE:
19    Q. You don't recall?
20    A. I thought I answered you. I don't
21 recall.
22    Q. Okay. Now, you're alleging that you
23 suffered emotional distress as a result of the
24 events we've been discussing, correct?

Page 225

1     A. Yes.
2     Q. Okay. What is it specifically that you
3  allege caused your emotional distress?
4     A. The physical act of the incident with
5  Jacobsen and the results of my employment with
6  JCA has definitely impacted me on a personal and
7  a professional level.
8     Q. Anything else?
9     A. That's -- I don't know. Did you want me
10 to elaborate, or I don't understand --
11    Q. No. I just want to --
12    A. -- anything else.
13    Q. So you've identified those two things
14 have -- you're alleging have caused you to suffer
15 the emotional distress you are seeking to be
16 compensated for?
17    A. It's a huge -- yeah, it's a huge --
18    Q. I'm not asking you to -- you know, I'm
19 just asking you if there's anything other than
20 those two things?
21    A. No, that's pretty much it.
22    Q. Okay. So with respect to, you said, you
23 know, the results of your employment. How did
24 that cause you emotional distress?

57 (Pages 222 - 225)

Page 226

1      Go -- yeah. Answer this question
2  and we'll -- how did that cause you to suffer
3  emotional distress?
4    A.  Just for the fact that I stood up for
5  myself and I lost my job basically.
6      MR. BOYLE:  Okay.  Do we need to go off
7  the record?
8      THE VIDEOGRAPHER:  Yeah.
9      We are going off the record at
10  3:18 p.m.  This is the end of media set 3.
11      (A short recess was taken.)
12      THE VIDEOGRAPHER:  We are back on the
13  record at 3:40 p.m.  This is media set 4.
14      EXAMINATION
15  BY MR. RUFF:
16    Q.  Good afternoon, Ms. Dziubla.  My name is
17  Ed Ruff, and I represent Peter Jacobsen.  Okay?
18    A.  Yeah.
19    Q.  I will be asking you some questions
20  about the event and your interaction with
21  Mr. Jacobsen.  Okay?
22    A.  Yes.
23    Q.  If at any time you don't understand me
24  or don't understand my question, please let that

Page 227

1  be known.  Okay?
2    A.  Okay.
3    Q.  And we'll just stop and have the
4  question repeated or rephrased.  All right?
5    A.  Okay.
6    Q.  How are you doing so far?
7    A.  I don't know how to answer that.
8    Q.  Are you okay?
9    A.  I'm fine to proceed, yes.
10    Q.  Okay.  You understand that the celebrity
11  guest at The Kev on September 18th, 2017, was
12  Peter Jacobsen?
13    A.  Yes.
14    Q.  Have you ever looked into Mr. Jacobsen's
15  background?
16    A.  Not -- after the incident, I did.
17    Q.  Okay.  Did you ever look into it before
18  the incident?
19    A.  I had no idea.  I just thought he was a
20  friend of Jim's.
21    Q.  Did you understand prior to the day of
22  The Kev that there was going to be a celebrity
23  there?
24    A.  Yeah, like there is every year.

Page 228

1    Q.  And this had been your second event?
2    A.  Correct.
3    Q.  Okay.  And so you understood that every
4  year they do have a celebrity come?
5    A.  Correct.
6    Q.  All right.  Who was it the year before?
7    A.  I want to say it was a hockey guy.
8    Q.  Do you know who it was?
9    A.  No idea.
10    Q.  Did you know before coming out to River
11  Forest Country Club on September 18th, 2017, that
12  Peter Jacobsen was going to be the celebrity?
13    A.  No.
14    Q.  So there was no prior publication or
15  pamphlet or anything on the emails that said, you
16  know, here is our celebrity?
17    A.  If there was, I didn't see it.
18    Q.  So before the event itself, you did not
19  have any knowledge of who Peter Jacobsen was?
20    A.  No, not at all.
21    Q.  You have looked him up after?
22    A.  I did.
23    Q.  And where did you look him up on, what
24  site?

Page 229

1    A.  Google.
2    Q.  I'm sorry?
3    A.  Just Google.
4    Q.  Did you look him up on Wikipedia?
5    A.  I don't know what the search brought up
6  on Google, if it was a Wikipedia thing.  Just an
7  autobiography and that's all.
8    Q.  And what did you learn about him?
9    A.  I think he has a house in Florida that's
10  actually near my in-laws, I think, if it's the --
11  I mean, I don't even -- it's speculating.
12    Q.  Did you look that up prior to hiring an
13  attorney?
14    A.  I don't recall.
15    Q.  Did you look him up prior to filing a
16  lawsuit?
17    A.  Yes.
18    Q.  Did you look him up prior to reporting
19  or scheduling an interview with the EEOC?
20    A.  No, I don't think so.
21    Q.  Do you understand Mr. Jacobsen to be an
22  NBC broadcaster?
23    A.  No.
24    Q.  When you looked him up, were you

58 (Pages 226 - 229)

Page 230

1　familiar with his charity work?
2　　A. I heard about charity and that he was
3　kind of a comedian. Like, that's what I read,
4　that's why I read it. And I was like, oh,
5　well -- I mean, it explains his position at the
6　event.
7　　Q. And you said that you found out that he
8　had a home in Florida. Did you -- what else did
9　you learn, if anything?
10　　A. I mean, I found out a Peter Jacobsen had
11　a home in Florida, and I was just, like, this is
12　stupid. Why I am looking -- I mean, it could
13　have been somebody else for all I know. I mean,
14　I didn't, like, dive into it and research it.
15　　Q. Right. But -- well, I'm not asking you
16　about the home itself. I'm asking about Peter
17　Jacobsen. What else did you find out? You
18　talked about his charity work. You talked about
19　a home in Florida. Anything else that you
20　learned about him?
21　　A. That's it.
22　　Q. And then you learned that he does like
23　to make jokes out on the golf course, comedian
24　you said?

Page 231

1　　MR. SEDAEI: Objection, mischaracterizes
2　the witness's testimony.
3　　　　But answer if you know the question.
4　BY THE WITNESS:
5　　A. I just read comedian. I don't know
6　where he did his comedian work at.
7　BY MR. RUFF:
8　　Q. Did you understand the extent of an
9　organization that he's involved in of what they
10　contributed to various nonprofits in the United
11　States?
12　　A. No idea.
13　　Q. Did you understand that he has a focus
14　connected to children's health and education?
15　　A. No, I didn't.
16　　Q. So you don't know the juvenile diabetes
17　research, Randall Children's Hospital, March of
18　Dimes, none -- you don't know about any of that
19　then?
20　　A. I just know charity. That's it. I
21　don't know any specifics.
22　　Q. Do you know about any of his
23　accomplishments on the -- in the golf arena?
24　　A. No idea.

Page 232

1　　Q. Did you know that he received the Payne
2　Stewart Award?
3　　A. No.
4　　Q. Do you know what that is?
5　　A. I have no idea.
6　　Q. Do you know who Payne Stewart was?
7　　A. No idea.
8　　Q. Do you know what it means to be on the
9　tour?
10　　A. I could take a swing at what I think it
11　means.
12　　Q. What do you think it means?
13　　A. That they're playing a series of games
14　for -- and this is all, like, referenced on Happy
15　Gilmore, playing a series of games to get -- to
16　win. So it just narrows down the pool until
17　somebody wins.
18　　Q. Do you know what it means to be a tour
19　event winner?
20　　A. No.
21　　Q. Can you name any of the major golf
22　tournaments?
23　　A. No.
24　　Q. Do you watch golf at all?

Page 233

1　　A. Against my will, my husband puts it on.
2　I think I saw Tiger Woods did pretty good a
3　couple -- a month ago or something like that. I
4　wouldn't choose to watch it.
5　　Q. Did you watch any of the golf this past
6　weekend?
7　　A. No.
8　　Q. Do you know what a major event is in
9　golf?
10　　A. I have no idea.
11　　Q. You're not a golfer, correct?
12　　A. No, I'm not a golfer.
13　　Q. I believe in -- somewhere, I believe it
14　may have been your diary or in the EEOC filings,
15　you indicated you have golfed less than -- as of
16　September 18th, 2017, have golfed less than five
17　times?
18　　A. That's pretty accurate.
19　　Q. Have you golfed any since the
20　tournament --
21　　A. No.
22　　Q. -- outing, The Kev?
23　　A. No.
24　　Q. Do you own golf clubs?

59 (Pages 230 - 233)

Page 234

1    A.   No.
2    Q.   How long had it been prior to
3  September 18th, 2017, that you had actually
4  played golf?
5    A.   I think I referenced earlier that there
6  was a JCA outing where we went to Topgolf.  That
7  would have been where we were shooting stuff off
8  of the -- where -- the ledge into your scoring
9  lanes.
10    Q.   And Topgolf is played inside, correct?
11    A.   It's half inside, half outside.  It's
12  the one in -- or, at least, the one in -- I think
13  we went to the one in Naperville.  So, like,
14  you're inside covered, and you hit it off a
15  ledge, and it lands in a pool of -- with the
16  other balls.
17    Q.   It wasn't -- so when you did this at
18  Topgolf, it wasn't on an actual golf course then?
19    A.   Correct.
20    Q.   Okay.  And my question was:  When had
21  you last played on a golf course?
22    A.   Oh, probably The Kev the year prior, I
23  would think.
24    Q.   Okay.  And had you gone to Topgolf

Page 235

1  before or after the year prior Kev event?
2    A.   That was in between.  So it was after
3  the second -- the first Kev event.
4    Q.   And when you were at The Kev event the
5  year prior, did you actually play all 18 holes?
6    A.   No.  I was just kind of screwing around.
7  You know, you screw around on the thing.  I
8  probably -- to my recollection, I've never played
9  a full 18 holes of golf ever.  I don't think I
10  could handle that.
11    Q.   Have you played a full nine holes?
12    A.   I remember once when I was in my -- I
13  dated a guy when I was, like, 17 that we went to
14  a golf course, and I think that was nine holes,
15  and I told him I couldn't take it anymore because
16  it was so boring and we left.
17    Q.   Does your husband Dan play golf?
18    A.   No.
19    Q.   And so you two have never gone golfing
20  together?
21    A.   No.
22    Q.   Okay.  Can you tell us what types of
23  clubs might be in a typical golf pack?
24    A.   I know there's a thing called a putter,

Page 236

1  because that's in mini golf.  I know that there's
2  something that's a big golf club that allows you
3  to get your drive for distance.  That's about it.
4    Q.   Other than something you hit your drives
5  with, do you know what that -- first of all, do
6  you know what that's called?
7    A.   Nine iron; is that right?  Do I get to
8  know if that's right?  No.  Okay.
9    Q.   So --
10    A.   I don't know.
11    Q.   Okay.  Do you know what type of golf
12  clubs are used to tee off, what the name of that
13  is?
14    A.   Uh-uh, no.
15    Q.   Do you know what type of club is used in
16  the fairway?
17    A.   No.
18    Q.   Do you know where the fairway is?
19    A.   It's someplace between where you start
20  and where the hole is, I guess.
21    Q.   Do you know if there's any difference in
22  the names of the clubs the closer you get to the
23  green?
24    A.   I know each club has a different name,

Page 237

1  because that's how you tell the guy on the course
2  what you need.  But that's all I know.  I don't
3  know what order they're in.
4    Q.   And do you know the area where you tee
5  off, what that's called?
6    A.   (Nodding).
7    Q.   Have you ever heard of the term tee box?
8    A.   No.
9    Q.   Have you ever heard of the term -- I
10  used the term green.  Is that a -- have you ever
11  heard of that term before, the green?
12    A.   Yeah.
13    Q.   Okay.  So you are familiar with that?
14    A.   The green -- well, I mean, I assume it's
15  the grass.  I mean, I don't know what part of the
16  course it is.  I just assume it's grass, because
17  grass is green.
18    Q.   Do you know where the flag is?
19    A.   Where the hole is --
20    Q.   Okay.
21    A.   -- I'm assuming, because there's a flag
22  there.
23    Q.   So do you know what the area where the
24  hole is placed, what area of the --

Page 238

1    A.  I don't know.
2    Q.  -- course that that's called?
3    A.  I don't know.
4    Q.  Do you know what type of club you use if
5    your ball lands in a sandy area?
6    A.  No idea.
7    Q.  Do you know what the sandy area is
8    called?
9    A.  The -- no, I -- sandy area.
10   Q.  Do you know how to rate whether you
11   scored a good number or not on a hole?
12   A.  Like, I know it's who -- wait.  A low
13   number means you got it in less strokes.
14   Q.  Yeah.
15   A.  Okay.
16   Q.  And that's what I'm getting at.  Do you
17   know what the terminology is for that?
18   A.  I have no idea.
19   Q.  Okay.  So you don't know what to shoot
20   par means, correct?
21   A.  That comes up in mini golf, so I think
22   it means if it takes a certain amount of swings
23   to get to a hole, that's par.  And if you do it
24   less, that's good.  If you do it more, it's bad.

Page 239

1    Q.  Is The Kev always held at River Forest
2    Country Club?
3    A.  I just went to the two.  I just went to
4    the two, the one prior, so it was at the same
5    place the year prior.
6    Q.  Did -- you had mentioned about how
7    Rachael was involved.  And what was Rachael's
8    position again?
9    A.  Something to do with accounting.
10   Q.  And --
11   A.  I think.
12   Q.  What's Rachael's last name?
13   A.  It's Weil, W-e-i-l.  Yeah.
14   Q.  And were you two -- I know counsel asked
15   you some questions about that, but were you two
16   friends or just colleagues during the 15 or
17   17 months that you worked?
18   A.  I'd say we were friends.  I mean, we
19   went out outside of work.
20   Q.  And I've read your diary.
21   A.  Uh-huh.
22   Q.  Yes.  You did a diary, right?
23   A.  Yeah, the journal, yeah.
24   Q.  So I did -- you call it a journal, not a

Page 240

1    diary; is that correct?
2    A.  Yes.
3    Q.  I just want to use the terminology you
4    use.
5    A.  Yeah.
6    Q.  All right.
7    A.  Journal.
8    Q.  And then I've read the submissions you
9    made at the EEOC.
10   A.  Okay.
11   Q.  All right.  And did -- you have
12   indicated, and I've seen it in the exhibits that
13   were marked here already, that Rachael was
14   drinking that day?
15   A.  Yes.
16   Q.  And I believe you used the term
17   shit-faced?
18   A.  Yes.
19   Q.  You arrived at approximately noon?
20   A.  Approximately, yes.
21   Q.  And you were already on the course by
22   1:00 o'clock?
23   A.  1:00, 1:30, something like that, yeah.
24   Q.  Did everybody tee off at the same time?

Page 241

1    A.  You don't start at one hole.  Like, you
2    kind of just -- somebody starts at 8, somebody
3    starts at 4.  You just kind of -- and then you
4    guys do whatever.  So whenever you get to your
5    hole is when you start.  I don't know when
6    everybody teed off, because I wasn't with them.
7    I was --
8    Q.  Right.  So people were starting at
9    different holes, right?
10   A.  Correct.
11   Q.  Okay.  And that's what I meant.
12   A.  Oh.
13   Q.  Was the start of the event then at --
14   everybody is shooting at a --
15   A.  Yes.
16   Q.  -- different hole, but starting at the
17   same time?
18   A.  Yes.  They were all told to go find your
19   hole and start.
20   Q.  And was the start time at 1:00 o'clock?
21   A.  I don't know.
22   Q.  Okay.  Your plan was to initially be
23   with one group; is that correct?
24   A.  No.  I said earlier my whole objective

61 (Pages 238 - 241)

Page 242

1  to going was to take photos and stuff for Lauren,
2  who couldn't be there, and just document --
3  that's what we did the year prior.  Like, we just
4  went around and took candid photos.  So that was
5  my goal to do that.  That was my mission, I
6  guess.
7    Q.  And were you told by one of the
8  supervisors or someone in an authority position
9  at JCA that you weren't needed to do the
10 photographing that day?
11   A.  When I got to one of the holes, I do
12 remember I offered to take their pictures, and
13 somebody commented that, like -- so The Kev, his
14 wife was there and the girls were there.  And
15 somebody said, oh, don't worry about it, they'll
16 take care of the pictures, and I think referring
17 to the girls, the daughters of Kev, Kevin.
18   Q.  Did you know any of the daughters'
19 names?
20   A.  No.
21   Q.  Do you know them now?
22   A.  No, no idea.
23   Q.  So when things started at 1:00 o'clock,
24 tell -- walk us through what you first did?

Page 243

1    A.  I mean, to the best of my knowledge, I
2  just got into a cart and started driving around
3  and taking pictures at various holes.  I mean --
4    Q.  Okay.  And were you taking pictures of
5  everyone or a certain group that you were
6  following?
7    A.  No, just everyone.  Anyone -- trying to
8  get people in candid moments, take pictures of
9  the course.  You know, if they could pose for it,
10 that was cool, if not, then that was fine, too.
11     MR. RUFF:  Can you get out Exhibit 39.
12 Exhibit 40, 16, 17, and 18.
13     (Discussion off the record.)
14 BY MR. RUFF:
15   Q.  So you started at about 1:00 and you
16 were driving by yourself, correct?
17   A.  Yeah.
18   Q.  And from what I heard from the questions
19 with counsel was that somewhere between 1:00 and
20 5:00, you came up to the hole where Tim Lee,
21 Kacper Stojowski, and is it Scheitly, Adam
22 Scheitly, am I saying that -- Scheitel?
23   A.  Scheitel.
24   Q.  Okay.

Page 244

1    A.  Yeah.
2    Q.  -- were located; is that correct?
3    A.  Yes.
4    Q.  Had you -- what time was that that you
5  came upon them?
6    A.  I have no idea.
7    Q.  Somewhere between 1:00 and 3:00?
8    A.  Right.
9    Q.  I mean 1:00 and 5:00, right?
10   A.  Between starting and leaving, yes.
11   Q.  And do you know what hole it was?
12   A.  I have no idea.
13   Q.  If the hole that -- if I told you that
14 it's been suggested that the hole is No. 2, that
15 didn't mean they started on 1, they could have
16 started on some hole, and by the time they got to
17 2, that's when you met up with them?
18   A.  Right.
19   Q.  Do you know what hole they started out
20 at?
21   A.  No.
22   Q.  Was there any kind of roster of where
23 people would be starting, like, a starters' list?
24   A.  There might have been.  I'm not sure how

Page 245

1  that's organized.  It seemed like everybody --
2  when it was, like, time to go, everybody kind of
3  just knew where to go, but it might have just
4  been because they had done it before.  I had
5  never -- I have no idea.
6    Q.  So do you have any idea whether it was
7  toward the beginning, middle, or end of the round
8  that you came upon Mr. Lee, Mr. Scheitel, and
9  Mr. Stojowski?
10   A.  What's the question again?
11   Q.  Was it beginning, middle, or end?  Was
12 it around halfway through, beginning?
13   A.  Oh, between 1:00 and 5:00?
14   Q.  Yes.
15   A.  I would have to say that it was towards
16 the latter part.
17   Q.  So toward one of the latter holes.  What
18 number hole?
19   A.  Towards -- I have no idea what --
20   Q.  Okay.
21   A.  -- direction they were going in or -- I
22 have no.
23   Q.  When you say the latter part, you're
24 talking about 3:00 o'clock?

62 (Pages 242 - 245)

Page 246

1      A.  I'm just talking time frame.
2      Q.  Right, that's what I'm getting at.
3      A.  Right, sure.
4      Q.  Was it after, like, 3:00 or after 4:00,
5  is that what you're talking about?
6      A.  I don't know.
7          MR. RUFF:  Okay.  We had previously
8  marked this exhibit, and I don't know what your
9  number was, Gene.  But it's the diary, or the
10  journal, excuse me.
11          Sam, if you could --
12          MR. SEDAEI:  35.
13          MR. RUFF:  39 is ours.  We marked it
14  before we came in today.  We can square up the
15  marking after.  But we marked the same exhibit as
16  Exhibit 39.
17          (Document marked as Dziubla Deposition
18          Exhibit No. 39 for identification.)
19  BY MR. RUFF:
20      Q.  This is your journal?
21      A.  Yes.
22      Q.  And can we agree that, at least, the
23  document we gave you, Exhibit 39, begins on
24  Dziubla 803 and continues through 809?

Page 247

1      A.  Yes.
2      Q.  And it starts on September 20th, 2017?
3      A.  Yes.
4      Q.  And this document was made
5  contemporaneously, in other words, it was made on
6  September 20th, 2017?
7      A.  Yes.
8      Q.  Okay.  So it wasn't made at some later
9  date and then September 20th put down, correct?
10      A.  Correct.
11      Q.  All right.  So this would have been --
12  the event was -- am I stating it correctly that
13  the event was the 17th or 18th?
14          MS. CRONIN:  18th.
15  BY MR. RUFF:
16      Q.  It's on the 18th.  So this would be two
17  days after the event?
18      A.  Right.
19      Q.  So things would be fresh in your mind at
20  that point; is that fair?
21      A.  Yes.
22      Q.  Now, between the time of the start and
23  the time of coming up onto the second hole, had
24  you seen Mr. Scheitel, Mr. Stojowski, and Mr. Lee

Page 248

1  throughout that time before?  Had you -- in other
2  words, had you run across them before on the
3  course?
4      A.  I don't know what you mean by second
5  hole.  What does that mean?
6      Q.  That means where the event occurred,
7  okay, where -- that is the subject --
8      A.  Oh, I don't know that that was the
9  second hole I went to, though.
10      Q.  Okay.  Let's just assume that that's
11  what -- where it was.  Okay?
12      A.  Okay.
13      Q.  By the time you got to where the event
14  was, how many times had you run across this
15  threesome?
16      A.  I don't remember.
17      Q.  More than once?
18      A.  I don't remember honestly.
19      Q.  Okay.  And what had you been doing
20  during that period of time?
21      A.  Like I said, taking pictures.  I know at
22  some point in time, I went to go -- like, I
23  texted them to meet up with them to try to figure
24  out what hole they were at.  But I don't recall

Page 249

1  what he said.
2      Q.  And when you texted, with whom did you
3  text?
4      A.  I think it was Tim.
5      Q.  Was he the one that you were the closest
6  with in that group?
7      A.  I don't know.  Adam was a close second.
8      Q.  Okay.  And what was Adam's position?
9      A.  I want to say assistant project manager
10  maybe.
11      Q.  So you could have text -- had a text
12  exchange with either of them or both?
13      A.  It's possible.
14      Q.  And what you did was text, and you were
15  going to meet up with them eventually?
16      A.  Yes.
17      Q.  Why was that?
18      A.  I don't know.  It's boring by yourself.
19      Q.  Okay.  And while you were out there,
20  between the time you started and the time you
21  came up to that hole where you met them, had you
22  had anything to drink?
23      A.  Yeah, probably, a couple.
24      Q.  Okay.  And you -- had you had anything

63 (Pages 246 - 249)

Page 250

1  to drink over lunch?
2      A.  Well, when we got there for lunch, we
3  ate lunch, and then I -- I'm pretty sure I had a
4  drink after that.
5      Q.  And what were you drinking?
6      A.  That I don't know.  I don't remember.
7      Q.  Wine, beer, liquor?
8      A.  I can't be sure what I was feeling that
9  day.
10      Q.  And by the time you came up to meet
11  them, had you had a number of drinks by this
12  time?
13          MR. SEDAEI:  Objection, form.
14              But answer if you can.
15  BY THE WITNESS:
16      A.  I had, at least, one.  I mean, I'll
17  admit to that, had a drink.
18  BY MR. RUFF:
19      Q.  Had you had, at least, five?
20      A.  I'm sorry?
21      Q.  Had you had, at least, five?
22      A.  Five?
23      Q.  Yes.
24      A.  Oh, God.

Page 251

1      Q.  Okay.  Was Tim --
2      A.  Five?
3      Q.  Yes.  Between noon and --
4      A.  Oh, my God, no.
5      Q.  -- and whatever this was, 3:00,
6  4:00 o'clock --
7      A.  Not that recall, no.
8      Q.  -- had you had five drinks?
9      A.  Not that I recall, no.
10      Q.  Do you drink alcohol normally?
11      A.  Yes.
12      Q.  Okay.  What kind of alcohol?
13      A.  Like I said, it depends on the mood.
14  Sometimes it's a beer, sometimes it's hard
15  liquor, sometimes it's wine.
16      Q.  And what were you drinking that day
17  between noon and approximately 4:00 p.m.?
18      A.  I thought I just told you I didn't
19  remember.
20      Q.  Okay.  Were Tim, Kacper, and Adam also
21  drinking that day?
22      A.  Yes, they were.
23      Q.  Okay.  How would you know that unless
24  you had seen them out on the course?

Page 252

1      A.  What do you mean, how would I know that
2  they were drinking?
3      Q.  Yes.
4      A.  Because there was -- let's see, Adam
5  peed in a bush because he was drunk.  And they
6  were actively -- I mean, we had people bringing
7  beers to the carts, so everyone had a beer.
8      Q.  So you would have met them at some point
9  before you actually met them at the time that
10  Mr. Jacobsen came up; is that fair?
11      A.  No, I don't -- I don't recall.
12      Q.  Well, then how would you know that -- my
13  point is how would you know that they were
14  drinking and that Adam was drunk?
15      A.  Because I met them afterwards.
16      Q.  Okay.
17      A.  Yeah.
18      Q.  So it was after the --
19      A.  That they were doing --
20      Q.  -- Mr. Jacobsen came up, correct?
21      A.  It was after -- I'm sorry, start again.
22  It was after?
23      Q.  What I'm trying to understand is how did
24  you know that they were drinking?

Page 253

1      A.  Because I was traveling with them after
2  the incident with Jacobsen.
3      Q.  Did either Tim, Kacper, or Adam have the
4  opportunity to see you drinking before that time
5  when Mr. Jacobsen came up?
6      A.  I don't know what they saw.
7      Q.  If Mr. Stojowski says that you were
8  drinking throughout the day, would that be
9  accurate?
10      A.  Throughout the -- no, I don't think so.
11  It's not like -- throughout the day implies I'm
12  just, like, (indicating) which I wasn't, so, I
13  mean, I admitted to having a couple drinks.
14      Q.  And at the time that you -- Mr. Jacobsen
15  came up, were you under the effects of alcohol?
16      A.  I don't believe I was.
17      Q.  Were you -- I'm using Kacper's term.
18  Were you buzzing at that point?
19      A.  I don't recall being buzzed.
20      Q.  Could have been.  You just don't recall?
21      A.  I don't recall.
22      Q.  All right.  When you came up -- and some
23  of this I'm going to take from the diary.  But,
24  for instance, on page 2 of the diary, 804, about

Page 254

1 a third of the way down from the top, it states
2 apparently I was driving right in the path of
3 where one of the women was going to hit her ball.
4 My bad. Do you see that?
5     A. Yes.
6     Q. It's about a third of the way down.
7         Is that an accurate statement?
8     A. Yes.
9     Q. Okay. So somebody was hitting a shot on
10 a particular hole and you happened to cross in
11 front; is that fair?
12     A. Yeah.
13     Q. Okay. And that's because you weren't
14 necessarily familiar with the protocol of how to
15 look for somebody hitting. You just
16 inadvertently did that; is that correct?
17     A. That's -- yeah, and I didn't know,
18 like -- I don't really understand what's off
19 limits in terms of a golf course, because we kind
20 of just drove around.
21     Q. And that's why I said not that you did
22 it intentionally, but you weren't aware of the
23 protocol --
24     A. Oh.

Page 255

1     Q. -- of how to look for somebody --
2     A. No.
3     Q. Let me finish --
4     A. Sorry.
5     Q. -- and then you can say no.
6     A. I'm sorry.
7     Q. My question was: You -- I'm not saying
8 that you did it intentionally, but you weren't
9 necessarily aware of the protocol of what to look
10 for to see if someone was hitting. That's why
11 you found yourself in a position where you were
12 crossing the path of a woman who was going to hit
13 her ball; is that fair?
14     A. Correct.
15     Q. Okay. So then as I understand it,
16 Mr. Jacobsen comes up on the scene; is that
17 right?
18     A. Comes up on what scene?
19     Q. You were at the hole?
20     A. No.
21     Q. Am I stating --
22     A. I got flagged down.
23     Q. Okay.
24     A. I think I talked about that earlier.

Page 256

1     Q. Yeah, but I wasn't clear of sequence, so
2 that's what I'm trying to figure out.
3     A. Yeah.
4     Q. So why don't you take us through, you
5 know, what the sequence of getting to where you
6 meet Mr. Jacobsen?
7     A. Well, I don't know the exact order of
8 it. But I do recall coming across a group with
9 Jacobsen in it prior, and I decided to -- and I
10 think, I'm not 100 percent sure, I think that's
11 the one where The Kev's daughters were at. And I
12 stopped to take a picture, and they said that
13 they didn't need any pictures, maybe. I don't
14 know if that's the -- but I was, like -- I didn't
15 really stay, because I was just there to do my
16 job.
17         And then as I was driving through, I
18 was flagged down to meet with the celebrity or
19 guest of honor and then also obtain an
20 autographed piece of paraphernalia.
21     Q. And that's what I'm trying to cover.
22     A. Yeah.
23     Q. Who flagged you down? Or does Tim or
24 Adam or Tim Lee or Adam Scheitel text you come

Page 257

1 over to this hole --
2     A. No.
3     Q. -- the celebrity --
4         Who is it then -- when you say
5 you're flagged down, I'm trying to understand it.
6     A. It -- I mean, I don't know. I know at
7 one point in time Tim told me what hole he was
8 at. I don't know -- it's not my recollection
9 that it was the one that Jacobsen was on, but Jim
10 flagged me down. I mean, he was, like, hey. You
11 know, I mean, he's celebrating his guest of
12 honor. And then honestly, if Tim would have done
13 it, I wouldn't have listened to him, because it's
14 Tim. I mean, if Schumacher tells you to do
15 something, you're going to do something.
16     Q. And that's what I'm trying to get at.
17 So who flagged you down to come over to this
18 hole? Whatever the hole is, I believe it's hole
19 No. 2, but who flagged you down to come over?
20     A. Jim, Jim Schumacher.
21     Q. And is Jim Schumacher in a cart when he
22 says this? Where's he?
23     A. No, they're all already -- they're
24 already there, yeah.

65 (Pages 254 - 257)

Page 258

1    Q.   That's what we don't know.
2    A.   Yeah, they're already there.
3    Q.   At this point, we don't know that.
4         So people are already gathered
5    around, and you're flagged to come over by
6    Mr. Schumacher; is that correct?
7    A.   Yes.
8    Q.   And do you know where they're gathered
9    around?  Do you know if it's by a -- where they
10   tee off, is it by the green?
11   A.   I mean, just in relation to where
12   everything happened, I want to say we were maybe
13   50 feet from the hole, so when the guys did their
14   practice, it took a couple shots, because no
15   one -- you know, unless you're an expert, I
16   guess, you can't hit that range in one shot.  So
17   I don't know what that means in terms of a green.
18   Q.   Well, let's assume the green is where
19   the hole is and where the flag --
20   A.   Yeah.
21   Q.   -- that goes into the hole sits.  Okay.
22   A.   Uh-huh.
23   Q.   How far were you from that?  Is that
24   what you're saying, you're about 60 feet?

Page 259

1    A.   Yeah, like, from -- probably from the
2    wall to the other side of -- to the other side of
3    the room, the length of the room away.
4    Q.   Okay.  And when you say away, that's how
5    far the group was away from the hole where the
6    flag was?
7    A.   Yes.
8    Q.   Okay.  And do you know there's a
9    different type of cut for the area where the hole
10   is, where the flag is?  They call that the green.
11   Were you on the green or just off that green?
12   A.   I feel like we were off the green.
13   Q.   And when you're flagged down, you're
14   flagged down by Mr. Schumacher correct?
15   A.   (Nodding).
16   Q.   And what does he say?
17   A.   Something to the extent of, hey, Ro,
18   come over here.  Do you want an autographed ball
19   washer.  I'm, like --
20   Q.   And you were driving at this point?
21   A.   Yeah.
22   Q.   Okay.  So he said it loud enough to be
23   above the -- whatever noise the cart was making?
24   A.   Oh, yeah, so I could -- yeah, so that

Page 260

1    it's heard.
2    Q.   All right.  And it just so happened to
3    be that three of your coworkers with whom you
4    were going to meet up at some point were the ones
5    that he was there with, or did you know to meet
6    them there?
7    A.   I did not know to meet them there.
8    Q.   All right.  So when you come up --
9    A.   Right.
10   Q.   -- on the scene, tell me who was there?
11   A.   From what I recall, they -- it's
12   those -- it's -- I want to -- I'm sure about Tim
13   and Kacper.  I feel like we met up with Adam
14   later, but it's possible that he was there as
15   well.
16   Q.   Incidentally, have you talked to any of
17   the ones who were at the hole since the time of
18   what you allege occurred between you and
19   Mr. Jacobsen?  Have you talked to any of the
20   witnesses as far as what they saw?
21   A.   I think there's text messages of me kind
22   of reaching out to them saying, hey, some shit
23   happened.  Tim said that he would help me in any
24   way -- well, he had actually checked in with me

Page 261

1    to see if I was okay after it happened.  Just
2    asked me if I was okay.  And I think I reached
3    out to Scheitel afterward.  I didn't hear
4    anything back.
5         But, oddly, he texted me a couple
6    times out of the blue with, like, really cryptic
7    messages and told me that now he was an
8    estimator, and that something -- somebody we knew
9    there got -- I think, got let go, and he ended up
10   moving over to estimating or something.  There
11   was a change in personnel.
12   Q.   Right.  But the question that's -- that
13   I was asking you, have you spoken to anyone who
14   was at the scene about what happened after it
15   happened?
16   A.   Yeah.
17   Q.   Who?
18   A.   Kacper.  Well, I said earlier Kacper and
19   then Tim and then Joe McGuire.
20   Q.   Joe -- was Joe McGuire at the scene?
21   A.   No.  Sorry.
22   Q.   Okay.  So I'm just talking about --
23   A.   I'm sorry.
24   Q.   -- you spoke to Tim Lee and Kacper

66 (Pages 258 - 261)

Page 262

1 Stojowski after the event about the event; is
2 that correct?
3    A. Yes.
4    Q. All right. I'll get to that in a
5 moment. But I'm just trying to figure out
6 anybody else that you spoke to after about what
7 happened?
8    A. That was present about -- no.
9    Q. Okay. So you've mentioned that Tim was
10 there, Kacper was there, you believe Adam
11 Scheitel was there.
12    A. Yes.
13    Q. Any -- Jim Schumacher was there?
14    A. Correct.
15    Q. Who else was there?
16    A. I don't remember.
17    Q. Obviously Mr. Jacobsen?
18    A. Oh, yeah.
19    Q. Abigail Radoha?
20    A. I don't know. The -- I'm assuming --
21 the last name I'm assuming is one of Kevin's
22 family members. That's all I know. I don't know
23 who it is or if it's the mom or the kid, or I
24 have no idea.

Page 263

1    Q. Okay. Do you know was there a Radoha
2 there as well?
3    A. I don't recall.
4    Q. Did one of the Radohas take the photo of
5 you together?
6    A. Maybe.
7    Q. Okay.
8    A. I don't recall.
9    Q. So your best recollection is that one of
10 the Radohas was there, could have been there?
11    A. My recollection is my photo was taken.
12 I don't know by who.
13    Q. And you're not denying that she could
14 have been, correct, or that she was there?
15    A. I guess it's possible she could have
16 been there.
17    Q. If she has -- gives a statement that
18 says she was there and has an account of what
19 occurred, you're not disputing that she was
20 there?
21    A. I don't know who she is. I don't know
22 who you're referring -- I mean, again, I don't
23 know the difference --
24    Q. Abigail Radoha.

Page 264

1    A. I know, but I don't know who that is.
2 You could --
3    Q. The daughter of Kev Radoha.
4    A. I have no idea of who that looks like or
5 any -- you know what I'm saying. Like, you could
6 put all three of those women in front of me and I
7 wouldn't be able to tell you who that is, who
8 either of them are.
9    Q. My question is very simply this. If
10 Abigail Radoha says she was there when you were
11 there and gives a statement attesting to that,
12 you're not saying she wasn't there, correct?
13 You're not disputing that?
14    A. I guess not. I don't recall her being
15 there, so...
16    Q. Okay. Was there anyone else there?
17    A. I don't recall.
18    Q. Do you know a Chad Crane?
19    A. Chad. No.
20    Q. Do you know that he was a golf pro who
21 was also there and witnessed the interaction
22 between you and Mr. Jacobsen?
23    A. I don't know.
24    Q. You're not denying he was there,

Page 265

1 correct?
2    A. I'm -- yeah, I don't -- he could have
3 been there.
4    Q. Okay. And if he gives a statement that
5 he was there and he witnessed what occurred,
6 you're not disputing that he wasn't -- he was
7 there, correct?
8    A. As long as, yeah --
9    Q. Okay.
10    A. -- he's not lying.
11    Q. So if Mr. Crane was there, Abigail
12 Radoha was there, Tim Lee was there, Kacper
13 Stojowski was there, Adam Scheitel was there, Jim
14 Schumacher was there, other than you and
15 Mr. Jacobsen, that would be seven -- six other
16 people, correct?
17    A. I honestly don't recall there being that
18 many people there.
19    Q. You just don't recall it, correct?
20    A. Correct.
21    Q. You're not saying they weren't there,
22 correct?
23    A. Correct.
24    Q. All right. Now, when you approached,

67 (Pages 262 - 265)

Page 266

1 Mr. Schumacher waves you down, you come over,
2 walk us through what occurs next?
3   A.  Something along the lines of, like, now
4 is your chance to get real life pro tutoring,
5 step right up kind of thing.  Take your shots.
6 And I was, like, I don't play golf.  I don't want
7 to.
8   Q.  And instructions were given then; is
9 that correct?
10   A.  They were verbally given, yes.
11   Q.  And so instructions were given to the
12 group as a whole?
13   A.  To the group as a whole; and then as you
14 went up, you know, he kind of gave you individual
15 verbal pointers.  You know, like, Tim went up
16 before me, so he got guidance.
17   Q.  So if you could take us through there
18 would have been four people who received
19 guidance; is that correct?
20   A.  Including myself, yeah.
21   Q.  Yes.
22   A.  Uh-huh.
23   Q.  So it would be Tim Lee, Kacper
24 Stojowski, and Adam Scheitel, correct?

Page 267

1   A.  Right.
2   Q.  And then yourself?
3   A.  Correct.
4   Q.  What order was the instruction given?
5   A.  Who went first?
6   Q.  Correct.
7   A.  I have no idea.
8   Q.  Could you have been last?
9   A.  I don't recall.
10   Q.  And so what Mr. Jacobsen did was
11 instruct on hitting a shot; is that correct?
12   A.  He performed something to show
13 originally how it's done, and then he gave
14 verbal -- I don't know what that's called, but
15 how to hit the ball into the hole from that
16 distance.
17   Q.  So we've established that, using the
18 terminology of being off the green and on the
19 green, you were off the green and he was showing
20 a shot that would hit onto the green toward the
21 hole; is that a fair characterization?
22   A.  That's my recollection of it, I guess.
23   Q.  All right.  And what he did was with
24 each individual -- first of all, he showed how to

Page 268

1 do it himself, correct?
2   A.  I believe so, yes.
3   Q.  And then the next phase was to
4 individually walk each person through this; is
5 that correct?
6   A.  Yeah, each person went up to take their
7 shot at it; and then he would give pointers, and
8 then they took another shot.
9   Q.  And Tim for sure went ahead of you?
10   A.  Yeah.
11   Q.  And as far as Kacper and Adam, you're
12 uncertain, but they could have?
13   A.  Correct.
14   Q.  All right.  So you could have been the
15 last one; is that correct?
16   A.  Sure.
17   Q.  And as I understand, you did tell
18 everyone that you weren't skilled at golf; is
19 that correct?
20   A.  Yes.
21   Q.  Okay.  And words you used were what?
22   A.  I don't -- is it written there?  I don't
23 know.  I don't know what I used.  I don't
24 remember.

Page 269

1   Q.  You said here, half -- about halfway
2 down, Then before we leave, someone suggests that
3 we each take a shot at putting on the green; is
4 that correct?  It's the second page, same page,
5 804, about halfway down, maybe just a little bit
6 above halfway.
7   A.  Okay.
8   Q.  So that's what you called what you were
9 doing, a shot at putting at the green, correct?
10   A.  Yes.
11   Q.  And it says here, I swore I sucked at
12 golf and Peter said to still give it a try.  Do
13 you see that?
14   A.  Yes.
15   Q.  Okay.  So how did you express that you
16 were not skilled at golf?  That's the question.
17   A.  I verbally told him.
18   Q.  How did you say it, what words?
19   A.  I don't play golf.  I don't remember my
20 exact words.  I might have even referenced the
21 last time me actually -- like, the whole
22 17-year-old.  I mean, I'm, like, I don't play
23 golf.  I think it's boring.  I don't know why
24 people -- I mean, I don't know what I said to

68 (Pages 266 - 269)

Page 270

1  him.
2      Q.  Okay.  And from what I understand is
3  that he tried to show you how to do it, correct?
4      A.  Him physically?
5      Q.  Yes.
6      A.  Himself, yes.
7      Q.  Okay.  And tried to have you, you say
8  here, make a snow angel with the club, a single
9  elevation back and forth, he motioned?
10     A.  Yeah.
11     Q.  What did you mean by that?  What did he
12  show you?
13     A.  I guess it's the, like, the whole --
14  like, you're holding the golf club in front of
15  you, and I guess you maintain, like, kind of
16  rigid.  And you just kind of swing back, so that
17  you're like a pendulum, so that there's no dipper
18  in how to hit the ball.  I think it's a fluid
19  motion from start to finish, so it continues the
20  ball through.
21     Q.  And so that's what you were trying to
22  do?
23     A.  Yeah, I was trying to mimic him.
24     Q.  And it didn't work?

Page 271

1      A.  No.
2      Q.  Okay.
3      A.  Well, it didn't go in the hole.  I don't
4  know -- I might have executed that movement.
5  It -- the ball didn't go in the hole, so I'm
6  guessing that's what I meant, like, fail.
7      Q.  Or did it mean that you didn't even hit
8  the ball?
9      A.  Maybe.
10     Q.  Okay.
11     A.  That's a possibility.  It's happened
12  before.
13     Q.  Okay.  And that's when Peter announced
14  that he was going to -- I'm going to need a
15  little bit more guidance; is that correct?
16     A.  Yes.
17     Q.  So he had actually told you that in
18  front of everyone that you may need a little bit
19  more guidance, correct?
20     A.  Yep, yes.
21     Q.  And just to back up a second.  Peter --
22  it said, I swore I sucked at golf, and Peter said
23  to still give it a try.
24     A.  Right.

Page 272

1      Q.  So he was encouraging you to try to get
2  involved and try to do it; is that fair?
3      A.  Yes.
4      Q.  Okay.  And I believe you said that he --
5  well, why don't you tell me.  So what happens --
6  let me even back up a little bit further.
7          When he's showing you how to swing
8  and he is showing you how to do that, are you
9  positioned where you can see him?  In other
10 words, are you facing him?
11     A.  I would have to be in order to see him,
12 right.
13     Q.  Right.  Well, that's what I'm -- either
14 you're behind him or beside him.  And I'm just
15 trying to figure out were you directly across
16 from him exactly facing him?
17     A.  If the hole is where the camera is, he's
18 in front of me demonstrating, and I'm standing
19 over here.  And we took the -- where everything
20 happened, I took the shot from here.
21     Q.  Understood.  So he is facing --
22     A.  In front of me.
23     Q.  -- you when that's occurring?
24     A.  He's, like, on the side.  And I'm, like,

Page 273

1  you know.  He's not -- he can't face me.  He's
2  hitting sideways from what I remember.
3      Q.  So you're to the back of him or you're
4  facing him?  That's what I'm trying to figure
5  out.
6      A.  I am not directly in front of him, no.
7  I don't --
8      Q.  Okay.  I'm not saying in front of him
9  shooting.  I'm saying where he's looking.  In
10 other words, you're shooting to the left, but I'm
11 looking across the table.
12     A.  I don't remember.
13     Q.  Okay.  When you were doing the
14 instruction, was he facing you, in other words,
15 your eyes are facing each other?
16     A.  I don't remember.
17     Q.  Was he to the back of you or to the side
18 of you?
19     A.  When I was doing my shot?
20     Q.  Yeah, when you were doing your --
21     A.  By myself?
22     Q.  Yes.
23     A.  I don't remember.
24     Q.  But he wasn't behind you actually

69 (Pages 270 - 273)

Page 274

1  physically touching you at that point, correct?
2      A.  Correct.
3      Q.  There was a -- okay.  There was a point
4  where there were -- independently you were
5  trying --
6      A.  Correct.
7      Q.  -- to do the motion.
8      A.  Correct.
9      Q.  Is that fair?
10     A.  Yes.
11     Q.  Okay.  And where he was, whether he was
12 facing you or not, you just don't remember at
13 this point?
14     A.  Correct.
15     Q.  He could have been; you just don't
16 remember?
17     A.  I don't remember.
18     Q.  All right.  But then he announces -- he
19 tells everyone that you're going to need some
20 physical instruction, so then he comes around
21 behind you at some point?
22     A.  Yes.
23     Q.  Okay.  And you said that this was
24 similar to -- up to this point, it's similar to

Page 275

1  the instruction that you received from Clint
2  Hickman?
3      A.  Yeah.
4      Q.  Okay.  And, in fact, I think you -- and
5  I can show you, but you reported to the EEOC that
6  the instruction that was physically given by
7  Mr. Jacobsen was very similar to that given by
8  Mr. Hickman; is that fair?
9      A.  The approach was, yeah.
10     Q.  Okay.  It's just the difference was is
11 the lewd comment; is that fair?
12     A.  The lewd comment and the proximity
13 that -- I mean, Clint definitely was a little --
14 I mean, he was still behind me, but you could
15 tell it was -- it wasn't uncomfortable to begin
16 with, and then obviously minus the lewd comment.
17     Q.  Okay.  But my point is is that the
18 physical contact between you and Mr. Jacobsen was
19 similar to that of you and Mr. Hickman; is that
20 correct?
21     A.  It was uncomfortable from the start.
22     Q.  I get it.
23     A.  It's similar.
24     Q.  It was similar?

Page 276

1      A.  Right.
2      Q.  What made it different was the lewd
3  comment; is that fair?
4      A.  And, also, his proximity to me as a
5  person.
6      Q.  Okay.
7      A.  Was different.
8      Q.  What is it about the proximity?
9      A.  He was right up against me.
10     Q.  Okay.  And was Clint Hickman up against
11 you or --
12     A.  No.  Like I said, he was -- it was done
13 in a -- you know, like, you go to hug someone,
14 you kind of keep your butt tucked out.  Like, he
15 was there behind me, but you could tell that he
16 was respecting my space behind me.  There was no
17 respect of my bodily space behind me.
18     Q.  Did you feel that there was anything
19 offensive about the physical contact?
20     A.  Yes.
21     Q.  Okay.  And what was it?
22     A.  I believe so.
23         That he was -- there was no space
24 between us.

Page 277

1      Q.  And what was it, just the physical
2  proximity or that's it?
3      A.  I don't know, how would you feel if a --
4  in that situation, if a man pressed his body up
5  against yours like that?  I mean, it was very
6  uncomfortable.
7      Q.  I wasn't there.  I'm asking you the
8  question.
9      A.  It was very uncomfortable.  I was, like,
10 wow this is different; and then with the comment,
11 it was just, like, holy shit.
12     Q.  Absent the comment, would you have felt
13 that there was anything unusual?
14     A.  Yeah.  It would have bothered me a lot.
15     Q.  Is there any difference in height
16 between Mr. Hickman and Mr. Jacobsen?
17     A.  I don't -- I would -- I mean, if I had
18 to say, I would say maybe he's tall -- he's
19 taller.  I'm not sure.
20         MR. SEDAEI:  Who is taller?
21 BY THE WITNESS:
22     A.  Peter.
23         I don't know what that means, but...
24

70 (Pages 274 - 277)

Page 278

1  BY MR. RUFF:
2     Q.  Absent -- I may have asked you this, but
3  I don't know if I heard the answer.  Absent the
4  lewd comment, would you have felt anything was
5  unusual about the contact?
6     A.  Yes.
7     Q.  What was that specifically?
8     A.  Like I said, it was the lack of space
9  between our bodies.
10    Q.  Okay.  It was the proximity --
11    A.  Yeah.
12    Q.  -- how close you were?
13    A.  Yes.  Like, touching.
14    Q.  Okay.  Anything -- but nothing unusual
15 in his movement absent -- other than being close;
16 is that correct?
17    A.  Yeah, that's correct.
18    Q.  So other than his being close or closer
19 than Clint Hickman did it, there was nothing
20 offensive about the touching portion of it; is
21 that correct?
22    A.  He was touching me.  That was offensive.
23    Q.  Okay.  And what was -- what part of his
24 body was touching you?

Page 279

1     A.  His lower part of his body was pressed
2  up against my butt.
3     Q.  And when you say lower part of his body,
4  was it his hip, his groin?  What was it, his
5  pelvis?
6     A.  The -- his -- I get his frontal part of
7  his bod -- I don't know, where his -- I don't
8  know where he lined up on me in terms of his
9  height.  Maybe it was his belly button.  I have
10 no idea.
11    Q.  So what was touching you, you don't
12 know; is that correct?
13    A.  Correct.
14    Q.  And what was the comment?
15    A.  Something along the lines of I'm going
16 to show her where I'm going to put my wood.
17    Q.  Are you certain -- is that -- as best
18 you can recall, that's the exact phraseology?
19    A.  I know I documented what he said the
20 night of, and I'll stand by that.
21    Q.  And --
22    A.  In my email.
23    Q.  What --
24    A.  In my email to Jim the night of,

Page 280

1  whatever that says is what --
2     Q.  It's Exhibit 16.
3     A.  Oh, when you take -- yeah, when you take
4  his wood out.
5        MR. SEDAEI:  Except he said my.
6        THE WITNESS:  Yeah.  Sorry.
7  BY MR. RUFF:
8     Q.  It says here -- you're looking at
9  exhibit -- what's the number?
10       MR. SEDAEI:  16.
11       MR. RUFF:  Because we had it marked 16,
12 but we'll go by 60.
13       THE WITNESS:  No, 16.
14       MS. CRONIN:  16.
15       THE WITNESS:  He said 16, 1-6.
16 BY MR. RUFF:
17    Q.  16.  All right.  So what you're
18 referring to is demonstrating to a female how to
19 play golf does not require you to press your
20 groin into her back side and tell her that's when
21 you take his wood out?
22    A.  Yeah.
23    Q.  When you put that in quotes, is that
24 what you believe was said at that point?

Page 281

1     A.  Yes.
2     Q.  And that's the entirety of what was
3  said?
4     A.  Yes, or what I heard.
5     Q.  Well --
6     A.  Like, if there was more context to it, I
7  didn't hear it.  That's what I heard.
8     Q.  And are you certain that he said when
9  you take his wood out?
10    A.  Yes.
11    Q.  The wood is in -- his is in parentheses.
12 Are you saying when you take wood out, and you're
13 adding the his?
14    A.  I'm not sure what the parentheses mean.
15    Q.  In other words, could he have said
16 that's when you take the wood out without the his
17 in there?
18    A.  He could have said that.
19    Q.  Okay.  Are you aware of the fact that
20 there is an old golf joke about woods and irons?
21    A.  I am not.
22    Q.  Okay.  Did he say beginning golfers
23 start with the irons and end up in the woods or
24 work their way in the woods?

71 (Pages 278 - 281)

Page 282

1    A.  Did he say that to me?
2    Q.  Yes.
3    A.  No, I don't remember that.
4    Q.  Okay.  Are you denying that he -- that's
5  the full joke?
6    A.  I didn't know it was a joke.  You know
7  what I'm saying.  I didn't -- I only --
8    Q.  You only heard part of it is what you're
9  saying?
10    A.  I heard -- I recorded --
11      MR. SEDAEI:  Mischaracterizes testimony.
12      THE WITNESS:  Yeah.
13      MR. SEDAEI:  But go ahead and answer
14  again.
15  BY THE WITNESS:
16    A.  I mean, I just reported what I heard.
17  Did I know it was a fragment?  No.
18  BY MR. RUFF:
19    Q.  Right.  What I'm saying is what you put
20  down here in quotes, could it have been a
21  fragment?
22    A.  I suppose.
23    Q.  Okay.  And what I'm saying is could the
24  rest of it be beginning golfers start with the

Page 283

1  irons and end up in the woods?
2    A.  I don't know.
3    Q.  Could have?
4    A.  It could have been anything that had the
5  wood in it.  I mean, I don't know.
6    Q.  Or work their way in the woods, correct?
7    A.  I don't know.
8    Q.  And what you took from the words was a
9  sexual reference?
10    A.  He was right behind me.  It's a very
11  inappropriate time to make a comment or crack a
12  joke.
13    Q.  Do you understand that beginning golfers
14  struggle to hit the ball straight?
15    A.  Beginning golfers.  Yeah, I guess.
16    Q.  Okay.  And they start with the irons,
17  which may be easier to control?
18    A.  I don't know what that means.
19    Q.  And that the woods are less easily
20  controlled?
21    A.  No idea what that relates to.
22    Q.  And that if you hit a wood, you might
23  end up in the woods?
24    A.  I don't know what that means.

Page 284

1    Q.  Do you know that iron is a club?
2    A.  It's a reference to a type of golf club,
3  yes.
4    Q.  Okay.  And did you know that wood is a
5  type of club?
6    A.  I'm assuming it's the ones that have
7  wood on it.  I don't know.
8    Q.  Do you know that historically that woods
9  were made out of woods, but now they are still
10  referred to as woods, but they just have the
11  bigger --
12    A.  No.
13    Q.  -- rounder ends to them?
14    A.  Not until you just told me right now
15  honestly.  No idea.
16    Q.  So you don't know if the entire joke
17  could have been misconstrued by you that
18  beginning golfers start with irons and end up in
19  the woods, correct?
20    A.  Could have been that.
21    Q.  And woods are trees, correct?  Could it
22  also be trees, woods could be trees?
23    A.  From what you told me today, sure.
24    Q.  Have you ever heard to go into the woods

Page 285

1  or poems about going -- walking through the
2  woods?
3    A.  Oh, yeah, sure.
4    Q.  Okay.  So you know that woods can be
5  trees as well, correct?
6    A.  Sure.
7    Q.  And do you know that woods are also an
8  area on the golf course?
9    A.  Where the trees are?
10    Q.  Correct.
11    A.  Okay.  Yeah.
12    Q.  And that if you use a wood, you can end
13  up in the woods, correct?
14    A.  I don't understand what this -- I don't
15  understand what this is.  Like, I -- so a golf
16  club could be called a wood.  Those are his
17  words.  I don't know what the terminology is.
18    Q.  You think what we have going on here is
19  you hearing the word woods and jumping to a
20  conclusion as to what woods meant from a sexual
21  standpoint as opposed to an innocent construction
22  related to golf clubs and an area on the golf
23  course?
24    A.  To tell you the truth, if that comment

72 (Pages 282 - 285)

Page 286

1  was made without him behind me pressing up
2  against me in a room full of people, I would not
3  have said -- I would have been, like, well, that
4  was inappropriate, and then I just would have let
5  it go. The fact that it was made while he was --
6  I mean, what I heard and what I experienced is my
7  experience.
8      Q. Understood.
9      A. So --
10     Q. Let's just try my question, though.
11         I'm going to ask Suzanne to read it
12  back.
13         (Whereupon, the question was read as
14         follows:
15         Q. You think what we have going
16     on here is you hearing the word woods
17     and jumping to a conclusion as to what
18     woods meant from a sexual standpoint as
19     opposed to an innocent construction related
20     to golf clubs and an area on the golf
21     course?)
22  BY THE WITNESS:
23     A. I do not think I jumped to a conclusion.
24

Page 287

1  BY MR. RUFF:
2      Q. If everybody else on -- that was
3  standing around there at that time came to the
4  same conclusion, that there was nothing
5  inappropriate about what was said and that it was
6  a simple golf joke, Tim Lee, Kacper Stojowski,
7  Adam Scheitel, Jim Schumacher, Peter Jacobsen,
8  Abigail Radoha, and Chad Crane, all say that it
9  was the interpretation that I just put to it, an
10  innocent construction, could you then realize
11  that perhaps you were mistaken as far as the
12  context?
13     A. Well, here is the thing, they're all
14  familiar with golf. I don't know -- none --
15  it's -- maybe if I knew stuff like that, maybe it
16  would have registered differently, but I don't
17  know this term and -- I don't know any of this
18  terminology.
19     Q. You raise a valid point. So had you
20  known the reference of golf to irons and woods
21  and ending up in the woods, you would agree that
22  there could be an innocent construction, but you
23  not having that reference could have come to a
24  different conclusion; is that correct?

Page 288

1      A. Say it again, I'm sorry.
2         MR. RUFF: It was so good I can't repeat
3  it.
4         THE WITNESS: Sorry.
5         MR. RUFF: And, Suzanne, real loud, so
6  the jury and the Judge can hear.
7         And, oh, by the way, don't put in
8  the transcript record read as above. I want to
9  see the actual transcript, so we all know what
10  you read.
11         (Whereupon, the question was read as
12         follows:
13         Q. You raise a valid point. So had
14     you known the reference of golf to irons
15     and woods and ending up in the woods, you
16     would agree that there could be an innocent
17     construction, but you not having that
18     reference could have come to a different
19     conclusion; is that correct?)
20         MR. SEDAEI: I know you said that was a
21  good question, but I'm going to object to form.
22         But answer if you understand it.
23         MR. RUFF: I think the Judge will allow
24  it.

Page 289

1  BY MR. RUFF:
2      Q. Go ahead. You want it back one more
3  time.
4      A. I do.
5         MR. RUFF: And, again, real loud,
6  Suzanne, please.
7         (Discussion off the record.)
8         (Whereupon, the question was read as
9         follows:
10         Q. You raise a valid point. So had
11     you known the reference of golf to irons
12     and woods and ending up in the woods, you
13     would agree that there could be an innocent
14     construction, but you not having that
15     reference could have come to a different
16     conclusion; is that correct?)
17  BY THE WITNESS:
18     A. I don't know that I can answer that
19  honestly, because I don't -- you don't know what
20  you don't know, and I didn't know that then.
21  BY MR. RUFF:
22     Q. You know it now, though, correct?
23     A. Right. But why would I speculate how
24  that -- I would feel two years ago had I known

73 (Pages 286 - 289)

1  something I just found out now.  I can't answer
2  how this knowledge now affects me two years ago.
3     Q.  I'm not asking you how it affected you.
4  You could --
5     A.  That's how I'm interpreting your
6  question.
7     Q.  There's no question pending.
8        All I'm asking you is very simply
9  realizing the context now, that it has no sexual
10  meaning whatsoever, but rather is a golf joke,
11  but you not having that reference which you now
12  have could have come to a wrong conclusion.  Can
13  we agree on that?
14        MR. SEDAEI:  Objection, mischaracterizes
15  testimony; objection, calls for speculation;
16  objection, asked and answered.
17        But answer again if you understand
18  it.
19  BY THE WITNESS:
20     A.  I feel like I've covered it.
21  BY MR. RUFF:
22     Q.  Right.
23        Can we have the question back.
24        We need an answer actually to this.

1  Do you need the question back or can you answer
2  it?
3     A.  I just feel like I've -- I don't think I
4  can answer it.
5     Q.  Right.  We're going to ask for an
6  answer, though.  You're required to answer.
7        MR. SEDAEI:  But I think that's her
8  answer, right?
9  BY THE WITNESS:
10     A.  That's my answer.
11        MR. SEDAEI:  I think that's her answer,
12  I don't know, that she does not know.
13        MR. RUFF:  Good try there, Sam.  So --
14        MR. SEDAEI:  She says she can't answer.
15        MR. RUFF:  You're doing a great job in
16  speaking up for her.  But let's just -- up until
17  this point, she was doing a good job in answering
18  the questions herself.  Happy to give you --
19        MR. BOYLE:  Ed, you want this?
20        MR. RUFF:  No, they can hear me.
21        Let's just have the question and
22  answer back -- my question back.
23        THE WITNESS:  I'm sorry.
24

1        (Whereupon, the question was read as
2        follows:
3        Q.  All I'm asking you is very
4     simply realizing the context now, that
5     it has no sexual meaning whatsoever, but
6     rather is a golf joke, but you not having
7     that reference which you now have could
8     have come to a wrong conclusion.  Can
9     we agree on that?)
10  BY THE WITNESS:
11     A.  No.
12  BY MR. RUFF:
13     Q.  Why not?
14     A.  Because it was the contents -- it was
15  the context that the joke was presented, that he
16  was behind me presenting the joke.  So I don't
17  feel like I could have come to a wrong
18  conclusion.
19     Q.  The con -- you said the context which
20  would be in the middle --
21     A.  He made me --
22     Q.  -- of an instruction; is that correct?
23     A.  With himself pressed against me, a joke
24  like that could on -- I mean, that's how it was

1  taken.
2     Q.  I get it.  How you would take it.  My
3  point is different.  Now having the joke
4  explained to you and the full joke, not a portion
5  of the joke, and realizing that you didn't know
6  irons, you didn't know woods, and you didn't know
7  there were areas on the course called woods, you
8  realize that there can be a nonsexual, just a
9  golf humor to the joke; can we agree on that?
10     A.  Sure.
11     Q.  Okay.  And it's solely what you believe
12  the context of the joke being presented, that is
13  your issue, in other words, his proximity to you
14  at the time the joke was delivered; is that fair?
15     A.  Yes.
16     Q.  And the physical contact was in your
17  view offensive because of the joke, agreed?
18     A.  No.  I said it before.  He was -- it was
19  uncomfortable from the start because he was too
20  close.
21     Q.  You know, I failed to ask you this
22  before.  When Mr. Jacobsen said that he was going
23  to show you physically how to do this, you had no
24  objection to that, correct?

74 (Pages 290 - 293)

Page 294

1  A. He said I was going to need a little bit
2  more guidance. At no point was he, like, hey,
3  I'm going to press myself up against you. When
4  he said I needed more guidance, I assumed it
5  would be similar to what I experienced with
6  Clint.
7  Q. I get that. So but you had no objection
8  to him coming around and grasping his arms around
9  you to help you swing. That was similar to what
10 Mr. Hickman had done, correct?
11 A. Had he executed it that way, that would
12 have been perfect.
13 Q. And you had no objection to that contact
14 with that thought in mind, correct?
15 A. Correct.
16 Q. And, in fact, he announced to everyone
17 that that's what he was going to do, to everyone
18 present, correct?
19 A. Actually so -- correct.
20 Q. Can we agree that if the joke was not
21 offensive, then the contact was not offensive,
22 correct?
23 A. No, no, because I already told you.
24 Q. Can we agree that when you called the

Page 295

1  EEOC the next morning that was done at the advice
2  of Beata, correct?
3  A. It was online, and, yes.
4  Q. And Beata is a police officer?
5  A. She's a high school friend of mine that
6  is a police officer, yes.
7  Q. And where is she a police officer?
8  A. Chicago.
9  Q. And what is her position in the --
10 A. I don't know.
11 Q. What is her last name?
12 A. She was married -- she recently got
13 divorced. I don't know if she was married to
14 him. It would either be Staszewski, her maiden
15 name, or Decker the married name.
16 Q. I didn't catch the second one.
17 A. Decker.
18 Q. Decker. Okay. And can you spell the
19 first name, Staszewski?
20 A. S-t-a-s-z-e-w-s-k-i.
21 Q. And when you reported to the EEOC, you
22 reported online; is that correct?
23 A. What was done online was actually to
24 file an appointment to report a claim that I

Page 296

1  didn't find out until later.
2  Q. But you didn't give your account of what
3  was going on at that time, correct?
4  A. Correct.
5  (Discussion off the record.)
6  THE WITNESS: You want this back.
7  MR. SEDAEI: So we already have an
8  Exhibit 17. How are you going to do that?
9  (Discussion off the record.)
10 MS. CRONIN: We have to remark it.
11 MR. SEDAEI: Do you want me to give this
12 to you or are we going to add it?
13 MR. RUFF: What was it -- what's 17
14 already?
15 MS. CRONIN: 17 is --
16 MR. RUFF: I think it's because we're
17 both marking, that's -- and we had come in for
18 this.
19 What's the marking for that one.
20 Just give it another marking.
21 (Discussion off the record.)
22 MR. SEDAEI: You want 39.
23 MR. RUFF: It's her diary.
24 MR. SEDAEI: But this is the one the

Page 297

1  witness is holding.
2  MR. RUFF: Just put another number on
3  it. Let's roll.
4  MS. CRONIN: All right. Let's go.
5  MR. RUFF: So we have 39 is the
6  statement and the diary and what's the --
7  MR. SEDAEI: So what are we calling 17
8  now?
9  MS. CRONIN: 40.
10 MR. SEDAEI: 40.
11 (Document marked as Dziubla Deposition
12 Exhibit No. 40 for identification.)
13 BY MR. RUFF:
14 Q. If we look at Exhibit 40, that is the
15 EEOC -- first of all, have you seen this document
16 before today?
17 A. I don't recall. I mean, it looks like
18 it's a confirmation page of maybe something I
19 submitted online.
20 Q. Yeah, for the record, and I think this
21 was in your production as well, it's JCA 98
22 through JCA 102, and it's your interview, I
23 believe, with the EEOC investigator.
24 A. Okay.

75 (Pages 294 - 297)

1    Q.  Have you seen this before?

2    A.  I feel like I answered this already. I

3 mean, this is two years ago. I don't remember

4 this exact document.

5    Q.  You're not denying that that's the

6 interview that occurred on October 24, 2017,

7 beginning at 8:45 p.m.?

8    A.  No.

9    Q.  Okay. If we look at page 101 at the

10 bottom.

11    A.  Okay.

12    Q.  And, again, this would be October 24th.

13 This would be approximately five weeks, can we

14 agree, after the encounter with Mr. Jacobsen?

15    A.  Yes.

16    Q.  Okay. And on October 24th, 2017, an

17 account was made of what you said to the

18 investigator; is that fair?

19    A.  Yes.

20    Q.  If we look on 101, about half of the way

21 down, it says -- no, excuse me, about a third of

22 the way down, Further into the afternoon I ran

23 into their group again, and Jim handed out

24 autographed flags by Peter. Do you see that?

1      Sam, can you show her? Thank you.

2      MR. SEDAEI: Right here.

3 BY THE WITNESS:

4    A.  101. Oh, I see it. Further. Okay.

5 BY MR. RUFF:

6    Q.  Do you see that?

7    A.  Yes.

8    Q.  Okay. It says further in the

9 afternoon -- into the afternoon, I ran into their

10 group again, and Jim handed out autographed flags

11 by Peter, and we all took a shot at the ball.

12 Did I read that correctly?

13    A.  Yes.

14    Q.  All right. And this is your account to

15 the investigator five weeks after the event,

16 correct?

17    A.  Yes.

18    Q.  Right?

19    A.  Yes.

20    Q.  All right. Since I am not a good golf

21 player, Peter gave me pointers - fine. But when

22 I wasn't getting the hang of it, he decided that

23 a more physical approach was required and

24 exclaimed to everyone that he was going to show

1 me where he puts his wood. It was beyond

2 humiliating.

3      Did I read that correctly?

4    A.  Correct.

5    Q.  All right. That's similar to the email

6 about when you take (his wood) -- (his) wood out.

7 You agree?

8    A.  Yes.

9    Q.  I cracked a couple jokes to Jim letting

10 him know that I was not okay with the situation,

11 and he just laughed.

12      All right. There's no account in

13 here of the physical nature of your contact with

14 Peter. Can we agree on that?

15    A.  Not on what you read, no.

16    Q.  I'm sorry?

17    A.  Not in what you read. I didn't read off

18 the --

19    Q.  Yeah, I didn't see anywhere else on

20 here. In fact, it goes onto other points in

21 here.

22    A.  Okay.

23    Q.  You're welcome to take a look at it.

24      Can we agree on that, though,

1 there's no indication of any inappropriate

2 physical contact?

3    A.  Right.

4    Q.  And then if we look at your diary, going

5 back to Exhibit 39, we talked about, So I watch

6 OG. I see and I give it a shot - fail. We read

7 that before?

8    A.  Yeah.

9      MR. SEDAEI: Can we have Exhibit 39

10 again.

11      MR. RUFF: We didn't take it away from

12 you.

13      MR. SEDAEI: Did I just give you

14 Exhibit 39?

15      MR. BOYLE: This was my copy.

16      MR. SEDAEI: Okay. Here, just look at

17 mine.

18      THE WITNESS: Okay.

19      (Discussion off the record.)

20      MR. SEDAEI: It's okay.

21      MR. RUFF: I'm almost done with this, by

22 the way.

23 BY MR. RUFF:

24    Q.  So I watch OG. I see and give it a shot

Page 302

1  - fail. And Peter announces that I'm going to
2  need a little bit -- a little more guidance and
3  says something along the lines of this is when I
4  tell them where I put my wood. That's another
5  version of that same phrase, correct?
6      A.  Yes.
7      Q.  Okay.  He straddles me from behind and
8  takes over my swing.
9          Did I read that correctly?
10     A.  Yes.
11     Q.  All right.  There's no indication in
12  this account of any inappropriate contact
13  physically, correct?
14     A.  I think that's what straddles implies.
15     Q.  Well, straddle would be the same thing
16  Clint Hickman did, correct?
17     A.  No.
18     Q.  Okay.  So he didn't straddle you to --
19  how did he do it then?
20     A.  In a nonoffensive way.
21     Q.  Okay.  All right.  Well, my point is
22  there's no indication in this account of any
23  offensive touching, correct?
24          MR. SEDAEI:  Objection, asked and

Page 303

1  answered.
2          But answer it again if you have --
3  BY THE WITNESS:
4      A.  My reference in this in my journal is
5  what I previously said about the contact between
6  me and him.  So maybe I used the same word for
7  two different meanings.
8  BY MR. RUFF:
9      Q.  Kind of like the joke, correct?
10         MR. SEDAEI:  Objection, form.
11         But answer if you understand.
12  BY THE WITNESS:
13     A.  Not in the context that I was in, no.
14  BY MR. RUFF:
15     Q.  The whole context relates to the
16  comment.  Can we agree on that?
17     A.  No.  I told you already.  Stop
18  rephrasing stuff.  I already told you.
19     Q.  All right.  There's no indication of any
20  offensive touching in this account.  Can we agree
21  on that?
22     A.  That's your interpretation.
23     Q.  Do you agree with that?
24         MR. SEDAEI:  Objection, mischaracterizes

Page 304

1  testimony.
2          But answer again.
3  BY THE WITNESS:
4      A.  I believe that that phrase does -- it --
5  he straddles me from behind and takes over my
6  swing is relating to my previous comments.  It
7  does not absolve him of it.
8  BY MR. RUFF:
9      Q.  No, that's not my question, ma'am.
10     A.  That's what you're leading to.
11     Q.  The reason -- a reasonably objective way
12  of looking at what you wrote there does not
13  indicate any offensive touching as far as your
14  diary indicates, true?
15     A.  It's my diary.  I am documenting how I
16  feel, and I am telling you that that's what those
17  words mean.
18     Q.  All right.  Move to strike the answer as
19  not responsive.
20         You want the question read back?
21         MR. SEDAEI:  I think that was
22  responsive, so objecting --
23         MR. RUFF:  But it's not responsive to
24  the question.

Page 305

1          MR. SEDAEI:  I'm sorry, if I may finish.
2          MR. RUFF:  Go ahead.
3          MR. SEDAEI:  And so the extent that we
4  can object to it being stricken, I'd like to --
5  I'd like that to be on the record, too.
6          MR. RUFF:  Fine.
7          MR. SEDAEI:  I think she's answered that
8  question more than once or twice, and you can't
9  keep asking questions until you get the answer
10  you want.
11         MR. RUFF:  Well, it's called cross exam,
12  and we know that she responded --
13         MR. SEDAEI:  I think it's shopping for
14  an answer.
15         MR. RUFF:  Let me finish.  I didn't
16  interrupt you.
17         MR. SEDAEI:  Okay.
18         MR. RUFF:  We all know that there was a
19  response, but it wasn't responsive to the
20  question.  That's why I'm moving to strike it.
21         So let's have Suzanne read it back.
22         (Whereupon, the question was read as
23          follows:
24     Q.  The reason -- a reasonably

77 (Pages 302 - 305)

Page 306

1    objective way of looking at what you
2    wrote there does not indicate any
3    offensive touching as far as your diary
4    indicates, true?)
5    BY THE WITNESS:
6        A.   True.
7    BY MR. RUFF:
8        Q.   Okay.  If we can go to exhibit -- we
9    have got this marked as 19.  Maybe it's best to
10   just put random numbers on it.
11           (Discussion off the record.)
12           (Document marked as Dziubla Deposition
13            Exhibit No. 41 for identification.)
14   BY MR. RUFF:
15       Q.   All right.  On Exhibit 41, this is the
16   text exchange -- I think it's the same text
17   exchange that counsel may have referred to.  This
18   just has the JCA number which they produced your
19   texts, JCA 173 through 183.  Can we agree on
20   that?
21       A.   Yes.
22       Q.   All right.  This is Lauren Graczyk.  Am
23   I saying that correctly or --
24       A.   I think it's Graczyk.

Page 307

1        Q.   Graczyk.
2        A.   C-Z is pronounced like C-H.
3        Q.   And Ms. Graczyk, was she at the event?
4        A.   No.  That's why I was taking pictures.
5        Q.   Okay.  And this is your texts to her
6    beginning actually September 13th, but the one
7    that relates to after the event is actually
8    Tuesday, 10:37 a.m., on the front page.  Can we
9    agree that that's Tuesday, September 18th, 2017,
10   the day after?
11       A.   The day after, I thought it was -- it's
12   not the 19th.  Or it's the day after, yes.
13       Q.   Okay.
14           (Discussion off the record.)
15   BY MR. RUFF:
16       Q.   Excuse me, the 19th, you're right.
17   Excuse me, Ms. Dziubla, the 19th.  That would be
18   the day after, correct?
19       A.   Correct.
20       Q.   Can we agree that in this account here
21   there's no indication of any offensive touching
22   by Mr. Jacobsen regarding you in this text
23   exchange?
24       A.   Yes.

Page 308

1        Q.   And you made a donation to the event on
2    page 2.  It reflects that you want your donation
3    back, correct?
4        A.   Yes.
5        Q.   So you made a donation of $50, and you
6    wanted your $50 back, correct?
7        A.   Yes.
8        Q.   Why did you want your $50 back?
9        A.   Because I was very upset about what
10   happened and --
11       Q.   Understood.  But what does that have to
12   do with donation to the family?
13       A.   It doesn't have anything to do with it
14   honestly.  I was just upset.
15           MR. RUFF:  Exhibit -- what's the next
16   one.
17           MS. CRONIN:  We are on 42.
18           (Discussion off the record.)
19           (Document marked as Dziubla Deposition
20            Exhibit No. 42 for identification.)
21           MR. SEDAEI:  We only got one of these.
22   Do you have another one?
23           MS. CRONIN:  Yes, I do.
24           MR. RUFF:  Exhibit 42 is this?

Page 309

1            MS. CRONIN:  Uh-huh.
2    BY MR. RUFF:
3        Q.   Exhibit 42 is the text exchange with
4    Beata, and counsel already went through these.  I
5    have some different questions on the same
6    document now marked 42.  That's JCA 191 through
7    205 -- 206, correct?
8        A.   Yes.
9        Q.   And this is an exchange with Beata,
10   correct?
11       A.   Yes.
12       Q.   And can we agree that there is no
13   indication of any offensive touching by
14   Mr. Jacobsen in this exchange?
15           MR. SEDAEI:  Take your time and go
16   through it.
17           (Discussion off the record.)
18   BY THE WITNESS:
19       A.   What was your question again?
20           MR. RUFF:  Can you ask it again,
21   Suzanne.
22           (Whereupon, the question was read as
23            follows:
24       Q.   And can we agree that there

Page 310

1    is no indication of any offensive
2    touching by Mr. Jacobsen in this
3    exchange?)
4    BY THE WITNESS:
5        A.  Well, she says sorry for some blunt
6    questions, but were you touched; and I answered,
7    yeah, he was showing me how to do a golf swing.
8    BY MR. RUFF:
9        Q.  Right.  So my question stands.
10       A.  Right, I'm answering her question was
11   I --
12       Q.  There's no indication anywhere in this
13   exchange of any offensive touching.  Can we agree
14   on that?
15       A.  I'm purely talking to her because I
16   wasn't offended.  It wasn't, like, hey, check
17   this out, I got groped by this guy and it was
18   awesome.  Want to share with me.  I mean, she's
19   asking me from a position of a police officer.
20   The only reason why -- I mean, that's what she
21   meant by that is that it's offensive, were you
22   touched.
23   BY MR. RUFF:
24       Q.  No, no, you're misunderstanding me.  She

Page 311

1    asks you were you touched, but there's no
2    indication of any response from you indicating
3    that there was anything offensive about the
4    touching.  Can we agree on that?  Because the
5    first thing you refer to is the comment.
6        A.  I don't agree with you again.
7        Q.  All right.  Just tell me where it
8    describes any offensive touching?
9        A.  It's in the context of our conversation.
10       Q.  All right.  Just tell me what language
11   you're referring to that suggests anything that
12   there was offensive touching?
13       A.  Her question -- context of her question
14   is asking if you were touched.  That is at --
15   touched offensively, inappropriately, against
16   your will.  That is her question, and I'm
17   answering her question with yes.
18       Q.  Well, I don't see that anywhere, so why
19   do you say --
20       A.  It's on the first page.
21       Q.  Right.  It says --
22       A.  What do you think the question means?
23   That's what it means.
24       Q.  I'm reading the words, Ms. Dziubla.

Page 312

1        A.  Oh, my gosh, okay.
2        Q.  Okay.  So where does it in your response
3    indicate any offensive touching?
4        A.  It does not say that.
5        Q.  Okay.  And not -- you never stated what
6    part of his body was physically touching you,
7    correct?
8        A.  I -- again, I mean, just like with her
9    and Lauren, it's not like I'm --
10       Q.  This could be answered a simple yes or
11   no.  It's --
12       A.  It could be, but --
13       Q.  -- a cross exam question.
14       A.  I just -- you're just picking words --
15   you're taking everything out of context, and it's
16   frustrating me and it's late in the day.  So this
17   is the response I'm giving you.
18       Q.  Let's just go with my question.  Okay.
19           Can we have the question back,
20   Suzanne.
21           (Whereupon, the question was read as
22           follows:
23       Q.  You never stated what part
24   of his body was physically touching

Page 313

1    you, correct?)
2    BY MR. RUFF:
3        Q.  Answer.
4        A.  Correct.
5        Q.  All right.  And you've never described
6    any type of physical -- what body part or
7    anything Mr. Jacobsen touched, any body part from
8    you, correct?
9        A.  Correct.
10       Q.  But what you did mention after his --
11   the question by Beata regarding touching is the
12   comment, correct?
13       A.  Not correct.
14       Q.  Yeah, he was showing me how to do a golf
15   swing and announced to everyone this is when it
16   is -- when -- this is the time when he shows them
17   where his wood is.  That's the comment, correct?
18       A.  Right.  But in response to her
19   question --
20       Q.  Right, that's my whole point.  In
21   response to the question regarding touching, you
22   refer to the comment, true?
23       A.  False.  I answered her question.  I said
24   yes, yes.

79 (Pages 310 - 313)

Page 314

1   Q.  And then immediately refer to the
2  comment, correct?
3      A.  Correct.
4      Q.  That's all.
5      All right.  We'll change.  We got to
6  change.
7      THE VIDEOGRAPHER:  We are going off the
8  record at 5:15 p.m.  This is the end of media
9  set 4.
10     (A short recess was taken.)
11     THE VIDEOGRAPHER:  We are back on the
12  record at 5:40 p.m.  This is media set 5.
13     MS. CRONIN:  Got it.
14     (Document marked as Dziubla Deposition
15         Exhibit No. 43 for identification.)
16  BY MR. RUFF:
17     Q.  The last text message sequence is
18  with -- I don't know where I put my -- is with
19  Rachael, Exhibit 43, correct?
20     A.  Yes.
21     Q.  Ms. Dziubla; is that correct?
22     A.  Yes, that's correct.
23     Q.  Okay.  And, again, in this
24  contemporaneous document, there was no indication

Page 315

1  of any offensive touching by Mr. Jacobsen.  Can
2  we agree on that?
3      MR. SEDAEI:  Take your time, go through
4  the whole thing before you answer.
5      MR. RUFF:  Oh, here, it is.  It's all my
6  fault.
7  BY MR. RUFF:
8      Q.  While you're looking, Ms. Dziubla, the
9  exhibit encompasses, for the record, JCA 785
10  through JCA 825.
11     A.  Yes.
12     (Discussion off the record.)
13  BY MR. RUFF:
14     Q.  Are you going to be a while?
15     A.  Yeah, slow reader.
16     MR. RUFF:  Okay.  Well, let's go off the
17  record.
18     THE VIDEOGRAPHER:  Off the record at
19  5:44 p.m.
20     (Discussion off the record.)
21     THE VIDEOGRAPHER:  Back on the record at
22  5:48 p.m.
23     MR. RUFF:  Suzanne, do you mind reading
24  it back.

Page 316

1      (Whereupon, the question was read
2      as follows:
3      Q.  Okay.  And, again, in this
4  contemporaneous document, there was
5  no indication of any offensive
6  touching by Mr. Jacobsen.  Can we agree
7  on that?)
8  BY THE WITNESS:
9      A.  I don't agree to that.
10  BY MR. RUFF:
11     Q.  Okay.  What page are you referring to?
12     A.  I'm referring to 796 and --
13     Q.  Anything else other than 796?
14     A.  Well, 796 and it continues on 797 at the
15  top.
16     Q.  Okay.  796, 797.  Tell me where this
17  refers to specific reference regarding offensive
18  touching?
19     A.  Yeah, he gave me a, air quotes, lesson
20  in golf and told everyone where he was going to
21  put his wood.
22     Q.  Right.  Where does it refer -- I'm not
23  talking about the comment.  I'm talking about
24  offensive touching.

Page 317

1      A.  That's what lesson is in quotes, the
2  context.
3      Q.  Oh, so it's the word lesson?
4      A.  Well, it's the context of my messages.
5  I mean, you can't take --
6      Q.  So --
7      A.  I'm telling her that I was offensively
8  touched.
9      Q.  By putting lesson in quote?
10     A.  Yes.
11     Q.  Okay.  Nowhere do you refer to any body
12  parts, touching any body parts, or how he touched
13  you.  Can we agree on that?
14     A.  Yes.
15     Q.  Okay.  And in that same quote, you refer
16  to the -- what you interpreted to be and you
17  alone interpreted to be an offensive comment,
18  correct?
19     A.  That is the comment I heard, correct.
20     MR. RUFF:  All right.  Exhibit 40 --
21  what is it?
22     MS. CRONIN:  44.
23     MR. RUFF:  -- 4.
24

80 (Pages 314 - 317)

Page 318

1     (Document marked as Dziubla Deposition
2        Exhibit No. 44 for identification.)
3  BY MR. RUFF:
4     Q.  While we're getting the exhibit passed,
5  you talked about an incident involving a coworker
6  where you -- it's referred to in the note of your
7  psychologist regarding a contact with a coworker
8  where apparently -- and this was discovered in
9  questioning by counsel, about how a person came
10 towards you or came at you at work; is that
11 correct?
12    A.  Yes.
13    Q.  And what is that gentleman's name?
14    A.  I believe he's re -- you're referring to
15 Sam.
16    Q.  What is that gentleman's full name?
17    A.  I want to say Lerner is his last name.
18 I'm not sure.
19    Q.  L-e-r-n-e-r?
20    A.  Sure, yeah.
21    Q.  Okay.  And he was at Talent Hitch?
22    A.  Correct.
23    Q.  Is he still there?
24    A.  I have no idea.

Page 319

1     Q.  The last time you knew of him was at
2  Talent Hitch?
3     A.  Yeah, that's the last I recall, I know
4  of his last employment, yes.
5     Q.  And then you swore at him and he -- or
6  he swore at you and then you swore at him,
7  correct?
8     A.  I did not swear at him.
9     Q.  Do I need to get the exact language out?
10 In your own words, I told him to fuck off?
11    A.  No, he said to go fuck yourself and
12 chased me down the hall.  I never said anything
13 to him.  I retreated as far as I could.
14    Q.  So you don't agree that you swore back?
15    A.  I did not.
16    Q.  I'm sorry?
17    A.  I did not.
18       (Discussion off the record.)
19    MR. RUFF:  Go off the record.
20    THE VIDEOGRAPHER:  Off the record at
21 5:52 p.m.
22       (Document marked as Dziubla Deposition
23       Exhibit No. 45 for identification.)
24    THE VIDEOGRAPHER:  Back on the record at

Page 320

1  5:54 p.m.
2  BY MR. RUFF:
3     Q.  Who is Agada, A-g-a-d-a?
4     A.  I don't know.
5     Q.  Is that your counselor?
6     A.  No, I don't know.
7     Q.  Okay.  If it's represent -- this was
8  produced to us as representation --
9     A.  Oh, it says up here that was her last
10 name.  I didn't know that was her last name.
11    Q.  Okay.  So you do know who this is?
12    A.  Yes.
13    Q.  Who is Ms. Agada?
14    A.  Latavia was my Talk Space counselor.
15    Q.  Okay.  And this is a recitation, it says
16 approximately a year ago.  When did the incident
17 occur with Sam from Talent Hitch?
18    A.  I don't recall.
19    Q.  What year?
20    A.  I honestly don't recall.
21    Q.  You were there five months.  Do we need
22 to go through --
23    A.  I mean, I worked for several months from
24 home.  I don't recall.

Page 321

1     Q.  Well, this wouldn't have occurred at
2  home.  This would have occurred at the --
3     A.  I could have been in the office at that
4  time.  I mean, I came in for meetings.  I could
5  have been there that day.
6     Q.  Okay.
7     A.  But I was working from home after the
8  incident for sure.
9     Q.  And you have no idea of the day?
10    A.  I don't, I'm sorry, I don't.
11    Q.  So it would have been after you left in
12 October --
13    A.  So between October and March.
14       (Reporter interrupted.)
15    MR. BOYLE:  Can we go off the record.
16    MR. RUFF:  Yeah.
17    THE VIDEOGRAPHER:  Off the record at
18 5:56 p.m.
19       (Discussion off the record.)
20       (Document marked as Dziubla Deposition
21       Exhibit No. 46 for identification.)
22    THE VIDEOGRAPHER:  Back on the record at
23 5:57 p.m.
24

81 (Pages 318 - 321)

Page 322

BY MR. RUFF:

1    Q.  Exhibit 46, these are documents produced
2    by you.  Exhibit 46 goes from 1818 to 1884.  Can
3    we agree on that?
4    A.  Yes.
5    Q.  Okay.  If you look at 1827, February 7,
6    6:17 p.m.  This is a Talk Space discussion with
7    Latavia, correct?
8    A.  Yes.
9    Q.  And her last name is Agada, correct?
10   A.  That's what it says.
11   Q.  If we go to the February 7th, 6:17,
12   about the fifth line down, THI, do you see that?
13   A.  Yes.
14   Q.  Has been open for just a little over two
15   years, and just yesterday, that would be
16   February 6th, a coworker and I (we are all
17   independent contractors) tried to address "my
18   attitude" with him.  I explained to him that it
19   was a misunderstanding (oye I hate tying all this
20   stuff out - I'm scared I'm going to leave
21   something out) but in a nutshell, I told him I
22   wasn't about to fight at work and said let's
23   chalk it up to a misunderstanding; and as I

Page 323

1    walked out of the meeting room, meeting is
2    misspelled, he told me to go fuck myself, and I
3    said -- and I was a piece of a sheet.  I
4    responded with grow the fuck up.
5        Did I read that correctly?
6    A.  You read it correctly.
7    Q.  Okay.  So that was your response to a
8    coworker on February 7th, 2018, correct?
9    A.  Correct.
10   Q.  What was the misunderstanding about?
11   A.  Basically I was brought on the team as
12   an expert of the industry, and I was told that at
13   any time that I -- if I needed to coach somebody
14   on something that I could.  And I addressed it
15   with him in front of a coworker, and he didn't
16   like it and he said let's talk about it one on
17   one; and I said, okay, let's go into a private
18   room and talk about it.  And so we went to go
19   talk about it, and I said, you know, honestly I
20   don't agree.  I was very calm.  I said, I don't
21   agree with, you know, where this is going.  I'm,
22   like, let's chalk it up to misunderstanding and
23   let's get on with our day, man.  And as I went up
24   to leave, I tried to leave peacefully, and that's

Page 324

1    when he came at me.  And I was just, like, what
2    the fuck is going on, and I just wanted to get
3    away from him as soon as possible.
4    Q.  And he came at you?
5    A.  He physically charged at me.  Like, we
6    had a portion of the office blocked off for the
7    owner's dog.  And I, like, kept going, opened the
8    door and got into the other part; and I was,
9    like -- and then I finally told him, I'm, like,
10   I'm going to call the police if you don't, like,
11   fricken get away from me.
12   Q.  So he physically charged you, correct?
13   A.  Yes.
14   Q.  And he used pretty harsh words, correct?
15   A.  Yes.
16   Q.  And you were upset, correct?
17   A.  Yes.
18   Q.  Why didn't you sue him?
19   A.  What -- it was an altercation at work.
20   Like I said, I've been in the industry for a
21   really long time.  Every little thing that hap --
22   you think if I -- everything little thing that
23   happened or every little calendar I saw with a
24   half dressed woman, if I -- I mean, that's not

Page 325

1    my -- I don't just go around suing people.
2    Q.  You got a pretty tough shell, right?
3    A.  I have a high threshold.
4    Q.  All right.  Let's go to Exhibit 46.
5        (Discussion off the record.)
6        MS. CRONIN:  Let's go off the record.
7        THE VIDEOGRAPHER:  Off the record at
8    6:02 p.m.
9        (Discussion off the record.)
10       THE VIDEOGRAPHER:  Back on the record at
11   6:03 p.m.
12   BY MR. RUFF:
13   Q.  So this is an email from you, at the
14   top, 9/27/7 -- 2017 at 10:51 a.m.?
15       MR. SEDAEI:  For the record, we're
16   looking at Exhibit 44.
17   BY MR. RUFF:
18   Q.  Is that correct?
19   A.  Exhibit 44, yes.
20   Q.  Okay.  And it's from you to Michael
21   Power, correct?
22   A.  Yes.
23   Q.  I'm going to the end of the second line,
24   you guys took care of.  Do you see that?

82 (Pages 322 - 325)

Page 326

1    A.  Yes.
2    Q.  You guys took care of McGuire, you'll
3  take care of Mott --
4    A.  Oh, Mott.
5    Q.  -- too, now that he's out, but when it
6  comes to me and being what I've been through at a
7  WORK FUNCTION, the best you can do is put me in a
8  defensive position with no opportunity to recover
9  from this.
10       Did I read that correctly?
11    A.  Yes.
12    Q.  So you looked at the opportunity to
13  recover against JCA and Mr. Jacobsen as an
14  opportunity?
15    A.  Like, in terms of --
16    Q.  Like an opportunity, just what the
17  question says.
18    A.  Again, I don't understand.
19    Q.  Your words, ma'am.  You don't understand
20  your words?
21    A.  Please don't talk to me that way.
22    Q.  What?
23    A.  The way you're taking to me.  Like I'm
24  -- your idea of the opportunity -- no opportunity

Page 327

1  to recover in terms of, like, time off and
2  figuring out what I'm going to do.  I just
3  thought that he would be more empathetic to what
4  happened instead of putting me on the defensive.
5    Q.  Move to strike --
6    A.  That's what I meant.
7    Q.  -- the answer as nonresponsive.
8       Do you know what the question is or
9  do you want it reread?
10    A.  I don't know how many times --
11    Q.  Do you want to know -- do you know what
12  the question is?
13    A.  I don't obviously.
14    Q.  Okay.
15    A.  Let's hear it again.
16    MR. RUFF:  Suzanne, can we have the
17  question.
18  BY MR. RUFF:
19    Q.  It's a yes-or-no answer.
20       (Whereupon, the question was read as
21       follows:
22       Q.  So you looked at the
23  opportunity to recover against JCA
24  and Mr. Jacobsen as an opportunity?)

Page 328

1  BY THE WITNESS:
2    A.  No.
3  BY MR. RUFF:
4    Q.  You were willing to sue Mr. Jacobsen
5  because of his status, true?
6    A.  No.
7    Q.  You were willing to sue Mr. Jacobsen
8  because he was potentially an easy target,
9  correct?
10    A.  No.
11    Q.  You were willing to sue Mr. Jacobsen,
12  because once you say something against a
13  celebrity, it must be true, true?
14    A.  No.
15    Q.  You were willing to sue Mr. Jacobsen,
16  because you had an opportunity to recover;
17  whereas you didn't have that same opportunity
18  against Sam Lerner, correct?
19    A.  I don't understand the question.
20    Q.  The jury will.
21       You're willing to sue over a comment
22  when apparently you portray yourself as thick
23  skinned; but when somebody physically charges you
24  and swears at you, you don't sue, correct?

Page 329

1    MR. SEDAEI:  Objection, form.
2       But answer if you understand.
3  BY THE WITNESS:
4    A.  You need to put yourself in my position.
5  I had just gotten out of a really tough situation
6  at JCA.  I'm at a new company trying to figure
7  shit out where I'm working on commission only,
8  and somebody charges at me.  If I can prevent
9  something from happening from it getting to a
10  litigation like this, I'm going to do it.  And I
11  asked him for help, and what I got was, okay, why
12  don't you work from home.
13    Q.  What opportunity did you give
14  Mr. Jacobsen before you sued him?
15    MR. SEDAEI:  Objection, form.
16       But answer if you understand the
17  question.
18  BY THE WITNESS:
19    A.  I don't understand the question.
20  BY MR. RUFF:
21    Q.  The jury will.  Thank you very much.
22       Exhibit --
23    MS. CRONIN:  Go ahead, 46, right?
24    MR. RUFF:  -- 46.

83 (Pages 326 - 329)

Page 330

1    (Document marked as Dziubla Deposition
2    Exhibit No. 47 for identification.)
3  BY MR. RUFF:
4    Q.  Who is this photo taken by?
5    A.  I don't know.
6    Q.  It was taken after the alleged incident
7  between you and Mr. Jacobsen, true?
8    A.  Yes.
9    Q.  Is that you in the photo?
10   A.  Yes.
11   Q.  Is that Mr. Jacobsen in the photo?
12   A.  Yes.
13   Q.  Have you ever written or said anything
14 publicly regarding Mr. Jacobsen?
15   A.  Not that I recall.
16   Q.  Has your attorney?
17   A.  I don't know what he writes.
18     MR. SEDAEI:  Objection, foundation.
19     But answer if you understand.
20 BY MR. RUFF:
21   Q.  Has your attorney ever posted anything
22 about Mr. Jacobsen publicly?
23   A.  I don't -- not that I know of.
24   Q.  Has he posted anything about the

Page 331

1  incident occurring on September 18th, 2017?
2     MR. SEDAEI:  Objection, foundation.
3     But answer if you know.
4  BY THE WITNESS:
5    A.  I don't know.
6     MR. RUFF:  All right.  I have damage
7  questions.
8     Anything else for right now?
9  Anything else for right now?
10     I have damage questions which I will
11 reserve.
12     Pass the baton unless we're going to
13 move to another day.
14     MR. BOYLE:  You want to just --
15     MR. SEDAEI:  Okay.  So are you done?
16 Can we go off the record.
17     THE VIDEOGRAPHER:  Off the record at
18 6:09 p.m.
19     (A short recess was taken.)
20     THE VIDEOGRAPHER:  We are back on the
21 record at 6:18 p.m.
22     MS. CRONIN:  The last exhibit was
23 incorrectly marked as Exhibit 46.  The photograph
24 should be marked as Exhibit 47.

Page 332

1     MR. RUFF:  And we are off the record.
2     MS. CRONIN:  We're done.  We're off the
3  record.
4     THE VIDEOGRAPHER:  This marks the end of
5  media set 5 and the end of this deposition at
6  6:18 p.m.
7     THE REPORTER:  Do you want a copy of the
8  transcript?
9     MR. SEDAEI:  Yeah, PDF.
10     (Whereupon, the deposition was
11     adjourned at 6:18)
12     (Signature was reserved.)
13
14
15
16
17
18
19
20
21
22
23
24

Page 333

1  STATE OF ILLINOIS  )
2                      )  SS:
3  COUNTY OF C O O K  )
4     I, Suzanne Burke, Illinois CSR
5  No. 084-002573, do hereby certify that ROWENA
6  DZIUBLA was duly sworn to testify the whole
7  truth, and that the foregoing deposition was
8  recorded stenographically by me and was reduced
9  to typewriting by me, and that the said
10 deposition constitutes a true record of the
11 testimony given by said witness.
12     I further certify that the
13 reading and signing of said deposition was not
14 waived by the witness and her attorney.
15     I further certify that I am not
16 a relative or employee or attorney or counsel of
17 any of the parties, or a relative or employee of
18 such attorney or counsel, or financially
19 interested directly or indirectly in this action.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand and affixed my seal of
22 office at Chicago, Illinois, 24th of June, A.D.,
23 2019.

     Certified Shorthand Reporter

24

84 (Pages 330 - 333)

Page 334

1          Veritext Legal Solutions
             1100 Superior Ave
2             Suite 1820
           Cleveland, Ohio 44114
3         Phone: 216-523-1313

4  June 24, 2019

5
   To: Sam Sedaei, Esq.

6
   Case Name: Dziubla, Rowena v. J.C. Anderson, Inc., et al.

7
   Veritext Reference Number: 3405962

8
   Witness: Rowena Dziubla     Deposition Date: 6/20/2019

9

10  Dear Sir/Madam:

11
   Enclosed please find a deposition transcript.  Please have the witness

12
   review the transcript and note any changes or corrections on the

13
   included errata sheet, indicating the page, line number, change, and

14
   the reason for the change.  Have the witness' signature notarized and

15
   forward the completed page(s) back to us at the Production address

16  shown

17  above, or email to production-midwest@veritext.com.

18
   If the errata is not returned within thirty days of your receipt of

19
   this letter, the reading and signing will be deemed waived.

20

21  Sincerely,

22  Production Department

23

24  NO NOTARY REQUIRED IN CA

Page 335

1      DEPOSITION REVIEW
      CERTIFICATION OF WITNESS

2
   ASSIGNMENT REFERENCE NO: 3405962

3  CASE NAME: Dziubla, Rowena v. J.C. Anderson, Inc.
   DATE OF DEPOSITION: 6/20/2019

4  WITNESS' NAME: Rowena Dziubla

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7    I have made no changes to the testimony
   as transcribed by the court reporter.

8  _____

9  Date       Rowena Dziubla

10   Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11  the referenced witness did personally appear
   and acknowledge that:

12
   They have read the transcript;

13  They signed the foregoing Sworn
      Statement; and

14   Their execution of this Statement is of
      their free act and deed.

15
   I have affixed my name and official seal

16
   this _____ day of_____, 20_____.

17

18    Notary Public

19
    Commission Expiration Date

20

21

22

23

24

25

Page 336

1     DEPOSITION REVIEW
     CERTIFICATION OF WITNESS

2
   ASSIGNMENT REFERENCE NO: 3405962

3  CASE NAME: Dziubla, Rowena v. J.C. Anderson, Inc., et al.
   DATE OF DEPOSITION: 6/20/2019

4  WITNESS' NAME: Rowena Dziubla

5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as

8  well as the reason(s) for the change(s).

9    I request that these changes be entered
   as part of the record of my testimony.

10
   I have executed the Errata Sheet, as well

11  as this Certificate, and request and authorize
   that both be appended to the transcript of my

12  testimony and be incorporated therein.

13  _____  _____
   Date       Rowena Dziubla

14
   Sworn to and subscribed before me, a

15  Notary Public in and for the State and County,
   the referenced witness did personally appear

16  and acknowledge that:

17    They have read the transcript;
   They have listed all of their corrections

18   in the appended Errata Sheet;
   They signed the foregoing Sworn

19  Statement; and
   Their execution of this Statement is of

20  their free act and deed.

21  I have affixed my name and official seal

22  this _____ day of_____, 20____.

23  _____
   Notary Public

24

25   Commission Expiration Date

Page 337

1    ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST

2    ASSIGNMENT NO: 3405962

3  PAGE/LINE(S) /    CHANGE   /REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19
   _____  _____

20  Date       Rowena Dziubla

21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22  DAY OF _____, 20_____ .

23  _____
   Notary Public

24

25   Commission Expiration Date

**[& - 215]**                                                                 Page 1

**&**

**&** 2:2,13 92:13,22
93:20,23

**0**

**04542** 5:22
**084-002573** 333:4

**1**

**1** 3:18 5:12 14:8
14:10,15 46:2
70:8 244:15
**1-6** 280:15
**1.3** 33:21
**10** 3:22 63:11,14
**100** 21:15 256:10
**101** 298:9,20 299:4
**102** 4:5 297:22
**1048** 65:5,5
**106** 21:12
**1085** 67:13
**1095** 66:5
**10:19** 1:17 5:2
**10:37** 307:8
**10:51** 325:14
**11** 3:23 70:2,14
73:2 74:7 217:14
**1100** 334:1
**1129** 71:3
**1146** 71:10
**11:00** 114:13
122:14
**11:35** 70:7
**11:47** 215:12
**11:48** 70:11
**11:58** 121:19
122:14
**12** 4:3 82:2,5
170:6,7
**120** 2:19 4:5
**1207** 71:20

**121** 4:6,6
**128** 4:7
**12:00** 121:21
**13** 4:4 84:23 85:3
190:4,12 192:19
196:8
**130** 4:7
**132** 4:8
**134** 4:8
**13th** 307:6
**14** 3:18 4:4 92:4,7
93:17
**14th** 221:17
**15** 4:5 102:12,15
190:2 200:9
239:16
**150** 4:9
**153** 4:9
**15th** 200:17 201:6
**16** 3:18 4:5 120:21
121:2 243:12
280:2,10,11,13,14
280:15,17
**163** 4:10
**166** 4:10
**169** 4:11
**17** 3:19,19 4:6
121:10,18 122:1
235:13 239:17
243:12 269:22
296:8,13,15 297:7
**173** 306:19
**176** 4:11
**178** 4:12
**17th** 247:13
**18** 3:20,20 4:6
21:8 95:2,8
121:14,20 124:18
197:4,4,9 235:5,9
243:12

**1818** 322:3
**1820** 334:2
**1827** 322:6
**183** 306:19
**185** 4:12
**188** 4:13
**1884** 322:3
**189** 4:13
**18s** 197:10
**18th** 94:5 198:7
227:11 228:11
233:16 234:3
247:13,14,16
307:9 331:1
**19** 4:7 128:4,6,9
306:9
**191** 309:6
**197** 4:14
**1979** 19:13
**199** 4:14
**1997** 26:19,21
**19th** 121:19
133:13 307:12,16
307:17
**1:15** 177:10
**1:18** 1:5 5:22
**1:22** 149:4
**1:30** 151:4 240:23
**1:38** 149:8

**2**

**2** 3:18 15:22 16:2
16:5 70:11 149:5
244:14,17 253:24
257:19 308:2
**20** 1:16 2:2 4:7
23:2 51:8 130:7
130:10 137:17
189:21 335:16
336:22 337:22
**2005** 21:2

**2006** 26:23,24
**2008** 21:1 23:2,2
**2012** 41:10 43:18
43:24 51:19,20
**2013** 41:10
**2014** 36:16 218:3
218:11,16
**2015** 21:8 33:16
36:17 217:23
**2016** 32:18,23
33:11 46:5
**2017** 22:2 33:6
46:5,8 81:8 93:4
94:5 95:2,8
178:21 186:1
199:15 200:9,17
207:13 209:4
212:8 215:11
218:21 227:11
228:11 233:16
234:3 247:2,6
298:6,16 307:9
325:14 331:1
**2018** 15:2,6 23:1
46:12 218:21
219:6 223:15
323:8
**2019** 1:16 5:3
333:22 334:4
**205** 309:7
**206** 4:15 309:7
**20th** 5:2 147:5
149:12 151:11
153:16 207:13
247:2,6,9
**21** 4:8 132:22
133:1
**210** 4:15
**2108** 333:23
**215** 3:3 4:16

**[216-523-1313 - 6:18]** Page 2

216-523-1313
  334:3
**21st** 150:4,16
**22** 4:8 134:5,7
**222** 1:15 2:7 5:24
**22nd** 150:4,16
  185:24
**23** 4:9 150:24
  151:3
**23rd** 209:4,13,23
**24** 3:21 4:9 153:4
  153:7 298:6 334:4
**246** 4:17
**24th** 298:12,16
  333:21
**25** 4:10 163:19,22
**2500** 2:14
**25th** 151:5,11
  153:9
**26** 4:10 166:22,24
  224:5
**2600** 1:16 2:8
**26th** 157:22
  163:24 167:2
  168:7 180:2 181:1
  181:14,20 182:6
  217:22
**27** 4:11 169:6,8
**27th** 168:11,12
  169:10 180:6,12
  181:3 214:23
  215:11 216:7
**28** 3:21 4:11
  176:11,14
**28th** 202:22 203:4
  203:9 204:10,20
**29** 4:12 178:13,16
**297** 4:17
**29th** 176:15
  177:10 181:3

**2nd** 178:21 205:4
  205:10 206:2

**3**

**3** 3:19 17:11,12,14
  17:21,22 18:3
  149:8 217:19
  226:10
**30** 4:12 42:21
  185:10,13
**300** 42:23
**300,000** 224:7
**306** 4:18
**308** 4:18
**30th** 19:13
**31** 4:13 188:3,6
**3100** 2:19
**312-332-6733** 2:5
**312-578-7458** 2:16
**312-609-7692** 2:10
**312-899-9090** 2:21
**314** 4:19
**318** 4:19
**319** 4:20
**31st** 15:6
**32** 4:13 189:2,5
**321** 4:20
**33** 4:14 197:21,23
  198:2
**330** 4:21
**34** 4:14 199:24
  200:2
**3405962** 334:7
  335:2 336:2 337:2
**35** 4:15 206:16,19
  246:12
**36** 4:15 210:20,22
**37** 4:16 215:6,8
**38** 4:16
**385** 3:2
**39** 4:17 243:11
  246:13,16,18,23

296:22 297:5
  301:5,9,14
**3:00** 244:7 245:24
  246:4 251:5
**3:05** 130:13
**3:18** 226:10
**3:40** 226:13
**3rd** 179:14 205:22
  219:2

**4**

**4** 3:19 17:16,18,22
  17:23 18:14
  226:13 241:3
  314:9 317:23
**40** 4:17 243:12
  297:9,10,12,14
  317:20
**41** 4:18 306:13,15
**42** 4:18 308:17,20
  308:24 309:3,6
**43** 4:19 314:15,19
**44** 3:22 4:19
  317:22 318:2
  325:16,19
**44114** 334:2
**45** 4:20 118:2
  319:23
**4542** 1:5
**46** 4:20 321:21
  322:2,3 325:4
  329:23,24 331:23
**47** 4:21 330:2
  331:24
**4:00** 246:4 251:6
  251:17
**4:28** 153:9
**4:45** 133:13
  134:17

**5**

**5** 3:20 18:20,24
  19:1 314:12 332:5
**50** 258:13 308:5,6
  308:8
**500** 2:3
**503-607-0224** 3:5
**5:00** 114:1 116:17
  243:20 244:9
  245:13
**5:15** 314:8
**5:40** 314:12
**5:44** 315:19
**5:48** 315:22
**5:52** 319:21
**5:54** 320:1
**5:56** 321:18
**5:57** 321:23

**6**

**6** 3:20 18:20,24
  19:3
**6/20/2019** 334:8
  335:3 336:3
**60** 258:24 280:12
**60007** 21:13
**60601-1106** 2:8
**60602** 2:20
**60603** 2:3
**60606** 2:14
**63** 3:22
**691** 129:13
**692** 129:22
**694** 128:16
**6:02** 325:8
**6:03** 325:11
**6:09** 331:18
**6:17** 322:7,12
**6:18** 331:21 332:6
  332:11

**6th** 322:17

**7**

**7** 3:21 24:15,18
  322:6
**70** 3:23
**718** 198:24,24
**724** 199:8
**785** 315:9
**796** 316:12,13,14
  316:16
**797** 316:14,16
**7:36** 130:12
**7th** 322:12 323:8

**8**

**8** 3:21 28:16,19
  30:16 31:13 36:9
  48:11 51:14 241:2
**80,000** 177:8
**803** 246:24
**804** 253:24 269:5
**807** 209:5,10
**808** 209:8,15
**809** 246:24
**82** 4:3
**825** 315:10
**84** 4:4
**8:28** 198:6
**8:45** 298:7

**9**

**9** 3:22 44:20,23
  102:17
**9/27/7** 325:14
**90,000** 223:20
**92** 4:4
**938** 48:1
**97034** 3:3
**98** 297:21
**9:00** 128:14,23
  129:7

**9:41** 198:6

**a**

**a.d.** 1:17 333:21
**a.m.** 1:17 5:2 70:7
  70:11 121:19
  128:14,23 129:7
  177:10 215:12
  307:8 325:14
**abigail** 262:19
  263:24 264:10
  265:11 287:8
**ability** 10:19
**able** 10:15 53:7
  54:5 98:9 109:13
  139:4,14 148:19
  148:20 161:11,12
  162:3,22 163:7
  174:15,20 194:19
  196:11 205:20
  264:7
**absent** 277:12
  278:2,3,15
**absolutely** 14:6
  28:12 40:16 76:20
  202:8,10
**absolve** 304:7
**absorbed** 123:24
**ac** 172:23
**accept** 56:9 167:16
  174:24 176:1,2
**acceptable** 7:17
  159:18,20 174:19
  175:14,19 176:16
  176:19 178:4
**accepted** 56:7,17
**accepting** 133:10
**access** 66:10 137:1
**accomplish** 80:7
**accomplishments**
  231:23

**account** 263:18
  296:2 298:17
  299:14 300:12
  302:12,22 303:20
  307:20
**accounting** 97:8
  239:9
**accurate** 15:17
  17:7 18:11 19:8
  30:13 33:18 34:4
  37:3 41:7 46:5
  47:17 62:7 63:4
  153:20 210:2
  233:18 253:9
  254:7
**accusing** 190:21
**achieved** 25:9
**acknowledge**
  335:11 336:16
**acknowledges**
  130:21
**acknowledging**
  150:12
**acl** 170:10 172:24
  193:13 194:16
**acquired** 194:18
**acronym** 7:14
  28:6
**act** 185:3 225:4
  335:14 336:20
**action** 6:8 210:10
  224:3 333:18
**actions** 126:17
  161:16
**active** 194:21
**actively** 34:23
  252:6
**actual** 71:21 73:8
  201:24 205:17
  234:18 288:9

**adam** 108:2 111:8
  111:12 243:21
  249:7 251:20
  252:4,14 253:3
  256:24,24 260:13
  262:10 265:13
  266:24 268:11
  287:7
**adam's** 249:8
**add** 50:1 97:24
  296:12
**added** 15:2
**adding** 281:13
**addition** 201:13
  202:7
**additional** 41:23
  50:5 74:9
**address** 21:11,14
  21:19,24 140:11
  322:18 334:15
**addressed** 89:14
  140:23 323:14
**adhere** 194:19
  196:4
**adhered** 64:19
**adjourned** 332:11
**adjust** 57:24
**administer** 6:6
**admit** 250:17
**admitted** 253:13
**advertising** 92:22
**advice** 127:22,24
  129:6 295:1
**advised** 129:13
  135:2
**advises** 128:17
**advising** 128:24
  217:6
**advocate** 93:6
**affiliations** 6:11

**affixed** 333:20 335:15 336:21
**african** 142:5
**afternoon** 111:8 112:1 124:22 130:13 133:13 136:24 151:5 226:16 298:22 299:9,9
**afterward** 261:3
**agada** 320:3,13 322:10
**agency** 30:17 40:8
**ago** 25:20 27:5,5 94:16 233:3 289:24 290:2 298:3 320:16
**agree** 5:10 52:2 67:17 72:2 134:10 134:13 175:9 181:11 186:12 246:22 287:21 288:16 289:13 290:13 292:9 293:9 294:20,24 298:14 300:7,14 300:24 303:16,20 303:23 306:19 307:9,20 309:12 309:24 310:13 311:4,6 315:2 316:6,9 317:13 319:14 322:4 323:20,21
**agreed** 134:2 165:9 166:17 175:6,12 220:17 293:17
**agreeing** 175:3
**agreement** 71:23 96:19 163:1 175:1

175:3,4,20 176:1 176:23 177:17 180:9
**ahead** 9:8 11:23 20:21 68:16 175:1 268:9 282:13 289:2 305:2 329:23
**air** 60:22,23 316:19
**al** 334:6 336:3
**alcohol** 251:10,12 253:15
**alj** 29:5 30:13
**allegation** 192:18 196:8
**allege** 225:3 260:18
**alleged** 330:6
**alleging** 224:22 225:14
**allocated** 61:4
**allow** 288:23
**allowed** 163:8 194:3 222:18,20
**allows** 236:2
**altercation** 324:19
**altogether** 20:5
**amended** 16:12 17:22 18:4 19:3 217:12
**americans** 142:5
**amount** 41:22 79:6 166:14 224:7 238:22
**anderson** 1:6 2:12 5:19 6:14,16,18 7:11,14,17 29:13 46:4 65:12,22 79:13 334:6 335:3 336:3

**anderson's** 19:2
**angel** 270:8
**angelovicz** 146:12 146:12,13,14
**anniversary** 21:7
**announced** 271:13 294:16 313:15
**announces** 274:18 302:1
**answer** 9:8 10:1,4 10:11 69:18,19 73:6 74:13,13 75:16 84:15,16 96:17 182:1 191:1 213:9 226:1 227:7 231:3 250:14 278:3 282:13 288:22 289:18 290:1,17,24 291:1 291:4,6,6,8,10,11 291:14,22 303:2 303:11 304:2,18 305:9,14 313:3 315:4 327:7,19 329:2,16 330:19 331:3
**answered** 75:18 84:14 109:16 224:20 290:16 298:2 303:1 305:7 310:6 312:10 313:23
**answering** 291:17 310:10 311:17
**answers** 9:13 16:19 17:23 18:2 18:4,10 217:13
**anticipate** 9:22
**anybody** 9:1 12:3 12:11 21:22,24 22:4 35:1 52:14

52:19 59:11 72:19 73:4,22 77:21 78:11 88:1 98:15 110:1 114:17 116:21 119:17 120:14 177:23 181:16 182:8,15 182:22 184:4 185:1 191:20 192:10,16 196:5,7 196:23 197:18 262:6
**anymore** 87:8 90:2,6,11 91:19 97:14 165:6 235:15
**apart** 152:5
**apparently** 222:20 254:2 318:8 328:22
**appear** 165:13,23 166:4 335:11 336:15
**appearances** 2:1 3:1 6:11
**appeared** 2:6,11 3:6 165:18 166:1
**appears** 209:8
**appended** 336:11 336:18
**applied** 64:1
**apply** 80:1
**appointment** 295:24
**appreciate** 83:3 89:15 142:20 144:6,9
**approach** 275:9 299:23
**approached** 265:24

**approve** 51:2
78:23
**approved** 150:7
150:11,11 153:16
**approximate**
211:22
**approximately**
33:9,21 36:16
81:9 154:11
240:19,20 251:17
298:13 320:16
**april** 20:12 21:8
23:2,2
**area** 28:3 49:1
110:23,24 237:4
237:23,24 238:5,7
238:9 259:9 285:8
285:22 286:20
**areas** 183:12
293:7
**arena** 231:23
**argument** 128:18
128:19 129:1
220:4
**arms** 294:8
**arrested** 22:10
**arrived** 98:2,21
104:24 240:19
**artist** 143:4
**arts** 25:23
**artwork** 142:20
143:3,5
**asian** 140:15
**asked** 10:10 12:20
12:23 35:20 38:19
75:1,5,19,21 84:14
112:18 133:6
139:3,10 150:2
158:19 165:1
177:7 181:9
217:18 239:14

261:2 278:2
290:16 302:24
329:11
**asking** 7:19 9:22
11:21 47:13 50:20
66:1 95:8 109:21
133:15 152:11,16
152:21 156:3,19
178:8 182:1,2
185:21 190:22
191:4 193:22
209:7,12 225:18
225:19 226:19
230:15,16 261:13
277:7 290:3,8
292:3 305:9
310:19 311:14
**asks** 9:1 311:1
**aspect** 50:10 52:21
171:5
**aspects** 162:4
**aspen** 107:19,23
**assaulted** 211:13
**asserted** 7:21
**assertively** 108:21
**asses** 136:11
**asshole** 147:1
**assholes** 214:16
**assigned** 56:22
59:22 60:4
**assignment** 335:2
336:2 337:2
**assist** 28:3
**assistant** 36:23
249:9
**assisted** 108:17
**associate's** 26:6,21
**associated** 47:15
**assume** 9:8 28:7
194:16 237:14,16
248:10 258:18

**assumed** 294:4
**assuming** 15:2
28:21 194:20
195:5 237:21
262:20,21 284:6
**assured** 43:12
54:12
**ate** 250:3
**atlas** 38:24 39:6,12
39:12 40:8,23
41:1 45:17,19
218:6,9
**atmosphere** 39:15
**attached** 176:24
336:7
**attack** 219:22
**attempt** 10:3
106:12
**attended** 94:5 95:1
95:4
**attention** 65:8
82:23 86:18
102:17 130:18
144:18 190:4
211:9 213:5
**attesting** 264:11
**attitude** 322:19
**attorney** 6:20
11:10,14 15:10
16:20 18:1,8 74:1
134:21,22 135:9
135:19 223:7
229:13 330:16,21
333:13,15,17
**attorneys** 70:23
85:4 224:15
**auctions** 94:21
117:5
**audience** 88:21
**audio** 5:8,9

**authority** 242:8
**authorize** 336:11
**authorized** 6:6
**authorizing**
149:21
**autobiography**
229:7
**autographed**
105:15,20 256:20
259:18 298:24
299:10
**ave** 334:1
**average** 59:20,21
**averaging** 51:24
**avon** 93:24
**award** 232:2
**aware** 10:15 131:3
131:7,19,21
254:22 255:9
281:19
**awesome** 49:16
170:24 310:18

**b**

**b** 2:15 3:16 62:10
176:2
**bachelor's** 25:10
25:11,23
**back** 12:21 15:19
19:11 41:17 43:5
43:9 48:10,16
51:17,18,19 53:9
55:14 60:7,9,15
65:2 70:10 75:7,8
75:9,19,20,22 76:1
80:12 84:21 85:21
86:17,20 87:11
90:8,9 92:24 97:1
107:8 108:10,12
110:18,22 114:20
116:7,12 117:3,7
117:17,23,24

**[back - bit]**

120:23 121:7
123:9 129:10,11
130:4 149:7,21
154:5 155:24
156:1,15 162:7
163:7 164:7 165:4
165:7,14,19,20,23
166:2,4 167:24
168:3,6 173:6
174:20,21 175:14
178:3,9,10 180:16
180:19 181:17,23
182:9,14,21 183:2
188:24 197:1
199:1 204:23
212:22 216:1,8
217:22 218:2,11
226:12 261:4
270:9,16 271:21
272:6 273:3,17
280:20 286:12
289:2 290:23
291:1,22,22 296:6
301:5 304:20
305:21 308:3,6,8
312:19 314:11
315:21,24 319:14
319:24 321:22
325:10 331:20
334:15
**backed** 171:9
194:9
**background** 37:9
227:15
**bad** 77:13 186:20
187:16 222:6,21
238:24 254:4
**balance** 183:11
**balanced** 60:14
**ball** 105:22 109:13
115:13 238:5

254:3 255:13
259:18 267:15
270:18,20 271:5,8
283:14 299:11
**balls** 234:16
**bankruptcy** 20:22
22:21 23:4,7,13,15
23:21,23 24:10,23
25:3
**bar** 212:17
**base** 49:23
**based** 49:24 57:20
165:12 175:20
187:13
**basic** 54:1 64:17
194:8,10
**basically** 11:6
13:14 41:18 42:24
45:11 48:24 51:10
56:21 57:9 58:22
59:16 62:24 87:8
92:20 93:4 95:14
103:18 136:2,4
137:7 154:23
157:8 158:2,6
164:20,23 165:9
191:4 226:5
323:11
**basis** 79:8 122:24
**bates** 48:1 198:24
**bathroom** 101:24
102:6
**baton** 331:12
**battle** 212:11
**beata** 125:22
126:24 127:24
128:10,24 129:6
129:12 130:1
295:2,4 309:4,9
313:11

**beautiful** 143:5
**beer** 250:7 251:14
252:7
**beers** 252:7
**began** 46:7 51:20
63:17 72:6
**begged** 181:23
**beginning** 49:19
132:13 198:5
245:7,11,12
281:22 282:24
283:13,15 284:18
298:7 307:6
**begins** 246:23
**behalf** 2:6,11 3:6
6:13,15,21,23 7:1
53:4 205:22
**believe** 25:1 52:4
52:15 65:24 74:8
94:14 110:12
113:8,11 114:4
115:4,15 125:2
132:10 136:6,23
145:15 147:12,15
150:9,14 163:1
187:15 191:17
197:11,17 208:16
220:18 233:13,13
240:16 253:16
257:18 262:10
268:2 272:4
276:22 280:24
293:11 297:23
304:4 318:14
**belly** 279:9
**belong** 74:3
**belonging** 66:11
**benefit** 161:20
171:12
**benefits** 158:23
159:6,10,11,13

**best** 15:17 17:7
18:13 23:11 31:24
47:4 56:16 83:1
86:24 89:15 97:20
97:22 115:1 120:1
131:11,16 135:24
152:7 162:4
182:20,20 194:23
210:13 221:9
243:1 263:9
279:17 306:9
326:7
**better** 29:24 35:16
47:7 80:18 136:11
213:9
**beyond** 300:1
**bid** 47:2 60:6
62:14 66:17 86:10
143:20
**bidding** 57:8
58:11,12,17 59:24
60:1 67:24 71:7
**bids** 54:10 59:18
67:2 212:24
**big** 39:16 54:9,11
96:5 236:2
**bigger** 200:11
284:11
**bill** 53:8 142:15,18
143:2,12,18
**billing** 49:4
**binder** 63:5,17,20
75:7 155:21
**birth** 19:12,24
**bit** 11:4 19:22
20:24 29:16 34:8
49:17 53:9 57:7,7
58:14 94:3 100:24
132:10 215:1,16
269:5 271:15,18
272:6 294:1 302:2

**bitch** 79:17
**blank** 155:6
**blinderman** 32:13
  33:15,20 34:6
  35:17,21 36:4
  37:14
**blocked** 324:6
**blow** 79:21 216:24
**blue** 261:6
**blunt** 310:5
**blur** 44:8
**bod** 279:7
**bodies** 278:9
**bodily** 276:17
**body** 106:20 143:9
  277:4 278:24
  279:1,3 312:6,24
  313:6,7 317:11,12
**book** 156:14
**booths** 115:2
**bored** 101:2
**boring** 235:16
  249:18 269:23
**born** 19:21
**boss** 78:22 221:20
**bother** 140:17
**bothered** 277:14
**bothers** 145:2
**bottom** 130:1
  200:6,13 298:10
**boulukos** 53:10,11
  53:20 78:16,17,18
  82:13 85:9 142:6
**bounce** 99:5
**bowen** 60:21
  87:15 213:13
**box** 155:24 237:7
**boy** 148:5
**boyle** 2:9 3:14
  6:13,13 7:9,11
  11:20 14:7,11,13

16:3,13,15 17:15
17:19 18:17,22
23:19 24:12,16
28:13,17 31:11
44:10,17,21 63:8
63:12 70:5,12
73:19 74:16 75:23
81:24 82:3 84:20
85:1 92:1,5 102:9
102:13 118:19
120:22 121:11,15
128:3,7 130:8
132:20,23 134:6
149:9 150:22
151:1 153:5
163:16,20 166:23
169:7 176:12
178:14 185:11
188:4 189:3 190:7
191:12 197:15,21
198:1 199:22
200:1 206:17
210:21 215:7
217:17,20 223:12
224:18 226:6
291:19 301:15
321:15 331:14
**boys** 148:5
**breadwinner** 23:9
**break** 10:8,9,12
  86:13 149:2
**briefly** 11:16,24
  12:8
**bring** 29:12 72:9
**bringing** 130:18
  160:7 178:5 252:6
**broadcaster**
  229:22
**broadway** 46:23
  219:8

**broke** 70:13
**brought** 7:13
  41:21 57:3 138:12
  144:18 229:5
  323:11
**brunt** 61:3
**buddying** 106:23
**build** 29:19 58:13
  58:14,20 62:23
  220:21
**building** 57:21
  58:8,9 59:12,14
  62:17
**built** 73:12
**bunch** 140:21
  214:16
**burfeind** 53:8
  142:15,18 143:12
  143:14,15,18
**burke** 1:14 6:4
  333:3
**burnt** 209:18
**bush** 252:5
**business** 25:15
  27:22 28:4,11
  62:3 66:15 93:11
  93:15,22 202:9,11
  202:12,14,15
  223:22
**busted** 119:24
**busy** 50:3 213:21
**butt** 276:14 279:2
**buttocks** 108:22
**button** 279:9
**butts** 43:2
**buzzed** 253:19
**buzzing** 253:18

**c**

**c** 2:20 307:2,2
  333:2

**ca** 334:24
**cackle** 142:3
**calendar** 205:6
  324:23
**call** 12:4 68:22
  73:18 77:1 133:7
  140:15 157:16
  164:11,12,19
  165:12 166:9
  168:10,14 174:4
  174:14,23 175:12
  180:13,18,24
  239:24 259:10
  324:10
**called** 1:10 7:6
  29:18 30:10 37:24
  38:2 41:2 63:6
  78:13 87:6,7 90:4
  105:21 106:13
  235:24 236:6
  237:5 238:2,8
  267:14 269:8
  285:16 293:7
  294:24 305:11
**calling** 142:6
  297:7
**calls** 31:9 74:11
  133:10 181:5,10
  290:15
**calm** 323:20
**camaraderie**
  58:14 220:21
**camera** 272:17
**cancer** 43:16
  94:17
**candid** 242:4
  243:8
**cantrel** 173:11
**car** 96:19,23 97:4
  97:6 117:17,22,24
  118:1,5

card 58:18
care 64:10,11
106:7 172:9,13
194:22 195:3,6
242:16 325:24
326:2,3
career 52:8 118:11
137:15
cares 28:1
carrying 23:9
cars 96:21
cart 100:11,12,16
101:1,18 105:8
110:22 111:5,5
112:2 243:2
257:21 259:23
carts 112:23
114:22 115:2,20
252:7
case 5:22 13:5,10
14:5 22:16 25:3
102:16 162:16
174:1 190:3 334:6
335:3 336:3
catch 295:16
caught 37:22 38:3
cause 65:14,15
96:10 225:24
226:2
caused 225:3,14
ceased 80:24
celebrating 257:11
celebrity 227:10
227:22 228:4,12
228:16 256:18
257:3 328:13
cell 5:6 133:8,10
cellular 5:5
center 26:16
certain 41:22
57:21 238:22

243:5 279:17
281:8
certainly 109:11
certificate 336:11
certification 335:1
336:1
certifications 27:3
27:9
certified 1:14 27:4
333:23
certify 333:4,11
333:14
cfo 94:15
chad 264:18,19
287:8
chain 83:22,23
chair 55:5
chalk 322:24
323:22
chance 70:15 82:6
102:19 118:10
171:5 223:10
266:4
change 76:8,9 91:4
222:12 261:11
314:5,6 334:13,14
336:8 337:3
changed 73:16
175:18 208:17
changes 334:12
335:7 336:7,9
characterization
267:21
characterize
184:15 188:15
characterizing
83:9
charge 56:3
122:11,15,16
charged 22:12
186:13 219:21

324:5,12
charges 328:23
329:8
charging 220:7
charity 94:23
230:1,2,18 231:20
chased 319:12
cheaters 141:24
142:1
check 148:3
310:16
checked 213:7
260:24
checking 54:16
56:22
chicago 1:16 2:3,8
2:14,20 6:1 26:12
26:18 41:18 43:11
295:8 333:21
children's 231:14
231:17
chip 103:1,8,11,21
104:2,8 106:14
choose 233:4
chose 50:5
chucked 115:13
circumstance
52:11
circumstances
23:3 39:12 52:7,7
83:6 195:20,23
civil 1:11 22:18
335:5 336:5
claim 122:19,21
123:2,21,23
124:15 183:5
295:24
claiming 137:6
161:11
claims 7:20 74:8

clarification 9:4
125:3,12
clarifications
85:24
clarifying 125:5
clark 2:2
claudia 211:2,10
214:15
clean 23:11
cleaners 105:22
clear 125:6 171:24
183:1 256:1
clearly 101:19
162:7
cleveland 334:2
client 30:22 31:24
49:5 59:2 68:5
85:22
client's 59:5
clients 57:23 61:4
93:9 191:9 219:24
221:2
clifford 2:18
cliffordlaw.com
2:21
clint 109:8 275:1
275:13 276:10
278:19 294:6
302:16
close 51:10 79:8
96:13 108:24
110:8 139:10
205:18 249:7
278:12,15,18
293:20
closed 25:19 53:8
155:23
closer 34:7,9 114:4
114:8 236:22
278:18

**closest** 249:5

**cloth** 115:13

**club** 148:5 228:11
236:2,15,24 238:4
239:2 270:8,14
284:1,2,5 285:16

**clubs** 233:24
235:23 236:12,22
285:22 286:20

**coach** 323:13

**code** 64:19

**coherent** 102:8

**cojowski** 107:21

**cold** 188:1

**colleagues** 239:16

**collected** 49:2

**collectively** 111:2

**college** 25:12,13
26:12,22

**colors** 213:8

**combination**
214:8

**come** 12:21 41:17
43:9 44:4 58:10
60:7,9 66:10
77:16 97:4 98:6,8
100:9 103:20
105:4,18 106:4,5
132:2 139:5
143:19 148:13
149:21 154:1
157:1 162:7 163:7
165:7,19 166:4
167:24 168:3,6,8
174:20,21 175:14
178:3 180:16
181:17,23 182:9
182:14,21 192:10
199:1 201:22
202:2 204:23
220:9,19,20 228:4

256:24 257:17,19
258:5 259:18
260:8 266:1
287:23 288:18
289:15 290:12
292:8,17 296:17

**comedian** 230:3
230:23 231:5,6

**comes** 92:21
114:22 162:16
192:16 238:21
255:16,18 274:20
326:6

**comfortable** 54:6
152:3

**coming** 150:10,12
157:14 165:2,4,14
165:20,23 166:2
175:23 177:6
178:9,10 180:19
222:9 228:10
247:23 256:8
294:8

**command** 200:21

**commenced**
138:15

**commencing** 1:17

**comment** 106:17
109:5,11 156:8
160:3,7 184:24
196:19 275:11,12
275:16 276:3
277:10,12 278:4
279:14 283:11
285:24 303:16
311:5 313:12,17
313:22 314:2
316:23 317:17,19
328:21

**commented**
143:16 242:13

**commenting**
142:13 144:9

**comments** 101:18
137:17 140:18,20
142:4,8 143:18
144:17 161:7
304:6

**commission** 32:1
49:24 222:7 329:7
335:19 336:25
337:25

**commissioned**
143:4

**commit** 169:2

**communication**
79:2 151:9 221:23

**companies** 51:3
57:1 59:8 67:10

**company** 29:18,21
30:10 33:8 34:2
35:7,8 36:12 37:2
37:23 38:20 39:16
40:20 41:2 42:2
42:15,17 47:8
49:16 54:2,3,20
55:6 56:1 59:1,2
61:20 66:11,18
67:15,19,22 69:8
69:14 70:14,22
72:1,3 73:2 74:6
74:19,22 76:19,22
77:22 78:3 80:7
80:14,20 81:10,18
82:17 83:17 88:19
93:2 123:22
130:22 131:4,9,16
131:19 136:7,8
137:8 138:15
139:21 141:15,23
143:2 148:8
149:14 154:8

158:15,24 161:8
161:13,15,17,23
164:3 168:18
171:18 173:22
177:4,13,23
178:19 181:16,22
182:20,23 183:18
191:22 193:2
194:23 199:1
201:1,19 206:9
214:13 218:19
329:6

**company's** 158:11
171:12 183:4

**compared** 192:1

**compensated**
225:16

**compensation**
40:23 42:2,7
56:13 177:7

**competing** 59:9

**competitors** 58:5

**compiled** 69:2

**complain** 110:1

**complaining** 145:6

**complaint** 102:16
102:17 104:10
108:20 130:21
132:18 133:21
137:11 138:6,11
149:13 190:3,15

**complaints** 138:3

**complete** 8:7
15:10 19:9 122:21
198:18,20 218:3

**completed** 334:15

**completely** 9:23
136:7 196:12,17

**compromise** 167:6
167:12

**con** 119:4 146:20
292:19
**concern** 54:9
120:12 183:24
**concerned** 119:7,8
126:16,18,19
148:13 159:23
160:10 161:6
213:18
**concerns** 130:24
135:7 149:13
160:21
**concluded** 154:23
**conclusion** 74:12
156:18 285:20
286:17,23 287:4
287:24 288:19
289:16 290:12
292:8,18
**concrete** 163:3
196:14
**concussion** 124:24
127:13 211:11,20
213:12 214:3
**concussions**
213:10
**condescending**
86:23
**condition** 125:8
172:12 173:15
**conditions** 56:23
57:24 62:12 197:6
**conduct** 131:20,22
133:19 134:18
135:17 167:13
**conducted** 131:15
154:3
**conducting** 130:23
**conference** 154:16
154:17

**confided** 76:21
114:24
**confident** 34:10
54:8 79:19
**confidential** 46:16
46:22 66:10 67:9
**confidentiality**
66:6
**confirm** 70:21
**confirmation**
12:22 297:18
**conflicts** 219:13
**confrontation**
220:11,12
**confrontations**
81:11
**connected** 30:12
47:10 231:14
**connection** 27:18
66:16 70:23 72:22
73:3 119:7
**consider** 164:20
164:23 165:10
176:3 177:5
**considered** 60:22
**consistent** 76:11
**constitutes** 333:9
**construction** 27:8
32:13 33:15 46:16
47:11 51:21 52:8
93:7,9 137:16
183:11 201:21,22
209:19 223:14
285:21 286:19
287:10,22 288:17
289:14
**consultant** 46:16
215:23
**consulting** 72:16
72:19 200:15
201:14

**cont'd** 3:1
**contact** 66:10
90:22 123:14
124:11 129:14
135:15,18 275:18
276:19 278:5
293:16 294:13,21
300:13 301:2
302:12 303:5
318:7
**contacted** 34:22
37:20 53:3 129:18
215:20 217:4
**contacting** 137:6,7
216:7
**contacts** 68:9 69:4
71:16
**contain** 31:13
**contained** 15:16
17:6 19:8 73:2
74:6 181:10
**containing** 218:1
**contains** 31:15
63:24 66:6 71:6
**contemporaneous**
314:24 316:4
**contemporaneou...**
247:5
**content** 76:8 87:17
183:18
**contents** 292:14
**context** 185:18
187:5,7,19 188:19
281:6 287:12
290:9 292:4,15,19
293:12 303:13,15
311:9,13 312:15
317:2,4
**continue** 5:10
43:22 77:3 94:23
151:16 152:1

162:5
**continued** 41:23
208:3
**continues** 246:24
270:19 316:14
**continuing** 93:14
204:22
**contract** 39:8 40:1
40:2,4 71:22
202:17
**contracting** 37:10
46:24
**contractor** 36:14
37:11 42:18
**contractors** 58:6
322:18
**contracts** 222:7
**contributed**
231:10
**control** 283:17
**controlled** 283:20
**controller** 48:24
**conversation**
11:15 12:3 29:21
89:20 112:17
141:16 143:11
146:16 156:17
174:12 219:22
311:9
**conversations** 5:5
80:9 114:17
**conversed** 186:18
186:20
**cool** 105:23 144:5
243:10
**coordinator** 41:6
**cop** 124:9 125:22
127:19
**cope** 155:3
**copied** 186:7
187:17 189:19

**copies** 14:11
185:13 198:4
**copy** 14:17 16:16
17:22 19:1 31:3
40:2 45:7 63:16
102:15 121:2
128:9 132:24
133:2 155:13
185:19 190:3,10
301:15 332:7
**copying** 87:15
**cordial** 79:5,10
104:20
**corner** 29:4
**cornerstone** 46:24
72:15,19 219:7,8
223:14,22
**corporate** 39:15
**correct** 16:13 17:3
20:8 22:22 24:7
31:7 32:5,13
33:12,16 34:3,18
36:17,20,23 39:1
41:2,11 42:16
44:15 45:8,14,15
46:9,13 55:21
66:6,20 67:3,5
68:6,11 69:18,19
70:24 71:1,14,18
72:4 76:13,14
82:14 87:15,20
88:3,16,19 89:2
93:15,16 94:9,10
95:2 97:10 103:5
103:6 108:18,19
108:23 111:13
121:5,6 122:5
127:1,21 129:8,9
129:15 130:19
131:3 132:18
133:13,17 134:22

136:14,21 138:15
138:18 144:13,14
150:4,5 151:19
153:14,18 154:3
159:17 161:3,18
163:11 164:5,6
166:11,15,16
167:7,17 173:24
174:9 175:18,19
176:15,20,21,24
177:10 178:22
179:19,22 180:4,8
180:12,23 181:4
183:21 189:11,12
195:14 198:15
199:2,13,14
200:23,24 201:3,4
201:8,12 202:19
203:1,2 205:4
208:15,19,20
210:7 214:4 216:2
218:23 219:7
222:23 223:15
224:3,8,24 228:2,5
233:11 234:10,19
238:20 240:1
241:10,23 243:16
244:2 247:9,10
252:20 254:16
255:14 258:6
259:14 262:2,14
263:14 264:12
265:1,7,16,19,20
265:22,23 266:9
266:19,24 267:3,6
267:11 268:1,5,13
268:15,19 269:4,9
270:3 271:15,19
274:1,2,6,8,14
275:20 278:16,17
278:21 279:12,13

283:6 284:19,21
285:5,10,13
287:24 288:19
289:16,22 292:22
293:24 294:10,14
294:15,18,19,22
295:2,22 296:3,4
299:16 300:4
302:5,13,16,23
303:9 307:18,19
308:3,6 309:7,10
312:7 313:1,4,8,9
313:12,13,17
314:2,3,19,21,22
317:18,19 318:11
318:22 319:7
322:8,10 323:8,9
324:12,14,16
325:18,21 328:9
328:18,24
**corrected** 180:23
**corrections** 334:12
336:17
**correctly** 29:17
111:11 136:5
194:15 247:12
299:12 300:3
302:9 306:23
323:5,6 326:10
**cosmetics** 94:2
**cost** 48:24 202:4
**costs** 49:3,3 62:17
**couch** 152:6
**counsel** 5:17 6:10
7:22 14:4 239:14
243:19 306:17
309:4 318:9
333:15,17
**counselor** 223:1
320:5,14

**count** 51:18 140:5
197:11,13
**counterproposal**
168:13
**country** 228:11
239:2
**county** 333:2
335:10 336:15
**couple** 21:16
25:19 27:4,5 30:1
53:15 55:14 56:11
80:5 86:8 95:20
99:9 103:23
110:16 111:9
112:23 116:18
121:21 125:11
148:1 199:4
206:21 233:3
249:23 253:13
258:14 261:5
300:9
**course** 76:9 77:18
113:9 129:24
169:17 230:23
234:18,21 235:14
237:1,16 238:2
240:21 243:9
248:3 251:24
254:19 285:8,23
286:21 293:7
**court** 1:1 5:21 6:3
7:13 8:5 9:17
19:23 335:7
**courtroom** 8:17
**courts** 1:12
**cover** 136:11
150:7 211:12
221:16 256:21
**covered** 32:8
47:19 234:14
290:20

coworker 141:17
185:24 187:8
219:17 318:5,7
322:17 323:8,15
coworkers 79:17
81:12 113:5 119:3
146:23 184:19
185:6 219:14
220:8 260:3
crack 283:11
cracked 91:13
300:9
crane 264:18
265:11 287:8
crappy 62:8
create 139:20
created 31:1
207:10 208:22
creating 172:12
cried 119:20
156:13
crime 22:12
criteria 50:1
cronin 2:15 7:1,1
247:14 280:14
296:10,15 297:4,9
308:17,23 309:1
314:13 317:22
325:6 329:23
331:22 332:2
cross 119:6 212:15
254:10 305:11
312:13
crossing 255:12
crying 120:1
139:21
cryptic 261:6
csr 333:3
cued 106:12
current 21:5,11
22:8 27:12 45:9

46:19 72:15
currently 20:7
35:17 223:13
customers 71:7,22
cut 73:11 97:19
98:1 259:9
cutoff 48:9
cutting 55:2
cv 1:5 5:22

**d**

d 3:11 4:1 320:3
dad 43:15 119:8
dads 213:14
daily 79:8
damage 331:6,10
damages 224:2,7
damn 86:15
dan 20:10 235:17
daniel 3:8 6:2
dark 54:23
date 13:7 14:23
19:12 21:7 32:15
151:5 179:10
198:7 205:17
209:24 211:22
247:9 334:8 335:3
335:9,19 336:3,13
336:25 337:20,25
dated 178:21
179:15,18 200:9
207:12 215:11
235:13
dates 15:2 20:23
46:3 218:20,23,24
daughter 264:3
daughters 94:22
156:8 160:4
242:17,18 256:11
dave 141:21 142:7
142:13 143:8
144:9

david 141:17
davison 215:9,13
day 46:19 60:1
77:3 95:9 96:20
99:24 111:13
112:20 114:17
115:19 121:17
125:6,11,20
127:11 130:13
135:3,4 136:17
148:23,23 152:24
154:8 167:2
168:11,12 179:16
180:6,14 181:14
186:24 204:10
205:23 206:2,6
227:21 240:14
242:10 250:9
251:16,21 253:8
253:11 307:10,11
307:12,18 312:16
321:5,9 323:23
331:13 335:16
336:22 337:22
days 56:11 123:10
147:16 150:8
247:17 334:18
deal 90:20 96:5
102:2 119:2 137:8
146:18 148:15,18
162:9,11,12 171:5
193:11 194:4
dealing 51:7
dealt 137:17,18
146:22
dear 334:10
debt 23:8 24:4,6
debts 24:2,9
december 121:18
171:2

decent 140:2
decide 50:2 124:20
decided 49:8 96:6
96:8 106:15
124:22 125:5
256:9 299:22
deciding 127:15
decision 44:11,12
157:1
decisions 118:17
decker 295:15,17
295:18
deed 335:14
336:20
deemed 334:19
defendant 2:11
3:6 5:18 19:2
22:17
defendants 1:8
7:12
defensive 152:19
326:8 327:4
definitely 79:6
98:8 110:24
116:15 145:19
225:6 275:13
definition 89:2
degree 25:21
26:11,22
degrees 26:3
delivered 293:14
delivery 179:16
demand 192:4
demands 190:13
190:14,22,23
191:14 192:1
demonstrate
106:15
demonstrating
272:18 280:18

**demonstration**
104:12 109:10
**denied** 159:1,10
159:14
**denying** 263:13
264:24 282:4
298:5
**dep** 16:23 129:12
**department**
140:10 334:22
**departure** 74:24
81:10
**depending** 85:17
**depends** 60:3
251:13
**deposition** 1:9
3:17 4:2 5:8,13,23
8:1 10:23 11:5
12:1 14:4,9,15
16:1,5 17:13,17
18:20 24:14,18
28:15,19 30:16
31:12 36:8 44:19
44:23 51:14 63:10
70:1 82:1,5 84:22
85:3 92:3,7
102:11,15 120:20
121:1,9,13,18,19
121:24 124:18
128:5,9 130:6,9
132:21,24 134:4,7
150:23 151:3
153:3,7 163:18,22
166:21,24 169:5,8
176:10,14 178:12
178:15 185:9,13
188:2,6 189:1,4
190:2 197:22
198:2 199:23
200:2 206:15,19
210:19,22 215:5,8

246:17 297:11
306:12 308:19
314:14 318:1
319:22 321:20
330:1 332:5,10
333:6,9,12 334:8
334:11 335:1,3
336:1,3
**depositions** 1:13
**deriving** 57:6
**describe** 29:16
58:2 76:15 79:3
79:12 106:8
**described** 24:24
52:24 80:1 81:21
87:19 89:20
108:14 112:18
160:1 313:5
**describes** 311:8
**design** 25:12 26:1
29:18
**desire** 182:5
**desk** 155:15,17
156:15
**despite** 182:18
**detail** 96:22 118:1
**detailed** 96:20
**details** 118:14
119:13 194:11
**determine** 62:12
**detrimental** 80:10
**develop** 68:5
**developed** 66:15
67:2 68:10 71:17
**development**
142:18
**diabetes** 231:16
**diagnosed** 44:6
214:3
**diary** 233:14
239:20,22 240:1

246:9 253:23,24
296:23 297:6
301:4 304:14,15
306:3
**died** 94:16
**differed** 85:17
**difference** 236:21
263:23 275:10
277:15
**different** 47:5
49:18 51:21 66:20
80:17 86:6 98:24
99:4 109:15
123:18 236:24
241:9,16 259:9
276:2,7 277:10
287:24 288:18
289:15 293:3
303:7 309:5
**differently** 183:7
191:21 192:5,17
193:7,17 287:16
**difficulty** 88:2
**dime** 44:4
**dimes** 231:18
**diner** 138:24
**dinner** 98:8
113:24,24 114:3,5
114:21 116:16
**dinnertime** 114:8
115:23
**dipper** 270:17
**direct** 75:24 76:3
76:12 82:23
102:16 190:4
**directed** 137:20
**directing** 65:8
211:9
**direction** 87:9
203:11 245:21

**directly** 88:15
272:15 273:6
333:18
**disability** 171:13
**disadvantage**
220:24
**discharge** 24:23
**discharged** 24:2,6
24:10
**disclose** 224:14
**disclosed** 164:13
**disclosures** 224:5
**discovered** 318:8
**discovery** 16:7
24:19 45:4 63:15
70:18 85:5 128:11
185:15,20 200:5
206:21 221:11
**discrimination**
138:4
**discuss** 8:10
133:19 135:7
138:17 144:24
149:12 151:18,21
152:14 154:2
168:12 181:13
**discussed** 67:24
139:23 141:7
149:16 164:19
180:24 224:15
**discussing** 214:12
224:24
**discussion** 14:12
44:9 91:14 113:18
114:5 145:13
149:19 158:1,2
160:21 162:2,21
168:15 172:16
182:4,22 190:6
198:21 199:11
243:13 289:7

296:5,9,21 301:19
306:11 307:14
308:18 309:17
315:12,20 319:18
321:19 322:7
325:5,9
**discussions** 116:4
119:16 180:7,11
181:1
**dismissive** 132:12
**disputing** 263:19
264:13 265:6
**disrespect** 84:10
84:12
**disrespectful**
89:13
**dissatisfied** 42:1,6
50:10 52:16 221:5
**distance** 236:3
267:16
**distress** 224:7,23
225:3,15,24 226:3
**district** 1:1,1,12
5:20,21
**dive** 230:14
**division** 1:2 5:22
**divorce** 20:20 23:5
23:6,7 24:6
**divorced** 20:2
295:13
**doctor** 213:22
**document** 13:2,9
14:9,18 15:5,11,15
15:16 16:1 17:13
17:17,24 18:5,7,8
18:11 19:2,4
24:14,17,19,20,23
25:5 27:7 28:15
28:20 30:15 31:1
32:4,8 33:14 36:8
44:19,22,24 45:3

45:19 46:2 47:17
47:21,24 48:1,1
58:23 63:10 64:4
64:10 70:1,19
71:3,6 72:9,14,18
82:1 84:22 85:4,6
87:13 92:3,8
102:11 120:20
121:9,13 128:5
130:6 132:21
134:4 150:23
153:3 163:18
166:21 169:5
176:9,10 178:12
178:16 179:22
185:9 188:2,7
189:1 197:22
199:23 206:15,18
206:24 210:19
215:5 221:10
242:2 246:17,23
247:4 297:11,15
298:4 306:12
308:19 309:6
314:14,24 316:4
318:1 319:22
321:20 330:1
**documented**
159:13 279:19
**documenting**
207:5 304:15
**documents** 13:12
17:21 18:19,23
19:1,5 25:2 67:23
68:3,6 73:2,8 74:2
74:9,19,20 78:1
198:17 205:16,21
322:2
**dog** 324:7
**doing** 27:21 61:23
66:19,21 76:7

81:22 86:24 87:2
89:15 107:4
111:14 128:20
129:2 143:20,23
172:1 188:19
203:13 207:14
221:8 227:6
248:19 252:19
269:9 273:13,19
273:20 291:15,17
**donation** 96:9
308:1,2,5,12
**door** 83:19 324:8
**dory** 125:15
**double** 49:21
**draft** 57:11 175:1
175:8
**drawings** 57:11
**dress** 64:19
**dressed** 324:24
**drew** 28:23
**drink** 99:17
249:22 250:1,4,17
251:10
**drinking** 99:16,18
240:14 250:5
251:16,21 252:2
252:14,24 253:4,8
**drinks** 99:23
250:11 251:8
253:13
**drive** 2:13 100:12
102:8 105:12
236:3
**drives** 236:4
**driving** 100:16
101:2 105:8 110:6
112:21 157:11
243:2,16 254:2
256:17 259:20

**drop** 216:3
**dropped** 20:3,5
**drove** 100:19
101:1 102:7
105:14 112:2
117:17 119:19
254:20
**drugs** 10:19
**drunk** 97:3 99:14
252:5,14
**dude** 110:11 115:4
142:15 146:1
211:11
**due** 168:17
**duly** 7:7 333:5
**duration** 45:21
**duties** 56:19
**dziubla** 1:3,10
3:13 5:13,14,15,18
7:5,10 14:9,14
16:1,16 17:13,17
17:20 18:19 19:15
20:6,10 24:14,17
28:15,18 44:19
63:10 65:5 70:1
70:13 82:1 84:22
92:3 102:11,14
120:20 121:9,13
128:5 130:6
132:21 134:4
149:10 150:23
153:3 163:18
166:21 169:5
176:10 178:12
185:9 188:2 189:1
190:1 197:22
199:23 206:15
210:19 215:5
226:16 246:17,24
297:11 306:12
307:17 308:19

311:24 314:14,21
315:8 318:1
319:22 321:20
330:1 333:5 334:6
334:8 335:3,4,9
336:3,4,13 337:20

**e**

e 3:11,16 4:1
132:24 239:13
295:20 318:19,19
ear 77:1
earlier 104:23
169:24 170:2
172:19 218:5,7
234:5 241:24
255:24 261:18
early 36:1
easier 207:18
208:24 220:21
283:17
easily 184:16
283:19
east 62:16
eastern 1:2 5:22
easy 328:8
eat 98:9 142:11
eboyle 2:10
ed 6:23 60:21 61:8
61:14 87:15 88:5
88:8 213:13
226:17 291:19
edge 55:2
education 25:9
27:13,17 28:3
34:11 231:14
edward 2:15
eeoc 12:17 122:11
122:15,19 123:15
123:21 124:11
129:15,18 135:15
137:6 229:19

233:14 240:9
275:5 295:1,21
297:15,23
eeoc's 126:22
effect 8:17
effects 214:6,9
253:15
efforts 89:1 93:15
162:4
ehrlich 2:2 81:15
83:9 145:14,18
ehrlich's 81:17
eight 51:21 52:5
either 22:17 52:11
55:1 65:12 97:21
133:18 151:9
167:21 175:24
176:19 249:12
253:3 264:8
272:13 295:14
elaborate 225:10
electric 46:24 48:2
48:5,19,23 49:7,15
219:8
elevation 270:9
elk 21:12 134:3
ellie 35:11
else's 97:6
email 12:20,24
13:7,20 69:10
82:9,20 83:11,11
83:16 85:8 86:20
86:22 87:3,13,14
87:17 88:16 89:7
89:20,22 90:3,7,8
90:13 91:4,15,15
91:17 119:15
120:15 121:2,5,18
121:20 124:17
125:7 129:4
130:11,14 131:1

132:8,16 133:2,5
133:12,24 134:8
134:16,20 137:1
149:24 150:1
151:3,6,9,11,15
153:6,8,10,21
154:7 157:15
163:22,24 164:2,9
165:13,18 167:1,3
167:5,11 168:7
169:9,12,17
173:20 174:8,11
176:14,24 177:9
178:11 179:9
180:2,15,21 181:4
181:20 182:5
187:9 215:8,24
221:20 222:3
279:22,24 300:5
325:13 334:17
emailed 179:4
emailing 215:17
215:22
emails 55:14 69:9
87:8 89:1,16 90:2
90:5,17 91:18,20
121:16,22 134:17
136:8 140:7 179:8
200:12 228:15
embrace 142:15
emotional 191:6
224:6,23 225:3,15
225:24 226:3
emotionally
151:16
empathetic 170:15
327:3
empathize 136:10
empathized 172:1
empathy 158:18

employ 123:16
employed 28:22
53:1 64:2 65:21
66:9 76:7 143:4
177:18
employee 40:15
49:23 63:6 65:13
65:21 66:2 81:14
97:9 104:11 109:8
145:14 146:11
155:13 158:5,23
159:10,13 160:24
195:17 197:16
333:15,16
employees 36:5
47:4,6,8 99:9
102:24 103:11,12
145:3 172:12,15
192:3,5 222:9
employer 36:9
72:7 75:11,13
138:7
employers 32:3,5
52:16 217:22
218:2,4,14
employment 31:13
32:12 33:4,8
34:18 35:8,23
42:9,10 44:14
46:3,19 49:6
50:10 59:20 63:3
63:18 64:1,7
65:11 67:18 69:15
72:4,23 76:10,18
80:2 81:4 177:14
177:20,24 193:10
197:7 199:16
203:15 209:18,23
210:6,6,16 215:3
218:21 223:23
225:5,23 319:4

empowering
  127:17
enclosed  334:11
encompasses
  315:9
encounter  298:14
encourage  213:19
encouraged  96:3
  120:10
encouraging  272:1
ended  33:5,8
  38:18 42:23 46:11
  69:15 102:5
  111:24 116:17
  118:9 119:10
  134:1,2 173:3
  179:5 261:9
ends  284:13
engineer  59:12
engineering  26:9
  26:10
engineers  43:1
enjoy  79:13 80:24
entered  336:9
enters  71:22
enthusiastic
  204:15
entice  49:19
entire  35:13
  119:20 137:15
  152:18 186:4
  284:16 335:5
  336:5
entirety  281:2
entitling  127:16
entry  46:15 209:4
  209:12
environment
  147:9,12,19
  155:11

erling  1:7 3:6 5:19
errata  334:13,18
  336:7,10,18 337:1
esq  334:5
essentially  54:17
  62:2
establish  179:10
established  47:1
  218:5,7 267:17
estimate  57:12
estimating  56:6,18
  61:15 81:22 87:18
  261:10
estimator  29:20
  33:24 41:6 56:20
  60:18 68:5 76:7
  107:17 145:23
  202:1 223:18
  261:8
estimators  60:20
  60:22 61:14 85:16
et  334:6 336:3
eugene  2:9 6:13
evening  119:15
  121:3 134:9
  157:12
event  8:8 35:15
  40:14 94:17,19,24
  95:1,7,24 96:11,18
  102:23 123:20
  133:12 171:14
  175:17 179:17
  182:19 207:22
  214:6 218:13
  226:20 228:1,18
  230:6 232:19
  233:8 235:1,3,4
  241:13 247:12,13
  247:17 248:6,13
  262:1,1 299:15
  307:3,7 308:1

events  196:12
  224:24
eventually  101:2
  249:15
everybody  66:18
  100:13 110:9
  114:22 240:24
  241:6,14 245:1,2
  287:2
everyone's  97:20
  185:3
evolved  93:5
ex  109:8
exact  14:23 106:10
  126:13 147:10
  192:24 200:20
  256:7 269:20
  279:18 298:4
  319:9
exactly  61:22
  100:1 145:16
  211:21 272:16
exaggerated  215:1
exam  305:11
  312:13
examination  1:10
  3:14,15 7:8
  226:14
examined  7:7
example  109:6
examples  75:3
  191:16
excel  85:14
exception  24:8
exchange  110:14
  129:24 169:9
  198:4,20 200:6
  201:5 202:21
  215:9 216:1,6
  221:11 249:12
  306:16,17 307:23

309:3,9,14 310:3
  310:13
exchanges  136:16
exclaimed  299:24
exclusions  58:1
  85:24
excuse  43:14
  246:10 298:21
  307:16,17
executed  271:4
  294:11 336:10
execution  335:14
  336:19
executive  81:19
  88:19
executives  78:14
  82:16 83:16
exhibit  3:17,18,18
  3:19,19,20,20,21
  3:21,22,22,23 4:2
  4:3,4,4,5,5,6,6,7,7
  4:8,8,9,9,10,10,11
  4:11,12,12,13,13
  4:14,14,15,15,16
  4:16,16,17,17,18
  4:18,19,19,20,20
  4:21 14:8,10,15
  15:22 16:2,5,23
  17:12,14,16,18,22
  17:22,23 18:3,14
  18:20,24 19:1,3
  24:13,15,18 28:14
  28:16,19 30:16
  31:13 36:9 44:20
  44:23 48:11 51:14
  63:11,14 70:2,14
  72:22 73:2 74:7
  82:2,5 84:23 85:3
  92:1,4,7 93:17
  102:10,12,15
  120:21 121:2,10

121:14,18,20
122:1 124:18
128:4,6,9 130:5,7
130:10 132:22
133:1 134:5,7
150:24 151:3
153:4,7 163:19,22
166:22,24 169:6,8
176:11,14 178:13
178:16 185:10,13
188:3,6 189:2,5
190:2 197:23
198:2 199:24
200:2 206:16,19
210:20,22 215:6,8
217:15 243:11,12
246:8,15,16,18,23
280:2,9 296:8
297:12,14 301:5,9
301:14 306:8,13
306:15 308:15,20
308:24 309:3
314:15,19 315:9
317:20 318:2,4
319:23 321:21
322:2,3 325:4,16
325:19 329:22
330:2 331:22,23
331:24
**exhibits** 17:21
18:18,24 240:12
**existence** 25:17
**existing** 56:23
62:11
**exit** 220:3
**expand** 28:11
**expect** 89:11
**expectations** 88:2
**expected** 63:2,4
64:22

**expecting** 42:21
153:13
**expensive** 40:17
**experience** 28:8
49:14 78:4 89:10
109:14 130:17
135:22 201:21
286:7
**experienced** 286:6
294:5
**expert** 28:8 105:4
220:1 258:15
323:12
**expiration** 335:19
336:25 337:25
**explain** 108:18
187:3 209:17
217:3
**explained** 76:5
135:14,15 293:4
322:19
**explains** 230:5
**express** 120:12
142:21 269:15
**expressed** 148:1
155:1
**expressing** 145:5
160:9
**expression** 181:21
**extended** 55:22
**extent** 69:2 77:23
126:6,8 158:18
194:8,10 231:8
259:17 305:3
**extra** 173:8
**extreme** 183:24
**eye** 117:12
**eyes** 58:11 273:15

**f**

**f** 6:23,23
**f.e.** 36:9,12,21
37:5 38:20 39:10
39:15
**face** 106:22 155:6
273:1
**facebook** 188:9,13
189:6,11
**faced** 196:13
240:17
**facing** 272:10,16
272:21 273:4,14
273:15 274:12
**fact** 24:22 96:6
132:5 178:2
201:10 209:22
224:5 226:4 275:4
281:19 286:5
294:16 300:20
**fail** 271:6 301:6
302:1
**failed** 74:10
293:21
**failure** 74:18
167:7
**fair** 10:6 14:2 28:4
30:8 31:5 33:21
35:18 42:2 61:13
61:17 62:4 63:23
71:5 87:22 119:9
158:13 191:7
247:20 252:10
254:11 255:13
267:21 272:2
274:9 275:8,11
276:3 293:14
298:18
**fairway** 236:16,18
**fall** 123:9

**false** 313:23
**familiar** 14:24
15:4 54:24 58:8
230:1 237:13
254:14 287:14
**family** 94:20,22,24
143:6 262:22
308:12
**fan** 78:22
**far** 25:18 48:10
66:12 77:7,10,12
78:15 90:18,18
101:19 119:18
159:13 181:22
211:24 220:9
227:6 258:23
259:5 260:20
268:11 287:11
304:13 306:3
319:13
**fast** 51:6 57:4
144:7
**faster** 207:4
**father** 43:24
**fault** 315:6
**favor** 171:24
**favorable** 197:17
**february** 41:10
51:19 221:17
322:6,12,17 323:8
**federal** 1:11 7:13
**feel** 9:2 28:2 32:20
32:20 54:5 55:13
104:14 135:24
154:24 159:14
160:14 162:18
196:3 202:6
259:12 260:13
276:18 277:3
289:24 290:20
291:3 292:17

298:2 304:16
**feeling** 124:9
  149:20 207:5
  250:8
**feelings** 146:4
  147:4
**feet** 173:7 258:13
  258:24
**fell** 152:5 212:17
**felt** 35:15 79:18
  83:15,24 86:21
  88:14 104:11,13
  122:16 123:7
  125:2 135:14,16
  136:1 145:19
  147:3,8,19 152:3
  152:18,19 158:11
  158:14,24 159:10
  182:18 184:4,13
  191:21 192:3
  220:4 277:12
  278:4
**female** 280:18
**fh** 42:15,17,18
  44:11
**fields** 92:13,23
  93:21,23
**fifth** 322:13
**fight** 322:23
**figure** 27:19 47:10
  69:22 85:13 118:3
  157:9,9 158:6,21
  167:18 170:5
  248:23 256:2
  262:5 272:15
  273:4 329:6
**figured** 23:11
  34:13 39:14 49:13
**figuring** 327:2
**file** 23:4,7 122:16
  123:2,11,20

295:24
**filed** 5:20 23:23
  25:3 122:11,15
  137:11
**filing** 124:15
  229:15
**filings** 233:14
**filled** 61:6 126:21
**finally** 102:8 324:9
**financial** 23:10
  94:20
**financially** 6:8
  333:17
**find** 69:23 93:10
  101:7,12 114:23
  117:24 146:9
  188:21 189:13
  203:24 230:17
  241:18 296:1
  334:11
**fine** 25:23 43:21
  43:21 70:5 105:19
  105:22 117:10
  157:11 169:3
  175:7 227:9
  243:10 299:21
  305:6
**finish** 9:24 116:15
  255:3 270:19
  305:1,15
**finished** 7:22
**finishing** 111:16
  114:20
**fired** 146:3 171:3
  193:18 195:13
**firm** 6:3,4
**first** 3:2 7:6 38:1,2
  53:13 62:2,6
  63:16 76:5 87:11
  87:13 102:22
  122:18 128:13

130:16 137:23
  138:11 144:17
  157:24 169:11
  179:4 180:23
  186:19 207:12
  208:6,7 211:19
  216:15 235:3
  236:5 242:24
  267:5,24 295:19
  297:15 311:5,20
**fit** 49:10 119:6
  212:15
**fitness** 27:15,18,21
  93:5 202:15
  223:22
**five** 14:11 21:18
  70:4 100:10
  103:17 117:13,16
  233:16 250:19,21
  250:22 251:2,8
  298:13 299:15
  320:21
**flag** 237:18,21
  258:19 259:6,10
**flagged** 105:14
  255:22 256:18,23
  257:5,10,17,19
  258:5 259:13,14
**flags** 298:24
  299:10
**flextime** 194:3
**flip** 47:23 65:5
  66:5 67:13 71:2,9
  71:20 128:16
  129:12 155:22
**flipping** 16:22
  129:21 214:11
**floor** 55:3
**flooring** 100:23
**florida** 229:9
  230:8,11,19

**flow** 106:2
**fluid** 57:8 270:18
**flying** 213:8
**fmla** 155:8 158:1,3
  159:15,20 164:4
  169:16 180:2
**focus** 124:23
  231:13
**focused** 137:4
**focusing** 186:6
**follow** 55:10 63:4
  64:22 68:1 121:20
  157:23 200:14
  223:7
**following** 89:19
  121:17 130:13
  138:18 151:4
  154:6,8 163:23
  180:6 207:22
  243:6
**follows** 7:7 286:14
  288:12 289:9
  292:2 305:23
  309:23 312:22
  316:2 327:21
**foregoing** 333:6
  335:13 336:18
**forest** 228:11
  239:1
**forget** 30:1 68:24
  108:3 141:24
  156:6
**forgot** 39:9 86:17
**form** 23:16 73:5
  126:21 250:13
  288:21 303:10
  329:1,15
**formal** 28:2 74:1
  206:9,13
**forms** 158:4

**forth** 55:14 110:18 270:9

**forward** 71:10,20 90:16,22 144:7 334:15

**forwarded** 90:4

**fought** 117:23

**found** 12:23,24 29:11,15 183:5 230:7,10 255:11 290:1

**foundation** 330:18 331:2

**four** 20:12 21:5 41:11 60:2 81:9 100:10 103:17 165:1 166:14 173:23 180:24 266:18

**fourth** 47:24

**fragment** 282:17 282:21

**frame** 30:2 32:8 35:11 110:17 218:10 246:1

**frank** 104:22 135:21

**franticly** 214:21 214:23

**free** 9:3 174:20 202:4 335:14 336:20

**freight** 62:16

**fresh** 247:19

**fricken** 324:11

**friday** 177:10 222:4

**friend** 119:5,5 124:8 126:24 127:19 211:1,4 227:20 295:5

**friendly** 79:10

**friends** 29:13 58:21 97:11,13,15 97:17 184:19 201:18 211:6 239:16,18

**friendships** 77:6

**froman** 3:8 6:2

**front** 8:18 12:22 107:6 191:9 254:11 264:6 270:14 271:18 272:18,22 273:6,8 307:8 323:15

**frontal** 279:6

**frustrated** 80:7 141:12

**frustrating** 86:12 312:16

**fuck** 115:14 119:24 220:5 319:10,11 323:2,4 324:2

**fucked** 127:18

**full** 19:14 49:22 130:24 202:8 235:9,11 282:5 286:2 293:4 318:16

**fully** 131:4,6,7

**function** 211:14 326:7

**fundraising** 94:17 94:19

**funny** 115:17 118:6 203:4,21

**further** 27:13,17 28:2 48:16 272:6 298:22 299:4,8 333:11,14

**future** 176:6

## g

**g** 320:3

**game** 146:1

**games** 232:13,15

**garage** 119:22,23

**garden** 134:3,14 136:21

**garland** 53:11,21 76:13,16 77:8,11 77:21 87:14 185:24

**gas** 118:5

**gathered** 8:4 124:3 258:4,8

**gathering** 125:4 191:15

**gcs** 58:17

**ge** 218:6

**gear** 38:10

**gearing** 136:2

**gears** 94:3

**gene** 7:11 246:9

**general** 37:10 42:18 48:2,5,19,22 49:6,15 58:6 86:1 116:10

**generally** 185:4

**generated** 189:19

**generic** 73:15

**gentleman's** 318:13,16

**genuine** 160:14,18

**getting** 49:21,24 53:23 60:15 62:3 89:1 96:20 101:23 106:14 141:13 179:6 238:16 246:2 256:5 299:22 318:4 329:9

**gilmore** 232:15

**ginger** 186:15,24

**girlfriend** 125:22

**girls** 242:14,17

**give** 10:1,15 48:12 58:17 59:3 60:7 62:9 75:19 124:5 125:1 127:14 167:12 204:3,8 211:22 213:17 223:10 268:7 269:12 271:23 291:18 296:2,11 296:20 301:6,13 301:24 329:13

**given** 8:15 53:1 63:2 74:21 75:12 75:20 123:22 159:21 266:8,10 266:11 267:4 275:6,7 333:10

**gives** 263:17 264:11 265:4

**giving** 108:16 119:13 127:16 178:6 312:17

**glance** 70:17

**glancing** 221:15

**go** 5:11,16 8:21 9:8 11:23 19:22 20:21 26:15 48:9 50:15 51:18,19 55:1,3 56:21 57:4 58:4,19 59:22 61:1 65:2 68:16 75:9 78:7 79:20 80:11 85:20 86:11 86:15,16 90:23 91:8 96:3,4,7,8,11 96:18,24 98:7 100:2,11 104:12

106:2 114:21
117:14 132:6
133:9,20 136:3
139:4,17 155:3
156:14 157:12
160:23 170:6,13
175:1 183:23
202:20 203:19,24
203:24 204:11,14
204:17,20,23
205:11,19 212:16
212:18,21 219:6
220:5 226:1,6
241:18 245:2,3
248:22 261:9
271:3,5 276:13
280:12 282:13
284:24 286:5
289:2 297:4 305:2
306:8 309:15
312:18 315:3,16
319:11,19 320:22
321:15 322:12
323:2,17,18 325:1
325:4,6 329:23
331:16
**goal** 95:10,19
168:3 242:5
**god** 113:12 182:14
250:24 251:4
**goes** 48:16 96:12
162:17 167:11
206:11 218:10
258:21 300:20
322:3
**goggles** 38:7
**going** 5:1 7:19
27:1 29:22 35:3
37:17 40:12 41:24
43:5,15 49:11,20
51:12 58:5,9 62:9

62:13 63:16 68:21
68:23 69:17,22,23
70:6 71:9 73:11
76:22 78:2,24
79:21 83:5 84:6
84:13 85:21 86:14
87:5 94:3,4 95:12
97:1 100:3,4,22
103:14 105:10,18
106:3 107:3 108:2
109:14 110:18
117:5 118:18
122:1 125:8,10,15
125:18 126:7,11
126:16 129:5,8,11
129:19 131:8,11
131:19,22,23
132:1,1,4,17
134:18 135:3
136:3 139:13
140:11 141:3,4
142:23 144:4
148:14 149:3
151:23,24 152:1
152:10,11,17
155:3,20 157:5,13
157:20 159:17,18
162:6,15,22 163:2
165:7 167:19
171:1 172:2,9,10
173:3,9 174:15
175:5,6,8 176:4,5
180:16 182:19
194:4 196:11,21
203:10,14,15
204:4,7,13 209:7
209:12 210:9,13
210:16,17,18
216:4,10,22,24
217:2,12,22 218:2
221:1,3 226:9

227:22 228:12
242:1 245:21
249:15 253:23
254:3 255:12
257:15 260:4
271:14,14 274:19
279:15,16 285:1
285:18 286:11,15
288:21 291:5
293:22 294:1,3,17
296:3,8,12 299:24
301:4 302:1 314:7
315:14 316:20
322:21 323:21
324:2,7,10 325:23
327:2 329:10
331:12
**goldman** 2:2
**goldmanehrlich....**
2:4
**golf** 94:4,6 95:14
95:15,16 98:7
100:5 101:4,5,11
101:18 103:19,20
105:8,13 110:22
111:4,16 114:21
117:4 131:5,14
136:13 145:1
198:7,14,15
207:23,24 208:3
208:12 211:23
231:23 232:21,24
233:5,9,24 234:4
234:18,21 235:9
235:14,17,23
236:1,2,11 238:21
254:19 264:20
266:6 268:18
269:12,16,19,23
270:14 271:22

280:19 281:20
284:2 285:8,15,22
285:22 286:20,20
287:6,14,20
288:14 289:11
290:10 292:6
293:9 299:20
310:7 313:14
316:20
**golfed** 233:15,16
233:19
**golfer** 109:8
233:11,12
**golfers** 109:18
281:22 282:24
283:13,15 284:18
**golfing** 95:9
111:13,18,19
114:1,9 115:19
235:19
**good** 7:10 10:13
26:23 27:23 29:13
32:21 34:13 39:18
45:24 47:10,14
49:10,12 57:5
59:18 60:13 62:11
68:19 70:3 77:3,8
77:19 100:18
113:5 119:5
134:19 139:19
158:15 171:4
189:18 195:8
211:1 226:16
233:2 238:11,24
288:2,21 291:13
291:17 299:20
**google** 158:22
229:1,3,6
**gosh** 312:1
**gotera** 94:1

**gotten** 49:9 209:2
329:5
**graczyk** 306:22,24
307:1,3
**graduate** 26:17
**grasping** 294:8
**grass** 237:15,16,17
**grateful** 118:9
**great** 37:13 76:17
92:19,19 291:15
**green** 236:23
237:10,11,14,17
258:10,17,18
259:10,11,11,12
267:18,19,19,20
269:3,9
**greg** 53:11,23 57:2
57:5 60:5,13 61:9
61:11 66:22 76:13
77:1 79:7,15,21
80:6,11,17 84:1
87:4,14 88:10,11
89:21,23 90:4,5,20
90:23 91:8,17
100:18,19 122:4
140:21 141:9,11
148:9 169:24
170:3,8 171:20,23
185:24 186:18,20
187:1,23 194:9
**greg's** 78:21
141:10 186:15
**groin** 279:4
280:20
**groped** 310:17
**gross** 141:17
143:15,17 144:9
**ground** 8:20 64:12
**grounds** 152:2
**group** 29:5 41:2,3
41:4,14,15 42:10

42:10 43:4,6,8
44:12 51:20 86:22
88:1 98:22 99:6,6
100:2,3 101:17
103:16 111:2
112:12,15 241:23
243:5 249:6 256:8
259:5 266:12,13
298:23 299:10
**groups** 99:1,4
**grove** 21:12 134:3
**grow** 93:15 323:4
**grown** 127:20
**growth** 37:15
**grumble** 80:21,21
**guaranty** 191:5,8
**guard** 37:22 38:3
**guess** 30:2 90:14
103:22 104:4,21
106:13 134:10,13
134:15 145:4
150:11 160:8
179:14 191:4
196:15 204:6
210:1 219:2
236:20 242:6
258:16 263:15
264:14 267:22
270:13,15 283:15
**guessing** 271:6
**guest** 104:16 106:5
227:11 256:19
257:11
**guidance** 156:4
266:16,19 271:15
271:19 294:2,4
302:2
**guide** 106:15
**guided** 109:13
**guiding** 107:6

**gurbeer** 200:7,19
204:24
**guy** 38:6 77:13
137:24 141:22
144:4,5 146:2
152:16 228:7
235:13 237:1
310:17
**guys** 51:6 66:24
74:21 80:16 95:20
135:23 139:23
141:7,15 142:2
148:10 152:5
157:17 170:11
171:17 172:4,21
173:5 201:23
202:2 211:12
212:23 213:13
241:4 258:13
325:24 326:2

## h

**h** 3:16 307:2
**half** 49:21 52:1
68:12 175:16
213:9 234:11,11
269:1 298:20
324:24
**halfway** 214:14
245:12 269:1,5,6
**hall** 319:12
**hallway** 83:23
**hand** 15:19 19:11
120:23 121:7
129:10,11 130:4
154:5 164:7 190:8
190:9 217:12
333:20
**handbook** 63:7
**handed** 14:14 16:4
17:20 18:23 24:17
28:18 63:13 70:14

82:4 85:2 92:6
102:14 121:1,16
133:1 178:15
298:23 299:10
**handing** 44:22
128:8 130:9 134:7
151:2 153:6
163:21 166:24
169:8 176:13
185:12 188:5
189:4 190:1 200:2
206:18 210:22
**handle** 54:13
135:23 235:10
**handled** 160:16
183:20 220:16
**handling** 131:24
219:24
**hands** 107:6 158:6
**handwrite** 209:2
**handwritten**
207:16 208:5,15
**hang** 58:21 96:14
99:8,10 299:22
**hangs** 96:15
**hap** 324:21
**happen** 43:2
110:19 125:8
151:23 210:18
212:14
**happened** 97:18
99:2,7,11 102:4
110:12 112:10
113:7,10,11 114:2
114:3 115:5,15
116:19 119:24
120:2,7,12 132:3
136:10 137:15
139:3 140:10
148:17 152:6,8
155:1 158:9

162:10 164:8
180:14,15 183:23
191:6,10 193:1
198:15 211:21
216:23 217:4
254:10 258:12
260:2,23 261:1,14
261:15 262:7
271:11 272:20
308:10 324:23
327:4
**happening** 144:20
329:9
**happens** 51:5
73:10 79:22 123:1
123:1,19,21
152:17 156:5
272:5
**happy** 9:6 81:3,7
90:12 165:14,23
204:16 222:2
232:14 291:18
**harassment**
130:23 138:3,7
**hard** 37:24 38:4
38:17 142:8 146:2
186:5 201:17,19
213:17 251:14
**hardhats** 38:7
**harrington** 25:12
25:13,22
**harsh** 324:14
**hat** 37:24 38:5,17
201:17,20
**hate** 322:20
**hats** 47:5
**hawkins** 212:23
**head** 15:8 104:19
110:18 212:17
**headhunter** 38:11

**heading** 29:1
114:20
**heads** 9:14
**heal** 127:14
**health** 93:7 170:4
172:10 231:14
**healthier** 93:10
**healthy** 49:12
170:22
**hear** 37:7 83:1,3
106:24 144:21
261:3 281:7 288:6
291:20 327:15
**heard** 25:19 38:4
107:1 153:21
230:2 237:7,9,11
243:18 260:1
278:3 281:4,7
282:8,10,16
284:24 286:6
317:19
**hearing** 285:19
286:16
**heart** 142:19,19
**height** 277:15
279:9
**held** 5:23 47:18
239:1
**helen** 2:15
**hell** 216:8,16
**help** 18:8 28:9
30:4 83:4 93:10
94:19 96:9 132:4
152:12 156:19
157:5 158:17
172:9,10 206:1
219:23 220:2
260:23 294:9
329:11
**helped** 42:19
77:24

**helping** 171:24
**helps** 94:21 191:1
**hereunto** 333:20
**hey** 30:4 51:11
75:7 86:24 89:14
90:8 95:21 96:13
100:22 103:18
105:15 106:4
110:4 115:11
125:9 136:9 140:7
144:3,5 148:2
158:19 165:5
206:10 216:23
257:10 259:17
260:22 294:2
310:16
**hickman** 109:9
275:2,8,19 276:10
277:16 278:19
294:10 302:16
**high** 26:15 62:9,10
189:22 295:5
325:3
**higher** 140:11
**highest** 25:8 84:6
88:18
**highlighted** 65:9
**highly** 96:3
**hilarious** 60:11
**hill** 101:16
**hip** 108:22 279:4
**hire** 89:10
**hired** 40:9,11
**hiring** 229:12
**historically** 284:8
**history** 47:16 54:2
**hit** 50:3,6 64:12
78:22 103:1,8,11
104:8 109:13
234:14 236:4
254:3 255:12

258:16 267:15,20
270:18 271:7
283:14,22
**hitch** 38:18 46:8
46:11 72:7 200:22
200:23 201:8,11
201:19 203:1,8,19
205:15 218:19
219:6,11 220:16
221:6,21 223:21
318:21 319:2
320:17
**hitting** 254:9,15
255:10 267:11
273:2
**ho** 143:22,22
**hockey** 228:7
**hold** 27:2 48:22
86:5
**holding** 270:14
297:1
**hole** 95:21 100:12
100:13 101:9,9,10
103:23 104:3
105:10,10,12,14
110:17 111:21
112:3,13 236:20
237:19,24 238:11
238:23 241:1,5,16
241:19 243:20
244:11,13,14,16
244:19 245:18
247:23 248:5,9,24
249:21 254:10
255:19 257:1,7,18
257:18,18 258:14
258:19,21 259:5,9
260:17 267:15,21
271:3,5 272:17
**holes** 110:16
114:20 235:5,9,11

235:14 241:9
242:11 243:3
245:17
holy 277:11
home 34:8 41:17
43:10,16,17 44:5
102:7 117:10,14
117:15 119:19,20
119:21 122:2,5
125:10,21 128:21
129:2 135:17
173:6 220:17
221:3 230:8,11,16
230:19 320:24
321:2,7 329:12
honestly 32:19,24
32:24 34:22 35:13
44:1,8 51:5,16
61:10 64:3,11
71:24 72:5 88:22
97:18 98:19
106:19 109:5
117:1,22 119:8
126:13,19 141:20
142:14 143:18
162:11 167:10
186:5,14 248:18
257:12 265:17
284:15 289:19
308:14 320:20
323:19
honor 104:16
106:5 256:19
257:12
hook 101:13
hope 216:3
hopefully 62:21
hopped 111:5
hospital 212:18,21
231:17

hostile 91:10
hosting 104:18
hour 1:17 134:19
157:11
hours 49:4,17 50:4
50:6 102:6 113:22
116:18
house 39:10 92:16
119:21 229:9
hr 152:16 156:4
hub 37:24 38:5,17
201:17,20
hug 276:13
huge 225:17,17
huh 21:6 33:17
42:14 129:23
167:8 169:21
180:5 200:8 209:6
211:16 216:12
217:24 218:22
239:21 258:22
266:22 309:1
humiliated 199:3
humiliating 300:2
humor 189:18
293:9
hung 76:24 101:16
113:4
hunky 125:15
hurt 38:13 204:3,8
husband 21:5,21
22:1,5 119:21
120:14 233:1
235:17
husband's 20:9
hysterectomy
170:4 171:2
173:10 211:13

i
idea 35:14 101:10
158:20 164:16
212:1 227:19
228:9 231:12,24
232:5,7 233:10
238:6,18 242:22
244:6,12 245:5,6
245:19 262:24
264:4 267:7
279:10 283:21
284:15 318:24
321:9 326:24
identification
14:10 16:2 17:14
17:18 18:21 24:15
28:16 44:20 63:11
70:2 82:2 84:23
92:4 102:12
120:21 121:10,14
128:6 130:7
132:22 134:5
150:24 153:4
163:19 166:22
169:6 176:11
178:13 185:10
188:3 189:2
197:23 199:24
206:16 210:20
215:6 246:18
297:12 306:13
308:20 314:15
318:2 319:23
321:21 330:2
identified 197:19
225:13
identify 190:14
idiot 210:12
iii 2:15
illinois 1:1,15,16
2:3,8,14,20 5:21

6:1 65:23 333:1,3
333:21
image 139:20
immediate 222:22
immediately 38:5
46:7 87:6 101:21
102:3 120:11
123:14 130:2
201:2 203:17
218:20 314:1
impact 10:19
213:6
impacted 225:6
implication
203:23
implies 253:11
302:14
important 8:24
122:16
impression 54:20
improve 109:24
141:15
inadvertently
254:16
inappropriate
144:16 183:6
283:11 286:4
287:5 301:1
302:12
inappropriately
311:15
incident 83:7,12
85:12 107:2 110:2
113:16,17 114:18
116:5,24 119:12
119:17 131:5
138:2,18 139:3
147:17 225:4
227:16,18 253:2
318:5 320:16
321:8 330:6 331:1

incidentally
  260:16
include  45:17 48:5
  50:17 67:23
  109:11 131:13
included  334:13
includes  48:15
including  266:20
inconsistency
  218:8
incorporated  5:19
  336:12
incorrectly  13:18
  331:23
increase  173:23
  174:7
independent  57:7
  322:18
independently
  274:4
indiana  49:1
indicate  46:3
  164:3 167:11
  224:6 304:13
  306:2 312:3
indicated  233:15
  240:12
indicates  33:14
  153:24 304:14
  306:4
indicating  253:12
  311:2 334:13
indication  301:1
  302:11,22 303:19
  307:21 309:13
  310:1,12 311:2
  314:24 316:5
indirectly  333:18
individual  72:12
  144:6 266:14
  267:24

individually  268:4
individuals  71:12
  71:17 81:20
industry  27:8,20
  27:21 34:12 39:17
  46:16 47:2 51:22
  55:1 68:18 73:9
  73:13 93:7,9
  130:2 137:16,19
  147:24 189:21
  201:21,22 209:19
  220:1 323:12
  324:20
information  15:9
  30:5,20,20 31:6,7
  45:12 48:19 50:17
  66:11,15 69:7
  72:3,11,22 73:1
  124:14 147:6
  217:21
informing  145:8
  145:10,11
initial  19:17 54:21
initially  241:22
injury  193:12
  195:10
innocent  285:21
  286:19 287:10,22
  288:16 289:13
input  81:21
inside  141:13
  234:10,11,14
insist  105:18
instagram  92:12
instance  253:24
instruct  267:11
instruction  103:8
  103:13 104:8
  105:13 106:8
  108:15 109:22
  110:21 267:4

273:14 274:20
  275:1,6 292:22
instructions  103:1
  103:11 106:3,11
  109:18,23 266:8
  266:11
intent  181:21
intention  125:18
  201:15 210:15
intentionally
  254:22 255:8
intentions  127:11
interaction  226:20
  264:21
interest  47:4 97:20
  97:22 131:11,16
  135:24 152:20
  185:3 210:14
interested  6:8
  333:18
interesting  53:22
interfere  5:7
interference  5:5
interior  26:1
  54:11 61:3
interiors  34:10
internal  131:8,22
internally  68:4
internet  187:18
  188:8
interpret  160:6
interpretation
  287:9 303:22
interpreted
  161:16 317:16,17
interpreting
  126:17 290:5
interrogatories
  17:23 18:4 217:13
interrogatory
  16:7 17:6 217:14

interrupt  305:16
interrupted
  321:14
interview  29:22
  50:14 53:6,9,12,13
  53:14,18 54:16,21
  55:10 154:19
  229:19 297:22
  298:6
interviewed
  122:21
interviews  55:17
intoxicated  196:18
investigate  123:23
  131:4,6 132:17
  133:6
investigation
  130:24 131:8,13
  131:17,20,23
  132:6,13 134:18
  138:15 154:2,23
  183:5 184:4,7,13
investigator
  297:23 298:18
  299:15
invitation  135:6
inviting  133:18
involved  78:23
  231:9 239:7 272:2
involvement  78:19
involving  318:5
iron  236:7 284:1
ironic  203:12
irons  281:20,23
  283:1,16 284:18
  287:20 288:14
  289:11 293:6
isolated  221:4
issue  120:13
  140:13 193:20
  293:13

**issues** 23:10 36:5 80:6,13 127:15 145:7 170:4 171:4

**j**

**j.c.** 1:6 2:12 5:19 6:14,16,18 7:11,14 7:17 19:2 29:13 46:4,4 65:12 79:13 334:6 335:3 336:3

**jacobsen** 1:7 3:6 5:20 6:20,22,24 7:2,22 102:24 103:4,4 104:15,23 105:13 106:9 107:5,13 108:9 109:17 110:21 112:14 113:16 114:18 119:12 175:21 176:8 225:5 226:17,21 227:12 228:12,19 229:21 230:10,17 252:10,20 253:2,5 253:14 255:16 256:6,9 257:9 260:19 262:17 264:22 265:15 267:10 275:7,18 277:16 287:7 293:22 298:14 307:22 309:14 310:2 313:7 315:1 316:6 326:13 327:24 328:4,7,11 328:15 329:14 330:7,11,14,22

**jacobsen's** 227:14

**jacobson** 38:16

**james** 2:20 3:4

**jason** 212:23

**jca** 7:14 28:23 31:14,22 32:12,16 33:5,11 34:9 35:15 48:6,13,20 50:18 51:15 53:1 53:3 55:3 56:20 59:20 61:7 62:3 63:1 64:2 65:22 66:3,9,16,20 67:5 67:20 68:1,6 69:2 71:16,22 73:4,22 74:3 76:8,10 80:2 80:24 81:3 94:16 94:18 97:9 102:24 103:11 104:11 109:7 118:9,10 120:11 135:23 138:3 139:18 143:1 147:9,13,22 148:3 159:3 160:24 161:1 182:20 190:13,21 190:23 192:5 197:5 199:5,18 201:2,12,13,15,16 202:7,18 203:15 204:11,20 210:6 218:20 223:24 225:6 234:6 242:9 297:21,22 306:18 306:19 309:6 315:9,10 326:13 327:23 329:6

**jca's** 19:4 66:6 68:1,11 71:6 96:23

**jcp** 2:21

**jerk** 146:21 212:16

**jewel** 76:23

**jim** 3:4 6:19,21 107:11 115:7,16 119:15 120:16 129:4,8 130:10,14 132:8 163:7 257:9 257:20,20,21 262:13 265:13 279:24 287:7 298:23 299:10 300:9

**jim's** 107:6 227:20

**job** 31:23 34:20 41:18 46:20 49:1 49:2,2,4,13 51:4 51:13 52:1 56:18 56:18,22 57:22 58:11,24 61:15 62:13,18,22,22 69:23 76:9 78:20 85:20 142:24 147:22 148:3 157:9 162:4,19 165:6 167:13,21 171:10 176:2,2 196:13 202:8 203:5,9,13,24 210:12 214:21,24 216:10 217:7 219:11 223:17 226:5 256:16 291:15,17

**jobs** 51:21,24 58:18 59:4 62:24 66:17 209:16

**joe** 114:23 116:1 172:22 192:20 193:6 261:19,20 261:20

**john** 146:12,20 147:1,2

**join** 32:16 98:22

**joined** 33:11

**joining** 31:14 32:12

**joke** 113:1 140:16 184:18,21 185:1 186:13 187:16 281:20 282:5,6 283:12 284:16 287:6 290:10 292:6,15,16,23 293:3,4,5,9,12,14 293:17 294:20 303:9

**jokes** 91:13 185:5 186:15 230:23 300:9

**journal** 207:9 208:15,18 239:23 239:24 240:7 246:10,20 303:4

**journaling** 207:3,5 207:14

**jr** 3:10

**judge** 8:18 288:6 288:23

**july** 19:13 81:8 93:4 185:24 216:1 217:4

**jump** 35:4

**jumped** 286:23

**jumping** 285:19 286:17

**june** 1:16 5:2 41:10 333:21 334:4

**jupiter** 48:15

**jury** 288:6 328:20 329:21

**justic** 29:8,10,11

**juvenile** 231:16

**k**

**k** 173:13 295:20
233:2
**kacper** 107:18,21
111:12 113:9,19
115:3 116:2
243:21 251:20
253:3 260:13
261:18,18,24
262:10 265:12
266:23 268:11
287:6
**kacper's** 107:20
253:17
**kantro** 173:3,13
192:20 195:19,21
**kay** 93:24
**keep** 67:9 136:12
148:19,20 178:5
204:13 276:14
305:9
**keeping** 111:17
**ken** 20:18
**kept** 20:6 42:11
161:18 194:18,19
196:20 214:1
324:7
**kev** 94:9,11,14,17
227:11,22 233:22
234:22 235:1,3,4
239:1 242:13,17
264:3
**kev's** 256:11
**kevin** 94:14,15
242:17
**kevin's** 262:21
**key** 59:16 104:19
**keys** 118:1,3,5
**kick** 92:15 98:11
186:23

**kicked** 98:5
**kid** 262:23
**kind** 13:17 21:17
27:21 29:1 30:5
34:24 39:13,13
45:21 57:16 58:13
61:6 69:6 77:17
77:24 78:5,10
80:8 86:2,23
90:16 96:9,13,22
97:19,22 99:5
100:17 104:17
106:15,19 110:10
112:2 115:12
119:2,10 140:17
141:4 146:10
155:5,12,20
156:18,22 158:18
159:3,22,24 177:6
183:3,10 188:18
196:10 206:7,10
207:6 213:2 223:3
230:3 235:6 241:2
241:3 244:22
245:2 251:12
254:19 260:21
266:5,14 270:15
270:16 276:14
303:9
**kinds** 92:14
100:20 137:18
**knee** 193:12
**knew** 37:19 43:16
52:9 55:15 57:23
64:18 65:2 66:1
68:24,24 79:20
80:11 113:3
122:24 123:7
132:5 139:8 140:4
148:19 150:9,12
156:9,9 201:16

245:3 261:8
287:15 319:1
**know** 9:3 10:9
11:1 13:19,23
14:17 16:8 23:18
23:24 27:16,22,23
28:6 29:24 31:16
31:20,21,22 32:24
35:10,12 37:21
39:13,14 40:7,9
42:5 43:11 47:11
47:12,12,14 48:7
48:18 49:19 50:1
50:9,12,19 51:5,6
51:9 52:12 53:23
54:5,12,15,17 55:1
55:13 56:2,10,15
57:15,20 58:4,7,10
58:16,16,19,20,23
59:1,17,24 60:6,10
60:14,15 62:15,16
64:13,14,16,18,20
65:20 68:18 69:10
71:24 72:5 74:7
74:13 75:6,8 77:7
77:10,13,14 78:1,4
78:5,15 79:1,1,5,8
79:10,16,22 80:5
80:12,14,15,16,17
80:19,21 81:14
82:6,21 83:11,20
83:22 84:18 85:17
85:18,19 86:7,13
86:19,24 87:1
88:1,3,7 89:15
90:8,18 92:17,19
92:22 94:18 95:15
95:21 96:14,19
97:8 99:1,6,8,11
100:7,22 101:7,12
101:14,22 102:5

102:19 103:19
104:16,16,17
105:4,5 106:1,5,11
107:4,7,8,21
108:11 109:7
110:3,8,13 111:1
111:10,17 112:3
113:6,8,10,17
114:15,20 115:11
116:13 118:8,15
119:1,3,10 120:7,8
120:18 122:4
123:11,18 124:4
126:2 127:17
128:1,1 131:19
132:2,3,17 133:5
134:13 135:16
137:9,12,22 139:9
140:3,5,13,14,17
140:23,24 141:9
141:10,12,14,20
141:22 142:3,4,7,9
142:16,23 144:5
146:22,23 147:10
147:11 148:23
149:23 150:10
152:3,15,16 153:1
155:2,7,7 156:2,16
156:17 157:2,6,20
159:9 162:3 163:2
163:2 167:10
170:6,10,18 171:9
171:11,14,19
172:11,14 173:1,5
173:17 174:1,11
178:5 179:5,13
180:1 184:6,9,19
185:18 186:6
188:22 190:16,18
190:19 191:24
192:9,11,12 193:2

193:13,21 194:5
195:4,9,14,22,22
195:23 196:1,16
200:20 201:23,24
202:1 203:13
204:6 205:8 206:8
206:10,12 209:1
209:11 213:2,10
213:13,14,15,17
213:18,22,22,24
215:18,21 216:19
216:20,24 217:1,2
217:3,5 221:14
223:3 224:17
225:9,18,23 227:7
228:8,10,16 229:5
230:13 231:3,5,16
231:18,20,21,22
232:1,4,6,8,18
233:8 235:7,24
236:1,5,6,8,10,11
236:15,18,21,24
237:2,3,4,15,18,23
238:1,3,4,7,10,12
238:17,19 239:14
241:5,21 242:18
242:21 243:9
244:11,19 246:6,8
248:4,8,21 249:7
249:18 250:6
251:23 252:1,12
252:13,24 253:6
254:17 256:5,7,14
257:6,6,8,11 258:1
258:3,8,9,15,17
259:8 260:5,7
262:20,22,22
263:1,12,21,21,23
264:1,1,5,18,20,23
266:14,15 267:14
268:23,23 269:23

269:24 271:4
273:1 276:13
277:3,23 278:3
279:7,8,12,19
282:6,6,17 283:2,5
283:7,18,24 284:1
284:4,7,8,16 285:4
285:7,17 287:14
287:17,17 288:9
288:20 289:18,19
289:20,20,22
291:12,12 293:5,6
293:6,21 295:10
295:13 300:10
305:12,18 314:18
319:3 320:4,6,10
320:11 323:19,21
327:8,10,11,11
330:5,17,23 331:3
331:5
**knowledge** 15:17
17:6,8 18:13 19:7
50:23 61:1 73:9
228:19 243:1
290:2
**knowledgeable**
77:14
**known** 227:1
287:20 288:14
289:11,24
**knows** 59:13
**kyle** 38:16 201:17
202:24 203:3
204:17,19 221:20
222:9
**kyle's** 200:21

**l**

**l** 239:13 318:19
**laced** 54:23
**lack** 278:8

**lacking** 184:13
**lake** 3:3
**lands** 234:15
238:5
**lanes** 234:9
**language** 311:10
319:9
**large** 154:16
**larry** 213:14
**lasalle** 1:15 2:7,19
5:24
**latavia** 221:12,14
320:14 322:8
**late** 312:16
**latest** 85:16
**laughed** 300:11
**laughing** 106:22
115:8 142:6
**launch** 93:18
**lauren** 95:12
100:19 242:1
306:22 312:9
**law** 2:18 3:2
**laws** 229:10
**lawsuit** 7:12,21
22:18 70:24
229:16
**lawyer** 137:7,8
**leading** 78:2
304:10
**leads** 62:3
**leaned** 87:4 90:1
**learn** 229:8 230:9
**learned** 87:1
230:20,22
**leather** 55:4
**leave** 34:6 35:20
36:1 38:19 39:6
41:13 43:3 44:11
49:8 75:11 96:23
100:24 110:24

159:16 199:5,12
220:3 269:2
322:21 323:24,24
**leaving** 37:2 81:5
201:12,16 244:10
**led** 23:3,7
**ledge** 234:8,15
**lee** 107:17 110:14
140:14 145:24,24
243:20 245:8
247:24 256:24
261:24 265:12
266:23 287:6
**left** 29:4 36:4 37:5
45:18 47:7 48:19
50:23 69:7 88:7
97:2 110:23 111:1
111:4 116:8
142:10 149:10
156:7 157:3 163:1
173:2 199:18
201:2 204:14
218:6,6 219:6
223:23 235:16
273:10 321:11
**legal** 6:3,5 74:8,12
74:17 334:1 337:1
**legs** 206:12
**length** 259:3
**lerner** 318:17
328:18
**lesson** 316:19
317:1,3,9
**letter** 178:18
179:3,18 181:16
334:19
**letting** 132:17
146:8 300:9
**level** 25:8 225:7
**lewd** 137:17
275:11,12,16

276:2 278:4
**licenses**  27:3,10
**lie**  210:4
**life**  52:6,7,11
   137:19 152:5,8
   171:6 194:12
   217:2 266:4
**light**  31:24 139:19
**liked**  57:3 77:17
**limits**  254:19
**line**  37:16 45:21
   200:14 322:13
   325:23 334:13
   336:7 337:3
**lined**  279:8
**lines**  27:14 79:2
   266:3 279:15
   302:3
**lingering**  214:5
**linkedin**  45:1,7,13
**liquor**  250:7
   251:15
**list**  47:4 68:8,13
   68:21 69:3,5
   71:11 73:14,15,15
   73:17 218:20
   244:23
**listed**  71:17
   218:24 336:7,17
**listen**  35:1,3 38:14
   39:22 221:2
**listened**  37:8
   257:13
**listing**  336:7
**lit**  220:13
**literally**  143:2
   152:5,7 155:18
   171:1 220:9
**litigation**  329:10
**little**  8:21 11:4
   19:22 20:24 29:16

34:8 36:19 49:17
53:9 56:14 57:7,7
58:14 94:3 100:24
112:16 147:3
213:3 215:1,16
269:5 271:15,18
272:6 275:13
294:1 302:2,2
322:15 324:21,22
324:23
**live**  21:19
**lived**  21:14,24
   22:5
**living**  21:18
**loaded**  57:14
   210:18
**loans**  24:8
**located**  5:24 25:13
   244:2
**location**  43:1
**logistics**  57:21
**lol**  204:15
**long**  20:11 21:14
   26:20 29:21 33:2
   33:7 40:4 52:10
   54:3 113:17,21
   148:1 194:23
   211:6,24 234:2
   265:8 324:21
**longer**  25:16 97:17
   146:18 175:19
   176:16 200:11
**look**  14:16 16:6,9
   31:17 47:12 49:13
   64:14,16 70:15
   82:5 118:12
   142:20 155:6
   156:22 157:4,17
   158:22 170:8
   175:13 185:15
   199:16 203:10,14

206:19 210:13
227:17 228:23
229:4,12,15,18
254:15 255:1,9
297:14 298:9,20
300:23 301:4,16
322:6
**looked**  12:19,20
   70:16 117:6,13
   119:23 137:23
   227:14 228:21
   229:24 326:12
   327:22
**looking**  23:24 30:9
   34:17,20,23 37:19
   39:20 97:22
   106:21 118:2,3
   121:24 152:20,23
   201:11 203:5,8
   209:16,22 210:5
   210:14 214:21,24
   215:2 216:10
   217:7 222:4
   230:12 273:9,11
   280:8 304:12
   306:1 315:8
   325:16
**looks**  14:24 15:4
   31:18 32:2,11
   36:15 45:1 71:11
   92:11 110:10
   115:6 198:5
   202:21 203:4
   210:1,24 215:14
   215:15 216:9
   264:4 297:17
**loop**  29:19 37:13
**loose**  20:24
**lose**  62:18 162:19
   171:10 191:9

**lost**  77:5 139:12
   221:2 226:5
**lot**  23:8 49:9,16
   52:6 53:8,12 57:1
   63:20 77:5,5,15,18
   82:24 96:24
   107:24 126:12
   140:6 142:4
   144:11 164:22,22
   207:4,17 208:23
   277:14
**loud**  259:22 288:5
   289:5
**louisiana**  21:18
**low**  39:14 62:14
   238:12
**lower**  279:1,3
**lunch**  98:6,7,9,13
   98:16 99:8 100:8
   100:8 250:1,2,3
**lunchroom**  79:11
   91:13 142:2,11
   144:17,20
**lying**  265:10

**m**

**m**  3:4
**ma**  39:13
**ma'am**  304:9
   326:19
**macon**  41:3,4,13
   41:15 42:10 43:4
   43:5,6 51:20
**madam**  334:10
**madison**  25:14
**maiden**  295:14
**mail**  179:6
**main**  100:14
**maintain**  270:15
**major**  25:24
   232:21 233:8

**making** 41:20
60:13 78:1 101:17
142:8 143:17
144:16 259:23
**man** 86:24 125:9
140:7,23 143:10
146:24 216:23
277:4 323:23
**management** 27:7
61:5 89:5
**manager** 33:24
36:23 37:2 41:6
43:10 202:1
223:18 249:9
**managers** 57:20
57:23 77:24 78:11
**manner** 90:12
160:24 221:6
222:14
**mannerisms** 213:5
**manual** 72:12
155:13 158:5
**march** 36:16
46:12 51:19
218:16,21 219:5
223:15 231:17
321:13
**mark** 17:11 78:8,9
130:5
**marked** 4:16 14:7
14:9,15 15:22
16:1,4 17:13,16,17
17:21 18:17,19,24
24:12,14,18 28:14
28:15,19 30:16
44:17,19,22 63:8
63:10,13 70:1
81:24 82:1,4
84:22 85:2 92:2,3
92:6 102:9,11
120:20 121:9,11

121:13 128:3,5,8
130:6 132:20,21
134:4 150:22,23
151:2 153:3,7
163:16,18,21
166:21 169:5
176:10,13 178:12
185:9,12 188:2,5
189:1 190:2
197:22 198:24
199:22,23 206:15
210:19 215:5
240:13 246:8,13
246:15,17 280:11
297:11 306:9,12
308:19 309:6
314:14 318:1
319:22 321:20
330:1 331:23,24
**marketing** 95:13
**marking** 246:15
296:17,19,20
**marks** 332:4
**markup** 176:23
177:2
**marriage** 20:19,23
**marriages** 20:13
21:9
**married** 20:1,7,11
20:17 21:2,4 24:5
49:10 295:12,13
295:15
**marty** 40:20
**mary** 2:15 7:1
93:24
**mason** 41:2 42:9
**material** 49:3
**math** 33:1
**matt** 173:2,11
192:20 195:19,21

**matter** 5:18 26:7
28:8 132:5 133:6
**matthew** 215:9,13
**mcguire** 114:23
115:5,6 116:1
170:10 173:1
192:20 193:7
195:24 261:19,20
326:2
**mckenna** 101:16
**mcronin** 2:16
**mean** 14:23,24
27:5 28:21 31:21
31:23 32:2 33:1
34:15 35:1,2,3
39:19,20 45:24
51:2 52:10 53:5
54:22,23 55:5
56:10 59:23 60:1
62:14 64:12,15
68:12,15,20 69:1
76:24 78:6,22
79:5,18,23,24
80:11,14 82:10,10
82:11 83:10,18,19
83:24 84:1,4,6
88:4,6 89:7,8,9,12
90:18 91:6,8,13
94:1 98:5 99:3,11
104:13,15 106:10
110:3 112:21
113:4,14 114:2
115:14 116:6
118:24 119:19
120:3,8 123:16,17
135:10 137:14
141:21 142:16
144:11 146:8
148:6,7,17,23
151:14,21 152:3,6
152:7 156:11

162:16 164:21
167:9,18 175:5,10
175:11 179:12
183:10 185:2,2
186:7,19,22
187:23 189:20
190:20,21 191:13
192:2,22 193:21
194:10,11 196:9
204:5,7 206:8,12
207:3 210:3,15
212:11,12 213:2
214:7,8,9 215:15
216:15,21,24
217:1 218:24
221:8,9 222:19
229:11 230:5,10
230:12,13 237:14
237:15 239:18
243:1,3 244:9,15
248:4,5 250:16
252:1,6 253:13
257:6,10,11,14
258:11 263:22
269:22,24 270:11
271:7 275:13,14
277:5,17 281:14
282:16 283:5
286:6 292:24
297:17 298:3
304:17 310:18,20
312:8 317:5
320:23 321:4
324:24
**meaning** 8:17
65:12 290:10
292:5
**meanings** 303:7
**means** 23:18
131:11 157:11
190:18 232:8,11

232:12,18 238:13
238:20,22 248:6
258:17 277:23
283:18,24 311:22
311:23
**meant** 43:7 84:9
84:11 216:19
241:11 271:6
285:20 286:18
310:21 327:6
**mechanical** 36:14
37:10
**media** 5:12 70:7
70:11 92:11,18,21
93:18 149:4,8
226:10,13 314:8
314:12 332:5
**medical** 10:23
171:14
**medication** 10:18
**medium** 93:10
**meet** 11:9,14 53:6
101:8 134:19
135:7 248:23
249:15 250:10
256:6,18 260:4,5,7
**meeting** 87:6
133:20 134:1,2,14
136:20 138:23
139:23 142:24
144:8,24 145:13
146:5,17 147:5
149:11,15,18,24
150:1,18 154:7,11
154:13,15,21
155:17 157:21
161:2,7 163:14,23
165:3 170:14
171:16,17 174:4
323:1,1

**meetings** 220:19
321:4
**members** 262:22
**memo** 83:23
**memory** 108:2
**mentally** 151:17
**mention** 75:24
313:10
**mentioned** 20:15
22:20 30:3 42:12
58:3 59:8 66:22
78:16 99:13
141:11 160:2
193:6 195:18
239:6 262:9
**mentor** 79:23
**merely** 161:15
**message** 13:15
79:1 187:10
203:23 210:24
314:17
**messages** 185:14
187:12 260:21
261:7 317:4
**met** 12:8,12 53:8
69:1 101:14,14
112:22,22 138:17
151:10 161:10
244:17 249:21
252:8,9,15 260:13
**metropolitan**
26:16
**michael** 3:10 6:17
325:20
**michelle** 2:9 6:15
**microphones** 5:3,7
**middle** 19:17
181:14 200:12,14
245:7,11 292:20
**midway** 114:2,7

**midwest** 334:17
337:1
**mike** 29:14 55:23
60:21 61:8,14
82:14 83:19 87:15
88:6,7 131:23
132:16 133:3
134:8,17 136:21
138:17,23 140:1
140:12 144:8,18
145:13,17 146:5
146:17 147:5,8,18
147:21 148:12
150:7,14 151:4,6
151:10 152:16
153:8,10,12
154:14 156:14,22
159:22 160:2,3
161:5,5,10 163:6,6
163:23 165:12,17
166:3 167:1
168:16,17 169:10
169:12,15 174:5
174:18 175:13
178:2 179:12
182:17,18
**mike's** 133:24
**military** 22:14
**million** 42:21,23
**mimic** 270:23
**mind** 152:14
175:10,18 185:3
192:10,17 221:19
247:19 294:14
315:23
**mine** 119:6 124:8
131:12,17 211:1
295:5 301:17
**mini** 236:1 238:21
**minus** 275:16

**minute** 43:20 87:4
96:7,9 117:19
135:8 165:4
200:10 206:19
**minutes** 89:23
90:1 117:13,16
118:2 121:21
125:11 180:15
**mischaracterizes**
75:14 231:1
282:11 290:14
303:24
**misconstrued**
284:17
**mission** 242:5
**misspelled** 323:2
**mistaken** 287:11
**misunderstanding**
310:24 322:20,24
323:10,22
**misunderstood**
35:5 90:21 91:2
**mlm** 92:14 93:24
94:1
**modern** 55:2
**mom** 262:23
**mom's** 20:4
**moment** 63:14
85:5 262:5
**moments** 243:8
**monday** 136:13
151:4 153:8,14
198:6 204:24
205:3,10,12
**money** 34:8 37:14
50:5 62:13,18,19
78:3 94:21
**month** 32:21
41:11 53:16 59:20
212:2,2,3,3,4,5
233:3

**months** 27:5 35:12
39:4 40:10,11
41:11 53:15 81:9
167:12,17 168:13
176:17 181:2
216:9,17 239:17
320:21,23
**mood** 146:21
251:13
**moons** 94:16
**moran** 36:9,12,21
37:5 38:20 39:16
**moran's** 39:10
**morning** 9:10
11:16,24 12:9,12
122:8,14 124:12
124:21 125:10,17
129:14 136:22
138:18 295:1
**motion** 270:19
274:7
**motioned** 270:9
**mott** 326:3,4
**move** 22:8 30:9
34:13 39:18 80:22
304:18 327:5
331:13
**movement** 271:4
278:15
**moving** 39:15
261:10 305:20
**mri** 213:24
**muddled** 86:2
**multiple** 59:24

**n**

**n** 3:11 4:1 173:13
318:19
**name** 6:2 7:10
19:14 20:1,4,6,9
28:7 30:3 37:22
38:15 81:14

107:20,22 108:3
134:21 141:17
146:12 173:2
211:2 219:18
226:16 232:21
236:12,24 239:12
262:21 295:11,15
295:15,19 318:13
318:16,17 320:10
320:10 322:10
334:6 335:3,4,15
336:3,4,21
**named** 71:12
**names** 19:19
236:12 242:19
**naperville** 234:13
**narrowed** 93:8
**narrows** 232:16
**nature** 173:14
185:6 187:11
300:13
**nbc** 229:22
**near** 229:10
**necessarily** 254:14
255:9
**need** 9:4,11,12
10:8,11,23 11:17
43:20 64:14,15
70:17,21 83:15
100:4 105:7 117:9
117:14,19 125:23
127:18 135:3
140:23,24 170:5
170:17,22 173:6,7
193:19 194:15
210:12 217:1
220:5 226:6 237:2
256:13 271:14,18
274:19 290:24
291:1 294:1 302:2
319:9 320:21

329:4
**needed** 57:12 61:7
64:23 69:10 75:6
75:9 76:24 86:9
88:14,20 125:2
126:1 137:13
140:3,6 157:8,9,10
165:20 170:3
193:11 210:12,13
220:20 242:9
294:4 323:13
**needing** 162:3
**needs** 61:7 124:2,3
**negatively** 146:18
**negotiate** 50:11
168:2,4
**negotiation** 56:12
**nema** 13:16
**network** 58:18
95:15,18
**networking** 96:11
99:12
**never** 28:23 54:6
64:3,4 65:3 68:21
79:15 91:10 120:4
122:19 137:14,19
142:24 147:22
152:19 161:14
162:10 163:8
175:10 199:1
206:12 214:2
235:8,19 245:5
312:5,23 313:5
319:12
**new** 34:7,15 41:16
42:13,20 58:15
199:16 203:5,9
329:6
**night** 102:5 104:23
119:20 120:15
130:12 133:10

198:14,21 279:20
279:24
**nine** 235:11,14
236:7
**nodding** 64:5,8
237:6 259:15
**noise** 259:23
**nonoffensive**
302:20
**nonprofits** 231:10
**nonresponsive**
327:7
**nonsexual** 293:8
**noon** 98:11 129:6
129:7 240:19
251:3,17
**nope** 199:21
212:19
**norm** 186:15,16
**normal** 54:15
**normally** 251:10
**north** 1:15 2:7,19
5:24
**northern** 1:1 5:21
**nos** 3:17 4:2 18:20
**notarized** 334:14
**notary** 334:24
335:10,18 336:15
336:23 337:23
**note** 5:3 118:4
175:9 216:3 318:6
334:12
**notes** 139:1 161:19
161:21 162:1
**notice** 65:15
**noticed** 45:16 88:5
118:4 212:24
**number** 56:3 62:9
62:10,24 114:12
134:22 217:15
218:2 224:13

238:11,13 245:18
246:9 250:11
280:9 297:2
306:18 334:7,13
**numbers** 59:4,18
66:13 306:10
336:7
**nutrition** 27:15,18
**nutshell** 322:22

**o**

**o** 173:13 333:2,2
**o'clock** 121:21
122:14 240:22
241:20 242:23
245:24 251:6
**oath** 6:7 8:15
**object** 84:13
288:21 305:4
**objected** 183:19
**objecting** 304:22
**objection** 23:16
31:9 73:5 74:11
75:14 231:1
250:13 290:14,15
290:16 293:24
294:7,13 302:24
303:10,24 329:1
329:15 330:18
331:2
**objective** 100:14
183:13,16 241:24
304:11 306:1
**obligated** 104:12
104:13,14
**obligation** 67:8
75:11
**observed** 145:7
**obtain** 256:19
**obtained** 31:6
**obviously** 82:11
123:18 139:20

170:6 172:11
173:5 262:17
275:16 327:13
**occur** 110:15
143:15 211:20
320:17
**occurred** 29:16
110:2 112:19
115:18 131:5
145:1 208:14
248:6 260:18
263:19 265:5
298:6 321:1,2
**occurring** 83:8
272:23 331:1
**occurs** 266:2
**october** 15:6 33:6
46:5,8 178:21
205:4,22 206:2
218:21 219:2
298:6,12,16
321:12,13
**oddly** 261:5
**offend** 185:4
189:16
**offended** 83:2
184:16 189:23
310:16
**offending** 189:22
**offensive** 184:21
188:21 189:13
276:19 278:20,22
293:17 294:21,21
302:23 303:20
304:13 306:3
307:21 309:13
310:1,13,21 311:3
311:8,12 312:3
315:1 316:5,17,24
317:17

**offensively** 311:15
317:7
**offer** 55:20,22
103:12 164:24
168:19 174:17
**offered** 41:19 56:5
102:24 103:10
104:7,20 158:24
166:10,12 206:5
214:13 242:12
**offers** 204:23
**office** 42:20,22
55:4 87:7 89:24
111:9 116:7,13,18
117:18 140:4,6
143:20 144:21
145:21 148:24
154:9 186:23
204:24 220:20
221:3 321:3 324:6
333:21
**officer** 295:4,6,7
310:19
**offices** 2:18 3:2
**official** 217:9
335:15 336:21
**officially** 216:11
217:7
**offs** 57:10
**og** 301:6,24
**oh** 11:19,24 19:24
20:22 24:3 26:6,9
38:5,11 39:10
40:16,16 41:4
43:9 45:5 48:17
62:15 70:16 76:2
103:20 105:3,17
105:18 107:12
113:12 120:24
121:8 125:15
127:19 131:21

134:10,10 136:11
157:17 159:22
173:5,16 182:14
195:5 204:18
213:6 217:19
230:4 234:22
241:12 242:15
245:13 248:8
250:24 251:4
254:24 259:24
262:18 280:3
285:3 288:7 299:4
312:1 315:5 317:3
320:9 326:4
**ohio** 334:2
**okay** 7:19 8:4,11
8:14,23 9:5,21
10:5,18 11:1,3,12
12:2,8,11 13:2,23
14:20 15:3,9,13,19
16:10,19,22 17:1,5
17:10 18:7,10
19:7,11,16,19 20:7
20:11 21:24 22:4
22:24 23:20 24:4
24:9 25:2,8,24
26:5,13 28:10
29:10 30:8,15
32:4,11 33:14,20
34:17 35:20 36:2
36:8,15 38:22
39:6 41:9,13 42:5
45:23 46:2,7,14
50:22 51:1,17,23
52:4 53:17 54:19
55:6,10,19 60:19
61:19 62:1 63:23
64:9 65:8,10 66:8
66:20 67:12,22
68:3 69:6,20
70:13 71:2,5,12

| | | | |
|---|---|---|---|
| 72:6,14 73:20,24 | 166:14 167:16,20 | 238:19 240:10 | **olson** 2:9 6:15,15 |
| 74:4 76:12 78:16 | 168:15,21 169:1 | 241:11,22 243:4 | **once** 41:5 53:3 |
| 81:2 82:8,19 | 169:14,22 171:11 | 243:24 245:20 | 71:23,23 98:20 |
| 83:13 84:21 85:7 | 171:21 172:20,20 | 246:7 247:8 248:7 | 127:2 142:24 |
| 85:11 86:14 87:10 | 173:18,20 174:13 | 248:10,11,12,19 | 235:12 248:17 |
| 87:12,24 88:18 | 174:18 177:9,12 | 249:8,19,24 251:1 | 305:8 328:12 |
| 89:19 91:1 93:17 | 177:23 178:2,21 | 251:12,20,23 | **ones** 59:3 260:4,17 |
| 93:23 94:8 95:1,7 | 179:8,17,24 | 252:16 254:9,13 | 284:6 |
| 95:17,24 96:2,6 | 182:17 184:18 | 255:15,23 258:21 | **online** 47:16 93:5 |
| 98:15,18,20 99:13 | 185:8 186:12 | 259:4,8,22 261:1,2 | 209:16 295:3,22 |
| 99:18,21,23 | 187:21 188:15,21 | 261:22 262:9 | 295:23 297:19 |
| 101:19 102:18,22 | 188:24 189:10 | 263:1,7 264:16 | **oooh** 106:5 148:4 |
| 103:14 104:1,5,7 | 192:8 193:3,6,14 | 265:4,9 268:21 | **open** 42:19 55:3 |
| 105:12,19 107:10 | 193:16 195:4,7,17 | 269:7,15 270:2,7 | 60:12 83:19 |
| 108:1,5,7,14 109:1 | 195:20 196:5 | 271:2,10,13 272:4 | 119:10 155:21 |
| 110:1,11,11 112:9 | 197:13,14,16,21 | 273:8,13 274:3,11 | 157:3 204:3 |
| 112:17 113:14,23 | 198:10,13,17 | 274:23 275:4,10 | 322:15 |
| 114:4,9,14,16 | 199:15,18 200:16 | 275:17 276:6,10 | **opened** 42:22 |
| 116:1,12 117:8 | 201:5 202:17,20 | 276:21 278:10,14 | 324:7 |
| 118:20 119:9,14 | 202:23 203:7,17 | 278:23 281:19,22 | **opportunity** 7:23 |
| 120:19 122:4,10 | 204:2,9,19,22 | 282:4,23 283:16 | 34:7,15 35:16,17 |
| 122:13 124:11 | 205:3,5,14,20,24 | 284:4 285:4,11 | 37:8,14 52:11,12 |
| 126:21 127:5,6 | 206:5,14,14,23 | 293:11 295:18 | 112:24 123:23 |
| 128:16,19,20 | 207:9 208:2,11 | 297:24 298:9,11 | 139:24 140:9 |
| 129:1,3,4,6,7,10 | 209:3,7,13,14,22 | 298:16 299:4,8 | 162:11,12 167:13 |
| 129:21 130:4 | 210:5 211:6,19 | 300:10,22 301:16 | 186:3,9 253:4 |
| 131:3,10 132:12 | 212:6 213:1 214:2 | 301:18,20 302:7 | 326:8,12,14,16,24 |
| 133:5,12 134:10 | 214:5,11,20 | 302:18,21 305:17 | 326:24 327:23,24 |
| 135:6 138:6,11,14 | 215:10,21 216:6 | 306:8 307:5,13 | 328:16,17 329:13 |
| 143:24 144:4,7 | 216:15 217:6 | 312:1,2,5,18 | **opposed** 58:12 |
| 145:6,9,12,12 | 218:13,18 219:3,9 | 314:23 315:16 | 285:21 286:19 |
| 146:4 147:8,12,15 | 219:13,17,20 | 316:3,11,16 | **option** 158:8 |
| 147:18,21 149:1,2 | 220:6,15 221:13 | 317:11,15 318:21 | 159:16,23 166:10 |
| 149:18 150:3,6,14 | 222:11,17 223:9 | 320:7,11,15 321:6 | 166:12 178:7 |
| 150:20 151:8,13 | 223:21 224:2,12 | 322:6 323:7,17 | 183:1 |
| 153:12,16,24 | 224:22 225:2,22 | 325:20 327:14 | **options** 151:19,22 |
| 154:5,10,13,18 | 226:6,17,21 227:1 | 329:11 331:15 | 152:13,22 155:2 |
| 156:23 158:7 | 227:2,5,8,10,17 | **old** 148:5 269:22 | 157:4 158:12 |
| 159:8,15 160:2 | 228:3 234:20,24 | 281:20 | **orangutans** 142:7 |
| 164:12,15,18 | 235:22 236:8,11 | **older** 141:22 | **order** 31:16 47:2 |
| 165:11,22 166:7 | 237:13,20 238:15 | | 99:1,7,11 111:10 |

www.veritext.com 888-391-3376

129:9 162:5 177:3 237:3 256:7 267:4 272:11
**ordinary** 219:15
**oregon** 3:3
**organization** 231:9
**organized** 245:1
**original** 85:21 125:7 179:5,6,21 190:9
**originally** 38:17 105:1 267:13
**orleans** 41:16 42:13,20
**oswego** 3:3
**outcome** 6:9 23:13 23:21 162:19 220:18
**outdated** 85:24
**outing** 94:4,6,8 98:3 99:19 100:5 101:4 109:6 116:4 117:5 131:5,14 136:13 145:1 198:8,14,15 207:23,24 208:3 208:12 211:23 212:7,8 233:22 234:6
**outside** 157:13 234:11 239:19
**overall** 86:1
**overhead** 39:14
**overhear** 221:1
**overtime** 49:20
**overview** 155:21
**owner** 40:20 80:19 203:1 221:20
**owner's** 324:7

**ownership** 68:14
**oye** 322:20

**p**

**p.m.** 130:12 149:4 149:8 153:9 198:6 198:6 226:10,13 251:17 298:7 314:8,12 315:19 315:22 319:21 320:1 321:18,23 322:7 325:8,11 331:18,21 332:6
**pa** 39:13
**pace** 57:4
**pack** 235:23
**package** 157:18 164:21,24 165:4 166:11 168:4 182:11 184:2 193:19
**packet** 12:17,18
**page** 3:12,17 4:2 16:22 17:2 46:2 47:23,24 65:5 66:5 67:13,14 71:3,3,10,10,20 128:13,16,17 129:13,22 130:1 188:10,13 189:6 189:11 198:23 199:6,7 200:6 207:12 209:5,8,15 211:10 214:11,15 253:24 269:4,4 297:18 298:9 307:8 308:2 311:20 316:11 334:13,15 336:7 337:3
**pages** 155:22 199:4

**paid** 169:16 223:19
**painting** 107:23
**pamphlet** 228:15
**pancreatic** 94:16
**paperwork** 54:13 164:4 168:24
**par** 77:18 238:20 238:23
**paragraph** 65:9 102:17,23 190:4 190:12,12,15 191:1,18 192:19 196:8 197:4,4,9 209:15 221:18
**paraphernalia** 106:6 256:20
**pardon** 134:12
**parentheses** 281:11,14
**park** 114:21
**parkchester** 21:12
**parking** 53:7 96:24
**part** 27:1 58:24 72:1 96:17 98:24 99:3 112:15 113:19 135:20 171:18 177:18 180:9 184:7 187:22 210:8 237:15 245:16,23 278:23 279:1,3,6 282:8 312:6,23 313:6,7 324:8 336:9
**partake** 116:16
**partaking** 111:15
**particular** 64:24 69:5 152:22 254:10

**parties** 5:10 333:16
**parts** 317:12,12
**party** 6:7 22:17,21 92:16 104:18 183:10,12,15
**paschen** 41:17 42:15,17,18 43:6,7 44:12 54:13
**pass** 43:24 44:5 222:1 331:12
**passed** 44:2 318:4
**paste** 185:19
**pasted** 186:7 187:17
**path** 37:12 254:2 255:12
**patience** 209:1
**pay** 49:17 167:17 170:21 173:23 195:16 210:13
**paycheck** 157:10 165:20
**paying** 213:5
**payne** 232:1,6
**pc** 2:7
**pdf** 45:1 332:9
**pdf'd** 45:5
**peacefully** 323:24
**peed** 252:5
**pelvis** 279:5
**pending** 290:7
**pendulum** 270:17
**people** 28:6 31:15 31:20 39:21 47:11 57:1 62:24 68:12 68:13,19 73:18 84:1,2,7 92:16 100:10,17 101:4,6 101:8,13 103:23 107:7 108:6,8

109:23 111:9 112:4,5 114:23 126:11,16 131:6 131:14 135:10 144:16 145:21 148:1,14 164:13 184:9 185:4 189:19 213:9 241:8 243:8 244:23 252:6 258:4 265:16,18 266:18 269:24 286:2 325:1

**percent** 21:15 51:8 256:10

**perception** 215:4

**perfect** 109:6 294:12

**perform** 106:12 108:17 201:11

**performance** 81:12 219:10,11

**performed** 267:12

**performing** 73:21 122:7

**period** 47:19 51:22 52:17 124:4 195:12 218:4 248:20

**perm** 40:7

**permanent** 40:15 143:10

**person** 42:5 47:13 55:13 61:19 95:13 97:4 104:19 114:24 156:5 163:4 220:22 268:4,6 276:5 318:9

**person's** 38:15

**personal** 6:19 30:20 193:11,20 194:12 202:14 207:9 211:4 223:22 225:6

**personality** 52:22

**personally** 89:14 137:20 172:14 215:18 335:11 336:15

**personnel** 261:11

**perspective** 223:4 223:11

**persuade** 145:22

**pertain** 49:3

**pertaining** 1:12

**pertains** 192:12,18

**pes** 194:24

**peter** 1:7 3:6 5:19 6:20,22,24 7:2 103:4 105:13 107:13 119:12 226:17 227:12 228:12,19 230:10 230:16 269:12 271:13,21,22 277:22 287:7 298:24 299:11,21 300:14 302:1

**peters** 137:24

**phase** 268:3

**phone** 11:15 12:2 38:2 133:19 157:16 164:11,19 168:14 169:3 174:4,11 175:9 180:13,18,22 181:5,10 334:3

**phones** 5:6

**phonetic** 13:17

**photo** 110:4 263:4 263:11 330:4,9,11

**photograph** 331:23

**photographing** 242:10

**photos** 60:8,9 101:23 242:1,4

**phrase** 190:17 302:5 304:4

**phrased** 89:8

**phraseology** 279:18

**physical** 194:17 195:10 225:4 274:20 275:18 276:19 277:1 293:16 299:23 300:13 301:2 313:6

**physically** 106:16 108:16,17 109:20 151:17 219:22 270:4 274:1 275:6 293:23 302:13 312:6,24 324:5,12 328:23

**pick** 5:4 100:11,11

**picked** 9:17

**picking** 312:14

**picture** 106:21 110:22 256:12

**pictures** 58:23 95:11 100:15,16 100:20 101:3 103:15 242:12,16 243:3,4,8 248:21 256:13 307:4

**piece** 106:6 256:20 323:3

**pipeline** 210:17

**pippin** 3:2,4 6:19 6:19

**pippinlawoffice...** 3:4

**piss** 91:20

**pissed** 222:4

**pitch** 201:23

**pivot** 52:13

**place** 5:6,10 37:13 46:19 52:9 54:23 55:2,3 56:13 94:19 144:4 147:2 154:11,15 157:22 181:1,3 190:23 207:23 239:5

**placed** 192:1 237:24

**placing** 190:21

**plaintiff** 1:4 2:6 7:3 22:17 104:11 108:21 197:5

**plaintiff's** 108:22

**plan** 27:12 55:3 96:23 241:22

**planned** 125:9 221:21

**planning** 131:4

**plans** 22:8 58:12 81:5

**plate** 60:13 77:18 97:24

**play** 103:19,20 235:5,17 266:6 269:19,22 280:19

**played** 234:4,10 234:21 235:8,11

**player** 299:21

**players** 59:16

**playing** 232:13,15

please 5:3,5 6:11
10:24 15:23 17:12
18:18 24:13 28:13
44:18 63:9 81:24
85:6 88:2 92:2
102:10 121:12
130:5 163:17
182:14 199:22
226:24 289:6
326:21 334:11,11
plus 217:3
pm 78:7
pm's 62:22
pms 62:22 85:18
115:1
poems 285:1
point 10:22 48:9
80:3,23 90:15,22
98:12,16 112:11
112:19 132:5
134:11 136:6
144:23 152:22
157:7 181:12
182:18 217:8
247:20 248:22
252:8,13 253:18
257:7 258:3
259:20 260:4
274:1,3,13,21,24
275:17 280:24
287:19 288:13
289:10 291:17
293:3 294:2
302:21 313:20
pointers 266:15
268:7 299:21
pointing 200:14
points 79:7 300:20
poking 143:21
police 295:4,6,7
310:19 324:10

policies 63:3,24
64:17,21 141:9
policy 64:24 66:6
67:8,14 83:20
171:18
polished 77:16
politic 80:14
pool 232:16
234:15
poor 139:20
poorly 161:16,17
popped 137:24
portion 65:9
278:20 293:4
324:6
portray 328:22
portrayed 83:2
220:1
pose 243:9
position 28:23
29:20 39:8 40:1
43:11 48:22 55:24
56:4,6,7,17,19
72:15 81:17
108:21 136:3
157:19 160:23
161:20 196:16
204:16 206:5,10
230:5 239:8 242:8
249:8 255:11
295:9 310:19
326:8 329:4
positioned 272:9
positions 47:18
52:5 201:23
positive 49:14
84:4 139:6
positively 161:9
161:14,23 191:22
possession 25:6
69:7 74:3,9,23

155:16
possibility 271:11
possible 31:24
147:18,20 220:10
249:13 260:14
263:15 324:3
possibly 140:13
post 188:12,15
189:5,8,14,20
posted 189:10
330:21,24
posting 93:18
posts 189:16 200:4
potentially 328:8
power 3:10 6:17
6:17 132:16 134:8
136:21 149:12,19
150:7 160:3 161:5
163:6,23 167:1
168:17 169:10,12
174:5 182:18
212:16 325:21
power's 144:18
153:8
powers 84:6
131:23 138:17
140:5,20 141:21
154:14,22 155:5
156:6 158:2
164:13
ppe 38:6
practice 258:14
preferred 69:3
pregnant 220:7
preparation 14:3
prepare 11:4 18:8
prepared 30:17
164:24
prescription 10:24
presence 140:18

present 3:7 6:10
12:11 57:19
116:21 154:13
157:18 176:6
184:1 262:8
294:18
presented 34:7,14
35:16 159:15
182:10 193:18
292:15 293:12
presenting 181:24
292:16
presently 27:12
preservation
193:10
preserve 210:10
215:3
preserved 203:15
preserving 210:16
president 42:24
56:2
press 280:19 294:3
pressed 108:22
277:4 279:1
292:23
pressing 286:1
pretty 37:9 39:9
57:15 61:22 76:11
91:23 113:1
189:22,23 199:3
225:21 233:2,18
250:3 324:14
325:2
pretzel 2:13,16
prevent 329:8
previous 95:5
187:13 304:6
previously 20:17
22:21 31:16 109:6
176:18 190:2
215:20 246:7

**[previously - put]** Page 37

303:5
**price** 2:7 5:24
**prices** 57:6
**pricing** 54:7 57:1
57:14,24
**pride** 82:24
**primary** 61:14
**print** 140:6
**printer** 140:8
**prior** 15:6 16:20
19:19 20:13 21:9
31:14 32:12 36:9
37:2 38:24 41:1
42:12 65:15 69:1
119:14 130:11
138:1,1,2,7 148:23
158:16 161:7
177:13 201:7,11
207:15,19 209:23
222:13 227:21
228:14 229:12,15
229:18 234:2,22
235:1,5 239:4,5
242:3 256:9
**pritchett** 211:2
**private** 5:4 323:17
**pro** 264:20 266:4
**prob** 31:2
**probably** 8:4,24
23:1 27:14 31:2
45:20 98:4 99:17
112:22 139:12,16
143:19 145:15
181:14 193:15
208:10 214:19
234:22 235:8
249:23 259:1
**problems** 219:9,10
219:20
**procedure** 1:11
335:5 336:5

**procedures** 63:3
63:24 71:7 73:21
74:6 141:10
**proceed** 157:2
227:9
**proceeded** 111:21
112:13
**proceeding** 7:15
7:24
**proceedings** 8:7,8
**process** 8:21 53:3
58:2 62:2 67:24
72:1 100:5 109:4
110:6 120:9 124:1
125:1 135:21
**processes** 71:6
86:7
**procore** 27:4,6
**produced** 13:3,10
14:5 17:24 24:19
45:3 70:18 85:4
128:10 179:8
185:14,20 198:18
200:4 306:18
320:8 322:2
**product** 189:20
**production** 19:3
297:21 334:15,17
334:22
**professional** 27:2
27:9 139:15 140:2
225:7
**professionally**
109:12
**profile** 45:2,13
**profiles** 47:9
**profitable** 80:19
**program** 57:13
66:22 76:22
**programs** 171:12

**project** 33:24
36:23 37:1 41:6
43:1 57:20,22
61:5 77:23 78:11
78:13 81:19 85:18
201:24 223:18
249:9
**projects** 37:15
59:24
**promise** 118:17
**promised** 41:21
**promoted** 37:1
**prompted** 43:3
82:21
**pronounce** 143:13
**pronounced** 307:2
**proper** 167:13
**property** 67:15,20
67:23 68:1,6,11
74:22 75:12
**proposal** 47:13
56:24 57:12 62:5
62:7,21 68:5
**proposals** 78:2,7
85:15
**proprietary** 67:4
67:24
**protocol** 123:9
254:14,23 255:9
**provide** 9:12
10:20 15:9 19:19
30:23 102:24
103:10 158:12
162:3 171:12
205:20 217:21
**provided** 18:10
31:7 45:13 50:17
73:3 109:22 218:1
**provides** 67:18
**providing** 10:4
103:8 105:13

109:17,22
**provision** 67:17
**proximity** 79:9
107:9 275:12
276:4,8 277:2
278:10 293:13
**psychologist** 318:7
**pto** 124:19,20,21
124:22 125:20
126:4,10 127:6,23
128:17,19,24
129:5,8 135:3,17
137:6 149:21
150:7,10,17
151:24 153:17
**public** 47:3 64:20
335:10,18 336:15
336:23 337:23
**publication**
228:14
**publicly** 330:14,22
**published** 188:12
**pulled** 103:15
106:3 143:22
**pullos** 2:20 6:21
6:21
**purely** 310:15
**purposes** 63:21
**pursuant** 1:10
**pursue** 27:13 52:8
74:7,18
**put** 30:6,7 31:23
35:8,24 56:23
57:9,11 62:6
124:14 136:2
139:18 147:2
152:19 156:1
207:17 208:23
223:3,11 247:9
264:6 279:16
280:23 282:19

[put - really]                                                          Page 38

287:9 288:7 297:2
302:4 306:10
314:18 316:21
326:7 329:4
**puts** 169:18 233:1
300:1
**putt** 103:24
**putter** 235:24
**putting** 62:5,20
86:3 103:23 104:2
269:3,9 317:9
327:4
**puzzled** 13:20

**q**

**qualify** 186:13
**question** 9:1,7,9
9:23 10:1,10,11
16:5 23:14,20,22
48:18 63:16 72:24
74:15 75:18 79:20
81:6 84:16 119:9
131:18 159:7
174:3 177:19
181:12 182:2,12
182:15 191:2,23
226:1,24 227:4
231:3 234:20
245:10 255:7
261:12 264:9
269:16 277:8
286:10,13 288:11
288:21 289:8
290:6,7,23 291:1
291:21,22 292:1
304:9,20,24 305:8
305:20,22 309:19
309:22 310:9,10
311:13,13,16,17
311:22 312:13,18
312:19,21 313:11
313:19,21,23

316:1 326:17
327:8,12,17,20
328:19 329:17,19
**questioning** 9:22
318:9
**questions** 7:20,23
9:13 16:8 54:1
84:14 148:16,18
157:22 181:9
190:11 206:21
213:9 223:8
226:19 239:15
243:18 291:18
305:9 309:5 310:6
331:7,10
**quick** 14:16
143:21
**quickly** 44:5
135:19
**quit** 49:13 118:18
222:5,22
**quite** 104:22
135:21
**quota** 50:3,6
**quote** 202:3 317:9
317:15
**quotes** 57:5 60:22
60:23 221:23
280:23 282:20
316:19 317:1

**r**

**r** 6:23 173:13
318:19,19
**rachael** 96:11 97:1
97:7,11 98:20,21
99:13 101:15
196:10 198:5,10
198:21,24 239:7
240:13 314:19
**rachael's** 239:7,12

**racist** 140:18
144:16
**radoha** 262:19
263:1,24 264:3,10
265:12 287:8
**radohas** 263:4,10
**rags** 105:20
**raise** 94:21 287:19
288:13 289:10
**raised** 130:24
160:22
**ran** 298:22 299:9
**randall** 231:17
**random** 306:10
**range** 258:16
**ranking** 88:19
**rash** 118:16
**rate** 238:10
**reach** 39:21 124:8
**reached** 29:18
30:9 34:16,24
37:6 38:1 39:11
71:23 120:11
134:20 203:16,22
261:2
**reaches** 35:2
**reaching** 203:7,11
216:2 260:22
**reaction** 132:8
222:22
**read** 11:6 12:14
13:14 14:24 64:3
64:4 67:8 82:7
102:20,21 155:14
186:3,10 190:24
204:14 221:18
222:12 230:3,4
231:5 239:20
240:8 286:11,13
288:8,10,11 289:8
292:1 299:12

300:3,15,17,17
301:6 302:9
304:20 305:21,22
309:22 312:21
316:1 323:5,6
326:10 327:20
335:5,6,12 336:5,6
336:17
**reader** 315:15
**reading** 65:16
155:8 186:6
209:20 311:24
315:23 333:12
334:19
**reads** 65:11
**ready** 14:17
149:20
**reaffirm** 13:17
**real** 47:12 146:21
266:4 288:5 289:5
**realize** 16:11
287:10 293:8
**realized** 119:22
127:11
**realizing** 290:9
292:4 293:5
**reallocated** 13:22
**really** 21:17 37:11
43:13 45:21 49:18
51:6 53:19 61:1,1
64:3,18 79:23
82:10 84:18 86:12
88:24 100:18
101:4 105:2 106:7
110:19 111:17
114:24 136:10
141:11 143:21
148:7 156:20
171:5 186:8
187:16 209:18
213:15 220:23

254:18 256:15
261:6 324:21
329:5
**realty** 48:15
**reason** 10:14,23
40:18 45:18 47:9
50:22 65:14
133:11 135:11
160:19 171:8,10
171:10 176:7
203:21 220:4,14
304:11 305:24
310:20 334:14
336:8 337:3
**reasonable** 98:4
**reasonably** 304:11
305:24
**recall** 13:12 14:1
15:5 27:11 32:19
32:21 33:2 37:18
44:1 48:21 50:20
50:21 51:16 52:14
52:18,19 53:2,7
54:19,20 64:8
81:8 82:12,22
83:15 86:4,6
98:12,13 106:10
108:7 116:13,23
119:13 120:17
126:9,13 130:14
133:23 139:22
146:15 149:14,24
151:8,12 153:9,23
161:4,5,10 162:24
163:5,13,24 164:8
164:19 165:21
166:3 167:2
168:10,15 169:11
172:18 173:16
174:18,22,23
175:2,3,15 177:2

178:6,8 179:4,18
180:14 181:8,18
181:22 182:3,4
184:23 185:7,23
187:24 192:7
199:15 205:13,14
205:17 206:1
207:19 210:2
211:21 219:17
224:17,19,21
229:14 248:24
251:7,9 252:11
253:19,20,21
256:8 260:11
263:3,8 264:14,17
265:17,19 267:9
279:18 297:17
319:3 320:18,20
320:24 330:15
**recalling** 29:17
**receipt** 154:6
334:18
**receive** 25:11,22
26:10 27:17 41:23
104:8
**received** 26:21
55:19 63:15,17
83:1 106:9 109:5
110:20 127:24
132:15 133:2
145:20 177:12,19
178:19,24 179:10
179:11 181:15
197:17 232:1
266:18 275:1
**receiving** 130:14
132:8 153:9
179:18
**recess** 70:9 149:6
226:11 314:10
331:19

**recitation** 320:15
**recognize** 24:20
28:19 44:23 70:19
82:9 92:7 121:22
178:16 185:16,17
185:21,22 188:6
189:8 198:2
206:24
**recollection** 83:5
84:10 113:20
138:5 179:2 235:8
257:8 263:9,11
267:22
**record** 5:2,11 6:12
8:7 14:12 44:9
70:7,11 149:4,8
190:6 226:7,9,13
243:13 288:8
289:7 296:5,9,21
297:20 301:19
305:5 306:11
307:14 308:18
309:17 314:8,12
315:9,12,17,18,20
315:21 319:18,19
319:20,24 321:15
321:17,19,22
325:5,6,7,9,10,15
331:16,17,21
332:1,3 333:9
336:9
**recorded** 5:13
9:12 282:10 333:7
**recording** 5:9 8:9
**recourse** 43:13
**recover** 326:8,13
327:1,23 328:16
**recruit** 201:20
203:18
**recruited** 29:12

**recruiter** 28:22
29:3,7,11 30:13
34:16 35:2 37:6
37:19 38:9 39:11
39:20 48:12 50:16
203:20,23 215:14
215:19,19,21,22
216:21
**recruiters** 28:24
51:2
**recruiting** 30:17
53:3,5 205:22
**reduced** 333:7
**ree** 140:15
**refer** 46:18 64:6
64:16 65:2,3
73:20 209:3 311:5
313:22 314:1
316:22 317:11,15
**reference** 48:2
84:19 185:1 283:9
284:2 287:20,23
288:14,18 289:11
289:15 290:11
292:7 303:4
316:17 334:7
335:2 336:2
**referenced** 232:14
234:5 269:20
335:11 336:15
**referencing** 83:12
83:12 199:11
**referred** 64:23
93:12 94:8 172:21
198:11 208:6
284:10 306:17
318:6
**referring** 7:14,16
80:13 84:11
159:12 168:6
171:7 190:15

192:4,13 193:9,15
204:11 214:18
216:20 217:13
242:16 263:22
280:18 311:11
316:11,12 318:14
**refers** 316:17
**reflect** 161:17
**reflects** 308:2
**refrain** 90:16
**refresh** 83:4
**regarding** 81:12
93:18 114:17
198:14 217:21
307:22 313:11,21
316:17 318:7
330:14
**regards** 159:6
**registered** 287:16
**regular** 122:23
141:8
**regularly** 44:3
186:21
**reiterate** 145:2
161:13
**related** 6:7 85:12
173:4,19 285:22
286:19
**relates** 67:14
283:21 303:15
307:7
**relating** 24:23
25:3 304:6
**relation** 91:7
108:8 258:11
**relationship** 49:12
65:13 76:15 77:8
79:4,14 91:4,7
96:22 140:3
158:14,17 187:4,6
187:8,14 201:18

**relationships** 47:1
58:14,20 62:8,23
73:10,12 77:5
**relative** 333:15,16
**relaxed** 101:6
111:16
**relied** 72:21
**relocated** 21:16
**remain** 77:8
**remainder** 111:7
124:19
**remark** 296:10
**remarried** 20:5
**remember** 12:15
13:7,18 14:22
26:13,20 33:4,7
40:4 44:7 53:14
53:17 55:5,12,16
56:4 82:11,19
83:6,7 85:8 94:6
94:13 95:12 97:5
98:2,17,23 99:23
100:1 103:7,17
108:4 111:3,4
112:7 113:14,15
113:20 116:20
117:1 118:13,20
119:11 124:24
136:5 138:22
140:20 141:6,16
141:19 145:16
146:16 147:21
151:6 154:10,20
154:22 156:16
168:14 178:24
212:11 235:12
242:12 248:16,18
250:6 251:19
262:16 268:24
269:19 273:2,12
273:16,23 274:12

274:16,17 282:3
298:3
**remote** 140:7
**repeat** 288:2
**repeated** 227:4
**rephrase** 103:9
**rephrased** 227:4
**rephrasing** 303:18
**reply** 222:2
**replying** 216:8
**report** 61:8 164:5
168:8 180:3
295:24
**reported** 61:11
133:7 275:5
282:16 295:21,22
**reporter** 1:14 6:4
8:5 9:17 19:23
321:14 332:7
333:23 335:7
**reporting** 229:18
**represent** 7:11
160:24 161:1,8,12
161:22 198:19
226:17 320:7
**representation**
320:8
**represented**
131:12,17 136:1
175:21
**representing** 59:1
59:2
**reputation** 27:23
47:15
**request** 19:2,4
74:1 122:20 126:3
127:23 336:9,11
**requested** 124:20
127:6
**require** 280:19

**required** 67:19
171:15 194:21
291:6 299:23
334:24
**requiring** 177:3
**reread** 327:9
**research** 230:14
231:17
**resentment** 46:1
**reserve** 331:11
**reserved** 332:12
**residence** 22:5
**resolution** 141:4
146:10 175:24
177:6 184:1
**resolved** 221:6
222:15
**respect** 18:3,14
83:8,10 88:22
89:3 91:11 95:7
191:18,21 195:21
225:22 276:17
**respected** 27:20
**respecting** 276:16
**respond** 88:15
90:7,9 134:20
137:10
**responded** 90:13
135:12 204:2
221:22 305:12
323:4
**responding** 169:15
**responds** 203:17
**response** 82:12
88:24 130:11,12
133:23 134:8,15
134:24 135:6
153:8 162:23
163:3 168:21
173:21 174:8,11
222:3 305:19

311:2 312:2,17
313:18,21 323:7
**responses** 16:7,17
17:7 19:1,4,8
**responsibilities**
13:22 41:24 79:19
194:20
**responsibility**
158:12
**responsible** 76:6
**responsive** 304:19
304:22,23 305:19
**rest** 107:7 186:21
190:24 282:24
**restoration** 39:1,7
40:23 45:18,19
**result** 24:10
150:18 224:23
**results** 225:5,23
**resume** 30:23 31:3
45:7,9,17 48:6,12
52:24
**retaliation** 197:5
**retreated** 319:13
**return** 67:15,19
69:14 70:22 72:2
74:2,10,18,24 75:1
75:4,5,6,12,22
150:3 162:22
181:21 182:5
187:13
**returned** 75:2,21
334:18
**returning** 115:19
**review** 11:16
15:15 16:19 18:7
31:12 32:4 51:14
64:23 84:3 85:5
158:15 166:12,19
169:1,4 334:12
335:1 336:1

**reviewed** 12:16
14:3
**reviewing** 13:13
15:5
**rid** 210:11
**ride** 116:7,12
117:3,7,9 216:9,16
**right** 8:22 9:10,15
9:18 16:12 21:3
31:16,18 32:1
33:1 35:10 55:21
56:9,10 65:17,19
65:20 66:23 67:2
74:7,18 81:3 86:7
88:11,12,14,17
89:12 95:4 98:10
105:6 108:11
110:5 112:14,19
115:23 117:15,16
120:3,6 121:24
122:17 123:2,5,16
124:2,3,5 126:23
129:16 132:13
134:23 135:1
136:15,17,18,19
136:24 138:22
144:15 157:16,21
160:13 161:24
176:22 180:11
181:7 187:1
191:20 195:11,15
201:9,10 202:12
203:3,6 204:13,14
208:6,21 214:22
215:24 216:5
218:9 219:5
224:11 227:4
228:6 230:15
236:7,8 239:22
240:6,11 241:8,9
244:8,9,18 246:2,3

247:11,18 253:22
254:2 255:17
260:2,8,9 261:12
262:4 265:24
266:5 267:1,23
268:14 271:24
272:12,13 274:18
276:1,9 280:17
282:19 283:10
284:14 289:23
290:22 291:5,8
297:4 299:2,14,18
299:20 300:5,12
301:3 302:11,21
303:19 304:18
306:15,22 307:16
310:9,10 311:7,10
311:21 313:5,18
313:20 314:5
316:22 317:20
325:2,4 329:23
331:6,8,9
**rights** 176:6
**rigid** 270:16
**river** 228:10 239:1
**ro** 75:7 105:15
127:18 132:3
136:9 177:20
201:20 259:17
**road** 21:12 49:9,11
**rodan** 92:13,22
93:20,23
**roll** 159:3 297:3
**rolled** 136:23
182:24 183:22
**room** 6:10 53:11
142:9 154:16,17
164:16 220:3
259:3,3 286:2
323:1,18

**rose** 134:2,14
136:21
**ross** 137:24
**roster** 244:22
**roughly** 26:20
**round** 245:7
**rounder** 284:13
**row** 196:17
**rowena** 1:3,10
3:13 5:13,18 7:5
19:15,16,21,24
20:1 333:4 334:6
334:8 335:3,4,9
336:3,4,13 337:20
**rude** 89:12
**ruff** 2:15 3:15 6:23
6:23 226:15,17
231:7 243:11,14
246:7,13,19
247:15 250:18
278:1 280:7,11,16
282:18 287:1
288:2,5,23 289:1,5
289:21 290:21
291:13,15,20
292:12 296:13,16
296:23 297:2,5,13
299:5 301:11,21
301:23 303:8,14
304:8,23 305:2,6
305:11,15,18
306:7,14 307:15
308:15,24 309:2
309:20 310:8,23
313:2 314:16
315:5,7,13,16,23
316:10 317:20,23
318:3 319:19
320:2 321:16
322:1 325:12,17
327:16,18 328:3

329:20,24 330:3
330:20 331:6
332:1
**rule**  10:10
**rules**  1:11 8:20
335:5 336:5
**run**  8:22 248:2,14
**running**  64:13
76:22 202:9,12

**s**

**s**  3:16 295:20,20
295:20 334:15
336:8,8 337:3
**safety**  38:6,10
41:6
**salary**  41:19 51:9
**sale**  51:8
**sam**  2:4,4 7:3
219:18,20,21
220:11 221:22,24
246:11 291:13
299:1 318:15
320:17 328:18
334:5
**sandy**  238:5,7,9
**sanghera**  200:7,19
**sarcastic**  207:6
**sat**  117:22 155:5
156:12
**satellite**  42:19
**satisfied**  40:22
222:14
**save**  164:3
**saw**  139:9 233:2
253:6 260:20
324:23
**saying**  45:6 50:21
52:19 68:17 89:7
90:8 112:24 113:2
116:23 118:20,23
119:11 129:4

134:18,20 145:4
154:22 159:18
161:10 166:3
167:5 174:19
175:15 177:20
179:13 186:17
192:15 203:12
216:2,7 243:22
255:7 258:24
260:22 264:5,12
265:21 273:8,9
281:12 282:7,9,19
282:23 306:23
**says**  29:5 33:23
46:15 80:20 82:24
88:24 104:11
122:10 128:15
130:16,22 132:2
133:16 153:15
177:1,18 179:9
187:22 201:6
204:14 214:20
221:24 253:7
257:22 263:18
264:10 269:11
280:1,8 291:14
298:21 299:8
302:3 310:5
311:21 320:9,15
322:11 326:17
**scan**  63:14
**scared**  322:21
**scene**  255:16,18
260:10 261:14,20
**schedule**  86:14
171:1
**schedules**  60:12
**scheduling**  229:19
**scheitel**  243:22,23
245:8 247:24
256:24 261:3

262:11 265:13
266:24 287:7
**scheitly**  243:21,22
**school**  25:16 26:15
295:5
**schumacher**
119:15 120:16
121:3,17 132:9
163:7 257:14,20
257:21 258:6
259:14 262:13
265:14 266:1
287:7
**schumacher's**
106:22 130:10
**schwanderlik**  20:2
20:3,18
**science**  26:9,11,16
**score**  95:22 111:18
**scored**  238:11
**scoring**  234:8
**screen**  128:14
188:9,19
**screw**  155:23
235:7
**screwing**  235:6
**seal**  333:20 335:15
336:21
**search**  167:14
229:5
**seasonal**  40:13
**second**  38:4 65:9
88:18 122:22
129:13 143:23
186:20 190:5
197:2 200:21
209:15 211:9
221:18 228:1
235:3 247:23
248:4,9 249:7
269:4 271:21

295:16 325:23
**seconds**  90:3
**sector**  47:3
**security**  66:13
**sedaei**  2:4 7:3,3
11:17 12:6 16:11
23:16 31:9 70:3
73:5 74:11 75:14
84:13 117:19
190:24 197:11
217:15 223:10
224:14 231:1
246:12 250:13
277:20 280:5,10
282:11,13 288:20
290:14 291:7,11
291:14 296:7,11
296:22,24 297:7
297:10 299:2
301:9,13,16,20
302:24 303:10,24
304:21 305:1,3,7
305:13,17 308:21
309:15 315:3
325:15 329:1,15
330:18 331:2,15
332:9 334:5
**see**  12:20 13:15
28:6,6 29:4 32:10
37:21 48:3 65:15
65:16,19 67:14
71:3 79:7 84:5
89:24 103:2
117:12 128:13,21
131:1 143:20
155:10 167:14
170:12 175:4
191:1 200:9
204:12 205:1
206:11 209:19
211:17 216:4,13

224:10 228:17
252:4 253:4 254:4
255:10 261:1
269:13 272:9,11
288:9 298:24
299:4,6 300:19
301:6,24 311:18
322:13 325:24
**seeing** 47:16
151:18
**seeking** 224:2,6
225:15
**seen** 14:17 16:16
18:4 19:5 120:4
188:8 240:12
247:24 251:24
297:15 298:1
**selling** 38:7 54:18
**send** 28:24 30:22
75:7 83:16 87:8
89:16 90:2,5
91:18 157:15
165:10 169:1
175:2,4,5 187:8
**sending** 85:8
87:14,24 89:19
90:16 91:20 151:6
151:11 163:24
167:2 169:11
180:15 185:23
187:24
**senior** 29:20
**sense** 221:2
**sensitive** 5:4
**sent** 75:8 82:13
83:22 86:19 87:4
88:3,15 119:15
120:15 121:3,17
121:19,20 129:5
130:11,12 133:12
151:3 163:23

164:9 165:13
167:1 168:7
173:21 174:8
176:15 177:9
179:5 181:3 182:6
187:12 221:20
**sentence** 65:11
82:24 88:23
102:22 104:10
164:2 216:13
**separate** 18:24
177:4 202:21
**separated** 101:20
**separating** 102:2
**separation** 176:1
176:23 177:17
180:9
**september** 22:2
32:18 33:6 94:5
95:2,8 151:5
169:10 180:2
198:7 200:9,17
201:6 202:22
203:4,9 204:20
207:13 209:4,13
212:9 215:11
217:22 227:11
228:11 233:16
234:3 247:2,6,9
307:6,9 331:1
**sequence** 256:1,5
314:17
**serg** 116:22 117:6
118:21 199:12
**sergio** 116:6,9,23
118:21,22
**series** 7:20 81:10
232:13,15
**serious** 101:4
123:6 189:23
217:10

**seriously** 183:9,14
**served** 22:14
**service** 174:6
**services** 73:3,22
**set** 34:11 49:18
52:9 53:6 70:8,11
89:24 149:5,8
167:6 220:23
226:10,13 314:9
314:12 332:5
333:20
**seth** 81:15 83:2,8
145:14,16,17,22
**setting** 167:7
**settling** 167:7
**setup** 195:24
**seven** 39:3 265:15
**severance** 157:18
164:21,24 165:3
166:10 167:17
168:4 173:23
174:7 177:3 180:8
180:8 181:13,24
182:10 184:2
193:19
**severed** 136:7
**sexism** 137:18
**sexual** 185:5,6
186:13 283:9
285:20 286:18
290:9 292:5
**sexually** 186:13
**shakes** 9:13
**shape** 152:8
**share** 67:9 78:5
140:9 158:20
185:5 310:18
**shared** 72:11,18
80:8 119:18
140:19,21 144:8
146:4 188:14,22

**sharing** 140:20
147:4,6 187:18
**sheet** 87:19 221:16
323:3 334:13
336:7,10,18 337:1
**shell** 325:2
**ship** 35:4
**shit** 78:22 100:23
136:11 152:9
157:10 191:9
196:13 240:17
260:22 277:11
329:7
**shocked** 107:1
**shoot** 100:23
238:19
**shooting** 95:20
234:7 241:14
273:9,10
**shop** 39:13 96:21
96:22 118:1
**shopping** 305:13
**short** 30:2 45:20
52:5 70:9 94:14
94:14 149:6
168:18 171:13
209:18 226:11
314:10 331:19
**shorthand** 1:14
333:23
**shortly** 132:16
173:2 174:9
**shot** 103:1,8,12,21
104:2,8 106:14
107:22 108:17
109:24 110:9
156:22 162:9
188:9 204:3,8
254:9 258:16
267:11,20 268:7,8
269:3,9 272:20

**[shot - space]** Page 44

273:19 299:11
301:6,24
**shots** 188:19
258:14 266:5
**shoulders** 9:16
155:12
**show** 48:11 91:12
141:24 142:5,10
143:1 196:12
221:10 267:12
270:3,12 275:5
279:16 293:23
299:1,24
**showed** 143:3
153:13 179:14
205:21 267:24
**showing** 89:2
139:21 267:19
272:7,8 310:7
313:14
**shown** 334:16
**shows** 313:16
**shrugged** 155:12
**shrugs** 9:16
**shut** 13:19 25:19
136:8,9 196:20
**sick** 44:2 101:15
**side** 27:22,22 28:4
28:11 62:17 83:3
93:11 201:14
203:13 214:9
259:2,2 272:24
273:17 280:20
**sideways** 273:2
**sign** 49:22 165:6
176:4 177:17
**signature** 16:23
18:15 332:12
333:23 334:14
**signed** 78:7 106:6
335:13 336:18

**signify** 86:10
**signing** 333:12
334:19
**signs** 186:23
**silent** 94:20
**silly** 169:19
**silverman** 40:21
**similar** 274:24,24
275:7,19,23,24
294:5,9 300:5
**simple** 287:6
312:10
**simply** 264:9
290:8 292:4
**sincerely** 156:3
334:21
**sincerity** 132:11
**single** 210:10
270:8
**sir** 334:10
**sit** 100:7 142:2
192:8,9
**site** 57:22 58:22
133:20 134:2
228:24
**sites** 49:1 56:22
142:24
**sits** 258:21
**sitting** 110:8
138:24 142:6,18
**situation** 50:8
127:8 158:19
171:14 192:22,24
193:5 220:15
221:7,22 222:15
222:21 277:4
300:10 329:5
**situations** 207:7
**six** 52:16 167:12
167:16 168:13,19
173:24 174:7,14

174:19,24 175:7,8
175:12,13,18
176:5,16,17 178:3
180:8 181:2,2
211:14 214:12
265:15
**sixth** 221:2
**skill** 34:10
**skilled** 268:18
269:16
**skills** 77:12
**skinned** 328:23
**slate** 23:12
**sleeping** 102:6
**sleeve** 143:21,22
**slept** 152:6
**slick** 38:3
**slow** 19:22 315:15
**smoother** 8:21
**snow** 270:8
**snuff** 41:21
**social** 66:13 92:11
92:17,21 93:17
113:1
**software** 27:7 54:7
**sold** 37:13 148:8
**solely** 202:17
293:11
**solid** 37:9
**solidified** 144:3
**solo** 112:4
**solutions** 6:3,5
334:1 337:1
**somebody** 60:6
76:20 77:1 86:11
89:10 97:5 111:5
124:7 125:19
131:15 164:16
172:22 183:15,24
184:16 196:1
230:13 232:17

241:2,2 242:13,15
254:9,15 255:1
261:8 323:13
328:23 329:8
**somebody's** 86:16
**someplace** 236:19
**somewhat** 140:2
**soon** 64:11 89:22
119:19 197:3
324:3
**sooner** 157:15
**sorry** 15:8 23:2
41:4 43:7,14
47:24 60:10 96:16
117:2 120:24
130:17 132:3
133:17 150:21
166:8 168:11
170:1 184:10,11
185:22 197:2
204:14 208:8
216:7 229:2
250:20 252:21
255:4,6 261:21,23
280:6 288:1,4
291:23 300:16
305:1 310:5
319:16 321:10
**sort** 138:3 152:2
171:13 172:23
**sound** 83:18
204:15
**sounds** 10:13 21:2
86:8
**source** 141:13
**south** 2:2,13
**souvenir** 115:12
**sox** 146:1
**space** 221:15
276:16,17,23
278:8 320:14

322:7
speak 163:8
speaking 191:22
211:10 291:16
speaks 146:17
specialize 54:4
specialties 54:14
specific 57:22 61:4
61:16 73:8 74:20
117:2 152:13,24
215:16 217:5
316:17
specifically 12:19
23:6,21 27:16
73:18 141:20
142:16 165:7
167:24 168:2,5
172:7 192:7 225:2
278:7
specifics 231:21
speculate 289:23
speculating
229:11
speculation 31:10
145:20 290:15
speculations 196:9
196:10
spell 295:18
spend 111:7
spending 111:24
spent 118:2
173:21
spin 51:12
spoke 29:19 43:10
187:20 206:2
261:24 262:6
spoken 261:13
sponsored 94:18
spot 222:5
spun 31:21

square 246:14
ss 333:1
staffing 40:8
stage 86:10
stained 54:23
stand 180:23
279:20
standing 89:6
107:4 108:8
109:19 115:2
162:20 272:18
287:3
standpoint 285:21
286:18
stands 310:9
start 9:21 92:14
93:19,21,22 95:8
107:10 124:10
167:5 200:5 206:9
209:10 210:14
216:10 236:19
241:1,5,13,19,20
247:22 252:21
270:19 275:21
281:23 282:24
283:16 284:18
293:19
started 32:21 33:2
33:15 36:22 53:15
63:6 64:12 93:3,4
100:16 101:17,22
110:6 114:9 115:7
118:7,8,12 148:2
156:21 180:11,13
181:13 199:16
201:19 205:14,18
207:13,15,16,19
208:2,13,14
209:16,17,22
213:4,4 219:4
220:7 223:14

242:23 243:2,15
244:15,16,19
249:20
starters 244:23
starting 155:19
218:18 241:8,16
244:10,23
starts 100:13
115:5 127:3,4
128:14 169:10,14
202:21 209:4
241:2,3 247:2
staszewski 295:14
295:19
state 1:15 6:11
46:21 65:23 85:3
190:12 197:4
209:16 333:1
335:10 336:15
stated 122:1 312:5
312:23
statement 61:18
169:17 183:3
192:12,14 218:3
254:7 263:17
264:11 265:4
297:6 335:13,14
336:19,19
states 1:1,12 5:20
102:23 124:17
153:20 231:11
254:1
stating 88:1
247:12 255:21
status 328:5
stay 40:12,18
47:10 49:11 98:21
112:14 222:2
256:15
stayed 112:4,5,12
117:11

stazinski 60:21
88:6
stenographically
333:7
step 62:2 87:11
92:24 165:3,5
266:5
stepped 160:3
steps 156:5
steuben 26:16
steve 53:10 78:16
78:22 79:4 80:15
82:13 83:19 86:19
87:9,14 88:15,16
88:18 90:4,4,12
91:4,15,20 118:10
140:12 142:5
148:7 169:22
170:9,9,12,14,15
171:8,16 172:5,7,7
172:17 173:8
214:19
steve's 87:9 90:7
stewart 232:2,6
stick 157:21
stojowski 243:21
245:9 247:24
253:7 262:1
265:13 266:24
287:6
stood 117:11
220:8 226:4
stop 100:21
105:16,23 227:3
303:17
stopped 256:12
story 216:22
stouffer 2:13
stouffer.com 2:16
straddle 302:15,18

**straddles** 302:7,14
    304:5
**straight** 136:13
    283:14
**strange** 53:19
**street** 1:15 2:7,19
    3:2 5:24
**strengths** 54:5,17
**stress** 77:15
**stricken** 305:4
**strict** 64:19
**strike** 39:24 67:12
    76:4 304:18
    305:20 327:5
**strokes** 238:13
**structure** 49:17
**struggle** 283:14
**struggling** 97:23
    171:3
**stuck** 155:24
**student** 24:8
**studied** 65:4
**stuff** 11:7 12:14,19
    13:14 28:24 38:8
    45:10 47:16 51:5
    51:9 54:4 58:1,23
    63:20 66:14 69:9
    78:2 80:15 84:3
    86:2 91:9 97:18
    98:9,10 113:2
    114:22,24 117:6
    118:24 119:1
    140:21 141:8,10
    141:13,14 142:3,8
    142:14 143:6
    144:12,20 148:9
    164:22 180:21
    186:15,16,24
    194:21 195:2
    201:24 216:24
    219:24 220:21,22

234:7 242:1
    287:15 303:18
    322:21
**stupid** 230:12
**sub** 68:21,22 71:11
    73:14,15,15,17
**subcontractors**
    13:16 68:9,10
    71:13
**subject** 89:7 248:7
**subjected** 138:8
    197:5
**submissions** 240:8
**submit** 51:3
**submitted** 11:7
    12:15 48:6,20
    51:15 297:19
**submitting** 16:20
    49:4
**subs** 57:5 58:7,7
    58:15 59:3,5 62:8
    68:14,20 69:3
    73:11 99:10
    107:23 139:10
**subscribed** 335:10
    336:14 337:21
**subsequent** 55:16
    72:23 91:3 176:18
    182:5
**subsequently**
    55:19 119:14
    132:15 174:13
    175:17
**substantially**
    41:20
**sucked** 269:11
    271:22
**sucks** 140:17
    146:3 157:12
**sudden** 13:21
    62:15 118:4

**sue** 222:8 324:18
    328:4,7,11,15,21
    328:24
**sued** 329:14
**suffer** 225:14
    226:2
**suffered** 224:23
**suggest** 153:2
**suggested** 176:18
    244:14
**suggesting** 203:18
**suggestion** 126:24
**suggests** 269:2
    311:11
**suing** 325:1
**suitable** 145:23
**suite** 1:16 2:3,8,14
    2:19 3:3 334:2
**summary** 47:17
**summit** 29:18
    30:10
**superintendent**
    116:11
**superior** 334:1
**supervised** 77:20
    78:12
**supervising** 78:6
    78:10
**supervisor** 53:22
    60:5 76:3,12
**supervisors** 81:11
    242:8
**supervisory** 77:12
    78:19
**support** 96:10
    196:8
**supported** 171:9
**supportive** 77:2
    79:11 140:8 143:7
**suppose** 282:22

**supposed** 90:20,21
    90:22 98:10 117:3
    123:13 124:5
    137:10 201:14
**sure** 11:2 13:9
    21:15 28:1 32:17
    33:13 37:21 38:13
    48:8,10 56:2,15
    58:8,9,16 60:13
    61:10 64:19 68:7
    70:5 77:15 78:1
    78:23,24 102:4
    103:10 105:6
    110:17 112:6
    114:8 120:10
    123:2 141:11
    147:3 150:19
    168:24 196:21
    205:9,16 216:18
    218:12 244:24
    246:3 250:3,8
    256:10 260:12
    268:9,16 277:19
    281:14 284:23
    285:3,6 293:10
    318:18,20 321:8
**surgery** 194:16
**surprise** 115:9
**surprised** 30:19
    115:16
**sushi** 76:23
**suzanne** 1:13 6:4
    286:11 288:5
    289:6 305:21
    309:21 312:20
    315:23 327:16
    333:3
**swallow** 142:9
**swear** 319:8
**swears** 328:24

**swiftly** 197:6
**swing** 232:10
  270:16 272:7
  294:9 302:8 304:6
  310:7 313:15
**swings** 238:22
**switch** 94:3
**swore** 269:11
  271:22 319:5,6,6
  319:14
**sworn** 7:4,7 333:5
  335:10,13 336:14
  336:18 337:21

**t**

**t** 2:9 3:16 19:17
  173:13 295:20
**table** 98:17 171:17
  172:8 218:1
  273:11
**tailspin** 162:17
**take** 5:10 10:9,12
  10:24 14:16 16:6
  16:9 30:21 43:20
  51:17 57:10 58:22
  59:19 63:14 64:9
  68:14 70:3,15
  76:1 82:5,24 85:5
  87:11 95:11 97:1
  103:21 105:5
  110:4,9 117:15,19
  123:10 124:21,22
  125:6,15,20,23
  126:10 127:18
  128:17,19,24
  129:5,8 135:3,17
  141:12,14 149:2
  152:1 154:15
  166:17 172:13
  185:15 188:18
  190:5 193:20
  197:1 200:10

206:19 213:16,24
232:10 235:15
242:1,12,16 243:8
253:23 256:4,12
263:4 266:5,17
268:6 269:3 280:3
280:3,21 281:9,12
281:16 293:2
300:6,23 301:11
309:15 315:3
317:5 326:3
**taken** 1:13 5:17
  8:2 53:9 70:9
  147:22 149:6
  226:11 263:11
  293:1 314:10
  330:4,6 331:19
**takes** 94:19 189:23
  217:10 238:22
  302:8 304:5
**talent** 38:18 46:8
  46:11 72:7 200:22
  200:23 201:8,11
  201:19 203:1,8,19
  205:15 215:23
  218:18 219:6,11
  220:16 221:6,21
  223:21 318:21
  319:2 320:17
**talk** 38:6,13 58:16
  58:18 77:1,4
  79:10 83:21 84:1
  91:9 94:4 135:9,9
  135:13 141:2
  142:19 146:11
  161:14 170:3,9,12
  201:22 204:24
  205:11 213:19
  221:15 222:4
  320:14 322:7
  323:16,18,19

326:21
**talked** 11:18 80:5
  84:7 96:12 104:23
  105:1 116:6,7
  118:15,24 120:15
  140:22 141:9,21
  146:21 164:23
  184:5,7 230:18,18
  255:24 260:16,19
  301:5 318:5
**talking** 35:7,11,11
  53:20 86:22 99:8
  103:24 116:18
  118:7,8,12 119:4
  136:16 148:10
  149:11 172:4,6,23
  181:18 184:3
  187:1,2 196:21
  201:7 203:12
  212:23 245:24
  246:1,5 261:22
  310:15 316:23,23
**tall** 277:18
**taller** 277:19,20
**tampons** 101:23
**tank** 118:6
**target** 328:8
**tattoos** 142:14
  143:1,12,16
  144:10
**teach** 202:2
**team** 88:13 100:11
  112:16 186:22
  220:21 323:11
**teams** 100:10
**tears** 117:23
**tee** 236:12 237:4,7
  240:24 258:10
**teed** 241:6
**telephone** 151:9

**tell** 11:3 37:5
  39:22 50:16 53:2
  53:17 56:18 85:11
  91:17 92:10 94:11
  105:5 113:12
  120:11 122:15
  124:7 125:19
  126:3 127:21
  138:22 139:14
  144:22 145:17
  147:8 148:12
  155:18 165:22
  169:23 172:11,15
  177:23 181:16
  182:8,15,17
  185:16 194:7
  203:3,8 204:9
  207:2 208:21
  209:8 210:23
  216:22 217:9
  220:5 235:22
  237:1 242:24
  260:10 264:7
  268:17 272:5
  275:15 276:15
  280:20 285:24
  302:4 311:7,10
  316:16
**telling** 52:14 115:5
  125:9,16 129:7
  139:2 143:8
  144:23 145:21
  147:21 151:15
  161:6 163:5
  173:22 174:24
  175:2 177:14
  180:16 304:16
  317:7
**tells** 153:12 257:14
  274:19

temp 40:6
templet 71:21
 85:16,19,21,22
 86:1
templets 85:15
temporary 40:10
ten 73:16
tend 207:6
tenure 52:4
 168:18
term 171:13
 209:18 237:7,9,10
 237:11 240:16
 253:17 287:17
terminate 35:23
 42:10 44:14
terminated 72:4
 137:1 141:5
 177:15,21,24
 197:6 210:7
termination 67:18
 178:18 181:15
terminology
 238:17 240:3
 267:18 285:17
 287:18
terms 13:18 45:24
 49:19 50:4 54:8
 55:1 66:13 68:20
 77:9,24 108:6
 111:15 124:1
 140:3 197:6 222:6
 254:19 258:17
 279:8 326:15
 327:1
test 183:11
testified 7:7
testify 138:14
 333:5
testimony 8:14,15
 10:16,20 75:15

81:2 222:13 231:2
 282:11 290:15
 304:1 333:10
 335:6,7 336:6,9,12
text 13:15 101:23
 128:14 129:12,24
 151:9 185:14,17
 185:23 186:10
 187:9,10 198:4,21
 210:24 214:20
 249:3,11,11,14
 256:24 260:21
 306:16,16 307:22
 309:3 314:17
texted 101:8
 214:16 248:23
 249:2 261:5
texting 128:23
 198:13
texts 128:10,10
 306:19 307:5
thank 44:16 299:1
 329:21
thanks 15:21
 130:18 171:1
 179:24 190:10
 206:14
theirs 54:9 69:5
therapist 151:18
 155:10
therapy 157:12
thi 322:13
thick 328:22
thing 31:23 39:13
 50:12 55:15 61:22
 67:9 85:13 112:16
 130:16 135:14,16
 139:6 142:17
 144:3 147:23
 156:1 159:2
 160:13 172:8

173:8 174:10
 186:4 193:9 204:9
 229:6 235:7,24
 266:5 287:13
 302:15 311:5
 315:4 324:21,22
things 11:8 13:18
 13:19 57:8,21
 63:19,22 66:19,21
 68:8 77:16 79:17
 80:6 86:3 92:15
 97:23 105:16
 106:2 125:1
 135:22,24 140:10
 140:12,23 159:3
 160:17 170:13
 181:10 182:24
 183:10 189:22
 203:4,10,14 204:6
 214:8 221:1 223:3
 223:11 225:13,20
 242:23 247:19
think 10:19 11:8
 12:18 13:15 15:14
 28:5,9 29:24 40:9
 52:6,21 53:10
 55:23 56:11,14
 59:15 60:21,24
 61:3,6 63:6,19
 66:21 69:16,21
 74:24 75:18 77:11
 78:13,21 80:16
 81:19 87:2,7
 88:20,24 89:6,9,12
 89:13,17 93:3
 94:13 96:24 97:3
 98:5,6,20 100:10
 101:14 103:16
 104:6 105:17
 109:14 112:22
 114:11 115:16

116:10 117:23
 119:8,8 125:10
 127:7 132:19
 137:9 139:5,18
 141:4,8 142:1
 148:6 156:14,24
 163:9 164:22
 166:18 168:23
 172:21 173:1,2,3
 183:1,8,14,22,23
 186:19 187:5,7,19
 188:18,20 191:7
 191:10,16 196:7
 207:16 212:10
 213:23 215:19
 218:5,6,9,9 220:19
 229:9,10,20
 232:10,12 233:2
 234:5,12,23 235:9
 235:14 238:21
 239:11 242:16
 249:4 253:10
 255:24 256:10,10
 260:21 261:2,9
 269:23 270:18
 275:4 285:18
 286:15,23 288:23
 291:3,7,11 296:16
 297:20 302:14
 304:21 305:7,13
 306:16,24 311:22
 324:22
thinking 55:6
 126:20 137:6
 209:17 213:4
thinks 80:18
third 47:23 183:10
 183:12,15 198:23
 254:1,6 298:21
thirty 334:18

thorough 56:24
thought 35:6
39:17 53:12,19
60:10 65:1 91:1
97:16 115:1 118:6
123:4,13,17,19
124:15 131:24
135:20 136:4
137:13 140:1
141:3 145:17
158:16 160:12,13
175:24 224:20
227:19 251:18
294:10 307:11
327:3
thoughts 207:7
three 21:2 40:10
40:11 60:2,16
81:9 89:23 90:1
113:22 147:16
155:19 260:3
264:6
threesome 248:15
threshold 189:21
325:3
threw 101:24
158:6
throat 73:11
throughs 13:21
56:21 59:19,21
60:2 61:2 139:4,6
139:18 160:23
194:20
throwing 114:12
thursday 5:2
thursdays 76:23
ti 157:21
tied 97:21
ties 97:19
tiger 233:2

tight 60:6,16
142:22
till 36:16
tim 60:7,7,8,17,20
61:11,13,19 79:15
80:12 88:7 99:9
101:8 107:15,16
107:17 110:7,9,14
111:8,11 112:18
113:18 116:3
140:14,15 145:24
145:24 146:22,24
243:20 249:4
251:1,20 253:3
256:23,24 257:7
257:12,14 260:12
260:23 261:19,24
262:9 265:12
266:15,23 268:9
287:6
tim's 60:18
time 10:8 16:9
22:1,6 24:5 27:1
30:1,2,9,24 32:8
33:8 34:18,21
35:10 36:4 37:23
41:22 43:14,15
47:18 49:21,21,22
50:13 51:22 52:10
52:15,17 57:18
65:13 69:15 70:3
73:24 76:24 80:3
82:17 83:3 96:12
97:15,16 98:16
100:18 109:2
110:17 112:11
113:4 116:13
124:5 125:1,23
127:14,18 132:5
134:11,19 136:6
139:17 140:16

144:17 147:15
152:1,18,22
153:17,22 154:10
155:9 157:7 162:8
162:15 166:14,18
168:16 169:16
170:18 173:8
177:13 181:13,15
186:5 193:20
194:23 195:13
202:4,8,12 211:7
212:16 213:16,18
213:20 214:1
217:8 218:4,10
222:16 226:23
240:24 241:17,20
244:4,16 245:2
246:1 247:22,23
248:1,13,20,22
249:20,20 250:10
250:12 252:9
253:4,14 257:7
260:17 269:21
283:11 287:3
289:3 293:14
296:3 309:15
313:16 315:3
319:1 321:4
323:13 324:21
327:1
timeline 15:8
128:2 136:12
137:2,3 181:9
times 8:16 21:16
59:23 73:16 112:1
142:10 233:17
248:14 261:6
327:10
timing 134:15
172:18 184:12

title 200:20 223:17
today 7:15,20 8:5
8:10 9:12 10:16
11:5 18:1 125:13
125:16 128:18,19
128:21,24 129:8
139:11 147:14
213:3 246:14
284:23 297:16
today's 10:22 14:3
todd 29:8,10,11
30:3,7 34:22 35:6
35:9,12 48:9
56:14
told 54:2,7 87:8
89:21 113:6,7,10
117:1,2 118:14
120:1 124:1,9
126:10 127:9
129:19 130:1
131:21 139:5
144:1,15 147:18
148:7 155:15
156:17 157:8
158:2 168:17
169:24 170:2
171:20,23 173:9
174:5 176:15
178:10 180:1
184:21 194:6
196:2 198:24
199:4,11 204:19
222:24 235:15
241:18 242:7
244:13 251:18
257:7 261:7
269:17 271:17
284:14,23 294:23
303:17,18 316:20
319:10 322:22
323:2,12 324:9

**toledo** 19:21,24
20:1,3,4,5
**tolerate** 130:22
**tomorrow** 164:5
178:11
**top** 30:21 82:16
83:16 128:17
199:6 202:20
254:1 316:15
325:14
**topgolf** 109:10
234:6,10,18,24
**totally** 222:8
**touch** 30:6,7 35:6
35:9 79:6
**touched** 310:6,22
311:1,14,15 313:7
317:8,12
**touching** 274:1
278:13,20,22,24
279:11 302:23
303:20 304:13
306:3 307:21
309:13 310:2,13
311:4,8,12 312:3,6
312:24 313:11,21
315:1 316:6,18,24
317:12
**tough** 170:16
207:6 325:2 329:5
**tour** 232:9,18
**tournament**
233:20
**tournaments**
232:22
**toxic** 147:9,11,13
147:19
**traditional** 54:22
**training** 63:21
93:5

**transcribed** 335:7
**transcript** 288:8,9
332:8 334:11,12
335:5,12 336:5,11
336:17
**transform** 148:9
**translates** 190:19
**transpired** 134:14
**traveled** 49:2
**traveling** 50:13,14
253:1
**treated** 91:11
191:21 192:5,17
193:7,16,24
**treating** 192:2
**treatment** 197:17
**trees** 284:21,22,22
285:5,9
**tried** 11:7 50:11
76:21 133:7
145:22 161:13
219:21 220:8
270:3,7 322:18
323:24
**trouble** 164:4
**true** 15:16 17:7
18:11 165:11
175:11 304:14
306:4,6 313:22
328:5,13,13 330:7
333:9
**truly** 183:8
**trust** 51:11,12
170:12 180:19
**trusting** 169:19
**truth** 285:24 333:6
**truthful** 8:16
10:16,20
**try** 56:15 93:15
95:21 159:4 185:2
185:2 248:23

269:12 271:23
272:1,2 286:10
291:13
**trying** 12:18 27:19
28:11 51:3 59:15
69:22 82:12,22,22
85:13 86:4 93:21
98:6 101:7,12
103:17 106:2
108:18 118:3
137:5 146:2,9
155:20 160:8
161:18 167:18
176:3 177:5,16
187:3,6 212:10
219:23 220:2,13
243:7 252:23
256:2,21 257:5,16
262:5 270:21,23
272:15 273:4
274:5 329:6
**tucked** 276:14
**tuesday** 128:14,15
136:6,18 137:4,5,8
307:8,9
**tulacz** 19:21,24
**turn** 5:6 204:6
**turnaround** 54:11
**turned** 122:18
**turning** 198:23
**tutoring** 266:4
**tv** 91:12 142:6
**twice** 305:8
**two** 17:20 18:18
18:24 35:12,24
75:3 82:16 83:16
90:3 92:16 99:17
102:6 106:23
121:16 123:10
143:19 144:2
152:9 155:19

160:4 174:14
180:22 189:18
197:10 200:11
225:13,20 235:19
239:3,4,14,15
247:16 289:24
290:2 298:3 303:7
322:15
**tying** 322:20
**type** 34:9 36:12
37:15 42:17 47:14
55:6 67:9 103:12
106:8,12,13 109:9
182:22 194:17
207:3,18 208:24
219:10 236:11,15
238:4 259:9 284:2
284:5 313:6
**types** 27:16 47:2
49:2 90:17 235:22
**typewriting** 333:8
**typewritten** 208:4
208:5,18
**typical** 54:4
235:23

**u**

**u** 6:23
**uh** 21:6 33:17 40:3
40:3 42:14 129:23
167:8 169:21
180:5 200:8 209:6
211:16 216:12
217:24 218:22
236:14,14 239:21
258:22 266:22
309:1
**ultimately** 62:3
**unable** 161:22
**unacceptable**
180:3 214:14

**unavailable** 133:8
**uncertain** 268:12
**unclear** 208:10
**uncomfortable**
　105:1 275:15,21
　277:6,9 293:19
**undergraduate**
　26:2
**understand** 7:16
　8:12,18 9:2,3,19
　23:14,22 34:19
　45:6 65:1 66:8,12
　67:7,22 72:24
　73:6 74:5,10,17
　75:16 90:10 100:5
　105:7 113:19
　126:7 137:5
　152:21 165:2
　170:16 175:21,22
　175:23 176:8
　186:8 190:17
　191:23 194:15
　196:15 225:10
　226:23,24 227:10
　227:21 229:21
　231:8,13 252:23
　254:18 255:15
　257:5 268:17
　270:2 283:13
　285:14,15 288:22
　290:17 303:11
　326:18,19 328:19
　329:2,16,19
　330:19
**understanding**
　62:11 75:10 94:12
　94:12 104:1
　108:15 111:11
　135:11 150:6
**understood** 9:9
　50:15 53:24 64:21

126:11 135:8
150:15 228:3
272:21 286:8
308:11
**unequal** 190:13,14
　190:22,23 191:13
　191:24 192:1
　197:5
**unfair** 192:4
**unhappy** 80:3
　166:1
**unique** 67:4
**unit** 5:12 54:6 57:1
　57:6,14
**united** 1:1,12 5:20
　231:10
**unpaid** 158:3
　159:16
**unreasonable**
　163:10
**unusual** 277:13
　278:5,14
**update** 86:9,11,15
**updated** 47:9
　87:19
**upper** 29:4
**ups** 140:11
**upset** 113:13
　116:16 118:16
　120:4,13 123:8
　125:17 127:7
　139:7,17,19,21
　145:5 147:16,17
　147:23 148:17,21
　151:17 155:2
　161:15 162:8
　163:12 191:11
　222:16,18,20
　308:9,14 324:16
**use** 68:4,4 73:12
　73:14,17 85:16,19

85:23 107:24
150:7 238:4 240:3
240:4 285:12
**usual** 164:5 168:9
　180:4
**usually** 28:24
　30:18,21 59:12
　112:24

**v**

**v** 5:18 334:6 335:3
　336:3
**vacation** 170:7
**vague** 47:7
**vaguely** 82:10
　141:18
**valid** 287:19
　288:13 289:10
**various** 49:1
　231:10 243:3
**vedder** 2:7 5:24
**vedderprice.com**
　2:10
**vented** 119:1
**verbal** 9:13 266:15
　267:14
**verbally** 106:11
　266:10 269:17
**verbiage** 190:18
**verification** 17:2
　18:1
**veritext** 6:3,4
　334:1,7 337:1
**veritext.com.**
　334:17
**version** 16:12
　45:16 302:5
**vertigo** 214:7,10
**vice** 42:24
**video** 5:9,12 8:9
　9:12 188:18

**videographer** 3:9
　5:1,15,17 8:9 70:6
　70:10 149:3,7
　226:8,12 314:7,11
　315:18,21 319:20
　319:24 321:17,22
　325:7,10 331:17
　331:20 332:4
**videotaped** 1:9
**view** 293:17
**viewpoint** 183:16
**village** 21:13
**visit** 44:3
**voice** 89:12
**voicemail** 133:9
**volume** 54:8,10,13
**voluntary** 44:12
　95:24 96:4
**von** 26:16
**vortex** 100:22
**vp** 142:18
**vs** 1:5
**vulgar** 184:24
　188:16

**w**

**w** 239:13 295:20
**wacker** 2:13
**wait** 9:24 143:22
　197:8 210:17
　222:1 238:12
**waive** 176:5
**waived** 333:13
　334:19
**walk** 13:21 56:21
　58:2,4,22,22 59:19
　59:21 60:2,7,9
　61:2 62:1 83:20
　83:23 139:4,6,9,18
　160:23 161:1
　194:20 196:18
　242:24 266:2

**[walk - winner]**

268:4
**walked** 220:6
323:1
**walking** 285:1
**wall** 259:2
**want** 21:1 23:1
27:24 38:6,12
43:3 51:7,8,10
58:15 59:17 62:6
62:10 77:23 93:3
94:15 97:21,24
102:1 104:18,19
105:2,16,17
107:18 113:17
115:12,14 116:17
119:10 123:9,12
130:2 131:18
148:4,11,13,15,18
151:18 157:17
159:9 161:17
165:5,19 166:4
168:1 169:4
180:19 183:2
190:4,11 192:8,23
199:1 200:5
203:18 209:10
213:24 216:3
221:10 222:5,5,7
222:11 225:9,11
228:7 240:3 249:9
258:12 259:18
260:12 266:6
288:8 289:2
291:19 296:6,11
296:22 304:20
305:10 308:2,8
310:18 318:17
327:9,11 331:14
332:7
**wanted** 12:21,22
13:23 23:10 37:7

41:17 43:9 49:12
80:6 86:23 88:21
101:5 125:5
139:19 147:2
148:8 152:1,14
155:2 157:2
167:24 168:1,3,6
169:2 175:4
181:17 182:8,13
183:6 197:3
209:11 210:9,11
213:19 222:22
308:6 324:2
**wanting** 52:8
137:7
**wants** 80:15,17
**warrant** 89:1
**washer** 259:19
**watch** 141:24
142:1 188:17
232:24 233:4,5
301:5,24
**watched** 91:12
**waves** 266:1
**way** 23:11 29:23
31:5 35:6 47:10
57:16,18 58:13
59:13 62:16 66:19
66:21 69:9 73:15
80:16,17,20,20
83:2,8 87:18 89:8
89:24 90:7 115:8
119:20 120:4
132:6 135:12
137:10 148:9
159:2 160:9,17
163:6 167:21
182:24 204:7
213:11 218:2
254:1,6 260:24
281:24 283:6

288:7 294:11
298:20,22 301:22
302:20 304:11
306:1 326:21,23
**we've** 14:15 16:4
17:20 18:23 24:18
28:18,18 30:15
44:22 63:13 67:23
82:4,4 85:2 92:6
105:15 128:8
151:2 153:6
163:21 176:13
178:15 185:12
190:2 224:24
267:17
**wear** 47:5
**weather** 79:10
**website** 124:13,16
126:22
**wednesday** 136:20
136:24 138:19
**week** 60:2 149:22
153:17 201:6
**weekend** 233:6
**weeks** 27:5 35:24
143:19 144:2
152:7,9 155:19
165:1 166:15
168:19 170:7
173:23,24 174:7
174:15,19,24
175:7,8,12,13,18
176:5,16 178:3
180:8,24 181:2
211:14 214:13
298:13 299:15
**weil** 239:13
**weird** 101:17
106:1 109:3
190:17

**welcome** 300:23
**wellness** 76:22
**wells** 25:14
**went** 12:17,18
53:3 54:4 55:13
65:3 69:10 76:23
89:22 90:3 96:24
103:23 111:22
112:7,8,9 113:15
115:3 124:13,16
139:6,8 142:24
152:9 155:21
156:14,22 201:1
208:5 212:16
213:7 218:19
219:1 220:3 234:6
234:13 235:13
239:3,3,19 242:4
248:9,22 266:14
266:15 267:5
268:6,9 309:4
323:18,23
**west** 29:19 37:13
**whatsoever**
290:10 292:5
**wheeling** 51:7
**whereof** 333:19
**whispering** 5:4
**whoa** 106:18
123:10
**wife** 242:14
**wikipedia** 229:4,6
**wilbur** 26:12
**willing** 39:22
167:16 328:4,7,11
328:15,21
**win** 50:7,7 232:16
**wine** 250:7 251:15
**wingspan** 39:17
**winner** 232:19

**wins** 232:17

**wise** 78:4

**withholding** 75:20

**witness** 3:12 5:14
5:16 7:4,6 11:19
16:14 23:17 73:7
74:14 75:17 84:17
117:21 191:3
197:12 217:19
224:16 231:4
250:15 277:21
280:6,13,15
282:12,15 286:22
288:4 289:17
290:19 291:9,23
292:10 296:6
297:1 299:3
301:18 303:3,12
304:3 306:5
309:18 310:4
316:8 328:1 329:3
329:18 331:4
333:10,13,19
334:8,11 335:1,4
335:11 336:1,4,15

**witness's** 231:2

**witnessed** 264:21
265:5

**witnesses** 260:20

**witness'** 334:14

**woderation** 92:22
93:1,2,19

**woman** 127:20
255:12 324:24

**women** 93:6,9
254:3 264:6

**women's** 93:7

**wondering** 187:24

**wood** 54:23
279:16 280:4,21
281:9,11,12,16

283:5,22 284:4,7
285:12,16 300:1,6
300:6 302:4
313:17 316:21

**woods** 233:2
281:20,23,24
283:1,6,19,23
284:8,9,10,19,21
284:22,24 285:2,4
285:7,13,19,20
286:16,18 287:20
287:21 288:15,15
289:12,12 293:6,7

**word** 57:14 147:11
169:19 285:19
286:16 303:6
317:3

**words** 126:14
147:10 247:5
248:2 268:21
269:18,20 272:10
273:10,14 281:15
283:8 285:17
293:13 304:17
311:24 312:14
319:10 324:14
326:19,20

**work** 12:21 13:16
21:16 31:15 34:9
34:12 38:2 42:22
46:11,23 47:2
50:6 51:1 55:20
57:12,19 61:3
68:23 71:7 77:20
78:12 81:12,22
83:9 99:22 113:4
122:7 123:2,20,20
125:18 128:20
129:2 131:7
135:17 148:4,13
150:3 153:14

155:10 157:13
162:7,23 163:7
164:5 165:5,8,15
165:19,24 166:2
167:24 168:8
170:18,19,20,21
170:23 171:15
173:4,6,19 174:20
174:21 175:14
178:3,9,11 180:3
181:17,21 182:5,9
182:21 194:2,18
195:12 199:6,13
200:15 201:2,7,11
201:14 202:7,18
203:4,19,24
211:11,13 212:22
213:17 218:19
219:6 220:17
230:1,18 231:6
239:19 270:24
281:24 283:6
318:10 322:23
324:19 326:7
329:12

**workday** 124:19

**worked** 31:20 32:3
32:5,7 33:3,7,20
36:15 37:23 38:17
38:24 39:3 41:1,9
43:2 54:6,12
68:13 73:13 76:4
96:21 127:13
131:9 137:16
170:9 194:14
211:15 219:5
239:17 320:23

**working** 30:3
37:16 38:18 41:16
46:8 49:15,20
53:21 57:23 58:8

63:1 72:6 73:16
79:3,13 80:3,10,24
81:3 88:8,9 93:6
122:2,5 124:21
125:9,20 127:11
138:8 144:2
150:16 201:13,15
202:18 204:4
212:15 214:1
219:10 223:13
321:7 329:7

**works** 29:19 100:6
131:15 200:23

**worry** 170:20
173:7 242:15

**worse** 209:2

**worth** 42:21

**wound** 142:22

**wow** 113:8 277:10

**wright** 26:12,22

**write** 207:4 209:1

**writes** 330:17

**writing** 169:19
177:13,20 207:7

**written** 268:22
330:13

**wrong** 57:17,18
78:9 89:17 113:3
134:15 139:11
148:10 154:24
290:12 292:8,17

**wrote** 82:11 86:20
161:19,21 162:1
210:3 304:12
306:2

**x**

**x** 3:11,16 4:1

**y**

**yazbec** 29:14
53:11,20 55:14,23

82:14 87:15
145:22 148:7
154:14 156:7,7,11
156:21,23 160:2
161:5 163:6
164:14 165:12,17
166:23 168:16
174:5,18 178:2
182:17 196:19
**yeah**   8:13,19 9:20
10:2,7,13 11:11,13
13:4,6 15:12
16:11,14 20:16
22:23 23:18 25:18
26:24 28:5,9 29:6
29:8 30:7,11,14,18
31:2,8 34:24
39:19 40:16,16
43:19,23 45:5,10
48:14 51:12 59:7
61:18 64:3 65:1
65:18 66:4,18
67:6 69:5,11,13
70:20 71:8 74:4
76:20 77:10 78:8
78:14 79:9,23
87:21,23 88:4,20
89:4 92:12,20
93:20,21 95:18
96:4,10 98:10,14
99:15,17 100:7
104:4,21 111:14
111:14,18,20
112:21 114:7,8,19
115:9 122:9 127:2
128:15 130:3
131:21,21,22
139:24 141:18
144:14 146:6,8
148:15,24 150:11
162:6 164:10

165:17 167:18
173:19 177:1
180:10 181:5
186:11 187:13,14
191:15 192:16
195:5 198:16,22
198:22 199:3
200:18,24 202:9
202:13,16 203:11
203:21 204:5
205:2,7 206:4,7
207:11 208:9,13
214:17 215:23
217:9 218:12,17
219:1,2,8 221:17
223:2 225:17
226:1,8,18 227:24
237:12 238:14
239:13,23,23
240:5,23 243:17
244:1 249:23
252:17 254:12,17
256:1,3,22 257:24
258:2,20 259:1,21
259:24,24 261:16
262:18 265:2,8
266:20 268:6,10
270:10,23 273:20
275:3,9 277:14
278:11,17 280:3,6
280:22 282:12
283:15 285:3,11
297:20 300:19
301:8 310:7
313:14 315:15
316:19 318:20
319:3 321:16
332:9
**year**   26:13 32:20
32:22 33:10 35:13
36:19 41:11 44:2

44:7 52:17 95:5
100:17 101:15
109:7 158:15
169:24 170:2
172:19 180:8
181:2 211:15
212:12 223:20
227:24 228:4,6
234:22 235:1,5
239:5 242:3
269:22 320:16,19
**year's**   177:7
**years**   20:12 21:1,2
21:5,18 25:20
33:21 52:1 73:13
86:8 137:17 174:6
189:21 196:17
214:10 289:24
290:2 298:3
322:16
**yep**   36:11 40:24
41:8 42:8 59:10
94:7 102:21 189:7
189:9 200:3 201:9
218:15 271:20
**yesterday**   11:15
12:3 322:16

z

**z**   295:20 307:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

```
 1        IN THE UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF ILLINOIS

 3                EASTERN DIVISION

 4   ROWENA DZIUBLA,              )

 5          Plaintiff,            )

 6     vs.                        )   No. 1:18-cv-4542

 7   J.C. ANDERSON, INC. and      )

 8   PETER ERLING JACOBSEN,       )

 9          Defendants.           )

10

11       The continued video deposition of

12   ROWENA DZIUBLA, called for examination pursuant

13   to the Rules of Civil Procedure for the United

14   States District Courts pertaining to the taking

15   of depositions, taken before BRENDA S.

16   TANNEHILL, CSR, at 222 North LaSalle Street,

17   Chicago, Illinois, on July 10, 2019 at the hour

18   of 10:13 a.m.

19

20

21

22

23   REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR

24   LICENSE NO.  084-003336

                                              338
```

```
 1   APPEARANCES:
     GOLDMAN & EHRLICH
 2   BY MR. SAM SEDAEI
     20 South Clark Street, Suite 500
 3   Chicago, Illinois 60603
     (312) 332-6733
 4   sam@goldmanehrlich.com
            Representing the Plaintiff;
 5
     VEDDER PRICE, P.C.
 6   BY MR. EUGENE BOYLE
     222 North LaSalle Street, Suite 2600
 7   Chicago, Illinois 60601
     (312) 609-7500
 8   eboyle@vedderprice.com
              -and-
 9   PRETZEL & STOUFFER, CHTD.
     MS. MARY H. CRONIN
10   One South Wacker Drive, Suite 2500
     Chicago, Illinois 60606
11   (312) 346-1973
     Mcronin@pretzel-stouffer.com
12         Representing the Defendant
               J.C. Anderson, Inc.;
13
     CLIFFORD LAW OFFICES
14   BY MR. JAMES PULLOS
     120 North LaSalle Street, Suite 3100
15   Chicago, Illinois 60602
     (312) 899-9090
16   jcp@cliffordlaw.com
            Representing the Defendant
17            Peter Erling Jacobsen.
18   Also Present:
        Mr. Michael J. Power, Jr.
19      Mr. David Dominiak, Videographer
20
21
22
23
24
                                              339
```

```
 1                    I N D E X
     WITNESS                        EXAMINATION
 2   ROWENA DZIUBLA
       By Mr. Boyle                    342
 3     By Ms. Cronin                   422
       By Mr. Sedaei                   446
 4   Further Examination
       By Mr. Boyle                    463
 5     By Ms. Cronin                   472
 6
                 E X H I B I T S
 7   NUMBER                        IDENTIFICATION
     Dziubla
 8    Exhibit 48 ............................350
      Exhibit 49 ............................392
 9    Exhibit 50 ............................411
      Exhibit 51.............................415
10    Exhibit 52 ............................418
      Exhibit 53 ............................430
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                              340
```

```
 1        THE VIDEOGRAPHER:  We're on the record

 2   on July 10, 2019, and the time is 10:13 a.m. as

 3   indicated on the video screen.

 4        This is the continuation of the

 5   deposition of Rowena Dziubla.

 6        The court reporter now will re-swear in

 7   the witness.

 8             (whereupon, the witness was duly

 9             sworn.)

10        MR. BOYLE:  Good morning, Ms. Dziubla.

11        THE WITNESS:  Hello.

12        MR. BOYLE:  Gene Boyle again.  We met

13   at the beginning of your deposition.

14        The same ground rules that we discussed

15   at the beginning of your deposition will apply

16   today.  Is that okay?

17        THE WITNESS:  Yes.

18        MR. BOYLE:  Okay.  And let me just

19   reconfirm that you're not under the influence of

20   any drugs or prescription medication that would

21   affect your ability to testify truthfully.

22        THE WITNESS:  That is correct.

23

24

                                              341
```



1          ROWENA DZIUBLA,
2  called as a witness herein, having been first
3  duly sworn, was examined and testified as
4  follows:
5              EXAMINATION
6  BY MR. BOYLE:
7      Q.   Okay.  Could you please look at what
8  has previously been marked as Deposition
9  Exhibit 3 which is on the top which is a copy of
10 your amended answers to the interrogatories
11 submitted by JCA in this case.
12         Do you recognize those?
13     A.   Yes.
14     Q.   If you could flip to Interrogatory
15 Number 5, please, that begins at the bottom of
16 Page 2, now, this interrogatory asks you to
17 provide information regarding any counselors,
18 therapists or other treatment that you had
19 received since September 26th of 2015, and in
20 response, you provided on Page 3 four
21 individuals from whom you received such
22 services.  You identified Kammie Juzwin, Latavia
23 Agada, a woman by the name of Holly from Crisis
24 Text Line and Patricia Stern from Better Health.

342

1          Do you see that?
2      A.   Yes.
3      Q.   And can you confirm that since
4  September of 2015, these are the only
5  individuals from whom you've received treatment
6  in connection with any mental or psychological
7  conditions that you've had?
8      A.   Yes.
9          I've actually started -- with these
10 being online therapists, I actually started
11 seeing a therapist that actually happens to be
12 right around the corner from us.
13         My husband and I had a long talk about
14 things that had been going on with the case, and
15 he doesn't feel that I've even really begun to
16 address the issues at hand and thought that it
17 would be better for me to see somebody in person
18 so I just met with her to kind of start talking
19 to somebody that actually might be able to help.
20     Q.   Okay.  And what is this person's name?
21     A.   It's Journey to Wellness.  She's in
22 Schaumburg.
23     Q.   Can you say her name again?
24     A.   I don't remember her first name.  I

343

1  just had one session with her.  I have it
2  somewhere, though.  I can provide it.
3      Q.   Okay.
4          MR. SEDAEI:  We'll amend the answers to
5  include the name of this new treater.
6          MR. BOYLE:  Okay.
7  BY MR. BOYLE:
8      Q.   But you said the last name is?
9      A.   The company name is Journey to
10 Wellness.
11     Q.   Journey to Wellness, okay.
12         And you said you've had one session
13 with --
14     A.   Yes.
15     Q.   -- the person from Journey to Wellness?
16         And when was that?
17     A.   I think it was last -- it was last week
18 sometime.
19     Q.   And when did you first contact Journey
20 to Wellness?
21     A.   Actually, she was referred by our
22 insurance company.  Again, I don't even know why
23 I didn't think of it.  And so they provided her
24 information.

344

1          I think I reached out to them a few
2  weeks ago, they got back to me.  I scheduled the
3  appointment, like, early last week.
4      Q.   Other than Journey to Wellness and the
5  individuals identified in your answer to
6  Interrogatory Number 5, have you sought
7  treatment from any other counselors or
8  therapists for any mental health issues?
9      A.   No.
10     Q.   Now, with respect to the first person
11 you've identified here, Kammie R. Juzwin, can
12 you tell me, when did you first see Ms. Juzwin?
13     A.   I don't -- it was after this incident.
14 I don't remember dates exactly.
15     Q.   But it was after the golf outing that
16 occurred on September 18th?
17     A.   Correct.  That was the reason why I was
18 meeting with her.
19     Q.   And how did you learn of Ms. Juzwin?
20     A.   She is actually a peer of my friend,
21 Beata.
22     Q.   And where did you meet with Ms. Juzwin?
23     A.   At her office, I think, in St. Charles
24 was the first meeting.

345



1    Q.   Do you remember the date of the first
2 meeting?
3    A.   I don't.
4    Q.   Approximately how many times did you
5 meet with Ms. Juzwin?
6    A.   Two for sure.
7    Q.   And so you met the first time. Was it
8 shortly after the golf outing on September 18th,
9 do you believe?
10    A.   I don't remember.
11    Q.   And what was the purpose of your visit
12 with Ms. Juzwin?
13    A.   Just to talk about what happened and
14 have somebody to talk to that I trusted because
15 she came as a referral.
16    You know, it was better than the
17 talk -- the hotline was immediately after the
18 incident so, you know, I was able to talk to
19 somebody in person and just kind of, I don't
20 know, just talk to somebody.
21    Q.   And of the two sessions with her that
22 you recall, how long did those sessions last?
23    A.   Probably about an hour each, maybe an
24 hour and a half tops.

346

1    Q.   And you said her office is in
2 St. Charles?
3    A.   Yeah.
4    Q.   So you had to travel to St. Charles?
5    A.   Yeah. That's kind of a haul.
6    Q.   Do you recall how long after your first
7 session with Ms. Juzwin, your second session,
8 occurred?
9    A.   I don't. I don't know if it's weeks or
10 two weeks or --
11    Q.   But each time you met with Ms. Juzwin,
12 you'd have to drive that St. Charles, correct?
13    A.   She had a satellite office near -- in
14 Schaumburg and I met with her there, but it's
15 not a place that she's at frequently so it was
16 just kind of like a one-off thing and it just
17 wasn't practical with her schedule to continue
18 working with her.
19    Q.   Was that the second time you met with
20 her, in Schaumburg?
21    A.   Yes, yes.
22    Q.   Okay. So you met with her one time in
23 St. Charles and one time in Schaumburg?
24    A.   Correct.

347

1    Q.   Okay. And you don't recall meeting
2 with her on any other occasions; is that
3 correct?
4    A.   Correct.
5    Q.   Do you recall why you stopped seeing
6 Ms. Juzwin?
7    A.   It was just schedule, honestly. She
8 had a lot of other things that she did for her
9 occupation in terms of teaching, and that's
10 where that location was. So it wasn't really
11 her therapy location, it was just an office so
12 it just wasn't practical.
13    Q.   And you believe when you started
14 meeting with her, it was after you had already
15 utilized the services of Crisis Text Line?
16    A.   Yes.
17    Q.   Do you recall whether or not Ms. Juzwin
18 diagnosed any conditions that you had?
19    A.   I don't recall.
20    Q.   What do you recall talking about with
21 Ms. Juzwin?
22    A.   The incident, how I felt about
23 everything, how scared I was, about just things
24 that were going to happen and, you know, my

348

1 future or my career, things how I'd be perceived
2 by my peers.
3    That's pretty much -- to see if I
4 was -- you know, obviously, you know, there's
5 people that have worse things happen to them
6 and, you know, just to make sure that I'm going
7 to be okay and just try to work on -- you know,
8 she gave me some launch points to just kind of
9 try to, you know, work through thought processes
10 and stuff and get on -- you know, just some
11 tips. It's not like, you know, you have to try
12 to incorporate that stuff daily, but . . .
13    Q.   Anything else you recall?
14    A.   No.
15    Q.   Did Ms. Juzwin charge you a fee for her
16 services?
17    A.   She didn't. It was a favor to Beata.
18    Q.   And you also indicate in your
19 interrogatory responses and you mentioned in
20 your testimony today that you utilized the
21 services of Crisis Text Line, correct?
22    A.   Correct.
23    Q.   And have you produced all of the
24 documents that you had in your possession

349

1  regarding your communications with Crisis Text
2  Line?
3      A.   Yes.
4      Q.   And Crisis Text Line, can you describe
5  what type of service that is?
6      A.   I honestly -- I'm assuming it's a
7  person on the other -- I mean, it's a live
8  person on the other side and it's just anonymous
9  support that can be contacted for any kind of
10 trauma or crisis that's occurred to kind of talk
11 people through the immediate situation.
12          I mean, it's very -- they don't know
13 who you are and it's pretty vague, a lot of
14 generic responses.
15     Q.   How did you learn about Crisis Text
16 Line?
17     A.   From Beata.
18          MR. BOYLE:  If we could mark this as --
19 can I get this marked as the next exhibit which
20 I believe is 48.
21               (Whereupon, Dziubla Deposition
22                Exhibit 48 was marked for
23                identification.)
24          MR. BOYLE:  That's the downside of a

350

1  bigger conference room.
2          MR. SEDAEI:  Do you have a copy for me?
3          MS. CRONIN:  Here you go.
4          MR. SEDAEI:  Thank you.
5          THE WITNESS:  48.
6  BY MR. BOYLE:
7      Q.   So Ms. Dziubla, we've handed you what
8  weave marked as Deposition Exhibit 48.  I'd ask
9  you to review those and let me know if these are
10 the records that you submitted in discovery
11 regarding your communications with Crisis Text
12 Line.
13     A.   Yeah.
14     Q.   So your first communication with them
15 it indicates was on September 19th, 2017,
16 correct?
17     A.   Yes.
18     Q.   So that was the day after the golf
19 outing, --
20     A.   Uh-huh.
21     Q.   -- is that your recollection?
22     A.   Yes.
23     Q.   And if you flip to the last page, it
24 looks like your last communication with them was

351

1  on September 21st so two days later, three days
2  later; is that correct?
3      A.   That's what it says.
4      Q.   Okay.  Is that what you recall?
5      A.   No, I mean, I don't recall it, but, I
6  mean, it's here so I don't recall talking to
7  them that long, honestly.  It seemed like a
8  fraction of the time.  Everything was going so
9  fast.
10     Q.   And when you say, "talking to them,"
11 are you talking about communicating
12 electronically, --
13     A.   Yes.
14     Q.   -- texting back and forth?
15     A.   Texting back and forth, correct.
16     Q.   And is that how you were able to come
17 up with a record of your communications with
18 them; you just then printed out a copy of your
19 texts?
20     A.   Yes.
21     Q.   So I'd like you to flip to Page 1678.
22 About three-quarters of the way down, it
23 indicates that you informed the counselor at
24 Crisis Hotline that "Boss sends me a shitty

352

1  e-mail.  I got to be the one to write them back
2  and tell them I don't deserve to be respected."
3          Do you see that?
4      A.   It says "disrespected."
5      Q.   I'm sorry.  Disrespected.
6          Do you see that?
7      A.   Yes.
8      Q.   Okay.  Are you referring here to that
9  e-mail we discussed in the first part of your
10 deposition exchanged with Steve Boulukos?
11     A.   I don't know what I'm referring to,
12 honestly.  I mean, it could be -- I don't know
13 exactly why I would consider that a shitty
14 e-mail, or I don't know.  Yeah, I can't
15 speculate.
16     Q.   If you flip to Page 1679, at the very
17 top, you clarify that -- this is before -- "Just
18 an example of the type of person I am."
19          Does that help refresh your
20 recollection as to whether or not you were
21 referring to that e-mail exchange you had with
22 Mr. Boulukos?
23     A.   With Steve?
24     Q.   Yes.

353

1    A.   I don't know what e-mail it's referring
2  to with Steve.  I don't recall Steve writing me
3  back.  I thought it was Jim.
4    Q.   But Steve's --
5    A.   Was he in there?  I mean, yeah, but do
6  we have the response to look at?  Because I
7  don't recall it being Steve when you're asking
8  about Steve.
9    Q.   Right.
10       Steve Boulukos -- am I pronouncing that
11  correctly?
12       MR. POWER:  Boulukos.
13  BY MR. BOYLE:
14    Q.   Steve Boulukos.
15       Do you not recall the e-mail that I'm
16  referring to?
17    A.   No.
18    Q.   So let me just hand you -- actually, I
19  should give you the actual Deposition
20  Exhibit 13.
21       So I'll hand you what I've already
22  introduced as Deposition Exhibit 13 which we
23  covered in the first session which is your
24  e-mail exchange with Mr. Boulukos.

354

1    A.   Right.
2       This has nothing to do with this
3  e-mail.  This is from July.
4    Q.   Correct.
5       And then you go on in your exchange
6  with the Crisis Help Line person because that
7  person was confused, too, about whether or not
8  that had just happened, and you tell them, "No.
9  This was before.  Just the example of the type
10  of person I am."
11       So my question is:  Is Deposition
12  Exhibit 13 that e-mail exchange that you're
13  referring to to Crisis Help Line?
14    A.   Let me read.
15       Sure, yeah.  I'm going to have to say
16  that just by -- I mean, I guess they did kind of
17  make Greg in charge of me from that point
18  forward after my response to Steve so . . .
19    Q.   Okay.  Thanks.
20       If you flip to the next page of
21  Exhibit 48 which is 1679, do you see in here
22  where in that first bubble, you continue to say,
23  "The assault yesterday was more than a nasty
24  e-mail so I can't even imagine the

355

1  repercussions."
2    A.   Uh-huh.
3    Q.   Why did you believe that the incident
4  at the golf outing was going to result in
5  repercussions?
6    A.   Just kind of how they handle stuff in
7  the office.
8       I mean, after that e-mail, Greg
9  basically pulled me aside and said, "Do me a
10  solid and, like, just don't bring anything up to
11  them, come to me first" because every time you
12  bring something up to them that they don't agree
13  with, they basically make his life harder, and
14  he's like, "I already have enough on my plate."
15       So we would have talks off site about
16  things that -- you know, if there was anything
17  going on with a bid and I needed help, you know,
18  we would have talks off site just so that we
19  could talk openly about stuff and share ideas.
20       He was kind of a mentor to me so I was
21  like, "Okay, I'll follow your lead."
22    Q.   And that was with respect to the e-mail
23  exchange with Steve?
24    A.   Yeah.

356

1       He basically was just like don't --
2  he's like, "If anything comes up," he's like,
3  "or you want to talk about stuff, just go
4  through me because he's like I can't handle it
5  anymore."  He's like, "I get a ton of e-mails
6  from them, and it just makes my life so much
7  harder."
8       So out of respect for him, I was like,
9  "Okay, fine.  Whatever you want."
10    Q.   Any other reason that you expected
11  there to be repercussions?
12    A.   Yeah.  I mean, it's just kind of the
13  way they handled stuff, you know.  I just didn't
14  feel like they would handle it professionally.
15    Q.   Did anybody from JCA tell you
16  specifically that there was going to be
17  repercussions with respect to this incident?
18    A.   I certainly didn't feel like an
19  internal investigation performed by somebody
20  within the company with people that had other
21  interests in preserving their job and benefiting
22  from the outing was something that was done in
23  any kind of support towards me so I felt like
24  that was the repercussion.

357



1    Q.    My question is a little different.
2         I asked you:  Did anybody from JCA tell
3  you specifically that there was going to be
4  repercussions from this incident?
5    A.    No.
6    Q.    Will you flip to Page 1680.
7         Now, in the middle of the page, you
8  tell the counselor at Crisis Text Line, "I want
9  to do stuff to get my mind off of it, but scared
10 they'll use it against me, see, she's fine."
11        Do you see that?
12   A.    Yes.
13   Q.    Okay.  Can you explain why you said
14 that to the counselor?
15   A.    I don't know.  I mean, I have to say
16 that I'm pretty upset still so probably doing a
17 lot of minimal brain-to-mouth filter while I'm
18 chatting or texting.
19   Q.    Is it true that you felt like you
20 wanted to do the normal things that you would
21 have been doing but you were afraid that they --
22 which I assume you meant JCA -- was going to use
23 against you?  Is it true?
24   A.    No.  I think it was more along the

358

1    A.    No.
2    Q.    Is that what you meant by that?
3    A.    All I can say is it's probably stuff
4  that -- I mean, my only reference to any kind of
5  these types of incidents is television so, like,
6  maybe that's -- you know, that's what happens in
7  these things is people use your words against
8  you so I didn't know what to do.
9    Q.    Could you flip to Page 1681?
10        In the middle of the page, the
11 therapist asks you, "Have you ever thought about
12 writing out how you are feeling?"
13        And you responded:  "I used to keep a
14 journal, but it was depressing to read things
15 over again because it seemed like nothing ever
16 improved.  I saw a therapist for a while, and
17 I'm on meds now.  Things are much better.  I
18 don't feel the need for a diary anymore."
19        Do you see that?
20   A.    Uh-huh.
21   Q.    So what therapist are you referring to
22 here?
23   A.    I don't know because none of those
24 prescribed me anything, and the medication I was

360

1  lines of I wanted -- I didn't want the impact
2  that this was going to have on my life, and I
3  was going to get it whether I wanted it or not.
4    Q.    But your words here are:  "I want to do
5  stuff to get my mind off of it but scared
6  they'll use it against me."
7         What stuff are you referring to?
8    A.    What stuff do I want to do?  Like,
9  function, which I didn't do for weeks.  Just to
10 function, that's pretty much what I wanted to
11 do.
12   Q.    But that's not what you're saying here.
13 You're not saying, "I can't function."  You're
14 saying, "I want to do stuff, but I'm afraid
15 they're going to use it against me" so I'm
16 asking, what stuff did you feel like you
17 wanted to do?
18   A.    Function.
19   Q.    But you were afraid to function because
20 you thought that JCA would use it against you?
21   A.    I don't know that I meant that.
22   Q.    Did somebody tell you that if you went
23 about and did your normal daily activities that
24 somebody was going to use that against you?

359

1  on, the only one that it would have been for
2  was -- like, it's something to do with -- it has
3  to do with menstrual stuff.  I don't know.  It
4  has to do with, yeah, like, postmenstrual
5  something -- it's, like, an acronym -- that I
6  was taking for a while.  That actually ended up
7  not being very effective.
8    Q.    So when you told the counselor on
9  September 19th that you had seen a therapist for
10 a while and "I'm on meds now," are you saying
11 you don't remember who the therapist was or what
12 the meds that you were taking are -- were?
13   A.    I don't know what that -- correct, I
14 don't know what therapist I'm referring to or
15 what meds I'm referring to.
16   Q.    Do you recall --
17        MS. CRONIN:  Sorry.
18 BY MR. BOYLE:
19   Q.    -- the name of any therapist that you
20 had seen prior to your employment at JCA?
21   A.    No.
22   Q.    Can you think of a reason why you would
23 have told the Crisis Hotline counselor that you
24 had seen a therapist who had prescribed meds?

361



1    A.   I don't recall.
2    Q.   Would you flip to Page 1685?
3         At the bottom of the page, you tell the
4    counselor that Mike Power told you -- I assume
5    you're referring to Mike Power when you say
6    "HR," correct?  Is that who you're referring to?
7    A.   Yeah.
8    Q.   Okay.  You say, "No.  HR said to let
9    them know what I want to do.  I feel like no
10   matter what I decide, I lose."
11        Do you see that?
12   A.   Yes.
13   Q.   Can you explain what you meant by that?
14   A.   I felt like, I guess, no matter what, I
15   was going to lose my job.
16   Q.   You felt like you were going to lose
17   your job on September 20th when you were talking
18   to the Crisis counselor?
19   A.   Well, I mean, this was after I met with
20   Mike.  I believe this is wednesday so I met with
21   him at -- I mean, I certainly didn't get a
22   different -- he wasn't very reassuring at the
23   meeting that, you know, things were going to be
24   done in my best interest and I was going to get

362

1    support from the company.
2         I very much felt like it was one sided
3    during that meeting, that it was about covering
4    their interests and not -- they could care less
5    about how distraught I was.
6    Q.   But you had already established that
7    Mike asked you when you're coming back to work,
8    correct?
9    A.   He did, but I ended up taking the rest
10   of that week off and then I met with him the
11   following week.
12        I don't understand what you're
13   getting -- what you're getting to.
14   Q.   I'm just trying to figure out what
15   you're telling the Crisis counselor here.
16        You said, "No matter what, I lose," and
17   I want to understand what you meant by that.
18   A.   I just don't -- I never felt like my
19   interests were ever represented during any of
20   this, during that whole week-and-a-half process
21   with them.
22   Q.   All right.  On Page 1686, in the second
23   bubble, you indicate that you filed an EEOC
24   claim yesterday and talked to a lawyer, too.  "I

363

1    know this will get resolved," and you put
2    "resolved" in quotation marks.  Do you see that?
3    A.   Uh-huh.
4    Q.   How did you expect that it would get
5    resolved?
6    A.   I think that was me -- it was sarcasm,
7    talking about how Power was going to do his
8    investigation.  So I was basically saying that
9    their -- you know, their way of resolving it
10   wasn't -- I mean, it's not really a resolution
11   for me.
12   Q.   Did you have a particular resolution in
13   mind?
14   A.   I honestly just wanted to have some
15   support, and that's kind of what I kept asking
16   them for.  I just wanted to have a little bit
17   more time, and I didn't feel like I ever had an
18   opportunity to not be on the defensive.
19        I mean, I'm still kind of in survival
20   mode and it's been almost two years later and
21   I'm still just trying to get by emotionally, and
22   I don't think it -- I don't think it ever needed
23   to happen like this.
24   Q.   What do you mean by that?

364

1    A.   I think they could have handled things
2    differently.
3    Q.   How?
4    A.   By being more supportive.
5    Q.   In what way?
6    A.   Maybe with helping me find or with
7    going to get therapy or just acknowledging the
8    fact that it happened and to understand that,
9    you know, hey, you know, you're a good employee,
10   you know, we're sorry this happened to you, just
11   to be more empathetic, and instead, I was on the
12   defense from the get-go.
13        I just didn't -- I didn't understand
14   why my e-mail got shut off, I didn't understand
15   why I was being put on the defense, I didn't
16   understand why -- it was like it's HR.  HR is
17   supposed to look out for my best interests, and
18   I never felt like that happened.  I felt like
19   immediately, they were like, "Shit, we got to
20   cover our ass."
21   Q.   That's how you felt, but nobody ever
22   told you that, correct?
23   A.   Yes, that's how I felt.
24   Q.   And you were given how much time off?

365



1    A.  He said my PTO was exhausted at the end
2 of that week.
3    Q.  Okay.  So you were allowed to stay at
4 home for a week, and then the following week,
5 you didn't show up to work on that Monday,
6 correct?
7    A.  Correct.
8    Q.  Okay.  And that day was not used
9 against you, was it?
10    MR. SEDAEI:  Objection to form.
11 BY MR. BOYLE:
12    Q.  You didn't -- you didn't -- there was
13 no discipline or penalty that resulted from you
14 not showing up to work that day, was there?
15    A.  I don't think I was paid for it.
16    Q.  So you had unpaid time available to you
17 to take off if that's what you chose to do,
18 correct?
19    A.  That was presented to me in the form of
20 FMLA.
21    Q.  But you didn't choose to utilize that?
22    A.  I didn't know that was an option on
23 Monday or Tuesday until I talked to them and he
24 gave me the employee manual and said it's in

366

1 there.
2    Q.  Right.  But you did not want to take
3 unpaid FMLA to resolve the issues that you were
4 having, correct?
5    A.  Correct, which is why I said I wanted
6 to come back to work, because I couldn't go
7 without a paycheck.
8    Q.  Right.  We covered that in the first
9 day of your deposition.
10    A.  Well, we covered a lot of stuff.
11    Q.  Could you hand me that back?
12    Ms. Dziubla, I'm handing you what was
13 previously introduced as Deposition Exhibit 46
14 which --
15    MR. BOYLE:  Can we go off the record.
16    THE VIDEOGRAPHER:  Going off the record
17 at 10:48 a.m.
18         (Whereupon, a short recess was
19         taken.)
20    THE VIDEOGRAPHER:  Back on the record
21 at 10:49 a.m.
22 BY MR. BOYLE:
23    Q.  So Ms. Dziubla, this is a copy of the
24 document that you produced in discovery

367

1 regarding your communications with Latavia Agada
2 at Talkspace, correct?
3    A.  Yes.
4    Q.  Now, you've previously testified that
5 you had some communication with Crisis Text Line
6 immediately after the golf outing, correct?
7    A.  Yes.
8    Q.  And that that communication ended on,
9 according to the document, September 21st,
10 correct?
11    A.  Yes.
12    Q.  And then you had at least two sessions
13 with Kammie Juzwin that occurred shortly after
14 that time frame, correct?
15    A.  Correct.
16    Q.  This document indicates that you
17 contacted Talkspace on November 3rd of that
18 year.  Do you see that on Page 1818?
19    A.  Yes.
20    Q.  Did you speak with anybody between the
21 time you talked to Kammie Juzwin and the time
22 you reached out to Talkspace?
23    A.  Not that I recall.
24    Q.  So on Page 1818, it indicates that you

368

1 contacted them in November, and that would have
2 been of 2017, but then if you flip to Page 1820,
3 you didn't actually start communicating or
4 receiving counselling from them until February
5 of 2019.
6    A.  Okay.
7    Q.  Do you see where I'm referring to?
8 There's a skip.
9    A.  Yes.
10    Q.  Okay.  Can you explain that three-month
11 delay?
12    A.  When I left, the delay is basically me
13 being in pure survival mode.  I mean, I went
14 from having a 9:00-to-5:00 job to working for
15 commission only.  I mean, I was on -- like, I
16 barely had time to do anything.  I was just
17 trying to get income, working for Talent Hitch.
18 I was in pure survival mode.
19    Q.  So you were focussing on your
20 employment with Talent Hitch at the time?
21    A.  Correct.
22    Q.  Now, if you flip back to 1818, they ask
23 you, "what has led you to seek help today."
24    Do you see that?  It's about a third of

369

1   the way down on the page.
2       A.   Yes.
3       Q.   And your response is:  "Went to a
4   therapist at the recommendation of my sleep
5   psychiatrist to get an opinion on depression and
6   bipolar."
7       A.   Uh-huh.
8       Q.   "Therapist said neither; it's
9   personality order with intuition.  Said to see a
10  therapist once a week."
11      A.   Okay.
12           MR. SEDAEI:  I think you misread that.
13  Personality disorder.
14           MR. BOYLE:  I'm sorry?
15           THE WITNESS:  It's personality
16  disorder.
17           MR. SEDAEI:  I thought you said
18  "personality order," but I may have misheard it.
19           MR. BOYLE:  Okay.  Well, the record
20  will reflect that.  The document says,
21  "personality disorder with intuition."
22           MR. SEDAEI:  Correct.
23  BY MR. BOYLE:
24      Q.   Okay.  So first of all, which therapist

370

1   are you referring to here?
2       A.   I know I went to a sleep study.  I
3   don't know why I would call them a sleep
4   psychiatrist.  I had sleep apnea because of
5   being overweight and other stuff.  I don't know
6   what that is.
7       Q.   So who asked you to get an opinion on
8   depression and bipolar?
9       A.   I don't know.
10      Q.   You don't recall?
11      A.   I don't recall.
12      Q.   Okay.  What's the name of your sleep
13  psychiatrist?
14      A.   I don't see them anymore.
15      Q.   When did you see them?
16      A.   I don't know.
17      Q.   Was it during your employment --
18      A.   I have no idea.
19      Q.   -- with JCA, before your employment
20  with JCA?
21      A.   I can't -- I don't know.  I don't even
22  know -- like, I don't know why I would refer to
23  them as a psychiatrist, either.  I don't know if
24  maybe that was, like, auto from talking into the

371

1   phone.  Maybe I went to --
2       Q.   Okay.  So you don't remember that.
3            Do you remember who the therapist was
4   that said you had personality disorder with
5   intuition?
6       A.   No.
7       Q.   Do you have any recollection of being
8   diagnosed as having personality disorder with
9   intuition?
10      A.   I've never been diagnosed with any of
11  that.
12      Q.   Why would you have told the people at
13  Talkspace that you had been?
14      A.   I don't know what this was referring
15  to.
16      Q.   And then the person at Talkspace
17  replies:  "Hi, Rowena.  So you're looking for
18  therapy now for personality disorder traits?"
19           And your response is:  "I guess.
20  Supposedly, that's easy to find.  Everyone has
21  them."
22           Do you see where I'm reading?
23      A.   Yes.
24      Q.   So you agreed with the person from

372

1   Talkspace that you were seeking therapy for
2   personality disorder traits?
3       A.   I guess.
4       Q.   So if you flip to Page 1820, after the
5   three-month hiatus, you contact them again on
6   February 5th.  Do you see where you've contacted
7   them on February 5th?
8       A.   Yes.
9       Q.   And then that exchange with them on
10  February 5th about resubscribing continues all
11  the way to Page 1822, and towards the bottom of
12  the page, the therapist asks you to summarize
13  what you would like to address in therapy.
14           Do you see that?
15      A.   Okay.
16      Q.   And your response is:  "Specifically
17  career counselling, what jobs are good for me
18  and where I will have the most longevity."
19           Do you recall saying that to the --
20      A.   No.
21      Q.   You don't recall saying that?
22      A.   No.
23      Q.   Do you recall why you contacted
24  Talkspace in February of 2018?

373

1    A.   My recollection is to have an outlet
2  for my thoughts so that I could stop bringing it
3  home and give my husband a break.
4    Q.   That's your recollection today?
5    A.   That's my recollection, yeah.  I needed
6  an outlet, otherwise, I'm going to drive him --
7  I'm driving him nuts now.
8    Q.   Okay.  But you'll agree that back in
9  February of 2018, what you told Talkspace was
10  that you were seeking career counselling so that
11  you knew what jobs were good for me and where I
12  would have the most longevity?
13    A.   That's what I wrote.
14    Q.   And then if you flip to Page 1824, the
15  entry on February 26th at 9:21 a.m., do you see
16  that?
17    A.   Yes.
18    Q.   So now you're speaking directly with
19  Latavia Agada and you repeat a day later:  "So
20  to get started about why I'm seeking some career
21  counselling, it's because I can't seem to make
22  it past six months at a place before getting fed
23  up."
24         Do you see that?

374

1    A.   Uh-huh.
2    Q.   I don't see anywhere in there where you
3  said that the reason you were seeking
4  counselling was to have an outlet to discuss how
5  you were feeling.
6         Isn't it true that you were seeking
7  career counselling?
8    A.   I'm trying to not -- I'm trying to find
9  a way for what happened to not happen again, and
10  that was my way of deciding.
11         I mean, it sounded like I'm going to
12  come straight out, and my personality isn't one
13  to come straight out and just be like, "But I
14  am."
15         Instead, I'm trying to find an
16  alternate solution so that I'm not placed in
17  that position again.
18    Q.   So let's talk about your statement that
19  you can't seem to make it past six months at a
20  place before getting fed up.  Is that a concern
21  that you had at the time?
22    A.   Yeah.
23    Q.   Is that a concern you still have?
24    A.   I'm very concerned about -- it's

375

1  actually gotten worse since this incident
2  because I don't -- like, I can't even handle any
3  kind of confrontation whether or not it's a
4  positive or a negative one at work.  It just
5  sends -- it sends me into a tailspin, and I just
6  sit at my desk and I don't interact with people,
7  and if something comes up where, you know, I'm
8  given new duties or my duties are shifted, I
9  automatically think that, you know, that's it,
10  they're just going to fire me.
11    Q.   And in the next sentence, you say, "I
12  feel like employers are dishonest from the
13  position from day one, thinking they offer
14  culture, room for advancement and opportunity to
15  learn new things when it couldn't be farther
16  from the truth."
17         Do you see that?
18    A.   Yes.
19    Q.   Is that a belief you hold generally
20  about employers?
21    A.   It was after JCA.
22         I mean, I really believed that
23  everything they told me in my interview, that
24  they were on the road to making changes, and I

376

1  even had Greg tell me basically -- I remember I
2  had my review, and I guess the guy said
3  something to Greg about what I said in my
4  review, and Greg pulled me over and was like,
5  "You're just going to tell him all of my ideas?"
6         He was pissed.  He had a way that he
7  wanted to roll out his new ideas to change
8  things at the company, and I thought it was
9  helping him by bringing it up to the guys, and
10  instead, it wasn't.
11    Q.   Well, wasn't it a belief that you
12  actually had even before you got to JCA?
13    A.   What?
14    Q.   That employers are dishonest.
15    A.   I don't know that that was ever to that
16  extent that I would say it in the manner with
17  such conviction.
18    Q.   Well, those are your words, aren't
19  they?
20    A.   I know, but this is after something --
21  I've never been fired before, and to be fired
22  for standing up for yourself kind of puts a bad
23  taste in your mouth.
24    Q.   And your belief that employers are

377



1  dishonest was a belief that you held before you
2  got to JCA, correct?
3      A.  I don't know.  No, it's not.
4      Q.  Well, let's see.  Why don't we flip to
5  Page 1825.  And we go down to that bottom
6  paragraph, and you're trying to explain to your
7  therapist or your counselor what you meant about
8  your comment that employers are dishonest.
9      A.  Okay.
10      Q.  And you say:  The dishonest part is
11  right at the interview.  They tell you that
12  they're going to be all these things, dot, dot,
13  dot, room for growth, work-life balance, new
14  streamlined process, and then nothing happens or
15  it happens but it's, like, done halfway and then
16  they complain about the results.  I once had the
17  owner, Steve Blinderman, and you go on to
18  describe an incident you had with Blinderman
19  Construction.
20          Do you see that?
21      A.  Uh-huh.
22      Q.  Blinderman Construction was the job you
23  held prior to coming to work for JCA, correct?
24      A.  Correct.

378

1      Q.  So you're giving that as an example of
2  how employers in your opinion are basically
3  dishonest?
4      A.  Okay.
5      Q.  So let's flip to Page 1840.
6          This is an entry that -- the entry I'm
7  looking at was February 27th at 11:24 p.m.  Do
8  you see that?
9      A.  Yes.
10      Q.  So on the second paragraph, you state:
11  "I'm supposed to start the new job 3/12 but
12  moved it up to 3/5 because I really need to get
13  a steady check in the bank, and there's no level
14  of confidence Kyle is going to be fair about
15  this departure from Talent Hitch."
16          Do you see where I'm reading?
17      A.  Yes.
18      Q.  And that's what you told to Ms. Agada,
19  correct?
20      A.  Yes.
21      Q.  So first of all, the job you're
22  referring to is when you left Talent Hitch and
23  joined Cornerstone, correct?
24      A.  Correct.

379

1      Q.  Okay.  But yet you're indicating that
2  you don't have confidence that Kyle is going to
3  be fair about your departure; is that correct?
4      A.  Yes.
5      Q.  And Kyle is the person who got you the
6  job with Talent Hitch, correct?
7      A.  Yes.
8      Q.  And Kyle is the person who you were
9  communicating with while you were at JCA about
10  potentially doing consulting work for them,
11  right?
12      A.  Correct.
13      Q.  Okay.  And hadn't he helped you out
14  previously in your career at some point?
15      A.  Sure, yes.
16      Q.  Okay.  Then why did you believe that
17  Kyle was not going to be fair about your
18  departure from Talent Hitch?
19      A.  I didn't -- as much as all that stuff
20  is true, I mean, I reminded myself of that, you
21  know, but we didn't have a contract.
22          I mean, he could have done whatever he
23  wanted.  It was kind of on a handshake, and with
24  my experience at JCA, I just didn't -- I mean, I

380

1  couldn't really trust anyone.
2          I mean, as much as, yes, there is
3  evidence there that he was a fair person and a
4  just person and he had his own things that he
5  had to deal with being a business owner in a
6  start-up company, and I had to just keep
7  reminding myself with each step I took with him
8  is that he's a good person, you've known him for
9  a while, but my -- you know, like I said, we
10  didn't have a contract.  He could have very well
11  just been like, "That's it, you're done."
12      Q.  Can you turn to Page 1841, please.
13          This is the entry for the next day,
14  February 28th, at 1:33 p.m.  It's all the way
15  towards the bottom of that entry.
16          You indicate that "I lashed out at Kyle
17  and attacked his character, told him he wasn't
18  trustworthy.  I regretted immediately after
19  texting, but it's said and I want to take it
20  back, but I also want him to take me seriously,"
21  correct?
22      A.  Yes.
23      Q.  Is that what you -- that's what you
24  told Ms. Agada at Talkspace?

381



1    A.    Yes.
2        Q.    Why did you regret it?
3    A.    I don't even know what incident that
4  was that I would have lashed out at him about
5  it, but, I mean, there was a lot of stuff going
6  on at Talent Hitch.  I mean, he was starting up
7  his company, you know, a lot of the employees
8  were his friends that had other personal issues
9  so it was a hard environment to work in, but he
10  was making it so, I mean, I don't think -- I
11  don't know.
12        I try not to -- I try to give people
13  the benefit of the doubt in what they're doing,
14  and I don't think he deserved to -- you know,
15  even now, I mean, everything that happened, I
16  wish I could tell him that, you know, he was
17  essentially there for me when I needed him and
18  he didn't have to be.
19        Q.    If you could flip back to Page 1835,
20  looking at the entry on February 14th at
21  7:26 p.m., it's a long entry.  I'm not going to
22  go into a lot of it.
23        You're describing this conflict you had
24  with this person, Sam, at Talent Hitch, but in
                                                  382

1  that second paragraph towards the bottom, --
2  it's the fourth line up from the bottom of the
3  second paragraph -- you say, "I am never content
4  and I always want more."
5        Do you see that?
6    A.    I do -- okay.
7        Q.    Is that something that you continue to
8  believe, that you're never content and you
9  always want more?
10    A.    I think I'm a very passionate person
11  and I don't like being idle, and that's what
12  that means.
13        Q.    Well, then at the -- well, when you say
14  you don't like being idle, how does that -- I
15  mean, you've just explained this conflict that
16  you have with Sam at Talent Hitch and how it's
17  impacting your -- the way you look at your
18  employment with Talent Hitch, and then you say,
19  "I am never content and I always want more."
20        I'm not sure I see the connection
21  between that and you being idle.
22    A.    Let me read the paragraph.  I didn't
23  read the paragraph.
24        What was your question?
                                                  383

1        Q.    So you had said -- I asked you why you
2  indicated that you were never content and always
3  want more, and you said that it's because you
4  don't like to be idle, and I said -- I asked
5  you, "How does that relate to what you are
6  discussing here which is your dissatisfaction
7  with the Sam situation and your employment at
8  Talent Hitch."
9    A.    I think there's two separate subjects
10  here.  I'm kind of rambling a little bit.  I
11  don't know that it's -- I think it's just
12  connected with my career in general and where I
13  saw myself.  It's not connected to Sam; it's
14  just that I should have put an "enter" there and
15  started a new paragraph.
16        Q.    Well, let's go to the next paragraph.
17    A.    Okay.
18        Q.    You say, "The biggest thing I am
19  struggling with right now this very moment is
20  why can't I be happy with any" -- and you put
21  "any" in capital letters -- "job that allows me
22  to pay my bills?  I feel like no matter what I
23  do, I will always find a reason why it's not a
24  good fit."
                                                  384

1    A.    Uh-huh.
2        Q.    So you agree then that you generally
3  are dissatisfied with the places you've been
4  employed?
5    A.    I would agree that I was very upset
6  when I was writing this stuff.
7        I mean, all I can tell you, I mean, I'm
8  still in contact with previous employers, and
9  when I see them, it's always a good -- when I
10  see them at networking events, I don't have a
11  bad taste in my mouth from any of the places
12  that I've worked at except JCA.
13        Q.    Well, do you agree that this is what
14  you said?
15    A.    That's what I -- yeah, that's what I
16  wrote.
17        Q.    And do you agree that you struggle with
18  the fact that you can't be happy at any job that
19  allows you to pay your bills?
20    A.    That's what I felt at the time.
21        Q.    Okay.  And this was in February of 2018
22  after you were having a dispute with an employee
23  at Talent Hitch, correct?
24    A.    Okay.
                                                  385



1    Q.   Correct?
2    A.   Correct.
3    Q.   And shortly thereafter, you left Talent
4  Hitch to take your job at Cornerstone, correct?
5    A.   Yes.
6    Q.   So if you'd flip to Page 1848, at the
7  bottom of the page, the entry on March 25th at
8  8:02 a.m., you're speaking to Ms. Agada now.
9  This is March 25th so you've already begun your
10 employment at Cornerstone, correct?
11   A.   Correct.
12   Q.   So you're about a month into your
13 employment at Cornerstone?
14   A.   Yes.
15   Q.   Okay.  And you're referring to a woman
16 there that you're having difficulty with by the
17 name of Roseanne.
18        Do you see?  It's the last paragraph.
19   A.   Yes.
20   Q.   Okay.  Who is Roseanne?
21   A.   She is our bid lady.  She handles all
22 of our bid forms and puts together the packages
23 to submit for bid.
24   Q.   Okay.  And you were having difficulty

386

1  with her at the time?
2    A.   Yes.
3    Q.   Do you continue to have difficulty with
4  her?
5    A.   No.  We've chalked it up to poor
6  management.  We're actually really good friends
7  now.
8    Q.   Okay.  Now, you state the third line
9  from the bottom, "All these chicks in this
10 office are outrageous, click after click.  It
11 makes me want to scream.  Why can't I just be
12 somewhere normal even if it's just for a few
13 months?"
14   A.   Okay.
15   Q.   Is that how you felt at the time?
16   A.   Yeah.  It was -- I mean, I was the new
17 girl in town, and, you know, accounting, that's
18 just the way it is.  New people come in and, you
19 know, they want to check you out first, and it
20 was a rough start.
21   Q.   And then in your next sentence, you
22 say, "The honeymoon period gets shorter and
23 shorter every time I change jobs," exclamation
24 point.

387

1    A.   Yeah.
2    Q.   What did you mean by that?
3    A.   Just, you know, I don't know that it
4  gets shorter and shorter.  I think it's just
5  perception, but, you know, you start a new job,
6  and I see it now when we hire new employees.
7  You know, everybody is like, "What can I get
8  you?  If you need anything, let me know," and
9  that's, like, the honeymoon period where
10 people just-- I don't know that it gets shorter
11 and shorter.  It just seems longer the more
12 green you are in the industry, I guess.  And
13 that's what I'm referring to.  Then people get
14 real, you know, like, figure-it-out-yourself
15 kind of thing.  It's just amusing, if anything.
16        I mean, every company puts up a front,
17 you know, and then sometimes it's six months and
18 sometimes it can only keep it going for a few
19 weeks and then you get to see really what
20 happens in the office and it's just -- that's
21 all I was really saying.
22   Q.   Can you flip to Page 1854.  The entry
23 actually begins on the prior page, 1853.  It's
24 your entry of April 18th at 8:57 a.m., but on

388

1  1854, about midway through, you know, the top of
2  that paragraph, you start speaking about an
3  encounter you had with Ethan.
4    A.   Okay.
5    Q.   You state that Ethan is an old guy that
6  is super quirky and awkward and that you had a
7  confrontation with him.
8        Do you see where I'm referring?
9    A.   Yes.
10   Q.   Okay.  What was the issue with Ethan?
11   A.   Ethan is an old dude with no new
12 tricks.  He's just a guy in the industry that's
13 been doing it for 35 years, and, I mean, they
14 know his -- they know his shortcomings when it
15 comes to working with other employees, and,
16 again, it was another -- this is the -- the
17 break-in period at a company now, getting to
18 know him.  He felt threatened by me.  It was
19 very hard to work with him, but he's an
20 extreme -- I mean, he's literally, like, a
21 database of estimating.  Like, you could walk
22 into his cubicle and give him a scenario, and he
23 can be within 2 percent of what a sub would
24 give.

389

1  So that's why he's there, and, I mean,
2  he's a value to the company so . . .
3  Q.  Okay.  And isn't it true that your
4  inability to work with Ethan led to you being
5  transferred into a different position with the
6  company?
7  A.  It's not -- it goes both ways.  It's
8  his inability to work with me as well, it's not
9  just me, and they felt like it would help if I
10 was -- and that's the thing is that it's not --
11 my responsibilities haven't changed.  I've
12 actually gained additional responsibilities.
13 It's just what they needed to tell him so that
14 he could get off the defensive.
15 And he still keeps trying to figure
16 out, like, ways to somehow pull me back in, but
17 I don't have to work with him so I don't --
18 Q.  So you transferred to another position,
19 correct?
20 A.  Not really.  I mean, I still have the
21 same responsibilities.  They just told him that
22 I'm on operations now, but I still do the same
23 stuff for the most part as what I was doing
24 before.  I just help out Estimating and

390

1  Operations.
2  Q.  Well, didn't you tell your therapist
3  that you felt as though this move was a
4  demotion?
5  A.  In the beginning, I did, you know, with
6  everything going on as opposed to I'm trying to
7  really keep a positive outlook on things so when
8  things don't necessarily -- you know, I try to
9  see it from their perspective, and again, also
10 reminding myself that I've worked with these
11 people in other positions and just try to
12 convince myself that, you know, it's in the best
13 interest of the company, they are looking out
14 for my best interests and not implode on myself.
15 It did feel, you know, but since then,
16 I've been continuously taking on new
17 responsibilities so --
18 Q.  And you also told your therapist --
19 A.  -- it's probably wrong.
20 Q.  -- that you resented that they made it
21 look like you were being transferred because it
22 was a problem with you?
23 A.  Where does it say that?
24 Q.  We'll get to it when we go through.  It

391

1  was when you were speaking with Patricia Stern
2  so we'll get to that.
3  MR. SEDAEI:  Gene, before you go to the
4  next question, do you mind if I take a bathroom
5  break if you think now would be appropriate?
6  MR. BOYLE:  That's fine.
7  THE VIDEOGRAPHER:  Going off the record
8  at 11:19 a.m.
9  (whereupon, a short recess was
10 taken.)
11 BY MR. BOYLE:
12 Q.  Ms. Dziubla, I'm going to hand you what
13 we've marked as Deposition Exhibit 49.  There's
14 a copy there for your attorney, too.
15 (whereupon, Dziubla Deposition
16 Exhibit 49 was marked for
17 identification.)
18 BY MR. BOYLE:
19 Q.  Now, these are a copy of the records we
20 received from Ms. Stern at Better Help
21 Counselling.  I ask you to take a look at those
22 because I'm going to be asking you a couple of
23 questions about them.  Specifically, I'd like
24 you to flip to JCA Stern 025, and I'm looking at

392

1  the entry for February 28th, 2019 at 7:29 p.m.,
2  and you indicate to Ms. Stern, "It really upsets
3  me that I'm getting transferred because of Ethan
4  and that they kind of spun it like it was kind
5  of my issue.  I feel like I'm getting fired."
6  Do you see that?
7  A.  Yes.
8  Q.  Did you say that to -- tell that to
9  Ms. Stern?
10 A.  It says that here, yes.
11 Q.  Okay.  And so having read that, would
12 you agree then that you felt as though
13 Cornerstone was penalizing you because of the
14 confrontation you had with Ethan?
15 A.  At the time, yes.
16 Q.  Okay.  And this was just in February of
17 this year, correct?
18 A.  Yes.
19 Q.  Okay.  You can hand me back that one,
20 and I'm going to ask you to take the Talkspace
21 notes again.
22 If you could flip to 1858 at the very
23 bottom of the page, the entry for May 30 -- I'm
24 sorry -- May 14, 2:50, it says, "Funny thing is

393



1  the first handful of recordings were me
2  literally rambling and complaining about John so
3  probably better that it just went into the
4  ether.  Ha, ha.  Negative, negative stuff."
5       Do you see that?
6  A.  Yes.
7  Q.  Okay.  Who is John?
8  A.  John's the owner of Broadway Electric.
9  Q.  Okay.  And what negative things were
10 you saying about John?
11 A.  I have no idea.
12 Q.  You have no idea?
13 A.  I sent -- I mean, I don't know.  It
14 must have been something that was going on at
15 the time that I was just venting about.
16 Q.  Have you had ongoing problems with the
17 owner of Cornerstone?
18 A.  Not at all.  I have a really good
19 relationship with John and Chris.
20 Q.  Okay.  Could you flip to the top of
21 Page 1859?
22 A.  Okay.
23 Q.  You indicate:  "Yesterday, I decided
24 with John to just return his comments with a

394

1  blank stare if I can't say anything nice."
2       What are you referring to there?
3  A.  I don't know.
4  Q.  Okay.  So you're telling Ms. Agada that
5  you're having this -- I'm sorry.
6       You're now speaking to, yeah,
7  Ms. Agada, that you're having this -- saying
8  negative things about John and that you're just
9  responding to his comments with a blank stare if
10 you can't say anything nice, but yet you don't
11 recall having any issues or trouble with John?
12 A.  I don't.
13 Q.  And do you have any idea why you would
14 be telling your therapist otherwise?
15 A.  I'm sure something at the time.  I
16 mean, stuff happens, you get disgruntled, and
17 I'm sure I just vented, and that's why it's like
18 why even invest additional energy to -- I think
19 the recording didn't go through.  Why even
20 invest additional energy to re-record it?
21      It's like I said it, got it off my
22 chest, and I was done.  I don't remember what it
23 was about, though.
24 Q.  Flipping to Page 1826, in the paragraph

395

1  at the bottom of the page, you're describing,
2  you know, some of your unhappiness with Talent
3  Hitch.  You say, "As much as I don't like a lot
4  of the things that have happened at Talent
5  Hitch, I can appreciate what it's brought to the
6  surface about myself and who I am as a person."
7       Do you see where I'm reading?
8  A.  Yes.
9  Q.  Okay.  And you write:  "For example,
10 the commissioned income, I realize now just how
11 out of hand my spending was."
12 A.  Uh-huh.
13 Q.  What did you realize about your
14 spending?  How had your spending gotten out of
15 hand?
16 A.  I'm not quite sure what specifically
17 that's referring to, but, I mean, this is a
18 prime example of me just trying to put a
19 positive thing, a spin on it, and try to learn
20 and come up with something positive that I could
21 have possibly gotten out of the incident and
22 what happened at JCA.
23      I don't have any excessive debt so I
24 don't know -- I mean, I have school loans and

396

1  then our regular bills, and that's it so . . .
2  Q.  Could you flip to Page 1854.
3  A.  Okay.
4  Q.  It's towards the bottom of the page.
5  It's the paragraph that begins:  "The children
6  thing is more Dan's decision."
7       Do you see that paragraph?
8  A.  Yes.
9  Q.  Okay.  First of all, when you say, "The
10 children thing is more Dan's decision," what do
11 you mean by that?
12 A.  In terms of having kids, I mean, it was
13 kind of like a maybe when we first met, and, you
14 know, almost 11 years later, it's kind of more
15 of a no.
16 Q.  Okay.  And was that a source of
17 distress to you?
18 A.  I think it's -- honestly, I think it's
19 just kind of a maternal thing that women go
20 through.  I think I'm just going through that
21 age now where it's like, you know, maybe I
22 should have -- I mean, it doesn't -- we don't
23 want kids.  I mean, I know I don't want kids,
24 but it's just you think about it, and I had pets

397

1  before and now we don't have pets so it's
2  like -- I guess that's -- I don't even know how
3  that's relevant to this, but that's where I am
4  now with the whole children decision.
5      Q.  Okay.  But at this time, I mean, a
6  sentence later, you say, "I also think I want
7  them because we don't have them" so were you
8  telling your therapist that you do, in fact,
9  want to have children?
10     A.  I think it's just that, again, like,
11 because I don't have them, I think I want them,
12 but if I had them, I don't think -- I mean, all
13 I need is a good, solid couple hours at my
14 in-laws with the grandkids, and I'm so glad to
15 come home to a house with no kids.
16         So I think it's just something like
17 that's what you're supposed to do.  All my
18 friends that are married do have kids.  The ones
19 that don't have kids aren't married and are very
20 single.  So it's just . . .
21     Q.  Are you able to have children?
22     A.  No, I'm not anymore.
23     Q.  And was that a painful event for you?
24     A.  It still continues to be because my

                                                    398

1  whole life has been placed on hold because of
2  everything that's going on with this, and I'm
3  not able to remedy my health situations because
4  of it, and I would very much like to because it
5  would make things a lot easier on my
6  relationship with my husband.
7      Q.  So your testimony is that the event
8  that took place on September 18, 2017 at the
9  golf outing is the event that's precluding you
10 from addressing your family situation in 2019?
11 Is that your testimony?
12     A.  Yes.
13     Q.  So going back to this Page 1854, after
14 you say, "The children thing is more Dan's
15 decision," you say, "I think if we met earlier
16 and I didn't have as much debt, we'd have kids."
17         What are you referring to when you say
18 that if you met earlier and if you didn't have
19 as much debt?  What debt are you referring to?
20     A.  My student loans.
21     Q.  Are your student loans so significant
22 that they were --
23     A.  They were when we met, yeah.
24     Q.  And if you didn't have that debt that

                                                    399

1  potentially you and your husband would have had
2  children by then, is that what you're saying?
3      A.  I think that's my -- what was in my
4  mind at the time.  It's definitely not a fact.
5          It's not like -- it's just something
6  that I was thinking about, trying to justify why
7  we don't have kids because at the time, it
8  seemed like I thought maybe I wanted kids.
9      Q.  And you and your husband were married
10 in 2015, correct?
11     A.  Correct.
12     Q.  So could you flip to Page 1828, if you
13 would.
14         So once again, this is your entry on
15 February 7th, but in the middle of the page on
16 1828, you say, "Also, side note, I went to see a
17 psychiatrist previously, and he basically said I
18 could be bipolar, but I am smart enough to
19 manage it effectively, whatever that means."
20         Now, I know you've said you can't
21 remember the name of any treating mental health
22 providers you may have seen, but you keep coming
23 back to that, and I want to know if when you
24 read this statement, does it help you recall who

                                                    400

1  it was that you saw?
2      A.  No.
3      Q.  Okay.  But at that time anyway, you
4  recalled that he diagnosed you as being bipolar?
5      A.  I don't know that it's a diagnosis from
6  what it says here.
7      Q.  Okay.  Well, your words were "He
8  basically said I could be bipolar" so is it a
9  possible diagnosis?
10     A.  I'm not so I would say no.
11     Q.  Okay.  But you told your therapist that
12 this psychiatrist thought that you might be,
13 correct?
14         MR. SEDAEI:  I'd just object and say
15 that the witness said she doesn't recall, but
16 you can ask it again if you wish.
17         THE WITNESS:  What was the question?
18 BY MR. BOYLE:
19     Q.  This psychiatrist whose name you can't
20 recall apparently believed that you could be
21 bipolar, correct?
22     A.  That's what I wrote.
23     Q.  And there would be no reason -- there's
24 no reason you can think of why you would write

                                                    401



1   something to your counselor that was not
2   accurate, true?
3      A.   True.
4      Q.   So right below that, you indicate that
5   your OB/GYN prescribed fluoxetine?
6      A.   Yes.
7      Q.   Is that the medication that you were
8   describing earlier?
9      A.   Yes, for the postmenstrual stuff.
10     Q.   Do you continue to be on that?
11     A.   No.
12     Q.   Are you on -- was something else
13   prescribed to you?
14     A.   No.  I decided I didn't want to do
15   anything because of the side effects.
16     Q.   What are the side effects to your
17   knowledge?
18     A.   I don't remember, honestly.  I don't
19   remember the side effects, or I could have been,
20   I mean, on a health thing where I was like I
21   don't want to take medication so I weaned off of
22   it.
23       I think getting weaned off of it
24   solidified the fact that I shouldn't be on it

402

1   because it was hard to get weaned off of it.  It
2   was, like, complete withdrawal.
3      Q.   Can you flip to Page 1839.
4       So on February 25th, your entry for
5   7:24 p.m., you indicate that your meds were
6   changed from fluoxetine to Pristiq?
7     A.   Yeah.
8     Q.   Okay.  So it wasn't you were just
9   weaned off of fluoxetine; it was actually
10   changed to Pristiq, correct?
11     A.   Oh, yeah.  I just remembered whatever I
12   was on with the gyne, I ended up getting weaned
13   off of it.  I don't know if that's, like -- I
14   don't know what Pristiq is.
15     Q.   Are you continuing to take it?
16     A.   No.
17     Q.   You can hand me that back, and I have a
18   few more questions about Exhibit 49 which is the
19   one right under it.
20       Now, as we mentioned, Exhibit 49 are
21   your records with Patricia Stern at Better
22   Health Counselling, correct?
23     A.   Correct.
24     Q.   And it looks like from these records

403

1   that you began your counselling with Ms. Stern
2   in January of 2019, January of this year,
3   correct?
4      A.   Yes.
5      Q.   And you had discontinued your
6   counselling with Ms. Agada at Talkspace in
7   August of 2018.  Do you recall why you stopped?
8      A.   Yes.
9       She went on vacation to Africa, and
10   because of her certification, she couldn't be a
11   provider to me anymore, and it was basically
12   offered for me to start up with somebody new,
13   and we just decided that maybe -- you know,
14   maybe I didn't need her anymore, and that's
15   basically it.
16     Q.   So you continued without seeing anybody
17   until you started seeing --
18     A.   Correct.
19     Q.   -- Ms. Stern in January of 2019?
20     A.   Correct.
21     Q.   And how did you get put into contact
22   with Ms. Stern?
23     A.   I think I saw a commercial with Michael
24   Phelps -- I think that was Better Health -- and

404

1   I didn't know of any other remote service that
2   was out there and I was like, oh, maybe -- you
3   know, maybe I should -- because of, like, just
4   reading the first paragraph, I felt like I
5   needed support, and remote seemed to work
6   because it was convenient so I tried to give
7   this place a try.
8      Q.   Okay.  And so sticking with that first
9   paragraph that you just referenced which is on
10   Page 002 of the exhibit, the second -- the last
11   two sentences of that paragraph read, "Right
12   now, my conflicts are with an immediate
13   co-worker and most of my immediate extended
14   family.  I feel like I have no extended support
15   and I am stuck between my dead-end day job and
16   trying to keep the start of my own personal
17   training business going," correct?
18     A.   Yes.
19     Q.   Are those the reasons why you decided
20   you needed to start receiving counselling from
21   Ms. Stern?
22     A.   Yeah.
23       I never -- I mean, I've never had this
24   kind of response to being at a -- I've never

405

1  gotten -- like, disagreed with a coworker to the
2  point where it caused me this much grief.
3      Q.   And is the coworker Ethan who we've
4  previously discussed?
5      A.   Yes.
6      Q.   And what were the -- strike that.
7           So at the bottom of Page 002, that last
8  paragraph, you indicate that "The negative
9  thoughts involved with my stressors, I guess
10  it's just more of a feeling like what's the
11  point.  I feel like I'm always working towards
12  something and never content with where I am, and
13  then I step back and I'm like why."
14          Do you see where I'm reading?
15     A.   Yes.
16     Q.   So as with Ms. Agada, you continued to
17  feel when you were treating with Ms. Stern that
18  you have this sense that you're never content
19  where you are?
20     A.   Why do I have a passion to do what I'm
21  doing now, yeah.
22          I mean, it just seems a little bit
23  easier to be someone that wants to come home and
24  just watch TV all night, and instead, I have a

                                              406

1  drive to help people.
2      Q.   Is it true you feel as though your
3  position at Cornerstone is a dead-end job?
4      A.   No, not at all, actually.
5      Q.   Well, then why did you use that phrase
6  to describe it?
7      A.   I was in a bad spot with Ethan.  I
8  mean, it was hard.  I didn't know what to do.  I
9  thought it was going to end in me getting fired
10  no matter what I did with him.  I was just like,
11  that's it.  They're just going to be like,
12  "Look, it's either you or him, you're out," and
13  I couldn't afford to go through that again.
14     Q.   And so that's what you describe as a
15  dead-end day job?
16     A.   Is what described what?
17     Q.   Well, would you agree with me at least
18  that a dead-end day job really has nothing to do
19  with conflicts that you're having with employees
20  at that job, does it?
21     A.   I think it has to do with the
22  environment, yeah.
23     Q.   Could you flip to Page 004.  Up towards
24  the top, you tell Ms. Stern:  As far as a full

                                              407

1  life, dot, dot, dot, I think I'd define that as
2  quality.  My ideal life would be working for
3  myself so I could have the ability to meet new
4  people, help new people, do charity stuff, make
5  a real impact instead of just administrative BS.  Yeah.
6      A.   Yeah.
7      Q.   Do you see that?
8      A.   Okay.
9      Q.   So isn't it true that actually starting
10  your personal training business continues to be
11  an important goal in your life?
12     A.   You said -- excuse --
13     Q.   I meant to say growing and eventually
14  having that be your primary occupation.
15     A.   You know, honestly, a lot -- I've done
16  so much growing in terms of my business, and I
17  don't know that I need to.  I mean, when I first
18  started it, that was the thing is that, you
19  know, they're like, "Oh, you started your own
20  business, it has to be your full-time job," and
21  I don't know that I need to.
22          And now that I actually specialize in
23  working with women in construction and their
24  health, like, it's better for me to stay in the

                                              408

1  industry because I can stay close to my client
2  and the struggles that they're with, I can get
3  more involved with networking groups, and I have
4  a conduit to provide content to help women like
5  me in the industry.
6           So under no circumstances -- I mean,
7  you know, maybe then that's what it is.  It's
8  definitely not what it is now.  I mean, I have
9  every intention of staying where I'm at at
10  Cornerstone.
11     Q.   Okay.  So if you flip to Page 24, the
12  entry towards the bottom on February 27th at
13  2:47 a.m. -- I'm sorry -- 2:51 a.m. -- there's a
14  couple of them next to each other -- where you
15  say, "I am so ready to be out on my own with my
16  own business," --
17     A.   Yeah.
18     Q.   -- your testimony is you don't feel
19  that way anymore?
20     A.   My testimony is that I am out on my own
21  in my own business, and I'm doing it both -- I'm
22  doing both.  I can do both.
23          There's no reason for me to quit my day
24  job to run WODeration because I'm doing it now

                                              409



1  both.
2       So at the time, I didn't realize I
3  could.  Maybe I was scared and I thought that
4  that was -- but, I mean, you go through a lot
5  of -- a huge learning curve when you start your
6  own business, and where I'm at today is I don't
7  need to -- where I've been at.  I mean, I have a
8  successful business, and I have a day job.
9       **Q.  Which you referred to as a dead-end day**
10 **job, correct?**
11      A.  Back then.
12      I certainly don't refer to that now.
13 It's allowing me to run my business.  I get
14 income to run my business.
15      **Q.  So what has changed between February of**
16 **this year and today?**
17      A.  Perspective, trying to just make the
18 best of the circumstances and find pivoting and
19 trying to find resources for -- you know, to
20 make my business grow, and I've had -- you know,
21 I've come to realize that the best way to apply
22 my knowledge and my experience is to reinvest it
23 into the industry because I am a woman in
24 construction so I should help other women in

410

1  construction reach leadership roles.
2       **Q.  If you can hand me that back, please.**
3            **Thanks.**
4       MR. BOYLE:  Can we have this marked as
5  the next exhibit.  And there's a copy for Sam.
6            (Whereupon, Dziubla Deposition
7             Exhibit 50 was marked for
8             identification.)
9       MR. BOYLE:  What number are we up to?
10      THE COURT REPORTER:  50.
11      MR. BOYLE:  50.
12 BY MR. BOYLE:
13      **Q.  So Ms. Dziubla, handing you what we've**
14 **marked as Exhibit 50 which is a document you**
15 **produced to us in discovery, this appears to be**
16 **a text exchange between you and somebody named**
17 **Neema Nazem.**
18      A.  Yes.
19      **Q.  Who is Neema Nazem?**
20      A.  He is or was -- doesn't work there
21 anymore.  He was a project manager for Klass
22 Electric.
23      **Q.  And is Klass -- who is Klass Electric?**
24      A.  They were one of the subs that we

411

1  solicited for bids at JCA.
2       **Q.  So they were a business contact of JCA;**
3  **is that correct?**
4       A.  Yes.
5       **Q.  A subcontractor that JCA solicited**
6  **business from?**
7       A.  Correct.
8       **Q.  And at the top of this Deposition**
9  Exhibit 50, he's indicating that you didn't show
10 up at a walk-through yesterday?
11      A.  Uh-huh.
12      **Q.  So that's true, there was a**
13 **walk-through that you didn't show up to?**
14      A.  I believe that was after all my stuff
15 was shut off so I couldn't show up.  I
16 couldn't -- I didn't have access to anything to
17 go to.
18      **Q.  Okay.  So the answer is you didn't go**
19 **to the walk-through, correct?**
20      A.  That's correct, I did not go to a
21 walk-through I didn't know about.
22      **Q.  He indicates to you that Greg -- do you**
23 **know who he's referring to when he says "Greg"?**
24      A.  Greg Garland.

412

1       **Q.  That's your immediate boss, right, at**
2  **the time when --**
3       A.  Correct.
4       **Q.  -- you were working for JCA?**
5            **Switched a bid that you were running to**
6  **Tim, do you know who he's referring to there?**
7       A.  Tim Lee.
8       **Q.  So they moved the matter over to Tim**
9  **Lee in your absence, correct?**
10      A.  Yeah.
11      **Q.  JCA did?**
12      A.  That's what he said, yeah.
13      **Q.  Okay.  And in response now, you inform**
14 **Mr. Nazem that you filed a complaint with the**
15 **EEOC, correct?**
16      A.  Uh-huh.
17      **Q.  But you tell him you're not fired so**
18 **you knew you weren't fired, correct?**
19      A.  Well, I said they turned off my e-mail
20 so this was after me being with Powers so it was
21 sarcasm, like, I don't understand how I still
22 had a job and I had no access to any of my stuff
23 to continue performing or even presented with
24 possibly performing my duties from home.

413

1    Q.   Okay.  Well, you state that you're on
2  PTO so that's not sarcasm because you were on
3  PTO, correct?
4    A.   Yeah.
5    Q.   Okay.  And then what do you say to him
6  in the next text?
7    A.   I say, "Place is a fucking joke."
8    Q.   So you're referring to one of JCA's
9  business subcontractors, you're calling your
10  place of employment a fucking joke; is that
11  accurate?
12    A.   Yes.
13    Q.   And so when we discussed in the first
14  day of your deposition that you were going to
15  have difficulty referring to JCA in a positive
16  light, is this an example of that?
17    A.   I don't think so.
18        Neema and I were friends, and we
19  oftentimes talked about things that we were
20  disgruntled with or how events went at JCA and
21  how he never got any work and he didn't
22  understand that.  So I don't know that it was
23  taken in that contents -- in that context by
24  him.  It's not like it would have prevented him

414

1  from doing business.
2    Q.   Not my question.
3        I'm really just asking, is this an
4  example of you not referring to JCA in a
5  positive light?
6    A.   Yes.
7    Q.   I'll take that back.
8        MR. BOYLE:  Can we get this marked as
9  Exhibit 51, and can you pass the extras around.
10        (Whereupon, Dziubla Deposition
11            Exhibit 51 was marked for
12            identification.)
13        MR. BOYLE:  Could we go off the record.
14        THE VIDEOGRAPHER:  Going off the record
15  at 11:59 a.m.
16        (Whereupon, a short recess was
17            taken.)
18        THE VIDEOGRAPHER:  Back on the record
19  at 12:00 p.m.
20  BY MR. BOYLE:
21    Q.   So Ms. Dziubla, we've handed you what
22  we've marked as Exhibit 51.  Do you recognize
23  this document?
24    A.   Yes.

415

1    Q.   Is this something that you prepared?
2    A.   Yes.
3    Q.   Okay.  Why did you prepare it?
4    A.   To kind of just put stuff on paper so I
5  could go to sleep, just write things down.
6    Q.   Any other reasons?
7    A.   Just to write stuff down.
8    Q.   Did anyone instruct you to prepare
9  this?
10    A.   No.
11    Q.   So you just did it on your own?
12    A.   I felt like a serious thing took place,
13  and I wanted to write my thoughts down to make
14  sure that I had them down.
15    Q.   Okay.  Could you flip to the last page
16  of the document, at the bottom.
17    A.   Yes.
18    Q.   Where it says, "5 pages."
19    A.   Okay.
20    Q.   Can you -- I can't make out your
21  handwriting completely.  Can you read that into
22  the record, please?
23    A.   "Five pages includes" -- I don't know
24  what "1125" means -- "documents at

416

1  kwspartners.com."
2    Q.   Okay.  And what is kwspartners.com?
3    A.   I don't remember.  I'm not sure.
4    Q.   Is that an e-mail address?
5    A.   It is an e-mail address.
6    Q.   Okay.  Did you e-mail this document to
7  somebody?
8    A.   I don't know that it was this document
9  per se.  I just wrote notes down.  I'm not sure
10  what was in that e-mail.
11    Q.   Do you recall e-mailing this document
12  to somebody?
13    A.   No.
14    Q.   Can you flip to Page 788, just one page
15  forward, the paragraph "Grateful for Dan and him
16  always sticking by my side.  I feel like he
17  deserves the fairy tale, and all I have done is
18  brought grief."
19        Why don't you read -- go ahead and read
20  your handwriting here?
21    A.   "Grief into his life."
22    Q.   And then can you read the next
23  sentence?
24    A.   I can't just keep my mouth shut or am

417

1    I -- was I looking for this as an opportunity.
2    I'm so tired.
3        Q.   You can stop there.
4            What did you mean by "was I looking for
5    this as an opportunity"?
6        A.   I have no idea.
7        Q.   You don't remember?
8        A.   No.
9        Q.   You can hand me that back.
10           Thanks.
11           MR. BOYLE:  Can we have these marked as
12   the next exhibit.
13                    (Whereupon, Dziubla Deposition
14                    Exhibit 52 was marked for
15                    identification.)
16   BY MR. BOYLE:
17       Q.   Ms. Dziubla, handing you what we've
18   marked as Exhibit 52 which is another document
19   you've produced to us through discovery, it
20   begins on Dziubla 790 and runs through 797.
21           Do you recognize this document?
22       A.   Yes.
23       Q.   Okay.  Did you prepare these documents?
24       A.   Yes.

                                                    418

1        Q.   And these purport to be calendars for
2    the dates September 18th, 2017 through
3    September 25th, 2017; is that correct?
4        A.   Yes.
5        Q.   Are these --
6        A.   Till when?
7        Q.   Till December 25th, 2017.
8        A.   December?
9        Q.   September.  I'm sorry.
10       A.   Oh, September.  Yes.
11       Q.   Are these the only dates for which you
12   prepared these calendars?
13       A.   Yes.
14       Q.   Why did you stop preparing them?
15       A.   Probably because I was at Talent Hitch.
16   There was a lot of stuff I stopped doing.
17       Q.   Did you prepare similar calendars to
18   this prior to September 18th of 2017?
19       A.   I made lists of things that I did, I
20   mean, just for general tasks.
21       Q.   But I'm specifically referring to
22   calendars like this.  Did you prepare calendars
23   like this prior to September 18, 2017?
24       A.   I don't know what "like this" means.

                                                    419

1        Q.   This document.
2            Are there documents like this that are
3    the daily schedule buttoned up prior to
4    September 18, 2017?
5        A.   Yeah.  I mean, I kept a calendar that
6    had stuff -- everything I did for the day
7    always, work, personal, always.
8        Q.   Okay.  We've requested those in
9    discovery, and they haven't been produced.
10       A.   what do you mean?  My whole calendar
11   was -- my whole calendar is in there.  I totally
12   produced everything that was in -- yeah.
13       Q.   Okay.  We'll review those, but to the
14   extent they're not, we're going to renew our
15   request for those to be produced in discovery.
16   I don't believe they are.
17           MR. SEDAEI:  We'll look at the request.
18   BY MR. BOYLE:
19       Q.   I only have one question -- further
20   question on this document, and that refers to
21   Page 797.
22           In the lower right-hand corner, you
23   create a list.  The eighth item looks like it
24   says, "Constructive discharge."

                                                    420

1            Can you read that item?
2        A.   I don't know what it says after that.
3        Q.   You don't know what that says?
4        A.   After "constructive discharge," there's
5    a dash.  I don't know if that word or those
6    words are.
7        Q.   Okay.  Do you recall why you were
8    writing the words "constructive discharge"?
9        A.   I don't.  I don't even know what it
10   means.
11       Q.   This is your entry for September 25th,
12   2017, correct?
13       A.   Yeah.
14       Q.   And you hadn't been notified that your
15   employment was terminated by JCA until after
16   October 2nd, correct?
17       A.   Yeah, yes.
18       Q.   And you have no recollection of where
19   you heard or why you were writing the term
20   "constructive discharge"?
21       A.   It's a list of -- it's part of a list
22   so I must have gotten it from the Internet or
23   something searching EEOC stuff.  I mean, --
24       Q.   But you can't remember; is that

                                                    421

1    correct?
2        A.   No, I can't specifically remember why
3    that line item is there.
4        Q.   **If you can hand me that back, please.**
5            MR. BOYLE:  Take a short break.
6            THE VIDEOGRAPHER:  Going off the record
7    at 12:09 p.m.
8                    (Whereupon, a short recess was
9                    taken.)
10           THE VIDEOGRAPHER:  Back on the record
11   at 12:38 p.m.
12           MR. BOYLE:  I have no further
13   questions, and I will turn the matter over to
14   Mary.
15           MS. CRONIN:  Ms. Dziubla, my name is
16   Mary Cronin, and I'm here on behalf of Peter
17   Jacobsen.
18                    EXAMINATION
19   BY MS. CRONIN:
20       Q.   **I know we talked in the beginning about**
21   **medications that affect your memory, but can you**
22   **tell me, are you currently taking any**
23   **medication?**
24       A.   No.  Well, birth control.  Sorry.

422

1        Q.   **Have you previously been diagnosed with**
2    **cancer?**
3        A.   Yes.
4        Q.   **And what type of cancer did you have?**
5        A.   It was called a fibrosarcoma.
6        Q.   **And what year did you have a**
7    **fibrosarcoma?**
8        A.   '96, I believe.
9        Q.   **And what treatment did you receive for**
10   **the fibrosarcoma?**
11       A.   Surgery.
12       Q.   **And what was the surgery performed?**
13       A.   They took out my left kidney, part of
14   my pancreas, part of my colon and my spleen.
15       Q.   **Did you receive any other treatment?**
16       A.   No.
17       Q.   **Were you infertile following that**
18   **procedure?**
19       A.   No.
20       Q.   **Did you have any chemotherapy?**
21       A.   No.
22       Q.   **And you're currently in remission?**
23       A.   I would like to say cured, but
24   remission works.

423

1        Q.   **So cured?**
2        A.   I said, "Cured."
3        Q.   **Cured?**
4        A.   Yeah.
5            Hopefully, that doesn't bite me.
6        Q.   **Have you ever taken any medication**
7    **for -- antidepression medication?**
8        A.   I think I took some stuff for anxiety.
9        Q.   **And when did you take medication for**
10   **anxiety?**
11       A.   I don't remember.  I know I take it
12   when I fly if I can.
13       Q.   **And what do you take when you fly?**
14       A.   I don't know.  I don't remember.
15       Q.   **So who prescribed any anti-anxiety**
16   **medication to you?**
17       A.   My GP.
18       Q.   **Who is your GP?**
19       A.   Now, it's Betty Lo.
20       Q.   **And where is Betty Lo located?**
21       A.   Elk Grove Village with Alexian
22   Brothers.
23       Q.   **Do you see Dr. Lo on a regular basis?**
24       A.   I do not.

424

1        Q.   **Do you recall the last time you saw**
2    **Dr. Lo?**
3        A.   I don't.
4        Q.   **Do any members in your family have a**
5    **history of mental illness?**
6        A.   I have no idea.
7        Q.   **I want to turn to your attention to**
8    **Exhibit 46.  It is Dziubla -- do you have**
9    **Exhibit 46?**
10       A.   Oh, I didn't know if it was okay to
11   reach for it.
12           MR. SEDAEI:  It's fine.
13           MR. BOYLE:  I think I put them in
14   order.
15   BY MS. CRONIN:
16       Q.   **Turning to Dziubla 1856 -- and let's go**
17   **back to Page 1855.**
18           **This is dated April 22nd, 2019,**
19   **correct?**
20       A.   2019?
21       Q.   **Or '18.  I'm sorry.**
22       A.   Okay.
23       Q.   **So it starts on 1855 and it carries**
24   **onto 1856, and you state here:  "Good enough for**

425

1    the site.  On another note, my antidepressants
2    are killing my libido.  I haven't had an orgasm
3    in about a year, and I'm starting to get pissed
4    about it."
5         Do you recall taking antidepressant
6    medication in April 2018?
7         A.   I don't recall.
8         Q.   But isn't it true that you -- these are
9    your words, correct?
10        A.   Yeah.
11        Q.   And you're writing this to a therapist,
12   correct?
13        A.   Correct.
14        Q.   And you're telling your therapist that
15   you're taking an antidepressant?
16        A.   That's -- yeah, that's what I was
17   calling it.  I don't know that I -- I don't know
18   what it was or what it was that I was -- what's
19   what I was calling it.  I don't know that I'm
20   using the right terminology.
21        Q.   Okay.  But you do refer -- you did tell
22   your therapist that you were taking an
23   antidepressant, correct?
24        A.   That's what it says, yes.

                                                   426

1    2018?
2         A.   I'm not sure.  I've always gone there.
3    I would assume so.
4         Q.   Okay.  Is there any other place where
5    you get your medication filled or prescriptions
6    filled?
7         A.   I had some stuff coming by mail from
8    CVS.
9         Q.   What did you get by mail from CVS?
10        MR. SEDAEI:  Objection.
11        What time?  What time period are you
12   talking about?
13        THE WITNESS:  Yeah.  Like, my whole
14   life?
15        MS. CRONIN:  If you have an objection,
16   that's fine.  I'll rephrase the question if you
17   have a problem with that.  Thanks, but
18   otherwise --
19        MR. SEDAEI:  Okay.  So objection to
20   form.
21        MS. CRONIN:  -- keep your objections to
22   not speaking objections, please.
23   BY MS. CRONIN:
24        Q.   In 2018, in addition to the Walgreens

                                                   428

1         Q.   I want -- can you tell me what
2    physicians you were seeing in 2018?
3         A.   It's a group there at Alexian so
4    whatever physician is available.
5         Q.   So in addition to Dr. Lo, who else did
6    you see?
7         A.   Nick Skiba who doesn't work there
8    anymore.  That's why I see Betty Lo.
9         Q.   Who's Nick Skiba?
10        A.   He was my GP before her.
11        Q.   And when did you begin seeing him?
12        A.   No idea.
13        Q.   Do you know when you started seeing
14   Dr. Lo?
15        A.   When he left, when he was no longer
16   available.
17        Q.   Where do you get your medications
18   filled?
19        A.   The Walgreens there on Biesterfield.
20        Q.   Were you getting your medications
21   filled at that Walgreens on Biesterfield -- this
22   is in Elk Grove Village?
23        A.   Yes.
24        Q.   Were you getting them filled there in

                                                   427

1    in Elk Grove Village, where else were you
2    getting your prescriptions filled?
3         A.   I don't know where else.
4         Q.   Okay.  So you mentioned online at CVS,
5    correct?
6         A.   Yes.
7         Q.   When did you get prescriptions filled
8    from the online CVS store?
9         A.   I don't remember.  I don't have a date
10   or time frame.
11        Q.   Within the past 10 years?
12        A.   Yes.
13        Q.   Within the past five years?
14        A.   I don't know.
15        Q.   Is it possible that you've gotten
16   prescriptions filled from the online CVS within
17   the past five years?
18        A.   It's possible.
19        MS. CRONIN:  What's the last exhibit we
20   had?
21        THE COURT REPORTER:  52.
22        MS. CRONIN:  Please mark that
23   Exhibit 53.
24

                                                   429

1              (Whereupon, Dziubla Deposition
2              Exhibit 53 was marked for
3              identification.)
4    BY MS. CRONIN:
5         Q.   Ms. Dziubla, I'm handing you what's
6    been previously marked as Deposition Exhibit
7    No. 53.  This is a March 30th, 2019 letter from
8    Dr. Juzwin, correct?
9         A.   Yes.
10        Q.   And you disclosed Dr. Juzwin as a
11   treating psychologist, correct?
12        A.   Yes.
13        Q.   And were you aware that Dr. Juzwin does
14   not consider you a patient?
15        A.   Yes.
16        Q.   And were you aware that Dr. Juzwin
17   stated that she does not have any records for
18   any care and treatment of you because she did
19   not provide formalized professional therapeutic
20   services to you?
21        A.   Yes.
22        Q.   Were you aware that Dr. Juzwin
23   indicated that you -- that you were aware that
24   Dr. Juzwin did not consider you a patient?

430

1         A.   Yes.
2         Q.   Were you aware that Dr. Juzwin did not
3    create any records regarding purported care and
4    treatment for you?
5         A.   Yes.
6         Q.   Were you aware that Dr. Juzwin did not
7    provide any diagnosis of you?
8         A.   Yes.
9         Q.   Were you aware that Dr. Juzwin did not
10   provide any assessment of you?
11        A.   Yes.  Formally, there's nothing there.
12        Q.   Were you aware that Dr. Juzwin did not
13   provide any written summaries of meetings with
14   you?
15        A.   Yes.
16        Q.   Were you aware that Dr. Juzwin did not
17   consider to be in any formal therapeutic
18   relationship with you?
19        A.   Yes.
20        Q.   Were you aware Dr. Juzwin met with you
21   in her office out of convenience?
22        A.   Yes.
23        Q.   And were you aware that Dr. Juzwin did
24   not have a formal professional therapeutic

431

1    relationship with you?
2         A.   Yes.
3         Q.   You stated that you saw a
4    psychologist -- is it psychiatrist or
5    psychologist last week?
6         A.   I don't know, honestly.  I just -- it
7    was who was referred to me by -- I can give you
8    that information, but I don't have it.
9         Q.   What date did you see this psychologist
10   or psychiatrist?
11        A.   I don't remember.  It was last week,
12   though.
13        Q.   Okay.  So you saw this psychiatrist or
14   psychologist following your deposition which was
15   on January 20th --
16        A.   Right.
17        Q.   -- or excuse me -- June 20th, 2019,
18   correct?
19        A.   Correct.
20        Q.   And from the date of the incident until
21   June 20th, 2019, have you sought any other --
22   any medical care?
23        A.   I don't know what you mean.
24        Q.   Have you seen any physician from the

432

1    date of the alleged incident until last week?
2         A.   Yes.
3              MR. SEDAEI:  Objection.  Form.
4    BY MS. CRONIN:
5         Q.   Who did you see?
6         A.   I think I had a Pap smear in between
7    there.  I had to have a birth control -- I had
8    the ablation that was done last year for that
9    procedure.  I'm sure I had blood work at some
10   point in time.
11             That's it, just my gyne and my GP.
12        Q.   Okay.  And who is your gynecologist
13   again?
14        A.   She's with -- her last name is Iyer.
15        Q.   Can you spell that, please?
16        A.   I can't.  I can barely -- like, I don't
17   know if it's Iner or Iyer, but she's also with
18   AMITA Health which is Alexian Brothers as well.
19   It's, like, Anita Iyer, I-Y-R-A.
20        Q.   And then aside from those individuals
21   you mentioned, you haven't sought any other
22   medical care or treatment, correct?
23        A.   Correct.  Don't know.
24        Q.   You mentioned before that you were

433

1  diagnosed with sleep apnea, correct?
2     A.   Yes.
3     Q.   When were you diagnosed?
4     A.   I don't remember.
5     Q.   Do you have a CPAP machine?
6     A.   I did, yes.
7     Q.   When did you have a CPAP machine?
8     A.   I don't remember.
9     Q.   The past year, have you used a CPAP
10 machine?
11    A.   No.
12    Q.   The year before that?
13    A.   No.
14    Q.   Okay.  In the past five years, have you
15 used a CPAP machine for a sleep disorder?
16    A.   That, I'm not sure.
17    Q.   Is there something that's affecting
18 your recollection as to when you --
19    A.   Exactly when it was?  Just because it's
20 been -- like, it's still sitting next to my
21 nightstand so you would think it would be pretty
22 recent, but I don't recall using it.  I don't
23 have --
24    Q.   Do you recall who you went to in order

434

1  to have a diagnosis with your sleep disorder?
2     A.   No, I don't recall the name.
3     Q.   Was it through Alexian Brothers or
4  AMITA Health?
5     A.   That I don't recall, either.
6     Q.   You don't recall when you first saw a
7  sleep psychologist?
8     A.   Like I said, I don't know why I would
9  refer to them as a psychologist, but my very
10 first time, I know for sure that I was using a
11 sleep apnea machine when I met my husband
12 11 years ago so -- and I continued to use it for
13 a period of time.  I don't recall how long.
14    Q.   I want to turn your attention back to
15 Exhibit 46, please.  If you could turn to Page
16 Dziubla 1819, at the top, it states in the
17 second line, "I don't know really how I see it
18 working for me.  Usually, the minute I complain
19 about something, I wish I hadn't.  I had a
20 therapist about five years ago for a few months,
21 and I just found it inconvenient."
22         Can you tell me who the therapist was
23 that you saw five years ago?
24    A.   I don't recall.

435

1     Q.   Where did you see a therapist five
2  years ago?
3     A.   Five years from -- I don't recall where
4  I was.
5     Q.   Do you recall why you saw a therapist
6  five years ago?
7     A.   I don't.
8     Q.   Do you know whether this therapist made
9  any diagnoses of you?
10    A.   I don't think there was.  Otherwise, I
11 would know what it is, right?
12    Q.   Ms. Dziubla, is there anything
13 affecting your memory as to why you can't recall
14 entries in a journal that were written in 2018
15 but you can't recall now?
16    A.   What do you mean, I can't recall now?
17    Q.   In 2018, you wrote this to Latavia
18 Agada, correct?
19    A.   Right.
20    Q.   So this entry was dated November --
21 excuse me -- November 3rd, 2017, correct?
22    A.   Yeah.
23    Q.   And you stated to her that you saw a
24 therapist, true?

436

1     A.   That's what it says there.
2     Q.   Okay.  Is there any reason why you
3  don't have any recollection as we sit here today
4  who this therapist was that you referenced in
5  2017?
6     A.   I don't remember the therapist.  I
7  honestly don't remember.
8         The remark is that there's a -- like,
9  it's officially filed under "therapist."  I just
10 labeled it "therapist."  I don't remember who it
11 was.
12    Q.   Okay.  I just want to check.
13         And you don't recall why you saw a
14 therapist five years ago?
15    A.   I answered that.  No, I don't.
16    Q.   I'm going to turn to Dziubla 1822,
17 please, and if you look, it's about midway
18 through.  It starts with:  "Can you please share
19 your previous experience with therapy, if any."
20         And then you state:  "Had a really good
21 therapist but relocated to New Orleans and she
22 would not do remote sessions."
23    A.   Okay.
24    Q.   Does this refresh your recollection as

437



1  to who your therapist was that moved to
2  New Orleans?
3      A.  I don't know the name.
4      Q.  Do you know when she moved to
5  New Orleans?
6      A.  I moved to New Orleans.
7      Q.  Okay.  So you were receiving therapy
8  within the Chicagoland area prior to when you
9  moved to New Orleans, correct?
10     A.  That's -- yeah, that's what it says.
11     Q.  And the therapist would not provide you
12 sessions after you moved, correct?
13     A.  That's what it says.
14     Q.  Aside from seeing a therapist five
15 years prior to this journal entry, do you recall
16 seeking therapy for any mental -- strike that.
17         Do you recall receiving any therapy at
18 any other time in the past?
19     A.  No.
20         MS. CRONIN:  Take a quick break.
21         THE VIDEOGRAPHER:  We're going off the
22 record at 12:57 p.m.
23             (Whereupon, a short recess was
24                 taken.)

                                            438

1          THE VIDEOGRAPHER:  Back on the record
2  at 1:02 p.m.
3  BY MS. CRONIN:
4      Q.  Ms. Dziubla, I just have a few more
5  follow-up questions.
6          When you informed Ms. Agada that you
7  were seeing a therapist, the therapist that you
8  were referring to was a mental health therapist,
9  correct?
10     A.  As opposed to?
11     Q.  Like, a physical therapist or
12 something.
13     A.  No, it wasn't a physical therapist.
14     Q.  So you felt it was significant to relay
15 to Ms. Agada that you had previously seen
16 someone for mental or emotional therapy,
17 correct?
18         MR. SEDAEI:  Objection.  Form, but
19 answer if you understand the question.
20         THE WITNESS:  What was the question?
21         I'm sorry.  I get distracted when he
22 objects.
23         MS. CRONIN:  Can you please repeat the
24 question, and can you put it in the record, too,

                                            439

1  please, type it up.
2             (Whereupon, the record was read
3              as requested as follows:  So
4              you felt it was significant to
5              relay to Ms. Agada that you had
6              previously seen someone for
7              mental or emotional therapy,
8              correct?)
9          THE WITNESS:  I don't know about
10 significant.  I just mentioned it because I'm
11 talking to her so I'm just mentioning in like.
12 BY MS. CRONIN:
13     Q.  And in -- excuse me.
14         You were in New Orleans in
15 approximately 2010, correct?
16     A.  I don't remember.  I mean, you guys can
17 refer to my -- I think my résumé was used.  I'll
18 go by whatever it says on there.
19     Q.  Okay.  And you agree the significance
20 of sharing the fact that you previously sought
21 therapy was for your ongoing care with
22 Ms. Agada, correct?
23     A.  I don't know that it has any relevancy
24 to my care with Latavia.

                                            440

1      Q.  I want to turn your attention back to
2  Dziubla 1838.  Are you there?
3      A.  Yes.
4      Q.  And there's an entry.  It's
5  February 21st, 2018.  It's about midway through.
6  Okay?  Do you see the entry of February 21 at
7  7:34 p.m.?
8      A.  Yes.
9      Q.  And do you see where you state to
10 Ms. Agada:  "Also, I think I may really be
11 bipolar.  Can I get that treated but still
12 continue our sessions?  Can any doctor prescribe
13 those meds or just a psychiatrist"?
14     A.  Okay.
15     Q.  Do you see that?
16     A.  Yes.
17     Q.  And that's something that you wrote to
18 Ms. Agada, correct?
19     A.  Correct.
20     Q.  Did you seek any medication from any
21 psychiatrist for being bipolar?
22     A.  No.
23     Q.  Have you ever been prescribed by any
24 physician any medication for bipolar disorder?

                                            441

1    A.   No.
2    Q.   Then later on, it goes -- in the next
3  paragraph, it says, "So I can't sleep and I'm
4  trying to be quiet in the house.  I Googled
5  symptoms of bipolar, and there was a 13-item
6  list composed of manic and depressive symptoms,
7  and I literally got through 11 of those symptoms
8  throughout the month and depending on my
9  stresses hourly.
10       I think what the other doc meant by
11 smart enough is I have enough common sense to
12 not ruin my marriage with an orgy or gambling my
13 paycheck away, however, can bipolar manage with
14 symptoms to that extent?  I have no idea, but I
15 do shift instantly in mood quite often.  Maybe
16 just a person with a short fuse.  I don't know?"
17       Is that what you wrote to Ms. Agada on
18 February 21st?
19    A.   Yes.
20    Q.   And so based upon this entry, you
21 suspected that you perhaps were bipolar,
22 correct?
23    A.   I was -- yeah, I was looking up stuff.
24    Q.   And so you researched the symptoms of
                                                442

1  bipolar on February 21st, correct?
2    A.   That's what it says.
3    Q.   And you found a list of 13 items of
4  manic and depressive symptoms, correct?
5    A.   That's what it says.
6    Q.   And you felt that 11 of those 13
7  symptoms applied to you, correct?
8    A.   That's what it says.
9    Q.   And you agree that according to this
10 entry, you shift instantly moods quite often,
11 correct?
12    A.   That's what it said on -- right then
13 and there.
14    Q.   And that's what you wrote to her right
15 then and there, correct?
16    A.   That's what it says.
17    Q.   No.  The question is:  You wrote that,
18 correct?
19    A.   Yes, this whole document I wrote.
20    Q.   Okay.  And do you agree that you're a
21 person with a short fuse?
22    A.   I do not think I am a person with a
23 short fuse.
24    Q.   On February 21st, do you agree that you
                                                443

1  indicated to Ms. Agada that you were a person
2  with a short fuse?
3    A.   I said maybe.
4    Q.   Is that correct?
5    A.   It says, "Maybe just a person," but I'm
6  speculating about myself.
7    Q.   Okay.  So on February 21st, you thought
8  that maybe you were just a person with a short
9  fuse, correct?
10    A.   Yes.
11       MR. SEDAEI:  Objection.  Asked and
12 answered.
13 BY MS. CRONIN:
14    Q.   I'm sorry.  We can't talk over each
15 other so I'm going to have to ask that again.
16       MS. CRONIN:  If you could wait to
17 object until I'm done asking the question.
18       MR. SEDAEI:  I can't wait.  If you ask
19 a question and I feel there is an objection, I
20 will make the objection, and then she will
21 answer.
22       MS. CRONIN:  But I just need to get the
23 question out first.
24       MR. SEDAEI:  Okay.
                                                444

1  BY MS. CRONIN:
2    Q.   On February 21st, you would agree that
3  you thought that maybe you were just a person
4  with a short fuse, correct?
5    A.   Correct.
6    Q.   I want to turn your attention to
7  Dziubla 1841, and towards the bottom,
8  three-quarters of the way down, you state, "I'm
9  so financially stressed, it's bringing out the
10 worst in me," is that true?
11    A.   I don't see that.  Where is that?
12    Q.   It's 1841, about six lines from the
13 bottom, second sentence.
14       MR. SEDAEI:  I'll object to form, but
15 answer if you understood the question.
16       THE WITNESS:  Yes.
17       MS. CRONIN:  I don't think I have any
18 more questions.
19       Pass the witness.
20       MR. SEDAEI:  I do have some follow-up
21 questions if you're done, too.
22       MR. BOYLE:  Yep.  Go ahead.
23       MR. SEDAEI:  Okay.
24
                                                445

EXAMINATION

BY MR. SEDAEI:

Q. Ms. Dziubla, I have some follow-up questions. Some of them relate to what you testified last time, and some of it will relate to some of your testimony today.

A. Uh-huh. Sorry. Yes.

Q. Prior to the KEV event, did you enjoy working at JCA?

A. Yes.

Q. Did you enjoy working with your colleagues at JCA?

A. Yes.

Q. Did you have plans to stay at JCA if it wasn't because of what happened at the golf event?

A. Yes.

Q. And would you have stayed at JCA for the foreseeable future if you had the choice to do so?

A. Yes.

Q. Did you start looking for any other jobs prior to learning that you were being terminated at JCA?

446

A. No.

Q. While you were at JCA, did you ever promise to anyone at JCA that you would not contact any subcontractors or competitors after your employment with JCA ended?

A. No.

Q. During the time that you were employed by JCA, did you reveal any information that you believed to be confidential information that belonged to JCA to any subcontractors or any competitors?

MR. BOYLE: Object to the form.

BY MR. SEDAEI:

Q. Do you understand the question?

A. What was the first part?

Q. While you worked at JCA, you came across some information that you believed to be confidential information, correct?

A. Correct.

Q. Did you ever reveal that information to any subcontractors while you were at JCA or after you left JCA?

A. No.

Q. Have you ever revealed any confidential

447

JCA information with any JCA competitors either while you were at JCA or after you left JCA?

A. No.

MR. BOYLE: Object to the form.

BY MR. SEDAEI:

Q. You've talked about your personal business, a fitness business, I think, WODeration, correct?

A. Yes.

Q. When did you start this business?

A. July/August of 2017.

Q. Okay. Did you start that business because you wanted to wind down your involvement in the construction industry?

A. No.

Q. Do you have any plans to wind down your involvement in the construction industry now?

A. No.

Q. Have you ever wanted to wind down your involvement in the construction industry at any point between 2017 and now?

A. No.

Q. Did you ever make any threats to anyone at JCA saying that you were going to be negative

448

about JCA to competitors or to subs?

A. No.

Q. When JCA presented you with a severance agreement, was the severance agreement provided to you as -- strike that.

You agree that you were presented with a severance agreement by JCA, correct?

A. Correct.

Q. Did JCA ever give you the option to reject the severance agreement and just come back to work?

A. No.

Q. So you understood your options to be either you agreed to the severance agreement or you did not, but either way, your employment at JCA was ending, correct?

A. Correct.

Q. Counsel for JCA showed you an exhibit where you made a comment to a person named Neema about JCA. Do you recall that?

A. Yes.

Q. And Counsel asked you if that was an example of you representing JCA in a negative light or not a positive light, and you said yes?

449

1    A.   Correct.
2    Q.   **Can you think of other examples where**
3  **other JCA employees made comments about JCA to**
4  **either subs or competitors that didn't show JCA**
5  **in a positive light?**
6    A.   Yes.  There are -- kind of something
7  that happens at walk-throughs is when you're
8  there, you're hanging out with the subs and
9  you're building relationships and you kind of
10 shoot the breeze with them, and it's a common
11 topic with the executives and/or whoever is out
12 there to just kind of joke about the
13 incompetency of the company and living the dream
14 and just talk about, you know, how you always
15 had to show up in a suit because it's the JCA
16 way and just general shots about the company.
17   Q.   **Can you give any specific examples of**
18 **individuals saying such things?**
19   A.   I know -- well, so Tim Lee and I worked
20 together.  He was the other estimator in the
21 department.  I think he was boyfriend and
22 girlfriend with Ashley who worked at Christopher
23 Glass who was a subcontractor of JCA, and, I
24 mean, we went on some company -- I forget who
                                              450

1  was -- Klass Electric, I think, held a thing at
2  Arlington Park.  And, I mean, there was just
3  constant shots back and forth about, you know,
4  her being able to get more business with the
5  company and, you know, just, again, just shots
6  about the company and their incompetency with
7  things.
8    Q.   **Okay.  And what about Greg Garland, did**
9  **he ever say anything that you believed to be**
10 **critical of JCA?**
11   A.   You know, Greg was another one.  I
12 mean, I got the privilege of going to a couple
13 of walk-throughs with him, and, you know, he was
14 another one that participated in kind of the
15 shooting the breeze and just kind of basically
16 talking about how things were done there and how
17 his hours were long and, you know, he
18 couldn't -- nothing -- you know, he was
19 constantly revising stuff for bids and just his
20 frustrations of working there, how he regretted
21 not taking an offer from Build Tech.  I think it
22 was between them and JCA when he initially got
23 hired.
24        Just I overheard him talking to a sub
                                              451

1  on the phone when I first started about how
2  impressive -- kind of sarcastically like, "Oh,
3  yeah, you know, this one can -- she can even
4  estimate, too," kind of implying that I had a
5  little bit more of a skill set than some of the
6  other females in our company which I guess was a
7  compliment, but it was just kind of a running
8  joke just about, you know, them bringing a
9  female on in there that actually had some kind
10 of responsibilities in the company.
11   Q.   **And you mentioned at some point, I**
12 **think, during your first deposition that you**
13 **heard people making comments during lunch hour**
14 **that you believed to be racially insensitive.**
15       **Do you recall making that statement?**
16   A.   Yes.
17   Q.   **Do you believe that those examples that**
18 **you talked about during your first deposition**
19 **would be another instance of people making**
20 **comments that were not reflecting positively on**
21 **JCA?**
22   A.   Yes.
23   Q.   **Going to the day of the golf event, do**
24 **you recall how many drinks you had that day?**
                                              452

1    A.   I stated two in the deposition.  I
2  think it might have been less just because of
3  what -- I had just finished with a program, a
4  health program, and I find it odd that I would
5  have started drinking so closely to finishing
6  the program, but it was a social event so I
7  would say no more than two without a doubt.
8    Q.   **Do you remember being drunk?**
9    A.   No.
10   Q.   **Do you remember being tipsy?**
11   A.   No.
12   Q.   **Do you think the amount of alcohol that**
13 **you had would have had any impact on your memory**
14 **of what happened that day?**
15   A.   Absolutely not.
16   Q.   **When Mr. Jacobsen wanted to show you --**
17 **wanted to demonstrate how to hit a chip shot, I**
18 **believe it was called, he got behind you,**
19 **correct, --**
20   A.   Correct.
21   Q.   **-- to do the demonstration?**
22   A.   Correct.
23   Q.   **Do you recall him doing that with**
24 **anyone else?**
                                              453



1      A.   No.
2      Q.   But he did demonstrate to other people
3 how to hit the ball?
4      A.   Yes.
5      Q.   When you've have alleged that Mr.
6 Jacobsen as he got behind you -- and you can
7 correct me if I'm wrong, but I believe you made
8 the allegation that, you know, as he wanted to
9 do the demonstration, he said something to the
10 effect that "And that's when I take my wood
11 out," is that correct?
12     A.   Correct.
13     Q.   Do you recall hearing that?
14     A.   I do.
15     Q.   Do you recall hearing it clearly?
16     A.   Yes.  Right here, right next to me.
17     Q.   So on a level of certainty, if I were
18 to ask you to give me a percentage of how
19 certain you are that that's what he said, would
20 you give me a percentage?
21     A.   100 percent, 110 percent.
22          MR. PULLOS:  I'll object to form and
23 leading.
24          MS. CRONIN:  Join.

454

1 and I don't know which one it is, but you can
2 tell me if you recall.
3          I believe you made the statement to a
4 therapist, saying that you wanted to do stuff
5 but you felt that if you did, it would be taken
6 against you, would be used against you.
7          Do you recall seeing that statement?
8      A.   Yes.
9      Q.   And is it true that you said by
10 "stuff," you meant, like, function?
11     A.   Yes.
12     Q.   Regardless of what you said at the time
13 you made the statement, were you able to
14 function actually and go through -- you know,
15 live your normal life at the time you made the
16 statement?
17     A.   No.
18     Q.   And why is it that you could not?
19     A.   I -- immediately after the incident, I
20 just shut down, and that's what happens when
21 this happens.  I mean, it's been an ongoing
22 thing.  I shut down after each deposition.  I
23 just shut down for two weeks, and my husband
24 just watched me lay there on the couch.

456

1 BY MR. SEDAEI:
2      Q.   I'm showing you what's marked as
3 Exhibit 31.  It's an exhibit from your first day
4 of deposition.  It's a Facebook post.
5          Do you recall seeing that exhibit?
6      A.   Yes.
7      Q.   And I don't recall if you agreed that
8 this post was of a sexual nature.  Would you
9 agree that that's how you'd describe it?
10     A.   Yes.
11     Q.   And I believe there may have been other
12 Facebook posts that you were presented with.  Do
13 you recall seeing those Facebook posts during
14 your first day of the deposition?
15     A.   Yes.
16     Q.   Do you believe these posts should be
17 taken as your willingness to be tolerant of
18 being subjected to sexual harassment?
19     A.   No.
20     Q.   Do you believe a person who sees these
21 posts on your Facebook page should consider it
22 acceptable to subject you to sexual harassment?
23     A.   No.
24     Q.   You were presented an exhibit today,

455

1      Q.   At some point, you, I believe,
2 mentioned to Ms. Agada -- and this was shown in
3 one of the exhibits -- that you were reaching
4 out to her for career counselling; is that
5 right?
6      A.   Yes.
7      Q.   Did you ever seek career counselling
8 from a therapist prior to the golf incident?
9      A.   No.
10     Q.   Why did you feel like you needed career
11 counselling at the time that you did?
12     A.   I think I said it earlier.  I was
13 just -- you know, one of the things that happens
14 with a traumatic experience is you sometimes
15 bring things on yourself, and I figured if there
16 was a way that I could prevent myself from being
17 in a situation like that again and it involved
18 getting career counselling that that would --
19 that would never happen to me again.
20     Q.   You were presented with a number of
21 statements that you made following the golf
22 incident.  It may have been one year later or
23 two years later during your therapy sessions
24 where you made statements about employers.

457



1    Do you recall that?
2    They were presented to you today.  So
3 one would be -- I'll give you examples.
4    You made the statement to the effect
5 that you considered employers to be dishonest.
6    A.   Yes.
7    Q.   Okay.  You made a statement about how
8 you were frustrated with certain coworkers at
9 your, I believe, current position; do you recall
10 that?
11    A.   Yes.
12    Q.   Do you believe that what happened with
13 JCA and your experience with JCA has impacted
14 your relationship with your employers?
15    A.   I think most definitely it has.  I
16 don't -- it's hard to interact with people and
17 to know whether or not they're being genuine in
18 the information that they share and how we
19 interact, if they have an alternate agenda.
20    Like I mentioned before with, you know,
21 the Ethan thing, I mean, I was very concerned
22 that I was going to lose my job because of that,
23 and everything was just coming forward.  I was
24 just like, are they going to find out about this

458

1 thing with JCA, am I going to be, you know, a
2 high-maintenance employee now because of it, you
3 know, am I going to be allowed to interact with
4 other people or, you know, are they going to --
5 who knows what they're going to do with me
6 because they think that, you know -- I don't
7 know.  I just would speculate.
8    It's definitely impacted my ability to
9 have relationships with coworkers.
10    Q.   Do you recall feeling like employers
11 were dishonest prior to the KEV event?
12    A.   No.
13    Q.   Can you tell me a little bit about how
14 your interaction with Mr. Jacobsen has impacted
15 you psychologically?
16    A.   I think that the biggest thing that
17 I've noticed the most is my interactions at work
18 because I'm there most of the time, and, you
19 know, if a male coworker comes by and says,
20 "Hey, nice outfit," immediately, I'm like, I
21 have to do something completely different to not
22 justify any additional comments or conversation
23 regarding that.
24    I'm extremely uncomfortable when people

459

1 work in proximity -- close proximity to me.  I
2 literally had my operations manager come to show
3 me something on a set of plans, and in the past,
4 I never would have reacted that way and I just
5 like -- it was so uncomfortable just to be
6 within a few feet of him because I didn't know
7 if something would happen that would result in
8 what happened at JCA.
9    I was just -- I -- like, it sucks.
10 Like, my whole body breaks out, I just get this
11 sheet of sweat and I'm sitting there, or if
12 they're on my screen, like, if they reach over
13 and touch the screen, and I'm like -- and I act
14 weird and then I know that they're like, what
15 the hell is wrong with her, and you can tell
16 that they're put off by it because they don't
17 know what's going on.
18    And I just -- so I just avoid being in
19 those situations.  I avoid trying to be -- you
20 know, if we have a meeting or something or I
21 walk in to have a meeting and somebody has to
22 close the door behind me and they're in close
23 proximity to me, it makes me so uncomfortable
24 now, whereas before, it would be just a meeting,

460

1 a meeting with the door closed, a private
2 meeting with the door closed, but now, it's
3 like, what's going to happen in here.
4    Q.   Has your interaction with Mr. Jacobsen
5 impacted intimacy with your husband?
6    A.   I think the biggest thing is that I was
7 in a very, very good place health-wise before
8 all of this happened, and I'm very much an
9 emotional eater, and I put on 20 pounds before
10 the end of that year, and it without a doubt
11 has.
12    I just -- there's that, there's the
13 mental aspect of it is that I can't shut my
14 brain off when it comes to -- especially now
15 that all of this is going on.  We don't even --
16 I mean, he's lucky if he gets it once a month
17 now because being spontan -- it just -- it's
18 hard.  You know, you're huffing and puffing now,
19 and before -- you know, it's hard to maneuver.
20 I mean, not to get -- it's TMI, but, you know, I
21 feel like a whale rolling around now.
22    Q.   Would it be accurate to say that your
23 intimacy has decreased substantially since the
24 golf event?

461



1    A.   Very substantially.

2    Q.   And you believe the decrease is related

3    to the incident?

4    A.   Yes.

5    Q.   You mentioned that you had an operation

6    called ablation?

7    A.   Yes.

8    Q.   And that prevents you from having

9    children?

10    A.   Yes.

11    Q.   Do you believe you would have gone

12    through the operation if you hadn't had the

13    experience that you had at the golf event?

14    A.   I don't think I would have done it as

15    quickly as I did.  My husband even commented on

16    it.  As soon as I found out it was an option, I

17    was like, "That's it, let's get it done."

18    I actually wanted to have the

19    hysterectomy right away, and I was talked down

20    to the ablation.

21    Q.   When did you have the operation, the

22    ablation?

23    A.   Actually had it a week after I started

24    Cornerstone so I started -- it was -- I think I

462

1    had either a day off or something.  It was a

2    relatively short recovery time, and I had the

3    procedure then.

4    Q.   So that would be around March of 2018?

5    A.   Yeah.

6    MR. SEDAEI:  I don't have anything

7    else.

8    MR. BOYLE:  I just have a couple of

9    follow-up questions, Ms. Dziubla.

10    FURTHER EXAMINATION

11    BY MR. BOYLE:

12    Q.   So you mentioned an event that you

13    attended with Tim Lee and his wife where there

14    were comments made about JCA that were not

15    positive.  Do you recall that testimony?

16    A.   Yes, and it wasn't his wife; it was the

17    business development girl of a subcontractor

18    that JCA dealt with.  And we thought they were

19    dating, but they could have just been friends

20    with benefits.  I don't know what the

21    relationship was.  They spent a lot of time

22    together.

23    Q.   So possible girlfriend, potential

24    girlfriend, okay.

463

1    What event was it that you were at?

2    A.   Klass Electric is all -- I believe,

3    yes, it was Klass Electric.  They had a running

4    event that they did maybe annually at Arlington

5    Park.  It was a subcontractor's event that we

6    were invited to because we're a GC, and then

7    Ashley came along because she was Tim's plus

8    one, I believe.

9    Q.   Okay.  And so you attended, Tim

10    attended.  Anybody else from JCA?

11    A.   Rachel was there.  I want to say a

12    couple others made an appearance, but we

13    definitely were the ones that stayed for a

14    while.

15    Q.   And there were, you said, shots back

16    and forth about JCA's lack of competency so

17    that's what I wrote down.  Is that your

18    recollection?

19    A.   Yeah, at the event and at

20    walk-throughs, yeah.  It's just a general --

21    Q.   No.  I'm talking about at this event.

22    A.   At this event, yes.

23    Q.   That's what you recall --

24    A.   Yes.

464

1    Q.   -- being said?

2    A.   Yes.

3    Q.   Okay.  And these -- other than Rachel,

4    you said there may be a couple of others who

5    attended, but you can't remember who they were;

6    is that correct?

7    A.   Right.

8    Q.   And then when you testified that

9    sometimes comments along those same lines would

10    be made at walk-throughs, you said -- could you

11    be more specific about -- you mentioned that,

12    "We show up in suits," and I wrote down "Living

13    the dream."

14    Can you be any more specific with what

15    you recall?

16    A.   So in the world of interiors and

17    general contractors, JCA is known for the attire

18    that they bring to the jobsite.  Everyone else

19    shows up in khakis and a polo, and JCA shows up

20    in a three-piece suit.

21    So a lot of the guys will go to the

22    jobsite, and it's just overkill in their opinion

23    and it's just kind of like from previous

24    discussions about how they were trying to kind

465

1  of change the image of JCA from being, you know,
2  this old school boy's club.  It just kind of led
3  into that, that they weren't changing and just
4  making comments about how they -- you know, the
5  appearance that they're giving isn't
6  necessarily, you know, more professional in that
7  respect.
8          And then there would be shots about,
9  you know, JCA has their logo on everything,
10 like, on the carpet protection, on corner guards
11 during an active project, and no other GC does
12 this.
13         And I know they pride themselves in
14 that, but that's just stuff that the guys would
15 just kind of complain about because it would be
16 hot outside and you'd just look like a jerk
17 showing up to a jobsite with a three-piece suit
18 on for, you know, a 20-minute walk-through or
19 something.
20         So it's just stuff that they would --
21 you know, but that's how they always do it would
22 be the thing or living the dream where, you
23 know, the PMs had a lot of stuff on their plate
24 and they would just show up just to be there or
                                                    466

1  they would show up to make an appearance to the
2  client and then they would leave and go do
3  something else because they had a lot of stuff
4  on their plate so . . .
5     Q.   Anything else you can recall?
6     A.   Not at the moment.
7     Q.   Was Mike Yazbec ever at one of those
8  walk-throughs where a comment like that was
9  made?
10    A.   I want to say I was -- I don't know
11 about other -- well, obviously, I'd have to be
12 present to hear it.
13         I remember seeing him at one
14 walk-through, and I don't know why that was the
15 case, but typically, Yazbec wouldn't go to a
16 walk-through.  That's just not a good use of his
17 time.
18    Q.   Would Mike Power -- would he ever
19 attend a walk-through?
20    A.   He would never.  He doesn't even know
21 what a -- no, he would have no business on a
22 jobsite.
23    Q.   What about Steve Boulukos?
24    A.   No, he would have no business on a
                                                    467

1  jobsite or at a walk-through.  Again, not a good
2  use of their salary.
3     Q.   I want to ask you to take a look at
4  Deposition Exhibit 31.  That's the Facebook post
5  that Sam asked you about.
6          MR. SEDAEI:  I'll show you.
7  BY MR. BOYLE:
8     Q.   So this is a -- you admit, correct,
9  that this is a copy of a post that was -- you
10 posted on your Facebook account, correct?
11    A.   Yes.  I shared somebody else's post.
12    Q.   You shared somebody else's post, right.
13 And that was in February of this year,
14 February 19th?
15    A.   I don't know if that refers to that
16 post.  That date stamp, I don't know.
17    Q.   Okay.  Do you recall when you shared
18 this post?  Was it within the year?
19    A.   I honestly don't recall.  When you
20 showed it to me last time, I was like, "Oh, I
21 don't recall everything I post."
22    Q.   I want to ask you about the little
23 thumbnail pictures in the upper left-hand
24 quadrant of the document.  So you see that there
                                                    468

1  are six pictures there?
2     A.   Yes.
3     Q.   So the one that's in the lower left, a
4  person wearing a white hat?
5     A.   Yes.
6     Q.   Is that you?
7     A.   Yes.
8     Q.   Do you recall that picture?
9     A.   Yes.
10    Q.   And what were you doing in that
11 picture?
12    A.   My back was hurting me after running
13 the marathon so I had a bag of ice on my back in
14 the back of my pants, and I was making a funny
15 stature for the picture.
16    Q.   So you completed the marathon?
17    A.   I did.
18    Q.   What marathon was that?
19    A.   The Chicago Marathon.
20    Q.   What year?
21    A.   That one I don't recall.  I've done it
22 three times.
23    Q.   And the Chicago Marathon is usually in
24 October of every year, right?
                                                    469



1    A.   Yes.

2    Q.   Now, your counsel asked you some

3 follow-up questions about your ability to

4 function after the golf outing on

5 September 18th, and your response was

6 essentially that you completely shut down.

7       Do you recall that testimony?

8    A.   Yes.

9    Q.   Okay.  But it's true, isn't it, that

10 you were also securing your employment with

11 Talent Hitch during that period of time, isn't

12 it?

13    A.   No.

14    Q.   Weren't there e-mail exchanges on,

15 like, September 23rd and September 27th

16 regarding your contacting Kyle and letting him

17 know that you might be back in the job market?

18    A.   My --

19    Q.   Well, you started there on October 2nd,

20 correct?

21    A.   Right.

22    Q.   And there were e-mail exchanges before

23 your start date about coming back to work there,

24 correct?

470

---

1    A.   Yes.

2    Q.   And you also had other e-mail

3 exchanges, I believe, with that other recruiter.

4 I can pull the e-mail out if we have

5 to, but do you remember the testimony that you

6 gave at your last deposition about reaching out

7 to that other recruiter at that time?

8    A.   Yes, I remember that e-mail.

9    Q.   Do you remember attending a pool party

10 at Heather's on September 24th?

11    A.   No.

12    Q.   Any reason why you would have written

13 in your calendar that you did?

14       MR. SEDAEI:  Objection.  Form, but

15 answer it if you know what dates --

16       THE WITNESS:  I don't remember it.

17 BY MR. BOYLE:

18    Q.   Do you remember attending Bikram Yoga

19 on September 24th?

20    A.   I went to yoga.  I was very active

21 athletically.

22       MR. BOYLE:  That's all I have.

23       MS. CRONIN:  Take a quick break.

24       THE VIDEOGRAPHER:  Going off the record

471

---

1 at 1:44 p.m.

2       (whereupon, a short recess was

3       taken.)

4       THE VIDEOGRAPHER:  Back on the record

5 at 1:56 p.m.

6       FURTHER EXAMINATION

7 BY MS. CRONIN:

8    Q.   Ms. Dziubla, this is the second part of

9 your deposition, correct?

10    A.   Yes.

11    Q.   And the first part of your deposition

12 occurred on June 20th, 2019, correct?

13    A.   Yes.

14    Q.   And do you recall during the first part

15 of your deposition being asked about the comment

16 that Mr. Jacobsen made while providing you golf

17 instruction?

18    A.   Yes.

19    Q.   I'm going to hand you your deposition

20 transcript from June 20th, 2019, and I'm going

21 to read for you Page 279, Lines 14 to 20, okay?

22       It states: "Question:  And what was

23 the comment?"

24       "Answer:  Something along the lines of

472

---

1 I'm going to show her where I'm going to put my

2 wood."

3       "Are you certain, is that as best you

4 can recall?  That's the exact phraseology?"

5       "Answer:  I know I documented what he

6 said the night of, and I'll stand by that."

7       Correct, is that what it states?

8    A.   Yes.

9    Q.   And that was your deposition testimony

10 on June 20th, 2019, correct?

11    A.   Yes.

12    Q.   I'm handing you what's been previously

13 marked in your first deposition as Exhibit 16.

14 This is an e-mail that you sent to Jim Shoemaker

15 on September 18th, 2017, correct?

16    A.   Yes.

17    Q.   And it was sent at 7:35 p.m., correct?

18    A.   Yes.

19    Q.   You sent this e-mail to Mr. Shoemaker

20 shortly after you arrived home from the golf

21 event, correct?

22    A.   Yes.

23    Q.   And I want to turn your attention to

24 the third line down.  It states:  Demonstrating

473

1  to a female how to play golf does not require
2  you to press your groin into her backside and
3  tell her that's, quote, when you take,
4  parenthesis, his, close parenthesis, wood out,
5  correct?
6     A.   Yes.
7     Q.   Nowhere in that sentence is the word
8  "my," correct?
9     A.   Yes.
10     Q.   And when your attorney just asked you
11  about the comment, he paraphrased that comment,
12  correct?
13     A.   What's "paraphrase" mean?  It sounds
14  like it's not --
15     MR. SEDAEI:  Objection.  Form.
16  BY MS. CRONIN:
17     Q.   You don't understand what the word
18  "paraphrase" means?
19     A.   I'm sorry.
20     Q.   So he put what he thought the comment
21  was in his own words, correct?
22     A.   I thought he said what was on the
23  e-mail.
24     Q.   Okay.  Did he show you a copy of the

474

1  e-mail?
2     A.   We saw it last time.  What do you mean,
3  show me?
4     Q.   Your attorney did not quote that
5  sentence that I just read for you, correct?
6     A.   I'm sorry.  Don't you have what he
7  said?  I'm not understanding.
8     Q.   That's all right.  Let's just talk
9  about something else.
10     You gave an oath today, right?
11     A.   Yes.
12     Q.   And you gave an oath to tell the truth,
13  correct?
14     A.   Yes.
15     Q.   Is that the same oath that you took on
16  June 20th, 2019?
17     A.   Yes.
18     Q.   And that's the oath to tell the truth,
19  correct?
20     A.   Yes, yes.
21     Q.   And have you had an opportunity to
22  review your deposition transcript since
23  June 20th, 2019?
24     A.   No.

475

1     Q.   You met with your attorney, right?
2     A.   When?
3     Q.   Following your deposition on June 20th,
4  2019, have you spoken to your attorney?
5     A.   Since then?
6     Q.   Yes.
7     A.   Yes.
8     Q.   And did you --
9     MR. SEDAEI:  Don't say anything about
10  what we discussed.
11     THE WITNESS:  Yeah.
12  BY MS. CRONIN:
13     Q.   And when you came here today, you took
14  the elevators up with your attorney, correct?
15     A.   Yes.
16     Q.   And you've had opportunities to speak
17  to your attorney during breaks during this
18  deposition, correct?
19     A.   Yes.
20     Q.   And are you -- do you understand that
21  you are still under oath from June 20th, 2019
22  till today's date?
23     A.   Yes.
24     Q.   Did you review anything prior to your

476

1  deposition?
2     MR. SEDAEI:  Objection.  Form.
3     THE WITNESS:  The other one, I think I
4  said what I reviewed at the time.  I don't
5  recall now, and then today, honestly, I didn't
6  review anything.
7  BY MS. CRONIN:
8     Q.   You didn't review anything prior to
9  your deposition today?
10     A.   There's a couple -- whatever I did with
11  Counsel.
12     Q.   Did you review your deposition
13  transcript prior to today?
14     A.   No.
15     Q.   Have you talked to anybody outside of
16  your attorney prior to today?
17     MR. SEDAEI:  Objection.  Form.
18     THE WITNESS:  What's that mean?
19  BY MS. CRONIN:
20     Q.   Have you talked to anybody regarding
21  your deposition prior to today?
22     A.   No.
23     Q.   Did you talk to anybody about what you
24  said during your deposition on June 20th, 2019

477

1  until today's date?
2     A.  No.
3     Q.  To the extent there's any difference
4  between Exhibit 16, the comment in Exhibit 16,
5  and your attorney's questions, we should rely on
6  the language of Exhibit 16, correct?
7        MR. SEDAEI:  Objection.  Form.
8        THE WITNESS:  I don't recall what
9  Exhibit 16 is.
10       MR. SEDAEI:  Is that 16?
11       MS. CRONIN:  Yes.
12       THE WITNESS:  What's 16?
13       MR. SEDAEI:  Do you want to give it to
14  her again?
15       THE WITNESS:  The question is?
16  BY MS. CRONIN:
17    Q.  To the extent there's any difference
18  between what you -- to the extent there's any
19  difference between what your counsel asked you
20  with respect to the comment today and
21  Exhibit 16, you would agree that we should rely
22  on what's stated in Exhibit 16, correct?
23    A.  Correct.
24       MS. CRONIN:  That's all I have.

                                                    478

1        MR. SEDAEI:  Anything?
2        MR. BOYLE:  Nothing.
3        MR. SEDAEI:  Okay.  We'll reserve.
4        THE VIDEOGRAPHER:  Going off the record
5  with the conclusion of the deposition at
6  2:02 p.m.
7            (FURTHER DEPONENT SAITH NOT.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

                                                    479

1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4  ROWENA DZIUBLA,            )
5        Plaintiff,           )
6    vs.                      )  No. 1:18-cv-4542
7  J.C. ANDERSON, INC. and    )
8  PETER ERLING JACOBSEN,     )
9        Defendants.          )
10    This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by BRENDA S. TANNEHILL,
13  Certified Shorthand Reporter, on July 10, 2019,
14  and that the foregoing transcript accurately
15  states the questions asked and the answers given
16  by me as they now appear.
17
18  _____
19        ROWENA DZIUBLA
20  SUBSCRIBED AND SWORN TO
    before me this _____, day
21  of _ _____ 2019.
    _____
22    Notary Public
23
24

                                                    480

1        C E R T I F I C A T E
2
3      I, BRENDA S. TANNEHILL, do hereby certify
4  that heretofore, to-wit, on July 10, 2019,
5  personally appeared before me, at 222 North
6  LaSalle Street, Chicago, Illinois, ROWENA
7  DZIUBLA, in a cause now pending and undetermined
8  in the United States District Court, Northern
9  District of Illinois, wherein ROWENA DZIUBLA is
10  the Plaintiff, and J.C. ANDERSON, INC. and
11  PETER ERLING JACOBSEN are the Defendants.
12      I further certify that the said witness
13  was first duly sworn to testify the truth, the
14  whole truth and nothing but the truth in the
15  cause aforesaid; that the testimony then given
16  by said witness was reported stenographically by
17  me in the presence of the said witness, and
18  afterwards reduced to typewriting by
19  Computer-Aided Transcription, and the foregoing
20  is a true and correct transcript of the
21  testimony so given by said witness as aforesaid.
22      I further certify that the signature to
23  the foregoing deposition was not waived by
24  counsel for the respective parties.

                                                    481

1      I further certify that the taking of this
2  deposition was pursuant to Notice, and that
3  there were present at the deposition the
4  attorneys hereinbefore mentioned.
5      I further certify that I am not counsel
6  for nor in any way related to the parties to
7  this suit, nor am I in any way interested in the
8  outcome thereof.
9      IN TESTIMONY WHEREOF:  I have hereunto
10  set my hand and affixed my seal this 15th day of
11  July, 2019.
12
13
14
15
16
17
18
19
20
21
22
23
24

482

1      McCorkle Litigation Services, Inc.
       200 N. LaSalle Street, Suite 2900
2        Chicago, Illinois 60601-1014
3  DATE: July 15, 2019
4  GOLDMAN & EHRLICH
   MR. SAM SEDAEI
5  20 South Clark Street, Suite 500
   Chicago, Illinois 60603
6
   IN RE: Dziubla v. J.C. Anderson
7  COURT NUMBER: 1:18-cv-4542
   DATE TAKEN: 07/10/2019
8  DEPONENT: ROWENA DZIUBLA
9  Dear Mr. Sedaei:
10  Enclosed is the deposition transcript for the
   aforementioned deponent in the above-entitled
11  cause. Also enclosed are additional signature
   pages, if applicable, and errata sheets.
12
   Per your agreement to secure signature, please
13  submit the transcript to the deponent for review
   and signature.  All changes or corrections must
14  be made on the errata sheets, not on the
   transcript itself.  All errata sheets should be
15  signed and all signature pages need to be signed
   and notarized.
16
   After the deponent has completed the above,
17  please return all signature pages and errata
   sheets to me at the above address, and I will
18  handle distribution to the respective parties.
19  If you have any questions, please call me at the
   phone number below.
20
21  Sincerely,
22
   Cynthia Alicea         Court Reporter:
23  Signature Department    Brenda S. Tannehill
24  cc: All counsel of record

483

