Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/20/20 Page 1 of 42 PageID #:475

Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1                IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

    ROWENA DZIUBLA,                        )
4                                          )
                     Plaintiff,            )
5                                          )
        vs.                                )  Case No.
6                                          )  1:18-cv-4542
    J.C. ANDERSON, INC., and               )
7   PETER ERLING JACOBSEN,                 )
                                           )
8                    Defendants.           )

9

10

11            The deposition of MICHAEL L. YAZBEC, taken

12      in the above-entitled cause before Gabrielle Pudlo,

13      CSR, and Notary Public within and for the County of

14      Cook and State of Illinois, taken pursuant to the

15      Federal Code of Civil Procedure for the United

16      States District Court, Northern District of

17      Illinois, Eastern Division, at 20 South Clark

18      Street, Suite 500, in the City of Chicago, Illinois,

19      on June 26, 2019, at the hour of 3:48 p.m.

20

21

22

23

24



Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 2 of 42 PageID #:476
Michael Yazbec  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
1                    A P P E A R A N C E S:

2          GOLDMAN& EHRLICH
           BY:  MR. SAM SEDAEI
3               20 South Clark Street, Suite 500
                Chicago, Illinois  60603
4               (312) 332-6733
                sam@goldmanehrlich.com
5
                     On behalf of the Plaintiff;
6

7          VEDDER PRICE
           BY:  MS. MICHELLE T. OLSON
8               222 North LaSalle Street
                Chicago, Illinois  60601
9               (312) 609-7569
                molson@vedderprice.com
10
                     On behalf of Defendant
11                   J.C. Anderson, Inc.;

12         PRETZEL & STOUFFER, CHTD.
           BY:  MS. MARY H. CRONIN
13              1 South Wacker Drive, Suite 2500
                Chicago, Illinois  60606
14              (312) 578-7458
                mcronin@pretzel-stouffer.com
15
                     On behalf of Defendant
16                   Peter Erling Jacobsen.

17

18         ALSO PRESENT:

           MS. ROWENA DZIUBLA
19

20

21

22

23

24
```

Michael Yazbec    6/26/2019
Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 3 of 42 PageID #:477
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1                    I N D E X

 2     WITNESS EXAMINATION          DX      CX      RDX     RCX

 3     MICHAEL L. YAZBEC

 4     By Mr. Sedaei                    4

 5                    E X H I B I T S

 6     DEPOSITION EXHIBITS                        MARKED

 7     Yazbec Exhibit No. 1                        19

 8     Yazbec Exhibit No. 2                        35

 9     Yazbec Exhibit No. 3                        42

10     Yazbec Exhibit No. 4                        46

11     Yazbec Exhibit No. 5                        54

12     Yazbec Exhibit No. 6                        60

13     Yazbec Exhibit No. 7                        67

14     Yazbec Exhibit No. 8                        74

15     Yazbec Exhibit No. 9                        76

16     Yazbec Exhibit No. 10                       77

17

18

19

20

21

22

23

24
```

Michael Yazbec                6/26/2019
Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/20/20 Page 4 of 42 PageID #:478
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    (Witness sworn.)
2        MICHAEL L. YAZBEC,
3    called as a witness on behalf of the plaintiff,
4    being first duly sworn, was examined and testified
5    as follows:
6        DIRECT EXAMINATION
7    BY MR. SEDAEI:
8    Q.  Hello, Mr. Yazbec.
9    **A.  Good afternoon.**
10   Q.  My name is Sam Sedaei.  I'm an attorney
11   for the plaintiff in this case, Ms. Dziubla.
12       Would you please state your full name for
13   the record.
14   **A.  Michael Louis Yazbec.**
15   Q.  Have you been deposed before?
16   **A.  Yes.**
17   Q.  Have you been deposed before more than
18   once?
19   **A.  Just once.**
20   Q.  When was that?
21   **A.  I was trying to recall.  It had to be at**
22   **least 20-plus years ago when I was a Project Manager**
23   **at Turner Construction, related to a Workers'**
24   **Compensation claim.**

Page 4

1    Q.  Do you understand that your testimony
2    today will be under oath?
3    **A.  Yes.**
4    Q.  I'm going to go over some basic ground
5    rules to keep in mind as we proceed.  You may recall
6    some of it from 20 years ago; probably not.
7    **A.  No.**
8    Q.  A deposition is much like a conversation,
9    but there are a few differences.  For one, we have a
10   court reporter today who is attempting to transcribe
11   the conversation.  Therefore, we can't interrupt
12   each other.  So please wait until I have finished
13   asking the question before answering, and I will
14   wait until you have responded to a question before
15   speaking.
16   **A.  Understood.**
17   Q.  Also, in answering questions, please try
18   to use full answers, which you have done so far;
19   like yeses and nos versus uh-huhs and uh-uhs.  Try
20   to refrain from -- try to make sure that your
21   answers are verbal rather than head nods and head
22   shakes.
23   **A.  Okay.**
24   Q.  Okay.  If you need to take a break, just

Page 5

1    let me know.  But please only ask for a break after
2    you've answered a question -- you have answered a
3    question but before I have asked a new question.
4    **A.  Okay.**
5    Q.  If you don't hear or understand a
6    question, ask me and I will repeat or rephrase.  But
7    if you do answer a question, I will assume that you
8    understood the question.  Okay?
9    **A.  Okay.**
10   Q.  Have you consumed any medicine or alcohol
11   over the past twelve hours?
12   **A.  No.**
13   Q.  I guess Illinois is going towards the
14   direction of legalizing marijuana for recreational
15   purposes.
16       So maybe I should add, Have you used any
17   recreational drugs over the past twelve hours?
18   **A.  No.**
19   Q.  Congratulations, you're the first deponent
20   I've ever asked that question.
21       Is there any reason such as being under
22   unusual stress, a physical or mental condition, or
23   being under the influence of any substances that
24   would prevent or limit your ability today to give

Page 6

1    truthful answers to my questions?
2    **A.  No.**
3    Q.  What did you do to prepare for today's
4    deposition?
5    **A.  Met with Counsel.**
6    Q.  You don't need to tell me what you
7    discussed.  Did you meet with anybody else other
8    than Counsel?
9    **A.  I did not.**
10   Q.  Okay.  So you didn't meet with anybody
11   else at JCA?
12   **A.  I did not.**
13   Q.  Okay.  Did you look at any documents?
14   **A.  I did.**
15   Q.  What types of documents did you look at?
16   **A.  I believe we reviewed the Interrogatories**
17   **that were prepared previously.**
18   Q.  Uh-huh.  Would that be JCA's Answers to
19   Plaintiff's Interrogatories?
20   **A.  I believe so.**
21   Q.  Okay.  Any other type of document you can
22   recall that you looked at?
23   **A.  Some emails; exhibits, I guess.**
24   Q.  Okay.  Would these have been exhibits from

Page 7



Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 5 of 42 PageID #:479
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Plaintiff's deposition?
2      **A. I don't know.**
3      Q.  It's okay; whatever you know.  Your
4  counsel can't answer these questions.  I understand
5  she probably knows the answer, but just tell me what
6  you remember or you know.
7      **A. Okay.**
8      Q.  But some emails relating directly or
9  indirectly to Ms. Dziubla?
10     **A. Correct.**
11     Q.  Okay.  Anything else you looked at?
12     **A. That's it.**
13     Q.  Okay.  Can you tell me where you reside,
14  just city and state.
15     **A. Sure.  Orland Park, Illinois.**
16     Q.  For how long have you been a resident
17  there?
18     **A. Thirteen years.**
19     Q.  Can you tell me your date of birth.
20     **A. June 1, 1963.**
21     Q.  Can you tell me the most advanced
22  educational degree that you have?
23     **A. Master's degree in Architecture.**
24     Q.  And where did you get your Master's degree

Page 8

1  from?
2      **A. University of Illinois, Urbana-Champaign.**
3      Q.  What year?
4      **A. Master's degree was 1988.**
5      Q.  Do you have any other Master's degrees?
6      **A. No.**
7      Q.  Do you have a Bachelor's degree?
8      **A. I do.**
9      Q.  And is that, like, a Bachelor of Arts or
10  science?
11     **A. I have a Bachelor of Arts in Urban**
12  **Planning.**
13     Q.  From what college?
14     **A. University of Illinois, Urbana-Champaign.**
15     Q.  When did you graduate with that degree
16  from there?
17     **A. 1985.**
18     Q.  Was your Master's degree a three-year
19  program?
20     **A. Yes.**
21     Q.  Do you have any other post high school
22  degrees?
23     **A. No.**
24     Q.  A certificate of any kind?

Page 9

1      **A. Nope.**
2      Q.  Are you currently employed?
3      **A. Yes.**
4      Q.  Who is your current employer?
5      **A. J.C. Anderson.**
6      Q.  And for how long have you been with JCA?
7      **A. It will be eight years on July 18th of**
8  **this year; almost eight years.**
9      Q.  Have you had more than one title at JCA?
10     **A. Yes.**
11     Q.  Okay.  Let's start with the first title
12  that you held at JCA.  What was that?
13     **A. Executive Vice President.**
14     Q.  Okay.  For how long were you an Executive
15  V.P.?
16     **A. Approximately two years.**
17     Q.  What's the next title you held?
18     **A. President.**
19     Q.  Is that your title today?
20     **A. Yes.**
21     Q.  So you've only had two titles at JCA?
22     **A. Correct.**
23     Q.  What were your duties and responsibilities
24  as an Executive V.P.?

Page 10

1      **A. Primarily new business development.**
2      Q.  Anything else?
3      **A. That was it.**
4      Q.  What are your duties and responsibilities
5  as the President?
6      **A. Basically oversight of all operations;**
7  **Sales, Marketing, Operations, Finance.**
8      Q.  As an executive V.P., who did you report
9  to?
10     **A. Tom Bean.**
11     Q.  Who was President at the time?
12     **A. Correct.**
13     Q.  Did you ever report to Mr. Radoha too?
14     **A. I did not.**
15     Q.  But was he employed at JCA when you joined
16  JCA?
17     **A. Yes, he was.**
18     Q.  And he was the President too?
19     **A. He was.  But I reported directly to Tom**
20  **Bean.**
21     Q.  And as President, do you report to
22  anybody?
23     **A. I report to the owners of the company.**
24     Q.  Who are...

Page 11

Michael Yazbec 6/26/2019
Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 6 of 42 PageID #:480
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 12**

1    A.  Jim and Tom Schumacher.
2    Q.  Who was involved -- to your knowledge, who
3  was involved in your hiring?
4    A.  Tom Bean and Jim Schumacher.
5    Q.  Are these the individuals who interviewed
6  you?
7    A.  Yes.
8    Q.  Did anybody else interview you?
9    A.  No.
10   Q.  Do you remember whose signature was at the
11  bottom of any offer letter you received from JCA?
12   A.  I believe it was Kevin's.
13   Q.  Kevin...
14   A.  Kevin Radoha.  But I did not interview
15  with him.
16   Q.  Okay.  Can you name some of the clients
17  that you would consider to be major clients of JCA?
18      MS. OLSON:  Objection, relevance.
19  BY MR. SEDAEI:
20   Q.  By the way, when she objects, you should
21  still go ahead and answer afterwards unless she
22  specifically tells you not to answer a question.
23   A.  Right.  Some of our major clients?
24   Q.  Yes.

**Page 13**

1    A.  DePaul University, Commonwealth Edison,
2  Jones Lang LaSalle, CB Richard Ellis, Cushman &
3  Wakefield; major clients.
4    Q.  Okay.  To your knowledge, other than the
5  case that we are here for today, has JCA ever been
6  sued by a current or former employee?
7    A.  Not to my knowledge.
8    Q.  To your knowledge, has any current or
9  former employee threatened to sue the company
10  because of something that they allege happened at
11  the company?
12   A.  Not to my knowledge.
13   Q.  To your knowledge, has anyone -- any
14  current or former employees at JCA alleged that you
15  personally discriminated against them?
16   A.  No.
17   Q.  To your knowledge, has any current or
18  former JCA employees alleged that you have
19  retaliated against them?
20   A.  No.
21   Q.  Can you tell me who Michael Power is.
22   A.  Michael Power is our Chief Financial
23  Officer.
24   Q.  Does he have any other role?

**Page 14**

1    A.  Yes, he does.  Human Resources falls under
2  Mike's purview, Information Technology, banking,
3  insurance.  That's about it.
4    Q.  Were you involved in Mr. Power's hiring?
5    A.  I was not.
6    Q.  When was the first time you met Mr. Power?
7    A.  My first day of work at J.C. Anderson.
8    Q.  That's when you joined JCA after
9  Mr. Power, correct?
10   A.  I did, yes.
11   Q.  I think you alluded to this earlier.  But
12  who is Mr. Jim Schumacher?
13   A.  He is one of the owners of the company.
14   Q.  Do you know if he reports to anybody?
15   A.  I don't think so.
16   Q.  There's nobody higher than him at the
17  company?
18   A.  He has a partner, a 50 percent partner,
19  which is his brother Tom.
20   Q.  Do you know for how long he has been with
21  the company or owned the company?
22   A.  Good question.  I know his father
23  purchased the company in 1976.  I am not quite sure
24  of the date when Jim and his brother bought out

**Page 15**

1  their father.  I'm going to guess --
2    Q.  Ballpark, that's fine.
3    A.  -- mid '80s, maybe.
4    Q.  But before they bought out their father,
5  were they -- "they" being Mr. Schumachers -- working
6  at JCA?
7    A.  Yes, I believe, to the best of my
8  knowledge.
9    Q.  Do you know Ms. Dziubla?
10   A.  Yes.
11   Q.  And how do you know her?
12   A.  We hired her to be an Estimator for us.
13   Q.  Were you involved in Ms. Dziubla's hiring?
14   A.  Yes.
15   Q.  What was your level of involvement with
16  the hiring?
17   A.  I sat in on her initial interview.
18   Q.  Okay.  What else did you do in relation to
19  her hiring?
20   A.  I guess that's really it.
21   Q.  Were there other individuals who
22  interviewed Ms. Dziubla too?
23   A.  Yes.
24   Q.  Do you recall who they were?



Michael Yazbec 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   A.   Yes.
2   Q.   Who were they?
3   A.   Steve Boulukos.
4   Q.   Who else?
5   A.   Greg Garland.
6   Q.   Anyone else?
7   A.   That's it.
8   Q.   And then after the interviews concluded,
9   did you all have some kind of a meeting to discuss
10  the various candidates?
11  A.   Yes, we did.
12  Q.   And were there other candidates that you
13  interviewed for the position?
14  A.   Yes, there were.
15  Q.   What made JCA hire Ms. Dziubla over the
16  other candidates?
17  A.   I think her technical abilities in
18  estimating were superior to the other candidates,
19  her ability to work in the software system that we
20  used were the two main...
21  Q.   Were the two main reasons?
22  A.   Were the two main reasons, yes.
23  Q.   And so would it be accurate to say that
24  the first time that you met Ms. Dziubla was at her

Page 16

1   initial interview?
2   A.   That would be correct.
3   Q.   Did you know her beforehand?
4   A.   I did not.
5   Q.   Okay.  Did you know of her beforehand?
6   A.   I did not.
7   Q.   Have you ever been Ms. Dziubla's direct
8   supervisor at any time during her employment?
9   A.   No.
10  Q.   How often did you interact with
11  Ms. Dziubla while she was employed at JCA?
12  A.   Occasionally.
13  Q.   Can you give me, like, an estimate of
14  frequency?  Is that once a week, once a month?
15  A.   Probably at least once a week.
16  Q.   Were the interactions related to specific
17  projects?
18  A.   Occasionally, sometimes.
19  Q.   And other times they were just personal
20  meet and greet or something?
21  A.   Besides the normal pleasantries of working
22  in close quarters with a bunch of people, yes.
23  Q.   Okay.
24  A.   Good morning, Hello.

Page 17

1   Q.   Right.
2   A.   How's it going?
3   Q.   So small talk, that kind of thing?
4   A.   Uh-huh.
5   Q.   To your knowledge, how was Ms. Dziubla's
6   performance while she was employed at JCA?
7   A.   Good; no issues.
8   Q.   And how did she come across to you
9   personally?  Was she personable?  Any other
10  adjective may use?
11  A.   Yes, very personable, smart.
12  MR. SEDAEI:  Do you mind if I take a
13  minute to get a refill?
14  THE WITNESS:  Only if I can get some
15  water.
16  (Brief pause.)
17  MR. SEDAEI:  We can go back on the record.
18  BY MR. SEDAEI:
19  Q.   Did Ms. Dziubla have an employment
20  contract with JCA?
21  A.   I don't believe so.
22  Q.   So she was an at-will employee?
23  A.   Yes.
24  MR. SEDAEI:  Mark this as Number 1.

Page 18

1   (Yazbec Exhibit No. 1
2   marked for identification.)
3   BY MR. SEDAEI:
4   Q.   Mr. Yazbec, I'm showing you what's marked
5   as Exhibit 1.  Would you take a look at that and
6   tell me if you know what this document is?
7   A.   Yes.  It's our office Policies and
8   Procedures Manual.
9   Q.   And is this handbook given to all new
10  hires at JCA?
11  A.   Yes.
12  Q.   Do you know if Ms. Dziubla was provided a
13  copy of this handbook?
14  A.   I did not personally do it, but she should
15  have been given this on her first day of employment.
16  Q.   Okay.  When employees are given this
17  handbook on their first day, is there usually any
18  kind of discussion about its contents; or are they
19  given this handbook and told that, You can use it as
20  reference as needed.
21  A.   We actually give it to them on the first
22  day.  Usually the first day of employment is a
23  pretty -- they're not given their job
24  responsibilities on that day.

Page 19

Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 8 of 42 PageID #:482
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 20**

1    So we ask them to review it, any
2    questions. They usually end up spending a good
3    portion of the first day with H.R. -- Mike --
4    filling out other paperwork; insurance stuff, W-9's,
5    things like that. So if they have any questions on
6    this after they've been through it, Mike is there to
7    answer those questions.
8    Q. Okay. And after someone is hired and
9    they're given that handbook, if they have questions,
10   the answers to which may already be in the booklet,
11   would the employee still have the option of reaching
12   out to Mr. Power or anyone else at JCA and ask those
13   questions?
14       A. Absolutely.
15       Q. And if they do, they would receive
16   answers?
17       A. Yes. We want to make sure everyone
18   understands what's in here.
19       Q. Okay. Do you know if Ms. Dziubla and JCA
20   had any kind of a non-compete agreement that
21   prohibited her from working with any other
22   competitors while she was -- you know, after she
23   leaves JCA?
24       A. It is my understanding that we were asking

**Page 21**

1    all employees to sign a non-compete,
2    non-solicitation agreement. So we had two separate
3    agreements, one for senior staff and one for the
4    rest of the employees.
5    Q. To your knowledge, did Ms. Dziubla
6    specifically sign such an agreement?
7        A. I don't know.
8        Q. And the non-compete that you have had at
9    least some, not all, employees sign, just can you
10   tell me generally the requirements that are imposed
11   on the employees?
12       A. I think the letter related to not the
13   senior leadership staff but most of the employees.
14   I don't believe there's a non-compete in there. I
15   believe there is a return of any proprietary
16   information that they may have and stuff like that.
17       Q. There is non-compete there?
18       A. I don't believe there's a non-compete
19   after they leave our -- you know, I know the senior
20   one has it laid out where we're pretty specific in
21   terms of a 50-mile radius and people that compete in
22   our business and things like that.
23       But I'm unclear at this point, the
24   distinction between the two of them that we outline

**Page 22**

1    for employees.
2    Q. I understand. Just going back to
3    something, I mean, it's something I should have
4    asked maybe at the beginning. But I asked Mr. Power
5    this question too.
6        Just generally, how do you describe what
7    JCA does?
8        A. We are interior contractors. So our work
9    is entirely focused on commercial and institutional
10   office interiors --
11       Q. You're a general -- I'm sorry.
12       A. A general contractor, yes.
13       Q. Okay. Did you have something else to say?
14       A. No. The institutional part is classrooms
15   and things that we do for our DePaul client, which
16   is a little different than 90 percent of our
17   clients, which are commercial office interiors,
18   general contracting.
19       We also self-perform work; drywall,
20   carpentry, ceilings. We have a field -- union field
21   staff of approximately somewhere between 50 and 75,
22   depending on the workload.
23       Q. You said they're all union?
24       A. Yes.

