Michael Power   6/26/2019
Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/20/20 Page 1 of 73 PageID #:517
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
    ROWENA DZIUBLA,                        )
4                                          )
                   Plaintiff,              )
5                                          )
        vs.                                ) Case No.
6                                          ) 1:18-cv-4542
    J.C. ANDERSON, INC., and               )
7   PETER ERLING JACOBSEN,                 )
                                           )
8                  Defendants.             )

9

10

11          The deposition of MICHAEL J. POWER, JR.,

12   taken in the above-entitled cause before Gabrielle

13   Pudlo, CSR, and Notary Public within and for the

14   County of Cook and State of Illinois, taken pursuant

15   to the Federal Code of Civil Procedure for the

16   United States District Court, Northern District of

17   Illinois, Eastern Division, at 20 South Clark

18   Street, Suite 500, in the City of Chicago, Illinois,

19   on June 26, 2019, at the hour of 9:30 a.m.

20

21

22

23

24



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 2 of 73 PageID #:518
Michael Power   6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
1              A P P E A R A N C E S:

2         GOLDMAN& EHRLICH
          BY:  MR. SAM SEDAEI
3              20 South Clark Street, Suite 500
               Chicago, Illinois  60603
4              (312) 332-6733
               sam@goldmanehrlich.com
5
                    On behalf of the Plaintiff;
6

7         VEDDER PRICE
          BY:  MS. MICHELLE T. OLSON
8              222 North LaSalle Street
               Chicago, Illinois  60601
9              (312) 609-7569
               molson@vedderprice.com
10
                    On behalf of Defendant
11                  J.C. Anderson, Inc.;

12        PRETZEL & STOUFFER, CHTD.
          BY:  MS. MARY H. CRONIN and
13             MR. EDWARD B. RUFF, III
               1 South Wacker Drive, Suite 2500
14             Chicago, Illinois  60606
               (312) 578-7458
15             mcronin@pretzel-stouffer.com

16                  On behalf of Defendant
                    Peter Erling Jacobsen;
17
          CLIFFORD LAW OFFICES
18        BY:  MR. JAMES C. PULLOS
               120 North LaSalle Street, 31st Floor
19             Chicago, Illinois  60602
               (312) 899-9090
20             JCP@CliffordLaw.com

