Peter Jacobsen 6/27/2019
Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 1 of 39 PageID #:594
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION


 3


 4      ROWENA DZIUBLA,            )
                                   )
 5              Plaintiff,         )
                                   )
 6         vs.                     ) No. 1:18 CV 4542
                                   )
 7      J.C. ANDERSON, INC., and   )
        PETER ERLING JACOBSEN,     )
 8                                 )
                   Defendants.     )
 9

10              The deposition of PETER JACOBSEN,

11      called by the Plaintiff for examination, pursuant to

12      notice and pursuant to the Federal Rules of Civil

13      Procedure for the United States District Courts

14      pertaining to the taking of depositions, taken

15      before JODI ANNE FEIGN, Certified Shorthand Reporter

16      and Notary Public within and for the County of Cook

17      and State of Illinois, at 20 South Clark Street,

18      Suite 500, Chicago, Illinois, on the 27th day of

19      June, 2019.

20

21

22

23

24
```



Peter Jacobsen  6/27/2019
Case: 1:18-cv-04542 Document #: 53-3 Filed: 02/26/20 Page 2 of 39 PageID #:595
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1      PRESENT:

 2
             GOLDMAN & EHRLICH
 3
                  (20 South Clark Street
 4                 Suite 500
                   Chicago, Illinois 60603
 5                 312-332-6733
                   sam@goldmanehrlich.com)
 6

 7      By:  MR. SAM SEDAEI,
                 Appearing on behalf of the Plaintiff;
 8

 9      PRETZEL & STOUFFER, CHARTERED

10           (One South Wacker Drive
              Suite 2500
11            Chicago, Illinois 60606
              312-346-1973
12            ERUFF@PRETZEL-STOUFFER.COM)

13      By:  MR. EDWARD B. RUFF,
              Appearing on behalf of the Defendant,
14            PETER JACOBSEN;

15      VEDDER PRICE

16           (222 North LaSalle Street
              Chicago, Illinois  60601
17            312-609-7569
              molson@vedderprice.com)
18
        By:  MS. MICHELLE T. OLSON,
19            Appearing on behalf of the Defendant,
              J.C. ANDERSON, INC.;
20

21

22

23

24
```

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 3 of 39 PageID #:596

Peter Jacobsen  6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1      APPEARANCES CONTINUED:

 2         CLIFFORD LAW OFFICES

 3              (120 North LaSalle Street
                31st Floor
 4              Chicago, Illinois  60602
                312-899-9090
 5              JCP@CLIFFORDLAW.COM)

 6         By:  MR. JAMES C. PULLOS,
                Appearing on behalf of the Defendant,
 7              J.C. ANDERSON, INC.

 8                 *   *   *   *   *   *   *   *   *   *

 9

10                      I N D E X
        Witness:
11
        PETER JACOBSEN,
12
        Direct examination by Mr Sedaei          4-62
13
        Cross Examination by Mr. Ruff            63-77
14

