IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROWENA DZIUBLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-4542 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| J.C. ANDERSON, INC., and PETER | ) | |
| ERLING JACOBSEN, | ) | Magistrate Judge M. David Weisman |
| | ) | |
| Defendants. | ) | JURY DEMANDED |

### PLAINTIFF'S RESPONSE TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, ROWENA DZIUBLA, by and through her attorney, Sam Sedaei of the Law Offices of GOLDMAN & EHRLICH, CHTD., and as her Response to Defendant Peter Jacobsen's Motion for Summary Judgment states as follows:

### INTRODUCTION

During a work golf outing on September 18, 2017 called "the Kev," Plaintiff was flagged down by Defendant JCA's co-owner to receive golf instructions from Defendant Peter Jacobsen. She felt obliged and accepted. Jacobsen took his position behind her Plaintiff, assertively pressed his hip against Plaintiff's buttocks, and told Dziubla, "I'm going to show her where I take my wood." Shaken, she left the event shortly thereafter, cried the entire night, and later complained to JCA about Jacobsen's conduct. Jacobsen now presents selective snippets of equivocal statements of alleged witnesses and an unqualified and biased "expert" witness to argue that Jacobsen's conduct was not offensive. But the evidence in the record shows that the only person who can speak with any certainty as to what Jacobsen did or said is Plaintiff, and at a very least, whether Jacobsen's conduct was offensive or not is a question of fact.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

1

Furthermore, testimonies of JCA's witnesses have raised serious credibility questions regarding the truthfulness of Jacobsen's statements. These issues cannot properly be decided at summary judgment. Therefore, Jacobsen's Motion should be denied, and the case should proceed to trial on the merits and for credibility determinations by a jury.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view all evidence in a light most favorable to the nonmoving party. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), cert. denied, 484 U.S. 977 (1987). Furthermore, it must draw all inferences in the nonmoving party's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). When determining the question of whether a genuine issue of material fact exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. The court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmoving party's favor. Determination of witnesses' credibility, weighing of evidence, and drawing inferences deemed to be reasonable are functions of the jury, not of a judge. *Anderson*, 477 U.S. at 255.

## ARGUMENT

The elements of a claim for civil battery are: (1) an intentional act on the part of the defendant, (2) resulting in offensive contact with the plaintiff's person, and (3) lack of consent to the defendant's conduct. *McNeil v. Brewer*, 304 Ill. App. 3d 1050, 1055 (1999). Defendant Peter Jacobsen ("Jacobsen") has presented a selective set of facts most favorable to him to argue that

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

Plaintiff, Rowena Dziubla (Dziubla") allegedly consented to the contact made, and the contact was not offensive. The argument is without merit.

## I. JACOBSEN MADE OFFENSIVE CONTACT WITH PLAINTIFF

Jacobsen first argues that Dziubla consented to his contact, and no offensive contact was made. A review of the contact made, as well as the context in which it was made, makes it clear that Jacobsen made offensive contact, and Plaintiff did not consent to it.

### A. *Plaintiff did not Consent to Jacobsen's Manner of Contact*

Plaintiff has testified at her deposition that during the outing on September 18, 2017, Defendant JCA's co-owner, Jim Schumacher ("Schumacher") flagged her down from the group that included Defendant, Peter Jacobsen ("Jacobsen"), as she was going from hole to hole to take pictures. Pl.'s L.R. 56.1(b)(3)(C) Stat. of Additional Facts ("SOAF") ¶ 1. At first, she told the group that she did not want to join them, but they insisted. Jacobsen offered to show Plaintiff how to take a chip shut, and she felt obligated to allow him to do so because he was the guest of honor at the event. *Id*. Therefore, there is testimony on the record that her joining Jacobsen's group was not fully consensual. She did so because she was asked to join the group by the co-owner of her employer.