**Page 23**

1    Q. Which union do they belong to?
2        A. Carpenters Union. We're signatory to
3    carpenters, laborers, and tapers. That's actually
4    the Painters Union. The tapers are the painters.
5        Q. And you work with a number of
6    subcontractors?
7        A. Yes.
8        Q. Approximately how many different
9    subcontractors does JCA work with?
10       A. Our sub list probably has over
11   200 subcontractors on it.
12       Q. You have a sub list of over
13   200 subcontractors; maybe more, not exactly. But --
14       A. Approximately.
15       Q. Okay. So when you have a job, do you
16   present that job to either the entire subcontracting
17   list or a relevant portion of it for their bids?
18       A. Yes.
19       Q. Okay. So are the subs categorized on that
20   list?
21       A. Yes. Most construction projects are
22   broken down under a systematic numbering for the
23   trades, called CSI codes.
24       Q. And when there's an announcement -- when



Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/26/20 Page 9 of 42 PageID #:483
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  there's a job announcement, the announcement goes to
2  a specific code or codes?
3     A.  Yes.  You have to figure out what the
4  scope of the work is, figure out what the
5  appropriate trades are.
6     Q.  Okay.
7     A.  Not all trades are involved in all jobs.
8  Some of them are smaller; some of them are all of
9  them.
10    Q.  When you're saying the announcement, is
11 that to solicit bids?
12    A.  Yes.  We send an invitation to bid to the
13 selected subcontractors based on the scope of work.
14    Q.  And then some respond with bids; and then
15 you review them and make a decision on who to hire,
16 potentially?
17    A.  That is correct.
18    Q.  These subcontractors, do any of them have
19 any kind of a contract with JCA that would require
20 them to work exclusively with JCA?
21    A.  No.
22    Q.  None of them do?
23    A.  No.
24    Q.  Does JCA have a rule that prohibits any

Page 24

1  former JCA employees from seeking employment with
2  any of the subcontractors?
3     A.  No.
4     Q.  Okay.  Switching gears a little bit, do
5  you know who Mr. Peter Jacobsen is?
6     A.  I do.
7     Q.  Who is he?
8     A.  He is a professional golfer and a
9  television commentator.
10    Q.  Are you a golfer?
11    A.  I am.
12    Q.  For how long have you known Mr. Jacobsen?
13    A.  Oh, boy.  Wow.  30 years.
14    Q.  You've seen him on T.V. in the past?
15    A.  I have.
16    Q.  And have you met Mr. Jacobsen in person?
17    A.  Yes.
18    Q.  When was the first time you met him?
19    A.  At our charity golf outing.
20    Q.  That would be in 2017?
21    A.  Correct.
22    Q.  The one called The Kev?
23    A.  Yes.
24    Q.  Are you friends with him?

Page 25

1     A.  No.
2     Q.  Have you spoken with him since the outing?
3     A.  No.
4     Q.  To your knowledge, when was the first time
5  that Mr. Jacobsen participated in any JCA-related
6  events?
7     A.  To my knowledge, it was that outing in
8  2017.
9     Q.  And has he participated in any JCA events
10 since?
11    A.  No.
12    Q.  Do you know whose idea it was to invite
13 Mr. Jacobsen to participate in the event?
14    A.  I believe it was Mr. Schumacher's.
15    Q.  That would be Jim Schumacher?
16    A.  Yes.
17    Q.  Is he friends with Mr. Jacobsen?
18    A.  I believe they have a personal
19 relationship, yes.
20    Q.  And do you know if their relationship goes
21 back further than The Kev event two years ago?
22    A.  I believe --
23        MS. CRONIN:  Objection, foundation.
24    Sorry, just give me a minute sometimes.

Page 26

1        THE WITNESS:  Okay.
2        MS. CRONIN:  Thank you.
3        Objection, foundation.
4  BY MR. BOYLE:
5     Q.  By the way, all the questions I ask -- you
6  know, obviously, the answer should be based on what
7  you know.  And that's what the objection to
8  foundation means.
9        Going back to the previous question, to
10 your knowledge is Mr. Schumacher friends with
11 Mr. Jacobsen?
12        And you said yes?
13    A.  I believe they are, yes.
14    Q.  Do you know how far back their friendship
15 goes?
16    A.  I do not.
17    Q.  Can you just tell me briefly your
18 understanding of what The Kev event is?
19    A.  It's a charity golf outing to raise funds
20 for Kevin's family and cancer research.
21    Q.  Kevin Radoha?
22    A.  Yes.
23    Q.  Did he pass away due to cancer?
24    A.  Yes.

Page 27

Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 10 of 42 PageID #:484
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Q. Mr. Radoha passed away in 2012?

A. I believe so.

Q. And has this charity event been taking place every year since?

A. I believe the first year was 2013.

Q. And does JCA always have a celebrity guest at every event?

A. Yes, we have.

Q. Is it always a golfer?

A. No.

Q. Can you tell me the names of some other celebrities who have attended?

A. Sure. We've had several of the Chicago Bulls; Tony Kukoc, Bill Wennington, Bill Cartwright, Craig Hodges were all together one year. We had Bo Jackson and Jim McMahon together one year. We had Dan Hampton from the Bears one year. We had Trevor Van Riemsdyk and -- What's the announcer, the Hawks announcer? Not Pat Foley.

THE COURT REPORTER: Olczyk?

THE WITNESS: Yes.

A. (Continuing) Trevor Van Riemsdyk from the Blackhawks and Eddie Olczyk from the Blackhaws. I'm trying to think of who else we've had. And then

Page 28

last year we had -- we had Eric Ferguson from The MIX and his partner, Melissa. I believe it's Melissa.

So various sports and/or entertainment personalities.

BY MR. SEDAEI:

Q. Good memory. They must have left quite a good impression on you -- or an impression. That wasn't a question.

So going back to Mr. Jacobsen's role, what was his role at the 2017 event?

A. I think his role was to be available to our guests as an ambassador for our company for the event. They usually sign autographs; in some cases, you know, give a little speech at the end.

Q. Just to make clear, Mr. Jacobsen is not a JCA employee?

A. That is correct.

Q. Did he receive any kind of compensation for his attendance in 2017?

A. He did not.

Q. He did not, or that he received an honorarium that he gave to the charity?

A. That is correct.

Page 29

Q. But he wasn't required to give that honorarium to the charity?

A. No. It was a surprise to us the day of the event.

Q. Was he also compensated for airfare and travel accommodations?

A. I believe so.

MS. CRONIN: Objection, foundation.

BY MR. SEDAEI:

Q. Did he make any other donations to JCA, to your knowledge, other than the honorarium that we discussed?

A. Not that I'm aware of.

Q. Prior to attending The Kev, was he given any kind of instructions on how to interact with JCA employees?

A. I don't know. Not by me.

MS. CRONIN: Can we take a quick break, if you don't mind.

MR. SEDAEI: I don't mind.

(Whereupon a recess was taken from 4:29 p.m. to 4:33 p.m., after which the following proceedings were had:)

Page 30

MR. SEDAEI: Back on the record.

BY MR. SEDAEI:

Q. Mr. Yazbec, before the break I was asking you some questions about Mr. Jacobsen. Was Mr. Jacobsen told about any rules that he had to follow in his interactions with JCA employees?

A. I don't know.

Q. But you certainly didn't personally give him any rules that he had to follow in his interactions with JCA employees, did you?

A. I did not.

Q. And were you asked to give him such rules?

A. I was not.

Q. Were you at the event personally, The Kev in 2017?

A. Yes.

Q. Can you describe your day to me, what you did throughout the day.

A. Played golf.

Q. How about if you can give me a little more details than that, perhaps in sequence what you did from morning to evening.

A. Okay. Arrived around lunchtime, had lunch. We then went out on the golf course, played

Page 31

Michael Yazbec    6/26/2019
Case: 1:18-cv-04542 Document #: 93-2 Filed: 02/20/20 Page 11 of 42 PageID #:485
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 32**

1 golf; came back in after the golf was over and had
2 some hors d'oeuvres. And the program for the --
3 started with the auction items, both silent and the
4 live auction items. And I think -- I believe I left
5 prior to the end of the program. I had a commitment
6 at home.
7 Q. By the way, do you have a family?
8 A. I do.
9 Q. Do you have a wife?
10 A. I do.
11 Q. And you have kids?
12 A. Three.
13 Q. Okay. How old are they?
14 A. 26, 22, and 18.
15 Q. And were any of your family members at the
16 event with you?
17 A. They were not.
18 Q. Does Mr. Jacobsen have family, to your
19 knowledge?
20 A. I do not know.
21 Q. So then probably you answered my next
22 question. But my question was going to be whether
23 you know if any of his family members attended the
24 event.

**Page 33**

1 A. I don't know.
2 Q. Do you recall spending time with
3 Mr. Jacobsen on the golf course?
4 A. Yes.
5 Q. And what were the nature of your
6 interactions with him?
7 A. I believe that day he was riding around to
8 the different groups. He came up to our group. We
9 were four pretty good golfers. He looked at us and
10 said, I don't need to do anything with you guys. He
11 shook everyone's hand and left.
12 Q. So you were in a group of four people.
13 Can you tell me who else was in your group?
14 A. I'm trying to remember.
15 Q. Sure.
16 A. I believe it was Bruce Litt from Admiral
17 Heating, Tom Coonan from Admiral Heating, and Clint
18 Hickman who was our Business Development manager. I
19 hope I'm not confusing that with the year before.
20 Q. Is the event always at a golf course?
21 A. (No response.)
22 Q. Is the event, the Kev event, always at a
23 golf course?
24 A. Yes.

**Page 34**

1 Q. Is it always at the same exact venue?
2 A. Yes.
3 Q. Which was River Forest Country Club?
4 A. River Forest Country Club, yes.
5 Q. Because I know in the past you've had
6 celebrities who are not golf players, I believe.
7 Right?
8 A. Uh-huh, yes.
9 Q. Did you see -- do you remember seeing
10 Ms. Dziubla at the event?
11 A. Yes.
12 Q. Did you speak with her at The Kev?
13 A. Yes.
14 Q. What do you recall from your conversation?
15 A. I remember saying Hi and commenting on
16 what a nice day it was weather-wise; something to
17 the effect of, Kind of nice to be out of the office.
18 Q. Do you recall if she said anything in
19 response?
20 A. I believe she acknowledged the fact that I
21 said that.
22 Q. Do you remember around what time of the
23 day that was?
24 A. No; towards the end of it.

**Page 35**

1 Q. It was the end. So it was --
2 A. We were on the golf course, towards the
3 end of our round of golf.
4 Q. But before dinner or hors d'oeuvres?
5 A. Correct.
6 Q. Did Ms. Dziubla say anything else to you
7 on that day?
8 A. No.
9 Q. Did you at some point learn later that
10 there was an alleged incident involving Ms. Dziubla
11 and Mr. Jacobsen at the event?
12 A. Yes.
13 Q. And when was the first time you learned
14 that?
15 A. I believe it was via an email that was
16 sent that evening.
17 Q. By whom?
18 A. Ms. Dziubla.
19 MR. SEDAEI: Number 2.
20 (Yazbec Exhibit No. 2
21 marked for identification.)
22 BY MR. SEDAEI:
23 Q. Before we proceed, did you bring notes to
24 this deposition with you?

Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 12 of 42 PageID #:486
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 36**

1    A. I did.

2    Q. Can I ask you where -- when you took those

3 notes?

4    A. I took these notes yesterday.

5    Q. Okay. And did you do it while you were

6 speaking with any of your attorneys?

7    A. Yes.

8    Q. Okay. I'm showing you what's marked as

9 Exhibit 2. Do you recognize that?

10    A. Yes.

11    Q. Can you tell me what it is, in your own

12 words.

13    A. It is an email from Ro describing what

14 happened that day.

15    Q. When do you remember seeing this email? I

16 know we have the time stamp when she sent it.

17    A. Yes. It was probably later than that,

18 this evening.

19    Q. Same evening?

20    A. Same evening, yes; probably closer to

21 10:00 o'clock would be my guess. Like I said, I

22 went home for a family commitment and didn't look at

23 my phone until before going to bed.

24    Q. Do you recall speaking with anybody --

**Page 37**

1 Well, let me form it this way.

2        Who do you remember speaking with about

3 the incident first?

4        MS. OLSON: Objection, foundation, assumes

5    that he spoke with other people about it.

6        MR. SEDAEI: Okay.

7 BY MR. SEDAEI:

8    Q. Have you ever spoken about this email with

9 anyone?

10    A. Yes.

11    Q. Okay. Now let's go back to the previous

12 question that I asked which was, Who was the first

13 person you spoke with about this email?

14    A. I believe it was Mr. Boulukos.

15    Q. And do you remember when that was?

16    A. The same evening.

17    Q. Did you speak with him on the phone?

18    A. I did.

19    Q. Was anyone else on the call with you?

20    A. Not that evening, no.

21    Q. Do you remember if you called him or he

22 called you?

23    A. He had left me a voice mail probably very

24 close to the time of this email. I picked it up

**Page 38**

1 later that evening and returned his call.

2    Q. I know it was from a few years ago. But

3 do you still have the voice mail on your phone?

4    A. I do not.

5    Q. Okay. And what do you remember discussing

6 on that call?

7    A. This email.

8    Q. Okay. And, more specifically, what do you

9 remember saying; what do you remember Mr. Boulukos

10 saying?

11    A. I don't recall exactly what he said. But

12 I know I said, This is a very serious allegation.

13    Q. Do you remember anything else you said?

14    A. No; that we would probably need to meet

15       first thing in the morning and figure out

16 how to

17 proceed.

18    Q. You said -- did you just say you

19 considered it to be a serious allegation?

20    A. Absolutely --

21    Q. Why is that?

22    A. -- very serious.

23        MS. CRONIN: Objection.

24        MR. SEDAEI: What was your objection?

**Page 39**

1        MS. CRONIN: Form.

2 BY MR. SEDAEI:

3    Q. What in your mind made it a serious

4 allegation?

5    A. What she said.

6    Q. So if what she had said had actually

7 occurred, that should have been something you would

8 consider to be a serious incident?

9        MS. CRONIN: Objection, form, foundation.

10    A. Absolutely.

11 BY MR. SEDAEI:

12    Q. If what Ms. Dziubla described in this

13 email had actually occurred, would that have been in

14 violation of JCA's sexual harassment policies?

15        MS. OLSON: Objection, calls for

16    speculation.

17 BY MR. SEDAEI:

18    Q. And you can look at the policy. You have

19 the exhibit. I can tell you what page that is on if

20 you need to look at it.

21    A. Sure.

22    Q. So that would be Exhibit 1. It's on the

23 page that is Bates stamped at the bottom

24 DZIUBLA 1053.



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 13 of 42 PageID #:487

Michael Yazbec        6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 40**

1      And I believe in the middle of the
2  section -- First you can confirm that that is JCA's
3  policy on harassment that starts in the middle of
4  the page on the page that I told you.  And it goes
5  to the next page.
6      A.  That's correct.
7      Q.  That is the JCA policy on harassment?
8      A.  Yes.
9         MS. OLSON:  You can take a moment to read
10  it.
11  BY MR. SEDAEI:
12     Q.  Yes, feel free to read through the
13  section.
14     A.  I know what it says.
15     Q.  Do you know who drafted this document,
16  "This" being Exhibit 1, Office Policies and
17  Procedures Manual of JCA?
18     A.  Yes.
19     Q.  Who drafted it?
20     A.  Our counsel, legal counsel.
21     Q.  Okay.  Were you involved in the drafting
22  or reviewing of it?
23     A.  Yes.
24     Q.  Okay.  So just when you were considering

**Page 41**

1  my previous question, you said you know what it
2  says?
3      A.  I have it, you know, not down to the
4  letter of the -- but I know what the intent is here,
5  yes.
6      Q.  You are sufficiently familiar with that
7  section?
8      A.  Yes.
9      Q.  Okay.  So do you recall the question that
10  I asked just a moment ago about it?
11     A.  Say it again.
12        MR. SEDAEI:  Can you go back and ask the
13  question.
14        (Record read as requested.)
15        MS. OLSON:  I'm also going to object to
16  form.
17     A.  Yes.
18  BY MR. SEDAEI:
19     Q.  Yes, you would have been.
20        Have you spoken with Mr. Jacobsen
21  regarding this incident, ever?
22     A.  No.
23     Q.  Have you asked to speak with him?
24     A.  No.

**Page 42**

1      Q.  Has anybody told you that you cannot reach
2  out to him to talk to him about the incident?
3      A.  No.
4      Q.  Do you actually have his contact
5  information personally?
6      A.  I do not.
7         MR. SEDAEI:  3.
8            (Yazbec Exhibit No. 3
9            marked for identification.)
10  BY MR. SEDAEI:
11     Q.  Mr. Yazbec, I'm showing you what's marked
12  as Exhibit 3.  Would you take a look at it and tell
13  me if you recognize it and what it is.
14     A.  Yes, I do recognize it.
15     Q.  Is that an email chain?
16     A.  Yes.
17     Q.  Okay.  The bottom part, I believe, is the
18  email that we just discussed that Ms. Dziubla sent.
19        Correct?
20     A.  Correct.
21     Q.  Okay.  And the email on top of the first
22  page of the exhibit is another email, correct, from
23  Ms. Dziubla to a number of individuals; you're one
24  of the individuals cc:'d on the email?

**Page 43**

1      A.  Yes.  I see that.
2      Q.  Okay.  Before I proceed, I have a question
3  about the formats of these emails.  Do you see on
4  top in the -- you know where it says the "To:" Box
5  and then the "cc" box.  And in front of each name,
6  there is this long link of some kind.
7         Do you know what that is, what that means?
8      A.  I have no idea.
9      Q.  Okay.  I'm sure there's some technical
10  explanation for that.  I'm just trying to figure out
11  if it's some kind of forwarding system or something.
12  Okay, you don't have the answer.
13        Going back to the email, would it be
14  accurate to say that this is an email from
15  Ms. Dziubla to a number of individuals -- to
16  Mr. Schumacher and then a number of individuals.
17  You're one of them who is cc:'d.
18        And in it she states that, I filed a claim
19  with the EEOC.  And it goes on and adds some further
20  statements relating to that.
21        Would it be accurate to say that?
22     A.  Yes.
23     Q.  Okay.  After receiving this email -- So
24  this is the day after, correct; this is the morning

1  after The Kev event.
2      After receiving this email, do you recall
3  having a conversation with anyone about this email?
4      **A.  Not to my knowledge about this email**
5  **specifically.**
6      Q.  When was the next time you remember
7  having -- when was the first time you remember
8  meeting with anyone about Ms. Dziubla's allegations?
9      **A.  To the best of my recollection, it was**
10  **much earlier on the 19th in the morning.**
11      Q.  And who do you remember meeting with on
12  that day?
13      **A.  Mr. Mike Power and Mr. Boulukos.**
14      Q.  Was anybody else there?
15      **A.  No.**
16      Q.  So none of the Mr. Schumachers?
17      **A.  Nope.**
18      Q.  And what did you discuss in your meeting
19  with Mr. Power and Mr. Boulukos?
20      **A.  That a very serious allegation has been**
21  **made and that we need to do something about it.**
22      Q.  And was there a decision on what JCA was
23  going to do about it?
24      **A.  First, we actually sought the advice of**

Page 44

1  our counsel to make sure that we were going to do
2  things correctly and follow our Policies and
3  Procedures Manual which they drafted for us.
4      Q.  And after that, what did JCA decide to
5  actually do in response to the allegations?
6      **A.  Well, we had a call with our counsel to --**
7      MS. OLSON:  I'm going to stop you.  You
8  don't want to disclose anything you discussed.
9      THE WITNESS:  Oh, got it.  Okay.
10  BY MR. SEDAEI:
11      Q.  After talking with your counsel, what
12  actions did JCA take in response to the allegations
13  afterwards?
14      **A.  We decided that we needed to investigate**
15  **the claim fully.**
16      Q.  Okay.  And was Mike Power put in charge of
17  the investigation?
18      **A.  Yes.**
19      Q.  Was he given any further instructions as
20  far as, like, what he specifically needed to do as
21  part of the investigation?
22      **A.  That I don't know.**
23      Q.  Now, do you recall having a meeting with
24  anyone ever where Ms. Dziubla's statement that she