21                  On behalf of Defendant
                    Peter Erling Jacobsen.
22
          ALSO PRESENT:
23
                    MS. ROWENA DZIUBLA
24
                         I N D E X
```

Case: 1:18-cv-04542 Document #: 93-3 Filed: 02/26/20 Page 3 of 73 PageID #:519
Michael Power  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | WITNESS EXAMINATION | DX | CX | RDX | RCX |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | MICHAEL J. POWER, JR. | | | | |
| 3 | By Mr. Sedaei | 5 | | | |
| 4 | By Ms. Olson | | 176 | | |

5                        E X H I B I T S

| | DEPOSITION EXHIBITS | MARKED |
|---|---|---|
| 6 | | |
| 7 | Power Exhibit No. 1 | 36 |
| 8 | Power Exhibit No. 2 | 39 |
| 9 | Power Exhibit No. 3 | 51 |
| 10 | Power Exhibit No. 4 | 69 |
| 11 | Power Exhibit No. 5 | 78 |
| 12 | Power Exhibit No. 6 | 83 |
| 13 | Power Exhibit No. 7 | 84 |
| 14 | Power Exhibit No. 8 | 86 |
| 15 | Power Exhibit No. 9 | 95 |
| 16 | Power Exhibit No. 10 | 104 |
| 17 | Power Exhibit No. 11 | 106 |
| 18 | Power Exhibit No. 12 | 112 |
| 19 | Power Exhibit No. 13 | 114 |
| 20 | Power Exhibit No. 14 | 124 |
| 21 | Power Exhibit No. 15 | 125 |
| 22 | Power Exhibit No. 16 | 140 |
| 23 | Power Exhibit No. 17 | 144 |

24                    E X H I B I T S (Cont'd.)

Michael Power   6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1    Power Exhibit No. 18                    147

 2    Power Exhibit No. 19                    148

 3    Power Exhibit No. 20                    152

 4    Power Exhibit No. 21                    160

 5    Power Exhibit No. 22                    162

 6    Power Exhibit No. 23                    166

 7    Power Exhibit No. 24                    168

 8    Power Exhibit No. 25                    169

 9    Power Exhibit No. 26                    170

10    Power Exhibit No. 27                    172

11    Power Exhibit No. 28                    174

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 5 of 73 PageID #:521

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Page 5

1   (Witness sworn.)
2        MICHAEL J. POWER, JR.,
3   called as a witness on behalf of the plaintiff,
4   being first duly sworn, was examined and testified
5   as follows:
6        DIRECT EXAMINATION
7   BY MR. SEDAEI:
8   Q.   Good morning, Mr. Power.
9   **A.   Good morning.**
10  Q.   My name is Sam Sedaei.  I am an attorney
11  for the plaintiff in this case, Ms. Dziubla.
12       Would you please state your full name for
13  the record.
14  **A.   Michael J. Power, Jr.**
15  Q.   Mr. Power, have you ever been deposed
16  before?
17  **A.   No, I have not.**
18  Q.   Do you understand that your testimony
19  today will be under oath?
20  **A.   Yes.**
21  Q.   So you were already at Ms. Dziubla's
22  deposition, so you have a sense of how these things
23  go.  But I'll still go over some basic ground rules
24  so you keep those in mind as we go forward.

Page 6

1        A deposition is much like a conversation,
2   but there are some differences.  First, we have a
3   court reporter who is attempting to transcribe the
4   conversation.  So we can't interrupt each other.  So
5   please wait until I finish asking a question before
6   answering.  And I will wait until you've answered a
7   question before we go on to a new question or
8   re-asking the same question if I don't feel like I
9   got an answer.
10       Also, in answering questions, please try
11  to use full answers; yeses and nos versus uh-huhs,
12  uh-uhs, or head nods, that kind of thing.
13  **A.   Okay.**
14  Q.   And if you need to take a break, you can
15  let me know.  But please ask for a break only after
16  you've answered a question and before I've gone on
17  to a new question.
18  **A.   Understood.**
19  Q.   And if you don't hear or understand a
20  question, ask me and I will repeat or rephrase.  If
21  you do answer a question, I will assume that you
22  understood the question.  If you --
23       Well, let me just first ask you if you
24  have consumed any medicine or alcohol over the past

Page 7

1   twelve hours?
2   **A.   The only thing I've taken is losartan for**
3   **minor hypertension.**
4   Q.   Okay.  When did you take that?
5   **A.   At about 6:00 a.m. today.**
6   Q.   Okay.  The medication you've taken, does
7   it impact your ability to answer questions today?
8   **A.   No, it does not.  I take it daily.**
9   Q.   Okay.  Is there any reason such as being
10  under unusual stress, a physical or mental
11  condition, or being under the influence of any
12  substance that would prevent or limit your ability
13  today to give truthful answers to my questions?
14  **A.   No.**
15  Q.   What did you do to prepare for today's
16  deposition?
17  **A.   I met with my counsel.**
18  Q.   Okay.  Was anybody else at the meeting?
19  **A.   No.**
20  Q.   Did you look at any documents?
21  **A.   Yes.**
22  Q.   What documents did you look at?
23  **A.   I reviewed some of the email**
24  **correspondence between ourselves and Ms. Dziubla and**

Page 8

1   **looked at our Policies and Procedures book.**
2   Q.   Policies and Procedures book, you said?
3   **A.   Yes.**
4   Q.   Anything else?
5   **A.   No.**
6   Q.   Will you please tell me where you reside?
7   **A.   I reside in Naperville, Illinois.**
8   Q.   Okay.  I'm going to ask you some questions
9   about your education.  So let's start with the
10  highest level of education you have.
11       What degree do you have?
12  **A.   I have a Bachelor's of Science degree in**
13  **Accountancy from DePaul University.**
14  Q.   Do you have any other post high school
15  degrees?
16  **A.   No, I do not.**
17  Q.   Where did you go to high school?
18  **A.   Elmwood Park.**
19  Q.   Have you lived in Illinois your whole
20  life?
21  **A.   Yes.**
22  Q.   So you aren't one of those people who run
23  to California as soon as they reach a legal age,
24  huh?

Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 6 of 73 PageID #:522
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A. (Shaking head.)
2    Q. Are you currently employed?
3    A. Yes.
4    Q. Where?
5    A. J.C. Anderson.
6    Q. When did you join J.C. Anderson?
7    A. February 14, 2011.
8    Q. What's your title?
9    A. CFO.
10   Q. For how long have you been the CFO?
11   A. Approximately three years.
12   Q. So that would put us somewhere in 2016?
13   A. Yes.
14   Q. What was your title before you were the
15 CFO?
16   A. Treasurer.
17   Q. For how long were you the Treasurer?
18   A. Since the end of 2012.
19   Q. Did you only have one other title before
20 that? Before Treasurer, what were you?
21   A. When I first started, my title was
22 Controller.
23   Q. Any other titles you've had at JCA?
24   A. No.

Page 9

1   Q. Do you also have some kind of Human
2 Resources role at the company?
3   A. Yes.
4   Q. So do you have an additional title for
5 that role?
6   A. I don't have an additional title. It's
7 listed in our Policies and Procedures book that I'm
8 the H.R. Representative for the company.
9   Q. So would it be accurate to say
10 H.R. Representative is your title?
11   A. Yes.
12   Q. For how long have you been in that role?
13   A. Middle of 2013. I don't know the exact
14 date.
15   Q. Do you know -- do you remember who made
16 you the H.R. Representative?
17   A. The owners of the company.
18   Q. Was there some kind of a meeting where
19 they called you in and said you were the
20 H.R. Representative now?
21   A. Yes.
22   Q. Did you undergo any kind of training
23 relating to your H.R. responsibilities?
24   A. No formal training.

Page 10

1   Q. So that would include -- so would it be
2 accurate so say that you have had no training on
3 U.S. discrimination and retaliation laws?
4   A. No, that would not be accurate.
5   Q. So you have had some training?
6   A. Yes.
7   Q. Okay.
8   A. I've gone to some seminars through
9 CFMA groups and other professional organizations
10 that have offered seminars on topics pertaining to
11 H.R. But I don't have the specifics on those.
12   Q. You don't remember dates, locations?
13   A. No.
14   Q. Do you know who would have further details
15 on your attendance at those seminars?
16   A. No, I do not.
17   Q. What are your duties and responsibilities
18 as the CFO?
19   A. To oversee the financial and accounting
20 functions of the company along with the money
21 management.
22   Q. What were your duties and responsibilities
23 as the Treasurer?
24   A. Duties were the same.

Page 11

1   Q. But when you became the CFO, were there
2 certain duties that were added to your
3 responsibilities?
4   A. No. It was just a change in title.
5   Q. And a change in compensation?
6   A. Yes.
7   Q. What about when you were the Controller,
8 what were your duties and responsibilities then?
9   A. When I was the Controller, I reported to
10 the CFO. And I assisted with everyday accounting
11 functions.
12   Q. As the CFO -- Sorry, one moment.
13     As the CFO, who do you report to?
14   A. The president of the company and the
15 owners.
16   Q. So that would be Mr. Yazbec and
17 Mr. Schumacher?
18   A. Jim and Tom Schumacher, yes.
19   Q. Did you report to the same individuals as
20 Treasurer?
21   A. Yes.
22   Q. Who was the CFO at the time you were the
23 Controller?
24   A. Kevin Radoha.

Page 12

Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 7 of 73 PageID #:523

Michael Power  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q.  Is this the same individual who passed
2  away?
3     A.  The same individual who passed away.
4  BY QUESTIONER:
5     Q.  As the CFO, who reports to you?
6     A.  I have a Senior Accountant who reports to
7  me, and the Office Manager/Receptionist reports to
8  me.
9     Q.  What is the Senior Accountant's name?
10    A.  Andy Lavis, L-a-v-i-s.
11    Q.  And when you were the Treasurer, who
12 reported to you?
13    A.  The same two individuals.
14    Q.  Did anybody report to you when you were a
15 Controller?
16    A.  No.
17    Q.  Where were you employed before you were at
18 JCA?
19    A.  Shaw Development Company.
20    Q.  For how long were you there?
21    A.  Eleven years.
22    Q.  Did you have various titles?
23    A.  No.  My title was -- Yes, I did.  I'm
24 sorry.

Page 13

1     I started as Senior Accountant and then
2  became Controller.
3     Q.  Why did you leave Shaw Development
4  Company?
5     A.  My position was eliminated due to the
6  downturn in the real estate market.  It was a real
7  estate development firm.
8     Q.  And when did you leave Shaw Development
9  Company?
10    A.  In August of 2010.
11    Q.  Were you unemployed, then, for a period of
12 time?
13    A.  Yes.
14    Q.  Who did you report to at Shaw Development
15 Company?  If you reported to multiple individuals,
16 then the last person you reported to.
17    A.  William King -- Bill King, Executive Vice
18 President and CFO.
19    Q.  When did you become a Controller at Shaw?
20    A.  Can you repeat that.
21    Q.  You said you were a Senior Accountant and
22 then you became the Controller, correct?
23    A.  Yes.
24    Q.  When did you become a Controller at Shaw?

Page 14

1  Approximate; just a year would be fine if you can't
2  remember.
3     A.  I think it was around 2003.  I started
4  there in 1999.  I don't recall the exact date.
5     Q.  That's fine.
6        Can you tell me what JCA does?
7     A.  We are a general contractor that
8  specializes in commercial interior construction.
9     Q.  Do you know when JCA was established?
10    A.  1879.
11    Q.  I read somewhere that Mr. Schumacher, Jim
12 Schumacher, was one of the founders of the company.
13       Is that not accurate, then?
14    A.  He was not one of the founders.
15    Q.  Okay.  But the company has been in his
16 family since it was established?
17    A.  The company has been in his family for --
18 No, not since it was established.  His dad worked
19 for the company, and then his dad bought it.  I
20 don't know the exact timeline.
21    Q.  So Mr. Jim's Schumacher's grandfather
22 bought the company?
23    A.  Mr. Jim Schumacher's father.
24    Q.  What are the names of some of JCA's major

Page 15

1  clients?
2     MS. OLSON:  I'm going to object based on
3  relevance.
4  BY MR. SEDAEI:
5     Q.  Go ahead and answer that, sir.
6     A.  DePaul University, Merchandise Mart,
7  United Airlines, Chicago Bears.
8     Q.  Before Chicago Bears, did you say United?
9     A.  United Airlines.
10    Q.  United Airlines.
11       Anything else -- anyone else you can
12 recall?
13    A.  Those are the main ones that come to mind.
14 Yelp.
15    Q.  Have you done more than one project with
16 each of these clients?
17    MS. OLSON:  Same objection.
18    A.  We've only done one with the Bears.  And
19 yes for the others.  Yes, we've done multiple
20 projects for the others.
21 BY MR. SEDAEI:
22    Q.  Okay.  Can you just generally describe the
23 process by which JCA competes to get projects with
24 clients?

Page 16

Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 8 of 73 PageID #:524
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    MS. OLSON:  Same objection.
2    A.  When we become aware of projects through
3 proposals or requests for pricing, we put together a
4 bid.  We submit our bids along with other GC's, and
5 then from there typically go through an interview
6 process with the customer.  And then if they -- then
7 they award the work.
8 BY MR. SEDAEI:
9    Q.  How do you become aware of projects?
10   A.  Our Marketing and Business Development
11 site handles that, or people contact us directly.
12   Q.  Does JCA only function or do projects
13 within Illinois?
14   A.  Yes.  There was one project in Ohio a few
15 years ago, but that was one time only.
16   Q.  Other than the case for which we are here
17 today, are you aware of JCA ever being sued by any
18 current or former employees?
19   A.  No.
20   Q.  While you have been in your position as
21 the H.R. Representative, has any individual alleged
22 to you that JCA or someone at JCA was discriminating
23 against them?
24   A.  No.

Page 17

1    Q.  While you have been in your H.R. role, has
2 anyone at JCA alleged that JCA had retaliated
3 against them or was retaliating against them?
4    A.  No.
5    Q.  You said Mr. Yazbec is the President of
6 the company?
7    A.  Yes.
8    Q.  Has he been the President for the entire
9 time you have been at JCA?
10   A.  No.
11   Q.  For how long have you known Mr. Yazbec?
12   A.  Roughly eight years.
13   Q.  So pretty much since when you joined the
14 company?
15   A.  He joined -- Yes.  He joined approximately
16 six months after I did.
17   Q.  I see.  Did you know him before that?
18   A.  I did not.
19   Q.  What role was he hired for?
20   A.  He was hired to become President.
21   Q.  So the entire --
22   A.  I believe he -- I'm trying to think what
23 his exact title was when he started.  It was Vice
24 President of some nature.  I don't know if it was

Page 18

1 just Vice President or if there was other --
2 something else attached to that.  But he was hired
3 to replace the President who would be retiring.
4    Q.  And who was that?
5    A.  Tom Bean, B-e-a-n.
6    Q.  Were you involved in Mr. Yazbec's hiring?
7    A.  Not at all.
8    Q.  We briefly talked about Mr. Schumacher,
9 Jim Schumacher.  What is his title?
10   A.  Chairman.
11   Q.  Do you know for how long he has been the
12 Chairman?
13   A.  I do not know.  He had that title when I
14 came in.
15   Q.  Is he the highest level person at JCA?
16   A.  Yes.
17   Q.  So would it be accurate to say that if he
18 orders somebody to do something, there is nobody
19 else who can override him?
20   A.  Correct.
21   Q.  What's the expression, the buck stops with
22 him?  I mean, you don't have to answer that.  That's
23 not a question.
24      What about Tim Schumacher?

Page 19

1    A.  Tom Schumacher.
2    Q.  Tom Schumacher.  So that's Mr. Jim
3 Schumacher's brother.
4      What is Mr. Tom Schumacher's title?
5    A.  CEO.
6    Q.  But in the hierarchy of the company, would
7 the CEO be below the Chairman?
8    A.  Yes.
9    Q.  Do you know for how long Mr. Jim
10 Schumacher has been with JCA?
11   A.  I do not know.
12   Q.  How about Tom Schumacher?
13   A.  I don't know his exact timing either.
14   Q.  Do you know Ms. Dziubla?
15   A.  Yes.
16   Q.  How do you know her?
17   A.  As an employee of the company.
18   Q.  When did you first meet her?
19   A.  When she was hired.
20   Q.  What was her title at the company?
21   A.  Estimator.
22   Q.  Can you tell me what Estimators do?
23   A.  I'm trying to formulate an answer without
24 using the word "estimate."

Page 20

Michael Power  6/26/2019
Case: 1:18-cv-04542 Document #: 93-3 Filed: 02/26/20 Page 9 of 73 PageID #:525
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 Q. Okay. I mean, you can put "estimate" in a
2 full sentence, if that helps.
3 **A. They estimate the project -- the cost of a**
4 **potential project.**
5 Q. And how do they do that?
6 **A. They acquire bids from various**
7 **subcontractors based on the information they're**
8 **given on the project.**
9 Q. And do they actually have to go to the
10 site where the project is being implemented before
11 doing the estimation or while they're doing the
12 estimation?
13 **A. Yes. They usually go on walk-throughs to**
14 **visit the site before preparing an estimate.**
15 Q. Who normally attends walk-throughs? I
16 don't want names; but like, you know, in terms of
17 the roles of individuals or the parties involved.
18 **A. Estimators and Project Managers.**
19 Q. And the Project Managers, are they
20 JCA employees?
21 **A. Yes.**
22 Q. Do the subcontractors attend the
23 walk-throughs?
24 **A. Yes. I've never been on a walk-through.**

Page 21

1 I just want to...
2 Q. No, I understand. But you know about
3 them?
4 **A. I know what I've heard, yes.**
5 Q. Okay. So we have the subcontractors; and
6 then from JCA we have the Estimators and Project
7 Managers. Correct?
8 **A. Correct.**
9 Q. Anybody else you can think of?
10 **A. I would speculate somebody from the**
11 **project itself or the client or somebody from the**
12 **building from which the project is. But that's**
13 **speculation. Like I said, I've never been on a**
14 **walk-through.**
15 Q. Okay. So possibly some potential client
16 representatives?
17 **A. Yes.**
18 Q. Do you recall when Ms. Dziubla was hired?
19 **A. May of 2016.**
20 Q. Were you involved in her hiring?
21 **A. No.**
22 Q. When did you -- I'm sorry if I asked this
23 before.
24 When did you first meet Ms. Dziubla?

Page 22

1 **A. On her first day.**
2 Q. Did she go through some kind of
3 orientation?
4 **A. Yes.**
5 Q. Were you involved in any aspect of that
6 orientation?
7 **A. Yes.**
8 Q. What was your role?
9 **A. To welcome her to the company and provide**
10 **Policies and Procedures and also to explain our**
11 **benefits packages and also to give new hire**
12 **paperwork, including tax withholding documents.**
13 Q. Anything else?
14 **A. No.**
15 Q. Who was Ms. Dziubla's direct supervisor?
16 **A. Greg Garland.**
17 Q. At the time Ms. Dziubla became a new
18 Estimator for JCA, how many other Estimators did you
19 have or did JCA have?
20 **A. Four.**
21 Q. Can you please tell me their names.
22 **A. Greg Garland, Tim Le, Mike Studzinski, Ed**
23 **Bowen.**
24 Q. Is Greg Garland still an Estimator at JCA?

Page 23

1 **A. Yes.**
2 Q. How about Mr. Le?
3 **A. No.**
4 Q. Is he still at JCA?
5 **A. No.**
6 Q. What was the reason for his departure?
7 **A. He found another job.**
8 Q. So he left on his own accord?
9 **A. Yes.**
10 Q. When did he leave?
11 **A. I don't remember.**
12 Q. Was it this year?
13 **A. No.**
14 Q. Do you recall if it was during 2018?
15 **A. I believe it was, but I don't remember the**
16 **exact date.**
17 Q. How about Mike, whose last name is Eastern
18 European, I believe?
19 THE WITNESS: Do you need me to spell that
20 for you?
21 BY MR. SEDAEI:
22 Q. I mean, you can later spell that for the
23 court reporter.
24 But is he still an Estimator there?

Page 24

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A. Yes.
2    Q. And how about Mr. Bowen?
3    A. Yes.
4    Q. Now, you said Mr. Garland is still an
5 Estimator. But does he also have some kind of
6 supervisory role?
7    A. Yes. He is the Lead Estimator. He
8 supervises the Estimating department.
9    Q. For how long has he been in that position
10 as a Lead Estimator?
11    A. I don't know the exact time. It's been a
12 few years. I don't know the exact timing though.
13    Q. Would you say it was for the entire time
14 that Ms. Dziubla was employed at JCA?
15    A. Yes.
16    Q. So throughout the entire time Ms. Dziubla
17 was at JCA, would it be accurate to say that she
18 didn't have any other direct supervisors other than
19 Mr. Garland?
20    A. Correct.
21    Q. How often did you interact with
22 Ms. Dziubla while she was employed there?
23    A. I would see her almost daily when she was
24 in the office.

Page 25

1    Q. By the way, how many employees does JCA
2 have?
3    A. In the office, there's roughly 27. In the
4 field, that ranges from 40 to 70, depending on how
5 busy we are.
6    Q. So let's start with in the field. Who
7 are -- and I don't want names again; more like
8 titles.
9      Who is in the field?
10    A. Union carpenters, laborers, and tapers.
11    Q. In terms of titles, who is in the office?
12    A. In the office, we have the President and
13 COO, the CFO, Project Management staff, Estimating,
14 Marketing, Accounting, Purchasing.
15    Q. Any other titles?
16    A. Not that come to mind.
17    Q. By the way, if you ever, like, want to
18 supplement or kind of, like, add to your answers to
19 the questions that I have already asked and
20 something comes to mind, just tell me that you want
21 to revisit that question and add to it.
22    A. Okay.
23    Q. How was Ms. Dziubla's work performance
24 while she was at JCA?

Page 26

1    A. I wasn't directly involved with her work
2 performance.
3    Q. But you have been the H.R. Representative
4 for the entire time she was there, correct?
5    A. Uh-huh.
6    Q. Did anybody ever bring up any issues about
7 her performance to you?
8    A. No.
9    Q. Was she ever put on something like a
10 Performance Improvement Plan relating to some issues
11 relating to her performance?
12    A. I don't believe she was put on a formal
13 plan. But I do believe there was a conversation
14 with her once about some questions on some
15 estimates.
16    Q. What do you recall about that
17 conversation?
18    A. I just recall Mike Yazbec telling me that
19 they had talked to her because they had some
20 concerns about a project.
21    Q. Just a single project?
22    A. I believe it was one. I don't know if it
23 was more.
24    Q. When was that; "that" being the

Page 27

1 conversation?
2    A. That would have been sometime probably --
3 I don't remember specifically. I would estimate
4 early 2017, early to mid 2017.
5    Q. To your knowledge, whatever the issue was
6 got resolved and --
7    A. Yes.
8    Q. Okay. You don't remember what the issue
9 was?
10    A. No.
11    Q. But you believe Mr. Yazbec does?
12    A. He might. He met with her; I did not.
13    Q. Okay. Was Ms. Dziubla part of that
14 conversation about the issue?
15    A. Yes.
16    Q. Do you know who else other than Mr. Yazbec
17 was involved in that conversation?
18    A. I believe Greg Garland was. I don't know
19 if anybody else was.
20    Q. How did you learn about this conversation
21 that you referenced?
22    A. Mike Yazbec told me.
23    Q. When did he tell you that?
24    A. Later that afternoon.

Page 28

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/26 Page 11 of 73 PageID #:527
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 Q. Do you remember why he told you?
2 A. I saw he was in the conference room and
3 just asked if they had a meeting, what was going on;
4 casual conversation.
5 Q. So he told you because you asked him what
6 was going on?
7 A. Uh-huh.
8 Q. But he didn't need you to do anything --
9 A. No.
10 Q. -- relating to that conversation?
11 A. No.
12 Q. Do you know if there's a written record of
13 that conversation anywhere, notes or anything like
14 that?
15 A. I do not know. I was not given any.
16 Q. Who is Joe Maguire?
17 A. He is a Project Manager.
18 Q. Can you tell me a little bit about the
19 Project Managers and how exactly they interact with
20 Estimators, how their roles fit into the bigger
21 picture?
22 A. As projects are being estimated, they're
23 also assigned a Project Management team who will
24 work with that project and review that estimate.

Page 29

1 Not being in that end of the business, my
2 understanding is it's a collaborative effort between
3 the Estimators and the Project Management to
4 finalize the estimate.
5 Q. For how long has Mr. Maguire been at JCA?
6 A. I'm unsure of his exact start date. But I
7 would say it's over ten years.
8 Q. So the entire time you have been at JCA?
9 A. Yes. It could be as many as fifteen. I
10 don't know the exact timing.
11 Q. Okay. Did he have an issue a few years
12 ago, some personal issue, that required him to take
13 time off or away from work?
14 A. He had a medical issue where he tore his
15 Achilles heel, and he worked from home.
16 Q. Do you recall the approximate date of
17 that?
18 A. I do not recall.
19 Q. Not even the year?
20 A. Quite honestly, I don't recall.
21 Q. Okay. For how long was he working from
22 home?
23 A. I believe approximately three weeks.
24 Q. Do Project Managers have to go on

Page 30

1 walk-throughs as often as Estimators do?
2 A. I don't know.
3 Q. But they do have to go on walk-throughs,
4 as you previously said. Right?
5 A. Yes.
6 Q. So for three weeks he was unable to go on
7 walk-throughs?
8 A. He would take cabs when necessary to get
9 to...
10 Q. But he actually went to all the
11 walk-throughs, or did he go to fewer walk-throughs?
12 A. I don't know.
13 Q. So he would take a cab to the project.
14 But then he was able to walk around while he was at
15 the project?
16 A. I believe he had some type of scooter
17 thing. I don't recall specifically.
18 Q. Has Mr. Maguire ever had any performance
19 issues at work?
20 A. No.
21 Q. Has he ever complained about working with
22 anyone specifically at JCA?
23 A. No.
24 Q. Do you know a person named Mott, M-o-t-t?

Page 31

1 A. Yes.
2 Q. Who is that that?
3 A. Andrew Mott, Project Manager.
4 Q. Okay, another Project Manager; Andrew
5 Mott?
6 A. Yes.
7 Q. By the way, how many Project Managers does
8 JCA have currently?
9 A. Can I take a moment and count it?
10 Q. Yes, sure. And the same goes for the
11 answers to all the questions.
12 A. Ten.
13 Q. Ten?
14 A. Yes.
15 Q. Were you just writing down their names?
16 A. I was trying to go through -- Eleven. I
17 missed one.
18 Q. You were writing down their names just
19 now?
20 A. Yes. I was going through the office and
21 writing initials so I can count them.
22 Q. Okay. Would you be able to read off your
23 names to me really quickly?
24 A. Yes.

Page 32

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 12 of 73 PageID #:528
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q.  Assuming that Mr. Mott and Mr. Maguire are
2  still Project Managers, we've got two of them down?
3     A.  Yes, correct.  Joe Maguire; John
4  Angelovich, A-n-g-e-l-o-v-i-c-h; Seth Erlich; Jason
5  Hawkins; Larry Regovic; Andrew Mott; Adam Bellin;
6  Kayla McKinley; Greg Krucek; Matt Kantro; Michael
7  Dunn.
8     Q.  While you have the list in front of you,
9  would you also answer the next question while the
10 list is in front you:  Do you know if all the
11 individuals you just named were Project Managers
12 throughout the time Ms. Dziubla was an Estimator?
13    A.  They were not.
14    Q.  Okay.  Can you think of the ones who were?
15    A.  Okay.
16    Q.  So can you tell me which ones were Project
17 Managers throughout the entire time Ms. Dziubla was
18 an Estimator there?
19    A.  Joe Maguire, John Angelovich, Seth Erlich
20 Jason Hawkins, Larry Regovic, Andrew Mott, and Matt
21 Kantro.
22    Q.  Thank you.  So did Mr. Mott have a
23 personal issue at some point that required him to
24 take time off or away from work?

Page 33

1  Q.  Andrew Mott also tore his Achilles heel.
2     Q.  Same issue?
3     A.  Yes.
4     Q.  When did that happen?
5     A.  I believe it was sometime in 2017.  I
6  don't recall the exact date.
7     Q.  For how long was he away from work?
8     A.  He worked from home.  He took one week of
9  his vacation time during his surgery.
10    Q.  Do you recall if he was able to go to
11 walk-throughs?
12    A.  I don't recall.  And Mr. Mott is an
13 Assistant Project Manager.  I don't know if he
14 attends walk-throughs regularly.
15    Q.  Who is he an assistant to?
16    A.  Seth Erlich.
17    Q.  Do all Project Managers have assistants?
18    A.  We have three main Project Managers.  At
19 times they are referred to as Project Executives,
20 and they lead teams.
21    Q.  Who are the leads?
22    A.  Joe Maguire, Seth Erlich, and John
23 Angelovich.
24    Q.  I believe you said there were four

Page 34

1  Estimators at JCA currently, correct?
2     A.  (No response.)
3     Q.  Let me go through their names, if that
4  helps.  The names I have is Greg Garland, Tim Le,
5  Mike, and Ed Bowen.  These are names I have.
6        Are these individuals who are Estimators
7  now?
8     A.  No.
9     Q.  Okay.  These were the ones who were
10 Estimator at the time Ms. Dziubla was employed?
11    A.  Correct.
12    Q.  Okay.  Tim Le is no longer there?
13    A.  Yes.
14    Q.  But the other three individuals are still
15 there?
16    A.  Yes.
17    Q.  And does JCA currently have, then, three
18 estimators?
19    A.  No.  There is a fourth.
20    Q.  Who is the fourth person?
21    A.  Dan Dunn, D-u-n-n.
22    Q.  When was Dan hired?
23    A.  Dan has been with the company for years.
24 He was a field carpenter.  He came into the office

Page 35

1  in June of 2018.
2     Q.  So you said Mr. Mott was working from home
3  for a period of time but he also used one week of
4  his vacation time?
5     A.  Yes.
6     Q.  Okay.  While he was dealing with the
7  medical issue?
8     A.  Yes.
9     Q.  Has Mr. Mott ever complained to you or to
10 anyone, to your knowledge, about working at JCA or
11 working with anyone specifically at JCA?
12    A.  No, not to my knowledge.
13       MR. SEDAEI:  You can mark this Exhibit 1.
14          (Power Exhibit No. 1
15           marked for identification.)
16 BY MR. SEDAEI:
17    Q.  I'm showing you what's marked as
18 Exhibit 1.  Have you seen this document before?
19    A.  I believe so.
20    Q.  Okay.  I represent to you that this is
21 JCA's initial Rule 26 disclosures.  And if you look
22 on the first page, Section 1, it focuses on the
23 individuals who likely have information that JCA may
24 use to support these defenses.

Page 36

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 13 of 73 PageID #:529
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    Do you see that?
2    A.  Yes.
3    Q.  Okay.  Would you take a look at that list
4  and tell me that if that's a complete list?  And it
5  goes into the second page.
6    MS. OLSON:  To clarify, are you going to
7    show him the people that were just identified
8    by the plaintiff or Mr. Jacobsen?
9    MR. SEDAEI:  I mean, it's already been
10    included in this section.  So no, I'm not going
11    to include anything.  I just want to know if
12    that list is a complete list.  And Section F, I
13    think, is phrased broadly.
14    A.  Just for clarification, can you please
15  repeat your question.
16  BY MR. SEDAEI:
17    Q.  Yes.  I just want to know if this list of
18  individuals who may have discoverable information
19  about the case we're here for, whether this list is
20  a complete list.
21    A.  The names of the witnesses are not listed.
22    Q.  Okay.  This would be the names of the
23  witnesses to the incident at The Kev?
24    A.  Yes, correct.

Page 37

1    Q.  Anyone else you can think of who should be
2  on the list?
3    A.  In addition to the witnesses?
4    Q.  Yes.
5    A.  No one comes to mind at this time.
6    Q.  And we'll get to the witnesses later.
7  Okay, you can put the exhibit aside.  I may revisit
8  it, so you can just hold onto it.
9    So did Ms. Dziubla have an employment
10  contract with JCA?
11    A.  No.
12    Q.  She was an at-will employee?
13    A.  Yes.
14    Q.  Did she receive any kind of training prior
15  to taking her job at JCA?
16    A.  I do not know.
17    Q.  So you do know that she had some kind of
18  an orientation, right, because you discussed your
19  role in it?
20    A.  Yes.
21    Q.  But as far as training to do the job, you
22  don't know if she had any kind of training like
23  that?
24    A.  I do not know.

Page 38

1    Q.  Okay.
2    MR. SEDAEI:  This will be Exhibit 2.
3    (Power Exhibit No. 2
4    marked for identification.)
5  BY MR. SEDAEI:
6    Q.  I'm showing you what's marked as
7  Exhibit 2.  Have you seen this document before?
8    A.  Yes.
9    Q.  Can you tell me what it is?
10    A.  J.C. Anderson's Office Policies and
11  Procedures Manual.
12    Q.  Do you know who has put this document
13  together?
14    A.  Specifically, no.
15    Q.  Do you know when this document was
16  prepared?
17    A.  It was prepared prior to my arrival.
18    Q.  To your knowledge, has this document been
19  revised throughout the time you've been employed at
20  JCA?
21    A.  I believe there have been updates as
22  personnel have changed.
23    Q.  Do you have knowledge regarding the
24  specific updates made to the document while you have

Page 39

1  been at JCA?
2    A.  Only names of people that have changed.
3  That's all that I have knowledge of.
4    Q.  So these would be the names of people who
5  have made changes to the document?
6    A.  No.  It lists Michael Yazbec as President.
7  It was changed when Mike came on board; those types
8  of changes.
9    Q.  Okay.  But to your knowledge, has there
10  been any changes to the actual Policies and
11  Procedures section of the manual?
12    A.  Not to my knowledge.
13    Q.  Is this handbook given to all the new
14  hires at JCA?
15    A.  Yes.
16    Q.  Was Ms. Dziubla provided a copy of this
17  Policies and Procedures Manual?
18    A.  Yes.
19    Q.  When was she provided a copy?
20    A.  On her first day.
21    Q.  Was she also offered any kind of training
22  on how to use the handbook or an orientation into
23  the sections included in the handbook?
24    A.  She was given a new employee orientation,

Page 40

Michael Power          6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 14 of 73 PageID #:530
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  and the book was referenced.  The book also has
2  another section about the actual operations work
3  that's not present in this part that I believe that
4  she would have received training for with estimating
5  staff.
6  Q.  Okay.  But specifically about the section
7  I provided to you --
8  A.  This section, no.
9  Q.  Was there any kind of a discussion or
10 training that specifically focused on various
11 sections of the booklet, or was she just given this
12 booklet and said, You can use it as a reference when
13 you need to.
14 A.  She was given the book and encouraged to
15 read it.
16 Q.  Okay.  Did Ms. Dziubla and JCA have any
17 kind of non-compete agreement that prohibited her
18 from working with any competitors after leaving JCA?
19 A.  I don't believe so.
20 Q.  Did Ms. Dziubla have an agreement with JCA
21 that required her to have no employment outside of
22 JCA while she was employed at JCA?
23 A.  No.
24 Q.  Does JCA have any rules or policies that

Page 41

1  prohibit employees from having employment outside of
2  JCA while they are employed at JCA?
3  A.  There is a conflict of interest clause in
4  our handbook.
5  Q.  And what can you tell me about that?  Is
6  it included in the exhibit that I just gave you?
7  A.  It should be, I think.  Yes.
8  Q.  Is it on page DZIUBLA 1094?
9  A.  Yes.
10 Q.  Okay.  So if there is no conflict of
11 interest, then the employee is allowed to have jobs
12 outside of JCA while they are employed at JCA?
13 A.  Yes.
14 Q.  Is a conflict of interest defined anywhere
15 in the manual or anywhere else?
16 A.  There are examples given in the manual.
17 Q.  Which page is that?
18 A.  Same page, DZIUBLA 1094.
19 Q.  Which section are you exactly referring
20 to?  Oh, you're talking about Section 6?
21 A.  Yes.
22 Q.  So the three bullet points, that's what
23 you're referring to as examples?
24 A.  Yes, and the paragraph above.

Page 42

1  Q.  So rather than examples, they're kind of
2  categories of individuals or companies, working for
3  whom may result in a conflict of interest with JCA.
4  Is that right?
5  MS. OLSON:  Object to form.
6  BY MR. SEDAEI:
7  Q.  You said examples.  I thought there were
8  names of specific companies listed here.
9  So no names of specific companies --
10 A.  There are no names --
11 Q.  -- listed in this section?
12 A.  -- of specific companies listed.
13 Q.  Is there a requirement anywhere in the
14 manual that an employee who obtains outside
15 employment, you know, would have to bring that
16 employment to JCA and specifically get approval?
17 A.  I don't believe so.
18 Q.  I think for now I'm done with that
19 Exhibit 2.  You can have it in front of you in case
20 you want to refer to it later.
21 MR. SEDAEI:  Can we take 5?
22 MS. OLSON:  Yes.
23 MR. SEDAEI:  Okay.
24 (Whereupon a recess was taken

Page 43

1  from 10:37 a.m. to 10:46 a.m.,
2  after which the following
3  proceedings were had:)
4  (Enter Mr. Ruff.)
5  MR. SEDAEI:  We can go back on the record.
6  We have one of Mr. Jacobsen's other attorneys
7  joining.
8  BY MR. SEDAEI:
9  Q.  Okay, let's continue.  Mr. Power, do all
10 employees at JCA receive the same number of Paid
11 Time Off days?
12 A.  No.
13 Q.  By the way, do you call them PTO's at JCA?
14 A.  We typically refer to it as vacation time;
15 vacation time, sick time, and everyone also gets a
16 personal holiday for their birthday.
17 Q.  So how is the number of vacation days
18 calculated for each employee?
19 A.  New employees are given two weeks'
20 vacation time unless they negotiate otherwise when
21 they start.
22 Q.  So there is some room for negotiation at
23 the time of hiring?
24 A.  Yes.

Page 44



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 15 of 73 PageID #:531

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q. When an employee needs to actually take
2  one of his or her vacation days, would he or she
3  have to get approval prior?
4  **A. Yes. They're supposed to get prior**
5  **approval with their direct supervisor.**
6  Q. Can anyone else give them approval, like
7  you, as the H.R. person?
8  **A. No, because they go through their**
9  **department, their direct report first.**
10  Q. If somebody doesn't use their vacation
11  days one year, do they roll over to the next year?
12  **A. No, they do not.**
13  Q. What happens if an employee who has no
14  vacation days left one year misses a day of work,
15  what would JCA's response be?
16  **A. Can you repeat all of that. I didn't**
17  **catch the beginning.**
18  Q. Yes, sure. Let's say an employee has
19  already run through all of their Paid Time Off and
20  then they miss a day of work.
21      What would JCA's response be?
22  **A. It would depend on why they missed it.**
23  Q. So you ask them -- you will reach out and
24  ask them, Why did you miss it?

Page 45

1  **A. Yes, it it's...**
2  Q. Go ahead and finish that thought. Just
3  tell me the various scenarios --
4  **A. Examples being if it was a death in the**
5  **family, we do have a bereavement policy. They are**
6  **allowed three sick days a year. If it was**
7  **completely unexcused and they didn't show up, they'd**
8  **be unpaid for the day.**
9  Q. Okay. So let's talk about the three days.
10  That three days of bereavement, that's outside of
11  the number of days that the employee is entitled to
12  for vacation?
13  **A. Yes. That's independent.**
14  Q. Okay. And the three days -- they would
15  qualify for those three days if there is a death in
16  the family, you said?
17  **A. Yes.**
18  Q. Anything other than a death they would
19  qualify for it?
20  **A. For bereavement leave, no.**
21  Q. Okay. What if it's just the employee is
22  sick?
23  **A. They would use their sick time.**
24  Q. So there's a certain amount of sick time

Page 46

1  they have outside of their vacation days that's
2  paid?
3  **A. Yes.**
4  Q. How many sick days do employees get; a set
5  number?
6  **A. Yes, three.**
7  Q. Three sick days a year?
8  **A. Yes.**
9  Q. Do they need to call in and get approval
10  prior to taking a sick day?
11  **A. Yes.**
12  Q. I mean call in or email or something.
13  **A. They're asked to give notice before their**
14  **regular working hours begin.**
15  Q. But if they're sick, then they don't
16  really need to get approval; they just need to give
17  notice?
18  **A. Just give notice, yes.**
19  Q. Okay. Now, let's say an employee is sick
20  and they don't have any more vacation days left and
21  they don't have any more sick days left and they
22  miss a day of work.
23      Then what would JCA's response be?
24      MS. OLSON: I'm going to object to the

Page 47

1  extent it calls for speculation.
2      MR. SEDAEI: I'm not asking you to
3  speculate. I'm asking you to tell me about
4  JCA's policy, if there is an actual policy that
5  deals with this situation.
6  **A. We have not encountered that situation.**
7  BY MR. SEDAEI:
8  Q. And there is no policy that addresses that
9  situation?
10  **A. No.**
11  Q. So throughout the time that you have been
12  at JCA, can you think of an example where an
13  employee had no vacation days left and no sick days
14  left and they missed at least one extra day of work?
15  **A. I can think of only one example. Matt**
16  **Kantro took off an additional week unpaid for his**
17  **honeymoon.**
18  Q. Matt Kantro, was it?
19  **A. Yes.**
20  Q. What is or was his role at the company?
21  **A. He's a Project Manager. I don't know if**
22  **his -- at that time if his title was Assistant**
23  **Project Manager or just Project Manager.**
24  Q. When did he take the additional -- you

Page 48

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 16 of 73 PageID #:532

Michael Power            6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 said additional week?
2   **A. Yes.**
3   Q. When did he take this additional week away
4 from work?
5   **A. It was years ago. I don't recall the**
6 **specifics.**
7   Q. Not even the year?
8   **A. No. I'd be guessing. I don't want to do**
9 **that.**
10   Q. But you were employed at JCA?
11   **A. Yes.**
12   Q. You were an H.R. Representative at JCA at
13 the time?
14   **A. Yes.**
15   Q. Is Mr. Kantro still employed at JCA?
16   **A. Yes.**
17   Q. Still a Project Manager?
18   **A. Yes.**
19   Q. Who is his direct supervisor?
20   **A. John Angelovich.**
21   Q. So he was an Assistant Project Manager?
22   **A. Yes.**
23   Q. And who does Mr. Angelovich -- who did
24 Mr. Angelovich report to -- Let me restart that.

Page 49

1   Who did Mr. Angelovich report to at the
2 time?
3   **A. Steve Boulukos, B-o-u-l-u-k-o-s.**
4   Q. What is Mr. Boulukos's title?
5   **A. Chief Operating Officer.**
6   Q. This was his title, it is his title, or
7 both?
8   **A. Both.**
9   Q. Do all Project Managers report to
10 Mr. Boulukos?
11   **A. Yes.**
12   Q. And do all Estimators also report to him
13 indirectly?
14   **A. Indirectly, yes.**
15   Q. Okay. In the case of Mr. Garland,
16 directly?
17   **A. Mr. Garland directly, correct.**
18   Q. To your knowledge, Mr. Kantro never
19 complained about, you know, working with anyone
20 specifically at JCA or working at JCA in general?
21   **A. Not to my knowledge.**
22   Q. Has Mr. Kantro ever been disciplined?
23   **A. No.**
24   Q. Has he had any performance issues?

Page 50

1   **A. Not to my knowledge.**
2   Q. To your knowledge, has he ever been given
3 a Performance Improvement Plan?
4   **A. No, not to my knowledge.**
5   Q. Has he ever been asked to leave?
6   **A. No.**
7   Q. Has he ever been presented with a
8 severance agreement?
9   **A. No.**
10   MR. SEDAEI: Mark this as Exhibit No. 3.
11     (Power Exhibit No. 3
12     marked for identification.)
13   MS. OLSON: Was this produced prior to now
14 or no? I didn't see a Bates label on it.
15   MR. SEDAEI: Is this one of JCA's
16 documents? I'm sorry. It's JCA930. I don't
17 know why that one is missing.
18   MS. OLSON: Okay.
19 BY MR. SEDAEI:
20   Q. Mr. Power, I'm showing you what's marked
21 as Exhibit 3. Have you seen this document before?
22   **A. Yes.**
23   Q. Could you tell me what it is?
24   **A. A list of vacation days Rowena used during**

Page 51

1 **2017.**
2   Q. Okay. Do you see at the bottom where it
3 says, Total. And then in parentheses it says, not
4 to exceed 16. And then it says, 15 Vacation plus
5 1 Birthday.
6   Do you see where it says that?
7   **A. Yes.**
8   Q. And then in front of it, it says 16 again.
9 So it says 16 in the parentheses, and then in front
10 of it, it says 16.0 in front of it. Right?
11   **A. Yes.**
12   Q. Okay. That section where it says, not to
13 exceed 16, is that 16 days the number of vacation
14 days that Ms. Dziubla was entitled to in 2017?
15   **A. Yes, three weeks' vacation time plus one**
16 **day for her birthday.**
17   Q. This document doesn't include how many
18 sick days she had used, does it?
19   **A. No.**
20   Q. Is there another document that's kind of
21 similar to this where it shows the number of sick
22 days she had and how many she had used in 2017?
23   **A. No.**
24   Q. So how do you keep a count of the number

Page 52

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/26 Page 17 of 73 PageID #:533
Michael Power      6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  of sick days that employees use at JCA?  Do you have
2  a chart?
3      A.  The supervisors keep track.
4      Q.  Do you know if they keep track by having
5  some kind of document --
6      A.  I do not know.
7      I'm sorry.  I didn't know if you wanted to
8  finish.
9      Q.  I do always want to finish, yes.  But go
10 ahead and answer.
11     A.  I do not know.
12     Q.  Okay.  According to Exhibit 3, did she run
13 out of vacation days on September 26, 2017?
14     A.  Yes.
15     Q.  Can you tell by looking at this chart, or
16 can you tell from your personal knowledge whether
17 she had any sick days left as of September 26, 2017?
18     A.  I do not know.
19     Q.  Do you know who would know the answer to
20 that?
21     A.  Greg Garland or Steve Boulukos.
22     Q.  Do you recall reaching out to them
23 sometime around this time to ask them if Ms. Dziubla
24 had any sick days left?

Page 53

1      A.  I don't recall.
2      Q.  I want to go back to the handbook, which I
3  believe is Exhibit 2.  If you look at page
4  DZIUBLA 1062 -- Actually, you may want to start on
5  1061 towards the bottom where it says, Attendance.
6  But then it continues to 1062.
7      Do you see that section?
8      A.  Yes.
9      Q.  Does that section apply to -- I'm sorry,
10 let me back up.
11     It seems like the section lists the
12 various forms of discipline that an employee may be
13 subjected to if they violate the company's
14 attendance policies; is that accurate?
15     MS. OLSON:  You can take a minute to read
16 it.
17     MR. SEDAEI:  Yes, take your time.
18     THE WITNESS:  Can you please repeat your
19 question.
20     MR. SEDAEI:  Would you mind reading it
21 back.
22     (Record read as requested.)
23     A.  Yes.
24

Page 54

1  BY MR. SEDAEI:
2      Q.  Okay.  Would that include an employee who
3  may be absent from work after they have already run
4  out of all their vacation days and all their sick
5  days?
6      MS. OLSON:  Object to form.
7  BY MR. SEDAEI:
8      Q.  The situation we were discussing earlier,
9  where an employee has already run out of all of
10 their vacation days and all of their sick days and
11 then they miss an additional day of work.
12     A.  Yes, they would be subject to this.
13     Q.  And then these -- there are three bullet
14 points for 1st Offense, 2nd Offense, 3rd Offense.
15     Would you describe that as some form of
16 progressive discipline that is applied to the
17 individual who has -- in the scenario that I just
18 described?
19     A.  (No response.)
20     Q.  Let me give you --
21     A.  Yes.  It could be viewed that way.
22     Q.  I can give you the example again.
23     Say an employee missed all -- they're out
24 of all their vacation days, they're out of all of

Page 55

1  their sick days, and then they're absent from work.
2      On that first day, they will be subjected
3  to the 1st Offense, Verbal reprimand.
4      Is that accurate, according to the
5  handbook?
6      A.  Yes.  I have not had a situation like
7  that.
8      Q.  Sure.  But if the situation arose, that's
9  what would happen?
10     A.  Yes.
11     Q.  And then if they miss another day, then it
12 would be a, Written notice with a copy placed in the
13 employee's personnel file.
14     Correct?
15     A.  Yes.
16     Q.  And then if they miss another day, they
17 will be subjected to, Suspension or termination
18 after management review.
19     Correct?
20     A.  Yes.
21     Q.  Okay, thanks.  We may revisit the handbook
22 again.  For now we're done.
23     Let me switch gears s little bit.  How do
24 you know Mr. Jacobsen?  Let me back up.

Page 56

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 18 of 73 PageID #:534
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1       Do you know Mr. Jacobsen?
2       A. No, I do not.
3       Q. Have you -- so you have never spoken with
4   him?
5       A. I was introduced to him briefly at the
6   outing that day.
7       Q. So you do know him?
8       A. (No response.)
9       Q. You know who he is, right?
10      A. I know who he is. I'm not personal
11  friends with him.
12      Q. No, I didn't ask you if you were friends.
13  I just asked you if you knew who he was -- or you
14  knew him -- you know him -- you know of him?
15      A. I know of him.
16      Q. And you have talked to him?
17      A. Very briefly, yes.
18      Q. You first were introduced to him at The
19  Kev outing?
20      A. Yes.
21      Q. And then you had a conversation with him
22  at that time, probably?
23      A. No. I was introduced and maybe exchanged
24  a few words. But I would not classify it as a full

Page 57

1   conversation.
2       Q. Okay. Have you talked to him since?
3       A. No, I have not.
4       Q. Who introduced him to you or you to him?
5       A. Jim Schumacher.
6       Q. Do you remember how he introduced you?
7   Like, do you remember any specific comments he made
8   about him to you or about you to him?
9       A. I believe he just said, This is Mike
10  Power, our CFO.
11      Q. And how did he introduce him to you; how
12  did Mr. Schumacher describe him?
13      A. This is Peter Jacobsen.
14      Q. And you already had seen the name before
15  so that when you heard "Peter Jacobsen," you already
16  knew why he was there and what his role was?
17      A. Yes.
18      Q. And I think you already answered my next
19  question which is, Are you friends with
20  Mr. Jacobsen? You said, No.
21      A. No, I'm not.
22      Q. Do you know if Mr. Jacobsen has ever
23  participated in any JCA-sponsored or related events
24  in the past other than The Kev?

Page 58

1       A. I do not believe he has.
2       Q. Can you tell me what The Kev is?
3       A. The Kev is a golf outing in memory of a
4   former J.C. Anderson employee to raise money for the
5   family of Kevin.
6       Q. That would be Kevin Radoha?
7       A. Radoha, yes.
8       Q. When did he pass away?
9       A. December of 2012.
10      Q. And has The Kev event been occurring every
11  year since?
12      A. Yes, I believe so. I believe the first
13  year was 2013.
14      Q. And you were already at JCA in 2013?
15      A. Yes.
16      Q. Have you been in attendance of each Kev
17  event since its inception?
18      A. Yes, I have.
19      Q. You said Mr. Radoha was a former
20  President?
21      A. Yes, President and CFO. There was a
22  little overlap. There were two gentlemen with
23  President on their title at the same time.
24      Q. Okay. So that would Mr. Yazbec?

Page 59

1       A. No. At that time it was Mr. Bean.
2       Q. Oh, Mr. Bean; got it. But there was a
3   short period of time, overlap time; would that be
4   accurate?
5       A. (No response.)
6       Q. There was a certain period -- a short
7   period of time when both Mr. Bean and Mr. Radoha
8   were both Presidents?
9       A. No. It was an extended period of time.
10  They both --
11      Q. Oh, extended.
12      A. From the day I started until the day Kevin
13  passed away, they both shared that title.
14      Q. To your knowledge they had the same
15  responsibilities?
16      A. No. Mr. Bean oversaw all the operations.
17  Mr. Radoha oversaw the financial and administrative
18  end.
19      Q. Do you know whose idea it was to invite
20  Mr. Jacobsen to The Kev event?
21      A. I do not know.
22      Q. And I mean specifically The Kev event in
23  2017.
24      A. Understood.

Page 60



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 19 of 73 PageID #:535
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q.  Okay.  Do you know who actually invited
2  him?
3      **A.  I believe Jim Schumacher did.**
4  Q.  Are Mr. Jim Schumacher and Mr. Jacobsen
5  friends?
6      MS. CRONIN:  Objection, foundation.
7  BY MR. SEDAEI:
8  Q.  By the way, all my questions are only if
9  you know the answer.
10     **A.  I do not know.**
11 Q.  You don't know if they were friends, okay.
12     Do you know if Mr. Jacobsen was
13 compensated to attend The Kev event?
14     MS. CRONIN:  Objection, foundation.
15     **A.  He was offered compensation, which he**
16 **donated back.**
17 BY MR. SEDAEI:
18 Q.  How much?
19     **A.  I believe it was 10,000.**
20 Q.  He donated it back to who?
21     **A.  To the family they were raising money for.**
22 Q.  The Radoha family?
23     **A.  Yes.**
24 Q.  Was he also offered airfare or hotel or

Page 61

1  A.  I do not know.
2  Q.  But you certainly didn't provide him with
3  one?
4      **A.  Correct, I did not.**
5  Q.  And you were not asked to provide him with
6  one?
7      **A.  I was not.**
8  Q.  You can go back to the handbook.  On page
9  DZIUBLA 001053, towards the middle of the page,
10 there's a section entitled, Policy on Harassment.
11     Do you see that?
12     **A.  Yes, I do.**
13 Q.  Is that JCA's sexual harassment policies?
14     **A.  Yes.**
15 Q.  So just to confirm, you did not provide a
16 copy of this policy to Mr. Jacobsen prior to him
17 attending The Kev, correct?
18     **A.  I did not.**
19 Q.  And you were not asked to provide him with
20 one?
21     **A.  I was not.**
22 Q.  Okay, thanks.
23     Are you a golfer?
24     **A.  Yes, I am.**

Page 63

1  other accommodations to attend the event?
2      **A.  I do not know.**
3  Q.  Was he given any instructions on how to
4  properly interact with JCA employees?
5      **A.  I do not know.**
6  Q.  Do you know who was in charge of
7  communicating with Mr. Jacobsen about the various
8  details of the event and his attendance at the
9  event?
10     **A.  I do not know.**
11 Q.  So at the time you were the
12 H.R. Representative at J.C. Anderson, correct?
13     **A.  Yes.**
14 Q.  And you certainly weren't asked to talk to
15 Mr. Jacobsen about the proper way of interacting
16 with JCA employees?
17     **A.  No, I was not.**
18 Q.  Okay.  You were not asked to instruct
19 Mr. Jacobsen on any JCA policies relating to
20 harassment?
21     **A.  No, I was not.**
22 Q.  Was Mr. Jacobsen provided a copy of the
23 handbook, Exhibit 2 that we were just discussing,
24 before attending The Kev?

Page 62

1  Q.  For how long have you golfed?
2      **A.  Since I was 14.**
3  Q.  Wow, that's almost as long as I have been
4  playing tennis.
5      Are you good?
6      **A.  I was before I had tennis elbow surgery.**
7  Q.  Oh, when did that happen?
8      **A.  Two years ago.**
9  Q.  Okay.  So you no longer play golf?
10     **A.  I do.  I'm just not as good.**
11 Q.  Okay.  I think there are some nice places
12 in Naperville, golf courses there.  I've got a
13 couple of cousins who play out there.
14     Do you know them?
15     **A.  I typically just play at the public**
16 **courses, but they're nice.  There's a lot of options**
17 **in the area.**
18 Q.  So you said you were at The Kev, right?
19     **A.  Yes, I was.**
20 Q.  Can you just kind of describe to me your
21 day at The Kev, the kinds of activities you engaged
22 in?  Just describe your day to me.
23     **A.  Show up at the golf course.  It's held at**
24 **River Forest Country Club in Bensenville.  I would**

Page 64



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 20 of 73 PageID #:536

Michael Power     6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 show up. Typically when we were getting there, they