15                 *   *   *   *   *   *   *   *   *   *

16

17

18                   E X H I B I T S

19

20      Exhibit No. 1                          37

21      Exhibit No. 2                          48

22      Exhibit No. 3                          55

23      Exhibit No. 4                          59

24
```

Peter Jacobsen  6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 4 of 39 PageID #:597
**Rowena Dziubla vs. J.C. Anderson, Inc., et al.**

1    (Witness duly sworn.)
2         PETER JACOBSEN,
3    called as a witness on behalf of the Plaintiff
4    having been first duly sworn on oath, was examined
5    and testified as follows:
6         DIRECT EXAMINATION
7         BY: MR. SEDAEI
8    Q.  Good morning, Mr. Jacobsen.
9    A.  Good morning.
10   Q.  My name is Sam Sedaei, and I'm the attorney
11   for the plaintiff in this case, Ms. Dziubla.
12        Will you please state your full name
13   for the record?
14   A.  Peter Erling Jacobsen.  Erling is spelled,
15   E-R-L-I-N-G.
16   Q.  Thank you.
17        Mr. Jacobsen, have you ever been
18   deposed before?
19   A.  Yes.
20   Q.  Have you ever been -- have you been deposed
21   more than once before?
22   A.  No.
23   Q.  Okay.  When was the last time you've been
24   deposed?

Page 4

1    other.
2         So please wait until I have finished
3    asking a question before answering, and I will try
4    to wait until you have responded to a question
5    before speaking.
6         Also, when answering questions, please
7    try to use full answers, yeses and nos versus
8    uh-huhs or ung-huhs.
9         Sounds good?
10   A.  Yes.
11   Q.  And please make sure all of your answers
12   are verbal rather than, you know, head nods or head
13   shakes.
14        If you need to take a break, just let
15   me know, but please only ask for a break after you
16   have answered a question but before I have posed a
17   new question.
18        Okay?
19   A.  I understand.
20   Q.  If you don't hear or understand the
21   question, ask me and I will repeat or rephrase.  But
22   if you do answer a question, I will assume that you
23   understood the question.
24        Can I ask you if you've consumed any

Page 6

1    A.  I was deposed I think in the year 2000.
2    Q.  And what kind of a case was that?
3    A.  I was testifying on behalf of Payne Stewart
4    who was a professional golfer who was killed in a
5    plane crash.  He was my friend.
6    Q.  Sorry to hear that.
7         Okay.  And just -- what kind of a case
8    was it generally?  Was it a -- would it be --
9    A.  It was a wrongful death suit.
10   Q.  Okay.
11   A.  Regarding the manufacturer of the airplane.
12   Q.  Okay.  Do you understand that your
13   testimony today will be under oath?
14   A.  Yes.
15   Q.  So I'm going to go over some basic ground
16   rules, and I would ask you to please keep them in
17   mind as we proceed.
18        So it's -- and you might recall some of
19   this from the last deposition you had -- but a
20   deposition is much like a conversation but there is
21   certain differences.
22        For one, we have a court reporter here
23   today who is attempting to transcribe the
24   conversation, therefore, we cannot interrupt each

Page 5

1    medicine, alcohol or recreational drugs over the
2    past 12 hours?
3    A.  No.
4    Q.  Is there any reason such as being under
5    unusual stress, a physical or mental condition or
6    under the influence of any substances that would
7    prevent or limit your ability today to give truthful
8    answers to my questions?
9    A.  No.
10   Q.  Mr. Jacobsen, do you know why you are here
11   today?
12   A.  Yes.
13   Q.  Why are you here today?
14   A.  I'm being sued by your plaintiff.
15   Q.  And have you had the chance to read the
16   complaint in this case?
17   A.  Yes.
18   Q.  What did you do to prepare for today's
19   deposition?
20   A.  I met with my attorney last night.
21   Q.  Okay.  And have you met with anyone else in
22   preparation for today?
23   A.  No.
24   Q.  Have you looked at any documents?

Page 7

Peter Jacobsen  6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 5 of 39 PageID #:598
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 8**

1   A. Yes.

2   Q. What documents have you looked at?

3   A. I read your client's deposition.

4   Q. Okay. Have you read any other documents?

5   A. Yes. I read the complaint, the lawsuit.

6   Q. Anything else?

7   A. I did see the EEOC report.

8   Q. Can you think of any other documents you

9 looked at?

10   A. No.

11   MR. RUFF: You may have seen some photos.

12   THE WITNESS: Yes, I did see some photos

13 from the day in question.

14   MR. SEDAEI: Q. Okay. Can you tell me the

15 city and state you reside in?

16   A. I live in Bonita Springs, Florida,

17 B-O-N-I-T-A, Springs, Florida.

18   Q. I just want to ask you some questions about

19 your level of education.

20   What is the highest level of education

21 you have?

22   A. I went to four years of college without a

23 degree.

24   Q. So you didn't graduate?

**Page 9**

1   A. I did not.

2   Q. What college did you go to?

3   A. University of Oregon.

4   Q. Are you from Portland?

5   A. Yes, I am.

6   Q. I've been there twice and I have still not

7 seen Portland sunny, rain the whole time, and it was

8 summer.

9   What year -- what years did you attend

10 University of Oregon?

11   A. '73, '74, '75 and '76.

12   Q. Do you have any post high school degrees?

13   A. No.

14   Q. Where did you go to high school?

15   A. I went to Lincoln High School downtown

16 Portland, Oregon.

17   Q. And did you graduate from high school?

18   A. Yes, I did.

19   Q. Did you graduate in 1973? That's the

20 year --

21   A. I would assume so. Oh, yeah, I graduated

22 on time.

23   Q. Okay. Are you currently employed?

24   A. Yes.

**Page 10**

1   Q. Who's your employer?

2   A. I work for NBC Sports. I also work for a

3 company that I own called Peter Jacobsen Sports.

4   Q. Do you work for anyone else?

5   A. I don't understand.

6   Q. Well, you know what, we are going to delve

7 a little deeper later into like various

8 organizations that you have partnerships with or you

9 do projects with, but for now, I think that's

10 sufficient.

11   For how long have you been involved

12 with NBC Sports?

13   A. Since 2009.

14   Q. And when did you start Peter Jacobsen

15 Sports?

16   1988.

17   Q. What is your role or title at NBC Sports?

18   A. I would be a golf analyst slash announcer.

19   Q. So you make regular appearances on programs

20 on NBC?

21   A. I am paid per the week that I work. And I

22 do broadcast at PGA tour events and get paid as an

23 independent contractor.

24   Q. Okay. And what is your role at Peter

**Page 11**

1 Jacobsen Sports other than being the founder?

2   A. CEO.

3   Q. How many employees approximately does Peter

4 Jacobsen Sports have?

5   A. Fourteen. I believe it's 14 right now.

6   Q. Okay. And what does the company do

7 exactly?

8   A. Sports marketing. We create tournaments,

9 PGA tour events, special events involving PGA tour

10 players.

11   We also represent corporations in the

12 golf space, manage their spend and help them

13 basically integrate their -- their products in

14 trying to arrange their awareness in the golf space.

15   Q. I know it's a small company with 14

16 employees, but do you have a specific individual at

17 Peter Jacobsen Sports who is in charge of human

18 resources?

19   A. Yes.

20   Q. Who's that person?

21   A. Monica Cruz, C-R-U-Z.

22   Q. At NBC Sports, who do you report to? Is

23 there somebody you report to? Is there a contact

24 you have there that you work with?

Peter Jacobsen  6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 6 of 39 PageID #:599
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A.   The producer each week is the gentleman I
2    work under as he produces each t.v. show.
3    Q.   And who is he?
4    A.   Tommy Roy, R-O-Y.
5    Q.   Okay.  And would it be accurate to say that
6    at Peter Jacobsen Sports, you don't report to
7    anybody, you are the highest person there?
8    A.   Yes, I'm the highest person there.
9    Q.   So we just covered two entities.  So I want
10   to cover other businesses, companies, organizations,
11   institutions, associations or clubs you are involved
12   in.  And then I would ask -- and then I'm going to
13   ask you questions about those.  We covered NBC.
14        Do you also have some kind of an
15   involvement with Golf Channel?
16   A.   Yeah.  Let's see if I can explain.
17        Comcast owns NBC Sports and they also
18   own Golf Channel.
19   Q.   Okay.
20   A.   So I make appearances on NBC and Golf
21   Channel.
22        In the business, it's kind of
23   considered the same thing.  One is on network.  One
24   is on cable.

Page 12

1    Q.   So would it be accurate to say you have a
2    contract with Comcast?
3    A.   I haven't looked at my contract, but I
4    would assume -- I can't really tell you.  I'd have
5    to look at the contract as to who the entity is
6    with.
7    Q.   Okay.  And we talked about Peter Jacobsen
8    Sports.
9        What is Peter Jacobsen Challenge Keno?
10   A.   Oh, that's a -- that's a parlor game that
11   I've been involved with for 30 years.
12   Q.   What is exactly your involvement with that
13   game?
14   A.   My name and likeness is on the game and I
15   get royalties.
16   Q.   Okay.  Can you think of any other
17   organizations or companies you have some kind of
18   partnership with?
19   A.   Yes, I'm involved with a parlor game called
20   Golden Tee.  It's out of Chicago.  Incredible
21   Technologies is the company.
22        I also have a contract to be a brand
23   ambassador for Lexus, the automobile company.  I
24   also have a contract with Cleveland Srixon Golf out

Page 13

1    of Huntington Beach, California.
2    Q.   The last one was Cleveland --
3    A.   It's Cleveland Srixon.  I'll spell that,
4    S-R-I-X-O-N.
5    Q.   So going back to Golden Tee, what is
6    exactly your role or involvement with them?
7    A.   I do voiceovers.  The game has been going
8    on since somewhere around the mid '90s to the late
9    '90s, and I do voiceovers for players when they play
10   the game along with Jim Nance who is also a CBS
11   broadcaster.
12   Q.   Now, going to your brand ambassadorship
13   with Lexus, when did you get involved with that?
14   A.   I started with Toyota back in 19, I
15   believe, 84.  And then when Lexus became a brand in
16   1989 -- Lexus is under Toyota.  Toyota -- Lexus is a
17   subsidiary of Toyota.
18        I -- they moved me to the Lexus
19   representation, and I've been with Lexus ever since.
20   Q.   So as a brand ambassador, what do you do
21   exactly?
22   A.   I make appearances.  I wear their logo on
23   my shirt.  I carry their golf bag.  I play their
24   clubs.  I've got woods and irons and putters and

Page 14

1    hybrids in my bag.
2    Q.   So in layman terms, would you say they are
3    your sponsor?
4    A.   Yes.
5    Q.   Okay.  And I'm sorry if you answered this
6    question, but what is your involvement with the
7    Cleveland Srixon?
8    A.   Same thing.  I play the Lexus -- sorry.
9        I play the Cleveland Srixon clubs,
10   irons, woods, putters, hybrids and I carry their bag
11   and play their golf ball.
12   Q.   Okay.  Can you think of any other
13   organizations, clubs, companies you work with in any
14   capacity?
15   A.   Throughout my career?
16   Q.   Let's focus on current ones.
17   A.   Donald Ross.  Donald Ross is a shirt
18   company.  I wear their shirts when I play on the PGA
19   Tour.
20   Q.   So again, kind of a sponsorship
21   relationship?
22   A.   Yes.  And that -- I believe that's it.
23   Q.   Okay.  And by the way, if you think about,
24   you know -- if you want to like go back to any

Page 15

1  questions that I've asked if something else comes to
2  mind, you can do that.
3     A.  Okay.
4     Q.  Okay.  Do you know if any of these
5  organizations or contacts know about this ongoing
6  lawsuit?
7     A.  Yes.
8     Q.  Which ones do?
9     A.  Lexus and NBC Sports and Cleveland Srixon.
10     Q.  Do you know how they know?
11     A.  I told them.
12     Q.  Did they ask you?
13     A.  No.  I volunteered to let them know.
14     Q.  Is there a reason why you haven't
15  volunteered to let the other organizations or
16  companies we talked about know?
17     A.  It didn't seem necessary to tell them.
18     Q.  Okay.  Have you ever been sued for any
19  reason other than the lawsuit we are here for today?
20     A.  No.
21     Q.  To your knowledge, has anyone ever alleged
22  either formally or informally that you sexually
23  harassed them, again, other than the ongoing
24  lawsuit?

Page 16

1     A.  When I was in high school, I learned how to
2  play golf from my father.  And one of the ways he
3  taught my family to play was to try to impersonate
4  the great players, the Lee Trevinos, the Jack
5  Nicklaus, the Arnold Palmers.
6      I decided to go out and actually do
7  that.  So I did it through high school and college.
8  Then I've been on tour for 43 years and have on
9  occasion done clinics, instructional clinics with a
10  group, ending it with doing some impressions and
11  impersonations of other famous golfers.
12     Q.  And just so I'm clear, how did you exactly
13  make money by doing these things?  Are you paid for
14  these clinics?
15     A.  Sometimes I'm paid, yes.
16     Q.  And were you paid for doing those
17  impressions throughout high school?
18     A.  No.
19     Q.  Do you still do those clinics?
20     A.  I still do clinics, but I very rarely do
21  impersonations because I do the older golfers, the
22  Arnold Palmers, the Lee Trevinos and nobody knows
23  those players anymore.
24     Q.  You don't do Tiger Woods?

Page 18

1     A.  No.
2     Q.  Mr. Jacobsen, would you consider yourself
3  some kind of a comedian?
4     A.  No.
5     Q.  Are you somebody who likes to joke, make
6  people laugh?
7     A.  I try -- I think I take a lighthearted
8  approach to most things in my life, certainly my
9  golf career.
10      That -- I would probably be considered
11  somebody who likes to have fun in the profession
12  that I am in which is taken pretty -- fairly
13  serious.
14     Q.  Have you ever done any gigs where you
15  actually made money for making jokes or doing
16  stand-up or anything like that?
17     A.  No.
18     Q.  Okay.  Have you done any gigs where you
19  made money for doing impressions?
20     A.  Yes.
21     Q.  And when did you do that?
22     A.  I've done that my whole career.
23     Q.  Okay.  So how do you make money by doing
24  impressions?

Page 17

1     A.  No.  If I could do Tiger Wodds's swing, I'd
2  do it every day, every shot.
3     Q.  Okay.  Do you recall a time when you said a
4  joke in any context, it could be in family, it could
5  be outside, where you said a joke that offended
6  someone and that person told you that the joke
7  offended them?
8     A.  No.
9     Q.  Do you recall a time when you did anything
10  that offended somebody and they told you that what
11  you had done was offensive?
12      And you can think for a minute on your
13  answer.  I know I'm asking these questions that go
14  back your whole life, so --
15     A.  No.
16     Q.  Do you know who Jim Schumacher is?
17     A.  Yes.
18     Q.  Who is he?
19     A.  He is -- he's named in the lawsuit, but he
20  is a friend of my tour caddy.
21     Q.  Who's your tour caddy?
22     A.  Troy Martin.
23     Q.  Is Mr. Schumacher not your friend?
24     A.  I met Jim Schumacher through my tour caddy

Page 19

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 8 of 39 PageID #:601
Peter Jacobsen 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 20**

1  about two years ago.

2      Q.  And what was the context in which you met

3  were Mr. Schumacher?

4      A.  We met at a golf tournament in Hawaii at

5  the Hualalai Resort at a tournament that I was

6  playing in.

7      Q.  And was Mr. Schumacher also playing or was

8  he a spectator?

9      A.  I don't know.  I don't know that.

10      Q.  Okay.  Do you remember the situation that

11  led you to meet Mr. Schumacher, like who introduced

12  who?

13      A.  My tour caddy introduced me to him.

14      Q.  Okay.  What do you recall from that

15  conversation while you were being introduced to

16  Mr. Schumacher?

17      A.  Because he's a friend of my tour caddy and

18  he was with my tour caddy, Troy, and he said meet my

19  friend Jim.

20      Q.  Do you know if there was a reason -- okay.

21         Do you know if Mr. Schumacher wanted to

22  meet you?

23      A.  I don't know that.

24      Q.  Okay.  You said about two years ago.

**Page 21**

1         Can you be more specific?

2      A.  Oh, gosh.

3      Q.  The month, the year?

4      A.  Well, no -- well, it was probably in

5  January because the tournament is in January.  I

6  would have to -- I don't know.

7      Q.  So if I say January, 2017 --

8      A.  January, it could have been 17, it could

9  have been 16.

10      Q.  Okay.  How often do you talk to

11  Mr. Schumacher?

12      A.  I think after I met Jim, I spoke to him

13  twice.

14      Q.  Okay.  Let's talk about those two times

15  that you spoke together.

16         When is the first time?

17      A.  Again, probably at that tournament in

18  Hawaii and another time with Troy.  I don't recall

19  when or where.

20         But in the world of golf, you meet a

21  lot of people, you shake a lot of hands and it's a

22  big game.  It's a big world of golf.

23      Q.  Okay.  Do you know who Michael Yasbeck

24  (phonetic) is?

**Page 22**

1      A.  No.

2      Q.  Would it refresh your memory if I say that

3  he is an employee of J.C. Anderson?

4      A.  Yes.

5      Q.  So having said that, do you recall --

6      A.  Well, I don't know him.  I know of him

7  through the complaint.

8      Q.  Okay.  But beyond what you learned from the

9  complaint, you don't know anything about him?

10      A.  No.

11      Q.  Do you know who Michael Power is?

12      A.  Same thing, I only know his name through

13  the complaint.

14      Q.  And you are aware that he works at J.C.

15  Anderson?

16      A.  Yes.

17      Q.  Do you know who Ms. Dziubla is?

18      A.  Miss --

19      Q.  The plaintiff in this case?

20      A.  The plaintiff, I do, same, through the

21  complaint.

22      Q.  Do you recall meeting her?

23      A.  No.

24      Q.  Do you recall attending an event called The

**Page 23**

1  Kev in 2017?

2      A.  Yes.

3      Q.  Did you attend the event at anyone's

4  invitation?

5      A.  Yes.

6      Q.  Whose invitation?

7      A.  The invitation came through Troy Martin, my

8  caddy, from Jim Schumacher.

9      Q.  And did you accept the invitation?

10      A.  I did.

11      Q.  Do you recall why?

12      A.  I did it because it was for a good cause.

13  When I talked to Jim on the phone, he told me that

14  it was to raise money for a family who had lost

15  their father to, I believe, cancer.

16      Q.  So at some point after you received the

17  invitation, you had a phone conversation with

18  Mr. Schumacher.

19      A.  Yes.

20      Q.  Do you recall around when that was?  And if

21  it helps, the The Kev was in September of 2017.

22      A.  Yeah, it was in September, yes.

23         I believe the conversation started

24  somewhere around June or July of that year, two or

Peter Jacobsen 6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 9 of 39 PageID #:602
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 three months preceding the event.
2   Q.  But as far as the specific phone
3 conversation goes, do you recall how long before the
4 event that was?
5   A.  June or July.
6   Q.  Okay.
7   A.  Yeah.
8   Q.  But nothing more specific than that?
9   A.  No.
10   Q.  And during that call, my understanding is
11 that you say you had talked about the cause that
12 was being advanced by the event.
13       What else do you recall talking about?
14   A.  I remember being unavailable to do the
15 event because I was flying out from Chicago to
16 Atlanta for the next tournament, and it was going to
17 be a tight squeeze for me to get to the event and
18 then get to my airplane.
19       And I spoke to Troy a few times, and
20 then I told Troy I would do it because of the
21 charity and because of the family.
22       And then Jim Schumacher called me and
23 said he would pick me up at the hotel.
24   Q.  At the hotel you were staying in

Page 24

1 Chicago?
2   A.  Correct.
3   Q.  And what was your role going to be at the
4 event?
5   A.  My role at the event was going to be just
6 like I've done a thousand times, I would go from
7 group to group, meet the participants, thank them
8 for being there, and if, on occasion, give them
9 instructions or pointers about their golf.
10       I would possibly demonstrate, some
11 people could be on the tee hitting a driver or
12 hitting a long iron or a wood or a wedge or chipping
13 or putting.
14       And we drove around in a chart and we
15 had to hit each group pretty quickly because we only
16 had a few hours.  So we -- that was my -- that was
17 my focus.
18   Q.  Okay.  You said we were driving around.
19       Who was with you?
20   A.  Jim Schumacher was driving the cart that I
21 was in.
22   Q.  And who do you recall being at the event,
23 being in attendance?
24   A.  Nobody I knew.

Page 25

1   Q.  Was it your understanding that the
2 attendees were -- some of them were JCA employees?
3   A.  I didn't know that at the time.
4   Q.  So all you knew was the cause, and that
5 there were going to be some people there?
6   A.  Yes.
7   Q.  Were you offered compensation for your
8 attendance?
9   A.  Jim told me he wanted to give me $10,000,
10 but I told him I didn't want the money because it
11 was such a good cause.
12   Q.  Okay.  So is it that you didn't get -- you
13 didn't receive the money or you got it and gave it
14 to charity?
15   A.  I never received any money.
16   Q.  But did you ask that that money be sent to
17 charity, to the charity you were there for?
18   A.  Yes.  I wanted that money to go back to the
19 charity that we were there for.
20   Q.  And you told Mr. Schumacher that?
21   A.  Yes.
22   Q.  Were you paid or reimbursed for any travel
23 accommodations for attending the event?
24   A.  No.

Page 26

1   Q.  Were you already in Chicago for some other
2 reason during that time?
3   A.  Yes.
4   Q.  Why were you in Chicago?
5   A.  I was in Chicago for an NBC golf event that
6 was held at Conway Farms.  It was the BMW
7 Championship.
8   Q.  So prior to attending The Kev, who else do
9 you recall speaking with other than Mr. Schumacher
10 from JCA?
11   A.  Nobody.
12       MR. RUFF:  On that day?
13       MR. SEDAEI:  Well --
14       MR. RUFF:  I didn't -- yeah, I wasn't
15 understanding the question.  Sorry.
16       MR. SEDAEI:  Q.  Okay.  So prior to The
17 Kev, you stated that you spoke with Mr. Schumacher
18 about the upcoming event; correct?
19   A.  Yes.
20   Q.  Okay.  Who else do you recall speaking with
21 from JCA about the upcoming event before the actual
22 event, it could be the day before, it could be three
23 months before?
24   A.  I didn't speak to anybody from J.C.

Page 27

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 10 of 39 PageID #:603
Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Anderson.  My contact was Jim Schumacher.
2    Q.  Okay.  Got it.
3        Prior to attending The Kev, did anyone
4  from JCA provide you with any instructions on how to
5  properly interact with JCA employees while at the
6  event?
7    A.  No.
8    Q.  Prior to attending the event, did anyone
9  from JCA provide you with a copy of JCA's sexual
10  harassment policies?
11    A.  No.
12    Q.  Were you provided any training or
13  orientation on JCA's sexual harassment policies
14  prior to attending that event?
15    A.  No.
16    Q.  Okay.  So you talked a little bit about
17  what you did that day.
18        But can you kind of just like generally
19  describe your day to me, what you did, kind of a
20  sequential format?
21    A.  Jim picked me up at the airport -- excuse
22  me.
23        Jim picked me up at the hotel.  We
24  drove to the golf course.  I was unfamiliar with the

Page 28

1  golf course.
2        We got out.  He asked me to sign some
3  flags which were to be given out to the
4  participants.
5        We went inside, and I remember we had
6  lunch, a quick lunch as I signed the flags.
7        Then when I was done with that, I went
8  out onto the porch to take pictures with the family.
9  And we took probably 10 or 12 pictures.
10        And then when all of the participants
11  had got -- had assembled in their carts and had left
12  for their starting holes, that's when we got in our
13  chart and went out to join them.
14    Q.  And what did you do after that?
15    A.  We got out on the golf course and we went
16  from group to group and we met the players,
17  participants.
18        I thanked them for being there which is
19  customary practice for me at a Pro Am.  I always
20  want to be as hospitable and engaging as possible.
21        And we went from group to group.  And I
22  believe there were probably 20 to 25 groups which is
23  somewhere near a hundred participants.
24        And I remember everybody having so much

Page 29

1  fun and having a wonderful time.  And I wasn't aware
2  of who these people were.  They were just
3  participating in a charity event.
4    Q.  Do you recall having conversations with
5  various employees -- I'm sorry, various attendees at
6  the event?
7    A.  No.
8    Q.  When you were going from group to group, do
9  you recall giving golf instructions to any of the
10  attendees?
11    A.  No.
12    Q.  But you are not saying that it didn't
13  happen, right, you're just saying you don't recall?
14    A.  Customary --
15        MR. RUFF:  Let him finish.
16        THE WITNESS:  I'm sorry.  I'm sorry, Sam.
17        MR. SEDAEI:  Q.  No.  No, I'm done with the
18  question.
19        Did you understand the question?
20    A.  Yes.
21        Customary practice for me or any
22  professional golfer when you are out at an outing or
23  a Pro Am event, especially when you're going from
24  group to group, you meet, you engage and you

Page 30

1  instruct.
2        And on so many occasions, I would say
3  thousands of occasions, we will give a tip.  We will
4  be asked to watch somebody's swing, whether it's
5  with a driver, a wood or a hybrid or an iron, they
6  will ask you specifically, I need help with my
7  putting.  I need help with my wedges.  And you are
8  there as a guest, and I jump in and help.
9    Q.  Okay.  And do you recall specifically doing
10  that kind of thing when you were at The Kev with the
11  attendees?
12    A.  No.
13    Q.  Can you tell me what a chip shot is?  I'm
14  not a golfer.
15    A.  Okay.  There are so many shots in the game
16  of golf which require a different stance and
17  different proximity to the ball for power and for
18  balance.
19        A chip shot is a shot that is close to
20  the green, in close proximity to the green, usually
21  used with a wedge which is an iron in a bag.
22        And that requires you to make a short
23  swing on balance because you are not trying to hit
24  the ball a long ways.  You are trying to get the

Page 31

Peter Jacobsen    6/27/2019
**Rowena Dziubla vs. J.C. Anderson, Inc., et al.**

1     ball a short distance up to the hole or in the hole.
2        Q.   Okay.  And that's called a chip shot?
3        A.   That's a chip shot.
4        Q.   And you would use what you call an iron for
5     that?
6        A.   Yes.
7        Q.   I've heard these phrases -- excuse me.
8             What is an iron and what is a wood?
9        A.   An iron would be anything from a sand wedge
10    up to a long iron or a two iron.  And there is about
11    11 -- 10 or 11 in the bag depending on your
12    configuration of your bag.
13            A wood would be the longest clubs in
14    your bag.  It could be a driver, a three wood, a
15    four wood, a five wood.  So those are called woods
16    because they used to be made of wood.
17            Back when I started, I played woods.
18    Now-a-days, they are mostly made of metal.  They
19    call them metal heads or composite heads.  So even
20    though they are not wood anymore, we still call them
21    woods.
22       Q.   Okay.  And irons, are they actually made of
23    iron?
24       A.   They can be made of so many different --

Page 32

1     they can be a forged steel.  They can be a cast
2     club.  I don't know what they are exactly made of.
3     I don't know the formula.
4        Q.   Okay.
5        A.   But they are called irons and they are
6     called woods.  There is also a new thing called a
7     hybrid which is kind of an in-between club.
8        Q.   My self-esteem about golf is just
9     plummeting as you're speaking.
10            Can you tell me in general terms in
11    what kind of a situation or at what point you use an
12    iron on the golf course?
13       A.   You can use an iron off the tee for
14    accuracy or you could use an iron off the fairway
15    for a certain distance that you hit the club.
16            There are some players, like Tiger
17    Woods, you mentioned him, he's very long.  Somebody
18    like me at 65, I'm a senior, I'm not as long, so I
19    would use a higher numbered iron.
20            So when you use -- the reason there is
21    so many different irons in the bag is they go a
22    specific distance.
23            So once you calculate your distance,
24    you then choose the iron to hit to the green.

Page 33

1        Q.   Okay.  Now let's go to the wood.
2             In what kind of situations do you use
3     the wood?
4        A.   You would use a wood off the tee when you
5     are trying to hit the ball as long as you possibly
6     can.  You are looking for maximum distance.  You
7     would use a wood in the fairway.
8        Q.   I'm so sorry, what is the fairway?  I've
9     heard that term twice now.
10       A.   Yeah, the fairway, there are -- there
11    usually -- there could be three or four or even five
12    different heights of cut on a golf course.
13            The fair would be the optimum place to
14    put the ball off the tee.  That's the short cut
15    grass.  That's the -- that's the ideal place to be
16    able to accurately play your shot where you make
17    solid contact to put the proper spin on the ball.
18            The next cut would be the intermediary
19    rough.  And then the other -- the long rough --
20    you've probably heard the word rough -- would be the
21    longest rough where it could be anywhere from two
22    inches to eight inches.
23            And so if your ball is in the fairway
24    and you have access to be able to put the club

Page 34

1     behind the ball without any interference with grass,
2     that's when you would use a wood from the fairway.
3        Q.   So again, the questions I ask you may seem
4     a little dumb to you, but I have to understand.
5             So you have the area where there is the
6     flag, and again, from what I've seen of golf, where
7     there is like really short grass right next to the
8     hole, that area is called what?
9        A.   The green.
10       Q.   The green.
11            And then there is the area with a
12    little longer grass right along the edges of the
13    green; correct?
14       A.   Yes.
15       Q.   What is that area called?
16       A.   It could be called the collar or the
17    fringe.  That's another one of the heights of cut we
18    talked about.
19       Q.   Correct.
20            Would you ever use a wood on either the
21    green or the collar or the fringe?
22       A.   Yes.
23       Q.   And the reason you would use a wood in
24    those areas is why?

Page 35