Furthermore, while Dziubla consented to receiving a golf pointer from Jacobsen, she did not consent to the *manner* in which he provided his instruction. As Plaintiff has alleged in her Complaint, "[a]s Jacobsen took his position behind Plaintiff, he assertively pressed his hip against Plaintiff's buttocks." Compl. ¶ 9. In fact, Jacobsen admitted to doing this. During his deposition, Jacobsen was presented with the Complaint, and was asked to point to any aspect of paragraph 9 therein that he believed to be inaccurate. SOAF ¶ 8. He testified that he could not say that this portion of the Complaint was inaccurate. *Id*. Jacobsen argues that the physical aspect of his instruction was consistent with how the instruction was supposed to be implemented, but there is

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

3

testimony to the contrary in the record. Plaintiff explained at her deposition that she had previously received instructions from another golfer, Clint Hickman, on how to hit a shot. SOAF ¶ 2. But Hickman did not position himself as proximately to her as Jacobsen did. *Id*. That is why she did not feel that the experience with Jacobsen would be any different before agreeing to receive the golf instruction from Jacobsen, and therefore agreed to receive the instruction from him. *Id*. A woman who allows a professional golfer to give her instruction cannot be presumed to have given consent to the golfer to do with her body as he saw fit.

Further testimony obtained in this case shows that Jacobsen *knew* his contact would be offensive, but he still made the contact without any explicit warning to Dziubla. Jacobsen has testified that he has given golf tips or instructions at Pro Am events thousands of times. SOAF ¶ 17. He explained that he often pushes the player up to the ball, and asks them to step into his feet. *Id*. He sometimes "reach[es] down and grab[s] them by the shorts and or the pants… and move[s] them a foot closer to the ball to be able to get them in the right proximity." *Id*. Notably, he also testified that "on just about every occasion they say, wow, this feels awful." *Id*. In light of his own admission, Plaintiff taking offense to the manner in which Jacobsen made his contact should not have come as a surprise, but should be seen as an occurrence that was fully consistent with how others have reacted to Jacobsen's instructions.

To the extent that Jacobsen implies that Plaintiff is not being honest about having been offended, the claim should be rejected for several reasons. First, credibility determinations are to be made by the jury, not the judge. *Anderson*, 477 U.S. at 255. Second, Dziubla's behavior following the incident is entirely consistent with her actually being offended by Jacobsen. Plaintiff did not partake in dinner following the golf event due to being upset. SOAF ¶ 4. Her coworker, Sergio, gave her a ride back to the office, and she fought back tears during the ride. *Id*. She then drove home later that evening, crying the entire way. *Id*. Upon seeing her husband at home, she continued

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

to cry, and her husband told her that she needed to let JCA know about the incident. *Id*. In an e-mail to Michael Power ("Power"), Defendant JCA's CFO, the day after the Kev, Plaintiff stated that she was emotionally, mentally, and physically upset, and that she was seeing a therapist. SOAF ¶ 5. Therefore, there is sufficient evidence based on which a jury could conclude that Plaintiff did not consent to the contact she received from Jacobsen, and she was genuinely, expectedly, and reasonably offended by the contact.

### B. Jacobsen's Equivocal "Witnesses" Appear to Lack Knowledge

Jacobsen next relies on the statements of various individuals to argue that Jacobsen did not make offensive contact with Dziubla. But every single alleged "witness" provided equivocal and qualified statements about what they actually saw.

Kacper Stojowski ("Stojowski") is one individual who has provided a statement regaring the events alleged by Plaintiff. Stojowski has qualified his statements about the incident with the preface "based on my observations." Pl.'s LR 56.1 (b)(3)(B) Resp. ¶ 27. Furthermore, according to Power's notes taken during the investigation, Stojowski admitted that he was "drinking a little throughout the round and was 'buzzing' a little." SOAF ¶ 14. Similarly, Timothy Le ("Le") qualified his statements with the preface "based on my observations." Pl.'s LR 56.1 (b)(3)(B) Resp. ¶ 26. He further states that "*[he] never saw* Mr. Jacobsen touch Ms. Dziubla's hips, waist or buttocks" (emphasis added), not that such contact was not made. *Id*. Schumacher's statement is no different, and replete with equivocal language. In the statement, he states that "[he] never observed Mr. Jacobsen touch Ms. Dziubla in a harmful or offensive manner," and continues to say "nor did I see Mr. Jacobsen touch Ms. Dziubla's buttocks, hips, or waist." Pl.'s LR 56.1 (b)(3)(B) Resp. ¶ 24. He prefaces his statements in the next sentence with "I did not observe," "I never saw," and "based on my observations." Looking at these statements, it is not clear what these individuals actually witnessed. A jury could look at these statements and their generic qualifiers, and conclude that they