Page 45

1  had filed a claim with the EEOC was discussed?
2      **A.  No.**
3      MR. SEDAEI:  4.
4          (Yazbec Exhibit No. 4
5           marked for identification.)
6  BY MR. SEDAEI:
7      Q.  I'm showing you what's marked as
8  Exhibit 4.  Do you recall seeing this email -- I'm
9  sorry.  There are two emails, both from Ms. Dziubla.
10      **A.  Yes.**
11      Q.  And the bottom email, again, is what we
12  just discussed, Exhibit 3.  In the top email
13  Ms. Dziubla is stating, I will be taking PTO for the
14  remainder of the work day.
15      Did I read that correctly?
16      **A.  Yes.**
17      Q.  Did you ever -- do you recall having a
18  discussion with anyone at JCA regarding this email,
19  Ms. Dziubla's statement that she was taking PTO?
20      **A.  I believe I was just informed by Mr. Power**
21      **that that's -- you know, that it was**
22  **available and**
23  **that she could do that.**
24      Q.  But my understanding is that JCA calls PTO

Page 46

1  vacation days?
2      **A.  Yes.**
3      Q.  Okay.  Was Ms. Dziubla's access to client
4  files and email account terminated at some point?
5      **A.  I believe it was.**
6      Q.  Were you a part of making that decision?
7      **A.  Yes.**
8      Q.  Was there anybody else who was a part of
9  making that decision?
10      **A.  Not to my knowledge.  Well, Mr. Power.**
11  **I'm sorry.  Mr. Power and I made that decision.**
12      Q.  Did Mr. Jim Schumacher have a role?
13      **A.  No.**
14      Q.  Why did you and Mr. Power decide to
15  terminate Ms. Dziubla's access to her email account
16  and the server -- Sorry.
17      When did you make that decision?  Let's go
18  with that first.
19      **A.  I believe, to the best of my recollection,**
20  **it was after Mr. Power had met with her off site, I**
21  **believe.**
22      Q.  Okay.  Now tell me with why her access was
23  terminated.
24      **A.  Given some of the statements that she made**

Page 47



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 15 of 42 PageID #:489
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   to Mr. Power regarding her sentiments towards the
2   company.
3       Q.  What is your understanding of what she had
4   said about the company?
5       A.  Some pretty negative things and not having
6   the ability to represent our company any further in
7   a positive light in front of potential clients
8   and/or subcontractors.
9       Q.  Okay.  And do you recall any specifics of
10  what she had said?
11      A.  I think just that.  That's what I remember
12  the most, was not being able to represent us in a
13  positive light in front of customers -- potential
14  customers or subcontractors at walk-throughs.
15      Q.  Is that what she had said, or was that
16  Mr. Power's interpretation of what she had said?
17      A.  That's what he had conveyed to me.  I was
18  not present at the meeting.
19      Q.  So the answer to my question would be you
20  don't know?
21      A.  I don't know.
22      Q.  To your knowledge, had Ms. Dziubla
23  threatened to say anything negative about JCA to any
24  outsiders; any subcontractors, any clients, anything

Page 48

1   Ms. Dziubla as an Estimator?
2       A.  I don't recall anything positive and/or
3   negative.
4       Q.  There is no comments that you recall?
5       A.  Uh-huh.
6           MR. SEDAEI:  If we can take a quick break
7   for one moment, I have the wrong exhibit.
8               (Whereupon a recess was taken
9               from 5:03 p.m. to 5:09 p.m.,
10              after which the following
11              proceedings were had:)
12          MR. SEDAEI:  Back on the record.
13  BY MR. SEDAEI:
14      Q.  Mr. Yazbec, picking up where we left off.
15  So there was a decision to conduct an investigation
16  into Ms. Dziubla's allegations, correct?
17      A.  Correct.
18      Q.  And that investigation was led by
19  Mr. Power?
20      A.  That is correct.
21      Q.  Did JCA consider hiring a third party to
22  do the investigation, somebody outside of JCA?
23      A.  We did not.
24      Q.  When you say you did not consider, that

Page 50

1   like that?
2       A.  Not to my knowledge.
3       Q.  Do you personally know of an instance
4   during Ms. Dziubla's employment when she had said or
5   done anything that reflected negatively on JCA?
6       A.  I am not aware of anything.
7       Q.  How often did you interact with clients or
8   subcontractors personally?
9       A.  Me?
10      Q.  Yes.  Did or do.
11      A.  Yes.  I interact probably more so with
12  clients very frequently and not as frequently with
13  subcontractors.
14      Q.  Ms. Dziubla was an Estimator, correct?
15      A.  Correct.
16      Q.  As an Estimator -- do Estimators interact
17  with clients at all; or if yes, how frequently?
18      A.  Yes.  They represent us at walk-throughs.
19  And typically the walk-through is conducted by the
20  client.  So they're in front of the client, and they
21  are also in front of subcontractors.  They invite
22  the subcontractors to the walk-through also.
23      Q.  Do you recall any clients ever saying
24  anything positive or negative about working with

Page 49

1   means it didn't even occur to you or anybody that
2   you know of at JCA?
3       A.  I can't speculate on that.
4       Q.  Sure.  Let's just talk about you.
5       A.  Yes.
6       Q.  You didn't even think about that?
7       A.  I did not.
8       Q.  My understanding is that a number of
9   individuals were interviewed as part of the
10  investigation, correct?
11      A.  That is correct.
12      Q.  And were you at those witness interviews?
13      A.  Most of them.
14      Q.  Which one were you not a part of?
15      A.  I was not part of Rowena's.
16      Q.  Anybody else's you were not a part of?
17      A.  I'm trying to remember.  I believe I was
18  at everyone else's.
19      Q.  Would it help if I specifically read the
20  names of individuals that --
21      A.  Sure.
22      Q.  -- I believe were interviewed?
23      A.  Sure.
24      Q.  Okay.  So the individuals I'm going to

Page 51

Case: 1:18-cv-04542 Document #: 95-2 Filed: 02/20/20 Page 16 of 42 PageID #:490

Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  read.  For each one you can confirm that they were
2  actually interviewed as part of the investigation.
3  And then you can tell me whether you were there at
4  the interview.
5     **A.  Yes.**
6     Q.  Mr. -- Is it Timothy or Tom Le?
7     **A.  Tim.**
8     Q.  Were you at his interview?
9     **A.  Yes.**
10    Q.  Adam Scheitel?
11    **A.  Yes.**
12    Q.  Kacper Stojowski?
13    **A.  Yes.  That was done via phone.**
14    Q.  Okay.  But you were on that call?
15    **A.  Yes.**
16    Q.  Chad Crane?
17    **A.  No.**
18    Q.  Joe Maguire?
19    **A.  Yes.**
20    Q.  Abby Radoha?
21    **A.  No.**
22    Q.  And was Mr. Jacobsen interviewed as part
23 of the investigation?
24    **A.  I believe so.**

Page 52

1  the allegation of the physical contact was
2  **consistent among all of them, that none of them**
3  **thought any of the contact was inappropriate.**
4     Q.  Do you know when the investigation began?
5     **A.  I believe -- I know the decision was made**
6  **certainly the day after in the morning on the 19th.**
7     Q.  The decision to have an investigation?
8     **A.  Absolutely.  I don't remember when the**
9  **first interview was conducted.**
10    Q.  And do you remember when the investigation
11 concluded?
12    **A.  Not the exact day.**
13    Q.  Was it that week?
14    **A.  I believe it was the following -- The**
15 **incident happened on a Monday.  We made the decision**
16 **to investigate on Tuesday.  I believe it continued**
17 **through that week and into the following week.**
18    Q.  And to your knowledge, the investigation
19 concluded sometime the following week?
20    **A.  Yes.**
21    Q.  You don't recall the specific day?
22    **A.  No.  Or earlier in the week, I believe.**
23       MR. SEDAEI:  5.
24          (Yazbec Exhibit No. 5

Page 54

1     Q.  By who?
2     **A.  I don't know.**
3     Q.  What makes you think that Mr. Jacobsen was
4  interviewed as part of the investigation, if you
5  don't know who actually did the investigation?
6     **A.  I believe Mr. Power mentioned it to me,**
7  **that he has a statement from him.**
8     Q.  Did he tell you if he personally had
9  spoken with him?
10    **A.  He did not.**
11    Q.  What do you recall the results of the
12 investigation to be?
13    **A.  The entire thing?**
14    Q.  Yes, the final conclusion of the
15 investigation into Ms. Dziubla's allegations.
16    **A.  I believe the findings did not prove that**
17 **the allegations were correct.**
18    Q.  And which part of Ms. Dziubla's
19 allegations were proven to not be correct, based on
20 the investigation?
21    **A.  I believe, at least the interviews that I**
22 **was present at, the allegation of an off-color joke**
23 **was consistent among all of them as not striking**
24 **anyone as being off color or offensive.  And then**

Page 53

1           marked for identification.)
2
3  BY MR. SEDAEI:
4     Q.  Mr. Yazbec, I'm showing you what's marked
5  as Exhibit 5.  Do you recall seeing the email on top
6  from Mr. Schumacher?  The date is September 18,
7  2017, which is the same day as The Kev.
8     **A.  Yes.**
9     Q.  And do you remember seeing this email that
10 same night when it was sent?
11    **A.  I don't believe I saw this one that**
12 **evening.  I think I might have seen this one the**
13 **first thing in the morning when I...**
14    Q.  Because, as I recall -- And you can
15 correct me if I'm wrong.  But I believe you said
16 that you check your email before going to bed that
17 day -- or that night.  And the time stamp on this
18 email is 8:34.
19    **A.  I may have seen it that night.**
20    Q.  This email was sent --
21    **A.  I certainly remember seeing it Tuesday**
22 **morning.**
23    Q.  Okay.  Based on the time stamp of the two
24 emails, it seems like this email from Mr. Schumacher

Page 55



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 17 of 42 PageID #:491

Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 56**

1  was sent less than an hour --
2      **A.   I could have -- Yes.  I could have seen it**
3  **on Monday night, yes.**
4      Q.   Okay.  I just want to make sure I'm clear,
5  that -- First, in the email that Mr. Schumacher
6  sent, does it say, I do not want anyone to discuss
7  this alleged issue with Rowena as there is no merit
8  to it.
9          Did I read that correctly?
10     **A.   Yes.**
11     Q.   If I understand it correctly, at the time
12  Mr. Schumacher sent this email, no investigation had
13  actually taken place yet?
14     **A.   That is correct.**
15     Q.   We're done with that email.
16          Is it your understanding that Ms. Dziubla
17  was taking PTO for the remainder of the week of
18  September 18, 2017, which was the week of The Kev?
19     **A.   Per the email you showed me previously,**
20     **that's -- that would be our notification**
21  **of that.**
22     Q.   I believe that email you're referring to
23  was Exhibit 4, which I think you still have.
24          Correct?

**Page 57**

1      **A.   That is correct.**
2      Q.   But that email -- in that email
3  Ms. Dziubla is just talking about the remainder of
4  the work day on the 19th, whereas I'm just asking
5   you about the other days during that week rather
6  than just the 19th.
7          Do you recall if Ms. Dziubla ended up
8  taking additional PTO for the remainder of that
9  week?
10     **A.   I believe that did happen, yes.**
11     Q.   Okay.  I don't have any emails or anything
12  to show for it.  But I just wanted to get your
13  confirmation on that.
14     **A.   Yes.  I believe the rest of the week was**
15  **PTO, vacation.**
16     Q.   Okay.  When do you recall meeting with --
17  Well, let me back up.
18          So after The Kev, during which you
19  exchanged some pleasantries with Ms. Dziubla, when
20  was the next time that you saw her?
21     **A.   I believe the next time that I saw her was**
22  **when she came into the office to meet with Mike and**
23  **myself, Mr. Power and myself.**
24     Q.   And that would have been what day?  Would

**Page 58**

1  it have been the following week?
2      **A.   It was the following week, yes.**
3      Q.   Do you recall if that was Tuesday,
4  September 26th?
5      **A.   To the best of my recollection, I believe**
6  **it was.**
7      Q.   What do you recall from that meeting?
8      **A.   I recall that we were presenting her with**
9  **the results of the investigation.**
10     Q.   Okay.  And you did present her with the
11  results?
12     **A.   Yes.**
13     Q.   And what did you say to her as part of
14  that presentation?
15     **A.   That we've conducted an investigation of**
16  **everyone that was present, questioned everyone that**
17  **was present at the event, and that no one across the**
18  **board thought anything inappropriate happened.**
19     Q.   And what was her response?
20     **A.   She wasn't very happy with that news.**
21     Q.   Do you recall specifically what she said?
22     **A.   I do not recall specifically what she**
23  **said.**
24     Q.   Do you recall her being upset?

**Page 59**

1      **A.   I do recall her being upset, yes.**
2      Q.   And do you recall any kind of a
3  conversation with Ms. Dziubla about certain options
4  that she had requested as far as, like, you know,
5  what to do next in terms of coming back to work or
6  taking time off, what have you?
7      **A.   Yes.  I do remember a conversation related**
8  **to potential options.**
9      Q.   Okay.  What do you remember from that --
10  about that conversation?
11     **A.   She asked us what her options are.  And we**
12  **presented them -- we presented her with what the**
13  **option was.**
14     Q.   And what were the options?
15     **A.   If she needed more time off, that that**
16  **could be taken per our Policies and Procedures**
17  **Manual.**
18     Q.   And according to the manual, what were her
19  options?
20     **A.   I believe it's in accordance with our FMLA**
21  **leave.**
22     Q.   And did she also have a short-term
23  disability option?
24     **A.   No, we do not have a short-term disability**



Case: 1:18-cv-04542 Document #: 93-2 Filed: 02/20/20 Page 18 of 42 PageID #:492
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    option.
2    Q.  Do you know why that is?
3    A.  It's a business decision as a company to
4    not have that.
5    Q.  FMLA leave would have been unpaid,
6    correct?
7    A.  That is correct.
8    Q.  Was there any option left for her to take
9    time away from work and be paid still?
10   A.  I don't believe there was.  Unused
11   vacation.
12   Q.  But if she had no unused vacation and no
13   unused sick days, any options you can think of that
14   she would have --
15   A.  No.  I believe at that point it would be
16   the FMLA option.
17   Q.  Okay.  Was she presented with the option
18   to just come back to work?
19   A.  Yes.
20   Q.  Was she presented that option on
21   September 26th?
22   A.  I believe so.
23   MR. SEDAEI:  Exhibit 6.
24   (Yazbec Exhibit No. 6

Page 60

1    marked for identification.)
2    BY MR. SEDAEI:
3    Q.  I'm showing you what's marked as
4    Exhibit 6.  Would you take a look and tell me if you
5    recognize it?
6    A.  Yes, I do.
7    Q.  And the email on top, is that an email
8    from Ms. Dziubla on September 26th?
9    A.  It appears -- Yes.
10   Q.  And it is sent to Mr. Power, correct?
11   A.  That is correct.
12   Q.  Do you recall seeing this email?  Was this
13   forwarded to you?
14   A.  I believe it was.
15   Q.  Do you recall when you saw this email?
16   A.  I do not recall when I saw this.
17   Q.  Do you recall if it was that day?
18   A.  I don't recall.
19   Q.  Okay.  And is it true that towards the end
20   of the email she says to Mr. Power, I'll save you
21   the trouble of the FMLA paperwork.  I'll report to
22   work tomorrow a.m. as usual.
23   A.  Yes.
24   Q.  And isn't it true that after she sent this

Page 61

1    email, sometime later she was presented with a
2    severance agreement?
3    A.  I believe so.
4    Q.  Why did JCA present Ms. Dziubla with a
5    severance agreement when she said she was going to
6    come back to work?
7    A.  I believe there was a period of time when
8    we -- after this email when we went back and forth
9    on conversations related to the ability to represent
10   our company in a positive light moving forward as
11   part of her job duties.  And she indicated that she
12   could not at this time do that.
13   Q.  What did she say specifically; just that
14   that you just said?
15   A.  Yes; something to that effect, yes.
16   Q.  And she said that in emails?
17   A.  I don't believe she put that in an email,
18   no.  Those were phone conversations.
19   Q.  Did she say, to your recollection, why she
20   couldn't present JCA in a positive light?
21   A.  Her explanation was what she had -- the
22   alleged incident that happened.
23   Q.  Did she say she couldn't present JCA in a
24   positive light because she was upset that she might

Page 62

1    start crying while doing the walk-throughs?
2    A.  It looks like she put it in this email,
3    yes.
4    Q.  Okay.  So any kind of explanation that she
5    gave on the phone was pretty much along the lines of
6    what it says in this second paragraph of her email
7    in Exhibit 6?
8    MS. OLSON:  I'm going to object to form
9    and foundation.
10   A.  Can you repeat the question.
11   MR. SEDAEI:  Can you read it back.
12   (Record read as requested.)
13   MS. OLSON:  I'm going to add that it
14   mischaracterizes prior testimony.
15   A.  I think it was -- I think it was this,
16   yes, and some of the other things that we discussed
17   in a personal meeting on the 26th.
18   BY MR. SEDAEI:
19   Q.  What things are you talking about?
20   A.  Some of the other accusations that she
21   made about the company.
22   Q.  Right.  But did she ever say that she was
23   going to express any of those thoughts about JCA to
24   outsiders, to clients, or to subcontractors?

Page 63



Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A. I don't recall.
2    Q. Okay. I think earlier I asked you if you
3  had -- if you knew of any instance where Ms. Dziubla
4  had said or done anything that reflected badly on
5  JCA.
6       And you said no; is that correct?
7    A. That is correct.
8    Q. So the reason that JCA asked for
9  assurances, was that because Ms. Dziubla has
10  expressed those negative or critical comments about
11  JCA during her meetings or conversations with
12  Mr. Power?
13       MS. OLSON: Objection to form.
14  BY MR. SEDAEI:
15    Q. Answer if you understand the question.
16    A. That is correct.
17    Q. Do you recall or do you know of any other
18  JCA employees who have ever been asked to provide
19  JCA with similar assurances as the ones that were
20  asked of Ms. Dziubla?
21    A. Well, I believe it's kind of implied in
22  our employment with the company, that you say good
23  things about the company and paint the company in a
24  good light and represent the company in a positive

Page 64

1  manner.
2    Q. Sure. But I'm asking about specifically
3  any requests that were made specific to various
4  individuals, the way that Ms. Dziubla was
5  specifically asked to provide assurances.
6    A. I cannot recall.
7    Q. So to your knowledge, no one; to your
8  knowledge?
9       MS. OLSON: I'm going to object,
10       mischaracterizes prior testimony.
11    A. To my knowledge, no.
12  BY MR. SEDAEI:
13    Q. Would it be accurate to say -- Well, I
14   think you already answered this question. But I
15  want to make sure I understand it.
16       Would it be accurate to say that, had
17  Ms. Dziubla not made those critical comments about
18  JCA, JCA would not have asked her to provide
19  assurances that she would be able to present JCA in
20  a positive light?
21       MS. OLSON: Objection, calls for
22       speculation.
23    A. I can't speculate on that.
24  BY MR. SEDAEI:

Page 65

1    Q. But I think you already stated the reason
2  that you did ask Ms. Dziubla for assurances,
3  correct?
4    A. Yes.
5    Q. And it was the comments that she had made
6  to Mr. Power?
7    A. That is correct.
8    Q. Okay. Whose decision was it to present
9  Ms. Dziubla with a severance agreement?
10    A. It was a joint decision between myself and
11  Mr. Power.
12    Q. Did anybody else have a say in that
13  decision?
14    A. No.
15    Q. When was the decision made?
16    A. I believe after the 26th meeting, after we
17  went back and forth on the phone regarding the
18  assurances of representing the company in a positive
19  light.
20    Q. You say after that meeting on the 26th.
21  But the decision was made on the 26th?
22    A. I don't believe so, on the 26th. I think
23  we -- we had subsequent phone calls on the 27th.
24    Q. So, to the best of your recollection, was

Page 66

1  the decision to present her with a severance
2  agreement made on --
3    A. On or about the 27th.
4    Q. Okay. And did you have a discussion with
5  Mr. Power before the decision was made to present
6  Ms. Dziubla with a severance agreement?
7    A. I had a discussion with Mr. Power and our
8  counsel.
9    Q. Did you have any kind of a discussion with
10  Mr. Power where counsel was not present?
11    A. No.
12       MR. SEDAEI: Number 7.
13       (Yazbec Exhibit No. 7
14        marked for identification.)
15  BY MR. SEDAEI:
16    Q. Showing you what's marked as Exhibit 7.
17  Take a look at that and tell me if you recognize
18  this document.
19    A. Yes, I do recognize it.
20    Q. Is this the severance agreement that was
21  presented to Ms. Dziubla?
22    A. I believe it is.
23    Q. When the severance agreement was presented
24  to Ms. Dziubla, had JCA already decided that

Page 67

Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 20 of 42 PageID #:494
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Ms. Dziubla would be terminated?