2 serve a casual buffet-style lunch.
3        Show up, greet a few people, say hello as
4 people are all arriving, eat lunch. Then after
5 lunch, go outside, maybe hit a couple of practice
6 shots on the driving range, take a few putts, and
7 then get ready to start the golf portion of the day.
8     Q.   How long was the -- what you call the golf
9 portion of the day?
10    A.   That's typically around four, four and a
11 half hours. It starts -- usually it's a shotgun
12 start at 1:00 p.m. I believe we're usually
13 finishing around 5:00 p.m. with the golf portion.
14    Q.   And then there is a dinner?
15    A.   Yes. There is -- it's classified as heavy
16 hors d'oeuvres. But yes, there's food afterwards.
17    Q.   What was Mr. Jacobsen's role at the event?
18    A.   His role was to be a celebrity guest.
19    Q.   Is he a celebrity?
20    A.   He's a well-known golfer.
21    Q.   Okay. I only know Tiger Woods. I'm not a
22 golfer.
23        But you are a golfer; you have been a
24 golfer for a long time. Had you heard of him before

Page 65

1 you were introduced to him?
2    A.   Yes. I was aware of who Peter Jacobsen
3 is.
4    Q.   By the way, this should have been one of
5 my first questions. What is your date of birth?
6    A.   6-30-1970.
7    Q.   Other than being introduced to him, do you
8 recall spending any time with Mr. Jacobsen during
9 The Kev?
10    A.   He briefly drove up to our group, took a
11 group photo, and went on to the next group.
12    Q.   Before I continue with the details of the
13 event, who were -- And, again, I'm not asking for
14 names, but just the categories of people.
15        Who were in attendance at the event?
16    A.   J.C. Anderson employees and
17 subcontractors, members of the Radoha family, and
18 some friends of the Radoha family.
19    Q.   And Mr. Jacobsen?
20    A.   And Mr. Jacobsen.
21    Q.   Anyone else; any other groups of people
22 that you recall?
23    A.   Not that come to mind.
24    Q.   Approximately how many people attended the

Page 66

1 event?
2    A.   Approximately 80 to 100.
3    Q.   Of the 80 to 100, ballpark, how many of
4 them were JCA employees, and how many were non-JCA
5 employees? That would include subcontractors; you
6 know, members of the family; Mr. Jacobsen.
7    A.   I don't know specifically. I would
8 estimate roughly 10 to 15 JCA employees, possibly a
9 few more. Like I said, I don't remember
10 specifically.
11    Q.   Were these 10 to 15 JCA employees all from
12 the office?
13    A.   Yes.
14    Q.   Nobody from the field?
15    A.   No.
16    Q.   And was there a requirement that anybody
17 in attendance -- except, presumably, the Radoha
18 family -- make a donation for attending?
19    A.   Yes. The groups that had signed up paid a
20 fee for the outing, paid an amount of money to be a
21 participant. And employees were asked if they would
22 like to contribute.
23    Q.   So contribution by employees was optional?
24    A.   Yes.

Page 67

1    Q.   But not by subs?
2    A.   No. They had to buy a foursome, pay to be
3 part of the outing.
4    Q.   Okay. Do you remember seeing Ms. Dziubla
5 at the event?
6    A.   I briefly saw her at lunch, and that's the
7 only time I remember seeing her.
8    Q.   So you didn't see her on the golf course?
9    A.   I did not.
10    Q.   So you said there were groups of people
11 golfing and Mr. Jacobsen was driving from group to
12 group?
13    A.   Yes.
14    Q.   He was by himself?
15    A.   No. He was --
16    Q.   Who was he with?
17    A.   He was with Jim Schumacher, Abby Radoha,
18 and Chad Crane.
19    Q.   Who is Chad Crane?
20    A.   Chad Crane is a golf professional who
21 helps us -- or helped the family put together the
22 outing.
23    Q.   Who is Mr. Crane's connection at JCA?
24    A.   Mr. Crane knows Jim Schumacher and Clint

Page 68

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 21 of 73 PageID #:537

Michael Power   6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Hickman.

1  Hickman.
2  Q.  Who is Mr. Hickman?  What's his role?
3  **A.  He is our Business Development employee.**
4  Q.  So are you familiar, generally, with
5  Ms. Dziubla's allegations in this case?
6  **A.  Yes.**
7  Q.  And you're familiar with what she has
8  alleged occurred while she was at the event?
9  **A.  Yes.**
10  Q.  Did you witness any of the events that she
11  has described or any of her allegations personally?
12  **A.  No, I have not personally.**
13  Q.  So as far as you were concerned, while you
14  were at the event -- Strike that.
15  How did you first learn that there was an
16  incident involving Ms. Dziubla and Mr. Jacobsen at
17  the event?
18  **A.  By the email Ms. Dziubla sent to Jim**
19  **Schumacher that I was copied on.**
20  MR. SEDAEI:  Would you mark the next
21  exhibit.  I think it's 4.
22  (Power Exhibit No. 4
23  marked for identification.)
24

Page 69

1  BY MR. SEDAEI:
2  Q.  I'm showing you what is marked as JCA1257.
3  Have you seen -- So let me just say, you said that
4  the first time you learned about Ms. Dziubla's
5  allegations was when there was an email from her to
6  Mr. Schumacher.
7  If you look at the bottom of the page,
8  towards the middle of the page, it starts there.  Is
9  that the email you're talking about where it says --
10  it starts with, Jim, I cannot even begin to express?
11  **A.  Yes, it is.**
12  Q.  Okay.  The first time you saw this email,
13  was it when you received it in your inbox?
14  **A.  Yes.  It was later that evening, though I**
15  **didn't see it at the time.**
16  Q.  Later on you checked your emails and you
17  saw this?
18  **A.  Yes.**
19  Q.  Okay.  When was the first time you
20  discussed the incident with Mr. Schumacher?
21  **A.  The following day.**
22  Q.  Did you discuss it in person or on the
23  phone?
24  **A.  I don't recall the first time.  He was in**

Page 70

1  and out of the office, so I don't remember.
2  Q.  Who else was there?
3  **A.  Mike Yazbec.**
4  Q.  Anyone else?
5  **A.  I don't believe so.**
6  Q.  What did you discuss specifically?
7  **A.  We discussed that it was a very serious**
8  **complaint and that we needed to follow up on it.**
9  Q.  Did somebody in attendance actually
10  describe it as a serious incident or a serious
11  complaint?
12  **A.  Yes.**
13  Q.  Who?
14  **A.  Myself.**
15  Q.  Anyone else?
16  **A.  Mr. Yazbec.**
17  Q.  Anyone else?
18  **A.  I don't know.**
19  Q.  Do you recall Mr. Schumacher saying this
20  was a serious incident or a serious complaint?
21  **A.  I don't recall.**
22  Q.  Nobody else was part of the conversation?
23  **A.  Not at that time, no.**
24  Q.  Okay.  So you discussed that it was a

Page 71

1  serious complaint and you needed to follow up -- or
2  JCA needed to follow up on it.
3  Was there anything else that was discussed
4  at the meeting?
5  **A.  No.**
6  Q.  How long was the meeting, approximately?
7  **A.  I don't recall.**
8  Q.  Would you describe it as a short or a long
9  meeting?
10  **A.  I don't recall.**
11  Q.  Same exhibit, do you recall seeing the
12  email on top from Mr. Schumacher?
13  **A.  No.  I don't recall seeing that part.**
14  Q.  Okay.  But if you look at the "To:" Box,
15  would it be accurate to say that you're included as
16  a recipient?
17  **A.  Yes.**
18  Q.  The email, it seems like it went out on
19  September 18, 2017, at 8:34 p.m.  Correct?
20  **A.  Correct.**
21  Q.  And if you look at the time stamp of
22  Ms. Dziubla's email, that went out at 7:35 p.m.,
23  correct?
24  **A.  Correct.**

Page 72



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 22 of 73 PageID #:538

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Q.   So Mr. Schumacher's email went out about
one hour after Ms. Dziubla's email; isn't that
right?
    A.   Yes.
    Q.   Okay.  And Mr. Schumacher's email reads,
All, I do not want anyone to discuss this alleged
issue with Rowena as there is no merit to it.  Jim.
    Is that right?
    A.   That is what it reads.
    Q.   So just to clarify, at this point no
investigation had actually taken place regarding
Ms. Dziubla's allegations?
    MS. CRONIN:  Objection, foundation.
    A.   No.  I wasn't aware of it until I read
this.
BY MR. SEDAEI:
    Q.   You were the person that actually
conducted the investigation, correct?
    A.   Yes.
    Q.   So you would have knowledge of whether an
investigation had taken place or not at the time?
    A.   Yes.
    Q.   And no investigation had taken place at
the time Mr. Schumacher sent this email?

Page 73

    A.   No.
    Q.   So, as you said before, you are familiar
with Ms. Dziubla's allegations in this case,
correct?
    A.   Yes.
    Q.   Let take out the dispute about whether the
incident actually happened as Ms. Dziubla described.
    But if it did, would you say that
Mr. Jacobsen's actions violated JCA's harassment
policy?
    MS. OLSON:  Objection, calls for
speculation.
    MS. CRONIN:  Join.
    A.   I don't know.
BY MR. SEDAEI:
    Q.   Just to confirm, you haven't spoken with
Mr. Jacobsen regarding the incident at any point; is
that right?
    A.   That is accurate; I have not.
    Q.   Do you know if anybody at JCA ever
informed Mr. Jacobsen that there was an incident
that related to him?
    A.   Jim informed him.  Jim Schumacher informed
him of this email.

Page 74

    Q.   When did Mr. Schumacher do that?
    A.   The event was the 18th.  On the 19th.
    Q.   How did Mr. Schumacher inform
Mr. Jacobsen?
    A.   He called him.
    Q.   Did he call him while you, Mr. Schumacher,
and Mr. Yazbec were meeting?
    A.   No.
    Q.   Do you know if anybody was with
Mr. Schumacher when Mr. Schumacher made the call to
Mr. Jacobsen?
    A.   I do not know.
    Q.   Do you know what Mr. Schumacher told
Mr. Jacobsen?
    A.   He told him of the contents of this email.
    Q.   Do you know if he actually shared a copy
of Ms. Dziubla's email with Mr. Jacobsen?
    A.   I do not know.
    Q.   Have you ever discussed The Kev
incident -- the incident involving Ms. Dziubla --
with Mr. Boulukos?
    A.   Yes.
    Q.   When was the first time you discussed the
event with him?

Page 75

    A.   The morning of the 19th.
    Q.   Did you discuss it with him in person?
    A.   Yes.
    Q.   What did you discuss specifically?
    A.   The complaint that was emailed over.  And
he had received a phone call from somebody who was
in the group at the time of the incident that Ro had
reached out to.
    Q.   And who was that person?
    A.   Kacper.
    Q.   Okay.  And what had Kacper -- as you
recall, based on what Mr. Boulukos told you, what
had Kacper said about the event?
    A.   He just said he was part of the group at
that time.
    Q.   He just called to say he was part of the
group?  Did he have anything to say about the
incident?
    A.   He said that Ro had reached out and was
not happy with event; she felt something happened
and wanted to talk to him about it, I believe.  I
can't remember specifically what was said to Kacper,
whether it was via phone or email.  I just know that
she had reached out to Kacper.

Page 76

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 23 of 73 PageID #:539
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Q.   Okay.  What was Kacper's title?

A.   **He works for one of our subcontractors.**

Q.   Okay.  So you talked to Mr. Boulukos.  Did he reach out to you and wanted to talk to you, or did you reach out to him the morning after the event?

A.   **Kacper reached out to Mr. Boulukos because he knows him personally --**

Q.   My question was -- I'm taking about the conversation you had with Mr. Boulukos.

     Did the conversation happen because you went to Mr. Boulukos and said, Hey, I want to talk about Ro's email; or did he come to you?

A.   **He came to me.**

Q.   And he came to you specifically because Kacper had contacted him?

A.   **Yes.**

Q.   Okay.  Have you ever had a conversation about the incident with Mr. Garland?

A.   **I don't believe so.**

Q.   Never?  I'm not talking about just the day after or anything.  Have you ever talked to him about the incident?

A.   **Yes.**

Page 77

Q.   When was the first time you recall talking to Mr. Garland about the incident?

A.   **I don't recall.**

Q.   Do you recall if it was during your investigation of the incident?

A.   **I don't recall.**

     MS. CRONIN:  Counsel, I'm going to make an objection to your reference to "the incident."  I'd ask you to rephrase it to "the alleged incident" for clarification.

     MR. SEDAEI:  Okay.

     MS. CRONIN:  Thank you.  And that's a continuing objection throughout the course of the deposition.

     MR. SEDAEI:  Sure.  We understand that these are allegations.

     MS. CRONIN:  Correct.

     MR. SEDAEI:  Mark this as 5, please.

     (Power Exhibit No. 5
        marked for identification.)

BY MR. SEDAEI:

Q.   Mr. Power, I'm showing you what's marked as Exhibit 5.  Have you seen this document before?

A.   **Yes.**

Page 78

Q.   So the bottom part of page 1 -- or the first page, that's the email we were just discussing, the email from Ms. Dziubla to a group of individuals at JCA.

     Correct?

A.   **Yes.**

Q.   Okay.  And then the top part is another email from Ms. Dziubla to the group of individuals.  I believe it's the same group of individuals at JCA; is that correct?

A.   **Yes.**

Q.   When was the first time you saw this document -- or this email, the top one?

A.   **On the 19th of -- September 19, 2017.**

Q.   Okay.  After receiving this email, do you recall having another conversation with anyone at JCA about the email?

A.   **I don't recall a specific conversation regarding this email.**

Q.   Did you have any other conversation with anyone at JCA in which Ms. Dziubla's comment that she had filed a claim with the EEOC was discussed?

A.   **Yes.**

Q.   Was there more than one such conversation?

Page 79

A.   **I don't recall.**

Q.   Okay.  But you do recall at least one?

A.   **Yes.**

Q.   Okay.  When was that conversation?

A.   **On the 19th of September, 2017.**

Q.   Who was the conversation with?

A.   **Mike Yazbec and Jim Schumacher.**

Q.   So I understand you met with these individuals after you received Ms. Dziubla's first email.

     This discussion you're talking about where Ms. Dziubla's EEOC complaint was mentioned, is this during the same conversation that we've previously talked about, or did you have another conversation after you received this email?

A.   **It was a second conversation.**

Q.   Okay.  Was the second meeting in person?

A.   **Yes.**

Q.   Do you remember around what time of the day that was?  And if it helps, you can see what time the email went out.

A.   **I don't remember exactly.  I know it was shortly after.  I would estimate maybe 12:30-ish, but I don't know specifically.**

Page 80

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 24 of 73 PageID #:540
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q.  Okay.  What do you recall about that
2  meeting; what was said?
3  **A.  We had already addressed that we knew it**
4  **was a serious issue and we had to take it serious,**
5  **which we were.  And Jim was drafting a response to**
6  **get back to Ro.**
7  Q.  He was drafting a response while the three
8  of you were meeting?
9  **A.  Yes.  He said he was in the process of**
10 **drafting it.  He wasn't, like, drafting it as we**
11 **were meeting.**
12 Q.  And was he asking you to give your
13 feedback on what should go in the response?
14 **A.  No, he did not ask me.**
15 Q.  Okay.  So other than him telling you that
16 he was drafting the response to Ms. Dziubla, what
17 else was discussed at this meeting?
18 **A.  I don't recall.**
19 Q.  All you recall from the meeting was him
20 saying that he was drafting the response?
21 **A.  No.  I previously answered that, that we**
22 **discussed that it was very serious in nature and we**
23 **were discussing how to handle it.**
24 Q.  I thought that was the first conversation.

Page 81

1  So you again talked about it --
2  **A.  Yes.**
3  Q.  -- at the second conversation?
4  **A.  Yes.**
5  Q.  Anything else you recall from that second
6  conversation?
7  **A.  No.**
8  Q.  And it seems like it was the same
9  individuals at the second conversation that were
10 there at the first conversation, correct?
11 **A.  Yes.**
12 Q.  When you became the H.R. person at JCA,
13 was there any kind of announcement to the employees
14 that you are the H.R. person now and anybody who has
15 issues should go to you relating to H.R. matters?
16 **A.  I don't recall if there was a specific**
17 **announcement. The Policies and Procedures book was**
18 **updated to include my name as the**
19 **H.R. Representative.**
20 Q.  Do people come to you with H.R. matters?
21 Do they know -- do the JCA employees, you believe,
22 know by and large that you are the H.R. person at
23 JCA?
24 **A.  Yes, they do; they know.**

Page 82

1  Q.  And how do you know that they know?
2  **A.  Because they come to me for benefits**
3  **questions.**
4  Q.  Okay.
5      MR. SEDAEI:  Number 6, please.
6          (Power Exhibit No. 6
7           marked for identification.)
8  BY MR. SEDAEI:
9  Q.  Showing you what's marked as Exhibit 6,
10 have you seen this document before?
11 **A.  Yes.**
12 Q.  Is that, again, an email chain -- a chain
13 of three different emails from Ms. Dziubla?
14 **A.  Yes.**
15 Q.  Okay.  Based on the time stamp, it looks
16 like the email on top on page 1 went out pretty much
17 one minute after Ms. Dziubla's previous email; is
18 that right?
19 **A.  Yes.  That appears accurate.**
20 Q.  Okay.  So during the second conversation
21 you had with Mr. Yazbec and Mr. Schumacher, did you
22 also discuss Ms. Dziubla's statement that she was
23 taking PTO for the remainder of the day?
24 **A.  I do not recall if that was specifically**

Page 83

1  **discussed.**
2      MR. SEDAEI:  Number 7, please.
3          (Power Exhibit No. 7
4           marked for identification.)
5  BY MR. SEDAEI:
6  Q.  I'm showing you what's marked as
7  Exhibit 7.  Have you seen this document before?
8  **A.  Yes, I have.**
9  Q.  On the top of page 1, is that an email
10 from Mr. Schumacher to Ms. Dziubla, and you were
11 cc:'d?
12 **A.  (No response.)**
13     MR. SEDAEI:  Do you want to re-read the
14 question.  I think he didn't hear me.
15         (Record read as requested.)
16 **A.  I'm sorry.  I did not hear you say "is."**
17 **I didn't realize you were asking a question.**
18 BY MR. SEDAEI:
19 Q.  Yes.
20 **A.  Yes, it is.**
21 Q.  The email was sent out the afternoon of
22 the day after The Kev alleged incident?
23 **A.  Yes, at 3:05 p.m.**
24 Q.  Okay.  During that day, my understanding

Page 84



Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  is that you already had two conversations with
2  Mr. Schumacher about the incident; isn't that right?
3  **A. Yes.**
4  Q. Did you have any other conversations with
5  Mr. Schumacher prior to him sending out this email?
6  **A. I don't recall. I don't believe so.**
7  Q. Now, as you recall, the day before
8  Mr. Schumacher had sent out an email saying that
9  there was no merit to Ms. Dziubla's allegations.
10  I'm paraphrasing, but I showed the exhibit to you.
11        But you know which email I'm talking
12  about?
13  **A. Yes, I know which email you're speaking**
14  **of.**
15  Q. Okay. During any of those two
16  conversations you had with Mr. Schumacher on the
17  19th, did he restate what he had said in the email?
18  **A. No, I don't recall that.**
19  Q. Okay. Do you recall him saying something
20  to the effect that there was no merit to
21  Ms. Dziubla's allegations but we needed to do an
22  investigation anyway?
23  **A. No, I do not recall.**
24  Q. Was Ms. Dziubla's access to client files

Page 85

1  **A. Yes.**
2  Q. Okay. First, can you tell me who made the
3  decision to -- Well, let me see. Let's go in order
4  here.
5        Just to confirm, Ms. Dziubla was an
6  employee at the time the suspension request
7  occurred, correct?
8  **A. Yes.**
9  Q. Why was her access being suspended?
10  **A. Based on comments she had made to myself**
11  **earlier in the day, we suspended her access until we**
12  **knew what the result of our investigation was and**
13  **when she was coming back to work.**
14  Q. Okay. What comments had she made that led
15  JCA to suspend her access?
16  **A. When I met with Rowena on the morning of**
17  **the 20th to discuss the outing with her in person,**
18  **she said that she felt JCA was very toxic. And she**
19  **used that phrase many times. She also shared many**
20  **other complaints about the company.**
21  Q. Okay. Any other comments that you recall
22  that led you to -- led JCA to suspend her access?
23  **A. I don't recall others, just the ones I**
24  **stated.**

Page 87

1  and emails terminated at some point?
2  **A. Yes. It was not terminated; it was**
3  **suspended.**
4  Q. Was it ever restored, to your knowledge?
5  **A. Not to my knowledge.**
6  Q. When was her access suspended?
7  **A. I believe it was at some point in time on**
8  **September 20th.**
9        MR. SEDAEI: Number 8, please.
10        (Power Exhibit No. 8
11        marked for identification.)
12  BY MR. SEDAEI:
13  Q. I'm showing you what's marked as
14  Exhibit 8. Have you seen this document before?
15  **A. Yes.**
16  Q. Can you describe to me what it is.
17  **A. It is asking our third-party IT consultant**
18  **to change Ro's password.**
19  Q. And by changing Ro's password, you were
20  effectively suspending her access?
21  **A. Correct.**
22  Q. And are you asking also that the IT person
23  give you and Mr. Boulukos access to her email
24  account?

Page 86

1  Q. Who made the decision to suspend
2  Ms. Dziubla's access to her email and --
3        Client files too?
4  **A. Just her email and server access.**
5  Q. And server access.
6        Who made the decision to suspend her
7  access?
8  **A. The conversation included myself, Mike**
9  **Yazbec, Jim Schumacher, and Tom Schumacher.**
10  Q. So this conversation occurred when?
11  **A. On the 20th.**
12  Q. Would that be in the morning of the 20th?
13  **A. It would probably have been around -- in**
14  **the 11:00 to 12:00o'clock, 11:00 a.m. to 12:00 p.m.**
15  **range.**
16  Q. And when did you meet with Ms. Dziubla on
17  the 20th?
18  **A. At 10:00 a.m.**
19  Q. What do you recall about the conversation
20  among you, both Mister Schumachers, and Mr. Yazbec?
21  What was discussed in that conversation?
22  **A. We discussed Ro's statements of being very**
23  **disappointed with the company and calling the**
24  **company toxic repeatedly, her concerns about some of**

Page 88

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 26 of 73 PageID #:542
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 her coworkers.
2    Q.   Anything else?
3    **A.   Not that I recall.**
4    Q.   What was discussed specifically about
5 Ms. Dziubla's access to the email and server at that
6 meeting?
7    **A.   It was discussed that, since she was not**
8 **presently working at that time and she was unhappy**
9 **with the company and very upset about the alleged**
10 **incident, that we should suspend her email account**
11 **until things had cleared up.**
12    Q.   Was it somebody specifically who made that
13 decision and said that, That's what we are going to
14 do?
15    **A.   I don't recall who specifically said to do**
16 **that.**
17    Q.   You don't recall it being Mr. Jim
18 Schumacher?
19    **A.   I do not recall.**
20    Q.   Did she, in your meeting -- and we'll talk
21 about the meeting you had with Ms. Dziubla in the
22 morning.
23        But did she -- Okay.  Just explain to me
24 the connection between the complaints she had about

Page 89

1 the company and why that should lead to a suspension
2 of her email account and the server.
3        What is the connection between the two?
4    **A.   The connection is she said a lot of**
5 **negative things about the company and she wasn't**
6 **presently at work.**
7    Q.   She hadn't resigned from the company?
8    **A.   No, she had not.  That's why it was**
9 **suspended.**
10    Q.   Right.  But what was it that JCA was
11 trying to prevent?  Was JCA trying to prevent
12 something bad from happening by her having continued
13 access to her email and server?
14    **A.   I don't know specifically what the**
15 **conversation was.  But they were probably trying to**
16 **prevent her from using that email account to send**
17 **negative emails to subcontractors and other contacts**
18 **she had.**
19    Q.   But had she threatened to do that?
20    **A.   She had not.**
21    Q.   Had she ever, throughout her employment,
22 used her JCA email account -- or any other email
23 account, to your knowledge -- to say something
24 negative about JCA to subcontractors or other

Page 90

1 outsiders?
2    **A.   Not to my knowledge.**
3    Q.   Does JCA have some kind of an Executive
4 Committee or a certain number of individuals who get
5 together on a regular basis and discuss the affairs
6 of JCA and make decisions for the entire company?
7    **A.   Yes, there's an Executive team.**
8    Q.   Okay.  Can you tell me who are on the
9 Executive team?
10    **A.   Jim Schumacher, Tom Schumacher, Mike**
11 **Yazbec, Steve Boulukos, William Burfeind --**
12 **B-u-r-f-e-i-n-d -- and myself.**
13    Q.   Six individuals?
14    **A.   Yes.**
15    Q.   All men?
16    **A.   Yes.**
17    Q.   Of the 27 -- Okay.  You said there were
18 about 27 people working in the office at JCA; is
19 that right?
20    **A.   Correct.**
21    Q.   So that --
22    **A.   That was the estimate I gave, yes.**
23    Q.   So that's an estimate, and that's your
24 estimate as of now.  Correct?

Page 91

1    **A.   Correct.**
2    Q.   Would you give the same estimate for when
3 Ms. Dziubla was employed at JCA?
4    **A.   Yes.**
5    Q.   Of the 27 ballpark, can you tell me the
6 male to female ratio?
7    **A.   I believe there are four females in the**
8 **company.**
9    Q.   Four females, 23 males in the office?
10    **A.   Yes.**
11    Q.   How many females in the field?
12    **A.   At this time I don't believe there are**
13 **any.**
14    Q.   Okay.  And you said there were about
15 70 people in the field?
16    **A.   It can range from 40 to 70.  I'd say, on**
17 **average, probably closer to mid 50s.**
18    Q.   Okay.
19    **A.   If we're slow, it's 40.  If we're busy,**
20 **it's 70.  And anywhere --**
21    Q.   So, on average --
22    **A.   -- in between.**
23    Q.   I'm sorry, I didn't mean to cut you off.
24        So, on average -- I'm sorry.  Were you

Page 92



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 27 of 73 PageID #:543

Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 finished?

2   A.  Yes.

3   Q.  So, on average, total number of

4 JCA employees in the office and in the field, on

5 average, would be about 80-something total, on

6 average?  I know it goes up and down, depending on

7 who is in the field.

8   A.  Correct.

9   Q.  And of the 80-some employees, there are

10 four females?

11   A.  Four.

12   Q.  And the rest are males?

13   A.  Yes.

14   Q.  Okay.  Currently, the four females who are

15 in the office, can you tell me their names and

16 titles?

17   A.  Kristn Robertazzo; K-r-i-s-t-n, Robert,

18 a-z-z-o, Office Manager/Receptionist.

19      Rachael Weil; W-e-i-l, R-a-c-h-a-e-l,

20 Project Coordinator.

21      Lauren Saunders; S-a-u-n-d-e-r-s,

22 Marketing Director.

23      And Kayla McKinney; M-c-K-i-n-n-e-y,

24 Assistant Project Manager.

                                    Page 93

1   Q.  In case you're afraid I'm going to ask you

2 to name all the male employees --

3   A.  I'm not going to; I'm sorry.

4   Q.  -- I'm not going to ask you.

5      All right, going back to what we were

6 talking about.  Had Ms. Dziubla -- while she was

7 employed at JCA, had Ms. Dziubla ever said or done

8 anything that had reflected badly on JCA?

9   A.  Not to my knowledge.

10   Q.  Not as part of this alleged incident at

11 The Kev, but just generally during the time she was

12 employed at JCA, had she ever threatened to do

13 anything that would reflect badly on JCA?

14   A.  Not to my knowledge.

15   Q.  Remind me for how long you've been the

16 H.R. Representative.

17   A.  Since sometime in 2013.

18   Q.  Okay.  During this time, can you think

19 of -- Other than Ms. Dziubla, can you think of any

20 other employees who ever came to you and they had --

21 they were upset about something that happened or

22 related to JCA?

23   A.  No, I cannot recall.

24   Q.  Do you recall anybody ever coming to you

                                    Page 94

1 about issues they had or a problem they had working

2 with somebody at JCA?

3   A.  No.

4   Q.  So as far as you were concerned, you

5 believed everybody was getting along well?

6   A.  Correct, yes.

7      THE WITNESS:  Is now a good time to run

8 down the hall?

9      MS. OLSON:  Can we take a break?

10      MR. SEDAEI:  Yes, absolutely.

11         (Whereupon a recess was taken

12         from 12:14 p.m. to 12:25 p.m.,

13         after which the following

14         proceedings were had:)

15      MR. SEDAEI:  Back on the record.

16      We are moving on to the next exhibit.

17         (Power Exhibit No. 9

18         marked for identification.)

19 BY MR. SEDAEI:

20   Q.  Mr. Power, I'm showing you what's marked

21 as Exhibit 9.  Have you seen this document before?

22   A.  Yes, I have.

23   Q.  Can you tell me what it is?

24   A.  It is my email to Ro, letting her know

                                    Page 95

1 **that I will be investigating the matter and looking**

2 **to get in touch with her, when I can speak to her or**

3 **meet with her to get her firsthand account because**

4 **it was a very serious issue and we wanted to speak**

5 **to her.**

6   Q.  Okay.  So there was a decision sometime

7 before this email that there was going to be an

8 investigation into Ms. Dziubla's allegations,

9 correct?

10   A.  Yes.

11   Q.  And who asked you to conduct an

12 investigation?

13   A.  Jim and Tom.  And it was decided because

14 of my role.

15   Q.  Do you know whose suggestion it was that

16 there should be an investigation?

17   A.  We all agreed on that in our first

18 conversation in the morning.

19   Q.  Okay.  And then did JCA -- or you,

20 actually -- conduct an investigation into the outing

21 incident or alleged incident?

22   A.  Yes.

23   Q.  And you led the investigation?

24   A.  Yes.

                                    Page 96



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 28 of 73 PageID #:544

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    Q.   Was there any discussion at any point at
2  JCA about the possibility of hiring a third party to
3  do the investigation versus you, a JCA employee?
4    A.   I do not recall.
5    Q.   Do you know if JCA ever tried to get a
6  third-party individual to do the investigation?
7    A.   I do not recall.
8    Q.   But you certainly didn't try to reach out
9  to a third party to do the investigation, correct?
10   A.   I did not.
11   Q.   Would you say that an investigation by a
12 third party who is not a JCA employee would have
13 been more impartial?
14      MS. OLSON:  Objection to the extent it
15      calls for speculation.
16   A.   I don't know if that's accurate.
17 BY MR. SEDAEI:
18   Q.   Did you feel like you were under pressure
19 to make sure that the investigation yielded a
20 specific result?
21   A.   Not at all.
22   Q.   Do you think you were fully fair and
23 impartial in your investigation?
24   A.   Yes.

Page 97

1    Q.   And who did you interview or speak with as
2  part of your investigation?
3    A.   I spoke with the witnesses who were
4  present at the time of the interaction between Ro
5  and Peter.
6    Q.   Who else?
7    A.   I also spoke with a JCA employee that Ro
8  saw in the parking lot afterwards.
9    Q.   I'm sorry.  What employee?
10   A.   A J.C. Anderson employee.
11   Q.   Okay.  I'll ask you for specific names of
12 these groups of people.  But first, who else did you
13 speak with as part of the investigation?
14   A.   Ro.
15   Q.   Who else?
16   A.   That's all.
17   Q.   Okay.  Let's talk about the witnesses.
18 Who are the witnesses that you spoke with as part of
19 the investigation?
20   A.   Kacper.  And I'm not sure how to pronounce
21 his last name properly.  It's Stojowski or
22 something.  I don't -- I'm sorry.
23   Q.   It's fine.  We'll find the last name.
24      Who else?

Page 98

1    A.   It's in my notes.  Kacper, Tim Le, Adam
2  Scheitel, Chad Crane, Abby Radoha, and Joe Maguire.
3    Q.   Who is the JCA employee that you said Ro
4  had spoken with afterwards in the parking lot?
5    A.   That was Joe Maguire.
6    Q.   To your knowledge, Mr. Maguire was also
7  personally a witness to the incident?
8    A.   No, he was not.
9    Q.   Oh, okay.  Because you listed him as part
10 of the witnesses.
11   A.   I'm sorry.  I thought you said witnesses
12 or anyone you spoke to.  I was trying to be
13 all-encompassing, all-inclusive.
14   Q.   No problem.  How did you come up with this
15 list of who you believed were the witnesses to the
16 alleged incident?
17   A.   When we were discussing the email in the
18 morning --
19   Q.   "We" being who?
20   A.   Myself, Mike Yazbec, and Jim Schumacher.
21 During our conversation on the morning of the 19th,
22 we had conversation of who all was present at the
23 time.
24   Q.   And who among you knew the answer to that

Page 99

1  question?
2    A.   Jim.
3    Q.   Jim Schumacher?
4    A.   Yes.
5    Q.   How did he know?
6    A.   He was present.
7    Q.   So he was also a witness?
8    A.   Yes.
9    Q.   Okay.  Did you speak to these
10 individuals -- Kacper, Tim, Adam, Chad, and Abby --
11 all on the same day?
12   A.   Yes.
13   Q.   Do you remember what day that was?
14   A.   The 19th.
15   Q.   Did you talk to all of them all at once or
16 one at a time?
17   A.   No, one at a time.
18   Q.   Do you remember about how long each
19 meeting took, approximately?
20   A.   Approximately 10 to 15 minutes.
21   Q.   Were they in-person meetings or on the
22 phone?
23   A.   Kacper was on the phone.  Joe Maguire was
24 on the phone.  Abby Radoha was on the phone.  Chad

Page 100

Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 29 of 73 PageID #:545
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Crane was on the phone.  Adam Scheitel and Tim Le
2  were in person.
3      Q.   Did any of these witnesses claim that they
4  heard specifically what comment Mr. Jacobsen had
5  made to Ms. Dziubla that had caused her offense,
6  according to her?
7      MS. OLSON:  I'm going to object based on
8  foundation.
9      You can answer.
10     A.   Not specifically.  They heard something,
11 but nobody seemed to hear it in its entirety.  And
12 Chad Crane said he did not hear it.
13 BY MR. SEDAEI:
14     Q.   He did not hear any of it?
15     A.   He did not hear; that he was at a
16 distance.  He was observing the interaction, but at
17 the distance he was, he could not hear.
18     Q.   And Ms. Dziubla's allegations were made
19 against who?
20     A.   Peter Jacobsen.
21     Q.   Did you interview Mr. Jacobsen?
22     A.   No, I did not.
23     Q.   Why not?
24     A.   Jim spoke to him, and I took the message

Page 101

1  from Jim; took Peter's statement through Jim.
2      Q.   But you were the investigator, correct?
3      A.   Yes.
4      Q.   Did you ask to speak with Mr. Jacobsen?
5      A.   I did not.
6      Q.   Did Mr. Schumacher tell you that you
7  cannot reach out to him?
8      A.   Not at all; no, he did not.
9      Q.   Why didn't you think it was necessary for
10 you personally to talk to Mr. Jacobsen to get his
11 side of the story?
12     A.   I didn't think his answer would change
13 from what he told Jim.  I felt it would have been
14 redundant to call him.
15     Q.   But didn't you think it would be more
16 effective for you to directly talk to him rather
17 than have a middle person tell you what he heard
18 Mr. Jacobsen say to him?
19     A.   I didn't think of it that way.
20     Q.   And by not talking to Mr. Jacobsen
21 directly, you never really had a chance to ask him
22 any questions or ask any follow-up questions,
23 correct?
24     A.   Correct.

Page 102

1      Q.   You didn't think asking follow-up
2  questions or asking him to clarify anything was
3  necessary?
4      A.   Not at that time, no.
5      Q.   Do you now believe it would have been
6  helpful or productive to the investigation if you
7  had the chance to directly speak with him?
8      A.   No.
9      Q.   What were the results of the
10 investigation?
11     A.   Speaking to all of the individuals --
12 except Joe Maguire.  His conversation was slightly
13 different because Joe wasn't present.
14     The other individuals were asked what they
15 witnessed.  They shared that they -- that there was
16 interaction with Peter; he came upon the group.
17 They were handing out golf flags that were
18 autographed by Peter.  He took a picture with the
19 group, and he was also offering lessons or advice on
20 chipping to the parties of the group.
21     I asked them if they felt they observed
22 anything -- if they felt they witnessed any
23 inappropriate behavior or actions by Peter.  And all
24 parties asked that question said no.

Page 103

1      Q.   Parties being witnesses?
2      A.   The witnesses, yes.
3      Q.   Did you write a report that stated the
4  findings, or your findings?
5      A.   Yes.  I took notes on the -- a formal
6  report, no.  I took notes on the witnesses'
7  statements.
8      Q.   Did you give the report to anyone?
9      MS. OLSON:  Objection --
10     MR. SEDAEI:  I'm sorry.
11 BY MR. SEDAEI:
12     Q.   The notes.  Did you give the notes to
13 anybody?
14     A.   No.
15     MR. SEDAEI:  Was that going to be your
16 objection?
17     MS. OLSON:  You said report.
18     MR. SEDAEI:  Okay.
19     We are at 10?
20     (Power Exhibit No. 10
21     marked for identification.)
22 BY MR. SEDAEI:
23     Q.   Showing you what's marked as Exhibit 10,
24 have you seen this document before?

Page 104



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 30 of 73 PageID #:546

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   A.  Yes, I have.

2   Q.  So the bottom email is from you.  I think

3  it's the email we just discussed, correct?

4   A.  Correct.

5   Q.  And the top email is an email reply to

6  your email, and that's from Ms. Dziubla.  Correct?

7   A.  Correct.

8   Q.  After receiving this email -- Well, first

9  let me back up.

10      Ms. Dziubla is stating that she had

11  reached out to an attorney, correct?

12   A.  Yes.  That's what it states.

13   Q.  And she's providing you with a name and a

14  phone number in that email; isn't that right?

15   A.  That's accurate.

16   Q.  Okay.  And after you received this email

17  from Ms. Dziubla, did you discuss it with anyone at

18  JCA?

19   A.  I don't specifically recall.  I'm sure we

20  did, but I don't specifically recall the

21  conversation.

22   Q.  You don't recall the conversation in which

23  you told, for example, Mr. Yazbec or Mr. Schumacher

24  that Ms. Dziubla had told you she was talking or

Page 105

1  consulting with an attorney?

2   A.  I know I made the statement.  I don't

3  recall specifically when and what time and where I

4  was at when I did such.  I don't know if I simply

5  forwarded this email or if I called them or if I

6  walked down the hall and talked to them.  That I

7  honestly don't remember.

8   Q.  Did you actually make contact with this

9  individual, Ross Peters?

10   A.  I did not.

11   Q.  Did you consider doing that as a

12  possibility?

13   A.  No.  I think I just forwarded that to our

14  counsel.

15   Q.  And who is your counsel?

16   A.  Gene Boyle and Michelle Olson.  At the

17  time, Gene was -- They're now with Vedder Price.  At

18  the time Gene was with a different firm.

19   Q.  He was with Neal, Gerber?

20   A.  Correct.

21      MR. SEDAEI:  Exhibit 11.

22      (Power Exhibit No. 11

23         marked for identification.)

24

Page 106

1  BY MR. SEDAEI:

2   Q.  I'm showing you what's marked as

3  Exhibit 11.  Do you recognize this document?

4   A.  Yes, I do.

5   Q.  Would it be accurate, it's an email chain,

6  emails from various people to various people?

7      It's basically an email chain; is that

8  accurate?

9   A.  Yes, that's accurate.

10   Q.  The bottom email is an email from

11  Ms. Dziubla to you, is that right, from

12  September 19, 2017, at 6:51 p.m.?

13   A.  Yes.

14   Q.  Okay.  And then there's an email on top --

15  or toward the middle of the page.  And I believe

16  it's from you --

17   A.  It's from me to Mike.

18   Q.  -- to Mr. Yazbec, Mike Yazbec?

19   A.  (No response.)

20   Q.  Yes?

21   A.  Yes.

22   Q.  Okay.  And were you asking, FYI - Are you

23  available or is this cutting it too close with your

24  appointment?

Page 107

1      What are you asking if he's available for?

2   A.  To join me to meet with Ro.

3   Q.  Okay.  When you met with Ms. Dziubla, was

4  Mr. Yazbec there too?

5   A.  No, he was not.

6   Q.  Okay.  But on top Mr. Yazbec says, I

7  should be good.

8      So at some point he decided that -- or

9  somebody decided he wasn't going to be at the

10  meeting with Ro?

11   A.  The next morning he was unavailable.  I

12  don't recall specifics of why.

13   Q.  Okay.  And then towards the middle of the

14  page in that email from you to Mr. Yazbec, you're

15  saying, One thing that is noteworthy for me sitting

16  down with her.

17      "With her," are you talking about Ro?

18   A.  Yes.

19   Q.  (Reading) She is friends with one of my

20  cousins so she might be a little more willing to

21  open up to me.  And then in parentheses it says, for

22  what it's worth, Ro doesn't know I don't care much

23  for that particular cousin.

24      Did I read that accurately?

Page 108

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 31 of 73 PageID #:547
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   A.  Yes, you read that accurately.
2   Q.  Which cousin are you talking about?
3   A.  My cousin Tracy.
4   Q.  What's her last name?
5   A.  Power.
6   Q.  So this would be a paternal cousin?
7   A.  Correct.
8   Q.  And then you say -- you start with -- in
9   parentheses you say, for what it's worth.  And then
10  you continue to say that you don't care much for
11  that cousin.
12      Can you explain to me what you mean by
13  that comment, "for what it's worth," and then you're
14  disclosing the fact that the cousin who is -- that
15  you believe was Ms. Dziubla's friend, that you don't
16  care much for that cousin.
17  A.  I was just upset with that cousin at that
18  point in time because of family matters.
19  Q.  But are you implying in that email that
20  you're not going to tell Ms. Dziubla that you don't
21  care much for that cousin?
22  A.  It was irrelevant at that time.
23  Q.  What was irrelevant at the time?  You said
24  it was irrelevant?

1   A.  My feelings toward my cousin -- to tell Ro
2   my feelings toward my cousin was irrelevant.
3   Q.  So why do you say it was noteworthy, that
4   you're including this fact to Mr. Yazbec?  Why was
5   it noteworthy?
6       MS. OLSON:  Objection.  I'm going to say
7       that mischaracterizes his testimony.
8   BY MR. SEDAEI:
9   Q.  I'm referring to the email.  Does the
10  email -- does the second paragraph, does it start
11  with, One thing that is noteworthy.
12      And then you're disclosing information
13  about your cousin?
14  A.  Uh-huh.
15  Q.  That was a yes?  The answer to the
16  previous question, was it yes?
17  A.  What was the previous question?
18      MR. SEDAEI:  Can you just repeat that.  I
19      think he said uh-huh.  I want to get that
20      corrected.
21      (Record read as requested.)
22  A.  Yes, I disclosed information about my
23  cousin.
24

1   BY MR. SEDAEI:
2   Q.  Why did you start the paragraph with, One
3   thing that is noteworthy?  Why did you say it was
4   noteworthy?
5   A.  I don't recall why I typed that at the
6   moment.
7   Q.  Did you ever tell Ms. Dziubla that you
8   were mad at Tracy or you didn't care much for her at
9   the time?
10  A.  No.
11  Q.  Why not?
12  A.  It was not relevant.
13  Q.  But you thought it was relevant to her --
14  "her" being Ro -- opening up to you because she was
15  friends with your cousin; that's what you're saying
16  in the email, isn't it?
17      You thought it was -- Let me read the
18  statement:  She is friends with one of my cousins so
19  she might be a little more willing to open up to me.
20  A.  That's what I said.
21  Q.  And that's what you believe?
22  A.  At the time I typed that?  Yes, that's why
23  it was typed.
24  Q.  Okay.  Does Ms. Power work at JCA?

1   A.  No, not at all.
2   Q.  Do you know how Ms. Dziubla is friends
3   with your cousin?
4   A.  She had stated that they worked out
5   together.  Based on the common last name, at one
6   point Ro asked me if I knew her.
7       MR. SEDAEI:  Exhibit 12.
8           (Power Exhibit No. 12
9           marked for identification.)
10  BY MR. SEDAEI:
11  Q.  Showing you what is marked as Exhibit 12,
12  have you seen this document before?
13  A.  Yes.
14  Q.  Is that an email from you to Mr. Boyle?
15  A.  Yes, it is.
16  Q.  And is the document that starts on the
17  second page, Bates number JCA1895 and goes to
18  JCA1897, is that the attachment to the email?
19  A.  Yes, it is.
20  Q.  If you look at the third page, JCA1896,
21  there are a number of bullets and sub bullets.  So
22  the first bullet, there's a discussion about Kacper
23  and the statements that you're saying he made about
24  the alleged incident.



Michael Power    6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 32 of 73 PageID #:548
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    Correct?
2    **A.   Correct.**
3    Q.   I'm sorry for my repetitive questions.
4    But what was Kacper's title at the time?
5    **A.   He works for one of our subcontractors.  I**
6    **don't know his specific title there.**
7    Q.   Okay.  Did you have to reach out to
8    Kacper's supervisor before you had the chance to
9    talk to Kacper, or did you just reach out to him
10   directly?
11   **A.   He was just contacted directly.**
12   Q.   And you were the one who made the contact
13   directly?
14   **A.   Steve Boulukos called him with Mike Yazbec**
15   **and myself in the room and basically made an**
16   **introduction because neither Mike nor myself**
17   **personally knew Kacper.**
18   Q.   And Adam Scheitel, can you tell me again
19   who that is.
20   **A.   He was a J.C. Anderson employee who was**
21   **present at the time of the alleged incident.**
22   Q.   What was his title?
23   **A.   Assistant Project Manager.**
24   Q.   If we look at the comments about

Page 113

1    Mr. Scheitel, that last sub bullet, kind of like
2    two-thirds of the way down, it says, Adam does
3    not feel he witnessed any inappropriate behavior,
4    but he did admit he can see how she -- "she" being
5    Ro -- might have taken the "wood" comment the wrong
6    way.
7        Do you recall now him saying that to you?
8    **A.   I don't specifically recall.  But yes, he**
9    **said that because it's in my notes.**
10   Q.   Right.  And you wrote these notes,
11   correct?
12   **A.   Yes, I wrote these notes.**
13   Q.   Okay.  If you go to the next page -- so
14   that's JCA1897 -- you talk about Joe Maguire and
15   Abby Radoha.
16       Would that be Kevin's wife or daughter?
17   **A.   That's his daughter.**
18   Q.   And Chad Crane was the golf professional,
19   correct?
20   **A.   Correct.**
21       MR. SEDAEI:  Number 13.
22           (Power Exhibit No. 13
23           marked for identification.)
24

Page 114

1    BY MR. SEDAEI:
2    Q.   I'm showing you what's marked as
3    Exhibit 13.  Have you seen this document before?
4    **A.   Yes, I have.**
5    Q.   Is that an email from Ms. Dziubla to you
6    on September 25th?
7    **A.   Correct.**
8    Q.   I believe you met with Ms. Dziubla on
9    September 20th in that cafe, correct?
10   **A.   Yes.**
11   Q.   Did you have any communications with her
12   between that meeting and this email the following
13   Monday?
14   **A.   I don't recall.  I don't believe so.**
15   Q.   If there were any communications, it would
16   have been in the form of emails?
17   **A.   Yes.**
18   Q.   But no conversations in person or on the
19   phone?
20   **A.   No, correct.**
21   Q.   Do you recall seeing this email from
22   Ms. Dziubla on the 25th?
23   **A.   Yes, I do.**
24   Q.   And the 25th, just to confirm, is one week

Page 115

1    after the alleged incident?
2    **A.   Yes.**
3    Q.   And she is saying that she would like to
4    discuss her options.
5        Did you have a chance to talk with her at
6    any point about, you know, her options or what she
7    meant by "my options"?
8    **A.   She came in the following day.**
9    Q.   She came in on September 26th?
10   **A.   Yes.**
11   Q.   Around what time of the day was that?
12   **A.   It was in the morning.  It was either 9:00**
13   **or 10:00 a.m.  It's noted somewhere.**
14   Q.   So you replied to this email and said,
15   Okay, why don't you come in the next morning and
16   we'll discuss it?
17   **A.   Yes.  There was a response to this email.**
18   Q.   Okay.  And she did come in the following
19   morning?
20   **A.   Yes.**
21   Q.   And you were at that meeting?
22   **A.   Yes, I was.**
23   Q.   And who else was at the meeting other than
24   you and Ms. Dziubla?

Page 116



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 33 of 73 PageID #:549
Michael Power       6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Page 117

1  A.  Mike Yazbec.
2  Q.  Anybody else?
3  A.  No.
4  Q.  What did you discuss at that meeting?
5  A.  At that meeting we discussed our
6  investigation to Ro.
7  Q.  So at that time the investigation had
8  concluded?
9  A.  Yes.
10  Q.  Can you tell me when the investigation
11  concluded?
12  A.  I believe the day prior.
13  Q.  So that Monday, the 25th?
14  A.  Yes, correct.
15  Q.  And you say it was concluded at that time.
16  Why do you say that, that it was that date?
17  A.  We had discussed all the interviews and
18  witness statements.
19  Q.  "We" being who?
20  A.  Mike Yazbec, myself, Jim and Tom
21  Schumacher.
22  Q.  And you had the conversation on the 25th?
23  A.  I believe so.
24  Q.  But you had pretty much done all the

Page 118

1  interviews relating to the investigation or part of
2  the investigation by the time you sent the email to
3  Mr. Boyle, which was the 19th?
4  A.  No, because I still had to talk to Ro.
5  Q.  Oh.  But other than Ms. Dziubla --
6  A.  Correct.
7  Q.  -- everybody else was included in this
8  email to Mr. Boyle?
9  A.  Yes.
10  Q.  So you discussed the results of the
11  investigation.  What else do you recall from that
12  meeting with Ms. Dziubla on September 26th?  What
13  else was discussed?
14  A.  Ro had asked for what her options for time
15  off were.  We discussed that we did not have a
16  short-term disability policy.  And based on our
17  Policies and Procedures, her only option at that
18  point would be to elect to take FMLA leave.
19  Q.  And FMLA leave is unpaid?
20  A.  Yes.
21  Q.  And she was told that it was unpaid?
22  A.  Yes.
23  Q.  Did she make any remarks about that?
24  A.  She did make a comment about needing to be

Page 119

1  paid.
2  Q.  So just to back up, you met with
3  Ms. Dziubla on September 20th and -- By the way, you
4  can correct me if I'm wrong, if I mischaracterize
5  anything you said.
6  But I believe you said that she had made
7  certain critical comments about JCA during that
8  meeting on the 20th, right?
9  A.  Yes.
10  Q.  She, as you recall, said the environment
11  was toxic; she had issues with a number of
12  coworkers.  Is that right?
13  A.  That's accurate.
14  Q.  There may have been other things.
15  Between that meeting on the 20th and this
16  meeting on the 26th, between that time period, do
17  you recall Ms. Dziubla making any other comments
18  that you perceived to be negative about JCA or
19  critical of JCA?
20  A.  No, I do not recall.
21  Q.  Do you recall her making any negative
22  comments about JCA while she was at this meeting on
23  September 26th?
24  A.  I don't believe so.

Page 120

1  Q.  Do you recall her making any negative
2  comments about JCA since that time, not including
3  anything she may have said as part of this ongoing
4  litigation?
5  A.  I don't recall.  I don't believe so.
6  Q.  Do you believe that -- you know, the
7  comments that she made to you on -- Let me back up.
8  We covered the comments she made to you
9  during the September 20th meeting, the time between
10  September 20th and 26th, the meeting on the 26th,
11  and the time since September 26, 2017.
12  I didn't cover the period of time before
13  September 20, 2017.  Other than the comments that we
14  have seen in the emails to various people at JCA
15  after The Kev incident, or alleged incident, do you
16  know of any other time when Ms. Dziubla said
17  anything negative about working at JCA or JCA
18  itself; any time before September 20, 2017?
19  A.  A coworker in the office, Lauren Graczyk
20  at the time, now Saunders, did state that Ro had
21  gone to her and said she was unhappy and wanted to
22  leave the company.
23  Q.  So you said Lauren is no longer at the
24  company?

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 34 of 73 PageID #:550
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  A.  No, she is.  She changed her last name.
2  She got married.  At the time I believe her last
3  name was Graczyk, and now it's Saunders.
4  Q.  Okay.  What is Lauren's title?
5  A.  Marketing Director.
6  Q.  And did she come to you to say what
7  Ms. Dziubla had allegedly said?
8  A.  Yes, after she learned of the allegations
9  in the lawsuit.
10  Q.  Okay.  When did Lauren speak with you?
11  A.  I don't recall specifically.  I would say
12  sometime in the fall of 2017, possibly early 2018.
13  Q.  So was this --
14  A.  I'm just trying to pinpoint, and I can't
15  recall the specific time.
16  Q.  But it was after Ms. Dziubla was already
17  gone?
18  A.  Yes.
19  Q.  So anything that Ms. Dziubla may have said
20  to Lauren, you didn't know about it until after
21  Ms. Dziubla was gone?
22  A.  That is accurate.
23  Q.  Okay.  Can you think of any other
24  instances before September 20th or September 26,

Page 121

1  2017, other than what we've already discussed, any
2  instances where Ms. Dziubla made any comments that
3  you perceived to be negative or critical of JCA?
4  A.  No, I'm not aware of any.
5  Q.  And same question, except this time do you
6  know of any comments that Ms. Dziubla may have made
7  in any context about any individuals working at JCA
8  other than what we have already discussed?
9  A.  No, I'm not aware.
10  Q.  So by September 20, 2016, you had -- with
11  the exception of the comment that Ms. Dziubla may
12  have made to Lauren, you knew of all the various
13  comments Ms. Dziubla had made about JCA that you
14  perceived to be negative or critical?
15  A.  Can you state that again.  I didn't catch
16  all of that.
17  MR. SEDAEI:  At the risk of changing the
18  phrasing, would you mind reading the question
19  back.
20  (Record read as requested.)
21  MS. OLSON:  I'm going to just object to
22  form.
23  BY MR. SEDAEI:
24  Q.  It's a long question.  Do you understand

Page 122

1  it?
2  A.  I believe I do.  And to answer it
3  properly, I'll say I learned of Ms. Dziubla's
4  complaints about the company on September 20th.  And
5  that was the first time learning of such.
6  Q.  Did you think Ms. Dziubla's comments about
7  JCA -- all the comments that you knew of as of
8  September 26, 2017 -- made her unfit to be an
9  employee of JCA?
10  A.  No.
11  Q.  But you -- or at least JCA -- thought it
12  made her unfit to have access to her emails and the
13  server based on her comments?
14  A.  Temporarily, yes.
15  Q.  When you say temporarily, was there a
16  decision that her access would be restored at some
17  point to the emails and the server?
18  A.  Yes.  When she returned to work, it would
19  be restored.
20  Q.  But if she were to work remotely, she
21  would have had to have access to the server and the
22  email, correct?
23  A.  Correct.  But that would be returning to
24  work.

Page 123

1  Q.  Okay.  So you don't mean physically return
2  to the office?
3  A.  Correct.
4  Q.  Okay.
5  MR. SEDAEI:  14.
6  (Power Exhibit No. 14
7  marked for identification.)
8  BY MR. SEDAEI:
9  Q.  I'm showing you what's marked as
10  Exhibit 14.  Have you seen this document before?
11  A.  Yes, I have.
12  Q.  We already discussed the email at the
13  bottom right, Ms. Dziubla's email to you?
14  A.  Yes.
15  Q.  On top, is that an email, a reply from you
16  to Ms. Dziubla on September 25th at 4:28 p.m.?