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/26 Page 12 of 39 PageID #:605
Peter Jacobsen                    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A.  When -- depending on the elevation change
2   of the shot, you could be going up the hill or you
3   could be going down a hill.
4           The speed of the green plays into this,
5   but you also could be hitting out of a different
6   length of -- cut of grass.
7           The fringe sometimes can be a little
8   longer depending on the golf course.  So if you are
9   trying to hit a specific shot, you can use a three
10  wood, a four wood, a five wood, a hybrid.
11          I've even used my sand wedge which is
12  an iron and I've deled (phonetic) the ball.
13          In other words -- let me have that-- I
14  will take the iron because the sand wedge is the
15  heaviest club in your bag and it's got a thick
16  flange, and I will take the club and I will hit it
17  in the belly, in the middle, in the forehead we call
18  it, and that's going to make the ball roll with some
19  speed to get it out of the grass.
20          And then hopefully you have the proper
21  measured strike to get the ball close to the hole.
22    Q.  Okay.  Thank you.
23          Okay.  So you may have already with
24  your answer to my previous question, already

Page 36

1   answered this one, but do you recall specifically
2   providing Ms. Dziubla, the plaintiff in this case,
3   with instructions on how to -- how to hit the ball
4   or how to hit a chip shot?
5     A.  No.
6     MR. SEDAEI:  This will be Exhibit 1.
7           (WHEREUPON, Exhibit No. 1 was
8               marked for identification.)
9     MR. SEDAEI:  Q.  I'm showing you what's
10  marked as Exhibit 1.
11          Would you please take a look at this
12  document and tell me if you've ever seen this
13  before?
14    A.  Yes, I've seen this before.
15    Q.  And is it your understanding that this is
16  the complaint that's filed in this case?
17    A.  Yes.
18    Q.  When was the first time you saw this
19  complaint?
20    A.  July, 2018.  I believe I got this the day
21  it was -- whatever date it was filed.
22    Q.  Okay.  And who did you get it from?
23    A.  I got it from Jim Schumacher.
24    Q.  So if you look at Paragraph 9 which will be

Page 37

1   on the second page?
2     A.  Yes.
3     Q.  All right.  This is one of the -- one of
4   plaintiff's allegations in this case.
5           Would you please read it and then tell
6   me if you believe any of that information is
7   inaccurate?
8     A.  Read it out loud or --
9     MR. RUFF:  No, just read it to yourself.
10    MR. SEDAEI:  Q.  Yes.  Just read it to
11  yourself.
12          (WHEREUPON, witness peruses
13              document.)
14    THE WITNESS:  I read that.
15    MR. SEDAEI:  Q.  You read it?
16    A.  Yes.
17    Q.  Okay.  To your understanding, is any of
18  this information inaccurate?
19    A.  Yes.
20    Q.  Which part is inaccurate?
21    A.  When it says that's when I take my wood
22  out.  I would never say that.
23    Q.  Is there anything else in this paragraph
24  that's inaccurate?

Page 38

1     A.  I don't think so.  Customary practice when
2   you are showing someone how to hit a chip shot is so
3   many times beginners in golf, they take the stance
4   of a driver or to hit a long shot.
5           And so many times you have to push the
6   golfer closer to the ball, get closer proximity
7   because you are using a shorter club.  So many
8   people assume the longer stance of a driver or a
9   long shot.
10          So I can only assume as I was giving
11  instruction to the plaintiff or to anybody, that I
12  had to get them -- get her closer to the ball.
13    Q.  Okay.  So regarding the part that you said
14  is inaccurate, just the statement, you said that you
15  would never say that.
16          But you said that you don't even
17  remember giving instructions to the plaintiff;
18  correct?
19    A.  Correct.
20    Q.  So you don't actually remember what you did
21  or did not say?
22    A.  I don't remember what I did or did not say.
23  But when I was told by Jim Schumacher about the
24  complaint, he said, you told that stupid Rodney

Page 39

Peter Jacobsen    6/27/2019
Case: 1:18-cv-04542 Document # 93-5 Filed: 02/20/20 Page 13 of 39 PageID #:606
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  Dangerfield joke about beginners start with the
2  irons and they end up in the woods.
3       The woods being the club in the bag and
4  the trees or the forest adjacent to the fairway
5  because a driver or a wood is hard to control and
6  what happens is you spray the ball.
7       And if you're a beginner, you have a
8  difficult time controlling the ball, putting the
9  ball in the fairway.
10   Q.  Okay.  And after Mr. Schumacher told you
11  that, did you recall that, yes, you made such a
12  joke?
13   A.  I don't recall, no.  But I've said that
14  joke a thousand times.  It's a common golf joke.
15   Q.  Okay.  You can hold on to that exhibit.  I
16  may have other questions about it, but for now, I
17  think I'm fine.
18       When was -- so you explained to me what
19  you did throughout the day when you were attending
20  The Kev.
21       After the golf portion was over, what
22  do you recall doing?
23   A.  I recall finishing up the day and hurrying
24  into the clubhouse to change my shoes and to get to

Page 40

1  November?
2   A.  I don't recall.
3   Q.  Okay.  But to the best of your
4  recollection, it was November?
5   A.  Yes.
6   Q.  Of 2017?
7   A.  Yes.
8   Q.  Okay.  And who was the person that
9  contacted you?
10   A.  Jim Schumacher.
11   Q.  And how did he contact you?
12   A.  He called me.
13   Q.  Did he have your phone number?
14   A.  Yes.
15   Q.  And was this the first time you talked to
16  Mr. Schumacher since the event?
17   A.  No.  He called me the day after to thank me
18  for coming to the day, and they made a record amount
19  of money and they were elated about the success of
20  the event.
21   Q.  And when he called to thank you during that
22  call, he didn't mention anything about Ms. Dziubla's
23  allegations?
24   A.  I don't recall if he did or not.  I don't

Page 42

1  the airport.
2       And I remember saying to Jim, we got to
3  go or I'm going to miss my flight because I was
4  flying to Atlanta for another tournament that I
5  needed to get to.
6   Q.  Okay.  This question is not related to what
7  you just answered, but something I should have asked
8  in the beginning.
9       Can you tell me your date of birth?
10   A.  Yes, March 4th, 1954.
11   Q.  So then Mr. Schumacher drove you to the
12  airport; is that correct?
13   A.  Correct.
14   Q.  Okay.  And you got on your flight and --
15   A.  Everything was -- I made my flight, yes.
16   Q.  All right.  At what point after The Kev
17  event did you first hear that Ms. Dziubla had made
18  certain allegations about her interactions with you
19  at the event?
20   A.  I don't recall, but it was sometime, I
21  think, in November when I heard about the complaint
22  or I heard about her displeasure with the
23  interaction.
24   Q.  Is it possible that it was any earlier than

Page 41

1  think so.
2   Q.  Then you recall there being another call
3  later during which he talked about Ms. Dziubla's
4  allegations against you?
5   A.  Yes.
6   Q.  During the call when he -- during the
7  second call when he discussed with you Ms. Dziubla's
8  allegations, what do you recall him specifically
9  saying?
10       I think you already mentioned that he
11  talked about the joke you made.  It was during that
12  call?
13   A.  Yes.
14   Q.  Okay.  What else?
15   A.  Yeah.  He told me there was a complaint by
16  the plaintiff about a joke that I told.  And he
17  didn't go into specifics.
18       He just told me there was someone that
19  was upset about the day.  And to me, it was a very
20  successful day.
21       It was a day that I've done a thousand
22  times before.  I didn't understand what could have
23  been the problem.
24   Q.  Based on the physical contact you may have

Page 43

Peter Jacobsen   6/27/2019
Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/26 Page 14 of 39 PageID #:607
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  had with Ms. Dziubla as you describe you sometimes
2  have with people when you are trying to show them
3  how to do like a chip shot, and the joke -- you may
4  have told the joke that you have said many times, do
5  you think somebody who is not a professional golfer,
6  a female who is getting those instructions from you,
7  might not understand the joke and might get
8  offended?
9      A.  I don't know.
10         In the world I live, the golf world,
11  people understand golf.
12     Q.  But did you understand that the attendees
13  at The Kev were not all professional golfers?  Did
14  you know that?
15     A.  Well, there aren't that many professional
16  golfers in the world.  And I knew that everybody
17  there was not a professional golfer.  I didn't have
18  that knowledge if they could have been professional
19  or not.
20         But I assume if they are out on the
21  golf course, they are willing to partake,
22  participate, learn, have fun, learn the game.
23     Q.  But you wouldn't assume that because they
24  were on the golf course that they knew how to play

Page 44

1  golf?
2      A.  I don't know.  I -- I don't know.  I --
3  that didn't cross my mind.
4      Q.  So regardless of how successful you thought
5  The Kev event was, once you learned that
6  Ms. Dziubla was offended by her interactions with
7  you, did you consider reaching out to her and
8  apologizing for making her uncomfortable if you did
9  make her uncomfortable?
10     A.  I wanted to rectify the situation, but my
11  contact was Jim Schumacher.
12     Q.  Okay.  How did you want to rectify the
13  situation?
14     A.  Explain what happened, if that had
15  happened, her perception.
16     Q.  And you wanted to provide Ms. Dziubla with
17  the explanation?
18     A.  I would have.
19     Q.  Did you tell Mr. Schumacher that you wanted
20  to do that?
21     A.  I don't recall.
22     Q.  Did Mr. Schumacher ask you if you would be
23  willing to talk to Ms. Dziubla?
24     A.  No.

Page 45

1      Q.  So other than the call that you received
2  from Mr. Schumacher in November of 2017 where you
3  discussed Ms. Dziubla's allegations, do you recall
4  speaking with anyone else from JCA since then --
5      A.  No.
6      Q.  -- about Ms. Dziubla's allegations?
7      A.  No.
8      Q.  Have you exchanged any emails with anybody
9  from JCA regarding Ms. Dziubla's allegations since
10  The Kev event until today?
11     A.  No.
12     Q.  So going back to that call in November
13  of 2017, do you know why Mr. Schumacher was reaching
14  out to you to tell you that an employee was
15  offended?
16         Was he asking you to do something
17  because of the allegations?
18     A.  No.
19     Q.  Did he tell you why he was telling you that
20  information?
21     A.  Well, I was involved -- I was at the event.
22  I was the guest of honor, the celebrated golfer
23  there.  So he wanted to let me know what was going
24  on.

Page 46

1      Q.  But even though he wanted you to know, he
2  didn't want you to do anything about it to try to
3  rectify things?
4      A.  Well, that wasn't my business.  He was my
5  point of contact.  I let him handle it.
6      Q.  Okay.  And that's the only conversation
7  that you have had with anybody from JCA about
8  Ms. Dziubla's allegations?
9      A.  Yes.
10     Q.  Did anyone from JCA ever tell you that
11  there was going to be an investigation into
12  Ms. Dziubla's allegations?
13     A.  No.
14     Q.  Were you ever told that during the --
15  either one of the two calls you remember with
16  Mr. Schumacher that he was interviewing you as part
17  of that investigation?
18     A.  No.
19     Q.  When Mr. Schumacher called you, did he
20  actually ask you to explain yourself and your
21  recollection of the events from The Kev?
22     A.  No.
23     Q.  Did Mr. Schumacher specifically ask you
24  to confirm or deny any specific portions of

Page 47



Peter Jacobsen                    6/27/2019
Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/20 Page 15 of 39 PageID #:608
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1 Ms. Dziubla's allegations?
2 A. No.
3     MR. SEDAEI: Would it be okay if we take a
4 five minute break?
5     MR. RUFF: Sure.
6         (WHEREUPON, a short recess was
7         taken.)
8     MR. SEDAEI: Back on the record.
9     Exhibit 2.
10        (WHEREUPON, Exhibit No. 2 was
11        marked for identification.)
12    MR. SEDAEI: Q. Mr. Jacobsen, we are back
13 on the record, and I am showing you what's marked as
14 Exhibit 2.
15        Would you please take a look at that
16 document and see if you recognize it?
17        (WHEREUPON, witness peruses
18        document.)
19    THE WITNESS: I do not recognize this.
20    MR. SEDAEI: Q. So you have never seen
21 that document before?
22    A. No.
23    Q. In the document, if you flip to the second
24 page, Section 6 on top where it says general release

Page 48

1 of claims?
2 A. Correct.
3 Q. And first, I will represent to you that
4 this was a severance agreement that was presented to
5 Ms. Dziubla by JCA.
6     And if we look at the paragraph that I
7 referenced, Paragraph 6, towards the end of the
8 third line, your name is included as a -- one of the
9 parties the liability against whom is being released
10 by this section.
11        Do you see that section where it says
12 Peter Jacobsen at the end of the third line?
13    MR. RUFF: Mr. Jacobsen -- hold on just one
14 second.
15        I'm going to lodge a formal objection
16 to any questioning about a document he's never seen,
17 he is not a party to, and I don't think the court
18 would allow it. But it's obviously a deposition, I
19 will allow the questioning.
20        But I want it on the record so that if
21 this is ever used at trial, the court is aware of
22 the fact that I object to any relevance to this
23 because it's clearly not related to him at all.
24        Go ahead.

Page 49

1     THE WITNESS: Okay. Would you repeat the
2 question?
3     MR. SEDAEI: Okay.
4     Q. With that objection noted, I was
5 going to ask the court reporter to read the
6 question, but it was kind of a long question. Let
7 me see if I can shorten it.
8        Do you see that there is a reference to
9 your name in this paragraph that I was referring to,
10 Paragraph 6?
11    A. Yes, I see it.
12    Q. Okay. Were you aware that your name was
13 going to be included in this document?
14    A. No.
15    Q. Did anybody from JCA ever tell you that
16 your name was being included as part of this release
17 from various forms of liabilities?
18    MR. RUFF: Again, your question assumes
19 that he was aware of the release. And he's already
20 established he's never seen this before.
21        And so again I object under Federal
22 Rules of Evidence regarding relevance, I believe
23 it's 608 -- 408, excuse me.
24    MR. SEDAEI: Okay. With the objection

Page 50

1 noted --
2     THE WITNESS: I can answer that question.
3        The answer is no.
4     MR. SEDAEI: Q. Okay. Were you -- Oh,
5 well, strike that. I'm trying to not ask you
6 repetitive questions.
7        One moment.
8     MR. RUFF: For the record, I rarely object,
9 but I've got to throw it in there every once in a
10 while.
11    MR. SEDAEI: I'd be disappointed if you
12 don't.
13    Q. So we talked about any discussions
14 you have had or have not had with anyone at JCA.
15        Have you discussed Ms. Dziubla's
16 allegations with anyone else other than
17 Mr. Schumacher and the individuals at the two or
18 three companies we discussed where you disclosed to
19 them the ongoing complaint?
20    MR. RUFF: And his attorneys.
21    MR. SEDAEI: Q. And of course your
22 attorneys, yes.
23    A. My wife knows.
24    Q. And a biographical question I probably

Page 51

Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   should have asked in the beginning, you are married?
2       A.  Yes, I am.  I'm married 43 years.  I even
3   remember the date, December 28th, 1976.  And I'll
4   never forget that date.
5       Q.  Wow, almost Christmas Eve.
6           Okay.  And do you have kids?
7       A.  I have four children -- excuse me, three
8   children, four grandchildren.  I tell my kids I'm
9   more concerned about my grand kids now than my kids.
10      Q.  Unfortunately, my parents are the same way.
11  My brother has two kids, and I'm pretty sure that my
12  parents love their grandchildren more than their
13  children.
14      A.  Special, very special.
15      Q.  And do your children know about the ongoing
16  lawsuit?
17      A.  Yes, they do.
18      Q.  Did you learn -- prior to seeing the
19  complaint in this case, did you learn that
20  Ms. Dziubla's employment was terminated at JCA?
21      A.  I didn't know that.
22      Q.  First time you learned that was when you
23  read the complaint?
24      A.  I don't recall.

                                            Page 52

1       Q.  Do you know as you sit here today that at
2   some point, Ms. Dziubla filed a claim with the EEOC
3   in relation to her termination at JCA?
4       A.  I got the EEOC, but I didn't focus on her
5   termination.  I focused on her claim.
6       Q.  Okay.  So are you aware that at some point,
7   Ms. Dziubla filed a claim with the EEOC?
8       A.  Yes.
9       Q.  When did you first become aware that
10  Ms. Dziubla had filed a claim with the EEOC?
11      A.  I don't recall the specifics, but sometime
12  maybe November -- November, 2017.
13      Q.  Do you think that you may have learned it
14  through the phone call you had with Mr. Schumacher?
15      A.  That's possible.
16      Q.  Are you aware as you sit here today that
17  sometime last year, Ms. Dziubla sent a demand letter
18  to JCA?
19      A.  Yes.
20      Q.  When did you become aware of that?
21      A.  I don't recall, but I believe it was after
22  I received the complaint.
23      Q.  The Federal Complaint?
24      A.  Yes.

                                            Page 54

1       Q.  You do know that Ms. Dziubla's employment
2   was terminated at JCA?
3       A.  I do know now, yes.
4       Q.  But you didn't know that before today?
5       A.  I did know that before today, but I don't
6   know when I became aware of that.  I thought that
7   was what the question was.
8       Q.  Yeah.  I was just trying to figure out when
9   was the first time that you learned that
10  Ms. Dziubla's employment was terminated?
11      A.  I don't recall.
12      Q.  Okay.
13          MR. RUFF:  And again, on all questions,
14  Mr. Sedaei is not asking about any discussions that
15  you've had with your attorneys.
16          THE WITNESS:  Okay.
17          MR. SEDAEI:  Q.  Don't discuss anything
18  you've discussed with your attorneys, yes.  That's
19  privileged.
20      A.  Okay.
21      Q.  You mentioned at the beginning of the
22  deposition that you had looked at the EEOC document;
23  is that correct?
24      A.  Yes.

                                            Page 53

1       Q.  Only then did you learn that sometime
2   before filing the complaint that there was a demand
3   letter sent to JCA?
4       A.  Yes.
5       Q.  So we discussed individuals with whom
6   you've discussed Ms. Dziubla's allegations, family
7   members, your attorneys, two or three companies that
8   you mentioned.
9           Is there anybody else you can think of?
10      A.  Nobody else.
11      Q.  Any friends?
12      A.  No friends.
13      Q.  Okay.  Any fellow professional golfers?
14      A.  No.
15      Q.  Have any reporters or journalists reached
16  out to you to discuss the complaint that was filed
17  against you?
18      A.  No.
19          MR. SEDAEI:  This will be Exhibit 3.
20          (WHEREUPON, Exhibit No. 3 was
21          marked for identification.)
22          MR. SEDAEI:  Q.  Mr. Jacobsen, I'm showing
23  you what's marked as Exhibit 3.
24          Would you please take a look at this

                                            Page 55

Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/26 Page 17 of 39 PageID #:610

Peter Jacobsen          6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1  document and tell me if you've seen this before?
2       (WHEREUPON, witness peruses
3       document.)
4       THE WITNESS:  Yes.
5       MR. SEDAEI:  Q.  You have seen this before?
6       (WHEREUPON, witness peruses
7       document.)
8       THE WITNESS:  Yes, I have.
9       MR. SEDAEI:  Q.  And I represent to you
10  that this is your response as to Plaintiff's Request
11  for Production of Documents.
12       A.  Uh-huh.
13       Q.  And if you look at the third page, that's
14  when the actual responses began.
15       A.  Okay.
16       Q.  And if you look at the response to request
17  two, it's asking for any and all photos and videos
18  from The Kev.
19       Do you recall -- and the response, you
20  can read, which is the response -- your response
21  which is none other than the photograph marked as
22  Exhibit B attached J.C. Anderson's position
23  statement with the EEOC which was a single
24  photograph.

Page 56

1       I just want to get confirmation that --
2  did you personally take any photographs while you
3  were at The Kev?
4       A.  No.
5       Q.  Did you take any videos?
6       A.  No.
7       Q.  And when I say The Kev, I mean not just the
8  golf portion, the dinner, the auction, anything
9  after that?
10      A.  No.
11      Q.  Okay.  If you look at the response to
12  Request Number 3, and -- where the request is any
13  and all documents you have received from JCA
14  relating to JCA's discrimination, harassment and
15  retaliation policies.
16      And after the objection section in the
17  middle of the third line, it reads notwithstanding
18  this objection, defendant has received a copy of
19  J.C. Anderson's Equal Employment Opportunity slash
20  Affirmation Action Policy as it is marked as
21  Exhibit A to J.C. Anderson's position taken with the
22  EEOC.
23      Do you see where it says that?
24      A.  Yes, I do.

Page 57

1       Q.  Okay.  So this statement is stating that
2  you have received a copy of the J.C. Anderson's
3  Equal Employment Opportunity slash Affirmation
4  Action Policy.
5       Did you receive the document stated
6  here as part of that JCA response to the EEOC?
7       A.  I might have.  I don't recall.
8       Q.  Okay.  You don't recall when you received
9  this?
10      A.  Correct.
11      Q.  Okay.  I already asked this question, but I
12  just want to confirm because it's an unusual answer.
13      We -- in Request Number 4, we ask for
14  all communications -- and it's a very comprehensive
15  request -- and -- all communications that refer or
16  relate to plaintiff in this case.  And no emails or
17  letters were produced by you.
18      Is there truly not a single email you
19  have relating to Ms. Dziubla's allegations --
20      A.  No.
21      Q.  -- except to your attorney?
22      A.  No.
23      MR. RUFF:  I'm going to object to the
24  editorial that that's an unusual response.  I don't

Page 58

1  find anything unusual about that response.
2       That's my editorial to your editorial.
3       MR. SEDAEI:  Sure.
4       Q.  Okay.  And one more question, if
5  you could please go to the next page, request number
6  six where we are asking for a copy of any written
7  agreements between you and JCA relating to your
8  appearance at The Kev.
9       Where it says none, I just want to get
10  your confirmation that you had no written contract
11  with JCA for your attendance?
12      A.  That is correct.  There is -- there was no
13  written agreement between JCA and me.
14      Q.  That's all I needed.  Thank you.
15      MR. SEDAEI:  This will be Exhibit 4.
16      (WHEREUPON, Exhibit No. 4 was
17      marked for identification.)
18      MR. SEDAEI:  Q.  Mr. Jacobsen, I'm showing
19  you what's marked as Exhibit 4.
20      Have you seen this document before?
21      A.  No.
22      Q.  Do you know what Wikipedia is?
23      A.  I do.
24      Q.  And do you understand that there is an

Page 59

Case: 1:18-cv-04542 Document # 53-5 Filed: 02/20/20 Page 18 of 39 PageID #:611
Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    entry about you on Wikipedia?
2    A.  It looks to be my bio.
3    Q.  So you have not seen this document before
4    or like on-line or --
5    A.  No.
6    Q.  -- like on Wikipedia's website?
7    A.  No.
8    Q.  So there is some statements -- and I don't
9    know who the author of these statements are, but I
10   just wanted to ask you to comment on certain
11   statements here and tell me if -- if they represent
12   you accurately.
13       So if you look at the second page under
14   section titled other projects --
15   A.  Uh-huh.
16   Q.  -- and if you go to fifth paragraph from
17   the top where it starts with Jacobsen is known for
18   his laid back, humorous personality, would you say
19   that that's an accurate description of you?
20   A.  Yes.
21   Q.  Okay.  And then if you look at the third
22   line towards the middle, same paragraph, towards the
23   middle, it -- there is a reference to your sharp,
24   but playful humor.

Page 60

1        Do you see that?
2    A.  I do.
3    Q.  Do you consider that to be an accurate
4    description of your sense of humor?
5    A.  It's hard for me to say.  Those aren't my
6    words.
7    Q.  I understand.
8        But do you think they accurately
9    represent your sense of humor?  Is that how you
10   would describe your sense of humor?
11   A.  That's not how I describe myself.  I
12   wouldn't say that.  I would say light-hearted and
13   having fun.
14   Q.  Okay.  What is Golden Tee Golf?
15   A.  Golden Tee, we talked about that.
16   Q.  Oh --
17   A.  That's the stand up parlor game that you
18   find in a lot of bars and video game parlors.
19   Q.  Got it.  Okay.  Yes, we did discuss that.
20       And we talked about Peter Jacobsen's
21   Challenging Keno and Peter Jacobsen's Challenging
22   Poker --
23   A.  Yes.
24   Q.  -- where your likeness is being used and

Page 61

1    you receive royalties?
2    A.  Yes.
3    Q.  Okay.  Have you been asked to attend any
4    other JCA sponsored events in the future?
5    A.  No.
6    Q.  If you are asked, would you attend?
7    A.  It depends on the situation.  It depends
8    from a schedule standpoint.
9    Q.  Okay.
10       MR. SEDAEI:  We are going to take a break.
11   I just need to talk to my client for a couple
12   minutes, and then I think we are pretty much ready
13   to wrap it up.
14       THE WITNESS:  Okay.
15       MR. SEDAEI:  So we'll be right back.
16       (WHEREUPON, a short recess was
17       taken.)
18       MR. SEDAEI:  Back on the record.
19       I don't have anymore questions.
20       Do you have any follow ups?
21       MS. OLSON:  I do not.
22
23
24

Page 62

1        CROSS EXAMINATION
2        BY:  MR. RUFF
3    Q.  Mr. Jacobsen, would you get out Exhibit
4    Number 1, please?
5    A.  Yes.
6    Q.  You were asked some questions about Exhibit
7    Number 1.
8        Do you recall that?
9    A.  Yes.
10   Q.  All right.  Exhibit Number 1 is the
11   complaint.  And it has -- you were directed to
12   Paragraph 9.
13       Do you recall that?
14   A.  Yes.
15   Q.  Okay.  And it says under the topic of
16   general allegations; do you see that?
17   A.  Yes.
18   Q.  All right.  You talked about Number 9, and
19   you said -- the question was somewhere along the
20   lines do you have any disagreement with that.
21       Do you recall that line of questioning?
22   A.  Yes, I do.  Yes, I do.
23   Q.  All right.  And you went to the comment, do
24   you recall that?

Page 63

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/26 Page 19 of 39 PageID #:612

Peter Jacobsen 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1    A.  Yes.

2    Q.  All right.  I want to take you through line

3  by line on this.

4         During the event, Jacobsen offered to

5  provide JCA employees instructions on how to hit a

6  chip shot.

7         And a chip shot is in quotes?

8    A.  Yes.

9    Q.  Do you see that?

10   A.  Yes.

11   Q.  Do you have any specific recollection of

12  that?

13   A.  No.

14   Q.  Okay.  Sir, you talked about a number of

15  times that you would in your career go to a

16  tournament.

17         Is it unusual for you to have had an

18  occasion to instruct or give a lesson or give a tip

19  on a chip shot?

20   A.  No.  It's common.

21   Q.  Happens I think you said thousands of

22  times?

23   A.  It happens probably eight to ten times in a

24  Pro Am round, one Pro Am round, 18 holes.

Page 64

1  stance of a driver or a position away from the ball

2  which is not how you hit a chip shot.

3         So you've got to move in and get the

4  player, physically push them up to the ball because

5  it's so foreign to beginning golfers to stand that

6  close to the ball.

7         So on so many times, I will have to

8  move the player up, have to make contact, sometimes

9  I even have them take my stance.

10        I'll take the stance in my

11  demonstration and ask them to step into my feet.

12  And on just about every occasion they say, wow, this

13  feels awful.

14        It's because they don't play golf or

15  because it's new to them.  So this is something that

16  I do a lot.

17   Q.  Would the instruction vary, in other words,

18  if it's a male or a female?

19   A.  No.

20   Q.  Okay.  Is the mechanics or the physics of

21  it the same?

22   A.  Yes.

23   Q.  Okay.  It says here as a JCA employee,

24  plaintiff felt obligated to go along with the

Page 66

1    Q.  Okay.

2    A.  Depending on the level -- the sophisticated

3  level of their ability.  A beginner would require

4  more attention.  A better amateur probably wouldn't

5  require much extra instruction.

6    Q.  And in a Pro Am, you may have a certain

7  level of player.

8         But was it common for you to have a

9  tournament on a level of what you would have seen in

10  The Kev?

11   A.  Yes.

12   Q.  Okay.  And how would you approach it, a

13  teaching moment like hitting a chip shot in a --

14  something like The Kev?

15   A.  What I would do is if I were coming upon a

16  group, I would ask them to demonstrate -- to hit the

17  shot.

18        I would then demonstrate.  I would

19  offer to help.  I would then demonstrate myself, and

20  then ask them to mimic or replicate my action.

21        And again, depending upon the level of

22  the ability of the player, I would have to help

23  them.

24        And again so many beginners assume the

Page 65

1  demonstration.

2         Would you ever make someone feel

3  obligated, ever, to go along with the demonstration?

4    A.  No.

5    Q.  How would you make sure that someone wasn't

6  obligated to go along with the demonstration?

7    A.  Well, if I were there giving a tip and

8  somebody chose not to participate, I'd -- in Pro

9  Am's, I have people that don't want instruction.

10        They don't want instruction.  They feel

11  like their game is either too bad or too good.  I've

12  played with people who think, oh, I'm better than

13  you.

14        So I would never make it incumbent -- I

15  would never tell somebody that they had to do it.

16   Q.  And before actually providing instruction

17  where it may require you to become more physically

18  involved as opposed to just demonstration, how would

19  you make that determination?

20   A.  If they are not understanding my

21  instruction, my verbal instruction, I would then

22  have to step in and actually, physically move

23  somebody closer to the ball.

24   Q.  And before you did that, would you announce

Page 67

Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/20 Page 20 of 39 PageID #:613

Peter Jacobsen 6/27/2019

Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**Page 68**