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

5

are nothing more than an attempt by JCA to give the appearance of due diligence, and manufacture "evidence" to contradict Plaintiff's account. A jury could also conclude upon further testimony of these individuals that as JCA employees, or individuals dependent on business with JCA, they felt obliged to sign these similarly-worded statements. The weighing of such controverted evidence and drawing inferences from it are in the province of the jury. *Anderson*, 477 U.S. at 255.

### C. Jacobsen's "Expert" Witness is Both Biased and Unqualified

Jacobsen also relies on the testimony of another professional golfer, Nancy Lopez ("Lopez"), which it presents as an "expert" witness. But there are several reasons why her opinion is not worthy of much weight, and she may even be disqualified for testimony at trial.

First, there is evidence in the record that Lopez has a significant familiarity with, and bias in favor of Jacobsen. She testified at her deposition that she has known Jacobsen since the late 1970s. SOAF ¶ 14. Throughout these years, she recalls seeing him at least 10 times. *Id*. She has previously attended at least one of Jacobsen's charity events, and Jacobsen has come to one of her charity events and did a clinic for people who were playing in her She testified that she is friends with Jacobsen through golf. *Id*. Furthermore, she testified that her conclusions in this case were based not just on deposition testimonies in the record, and her personal opinion about Jacobsen, and certain conclusions she had formed about him throughout these years. During her deposition, she stated:

> I know Peter Jacobsen in the professional way and have watched him and he is an entertainer. I've watched him. He makes people laugh. He's a great instruction professional. I've seen him at work on the golf course before, so from what the depositions of the people -- what they said, I feel like they would agree with me, and I would agree with them, that he was doing what he's supposed to do at these events.

*Id*. ¶ 19. She further stated that "I know Peter Jacobsen is not ever doing to do something to offend somebody. That's not his character." *Id*. She also explained, "just knowing Peter, he does not have that character at all. I respect him as a man, and I've been around a lot of PGA players, and I have

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

6

never felt uncomfortable around him." *Id*. A reasonable jury must listen to Lopez's personal relationship with and pre-formed respect for Jacobsen, and determine the proper weight to give her testimony.

In addition to Lopez's apparent bias, there appears to be major gaps between her knowledge of the facts and her conclusion that Jacobsen conducted himself appropriately in *this case*. First, Lopez was not present at "the Kev" on September 18, 2017. SOAF ¶ 19. When asked if she believed there were limits to fully grasp what has occurred during the Kev due to her lack of presence, she responded, "absolutely. The limit is that I wasn't right there to see it." *Id*. Furthermore, when asked if she knew whether there were different accounts from witnesses as to what actually may have transpired at the Kev, Lopez appeared to not know the answer. An excerpt from her deposition is as follows:

> Q: Based on the statements that you read from the deposition transcripts and maybe the statements of other individuals who are on the record, is it your understanding that the people who were at the event all agreed on what Mr. Jacobsen actually said or were there different accounts of what he may have said?
>
> …
>
> A: You know, I can't remember what they felt about that joke. You would have to read that to me so I can make my statement on that, but I can't remember what I read about what they felt about the joke and if they agreed about the joke for whatever reason. You know, what their feelings were about it, I can't remember -- I can't remember that.
>
> Q: My question isn't how they felt about the joke, my question is were there different accounts of -- different accounts of what they believed Mr. Jacobsen actually said?
>
> A: I still can't remember what -- what they actually said about that.