A.  No.

Q.  So if Ms. Dziubla didn't want to engage in any discussions regarding the severance agreement or sign the agreement, did she have the option to come back to work?

A.  Yes.

Q.  And was she explicitly told that she did have the option to reject the agreement and just come back to work?

A.  I don't recall.  I believe so.

Q.  But I did show you an email earlier where Ms. Dziubla had stated in the email that she was coming back to work, correct?

A.  Yes, you did.

Q.  And that was when JCA presented the severance agreement to her?

A.  I don't believe that's correct, if you look at the dates.

Q.  The severance agreement was presented to Ms. Dziubla after -- Wasn't it presented to her after she had stated that she was coming back to work?  You can look at the exhibit that I just gave you.  Exhibit 6 is when her email went out.

Page 68

A.  Yes.

Q.  So was the severance agreement presented to her before or after this email?

A.  After.

Q.  Okay.  So she said in the email she was coming back -- she will report to work tomorrow a.m. as usual.  And she states this on the 26th.  And then sometime after she sends this email, she receives a severance agreement from JCA.

Is that an accurate sequence of events?

A.  No.

Q.  So which part of it is inaccurate?

A.  Well, there's a part in between that we're missing, which is some phone calls between -- seeking the assurances that she could come back.

Q.  Sure.  But my question wasn't whether what I stated was a comprehensive set of facts involved in this situation.  I was just trying to get a clarification on the sequence of these two events, the email and the severance agreement.

A.  Okay.

Q.  And do you agree that the email that was marked as Exhibit 6 was sent by Ms. Dziubla and was

Page 69

received by JCA before the severance agreement marked as Exhibit 7 was presented to her?

A.  Yes.

Q.  Okay.  And you said that there were calls in between the email that we just discussed and the severance agreement that I just presented as Exhibit 7; there were calls with Ms. Dziubla where there was discussion about whether she could present JCA in a positive light, and she couldn't give that assurance?

A.  That is correct.

MS. OLSON:  Objection to form.

BY MR. SEDAEI:

Q.  You understood the question?

A.  That is correct, yes.

BY MR. SEDAEI:

Q.  But I asked you if, when the severance agreement was presented to her, whether Ms. Dziubla still had the option to come back to work.

And what was your answer?  I won't try to restate it.

A.  Yes.

Q.  Having had the discussions with her about whether she could present JCA in a positive light

Page 70

and receiving her answers, you sent out the severance agreement still as just an option; the other option was for her to come back to work if she wanted to?

A.  Correct.

Q.  And would it be accurate to say that JCA and Ms. Dziubla engaged in further back-and-forth after receiving -- after she received the severance agreement about the terms of the severance agreement?

A.  That is correct.

Q.  And after some back-and-forth, is it accurate to say that Ms. Dziubla and JCA were not able to agree on the terms of a severance agreement?

A.  Correct.

Q.  And what was the sticking point or issue?

A.  I believe it was the separation payment.  And I believe there was some objection to the waiving -- some of the rights being waived.

Q.  Okay.

A.  To the best of my recollection.

Q.  First, regarding the compensation portion of the agreement, do you recall what Ms. Dziubla was demanding?

Page 71

Case: 1:18-cv-04542 Document #: 95-2 Filed: 02/20/20 Page 21 of 42 PageID #:495
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 72**

1    A.   I don't recall specifically.  More than
2    this.
3    Q.   "This" being the six weeks offered in
4    Section 4, page 1 of Exhibit 7?
5    A.   Correct.
6    Q.   Was JCA offering six weeks of pay to
7    Ms. Dziubla as part of the severance agreement?
8    A.   Yes, we were offering six weeks.
9    Q.   Okay.  And what do you recall about the
10   issue she had with the Release section, I believe;
11   Section 6?
12   A.   I believe, to the best of my recollection,
13   it was too broad.
14   Q.   Do you know why Mr. Jacobsen is included
15   as part of the Release?
16       MS. OLSON:  I'm going to remind you not to
17   disclose anything that you discussed with
18   Counsel.
19   A.   I don't know.
20   BY MR. SEDAEI:
21   Q.   Do you remember any issues about this
22   section more specifically than just her thinking it
23   was too broad; like what was broad about it to her?
24   A.   I don't recall.

**Page 74**

1    specifically given that option with the condition
2    that you just described about the assurances?
3    A.   I don't recall.
4    Q.   Was it in writing?
5    A.   I don't recall.
6    Q.   But you do recall it being sometime after
7    negotiations on the severance agreement pretty much
8    fell apart?
9    A.   Yes.
10       MS. OLSON:  I'm going to object,
11   mischaracterizes prior testimony.
12   A.   Yes.
13   BY MR. SEDAEI:
14   Q.   And was she specifically told that if she
15   doesn't take the option to return to work with the
16   assurances, she would be terminated?
17   A.   I believe so.
18   Q.   Do you know who presented her with those
19   options?
20   A.   I believe it was Mr. Power.
21   Q.   But -- Okay.  And you said that -- Do you
22   know when she was presented with those two explicit
23   options?
24   A.   Not exactly.

**Page 73**

1    Q.   So by the time she was -- when she was
2    presented this severance agreement, you state that
3    she still had the option to return to work -- reject
4    the agreement and return to work.
5        Correct?
6    A.   Correct.
7    Q.   But at some point, would it be accurate to
8    say that the decision was made to terminate
9    Ms. Dziubla?
10   A.   Correct.
11   Q.   And when was that decision made?
12   A.   Oh, boy.  I believe -- I don't know the
13   exact date.  But I believe when we just couldn't
14   come to terms on this agreement.
15   Q.   So since the parties couldn't come to
16   terms on this agreement and you said that
17   Ms. Dziubla had the option to come back to work, was
18   she told prior to termination that, You do still
19   preserve the right to just come back and work?
20   A.   That was consistent throughout:  You have
21   the right to come back to work, with certain
22   assurances that you'll represent the company in a
23   positive light.
24   Q.   When was the last time she was

**Page 75**

1    Q.   Okay.
2        MR. SEDAEI:  Number 8.
3        (Yazbec Exhibit No. 8
4        marked for identification.)
5    BY MR. SEDAEI:
6    Q.   I'm showing you what's been marked as
7    Exhibit 8.  Have you seen this document before?
8    A.   Yes.
9    Q.   Can you tell me what it is.
10   A.   It's a termination letter.
11   Q.   Which was sent to Ms. Dziubla?
12   A.   That is correct.
13   Q.   And who drafted the letter?
14   A.   I believe it was drafted by our counsel.
15   Q.   Is that your signature at the bottom?
16   A.   Yes, it is.
17   Q.   Is it accurate to say that no reasons for
18   the termination were included in the letter?
19   A.   Yes.
20   Q.   Why -- or why not?
21       MS. OLSON:  Again, I'm just going to
22   remind you not to disclose anything you
23   discussed with Counsel.
24   A.   This is what was drafted by our legal



Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

---

**Page 76**

1  counsel.
2  BY MR. SEDAEI:
3     Q.  But that's your signature at the bottom,
4  isn't it?
5     **A.  That is correct.**
6     Q.  You don't know why they didn't include
7  reasons for the termination?
8     **A.  I was --**
9     MS. OLSON:  Objection, asked and answered.
10     **A.  I was just going on the advice of our**
11  **legal counsel.**
12  BY MR. SEDAEI:
13     Q.  Whose decision was it to send out the
14  termination letter?
15     **A.  Mr. Power and myself.**
16     MR. SEDAEI:  Number 9.
17       (Yazbec Exhibit No. 9
18        marked for identification.)
19  BY MR. SEDAEI:
20     Q.  I'm showing you what's been marked as
21  Exhibit 9.  Do you recognize this document?
22     **A.  I guess it was sent to me, but I don't**
23  **recall this.**
24     Q.  You don't recall actually reading it?

---

**Page 77**

1     **A.  No.**
2     Q.  Do you know why Mr. Power was sending you
3  this email?
4     **A.  No idea.**
5     Q.  Did you have any discussions with
6  Mr. Power about the contents of this email?
7     **A.  I don't recall talking to him about this**
8  **at all.**
9     Q.  Do you recall talking to him about the
10  subject matter of the email?
11     **A.  No.**
12     Q.  Do you recall having a conversation with
13  anyone at JCA about Ms. Dziubla's Funded Justice
14  page, which is the link which is included in this
15  email?
16     **A.  No.**
17     Q.  And that is no, you don't recall; or no,
18  you had no such discussions?
19     **A.  I don't remember seeing this, so I**
20  **don't -- I didn't discuss -- I wouldn't have**
21  **discussed this with anyone.**
22     MR. SEDAEI:  10.
23       (Yazbec Exhibit No. 10
24        marked for identification.)

---

**Page 78**

1  BY MR. SEDAEI:
2     Q.  The date of the previous email was July 7,
3  2018?
4     **A.  That's what it says, yes.**
5     Q.  I'm showing you what's marked as
6  Exhibit 10.  Is this an email from you to
7  Mr. Boulukos?
8     **A.  Okay.**
9     Q.  Was that a yes?
10     **A.  Yes, it is.**
11     Q.  And in the email, is it accurate that
12  you're forwarding Mr. Power's email, which was
13  Exhibit 9, to Mr. Boulukos on July 10, which is
14  three days after Mr. Power sent you that email?
15     **A.  It appears that way.**
16     Q.  And did you write those words in the email
17  on July 10:  FYI, Per our discussion?
18     **A.  Yes.**
19     Q.  So does that ring any bells as far as any
20  conversations you had with anyone regarding the
21  contents of this email, specifically with
22  Mr. Boulukos?
23     **A.  I think I just passed it on to him.  Yes,**
24  **this one I don't remember.**

---

**Page 79**

1     Q.  So that "per our discussion" that it
2  states, you still don't remember any discussions?
3     **A.  I don't remember any discussion about**
4  **this, no.**
5     Q.  July 2018, that's less than a year ago.
6  Correct?
7     **A.  That is correct.**
8     Q.  Is JCA planning to engage Mr. Jacobsen in
9  any other events in the future?
10     **A.  Not to my knowledge.**
11     Q.  Does anyone at JCA, to your knowledge,
12  regret inviting Mr. Jacobsen to take part in the
13  2017 The Kev event?
14     MS. CRONIN:  Objection, foundation and
15     relevancy.
16     **A.  Yes.  I can't speculate on that.**
17  BY MR. SEDAEI:
18     Q.  To your knowledge.  I don't need you to
19  speculate.
20     **A.  I have no idea.**
21     Q.  So nobody has said anything to you that
22  would express their regret about the decision?
23     **A.  No.**
24     Q.  Have you mentioned this lawsuit to any of

---

Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 23 of 42 PageID #:497
Michael Yazbec 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

JCA's clients?

1    JCA's clients?

2    **A. Not to my knowledge.**

3    Q. Do you know if anyone at JCA has?

4    **A. I don't know.**

5    Q. Can you describe generally your

6 understanding of what Estimators do?

7    **A. Sure. They take potential projects that**

8 **we have to put pricing together on, break down the**

9 **drawings into the different scopes of work, and**

10 **either do a takeoff and an estimate themselves or**

11 **solicit bids and pricing from subcontractors, and**

12 **assemble it into an entire response -- or a bid --**

13 **from our company. That's the CliffsNotes version.**

14    Q. That's exactly what I wanted. Can you

15 tell me what portion of an Estimator's job is spent

16 in the office and what portion of it is outside of

17 the office; ballpark.

18    **A. Yes. I would say 75 percent in the**

19 **office, 25 percent out of the office, depending on**

20 **workload and nature of project. It could go 50/50,**

21 **depending on what's going on.**

22    Q. Of the time spent outside of the office,

23 what does that consist of? What do they do when

24 they're outside the office?

Page 80

1    **A. Outside the office consists of -- the main**

2 **thing is walk-throughs of potential projects with**

3 **our potential clients and subcontractors. And the**

4 **other main thing is sitting in meetings, discussing**

5 **the scope of their bids with our clients.**

6     **Sometimes we do a lot of budgets for**

7 **clients. And they're required at those meetings**

8 **because they know the scope of the project. So**

9 **they're front and center in those meetings in front**

10 **of our clients, describing what they've priced.**

11    Q. Okay.

12    MS. CRONIN: Can we go off the record for

13 one moment.

14     (Discussion off the record.)

15     (Exit Ms. Cronin.)

16     (Ms. Cronin now appearing

17 telephonically.)

18    MR. SEDAEI: Can we get back on the

19 record.

20 BY MR. SEDAEI:

21    Q. We were talking about the Estimators.

22    **A. Uh-huh.**

23    Q. And throughout the time you've been at

24 JCA, can you recall a time when an Estimator -- or

Page 81

1 more than one Estimator -- at some point were unable

2 to go on walk-throughs? It could be for health

3 reasons; for any reason.

4    **A. Yes. It's usually scheduling. There's**

5 **multiple walk-throughs happening at the same time.**

6    Q. Okay. Other than scheduling issues, like

7 a personal issue, like a health issue,

8 something

9 like that?

10    **A. I can't recall that we've had that issue**

11 **besides scheduling.**

12    Q. Do you specifically remember Mr. Maguire

13 having certain issues -- And I understand he's a

14 Project Manager, correct?

15    **A. Correct.**

16    Q. Okay. Do you remember he had some kind of

17 issue with his foot, some kind of a medical issue

18 that may have prevented him from going on

19 walk-throughs?

20    **A. Well, first of all, Project Manager,**

21 **that's not their responsibility. That's why we have**

22 **Estimators.**

23    Q. So he never had to go on walk-throughs,

24 and he never goes on walk-throughs?

Page 82

1    **A. At his level, it's pretty rare. I mean,**

2 **he would go if he had to fill in for an Estimator**

3 **that couldn't make it because they were**

4 **double-booked somewhere else.**

5    Q. Okay. But for whatever reason an

6 Estimator is unable to temporarily go on a

7 walk-through, do you think they still have enough

8 responsibilities that they can do, that they could

9 temporarily be relieved of that responsibility?

10    MS. OLSON: Object to form.

11    **A. I guess I don't understand the question.**

12 BY MR. SEDAEI:

13    Q. Okay. It's a hypothetical because we

14 don't have an actual example. I was hoping to rely

15 on an actual example.

16    **A. Yes.**

17    Q. So we talked about the responsibilities of

18 an Estimator and the distribution of time between

19 how much of their time is spent in the office,

20 outside of the office, how much time they spend

21 going on walk-throughs.

22     And I'm saying based on their

23 responsibilities, if for some reason an Estimator is

24 unable to go on walk-throughs -- for whatever

Page 83



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 24 of 42 PageID #:498
Michael Yazbec          6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Page 84

1   reason --
2       A.   Sure.
3       Q.   -- are there enough responsibilities that
4   they have that are not related to walk-throughs that
5   they can pretty much fulfill most of their
6   responsibilities as the Estimator or an Estimator
7   even though they're not going on walk-throughs,
8   temporarily at least?
9           MS. OLSON:  Objection, calls for
10          speculation.
11  BY MR. SEDAEI:
12      Q.   Go ahead and answer it.
13      A.   It would be -- it would be difficult, only
14  because they're going to see the site conditions
15  that the bid -- you know, so they actually --
16  someone needs to put their eyes on what the actual
17  conditions are at the job site or a potential bid
18  site, what kind of conditions we are bidding under.
19          So someone from the company has to
20  represent us at a walk-through.  It's not like they
21  could do the work from their desk.
22      Q.   Could some other Estimator temporarily do
23  the walk-throughs but work in collaboration with the
24  person who can't do the walk-throughs?

Page 85

1           MS. OLSON:  Same objection.
2       A.   That does happen, usually for scheduling
3   reasons.
4           MR. SEDAEI:  But it does happen?
5       A.   They're double-booked.  Absolutely.
6   That's why there are multiple people in the
7   department.
8       Q.   I'm sorry.  What department?
9       A.   The Estimating department.
10      Q.   Oh, okay.  And this kind of a situation,
11  where Estimators cover for each other for
12  walk-throughs, happens frequently?
13      A.   Not ideal.  I wouldn't say frequently, but
14  it happens.
15          MR. SEDAEI:  Pardon the pauses.  I'm just
16          going through my notes to make sure nothing is
17          left out.
18          THE WITNESS:  I understand.
19  BY MR. SEDAEI:
20      Q.   You referenced certain comments that
21  Ms. Dziubla had made to Mr. Power that were critical
22  of JCA or negative about JCA.  Correct?
23      A.   Correct.
24      Q.   Okay.  Did she make any of those comments

Page 86

1   to you personally?
2       A.   Yes, in the meeting that we had at our
3   office on the 26th when we presented her with the
4   findings of our investigation.
5       Q.   Was it those comments that made JCA
6   conclude that she could not have presented JCA in a
7   positive light while at work?
8       A.   I think in conjunction with what she said
9   to Mr. Power when he interviewed her as part of the
10  investigation.
11      Q.   And what she said, specifically what
12  you're referring to, are the comments that she made
13  about JCA?
14          MS. OLSON:  Object to form.
15      A.   I can't speak to what was said between her
16  and Mr. Power.  I only have his notes from that.
17  But yes, in front of us -- in front of myself, the
18  meeting where I was present.
19  BY MR. SEDAEI:
20      Q.   So would it be an accurate recap of your
21  testimony that Ms. Dziubla made a number of comments
22  about JCA, working at JCA, and made some more
23  comments, perhaps on the same subject matter, while
24  she met with you and Mr. Power.  And that led you

Page 87

1   and Mr. Power to ask Ms. Dziubla for assurances that
2   she could present JCA -- whether she could present
3   JCA in a positive light.  She wouldn't give those
4   assurances.  The parties couldn't reach an agreement
5   on a severance agreement.  And that led to
6   Ms. Dziubla's termination.
7           It's a broad recap.  But is that more or
8   less accurate?
9       A.   That is more or less accurate, correct.
10      Q.   So when you think about the chain of
11  events that I just described, with the first item
12  being Ms. Dziubla's comments and complaints --
13  comments about JCA -- and the last one being the
14  termination, would Ms. Dziubla have been terminated
15  if she originally hadn't made those comments?
16          MS. OLSON:  Objection, calls for
17          speculation.
18      A.   Yes.  I can't speculate on that.
19  BY MR. SEDAEI:
20      Q.   I don't need for you to speculate.  I just
21  need to go based on JCA's actual reasons for
22  offering Ms. Dziubla the termination letter.
23          MS. OLSON:  Same objection.
24  BY MR. SEDAEI:



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 25 of 42 PageID #:499
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 88**

1 Q. You can work that backward and tell me if
2 you take the reason out, whether that final decision
3 would still stand.
4 MS. OLSON: Same objection.
5 If you understand.
6 A. No, I understand. I believe if the
7 assurances were given to us, that she would have
8 come back to work.
9 BY MR. SEDAEI:
10 Q. But you asked for the assurances only
11 because she had made the comments or the complaints?
12 A. That is correct.
13 Q. We talked about Ms. Dziubla's access to
14 emails and the server being terminated. Would an
15 Estimator be able to do her job, either in the
16 office or remotely, if he or she doesn't have access
17 to either his or her emails or the server?
18 A. I don't think -- I don't believe so.
19 Q. Based on what Mr. Power told us, he
20 estimated that about 27 people, more or less, work
21 in the office at JCA.
22 Q. Is that, more or less, an accurate
23 estimate?
24 A. More or less, that's correct, yes.

**Page 89**

1 Q. And he said of those individuals, only
2 four are women. Is that, to your knowledge,
3 accurate? And, again, it might have been an
4 estimate. But I think he specifically named the
5 individuals. In any case, you can give your own
6 answer.
7 A. That is correct.
8 Q. Okay. Do you believe that, given the
9 number of males and females in the office, that JCA
10 still provides an environment where women can
11 comfortably work?
12 A. Yes.
13 Q. And why do you say that?
14 A. Because that's what we do.
15 Q. Who is the most senior female person
16 working at JCA, and what does she do?
17 A. In terms of tenure or...
18 Q. In terms of title.
19 A. In terms of title? On the Operations
20 side, it would be Kayla McKinney.
21 Q. And what is her position?
22 A. She is a Project Manager.
23 Q. And you said Operations side. Is there
24 another side?