17  A.  Yes, it is.
18  Q.  And you're stating in the email -- Correct
19  me if I'm wrong.  But on the 25th you were saying
20  that, you know, We were actually expecting you to be
21  at work today, in the first line of your email.
22  Is that correct?
23  A.  That's accurate.  That's what it reads.
24  Q.  Did you ever tell Ms. Dziubla that she was

Page 124

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 35 of 73 PageID #:551

Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 supposed to be at work on September 25th before
2 September 25th?
3   **A. No, not specifically.**
4   Q. But assuming that you were right, that she
5 was supposed to be at work on September 25th, were
6 you in this email pretty much assuming that she
7 already knew she was supposed to be back at work on
8 September 25th?
9   **A. I wasn't assuming anything.**
10   MR. SEDAEI: 15.
11       (Power Exhibit No. 15
12       marked for identification.)
13 BY MR. SEDAEI:
14   Q. I'm showing you what's been marked as
15 Exhibit 15. It's a few pages. But if you want to
16 flip through the pages and tell me if you have seen
17 these emails before.
18   **A. Yes, I have.**
19   Q. So at this point she is using her personal
20 email address to communicate with you, correct,
21 because she didn't have access to her work email?
22   **A. Yes.**
23   Q. Would you tell me approximately what
24 percentage of -- and this is all ballpark --

Page 125

1 approximately how much of an Estimator's time is
2 spent doing walk-throughs and how much of it is
3 spent, like, behind a computer?
4   **A. I don't know. I'm on the accounting side.**
5 **I'm not that familiar with the estimating to give**
6 **that detailed of an answer.**
7   Q. But you would agree that if she didn't
8 have access to her emails or the server, she
9 wouldn't have been able to work in any capacity as
10 an Estimator, either remotely or while in the
11 office?
12   **A. I agree with that statement.**
13   Q. At the end of her email -- Just to back
14 up, did you write this email after you met with
15 her -- "her" being Ms. Dziubla -- on September 26,
16 2017?
17   **A. Did I write what email? She wrote this**
18 **email.**
19   Q. I'm sorry. Did you receive this email
20 from Ms. Dziubla after you had met with her that
21 day?
22   **A. Yes.**
23   Q. Okay. And during your meeting on the
24 26th, she was presented with various options -- you

Page 126

1 know, short-term disability -- and she was told that
2 there is no such option for -- FMLA was the only
3 other option.
4   Correct?
5   **A. Yes. She was told FMLA was her option, as**
6 **her other time had been exhausted.**
7   Q. Okay. And at the end of this email on
8 September 26th, she is stating that, I'll save you
9 the trouble of the FMLA paperwork. I'll report to
10 work tomorrow a.m. as usual.
11   Is that right?
12   **A. Yes. That's what the email reads.**
13   Q. Do you recall how long after your meeting
14 with Ms. Dziubla on the 26th you received this
15 email? And I ask because the time stamp is 10:23.
16 And you're saying that at that point, you had
17 already met that day.
18   **A. I believe we met with her at 9:00 a.m.**
19 **And I'm going based on the below email where I said,**
20 **Mike Yazbec and I can meet with you at 9 am tomorrow**
21 **morning.**
22   Q. Okay. Do you recall how long your meeting
23 was with Ms. Dziubla that day?
24   **A. Specifically, no. I would estimate it to**

Page 127

1 be 25 minutes.
2   Q. So, ballpark, I believe she sent this
3 email about an hour after the conclusion of your
4 meeting?
5   **A. Yes.**
6   Q. After receiving this email, did you
7 discuss her email with anyone at JCA?
8   **A. Yes. This email was discussed with Mike**
9 **Yazbec, Jim Schumacher, and Tom Schumacher.**
10   Q. And when was that discussion?
11   **A. Without trying to sound like a smartass,**
12 **after 10:23 a.m. It was sometime later that morning**
13 **after receiving this. I don't know specifically**
14 **what time.**
15   Q. But it was in the morning; it was before
16 noon?
17   **A. I believe so, yes.**
18   Q. What did you discuss in that meeting?
19   **A. We discussed whether or not we felt Ro**
20 **would be able to work comfortably in the office.**
21 **Because during our meeting on the 26th, Mike Yazbec**
22 **had asked her if she could come back to work and**
23 **perform all the functions of her job as outlined in**
24 **her job description.**

Page 128

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 36 of 73 PageID #:552

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 129**

1    And she said, Yes, as long as Jim
2  Schumacher is not allowed to talk to me.
3    Q.  When she had said that, what did you or
4  anybody else at that meeting say in response to her?
5    A.  We reminded her that Jim Schumacher owns
6  the company and that was a fairly unreasonable
7  request.
8    Q.  And you told her that you could not
9  accommodate that request?
10   A.  Yes.
11   Q.  And knowing this information and your
12  answer, she wrote this email saying, I will be
13  returning to work?
14   A.  Correct.
15   Q.  So would it be reasonable to say that she
16  wasn't asking that that condition be met in order
17  for her to return to work, because you had already
18  told her that that's unacceptable?
19     MS. OLSON:  Objection, calls for
20    speculation.
21   A.  She did not restate that condition in her
22  email.
23     MR. SEDAEI:  Would you read the question.
24     (Record read as requested.)

**Page 130**

1    A.  I don't know.  She did not restate that in
2  her email.
3  BY MR. SEDAEI:
4    Q.  She did not restate, as a condition of her
5  returning to work, that Mr. Schumacher not be
6  allowed to speak with her?
7    A.  Correct, yes.
8    Q.  Did you ever reach out to her to get a
9  clarification on whether she was still demanding
10  that Mr. Schumacher not speak with her, even after
11  you had told her that that condition was
12  unacceptable?
13   A.  We did not reach out to her and question
14  that.
15   Q.  Isn't it true that after receiving this
16  email, you presented Ms. -- "you" being JCA --
17  presented Ms. Dziubla with a severance agreement?
18   A.  Yes.  She was presented with -- she was
19  not presented -- Excuse me one second; take a sip of
20  water.
21     She was not presented with a severance
22  agreement that day.  The subject of a separation
23  agreement was discussed with her.
24   Q.  That day?

**Page 131**

1    A.  That day.
2    Q.  And how was that discussed with her?
3    A.  Via a telephone call with Mike Yazbec and
4  myself.
5    Q.  Mike Yazbec and yourself?
6    A.  Correct.
7    Q.  And this was discussed after you,
8  Mr. Yazbec, and the two Mr. Schumachers met?
9    A.  Yes.
10   Q.  But Mr. Schumachers were not on the call,
11  were they?
12   A.  They were not.
13   Q.  They were not in the room?
14   A.  They were not.  Mike and I called from my
15  office with the door closed.  We were the only two
16  in there.
17   Q.  And at that point during your meeting with
18  the four of you -- "the four of you" being you,
19  Mr. Yazbec, and the two Schumachers -- there was a
20  decision that Ms. Dziubla could not perform her
21  functions at JCA if she comes back?
22   A.  Based on her comments, we did not feel she
23  was ready to fully represent the company positively
24  at that point in time.

**Page 132**

1    Q.  And why did you feel that way?
2    A.  One more time?
3    Q.  Why did you feel that she could not
4  represent the company?
5    A.  Based on her comments.
6    Q.  Okay.  But again, just to clarify
7  something that we went over before, she had never
8  said that she would say anything negatively about
9  JCA to any outsiders.  Correct?
10   A.  On the meeting of the 20th, she said she
11  was not in a position to go to -- yes, the 20th --
12  was not in a position to go to walk-throughs and say
13  she was a JCA employee; she could not represent the
14  company positively.
15   Q.  She specifically said that last part, that
16  she couldn't represent the company positively?
17   A.  Yes.  She said, I cannot -- And she even
18  made a flag-waving motion with her arms saying, I
19  can't say, Hey, I'm here from JCA (indicating).  She
20  said, I can't do that.
21   Q.  And before there was a call to Ms. Dziubla
22  to discuss the possibility of severance, did you
23  read this paragraph in the middle of her email where
24  it starts with, I also don't appreciate, where she

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 37 of 73 PageID #:553
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 is trying to clarify what she said or meant?
2 **A. I read that.**
3 Q. Okay.
4 **A. I disagreed with it.**
5 Q. You disagreed with...
6 **A. Her statement.**
7 Q. Okay. You disagreed that you had
8 misrepresented what she had said previously?
9 **A. Yes.**
10 Q. But in any case, you're saying you saw her
11 clarification on what she meant in this email,
12 right?
13 **A. I read the email.**
14 Q. So after reading the email, would you say
15 that you understood after reading the email what she
16 meant?
17 **A. I can't guess on what she specifically**
18 **meant.**
19 Q. I'm not asking you to guess. I'm just
20 saying, based on the plain words of her email, does
21 this provide further -- whether the words of this
22 email and this specific paragraph that I just
23 referenced provides clarification to you as far as
24 what she meant?

Page 133

1 **A. She further clarified what she said, yes.**
2 Q. And did this clarify things for you, the
3 explanation in this email?
4 **A. No.**
5 Q. It did not?
6 **A. No.**
7 Q. So reading this email, you still --
8 **A. I understood -- Sorry.**
9 Q. So reading this email, you still believed
10 that she might say something negative about JCA when
11 meeting with subcontractors or other outsiders?
12 **A. We collectively did, yes.**
13 MR. RUFF: Is this a good time to take a
14 break?
15 MR. SEDAEI: I think we were going to take
16 a break for lunch. I'm trying to speed it up
17 so we were done by 2:00.
18 MR. RUFF: I just want to take 5 minutes.
19 MR. SEDAEI: Okay, yes.
20 MR. RUFF: Do you think you're going to be
21 done by 2:00 with this witness?
22 MR. SEDAEI: Well, if we're taking 5, it
23 might go a little after 2:00.
24 MR. RUFF: Yes, I understand.

Page 134

1 MR. SEDAEI: We're cutting it very close.
2 But yes, I don't think I have more than half an
3 hour.
4 (Whereupon a recess was taken
5 from 1:27 p.m. to 1:39 p.m.,
6 after which the following
7 proceedings were had:)
8 (Exit Mr. Pullos and Mr. Ruff.)
9 MR. SEDAEI: Back on the record.
10 BY MR. SEDAEI:
11 Q. So we were discussing the severance
12 agreement before the break. And there was a
13 discussion between you, Mr. Yazbec, and the two
14 Schumachers. And the four of you collectively
15 determined that if Ms. Dziubla were to come back to
16 work, she would not be able to perform the functions
17 of her job.
18 Correct?
19 MS. OLSON: Object, mischaracterizes prior
20 testimony.
21 BY MR. SEDAEI:
22 Q. And feel free to clarify.
23 **A. We had questions about her ability to do**
24 **so. We didn't concretely say she couldn't. We just**

Page 135

1 questioned whether or not she would be able to.
2 Q. Okay. So was there a decision actually
3 made that Ms. Dziubla would not be allowed to come
4 back to work immediately?
5 **A. Not at that time, no.**
6 Q. Okay. So why did JCA present Ms. Dziubla
7 with a severance agreement after she said that she
8 wanted to come back to work, report back to work?
9 **A. I think I answered this already. But**
10 **because of her negative comments is why it was**
11 **decided to go in that direction.**
12 Q. So was this severance agreement offered to
13 Ms. Dziubla as an option?
14 **A. Yes.**
15 Q. And what do you mean by that, "as an
16 option"? What were the other options?
17 **A. Come back to work. Well, it was**
18 **originally put at that point -- No, I'm sorry. Let**
19 **me -- No. At that point there weren't other options**
20 **at that point. We were just presenting her with a**
21 **separation agreement.**
22 Q. To come back to work. Just to clarify
23 what you just said, coming back to work was not an
24 option as of September 26th?

Page 136



Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 38 of 73 PageID #:554
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  A.  I shouldn't say that.  That's incorrect,
2  because we -- it was still an option.  Hang on.  Let
3  me back up.
4  Q.  Sure.
5  A.  I know what I'm thinking.  Just the words
6  aren't there.
7      We had not said that she cannot come back
8  to work.  We thought it was in the best interests of
9  both parties at that point in time to offer a
10  separation agreement.
11  Q.  So was it or was it not an option for her
12  to come back to work if she wanted to on
13  September 27th, which would have been the day after
14  she sent this email?
15      If she wanted to come back to work and
16  reject the separation agreement, would that have
17  been an option for her?
18  A.  Yes.  That actually was said to her at
19  some point in time during the discussions of the
20  separation agreement.
21  Q.  When was that specifically told to her and
22  by whom?
23  A.  By Mike Yazbec.  We had a couple different
24  conversations about it that spanned one evening into

Page 137

1  the following day.  Because our original separation
2  agreement offer was for four weeks.  She came back
3  and, I believe, asked for six months.  We called her
4  back and said, Based on your tenure with the company
5  of being less than two years -- approximately
6  18 months -- we felt -- we would go up to six weeks.
7  That was what we felt was a very fair offer based on
8  her tenure.
9  Q.  Okay.
10  A.  And then there was some additional -- You
11  may have an email.  There was an email in between.
12      And then there was another conversation
13  where we said, Six weeks is our best and final offer
14  for a separation agreement.
15      At that point in time, verbally on the
16  phone, she said, Well, what if I don't take this?
17      And she was told she could come back to
18  work.
19      And she said, I'll take the six weeks.
20  Send me the paperwork.
21  MR. SEDAEI:  Would you mind reading back
22  the last part, just the last few sentences of
23  the answer to me.
24      (Record read as requested.)

Page 138

1  BY MR. SEDAEI:
2  Q.  So at this point, would it be accurate to
3  say that you -- "you" being JCA -- and Ms. Dziubla
4  were engaging in a discussion about what the terms
5  of an acceptable severance agreement would be?
6  A.  Yes, that's accurate.
7  Q.  Okay.  But was she ever told that, You can
8  reject this entire severance, take no severance and
9  sign no severance agreement, and just come back to
10  work as usual and do your job?
11  A.  Yes.  I answered that.  We said -- I mean,
12  we didn't phrase it exactly as you did.  But we told
13  her that she could take that offer or come back to
14  work.
15  Q.  And you said "we," being -- Who said that?
16  A.  Mike Yazbec.
17  Q.  Okay.  Do you remember when?  Do you know
18  when?
19  A.  I'm trying to make sure I get the dates
20  right.  I believe it was the 27th.  At that point it
21  was the 27th, probably midday.
22  Q.  This was on the phone?
23  A.  Yes.
24  Q.  So there's no written record of it?

Page 139

1  A.  No.
2  MR. SEDAEI:  This is going to be 16.
3      (Power Exhibit No. 16
4      marked for identification.)
5  BY MR. SEDAEI:
6  Q.  I'm showing you what's marked as
7  Exhibit 16.  Have you seen this document before?
8  And feel free to flip through it.
9  A.  I believe I have; but give me a moment,
10  please.
11      Yes, I've seen this.
12  Q.  Okay.  Are these JCA's Answers and
13  Objections to Plaintiff's First Set of
14  Interrogatories?
15  A.  Yes.
16  Q.  And on the last -- on the second-to-last
17  page, is that your signature?
18  A.  Yes, it is.
19  Q.  Before these answers were submitted to
20  Plaintiff, did you have a chance to review all the
21  answers and ensure that everything was accurate?
22  A.  Yes, I did review them.
23  Q.  I'm just going to flip through and see if
24  I have any specific questions I haven't already

Page 140



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 39 of 73 PageID #:555
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 asked.
2      Would you look at the Answer to
3 Interrogatory Number 7.  Interrogatory Number 7
4 starts on page 4, and then the answer also starts on
5 page 4 and goes on to page 5.
6      The specific question I have is, if you
7 look at page 5, the third line from the top, it says
8 that, Power, Yazbec, and J. Schumacher were involved
9 in the investigation into Plaintiff's allegations.
10      I just want to make sure that I understand
11 the extent of Mr. Schumacher's and Mr. Yazbec's
12 involvement.  So basically you discussed a number of
13 meetings you had with them where you discussed the
14 allegations.
15      Other those meetings with you and the
16 meetings that we have discussed, did they have any
17 other kind of involvement?  Oh, and I believe
18 Mr. Schumacher spoke with Mr. Jacobsen.
19      **A.  Correct.  Mr. Schumacher's other**
20 **involvement was speaking to Mr. Jacobsen.**
21 **Mr. Yazbec was present during all witness**
22 **interviews, whether it be in person or on the phone.**
23      Q.  Okay.  And do you recall him taking notes
24 when listening to the witnesses?

Page 141

1      **A.  I do not recall if he did or not.**
2      Q.  Mr. Yazbec was present?
3      **A.  Mr. Yazbec was present.**
4      Q.  The next line, fourth line from the top,
5 it says, JCA's investigation took place between
6 September 19, 2017, and September 27, 2017.
7      Do I recall correctly that when you met
8 with Ms. Dziubla on the 25th, you already told her
9 the results of the investigation, which means that
10 the investigation had concluded at that point?
11      MS. OLSON:  Objection --
12      **A.  We met with her on the 26th.**
13      MS. OLSON:  -- mischaracterizes prior
14      testimony.
15 BY MR. SEDAEI:
16      Q.  Okay, go ahead.  Was it not the 25th when
17 you --
18      **A.  Yes.  Obviously, there's a discrepancy by**
19 **two days.**
20      Q.  Okay.  So September 27th is inaccurate?
21      **A.  Reading this back now, yes.  It probably**
22 **should be changed to the 25th.**
23      MS. OLSON:  Just to clarify, the 25th was
24      that Monday; is that right?

Page 142

1      THE WITNESS:  Yes, it was.
2 BY MR. SEDAEI:
3      Q.  It was exactly one week after The Kev?
4      **A.  Uh-huh.**
5 BY MR. SEDAEI:
6      Q.  Did JCA at some point ask Ms. Dziubla for
7 assurance that Ms. Dziubla -- Strike that.
8      Did JCA or anyone at JCA ever ask
9 Ms. Dziubla if she was able to perform her job and
10 represent JCA in a positive light?
11      **A.  Yes.  She was asked that question during**
12 **the meeting on September 26th.  And that's when she**
13 **responded with the comment about Jim can't talk to**
14 **her.**
15      Q.  Did she make any other comments in
16 response to that?
17      **A.  No, not that I recall.**
18      Q.  And she didn't restate that condition in
19 her email later when she said she was coming back to
20 work?
21      **A.  It's already been answered.  But no, she**
22 **did not.**
23      Q.  You said you met with Ms. Dziubla two days
24 after The Kev alleged incident, correct?

Page 143

1      **A.  Yes.**
2      Q.  And would you describe her -- Well, how
3 would you describe her, kind of, mood?  Would you
4 say she was upset?
5      **A.  Yes, she was upset.  She stated she was**
6 **upset.**
7      Q.  And did she look upset?
8      **A.  Yes.**
9      Q.  Did she cry?
10      **A.  I don't think she did, but I don't recall.**
11      Q.  Did she seem angry?
12      **A.  She just seemed upset.  I don't know if**
13 **I'd use the word "angry."**
14      MR. SEDAEI:  Next exhibit.
15           (Power Exhibit No. 17
16           marked for identification.)
17 BY MR. SEDAEI:
18      Q.  Showing you what's marked as Exhibit 17,
19 do you recognize this document?
20      **A.  Yes, I do.**
21      Q.  This a copy of -- at least one of the
22 copies of the severance agreement that was presented
23 to Ms. Dziubla?
24      **A.  Yes.**

Page 144



Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 40 of 73 PageID #:556

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    Q.   Do you know by looking at it and the terms
2    included here, whether this was the first version
3    that was presented to her?
4        A.   Yes.  This was the only version we
5    presented to her.
6        Q.   So after you engaged in kind of a
7    back-and-forth with Ms. Dziubla regarding the
8    specific terms of the agreement, JCA didn't really
9    actually modify the terms and present her with a new
10   version of the agreement after your discussions with
11   Ms. Dziubla?
12       A.   Correct.  First it was discussions only.
13   And then this document was sent to us when she
14   agreed to it over the phone.
15       Q.   Okay.  Who drafted this document?
16       A.   Counsel.
17       Q.   Counsel, being Mr. Boyle and his team?
18       A.   Yes.
19       Q.   When was it drafted?
20       A.   On the 27th.
21       Q.   When was it presented to Ms. Dziubla?
22       A.   It may have been drafted on the 28th.  I'm
23   trying to -- It was presented via email to
24   Ms. Dziubla on the 28th.  And also a hard copy was

Page 145

1    sent via UPS.
2        Q.   When was -- Well, strike that.
3            Did the severance agreement propose that
4    Ms. Dziubla release JCA from certain kinds of
5    liabilities?  And you can look at it.  You can look
6    at Section 6 particularly, if it helps answer the
7    question; page 2.
8        A.   Yes, it does.
9        Q.   And is Mr. Jacobsen included in that
10   release?
11       A.   Yes.  His name is listed here.
12       Q.   Why was he included in the severance
13   agreement?
14           MS. OLSON:  I'm going to object to the
15       extent it calls for attorney/client privileged
16       information.
17       A.   I don't know the specific reason why.  It
18   was drafted by Counsel.
19   BY MR. SEDAEI:
20       Q.   Did Mr. Schumacher tell you that he wanted
21   Mr. Jacobsen to be included in the agreement?
22       A.   I do not recall that.
23       Q.   Do you recall Mr. Yazbec or anybody else
24   from JCA telling you that?

Page 146

1        A.   I do not.
2            MR. SEDAEI:  Okay, thanks.
3            We're at 18, I believe.
4               (Power Exhibit No. 18
5                marked for identification.)
6    BY MR. SEDAEI:
7        Q.   Showing you what's marked as Exhibit 18,
8    have you seen this document before?
9        A.   Yes, I have.
10       Q.   I want to draw your attention to the email
11   on the top of page -- on the top of the only page on
12   here.  It's an email from you to Mr. Schumacher,
13   correct; Jim Schumacher?
14       A.   Yes.
15       Q.   Okay.  And you're stating that, She has to
16   be given 7 days to review and sign.  We are lucky
17   she is under 40 years old or she would get 21 days
18   to review.
19           Did I read that correctly?
20       A.   Yes, you read that correctly.
21       Q.   Why did you say that -- why did you
22   consider yourself or JCA lucky that she had 7 days
23   instead of 21 days to review the agreement?
24       A.   We just wanted to bring this matter to a

Page 147

1    conclusion quicker.
2        Q.   Why did you want that?
3        A.   We just wanted to bring it to a resolution
4    and conclusion.
5        Q.   What harm would it have caused JCA if
6    Ms. Dziubla had two additional weeks to review the
7    agreement?
8        A.   I don't know.
9        Q.   Did you want Ms. Dziubla gone as soon as
10   possible?
11       A.   No.  I wanted the matter resolved.
12       Q.   But you can't say why you wanted it
13   resolved in one week versus three weeks?
14           MS. OLSON:  Objection, asked and answered.
15   BY MR. SEDAEI:
16       Q.   The answer was, I don't know?
17       A.   I don't know.  We just wanted it resolved,
18   period.
19           MR. SEDAEI:  Okay, done with that one.
20           19.
21               (Power Exhibit No. 19
22                marked for identification.)
23   BY MR. SEDAEI:
24       Q.   Showing you what's marked as Exhibit 19,

Page 148

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 41 of 73 PageID #:557
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 do you recognize this document?
2 **A. Yes, I do.**
3 Q. Is it an email chain between you and
4 Mr. Schumacher, Jim Schumacher; the one -- at least
5 the email in the middle of the first page?
6 **A. Yes, in response to an email received from**
7 **Ro.**
8 Q. Okay. And if you look at the third page,
9 a document titled, JCA -- or Bates stamped JCA1920.
10 And it goes to 1924.
11     Is that the attachment to the email?
12 **A. Yes.**
13 Q. Is that the severance agreement with
14 Ms. Dziubla's proposed edits?
15 **A. Yes.**
16 Q. On the email in the middle of the page to
17 Mr. Schumacher, you're saying, Jim, Here is what she
18 sent back -- it's ridiculous.
19     Did I read that correctly?
20 **A. Yes. That's what I wrote at that time.**
21 Q. Okay. What did you find ridiculous about
22 her edits?
23 **A. Asking for one year's salary.**
24 Q. Why did you think that was ridiculous?

Page 149

1 **A. I thought it was very excessive.**
2 Q. Anything else that you find ridiculous
3 about her edits?
4 **A. I don't believe so.**
5 Q. When we were discussing earlier, I was
6 asking you if Ms. Dziubla was presented with the
7 option to return to work.
8     And you said that she was, correct?
9 **A. Yes.**
10 Q. If she didn't want to sign the agreement
11 that we're discussing, the severance agreement?
12 **A. Uh-huh, yes.**
13 Q. So what happened? You engaged in certain
14 back-and-forth on the severance agreement.
15     And JCA and Ms. Dziubla didn't reach an
16 agreement on the terms?
17 **A. Correct.**
18 Q. Okay. So at that point, it seems like
19 severance was no longer an option because there was
20 no agreement on the terms, correct?
21 **A. Correct.**
22 Q. So then the only option that would be left
23 would be for Ms. Dziubla to come back to work?
24 **A. That's not the only option.**

Page 150

1 Q. What would be the other option?
2 **A. The letter you're holding that she was**
3 **terminated.**
4 Q. Okay. After there was a discussion on --
5 was there a definitive conversation you had --
6 again, you or anybody at JCA -- with Ms. Dziubla in
7 which it was determined that, Okay, we have reached
8 the end of the road on the negotiations with the
9 severance agreement, and we are not going to reach
10 an agreement on the terms?
11 **A. I do not recall a conversation like that**
12 **with Ms. Dziubla.**
13 Q. Okay. Do you remember or do you know of
14 you or anybody at JCA ever telling Ms. Dziubla,
15 Okay, at this point, since it seems like an
16 agreement on the severance agreement is not an
17 option anymore, you can come back to work as the
18 only other option to preserve your job?
19 **A. I'm not aware of such conversation.**
20 Q. And then you said that Ms. Dziubla was
21 actually terminated?
22 **A. Yes.**
23 Q. When was she terminated -- when was she
24 told that she was terminated?

Page 151

1 **A. I believe it was October 2nd.**
2     MR. SEDAEI: 20.
3         (Power Exhibit No. 20
4             marked for identification.)
5 BY MR. SEDAEI:
6 Q. I'm showing you what's marked as
7 Exhibit 20. Have you seen this document before?
8 **A. Yes.**
9 Q. Can you tell me what it is?
10 **A. It is a letter from J.C. Anderson signed**
11 **by Mike Yazbec, President, sent to Rowena,**
12 **terminating her employment.**
13 Q. Okay. Who drafted this letter?
14 **A. I do not recall.**
15 Q. Who made the decision to terminate
16 Ms. Dziubla?
17 **A. Mike Yazbec, myself, Jim Schumacher, and**
18 **Tom Schumacher.**
19 Q. When did you make the decision?
20 **A. I don't recall if it was made on Friday,**
21 **the 29th or Monday, the 2nd. I believe it was**
22 **Monday, the 2nd.**
23 Q. Did you all meet regarding this decision?
24 **A. Yes. Tom Schumacher was not present; he**

Page 152

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 42 of 73 PageID #:558

**Michael Power** 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 153**

1  was on the phone.

2  Q.  Okay.  Tell me what you remember about the

3  discussion.

4  **A.  The discussion centered around**

5  **Ms. Dziubla's markup comments back to us and seeing**

6  **what she had marked up and knowing we wouldn't be**

7  **able to mutually agree on a separation.  And reading**

8  **through that, we didn't feel that she was going to**

9  **be a good employee coming back, and we thought it**

10  **was best to terminate employment.**

11  Q.  Would it be accurate to say that during

12  that conversation, you decided that her coming back

13  to work could not be an option?

14  **A.  At that point in time, yes.**

15  Q.  Did something happen between

16  September 26th and September 29th or September 26th

17  and October 2nd -- whenever the decision was made to

18  terminate Ms. Dziubla -- that led this group of

19  individuals you just mentioned to conclude that

20  returning to work should not be an option for

21  Ms. Dziubla?

22  **A.  Yes.  It was based on the receipt of her**

23  **comments back on the markup.**

24  Q.  What was it about the comments that led

**Page 154**

1  the group to decide that she should no longer have

2  the option to return to work if she wanted?

3  **A.  I don't recall -- for starters, it was the**

4  **dollar amount she was asking for.**

5  Q.  But that was for -- if she were to agree

6  to separate.  But if not, had she asked for some

7  kind of a raise for, like, you know -- or any change

8  in her terms and conditions of employment if she

9  returned to work?

10  **A.  Had she asked?  No, she had not.**

11  Q.  Okay.  So why would her markup on the

12  severance agreement be relevant to whether she would

13  be a good employee at JCA?

14  **A.  To change from six weeks to $80,000, we**

15  **could tell she appeared to be angry with us -- that**

16  **was our interpretation -- and we did not feel she**

17  **would be a good employee coming back.**

18  Q.  But hadn't she presented you reasons for

19  why she wanted a longer term of pay as part of the

20  severance?  And, specifically, I'm talking about her

21  saying that, It's -- something along the lines of,

22  It's a tough job market and I have to look for a new

23  job, and she wanted some kind of security in that

24  regard?

**Page 155**

1  **A.  She may have had language like that in one**

2  **of her emails.  I don't specifically recall it.  But**

3  **I can't say no to that either.**

4  Q.  Okay.  Had she ever said, alternatively,

5  that she was asking for this amount of money as part

6  of her severance because she was angry with JCA?

7  **A.  No.**

8  Q.  Was there any discussion during your

9  meeting on either September 29th or October 2nd, the

10  meeting when the decision was made to terminate

11  Ms. Dziubla, that she be presented an opportunity to

12  come back to work and kind of -- on a probationary

13  basis, based on her comments, to see if she can

14  represent JCA in a positive light and go back to her

15  old routine?

16  **A.  No.  That was not discussed.**

17  Q.  Do you believe JCA creates an environment

18  for employees where everyone can feel respected?

19  **A.  Yes.**

20  Q.  And that it would include women?

21  **A.  Yes.**

22  Q.  Minorities?

23  **A.  Yes.**

24  Q.  Are there any employees at JCA who are not

**Page 156**

1  Caucasian?  First start with the office.

2  **A.  I'm just trying to think through.**

3  MS. OLSON:  Current employees?

4  MR. SEDAEI:  Yes, current employees.

5  **A.  I believe all office employees are**

6  **Caucasian.**

7  BY MR. SEDAEI:

8  Q.  Okay, now let's go to the field.  Can you

9  think of any JCA employees who are not Caucasian?

10  **A.  Yes.  There are a number of non-Caucasian**

11  **field employees.**

12  Q.  A number...

13  **A.  A fair number.  I'm trying to quantify it**

14  **for you.  I would estimate at least 20.**

15  Q.  And when you say they're not Caucasian,

16  like, what ethnicities are we talking about?

17  **A.  African-American or Hispanic.**

18  Q.  Of those minorities, are they pretty much

19  half and half split between the two; or is there

20  more of one than the other?  Or is there another

21  ethnicity that you didn't mention?

22  **A.  I don't know specifically.**

23  Q.  Okay.  Are you aware of any JCA employees

24  making racially insensitive comments at the office



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 43 of 73 PageID #:559
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  in your presence?
2      A.  No, I'm not aware of any comments in my
3  presence.
4      Q.  Has anybody ever brought any comments they
5  heard that they considered to be sensitive to your
6  attention?
7      A.  No, not prior to this matter.
8      Q.  Do you ever spend any time in the lunch
9  room?
10     A.  I spend very minimal time in there.
11     Q.  Okay.  Are you ever there when people are
12  watching T.V.?
13     A.  Not usually, no.
14     Q.  Have you ever been there while people are
15  watching T.V.?
16     A.  Have I been?  Yes.
17     Q.  Do you ever recall seeing them watching a
18  show called "The Cheaters"?
19     A.  I don't recall what was on the T.V.
20     Q.  Do you recall hearing any employees refer
21  to black people on T.V. as orangutans while you were
22  in the lunch room?
23     A.  No, I have not heard that.
24     Q.  Are you aware -- are JCA's clients aware

Page 157

1  of this lawsuit?
2      A.  I don't know.
3      Q.  Have you personally had a conversation
4  with anyone from any of your clients' companies
5  regarding this lawsuit?
6      A.  No, I have not.
7      Q.  Have you had any discussions with anyone
8  during this lawsuit, period, other than the
9  individuals at JCA?
10     A.  No.
11     Q.  Have you ever had any discussions with
12  Andy Stegman regarding this lawsuit?  Is it Stegman?
13     A.  I believe so.  I know who he is.  I don't
14  know him personally.
15     Q.  Okay.
16     A.  So no, I have not had any conversations
17  with him.
18     Q.  Do you know if anyone at JCA has had any
19  such conversations with him?
20     A.  I don't know for sure, no.
21     Q.  Is JCA planning to engage Mr. Jacobsen in
22  other events in the future?
23     A.  Not to my knowledge.
24     Q.  Has there been a specific decision on the

Page 158

1  topic at JCA?
2      A.  Not to my knowledge.
3      Q.  Okay.  So, to your knowledge, JCA hasn't
4  specifically definitively decided that, We're not
5  going to engage -- or that JCA is not going to
6  engage Mr. Jacobsen in future events?
7      A.  Correct.
8      Q.  Did you ever ask -- Oh, okay.
9          So I disclosed a copy of the handbook,
10  correct?  Do you remember that?
11     A.  Yes.
12     Q.  I think it's Exhibit 2.
13     A.  Yes.
14     Q.  And you stated that -- Let me just back
15  up.
16          Was Ms. Dziubla provided with a copy of
17  the handbook -- When was she provided with a copy?
18     A.  When she was hired.
19     Q.  So the first day, maybe?
20     A.  Yes.
21     Q.  Okay.  And did you ever ask her to turn in
22  this handbook to you when she left?
23     A.  I don't recall specifically asking for
24  that.  I believe we sent a statement that said,

Page 159

1  Please return all company property, including --
2  that we outlined.
3          We said, (Reading) Please return all
4  company property to J.C. Anderson, Inc., including
5  keys, gate fob, cell phone, laptop computer, and any
6  other company property you have in your possession.
7          So yes, we did.
8      Q.  But "handbook" wasn't specifically
9  mentioned, right?
10     A.  It was not specifically -- well, it was,
11  because it's company property.
12     Q.  Yes.  But there were a number of items --
13     A.  Did it say "handbook" on there?  No, it
14  did not.
15     Q.  Okay.  But a number of other items were
16  specifically mentioned?
17     A.  Yes.
18         MR. SEDAEI:  Mark this as the next
19  exhibit.
20             (Power Exhibit No. 21
21             marked for identification.)
22  BY MR. SEDAEI:
23     Q.  Showing you what was marked as Exhibit 21.
24     A.  Okay.

Page 160

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/26/20 Page 44 of 73 PageID #:560

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Q.  Have you seen this document before?
2  A.  Yes.
3  Q.  Is that an email exchange between you and
4  Ms. Dziubla?
5  A.  Yes.
6  Q.  And toward the top of that page, on
7  Tuesday, October 3, 2017, at 9:22 a.m., is that an
8  email from you to Ms. Dziubla?
9  A.  It appears to be.
10  Q.  Okay.  And does the email read, Please
11  send your keys, gate fob and phone in the UPS
12  envelope already provided.  We will include
13  packaging materials for your laptop with your
14  personal items.
15      Did I read that correctly?
16  A.  Yes.
17  Q.  Was that the entire email?
18  A.  It appears to be.
19  Q.  Would it be fair to say that there is no
20  reference of the manual, the JCA manual, in this
21  email?
22  A.  Not in this email.  It was previously
23  covered in her termination letter as company
24  property.

Page 161

1  Q.  I understand; we already discussed that.
2  I'm just talking about this email.
3  A.  Okay.
4      MR. SEDAEI:  22.
5          (Power Exhibit No. 22
6           marked for identification.)
7  BY MR. SEDAEI:
8  Q.  Showing you what's marked as Exhibit 22,
9  do you recognize this document?
10  A.  Yes, I do.
11  Q.  Is that an email from you on top, from you
12  to a number of individuals; Mr. Yazbec, I believe,
13  and Mr. Boulukos, and then cc:'d is Jim Schumacher?
14  A.  Yes, it is.
15  Q.  Okay.  And does the email read, She is so
16  distraught she is already working and soliciting our
17  subs.
18  A.  That's accurate.
19  Q.  And that's on October 3rd?
20  A.  (No response.)
21  Q.  I'm sorry.  The date of the email is
22  October 3rd?
23  A.  Yes.
24  Q.  Okay.  In the email are you implying that

Page 162

1  she was not distraught?
2  A.  I'm not implying anything.
3  Q.  So tell me what that means, then.  Are you
4  saying that somebody who is distraught would be
5  looking -- working and soliciting JCA subs?
6  A.  I was saying that we were -- I was
7  surprised to receive this email forwarded that she
8  was soliciting our subs because she had said she was
9  very distraught and couldn't work or sleep or eat
10  much.
11  Q.  So you believe that her working -- if she
12  was, in fact, working and soliciting JCA subs, that
13  was inconsistent with being distraught?
14  A.  Yes.
15  Q.  What do you think would have been the
16  appropriate or expected way to act if she was
17  distraught?
18  A.  I don't think she would be working one day
19  later.
20  Q.  You don't think she would be looking for a
21  new job after she was told she was terminated?
22  A.  No.  I didn't say that.
23  Q.  Okay.
24  A.  I said I didn't think she would be

Page 163

1  working.  Looking and working are two different
2  things.
3  Q.  Okay.  Why do you think that?
4  A.  Why do I think that?
5  Q.  Yes.
6  A.  Because they are.
7  Q.  That if somebody was distraught, they
8  can't be working while distraught?
9  A.  She told us she couldn't work when she was
10  distraught, so no.  And I'm speaking specifically to
11  her comments to us, not making a generalization.
12  Q.  But she had already told JCA that she was
13  ready to work at JCA.  She had told you that in an
14  email that she sent in late September.
15      We already discussed that, didn't we?
16  A.  Yes, we discussed it.
17  Q.  So what makes you think that -- so what
18  are you talking about when you say she had said
19  something that made you conclude she wasn't ready to
20  work?
21  A.  She had previously told us she wasn't
22  ready to work.
23  Q.  And any comments that she had made about
24  her ability to work, wasn't that related to her

Page 164

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 45 of 73 PageID #:561
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 165**

1 working at JCA?

2    **A. Yes. But we didn't feel they were genuine**

3 **because she ended it with, I need a paycheck.**

4    Q. When she said that she needed a paycheck,

5 didn't she say that in response to the options she

6 was presented, the only one of which was -- other

7 than her returning to work was the FMLA option --

8    **A. Yes.**

9    Q. -- which was a non-paid option?

10    **A. Correct.**

11    Q. Okay. If she was reaching to JCA subs

12 after her termination, was there anything wrong with

13 that?

14    **A. (No response.)**

15    Q. Was she not supposed to do that, according

16 to what you believe?

17    **A. Personally, I don't know if there was**

18 **anything wrong with it. She could have been**

19 **reaching out to someone who was a personal contact**

20 **prior to coming to J.C. Anderson.**

21    Q. And that would have been okay?

22    **A. If it's been a long-standing contact, yes.**

23    Q. What if it was not a long-standing

24 contact, but it was a contact she had before she

**Page 166**

1 joined JCA?

2    **A. Yes.**

3    Q. And JCA didn't have any specific policy

4 that prohibited all former employees of JCA from

5 communicating with any of JCA's subcontractors after

6 the former employee departs JCA?

7    **A. There is a confidentiality agreement and**

8 **document -- I don't know the specific title of it --**

9 **that covers non-compete and confidentiality. But Ro**

10 **was not subject to that document. Some of our**

11 **Project Managers are.**

12    Q. Okay. You said Ms. Dziubla was not

13 subject to that contract, correct?

14    **A. Correct. She did not sign one.**

15    MR. SEDAEI: 23.

16       (Power Exhibit No. 23

17       marked for identification.)

18 BY MR. SEDAEI:

19    Q. I'm showing you what's marked as

20 Exhibit 23. Have you seen this document before?

21    **A. Yes.**

22    Q. The bottom part of the page on

23 October 3rd, is that an email from Andy Stegman to

24 Mr. Garland?

**Page 167**

1    **A. Yes.**

2    Q. And on top Mr. Garland is forwarding the

3 message to you; is that right?

4    **A. Correct.**

5    Q. Do you know why Mr. Stegman was sending

6 that email to Mr. Garland?

7    **A. Just sharing what he had received from Ro.**

8 **And Greg is one of his main contacts in our office.**

9    Q. Do you know if Mr. Garland had asked

10 Mr. Stegman to share any communications coming from

11 Ro with him?

12    **A. I do not know.**

13    Q. Do you know why Mr. Garland is forwarding

14 this message to you?

15    **A. Just so I can be aware of what was sent**

16 **out or what he received.**

17    Q. Had you asked any JCA employees to forward

18 any communications coming from Ms. Dziubla to you?

19    **A. I don't recall specifically asking that.**

20    Q. Do you recall anybody else asking JCA

21 employees to do that?

22    **A. I do not recall.**

23    MR. SEDAEI: 24.

24

**Page 168**

1       (Power Exhibit No. 24

2       marked for identification.)

3 BY MR. SEDAEI:

4    Q. Showing you what's marked as Exhibit 24,

5 have you seen this chain of emails between you and

6 Rachael Weil?

7    **A. I see it now in front of me. I don't**

8 **remember it back at that time.**

9    Q. Okay. And is it accurate that Rachael

10 Weil is reaching out to you and saying that

11 Ms. Dziubla had tried to recruit her?

12    **A. Yes, that's accurate.**

13    Q. Okay. And on October 18th, towards the

14 middle of the page, you're sending an email to

15 Ms. Weil saying, Can you share with me what she sent

16 you? Legally we can't do anything about it. I'm

17 just curious to see what she is doing.

18    Did I read that accurately?

19    **A. Yes, it's accurate.**

20    Q. So this is weeks after Ms. Dziubla was

21 terminated, right?

22    **A. Correct.**

23    Q. So why were you curious to see what she

24 was doing?



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 46 of 73 PageID #:562

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    **A.  I was just curious; that's all.**
2    Q.  No specific reason?
3    **A.  No.**
4        MR. SEDAEI:  25.
5            (Power Exhibit No. 25
6            marked for identification.)
7    BY MR. SEDAEI:
8    Q.  I'm showing you what is marked as
9    Exhibit 25.  Have you seen this email before?
10    **A.  Yes.**
11    Q.  So this is an -- at the bottom it's an
12    email from Ms. Dziubla to a number of individuals,
13    correct; Emily Armstrong, John Watts.  I think those
14    are the individuals I see.
15        Do you see that?
16    **A.  Yes, I do.**
17    Q.  Do you know those individuals, Emily
18    Armstrong and John Watts?
19    **A.  No, I do not.**
20    Q.  So they're not JCA employees?
21    **A.  No, they are not.**
22    Q.  And then towards the middle, it seems like
23    the message is being forwarded from Mr. Stegman to
24    Mr. Garland; is that right?

Page 169

1    **A.  Yes.**
2    Q.  And on top Mr. Garland is again forwarding
3    the message to you?
4    **A.  Yes.**
5    Q.  So, again, you didn't ask for
6    communications from Ms. Dziubla to be forwarded to
7    you?
8    **A.  No.  I do not recall asking specifically**
9    **for that.**
10    Q.  Mr. Garland was just doing that on his own
11    accord?
12    **A.  Yes.**
13        MR. SEDAEI:  26.
14            (Power Exhibit No. 26
15            marked for identification.)
16    BY MR. SEDAEI:
17    Q.  I'm showing you what's marked as
18    Exhibit 26.  Have you seen this document before?
19    **A.  Yes, I have.**
20    Q.  Can you tell me what it is?
21    **A.  It is me forwarding a link and some --**
22    **part of the page of a form of a GoFundMe-type page**
23    **that Ro had set up, looking for people to help her**
24    **contribute to a defense fund -- or a legal fund.  I**

Page 170

1    shouldn't say defense.  That's the wrong word.
2    Q.  The email is from you to Mr. Yazbec?
3    **A.  Yes.**
4    Q.  And it is on July 7, 2018?
5    **A.  Correct.**
6    Q.  How --
7    **A.  I was going to answer your next question.**
8    **I don't recall how I was made aware of this.**
9    Q.  Okay, that wasn't going to be my next
10    question.
11    **A.  That's what I thought.**
12    Q.  Thank you for adding details.
13        My question was going to be, Why did you
14    forward this to Mr. Yazbec?
15    **A.  I just thought he would be interested to**
16    **see it.**
17    Q.  Why do you think he would be interested?
18    **A.  Because he's the President of the company**
19    **and this was her statements about the company or her**
20    **lawsuit against the company.**
21    Q.  She doesn't mention the company
22    specifically, correct?
23    **A.  No, she does not.**
24    Q.  Okay.  Did you have a discussion with

Page 171

1    Mr. Yazbec about this?
2    **A.  I don't recall having a full discussion**
3    **about it.  I think it was more informative.  But,**
4    **like I said, I don't recall a specific discussion.**
5    Q.  You just forwarded an email and you didn't
6    talk about it afterwards?
7    **A.  He may have made a comment to me of Oh,**
8    **that's interesting, or something along those lines.**
9    **But, like I said, I don't remember a full**
10    **conversation about it.**
11        MR. SEDAEI:  27.
12            (Power Exhibit No. 27
13            marked for identification.)
14    BY MR. SEDAEI:
15    Q.  This is just an email, now three days
16    later.  So I'm talking about Exhibit 27 that we just
17    presented to you.  This is three days after you sent
18    the email to Mr. Power [sic] and this email to
19    Mr. Boulukos.
20        And on top you're saying, FYI, Per our
21    discussion.
22    **A.  This email is not from me.**
23    Q.  Oh, I'm sorry.  You're right, it's not
24    from you.

Page 172



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 47 of 73 PageID #:563
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1    But it's an -- Yes, I misstated.  I'm<br>2 sorry.  I meant to say it's from Mr. Yazbec to<br>3 Mr. Boulukos.  Right?<br>4    **A.  Yes.**<br>5    Q.  But he's referencing a discussion?<br>6    **A.  Correct.**<br>7    Q.  FYI, Per our discussion.<br>8      I just presented that to you to see if<br>9 that refreshes your memory as far as whether you<br>10 were part of that discussion, if such a discussion<br>11 actually took place?<br>12    **A.  I do not recall being part of a**<br>13 **discussion.**<br>14    Q.  Okay.<br>15    **A.  And I was not part of this email.**<br>16    Q.  Have you discussed Ms. Dziubla's GoFundMe<br>17 page at any point with anyone at JCA?<br>18    **A.  I don't recall.**<br>19    MR. SEDAEI:  Let me just have a quick chat<br>20 with my client, and then I'm done.<br>21    MS. OLSON:  Okay.<br>22    MR. SEDAEI:  Are you going to have any<br>23 follow-ups?<br>24    MS. OLSON:  Minor.<br><div align="right">Page 173</div> | 1 on the 20th and when Mike Yazbec and I met with her<br>2 on the 26th.<br>3    Q.  So can you tell me which part of the notes<br>4 relates to which meeting?<br>5    **A.  Would you like me to go by the number on**<br>6 **the bottom right; 1931.**<br>7    Q.  Let me just back up.  It seems like first<br>8 there are two pages of handwritten notes.<br>9      The first two pages, correct, JCA1929<br>10 JCA1930.  Correct?<br>11    **A.  Yes.**<br>12    Q.  So first focus on the handwritten notes.<br>13    **A.  Okay.**<br>14    Q.  When did you write these notes?<br>15    **A.  I wrote these while sitting talking with**<br>16 **Ro.**<br>17    Q.  Okay.  So now we go to the third page,<br>18 which is Bates stamped JCA001931.  Do you see that?<br>19    **A.  Yes.**<br>20    Q.  And then those -- JCA1931, JCA1932, and<br>21 JCA1933 are typewritten.  Correct?<br>22    **A.  Yes.**<br>23    Q.  And when did you write these notes, these<br>24 typewritten notes?<br><div align="right">Page 175</div> |
| 1      (Whereupon a recess was taken<br>2        from 2:39 p.m. to 2:46 p.m,<br>3        after which the following<br>4        proceedings were had:)<br>5    MR. SEDAEI:  So I'm done.  I don't have<br>6 any other questions.<br>7    MS. OLSON:  I just have a brief<br>8 redirect --<br>9    MR. SEDAEI:  Sorry to interrupt you.  I<br>10 just saw that there's just one thing that I<br>11 wanted to run by Mr. Power just one more time.<br>12    MS. OLSON:  Okay, sure.<br>13    MR. SEDAEI:  This is a document that was<br>14 sent last night.  I had it on the side, so I<br>15 didn't have it in my notes.<br>16      This will be the last exhibit.<br>17      (Power Exhibit No. 28<br>18        marked for identification.)<br>19 BY MR. SEDAEI:<br>20    Q.  Mr. Power, I'm showing you what's marked<br>21 as Exhibit 28.  Have you seen this document before?<br>22    **A.  Yes, I have.**<br>23    Q.  Can you tell me what it is?<br>24    **A.  These are notes I took when I met with Ro**<br><div align="right">Page 174</div> | 1    **A.  Right after, on -- the ones from the 20th**<br>2 **I typed on the 20th.  And the 26th I typed on the**<br>3 **26th.  I just added to the existing file.**<br>4    Q.  Okay.  So everything in this exhibit was<br>5 written on or before September 26, 2017?<br>6    **A.  Yes, I believe so.**<br>7    Q.  Do you know why, when we -- when<br>8 Ms. Dziubla initially sent her document request,<br>9 that this document was not included as part of JCA's<br>10 original document production to us?<br>11    **A.  I do not know.  I forwarded it to Counsel**<br>12 **very early on in the process.**<br>13    Q.  Okay.  I don't think I have any specific<br>14 questions about -- I just had questions about the<br>15 notes.<br>16      And I do want to confirm that you are the<br>17 author of everything in this exhibit, correct?<br>18    **A.  Yes.**<br>19    MR. SEDAEI:  Okay, I have no other<br>20 questions.<br>21      CROSS-EXAMINATION<br>22 BY MS. OLSON:<br>23    Q.  I'm going to turn your attention to<br>24 Exhibit No. 2, the employee handbook.<br><div align="right">Page 176</div> |



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 48 of 73 PageID #:564
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   A.  Okay.
2   Q.  Page 1062.
3   A.  Okay.
4   Q.  This goes through the Attendance policy,
5   correct?
6   A.  Yes.
7   Q.  And earlier on Counsel was asking you
8   about the three bulleted points in the middle of the
9   policy, correct?
10  A.  Yes.
11  Q.  I want to draw your attention to the third
12  paragraph, the second sentence, where it says, The
13  Company reserves the right, depending on the
14  severity of the conduct and/or the individual
15  circumstances of a particular situation, to skip
16  some or all of the steps outlined above, or to issue
17  alternative discipline.  The exercise of this right
18  may result in termination without any prior warning.
19      Did I read that correctly?
20  A.  Yes, you did.
21  Q.  So is it your understanding that under the
22  policy, it is not necessary to follow the three
23  bulleted points in every instance?
24  A.  Correct, yes.

Page 177

1   Q.  Okay.  I want to revisit briefly a
2   conversation that you had either late morning or
3   early afternoon on 9-20 after you had met with
4   Ms. Dziubla on site.
5   A.  Uh-huh.
6   Q.  I believe you said you came back and you
7   spoke with Mike Yazbec, Jim Schumacher, and Tom
8   Schumacher; is that correct?
9   A.  Yes.
10  Q.  And Counsel had asked you what was
11  discussed during the course of that meeting,
12  correct?
13  A.  Yes.
14  Q.  And if I recall correctly, you had said
15  that you discussed Plaintiff's statements regarding
16  the company being toxic; you discussed her
17  complaints regarding the company; and her concerns
18  regarding coworkers?
19  A.  Yes.
20  Q.  Did you also discuss your discussion with
21  her earlier that day about the incident that
22  occurred at The Kev?
23  A.  Yes, we did.
24  Q.  And what do you recall about that

Page 178

1   discussion?
2   A.  That I just shared with them what Ro had
3   told me about her day at The Kev and her
4   interactions with Peter Jacobsen.
5   Q.  So I want to direct your attention to a
6   conversation that you had with Mike Yazbec, Jim
7   Schumacher, Tom Schumacher, and yourself after you
8   had received Ms. Dziubla's markup of the separation
9   agreement.
10  A.  Okay.
11  Q.  I believe that conversation, you said,
12  occurred either on 9-29 or 10-2 --
13  A.  Correct.
14  Q.  -- does that sound correct?  Okay.
15      And Counsel had asked you what led the
16  group -- or words to that effect -- what led the
17  group to conclude that the termination was
18  appropriate at that time.
19      Do you recall him asking you about that?
20  A.  Yes.
21  Q.  And I believe your response was that,
22  based on her receipt -- based on the company's
23  receipt of her comments, you had considered her
24  markup of the severance agreement in the

Page 179

1   conversation of whether termination was appropriate?
2   A.  Yes.
3   Q.  Is it also fair to say that, during that
4   conversation, the group also considered her
5   inability or unwillingness up to that point to give
6   any assurances that she could perform the duties of
7   her job and positively represent the company?
8   A.  Yes.
9       MS. OLSON:  No further questions.
10      MR. SEDAEI:  Okay, nothing from me.
11      MS. OLSON:  We'll reserve.
12      MR. SEDAEI:  Electronic, please.
13      MS. OLSON:  We'll order a copy;
14  electronic.
15      MS. CRONIN:  Electronic, please.
16          (WITNESS EXCUSED.)
17
18
19
20
21
22
23
24

Page 180

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

     ROWENA DZIUBLA,                    )
 4                                      )
                     Plaintiff,         )
 5                                      )
         vs.                            )  Case No.
 6                                      )  1:18-cv-4542
     J.C. ANDERSON, INC., and           )
 7   PETER ERLING JACOBSEN,             )
                                        )
 8                   Defendants.        )

 9

10              I, MICHAEL J. POWER, JR., being first duly

11   sworn, on oath say that I am the deponent in the

12   aforesaid deposition taken on June 26, 2019; that I

13   have read the foregoing transcript of my deposition,

14   consisting of pages 1 through 180 inclusive, and

15   affix my signature to same.

16                   _____  No corrections have been made.

17                   _____  Corrections have been made and
                             are included with the following
18                           errata sheet(s).

19                           _____

20                           MICHAEL J. POWER, JR.

21
     SUBSCRIBED AND SWORN TO
22   before me this _____
     day of _____ 20  .
23   _____

24        Notary Public
```