```
 1   or declare what you were going to do?
 2       A.  Sometimes.  Sometimes I would just go ahead
 3   and ask them can I show you or I would get them in
 4   my stance.
 5           Sometimes you do.  Sometimes you don't.
 6   But again, when you are on the golf course, you
 7   assume that people want to learn and really
 8   understand how to hit the shot.
 9       Q.  Would you be encouraging and optimistic
10   trying to get people involved?
11       A.  I'm always optimistic and encouraging and
12   hoping people get involved, but I would never demand
13   or require anybody to step up and hit a shot.
14       Q.  Ms. Dziubla has testified to this and has
15   written in a number of documents that before you
16   provided physical instruction, you had demonstrated.
17           Would that be within your custom and
18   practice?
19       A.  That would be what I would do, yes.
20       Q.  And then by her own words in deposition and
21   in written documents that she has provided, in her
22   own hand or in her own typewriting, she stated that
23   she wasn't, quote, getting it, end quote, but that
24   you encouraged her to participate.
```

**Page 69**

```
 1           Would that be something that would be
 2   your custom and practice to do?
 3       A.  Yes.
 4       MR. SEDAEI:  Objection, mischaracterizes
 5   the plaintiff's testimony, but you can answer.
 6       MR. RUFF:  Q.  And, sir, if her testimony
 7   has been in a number of instances before the EEOC,
 8   in her diary, in her deposition just last week that
 9   before you did any instruction, you physically
10   announced that you were going to do so, would that
11   be consistent with your custom and practice?
12       A.  Yes, it would be.
13       Q.  Describe that.
14       A.  Any time I'm going to give a lesson to
15   anybody -- I understand that you could give a verbal
16   or you could give a demonstration.  You could tell
17   them what to do.
18           But if they are not getting it, you
19   want them to get it.  You want them to understand
20   it.
21           So you -- you have to actually
22   sometimes physically move someone closer to the ball
23   for balance, for control, for -- the control of the
24   swing.
```

**Page 70**

```
 1   It's hard to explain how to hit a chip
 2   shot when somebody is a complete beginner.  It's
 3   hard to really get that across.
 4           But, you know, it would be standard
 5   practice for me to -- that's why I'm there.  I'm
 6   there to engage and encourage and teach.
 7       Q.  And if she says in those three instances
 8   you actually told her that that's what you were
 9   going to do, would that also be consistent with your
10   custom and practice?
11       A.  Yes.
12       Q.  Okay.  It says here -- so is there any
13   question that if she felt obligated; in other words,
14   if she was reluctant at all, would you have
15   continued further?
16       A.  No.
17       Q.  Why not?  Why do you say that?
18       MR. SEDAEI:  Objection, speculation.
19       MR. RUFF:  Q.  I'm talking about your
20   custom and practice, sir.
21       A.  I've had many Pro Am partners who don't
22   want instruction.  They don't want me to help them
23   any further than what I've done.
24       Q.  And if someone says, objection, I don't
```

**Page 71**

```
 1   need any physical --
 2       A.  I stop.  I stop.
 3       Q.  Okay.  Is there any question in your mind
 4   that you would not have imposed upon Ms. Dziubla or
 5   made her feel obligated to continue?
 6       A.  No.
 7       Q.  I'm continuing on, Mr. Jacobsen, in that
 8   same paragraph.
 9           As Jacobsen took his position behind
10   plaintiff, he assertedly placed his hips against
11   plaintiff's buttocks.
12           Sir, did you do that?
13       A.  I don't remember.
14       Q.  What would your custom and practice be in
15   this situations?
16       A.  In a lot of -- because beginners assume a
17   driver's stance, they are way too far from the ball.
18           If they are not understanding, you have
19   to sometimes get in, make physical contact and
20   literally move them forward.
21           And --
22       Q.  Why is that?
23       A.  Because you need them to get closer to the
24   ball, closer proximity to the ball, almost like
```

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/26 Page 21 of 39 PageID #:614
Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

1   assuming a putting stance.
2       Q.  Is that -- is that need to get closer to
3   the ball actually a physics principle to assist them
4   in making an accurate shot?
5       A.  When you play golf -- golf is a side-on
6   game.  Bowling is an on-line game.  Archery is an
7   on-line game.
8           Golf, like tennis, like baseball, like
9   LaCrosse, like hockey, is a side-on game.  You stand
10  to the side, parallel to the side of your target
11  line.
12          To hit a proper shot to be in balance,
13  you have to be a certain distance from that target
14  line or in this case, the golf ball.
15          So you are going to make a little bit
16  of a swing, a little bit of an arch, the rotation of
17  your body.
18          And on a chip shot for control, you
19  have to be close to the ball to allow your body to
20  make that small motion needed to play that short
21  shot.
22      Q.  And it says assertively pressed hip against
23  buttocks.  Would.
24          You have been directly behind her or to

Page 72

1   a side?
2       A.  It could be -- it could be one of many
3   things.  It could be where you are trying to
4   actually push somebody closer to the -- I've
5   actually done clinics where I've had junior players
6   where I've had to reach down and grab them by the
7   shorts or the pants and because they are little,
8   they are six, seven, eight, nine, lift them up and
9   move them a foot closer to the ball to be able to
10  get them in the right proximity.
11      Q.  If we are talking about pressing hips
12  against the buttocks, would that be -- if she's
13  shooting right-handed, would that be your left hip
14  against the right buttocks?
15      A.  Correct.  It would more than likely be the
16  left hip to the right buttocks with my arm on her
17  back or on the person's back maybe reaching around
18  trying to help that person with the arm's club
19  swing.  It can be all different things.
20      Q.  And would this be any instruction different
21  than what you have provided hundreds of time before?
22      A.  It's the same.
23      Q.  Would it matter if it was male or female?
24      A.  No.

Page 73

1       Q.  And on a given outing such as this where
2   you may have more inexperienced players than in a
3   Pro Am, for instance, is there any question in your
4   mind that you may have run across in a typical
5   tournament like this males who needed similar
6   instruction?
7       A.  Yes.
8       Q.  Any question in your mind you would have
9   provided precisely the same type of instruction?
10      A.  I've done the same to men, women, juniors,
11  seniors, it doesn't matter.
12      Q.  And, sir, regarding the comment,
13  furthermore, as he proceeded to show plaintiff how
14  to hit the shot, that's when he said that's when I
15  take my wood out, a lewd comment that was intended
16  as a sexual innuendo.  I want to take this step by
17  step.
18      A.  Okay.
19      Q.  Would you have ever said that's when I take
20  my wood out?
21      A.  No.
22      Q.  What is the joke?
23      A.  The joke is beginners start with the irons
24  and they end up in the woods, being when you start

Page 74

1   as a beginner, you usually start with a wedge which
2   is an iron.
3           Then as you progress up through the bag
4   to the driver or three wood, you get to the woods.
5   Because they are -- because woods require a longer,
6   more of a fuller swing, it's harder to control.
7           The ball can end up adjacent to the
8   fairway, off the fairway in the rough where there
9   are trees, a forest or woods.  That's the joke.
10      Q.  Would you have ever said, sir -- first of
11  all, how many times have you said similar jokes to
12  similar levels of perhaps beginner golfers?
13      A.  Hundreds of times.
14      Q.  And you said this has an old origin to it?
15      A.  Yeah.  There's a -- it's an old Henny
16  Youngman or Rodney Dangerfield joke.
17          My father was a big golf nut.  He loved
18  humor.  He loved comedy shows, and he especially
19  loved the golf humor.
20      Q.  Is there any question in your mind that you
21  would not have said that's when I take my wood out?
22      A.  There is no way I would say that.  I didn't
23  know anybody there.
24      Q.  A lewd comment that was intended as a

Page 75

Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/26 Page 22 of 39 PageID #:615

Peter Jacobsen   6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | |
|---|---|
| 1 | sexual innuendo. |
| 2 | Do you ever do that on a golf course in |
| 3 | instruction? |
| 4 | A.  No. |
| 5 | Q.  Did you ever do that ever? |
| 6 | A.  No. |
| 7 | Q.  Would you have done it in this instance? |
| 8 | A.  No. |
| 9 | MR. RUFF:  I think I'm done.  That's all I |
| 10 | have. |
| 11 | Thank you, sir. |
| 12 | MR. SEDAEI:  Nothing further. |
| 13 | MR. RUFF:  Reserve signature. |
| 14 | MS. REPORTER:  Do we need this written? |
| 15 | MR. SEDAEI:  Yes.  We'll have a PDF with |
| 16 | the exhibits. |
| 17 | MS. REPORTER:  Does anyone else need a |
| 18 | copy? |
| 19 | MR. RUFF:  Copy. |
| 20 | MS. OLSON:  Copy. |
| 21 | MS. REPORTER:  PDF, Etran? |
| 22 | |
| 23 | |
| 24 | |

Page 76

| | |
|---|---|
| 1 | MR. RUFF:  Etran for me. |
| 2 | MS. OLSON:  PDF. |
| 3 | MR. SEDAEI:  PDF. |
| 4 | (Witness excused.) |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 77

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/26 Page 23 of 39 PageID #:616
Peter Jacobsen   6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION


 3
        ROWENA DZIUBLA,                    )
 4                                         )
                    Plaintiff,             )
 5                                         )
            vs.                            ) No. 1:18 CV 4542
 6                                         )
        J.C. ANDERSON, INC., and PETER)
 7      ERLING JACOBSEN,                   )
                                           )
 8                  Defendants.            )


 9


10                 I, PETER JACOBSEN, hereby certify that

11      I have read the foregoing transcript of my

12      deposition taken on June 27, 2019, consisting of

13      pages 1 through 80, and that to the best of my

14      knowledge it is a true and correct transcript of

15      said deposition, except as I have changed it on the

16      attached sheets in accordance with the rules

17      provided by the said Court.

18

19              _____
                           Deponent
20
        SUBSCRIBED AND SWORN TO
21      before me this _____day
        of _____, 2019.
22
        _____
23            Notary Public

24
```



Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/20 Page 24 of 39 PageID #:617

Peter Jacobsen     6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
 1     UNITED STATES OF AMERICA        )
       NORTHERN DISTRICT OF ILLINOIS   )
 2     EASTERN DIVISION                )     SS.
       STATE OF ILLINOIS               )
 3     COUNTY OF COOK                  )

 4

 5                    I, JODI ANNE FEIGN, Certified Shorthand

 6     Reporter and Notary Public in and for the County of

 7     Cook and State of Illinois, do hereby certify that

 8     PETER JACOBSEN was first duly sworn by me to testify

 9     the whole truth and that the above deposition was

10     reported stenographically by me and reduced to

11     typewriting under my personal direction.

12                    I further certify that the said

13     deposition was taken at the time and place specified

14     and that the taking of said deposition commenced on

15     the 27th day of June, 2019, at 10:00 o'clock a.m.

16                    I further certify that I am not a

17     relative or employee or attorney or counsel of any

18     of the parties, nor a relative or employee of such

19     attorney or counsel or financially interested

20     directly or indirectly in this action.

21

22

23

24
```



Peter Jacobsen   6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 25 of 39 PageID #:618
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