*Id*. ¶ 20. Furthermore, Plaintiff has alleged that what made Jacobsen's physical conduct offensive was the fact that it was coupled with a comment that carried a sexual innuendo. As explained in §

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

7

II *infra*, Lopez also does not know what Jacobsen actually said. The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Based on the facts in the record, it is not readily apparent if Lopez can even meet the *Daubert* standard due to her lack of sufficient knowledge regarding the events that transpired at the Kev. But even if she can qualify to testify at trial, the many gaps in her knowledge could very well lead a reasonable jury to conclude that her opinion does not deserve more weight than Plaintiff's first-hand and personal account. Finally, the jury could conclude that it does not matter whether Lopez, as a professional golfer, would have been offended by Jacobsen's instructions, but whether a reasonable non-golfer *in Plaintiff's position* would have been offended by Jacobsen's conduct.

As previously explained, another factor that caused Jacobsen's conduct to be offensive was the comment that he made as he was giving Plaintiff his instructions, which is discussed *infra*.

## II. JACOBSEN MADE HIS CONTACT MORE OFFENSIVE WITH A SEXUAL COMMENT

Plaintiff testified that as Jacobsen showed her how to hit the shot and pressed his body against her buttocks, he said something to the effect of "I'm going to show her where I take my wood." SOAF ¶ 3. When she was asked how certain she was that she correctly remembered what Jacobsen said, she responded "100 percent. 110 percent." *Id*.

To counter this account, Jacobsen offers the statements of a number of people, every single one of whom admits that (s)he did not hear what Jacobsen actually said. In his statement, Le states that Jacobsen told "a golf joke," but does not recall what the joke was. Pl.'s LR 56.1 (b)(3)(B) Resp. ¶ 35. Similarly, Schumacher references a "golf joke," but does not say what the joke actually was. *Id*. ¶ 34. Stojowski and Radoha also admit that they "did not hear the full joke." *Id*. ¶¶ 32, 36. And Jacobsen claims to not even recall giving instructions to anyone at the Kev or meeting

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

8

Plaintiff, much less recall what he specifically said during such an instruction. SOAF ¶ 7. A reasonable jury could listen to the testimonies of these individuals, and conclude that Plaintiff's specific account of what Jacobsen said is worthy of more credence than the ambiguous statements of anyone else on the record.

Defendant also argues that there exists a golf joke that contains the word "wood," and is apparently very funny. First, Plaintiff has not argued that such a joke does not exist. She has only argued that Jacobsen did not tell this alleged joke while giving his instruction. Second, not only did none of Jacobsen's "witnesses" actually appears to know what joke he allegedly told, but his own "expert" also could not deliver the punch line. When asked if she knew what joke Jacobsen had told during the Kev, she could not answer. SOAF ¶ 21. An excerpt from her deposition is as follows:

> Q: So my question is not whether, you know, what you read from the transcripts to remind you of a joke you know, but because you are saying matter-of-factly that you're aware of what joke Mr. Jacobsen told, I'm trying to understand, how do you know what joke he told?
>
> …
>
> A: Yes. You know, that joke has been around for a long, long time, and I don't even remember the last time I heard it, but it's -- it's an old joke. I know I've told jokes, and if you don't understand golf, you probably wouldn't understand the joke. And there's a lot of golf jokes out there.
>
> Q: So going back to the joke that you believe Mr. Jacobsen told, can you explain what that joke is to a nongolfer?
>
> A: You know, I'd have to hear it again to really tell you because it's been so long since I've heard the joke, that I would have to hear it again to let you know what I feel about it.

*Id*. That is convenient. The "expert" wants us to tell her the joke so she could tell the joke back to us. Interestingly, Lopez testified that she did not believe whatever joke Jacobsen may have told was a "famous" joke. SOAF ¶ 23. She admitted that she had heard it a long time ago, and even

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

then she probably did not get it because she was "not good at getting jokes." *Id*. She further stated that "it's not a joke that you hear every day on the golf course." *Id*. Lopez further testified that it's a joke that an individual who is not a professional golfer may not get. *Id*. Most notably, Lopez testified that she believed the person who was closest to Jacobsen would have been in the best position to hear what Jacobsen said. SOAF ¶ 24. She admitted that Plaintiff was the person who was the closest to Jacobsen. *Id*.