**Page 90**

1 A. There's a Marketing department. And
2 Lauren Saunders is our Marketing Director.
3 And then on the Administrative side,
4 Rachael Weil is a Project Coordinator. And Kristn
5 is our Administrative Assistant; Kristn Robertazzo.
6 Q. Okay. So in the organization's hierarchy,
7 who is the highest level?
8 A. It's hard to say. From an Operations
9 standpoint, it's Kayla. She's the only Operations
10 person.
11 Q. So each individual you mentioned, they're
12 within specific departments. Right?
13 A. Correct. But no department is really
14 above the other one. They're all integral functions
15 to our operation.
16 Q. Okay. But there are certain positions at
17 the company that are not in a specific department,
18 correct; like your position?
19 A. Correct.
20 Q. Are you in one department, or are you not
21 in any specific department?
22 A. We call it Management.
23 Q. Management. Who is in Management?
24 A. Myself; Steve Boulukos, our Chief

**Page 91**

1 Operating Officer; Mike Power, our CFO; and William
2 Burfeind, our Director of Sales, I guess, Vice
3 President of Sales. That would be the leadership
4 team.
5 Q. And Mr. Schumachers are not on the
6 Management team?
7 A. They're not actively engaged in the
8 business.
9 Q. But they have authority over the
10 Management team, correct?
11 A. That is correct.
12 Q. And so including the two Mr. Schumachers
13 and the four individuals you mentioned, these are
14 six individuals either on the Management team or
15 with authority over the Management team.
16 Anybody else that you left out among these
17 two groups?
18 A. I think you're correct.
19 Q. Okay. And just to confirm, these
20 individuals are all male?
21 A. That is correct.
22 MR. SEDAEI: Let me just have a quick chat
23 with my client, and then I think I'm done with
24 my portion.



Michael Yazbec      6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 | MS. OLSON: Okay. |
| 2 | MR. SEDAEI: I'll be right back. |
| 3 | (Whereupon a recess was taken |
| 4 | from 6:22 p.m. to 6:29 p.m., |
| 5 | after which the following |
| 6 | proceedings were had:) |
| 7 | MR. SEDAEI: Back on the record. |
| 8 | I just need some clarification, and then |
| 9 | I'm done. |
| 10 | THE WITNESS: Understood. |
| 11 | BY MR. SEDAEI: |
| 12 | Q. There is an individual you mentioned named |
| 13 | Kayla? |
| 14 | A. Uh-huh. |
| 15 | MS. CRONIN: I'm having a little bit of a |
| 16 | hard time hearing. |
| 17 | MR. SEDAEI: Can you hear me now? |
| 18 | MS. CRONIN: Yes, much better. Thank you. |
| 19 | BY MR. SEDAEI: |
| 20 | Q. One of the four females that you |
| 21 | mentioned, her name was Kayla. Right? |
| 22 | A. Yes. |
| 23 | Q. And you said she was a Project Manager? |
| 24 | A. That's correct. |

Page 92

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And Project Managers, they report to who? |
| 3 | A. The Project Executives. |
| 4 | Q. Okay. And how many Project Executives are |
| 5 | there? |
| 6 | A. Three. |
| 7 | MR. SEDAEI: Okay, I think I have no more |
| 8 | questions. |
| 9 | MS. OLSON: I don't have any questions. |
| 10 | MR. SEDAEI: Mary, do you have any |
| 11 | follow-ups? |
| 12 | MS. CRONIN: No, no questions. Thanks so |
| 13 | much. |
| 14 | MS. OLSON: We'll reserve. |
| 15 | MR. SEDAEI: Same order. |
| 16 | MS. OLSON: Same order. |
| 17 | MS. CRONIN: Same order. |
| 18 | (WITNESS EXCUSED.) |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 94

| | |
|---|---|
| 1 | Q. Is it possible that she's an Assistant |
| 2 | Project Manager? |
| 3 | A. She started as a Project Manager. And |
| 4 | she's been promoted to Assistant Project Manager |
| 5 | about January 1st, I believe it was. |
| 6 | Q. Okay. So the Assistant Project Manager is |
| 7 | a higher level than a Project Manager? |
| 8 | A. No, no. She started with us as an |
| 9 | Assistant Project Manager. |
| 10 | Q. Okay. |
| 11 | A. As of January 1 of this year, she was |
| 12 | promoted to Project Manager. |
| 13 | Q. Okay. So she's on the same level as -- |
| 14 | Well, who are the other Project Managers at JCA? |
| 15 | A. Oh, boy. |
| 16 | Q. Are there many? |
| 17 | A. There are, there are. |
| 18 | Q. Over ten? |
| 19 | A. There's probably -- Yes, eight to ten. |
| 20 | Q. Okay. Eight to ten -- |
| 21 | A. Yes, yes. |
| 22 | Q. -- is an adequate answer for my purposes. |
| 23 | A. Okay. |
| 24 | Q. Is Kayla the only female Project Manager? |

Page 93

Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 27 of 42 PageID #:501
Michael Yazbec  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
1                  IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                         EASTERN DIVISION

3

     ROWENA DZIUBLA,                           )
4                                              )
                        Plaintiff,             )
5                                              )
         vs.                                   ) Case No.
6                                              ) 1:18-cv-4542
     J.C. ANDERSON, INC., and                  )
7    PETER ERLING JACOBSEN,                     )
                                               )
8                       Defendants.            )

9

10               I, MICHAEL L. YAZBEC, being first duly

11     sworn, on oath say that I am the deponent in the

12    aforesaid deposition taken on June 26, 2019; that I

13    have read the foregoing transcript of my deposition,

14    consisting of pages 1 through 94 inclusive, and

15    affix my signature to same.

16                    _____  No corrections have been made.

17                    _____  Corrections have been made and
                               are included with the following
18                             errata sheet(s).

19                         _____

20                              MICHAEL L. YAZBEC

21

     SUBSCRIBED AND SWORN TO
22   before me this _____
     day of _____ 20  .
23   _____