1    STATE OF ILLINOIS         )
                                ) SS.
2    COUNTY OF COOK            )

3

4            I, GABRIELLE PUDLO, Certified Shorthand

5    Reporter No. 084-004173, and Notary Public within

6    and for the County of Cook and State of Illinois, do

7    hereby certify that on June 26, 2019, at 9:30 a.m.,

8    20 South Clark Street, Suite 500, in the City of

9    Chicago, Illinois, the deponent, MICHAEL J. POWER,

10   JR., personally appeared before me.

11           I further certify that MICHAEL J. POWER,

12   JR. Was by me duly sworn to testify the truth and

13   that the foregoing is a true record of the testimony

14   given by MICHAEL J. POWER, JR.

15           I further certify that the deposition

16   terminated at 2:55 p.m.

17           I further certify that there were present

18   at the taking of the said deposition the persons and

19   parties as indicated on the appearance page made a

20   part of this deposition transcript.

21           I further certify that the signature of

22   the witness to the foregoing deposition was reserved

23   by agreement of counsel; and that I am not counsel

24   for nor in any way related to any of the parties to

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 51 of 73 PageID #:567
Michael Power  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1     this suit, nor am I in any way interested in the

2     outcome thereof.

3            IN TESTIMONY WHEREOF, I have hereunto set

4     my hand and affixed my notarial seal on this

5     12th day of July, 2019.

6

       /s/ Gabrielle Pudlo
7                        _____
                         GABRIELLE PUDLO, CSR
8                        Notary Public
                         License No. 084-004173
9                        Expiration Date:  May 31, 2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 52 of 73 PageID #:568
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

## WORD INDEX

**< >**
 183:5

**< $ >**
**$80,000**  154:14

**< 0 >**
**001053**  63:9
**084-004173**  182:5
 183:8

**< 1 >**
**1**  2:13  3:7  36:13,
 14, 18, 22  52:5  79:1
 83:16  84:9  181:14
**1:00**  65:12
**1:18-cv-4542**  1:6
 181:6
**1:27**  135:5
**1:39**  135:5
**10**  3:16  67:8, 11
 100:20  104:19, 20,
 23
**10,000**  61:19
**10:00**  88:18  116:13
**10:23**  127:15
 128:12
**10:37**  44:1
**10:46**  44:1
**100**  67:2, 3
**10-2**  179:12
**104**  3:16
**106**  3:17
**1061**  54:5
**1062**  54:4, 6  177:2
**1094**  42:8, 18
**11**  3:17  106:21, 22
 107:3
**11:00**  88:14, 14
**112**  3:18
**114**  3:19
**12**  3:18  112:7, 8, 11
**12:00**  88:14
**12:00o'clock**  88:14
**12:14**  95:12
**12:25**  95:12
**12:30-ish**  80:23
**120**  2:18

**124**  3:20
**125**  3:21
**12th**  183:5
**13**  3:19  114:21, 22
 115:3
**14**  3:20  9:7  64:2
 124:5, 6, 10
**140**  3:22
**144**  3:23
**147**  4:1
**148**  4:2
**15**  3:21  52:4  67:8,
 11  100:20  125:10,
 11, 15
**152**  4:3
**16**  3:22  52:4, 8, 9,
 13, 13  140:2, 3, 7
**16.0**  52:10
**160**  4:4
**162**  4:5
**166**  4:6
**168**  4:7
**169**  4:8
**17**  3:23  144:15, 18
**170**  4:9
**172**  4:10
**174**  4:11
**176**  3:4
**18**  4:1  72:19
 138:6  147:3, 4, 7
**180**  181:14
**1879**  15:10
**18th**  75:2  168:13
**19**  4:2  79:14
 107:12  142:6
 148:20, 21, 24
**1924**  149:10
**1931**  175:6
**1999**  15:4
**19th**  75:2  76:1
 79:14  80:5  85:17
 99:21  100:14  118:3
**1st**  55:14  56:3

**< 2 >**
**2**  3:8  39:2, 3, 7
 43:19  54:3  62:23
 146:7  159:12
 176:24
**2:00**  134:17, 21, 23

**2:39**  174:2
**2:46**  174:2
**2:55**  182:16
**20**  1:17  2:3  4:3
 120:13, 18  122:10
 152:2, 3, 7  156:14
 181:22  182:8
**2003**  15:3
**2010**  14:10
**2011**  9:7
**2012**  9:18  59:9
**2013**  10:13  59:13,
 14  94:17
**2016**  9:12  22:19
 122:10
**2017**  28:4, 4  34:5
 52:1, 14, 22  53:13,
 17  60:23  72:19
 79:14  80:5  107:12
 120:11, 13, 18
 121:12  122:1
 123:8  126:16
 142:6, 6  161:7
 176:5
**2018**  24:14  36:1
 121:12  171:4
**2019**  1:19  181:12
 182:7  183:5
**2021**  183:9
**20th**  86:8  87:17
 88:11, 12, 17  115:9
 119:3, 8, 15  120:9,
 10  121:24  123:4
 132:10, 11  175:1
 176:1, 2
**21**  4:4  147:17, 23
 160:20, 23
**22**  4:5  162:4, 5, 8
**222**  2:8
**23**  4:6  92:9
 166:15, 16, 20
**24**  4:7  167:23
 168:1, 4
**25**  4:8  128:1
 169:4, 5, 9
**2500**  2:13
**25th**  115:6, 22, 24
 117:13, 22  124:16,
 19  125:1, 2, 5, 8
 142:8, 16, 22, 23

**26**  1:19  4:9  36:21
 53:13, 17  120:11
 121:24  123:8
 126:15  170:13, 14,
 18  176:5  181:12
 182:7
**26th**  116:9  118:12
 119:16, 23  120:10,
 10  126:24  127:8, 14
 128:21  136:24
 142:12  143:12
 153:16, 16  175:2
 176:2, 3
**27**  4:10  26:3
 91:17, 18  92:5
 142:6  172:11, 12, 16
**27th**  137:13  139:20,
 21  142:20  145:20
**28**  4:11  174:17, 21
**28th**  145:22, 24
**29th**  152:21  153:16
 155:9
**2nd**  55:14  152:1,
 21, 22  153:17  155:9

**< 3 >**
**3**  3:9  51:10, 11, 21
 53:12  161:7
**3:05**  84:23
**31**  183:9
**312**  2:4, 9, 14, 19
**31st**  2:18
**332-6733**  2:4
**36**  3:7
**39**  3:8
**3rd**  55:14  162:19,
 22  166:23

**< 4 >**
**4**  3:10  69:21, 22
 141:4, 5
**4:28**  124:16
**40**  26:4  92:16, 19
 147:17

**< 5 >**
**5**  3:3, 11  43:21
 78:18, 19, 23  134:18,
 22  141:5, 7
**5:00**  65:13

Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 53 of 73 PageID #:569
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**500** 1:*18* 2:*3* 182:*8*
**50s** 92:*17*
**51** 3:*9*
**578-7458** 2:*14*

**< 6 >**
**6** 3:*12* 42:*20* 83:*5*,
*6*, *9* 146:*6*
**6:00** 7:*5*
**6:51** 107:*12*
**60601** 2:*8*
**60602** 2:*19*
**60603** 2:*3*
**60606** 2:*14*
**609-7569** 2:*9*
**6-30-1970** 66:*6*
**69** 3:*10*

**< 7 >**
**7** 3:*13* 84:*2, 3, 7*
141:*3, 3* 147:*16, 22*
171:*4*
**7:35** 72:*22*
**70** 26:*4* 92:*15, 16,*
20
**78** 3:*11*

**< 8 >**
**8** 3:*14* 86:*9, 10, 14*
**8:34** 72:*19*
**80** 67:*2, 3*
**80-some** 93:*9*
**80-something** 93:*5*
**83** 3:*12*
**84** 3:*13*
**86** 3:*14*
**899-9090** 2:*19*

**< 9 >**
**9** 3:*15* 95:*17, 21*
127:*20*
**9:00** 116:*12* 127:*18*
**9:22** 161:*7*
**9:30** 1:*19* 182:*7*
**9-20** 178:*3*
**9-29** 179:*12*
**95** 3:*15*

**< A >**
**a.m** 1:*19* 7:*5* 44:*1,*
*1* 88:*14, 18* 116:*13*

127:*10, 18* 128:*12*
161:*7* 182:*7*
**Abby** 68:*17* 99:*2*
100:*10, 24* 114:*15*
**ability** 7:*7, 12*
135:*23* 164:*24*
**able** 31:*14* 32:*22*
34:*10* 126:*9*
128:*20* 135:*16*
136:*1* 143:*9* 153:*7*
**above-entitled** 1:*12*
**absent** 55:*3* 56:*1*
**absolutely** 95:*10*
**acceptable** 139:*5*
**access** 85:*24* 86:*6,*
*20, 23* 87:*9, 11, 15,*
*22* 88:*2, 4, 5, 7* 89:*5*
90:*13* 123:*12, 16, 21*
125:*21* 126:*8*
**accommodate** 129:*9*
**accommodations**
62:*1*
**accord** 24:*8* 170:*11*
**account** 86:*24*
89:*10* 90:*2, 16, 22,*
*23* 96:*3*
**Accountancy** 8:*13*
**Accountant** 13:*6*
14:*1, 21*
**Accountant's** 13:*9*
**accounting** 11:*19*
12:*10* 26:*14* 126:*4*
**accurate** 10:*9* 11:*2,*
*4* 15:*13* 19:*17*
25:*17* 54:*14* 56:*4*
60:*4* 72:*15* 74:*19*
83:*19* 97:*16*
105:*15* 107:*5, 8, 9*
119:*13* 121:*22*
124:*23* 139:*2, 6*
140:*21* 153:*11*
162:*18* 168:*9, 12, 19*
**accurately** 108:*24*
109:*1* 168:*18*
**Achilles** 30:*15* 34:*1*
**acquire** 21:*6*
**act** 163:*16*
**actions** 74:*9* 103:*23*
**activities** 64:*21*
**actual** 40:*10* 41:*2*
48:*4*

**Adam** 33:*5* 99:*1*
100:*10* 101:*1*
113:*18* 114:*2*
**add** 26:*18, 21*
**added** 12:*2* 176:*3*
**adding** 171:*12*
**addition** 38:*3*
**additional** 10:*4, 6*
48:*16, 24* 49:*1, 3*
55:*11* 138:*10* 148:*6*
**address** 125:*20*
**addressed** 81:*3*
**addresses** 48:*8*
**administrative** 60:*17*
**admit** 114:*4*
**advice** 103:*19*
**affairs** 91:*5*
**affix** 181:*15*
**affixed** 183:*4*
**aforesaid** 181:*12*
**afraid** 94:*1*
**African-American**
156:*17*
**afternoon** 28:*24*
84:*21* 178:*3*
**age** 8:*23*
**ago** 17:*15* 30:*12*
49:*5* 64:*8*
**agree** 126:*7, 12*
153:*7* 154:*5*
**agreed** 96:*17*
145:*14*
**agreement** 41:*17, 20*
51:*8* 130:*17, 22, 23*
135:*12* 136:*7, 12, 21*
137:*10, 16, 20* 138:*2,*
*14* 139:*5, 9* 144:*22*
145:*8, 10* 146:*3, 13,*
*21* 147:*23* 148:*7*
149:*13* 150:*10, 11,*
*14, 16, 20* 151:*9, 10,*
*16, 16* 154:*12* 166:*7*
179:*9, 24* 182:*23*
**ahead** 16:*5* 46:*2*
53:*10* 142:*16*
**airfare** 61:*24*
**Airlines** 16:*7, 9, 10*
**alcohol** 6:*24*
**allegations** 69:*5, 11*
70:*5* 73:*12* 74:*3*
78:*16* 85:*9, 21*

96:*8* 101:*18* 121:*8*
141:*9, 14*
**alleged** 17:*21* 18:*2*
69:*8* 73:*6* 78:*9*
84:*22* 89:*9* 94:*10*
96:*21* 99:*16*
112:*24* 113:*21*
116:*1* 120:*15*
143:*24*
**allegedly** 121:*7*
**all-encompassing**
99:*13*
**all-inclusive** 99:*13*
**allowed** 42:*11* 46:*6*
129:*2* 130:*6* 136:*3*
**alternative** 177:*17*
**alternatively** 155:*4*
**amount** 46:*24*
67:*20* 154:*4* 155:*5*
**ANDERSON** 1:*6*
2:*11* 9:*5, 6* 59:*4*
62:*12* 66:*16* 98:*10*
113:*20* 152:*10*
160:*4* 165:*20* 181:*6*
**Anderson's** 39:*10*
**Andrew** 32:*3, 4*
33:*5, 20* 34:*1*
**Andy** 13:*10* 158:*12*
166:*23*
**Angelovich** 33:*4, 19*
34:*23* 49:*20, 23, 24*
50:*1*
**A-n-g-e-l-o-v-i-c-h**
33:*4*
**angry** 144:*11, 13*
154:*15* 155:*6*
**announcement**
82:*13, 17*
**answer** 6:*9, 21* 7:*7*
16:*5* 19:*22* 20:*23*
33:*9* 53:*10, 19*
61:*9* 99:*24* 101:*9*
102:*12* 110:*15*
123:*2* 126:*6*
129:*12* 138:*23*
141:*2, 4* 146:*6*
148:*16* 171:*7*
**answered** 6:*6, 16*
58:*18* 81:*21* 136:*9*
139:*11* 143:*21*



Michael Power    6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 54 of 73 PageID #:570
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

148:*14*

**answering** 6:*6, 10*

**answers** 6:*11* 7:*13*
26:*18* 32:*11*
140:*12, 19, 21*

**anybody** 7:*18*
13:*14* 22:*9* 27:*6*
28:*19* 67:*16* 74:*20*
75:*9* 82:*14* 94:*24*
104:*13* 117:2
129:*4* 146:*23*
151:*6, 14* 157:*4*
167:*20*

**anymore** 151:*17*

**anyway** 85:*22*

**appearance** 182:*19*

**appeared** 154:*15*
182:*10*

**appears** 83:*19*
161:*9, 18*

**applied** 55:*16*

**apply** 54:*9*

**appointment** 107:*24*

**appreciate** 132:*24*

**appropriate** 163:*16*
179:*18* 180:*1*

**approval** 43:*16*
45:*3, 5, 6* 47:*9, 16*

**Approximate** 15:*1*
30:*16*

**Approximately** 9:*11*
18:*15* 30:*23* 66:*24*
67:*2* 72:*6* 100:*19,
20* 125:*23* 126:*1*
138:*5*

**area** 64:*17*

**arms** 132:*18*

**Armstrong** 169:*13,
18*

**arose** 56:*8*

**arrival** 39:*17*

**arriving** 65:*4*

**aside** 38:*7*

**asked** 22:*22* 26:*19*
29:*3, 5* 47:*13* 51:*5*
57:*13* 62:*14, 18*
63:*5, 19* 67:*21*
96:*11* 103:*14, 21, 24*
112:*6* 118:*14*
128:*22* 138:*3*
141:*1* 143:*11*

148:*14* 154:*6, 10*
167:*9, 17* 178:*10*
179:*15*

**asking** 6:*5* 48:*2, 3*
66:*13* 81:*12* 84:*17*
86:*17, 22* 103:*1, 2*
107:*22* 108:*1*
129:*16* 133:*19*
149:*23* 150:*6*
154:*4* 155:*5*
159:*23* 167:*19, 20*
170:*8* 177:*7* 179:*19*

**aspect** 23:*5*

**assigned** 29:*23*

**Assistant** 34:*13, 15*
48:*22* 49:*21* 93:*24*
113:*23*

**assistants** 34:*17*

**assisted** 12:*10*

**assume** 6:*21*

**Assuming** 33:*1*
125:*4, 6, 9*

**assurance** 143:*7*

**assurances** 180:*6*

**attached** 19:*2*

**attachment** 112:*18*
149:*11*

**attempting** 6:*3*

**attend** 21:*22* 61:*13*
62:*1*

**attendance** 11:*15*
54:*5, 14* 59:*16*
62:*8* 66:*15* 67:*17*
71:*9* 177:*4*

**attended** 66:*24*

**attending** 62:*24*
63:*17* 67:*18*

**attends** 21:*15* 34:*14*

**attention** 147:*10*
157:*6* 176:*23*
177:*11* 179:*5*

**attorney** 5:*10*
105:*11* 106:*1*
146:*15*

**attorneys** 44:*6*

**at-will** 38:*12*

**August** 14:*10*

**author** 176:*17*

**autographed** 103:*18*

**available** 107:*23*
108:*1*

**average** 92:*17, 21,
24* 93:*3, 5, 6*

**award** 17:*7*

**aware** 17:*2, 9, 17*
66:*2* 73:*14* 122:*4,
9* 151:*19* 156:*23*
157:*2, 24, 24* 167:*15*
171:*8*

**a-z-z-o** 93:*18*

**< B >**

**Bachelor's** 8:*12*

**back** 44:*5* 54:*2, 10,
21* 56:*24* 61:*16, 20*
63:*8* 81:*6* 87:*13*
94:*5* 95:*15* 105:*9*
119:*2* 120:*7*
122:*19* 125:*7*
126:*13* 128:*22*
131:*21* 135:*9, 15*
136:*4, 8, 8, 17, 22, 23*
137:*3, 7, 12, 15*
138:*2, 4, 17, 21*
139:*9, 13* 142:*21*
143:*19* 149:*18*
150:*23* 151:*17*
153:*5, 9, 12, 23*
154:*17* 155:*12, 14*
159:*14* 168:*8*
175:*7* 178:*6*

**back-and-forth**
145:*7* 150:*14*

**bad** 90:*12*

**badly** 94:*8, 13*

**ballpark** 67:*3* 92:*5*
125:*24* 128:*2*

**based** 16:*2* 21:*7*
76:*12* 83:*15* 87:*10*
101:*7* 112:*5*
118:*16* 123:*13*
127:*19* 131:*22*
132:*5* 133:*20*
138:*4, 7* 153:*22*
155:*13* 179:*22, 22*

**basic** 5:*23*

**basically** 107:*7*
113:*15* 141:*12*

**basis** 91:*5* 155:*13*

**Bates** 51:*14* 112:*17*
149:*9* 175:*18*

**Bean** 19:*5* 60:*1, 2,
7, 16*

**B-e-a-n** 19:*5*

**Bears** 16:*7, 8, 18*

**beginning** 45:*17*

**behalf** 2:*4, 9, 16, 21*
5:*3*

**behavior** 103:*23*
114:*3*

**believe** 18:*22* 24:*15,
18* 27:*12, 13, 22*
28:*11, 18* 30:*23*
31:*16* 34:*5, 24*
36:*19* 39:*21* 41:*3,
19* 43:*17* 54:*3*
58:*9* 59:*1, 12, 12*
61:*3, 19* 65:*12*
71:*5* 76:*21* 77:*20*
79:*9* 82:*21* 85:*6*
86:*7* 92:*7, 12*
103:*5* 107:*15*
109:*15* 111:*21*
115:*8, 14* 117:*12, 23*
119:*6, 24* 120:*5, 6*
121:*2* 123:*2*
127:*18* 128:*2, 17*
138:*3* 139:*20*
140:*9* 141:*17*
147:*3* 150:*4* 152:*1,
21* 155:*17* 156:*5*
158:*13* 159:*24*
162:*12* 163:*11*
165:*16* 176:*6*
178:*6* 179:*11, 21*

**believed** 95:*5* 99:*15*
134:*9*

**Bellin** 33:*5*

**benefits** 23:*11* 83:*2*

**Bensenville** 64:*24*

**bereavement** 46:*5,
10, 20*

**best** 137:*8* 138:*13*
153:*10*

**bid** 17:*4*

**bids** 17:*4* 21:*6*

**bigger** 29:*20*

**Bill** 14:*17*

**birth** 66:*5*

**birthday** 44:*16*
52:*5, 16*

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 55 of 73 PageID #:571
Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

bit 29:*18* 56:*23*

black 157:*21*

board 40:*7*

book 8:*1, 2* 10:*7*
41:*1, 1, 14* 82:*17*

booklet 41:*11, 12*

bottom 52:*2* 54:*5*
70:*7* 79:*1* 105:*2*
107:*10* 124:*13*
166:*22* 169:*11*
175:*6*

bought 15:*19, 22*

Boulukos 50:*3, 10*
53:*21* 75:*21* 76:*12*
77:*3, 7, 10, 12* 86:*23*
91:*11* 113:*14*
162:*13* 172:*19*
173:*3*