```
1                    In witness whereof, I have hereunto set

2          my hand and affixed my seal of office at Chicago,

3          Illinois, this 12th day of July, A.D., 2019.

4

5

6

7

8
/s/ Jodi Anne Feign
9          _____

                  JODI ANNE FEIGN, CSR
10

11

12
           License No. 084-003375
13

14

15

16

17

18

19

20

21

22

23

24
```

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 26 of 39 PageID #:619

Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**WORD INDEX**

**< $ >**
**$10,000**   26:*1*

**< 0 >**
**084-003375**   80:*1*

**< 1 >**
**1**   1:*1*   2:*1*   3:*1, 1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1*
30:*1*   31:*1*   32:*1*
33:*1*   34:*1*   35:*1*
36:*1*   37:*1, 1, 1, 1*
38:*1*   39:*1*   40:*1*
41:*1*   42:*1*   43:*1*
44:*1*   45:*1*   46:*1*
47:*1*   48:*1*   49:*1*
50:*1*   51:*1*   52:*1*
53:*1*   54:*1*   55:*1*
56:*1*   57:*1*   58:*1*
59:*1*   60:*1*   61:*1*
62:*1*   63:*1, 1, 1, 1*
64:*1*   65:*1*   66:*1*
67:*1*   68:*1*   69:*1*
70:*1*   71:*1*   72:*1*
73:*1*   74:*1*   75:*1*
76:*1*   77:*1*   78:*1, 1*
79:*1*   80:*1*
**1:18**   1:*1*   78:*1*
**10**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1, 1*
30:*1*   31:*1*   32:*1, 1*
33:*1*   34:*1*   35:*1*
36:*1*   37:*1*   38:*1*
39:*1*   40:*1*   41:*1*
42:*1*   43:*1*   44:*1*

45:*1*   46:*1*   47:*1*
48:*1*   49:*1*   50:*1*
51:*1*   52:*1*   53:*1*
54:*1*   55:*1*   56:*1*
57:*1*   58:*1*   59:*1*
60:*1*   61:*1*   62:*1*
63:*1*   64:*1*   65:*1*
66:*1*   67:*1*   68:*1*
69:*1*   70:*1*   71:*1*
72:*1*   73:*1*   74:*1*
75:*1*   76:*1*   77:*1*
78:*1*   79:*1*   80:*1*
**10:00**   79:*1*
**11**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1*
30:*1*   31:*1*   32:*1, 1,
1*   33:*1*   34:*1*   35:*1*
36:*1*   37:*1*   38:*1*
39:*1*   40:*1*   41:*1*
42:*1*   43:*1*   44:*1*
45:*1*   46:*1*   47:*1*
48:*1*   49:*1*   50:*1*
51:*1*   52:*1*   53:*1*
54:*1*   55:*1*   56:*1*
57:*1*   58:*1*   59:*1*
60:*1*   61:*1*   62:*1*
63:*1*   64:*1*   65:*1*
66:*1*   67:*1*   68:*1*
69:*1*   70:*1*   71:*1*
72:*1*   73:*1*   74:*1*
75:*1*   76:*1*   77:*1*
78:*1*   79:*1*   80:*1*
**12**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1, 1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1, 1*
30:*1*   31:*1*   32:*1*
33:*1*   34:*1*   35:*1*
36:*1*   37:*1*   38:*1*

39:*1*   40:*1*   41:*1*
42:*1*   43:*1*   44:*1*
45:*1*   46:*1*   47:*1*
48:*1*   49:*1*   50:*1*
51:*1*   52:*1*   53:*1*
54:*1*   55:*1*   56:*1*
57:*1*   58:*1*   59:*1*
60:*1*   61:*1*   62:*1*
63:*1*   64:*1*   65:*1*
66:*1*   67:*1*   68:*1*
69:*1*   70:*1*   71:*1*
72:*1*   73:*1*   74:*1*
75:*1*   76:*1*   77:*1*
78:*1*   79:*1*   80:*1*
**120**   3:*1*
**12th**   80:*1*
**13**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1*
30:*1*   31:*1*   32:*1*
33:*1*   34:*1*   35:*1*
36:*1*   37:*1*   38:*1*
39:*1*   40:*1*   41:*1*
42:*1*   43:*1*   44:*1*
45:*1*   46:*1*   47:*1*
48:*1*   49:*1*   50:*1*
51:*1*   52:*1*   53:*1*
54:*1*   55:*1*   56:*1*
57:*1*   58:*1*   59:*1*
60:*1*   61:*1*   62:*1*
63:*1*   64:*1*   65:*1*
66:*1*   67:*1*   68:*1*
69:*1*   70:*1*   71:*1*
72:*1*   73:*1*   74:*1*
75:*1*   76:*1*   77:*1*
78:*1*   79:*1*   80:*1*
**14**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1,
1, 1*   12:*1*   13:*1*
14:*1*   15:*1*   16:*1*
17:*1*   18:*1*   19:*1*
20:*1*   21:*1*   22:*1*
23:*1*   24:*1*   25:*1*
26:*1*   27:*1*   28:*1*

29:*1*   30:*1*   31:*1*
32:*1*   33:*1*   34:*1*
35:*1*   36:*1*   37:*1*
38:*1*   39:*1*   40:*1*
41:*1*   42:*1*   43:*1*
44:*1*   45:*1*   46:*1*
47:*1*   48:*1*   49:*1*
50:*1*   51:*1*   52:*1*
53:*1*   54:*1*   55:*1*
56:*1*   57:*1*   58:*1*
59:*1*   60:*1*   61:*1*
62:*1*   63:*1*   64:*1*
65:*1*   66:*1*   67:*1*
68:*1*   69:*1*   70:*1*
71:*1*   72:*1*   73:*1*
74:*1*   75:*1*   76:*1*
77:*1*   78:*1*   79:*1*
80:*1*
**15**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1*   22:*1*   23:*1*
24:*1*   25:*1*   26:*1*
27:*1*   28:*1*   29:*1*
30:*1*   31:*1*   32:*1*
33:*1*   34:*1*   35:*1*
36:*1*   37:*1*   38:*1*
39:*1*   40:*1*   41:*1*
42:*1*   43:*1*   44:*1*
45:*1*   46:*1*   47:*1*
48:*1*   49:*1*   50:*1*
51:*1*   52:*1*   53:*1*
54:*1*   55:*1*   56:*1*
57:*1*   58:*1*   59:*1*
60:*1*   61:*1*   62:*1*
63:*1*   64:*1*   65:*1*
66:*1*   67:*1*   68:*1*
69:*1*   70:*1*   71:*1*
72:*1*   73:*1*   74:*1*
75:*1*   76:*1*   77:*1*
78:*1*   79:*1*   80:*1*
**16**   1:*1*   2:*1*   3:*1*
4:*1*   5:*1*   6:*1*   7:*1*
8:*1*   9:*1*   10:*1*   11:*1*
12:*1*   13:*1*   14:*1*
15:*1*   16:*1*   17:*1*
18:*1*   19:*1*   20:*1*
21:*1, 1*   22:*1*   23:*1*

Peter Jacobsen   6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 27 of 39 PageID #:620
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

| | | | |
|---|---|---|---|
| 24:*1*  25:*1*  26:*1* | 21:*1*  22:*1*  23:*1* | **1989**  14:*1* | 65:*1*  66:*1*  67:*1* |
| 27:*1*  28:*1*  29:*1* | 24:*1*  25:*1*  26:*1* | | 68:*1*  69:*1*  70:*1* |
| 30:*1*  31:*1*  32:*1* | 27:*1*  28:*1*  29:*1* | **< 2 >** | 71:*1*  72:*1*  73:*1* |
| 33:*1*  34:*1*  35:*1* | 30:*1*  31:*1*  32:*1* | **2**  1:*1*  2:*1*  3:*1, 1* | 74:*1*  75:*1*  76:*1* |
| 36:*1*  37:*1*  38:*1* | 33:*1*  34:*1*  35:*1* | 4:*1*  5:*1*  6:*1*  7:*1* | 77:*1*  78:*1*  79:*1* |
| 39:*1*  40:*1*  41:*1* | 36:*1*  37:*1*  38:*1* | 8:*1*  9:*1*  10:*1*  11:*1* | 80:*1* |
| 42:*1*  43:*1*  44:*1* | 39:*1*  40:*1*  41:*1* | 12:*1*  13:*1*  14:*1* | **2000**  5:*1* |
| 45:*1*  46:*1*  47:*1* | 42:*1*  43:*1*  44:*1* | 15:*1*  16:*1*  17:*1* | **2009**  10:*1* |
| 48:*1*  49:*1*  50:*1* | 45:*1*  46:*1*  47:*1* | 18:*1*  19:*1*  20:*1* | **2017**  21:*1*  23:*1, 1* |
| 51:*1*  52:*1*  53:*1* | 48:*1*  49:*1*  50:*1* | 21:*1*  22:*1*  23:*1* | 42:*1*  46:*1, 1*  54:*1* |
| 54:*1*  55:*1*  56:*1* | 51:*1*  52:*1*  53:*1* | 24:*1*  25:*1*  26:*1* | **2018**  37:*1* |
| 57:*1*  58:*1*  59:*1* | 54:*1*  55:*1*  56:*1* | 27:*1*  28:*1*  29:*1* | **2019**  1:*1*  78:*1, 1* |
| 60:*1*  61:*1*  62:*1* | 57:*1*  58:*1*  59:*1* | 30:*1*  31:*1*  32:*1* | 79:*1*  80:*1* |
| 63:*1*  64:*1*  65:*1* | 60:*1*  61:*1*  62:*1* | 33:*1*  34:*1*  35:*1* | **21**  1:*1*  2:*1*  3:*1* |
| 66:*1*  67:*1*  68:*1* | 63:*1*  64:*1, 1*  65:*1* | 36:*1*  37:*1*  38:*1* | 4:*1*  5:*1*  6:*1*  7:*1* |
| 69:*1*  70:*1*  71:*1* | 66:*1*  67:*1*  68:*1* | 39:*1*  40:*1*  41:*1* | 8:*1*  9:*1*  10:*1*  11:*1* |
| 72:*1*  73:*1*  74:*1* | 69:*1*  70:*1*  71:*1* | 42:*1*  43:*1*  44:*1* | 12:*1*  13:*1*  14:*1* |
| 75:*1*  76:*1*  77:*1* | 72:*1*  73:*1*  74:*1* | 45:*1*  46:*1*  47:*1* | 15:*1*  16:*1*  17:*1* |
| 78:*1*  79:*1*  80:*1* | 75:*1*  76:*1*  77:*1* | 48:*1, 1, 1, 1*  49:*1* | 18:*1*  19:*1*  20:*1* |
| **17**  1:*1*  2:*1*  3:*1* | 78:*1*  79:*1*  80:*1* | 50:*1*  51:*1*  52:*1* | 21:*1*  22:*1*  23:*1* |
| 4:*1*  5:*1*  6:*1*  7:*1* | **19**  1:*1*  2:*1*  3:*1* | 53:*1*  54:*1*  55:*1* | 24:*1*  25:*1*  26:*1* |
| 8:*1*  9:*1*  10:*1*  11:*1* | 4:*1*  5:*1*  6:*1*  7:*1* | 56:*1*  57:*1*  58:*1* | 27:*1*  28:*1*  29:*1* |
| 12:*1*  13:*1*  14:*1* | 8:*1*  9:*1*  10:*1*  11:*1* | 59:*1*  60:*1*  61:*1* | 30:*1*  31:*1*  32:*1* |
| 15:*1*  16:*1*  17:*1* | 12:*1*  13:*1*  14:*1, 1* | 62:*1*  63:*1*  64:*1* | 33:*1*  34:*1*  35:*1* |
| 18:*1*  19:*1*  20:*1* | 15:*1*  16:*1*  17:*1* | 65:*1*  66:*1*  67:*1* | 36:*1*  37:*1*  38:*1* |
| 21:*1, 1*  22:*1*  23:*1* | 18:*1*  19:*1*  20:*1* | 68:*1*  69:*1*  70:*1* | 39:*1*  40:*1*  41:*1* |
| 24:*1*  25:*1*  26:*1* | 21:*1*  22:*1*  23:*1* | 71:*1*  72:*1*  73:*1* | 42:*1*  43:*1*  44:*1* |
| 27:*1*  28:*1*  29:*1* | 24:*1*  25:*1*  26:*1* | 74:*1*  75:*1*  76:*1* | 45:*1*  46:*1*  47:*1* |
| 30:*1*  31:*1*  32:*1* | 27:*1*  28:*1*  29:*1* | 77:*1*  78:*1*  79:*1* | 48:*1*  49:*1*  50:*1* |
| 33:*1*  34:*1*  35:*1* | 30:*1*  31:*1*  32:*1* | 80:*1* | 51:*1*  52:*1*  53:*1* |
| 36:*1*  37:*1*  38:*1* | 33:*1*  34:*1*  35:*1* | **20**  1:*1, 1*  2:*1, 1* | 54:*1*  55:*1*  56:*1* |
| 39:*1*  40:*1*  41:*1* | 36:*1*  37:*1*  38:*1* | 3:*1*  4:*1*  5:*1*  6:*1* | 57:*1*  58:*1*  59:*1* |
| 42:*1*  43:*1*  44:*1* | 39:*1*  40:*1*  41:*1* | 7:*1*  8:*1*  9:*1*  10:*1* | 60:*1*  61:*1*  62:*1* |
| 45:*1*  46:*1*  47:*1* | 42:*1*  43:*1*  44:*1* | 11:*1*  12:*1*  13:*1* | 63:*1*  64:*1*  65:*1* |
| 48:*1*  49:*1*  50:*1* | 45:*1*  46:*1*  47:*1* | 14:*1*  15:*1*  16:*1* | 66:*1*  67:*1*  68:*1* |
| 51:*1*  52:*1*  53:*1* | 48:*1*  49:*1*  50:*1* | 17:*1*  18:*1*  19:*1* | 69:*1*  70:*1*  71:*1* |
| 54:*1*  55:*1*  56:*1* | 51:*1*  52:*1*  53:*1* | 20:*1*  21:*1*  22:*1* | 72:*1*  73:*1*  74:*1* |
| 57:*1*  58:*1*  59:*1* | 54:*1*  55:*1*  56:*1* | 23:*1*  24:*1*  25:*1* | 75:*1*  76:*1*  77:*1* |
| 60:*1*  61:*1*  62:*1* | 57:*1*  58:*1*  59:*1* | 26:*1*  27:*1*  28:*1* | 78:*1*  79:*1*  80:*1* |
| 63:*1*  64:*1*  65:*1* | 60:*1*  61:*1*  62:*1* | 29:*1, 1*  30:*1*  31:*1* | **22**  1:*1*  2:*1*  3:*1* |
| 66:*1*  67:*1*  68:*1* | 63:*1*  64:*1*  65:*1* | 32:*1*  33:*1*  34:*1* | 4:*1*  5:*1*  6:*1*  7:*1* |
| 69:*1*  70:*1*  71:*1* | 66:*1*  67:*1*  68:*1* | 35:*1*  36:*1*  37:*1* | 8:*1*  9:*1*  10:*1*  11:*1* |
| 72:*1*  73:*1*  74:*1* | 69:*1*  70:*1*  71:*1* | 38:*1*  39:*1*  40:*1* | 12:*1*  13:*1*  14:*1* |
| 75:*1*  76:*1*  77:*1* | 72:*1*  73:*1*  74:*1* | 41:*1*  42:*1*  43:*1* | 15:*1*  16:*1*  17:*1* |
| 78:*1*  79:*1*  80:*1* | 75:*1*  76:*1*  77:*1* | 44:*1*  45:*1*  46:*1* | 18:*1*  19:*1*  20:*1* |
| **18**  1:*1*  2:*1*  3:*1* | 78:*1*  79:*1*  80:*1* | 47:*1*  48:*1*  49:*1* | 21:*1*  22:*1*  23:*1* |
| 4:*1*  5:*1*  6:*1*  7:*1* | **1954**  41:*1* | 50:*1*  51:*1*  52:*1* | 24:*1*  25:*1*  26:*1* |
| 8:*1*  9:*1*  10:*1*  11:*1* | **1973**  9:*1* | 53:*1*  54:*1*  55:*1* | 27:*1*  28:*1*  29:*1* |
| 12:*1*  13:*1*  14:*1* | **1976**  52:*1* | 56:*1*  57:*1*  58:*1* | 30:*1*  31:*1*  32:*1* |
| 15:*1*  16:*1*  17:*1* | **1988**  10:*1* | 59:*1*  60:*1*  61:*1* | 33:*1*  34:*1*  35:*1* |
| 18:*1*  19:*1*  20:*1* | | 62:*1*  63:*1*  64:*1* | 36:*1*  37:*1*  38:*1* |

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 28 of 39 PageID #:621

Peter Jacobsen 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**222** 2:1
**23** 1:1 2:1 3:1
4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**24** 1:1 2:1 3:1
4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1

33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**25** 29:1
**2500** 2:1
**27** 78:1
**27th** 1:1 79:1
**28th** 52:1

< 3 >
**3** 1:1 2:1 3:1, 1
4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1, 1, 1, 1
56:1 57:1, 1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1

**30** 13:1
**312-332-6733** 2:1
**312-346-1973** 2:1
**312-609-7569** 2:1
**312-899-9090** 3:1
**31st** 3:1
**37** 3:1

< 4 >
**4** 1:1 2:1 3:1, 1
4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1, 1 59:1,
1, 1, 1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1
**408** 50:1
**43** 18:1 52:1
**4542** 1:1 78:1
**4-62** 3:1
**48** 3:1
**4th** 41:1

< 5 >
**5** 1:1 2:1 3:1 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1

24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**500** 1:1 2:1
**55** 3:1
**59** 3:1

< 6 >
**6** 1:1 2:1 3:1 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1, 1 49:1, 1
50:1, 1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 29 of 39 PageID #:622

Peter Jacobsen    6/27/2019

Rowena Dziubla vs. J.C. Anderson, Inc., et al.

80:1
**60601** 2:1
**60602** 3:1
**60603** 2:1
**60606** 2:1
**608** 50:1
**63-77** 3:1
**65** 33:1

**< 7 >**
**7** 1:1 2:1 3:1 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**73** 9:1
**74** 9:1
**75** 9:1
**76** 9:1

**< 8 >**
**8** 1:1 2:1 3:1 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1

30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
**80** 78:1
**84** 14:1

**< 9 >**
**9** 1:1 2:1 3:1 4:1
5:1 6:1 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1, 1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1, 1, 1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1
**90s** 14:1, 1

**< A >**
**A.D** 80:1
**a.m** 79:1
**ability** 7:1 65:1, 1
**able** 34:1, 1 73:1
**accept** 23:1
**access** 34:1
**accommodations**
26:1
**accuracy** 33:1
**accurate** 12:1 13:1
60:1 61:1 72:1
**accurately** 34:1
60:1 61:1
**Action** 57:1 58:1
65:1 79:1
**actual** 27:1 56:1
**adjacent** 40:1 75:1
**advanced** 24:1
**Affirmation** 57:1
58:1
**affixed** 80:1
**ago** 20:1, 1
**agreement** 49:1
59:1
**agreements** 59:1
**ahead** 49:1 68:1
**airplane** 5:1 24:1
**airport** 28:1 41:1, 1
**alcohol** 7:1
**allegations** 38:1
41:1 42:1 43:1, 1
46:1, 1, 1, 1 47:1, 1
48:1 51:1 55:1
58:1 63:1
**alleged** 16:1
**allow** 49:1, 1 72:1
**amateur** 65:1
**ambassador** 13:1
14:1
**ambassadorship**
14:1
**AMERICA** 79:1
**amount** 42:1
**Am's** 67:1
**analyst** 10:1
**ANDERSON** 1:1
2:1 3:1 22:1, 1
28:1 78:1
**Anderson's** 56:1
57:1, 1 58:1

**ANNE** 1:1 79:1
80:1, 1
**announce** 67:1
**announced** 69:1
**announcer** 10:1
**answer** 6:1 19:1
36:1 51:1, 1 58:1
69:1
**answered** 6:1 15:1
37:1 41:1
**answering** 6:1, 1
**answers** 6:1, 1 7:1
**anybody** 12:1 27:1
39:1 46:1 47:1
50:1 55:1 68:1
69:1 75:1
**anymore** 18:1 32:1
62:1
**anyone's** 23:1
**apologizing** 45:1
**appearance** 59:1
**APPEARANCES**
3:1 10:1 12:1 14:1
**Appearing** 2:1, 1, 1
3:1
**approach** 17:1 65:1
**approximately** 11:1
**arch** 72:1
**Archery** 72:1
**area** 35:1, 1, 1, 1
**areas** 35:1
**arm** 73:1
**arm's** 73:1
**Arnold** 18:1, 1
**arrange** 11:1
**asked** 16:1 29:1
31:1 41:1 52:1