Finally, there are statements in the record indicating that at least two individuals who were interviewed during the investigation could see how Dziubla could be offended by Jacobsen's conduct and comment. Power interviewed Le as part of the investigation. During the interview, Le admitted to Power that he "could see where [Dziubla] would be bothered by the locker room banter." SOAF ¶ 15. Furthermore, Adam Scheitel ("Sheitel") was another witness who was interviewed during the investigation. SOAF ¶ 16. During the interview, he admitted that "he can see how [Dziubla] might have taken the 'wood' comment the wrong way." *Id*. The fact that Jacobsen has left these statements out of its Memorandum and L.R. 56.1 Statement is certainly curious. But a summary judgment motion is a chance for a party to argue that there is no set of facts based on which a reasonable jury could find for the other party, not an opportunity for the moving party to escape jury trial through a misleading presentation of a fraction of the evidence.

Therefore, a reasonable jury could review the evidence and available testimony in their entirety, weigh conflicting pieces against each other based on their contents and contexts, and conclude that Plaintiff's version of events is the most likely account of events.

### III. QUESTIONS ON CREDIBILITY PRECLUDE SUMMARY JUDGMENT

Finally, there is contradicting evidence from JCA's witnesses and Jacobsen that raises serious credibility questions. These issues make summary judgment improper.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

Jacobsen testified that Schumacher called him the day after the Kev to thank him for attending the event, but did not mention anything about Plaintiff's complaint to JCA about Jacobsen's conduct at that time. SOAF ¶ 10. He testified that the first time he heard about those complaint was in November, 2017 (at least over 40 days after the incident). *Id*. Jacobsen further testified that no one from JCA told him there was going to be an investigation into Plaintiff's allegations. SOAF ¶ 11. He further testified that he was not told during either one of two phone calls with Schumacher following the incident that he was being interviewed as part of any investigation into his conduct. *Id*. Jacobsen claims that Schumacher did not ask him to explain himself or his conduct, or confirm or deny any part of Plaintiff's allegations. *Id*.

Contrary to Jacobsen's account, JCA witnesses have testified that JCA did reach out to Jacobsen immediately following the incident about Dziubla's allegations. Michael Yazbec, JCA's President, testified that JCA interviewed Jacobsen as part of the investigation into Plaintiff's allegations, and obtained a statement from him relating to those events. SOAF ¶ 12. Yazbec testified that the investigation had concluded by the week following the week of the incident. *Id*. This means that JCA had reached out to Jacobsen within that period. Power corroborated Yazbec's account of JCA informing Jacobsen about the incident. SOAF ¶ 13. Power testified that Schumacher called Jacobsen on September 19, 2017, the day after the incident. *Id*. During this call, Schumacher informed Jacobsen about the details of Plaintiff's allegations. *Id*. Power also confirmed that Schumacher took Jacobsen's statement in response to the incident. *Id*.

Jacobsen's and JCA's accounts of their communications regarding the incident cannot both be true. The jury must listen to these conflicting accounts, and determine if one or more of these witnesses is not being truthful. The need for such a credibility determination by a jury should preclude the court from prematurely disposing of the claim against one of the defendants.

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant Jacobsen's Motion for Summary Judgment should be denied, and the case should proceed to trial.

*Respectfully Submitted,*

Dated: February 20, 2020

                 */s/ Sam Sedaei*
Sam Sedaei of the Law Offices of Goldman & Ehrlich, CHTD., as Attorney for Plaintiff, ROWENA DZIUBLA

Arthur R. Ehrlich
Sam Sedaei
Law Offices of Goldman & Ehrlich, Chtd.
20 S. Clark Street, Suite 500
Chicago, IL 60603
(312) 332-6733
arthur@goldmanehrlich.com
sam@goldmanehrlich.com

LAW OFFICES
**GOLDMAN & EHRLICH**
20 SOUTH CLARK STREET
SUITE 500
CHICAGO, ILLINOIS 60603
(312)332-6733

ARDC No. 6317657