24       Notary Public
```



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 28 of 42 PageID #:502
Michael Yazbec   6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1     STATE OF ILLINOIS         )
                                 ) SS.
2     COUNTY OF COOK            )

3

4                 I, GABRIELLE PUDLO, Certified Shorthand

5     Reporter No. 084-004173, and Notary Public within

6     and for the County of Cook and State of Illinois, do

7     hereby certify that on June 26, 2019, at 3:48 p.m.,

8      20 South Clark Street, Suite 500, in the City of

9     Chicago, Illinois, the deponent, MICHAEL L. YAZBEC,

10    personally appeared before me.

11                I further certify that MICHAEL L. YAZBEC

12    was by me duly sworn to testify the truth and that

13    the foregoing is a true record of the testimony

14    given by MICHAEL L. YAZBEC

15                I further certify that the deposition

16    terminated at 6:32 p.m.

17                I further certify that there were present

18    at the taking of the said deposition the persons and

19    parties as indicated on the appearance page made a

20    part of this deposition transcript.

21                I further certify that the signature of

22    the witness to the foregoing deposition was reserved

23    by agreement of counsel; and that I am not counsel

24    for nor in any way related to any of the parties to

Case: 1:18-cv-04542 Document #: 93-2 Filed: 02/20/20 Page 29 of 42 PageID #:503

Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1      this suit, nor am I in any way interested in the

2     outcome thereof.

3              IN TESTIMONY WHEREOF, I have hereunto set

4     my hand and affixed my notarial seal on this

5     12th day of July, 2019.

6

       /s/Gabrielle Pudlo
7                              _____
                               GABRIELLE PUDLO, CSR
8                              Notary Public
                               License No. 084-004173
9                              Expiration Date:  May 31, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Michael Yazbec   6/26/2019
Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 30 of 42 PageID #:504
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

## WORD INDEX

< >
    97:5

< 0 >
**084-004173** 96:5
97:8

< 1 >
**1** 2:13  3:7  8:20
18:24  19:1, 5
39:22  40:16  72:4
93:11  95:14
**1:18-cv-4542** 1:6
95:6
**10** 3:16  77:22, 23
78:6, 13, 17
**10:00** 36:21
**1053** 39:24
**12th** 97:5
**18** 32:14  55:6
56:18
**18th** 10:7
**19** 3:7
**1963** 8:20
**1976** 14:23
**1985** 9:17
**1988** 9:4
**19th** 44:10  54:6
57:4, 6
**1st** 93:5

< 2 >
**2** 3:8  35:19, 20
36:9
**20** 1:17  2:3  5:6
95:22  96:8
**200** 23:11, 13
**2012** 28:1
**2013** 28:5
**2017** 25:20  26:8
29:11, 20  31:15
55:7  56:18  79:13
**2018** 78:3  79:5
**2019** 1:19  95:12
96:7  97:5
**2021** 97:9
**20-plus** 4:22
**22** 32:14

**222** 2:8
**25** 80:19
**2500** 2:13
**26** 1:19  32:14
95:12  96:7
**26th** 58:4  60:21
61:8  63:17  66:16,
20, 21, 22  69:7  86:3
**27** 88:20
**27th** 66:23  67:3

< 3 >
**3** 3:9  42:7, 8, 12
46:12
**3:48** 1:19  96:7
**30** 25:13
**31** 97:9
**312** 2:4, 9, 14
**332-6733** 2:4
**35** 3:8

< 4 >
**4** 3:4, 10  46:3, 4, 8
56:23  72:4
**4:29** 30:22
**4:33** 30:22
**42** 3:9
**46** 3:10

< 5 >
**5** 3:11  54:23, 24
55:5
**5:03** 50:9
**5:09** 50:9
**50** 14:18  22:21
80:20, 20
**500** 1:18  2:3  96:8
**50-mile** 21:21
**54** 3:11
**578-7458** 2:14

< 6 >
**6** 3:12  60:23, 24
61:4  63:7  68:24
69:24  72:11
**6:22** 92:4
**6:29** 92:4
**6:32** 96:16
**60** 3:12
**60601** 2:8

**60603** 2:3
**60606** 2:13
**609-7569** 2:9
**67** 3:13

< 7 >
**7** 3:13  67:12, 13, 16
70:2, 7  72:4  78:2
**74** 3:14
**75** 22:21  80:18
**76** 3:15
**77** 3:16

< 8 >
**8** 3:14  75:2, 3, 7
**8:34** 55:18
**80s** 15:3

< 9 >
**9** 3:15  76:16, 17, 21
78:13
**90** 22:16
**94** 95:14

< A >
**a.m** 61:22  69:6
**Abby** 52:20
**abilities** 16:17
**ability** 6:24  16:19
48:6  62:9
**able** 48:12  65:19
71:14  88:15
**above-entitled** 1:12
**Absolutely** 20:14
38:20  39:10  54:8
85:5
**access** 47:3, 15, 22
88:13, 16
**accommodations**
30:6
**account** 47:4, 15
**accurate** 16:23
43:14, 21  65:13, 16
69:10  71:6, 13
73:7  75:17  78:11
86:20  87:8, 9
88:22  89:3
**accusations** 63:20
**acknowledged** 34:20
**actions** 45:12
**actively** 91:7

**actual** 83:14, 15
84:16  87:21
**Adam** 52:10
**add** 6:16  63:13
**additional** 57:8
**adds** 43:19
**adequate** 93:22
**adjective** 18:10
**Administrative** 90:3,
5
**Admiral** 33:16, 17
**advanced** 8:21
**advice** 44:24  76:10
**affix** 95:15
**affixed** 97:4
**aforesaid** 95:12
**afternoon** 4:9
**ago** 4:22  5:6
26:21  38:2  41:10
79:5
**agree** 69:23  71:14
**agreement** 20:20
21:2, 6  62:2, 5
66:9  67:2, 6, 20, 23
68:4, 5, 9, 17, 20
69:2, 9, 21  70:1, 6,
18  71:2, 9, 10, 14, 23
72:7  73:2, 4, 14, 16
74:7  87:4, 5  96:23
**agreements** 21:3
**ahead** 12:21  84:12
**airfare** 30:5
**alcohol** 6:10
**allegation** 38:12, 19
39:4  44:20  53:22
54:1
**allegations** 44:8
45:5, 12  50:16
53:15, 17, 19
**allege** 13:10
**alleged** 13:14, 18
35:10  56:7  62:22
**alluded** 14:11
**ambassador** 29:13
**ANDERSON** 1:6
2:11  10:5  14:7
95:6
**announcement**
23:24  24:1, 1, 10
**announcer** 28:18, 19



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 31 of 42 PageID #:505

Michael Yazbec   6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**answer** 6:7 8:*4, 5*
12:2*1, 22* 20:7
27:6 43:*12* 48:*19*
64:*15* 70:*20* 84:*12*
89:*6* 93:22
**answered** 6:2, *2*
32:21 65:*14* 76:9
**answering** 5:*13, 17*
**answers** 5:*18, 21*
7:*1, 18* 20:*10, 16*
71:*1*
**anybody** 7:7, *10*
11:22 12:8 14:*14*
36:*24* 42:*1* 44:*14*
47:8 51:*1, 16*
66:*12* 91:*16*
**apart** 74:8
**appearance** 96:*19*
**appeared** 96:*10*
**appearing** 81:*16*
**appears** 61:9 78:*15*
**appropriate** 24:*5*
**Approximately**
10:*16* 22:21 23:*8,*
*14*
**Architecture** 8:*23*
**Arrived** 31:*23*
**Arts** 9:9, *11*
**asked** 6:*3, 20* 22:*4,*
*4* 31:*12* 37:*12*
41:*10, 23* 59:*11*
64:2, *8, 18, 20* 65:*5,*
*18* 70:*17* 76:9
88:*10*
**asking** 5:*13* 20:*24*
31:*3* 57:*4* 65:2
**assemble** 80:*12*
**Assistant** 90:*5* 93:*1,*
*4, 6, 9*
**assume** 6:7
**assumes** 37:*4*
**assurance** 70:*10*
**assurances** 64:9, *19*
65:*5, 19* 66:*2, 18*
69:*15* 73:22 74:*2,*
*16* 87:*1, 4* 88:*7, 10*
**attempting** 5:*10*
**attendance** 29:*20*
**attended** 28:*12*
32:*23*

**attending** 30:*14*
**attorney** 4:*10*
**attorneys** 36:*6*
**at-will** 18:22
**auction** 32:*3, 4*
**authority** 91:9, *15*
**autographs** 29:*14*
**available** 29:*12*
46:22
**aware** 30:*13* 49:*6*

**< B >**
**Bachelor** 9:9, *11*
**Bachelor's** 9:7
**back** 18:*17* 22:2
26:*21* 27:9, *14*
29:*10* 31:*1* 32:*1*
37:*11* 41:*12* 43:*13*
50:*12* 57:*17* 59:*5*
60:*18* 62:6, *8*
63:*11* 66:*17* 68:*6,*
*10, 14, 22* 69:*6, 15*
70:*19* 71:*3* 73:*17,*
*19, 21* 81:*18* 88:*8*
92:*2, 7*
**back-and-forth** 71:*7,*
*12*
**backward** 88:*1*
**badly** 64:*4*
**Ballpark** 15:2
80:*17*
**banking** 14:2
**based** 24:*13* 27:6
53:*19* 55:23 83:22
87:*21* 88:*19*
**basic** 5:*4*
**Basically** 11:6
**Bates** 39:*23*
**Bean** 11:*10, 20* 12:*4*
**Bears** 28:*17*
**bed** 36:23 55:*16*
**began** 54:*4*
**beginning** 22:*4*
**behalf** 2:*4, 9, 14* 4:*3*
**believe** 7:*16, 20*
12:*12* 15:*7* 18:*21*
21:*14, 15, 18* 26:*14,*
*18, 22* 27:*13* 28:*2, 5*
29:*2* 30:*7* 32:*4*
33:*7, 16* 34:*6, 20*
35:*15* 37:*14* 40:*1*

42:*17* 46:*20* 47:*5,*
*19, 21* 51:*17, 22*
52:*24* 53:*6, 16, 21*
54:*5, 14, 16, 22*
55:*11, 15* 56:22
57:*10, 14, 21* 58:*5*
59:*20* 60:*10, 15, 22*
61:*14* 62:*3, 7, 17*
64:*21* 66:*16, 22*
67:22 68:*11, 18*
71:*17, 18* 72:*10, 12*
73:*12, 13* 74:*17, 20*
75:*14* 88:*6, 18*
89:*8* 93:*5*
**bells** 78:*19*
**belong** 23:*1*
**best** 15:*7* 44:*9*
47:*19* 58:*5* 66:*24*
71:*21* 72:*12*
**better** 92:*13*
**bid** 24:*12* 80:*12*
84:*15, 17*
**bidding** 84:*18*
**bids** 23:*17* 24:*11,*
*14* 80:*11* 81:*5*
**Bill** 28:*14, 14*
**birth** 8:*19*
**bit** 25:*4* 92:*15*
**Blackhawks** 28:*23*
**Blackhaws** 28:*23*
**Bo** 28:*15*
**board** 58:*18*
**booklet** 20:*10*
**bottom** 12:*11*
39:*23* 42:*17* 46:*11*
75:*15* 76:*3*
**bought** 14:*24* 15:*4*
**Boulukos** 16:*3*
37:*14* 38:9 44:*13,*
*19* 78:*7, 13, 22*
90:*24*
**Box** 43:*4, 5*
**boy** 25:*13* 73:*12*
93:*15*
**BOYLE** 27:*4*
**break** 5:24 6:*1*
30:*18* 31:*3* 50:*6*
80:*8*
**Brief** 18:*16*
**briefly** 27:*17*
**bring** 35:23

**broad** 72:*13, 23, 23*
87:*7*
**broken** 23:22
**brother** 14:*19, 24*
**Bruce** 33:*16*
**budgets** 81:*6*
**Bulls** 28:*14*
**bunch** 17:22
**Burfeind** 91:*2*
**business** 11:*1*
21:22 33:*18* 60:*3*
91:*8*

**< C >**
**call** 37:*19* 38:*1, 6*
45:*6* 52:*14* 90:22
**called** 4:*3* 23:*23*
25:22 37:*21, 22*
**calls** 39:*15* 46:*24*
65:*21* 66:*23* 69:*14*
70:*4, 7* 84:*9* 87:*16*
**cancer** 27:*20, 23*
**candidates** 16:*10,*
*12, 16, 18*
**Carpenters** 23:*2, 3*
**carpentry** 22:*20*
**Cartwright** 28:*14*
**Case** 1:*5* 4:*11*
13:*5* 89:*5* 95:*5*
**cases** 29:*14*
**categorized** 23:*19*
**cause** 1:*12*
**CB** 13:2
**cc** 43:*5*
**cc:'d** 42:*24* 43:*17*
**ceilings** 22:*20*
**celebrities** 28:*12*
34:*6*
**celebrity** 28:*6*
**center** 81:*9*
**certain** 59:*3* 73:*21*
82:*13* 85:*20* 90:*16*
**certainly** 31:*8* 54:*6*
55:*21*
**certificate** 9:*24*
**Certified** 96:*4*
**certify** 96:*7, 11, 15,*
*17, 21*
**CFO** 91:*1*
**Chad** 52:*16*



Michael Yazbec    6/26/2019
Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 32 of 42 PageID #:506
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**chain** 42:*15* 87:*10*
**charge** 45:*16*
**charity** 25:*19*
27:*19* 28:*3* 29:*23*
30:*2*
**chat** 91:*22*
**check** 55:*16*
**Chicago** 1:*18* 2:*3, 8,
13* 28:*13* 96:*9*
**Chief** 13:*22* 90:*24*
**CHTD** 2:*12*
**City** 1:*18* 8:*14*
96:*8*
**Civil** 1:*15*
**claim** 4:*24* 43:*18*
45:*15* 46:*1*
**clarification** 69:*20*
92:*8*
**Clark** 1:*17* 2:*3*
96:*8*
**classrooms** 22:*14*
**clear** 29:*16* 56:*4*
**client** 22:*15* 47:*3*
49:*20, 20* 91:*23*
**clients** 12:*16, 17, 23*
13:*3* 22:*17* 48:*7,
24* 49:*7, 12, 17, 23*
63:*24* 80:*1* 81:*3, 5,
7, 10*
**CliffsNotes** 80:*13*
**Clint** 33:*17*
**close** 17:*22* 37:*24*
**closer** 36:*20*
**Club** 34:*3, 4*
**Code** 1:*15* 24:*2*
**codes** 23:*23* 24:*2*
**collaboration** 84:*23*
**college** 9:*13*
**color** 53:*24*
**come** 18:*8* 60:*18*
62:*6* 68:*5, 10*
69:*15* 70:*19* 71:*3*
73:*14, 15, 17, 19, 21*
88:*8*
**comfortably** 89:*11*
**coming** 59:*5* 68:*14,
22* 69:*6*
**commentator** 25:*9*
**commenting** 34:*15*
**comments** 50:*4*
64:*10* 65:*17* 66:*5*

85:*20, 24* 86:*5, 12,
21, 23* 87:*12, 13, 15*
88:*11*
**commercial** 22:*9, 17*
**commitment** 32:*5*
36:*22*
**Commonwealth** 13:*1*
**company** 11:*23*
13:*9, 11* 14:*13, 17,
21, 21, 23* 29:*13*
48:*2, 4, 6* 60:*3*
62:*10* 63:*21* 64:*22,
23, 23, 24* 66:*18*
73:*22* 80:*13* 84:*19*
90:*17*
**compensated** 30:*5*
**Compensation** 4:*24*
29:*19* 71:*22*
**compete** 21:*21*
**competitors** 20:*22*
**complaints** 87:*12*
88:*11*
**comprehensive**
69:*17*
**conclude** 86:*6*
**concluded** 16:*8*
54:*11, 19*
**conclusion** 53:*14*
**condition** 6:*22* 74:*1*
**conditions** 84:*14, 17,
18*
**conduct** 50:*15*
**conducted** 49:*19*
54:*9* 58:*15*
**confirm** 40:*2* 52:*1*
91:*19*
**confirmation** 57:*13*
**confusing** 33:*19*
**Congratulations**
6:*19*
**conjunction** 86:*8*
**consider** 12:*17*
39:*8* 50:*21, 24*
**considered** 38:*19*
**considering** 40:*24*
**consist** 80:*23*
**consistent** 53:*23*
54:*2* 73:*20*
**consisting** 95:*14*
**consists** 81:*1*

**Construction** 4:*23*
23:*21*
**consumed** 6:*10*
**contact** 42:*4* 54:*1, 3*
**contents** 19:*18*
77:*6* 78:*21*
**continued** 54:*16*
**Continuing** 28:*22*
**contract** 18:*20*
24:*19*
**contracting** 22:*18*
**contractor** 22:*12*
**contractors** 22:*8*
**conversation** 5:*8, 11*
34:*14* 44:*3* 59:*3, 7,
10* 77:*12*
**conversations** 62:*9,
18* 64:*11* 78:*20*
**conveyed** 48:*17*
**Cook** 1:*14* 96:*2, 6*
**Coonan** 33:*17*
**Coordinator** 90:*4*
**copy** 19:*13*
**Correct** 8:*10* 10:*22*
11:*12* 14:*9* 17:*2*
24:*17* 25:*21* 29:*18,
24* 35:*5* 40:*6*
42:*19, 20, 22* 43:*24*
49:*14, 15* 50:*16, 17,
20* 51:*10, 11* 53:*17,
19* 55:*15* 56:*14, 24*
57:*1* 60:*6, 7* 61:*10,
11* 64:*6, 7, 16* 66:*3,
7* 68:*14, 18* 70:*11,
15* 71:*5, 11, 15* 72:*5*
73:*5, 6, 10* 75:*12*
76:*5* 79:*6, 7* 82:*14,
15* 85:*22, 23* 87:*9*
88:*12, 24* 89:*7*
90:*13, 18, 19* 91:*10,
11, 18, 21* 92:*24*
**corrections** 95:*16, 17*
**correctly** 45:*2*
46:*15* 56:*9, 11*
**Counsel** 7:*5, 8* 8:*4*
40:*20, 20* 45:*1, 6, 11*
67:*8, 10* 72:*18*
75:*14, 23* 76:*1, 11*
96:*23, 23*
**Country** 34:*3, 4*
**County** 1:*13* 96:*2, 6*

**course** 31:*24* 33:*3,
20, 23* 35:*2*
**COURT** 1:*1, 16*
5:*10* 28:*20* 95:*1*
**cover** 85:*11*
**Craig** 28:*15*
**Crane** 52:*16*
**critical** 64:*10* 65:*17*
85:*21*
**CRONIN** 2:*12*
26:*23* 27:*2* 30:*8,
18* 38:*23* 39:*1, 9*
79:*14* 81:*12, 15, 16*
92:*15, 18* 94:*12, 17*
**crying** 63:*1*
**CSI** 23:*23*
**CSR** 1:*13* 97:*7*
**current** 10:*4* 13:*6,
8, 14, 17*
**currently** 10:*2*
**Cushman** 13:*2*
**customers** 48:*13, 14*
**CX** 3:*2*

**< D >**
**Dan** 28:*17*
**date** 8:*19* 14:*24*
55:*6* 73:*13* 78:*2*
97:*9*
**dates** 68:*19*
**day** 14:*7* 19:*15, 17,
22, 22, 24* 20:*3* 30:*3*
31:*17, 18* 33:*7*
34:*16, 23* 35:*7*
36:*14* 43:*24* 44:*12*
46:*14* 54:*6, 12, 21*
55:*7, 17* 57:*4, 24*
61:*17* 95:*22* 97:*5*
**days** 47:*1* 57:*5*
60:*13* 78:*14*
**decide** 45:*4* 47:*14*
**decided** 45:*14*
67:*24*
**decision** 24:*15*
44:*22* 47:*6, 9, 11, 17*
50:*15* 54:*5, 7, 15*
60:*3* 66:*8, 10, 13, 15,
21* 67:*1, 5* 73:*8, 11*
76:*13* 79:*22* 88:*2*
**Defendant** 2:*9, 14*



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 33 of 42 PageID #:507

Michael Yazbec - 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Defendants** 1:8 95:8

**degree** 8:22, 23, 24 9:4, 7, 15, 18

**degrees** 9:5, 22

**demanding** 71:24

**department** 85:7, 8, 9 90:1, 13, 17, 20, 21

**departments** 90:12

**DePaul** 13:1 22:15

**depending** 22:22 80:19, 21

**deponent** 6:19 95:11 96:9

**deposed** 4:15, 17

**deposition** 1:11 3:6 5:8 7:4 8:1 35:24 95:12, 13 96:15, 18, 20, 22

**describe** 22:6 31:17 80:5

**described** 39:12 74:2 87:11

**describing** 36:13 81:10

**desk** 84:21

**details** 31:21

**development** 11:1 33:18

**differences** 5:9

**different** 22:16 23:8 33:8 80:9

**difficult** 84:13

**dinner** 35:4

**DIRECT** 4:6 17:7

**direction** 6:14

**directly** 8:8 11:19

**Director** 90:2 91:2

**disability** 59:23, 24

**disclose** 45:8 72:17 75:22

**discriminated** 13:15

**discuss** 16:9 44:18 56:6 77:20

**discussed** 7:7 30:12 42:18 45:8 46:1, 12 63:16 70:5 72:17 75:23 77:21

**discussing** 38:5 81:4

**discussion** 19:18 46:18 67:4, 7, 9 70:8 78:17 79:1, 3 81:14

**discussions** 68:4 70:23 77:5, 18 79:2

**distinction** 21:24

**distribution** 83:18

**DISTRICT** 1:1, 1, 16, 16 95:1, 1

**DIVISION** 1:2, 17 95:2

**document** 7:21 19:6 40:15 67:18 75:7 76:21

**documents** 7:13, 15

**d'oeuvres** 32:2 35:4

**doing** 63:1

**donations** 30:10

**double-booked** 83:4 85:5

**drafted** 40:15, 19 45:3 75:13, 14, 24

**drafting** 40:21

**drawings** 80:9

**Drive** 2:13

**drugs** 6:17

**drywall** 22:19

**due** 27:23

**duly** 4:4 95:10 96:12

**duties** 10:23 11:4 62:11

**DX** 3:2

**DZIUBLA** 1:2 2:16 4:11 8:9 15:9, 22 16:15, 24 17:11 18:19 19:12 20:19 21:5 34:10 35:6, 10, 18 39:12, 24 42:18, 23 43:15 46:9, 13 48:22 49:14 50:1 56:16 57:3, 7, 19 59:3 61:8 62:4 64:3, 9, 20 65:4, 17 66:2, 9 67:6, 21, 24 68:1, 3, 13, 21 69:24 70:7, 18 71:7, 13, 23 72:7 73:9, 17 75:11

85:21 86:21 87:1, 14, 22 95:2

**Dziubla's** 15:13 17:7 18:5 44:8 45:24 46:19 47:3, 15 49:4 50:16 53:15, 18 77:13 87:6, 12 88:13

**< E >**

**earlier** 14:11 44:10 54:22 64:2 68:12

**EASTERN** 1:2, 17 95:2

**Eddie** 28:23

**Edison** 13:1

**educational** 8:22

**EEOC** 43:19 46:1

**effect** 34:17 62:15

**EHRLICH** 2:2

**eight** 10:7, 8 93:19, 20

**either** 23:16 80:10 88:15, 17 91:14

**Ellis** 13:2

**else's** 51:16, 18

**email** 35:15 36:13, 15 37:8, 13, 24 38:7 39:13 42:15, 18, 21, 22, 24 43:13, 14, 23 44:2, 3, 4 46:8, 11, 12, 18 47:4, 15 55:5, 9, 16, 18, 20, 24 56:5, 12, 15, 19, 22 57:2, 2 61:7, 7, 12, 15, 20 62:1, 8, 17 63:2, 6 68:12, 13, 24 69:3, 5, 8, 21, 23 70:5 77:3, 6, 10, 15 78:2, 6, 11, 12, 14, 16, 21

**emails** 7:23 8:8 43:3 46:9 55:24 57:11 62:16 88:14, 17

**employed** 10:2 11:15 17:11 18:6

**employee** 13:6, 9 18:22 20:11 29:17

**employees** 13:14, 18 19:16 21:1, 4, 9, 11, 13 22:1 25:1

30:16 31:6, 10 64:18