B-o-u-l-u-k-o-s 50:*3*

Boulukos's 50:*4*

Bowen 23:*23* 25:*2*
35:*5*

Box 72:*14*

Boyle 106:*16*
112:*14* 118:*3, 8*
145:*17*

break 6:*14, 15* 95:*9*
134:*14, 16* 135:*12*

brief 174:*7*

briefly 19:*8* 57:*5,
17* 66:*10* 68:*6*
178:*1*

bring 27:*6* 43:*15*
147:*24* 148:*3*

broadly 37:*13*

brother 20:*3*

brought 157:*4*

buck 19:*21*

buffet-style 65:*2*

building 22:*12*

bullet 42:*22* 55:*13*
112:*22* 114:*1*

bulleted 177:*8, 23*

bullets 112:*21, 21*

Burfeind 91:*11*

B-u-r-f-e-i-n-d 91:*12*

Business 17:*10*
30:*1* 69:*3*

busy 26:*5* 92:*19*

buy 68:*2*

< C >

cab 31:*13*

cabs 31:*8*

cafe 115:*9*

calculated 44:*18*

California 8:*23*

call 44:*13* 47:*9, 12*
65:*8* 75:*6, 10* 76:*6*
102:*14* 131:*3, 10*
132:*21*

called 5:*3* 10:*19*
75:*5* 76:*16* 106:*5*
113:*14* 131:*14*
138:*3* 157:*18*

calling 88:*23*

calls 48:*1* 74:*11*
97:*15* 129:*19*
146:*15*

capacity 126:*9*

care 108:*22* 109:*10,
16, 21* 111:*8*

carpenter 35:*24*

carpenters 26:*10*

Case 1:*5* 5:*11*
17:*16* 37:*19* 43:*19*
50:*15* 69:*5* 74:*3*
94:*1* 133:*10* 181:*5*

casual 29:*4* 65:*2*

catch 45:*17* 122:*15*

categories 43:*2*
66:*14*

Caucasian 156:*1, 6,
9, 15*

cause 1:*12*

caused 101:*5* 148:*5*

cc:'d 84:*11* 162:*13*

celebrity 65:*18, 19*

cell 160:*5*

centered 153:*4*

CEO 20:*5, 7*

certain 12:*2* 46:*24*
60:*6* 91:*4* 119:*7*
146:*4* 150:*13*

certainly 62:*14*
63:*2* 97:*8*

Certified 182:*4*

certify 182:*7, 11, 15,
17, 21*

CFMA 11:*9*

CFO 9:*9, 10, 15*
11:*18* 12:*1, 10, 12,
13, 22* 13:*5* 14:*18*
26:*13* 58:*10* 59:*21*

Chad 68:*18, 19, 20*
99:*2* 100:*10, 24*
101:*12* 114:*18*

chain 83:*12, 12*
107:*5, 7* 149:*3*
168:*5*

Chairman 19:*10, 12*
20:*7*

chance 102:*21*
103:*7* 113:*8* 116:*5*
140:*20*

change 12:*4, 5*
59:*22* 86:*18*
102:*12* 154:*7, 14*

changed 39:*22*
40:*2, 7* 121:*1*
142:*22*

changes 40:*5, 8, 10*

changing 86:*19*
122:*17*

charge 62:*6*

chart 53:*2, 15*

chat 173:*19*

Cheaters 157:*18*

checked 70:*16*

Chicago 1:*18* 2:*3, 8,
14, 19* 16:*7, 8* 182:*9*

Chief 50:*5*

chipping 103:*20*

CHTD 2:*12*

circumstances
177:*15*

City 1:*18* 182:*8*

Civil 1:*15*

claim 79:*22* 101:*3*

clarification 37:*14*
78:*10* 130:*9*
133:*11, 23*

clarified 134:*1*

clarify 37:*6* 73:*10*
103:*2* 132:*6* 133:*1*
134:*2* 135:*22*
136:*22* 142:*23*

Clark 1:*17* 2:*3*
182:*8*

classified 65:*15*

classify 57:*24*

clause 42:*3*

cleared 89:*11*

client 22:*11, 15*
85:*24* 88:*3* 146:*15*
173:*20*

clients 16:*1, 16, 24*
157:*24* 158:*4*

CLIFFORD 2:*16*

Clint 68:*24*

close 107:*23* 135:*1*

closed 131:*15*

closer 92:*17*

Club 64:*24*

Code 1:*15*

collaborative 30:*2*

collectively 134:*12*
135:*14*

come 16:*13* 26:*16*
66:*23* 77:*13* 82:*20*
83:*2* 99:*14* 116:*15,
18* 121:*6* 128:*22*
135:*15* 136:*3, 8, 17,
22* 137:*7, 12, 15*
138:*17* 139:*9, 13*
150:*23* 151:*17*
155:*12*

comes 26:*20* 38:*5*
131:*21*

comfortably 128:*20*

coming 87:*13*
94:*24* 136:*23*
143:*19* 153:*9, 12*
154:*17* 165:*20*
167:*10, 18*

comment 79:*21*
101:*4* 109:*13*
114:*5* 118:*24*
122:*11* 143:*13*
172:*7*

comments 58:*7*
87:*10, 14, 21* 113:*24*
119:*7, 17, 22* 120:*2,
7, 8, 13* 122:*2, 6, 13*
123:*6, 7, 13* 131:*22*
132:*5* 136:*10*
143:*15* 153:*5, 23, 24*
155:*13* 156:*24*
157:*2, 4* 164:*11, 23*
179:*23*

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 56 of 73 PageID #:572
Michael Power     6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**commercial** 15:*8*
**Committee** 91:*4*
**common** 112:*5*
**communicate** 125:*20*
**communicating** 62:*7* 166:*5*
**communications** 115:*11, 15* 167:*10, 18* 170:*6*
**companies** 43:*2, 8, 9, 12* 158:*24*
**company** 10:*2, 8, 17* 11:*20* 12:*14* 13:*19* 14:*4, 9, 15* 15:*12, 15, 17, 19, 22* 18:*6, 14* 20:*6, 17, 20* 23:*9* 35:*23* 48:*20* 87:*20* 88:*23, 24* 89:*9* 90:*1, 5, 7* 91:*6* 92:*8* 120:*22, 24* 123:*4* 129:*6* 131:*23* 132:*4, 14, 16* 138:*4* 160:*1, 4, 6, 11* 161:*23* 171:*18, 19, 20, 21* 177:*13* 178:*16, 17* 180:*7*
**company's** 54:*13* 179:*22*
**compensated** 61:*13*
**compensation** 12:*5* 61:*15*
**competes** 16:*23*
**competitors** 41:*18*
**complained** 31:*21* 36:*9* 50:*19*
**complaint** 71:*8, 11, 20* 72:*1* 76:*5* 80:*12*
**complaints** 87:*20* 89:*24* 123:*4* 178:*17*
**complete** 37:*4, 12, 20*
**completely** 46:*7*
**computer** 126:*3* 160:*5*
**concerned** 69:*13* 95:*4*
**concerns** 27:*20* 88:*24* 178:*17*
**conclude** 153:*19* 164:*19* 179:*17*

**concluded** 117:*8, 11, 15* 142:*10*
**conclusion** 128:*3* 148:*1, 4*
**concretely** 135:*24*
**condition** 7:*11* 129:*16, 21* 130:*4, 11* 143:*18*
**conditions** 154:*8*
**conduct** 96:*11, 20* 177:*14*
**conducted** 73:*18*
**conference** 29:*2*
**confidentiality** 166:*7, 9*
**confirm** 63:*15* 74:*16* 87:*5* 115:*24* 176:*16*
**conflict** 42:*3, 10, 14* 43:*3*
**connection** 68:*23* 89:*24* 90:*3, 4*
**consider** 106:*11* 147:*22*
**considered** 157:*5* 179:*23* 180:*4*
**consisting** 181:*14*
**construction** 15:*8*
**consultant** 86:*17*
**consulting** 106:*1*
**consumed** 6:*24*
**contact** 17:*11* 106:*8* 113:*12* 165:*19, 22, 24, 24*
**contacted** 77:*16* 113:*11*
**contacts** 90:*17* 167:*8*
**Cont'd** 3:*24*
**contents** 75:*15*
**context** 122:*7*
**continue** 44:*9* 66:*12* 109:*10*
**continued** 90:*12*
**continues** 54:*6*
**continuing** 78:*13*
**contract** 38:*10* 166:*13*
**contractor** 15:*7*
**contribute** 67:*22*

170:*24*
**contribution** 67:*23*
**Controller** 9:*22* 12:*7, 9, 23* 13:*15* 14:*2, 19, 22, 24*
**conversation** 6:*1, 4* 27:*13, 17* 28:*1, 14, 17, 20* 29:*4, 10, 13* 57:*21* 58:*1* 71:*22* 77:*10, 11, 18* 79:*16, 18, 20, 24* 80:*4, 6, 13, 14, 16* 81:*24* 82:*3, 6, 9, 10* 83:*20* 88:*8, 10, 19, 21* 90:*15* 96:*18* 99:*21, 22* 103:*12* 105:*21, 22* 117:*22* 138:*12* 151:*5, 11, 19* 153:*12* 158:*3* 172:*10* 178:*2* 179:*6, 11* 180:*1, 4*
**conversations** 85:*1, 4, 16* 115:*18* 137:*24* 158:*16, 19*
**COO** 26:*13*
**Cook** 1:*14* 182:*2, 6*
**Coordinator** 93:*20*
**copied** 69:*19*
**copies** 144:*22*
**copy** 40:*16, 19* 56:*12* 62:*22* 63:*16* 75:*16* 144:*21* 145:*24* 159:*9, 16, 17* 180:*13*
**correct** 14:*22* 19:*20* 22:*7, 8* 25:*20* 27:*4* 33:*3* 35:*1, 11* 37:*24* 50:*17* 56:*14, 19* 62:*12* 63:*4, 17* 72:*19, 20, 23, 24* 73:*18* 74:*4* 78:*17* 79:*5, 10* 82:*10* 86:*21* 87:*7* 91:*20, 24* 92:*1* 93:*8* 95:*6* 96:*9* 97:*9* 102:*2, 23, 24* 105:*3, 4, 6, 7, 11* 106:*20* 109:*7* 113:*1, 2* 114:*11, 19, 20* 115:*7, 9, 20* 117:*14* 118:*6* 119:*4* 123:*22, 23*

124:*3, 18, 22* 125:*20* 127:*4* 129:*14* 130:*7* 131:*6* 132:*9* 135:*18* 141:*19* 143:*24* 145:*12* 147:*13* 150:*8, 17, 20, 21* 159:*7, 10* 165:*10* 166:*13, 14* 167:*4* 168:*22* 169:*13* 171:*5, 22* 173:*6* 175:*9, 10, 21* 176:*17* 177:*5, 9, 24* 178:*8, 12* 179:*13, 14*
**corrected** 110:*20*
**corrections** 181:*16, 17*
**correctly** 142:*7* 147:*19, 20* 149:*19* 161:*15* 177:*19* 178:*14*
**correspondence** 7:*24*
**cost** 21:*3*
**counsel** 7:*17* 78:*7* 106:*14, 15* 145:*16, 17* 146:*18* 176:*11* 177:*7* 178:*10* 179:*15* 182:*23, 23*
**count** 32:*9, 21* 52:*24*
**Country** 64:*24*
**County** 1:*14* 182:*2, 6*
**couple** 64:*13* 65:*5* 137:*23*
**course** 64:*23* 68:*8* 78:*13* 178:*11*
**courses** 64:*12, 16*
**COURT** 1:*1, 16* 6:*3* 24:*23* 181:*1*
**cousin** 108:*23* 109:*2, 3, 6, 11, 14, 16, 17, 21* 110:*1, 2, 13, 23* 111:*15* 112:*3*
**cousins** 64:*13* 108:*20* 111:*18*
**cover** 120:*12*
**covered** 120:*8* 161:*23*
**covers** 166:*9*
**coworker** 120:*19*



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 57 of 73 PageID #:573

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

coworkers 89:1
119:12 178:18
Crane 68:18, 19, 20,
24 99:2 101:1, 12
114:18
Crane's 68:23
creates 155:17
critical 119:7, 19
122:3, 14
CRONIN 2:12
61:6, 14 73:13
74:13 78:7, 12, 17
180:15
CROSS-EXAMINAT
ION 176:21
cry 144:9
CSR 1:13 183:7
curious 168:17, 23
169:1
current 17:18
156:3, 4
currently 9:2 32:8
35:1, 17 93:14
customer 17:6
cut 92:23
cutting 107:23
135:1
CX 3:1

< D >
dad 15:18, 19
daily 7:8 25:23
Dan 35:21, 22, 23
date 10:14 15:4
24:16 30:6, 16
34:6 66:5 117:16
162:21 183:9
dates 11:12 139:19
daughter 114:16, 17
day 23:1 40:20
45:14, 20 46:8
47:10, 22 48:14
52:16 55:11 56:2,
11, 16 57:6 60:12,
12 64:21, 22 65:7, 9
70:21 77:21 80:20
83:23 84:22, 24
85:7 87:11 100:11,
13 116:8, 11 117:12
126:21 127:17, 23
130:22, 24 131:1

137:13 138:1
159:19 163:18
178:21 179:3
181:22 183:5
days 44:11, 17 45:2,
11, 14 46:6, 9, 10, 11,
14, 15 47:1, 4, 7, 20,
21 48:13, 13 51:24
52:13, 14, 18, 22
53:1, 13, 17, 24 55:4,
5, 10, 10, 24 56:1
142:19 143:23
147:16, 17, 22, 23
172:15, 17
dealing 36:6
deals 48:5
death 46:4, 15, 18
December 59:9
decide 154:1
decided 96:13
108:8, 9 136:11
153:12 159:4
decision 87:3 88:1,
6 89:13 96:6
123:16 131:20
136:2 152:15, 19, 23
153:17 155:10
158:24
decisions 91:6
Defendant 2:9, 16,
21
Defendants 1:8
181:8
defense 170:24
171:1
defenses 36:24
defined 42:14
definitive 151:5
definitively 159:4
degree 8:11, 12
degrees 8:15
demanding 130:9
department 25:8
45:9
departs 166:6
departure 24:6
DePaul 8:13 16:6
depend 45:22
depending 26:4
93:6 177:13

deponent 181:11
182:9
deposed 5:15
deposition 1:11 3:6
5:22 6:1 7:16
78:14 181:12, 13
182:15, 18, 20, 22
describe 16:22
55:15 58:12 64:20,
22 71:10 72:8
86:16 144:2, 3
described 55:18
69:11 74:7
description 128:24
detailed 126:6
details 11:14 62:8
66:12 171:12
determined 135:15
151:7
Development 13:19
14:3, 7, 8, 14 17:10
69:3
differences 6:2
different 83:13
103:13 106:18
137:23 164:1
dinner 65:14
DIRECT 5:6 23:15
25:18 45:5, 9
49:19 179:5
direction 136:11
directly 17:11 27:1
50:16, 17 102:16, 21
103:7 113:10, 11, 13
Director 93:22
121:5
disability 118:16
127:1
disagreed 133:4, 5, 7
disappointed 88:23
discipline 54:12
55:16 177:17
disciplined 50:22
disclosed 110:22
159:9
disclosing 109:14
110:12
disclosures 36:21
discoverable 37:18
discrepancy 142:18

discriminating 17:22
discrimination 11:3
discuss 70:22 71:6
73:6 76:2, 4 83:22
87:17 91:5 105:17
116:4, 16 117:4
128:7, 18 132:22
178:20
discussed 38:18
70:20 71:7, 24
72:3 75:19, 23
79:22 81:17, 22
84:1 88:21, 22
89:4, 7 105:3
117:5, 17 118:10, 13,
15 122:1, 8 124:12
128:8, 19 130:23
131:2, 7 141:12, 13,
16 155:16 162:1
164:15, 16 173:16
178:11, 15, 16
discussing 55:8
62:23 79:3 81:23
99:17 135:11
150:5, 11
discussion 41:9
80:11 97:1 112:22
128:10 135:13
139:4 151:4 153:3,
4 155:8 171:24
172:2, 4, 21 173:5, 7,
10, 10, 13 178:20
179:1
discussions 137:19
145:10, 12 158:7, 11
dispute 74:6
distance 101:16, 17
distraught 162:16
163:1, 4, 9, 13, 17
164:7, 8, 10
DISTRICT 1:1, 1,
16, 16 181:1, 1
DIVISION 1:2, 17
181:2
document 36:18
39:7, 12, 15, 18, 24
40:5 51:21 52:17,
20 53:5 78:23
79:13 83:10 84:7
86:14 95:21
104:24 107:3



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 58 of 73 PageID #:574
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

112:*12*, *16* 115:*3*
124:*10* 140:*7*
144:*19* 145:*13*, *15*
147:*8* 149:*1*, *9*
152:*7* 161:*1* 162:*9*
166:*8*, *10*, *20* 170:*18*
174:*13*, *21* 176:*8*, *9*,
*10*
**documents** 7:*20*, *22*
23:*12* 51:*16*
**d'oeuvres** 65:*16*
**doing** 21:*11*, *11*
106:*11* 126:*2*
168:*17*, *24* 170:*10*
**dollar** 154:*4*
**donated** 61:*16*, *20*
**donation** 67:*18*
**door** 131:*15*
**downturn** 14:*6*
**drafted** 145:*15*, *19*,
*22* 146:*18* 152:*13*
**drafting** 81:*5*, *7*, *10*,
*10*, *16*, *20*
**draw** 147:*10* 177:*11*
**Drive** 2:*13*
**driving** 65:*6* 68:*11*
**drove** 66:*10*
**due** 14:*5*
**duly** 5:*4* 181:*10*
182:*12*
**Dunn** 33:*7* 35:*21*
**D-u-n-n** 35:*21*
**duties** 11:*17*, *22*, *24*
12:*2*, *8* 180:*6*
**DX** 3:*1*
**DZIUBLA** 1:*2*
2:*21* 5:*11* 7:*24*
20:*14* 22:*18*, *24*
23:*17* 25:*14*, *16*, *22*
28:*13* 33:*12*, *17*
35:*10* 38:*9* 40:*16*
41:*16*, *20* 42:*8*, *18*
52:*14* 53:*23* 54:*4*
63:*9* 68:*4* 69:*16*,
*18* 74:*7* 75:*20*
79:*3*, *8* 81:*16*
83:*13* 84:*10* 87:*5*
88:*16* 89:*21* 92:*3*
94:*6*, *7*, *19* 101:*5*
105:*6*, *10*, *17*, *24*
107:*11* 108:*3*

109:*20* 111:*7*
112:*2* 115:*5*, *8*, *22*
116:*24* 118:*5*, *12*
119:*3*, *17* 120:*16*
121:*7*, *16*, *19*, *21*
122:*2*, *6*, *11*, *13*
124:*16*, *24* 126:*15*,
*20* 127:*14*, *23*
130:*17* 131:*20*
132:*21* 135:*15*
136:*3*, *6*, *13* 139:*3*
142:*8* 143:*6*, *7*, *9*, *23*
144:*23* 145:*7*, *11*, *21*,
*24* 146:*4* 148:*6*, *9*
150:*6*, *15*, *23* 151:*6*,
*12*, *14*, *20* 152:*16*
153:*18*, *21* 155:*11*
159:*16* 161:*4*, *8*
166:*12* 167:*18*
168:*11*, *20* 169:*12*
170:*6* 176:*8* 178:*4*
181:*2*
**Dziubla's** 5:*21*
23:*15* 26:*23* 69:*5*
70:*4* 72:*22* 73:*2*,
*12* 74:*3* 75:*17*
79:*21* 80:*9*, *12*
83:*17*, *22* 85:*9*, *21*,
*24* 88:*2* 89:*5* 96:*8*
101:*18* 109:*15*
123:*3*, *6* 124:*13*
149:*14* 153:*5*
173:*16* 179:*8*

**< E >**
**earlier** 55:*8* 87:*11*
150:*5* 177:*7* 178:*21*
**early** 28:*4*, *4*
121:*12* 176:*12*
178:*3*
**EASTERN** 1:*2*, *17*
24:*17* 181:*2*
**eat** 65:*4* 163:*9*
**Ed** 23:22 35:*5*
**edits** 149:*14*, *22*
150:*3*
**education** 8:*9*, *10*
**EDWARD** 2:*13*
**EEOC** 79:22 80:*12*
**effect** 85:*20* 179:*16*

**effective** 102:*16*
**effectively** 86:*20*
**effort** 30:*2*
**EHRLICH** 2:*2*
**eight** 18:*12*
**either** 20:*13* 116:*12*
126:*10* 155:*3*, *9*
178:*2* 179:*12*
**elbow** 64:*6*
**elect** 118:*18*
**Electronic** 180:*12*,
*14*, *15*
**Eleven** 13:*21* 32:*16*
**eliminated** 14:*5*
**Elmwood** 8:*18*
**email** 7:*23* 47:*12*
69:*18* 70:*5*, *9*, *12*
72:*12*, *18*, *22* 73:*1*, *2*,
*5*, *24* 74:24 75:*15*,
*17* 76:23 77:*13*
79:*2*, *3*, *8*, *13*, *15*, *17*,
*19* 80:*10*, *15*, *21*
83:*12*, *16*, *17* 84:*9*,
*21* 85:*5*, *8*, *11*, *13*, *17*
86:23 88:*2*, *4* 89:*5*,
*10* 90:*2*, *13*, *16*, *22*,
*22* 95:24 96:*7*
99:*17* 105:*2*, *3*, *5*, *5*,
*6*, *8*, *14*, *16* 106:*5*
107:*5*, *7*, *10*, *10*, *14*
108:*14* 109:*19*
110:*9*, *10* 111:*16*
112:*14*, *18* 115:*5*, *12*,
*21* 116:*14*, *17* 118:*2*,
*8* 123:22 124:*12*, *13*,
*15*, *18*, *21* 125:*6*, *20*,
*21* 126:*13*, *14*, *17*, *18*,
*19* 127:*7*, *12*, *15*, *19*
128:*3*, *6*, *7*, *8* 129:*12*,
*22* 130:*2*, *16* 132:23
133:*11*, *13*, *14*, *15*, *20*,
*22* 134:*3*, *7*, *9*
137:*14* 138:*11*, *11*
143:*19* 145:23
147:*10*, *12* 149:*3*, *5*,
*6*, *11*, *16* 161:*3*, *6*, *10*,
*17*, *21*, *22* 162:*2*, *11*,
*15*, *21*, *24* 163:*7*
164:*14* 166:23
167:*6* 168:*14*
169:*9*, *12* 171:*2*

**effective** 102:*16*
172:*5*, *15*, *18*, *18*, *22*
173:*15*
**emailed** 76:*5*
**emails** 70:*16* 83:*13*
86:*1* 90:*17* 107:*6*
115:*16* 120:*14*
123:*12*, *17* 125:*17*
126:*8* 155:*2* 168:*5*
**Emily** 169:*13*, *17*
**employed** 9:*2*
13:*17* 25:*14*, *22*
35:*10* 39:*19* 41:22
42:*2*, *12* 49:*10*, *15*
92:*3* 94:*7*, *12*
**employee** 20:*17*
38:*12* 40:24 42:*11*
43:*14* 44:*18* 45:*1*,
*13*, *18* 46:*11*, *21*
47:*19* 48:*13* 54:*12*
55:*2*, *9*, *23* 59:*4*
69:*3* 87:*6* 97:*3*, *12*
98:*7*, *9*, *10* 99:*3*
113:*20* 123:*9*
132:*13* 153:*9*
154:*13*, *17* 166:*6*
176:24
**employees** 17:*18*
21:*20* 26:*1* 42:*1*
44:*10*, *19* 47:*4*
53:*1* 62:*4*, *16*
66:*16* 67:*4*, *5*, *8*, *11*,
*21*, *23* 82:*13*, *21*
93:*4*, *9* 94:*2*, *20*
155:*18*, *24* 156:*3*, *4*,
*5*, *9*, *11*, *23* 157:*20*
166:*4* 167:*17*, *21*
169:*20*
**employee's** 56:*13*
**employment** 38:*9*
41:*21* 42:*1* 43:*15*,
*16* 90:*21* 152:*12*
153:*10* 154:*8*
**encountered** 48:*6*
**encouraged** 41:*14*
**ended** 165:*3*
**engage** 158:*21*
159:*5*, *6*
**engaged** 64:*21*
145:*6* 150:*13*
**engaging** 139:*4*

Michael Power    6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 59 of 73 PageID #:575
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**ensure** 140:*21*
**Enter** 44:*4*
**entire** 18:*8, 21*
 25:*13, 16* 27:*4*
 30:*8* 33:*17* 91:*6*
 139:*8* 161:*17*
**entirety** 101:*11*
**entitled** 46:*11*
 52:*14* 63:*10*
**envelope** 161:*12*
**environment** 119:*10*
 155:*17*
**Erlich** 33:*4, 19*
 34:*16, 22*
**ERLING** 1:*7* 2:*16,*
 *21* 181:*7*
**errata** 181:*18*
**established** 15:*9, 16,*
 *18*
**estate** 14:*6, 7*
**estimate** 20:*24*
 21:*1, 3, 14* 28:*3*
 29:*24* 30:*4* 67:*8*
 80:*23* 91:*22, 23, 24*
 92:*2* 127:*24* 156:*14*
**estimated** 29:*22*
**estimates** 27:*15*
**Estimating** 25:*8*
 26:*13* 41:*4* 126:*5*
**estimation** 21:*11, 12*
**Estimator** 20:*21*
 23:*18, 24* 24:*24*
 25:*5, 7, 10* 33:*12, 18*
 35:*10* 126:*10*
**Estimators** 20:*22*
 21:*18* 22:*6* 23:*18*
 29:*20* 30:*3* 31:*1*
 35:*1, 6, 18* 50:*12*
**Estimator's** 126:*1*
**ethnicities** 156:*16*
**ethnicity** 156:*21*
**European** 24:*18*
**evening** 70:*14*
 137:*24*
**event** 59:*10, 17*
 60:*20, 22* 61:*13*
 62:*1, 8, 9* 65:*17*
 66:*13, 15* 67:*1*
 68:*5* 69:*8, 14, 17*
 75:*2, 24* 76:*13, 20*
 77:*6*

**events** 58:*23* 69:*10*
 158:*22* 159:*6*
**everybody** 95:*5*
 118:*7*
**everyday** 12:*10*
**exact** 10:*13* 15:*4,*
 *20* 18:*23* 20:*13*
 24:*16* 25:*11, 12*
 30:*6, 10* 34:*6*
**exactly** 29:*19* 42:*19*
 80:*22* 139:*12* 143:*3*
**EXAMINATION**
 3:*1* 5:*6*
**examined** 5:*4*
**example** 48:*12, 15*
 55:*22* 105:*23*
**examples** 42:*16, 23*
 43:*1, 7* 46:*4*
**exceed** 52:*4, 13*
**exception** 122:*11*
**excessive** 150:*1*
**exchange** 161:*3*
**exchanged** 57:*23*
**Excuse** 130:*19*
**EXCUSED** 180:*16*
**Executive** 14:*17*
 91:*3, 7, 9*
**Executives** 34:*19*
**exercise** 177:*17*
**exhausted** 127:*6*
**Exhibit** 3:*7, 8, 9, 10,*
 *11, 12, 13, 14, 15, 16,*
 *17, 18, 19, 20, 21, 22,*
 *23* 4:*1, 2, 3, 4, 5, 6, 7,*
 *8, 9, 10, 11* 36:*13, 14,*
 *18* 38:*7* 39:*2, 3, 7*
 42:*6* 43:*19* 51:*10,*
 *11, 21* 53:*12* 54:*3*
 62:*23* 69:*21, 22*
 72:*11* 78:*19, 23*
 83:*6, 9* 84:*3, 7*
 85:*10* 86:*10, 14*
 95:*16, 17, 21* 104:*20,*
 *23* 106:*21, 22* 107:*3*
 112:*7, 8, 11* 114:*22*
 115:*3* 124:*6, 10*
 125:*11, 15* 140:*3, 7*
 144:*14, 15, 18* 147:*4,*
 *7* 148:*21, 24* 152:*3,*
 *7* 159:*12* 160:*19, 20,*
 *23* 162:*5, 8* 166:*16,*

*20* 168:*1, 4* 169:*5, 9*
 170:*14, 18* 172:*12,*
 *16* 174:*16, 17, 21*
 176:*4, 17, 24*
**EXHIBITS** 3:*6*
**existing** 176:*3*
**Exit** 135:*8*
**expected** 163:*16*
**expecting** 124:*20*
**Expiration** 183:*9*
**explain** 23:*10*
 89:*23* 109:*12*
**explanation** 134:*3*
**express** 70:*10*
**expression** 19:*21*
**extended** 60:*9, 11*
**extent** 48:*1* 97:*14*
 141:*11* 146:*15*
**extra** 48:*14*

**< F >**
**fact** 109:*14* 110:*4*
 163:*12*
**fair** 97:*22* 138:*7*
 156:*13* 161:*19*
 180:*3*
**fairly** 129:*6*
**fall** 121:*12*
**familiar** 69:*4, 7*
 74:*2* 126:*5*
**family** 15:*16, 17*
 46:*5, 16* 59:*5*
 61:*21, 22* 66:*17, 18*
 67:*6, 18* 68:*21*
 109:*18*
**far** 38:*21* 69:*13*
 95:*4* 133:*23* 173:*9*
**father** 15:*23*
**February** 9:*7*
**Federal** 1:*15*
**fee** 67:*20*
**feedback** 81:*13*
**feel** 6:*8* 97:*18*
 114:*3* 131:*22*
 132:*1, 3* 135:*22*
 140:*8* 153:*8*
 154:*16* 155:*18*
 165:*2*
**feelings** 110:*1, 2*

**felt** 76:*20* 87:*18*
 102:*13* 103:*21, 22*
 128:*19* 138:*6, 7*
**female** 92:*6*
**females** 92:*7, 9, 11*
 93:*10, 14*
**fewer** 31:*11*
**field** 26:*4, 6, 9*
 35:*24* 67:*14* 92:*11,*
 *15* 93:*4, 7* 156:*8, 11*
**fifteen** 30:*9*
**file** 56:*13* 176:*3*
**filed** 79:*22*
**files** 85:*24* 88:*3*
**final** 138:*13*
**finalize** 30:*4*
**financial** 11:*19*
 60:*17*
**find** 98:*23* 149:*21*
 150:*2*
**findings** 104:*4, 4*
**fine** 15:*1, 5* 98:*23*
**finish** 6:*5* 46:*2*
 53:*8, 9*
**finished** 93:*1*
**finishing** 65:*13*
**firm** 14:*7* 106:*18*
**first** 5:*4* 6:*2, 23*
 9:*21* 20:*18* 22:*24*
 23:*1* 36:*22* 40:*20*
 45:*9* 56:*2* 57:*18*
 59:*12* 66:*5* 69:*15*
 70:*4, 12, 19, 24*
 75:*23* 78:*1* 79:*2,*
 *12* 80:*9* 81:*24*
 82:*10* 87:*2* 96:*17*
 98:*12* 105:*8*
 112:*22* 123:*5*
 124:*21* 140:*13*
 145:*2, 12* 149:*5*
 156:*1* 159:*19*
 175:*7, 9, 12* 181:*10*
**firsthand** 96:*3*
**fit** 29:*20*
**flags** 103:*17*
**flag-waving** 132:*18*
**flip** 125:*16* 140:*8,*
 *23*
**Floor** 2:*18*
**FMLA** 118:*18, 19*

Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 60 of 73 PageID #:576
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

127:2, *5, 9*  165:7
**fob** 160:*5*  161:*11*
**focus** 175:*12*
**focused** 41:*10*
**focuses** 36:*22*
**follow** 71:8  72:*1, 2*
177:22
**following** 44:*2*
70:*21*  95:*13*
115:*12*  116:*8, 18*
135:6  138:*1*  174:*3*
181:*17*
**follows** 5:*5*
**follow-up** 102:*22*
103:*1*
**follow-ups** 173:*23*
**food** 65:*16*
**foregoing** 181:*13*
182:*13, 22*
**Forest** 64:*24*
**form** 43:*5*  55:*6, 15*
115:*16*  122:*22*
170:22
**formal** 10:*24*  27:*12*
104:*5*
**former** 17:*18*  59:*4,*
*19*  166:*4, 6*
**forms** 54:*12*
**formulate** 20:*23*
**forward** 5:*24*
167:*17*  171:*14*
**forwarded** 106:*5, 13*
163:*7*  169:*23*
170:*6*  172:*5*  176:*17*
**forwarding** 167:*2,*
*13*  170:2, *21*
**found** 24:7
**foundation** 61:6, *14*
73:*13*  101:8
**founders** 15:*12, 14*
**Four** 23:*20*  34:*24*
65:*10, 10*  92:*7, 9*
93:*10, 11, 14*  131:*18,*
*18*  135:*14*  138:2
**foursome** 68:2
**fourth** 35:*19, 20*
142:*4*
**free** 135:*22*  140:8
**Friday** 152:*20*
**friend** 109:*15*

**friends** 57:*11, 12*
58:*19*  61:*5, 11*
66:*18*  108:*19*
111:*15, 18*  112:2
**front** 33:8, *10*
43:*19*  52:8, *9, 10*
168:7
**full** 5:*12*  6:*11*  21:2
57:*24*  172:2, *9*
**fully** 97:*22*  131:*23*
**function** 17:*12*
**functions** 11:*20*
12:*11*  128:*23*
131:*21*  135:*16*
**fund** 170:*24, 24*
**further** 11:*14*
133:*21*  134:*1*
180:*9*  182:*11, 15, 17,*
*21*
**future** 158:*22*  159:6
**FYI** 107:*22*  172:*20*
173:7

**< G >**
**Gabrielle** 1:*12*
182:*4*  183:*5, 7*
**Garland** 23:*16, 22,*
*24*  25:*4, 19*  28:*18*
35:*4*  50:*15, 17*
53:*21*  77:*19*  78:2
166:*24*  167:*2, 6, 9,*
*13*  169:*24*  170:*2, 10*
**gate** 160:*5*  161:*11*
**GC's** 17:*4*
**gears** 56:*23*
**Gene** 106:*16, 17, 18*
**general** 15:7  50:*20*
**generalization**
164:*11*
**generally** 16:*22*
69:*4*  94:*11*
**gentlemen** 59:*22*
**genuine** 165:2
**Gerber** 106:*19*
**getting** 65:*1*  95:5
**give** 7:*13*  23:*11*
45:6  47:*13, 16, 18*
55:*20, 22*  81:*12*
86:*23*  92:2  104:*8,*
*12*  126:*5*  140:*9*
180:*5*

**given** 21:8  29:*15*
40:*13, 24*  41:*11, 14*
42:*16*  44:*19*  51:2
62:*3*  147:*16*  182:*14*
**go** 5:*23, 23, 24*  6:7
8:*17*  16:*5*  17:5
21:*9, 13*  23:2
30:*24*  31:*3, 6, 11*
32:*16*  34:*10*  35:*3*
44:*5*  45:8  46:2
53:9  54:2  63:8
65:*5*  81:*13*  82:*15*
87:*3*  114:*13*
132:*11, 12*  134:*23*
136:*11*  138:6
142:*16*  155:*14*
156:8  175:*5, 17*
**goes** 32:*10*  37:5
93:6  112:*17*  141:5
149:*10*  177:*4*
**GoFundMe** 173:*16*
**GoFundMe-type**
170:22
**going** 8:8  16:2
29:*3, 6*  32:*20*  37:*6,*
*10*  47:*24*  78:7
89:*13*  94:*1, 3, 4, 5*
96:7  101:7  104:*15*
108:*9*  109:*20*
110:6  122:*21*
127:*19*  134:*15, 20*
140:*2, 23*  146:*14*
151:9  153:8  159:*5,*
*5*  171:*7, 9, 13*
173:22  176:*23*
**GOLDMAN** 2:2
**golf** 59:*3*  64:*9, 12,*
*23*  65:*7, 8, 13*  68:*8,*
*20*  103:*17*  114:*18*
**golfed** 64:*1*
**golfer** 63:*23*  65:*20,*
*22, 23, 24*
**golfing** 68:*11*
**Good** 5:*8, 9*  64:*5,*
*10*  95:7  108:7
134:*13*  153:*9*
154:*13, 17*
**Graczyk** 120:*19*
121:*3*
**grandfather** 15:*21*
**greet** 65:*3*

**Greg** 23:*16, 22, 24*
28:*18*  33:6  35:*4*
53:*21*  167:8
**ground** 5:*23*
**group** 66:*10, 11, 11*
68:*11, 12*  76:*7, 14,*
*17*  79:*3, 8, 9*  103:*16,*
*19, 20*  153:*18*  154:*1*
179:*16, 17*  180:*4*
**groups** 11:9  66:*21*
67:*19*  68:*10*  98:*12*
**guess** 133:*17, 19*
**guessing** 49:*8*
**guest** 65:*18*

**< H >**
**H.R** 10:*8, 10, 16, 20,*
*23*  11:*11*  17:*21*
18:*1*  27:*3*  45:*7*
49:*12*  62:*12*  82:*12,*
*14, 15, 19, 20, 22*
94:*16*
**had:** 44:*3*  95:*14*
135:7  174:*4*
**half** 65:*11*  135:2
156:*19, 19*
**hall** 95:8  106:6
**hand** 183:*4*
**handbook** 40:*13, 22,*
*23*  42:*4*  54:2  56:*5,*
*21*  62:*23*  63:8
159:*9, 17, 22*  160:*8,*
*13*  176:*24*
**handing** 103:*17*
**handle** 81:*23*
**handles** 17:*11*
**handwritten** 175:*8,*
*12*
**Hang** 137:2
**happen** 34:*4*  56:*9*
64:7  77:*11*  153:*15*
**happened** 74:7
76:*20*  94:*21*  150:*13*
**happening** 90:*12*
**happens** 45:*13*
**happy** 76:*20*
**harassment** 62:*20*
63:*10, 13*  74:*9*
**hard** 145:*24*
**harm** 148:*5*