58:1 62:1, 1 63:1
**asking** 6:1 19:1
46:1 53:1 56:1
59:1
**assembled** 29:1
**assertedly** 71:1
**assertively** 72:1
**assist** 72:1
**associations** 12:1
**assume** 6:1 9:1
13:1 39:1, 1 44:1,
1 65:1 68:1 71:1
**assumes** 50:1

assuming 72:*1*
Atlanta 24:*1* 41:*1*
attached 56:*1* 78:*1*
attempting 5:*1*
attend 9:*1* 23:*1*
  62:*1, 1*
attendance 25:*1*
  26:*1* 59:*1*
attendees 26:*1* 30:*1,*
  *1* 31:*1* 44:*1*
attending 22:*1*
  26:*1* 27:*1* 28:*1, 1,*
  *1* 40:*1*
attention 65:*1*
attorney 4:*1* 7:*1*
  58:*1* 79:*1, 1*
attorneys 51:*1, 1*
  53:*1, 1* 55:*1*
auction 57:*1*
author 60:*1*
automobile 13:*1*
aware 22:*1* 30:*1*
  49:*1* 50:*1, 1* 53:*1*
  54:*1, 1, 1, 1*
awareness 11:*1*
awful 66:*1*

< B >
back 14:*1, 1* 15:*1*
  19:*1* 26:*1* 32:*1*
  46:*1* 48:*1, 1* 60:*1*
  62:*1, 1* 73:*1, 1*
bad 67:*1*
bag 14:*1* 15:*1, 1*
  31:*1* 32:*1, 1, 1*
  33:*1* 36:*1* 40:*1*
  75:*1*
balance 31:*1, 1*
  69:*1* 72:*1*
ball 15:*1* 31:*1, 1*
  32:*1* 34:*1, 1, 1*
  35:*1* 36:*1, 1, 1*
  37:*1* 39:*1, 1* 40:*1,*
  *1, 1* 66:*1, 1, 1* 67:*1*
  69:*1* 71:*1, 1, 1*
  72:*1, 1, 1* 73:*1* 75:*1*
bars 61:*1*
baseball 72:*1*
Based 43:*1*
basic 5:*1*

basically 11:*1*
Beach 14:*1*
began 56:*1*
beginner 40:*1* 65:*1*
  70:*1* 75:*1, 1*
beginners 39:*1*
  40:*1* 65:*1* 71:*1*
  74:*1*
beginning 41:*1*
  52:*1* 53:*1* 66:*1*
behalf 2:*1, 1, 1* 3:*1*
  4:*1* 5:*1*
believe 11:*1* 14:*1*
  15:*1* 23:*1, 1* 29:*1*
  37:*1* 38:*1* 50:*1*
  54:*1*
belly 36:*1*
best 42:*1* 78:*1*
better 65:*1* 67:*1*
beyond 22:*1*
big 21:*1, 1* 75:*1*
bio 60:*1*
biographical 51:*1*
birth 41:*1*
bit 28:*1* 72:*1, 1*
BMW 27:*1*
body 72:*1, 1*
Bonita 8:*1*
B-O-N-I-T-A 8:*1*
Bowling 72:*1*
brand 13:*1* 14:*1, 1,*
  *1*
break 6:*1, 1* 48:*1*
  62:*1*
broadcast 10:*1*
broadcaster 14:*1*
brother 52:*1*
business 12:*1* 47:*1*
businesses 12:*1*
buttocks 71:*1* 72:*1*
  73:*1, 1, 1*

< C >
cable 12:*1*
caddy 19:*1, 1, 1*
  20:*1, 1, 1* 23:*1*
calculate 33:*1*
California 14:*1*
call 24:*1* 32:*1, 1, 1*
  36:*1* 42:*1* 43:*1, 1,*
  *1, 1* 46:*1, 1* 54:*1*

called 1:*1* 4:*1*
  10:*1* 13:*1* 22:*1*
  24:*1* 32:*1, 1* 33:*1,*
  *1, 1* 35:*1, 1, 1* 42:*1,*
  *1, 1* 47:*1*
calls 47:*1*
cancer 23:*1*
capacity 15:*1*
career 15:*1* 17:*1, 1*
  64:*1*
carry 14:*1* 15:*1*
cart 25:*1*
carts 29:*1*
case 4:*1* 5:*1, 1* 7:*1*
  22:*1* 37:*1, 1* 38:*1*
  52:*1* 58:*1* 72:*1*
cast 33:*1*
cause 23:*1* 24:*1*
  26:*1, 1*
CBS 14:*1*
celebrated 46:*1*
CEO 11:*1*
certain 5:*1* 33:*1*
  41:*1* 60:*1* 65:*1*
  72:*1*
certainly 17:*1*
Certified 1:*1* 79:*1*
certify 78:*1* 79:*1, 1,*
  *1*
Challenge 13:*1*
Challenging 61:*1, 1*
Championship 27:*1*
chance 7:*1*
change 36:*1* 40:*1*
changed 78:*1*
Channel 12:*1, 1, 1*
charge 11:*1*
charity 24:*1* 26:*1,*
  *1, 1, 1* 30:*1*
chart 25:*1* 29:*1*
CHARTERED 2:*1*
Chicago 1:*1* 2:*1, 1,*
  *1* 3:*1* 13:*1* 24:*1*
  25:*1* 27:*1, 1, 1* 80:*1*
children 52:*1, 1, 1, 1*
chip 31:*1, 1* 32:*1, 1*
  37:*1* 39:*1* 44:*1*
  64:*1, 1, 1* 65:*1*
  66:*1* 70:*1* 72:*1*
chipping 25:*1*

choose 33:*1*
chose 67:*1*
Christmas 52:*1*
city 8:*1*
Civil 1:*1*
claim 54:*1, 1, 1, 1*
claims 49:*1*
Clark 1:*1* 2:*1*
clear 18:*1*
clearly 49:*1*
Cleveland 13:*1*
  14:*1, 1* 15:*1, 1* 16:*1*
client 62:*1*
client's 8:*1*
CLIFFORD 3:*1*
clinics 18:*1, 1, 1, 1,*
  *1* 73:*1*
close 31:*1, 1* 36:*1*
  66:*1* 72:*1*
closer 39:*1, 1, 1*
  67:*1* 69:*1* 71:*1, 1*
  72:*1* 73:*1, 1*
club 33:*1, 1, 1* 34:*1*
  36:*1, 1* 39:*1* 40:*1*
  73:*1*
clubhouse 40:*1*
clubs 12:*1* 14:*1*
  15:*1, 1* 32:*1*
collar 35:*1, 1*
college 8:*1* 9:*1*
  18:*1*
Comcast 12:*1* 13:*1*
comedian 17:*1*
comedy 75:*1*
comes 16:*1*
coming 42:*1* 65:*1*
commenced 79:*1*
comment 60:*1* 63:*1*
  74:*1, 1* 75:*1*
common 40:*1* 64:*1*
  65:*1*
communications
  58:*1, 1*
companies 12:*1*
  13:*1* 15:*1* 16:*1*
  51:*1* 55:*1*
company 10:*1* 11:*1,*
  *1* 13:*1, 1* 15:*1*
compensation 26:*1*
complaint 7:*1* 8:*1*
  22:*1, 1, 1, 1* 37:*1, 1*

Peter Jacobsen   6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 31 of 39 PageID #:624
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

39:*1*  41:*1*  43:*1*
51:*1*  52:*1*, *1*  54:*1*,
*1*  55:*1*, *1*  63:*1*
**complete**  70:*1*
**composite**  32:*1*
**comprehensive**  58:*1*
**concerned**  52:*1*
**condition**  7:*1*
**configuration**  32:*1*
**confirm**  47:*1*  58:*1*
**confirmation**  57:*1*
59:*1*
**consider**  17:*1*  45:*1*
61:*1*
**considered**  12:*1*
17:*1*
**consistent**  69:*1*  70:*1*
**consisting**  78:*1*
**consumed**  6:*1*
**contact**  11:*1*  28:*1*
34:*1*  42:*1*  43:*1*
45:*1*  47:*1*  66:*1*
71:*1*
**contacted**  42:*1*
**contacts**  16:*1*
**context**  19:*1*  20:*1*
**continue**  71:*1*
**CONTINUED**  3:*1*
70:*1*
**continuing**  71:*1*
**contract**  13:*1*, *1*, *1*, *1*,
*1*  59:*1*
**contractor**  10:*1*
**control**  40:*1*  69:*1*,
*1*  72:*1*  75:*1*
**controlling**  40:*1*
**conversation**  5:*1*, *1*
20:*1*  23:*1*, *1*  24:*1*
47:*1*
**conversations**  30:*1*
**Conway**  27:*1*
**Cook**  1:*1*  79:*1*, *1*
**copy**  28:*1*  57:*1*
58:*1*  59:*1*  76:*1*, *1*, *1*
**corporations**  11:*1*
**Correct**  25:*1*  27:*1*
35:*1*, *1*  39:*1*, *1*
41:*1*, *1*  49:*1*  53:*1*
58:*1*  59:*1*  73:*1*
78:*1*

**counsel**  79:*1*, *1*
**County**  1:*1*  79:*1*, *1*
**couple**  62:*1*
**course**  28:*1*  29:*1*, *1*
33:*1*  34:*1*  36:*1*
44:*1*, *1*  51:*1*  68:*1*
76:*1*
**COURT**  1:*1*  5:*1*
49:*1*, *1*  50:*1*  78:*1*, *1*
**Courts**  1:*1*
**cover**  12:*1*
**covered**  12:*1*, *1*
**crash**  5:*1*
**create**  11:*1*
**Cross**  3:*1*  45:*1*
63:*1*
**Cruz**  11:*1*
**C-R-U-Z**  11:*1*
**CSR**  80:*1*
**current**  15:*1*
**currently**  9:*1*
**custom**  68:*1*  69:*1*,
*1*  70:*1*, *1*  71:*1*
**customary**  29:*1*
30:*1*, *1*  39:*1*
**cut**  34:*1*, *1*, *1*  35:*1*
36:*1*
**CV**  1:*1*  78:*1*

**< D >**
**Dangerfield**  40:*1*
75:*1*
**date**  37:*1*  41:*1*
52:*1*, *1*
**day**  1:*1*  8:*1*  19:*1*
27:*1*, *1*  28:*1*, *1*
37:*1*  40:*1*, *1*  42:*1*,
*1*  43:*1*, *1*, *1*  78:*1*
79:*1*  80:*1*
**death**  5:*1*
**December**  52:*1*
**decided**  18:*1*
**declare**  68:*1*
**deeper**  10:*1*
**Defendant**  2:*1*, *1*
3:*1*  57:*1*
**Defendants**  1:*1*
78:*1*
**degree**  8:*1*
**degrees**  9:*1*

**deled**  36:*1*
**delve**  10:*1*
**demand**  54:*1*  55:*1*
68:*1*
**demonstrate**  25:*1*
65:*1*, *1*, *1*
**demonstrated**  68:*1*
**demonstration**  66:*1*
67:*1*, *1*, *1*, *1*  69:*1*
**deny**  47:*1*
**depending**  32:*1*
36:*1*, *1*  65:*1*, *1*
**depends**  62:*1*, *1*
**Deponent**  78:*1*
**deposed**  4:*1*, *1*, *1*
5:*1*
**deposition**  1:*1*  5:*1*,
*1*  7:*1*  8:*1*  49:*1*
53:*1*  68:*1*  69:*1*
78:*1*, *1*  79:*1*, *1*, *1*
**depositions**  1:*1*
**describe**  28:*1*  44:*1*
61:*1*, *1*  69:*1*
**description**  60:*1*
61:*1*
**determination**  67:*1*
**diary**  69:*1*
**differences**  5:*1*
**different**  31:*1*, *1*
32:*1*  33:*1*  34:*1*
36:*1*  73:*1*, *1*
**difficult**  40:*1*
**dinner**  57:*1*
**Direct**  3:*1*  4:*1*
**directed**  63:*1*
**direction**  79:*1*
**directly**  72:*1*  79:*1*
**disagreement**  63:*1*
**disappointed**  51:*1*
**disclosed**  51:*1*
**discrimination**  57:*1*
**discuss**  53:*1*  55:*1*
61:*1*
**discussed**  43:*1*  46:*1*
51:*1*, *1*  53:*1*  55:*1*, *1*
**discussions**  51:*1*
53:*1*
**displeasure**  41:*1*
**distance**  32:*1*  33:*1*,
*1*, *1*  34:*1*  72:*1*

**DISTRICT**  1:*1*, *1*, *1*
78:*1*, *1*  79:*1*
**DIVISION**  1:*1*
78:*1*  79:*1*
**document**  37:*1*
38:*1*  48:*1*, *1*, *1*, *1*
49:*1*  50:*1*  53:*1*
56:*1*, *1*, *1*  58:*1*
59:*1*  60:*1*
**documents**  7:*1*  8:*1*,
*1*, *1*  56:*1*  57:*1*
68:*1*, *1*
**doing**  17:*1*, *1*, *1*
18:*1*, *1*, *1*  31:*1*  40:*1*
**Donald**  15:*1*, *1*
**downtown**  9:*1*
**Drive**  2:*1*
**driver**  25:*1*  31:*1*
32:*1*  39:*1*, *1*  40:*1*
66:*1*  75:*1*
**driver's**  71:*1*
**driving**  25:*1*, *1*
**drove**  25:*1*  28:*1*
41:*1*
**drugs**  7:*1*
**duly**  4:*1*, *1*  79:*1*
**dumb**  35:*1*
**DZIUBLA**  1:*1*  4:*1*
22:*1*  37:*1*  41:*1*
44:*1*  45:*1*, *1*, *1*
49:*1*  54:*1*, *1*, *1*, *1*
68:*1*  71:*1*  78:*1*
**Dziubla's**  42:*1*  43:*1*,
*1*  46:*1*, *1*, *1*  47:*1*, *1*
48:*1*  51:*1*  52:*1*
53:*1*, *1*  55:*1*  58:*1*

**< E >**
**earlier**  41:*1*
**EASTERN**  1:*1*
78:*1*  79:*1*
**edges**  35:*1*
**editorial**  58:*1*  59:*1*,
*1*
**education**  8:*1*, *1*
**EDWARD**  2:*1*
**EEOC**  8:*1*  53:*1*
54:*1*, *1*, *1*, *1*  56:*1*
57:*1*  58:*1*  69:*1*
**EHRLICH**  2:*1*



Peter Jacobsen    6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 32 of 39 PageID #:625
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**eight** 34:*1* 64:*1*
73:*1*
**either** 16:*1* 35:*1*
47:*1* 67:*1*
**elated** 42:*1*
**elevation** 36:*1*
**email** 58:*1*
**emails** 46:*1* 58:*1*
**employed** 9:*1*
**employee** 22:*1* 46:*1*
66:*1* 79:*1*, *1*
**employees** 11:*1*, *1*
26:*1* 28:*1* 30:*1*
64:*1*
**employer** 10:*1*
**employment** 52:*1*
53:*1*, *1* 57:*1* 58:*1*
**encourage** 70:*1*
**encouraged** 68:*1*
**encouraging** 68:*1*, *1*
**engage** 30:*1* 70:*1*
**engaging** 29:*1*
**entities** 12:*1*
**entity** 13:*1*
**entry** 60:*1*
**Equal** 57:*1* 58:*1*
**ERLING** 1:*1* 4:*1*, *1*
78:*1*
**E-R-L-I-N-G** 4:*1*
**ERUFF@PRETZEL-
STOUFFER.COM**
2:*1*
**especially** 30:*1* 75:*1*
**established** 50:*1*
**Etran** 76:*1* 77:*1*
**Eve** 52:*1*
**event** 22:*1* 23:*1*
24:*1*, *1*, *1*, *1* 25:*1*,
*1*, *1* 26:*1* 27:*1*, *1*, *1*,
*1* 28:*1*, *1* 30:*1*, *1*,
*1* 41:*1*, *1* 42:*1*, *1*
45:*1* 46:*1*, *1* 64:*1*
**events** 10:*1* 11:*1*, *1*
47:*1* 62:*1*
**everybody** 29:*1*
44:*1*
**Evidence** 50:*1*
**exactly** 11:*1* 13:*1*
14:*1*, *1* 18:*1* 33:*1*
**examination** 1:*1*

3:*1*, *1* 4:*1* 63:*1*
**examined** 4:*1*
**exchanged** 46:*1*
**excuse** 28:*1* 32:*1*
50:*1* 52:*1*
**excused** 77:*1*
**Exhibit** 3:*1*, *1*, *1*, *1*
37:*1*, *1*, *1* 40:*1*
48:*1*, *1*, *1* 55:*1*, *1*, *1*
56:*1* 57:*1* 59:*1*, *1*,
*1* 63:*1*, *1*, *1*
**exhibits** 76:*1*
**explain** 12:*1* 45:*1*
47:*1* 70:*1*
**explained** 40:*1*
**explanation** 45:*1*
**extra** 65:*1*

**< F >**
**fact** 49:*1*
**fair** 34:*1*
**fairly** 17:*1*
**fairway** 33:*1* 34:*1*,
*1*, *1*, *1* 35:*1* 40:*1*, *1*
75:*1*, *1*
**family** 18:*1* 19:*1*
23:*1* 24:*1* 29:*1*
55:*1*
**famous** 18:*1*
**far** 24:*1* 71:*1*
**Farms** 27:*1*
**father** 18:*1* 23:*1*
75:*1*
**Federal** 1:*1* 50:*1*
54:*1*
**feel** 67:*1*, *1* 71:*1*
**feels** 66:*1*
**feet** 66:*1*
**FEIGN** 1:*1* 79:*1*
80:*1*, *1*
**fellow** 55:*1*
**felt** 66:*1* 70:*1*
**female** 44:*1* 66:*1*
73:*1*
**fifth** 60:*1*
**figure** 53:*1*
**filed** 37:*1*, *1* 54:*1*, *1*,
*1* 55:*1*
**filing** 55:*1*
**financially** 79:*1*

**find** 59:*1* 61:*1*
**fine** 40:*1*
**finish** 30:*1*
**finished** 6:*1*
**finishing** 40:*1*
**first** 4:*1* 21:*1* 37:*1*
41:*1* 42:*1* 49:*1*
52:*1* 53:*1* 54:*1*
75:*1* 79:*1*
**five** 32:*1* 34:*1*
36:*1* 48:*1*
**flag** 35:*1*
**flags** 29:*1*, *1*
**flange** 36:*1*
**flight** 41:*1*, *1*, *1*
**flip** 48:*1*
**Floor** 3:*1*
**Florida** 8:*1*, *1*
**flying** 24:*1* 41:*1*
**focus** 15:*1* 25:*1*
54:*1*
**focused** 54:*1*
**follow** 62:*1*
**follows** 4:*1*
**foot** 73:*1*
**foregoing** 78:*1*
**forehead** 36:*1*
**foreign** 66:*1*
**forest** 40:*1* 75:*1*
**forged** 33:*1*
**forget** 52:*1*
**formal** 49:*1*
**formally** 16:*1*
**format** 28:*1*
**forms** 50:*1*
**formula** 33:*1*
**forward** 71:*1*
**founder** 11:*1*
**four** 8:*1* 32:*1* 34:*1*
36:*1* 52:*1*, *1*
**Fourteen** 11:*1*
**friend** 5:*1* 19:*1*, *1*
20:*1*, *1*
**friends** 55:*1*, *1*
**fringe** 35:*1*, *1* 36:*1*
**full** 4:*1* 6:*1*
**fuller** 75:*1*
**fun** 17:*1* 30:*1* 44:*1*
61:*1*
**further** 70:*1*, *1*

76:*1* 79:*1*, *1*
**furthermore** 74:*1*
**future** 62:*1*

**< G >**
**game** 13:*1*, *1*, *1*, *1*
14:*1*, *1* 21:*1* 31:*1*
44:*1* 61:*1*, *1* 67:*1*
72:*1*, *1*, *1*
**general** 33:*1* 48:*1*
63:*1*
**generally** 5:*1* 28:*1*
**gentleman** 12:*1*
**getting** 44:*1* 68:*1*
69:*1*
**gigs** 17:*1*, *1*
**give** 7:*1* 25:*1* 26:*1*
31:*1* 64:*1*, *1* 69:*1*,
*1*, *1*
**given** 29:*1* 74:*1*
**giving** 30:*1* 39:*1*, *1*
67:*1*
**go** 5:*1* 9:*1*, *1* 15:*1*
18:*1* 19:*1* 25:*1*
26:*1* 33:*1* 34:*1*
41:*1* 43:*1* 49:*1*
59:*1* 60:*1* 64:*1*
66:*1* 67:*1*, *1* 68:*1*
**goes** 24:*1*
**going** 5:*1* 10:*1*
12:*1* 14:*1*, *1*, *1*
24:*1* 25:*1*, *1* 26:*1*
30:*1*, *1* 36:*1*, *1*, *1*
41:*1* 46:*1*, *1* 47:*1*
49:*1* 50:*1*, *1* 58:*1*
62:*1* 68:*1* 69:*1*, *1*
70:*1* 72:*1*
**Golden** 13:*1* 14:*1*
61:*1*, *1*
**GOLDMAN** 2:*1*
**golf** 10:*1* 11:*1*, *1*
12:*1*, *1*, *1* 13:*1*
14:*1* 15:*1* 17:*1*
18:*1* 20:*1* 21:*1*, *1*
25:*1* 27:*1* 28:*1*
29:*1*, *1* 30:*1* 31:*1*
33:*1*, *1* 34:*1* 35:*1*
36:*1* 39:*1* 40:*1*, *1*
44:*1*, *1*, *1*, *1* 45:*1*
57:*1* 61:*1* 66:*1*

Peter Jacobsen 6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 33 of 39 PageID #:626
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

68:*1* 72:*1, 1, 1, 1*
75:*1, 1* 76:*1*
**golfer** 5:*1* 30:*1*
31:*1* 39:*1* 44:*1, 1*
46:*1*
**golfers** 18:*1, 1* 44:*1,*
*1* 55:*1* 66:*1* 75:*1*
**Good** 4:*1, 1* 6:*1*
23:*1* 26:*1* 67:*1*
**gosh** 21:*1*
**grab** 73:*1*
**graduate** 8:*1* 9:*1, 1*
**graduated** 9:*1*
**grand** 52:*1*
**grandchildren** 52:*1,*
*1*
**grass** 34:*1* 35:*1, 1,*
*1* 36:*1, 1*
**great** 18:*1*
**green** 31:*1, 1* 33:*1*
35:*1, 1, 1, 1* 36:*1*