**employer** 10:4

**employment** 17:8 18:19 19:15, 22 25:1 49:4 64:22

**ended** 57:7

**engage** 68:3 79:8

**engaged** 71:7 91:7

**entertainment** 29:4

**entire** 23:16 53:13 80:12

**entirely** 22:9

**environment** 89:10

**Eric** 29:1

**ERLING** 1:7 2:16 95:7

**errata** 95:18

**estimate** 17:13 80:10 88:23 89:4

**estimated** 88:20

**estimating** 16:18 85:9

**Estimator** 15:12 49:14, 16 50:1 81:24 82:1 83:2, 6, 18, 23 84:6, 6, 22 88:15

**Estimators** 49:16 80:6 81:21 82:22 85:11

**Estimator's** 80:15

**evening** 31:22 35:16 36:18, 19, 20 37:16, 20 38:1 55:12

**event** 26:13, 21 27:18 28:3, 7 29:11, 14 30:4 31:14 32:16, 24 33:20, 22, 22 34:10 35:11 44:1 58:17 79:13

**events** 26:6, 9 69:10, 20 79:9 87:11

**everyone's** 33:11

**exact** 34:1 54:12 73:13

**exactly** 23:13 38:11 74:24 80:14



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 34 of 42 PageID #:508

Michael Yazbec        6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**EXAMINATION**
  3:2  4:6
**examined**  4:4
**example**  83:14, 15
**exchanged**  57:19
**exclusively**  24:20
**EXCUSED**  94:18
**Executive**  10:13, 14,
  24  11:8
**Executives**  94:3, 4
**Exhibit**  3:7, 8, 9, 10,
  11, 12, 13, 14, 15, 16
  19:1, 5  35:20  36:9
  39:19, 22  40:16
  42:8, 12, 22  46:4, 8,
  12  50:7  54:24
  55:5  56:23  60:23,
  24  61:4  63:7
  67:13, 16  68:23, 24
  69:24  70:2, 7  72:4
  75:3, 7  76:17, 21
  77:23  78:6, 13
**EXHIBITS**  3:6
  7:23, 24
**Exit**  81:15
**Expiration**  97:9
**explanation**  43:10
  62:21  63:4
**explicit**  74:22
**explicitly**  68:8
**express**  63:23  79:22
**expressed**  64:10
**eyes**  84:16

**< F >**
**fact**  34:20
**facts**  69:17
**falls**  14:1
**familiar**  41:6
**family**  27:20  32:7,
  15, 18, 23  36:22
**far**  5:18  27:14
  45:20  59:4  78:19
**father**  14:22  15:1, 4
**Federal**  1:15
**feel**  40:12
**fell**  74:8
**female**  89:15  93:24
**females**  89:9  92:20
**Ferguson**  29:1
**field**  22:20, 20

**figure**  24:3, 4
  38:15  43:10
**filed**  43:18  46:1
**files**  47:4
**fill**  83:2
**filling**  20:4
**final**  53:14  88:2
**Finance**  11:7
**Financial**  13:22
**findings**  53:16  86:4
**fine**  15:2
**finished**  5:12
**first**  4:4  6:19
  10:11  14:6, 7
  16:24  19:15, 17, 21,
  22  20:3  25:18
  26:4  28:5  35:13
  37:3, 12  38:15
  40:2  42:21  44:7,
  24  47:18  54:9
  55:13  56:5  71:22
  82:20  87:11  95:10
**FMLA**  59:20  60:5,
  16  61:21
**focused**  22:9
**Foley**  28:19
**follow**  31:6, 9  45:2
**following**  30:23
  50:10  54:14, 17, 19
  58:1, 2  92:5  95:17
**follows**  4:5
**follow-ups**  94:11
**foot**  82:17
**foregoing**  95:13
  96:13, 22
**Forest**  34:3, 4
**form**  37:1  39:1, 9
  41:16  63:8  64:13
  70:12  83:10  86:14
**formats**  43:3
**former**  13:6, 9, 14,
  18  25:1
**forth**  62:8  66:17
**forward**  62:10
**forwarded**  61:13
**forwarding**  43:11
  78:12
**foundation**  26:23
  27:3, 8  30:8  37:4
  39:9  63:9  79:14

**four**  33:9, 12  89:2
  91:13  92:20
**free**  40:12
**frequency**  17:14
**frequently**  49:12, 12,
  17  85:12, 13
**friends**  25:24  26:17
  27:10
**friendship**  27:14
**front**  43:5  48:7, 13
  49:20, 21  81:9, 9
  86:17, 17
**fulfill**  84:5
**full**  4:12  5:18
**fully**  45:15
**functions**  90:14
**Funded**  77:13
**funds**  27:19
**further**  26:21
  43:19  45:19  48:6
  71:7  96:11, 15, 17,
  21
**future**  79:9
**FYI**  78:17

**< G >**
**Gabrielle**  1:12  96:4
  97:5, 7
**Garland**  16:5
**gears**  25:4
**general**  22:11, 12, 18
**generally**  21:10
  22:6  80:5
**give**  6:24  17:13
  19:21  26:24  29:15
  30:1  31:8, 12, 20
  70:9  87:3  89:5
**given**  19:9, 15, 16,
  19, 23  20:9  30:14
  45:19  47:24  74:1
  88:7  89:8  96:14
**go**  5:4  12:21
  18:17  37:11  41:12
  47:17  80:20  81:12
  82:2, 23  83:2, 6, 24
  84:12  87:21
**goes**  24:1  26:20
  27:15  40:4  43:19
  82:24
**going**  5:4  6:13
  15:1  18:2  22:2

**27:9  29:10  32:22
  36:23  41:15  43:13
  44:23  45:1, 7
  51:24  55:16  62:5
  63:8, 13, 23  65:9
  72:16  74:10  75:21
  76:10  80:21  82:18
  83:21  84:7, 14
  85:16
**GOLDMAN**  2:2
**golf**  25:19  27:19
  31:19, 24  32:1, 1
  33:3, 20, 23  34:6
  35:2, 3
**golfer**  25:8, 10  28:9
**golfers**  33:9
**Good**  4:9  14:22
  17:24  18:7  20:2
  29:7, 8  33:9  64:22,
  24
**graduate**  9:15
**greet**  17:20
**Greg**  16:5
**ground**  5:4
**group**  33:8, 12, 13
**groups**  33:8  91:17
**guess**  6:13  7:23
  15:1, 20  36:21
  76:22  83:11  91:2
**guest**  28:6
**guests**  29:13
**guys**  33:10

**< H >**
**H.R**  20:3
**had:**  30:24  50:11
  92:6
**Hampton**  28:17
**hand**  33:11  97:4
**handbook**  19:9, 13,
  17, 19  20:9
**happen**  57:10  85:2,
  4
**happened**  13:10
  36:14  54:15  58:18
  62:22
**happening**  82:5
**happens**  85:12, 14
**happy**  58:20
**harassment**  39:14



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 35 of 42 PageID #:509
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

40:*3*, *7*
**hard** 90:*8* 92:*16*
**Hawks** 28:*18*
**head** 5:*21*, *21*
**health** 82:*2*, *7*
**hear** 6:*5* 92:*17*
**hearing** 92:*16*
**Heating** 33:*17*, *17*
**held** 10:*12*, *17*
**Hello** 4:*8* 17:*24*
**help** 51:*19*
**hereunto** 97:*3*
**Hi** 34:*15*
**Hickman** 33:*18*
**hierarchy** 90:*6*
**high** 9:*21*
**higher** 14:*16* 93:*7*
**highest** 90:*7*
**hire** 16:*15* 24:*15*
**hired** 15:*12* 20:*8*
**hires** 19:*10*
**hiring** 12:*3* 14:*4*
  15:*13*, *16*, *19* 50:*21*
**Hodges** 28:*15*
**home** 32:*6* 36:*22*
**honorarium** 29:*23*
  30:*2*, *11*
**hope** 33:*19*
**hoping** 83:*14*
**hors** 32:*2* 35:*4*
**hour** 1:*19* 56:*1*
**hours** 6:*11*, *17*
**How's** 18:*2*
**Human** 14:*1*
**hypothetical** 83:*13*

**< I >**
**idea** 26:*12* 43:*8*
  77:*4* 79:*20*
**ideal** 85:*13*
**identification** 19:*2*
  35:*21* 42:*9* 46:*5*
  55:*1* 61:*1* 67:*14*
  75:*4* 76:*18* 77:*24*
**ILLINOIS** 1:*1*, *14*,
  *17*, *18* 2:*3*, *8*, *13*
  6:*13* 8:*15* 9:*2*, *14*
  95:*1* 96:*1*, *6*, *9*
**implied** 64:*21*
**imposed** 21:*10*

**impression** 29:*8*, *8*
**inaccurate** 69:*12*
**inappropriate** 54:*3*
  58:*18*
**incident** 35:*10* 37:*3*
  39:*8* 41:*21* 42:*2*
  54:*15* 62:*22*
**include** 76:*6*
**included** 72:*14*
  75:*18* 77:*14* 95:*17*
**including** 91:*12*
**inclusive** 95:*14*
**indicated** 62:*11*
  96:*19*
**indirectly** 8:*9*
**individual** 90:*11*
  92:*12*
**individuals** 12:*5*
  15:*21* 42:*23*, *24*
  43:*15*, *16* 51:*9*, *20*,
  *24* 65:*4* 89:*1*, *5*
  91:*13*, *14*, *20*
**influence** 6:*23*
**Information** 14:*2*
  21:*16* 42:*5*
**informed** 46:*20*
**initial** 15:*17* 17:*1*
**instance** 49:*3* 64:*3*
**institutional** 22:*9*, *14*
**instructions** 30:*15*
  45:*19*
**insurance** 14:*3* 20:*4*
**integral** 90:*14*
**intent** 41:*4*
**interact** 17:*10*
  30:*15* 49:*7*, *11*, *16*
**interactions** 17:*16*
  31:*6*, *10* 33:*6*
**interested** 97:*1*
**interior** 22:*8*
**interiors** 22:*10*, *17*
**interpretation** 48:*16*
**Interrogatories** 7:*16*,
  *19*
**interrupt** 5:*11*
**interview** 12:*8*, *14*
  15:*17* 17:*1* 52:*4*, *8*
  54:*9*
**interviewed** 12:*5*
  15:*22* 16:*13* 51:*9*,

*22* 52:*2*, *22* 53:*4*
  86:*9*
**interviews** 16:*8*
  51:*12* 53:*21*
**investigate** 45:*14*
  54:*16*
**investigation** 45:*17*,
  *21* 50:*15*, *18*, *22*
  51:*10* 52:*2*, *23*
  53:*4*, *5*, *12*, *15*, *20*
  54:*4*, *7*, *10*, *18* 56:*12*
  58:*9*, *15* 86:*4*, *10*
**invitation** 24:*12*
**invite** 26:*12* 49:*21*
**inviting** 79:*12*
**involved** 12:*2*, *3*
  14:*4* 15:*13* 24:*7*
  40:*21* 69:*18*
**involvement** 15:*15*
**involving** 35:*10*
**issue** 56:*7* 71:*16*
  72:*10* 82:*7*, *7*, *10*, *17*,
  *17*
**issues** 18:*7* 72:*21*
  82:*6*, *13*
**item** 87:*11*
**items** 32:*3*, *4*
**its** 19:*18*

**< J >**
**J.C** 1:*6* 2:*11* 10:*5*
  14:*7* 95:*6*
**Jackson** 28:*16*
**JACOBSEN** 1:*7*
  2:*16* 25:*5*, *12*, *16*
  26:*5*, *13*, *17* 27:*11*
  29:*16* 31:*4*, *5*
  32:*18* 33:*3* 35:*11*
  41:*20* 52:*22* 53:*3*
  72:*14* 79:*8*, *12* 95:*7*
**Jacobsen's** 29:*10*
**January** 93:*5*, *11*
**JCA** 7:*11* 10:*6*, *9*,
  *12*, *21* 11:*15*, *16*
  12:*11*, *17* 13:*5*, *14*,
  *18* 14:*8* 15:*6*
  16:*15* 17:*11* 18:*6*,
  *20* 19:*10* 20:*12*, *19*,
  *23* 22:*7* 23:*9*
  24:*19*, *20*, *24* 25:*1*
  26:*9* 28:*6* 29:*17*

30:*10*, *15* 31:*6*, *10*
  40:*7*, *17* 44:*22*
  45:*4*, *12* 46:*18*, *24*
  48:*23* 49:*5* 50:*21*,
  *22* 51:*2* 62:*4*, *20*, *23*
  63:*23* 64:*5*, *8*, *11*, *18*,
  *19* 65:*18*, *18*, *19*
  67:*24* 68:*16* 69:*9*
  70:*1*, *9*, *24* 71:*6*, *13*
  72:*6* 77:*13* 79:*8*,
  *11* 80:*3* 81:*24*
  85:*22*, *22* 86:*5*, *6*, *13*,
  *22*, *22* 87:*2*, *3*, *13*
  88:*21* 89:*9*, *16*
  93:*14*
**JCA-related** 26:*5*
**JCA's** 7:*18* 39:*14*
  40:*2* 80:*1* 87:*21*
**Jim** 12:*1*, *4* 14:*12*,
  *24* 26:*15* 28:*16*
  47:*12*
**job** 19:*23* 23:*15*, *16*
  24:*1* 62:*11* 80:*15*
  84:*17* 88:*15*
**jobs** 24:*7*
**Joe** 52:*18*
**joined** 11:*15* 14:*8*
**joint** 66:*10*
**joke** 53:*22*
**Jones** 13:*2*
**July** 10:*7* 78:*2*, *13*,
  *17* 79:*5* 97:*5*
**June** 1:*19* 8:*20*
  95:*12* 96:*7*
**Justice** 77:*13*

**< K >**
**Kacper** 52:*12*
**Kayla** 89:*20* 90:*9*
  92:*13*, *21* 93:*24*
**keep** 5:*5*
**Kev** 25:*22* 26:*21*
  27:*18* 30:*14* 31:*14*
  33:*22* 34:*12* 44:*1*
  55:*7* 56:*18* 57:*18*
  79:*13*
**Kevin** 12:*13*, *14*
  27:*21*
**Kevin's** 12:*12* 27:*20*
**kids** 32:*11*



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 36 of 42 PageID #:510
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

kind  9:24  16:9
18:3  19:18  20:20
24:19  29:19  30:15
34:17  43:6, 11
59:2  63:4  64:21
67:9  82:16, 17
84:18  85:10
knew  64:3
know  6:1  8:2, 3, 6
14:14, 20, 22  15:9,
11  17:3, 5  19:6, 12
20:19, 22  21:7, 19,
19  25:5  26:12, 20
27:6, 7, 14  29:15
30:17  31:7  32:20,
23  33:1  34:5
36:16  38:2, 12
40:14, 15  41:1, 3, 4
43:4, 7  45:22
46:21  48:20, 21
49:3  51:2  53:2, 5
54:4, 5  59:4  60:2
64:17  72:14, 19
73:12  74:18, 22
76:6  77:2  80:3, 4
81:8  84:15
knowledge  12:2
13:4, 7, 8, 12, 13, 17
15:8  18:5  21:5
26:4, 7  27:10
30:11  32:19  44:4
47:10  48:22  49:2
54:18  65:7, 8, 11
79:10, 11, 18  80:2
89:2
known  25:12
knows  8:5
Kristn  90:4, 5
Kukoc  28:14

< L >
laborers  23:3
laid  21:20
Lang  13:2
LaSalle  2:8  13:2
Lauren  90:2
lawsuit  79:24
Le  52:6
leadership  21:13
91:3

learn  35:9
learned  35:13
leave  21:19  59:21
60:5
leaves  20:23
led  50:18  86:24
87:5
left  29:7  32:4
33:11  37:23  50:14
60:8  85:17  91:16
legal  40:20  75:24
76:11
legalizing  6:14
letter  12:11  21:12
41:4  75:10, 13, 18
76:14  87:22
level  15:15  83:1
90:7  93:7, 13
License  97:8
light  48:7, 13  62:10,
20, 24  64:24  65:20
66:19  70:9, 24
73:23  86:7  87:3
limit  6:24
lines  63:5
link  43:6  77:14
list  23:10, 12, 17, 20
Litt  33:16
little  22:16  25:4
29:15  31:20  92:15
live  32:4
long  8:16  10:6, 14
14:20  25:12  43:6
look  7:13, 15  19:5
36:22  39:18, 20
42:12  61:4  67:17
68:19, 23
looked  7:22  8:11
33:9
looks  63:2
lot  81:6
Louis  4:14
lunch  31:24
lunchtime  31:23

< M >
Maguire  52:18
82:12
mail  37:23  38:3
main  16:20, 21, 22
81:1, 4

major  12:17, 23
13:3
making  47:6, 9
male  91:20
males  89:9
Management  90:22,
23, 23  91:6, 10, 14,
15
Manager  4:22
33:18  82:14, 20
89:22  92:23  93:2,
3, 4, 6, 7, 9, 12, 24
Managers  93:14
94:2
manner  65:1
Manual  19:8  40:17
45:3  59:17, 18
marijuana  6:14
Mark  18:24
MARKED  3:6
19:2, 4  35:21  36:8
42:9, 11  46:5, 7
55:1, 4  61:1, 3
67:14, 16  69:24
70:2  75:4, 6  76:18,
20  77:24  78:5
Marketing  11:7
90:1, 2
MARY  2:12  94:10
Master's  8:23, 24
9:4, 5, 18
matter  77:10  86:23
McKinney  89:20
McMahon  28:16
mcronin@pretzel-sto
uffer.com  2:14
mean  22:3  83:1
means  27:8  43:7
51:1
medical  82:17
medicine  6:10
meet  7:7, 10  17:20
38:14  57:22
meeting  16:9  44:8,
11, 18  45:23  48:18
57:16  58:7  63:17
66:16, 20  86:2, 18
meetings  64:11
81:4, 7, 9
Melissa  29:2, 3

members  32:15, 23
memory  29:7
mental  6:22
mentioned  53:6
79:24  90:11  91:13
92:12, 21
merit  56:7
Met  7:5  14:6
16:24  25:16, 18
47:20  86:24
MICHAEL  1:11
3:3  4:2, 14  13:21,
22  95:10, 20  96:9,
11, 14
MICHELLE  2:7
mid  15:3
middle  40:1, 3
Mike  20:3, 6  44:13
45:16  57:22  91:1
Mike's  14:2
mind  5:5  18:12
30:19, 20  39:3
minute  18:13  26:24
mischaracterizes
63:14  65:10  74:11
missing  69:14
MIX  29:2
molson@vedderprice
.com  2:9
moment  40:9  41:10
50:7  81:13
Monday  54:15  56:3
month  17:14
morning  17:24
31:22  38:15  43:24
44:10  54:6  55:13,
22
moving  62:10
multiple  82:5  85:6

< N >
name  4:10, 12
12:16  43:5  92:21
named  89:4  92:12
names  28:11  51:20
nature  33:5  80:20
need  5:24  7:6
33:10  38:14  39:20
44:21  79:18  87:20,
21  92:8



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 37 of 42 PageID #:511
Michael Yazbec *6/26/2019*
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

needed 19:*20* 45:*14*,
*20* 59:*15*

needs 84:*16*

negative 48:5, *23*
49:*24* 50:*3* 64:*10*
85:*22*

negatively 49:*5*

negotiations 74:*7*

never 82:*23*, *24*

new 6:*3* 11:*1* 19:*9*

news 58:*20*

nice 34:*16*, *17*

night 55:*10*, *17*, *19*
56:*3*

nods 5:*21*

non-compete 20:*20*
21:*1*, *8*, *14*, *17*, *18*

non-solicitation 21:2

Nope 10:*1* 44:*17*

normal 17:*21*

North 2:*8*

NORTHERN 1:*1*,
*16* 95:*1*

nos 5:*19*

notarial 97:*4*

Notary 1:*13* 95:*24*
96:*5* 97:*8*

notes 35:*23* 36:*3*, *4*
85:*16* 86:*16*

notification 56:*20*

Number 18:*24*
23:5 35:*19* 42:*23*
43:*15*, *16* 51:*8*
67:*12* 75:*2* 76:*16*
86:*21* 89:*9*

numbering 23:*22*

**< O >**

oath 5:*2* 95:*11*

object 41:*15* 63:*8*
65:9 74:*10* 83:*10*
86:*14*

Objection 12:*18*
26:*23* 27:*3*, *7* 30:8
37:4 38:*23*, *24*
39:*9*, *15* 64:*13*
65:*21* 70:*12* 71:*18*
76:9 79:*14* 84:*9*
85:*1* 87:*16*, *23* 88:4

objects 12:*20*

obviously 27:*6*

Occasionally 17:*12*,
*18*

occur 51:*1*

occurred 39:*7*, *13*

o'clock 36:*21*

off-color 53:*22*

offensive 53:*24*

offer 12:*11*

offered 72:*3*

offering 72:6, *8*
87:*22*

office 19:7 22:*10*,
*17* 34:*17* 40:*16*
57:*22* 80:*16*, *17*, *19*,
*19*, *22*, *24* 81:*1*
83:*19*, *20* 86:*3*
88:*16*, *21* 89:*9*

Officer 13:*23* 91:*1*

Oh 25:*13* 45:*9*
73:*12* 85:*10* 93:*15*

Okay 5:*23*, *24* 6:*4*,
*8*, *9* 7:*10*, *13*, *21*, *24*
8:*3*, *7*, *11*, *13* 10:*11*,
*14* 12:*16* 13:*4*
15:*18* 17:*5*, *23*
19:*16* 20:*8*, *19*
22:*13* 23:*15*, *19*
24:6 25:*4* 27:*1*
31:*23* 32:*13* 36:*5*,
*8* 37:*6*, *11* 38:*5*, *8*
40:*21*, *24* 41:*9*
42:*17*, *21* 43:*2*, *9*, *12*,
*23* 45:*9*, *16* 47:*3*, *22*
48:9 51:*24* 52:*14*
55:*23* 56:*4* 57:*11*,
*16* 58:*10* 59:*9*
60:*17* 61:*19* 63:*4*
64:2 66:*8* 67:*4*
69:*5*, *22* 70:*4*
71:*20* 72:*9* 74:*21*
75:*1* 78:*8* 81:*11*
82:*6*, *16* 83:*5*, *13*
85:*10*, *24* 89:*8*
90:*6*, *16* 91:*19*
92:*1* 93:*6*, *10*, *13*, *20*,
*23* 94:*4*, *7*

Olczyk 28:*20*, *23*

old 32:*13*

OLSON 2:*7* 12:*18*
37:*4* 39:*15* 40:*9*
41:*15* 45:*7* 63:*8*,

*13* 64:*13* 65:*9*, *21*
70:*12* 72:*16* 74:*10*
75:*21* 76:9 83:*10*
84:9 85:*1* 86:*14*
87:*16*, *23* 88:*4*
92:*1* 94:*9*, *14*, *16*

once 4:*18*, *19* 17:*14*,
*14*, *15*

ones 64:*19*

Operating 91:*1*

operation 90:*15*

operations 11:*6*, *7*
89:*19*, *23* 90:*8*, *9*

option 20:*11* 59:*13*,
*23* 60:*1*, *8*, *16*, *17*, *20*
68:*5*, *9* 70:*19* 71:*2*,
*3* 73:*3*, *17* 74:*1*, *15*

options 59:*3*, *8*, *11*,
*14*, *19* 60:*13* 74:*19*,
*23*

order 94:*15*, *16*, *17*

organization's 90:*6*

originally 87:*15*

Orland 8:*15*

outcome 97:*2*

outing 25:*19* 26:*2*,
*7* 27:*19*

outline 21:*24*

outside 50:*22*
80:*16*, *22*, *24* 81:*1*
83:*20*

outsiders 48:*24*
63:*24*

oversight 11:*6*

owned 14:*21*

owners 11:*23* 14:*13*

**< P >**

p.m 1:*19* 30:*22*, *22*
50:*9*, *9* 92:*4*, *4*
96:*7*, *16*

page 39:*19*, *23* 40:*4*,
*4*, *5* 42:*22* 72:*4*
77:*14* 96:*19*

pages 95:*14*

paid 60:*9*

paint 64:*23*

Painters 23:*4*, *4*

paperwork 20:*4*
61:*21*

paragraph 63:*6*

Pardon 85:*15*

Park 8:*15*

part 22:*14* 42:*17*
45:*21* 47:*6*, *8* 51:*9*,
*14*, *15*, *16* 52:*2*, *22*
53:*4*, *18* 58:*13*
62:*11* 69:*12*, *13*
72:*7*, *15* 79:*12*
86:9 96:*20*

participate 26:*13*

participated 26:*5*, *9*

parties 73:*15* 87:*4*
96:*19*, *24*

partner 14:*18*, *18*
29:*2*

party 50:*21*

pass 27:*23*

passed 28:*1* 78:*23*

Pat 28:*19*

pause 18:*16*

pauses 85:*15*

pay 72:*6*

payment 71:*17*

people 17:*22* 21:*21*
33:*12* 37:*5* 85:*6*
88:*20*

percent 14:*18*
22:*16* 80:*18*, *19*

performance 18:*6*

period 62:*7*

person 25:*16* 37:*13*
84:*24* 89:*15* 90:*10*

personable 18:*9*, *11*

personal 17:*19*
26:*18* 63:*17* 82:*7*

personalities 29:*5*

personally 13:*15*
18:*9* 19:*14* 31:*8*,
*14* 42:*5* 49:*3*, *8*
53:*8* 86:*1* 96:*10*

persons 96:*18*

PETER 1:*7* 2:*16*
25:*5* 95:*7*

phone 36:*23* 37:*17*
38:*3* 52:*13* 62:*18*
63:*5* 66:*17*, *23*
69:*14*

physical 6:*22* 54:*1*