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 61 of 73 PageID #:577

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

Hawkins 33:5, 20

head 6:12 9:1

hear 6:19 84:14, 16
101:11, 12, 14, 15, 17

heard 22:4 58:15
65:24 101:4, 10
102:17 157:5, 23

hearing 157:20

heavy 65:15

heel 30:15 34:1

held 64:23

hello 65:3

help 170:23

helped 68:21

helpful 103:6

helps 21:2 35:4
68:21 80:20 146:6

her, 108:17

hereunto 183:3

Hey 77:12 132:19

Hickman 69:1, 2

hierarchy 20:6

high 8:14, 17

highest 8:10 19:15

hire 23:11

hired 18:19, 20
19:2 20:19 22:18
35:22 159:18

hires 40:14

hiring 19:6 22:20
44:23 97:2

Hispanic 156:17

hit 65:5

hold 38:8

holding 151:2

holiday 44:16

home 30:15, 22
34:8 36:2

honestly 30:20
106:7

honeymoon 48:17

hors 65:16

hotel 61:24

hour 1:19 73:2
128:3 135:3

hours 7:1 47:14
65:11

huh 8:24

Human 10:1

hypertension 7:3

< I >

idea 60:19

identification 36:15
39:4 51:12 69:23
78:20 83:7 84:4
86:11 95:18
104:21 106:23
112:9 114:23
124:7 125:12
140:4 144:16
147:5 148:22
152:4 160:21
162:6 166:17
168:2 169:6
170:15 172:13
174:18

identified 37:7

III 2:13

ILLINOIS 1:1, 14,
17, 18 2:3, 8, 14, 19
8:7, 19 17:13
181:1 182:1, 6, 9

immediately 136:4

impact 7:7

impartial 97:13, 23

implemented 21:10

implying 109:19
162:24 163:2

Improvement 27:10
51:3

inability 180:5

inaccurate 142:20

inappropriate
103:23 114:3

inbox 70:13

inception 59:17

incident 37:23
69:16 70:20 71:10,
20 74:7, 17, 21
75:20, 20 76:7, 18
77:19, 23 78:2, 5, 8,
10 84:22 85:2
89:10 94:10 96:21,
21 99:7, 16 112:24
113:21 116:1
120:15, 15 143:24
178:21

include 11:1 37:11
52:17 55:2 67:5

82:18 155:20
161:12

included 37:10
40:23 42:6 72:15
88:8 118:7 145:2
146:9, 12, 21 176:9
181:17

including 23:12
110:4 120:2 160:1,
4

inclusive 181:14

inconsistent 163:13

incorrect 137:1

independent 46:13

indicated 182:19

indicating 132:19

indirectly 50:13, 14

individual 13:1, 3
17:21 55:17 97:6
106:9 177:14

individuals 12:19
13:13 14:15 21:17
33:11 35:6, 14
36:23 37:18 43:2
79:4, 8, 9 80:9
82:9 91:4, 13
100:10 103:11, 14
122:7 153:19
158:9 162:12
169:12, 14, 17

influence 7:11

inform 75:3

information 21:7
36:23 37:18
110:12, 22 129:11
146:16

informative 172:3

informed 74:21, 23,
23

initial 36:21

initially 176:8

initials 32:21

in-person 100:21

insensitive 156:24

instance 177:23

instances 121:24
122:2

instruct 62:18

instructions 62:3

interact 25:21

29:19 62:4

interacting 62:15

interaction 98:4
101:16 103:16

interactions 179:4

interest 42:3, 11, 14
43:3

interested 171:15,
17 183:1

interesting 172:8

interests 137:8

interior 15:8

interpretation
154:16

Interrogatories
140:14

Interrogatory 141:3,
3

interrupt 6:4 174:9

interview 17:5 98:1
101:21

interviews 117:17
118:1 141:22

introduce 58:11

introduced 57:5, 18,
23 58:4, 6 66:1, 7

introduction 113:16

investigating 96:1

investigation 73:11,
18, 21, 23 78:5
85:22 87:12 96:8,
12, 16, 20, 23 97:3, 6,
9, 11, 19, 23 98:2, 13,
19 103:6, 10 117:6,
7, 10 118:1, 2, 11
141:9 142:5, 9, 10

investigator 102:2

invite 60:19

invited 61:1

involved 19:6
21:17 22:20 23:5
27:1 28:17 141:8

involvement 141:12,
17, 20

involving 69:16
75:20

irrelevant 109:22,
23, 24 110:2

issue 28:5, 8, 14
30:11, 12, 14 33:23



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 62 of 73 PageID #:578

Michael Power  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

34:2  36:7  73:7
81:4  96:4  177:16
**issues**  27:6, 10
31:19  50:24  82:15
95:1  119:11
**items**  160:12, 15
161:14
**its**  59:17  101:11

**< J >**
**J.C**  1:6  2:11  9:5, 6
39:10  59:4  62:12
66:16  98:10
113:20  152:10
160:4  165:20  181:6
**JACOBSEN**  1:7
2:16, 21  37:8
56:24  57:1  58:13,
20, 22  60:20  61:4,
12  62:7, 15, 19, 22
63:16  66:2, 8, 19, 20
67:6  68:11  69:16
74:17, 21  75:4, 11,
14, 17  101:4, 20, 21
102:4, 10, 18, 20
141:18, 20  146:9, 21
158:21  159:6
179:4  181:7
**Jacobsen,**  58:15
**Jacobsen's**  44:6
65:17  74:9
**JAMES**  2:18
**Jason**  33:4, 20
**JCA**  9:23  13:18
15:6, 9  16:23
17:12, 17, 22, 22
18:2, 2, 9  19:15
20:10  21:20  22:6
23:18, 19, 24  24:4
25:14, 17  26:1, 24
30:5, 8  31:22  32:8
35:1, 17  36:10, 11,
23  38:10, 15  39:20
40:1, 14  41:16, 18,
20, 22, 22, 24  42:2, 2,
12, 12  43:3, 16
44:10, 13  48:12
49:10, 12, 15  50:20,
20  53:1  59:14
62:4, 16, 19  67:4, 8,
11  68:23  72:2

74:20  79:4, 9, 17, 21
82:12, 21, 23  87:15,
18, 22  90:10, 11, 22,
24  91:3, 6, 18  92:3
93:4  94:7, 8, 12, 13,
22  95:2  96:19
97:2, 3, 5, 12  98:7
99:3  105:18
111:24  119:7, 18, 19,
22  120:2, 14, 17, 17
122:3, 7, 13  123:7, 9,
11  128:7  130:16
131:21  132:9, 13, 19
134:10  136:6
139:3  143:6, 8, 8, 10
145:8  146:4, 24
147:22  148:5
149:9  150:15
151:6, 14  154:13
155:6, 14, 17, 24
156:9, 23  158:9, 18,
21  159:1, 3, 5
161:20  163:5, 12
164:12, 13  165:1, 11
166:1, 3, 4, 6  167:17,
20  169:20  173:17
**JCA001931**  175:18
**JCA1257**  70:2
**JCA1895**  112:17
**JCA1896**  112:20
**JCA1897**  112:18
114:14
**JCA1920**  149:9
**JCA1929**  175:9
**JCA1930**  175:10
**JCA1931**  175:20
**JCA1932**  175:20
**JCA1933**  175:21
**JCA930**  51:16
**JCA's**  15:24  36:21
45:15, 21  47:23
48:4  51:15  63:13
74:9  140:12  142:5
157:24  166:5  176:9
**JCA-sponsored**
58:23
**JCP@CliffordLaw.co
m**  2:20
**Jim**  12:18  15:11,
23  19:9  20:2, 9
58:5  61:3, 4  68:17,

24  69:18  70:10
73:7  74:23, 23
80:7  81:5  88:9
89:17  91:10  96:13
99:20  100:2, 3
101:24  102:1, 1, 13
117:20  128:9
129:1, 5  143:13
147:13  149:4, 17
152:17  162:13
178:7  179:6
**Jim's**  15:21
**job**  24:7  38:15, 21
128:23, 24  135:17
139:10  143:9
151:18  154:22, 23
163:21  180:7
**jobs**  42:11
**Joe**  29:16  33:3, 19
34:22  99:2, 5
100:23  103:12, 13
114:14
**John**  33:3, 19
34:22  49:20
169:13, 18
**join**  9:6  74:13
108:2
**joined**  18:13, 15, 15
166:1
**joining**  44:7
**JR**  1:11  3:2  5:2,
14  181:10, 20
182:10, 12, 14
**July**  171:4  183:5
**June**  1:19  36:1
181:12  182:7

**< K >**
**Kacper**  76:10, 11,
13, 22, 24  77:7, 16
98:20  99:1  100:10,
23  112:22  113:9, 17
**Kacper's**  77:1
113:4, 8
**Kantro**  33:6, 21
48:16, 18  49:15
50:18, 22
**Kayla**  33:6  93:23
**keep**  5:24  52:24
53:3, 4

**Kev**  37:23  57:19
58:24  59:2, 3, 10, 16
60:20, 22  61:13
62:24  63:17  64:18,
21  66:9  75:19
84:22  94:11
120:15  143:3, 24
178:22  179:3
**Kevin**  12:24  59:5,
6  60:12
**Kevin's**  114:16
**keys**  160:5  161:11
**kind**  6:12  10:1, 18,
22  23:2  25:5
26:18  38:14, 17, 22
40:21  41:9, 17
43:1  52:20  53:5
64:20  82:13  91:3
114:1  141:17
144:3  145:6  154:7,
23  155:12
**kinds**  64:21  146:4
**King**  14:17, 17
**knew**  57:13, 14
58:16  81:3  87:12
99:24  112:6
113:17  122:12
123:7  125:7
**know**  6:15  10:13,
15  11:14  15:9, 20
18:17, 24  19:11, 13
20:9, 11, 13, 14, 16
21:16  22:2, 4
25:11, 12  27:22
28:16, 18  29:12, 15
30:10  31:2, 12, 24
33:10  34:13  37:11,
17  38:16, 17, 22, 24
39:12, 15  43:15
48:21  50:19  51:17
53:4, 6, 7, 11, 18, 19,
19  56:24  57:1, 7, 9,
10, 14, 14, 15  58:22
60:19, 21  61:1, 9, 10,
11, 12  62:2, 5, 6, 10
63:1  64:14  65:21
67:6, 7  71:18
74:14, 20  75:9, 12,
13, 16, 18  76:23
80:22, 24  82:21, 22,
24  83:1, 1  85:11, 13

Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 63 of 73 PageID #:579

90:*14* 93:6 95:*24*
96:*15* 97:5, *16*
100:5 106:*2, 4*
108:22 112:2
113:6 116:6 120:*6,*
*16* 121:*20* 122:6
124:*20* 126:*4*
127:*1* 128:*13*
130:*1* 137:5
139:*17* 144:*12*
145:*1* 146:*17*
148:*8, 16, 17* 151:*13*
154:7 156:22
158:2, *13, 14, 18, 20*
165:*17* 166:8
167:5, *9, 12, 13*
169:*17* 176:7, *11*
**knowing** 129:*11*
153:6
**knowledge** 28:5
36:*10, 12* 39:*18, 23*
40:*3, 9, 12* 50:*18, 21*
51:*1, 2, 4* 53:16
60:*14* 73:20 86:*4,*
*5* 90:*23* 91:2 94:*9,*
*14* 99:6 158:*23*
159:2, *3*
**known** 18:*11*
**knows** 68:*24* 77:8
**Kristn** 93:*17*
**K-r-i-s-t-n** 93:*17*
**Krucek** 33:6

**< L >**
**label** 51:*14*
**laborers** 26:*10*
**language** 155:*1*
**laptop** 160:5 161:*13*
**large** 82:22
**Larry** 33:5, *20*
**LaSalle** 2:8, *18*
**late** 164:*14* 178:2
**Lauren** 93:*21*
120:*19, 23* 121:*10,*
*20* 122:12
**Lauren's** 121:*4*
**Lavis** 13:*10*
**L-a-v-i-s** 13:*10*
**LAW** 2:*16*
**laws** 11:*3*

**lawsuit** 121:*9*
158:*1, 5, 8, 12*
171:*20*
**Le** 23:22 24:2
35:*4, 12* 99:*1* 101:*1*
**Lead** 25:7, *10*
34:*20* 90:*1*
**leads** 34:*21*
**learn** 28:*20* 69:*15*
**learned** 70:*4* 121:8
123:*3*
**learning** 123:*5*
**leave** 14:*3, 8* 24:*10*
46:*20* 51:5 118:*18,*
*19* 120:22
**leaving** 41:*18*
**led** 87:*14, 22, 22*
96:*23* 153:*18, 24*
179:*15, 16*
**left** 24:8 45:*14*
47:*20, 21* 48:*13, 14*
53:*17, 24* 150:22
159:22
**legal** 8:*23* 170:*24*
**Legally** 168:*16*
**lessons** 103:*19*
**letter** 151:2 152:*10,*
*13* 161:*23*
**letting** 95:*24*
**level** 8:*10* 19:*15*
**liabilities** 146:5
**License** 183:8
**life** 8:*20*
**light** 143:*10* 155:*14*
**limit** 7:*12*
**line** 124:*21* 141:7
142:*4, 4*
**lines** 154:*21* 172:8
**link** 170:*21*
**list** 33:8, *10* 37:*3, 4,*
*12, 12, 17, 19, 20*
38:2 51:*24* 99:*15*
**listed** 10:7 37:*21*
43:8, *11, 12* 99:9
146:*11*
**listening** 141:*24*
**lists** 40:6 54:*11*
**litigation** 120:*4*
**little** 29:*18* 56:*23*
59:22 108:*20*

**111:*19* 134:*23***
**lived** 8:*19*
**locations** 11:*12*
**long** 9:*10, 17* 10:*12*
13:*20* 18:*11* 19:*11*
20:9 25:9 30:5, *21*
34:7 64:*1, 3* 65:*8,*
*24* 72:6, 8 94:*15*
100:*18* 122:*24*
127:*13, 22* 129:*1*
**longer** 35:*12* 64:*9*
120:*23* 150:*19*
154:*1, 19*
**long-standing**
165:22, *23*
**look** 7:*20, 22* 36:*21*
37:*3* 54:*3* 70:7
72:*14, 21* 112:*20*
113:*24* 141:2, *7*
144:7 146:5, *5*
149:8 154:*22*
**looked** 8:*1*
**looking** 53:*15* 96:*1*
145:*1* 163:5, *20*
164:*1* 170:*23*
**looks** 83:*15*
**losartan** 7:*2*
**lot** 64:*16* 90:*4*
98:*8* 99:*4*
**lucky** 147:*16, 22*
**lunch** 65:*2, 4, 5*
68:6 134:*16* 157:*8,*
*22*

**< M >**
**mad** 111:*8*
**Maguire** 29:*16*
30:5 31:*18* 33:*1, 3,*
*19* 34:22 99:*2, 5, 6*
100:*23* 103:*12*
114:*14*
**main** 16:*13* 34:*18*
167:*8*
**major** 15:*24*
**making** 119:*17, 21*
120:*1* 156:*24*
164:*11*
**male** 92:6 94:*2*
**males** 92:9 93:*12*

**management** 11:*21*
26:*13* 29:*23* 30:*3*
56:*18*
**Manager** 13:7
29:*17* 32:*3, 4*
34:*13* 48:*21, 23, 23*
49:*17, 21* 93:*18, 24*
113:*23*
**Managers** 21:*18, 19*
22:7 29:*19* 30:*24*
32:7 33:2, *11, 17*
34:*17, 18* 50:*9*
166:*11*
**Manual** 39:*11*
40:*11, 17* 42:*15, 16*
43:*14* 161:*20, 20*
**mark** 36:*13* 51:*10*
69:*20* 78:*18* 160:*18*
**MARKED** 3:6
36:*15, 17* 39:*4, 6*
51:*12, 20* 69:*23*
70:2 78:*20, 22*
83:7, *9* 84:4, *6*
86:*11, 13* 95:*18, 20*
104:*21, 23* 106:*23*
107:2 112:*9, 11*
114:*23* 115:2
124:7, *9* 125:*12, 14*
140:4, *6* 144:*16, 18*
147:5, *7* 148:*22, 24*
152:4, *6* 153:6
160:*21, 23* 162:6, *8*
166:*17, 19* 168:*2, 4*
169:6, *8* 170:*15, 17*
172:*13* 174:*18, 20*
**market** 14:6 154:*22*
**Marketing** 17:*10*
26:*14* 93:22 121:*5*
**markup** 153:5, *23*
154:*11* 179:*8, 24*
**married** 121:*2*
**Mart** 16:*6*
**MARY** 2:*12*
**materials** 161:*13*
**Matt** 33:6, *20*
48:*15, 18*
**matter** 96:*1* 147:*24*
148:*11* 157:7
**matters** 82:*15, 20*
109:*18*



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 64 of 73 PageID #:580
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

McKinley 33:6
McKinney 93:23
M-c-K-i-n-n-e-y 93:23
mcronin@pretzel-sto uffer.com 2:15
mean 19:22 21:1 24:22 37:9 47:12 60:22 92:23 109:12 124:1 136:15 139:11
means 142:9 163:3
meant 116:7 133:1, 11, 16, 18, 24 173:2
medical 30:14 36:7
medication 7:6
medicine 6:24
meet 20:18 22:24 88:16 96:3 108:2 127:20 152:23
meeting 7:18 10:18 29:3 72:4, 6, 9 75:7 80:17 81:2, 8, 11, 17, 19 89:6, 20, 21 100:19 108:10 115:12 116:21, 23 117:4, 5 118:12 119:8, 15, 16, 22 120:9, 10 126:23 127:13, 22 128:4, 18, 21 129:4 131:17 132:10 134:11 143:12 155:9, 10 175:4 178:11
meetings 100:21 141:13, 15, 16
members 66:17 67:6
memory 59:3 173:9
men 91:15
mental 7:10
mention 156:21 171:21
mentioned 80:12 153:19 160:9, 16
Merchandise 16:6
merit 73:7 85:9, 20
message 101:24 167:3, 14 169:23 170:3

met 7:17 28:12 80:8 87:16 108:3 115:8 119:2 126:14, 20 127:17, 18 129:16 131:8 142:7, 12 143:23 174:24 175:1 178:3
MICHAEL 1:11 3:2 5:2, 14 33:6 40:6 181:10, 20 182:9, 11, 14
MICHELLE 2:7 106:16
mid 28:4 92:17
midday 139:21
Middle 10:13 63:9 70:8 102:17 107:15 108:13 132:23 149:5, 16 168:14 169:22 177:8
Mike 23:22 24:17 27:18 28:22 35:5 40:7 58:9 71:3 80:7 88:8 91:10 99:20 107:17, 18 113:14, 16 117:1, 20 127:20 128:8, 21 131:3, 5, 14 137:23 139:16 152:11, 17 175:1 178:7 179:6
mind 5:24 16:13 26:16, 20 38:5 54:20 66:23 122:18 138:21
minimal 157:10
minor 7:3 173:24
Minorities 155:22 156:18
minute 54:15 83:17
minutes 100:20 128:1 134:18
mischaracterize 119:4
mischaracterizes 110:7 135:19 142:13
misrepresented 133:8
missed 32:17 45:22

48:14 55:23
misses 45:14
missing 51:17
misstated 173:1
Mister 88:20
modify 145:9
molson@vedderprice .com 2:9
moment 12:12 32:9 111:6 140:9
Monday 115:13 117:13 142:24 152:21, 22
money 11:20 59:4 61:21 67:20 155:5
months 18:16 138:3, 6
mood 144:3
morning 5:8, 9 76:1 77:5 87:16 88:12 89:22 96:18 99:18, 21 108:11 116:12, 15, 19 127:21 128:12, 15 178:2
motion 132:18
Mott 31:24 32:3, 5 33:1, 5, 20, 22 34:1, 12 36:2, 9
M-o-t-t 31:24
moving 95:16
multiple 14:15 16:19
mutually 153:7

< N >
name 5:10, 12 13:9 24:17 58:14 82:18 94:2 98:21, 23 105:13 109:4 112:5 121:1, 3 146:11
named 31:24 33:11
names 15:24 21:16 23:21 26:7 32:15, 18, 23 35:3, 4, 5 37:21, 22 40:2, 4 43:8, 9, 10 66:14 93:15 98:11
Naperville 8:7

64:12
nature 18:24 81:22
Neal 106:19
necessary 31:8 102:9 103:3 177:22
need 6:14 24:19 29:8 41:13 47:9, 16, 16 165:3
needed 71:8 72:1, 2 85:21 165:4
needing 118:24
needs 45:1
negative 90:5, 17, 24 119:18, 21 120:1, 17 122:3, 14 134:10 136:10
negatively 132:8
negotiate 44:20
negotiation 44:22
negotiations 151:8
neither 113:16
never 21:24 22:13 50:18 57:3 77:21 102:21 132:7
new 6:7, 17 23:11, 17 40:13, 24 44:19 145:9 154:22 163:21
nice 64:11, 16
night 174:14
nods 6:12
non-Caucasian 156:10
non-compete 41:17 166:9
non-JCA 67:4
non-paid 165:9
noon 128:16
normally 21:15
North 2:8, 18
NORTHERN 1:1, 16 181:1
nos 6:11
notarial 183:4
Notary 1:13 181:24 182:5 183:8
noted 116:13
notes 29:13 99:1 104:5, 6, 12, 12 114:9, 10, 12 141:23



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 65 of 73 PageID #:581

Michael Power    6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

174:*15, 24*   175:*3, 8, 12, 14, 23, 24*   176:*15*
noteworthy   108:*15*
110:*3, 5, 11*   111:*3, 4*
notice   47:*13, 17, 18*
56:*12*
number   44:*10, 17*
46:*11*   47:*5*   52:*13, 21, 24*   83:*5*   84:*2*
86:*9*   91:*4*   93:*3*
105:*14*   112:*17, 21*
114:*21*   119:*11*
141:*3, 3, 12*   156:*10, 12, 13*   160:*12, 15*
162:*12*   169:*12*
175:*5*

< O >
oath   5:*19*   181:*11*
object   16:*2*   43:*5*
47:*24*   55:*6*   101:*7*
122:*21*   135:*19*
146:*14*
objection   16:*17*
17:*1*   61:*6, 14*
73:*13*   74:*11*   78:*8, 13*   97:*14*   104:*9, 16*
110:*6*   129:*19*
142:*11*   148:*14*
Objections   140:*13*
observed   103:*21*
observing   101:*16*
obtains   43:*14*
Obviously   142:*18*
occurred   69:*8*   87:*7*
88:*10*   178:*22*
179:*12*
occurring   59:*10*
October   152:*1*
153:*17*   155:*9*
161:*7*   162:*19, 22*
166:*23*   168:*13*
Offense   55:*14, 14, 14*   56:*3*   101:*5*
offer   137:*9*   138:*2, 7, 13*   139:*13*
offered   11:*10*
40:*21*   61:*15, 24*
136:*12*
offering   103:*19*

Office   13:*7*   25:*24*
26:*3, 11, 12*   32:*20*
35:*24*   39:*10*   67:*12*
71:*1*   91:*18*   92:*9*
93:*4, 15, 18*   120:*19*
124:*2*   126:*11*
128:*20*   131:*15*
156:*1, 5, 24*   167:*8*
Officer   50:*5*
OFFICES   2:*16*
Oh   42:*20*   60:*2, 11*
64:*7*   99:*9*   118:*5*
141:*17*   159:*8*
172:*7, 23*
Ohio   17:*14*
Okay   6:*13*   7:*4, 6, 9, 18*   8:*8*   11:*7*   15:*15*
16:*22*   21:*1*   22:*5, 15*   26:*22*   28:*8, 13*
30:*11, 21*   32:*4, 22*
33:*14, 15*   35:*9, 12*
36:*6, 20*   37:*3, 22*
38:*7*   39:*1*   40:*9*
41:*6, 16*   42:*10*
43:*23*   44:*9*   46:*9, 14, 21*   47:*19*   50:*15*
51:*18*   52:*2, 12*
53:*12*   55:*2*   56:*21*
58:*2*   59:*24*   61:*1, 11*   62:*18*   63:*22*
64:*9, 11*   65:*21*
68:*4*   70:*12, 19*
71:*24*   72:*14*   73:*5*
76:*11*   77:*1, 3, 18*
78:*11*   79:*7, 15*
80:*2, 4, 17*   81:*1, 15*
83:*4, 15, 20*   84:*24*
85:*15, 19*   87:*2, 14, 21*   89:*23*   91:*8, 17*
92:*14, 18*   93:*14*
94:*18*   96:*6, 19*
98:*11, 17*   99:*9*
100:*9*   104:*18*
105:*16*   107:*14, 22*
108:*3, 6, 13*   111:*24*
113:*7*   114:*13*
116:*15, 18*   121:*4, 10, 23*   124:*1, 4*   126:*23*
127:*7, 22*   132:*6*
133:*3, 7*   134:*19*
136:*2, 6*   138:*9*

139:*7, 17*   140:*12*
141:*23*   142:*16, 20*
145:*15*   147:*2, 15*
148:*19*   149:*8, 21*
150:*18*   151:*4, 7, 13, 15*   152:*13*   153:*2*
154:*11*   155:*4*
156:*8, 23*   157:*11*
158:*15*   159:*3, 8, 21*
160:*15, 24*   161:*10*
162:*3, 15, 24*   163:*23*
164:*3*   165:*11, 21*
166:*12*   168:*9, 13*
171:*9, 24*   173:*14, 21*
174:*12*   175:*13, 17*
176:*4, 13, 19*   177:*1, 3*   178:*1*   179:*10, 14*
180:*10*
old   147:*17*   155:*15*
OLSON   2:*7*   3:*4*
16:*2, 17*   17:*1*   37:*6*
43:*5, 22*   47:*24*
51:*13, 18*   54:*15*
55:*6*   74:*11*   95:*9*
97:*14*   101:*7*   104:*9, 17*   106:*16*   110:*6*
122:*21*   129:*19*
135:*19*   142:*11, 13, 23*   146:*14*   148:*14*
156:*3*   173:*21, 24*
174:*7, 12*   176:*22*
180:*9, 11, 13*

once   27:*14*   100:*15*
ones   16:*13*   33:*14, 16*   35:*9*   87:*23*
176:*1*
ongoing   120:*3*
open   108:*21*   111:*19*
opening   111:*14*
Operating   50:*5*
operations   41:*2*
60:*16*
opportunity   155:*11*
option   118:*17*
127:*2, 3, 5*   136:*13, 16, 24*   137:*2, 11, 17*
150:*7, 19, 22, 24*
151:*1, 17, 18*   153:*13, 20*   154:*2*   165:*7, 9*
optional   67:*23*

options   64:*16*
116:*4, 6, 7*   118:*14*
126:*24*   136:*16, 19*
165:*5*
orangutans   157:*21*
order   87:*3*   129:*16*
180:*13*
orders   19:*18*
organizations   11:*9*
orientation   23:*3, 6*
38:*18*   40:*22, 24*
original   138:*1*
176:*10*
originally   136:*18*
outcome   183:*2*
outing   57:*6, 19*
59:*3*   67:*20*   68:*3, 22*   87:*17*   96:*20*
outlined   128:*23*
160:*2*   177:*16*
outside   41:*21*   42:*1, 12*   43:*14*   46:*10*
47:*1*   65:*5*
outsiders   91:*1*
132:*9*   134:*11*
overlap   60:*3*
override   19:*19*
oversaw   60:*16, 17*
oversee   11:*19*
owners   10:*17*   12:*15*
owns   129:*5*

< P >
p.m   65:*12, 13*
72:*19, 22*   84:*23*
88:*14*   95:*12, 12*
135:*5, 5*   174:*2, 2*
182:*16*
p.m.   107:*12*   124:*16*
packages   23:*11*
packaging   161:*13*
page   36:*22*   37:*5*
42:*8, 17, 18*   54:*3*
63:*8, 9*   70:*7, 8*
79:*1, 2*   83:*16*   84:*9*
107:*15*   108:*14*
112:*17, 20*   114:*13*
140:*17*   141:*4, 5, 5, 7*
146:*7*   147:*11, 11*
149:*5, 8, 16*   161:*6*
166:*22*   168:*14*



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 66 of 73 PageID #:582
Michael Power 6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

170:22, 22  173:17
175:17  177:2
182:19
pages  125:15, 16
175:8, 9  181:14
Paid  44:10  45:19
47:2  67:19, 20
119:1
paperwork  23:12
127:9  138:20
paragraph  42:24
110:10  111:2
132:23  133:22
177:12
paraphrasing  85:10
parentheses  52:3, 9
108:21  109:9
Park  8:18
parking  98:8  99:4
part  28:13  41:3
68:3  71:22  72:13
76:14, 16  79:1, 7
94:10  98:2, 13, 18
99:9  118:1  120:3
132:15  138:22
154:19  155:5
166:22  170:22
173:10, 12, 15  175:3
176:9  182:20
participant  67:21
participated  58:23
particular  108:23
177:15
particularly  146:6
parties  21:17
103:20, 24  104:1
137:9  182:19, 24
party  97:2, 9, 12
pass  59:8
passed  13:1, 3
60:13
password  86:18, 19
paternal  109:6
pay  68:2  154:19
paycheck  165:3, 4
people  8:22  17:11
37:7  40:2, 4  65:3,
4  66:14, 21, 24
68:10  82:20  91:18
92:15  98:12  107:6,

6  120:14  157:11, 14,
21  170:23
perceived  119:18
122:3, 14
percentage  125:24
perform  128:23
131:20  135:16
143:9  180:6
performance  26:23
27:2, 7, 10, 11  31:18
50:24  51:3
period  14:11  36:3
60:3, 6, 7, 9  119:16
120:12  148:18
158:8
person  14:16  19:15
31:24  35:20  45:7
70:22  73:17  76:2,
9  80:17  82:12, 14,
22  86:22  87:17
101:2  102:17
115:18  141:22
personal  30:12
33:23  44:16  53:16
57:10  125:19
161:14  165:19
personally  69:11, 12
77:8  99:7  102:10
113:17  158:3, 14
165:17  182:10
personnel  39:22
56:13
persons  182:18
pertaining  11:10
PETER  1:7  2:16,
21  58:13, 15  66:2
98:5  101:20
103:16, 18, 23  179:4
181:7
Peters  106:9
Peter's  102:1
phone  70:23  76:6,
23  100:22, 23, 24, 24
101:1  105:14
115:19  138:16
139:22  141:22
145:14  153:1
160:5  161:11
photo  66:11
phrase  87:19

139:12
phrased  37:13
phrasing  122:18
physical  7:10
physically  124:1
picture  29:21
103:18
pinpoint  121:14
place  73:11, 21, 23
142:5  173:11
placed  56:12
places  64:11
plain  133:20
Plaintiff  1:4  2:4
5:3, 11  37:8
140:20  181:4
Plaintiff's  140:13
141:9  178:15
Plan  27:10, 13  51:3
planning  158:21
play  64:9, 13, 15
playing  64:4
please  5:12  6:5, 10,
15  8:6  23:21
37:14  54:18  78:18
83:5  84:2  86:9
140:10  160:1, 3
161:10  180:12, 15
plus  52:4, 15
point  33:23  73:10
74:17  86:1, 7  97:1
108:8  109:18
112:6  116:6
118:18  123:17
125:19  127:16
131:17, 24  136:18,
19, 20  137:9, 19
138:15  139:2, 20
142:10  143:6
150:18  151:15
153:14  173:17
180:5
points  42:22  55:14
177:8, 23
Policies  8:1, 2  10:7
23:10  39:10  40:10,
17  41:24  54:14
62:19  63:13  82:17
118:17
policy  46:5  48:4, 4,
8  63:10, 16  74:10

118:16  166:3
177:4, 9, 22
portion  65:7, 9, 13
position  14:5  17:20
25:9  132:11, 12
positive  143:10
155:14
positively  131:23
132:14, 16  180:7
possession  160:6
possibility  97:2
106:12  132:22
possible  148:10
possibly  22:15  67:8
121:12
post  8:14
potential  21:4
22:15
POWER  1:11  3:2,
7, 8, 9, 10, 11, 12, 13,
14, 15, 16, 17, 18, 19,
20, 21, 22, 23  4:1, 2,
3, 4, 5, 6, 7, 8, 9, 10,
11  5:2, 8, 14, 15
36:14  39:3  44:9
51:11, 20  58:10
69:22  78:19, 22
83:6  84:3  86:10
95:17, 20  104:20
106:22  109:5
111:24  112:8
114:22  124:6
125:11  140:3
141:8  144:15
147:4  148:21
152:3  160:20
162:5  166:16
168:1  169:5
170:14  172:12, 18
174:11, 17, 20
181:10, 20  182:9, 11,
14
practice  65:5
prepare  7:15
prepared  39:16, 17
preparing  21:14
presence  157:1, 3
PRESENT  2:21
41:3  98:4  99:22
100:6  103:13
113:21  136:6



Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 67 of 73 PageID #:583
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

141:*21* 142:2, *3*
145:9 152:*24*
182:*17*
**presented** 51:7
126:*24* 130:*16, 17,*
*18, 19, 21* 144:22
145:*3, 5, 21, 23*
150:*6* 154:*18*
155:*11* 165:6
172:*17* 173:8
**presenting** 136:*20*
**presently** 89:*8* 90:*6*
**preserve** 151:*18*
**president** 12:*14*
14:*18* 18:*5, 8, 20, 24*
19:*1, 3* 26:*12* 40:*6*
59:*20, 21, 23* 152:*11*
171:*18*
**Presidents** 60:*8*
**pressure** 97:*18*
**presumably** 67:*17*
**pretty** 18:*13* 83:*16*
117:*24* 125:6
156:*18*
**PRETZEL** 2:*12*
**prevent** 7:*12* 90:*11,*
*11, 16*
**previous** 83:*17*
110:*16, 17*
**previously** 31:*4*
80:*13* 81:*21* 133:8
161:22 164:*21*
**PRICE** 2:*7* 106:*17*
**pricing** 17:*3*
**prior** 38:*14* 39:*17*
45:*3, 4* 47:*10*
51:*13* 63:*16* 85:*5*
117:*12* 135:*19*
142:*13* 157:*7*
165:*20* 177:*18*
**privileged** 146:*15*
**probably** 28:*2*
57:22 88:*13* 90:*15*
92:*17* 139:*21*
142:*21*
**probationary** 155:*12*
**problem** 95:*1* 99:*14*
**Procedure** 1:*15*
**Procedures** 8:*1, 2*
10:7 23:*10* 39:*11*

40:*11, 17* 82:*17*
118:*17*
**proceedings** 44:*3*
95:*14* 135:7 174:*4*
**process** 16:*23* 17:6
81:9 176:*12*
**produced** 51:*13*
**production** 176:*10*
**productive** 103:*6*
**professional** 11:9
68:*20* 114:*18*
**progressive** 55:*16*
**prohibit** 42:*1*
**prohibited** 41:*17*
166:*4*
**project** 16:*15*
17:*14* 21:*3, 4, 8, 10,*
*18, 19* 22:6, *11, 12*
26:*13* 27:20, *21*
29:*17, 19, 23, 24*
30:*3, 24* 31:*13, 15*
32:*3, 4, 7* 33:2, *11,*
*16* 34:*13, 17, 18, 19*
48:*21, 23, 23* 49:*17,*
*21* 50:9 93:20, *24*
113:*23* 166:*11*
**projects** 16:*20, 23*
17:*2, 9, 12* 29:22
**pronounce** 98:*20*
**proper** 62:*15*
**properly** 62:4
98:*21* 123:*3*
**property** 160:*1, 4, 6,*
*11* 161:*24*
**proposals** 17:*3*
**propose** 146:*3*
**proposed** 149:*14*
**provide** 23:9 63:2,
*5, 15, 19* 133:*21*
**provided** 40:*16, 19*
41:7 62:22 159:*16,*
*17* 161:*12*
**provides** 133:*23*
**providing** 105:*13*
**PTO** 83:*23*
**PTO's** 44:*13*
**Public** 1:*13* 64:*15*
181:*24* 182:*5* 183:*8*
**Pudlo** 1:*13* 182:*4*
183:*5, 7*

**PULLOS** 2:*18*
135:*8*
**Purchasing** 26:*14*
**pursuant** 1:*14*
**put** 9:*12* 17:*3* 21:*1*
27:*9, 12* 38:7
39:*12* 68:*21* 136:*18*
**putts** 65:6

**< Q >**
**qualify** 46:*15, 19*
**quantify** 156:*13*
**question** 6:*5, 7, 7, 8,*
*16, 17, 20, 21, 22*
19:*23* 26:*21* 33:9
37:*15* 54:*19* 58:*19*
77:9 84:*14, 17*
100:*1* 103:*24*
110:*16, 17* 122:*5, 18,*
*24* 129:*23* 130:*13*
141:6 143:*11*
146:7 171:*7, 10, 13*
**questioned** 136:*1*
**QUESTIONER** 13:*4*
**questions** 6:*10* 7:*7,*
*13* 8:*8* 26:*19*
27:*14* 32:*11* 61:*8*
66:*5* 83:*3* 102:22,
*22* 103:2 113:*3*
135:*23* 140:*24*
174:6 176:*14, 14, 20*
180:9
**quick** 173:*19*
**quicker** 148:*1*
**quickly** 32:*23*
**Quite** 30:*20*

**< R >**
**Rachael** 93:*19*
168:6, *9*
**R-a-c-h-a-e-l** 93:*19*
**racially** 156:*24*
**Radoha** 12:*24* 59:*6,*
*7, 19* 60:*7, 17* 61:22
66:*17, 18* 67:*17*
68:*17* 99:2 100:*24*
114:*15*
**raise** 59:*4* 154:7
**raising** 61:*21*
**range** 65:6 88:*15*