**ground** 5:*1*
**group** 18:*1* 25:*1, 1,*
*1* 29:*1, 1, 1, 1* 30:*1,*
*1, 1, 1* 65:*1*
**groups** 29:*1*
**guest** 31:*1* 46:*1*

**< H >**
**hand** 68:*1* 80:*1*
**handle** 47:*1*
**hands** 21:*1*
**happen** 30:*1*
**happened** 45:*1, 1*
**happens** 40:*1* 64:*1,*
*1*
**harassed** 16:*1*
**harassment** 28:*1, 1*
57:*1*
**hard** 40:*1* 61:*1*
70:*1, 1*
**harder** 75:*1*
**Hawaii** 20:*1* 21:*1*
**head** 6:*1, 1*
**heads** 32:*1, 1*
**hear** 5:*1* 6:*1* 41:*1*
**heard** 32:*1* 34:*1, 1*
41:*1, 1*
**heaviest** 36:*1*
**heights** 34:*1* 35:*1*
**held** 27:*1*

**help** 11:*1* 31:*1, 1, 1*
65:*1, 1* 70:*1* 73:*1*
**helps** 23:*1*
**Henny** 75:*1*
**hereunto** 80:*1*
**high** 9:*1, 1, 1, 1*
18:*1, 1, 1*
**higher** 33:*1*
**highest** 8:*1* 12:*1, 1*
**hill** 36:*1, 1*
**hip** 72:*1* 73:*1, 1*
**hips** 71:*1* 73:*1*
**hit** 25:*1* 31:*1* 33:*1,*
*1* 34:*1* 36:*1, 1*
37:*1, 1* 39:*1, 1*
64:*1* 65:*1* 66:*1*
68:*1, 1* 70:*1* 72:*1*
74:*1*
**hitting** 25:*1, 1* 36:*1*
65:*1*
**hockey** 72:*1*
**hold** 40:*1* 49:*1*
**hole** 32:*1, 1* 35:*1*
36:*1*
**holes** 29:*1* 64:*1*
**honor** 46:*1*
**hopefully** 36:*1*
**hoping** 68:*1*
**hospitable** 29:*1*
**hotel** 24:*1, 1* 28:*1*
**hours** 7:*1* 25:*1*
**Hualalai** 20:*1*
**human** 11:*1*
**humor** 60:*1* 61:*1, 1,*
*1* 75:*1, 1*
**humorous** 60:*1*
**hundred** 29:*1*
**hundreds** 73:*1* 75:*1*
**Huntington** 14:*1*
**hurrying** 40:*1*
**hybrid** 31:*1* 33:*1*
36:*1*
**hybrids** 15:*1, 1*

**< I >**
**ideal** 34:*1*
**identification** 37:*1*
48:*1* 55:*1* 59:*1*
**Illinois** 1:*1, 1, 1* 2:*1,*
*1, 1* 3:*1* 78:*1* 79:*1,*

*1, 1* 80:*1*
**impersonate** 18:*1*
**impersonations**
18:*1, 1*
**imposed** 71:*1*
**impressions** 17:*1, 1*
18:*1, 1*
**inaccurate** 38:*1, 1, 1,*
*1* 39:*1*
**in-between** 33:*1*
**inches** 34:*1, 1*
**included** 49:*1* 50:*1,*
*1*
**Incredible** 13:*1*
**incumbent** 67:*1*
**independent** 10:*1*
**indirectly** 79:*1*
**individual** 11:*1*
**individuals** 51:*1*
55:*1*
**inexperienced** 74:*1*
**influence** 7:*1*
**informally** 16:*1*
**information** 38:*1, 1*
46:*1*
**innuendo** 74:*1* 76:*1*
**inside** 29:*1*
**instance** 74:*1* 76:*1*
**instances** 69:*1* 70:*1*
**institutions** 12:*1*
**instruct** 31:*1* 64:*1*
**instruction** 39:*1*
65:*1* 66:*1* 67:*1, 1,*
*1, 1, 1* 68:*1* 69:*1*
70:*1* 73:*1* 74:*1, 1*
76:*1*
**instructional** 18:*1*
**instructions** 25:*1*
28:*1* 30:*1* 37:*1*
39:*1* 44:*1* 64:*1*
**integrate** 11:*1*
**intended** 74:*1* 75:*1*
**interact** 28:*1*
**interaction** 41:*1*
**interactions** 41:*1*
45:*1*
**interested** 79:*1*
**interference** 35:*1*
**intermediary** 34:*1*
**interrupt** 5:*1*

**interviewing** 47:*1*
**introduced** 20:*1, 1, 1*
**investigation** 47:*1, 1*
**invitation** 23:*1, 1, 1,*
*1, 1*
**involved** 10:*1* 12:*1*
13:*1, 1* 14:*1* 46:*1*
67:*1* 68:*1, 1*
**involvement** 12:*1*
13:*1* 14:*1* 15:*1*
**involving** 11:*1*
**iron** 25:*1* 31:*1, 1*
32:*1, 1, 1, 1, 1*
33:*1, 1, 1, 1, 1* 36:*1,*
*1* 75:*1*
**irons** 14:*1* 15:*1*
32:*1* 33:*1, 1* 40:*1*
74:*1*

**< J >**
**J.C** 1:*1* 2:*1* 3:*1*
22:*1, 1* 27:*1* 56:*1*
57:*1, 1* 58:*1* 78:*1*
**Jack** 18:*1*
**JACOBSEN** 1:*1, 1*
2:*1* 3:*1* 4:*1, 1, 1*
7:*1* 10:*1, 1* 11:*1, 1,*
*1* 12:*1* 13:*1, 1*
17:*1* 48:*1* 49:*1, 1*
55:*1* 59:*1* 60:*1*
63:*1* 64:*1* 71:*1, 1*
78:*1, 1* 79:*1*
**Jacobsen's** 61:*1, 1*
**JAMES** 3:*1*
**January** 21:*1, 1, 1, 1*
**JCA** 26:*1* 27:*1, 1*
28:*1, 1, 1* 46:*1, 1*
47:*1, 1* 49:*1* 50:*1*
51:*1* 52:*1* 53:*1*
54:*1, 1* 55:*1* 57:*1*
58:*1* 59:*1, 1, 1*
62:*1* 64:*1* 66:*1*
**JCA's** 28:*1, 1* 57:*1*
**JCP@CLIFFORDL**
**AW.COM** 3:*1*
**Jim** 14:*1* 19:*1, 1*
20:*1* 21:*1* 23:*1, 1*
24:*1* 25:*1* 26:*1*
28:*1, 1, 1* 37:*1*
39:*1* 41:*1* 42:*1*
45:*1*

Peter Jacobsen    6/27/2019
Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/20 Page 34 of 39 PageID #:627
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**JODI** 1:*1* 79:*1*
80:*1, 1*
**join** 29:*1*
**joke** 17:*1* 19:*1, 1, 1*
40:*1, 1, 1, 1* 43:*1, 1*
44:*1, 1, 1* 74:*1, 1*
75:*1, 1*
**jokes** 17:*1* 75:*1*
**journalists** 55:*1*
**July** 23:*1* 24:*1*
37:*1* 80:*1*
**jump** 31:*1*
**June** 1:*1* 23:*1*
24:*1* 78:*1* 79:*1*
**junior** 73:*1*
**juniors** 74:*1*

**< K >**
**keep** 5:*1*
**Keno** 13:*1* 61:*1*
**Kev** 23:*1, 1* 27:*1, 1*
28:*1* 31:*1* 40:*1*
41:*1* 44:*1* 45:*1*
46:*1* 47:*1* 56:*1*
57:*1, 1* 59:*1* 65:*1, 1*
**kids** 52:*1, 1, 1, 1, 1*
**killed** 5:*1*
**kind** 5:*1, 1* 12:*1, 1*
13:*1* 15:*1* 17:*1*
28:*1, 1* 31:*1* 33:*1,
1* 34:*1* 50:*1*
**knew** 25:*1* 26:*1*
44:*1, 1*
**know** 6:*1, 1* 7:*1*
10:*1* 11:*1* 15:*1*
16:*1, 1, 1, 1, 1, 1*
19:*1, 1* 20:*1, 1, 1, 1,
1* 21:*1, 1* 22:*1, 1, 1,
1, 1, 1* 26:*1* 33:*1, 1*
44:*1, 1* 45:*1, 1*
46:*1, 1* 47:*1* 52:*1,
1* 53:*1, 1, 1, 1, 1*
54:*1* 59:*1* 60:*1*
70:*1* 75:*1*
**knowledge** 16:*1*
44:*1* 78:*1*
**known** 60:*1*
**knows** 18:*1* 51:*1*

**< L >**

**LaCrosse** 72:*1*
**laid** 60:*1*
**LaSalle** 2:*1* 3:*1*
**late** 14:*1*
**laugh** 17:*1*
**LAW** 3:*1*
**lawsuit** 8:*1* 16:*1, 1,
1* 19:*1* 52:*1*
**layman** 15:*1*
**learn** 44:*1, 1* 52:*1,
1* 55:*1* 68:*1*
**learned** 18:*1* 22:*1*
45:*1* 52:*1* 53:*1*
54:*1*
**led** 20:*1*
**Lee** 18:*1, 1*
**left** 29:*1* 73:*1, 1*
**length** 36:*1*
**lesson** 64:*1* 69:*1*
**letter** 54:*1* 55:*1*
**letters** 58:*1*
**level** 8:*1, 1* 65:*1, 1,
1, 1, 1*
**levels** 75:*1*
**lewd** 74:*1* 75:*1*
**Lexus** 13:*1* 14:*1, 1,
1, 1, 1, 1* 15:*1* 16:*1*
**liabilities** 50:*1*
**liability** 49:*1*
**License** 80:*1*
**life** 17:*1* 19:*1*
**lift** 73:*1*
**lighthearted** 17:*1*
**light-hearted** 61:*1*
**likeness** 13:*1* 61:*1*
**likes** 17:*1, 1*
**limit** 7:*1*
**Lincoln** 9:*1*
**line** 49:*1, 1* 57:*1*
60:*1* 63:*1* 64:*1, 1*
72:*1, 1*
**lines** 63:*1*
**literally** 71:*1*
**little** 10:*1* 28:*1*
35:*1, 1* 36:*1* 72:*1,
1* 73:*1*
**live** 8:*1* 44:*1*
**lodge** 49:*1*
**logo** 14:*1*
**long** 10:*1* 24:*1*
25:*1* 31:*1* 32:*1*

33:*1, 1* 34:*1, 1*
39:*1, 1* 50:*1*
**longer** 35:*1* 36:*1*
39:*1* 75:*1*
**longest** 32:*1* 34:*1*
**look** 13:*1* 37:*1, 1*
48:*1* 49:*1* 55:*1*
56:*1, 1* 57:*1* 60:*1, 1*
**looked** 7:*1* 8:*1, 1*
13:*1* 53:*1*
**looking** 34:*1*
**looks** 60:*1*
**lost** 23:*1*
**lot** 21:*1, 1* 61:*1*
66:*1* 71:*1*
**loud** 38:*1*
**love** 52:*1*
**loved** 75:*1, 1, 1*
**lunch** 29:*1, 1*

**< M >**
**making** 17:*1* 45:*1*
72:*1*
**male** 66:*1* 73:*1*
**males** 74:*1*
**manage** 11:*1*
**manufacturer** 5:*1*
**March** 41:*1*
**marked** 37:*1, 1*
48:*1, 1* 55:*1, 1*
56:*1* 57:*1* 59:*1, 1*
**marketing** 11:*1*
**married** 52:*1, 1*
**Martin** 19:*1* 23:*1*
**matter** 73:*1* 74:*1*
**maximum** 34:*1*
**mean** 57:*1*
**measured** 36:*1*
**mechanics** 66:*1*
**medicine** 7:*1*
**meet** 20:*1, 1, 1*
21:*1* 25:*1* 30:*1*
**meeting** 22:*1*
**members** 55:*1*
**memory** 22:*1*
**men** 74:*1*
**mental** 7:*1*
**mention** 42:*1*
**mentioned** 33:*1*
43:*1* 53:*1* 55:*1*

**met** 7:*1, 1* 19:*1*
20:*1, 1* 21:*1* 29:*1*
**metal** 32:*1, 1*
**Michael** 21:*1* 22:*1*
**MICHELLE** 2:*1*
**mid** 14:*1*
**middle** 36:*1* 57:*1*
60:*1, 1*
**mimic** 65:*1*
**mind** 5:*1* 16:*1*
45:*1* 71:*1* 74:*1, 1*
75:*1*
**minute** 19:*1* 48:*1*
**minutes** 62:*1*
**mischaracterizes**
69:*1*
**molson@vedderprice
.com** 2:*1*
**moment** 51:*1* 65:*1*
**money** 17:*1, 1, 1*
18:*1* 23:*1* 26:*1, 1,
1, 1, 1* 42:*1*
**Monica** 11:*1*
**month** 21:*1*
**months** 24:*1* 27:*1*
**morning** 4:*1, 1*
**motion** 72:*1*
**move** 66:*1, 1* 67:*1*
69:*1* 71:*1* 73:*1*
**moved** 14:*1*

**< N >**
**name** 4:*1, 1* 13:*1*
22:*1* 49:*1* 50:*1, 1, 1*
**named** 19:*1*
**Nance** 14:*1*
**NBC** 10:*1, 1, 1, 1*
11:*1* 12:*1, 1, 1*
16:*1* 27:*1*
**near** 29:*1*
**necessary** 16:*1*
**need** 6:*1* 31:*1, 1*
62:*1* 71:*1, 1* 72:*1*
76:*1, 1*
**needed** 41:*1* 59:*1*
72:*1* 74:*1*
**network** 12:*1*
**never** 26:*1* 38:*1*
39:*1* 48:*1* 49:*1*
50:*1* 52:*1* 67:*1, 1*

Peter Jacobsen 6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 35 of 39 PageID #:628
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

68:*1*

**new** 6:*1* 33:*1* 66:*1*
**Nicklaus** 18:*1*
**night** 7:*1*
**nine** 73:*1*
**nods** 6:*1*
**North** 2:*1* 3:*1*
**NORTHERN** 1:*1*
78:*1* 79:*1*
**nos** 6:*1*
**Notary** 1:*1* 78:*1*
79:*1*
**noted** 50:*1* 51:*1*
**notice** 1:*1*
**notwithstanding**
57:*1*
**November** 41:*1*
42:*1, 1* 46:*1, 1*
54:*1, 1*
**Now-a-days** 32:*1*
**number** 42:*1* 57:*1*
58:*1* 59:*1* 63:*1, 1,*
*1, 1* 64:*1* 68:*1* 69:*1*
**numbered** 33:*1*
**nut** 75:*1*

**< O >**
**oath** 4:*1* 5:*1*
**object** 49:*1* 50:*1*
51:*1* 58:*1*
**objection** 49:*1* 50:*1,*
*1* 57:*1, 1* 69:*1*
70:*1, 1*
**obligated** 66:*1* 67:*1,*
*1* 70:*1* 71:*1*
**obviously** 49:*1*
**occasion** 18:*1* 25:*1*
64:*1* 66:*1*
**occasions** 31:*1, 1*
**o'clock** 79:*1*
**offended** 19:*1, 1, 1*
44:*1* 45:*1* 46:*1*
**offensive** 19:*1*
**offer** 65:*1*
**offered** 26:*1* 64:*1*
**office** 80:*1*
**OFFICES** 3:*1*
**Oh** 9:*1* 13:*1* 21:*1*
51:*1* 61:*1* 67:*1*
**Okay** 4:*1* 5:*1, 1, 1*
6:*1* 7:*1* 8:*1, 1* 9:*1*

10:*1* 11:*1* 12:*1, 1*
13:*1, 1* 15:*1, 1, 1*
16:*1, 1, 1* 17:*1, 1*
19:*1* 20:*1, 1, 1*
21:*1, 1, 1* 22:*1*
24:*1* 25:*1* 26:*1*
27:*1, 1* 28:*1, 1*
31:*1, 1* 32:*1, 1*
33:*1* 34:*1* 36:*1, 1*
37:*1* 38:*1* 39:*1*
40:*1, 1* 41:*1, 1*
42:*1, 1* 43:*1* 45:*1*
47:*1* 48:*1* 50:*1, 1,*
*1, 1* 51:*1* 52:*1*
53:*1, 1, 1* 54:*1*
55:*1* 56:*1* 57:*1*
58:*1, 1, 1* 59:*1*
60:*1* 61:*1, 1* 62:*1,*
*1, 1* 63:*1* 64:*1*
65:*1, 1* 66:*1, 1*
70:*1* 71:*1* 74:*1*
**old** 75:*1, 1*
**older** 18:*1*
**OLSON** 2:*1* 62:*1*
76:*1* 77:*1*
**once** 4:*1* 33:*1* 45:*1*
51:*1*
**ones** 15:*1* 16:*1*
**ongoing** 16:*1, 1*
51:*1* 52:*1*
**on-line** 60:*1* 72:*1, 1*
**Opportunity** 57:*1*
58:*1*
**opposed** 67:*1*
**optimistic** 68:*1, 1*
**optimum** 34:*1*
**Oregon** 9:*1, 1, 1*
**organizations** 10:*1*
12:*1* 13:*1* 15:*1*
16:*1, 1*
**orientation** 28:*1*
**origin** 75:*1*
**outing** 30:*1* 74:*1*
**outside** 19:*1*
**owns** 12:*1*

**< P >**
**page** 38:*1* 48:*1*
56:*1* 59:*1* 60:*1*
**pages** 78:*1*

**paid** 10:*1, 1* 18:*1, 1,*
*1* 26:*1*
**Palmers** 18:*1, 1*
**pants** 73:*1*
**Paragraph** 37:*1*
38:*1* 49:*1, 1* 50:*1,*
*1* 60:*1, 1* 63:*1* 71:*1*
**parallel** 72:*1*
**parents** 52:*1, 1*
**parlor** 13:*1, 1* 61:*1*
**parlors** 61:*1*
**part** 38:*1* 39:*1*
47:*1* 50:*1* 58:*1*
**partake** 44:*1*
**participants** 25:*1*
29:*1, 1, 1, 1*
**participate** 44:*1*
67:*1* 68:*1*
**participating** 30:*1*
**parties** 49:*1* 79:*1*
**partners** 70:*1*
**partnership** 13:*1*
**partnerships** 10:*1*
**party** 49:*1*
**Payne** 5:*1*
**PDF** 76:*1, 1* 77:*1, 1*
**people** 17:*1* 21:*1*
25:*1* 26:*1* 30:*1*
39:*1* 44:*1, 1* 67:*1,*
*1* 68:*1, 1, 1*
**perception** 45:*1*
**person** 11:*1* 12:*1, 1*
19:*1* 42:*1* 73:*1*
**personal** 79:*1*
**personality** 60:*1*
**personally** 57:*1*
**person's** 73:*1*
**pertaining** 1:*1*
**peruses** 38:*1* 48:*1*
56:*1, 1*
**PETER** 1:*1, 1* 2:*1*
3:*1* 4:*1, 1* 10:*1, 1,*
*1* 11:*1, 1* 12:*1*
13:*1, 1* 49:*1* 61:*1,*
*1* 78:*1, 1* 79:*1*
**PGA** 10:*1* 11:*1, 1*
15:*1*
**phone** 23:*1, 1* 24:*1*
42:*1* 54:*1*
**phonetic** 21:*1* 36:*1*

**photograph** 56:*1, 1*
**photographs** 57:*1*
**photos** 8:*1, 1* 56:*1*
**phrases** 32:*1*
**physical** 7:*1* 43:*1*
68:*1* 71:*1, 1*
**physically** 66:*1*
67:*1, 1* 69:*1, 1*
**physics** 66:*1* 72:*1*
**pick** 24:*1*
**picked** 28:*1, 1*
**pictures** 29:*1, 1*
**place** 34:*1, 1* 79:*1*
**placed** 71:*1*
**Plaintiff** 1:*1, 1* 2:*1*
4:*1, 1* 7:*1* 22:*1, 1*
37:*1* 39:*1, 1* 43:*1*
58:*1* 66:*1* 71:*1*
74:*1* 78:*1*
**plaintiff's** 38:*1*
56:*1* 69:*1* 71:*1*
**plane** 5:*1*
**play** 14:*1, 1* 15:*1, 1,*
*1, 1* 18:*1, 1* 34:*1*
44:*1* 66:*1* 72:*1, 1*
**played** 32:*1* 67:*1*
**player** 65:*1, 1* 66:*1,*
*1*
**players** 11:*1* 14:*1*
18:*1, 1* 29:*1* 33:*1*
73:*1* 74:*1*
**playful** 60:*1*
**playing** 20:*1, 1*
**plays** 36:*1*
**please** 4:*1* 5:*1* 6:*1,*
*1, 1, 1* 37:*1* 38:*1*
48:*1* 55:*1* 59:*1*
63:*1*
**plummeting** 33:*1*
**point** 23:*1* 33:*1*
41:*1* 47:*1* 54:*1, 1*
**pointers** 25:*1*
**Poker** 61:*1*
**policies** 28:*1, 1* 57:*1*
**Policy** 57:*1* 58:*1*
**porch** 29:*1*
**portion** 40:*1* 57:*1*
**portions** 47:*1*
**Portland** 9:*1, 1, 1*
**posed** 6:*1*

Case: 1:18-cv-04542 Document #: 93-5 Filed: 02/20/20 Page 36 of 39 PageID #:629

Peter Jacobsen    6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**position** 56:*1* 57:*1*
66:*1* 71:*1*
**possible** 29:*1* 41:*1*
54:*1*
**possibly** 25:*1* 34:*1*
**post** 9:*1*
**Power** 22:*1* 31:*1*
**practice** 29:*1* 30:*1*
39:*1* 68:*1* 69:*1, 1*
70:*1, 1, 1* 71:*1*
**preceding** 24:*1*
**precisely** 74:*1*
**preparation** 7:*1*
**prepare** 7:*1*
**PRESENT** 2:*1*
**presented** 49:*1*
**pressed** 72:*1*
**pressing** 73:*1*
**pretty** 17:*1* 25:*1*
52:*1* 62:*1*
**PRETZEL** 2:*1*
**prevent** 7:*1*
**previous** 36:*1*
**PRICE** 2:*1*
**principle** 72:*1*
**prior** 27:*1, 1* 28:*1,
1, 1* 52:*1*
**privileged** 53:*1*
**Pro** 29:*1* 30:*1*
64:*1, 1* 65:*1* 67:*1*
70:*1* 74:*1*
**probably** 17:*1* 21:*1,
1* 29:*1, 1* 34:*1*
51:*1* 64:*1* 65:*1*
**problem** 43:*1*
**Procedure** 1:*1*
**proceed** 5:*1*
**proceeded** 74:*1*
**produced** 58:*1*
**producer** 12:*1*
**produces** 12:*1*
**Production** 56:*1*
**products** 11:*1*
**profession** 17:*1*
**professional** 5:*1*
30:*1* 44:*1, 1, 1, 1, 1*
55:*1*
**programs** 10:*1*
**progress** 75:*1*
**projects** 10:*1* 60:*1*

**proper** 34:*1* 36:*1*
72:*1*
**properly** 28:*1*
**provide** 28:*1, 1*
45:*1* 64:*1*