picked 37:*24*

Michael Yazbec    6/26/2019
Case: 1:18-cv-04542 Document #: 53-2 Filed: 02/20/20 Page 38 of 42 PageID #:512
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

picking  50:*14*
place  28:*4*  56:*13*
Plaintiff  1:*4*  2:*4*
  4:*3*, *11*  95:*4*
Plaintiff's  7:*19*  8:*1*
Planning  9:*12*  79:8
Played  31:*19*, *24*
players  34:6
pleasantries  17:*21*
  57:*19*
please  4:*12*  5:*12*,
  *17*  6:*1*
point  21:*23*  35:9
  47:*4*  60:*15*  71:*16*
  73:7  82:*1*
Policies  19:7  39:*14*
  40:*16*  45:2  59:*16*
policy  39:*18*  40:*3*, 7
portion  20:*3*  23:*17*
  71:22  80:*15*, *16*
  91:*24*
position  16:*13*
  89:*21*  90:*18*
positions  90:*16*
positive  48:*7*, *13*
  49:*24*  50:2  62:*10*,
  *20*, *24*  64:*24*  65:*20*
  66:*18*  70:9, *24*
  73:*23*  86:7  87:*3*
possible  93:*1*
post  9:*21*
potential  48:*7*, *13*
  59:*8*  80:7  81:2, *3*
  84:*17*
potentially  24:*16*
Power  13:*21*, 22
  14:*6*, 9  20:*12*  22:*4*
  44:*13*, *19*  45:*16*
  46:20  47:*10*, *11*, *14*,
  *20*  48:*1*  50:*19*
  53:6  57:*23*  61:*10*,
  *20*  64:*12*  66:*6*, *11*
  67:*5*, *7*, *10*  74:*20*
  76:*15*  77:*2*, *6*
  78:*14*  85:*21*  86:9,
  *16*, *24*  87:*1*  88:*19*
  91:*1*
Power's  14:*4*  48:*16*
  78:*12*
prepare  7:*3*
prepared  7:*17*

PRESENT  2:*16*
  23:*16*  48:*18*  53:22
  58:*10*, *16*, *17*  62:*4*,
  *20*, *23*  65:*19*  66:8
  67:*1*, *5*, *10*  70:*8*, *24*
  86:*18*  87:*2*, *2*  96:*17*
presentation  58:*14*
presented  59:*12*, *12*
  60:*17*, *20*  62:*1*
  67:*21*, *23*  68:*16*, *20*,
  *21*  69:2  70:2, *6*, *18*
  73:*2*  74:*18*, 22
  86:*3*, 6
presenting  58:8
preserve  73:*19*
President  10:*13*, *18*
  11:*5*, *11*, *18*, *21*  91:*3*
pretty  19:*23*  21:*20*
  33:9  48:*5*  63:*5*
  74:7  83:*1*  84:*5*
PRETZEL  2:*12*
prevent  6:*24*
prevented  82:*18*
previous  27:9
  37:*11*  41:*1*  78:2
previously  7:*17*
  56:*19*
PRICE  2:7
priced  81:*10*
pricing  80:*8*, *11*
Primarily  11:*1*
Prior  30:*14*  32:5
  63:*14*  65:*10*  73:*18*
  74:*11*
probably  5:*6*  8:*5*
  17:*15*  23:*10*  32:*21*
  36:*17*, *20*  37:*23*
  38:*14*  49:*11*  93:*19*
Procedure  1:*15*
Procedures  19:8
  40:*17*  45:*3*  59:*16*
proceed  5:*5*  35:23
  38:*17*  43:2
proceedings  30:*24*
  50:*11*  92:6
professional  25:8
program  9:*19*  32:2,
  5
prohibited  20:*21*
prohibits  24:*24*

Project  4:22  80:*20*
  81:8  82:*14*, *20*
  89:22  90:*4*  92:23
  93:2, *3*, *4*, 6, *7*, 9, *12*,
  *14*, *24*  94:2, *3*, *4*
projects  17:*17*
  23:*21*  80:7  81:2
promoted  93:*4*, *12*
proprietary  21:*15*
prove  53:*16*
proven  53:*19*
provide  64:*18*  65:*5*,
  *18*
provided  19:*12*
provides  89:*10*
PTO  46:*13*, *19*, *24*
  56:*17*  57:8, *15*
Public  1:*13*  95:*24*
  96:*5*  97:8
Pudlo  1:*12*  96:*4*
  97:*5*, 7
purchased  14:*23*
purposes  6:*15*
  93:22
pursuant  1:*14*
purview  14:2
put  45:*16*  62:*17*
  63:2  80:*8*  84:*16*

< Q >
quarters  17:22
question  5:*13*, *14*
  6:2, *3*, *3*, *6*, *7*, 8, *20*
  12:22  14:22  22:5
  27:9  29:9  32:22,
  22  37:*12*  41:*1*, 9, *13*
  43:2  48:*19*  63:*10*
  64:*15*  65:*14*  69:*16*
  70:*14*  83:*11*
questioned  58:*16*
questions  5:*17*  7:*1*
  8:*4*  20:2, *5*, *7*, 9, *13*
  27:5  31:*4*  94:8, 9,
  *12*
quick  30:*18*  50:6
  91:22
quite  14:*23*  29:7

< R >
Rachael  90:*4*
radius  21:21

Radoha  11:*13*
  12:*14*  27:*21*  28:*1*
  52:20
raise  27:*19*
rare  83:*1*
RCX  3:2
RDX  3:2
reach  42:*1*  87:*4*
reaching  20:*11*
read  40:9, *12*  41:*14*
  46:*15*  51:*19*  52:*1*
  56:9  63:*11*, *12*
  95:*13*
reading  76:*24*
really  15:*20*  90:*13*
reason  6:*21*  64:8
  66:*1*  82:*3*  83:*5*, *23*
  84:*1*  88:2
reasons  16:*21*, 22
  75:*17*  76:7  82:*3*
  85:*3*  87:*21*
recall  4:*21*  5:*5*
  7:22  15:*24*  33:2
  34:*14*, *18*  36:*24*
  38:*11*  41:9  44:2
  45:*23*  46:*8*, *17*
  48:9  49:*23*  50:2, *4*
  53:*11*  54:*21*  55:*5*,
  *14*  57:*7*, *16*  58:*3*, *7*,
  8, *21*, 22, *24*  59:*1*, 2
  61:*12*, *15*, *16*, *17*, *18*
  64:*1*, *17*  65:6
  68:*11*  71:*23*  72:*1*,
  9, *24*  74:*3*, 5, 6
  76:*23*, *24*  77:*7*, 9, *12*,
  *17*  81:*24*  82:*10*
recap  86:*20*  87:7
receive  20:*15*  29:*19*
received  12:*11*
  29:22  70:*1*  71:8
receives  69:9
receiving  43:*23*
  44:2  71:*1*, 8
recess  30:*21*  50:8
  92:*3*
recognize  36:9
  42:*13*, *14*  61:5
  67:*17*, *19*  76:*21*
recollection  44:9
  47:*19*  58:*5*  62:*19*
  66:*24*  71:*21*  72:*12*



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 39 of 42 PageID #:513
Michael Yazbec - 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

record 4:13 18:17
31:1 41:14 50:12
63:12 81:12, 14, 19
92:7 96:13
recreational 6:14, 17
reference 19:20
referenced 85:20
referring 56:22
86:12
refill 18:13
reflected 49:5 64:4
refrain 5:20
regarding 41:21
46:18 48:1 66:17
68:4 71:22 78:20
regret 79:12, 22
reject 68:9 73:3
related 4:23 17:16
21:12 59:7 62:9
84:4 96:24
relating 8:8 43:20
relation 15:18
relationship 26:19,
20
Release 72:10, 15
relevance 12:18
relevancy 79:15
relevant 23:17
relieved 83:9
rely 83:14
remainder 46:14
56:17 57:3, 8
remember 8:6
12:10 33:14 34:9,
15, 22 36:15 37:2,
15, 21 38:5, 9, 9, 13
44:6, 7, 11 48:11
51:17 54:8, 10
55:9, 21 59:7, 9
72:21 77:19 78:24
79:2, 3 82:12, 16
remind 72:16 75:22
remotely 88:16
repeat 6:6 63:10
rephrase 6:6
report 11:8, 13, 21,
23 61:21 69:6 94:2
reported 11:19
reporter 5:10
28:20 96:5
reports 14:14

represent 48:6, 12
49:18 62:9 64:24
73:22 84:20
representing 66:18
requested 41:14
59:4 63:12
requests 65:3
require 24:19
required 30:1 81:7
requirements 21:10
research 27:20
reserve 94:14
reserved 96:22
reside 8:13
resident 8:16
Resources 14:1
respond 24:14
responded 5:14
response 33:21
34:19 45:5, 12
58:19 80:12
responsibilities
10:23 11:4 19:24
83:8, 17, 23 84:3, 6
responsibility 82:21
83:9
rest 21:4 57:14
restate 70:21
results 53:11 58:9,
11
retaliated 13:19
return 21:15 73:3,
4 74:15
returned 38:1
review 20:1 24:15
reviewed 7:16
reviewing 40:22
Richard 13:2
riding 33:7
Riemsdyk 28:18, 22
Right 12:23 18:1
34:7 63:22 73:19,
21 90:12 92:2, 21
rights 71:19
ring 78:19
River 34:3, 4
Ro 36:13
Robertazzo 90:5
role 13:24 29:10,
11, 12 47:12
round 35:3

ROWENA 1:2
2:16 56:7 95:2
Rowena's 51:15
rule 24:24
rules 5:5 31:5, 9, 12

< S >
Sales 11:7 91:2, 3
SAM 2:2 4:10
sam@goldmanehrlic
h.com 2:4
sat 15:17
Saunders 90:2
save 61:20
saw 55:11 57:20,
21 61:15, 16
saying 24:10 34:15
38:9, 10 49:23
83:22
says 40:14 41:2
43:4 61:20 63:6
78:4
scheduling 82:4, 6,
11 85:2
Scheitel 52:10
school 9:21
Schumacher 12:1, 4
14:12 26:15 27:10
43:16 47:12 55:6,
24 56:5, 12
Schumachers 15:5
44:16 91:5, 12
Schumacher's 26:14
science 9:10
scope 24:4, 13 81:5,
8
scopes 80:9
seal 97:4
second 63:6
section 40:2, 13
41:7 72:4, 10, 11, 22
SEDAEI 2:2 3:4
4:7, 10 12:19
18:12, 17, 18, 24
19:3 29:6 30:9, 20
31:1, 2 35:19, 22
37:6, 7 38:24 39:2,
11, 17 40:11 41:12,
18 42:7, 10 45:10
46:3, 6 50:6, 12, 13
54:23 55:3 60:23

61:2 63:11, 18
64:14 65:12, 24
67:12, 15 70:13, 16
72:20 74:13 75:2,
5 76:2, 12, 16, 19
77:22 78:1 79:17
81:18, 20 83:12
84:11 85:4, 15, 19
86:19 87:19, 24
88:9 91:22 92:2, 7,
11, 17, 19 94:7, 10,
15
see 34:9 43:1, 3
84:14
seeing 34:9 36:15
46:8 55:5, 9, 21
61:12 77:19
seeking 25:1 69:15
seen 25:14 55:12,
19 56:2 75:7
selected 24:13
self-perform 22:19
send 24:12 76:13
sending 77:2
sends 69:8
senior 21:3, 13, 19
89:15
sent 35:16 36:16
42:18 55:10, 20
56:1, 6, 12 61:10, 24
69:24 71:1 75:11
76:22 78:14
sentiments 48:1
separate 21:2
separation 71:17
September 55:6
56:18 58:4 60:21
61:8
sequence 31:21
69:10, 20
serious 38:12, 19, 22
39:3, 8 44:20
server 47:16 88:14,
17
set 69:17 97:3
severance 62:2, 5
66:9 67:1, 6, 20, 23
68:4, 17, 20 69:2, 9,
21 70:1, 6, 17 71:2,
8, 9, 14 72:7 73:2



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 40 of 42 PageID #:514
Michael Yazbec    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

74:7 87:5
**sexual** 39:*14*
**shakes** 5:*22*
**sheet** 95:*18*
**shook** 33:*11*
**Shorthand** 96:*4*
**short-term** 59:*22, 24*
**show** 57:*12* 68:*12*
**showed** 56:*19*
**showing** 19:*4* 36:*8*
42:*11* 46:*7* 55:*4*
61:*3* 67:*16* 75:*6*
76:*20* 78:*5*
**sick** 60:*13*
**side** 89:*20, 23, 24*
90:*3*
**sign** 21:*1, 6, 9*
29:*14* 68:*5*
**signatory** 23:*2*
**signature** 12:*10*
75:*15* 76:*3* 95:*15*
96:*21*
**silent** 32:*3*
**similar** 64:*19*
**site** 47:*20* 84:*14, 17,*
*18*
**sitting** 81:*4*
**situation** 69:*19*
85:*10*
**six** 72:*3, 6, 8* 91:*14*
**small** 18:*3*
**smaller** 24:*8*
**smart** 18:*11*
**software** 16:*19*
**solicit** 24:*11* 80:*11*
**somebody** 50:*22*
**sorry** 22:*11* 26:*24*
46:*9* 47:*11, 16* 85:*8*
**sought** 44:*24*
**South** 1:*17* 2:*3, 13*
96:*8*
**speak** 34:*12* 37:*17*
41:*23* 86:*15*
**speaking** 5:*15* 36:*6,*
*24* 37:*2*
**specific** 17:*16*
21:*20* 24:*2* 54:*21*
65:*3* 90:*12, 17, 21*
**specifically** 12:*22*
21:*6* 38:*8* 44:*5*
45:*20* 51:*19* 58:*21,*

22 62:*13* 65:*2, 5*
72:*1, 22* 74:*1, 14*
78:*21* 82:*12* 86:*11*
89:*4*
**specifics** 48:*9*
**speculate** 51:*3*
65:*23* 79:*16, 19*
87:*18, 20*
**speculation** 39:*16*
65:*22* 84:*10* 87:*17*
**speech** 29:*15*
**spend** 83:*20*
**spending** 20:*2* 33:*2*
**spent** 80:*15, 22*
83:*19*
**spoke** 37:*5, 13*
**spoken** 26:*2* 37:*8*
41:*20* 53:*9*
**sports** 29:*4*
**SS** 96:*1*
**staff** 21:*3, 13* 22:*21*
**stamp** 36:*16* 55:*17,*
*23*
**stamped** 39:*23*
**stand** 88:*3*
**standpoint** 90:*9*
**start** 10:*11* 63:*1*
**started** 32:*3* 93:*3, 8*
**starts** 40:*3*
**State** 1:*14* 4:*12*
8:*14* 73:*2* 96:*1, 6*
**stated** 66:*1* 68:*13,*
*22* 69:*17*
**statement** 45:*24*
46:*19* 53:*7*
**statements** 43:*20*
47:*24*
**STATES** 1:*1, 16*
43:*18* 69:*7* 79:*2*
95:*1*
**stating** 46:*13*
**Steve** 16:*3* 90:*24*
**sticking** 71:*16*
**Stojowski** 52:*12*
**stop** 45:*7*
**STOUFFER** 2:*12*
**Street** 1:*18* 2:*3, 8*
96:*8*
**stress** 6:*22*
**striking** 53:*23*

**stuff** 20:*4* 21:*16*
**sub** 23:*10, 12*
**subcontracting**
23:*16*
**subcontractors** 23:*6,*
*9, 11, 13* 24:*13, 18*
25:*2* 48:*8, 14, 24*
49:*8, 13, 21, 22*
63:*24* 80:*11* 81:*3*
**subject** 77:*10* 86:*23*
**subs** 23:*19*
**SUBSCRIBED**
95:*20*
**subsequent** 66:*23*
**substances** 6:*23*
**sue** 13:*9*
**sued** 13:*6*
**sufficiently** 41:*6*
**suit** 97:*1*
**Suite** 1:*18* 2:*3, 13*
96:*8*
**superior** 16:*18*
**supervisor** 17:*8*
**sure** 5:*20* 8:*15*
14:*23* 20:*17* 28:*13*
33:*15* 39:*21* 43:*9*
45:*1* 51:*4, 21, 23*
56:*4* 65:*2, 15*
69:*16* 80:*7* 84:*2*
85:*16*
**surprise** 30:*3*
**Switching** 25:*4*
**sworn** 4:*1, 4* 95:*11,*
*20* 96:*12*
**system** 16:*19* 43:*11*
**systematic** 23:*22*

**< T >**
**T.V** 25:*14*
**take** 5:*24* 18:*12*
19:*5* 30:*18* 40:*9*
42:*12* 45:*12* 50:*6*
60:*8* 61:*4* 67:*17*
74:*15* 79:*12* 80:*7*
88:*2*
**taken** 1:*11, 14*
30:*21* 50:*8* 56:*13*
59:*16* 92:*3* 95:*12*
**takeoff** 80:*10*
**talk** 18:*3* 42:*2* 51:*4*
**talked** 83:*17* 88:*13*

**talking** 45:*11* 57:*3*
63:*19* 77:*7, 9* 81:*21*
**tapers** 23:*3, 4*
**team** 91:*4, 6, 10, 14,*
*15*
**technical** 16:*17*
43:*9*
**Technology** 14:*2*
**telephonically** 81:*17*
**television** 25:*9*
**tell** 7:*6* 8:*5, 13, 19,*
*21* 13:*21* 19:*6*
21:*10* 27:*17* 28:*11*
33:*13* 36:*11* 39:*19*
42:*12* 47:*22* 52:*3*
53:*8* 61:*4* 67:*17*
75:*9* 80:*15* 88:*1*
**tells** 12:*22*
**temporarily** 83:*6, 9*
84:*8, 22*
**ten** 93:*18, 19, 20*
**tenure** 89:*17*
**terminate** 47:*15*
73:*8*
**terminated** 47:*4, 23*
68:*1* 74:*16* 87:*14*
88:*14* 96:*16*
**termination** 73:*18*
75:*10, 18* 76:*7, 14*
87:*6, 14, 22*
**terms** 21:*21* 59:*5*
71:*9, 14* 73:*14, 16*
89:*17, 18, 19*
**testified** 4:*4*
**testify** 96:*12*
**testimony** 5:*1*
63:*14* 65:*10* 74:*11*
86:*21* 96:*13* 97:*3*
**Thank** 27:*2* 92:*18*
**Thanks** 94:*12*
**thereof** 97:*2*
**thing** 18:*3* 38:*15*
53:*13* 55:*13* 81:*2, 4*
**things** 20:*5* 21:*22*
22:*15* 45:*2* 48:*5*
63:*16, 19* 64:*23*
**think** 14:*11, 15*
16:*17* 21:*12* 28:*24*
29:*12* 32:*4* 48:*11*
51:*6* 53:*3* 55:*12*
56:*23* 60:*13* 63:*15,*



Case: 1:18-cv-04542 Document #: 55-2 Filed: 02/20/20 Page 41 of 42 PageID #:515

Michael Yazbec      6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

*15* 64:*2*  65:*14*
66:*1, 22*  78:*23*
83:*7*  86:*8*  87:*10*
88:*18*  89:*4*  91:*18,
23*  94:*7*
**thinking**  72:*22*
**third**  50:*21*
**Thirteen**  8:*18*
**thought**  54:*3*  58:*18*
**thoughts**  63:*23*
**threatened**  13:*9*
48:*23*
**Three**  32:*12*  78:*14*
94:*6*
**three-year**  9:*18*
**Tim**  52:*7*
**time**  11:*11*  14:6
16:*24*  17:8  25:*18*
26:*4*  33:2  34:22
35:*13*  36:16  37:*24*
44:6, *7*  55:*17, 23*
56:*11*  57:20, *21*
59:*6, 15*  60:*9*  62:*7,
12*  73:*1, 24*  80:22
81:*23, 24*  82:5
83:*18, 19, 20*  92:*16*
**times**  17:*19*
**Timothy**  52:6
**title**  10:*9, 11, 17, 19*
89:*18, 19*
**titles**  10:*21*
**To:**  43:*4*
**today**  5:2, *10*  6:*24*
10:*19*  13:5
**today's**  7:*3*
**told**  19:*19*  31:5
40:*4*  42:*1*  68:*8*
73:*18*  74:*14*  88:*19*
**Tom**  11:*10, 19*  12:*1,
4*  14:*19*  33:*17*  52:6
**tomorrow**  61:*22*
69:6
**Tony**  28:*14*
**top**  42:*21*  43:*4*
46:*12*  55:5  61:*7*
**trades**  23:*23*  24:5, *7*
**transcribe**  5:*10*
**transcript**  95:*13*
96:*20*
**travel**  30:6

**Trevor**  28:*17, 22*
**trouble**  61:*21*
**true**  61:*19, 24*  96:*13*
**truth**  96:*12*
**truthful**  7:*1*
**try**  5:*17, 19, 20*
70:*20*
**trying**  4:*21*  28:*24*
33:*14*  43:*10*  51:*17*
69:*19*
**Tuesday**  54:*16*
55:*21*  58:*3*
**Turner**  4:*23*
**twelve**  6:*11, 17*
**two**  10:*16, 21*
16:*20, 21, 22*  21:2,
*24*  26:*21*  46:*9*
55:*23*  69:*20*  74:22
91:*12, 17*
**type**  7:*21*
**types**  7:*15*
**typically**  49:*19*

**< U >**
**Uh-huh**  7:*18*  18:*4*
34:*8*  50:5  81:*22*
92:*14*
**uh-huhs**  5:*19*
**uh-uhs**  5:*19*
**unable**  82:*1*  83:6,
*24*
**unclear**  21:*23*
**understand**  5:*1*  6:5
8:*4*  22:2  56:*11*
64:*15*  65:*15*  82:*13*
83:*11*  85:*18*  88:5, *6*
**understanding**
20:*24*  27:*18*  46:24
48:*3*  51:*8*  56:*16*
80:*6*
**understands**  20:*18*
**Understood**  5:*16*
6:*8*  70:*14*  92:*10*
**union**  22:*20, 23*
23:*1, 2, 4*
**UNITED**  1:*1, 15*
95:*1*
**University**  9:2, *14*
13:*1*
**unpaid**  60:*5*

**Unused**  60:*10, 12, 13*
**unusual**  6:*22*
**upset**  58:*24*  59:*1*
62:*24*
**Urban**  9:*11*
**Urbana-Champaign**
9:2, *14*
**use**  5:*18*  18:*10*
19:*19*
**usual**  61:*22*  69:*7*
**usually**  19:*17, 22*
20:2  29:*14*  82:*4*
85:2

**< V >**
**V.P**  11:*8*
**V.P.**  10:*15, 24*
**vacation**  47:*1*
57:*15*  60:*11, 12*
**Van**  28:*18, 22*
**various**  16:*10*  29:*4*
65:*3*
**VEDDER**  2:*7*
**venue**  34:*1*
**verbal**  5:*21*
**version**  80:*13*
**versus**  5:*19*
**Vice**  10:*13*  91:2
**violation**  39:*14*
**voice**  37:*23*  38:*3*
**vs**  1:5  95:5

**< W >**
**W-9's**  20:*4*
**Wacker**  2:*13*
**wait**  5:*12, 14*
**waived**  71:*19*
**waiving**  71:*19*
**Wakefield**  13:*3*
**walk-through**  49:*19,
22*  83:*7*  84:*20*
**walk-throughs**
48:*14*  49:*18*  63:*1*
81:2  82:2, *5, 19, 23,
24*  83:*21, 24*  84:4, *7,
23, 24*  85:*12*
**want**  20:*17*  45:*8*
56:*4, 6*  65:*15*  68:*3*
**wanted**  57:*12*  71:*4*
80:*14*
**water**  18:*15*

**way**  12:*20*  27:5
32:7  37:*1*  65:*4*
78:*15*  96:*24*  97:*1*
**weather-wise**  34:*16*
**week**  17:*14, 15*
54:*13, 17, 17, 19, 22*
56:*17, 18*  57:5, *9, 14*
58:*1, 2*
**weeks**  72:*3, 6, 8*
**Weil**  90:*4*
**Well**  37:*1*  45:6
47:*10*  57:*17*  64:*21*
65:*13*  69:*13*  82:20
93:*14*
**Wennington**  28:*14*
**went**  31:24  36:22
62:*8*  66:*17*  68:24
**we're**  21:*20*  23:2
56:*15*  69:*13*
**We've**  28:*13, 24*
58:*15*  82:*10*
**WHEREOF**  97:*3*
**wife**  32:*9*
**William**  91:*1*
**WITNESS**  3:2  4:*1,
3*  18:*14*  27:*1*
28:*21*  45:*9*  51:*12*
85:*18*  92:*10*  94:*18*
96:*22*
**women**  89:2, *10*
**words**  36:*12*  78:*16*
**work**  14:7  16:*19*
22:*8, 19*  23:5, *9*
24:*4, 13, 20*  46:*14*
57:*4*  59:5  60:*9, 18*
61:*22*  62:6  68:*6,
10, 14, 23*  69:6
70:*19*  71:*3*  73:*3, 4,
17, 19, 21*  74:*15*
80:*9*  84:*21, 23*
86:*7*  88:*1, 8, 20*
89:*11*
**Workers**  4:*23*
**working**  15:*5*
17:*21*  20:*21*  49:*24*
86:22  89:*16*
**workload**  22:*22*
80:*20*
**Wow**  25:*13*
**write**  78:*16*



**Michael Yazbec** *6/26/2019*
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**writing** 74:*4*
**wrong** 50:*7* 55:*15*

**< Y >**
**YAZBEC** 1:*11* 3:*3,*
*7, 8, 9, 10, 11, 12, 13,*
*14, 15, 16* 4:*2, 8, 14*
19:*1, 4* 31:*3* 35:*20*
42:*8, 11* 46:*4*
50:*14* 54:*24* 55:*4*
60:*24* 67:*13* 75:*3*
76:*17* 77:*23* 95:*10,*
*20* 96:*9, 11, 14*
**year** 9:*3* 10:*8* 28:*4,*
*5, 15, 16, 17* 29:*1*
33:*19* 79:*5* 93:*11*
**years** 4:*22* 5:*6*
8:*18* 10:*7, 8, 16*
25:*13* 26:*21* 38:*2*
**yeses** 5:*19*
**yesterday** 36:*4*