92:*16*
**ranges** 26:*4*
**ratio** 92:6
**RCX** 3:*1*
**RDX** 3:*1*
**reach** 8:*23* 45:*23*
77:*4, 5* 97:*8* 102:7
113:*7, 9* 130:*8, 13*
150:*15* 151:*9*
**reached** 76:*8, 19, 24*
77:7 105:*11* 151:7
**reaching** 53:22
165:*11, 19* 168:*10*
**read** 15:*11* 32:22
41:*15* 54:*15, 22*
73:*14* 84:*15*
108:*24* 109:*1*
110:*21* 111:*17*
122:20 129:*23, 24*
132:*23* 133:*2, 13*
138:*24* 147:*19, 20*
149:*19* 161:*10, 15*
162:*15* 168:*18*
177:*19* 181:*13*
**reading** 54:20
108:*19* 122:*18*
133:*14, 15* 134:*7, 9*
138:*21* 142:*21*
153:7 160:*3*
**reads** 73:*5, 9*
124:*23* 127:*12*
**ready** 65:7 131:*23*
164:*13, 19, 22*
**real** 14:6, *6*
**realize** 84:*17*
**really** 32:*23* 47:*16*
102:*21* 145:*8*
**re-asking** 6:*8*
**reason** 7:9 24:6
146:*17* 169:2
**reasonable** 129:*15*
**reasons** 154:*18*
**recall** 15:*4* 16:*12*
22:*18* 24:*14* 27:*16,*
*18* 30:*16, 18, 20*
31:*17* 34:6, *10, 12*
49:5 53:22 54:*1*
66:*8, 22* 70:24
71:*19, 21* 72:7, *10,*
*11, 13* 76:12 78:*1, 3,*
*4, 6* 79:*16, 18* 80:*1,*



Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 68 of 73 PageID #:584
Michael Power  6/26/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

2 81:*1*, *18*, *19*  82:*5*,
*16*  83:*24*  85:*6*, *7*, *18*,
*19*, *23*  87:*21*, *23*
88:*19*  89:*3*, *15*, *17*,
*19*  94:*23*, *24*  97:*4*, *7*
105:*19*, *20*, *22*  106:*3*
108:*12*  111:*5*
114:*7*, *8*  115:*14*, *21*
118:*11*  119:*10*, *17*,
*20*, *21*  120:*1*, *5*
121:*11*, *15*  127:*13*,
*22*  141:*23*  142:*1*, *7*
143:*17*  144:*10*
146:*22*, *23*  151:*11*
152:*14*, *20*  154:*3*
155:*2*  157:*17*, *19*, *20*
159:*23*  167:*19*, *20*,
*22*  170:*8*  171:*8*
172:*2*, *4*  173:*12*, *18*
178:*14*, *24*  179:*19*
**receipt**  153:*22*
179:*22*, *23*
**receive**  38:*14*  44:*10*
126:*19*  163:*7*
**received**  41:*4*
70:*13*  76:*6*  80:*9*,
*15*  105:*16*  127:*14*
149:*6*  167:*7*, *16*
179:*8*
**receiving**  79:*15*
105:*8*  128:*6*, *13*
130:*15*
**Receptionist**  13:*7*
93:*18*
**recess**  43:*24*  95:*11*
135:*4*  174:*1*
**recipient**  72:*16*
**recognize**  107:*3*
144:*19*  149:*1*  162:*9*
**record**  5:*13*  29:*12*
44:*5*  54:*22*  84:*15*
95:*15*  110:*21*
122:*20*  129:*24*
135:*9*  138:*24*
139:*24*  182:*13*
**recruit**  168:*11*
**redirect**  174:*8*
**redundant**  102:*14*
**refer**  43:*20*  44:*14*
157:*20*

**reference**  41:*12*
78:*8*  161:*20*
**referenced**  28:*21*
41:*1*  133:*23*
**referencing**  173:*5*
**referred**  34:*19*
**referring**  42:*19*, *23*
110:*9*
**reflect**  94:*13*
**reflected**  94:*8*
**refreshes**  173:*9*
**regard**  154:*24*
**regarding**  39:*23*
73:*11*  74:*17*  79:*19*
145:*7*  152:*23*
158:*5*, *12*  178:*15*, *17*,
*18*
**Regovic**  33:*5*, *20*
**regular**  47:*14*  91:*5*
**regularly**  34:*14*
**reject**  137:*16*  139:*8*
**related**  58:*23*  74:*22*
94:*22*  164:*24*
182:*24*
**relates**  175:*4*
**relating**  10:*23*
27:*10*, *11*  29:*10*
62:*19*  82:*15*  118:*1*
**release**  146:*4*, *10*
**relevance**  16:*3*
**relevant**  111:*12*, *13*
154:*12*
**remainder**  83:*23*
**remarks**  118:*23*
**remember**  10:*15*
11:*12*  15:*2*  24:*11*,
*15*  28:*3*, *8*  29:*1*
58:*6*, *7*  67:*9*  68:*4*,
*7*  71:*1*  76:*22*
80:*19*, *22*  100:*13*, *18*
106:*7*  139:*17*
151:*13*  153:*2*
159:*10*  168:*8*  172:*9*
**Remind**  94:*15*
**reminded**  129:*5*
**remotely**  123:*20*
126:*10*
**repeat**  6:*20*  14:*20*
37:*15*  45:*16*  54:*18*
110:*18*

**repeatedly**  88:*24*
**repetitive**  113:*3*
**rephrase**  6:*20*  78:*9*
**replace**  19:*3*
**replied**  116:*14*
**reply**  105:*5*  124:*15*
**report**  12:*13*, *19*
13:*14*  14:*14*  45:*9*
49:*24*  50:*1*, *9*, *12*
104:*3*, *6*, *8*, *17*  127:*9*
136:*8*
**reported**  12:*9*
13:*12*  14:*15*, *16*
**reporter**  6:*3*  24:*23*
182:*5*
**reports**  13:*5*, *6*, *7*
**represent**  36:*20*
131:*23*  132:*4*, *13*, *16*
143:*10*  155:*14*
180:*7*
**Representative**  10:*8*,
*10*, *16*, *20*  17:*21*
27:*3*  49:*12*  62:*12*
82:*19*  94:*16*
**representatives**
22:*16*
**reprimand**  56:*3*
**request**  87:*6*  129:*7*,
*9*  176:*8*
**requested**  54:*22*
84:*15*  110:*21*
122:*20*  129:*24*
138:*24*
**requests**  17:*3*
**required**  30:*12*
33:*23*  41:*21*
**requirement**  43:*13*
67:*16*
**re-read**  84:*13*
**reserve**  180:*11*
**reserved**  182:*22*
**reserves**  177:*13*
**reside**  8:*6*, *7*
**resigned**  90:*7*
**resolution**  148:*3*
**resolved**  28:*6*
148:*11*, *13*, *17*
**Resources**  10:*2*
**respected**  155:*18*
**responded**  143:*13*

**response**  35:*2*
45:*15*, *21*  47:*23*
55:*19*  57:*8*  60:*5*
81:*5*, *7*, *13*, *16*, *20*
84:*12*  107:*19*
116:*17*  129:*4*
143:*16*  149:*6*
162:*20*  165:*5*, *14*
179:*21*
**responsibilities**
10:*23*  11:*17*, *22*
12:*3*, *8*  60:*15*
**rest**  93:*12*
**restart**  49:*24*
**restate**  85:*17*
129:*21*  130:*1*, *4*
143:*18*
**restored**  86:*4*
123:*16*, *19*
**result**  43:*3*  87:*12*
97:*20*  177:*18*
**results**  103:*9*
118:*10*  142:*9*
**retaliated**  18:*2*
**retaliating**  18:*3*
**retaliation**  11:*3*
**retiring**  19:*3*
**return**  124:*1*
129:*17*  150:*7*
154:*2*  160:*1*, *3*
**returned**  123:*18*
154:*9*
**returning**  123:*23*
129:*13*  130:*5*
153:*20*  165:*7*
**review**  29:*24*  56:*18*
140:*20*, *22*  147:*16*,
*18*, *23*  148:*6*
**reviewed**  7:*23*
**revised**  39:*19*
**revisit**  26:*21*  38:*7*
56:*21*  178:*1*
**ridiculous**  149:*18*,
*21*, *24*  150:*2*
**Right**  31:*4*  38:*18*
43:*4*  52:*10*  57:*9*
64:*18*  73:*3*, *8*
74:*18*  83:*18*  85:*2*
90:*10*  91:*19*  94:*5*
105:*14*  107:*11*
114:*10*  119:*8*, *12*



Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-5 Filed: 02/20/20 Page 69 of 73 PageID #:585
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

124:13 125:4
127:11 133:12
139:20 142:24
160:9 167:3
168:21 169:24
172:23 173:3
175:6 176:1
177:13, 17
**risk** 122:17
**River** 64:24
**Ro** 76:7, 19 81:6
95:24 98:4, 7, 14
99:3 108:2, 10, 17,
22 110:1 111:14
112:6 114:5 117:6
118:4, 14 120:20
128:19 149:7
166:9 167:7, 11
170:23 174:24
175:16 179:2
**road** 151:8
**Robert** 93:17
**Robertazzo** 93:17
**role** 10:2, 5, 12
18:1, 19 23:8 25:6
38:19 48:20 58:16
65:17, 18 69:2
96:14
**roles** 21:17 29:20
**roll** 45:11
**room** 29:2 44:22
113:15 131:13
157:9, 22
**Ro's** 77:13 86:18,
19 88:22
**Ross** 106:9
**Roughly** 18:12
26:3 67:8
**routine** 155:15
**ROWENA** 1:2
2:21 51:24 73:7
87:16 152:11 181:2
**RUFF** 2:13 44:4
134:13, 18, 20, 24
135:8
**Rule** 36:21
**rules** 5:23 41:24
**run** 8:22 45:19
53:12 55:3, 9 95:7
174:11

**< S >**
**salary** 149:23
**SAM** 2:2 5:10
**sam@goldmanehrlic**
**h.com** 2:4
**Saunders** 93:21
120:20 121:3
**S-a-u-n-d-e-r-s**
93:21
**save** 127:8
**saw** 29:2 68:6
70:12, 17 79:12
98:8 133:10 174:10
**saying** 71:19 81:20
85:8, 19 108:15
111:15 112:23
114:7 116:3
124:19 127:16
129:12 132:18
133:10, 20 149:17
154:21 163:4, 6
168:10, 15 172:20
**says** 52:3, 3, 4, 6, 8,
9, 10, 12 54:5 70:9
108:6, 21 114:2
141:7 142:5 177:12
**scenario** 55:17
**scenarios** 46:3
**Scheitel** 99:2 101:1
113:18 114:1
**school** 8:14, 17
**Schumacher** 12:17,
18 15:11, 12 19:8, 9,
24 20:1, 2, 10, 12
58:5, 12 61:3, 4
68:17, 24 69:19
70:6, 20 71:19
72:12 73:24 74:23
75:1, 3, 6, 10, 10, 13
80:7 83:21 84:10
85:2, 5, 8, 16 88:9, 9
89:18 91:10, 10
99:20 100:3 102:6
105:23 117:21
128:9, 9 129:2, 5
130:5, 10 141:8, 18
146:20 147:12, 13
149:4, 4, 17 152:17,
18, 24 162:13 178:7,
8 179:7, 7

**Schumachers** 88:20
131:8, 10, 19 135:14
**Schumacher's** 15:21,
23 20:3, 4 73:1, 5
141:11, 19
**Science** 8:12
**scooter** 31:16
**seal** 183:4
**second** 37:5 80:16,
17 82:3, 5, 9 83:20
110:10 112:17
130:19 177:12
**second-to-last**
140:16
**Section** 36:22
37:10, 12 40:11
41:2, 6, 8 42:19, 20
43:11 52:12 54:7,
9, 11 63:10 146:6
**sections** 40:23
41:11
**security** 154:23
**SEDAEI** 2:2 3:3
5:7, 10 16:4, 21
17:8 24:21 36:13,
16 37:9, 16 39:2, 5
43:6, 21, 23 44:5, 8
48:2, 7 51:10, 15, 19
54:17, 20 55:1, 7
61:7, 17 69:20
70:1 73:16 74:15
78:11, 15, 18, 21
83:5, 8 84:2, 5, 13,
18 86:9, 12 95:10,
15, 19 97:17 101:13
104:10, 11, 15, 18, 22
106:21 107:1
110:8, 18 111:1
112:7, 10 114:21
115:1 122:17, 23
124:5, 8 125:10, 13
129:23 130:3
134:15, 19, 22 135:1,
9, 10, 21 138:21
139:1 140:2, 5
142:15 143:2, 5
144:14, 17 146:19
147:2, 6 148:15, 19,
23 152:2, 5 156:4, 7
160:18, 22 162:4, 7
166:15, 18 167:23

168:3 169:4, 7
170:13, 16 172:11,
14 173:19, 22 174:5,
9, 13, 19 176:19
180:10, 12
**see** 18:17 25:23
37:1 51:14 52:2, 6
54:7 63:11 68:8
70:15 80:20 87:3
114:4 140:23
155:13 168:7, 17, 23
169:14, 15 171:16
173:8 175:18
**seeing** 68:4, 7
72:11, 13 115:21
153:5 157:17
**seen** 36:18 39:7
51:21 58:14 70:3
78:23 83:10 84:7
86:14 95:21
104:24 112:12
115:3 120:14
124:10 125:16
140:7, 11 147:8
152:7 161:1
166:20 168:5
169:9 170:18
174:21
**seminars** 11:8, 10,
15
**send** 90:16 138:20
161:11
**sending** 85:5 167:5
168:14
**Senior** 13:6, 9 14:1,
21
**sense** 5:22
**sensitive** 157:5
**sent** 69:18 73:24
84:21 85:8 118:2
128:2 137:14
145:13 146:1
149:18 152:11
159:24 164:14
167:15 168:15
172:17 174:14
176:8
**sentence** 21:2
177:12
**sentences** 138:22
**separate** 154:6



**separation** 130:*22*
136:*21* 137:*10, 16,
20* 138:*1, 14* 153:*7*
179:*8*

**September** 53:*13,
17* 72:*19* 79:*14*
80:*5* 86:*8* 107:*12*
115:*6, 9* 116:*9*
118:*12* 119:*3, 23*
120:*9, 10, 11, 13, 18*
121:*24, 24* 122:*10*
123:*4, 8* 124:*16*
125:*1, 2, 5, 8* 126:*15*
127:*8* 136:*24*
137:*13* 142:*6, 6, 20*
143:*12* 153:*16, 16,
16* 155:*9* 164:*14*
176:*5*

**serious** 71:*7, 10, 10,
20, 20* 72:*1* 81:*4, 4,
22* 96:*4*

**serve** 65:*2*

**server** 88:*4, 5* 89:*5*
90:*2, 13* 123:*13, 17,
21* 126:*8*

**set** 47:*4* 140:*13*
170:*23* 183:*3*

**Seth** 33:*4, 19* 34:*16,
22*

**severance** 51:*8*
130:*17, 21* 132:*22*
135:*11* 136:*7, 12*
139:*5, 8, 8, 9* 144:*22*
146:*3, 12* 149:*13*
150:*11, 14, 19* 151:*9,
16* 154:*12, 20* 155:*6*
179:*24*

**severity** 177:*14*

**sexual** 63:*13*

**Shaking** 9:*1*

**share** 167:*10*
168:*15*

**shared** 60:*13* 75:*16*
87:*19* 103:*15* 179:*2*

**sharing** 167:*7*

**Shaw** 13:*19* 14:*3, 8,
14, 19, 24*

**sheet** 181:*18*

**short** 60:*3, 6* 72:*8*

**Shorthand** 182:*4*

**shortly** 80:*23*

**short-term** 118:*16*
127:*1*

**shotgun** 65:*11*

**shots** 65:*6*

**show** 37:*7* 46:*7*
64:*23* 65:*1, 3*
157:*18*

**showed** 85:*10*

**showing** 36:*17* 39:*6*
51:*20* 70:*2* 78:*22*
83:*9* 84:*6* 86:*13*
95:*20* 104:*23*
107:*2* 112:*11*
115:*2* 124:*9*
125:*14* 140:*6*
144:*18* 147:*7*
148:*24* 152:*6*
160:*23* 162:*8*
166:*19* 168:*4*
169:*8* 170:*17*
174:*20*

**shows** 52:*21*

**sic** 172:*18*

**sick** 44:*15* 46:*6, 22,
23, 24* 47:*4, 7, 10, 15,
19, 21* 48:*13* 52:*18,
21* 53:*1, 17, 24* 55:*4,
10* 56:*1*

**side** 102:*11* 126:*4*
174:*14*

**sign** 139:*9* 147:*16*
150:*10* 166:*14*

**signature** 140:*17*
181:*15* 182:*21*

**signed** 67:*19* 152:*10*

**similar** 52:*21*

**simply** 106:*4*

**single** 27:*21*

**sip** 130:*19*

**sir** 16:*5*

**site** 17:*11* 21:*10, 14*
178:*4*

**sitting** 108:*15*
175:*15*

**situation** 48:*5, 6, 9*
55:*8* 56:*6, 8* 177:*15*

**six** 18:*16* 91:*13*
138:*3, 6, 13, 19*
154:*14*

**skip** 177:*15*

**sleep** 163:*9*

**slightly** 103:*12*

**slow** 92:*19*

**smartass** 128:*11*

**soliciting** 162:*16*
163:*5, 8, 12*

**somebody** 19:*18*
22:*10, 11* 45:*10*
71:*9* 76:*6* 89:*12*
95:*2* 108:*9* 163:*4*
164:*7*

**soon** 8:*23* 148:*9*

**Sorry** 12:*12* 13:*24*
22:*22* 51:*16* 53:*7*
54:*9* 84:*16* 92:*23,
24* 94:*3* 98:*9, 22*
99:*11* 104:*10*
113:*3* 126:*19*
134:*8* 136:*18*
162:*21* 172:*23*
173:*2* 174:*9*

**sound** 128:*11*
179:*14*

**South** 1:*17* 2:*3, 13*
182:*8*

**spanned** 137:*24*

**speak** 96:*2, 4* 98:*1,
13* 100:*9* 102:*4*
103:*7* 121:*10*
130:*6, 10*

**speaking** 85:*13*
103:*11* 141:*20*
164:*10*

**specializes** 15:*8*

**specific** 39:*24* 43:*8,
9, 12* 58:*7* 79:*18*
82:*16* 97:*20* 98:*11*
113:*6* 121:*15*
133:*22* 140:*24*
141:*6* 145:*8*
146:*17* 158:*24*
166:*3, 8* 169:*2*
172:*4* 176:*13*

**specifically** 28:*3*
31:*17, 22* 36:*11*
39:*14* 41:*6, 10*
43:*16* 50:*20* 60:*22*
67:*7, 10* 71:*6* 76:*4,
22* 77:*15* 80:*24*
83:*24* 89:*4, 12, 15*
90:*14* 101:*4, 10*

105:*19, 20* 106:*3*
114:*8* 121:*11*
125:*3* 127:*24*
128:*13* 132:*15*
133:*17* 137:*21*
154:*20* 155:*2*
156:*22* 159:*4, 23*
160:*8, 10, 16* 164:*10*
167:*19* 170:*8*
171:*22*

**specifics** 11:*11*
49:*6* 108:*12*

**speculate** 22:*10*
48:*3*

**speculation** 22:*13*
48:*1* 74:*12* 97:*15*
129:*20*

**speed** 134:*16*

**spell** 24:*19, 22*

**spend** 157:*8, 10*

**spending** 66:*8*

**spent** 126:*2, 3*

**split** 156:*19*

**spoke** 98:*3, 7, 18*
99:*12* 101:*24*
141:*18* 178:*7*

**spoken** 57:*3* 74:*16*
99:*4*

**SS** 182:*1*

**staff** 26:*13* 41:*5*

**stamp** 72:*21* 83:*15*
127:*15*

**stamped** 149:*9*
175:*18*

**start** 8:*9* 26:*6* 30:*6*
44:*21* 54:*4* 65:*7,
12* 109:*8* 110:*10*
111:*2* 156:*1*

**started** 9:*21* 14:*1*
15:*3* 18:*23* 60:*12*

**starters** 154:*3*

**starts** 65:*11* 70:*8,
10* 112:*16* 132:*24*
141:*4, 4*

**State** 1:*14* 5:*12*
120:*20* 122:*15*
182:*1, 6*

**stated** 87:*24* 104:*3*
112:*4* 144:*5* 159:*14*

**statement** 83:*22*
102:*1* 106:*2*

Michael Power 6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 71 of 73 PageID #:587
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

111:*18*  126:*12*
133:*6*  159:*24*
**statements**  88:*22*
104:*7*  112:*23*
117:*18*  171:*19*
178:*15*
**STATES**  1:*1, 16*
105:*12*  181:*1*
**stating**  105:*10*
124:*18*  127:*8*
147:*15*
**Stegman**  158:*12, 12*
166:*23*  167:*5, 10*
169:*23*
**steps**  177:*16*
**Steve**  50:*3*  53:*21*
91:*11*  113:*14*
**Stojowski**  98:*21*
**stops**  19:*21*
**story**  102:*11*
**STOUFFER**  2:*12*
**Street**  1:*18*  2:*3, 8,*
*18*  182:*8*
**stress**  7:*10*
**Strike**  69:*14*  143:*7*
146:*2*
**Studzinski**  23:*22*
**sub**  112:*21*  114:*1*
**subcontractors**  21:*7,*
*22*  22:*5*  66:*17*
*67:5*  77:*2*  90:*17,*
*24*  113:*5*  134:*11*
166:*5*
**subject**  55:*12*
130:*22*  166:*10, 13*
**subjected**  54:*13*
56:*2, 17*
**submit**  17:*4*
**submitted**  140:*19*
**subs**  68:*1*  162:*17*
163:*5, 8, 12*  165:*11*
**SUBSCRIBED**
181:*20*
**substance**  7:*12*
**sued**  17:*17*
**suggestion**  96:*15*
**suit**  183:*1*
**Suite**  1:*18*  2:*3, 13*
182:*8*
**supervises**  25:*8*

**supervisor**  23:*15*
45:*5*  49:*19*  113:*8*
**supervisors**  25:*18*
53:*3*
**supervisory**  25:*6*
**supplement**  26:*18*
**support**  36:*24*
**supposed**  45:*4*
125:*1, 5, 7*  165:*15*
**sure**  32:*10*  45:*18*
56:*8*  78:*15*  97:*19*
98:*20*  105:*19*
137:*4*  139:*19*
141:*10*  158:*20*
174:*12*
**surgery**  34:*9*  64:*6*
**surprised**  163:*7*
**suspend**  87:*15, 22*
88:*1, 6*  89:*10*
**suspended**  86:*3, 6*
87:*9, 11*  90:*9*
**suspending**  86:*20*
**Suspension**  56:*17*
87:*6*  90:*1*
**switch**  56:*23*
**sworn**  5:*1, 4*
181:*11, 20*  182:*12*

**< T >**
**T.V**  157:*19, 21*
**T.V.**  157:*12, 15*
**take**  6:*14*  7:*4, 8*
30:*12*  31:*8, 13*
32:*9*  33:*24*  37:*3*
43:*21*  45:*1*  48:*24*
49:*3*  54:*15, 17*
65:*6*  74:*6*  81:*4*
95:*9*  118:*18*
130:*19*  134:*13, 15,*
*18*  138:*16, 19*  139:*8,*
*13*
**taken**  1:*12, 14*  7:*2,*
*6*  43:*24*  73:*11, 21,*
*23*  95:*11*  114:*5*
135:*4*  174:*1*  181:*12*
**talk**  46:*9*  62:*14*
76:*21*  77:*4, 12*
89:*20*  98:*17*
100:*15*  102:*10, 16*
113:*9*  114:*14*

116:*5*  118:*4*  129:*2*
143:*13*  172:*6*
**talked**  19:*8*  27:*19*
57:*16*  58:*2*  77:*3,*
*22*  80:*14*  82:*1*
106:*6*
**talking**  42:*20*  70:*9*
77:*21*  78:*1*  80:*11*
85:*11*  94:*6*  102:*20*
105:*24*  108:*17*
109:*2*  154:*20*
156:*16*  162:*2*
164:*18*  172:*16*
175:*15*
**tapers**  26:*10*
**tax**  23:*12*
**team**  29:*23*  91:*7, 9*
145:*17*
**teams**  34:*20*
**telephone**  131:*3*
**tell**  8:*6*  15:*6*  20:*22*
23:*21*  26:*20*  28:*23*
29:*18*  33:*16*  37:*4*
39:*9*  42:*5*  46:*3*
48:*3*  51:*23*  53:*15,*
*16*  59:*2*  87:*2*  91:*8*
92:*5*  93:*15*  95:*23*
102:*6, 17*  109:*20*
110:*1*  111:*7*
113:*18*  117:*10*
124:*24*  125:*16, 23*
146:*20*  152:*9*
153:*2*  154:*15*
163:*3*  170:*20*
174:*23*  175:*3*
**telling**  27:*18*  81:*15*
146:*24*  151:*14*
**Temporarily**  123:*14,*
*15*
**ten**  30:*7*  32:*12, 13*
**tennis**  64:*4, 6*
**tenure**  138:*4, 8*
**term**  154:*19*
**terminate**  152:*15*
153:*10, 18*  155:*10*
**terminated**  86:*1, 2*
151:*3, 21, 23, 24*
163:*21*  168:*21*
182:*16*
**terminating**  152:*12*

**termination**  56:*17*
161:*23*  165:*12*
177:*18*  179:*17*
180:*1*
**terms**  21:*16*  26:*11*
139:*4*  145:*1, 8, 9*
150:*16, 20*  151:*10*
154:*8*
**testified**  5:*4*
**testify**  182:*12*
**testimony**  5:*18*
110:*7*  135:*20*
142:*14*  182:*13*
183:*3*
**Thank**  33:*22*  78:*12*
171:*12*
**thanks**  56:*21*  63:*22*
147:*2*
**thereof**  183:*2*
**thing**  6:*12*  7:*2*
31:*17*  108:*15*
110:*11*  111:*3*
174:*10*
**things**  5:*22*  89:*11*
90:*5*  119:*14*  134:*2*
164:*2*
**think**  15:*3*  18:*22*
22:*9*  33:*14*  37:*13*
38:*1*  42:*7*  43:*18*
48:*12, 15*  58:*18*
64:*11*  69:*21*  84:*14*
94:*18, 19*  97:*22*
102:*9, 12, 15, 19*
103:*1*  105:*2*
106:*13*  110:*19*
121:*23*  123:*6*
134:*15, 20*  135:*2*
136:*9*  144:*10*
149:*24*  156:*2, 9*
159:*12*  163:*15, 18,*
*20, 24*  164:*3, 4, 17*
169:*13*  171:*17*
172:*3*  176:*13*
**thinking**  137:*5*
**third**  97:*2, 9, 12*
112:*20*  141:*7*
149:*8*  175:*17*
177:*11*
**third-party**  86:*17*
97:*6*



Michael Power    6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 72 of 73 PageID #:588
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

thought 43:7 46:2
81:24 99:11
111:13, 17 123:11
137:8 150:1 153:9
171:11, 15
threatened 90:19
94:12
three 9:11 30:23
31:6 34:18 35:14,
17 42:22 46:6, 9, 10,
14, 15 47:6, 7 52:15
55:13 81:7 83:13
148:13 172:15, 17
177:8, 22
Tiger 65:21
Tim 19:24 23:22
35:4, 12 99:1
100:10 101:1
time 12:22 14:12
17:15 18:9 23:17
25:11, 13, 16 27:4
30:8, 13 33:12, 17,
24 34:9 35:10
36:3, 4 38:5 39:19
44:11, 14, 15, 15, 20,
23 45:19 46:23, 24
48:11, 22 49:13
50:2 52:15 53:23
54:17 57:22 59:23
60:1, 3, 3, 7, 9 62:11
65:24 66:8 68:7
70:4, 12, 15, 19, 24
71:23 72:21 73:21,
24 75:23 76:7, 15
78:1 79:12 80:19,
21 83:15 86:7
87:6 89:8 92:12
94:11, 18 95:7
98:4 99:23 100:16,
17 103:4 106:3, 17,
18 109:18, 22, 23
111:9, 22 113:4, 21
116:11 117:7, 15
118:2, 14 119:16
120:2, 9, 11, 12, 16,
18, 20 121:2, 15
122:5 123:5 126:1
127:6, 15 128:14
131:24 132:2
134:13 136:5
137:9, 19 138:15

149:20 153:14
157:8, 10 168:8
174:11 179:18
timeline 15:20
times 34:19 87:19
timing 20:13 25:12
30:10
title 9:8, 14, 19, 21
10:4, 6, 10 12:4
13:23 18:23 19:9,
13 20:4, 20 48:22
50:4, 6, 6 59:23
60:13 77:1 113:4,
6, 22 121:4 166:8
titled 149:9
titles 9:23 13:22
26:8, 11, 15 93:16
To: 72:14
today 5:19 7:5, 7,
13 17:17 124:21
today's 7:15
told 28:22 29:1, 5
75:13, 15 76:12
102:13 105:23, 24
118:21 127:1, 5
129:8, 18 130:11
137:21 138:17
139:7, 12 142:8
151:24 163:21
164:9, 12, 13, 21
179:3
Tom 12:18 19:5
20:1, 2, 4, 12 88:9
91:10 96:13
117:20 128:9
152:18, 24 178:7
179:7
tomorrow 127:10, 20
top 72:12 79:7, 13
83:16 84:9 105:5
107:14 108:6
124:15 141:7
142:4 147:11, 11
161:6 162:11
167:2 170:2 172:20
topic 159:1
topics 11:10
tore 30:14 34:1
Total 52:3 93:3, 5
touch 96:2
tough 154:22

toxic 87:18 88:24
119:11 178:16
track 53:3, 4
Tracy 109:3 111:8
training 10:22, 24
11:2, 5 38:14, 21, 22
40:21 41:4, 10
transcribe 6:3
transcript 181:13
182:20
Treasurer 9:16, 17,
20 11:23 12:20
13:11
tried 97:5 168:11
trouble 127:9
true 130:15 182:13
truth 182:12
truthful 7:13
try 6:10 97:8
trying 18:22 20:23
32:16 90:11, 11, 15
99:12 121:14
128:11 133:1
134:16 139:19
145:23 156:2, 13
Tuesday 161:7
turn 159:21 176:23
twelve 7:1
two 13:13 33:2
44:19 59:22 64:8
85:1, 15 90:3
131:8, 15, 19 135:13
138:5 142:19
143:23 148:6
156:19 164:1
175:8, 9
two-thirds 114:2
type 31:16
typed 111:5, 22, 23
176:2, 2
types 40:7
typewritten 175:21,
24
typically 17:5
44:14 64:15 65:1,
10

< U >
U.S 11:3

Uh-huh 27:5 29:7
110:14, 19 143:4
150:12 178:5
uh-huhs 6:11
uh-uhs 6:12
unable 31:6
unacceptable
129:18 130:12
unavailable 108:11
undergo 10:22
understand 5:18
6:19 22:2 78:15
80:8 122:24
134:24 141:10
162:1
understanding 30:2
84:24 177:21
Understood 6:18, 22
60:24 133:15 134:8
unemployed 14:11
unexcused 46:7
unfit 123:8, 12
unhappy 89:8
120:21
Union 26:10
UNITED 1:1, 16
16:7, 8, 9, 10 181:1
University 8:13
16:6
unpaid 46:8 48:16
118:19, 21
unreasonable 129:6
unsure 30:6
unusual 7:10
unwillingness 180:5
updated 82:18
updates 39:21, 24
UPS 146:1 161:11
upset 89:9 94:21
109:17 144:4, 5, 6, 7,
12
use 6:11 36:24
40:22 41:12 45:10
46:23 53:1 144:13
usual 127:10
139:10
usually 21:13
65:11, 12 157:13

< V >



Michael Power    6/26/2019
Case: 1:18-cv-04542 Document #: 55-3 Filed: 02/20/20 Page 73 of 73 PageID #:589
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**vacation** 34:*9* 36:*4* 44:*14, 15, 17, 20* 45:*2, 10, 14* 46:*12* 47:*1, 20* 48:*13* 51:*24* 52:*4, 13, 15* 53:*13* 55:*4, 10, 24*
**various** 13:*22* 21:*6* 41:*10* 46:*3* 54:*12* 62:*7* 107:*6, 6* 120:*14* 122:*12* 126:*24*
**VEDDER** 2:*7* 106:*17*
**Verbal** 56:*3*
**verbally** 138:*15*
**version** 145:*2, 4, 10*
**versus** 6:*11* 97:*3* 148:*13*
**Vice** 14:*17* 18:*23* 19:*1*
**viewed** 55:*21*
**violate** 54:*13*
**violated** 74:*9*
**visit** 21:*14*
**vs** 1:*5* 181:*5*

**< W >**
**Wacker** 2:*13*
**wait** 6:*5, 6*
**walk** 31:*14*
**walked** 106:*6*
**walk-through** 21:*24* 22:*14*
**walk-throughs** 21:*13, 15, 23* 31:*1, 3, 7, 11, 11* 34:*11, 14* 126:*2* 132:*12*
**want** 21:*16* 22:*1* 26:*7, 17, 20* 37:*11, 17* 43:*20* 49:*8* 53:*9* 54:*2, 4* 73:*6* 77:*12* 84:*13* 110:*19* 125:*15* 134:*18* 141:*10* 147:*10* 148:*2, 9* 150:*10* 176:*16* 177:*11* 178:*1* 179:*5*
**wanted** 53:*7* 76:*21* 77:*4* 96:*4* 120:*21* 136:*8* 137:*12, 15* 146:*20* 147:*24*

148:*3, 11, 12, 17* 154:*2, 19, 23* 174:*11*
**warning** 177:*18*
**watching** 157:*12, 15, 17*
**water** 130:*20*
**Watts** 169:*13, 18*
**way** 26:*1, 17* 32:*7* 44:*13* 55:*21* 61:*8* 62:*15* 66:*4* 102:*19* 114:*2, 6* 119:*3* 132:*1* 163:*16* 182:*24* 183:*1*
**we,** 139:*15*
**week** 34:*8* 36:*3* 48:*16* 49:*1, 3* 115:*24* 143:*3* 148:*13*
**weeks** 30:*23* 31:*6* 44:*19* 52:*15* 138:*2, 6, 13, 19* 148:*6, 13* 154:*14* 168:*20*
**Weil** 93:*19* 168:*6, 10, 15*
**W-e-i-l** 93:*19*
**welcome** 23:*9*
**Well** 6:*23* 87:*3* 95:*5* 105:*8* 134:*22* 136:*17* 138:*16* 144:*2* 146:*2* 160:*10*
**well-known** 65:*20*
**went** 31:*10* 66:*11* 72:*18, 22* 73:*1* 77:*12* 80:*21* 83:*16* 132:*7*
**we're** 37:*19* 56:*22* 65:*12* 92:*19, 19* 134:*22* 135:*1* 147:*3* 150:*11* 159:*4*
**We've** 16:*18, 19* 33:*2* 80:*13* 122:*1*
**WHEREOF** 183:*3*
**wife** 114:*16*
**William** 14:*17* 91:*11*
**willing** 108:*20* 111:*19*
**withholding** 23:*12*
**WITNESS** 3:*1* 5:*1, 3* 24:*19* 54:*18* 69:*10* 95:*7* 99:*7*

100:*7* 117:*18* 134:*21* 141:*21* 143:*1* 180:*16* 182:*22*
**witnessed** 103:*15, 22* 114:*3*
**witnesses** 37:*21, 23* 38:*3, 6* 98:*3, 17, 18* 99:*10, 11, 15* 101:*3* 104:*1, 2, 6* 141:*24*
**women** 155:*20*
**wood** 114:*5*
**Woods** 65:*21*
**word** 20:*24* 144:*13* 171:*1*
**words** 57:*24* 133:*20, 21* 137:*5* 179:*16*
**work** 17:*7* 26:*23* 27:*1* 29:*24* 30:*13* 31:*19* 33:*24* 34:*7* 41:*2* 45:*14, 20* 47:*22* 48:*14* 49:*4* 55:*3, 11* 56:*1* 87:*13* 90:*6* 111:*24* 123:*18, 20, 24* 124:*21* 125:*1, 5, 7, 21* 126:*9* 127:*10* 128:*20, 22* 129:*13, 17* 130:*5* 135:*16* 136:*4, 8, 8, 17, 22, 23* 137:*8, 12, 15* 138:*18* 139:*10, 14* 143:*20* 150:*7, 23* 151:*17* 153:*13, 20* 154:*2, 9* 155:*12* 163:*9* 164:*9, 13, 20, 22, 24* 165:*7*
**worked** 15:*18* 30:*15* 34:*8* 112:*4*
**working** 30:*21* 31:*21* 36:*2, 10, 11* 41:*18* 43:*2* 47:*14* 50:*19, 20* 89:*8* 91:*18* 95:*1* 120:*17* 122:*7* 162:*16* 163:*5, 11, 12, 18* 164:*1, 1, 8* 165:*1*
**works** 77:*2* 113:*5*
**worth** 108:*22* 109:*9*

**worth,** 109:*13*
**Wow** 64:*3*
**write** 104:*3* 126:*14, 17* 175:*14, 23*
**writing** 32:*15, 18, 21* 56:*12* 139:*24* 176:*5*
**written** 29:*12*
**wrong** 114:*5* 119:*4* 124:*19* 165:*12, 18* 171:*1*
**wrote** 114:*10, 12* 126:*17* 129:*12* 149:*20* 175:*15*

**< Y >**
**Yazbec** 12:*16* 18:*5, 11* 27:*18* 28:*11, 16, 22* 40:*6* 59:*24* 71:*3, 16* 75:*7* 80:*7* 83:*21* 88:*9, 20* 91:*11* 99:*20* 105:*23* 107:*18, 18* 108:*4, 6, 14* 110:*4* 113:*14* 117:*1, 20* 127:*20* 128:*9, 21* 131:*3, 5, 8, 19* 135:*13* 137:*23* 139:*16* 141:*8, 21* 142:*2, 3* 146:*23* 152:*11, 17* 162:*12* 171:*2, 14* 172:*1* 173:*2* 175:*1* 178:*7* 179:*6*
**Yazbec's** 19:*6* 141:*11*
**year** 15:*1* 24:*12* 30:*19* 45:*11, 11, 14* 46:*6* 47:*7* 49:*7* 59:*11, 13*
**years** 9:*11* 13:*21* 17:*15* 18:*12* 25:*12* 30:*7, 11* 35:*23* 49:*5* 64:*8* 138:*5* 147:*17*
**year's** 149:*23*
**Yelp** 16:*14*
**yeses** 6:*11*
**yielded** 97:*19*