**provided** 28:*1* 68:*1,
1* 73:*1* 74:*1* 78:*1*
**providing** 37:*1* 67:*1*
**proximity** 31:*1, 1*
39:*1* 71:*1* 73:*1*
**Public** 1:*1* 78:*1*
79:*1*
**PULLOS** 3:*1*
**pursuant** 1:*1, 1*
**push** 39:*1* 66:*1*
73:*1*
**put** 34:*1, 1, 1*
**putters** 14:*1* 15:*1*
**putting** 25:*1* 31:*1*
40:*1* 72:*1*

**< Q >**
**question** 6:*1, 1, 1, 1,
1, 1, 1* 8:*1* 15:*1*
27:*1* 30:*1, 1* 36:*1*
41:*1* 50:*1, 1, 1*
51:*1, 1* 53:*1* 58:*1*
59:*1* 63:*1* 70:*1*
71:*1* 74:*1, 1* 75:*1*
**questioning** 49:*1, 1*
63:*1*
**questions** 6:*1* 7:*1*
8:*1* 12:*1* 16:*1*
19:*1* 35:*1* 40:*1*
51:*1* 53:*1* 62:*1*
63:*1*
**quick** 29:*1*
**quickly** 25:*1*
**quote** 68:*1, 1*
**quotes** 64:*1*

**< R >**
**rain** 9:*1*
**raise** 23:*1*
**rarely** 18:*1* 51:*1*
**reach** 73:*1*
**reached** 55:*1*
**reaching** 45:*1* 46:*1*
73:*1*
**read** 7:*1* 8:*1, 1, 1*
38:*1, 1, 1, 1, 1, 1*

50:*1* 52:*1* 56:*1*
78:*1*
**reads** 57:*1*
**ready** 62:*1*
**really** 13:*1* 35:*1*
68:*1* 70:*1*
**reason** 7:*1* 16:*1, 1*
20:*1* 27:*1* 33:*1*
35:*1*
**recall** 5:*1* 19:*1, 1*
20:*1* 21:*1* 22:*1, 1,
1* 23:*1, 1* 24:*1, 1*
25:*1* 27:*1, 1* 30:*1,
1, 1* 31:*1* 37:*1*
40:*1, 1, 1, 1* 41:*1*
42:*1, 1* 43:*1, 1*
45:*1* 46:*1* 52:*1*
53:*1* 54:*1, 1* 56:*1*
58:*1, 1* 63:*1, 1, 1, 1*
**receive** 26:*1* 58:*1*
62:*1*
**received** 23:*1* 26:*1*
46:*1* 54:*1* 57:*1, 1*
58:*1, 1*
**recess** 48:*1* 62:*1*
**recognize** 48:*1, 1*
**recollection** 42:*1*
47:*1* 64:*1*
**record** 4:*1* 42:*1*
48:*1, 1* 49:*1* 51:*1*
62:*1*
**recreational** 7:*1*
**rectify** 45:*1, 1* 47:*1*
**reduced** 79:*1*
**refer** 58:*1*
**reference** 50:*1* 60:*1*
**referenced** 49:*1*
**referring** 50:*1*
**refresh** 22:*1*
**Regarding** 5:*1* 39:*1*
46:*1* 50:*1* 74:*1*
**regardless** 45:*1*
**regular** 10:*1*
**reimbursed** 26:*1*
**relate** 58:*1*
**related** 41:*1* 49:*1*
**relating** 57:*1* 58:*1*
59:*1*
**relation** 54:*1*
**relationship** 15:*1*

**relative** 79:*1, 1*
**release** 48:*1* 50:*1, 1*
**released** 49:*1*
**relevance** 49:*1* 50:*1*
**reluctant** 70:*1*
**remember** 20:*1*
24:*1* 29:*1, 1* 39:*1,
1, 1* 41:*1* 47:*1*
52:*1* 71:*1*
**repeat** 6:*1* 50:*1*
**repetitive** 51:*1*
**rephrase** 6:*1*
**replicate** 65:*1*
**report** 8:*1* 11:*1, 1*
12:*1*
**reported** 79:*1*
**Reporter** 1:*1* 5:*1*
50:*1* 76:*1, 1, 1* 79:*1*
**reporters** 55:*1*
**represent** 11:*1*
49:*1* 56:*1* 60:*1*
61:*1*
**representation** 14:*1*
**Request** 56:*1, 1*
57:*1, 1* 58:*1, 1* 59:*1*
**require** 31:*1* 65:*1,
1* 67:*1* 68:*1* 75:*1*
**requires** 31:*1*
**Reserve** 76:*1*
**reside** 8:*1*
**Resort** 20:*1*
**resources** 11:*1*
**responded** 6:*1*
**response** 56:*1, 1, 1,
1, 1* 57:*1* 58:*1, 1*
59:*1*
**responses** 56:*1*
**retaliation** 57:*1*
**right** 11:*1* 30:*1*
35:*1, 1* 38:*1* 41:*1*
62:*1* 63:*1, 1, 1*
64:*1* 73:*1, 1, 1*
**right-handed** 73:*1*
**Rodney** 39:*1* 75:*1*
**role** 10:*1, 1* 14:*1*
25:*1, 1*
**roll** 36:*1*
**Ross** 15:*1, 1*
**rotation** 72:*1*
**rough** 34:*1, 1, 1, 1*

Peter Jacobson 6/27/2019
Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/26/20 Page 37 of 39 PageID #:630
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

75:*1*

**round** 64:*1, 1*
**ROWENA** 1:*1* 78:*1*
**Roy** 12:*1*
**R-O-Y** 12:*1*
**royalties** 13:*1* 62:*1*
**RUFF** 2:*1* 3:*1* 8:*1*
27:*1, 1* 30:*1* 38:*1*
48:*1* 49:*1* 50:*1*
51:*1, 1* 53:*1* 58:*1*
63:*1* 69:*1* 70:*1*
76:*1, 1, 1* 77:*1*
**Rules** 1:*1* 5:*1* 50:*1*
78:*1*
**run** 74:*1*

**< S >**
**SAM** 2:*1* 4:*1* 30:*1*
**sam@goldmanehrlic**
**h.com** 2:*1*
**sand** 32:*1* 36:*1, 1*
**saw** 37:*1*
**saying** 30:*1, 1* 41:*1*
43:*1*
**says** 38:*1* 48:*1*
49:*1* 57:*1* 59:*1*
63:*1* 66:*1* 70:*1, 1,
1* 72:*1*
**schedule** 62:*1*
**school** 9:*1, 1, 1, 1*
18:*1, 1, 1*
**Schumacher** 19:*1, 1,
1* 20:*1, 1, 1, 1, 1*
21:*1* 23:*1, 1* 24:*1*
25:*1* 26:*1* 27:*1, 1*
28:*1* 37:*1* 39:*1*
40:*1* 41:*1* 42:*1, 1*
45:*1, 1, 1* 46:*1, 1*
47:*1, 1, 1* 51:*1* 54:*1*
**seal** 80:*1*
**second** 38:*1* 43:*1*
48:*1* 49:*1* 60:*1*
**Section** 48:*1* 49:*1,
1* 57:*1* 60:*1*
**SEDAEI** 2:*1* 3:*1*
4:*1, 1* 8:*1* 27:*1, 1*
30:*1* 37:*1, 1* 38:*1,
1* 48:*1, 1, 1, 1* 50:*1,
1* 51:*1, 1, 1* 53:*1, 1*
55:*1, 1* 56:*1, 1*
59:*1, 1, 1* 62:*1, 1, 1*

69:*1* 70:*1* 76:*1, 1*
77:*1*
**see** 8:*1, 1* 12:*1*
48:*1* 49:*1* 50:*1, 1,
1* 57:*1* 61:*1* 63:*1*
64:*1*
**seeing** 52:*1*
**seen** 8:*1* 9:*1* 35:*1*
37:*1, 1* 48:*1* 49:*1*
50:*1* 56:*1, 1* 59:*1*
60:*1* 65:*1*
**self-esteem** 33:*1*
**senior** 33:*1*
**seniors** 74:*1*
**sense** 61:*1, 1, 1*
**sent** 26:*1* 54:*1* 55:*1*
**September** 23:*1, 1*
**sequential** 28:*1*
**serious** 17:*1*
**set** 80:*1*
**seven** 73:*1*
**severance** 49:*1*
**sexual** 28:*1, 1* 74:*1*
76:*1*
**sexually** 16:*1*
**shake** 21:*1*
**shakes** 6:*1*
**sharp** 60:*1*
**sheets** 78:*1*
**shirt** 14:*1* 15:*1*
**shirts** 15:*1*
**shoes** 40:*1*
**shooting** 73:*1*
**short** 31:*1* 32:*1*
34:*1* 35:*1* 48:*1*
62:*1* 72:*1*
**shorten** 50:*1*
**shorter** 39:*1*
**Shorthand** 1:*1* 79:*1*
**shorts** 73:*1*
**shot** 19:*1* 31:*1, 1, 1*
32:*1, 1* 34:*1* 36:*1,
1* 37:*1* 39:*1, 1, 1*
44:*1* 64:*1, 1, 1*
65:*1, 1* 66:*1* 68:*1,
1* 70:*1* 72:*1, 1, 1, 1*
74:*1*
**shots** 31:*1*
**show** 12:*1* 44:*1*
68:*1* 74:*1*

**showing** 37:*1* 39:*1*
48:*1* 55:*1* 59:*1*
**shows** 75:*1*
**side** 72:*1, 1* 73:*1*
**side-on** 72:*1, 1*
**sign** 29:*1*
**signature** 76:*1*
**signed** 29:*1*
**similar** 74:*1* 75:*1, 1*
**single** 56:*1* 58:*1*
**Sir** 64:*1* 69:*1* 70:*1*
71:*1* 74:*1* 75:*1*
76:*1*
**sit** 54:*1, 1*
**situation** 20:*1* 33:*1*
45:*1, 1* 62:*1*
**situations** 34:*1* 71:*1*
**six** 59:*1* 73:*1*
**slash** 10:*1* 57:*1*
58:*1*
**small** 11:*1* 72:*1*
**solid** 34:*1*
**somebody** 11:*1*
17:*1, 1* 19:*1* 33:*1*
44:*1* 67:*1, 1, 1*
70:*1* 73:*1*
**somebody's** 31:*1*
**sophisticated** 65:*1*
**Sorry** 5:*1* 15:*1, 1*
27:*1* 30:*1, 1, 1* 34:*1*
**Sounds** 6:*1*
**South** 1:*1* 2:*1, 1*
**space** 11:*1, 1*
**speak** 27:*1*
**speaking** 6:*1* 27:*1,
1* 33:*1* 46:*1*
**special** 11:*1* 52:*1, 1*
**specific** 11:*1* 21:*1*
24:*1, 1* 33:*1* 36:*1*
47:*1* 64:*1*
**specifically** 31:*1, 1*
37:*1* 43:*1* 47:*1*
**specifics** 43:*1* 54:*1*
**specified** 79:*1*
**spectator** 20:*1*
**speculation** 70:*1*
**speed** 36:*1, 1*
**spell** 14:*1*
**spelled** 4:*1*
**spend** 11:*1*
**spin** 34:*1*

**spoke** 21:*1, 1* 24:*1*
27:*1*
**sponsor** 15:*1*
**sponsored** 62:*1*
**sponsorship** 15:*1*
**Sports** 10:*1, 1, 1, 1,
1* 11:*1, 1, 1, 1, 1*
12:*1, 1* 13:*1* 16:*1*
**spray** 40:*1*
**Springs** 8:*1, 1*
**squeeze** 24:*1*
**Srixon** 13:*1* 14:*1*
15:*1, 1* 16:*1*
**S-R-I-X-O-N** 14:*1*
**SS** 79:*1*
**stance** 31:*1* 39:*1, 1*
66:*1, 1, 1* 68:*1*
71:*1* 72:*1*
**stand** 61:*1* 66:*1*
72:*1*
**standard** 70:*1*
**standpoint** 62:*1*
**stand-up** 17:*1*
**start** 10:*1* 40:*1*
74:*1, 1* 75:*1*
**started** 14:*1* 23:*1*
32:*1*
**starting** 29:*1*
**starts** 60:*1*
**State** 1:*1* 4:*1* 8:*1*
79:*1, 1*
**stated** 27:*1* 58:*1*
68:*1*
**statement** 39:*1*
56:*1* 58:*1*
**statements** 60:*1, 1, 1*
**States** 1:*1, 1* 78:*1*
79:*1*
**stating** 58:*1*
**staying** 24:*1*
**steel** 33:*1*
**stenographically**
79:*1*
**step** 66:*1* 67:*1*
68:*1* 74:*1, 1*
**Stewart** 5:*1*
**stop** 71:*1, 1*
**STOUFFER** 2:*1*
**Street** 1:*1* 2:*1, 1*
3:*1*

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 38 of 39 PageID #:631

Peter Jacobsen 6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

**stress** 7:*1*
**strike** 36:*1* 51:*1*
**stupid** 39:*1*
**SUBSCRIBED** 78:*1*
**subsidiary** 14:*1*
**substances** 7:*1*
**success** 42:*1*
**successful** 43:*1* 45:*1*
**sued** 7:*1* 16:*1*
**sufficient** 10:*1*
**suit** 5:*1*
**Suite** 1:*1* 2:*1, 1*
**summer** 9:*1*
**sunny** 9:*1*
**sure** 6:*1* 48:*1* 52:*1*
59:*1* 67:*1*
**swing** 19:*1* 31:*1, 1*
69:*1* 72:*1* 73:*1*
75:*1*
**sworn** 4:*1, 1* 78:*1*
79:*1*

**< T >**
**t.v** 12:*1*
**take** 6:*1* 17:*1* 29:*1*
36:*1, 1* 37:*1* 38:*1*
39:*1* 48:*1, 1* 55:*1*
57:*1, 1* 62:*1* 64:*1*
66:*1, 1* 74:*1, 1, 1*
75:*1*
**taken** 1:*1* 17:*1*
48:*1* 57:*1* 62:*1*
78:*1* 79:*1*
**talk** 21:*1, 1* 45:*1*
62:*1*
**talked** 13:*1* 16:*1*
23:*1* 24:*1* 28:*1*
35:*1* 42:*1* 43:*1, 1*
51:*1* 61:*1, 1* 63:*1*
64:*1*
**talking** 24:*1* 70:*1*
73:*1*
**target** 72:*1, 1*
**taught** 18:*1*
**teach** 70:*1*
**teaching** 65:*1*
**Technologies** 13:*1*
**Tee** 13:*1* 14:*1*
25:*1* 33:*1* 34:*1, 1*
61:*1, 1*

**tell** 8:*1* 13:*1* 16:*1*
31:*1* 33:*1* 37:*1*
38:*1* 41:*1* 45:*1*
46:*1, 1* 47:*1* 50:*1*
52:*1* 56:*1* 60:*1*
67:*1* 69:*1*
**telling** 46:*1*
**ten** 64:*1*
**tennis** 72:*1*
**term** 34:*1*
**terminated** 52:*1*
53:*1, 1*
**termination** 54:*1, 1*
**terms** 15:*1* 33:*1*
**testified** 4:*1* 68:*1*
**testify** 79:*1*
**testifying** 5:*1*
**testimony** 5:*1* 69:*1,
1*
**Thank** 4:*1* 25:*1*
36:*1* 42:*1, 1* 59:*1*
76:*1*
**thanked** 29:*1*
**thick** 36:*1*
**thing** 12:*1* 15:*1*
22:*1* 31:*1* 33:*1*
**things** 17:*1* 18:*1*
47:*1* 73:*1, 1*
**think** 5:*1* 8:*1* 10:*1*
13:*1* 15:*1, 1* 17:*1*
19:*1* 21:*1* 39:*1*
40:*1* 41:*1* 43:*1, 1*
44:*1* 49:*1* 54:*1*
55:*1* 61:*1* 62:*1*
64:*1* 67:*1* 76:*1*
**third** 49:*1, 1* 56:*1*
57:*1* 60:*1*
**thought** 45:*1* 53:*1*
**thousand** 25:*1* 40:*1*
43:*1*
**thousands** 31:*1*
64:*1*
**three** 24:*1* 27:*1*
32:*1* 34:*1* 36:*1*
51:*1* 52:*1* 55:*1*
70:*1* 75:*1*
**throw** 51:*1*
**Tiger** 18:*1* 19:*1*
33:*1*
**tight** 24:*1*

**time** 4:*1* 9:*1, 1*
19:*1, 1* 21:*1, 1*
26:*1* 27:*1* 30:*1*
37:*1* 40:*1* 42:*1*
52:*1* 53:*1* 69:*1*
73:*1* 79:*1*
**times** 21:*1* 24:*1*
25:*1* 39:*1, 1* 40:*1*
43:*1* 44:*1* 64:*1, 1,
1* 66:*1* 75:*1, 1*
**tip** 31:*1* 64:*1* 67:*1*
**title** 10:*1*
**titled** 60:*1*
**today** 5:*1, 1* 7:*1, 1,
1, 1* 16:*1* 46:*1*
53:*1, 1* 54:*1, 1*
**today's** 7:*1*
**told** 16:*1* 19:*1, 1*
23:*1* 24:*1* 26:*1, 1,
1* 39:*1, 1* 40:*1*
43:*1, 1, 1* 44:*1*
47:*1* 70:*1*
**Tommy** 12:*1*
**top** 48:*1* 60:*1*
**topic** 63:*1*
**tour** 10:*1* 11:*1, 1*
15:*1* 18:*1* 19:*1, 1,
1* 20:*1, 1, 1*
**tournament** 20:*1, 1*
21:*1, 1* 24:*1* 41:*1*
64:*1* 65:*1* 74:*1*
**tournaments** 11:*1*
**Toyota** 14:*1, 1, 1, 1*
**training** 28:*1*
**transcribe** 5:*1*
**transcript** 78:*1, 1*
**travel** 26:*1*
**trees** 40:*1* 75:*1*
**Trevinos** 18:*1, 1*
**trial** 49:*1*
**Troy** 19:*1* 20:*1*
21:*1* 23:*1* 24:*1, 1*
**true** 78:*1*
**truly** 58:*1*
**truth** 79:*1*
**truthful** 7:*1*
**try** 6:*1, 1* 17:*1*
18:*1* 47:*1*
**trying** 11:*1* 31:*1, 1*
34:*1* 36:*1* 44:*1*

51:*1* 53:*1* 68:*1*
73:*1, 1*
**twice** 9:*1* 21:*1* 34:*1*
**two** 12:*1* 20:*1, 1*
21:*1* 23:*1* 32:*1*
34:*1* 47:*1* 51:*1*
52:*1* 55:*1* 56:*1*
**type** 74:*1*
**typewriting** 68:*1*
79:*1*
**typical** 74:*1*

**< U >**
**Uh-huh** 56:*1* 60:*1*
**uh-huhs** 6:*1*
**unavailable** 24:*1*
**uncomfortable** 45:*1,
1*
**understand** 5:*1* 6:*1,
1* 10:*1* 30:*1* 35:*1*
43:*1* 44:*1, 1, 1*
59:*1* 61:*1* 68:*1*
69:*1, 1*
**understanding** 24:*1*
26:*1* 27:*1* 37:*1*
38:*1* 67:*1* 71:*1*
**understood** 6:*1*
**unfamiliar** 28:*1*
**Unfortunately** 52:*1*
**ung-huhs** 6:*1*
**United** 1:*1, 1* 78:*1*
79:*1*
**University** 9:*1, 1*
**unusual** 7:*1* 58:*1, 1*
59:*1* 64:*1*
**upcoming** 27:*1, 1*
**ups** 62:*1*
**upset** 43:*1*
**use** 6:*1* 32:*1* 33:*1,
1, 1, 1, 1* 34:*1, 1, 1*
35:*1, 1, 1* 36:*1*
**usually** 31:*1* 34:*1*
75:*1*

**< V >**
**various** 10:*1* 30:*1,
1* 50:*1*
**vary** 66:*1*
**VEDDER** 2:*1*
**verbal** 6:*1* 67:*1*

Case: 1:18-cv-04542 Document #: 53-5 Filed: 02/20/20 Page 39 of 39 PageID #:632
Peter Jacobsen   6/27/2019
Rowena Dziubla vs. J.C. Anderson, Inc., et al.

69:*1*
**versus**  6:*1*
**video**  61:*1*
**videos**  56:*1*  57:*1*
**voiceovers**  14:*1, 1*
**volunteered**  16:*1, 1*
**vs**  1:*1*  78:*1*

**< W >**
**Wacker**  2:*1*
**wait**  6:*1, 1*
**want**  8:*1*  12:*1*
  15:*1*  26:*1*  29:*1*
  45:*1*  47:*1*  49:*1*
  57:*1*  58:*1*  59:*1*
  64:*1*  67:*1, 1*  68:*1*
  69:*1, 1*  70:*1, 1*  74:*1*
**wanted**  20:*1*  26:*1,
1*  45:*1, 1, 1*  46:*1*
  47:*1*  60:*1*
**watch**  31:*1*
**way**  15:*1*  52:*1*
  71:*1*  75:*1*
**ways**  18:*1*  31:*1*
**wear**  14:*1*  15:*1*
**website**  60:*1*
**wedge**  25:*1*  31:*1*
  32:*1*  36:*1, 1*  75:*1*
**wedges**  31:*1*
**week**  10:*1*  12:*1*
  69:*1*
**Well**  10:*1*  21:*1, 1*
  22:*1*  27:*1*  44:*1*
  46:*1*  47:*1*  51:*1*
  67:*1*
**went**  8:*1*  9:*1*  29:*1,
1, 1, 1, 1*  63:*1*
**whereof**  80:*1*
**wife**  51:*1*
**Wikipedia**  59:*1*
  60:*1*
**Wikipedia's**  60:*1*
**willing**  44:*1*  45:*1*
**Witness**  3:*1*  4:*1, 1*
  8:*1*  30:*1*  38:*1, 1*
  48:*1, 1*  50:*1*  51:*1*
  53:*1*  56:*1, 1, 1, 1*
  62:*1*  77:*1*  80:*1*
**Wodds's**  19:*1*
**women**  74:*1*
**wonderful**  30:*1*

**wood**  25:*1*  31:*1*
  32:*1, 1, 1, 1, 1, 1, 1*
  34:*1, 1, 1, 1*  35:*1, 1,
1*  36:*1, 1, 1*  38:*1*
  40:*1*  74:*1, 1*  75:*1, 1*
**woods**  14:*1*  15:*1*
  18:*1*  32:*1, 1, 1*
  33:*1, 1*  40:*1, 1*
  74:*1*  75:*1, 1, 1*
**word**  34:*1*
**words**  36:*1*  61:*1*
  66:*1*  68:*1*  70:*1*
**work**  10:*1, 1, 1, 1*
  11:*1*  12:*1*  15:*1*
**works**  22:*1*
**world**  21:*1, 1*  44:*1,
1, 1*
**Wow**  52:*1*  66:*1*
**wrap**  62:*1*
**written**  59:*1, 1, 1*
  68:*1, 1*  76:*1*
**wrongful**  5:*1*

**< Y >**
**Yasbeck**  21:*1*
**yeah**  9:*1*  12:*1*
  23:*1*  24:*1*  27:*1*
  34:*1*  43:*1*  53:*1*
  75:*1*
**year**  5:*1*  9:*1, 1*
  21:*1*  23:*1*  54:*1*
**years**  8:*1*  9:*1*  13:*1*
  18:*1*  20:*1, 1*  52:*1*
**yeses**  6:*1*
**Youngman**  75:*1*